Boston Globe Online / Archives



‹boston.com

The Boston Globe

boston.com

# Search

MONDAY, MAY 5, 2003

**ASSISTANCE**
Questions
Search help
Search fees
Account info
Help and
feedback
Copyright
information
Search NY Times
Search other
papers

**About your archives purchase:** Your purchase of archives expires on . You have viewed articles and have articles remaining.

**Easy-print version** | **Search again**

## DOUBT CAST OVER TIFFANY MOORE VERDICT

**Sections**
PAGE ONE
NATION | WORLD
CITY | REGION
BUSINESS
SPORTS
LIVING | ARTS
EDITORIALS | OP-ED

**Author(s):**   Dick Lehr, Globe Staff **Date:** May 4, 2003 **Page:** A1 **Section:** Metro/Region

The 911 call came in to Boston police at 9:22 p.m. "There's a little girl shot on Humboldt Ave!" Screams and shrieks swirled in the background as the woman caller continued: "Oh God! Oh, the little girl on the ground, shot!"

**RELATED FEATURES**
Obituaries
Death notices
Globe archives
Web reprints
Buy Globe
photos

It was Aug. 19, 1988, a sultry night in the Grove Hall section of Roxbury. The girl on the ground was Darlene Tiffany Moore, a 12-year-old who moments before was perched on a mailbox, talking with friends. Blood poured from three bullet wounds. One - to the head - was the wound a medical examiner termed "incompatible with life." An unintended victim of street gang vengeance, Tiffany Moore became an instant symbol of the drug-fueled lawlessness then rocking the city. Police launched a massive search for the Halloween-masked killers. Officials sought to calm a public crying out for an arrest and panicked by the soaring murder rate. Some in the community called for the deployment of the National Guard.

Two tense weeks later justice was apparently in hand. **Shawn Drumgold,** then 22, and a second man were charged with killing the girl. In their trial 14 months later, only **Drumgold** was convicted. Guilty of first-degree murder, he was sentenced to life without parole, an outcome confirmed on appeal by the state's highest court in 1996.

But a Globe investigation has found a prosecution marred by faulty assumptions, questionable tactics, and

SCDA1138



Boston Globe Online / Archives



possible wrongdoing at each stage of the high-profile case: the initial homicide investigation, the indictment, and, finally, the trial. **Shawn Drumgold** was no innocent - a street-corner drug dealer who had shot and been shot at, he surely fit the profile of a possible suspect. But the Globe review suggests strongly that **Drumgold**, who has protested his innocence from the day of his arrest, was not the killer.

In recent interviews, two witnesses recanted statements and testimony used to convict **Drumgold**, saying authorities bullied them into providing incriminating evidence. They and other witnesses described a pattern of intimidation by police intent on building a case against **Drumgold**. The Globe also located neighborhood residents who said they were frightened to testify in 1989 but will now come forward to support the alibi **Drumgold** offered detectives days after the murder - that he was several blocks away on Sonoma Street when Moore was shot.

Moreover, the Globe found that one key prosecution witness faced a raft of criminal charges that evaporated soon after he testified, while another witness who said she saw **Drumgold** leaving the scene of the murder - testimony by all accounts critical to **Drumgold's** conviction - was suffering from a deadly brain cancer. Her condition, which can affect perception and memory, was not revealed to the defense or jury.

In the age of DNA, guilt or innocence is sometimes established by conclusive genetic evidence. Most successful prosecutions don't work that way, but are built fact upon fact, brick by brick, leading to a finding of guilt. **Drumgold's** conviction now appears to have been built largely on sand.

Trial prosecutor Philip T. Beauchesne, now retired, recalled being surprised by the 1989 verdict. The evidence against **Drumgold** was "weak," he said in a recent interview, and while he has not second-guessed the jury or doubted **Drumgold's** guilt, he said, "If I was wrong . . . If it was not **Drumgold**, then definitely the mistake should be corrected. The system is not perfect." Police and other prosecutors declined to comment.

Fifteen years after a young girl's death, **Drumgold's** case continues to gnaw at some in the criminal justice system, causing "an uneasiness with police and assistant district attorneys who know the history of it," said one police investigator who worked in Roxbury at the time

SCDA1139

police investigator who worked in Roxbury at the time and requested anonymity, citing fear of reprisals within the department. "Number one, because of the age of the victim. Number two, because the person convicted of the killing is the wrong person. This is a real tragedy. There's been no justice either way."

Murder on `Heroin Alley'

In 1988, Humboldt Avenue was the focal point of Roxbury's drug trade - "heroin alley," some called it. The stretch along the broad avenue near Homestead Street was scarred by burned-out homes, empty lots, and broken-down cars. The dominant street culture revolved around cash, clothes, and cocaine.

Rampant drug use - especially crack - was behind a frightening rise in crime. The 95 homicides in 1988 in Boston would skyrocket to 152 by 1990. Gangs flourished, often adopting the name of their home street. There was Castlegate, for example, operating from the short, narrow street off Blue Hill Avenue, just north of Franklin Park. Or there was the gang on Humboldt itself. Both were widely feared, especially Humboldt. "Humboldt was a bulldozer at that time. You kill their dog, they kill your family," a Boston police investigator said.

**Shawn Drumgold** was living that summer on Humboldt Avenue with his girlfriend and their baby daughter. His apartment was above a store at the intersection of Humboldt and Homestead, a popular gathering spot for neighborhood teens. **Drumgold's** mother, sister, and other siblings lived about a block away. **Drumgold** had only been back in Boston a few months, having just completed a jail term in March for possession of cocaine. He soon picked up where he left off - using and dealing drugs. "I used it mostly for a sexual thing, for pleasure," he said in a recent prison interview. **Drumgold** was usually seen hanging around and doing business with two friends, Terrance "Lug" Taylor and Antonio "Country" Anthony. All had criminal records.

The Friday night of Aug. 19 was supposed to be the last night of young Tiffany Moore's two-week visit with her mother before returning to South Carolina. She was staying with relatives in the South to get her away from Boston's mounting street troubles. The girl was on the corner of Humboldt and Homestead at twilight with a dozen or so teenagers. Moore sat atop the blue mailbox,

SCDA1140

Boston Globe Online / Archives



her back to a fenced-in Boston Edison substation.
Seated next to her was one of the Humboldt gang
leaders.

Vantrell "Trell" McPherson was standing next to
Moore. Looking over her shoulder, the 14-year-old saw
two or three masked men running toward them across
the small grassy Edison lot. "I screamed and I started
pushing someone in front of me to get out of the way
and then all these shots were fired," she said in an
interview. Kids scattered and fled, except Tiffany
Moore. She lay dead.

Police, according to court records, concluded almost
immediately that the shooting was part of an ongoing
feud between the Castlegate and Humboldt street gangs
- revenge for the wounding of a Castlegate member two
weeks earlier.

The lead homicide detectives were Richard Walsh and
Paul Murphy, both veterans. They soon learned the
shooters were masked - one wore the Jason mask from
the film "Friday the 13th" - and wore black Adidas
sweatsuits, the lightweight running gear popular among
Roxbury males at the time.

Lacking key physical evidence - the guns and masks -
police were forced to rely on interviews with witnesses
and other sources. Teenagers told police they had seen
**Drumgold** and Taylor earlier that evening leave the
apartment across the street from the mailbox. Both men
were known drug dealers, and police picked up some
street talk about a possible beef the two were having
with another small-time dealer.

There were leads on other possible suspects, but almost
from the start, the focus was on **Drumgold** and Taylor -
even though their involvement would defy basic street
logic and common sense, according to recent interviews
with two veteran police investigators who spoke on
condition of anonymity. **Drumgold** and Taylor, they
said, were freelance drug dealers unaffiliated with any
gang. "**Shawn** was dealing in peace, not bothering
either gang," said one of the investigators who worked
in Roxbury at the time.

Moreover, police, as part of the effort to combat
escalating street gang violence, kept books listing street
gang members and anyone who might be loosely
associated with a gang. **Drumgold** and Taylor were not

SCDA1141

Boston Globe Online / Archives

listed in the Castlegate book nor in any gang listing, according to police records and later trial testimony.

Even more puzzling was the notion that **Drumgold**, who lived on Humboldt Avenue, would be an agent of the Castlegates. "He was living on Humboldt. Why would he shoot at [Humboldt]?" one investigator asked. **Drumgold** and Taylor would have been hunted down and killed by the Humboldt gang, he said.

Such information didn't stop police from telling reporters upon their arrest of **Drumgold** 10 days after Moore's death that he was a "drug dealer and member of the Castlegate gang." The arrest story was headlined in the Boston Herald, " `Tiffany killer' jailed: Roxbury gang member charged in the murder of 12-year-old girl," a spread that featured a photograph of **Drumgold**, handcuffed, with a Boston police officer at his side.

"You have to understand, back then they [homicide] would get something and run right to the grand jury. It wasn't like they'd first corroborate it," the longtime investigator said. Given the public and political pressure, making an arrest was paramount. Building the case could come later.

A shaky indictment

The Suffolk County grand jury that convened on Sept. 8, 1988, to take up the Moore killing heard testimony from just two witnesses - an extraordinarily small showing for a high-profile murder case. The principal was Detective Walsh, who summarized the early evidence against **Drumgold** and Taylor. But a review of his testimony, other records, and new interviews suggests portions of Walsh's account were, at best, misleading.

Walsh described questioning Tracie Peaks, a teenage girl who said she'd seen two men leaving the back of the Edison lot immediately after the shooting and had recognized one as **Drumgold**. Walsh also said Peaks described the men as wearing "black Adidas suits" - matching exactly the descriptions given by the teenagers at the crime scene.

In her testimony, however, Peaks flatly contradicted Walsh. "I told them black sneakers," she said of her discussion with detectives. "Adidas sneakers and black jeans."

SCDA1142



"Did you ever tell the officer that you saw Adidas suits?" she was asked.

"No," the 16-year-old said.

It was a standoff on a key investigatory detail, though one that paled next to Peaks saying she had seen **Drumgold**, whom she knew, near the crime scene. It turned out to be the first of several instances in which Walsh's version was challenged.

During his presentation to the grand jury, Walsh testified that some of the most incriminating evidence police had obtained came from one of **Drumgold's** drug-dealing cohorts, Antonio "Country" Anthony. He said he and his partner met with Anthony, then 23, at the Area B police station in Roxbury on Aug. 31 - just a week before the grand jury session.

Walsh said that Anthony, in a taped interview, told him he had been hanging out with **Drumgold** and Taylor early in the evening of Aug. 19, at the Humboldt Avenue apartment where **Drumgold** usually stayed. Anthony said **Drumgold** had told them that trouble was brewing - possibly even that night - in a drug-turf dispute, and he displayed two .22 caliber pistols.

They all eventually left the apartment, with **Drumgold** and Taylor dropping their friend off at the Dudley T station. Anthony said he did not see either man the rest of the night. In short, Anthony left **Drumgold** and Taylor, armed and ready for trouble, only hours before Tiffany Moore was killed by shots from a .22-caliber handgun.

It was powerful stuff - but Antonio Anthony, in recent Globe interviews, said it was untrue. Anthony recanted key parts of what he told police and said much of Walsh's testimony before the grand jury was false. "That is not how it happened," he said, adding that he felt "under pressure" by police and told them what they wanted to hear.

Anthony was interviewed at the Old Colony Correctional Center in Bridgewater, where he is serving a seven-year prison term for unarmed robbery. He confirmed parts of what police said he told them - that he was with **Drumgold** and Taylor at the Humboldt Avenue apartment early that evening and that they were packing pistols.

SCDA1143

Boston Globe Online / Archives



But Anthony said he was never dropped off at the Dudley T station when they left the apartment. "That never happened," he said.

The truth, Anthony said, is that as darkness fell he, **Drumgold**, Taylor, and a fourth man left Humboldt Avenue and drove to 23 Sonoma St. so that he and Taylor could visit their girlfriends. He said Taylor was upstairs with his girlfriend, he was in the hallway with his, and **Drumgold** was hanging out downstairs.

Nearly an hour later, "we heard about a shooting that had happened." He said **Drumgold** immediately wanted to return to Humboldt Avenue, worried the victim might be his sister.

"There's no way he could have done that [killing]," said Anthony. "I know that for a fact. Because I was with him and Lug on Sonoma Street when the shooting happened."

Reviewing the discrepancies between the transcript of his 1988 police interview and what he says now, Anthony said, "I went in there to tell the truth and they didn't want to hear it. They wanted me to corroborate that they [**Drumgold** and Taylor] had done the shooting. They kept putting the same questions to me and I'd say, `Yo, he didn't do it. I was with him. He didn't do it.' They'd say, `You holding back on us?' "

Anthony said he grew increasingly afraid that police were going to charge him in the murder. "I lost control of the whole situation," he said in the Globe interview, "and I'm just doing what they want me to do. I'm just a dumb puppet in there."

Police spokeswoman Mariellen Burns declined requests for interviews with Walsh and other police officials. Citing the ongoing appeals in the case, she referred questions about **Drumgold** to the Suffolk County prosecutors' office. Deputy District Attorney Joshua Wall also declined to comment. Beauchesne, the retired prosecutor, said Walsh "did not have any type of reputation as a rubberhose cop . . . I don't think any witnesses were pressured excessively."

Anthony said he now understands why he was not summoned to testify in person at the grand jury. "I would have told the grand jury the same thing I told

SCDA1144

Boston Globe Online / Archives



homicide," he said. "I would have told the grand jury, no way **Shawn** and Lug coulda done it."

The Sonoma Street alibi

Others are also now prepared to join Anthony in corroborating **Drumgold's** alibi. In separate interviews, three former Sonoma Street residents told the Globe they saw **Drumgold**, Taylor, and Anthony on their street when Tiffany Moore was killed several blocks away on Humboldt Avenue. Two never came forward and cooperated with police at the time and a third said she spoke to authorities but backed off after feeling intimidated by police.

"When I heard they got arrested for the shooting, I said, 'That's impossible,' because they were on Sonoma and could not have done it," said Olisa Graham. "You can't be two places at once."

Then 19 years old, Graham lived in a third-floor apartment at 23 Sonoma St. She said that around twilight on the night of the murder, she returned home and ran into Anthony and Taylor in the building. Taylor, she said, was with her sister. She made a call, went out, and sat on a stoop, smoking a cigarette.

"I saw **Shawn** coming out of the building next to mine," she said. "He went into the other building. Then 10 or 15 minutes go by and it seemed like all these people started coming up. People were saying there's a shooting on Humboldt.

"**Shawn** came out of the other building and he crossed the street and stood in front of 23 Sonoma with Country and Terrance," she said. The three then took off, she said.

Graham said she gave this information to authorities who met with her in her family's apartment. She said she was willing to testify until one of the men who interviewed her telephoned with a warning. "[He] told me I wouldn't be able to testify because I had a warrant, a shoplifting warrant," she said. "He said if I was to testify there was a possibility I could be arrested after I got off the witness stand."

Court records show that Graham had an outstanding arrest warrant for shoplifting at the time, a charge that would be dismissed in 1999. Graham said no one

SCDA1145

contacted her again – and she was not about to stick her neck out. "I would have testified. I wanted to help, but when they told me that, it was like, OK, I don't want to go to court and get arrested," she said recently. Now 34 and taking nursing courses, she said she is willing to testify if there is a new challenge to **Drumgold's** conviction.

Two others told the Globe they saw **Drumgold** and Taylor on Sonoma Street at the time of the shooting but had been afraid to go to police. "You didn't want to get caught dead talking to the police," said Gemini Hullum. The third resident, who asked not to be identified, echoed Hullum's wariness. "I didn't want to have any part of it, because of the way I was living back then," said the resident. Besides, the resident said, people heard about the call Olisa Graham got. "People were scared of what the police were saying."

A trial witness recants

During the year after Darlene Tiffany Moore was gunned down, her death had an impact far beyond the investigation. Police cracked down on the gangs and beefed up foot patrols in known trouble spots. Federal, state, and local officials met with Roxbury community leaders, promising tougher laws to combat street crime and drug offenses. Talk of organizing neighborhood crime watch groups was widespread.

Then came time for justice for a 12-year-old girl.

"All of society, all of the might of society has gathered to convict **Shawn Drumgold**," Beauchesne told a Suffolk County jury in the fall of 1989. "Think of the person who isn't here. Tiffany Moore is as much entitled to clear, cool, calm justice as is **Shawn Drumgold**."

The murder trial began on Oct. 2, a cloudy Monday morning. It lasted 11 days and involved 47 witnesses. The gist of the state's case was that **Drumgold** and Taylor, acting as hit men for the Castlegate gang, fired shots into a crowd of youths and killed the girl instead of the intended target. No witness placed Taylor at the crime scene, and he was acquitted by the trial judge.

To convict **Drumgold**, the prosecution, lacking physical evidence, relied on a half-dozen witnesses whose testimony, taken together, portrayed **Drumgold** as the killer.

SCDA1146

Boston Globe Online / Archives



Vantrell "Trell" McPherson was one of those witnesses - although initially the teenager did not seem to have much to offer the prosecution. In her first taped interview with police, she said she and Tiffany Moore had run into **Drumgold** and Taylor at around 6 p.m., hours before the shooting. "They were walking by," McPherson said, according to the police transcript.

Twice the investigators asked, "Is there anything else you would like to add, Trell?" Twice she replied, "No."

But four months later, when she took the witness stand, there was more. McPherson now said **Drumgold** and Taylor seemed in a hurry when she and Moore ran into them. The new twist emerged in the following exchange between the prosecutor and McPherson:

"Did Mr. Taylor say anything in your presence to the defendant **Shawn Drumgold**?"

"He said, "Come on, **Shawn**, you know we got to do this."

"Say that again slowly."

"Come on, **Shawn**, you know we got to do this."

"We got to go do this."

"Yes."

"Did you know what he meant?"

"No."

"I have no further questions, your honor."

It was the climax to McPherson's testimony, with the prosecutor pausing to savor the words that suggested **Drumgold** and Taylor were men with a mission the night Moore was shot.

But in a recent interview, McPherson recanted.

The testimony about Taylor, she said, was false. "I don't remember anyone saying, "Come on, **Shawn**, we got to go do this." McPherson said she did not even remember giving that testimony - because, she explained, she was "so shook up" by the time she took the stand. During witness preparation, she said, a member of the

SCDA1147

Boston Globe Online / Archives

prosecution team berated her to the point of tears.

"He was yelling and screaming at me," McPherson, then 15, said. She did not know the official's name. "It was a fat guy," she said. The two were alone in a room in the courthouse. "He was telling me how can I not know who it was wearing a mask, if I saw the person the same day. How can I not know it's him even if he's got a mask on, because I know **Shawn** and had seen him.

"I felt very much intimidated," said McPherson, now 29. "He wasn't backing off at all. He was really screaming in my face, to the point where I was crying. That man could have got me to say anything, the way he was in my face."

Sweetheart deal?

Another key trial witness was Ricky Evans, a young Roxbury man whom police stumbled across 10 months after the Moore shooting, three months before the trial.

Detectives had been in contact with him about another murder. "I don't know why I brought it up. I just happened to hit him [Evans] with the question, "By the way, do you know anything on the Tiffany Moore murder?' " one detective later testified to explain the surprising good fortune.

Evans said he knew plenty, and on June 21, 1989, he met with investigators and a prosecutor, according to police records. Evans said that on the night Moore was murdered he had seen **Drumgold** and Taylor outside his apartment building on Elm Hill Avenue, a few blocks from the crime scene. Both men were armed with pistols, he said, and he overheard Taylor telling **Drumgold** where they could find the two Humboldt gang leaders whom investigators believed were targeted for revenge by the Castlegate gang. Evans further said that he met up with **Drumgold** and Taylor later that night, after the murder, and that both had acted "strange" and told him they had "ditched" the pistols.

For homicide detectives, Evans's account was like hitting the lottery, a witness who could testify about guns, motive, and cover-up. Evans, meanwhile, was a wanted man himself. Even as he opened up to police about the Moore murder case, Evans, according to Roxbury District Court records, had at least four criminal cases pending against him - for trespassing, for

SCDA1148

Boston Globe Online / Archives

car theft, and for possessing and dealing cocaine. If convicted of the most serious charges, he faced up to 10 years in prison.

Life improved for Evans, however, once he cooperated against **Drumgold** and Taylor. Six days after the June 21 meeting, a homicide detective drove Evans to the Roxbury court, where Evans's outstanding arrest warrants were cleared up. Evans's cases were then continued for further court action until Oct. 10 - after the trial, scheduled to begin Sept. 19, was expected to be over.

At trial, Evans's testimony was sharply challenged by lawyers for **Drumgold** and Taylor, who said his version was preposterous. **Drumgold** and Taylor did not even know Evans, the lawyers said. And Evans, they said, had a sweetheart deal with police. "Is it your testimony you don't expect anything in return for your testimony here today?" one lawyer asked.

"No," Evans replied, he expected no special treatment. It was his civic duty, he said.

Five days after **Drumgold** was convicted, the trespassing charge against Evans was dropped outright. The cocaine possession charges were continued without a finding and would be erased so long as he performed five hours of community service. (Evans never did the five hours, according to records.) The stolen car case was also continued without a finding. A crack cocaine-dealing charge was not brought up during the bulk disposition and, according to records, remains an open case.

For all practical purposes, Evans left court free and easy. In a recent interview, Evans declined to answer questions about his role as a witness against **Drumgold** or his relationship with homicide detectives. He cut off the questions during a brief meeting near his South Boston apartment. "There was no coercion," he said. "What I said was the way it happened."

A troubled star witness

**Drumgold** was convicted of first-degree murder on Friday, Oct. 13, after fewer than six hours of deliberations over two days. The jury consisted of five men and seven women and included one black, the foreman, Lance E. Woodley. In the years since, one juror has died, another suffers from failing memory, and

SCDA1149

Boston Globe Online / Archives



juror has died, another suffers from failing memory, and
a third's health troubles prevented her from discussing
the case. Most have moved away from Boston.

Five jurors, in interviews, said the tipping point for a
guilty verdict was one girl's testimony. "The biggest
thing that stands out was that **Shawn Drumgold** was
identified," said Woodley. "The girl who said she
looked right in his eyes."

That "girl" was 22-year-old Mary Alexander, and her
path to a courtroom identification was hardly a straight
line. She lived in an apartment at 72 Homestead St. with
her mother and children. Detectives first came to see her
seven days after the murder, according to police records.
She told them she saw two men walk past her after the
shooting, "putting what she believed to be guns inside
their pants," according to a police report. But she could
not identify either man.

"The officers observed Mary Alexander pick up the
photo no. 304-159, the photo of Shawne [sic]
**Drumgold** several times look at this photo for some
time put it down and pick it up again and again before
saying she could not make an identification of any of
the photos of the two men she had seen," according to
the police report.

Alexander wouldn't make her first positive
identification until 13 months later, just as the trial
began and after the blaze of media coverage fingering
**Drumgold** as the killer. When she took the witness
stand she confidently and positively identified
**Drumgold**.

"I'll never forget those eyes, because they was like
staring," she testified.

For the jurors, her words proved compelling. "I totally
believed her," said juror Kimberly Barr. "I was just so
impressed with her description; she said she'd never
forget those eyes." said Sheila Finnerty. "That clinched
it for me," said Cecille Y. Manning about the girl's
identification. Woodley, the foreman, said, "You
remember something that was strong - like someone
saying, I saw him."

But unknown to jurors or defense attorneys was that
young Mary Alexander suffered from brain cancer in
1989. She died four years later. "Cause of death was
Cerebral Astrocytoma, Seizure Disorders, Five years of

SCDA1150

Boston Globe Online / Archives



Disorder," according to her death certificate. The fatal brain cancer, according to oncologists, can affect a person's memory, perception, and cognitive function.

In an interview, Lola Alexander said her daughter was first diagnosed when she was 20 years old, in early 1988. "She was getting very severe headaches. I used to have to sit up all night with her and hold her head like a baby." One day, she said, Mary "fell on her face," was rushed by ambulance to the hospital, and the brain cancer was diagnosed. Mary underwent various treatments, the mother said.

Neither the defense nor the jury knew about the fatal condition - but police did, the mother said. "They didn't care she had cancer; that had nothing to do with her mouth." She said police came around often. "I think they were trying to coach her what to say." Moreover, the mother said police were after her to testify, too. "I didn't see nothing, and they wanted me to see something," she said. "They were saying, `You got to have seen something.'"

Beauchesne, the prosecutor, said he never knew Mary Alexander had a fatal brain cancer until a Globe reporter brought it up. "Talking to her, there was nothing about her that would indicate that she was anything but an average, ordinary citizen." He also said that without her testimony, **Drumgold** would have been acquitted. "I was trying a case that was falling apart on me," he said. "Going down the tubes." Her identification turned around what he'd figured was going to be "a high-publicity loser."

Told recently about Alexander's cancer and asked whether the medical condition might have affected the jury's verdict, Barr paused and then said, "It was easier making the decision not knowing that fact. If that were part of the mix it would have been a more complicated decision."

Seeking a new day in court

Today **Shawn Drumgold** is a much different-looking man than when he was arrested in 1988. He is 37, no longer the skinny drug dealer who worked the streets of Roxbury. Lifting weights, he's bulked up. His head is shaved.

Following a few disciplinary controversies early on,

SCDA1151

Boston Globe Online / Archives



**Drumgold** settled into a largely uneventful prison life. In interviews, he said he became a Muslim, earned a high school equivalency diploma in May 1995, and now takes correspondence college courses through Bunker Hill Community College.

His daughter, a baby when he was convicted, is now a teenager attending a Boston high school, and **Drumgold** said he tries his best to stay involved with her upbringing.

Throughout, **Drumgold** has maintained his innocence."We went to Sonoma Street," he told police 10 days after the shooting, and he has never changed his story. For years he and his appellate attorney, Rosemary Curran Scapicchio, have unsuccessfully pursued appeals in state and federal court. Most recently, **Drumgold's** hopes have grown based on several new developments. For one, Olisa Graham has come forward, providing a sworn affidavit corroborating the Sonoma Street alibi and saying police intimidated her at the time.

Even members of the Castlegate gang have said **Drumgold** was not the shooter. The disclosures were made in the wake of a 1998 federal racketeering indictment of about 30 Castlegate members. During debriefings, at least two defendants said it was common knowledge **Drumgold** was not Moore's killer. Boston police and Suffolk prosecutors eventually conducted interviews with the men but discounted their information as hearsay.

For her part, Scapicchio last year filed a motion for a new trial based on new evidence, relying on the Castlegate gang disclosures and Graham's alibi corroboration. Her request for a hearing on the new evidence is scheduled to be heard soon by Superior Court Judge Barbara J. Rouse. A spokesman for Suffolk County District Attorney Daniel F. Conley said prosecutors continue to stand by **Drumgold's** conviction, noting it has been upheld on appeal, but that Conley would not challenge a judge's order, if there were one, to hold a hearing. "We would always consider any substantive evidence," said Joshua Wall, Conley's top deputy. "Our interest in seeing that convictions are correct is always present."

Woodley, the jury foreman, is one who would welcome a reexamination of the conviction. "I always question whether I did the right thing," he said. "I still question, is this the right guy?

SCDA1152

Boston Globe Online / Archives

is this the right guy?

"Too often the justice system doesn't do justice," he said.

That sentiment is not his alone. Back in 1989, even Tiffany Moore's mother was not wholly persuaded about **Drumgold**'s guilt. In the city's two major newspapers, Alice Moore expressed relief that one of the killers was convicted. "At least they got one," she said. But a neighborhood newspaper captured a different side of the mother - one full of doubts. "It was very hard to tell if he was the right one," Alice Moore, who died in 1994, told the weekly Bay State Banner. "It's a big mess."

Dick Lehr can be reached at lehr@globe.com.

### Easy-print version | Search again

**Techical problems**: If you have a technical problem with your account please contact Newsbank at 1-800-896-5587 or by e-mail at bostonglobe@newsbank.com.

Return to the home page
of The Boston Globe Online

© Copyright 2003 New York Times Company



SCDA1153

| REPORT OF INVESTIGATION | | DATE | | |
| --- | --- | --- | --- | --- |
| | | August 24, 1988 | PAGE 1 OF | |
| FILE TITLE Homicide Case 70/88 Tiffany Moore CC# 81-718906 | | INVESTIGATOR R. Walsh | FILE NUMBER | |
| | | REPORT RE Homicide Investigation | | |

Sir:

About 12:15 PM this date Dets. Paul Murphy and Richard Walsh of the Homicide Unit spoke to one Erick Johnson, B/M 14 yrs. d.o.b. 3-17-74 of 67 Elm Hill Ave. apt.#6 who related that he was standing at the mailbox at Humboldt and Homestead talking to Tiffany Moore, when he herd one of the girls in the group yell. He looken into the Edison yard and saw a male wearing all white, wearing a halloween mask with hair coming out from under a hood wich had been pulled up over the persons head. He had a gun in his hand and fired two times. This person fired first. He also saw another person standing in the dark, wearing a green jogging suite also wearing a mask. This person also fired two shots and then both leave the area to the rear of the Edison yard.

Erick also observed a small jeep, possibly a Sazuki with a white top with the rear window rolled up and tied open. This vehicle came down Homestead the wrong direction and left in the Direction ow Wallnut Park.

The people that where with him in the group were, Caryon, Tasha, Toya Trell, McFearson, Tiffany Moore (Victim). The boys in the group were Chris Cheeney, Troy Jenkins, Kevin Lucis, and Michael Watson.

To be further investigated...

R. Walsh

SCDA1154

*Appx B*

Boston Globe Online: Print it!

boston.com
◁Home

TAKE ADVANTAGE OF BOSTON'S *BEST BRAND-NAME SAVINGS!*

Enter e-mail address: _____    Enter zip code: _____   GO

THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

# A third witness recants testimony about '88 killing

By Dick Lehr, Globe Staff, 5/15/2003

On the eve of a court hearing that could lead to the reopening of the notorious Tiffany Moore murder case, another key prosecution witness has come forward to say he lied on the witness stand when he implicated Shawn Drumgold as the man who killed the 12-year-old girl in 1988.

Prosecutors at the murder trial presented Eric Johnson of Roxbury as one of three witnesses who could name Drumgold, then a Roxbury drug dealer, as the girl's killer. Describing a masked gunman who fired a gun into a crowd at the corner of Humboldt Avenue and Homestead Street, Johnson testified, "I thought it was Shawn."

Then 15, Johnson testified that when the gunshots rang out, "I looked when I fell down. I got back up and everything was over. I'm saying to myself that looked like Shawn Drumgold."

But in a Globe interview this week, Johnson said authorities pressured him into naming Drumgold. "It's a lie," Johnson said, reviewing a transcript of the trial testimony in which he identified Drumgold. Now 29 years old and an aspiring music promoter, he said, "It's wrong, completely wrong."

Johnson is the third prosecution witness to recant statements and testimony used to convict Drumgold at his 1989 trial, and send him to prison for life without parole. All were interviewed in the course of an ongoing Globe reexamination of the Drumgold conviction; all three say authorities bullied them into giving the false evidence they now want to correct.

The murder of Darlene Tiffany Moore was a crime that came to symbolize a time in Boston history when street gang violence ran amok and the murder rate was spiraling upward. Public pressure for a swift arrest and sure conviction was intense. Lacking forensic evidence - the gun or masks - prosecutors relied on a small group of witnesses, including Johnson, to persuade a jury that Drumgold was the killer.

"They got me to say, "Shawn, Shawn, Shawn," Johnson said, referring to homicide detectives who visited him regularly prior to the start of the murder trial. "I was just a kid."

In addition to the recantations, the Globe's investigation has revealed that a prosecution witness who said she saw Drumgold walking away from the crime scene - an identification jurors have said was critical to Drumgold's conviction - suffered from brain cancer. The fatal condition, which can affect perception and memory, was not revealed to the defense or jury.

SCDA1155

APPX C

Boston Globe Online: Print it!

The Globe also found that another prosecution witness faced a raft of criminal charges that evaporated soon after he testified. And neighborhood residents were located who said they were frightened to testify in 1989 but will now come forward to support Drumgold's alibi - that he was several blocks away on Sonoma Street when Tiffany was shot.

Last week Suffolk District Attorney Daniel F. Conley ordered his chief homicide prosecutor to conduct an internal review of the new information, and a court hearing is scheduled tomorrow before Superior Court Judge Barbara J. Rouse to consider Drumgold's motion for an evidentiary hearing. Yesterday, Conley said Johnson's claims of police pressure and the recantation constitute "substantial allegations that warrant our evaluation" as part of his office's ongoing review. He declined comment on whether he'd changed his position regarding an evidentiary hearing. In the past, he has said a hearing was not called for but that he would not oppose a judge's ruling to hold one.

Drumgold's attorney, Rosemary Curran Scapicchio, yesterday called on Conley "to step up to the plate and correct the injustice from a prior administration. Shawn has served 14 years for a crime he did not commit." Scapicchio said prosecutors "at a minimum should join me in my motion for an evidentiary hearing to flesh out in court whether Shawn got a fair trial."

Following the Aug. 19, 1988, murder, police believed that Tiffany was an innocent victim in a feud between rival street gangs, the Castlegates and Humboldts. Johnson, a neighborhood teen who'd had his own tangles with the law, including a drug conviction in juvenile court, was one of a number of youths hanging out near two mailboxes enjoying the summer night.

Johnson was sweet on Tiffany, who was visiting from South Carolina where her mother had sent her to live with relatives. "It was a beautiful night. Music blaring. Cars running," Johnson said this week. He and other witnesses, according to records and court testimony, then saw two masked gunmen approach from inside a fenced-in Edison substation and open fire. Police later arrested Drumgold and a friend, Terrance "Lug" Taylor, who was acquitted because no witness placed him at the crime scene.

In his initial police interview five days after the shooting, Johnson was of little help to the two Boston homicide detectives in charge of the case, Richard Walsh and Paul Murphy. Johnson described the scene at the mailbox and the shooting, according to Walsh's one-page police report. But there was no mention of Drumgold or of any other named individual.

That changed a year later, just days before the trial started. Defense attorneys were notified by prosecutors about a witness who could identify Drumgold. Taking the witness stand on the trial's sixth day, Johnson said one of the shooters wore a mask and was bowlegged - and that he remembered thinking, in the instant following the gunshots, that the bowlegged shooter reminded him of "Shawn."

In the Globe interview this week, Johnson said the shooter was bowlegged, but that his identification of Drumgold was false. "They [detectives] kept coming to my house - they were pressuring me. They kept saying, "We want you to say this.

"I was 15. I was scared. I didn't know what I was doing."

Johnson said that just before he testified, one of the detectives coached him. "He said, "Whatever the DA asks you, just say, Yes. Say yes to whatever questions they ask you about

SCDA1156

Boston Globe Online: Print it!

Shawn." He said he could not recall the name of either of the detectives who dealt with him.

*Dick Lehr can be reached at* lehr@globe.com.

This story ran on page B1 of the Boston Globe on 5/15/2003.
© Copyright 2003 Globe Newspaper Company.

SCDA1157



A&E | BOSTON GLOBE | CARS | JOBS | REAL ESTATE | SPORTS | TECH | TRAVEL

The Boston Globe
HOME DELIVERY
SPECIAL OFFER!

The Boston Globe

## City & Region

boston.com

[ Send this story to a friend | Easy-print version | Search archives ]

# DA to eye new evidence in Drumgold conviction

**By Dick Lehr, Globe Staff, 5/6/2003**

Archives
Buy photos
Contact the Globe
Globe services
Search the Globe
Send us feedback

Electronic edition
Headlines e-mail
Low-graphics version
Most e-mailed articles
Front page [JPG]
[PDF]
Today's paper A to Z

## Sections

PAGE ONE
NATION|WORLD
CITY|REGION
  Death notices
  Lottery
  Politics

  Brian McGrory
  Eileen McNamara
  Spiritual Life
  Adrian Walker

Peaks & Valleys
  BJ Roche
Starts & Stops
  Mac Daniel
The Observer
  Sam Allis

BUSINESS
SPORTS
LIVING|ARTS
EDITORIALS | OP-ED

SPECIALS
Beyond the Big Dig
Big Dig cost overruns
Global health crisis
New Big Dig tunnel
Rebuilding Iraq
Space shuttle disaster
More special reports

Spotlight
investigations
  Scandal in the
church

WEEKLY
Health | Science (Tue)
  Judy Foreman
  Chet Raymo
Food (Wed)
  Recipes
Calendar (Thur)
Life at Home (Thur)

City Weekly
Globe South
Globe West
Globe North

**S**uffolk District Attorney Daniel F. Conley yesterday ordered homicide prosecutors to conduct an internal review of new evidence casting doubt on the 1989 first-degree murder conviction of Shawn Drumgold for killing 12-year-old Darlene Tiffany Moore.

David Procopio, Conley's spokesman, declined to provide a timetable or describe the specific steps that will be taken in the internal investigation, but said it will be a "thorough process and we will follow the information wherever it leads."

BRITISH AIRWAYS

Sample fares to Europe

Boston to Paris        $177    San Francisco to Munich    $321
Chicago to Geneva      $253    Philadelphia to Zurich     $228
Los Angeles to Zurich  $315    Houston to Madrid          $286

Prices one-way based on r/t airfare, taxes & fees extra

Sale ends May 8, 2003!          ▸▸ Book now.

"If this examination determines that further action is warranted in the interests of justice, we will undertake those actions," Procopio said. Conley's chief homicide prosecutor, David E. Meier, will lead the effort, he said.

The announcement follows a Globe investigation into the high-profile murder case that became a symbol for the street gang violence in Boston in the late 1980s. Tiffany Moore was killed by a stray bullet in a gang shooting as she sat on a blue mailbox on Humboldt Avenue in Roxbury playing with friends on a hot summer evening.

Drumgold, one of two men charged with shooting her on Aug. 19, 1988, was convicted a year later and sentenced to life in prison without parole. Lacking any forensic evidence, either the guns or masks worn by the killers, prosecutors relied on a number of witnesses who portrayed Drumgold as the killer.

In its reexamination, the Globe found a prosecution marred by faulty assumptions, questionable tactics, and possible wrongdoing. Two witnesses recanted statements and testimony used to convict Drumgold, saying that they were intimidated by investigators into providing false evidence.

The Globe found another witness facing a raft of charges whose criminal exposure evaporated within weeks of testifying. Moreover, the Globe learned

SCDA1158

Globe NorthWest

**WEEKEND**
Automotive
Books
Education
Ideas
Magazine
Real Estate
Travel

**FEATURES**
Chat
Columns
Comics
Crossword
Events Tickets
Horoscopes
Death Notices
Lottery
Obituaries
Personals
Traffic
TV listings
Weather

**CLASSIFIEDS**
Cars, trucks, SUVs
Jobs (BostonWorks)
MarketBasket
Real Estate

that the star witness -- a woman who testified that she saw Drumgold at the crime scene -- suffered from a fatal brain cancer. The condition, which can affect judgment and memory, was unknown at the time to the defense or the jury.

In addition, residents who said they were too frightened to testify in 1989 now say they are willing to come forward to verify the alibi Drumgold cited from the moment of his arrest: that he and friends were several blocks away on Sonoma Street at the time Tiffany Moore was killed.

Drumgold's attorney, Rosemary Curran Scappichio, welcomed Conley's announcement but also called on prosecutors to join her in supporting Drumgold's motion for a new trial pending before Judge Barbara J. Rouse in Suffolk Superior Court.

"It would be nice if [Conley] were on board for the hearing, especially since the trial prosecutor has conceded the case against Shawn was weak," she said.

In the Globe story, the trial prosecutor, Philip T. Beauchesne, now retired, while not doubting the outcome of the trial, said he was surprised by the conviction given the "weak" case.

To date, Conley has staked out a middle position in court regarding Drumgold's request for an evidentiary hearing. In court papers, Conley has said that there has not been any reason to doubt the guilty verdict, which has been upheld on appeal. He also said he would not oppose a judge's ruling, if there was one, to hold a hearing. Procopio said Conley's position on the hearing is "unchanged."

"We're not ruling that out," Procopio said about the possibility of joining Scappichio in calling on Rouse to hold a hearing. "It's really too early to speculate what will happen. We want to proceed carefully, thoughtfully, and thoroughly to insure the interests of justice are served."

Procopio said Meier will be looking to test the "accuracy, significance, and credibility" of the new information as a "sort of intermediary step" to possible further action.

Drumgold's is not the first high-profile Suffolk County murder conviction to come under scrutiny. Two others from the mid-1990s, both affirmed by the Supreme Judicial Court, were overturned after prosecutors and Boston police realized that the convictions were a mistake.

Three years ago, Marlon Passley was exonerated in the 1995 drive-by killing in Dorchester of Tennyson Drakes, 18. In 1999, Donnell Johnson was released and eventually cleared in the 1994 killing of Jermaine Goffigan, 9.

In those two cases, exonerations resulted from different legal routes. Passley's came out of a new police investigation undertaken at the request of then-Suffolk District Attorney Ralph C. Martin II. Johnson's followed a special

SCDA1159

grand jury that was convened by Martin. The inquiries concluded that the men had been wrongly convicted by faulty eyewitness testimony.

Yesterday, Boston City Councilor Chuck Turner also urged Conley to support an evidentiary hearing and a new trial for Drumgold based on the "strong new evidence that supports Mr. Drumgold's position that he was not involved in the murder of Ms. Moore."

Meanwhile, Drumgold's mother, Juanda Drumgold, voiced skepticism about Conley's internal review, "because they still protect themselves. I'd rather see an independent look at the way the case was handled. Shawn is innocent. He was just plain railroaded. It was a political, high-powered case where they had to get someone fast and so they were very sloppy."

This story ran on page A1 of the Boston Globe on 5/6/2003.
© Copyright 2003 Globe Newspaper Company.

[ Send this story to a friend | Easy-print version | Search archives ]

**Search the Globe**

Search for: [                                    ] Go
⊙ Today   ○ Yesterday   ○ Past month   ○ Past year   ▸ Advanced Search

Get Boston Globe home delivery at 50% off and receive a Barnes & Noble gift card for up to $40!   The Boston Globe

© Copyright 2003 New York Times Company
| Advertise | Contact us | Privacy policy |



SCDA1160