## Page 118

```
 1  Q.  Christopher Chaney?
 2  A.  I think I interviewed Christopher Chaney
 3      actually at Charles Street jail once.
 4  Q.  Do you know if you took any notes of that
 5      interview?
 6  A.  I don't know.
 7  Q.  Mervin Reese?
 8  A.  Maybe it was Mervin Reese that I interviewed at
 9      the Charles Street jail. I have a recollection
10      of interviewing one of these two kids at the
11      Charles Street jail.
12  Q.  Romero Holiday?
13  A.  I may have interviewed Romero Holiday. I know
14      that Romero Holiday was a Castlegate who may
15      have been -- he may have been the kid that was
16      hospitalized and was part of the reason for the
17      ongoing dispute between the Humboldts and the
18      Castlegates.
19  Q.  If I was to tell you that one of the theories
20      was that this was retribution, that was put
21      forth at trial, was that this was retribution
22      for the stabbing of Romero Holiday or shooting
23      of Romero Holiday --
24  A.  I don't know if it was a stabbing or a
```

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

## Page 119

```
 1      shooting, but that would be consistent with
 2      what my belief was at the time.
 3  Q.  Do you acknowledge that there were various
 4      witnesses in the pretrial discovery and at
 5      trial that indicated that they observed Shawn
 6      Drumgold and Terrance Taylor at a hospital room
 7      of Romero Holiday where retribution was
 8      discussed?
 9          MS. SCAPICCHIO: Objection.
10  A.  I don't recall that retribution was discussed.
11      I do recall some evidence that Taylor and/or
12      Drumgold were at Romero Holiday's hospital
13      room.
14  Q.  Do you acknowledge that the witnesses to that
15      incident, the hospital room incident, were very
16      important to be interviewed in the defense of
17      your case?
18          MS. SCAPICCHIO: Objection.
19  A.  I don't remember.
20  Q.  Did you ever ask Shawn Drumgold whether or not
21      he was at a hospital room at any time visiting
22      Romero Holiday?
23          MS. SCAPICCHIO: Objection.
24  A.  I don't remember.
```

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

## Page 120

```
 1  Q.  If he provided you that information, would you
 2      have reduced that to notes?
 3          MS. SCAPICCHIO: Objection.
 4  A.  I don't know. Let me say this. If it was
 5      inculpatory of my client, I might not have.
 6  Q.  Might not have asked or might not have
 7      reduced --
 8  A.  Might not have reduced to writing.
 9  Q.  Did you interview or interview on anyone's
10      behalf Tyrone Brewer?
11  A.  I don't remember.
12  Q.  Willie Simms?
13  A.  Was that the guy up on the second floor? That
14      was the guy on the second floor that I
15      interviewed.
16  Q.  Donald Wilson?
17  A.  Don't remember.
18  Q.  Rodney Sadbury?
19  A.  Don't remember.
20  Q.  Troy Jenkins?
21  A.  Don't remember.
22  Q.  Paul Durand?
23  A.  I know I interviewed Paul Durand at some point.
24  Q.  Did you interview him with his attorney
```

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

## Page 121

```
 1      present?
 2  A.  Don't remember.
 3  Q.  Do you know if he had an attorney at any time?
 4  A.  I don't remember.
 5  Q.  Did you take notes at that interview?
 6  A.  I don't remember.
 7  Q.  Do you acknowledge that Paul Durand was an
 8      important witness to support the alibi defense
 9      of Shawn Drumgold?
10          MS. SCAPICCHIO: Objection.
11  A.  I believe so.
12  Q.  Do you acknowledge that it was prudent to write
13      down any notes of any interviews of Paul
14      Durand?
15          MS. SCAPICCHIO: Objection.
16  A.  As I recall, Paul Durand was somebody that was
17      friendly with either Taylor or Drumgold, and it
18      would not have been imperative to write
19      anything down.
20  Q.  Did you interview Rena Roisten or any of the
21      Roistens?
22  A.  I don't remember.
23  Q.  Did you interview Lisa Graham?
24  A.  I don't think so.
```

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

## Page 122

```
 1  Q.  Did you interview Obie Graham?
 2  A.  Don't remember.
 3  Q.  Did you interview Kathy Jamison, Monty?
 4  A.  Don't remember.
 5  Q.  Did you interview Michelle Payne?
 6  A.  Don't remember. I do as we're sitting here
 7      have some recollection of going to a number of
 8      different houses one day looking for a lot of
 9      these people that you mentioned. When I say "a
10      lot of these people," a lot of the witnesses to
11      the shooting, alleged witnesses to the
12      shooting.
13  Q.  Do you acknowledge that there was a group of
14      individuals that supported Drumgold's alibi at
15      23 Sonoma Street?
16          MS. SCAPICCHIO: Objection.
17  A.  Yes.
18  Q.  Do you acknowledge that that was where the
19      Grahams and the Paynes resided?
20          MS. SCAPICCHIO: Objection.
21  A.  The Grahams, yes. I don't remember the Paynes.
22  Q.  Same family, different --
23  A.  For other reasons I was questioned about, I
24      guess, Lisa Graham a few years ago.
```

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

## Page 123

```
 1  Q.  Did you interview Antonio Anthony?
 2  A.  I believe so.
 3  Q.  Did you take notes?
 4  A.  I don't know.
 5  Q.  Was he in custody or did you interview him
 6      somewhere else?
 7  A.  I don't remember.
 8  Q.  Do you recall whether or not anyone was present
 9      with you?
10  A.  I don't remember.
11  Q.  Is there anything that would refresh your
12      memory regarding the interviews of these
13      witnesses?
14  A.  I don't think so.
15  Q.  Other than your file, your original file?
16  A.  Well --
17          MS. SCAPICCHIO: Objection.
18  A.  If my original file had notes of interviews,
19      well, that would perhaps give me some more
20      insight into what transpired at the time. Just
21      being questioned does jog certain things, but
22      it's been a long time.
23  Q.  Do you acknowledge that you were aware that
24      Antonio Anthony and Terrance Taylor had girl
```

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**Page 124**

friends that lived at 23 Sonoma Street?
MS. SCAPICCHIO: Objection.
A. I don't remember that Anthony had a girl friend there, but I do remember that Anthony was supposedly there with Taylor, and I don't remember if Drumgold was inside or outside.
Q. Do you have a memory that Adrina Payne and Michelle Payne were the girl friends of Antonio Anthony and Terrance Taylor?
MS. SCAPICCHIO: Objection.
A. I don't remember.
Q. Did you discuss with any witnesses the relationship between the residents at 23 Sonoma Street and the defendants in this case?
MS. SCAPICCHIO: Objection.
A. Could you repeat that?
Q. Did you discuss with anybody the relationship between the residents of 23 Sonoma Street and the defendants in this case, Terrance Taylor and Shawn Drumgold?
MS. SCAPICCHIO: Objection.
A. I'm sure I had discussions along those lines with Mr. George, and I'm sure I had discussions along those lines with Mr. Drumgold. I don't

**Page 125**

remember them, though.
Q. Any other independent witnesses?
A. Maybe Mr. Durand, maybe Mr. Anthony. I just don't remember.
Q. Did you have any discussions in regards to the relationship between the residents at 23 Sonoma Street and any Castlegate members?
MS. SCAPICCHIO: Objection.
A. That I don't remember.
Q. Would you acknowledge that that would be an important piece of information to have in determining whether or not to put on that particular alibi defense on behalf of Drumgold or Taylor?
MS. SCAPICCHIO: Objection.
A. I think that if the determination were made, was made that the alibi defense was valid, then I don't think I would have been deterred by a connection between the inhabitants of 23 Sonoma and the Castlegates. That's all I can say. If I believed the alibi, then I wouldn't have allowed the -- nothing is black and white or perfectly good or perfectly bad.
Q. Do you acknowledge that if there was a

**Page 126**

relationship between members of Castlegate and residents of 23 Sonoma Street that supported the alibi of Shawn Drumgold and Terrance Taylor that that fact would diminish the effectiveness of the alibi defense?
MS. SCAPICCHIO: Objection.
A. It could have had that effect upon the fact finder. I think that's what I was saying before about nothing being a hundred percent black or white.
Q. In your opinion what relationships would impact and diminish the effectiveness of the alibi if there was one between Castlegate and 23 Sonoma?
MS. SCAPICCHIO: Objection.
A. I don't know. It's always better to have an alibi witness that's not associated with a particular individual, but it's been my experience that when a person says they're at a certain place at three o'clock in the morning it's probably their girl friend or their wife or their mother that's going to be the alibi witness, and of course they don't want to see anything happen to their boyfriend, lover, or husband or son, but that's what -- alibi

**Page 127**

witnesses tend to be people that are motivated to protect the people they're testifying for. That's why if you can avoid an alibi defense sometimes that's the best thing to do.
Q. Did you inquire of Shawn Drumgold what his relationship was with Terrance Taylor?
MS. SCAPICCHIO: Objection.
A. I must have.
Q. What did Drumgold tell you?
MS. SCAPICCHIO: Objection.
A. I don't remember.
Q. Do you acknowledge that Drumgold and Taylor were friends before this incident occurred and were friends?
MS. SCAPICCHIO: Objection.
A. Certainly that they were friendly.
Q. Did you ever ask them in regards to any drug dealing activity whether or not they were involved in it together?
MS. SCAPICCHIO: Objection.
A. No. I wasn't aware of anything along those lines.
Q. Do you acknowledge that there was a connection to Castlegate and 23 Sonoma which would have

**Page 128**

supported the theory of the Commonwealth's case that it would have been a strategic mistake to present as alibi witnesses those individual residents at 23 Sonoma Street?
MS. SCAPICCHIO: Objection.
A. You know, prospectively I think you have to leave it on the back burner even though there may be a downside. Those are the strategic decisions you make during trial depending upon other evidence in the case. I don't think you can just look at something and say, well, because it's got a certain negative to it it shouldn't be presented. I think sometimes your back is to the wall, and sometimes things are going your way. I think it depends.
Q. Best case scenario, you have someone that has an alibi that doesn't know the defendants, correct?
A. Correct. Best case scenario you have an official record to back up your client that he was in jail or being operated on at the time of the crime.
Q. Do you acknowledge that throughout trial your strategies sometimes and who you call as

**Page 129**

witnesses changes because of certain evidence?
A. Absolutely.
MS. SCAPICCHIO: Objection.
Q. Relative to the alibi defense, if you have a particular number of witnesses that can support an alibi defense, Shawn Drumgold in this case, that at some point in time you make choices of who you put on to support the alibi versus who you don't put on?
MS. SCAPICCHIO: Objection.
A. That's fair to say.
Q. One of the choices was to put on Terrance Taylor to support the alibi defense of Shawn Drumgold?
MS. SCAPICCHIO: Objection.
A. Well, if Terrance Taylor was to testify that he was with Shawn Drumgold at the time of the crime and that there's not even a scintilla of evidence, certainly not enough evidence to put Terrance Taylor at the scene of the crime, that would be helpful to Shawn Drumgold.
Q. In fact, you called Paul Durand for purposes of supporting the alibi defense?
A. That's probably true. I don't remember exactly

**Page 130**

as I sit here why I called Paul Durand, but I think that would have been the reason.

Q. Do you have any memory as you sit here today of making a conscious decision not to put on certain witnesses in support of the alibi?

MS. SCAPICCHIO: Objection.

A. I do think that there was a point during the trial when Terrance Taylor really did shock us -- when I say "us," I mean shock me -- by claiming his Fifth Amendment privilege when I said, Do you know Shawn Drumgold, that anybody who I viewed as more related to Taylor than to Drumgold, that was going to be a dangerous course of action at that point. That was happening bing-bing as I recall. The Commonwealth had rested, and it was all happening very fast. I was truly in shock when Taylor took the Fifth, and as a result I wondered whether I could trust anybody who was associated with Taylor.

Q. The individuals that were associated with Taylor were the residents of 23 Sonoma Street?

MS. SCAPICCHIO: Objection.

A. My memory is they certainly were more

**Page 131**

associated with Taylor than with Drumgold.

Q. In fact, Taylor's girl friend was a resident of 23 Sonoma Street, correct?

MS. SCAPICCHIO: Objection.

A. As I recall.

Q. Her sister was a resident of 23 Sonoma Street?

MS. SCAPICCHIO: Objection.

A. As I recall.

Q. Two individual witnesses that allegedly walked from the homicide scene of Tiffany Moore to 23 Sonoma Street, Obie Graham, the brother of Terrance Taylor's girl friend, was a resident at 23 Sonoma Street?

MS. SCAPICCHIO: Objection.

A. As I recall, the people at 23 Sonoma Street were much more closely aligned in terms of friendship with Taylor than with Drumgold. As I recall as well, the allegation was that Drumgold was actually waiting outside; he wasn't even in the house. I could be wrong on that, but it's my best memory that Drumgold was waiting outside for Taylor.

Q. Do you also acknowledge that a witness, Gemini Hullum, was also a resident of 23 Sonoma

**Page 132**

Street living with the Graham family?

MS. SCAPICCHIO: Objection.

A. I remember the name. I don't remember Gemini's relation to the case.

Q. If she was a resident of 23 Sonoma Street, you would have had the same concern that after Taylor took the Fifth whether or not there would be further damage to your case if you called the residents of 23 Sonoma Street?

MS. SCAPICCHIO: Objection.

A. Again, best memory, the alibi defense in the case was part of that distribution or divvying of labor that Mr. George took up to a greater extent than I did, whereas I went after the third-party culprit. That's my memory.

At this point I think that I lost all trust and faith in Mr. George, more so than Mr. Taylor. I never begrudged Mr. Taylor for doing what he did on advice of counsel other than you wonder about character, but putting that aside for a second at that point I decided that I couldn't trust Mr. George or anything that he did in the case.

Q. Still had an active investigator assigned?

**Page 133**

A. I don't know how active Mr. Groob was throughout the trial. I don't remember him being a factor.

Q. What was your experience prior to this trial with Judge Alberti?

A. I always had a great deal of respect for Alberti. I knew that he was tough. But I had some matter before him before this case that as tough as he was I thought he was reasonable, although his reputation was he was a real hard nut, but I actually had a decent experience with him. And there was a point at which I believe Mr. Beauchesne and I were trying to agree on a judge for the case, and I thought Alberti would be a good choice because it's a first degree murder case, sentencing -- Alberti had a reputation of being a heavy sentencer, but sentencing really doesn't matter in a first degree murder case. My view of the case was it was either going to be murder or not guilty.

Alberti was from the Berkshires, and as he said to us, Is there any publicity on this case, when he first met with me and Phil, and we looked at him like he had two heads and he

**Page 134**

said, Where I come from we read The New York Times; we don't read The Boston Globe. So that was my experience with Alberti.

Q. As a trial attorney, did you consider Judge Alberti to be fair and flexible relative to witness issues and presentation of your case?

MS. SCAPICCHIO: Objection.

A. He was a pleasure to try with in terms of being reasonable with lawyers and their problems and understanding that, you know, it's the real world. I found him to be a very good trial judge in that sense and I think the type of trial judge anyone in this room would appreciate for issues, personal issues or lawyer issues that come up during a case.

I thought that he was very decent in terms of his demeanor towards my client and Mr. Taylor. I remember that he allowed them on the view on the bus with the jurors as long as they promised -- I remember at least as long as my client promised to stay between me and the court officer while we were on the view he had no problem with Mr. Drumgold being on the view,

**Page 135**

which I thought was decent.

Until the Chaney/Reese issue surfaced I actually thought I was getting a very fair trial. That's when I felt the thumb on the scale.

Q. Relative to witness issues and problems that trial lawyers have on numerous cases, did you consider Judge Alberti to be fair relative to the coordination of witnesses or problems that come up in cases?

MS. SCAPICCHIO: Objection.

A. Yes, I did.

Q. Do you acknowledge that Judge Alberti was not too pleased when Taylor took the Fifth on the stand in front of the jury?

MS. SCAPICCHIO: Objection.

A. I don't remember. I just remember feeling like somebody just punched me in the stomach. I don't think that type of incident had ever occurred to me, had ever occurred to me, for me, whatever. I never had, like, that feeling that a brother or sister lawyer on my side of the fence had stabbed me in the back. I felt, you know, that in the past I've had some

**Page 136**

uncomfortable situations with prosecutors where I felt I caught them cheating during a trial, but I had never, ever experienced a brother or sister defense attorney basically stabbing me the back. That's what I felt happened in that case.

Q. Do you acknowledge that in your opinion that had an effect on the jury in regards --

MS. SCAPICCHIO: Objection.

Q. -- to the consideration of Shawn Drumgold's guilt or innocence?

MS. SCAPICCHIO: Objection.

A. I think that it may have had an effect. I know that at the time I was like -- I was not happy. But that may have had an effect.

Q. Based on your testimony here today and how it impacted you as a trial lawyer and it never happened again, do you acknowledge that it was clear to you and your concern the effect it had on the jury?

MS. SCAPICCHIO: Objection.

A. I don't think it was as important to me in that sense as it was on a very personal level. Mr. George and I had spent a great deal of time

**Page 137**

working together, I thought that Mr. George -- up until that time I never had any negative experiences with him. I thought he was top knit counsel. I thought he was of the right spirit. Basically up until that moment I trusted the guy. I think I'm a fairly good judge of character, and I said, whoa, I think I made a mistake here.

Q. Did you move for a mistrial?

A. I don't remember. It would have been by my own doing. I don't know that I had any right to a mistrial at that point because I was the one who called the witness.

Q. Did you seek a continuance at that time to regroup relative to any trial strategy?

A. I don't remember. I don't think I had to regroup that badly. During the course of the trial, any trial that goes for a few weeks, there are going to be moments that one thinks is a bad moment in the trial. That was a bad moment in this trial. That's all I can say. I think it might have been more personal, professional/personal than case related.

Q. You had conducted a voir dire already of

**Page 138**

Terrance Taylor, correct?

A. I don't remember.

Q. I'll just tell you that the record shows that there was a voir dire conducted of Terrance Taylor on Day Nine on October 10th of 1989 that went in the transcript from Pages 193 to 209. Does that refresh your memory that there was a voir dire conducted of Taylor before he was called?

A. That may be why I was as surprised as I was. It's my memory, again, it's so long ago, but my memory is that it was early in the morning when I called Taylor to the stand, and it was probably the day after he was directed out. And if there was a voir dire, it was the day after the voir dire. There was no indication whatsoever to me that he was going to assert a testimonial privilege.

Q. The record indicates a voir dire on Day Nine of the trial, October 10th, and that you called Taylor to the stand on October 11th of 1989.

A. That would comport with my memory. I don't remember the voir dire, but certainly he wouldn't have been voir dire'd until the case

**Page 139**

was directed out, so it would have been after the case was directed out against him.

Q. In fact, that was the last day of evidence?

A. As I think about it, that's consistent.

Q. And closing arguments went on --

A. The following day.

Q. -- following two days or following day?

A. I think it was the following day.

Q. Do you have any memory as you sit here today why you called Shawn Drumgold before you called Terrance Taylor?

A. No.

Q. Was there a particular --

A. There may have been -- the jury is not stupid. They see the defendants sitting in the courtroom, and he could be shaping his testimony based upon what people before him say. Feeling fairly confident as to what Taylor would say because, don't forget, Taylor gave a complete statement, I don't think I was worried about Taylor's statement and that -- I don't remember calling Taylor before Drumgold or Drumgold before Taylor, but, once again, I had a sense of what Taylor was going to testify

**Page 140**

to because I assumed he would testify consistently with his original statement to the police. But I thought that that happened before I called Drumgold. Actually I thought Drumgold was the last witness, but maybe I'm wrong.

Q. Do you have any memory today of any reasons why you didn't ask Alberti for an afternoon or a day to regroup relative to the alibi defense issue before making a decision whether to call Drumgold or any other witnesses?

MS. SCAPICCHIO: Objection.

A. I didn't feel a need to regroup. I think that I would have discussed with Shawn, bearing in mind what had just happened with Taylor, whether or not we should take the risk of calling anyone else from the Taylor camp so to speak. I think we decided not to.

Q. When you say "the Taylor camp," you're talking about --

A. 23 Sonoma Street.

Q. -- 23 Sonoma Street and any other individuals that were associated with Taylor?

A. When I said "the Taylor camp," I meant the

**Page 141**

23 Sonoma Street group.

MS. SCAPICCHIO: Objection.

Q. At that point in time, after discussing it with Shawn Drumgold you both made a decision --

A. Let me put it to you this way.

MS. SCAPICCHIO: Objection.

A. I believe I discussed it with Shawn. Whether I could say we both made a decision or he agreed with my decision, I do believe that the issue was discussed with Shawn.

Q. You had submitted an affidavit previously in the motions for new trial relative to Lisa Graham that was a resident of 23 Sonoma Street that you never were provided any information on Lisa Graham and was not aware of her, is that correct?

A. When I submitted the affidavit, what I said was so. Subsequent to submitting that affidavit it came to my attention that I had actually written to Mr. Beauchesne referencing Lisa Graham, I believe. So obviously what I said in the affidavit was factually incorrect.

Q. During the course of this trial, there was a joint submission, correct, of the witness lists

## Page 142

```
 1             in the case?
 2   A.    I believe so.
 3   Q.    As part of the pretrial discovery phase, the
 4         judge made it incumbent upon Mr. Beauchesne to
 5         ensure that all law enforcement personnel
 6         appeared for the purpose of testimony; he
 7         coordinated that?
 8              MS. SCAPICCHIO: Objection.
 9   A.    I think it made sense from a money standpoint.
10         The Commonwealth was going to have to pay for
11         it once or twice, so why not have them pay for
12         it once. We would have used our subpoena
13         power, and the money would have come from the
14         Commonwealth, so why not. Again, understand
15         that with regard to Mr. Beauchesne and counsel
16         for the defendants, we were, I thought, trying
17         to cooperate with each other.
18   Q.    There were mutual witnesses that you both
19         wanted to call?
20   A.    Absolutely.
21   Q.    Mary Alexander, Tracie Peaks, there's a whole
22         list of them, that you both submitted and
23         wanted and you merged them, correct?
24   A.    Yes.
```

## Page 143

```
 1   Q.    And the Court expected cooperation from the
 2         counsel in the case to do a joint effort to
 3         subpoena and summons witnesses to appear as
 4         opposed to multiple?
 5   A.    We were trying to coordinate the appearance of
 6         witnesses, no question.
 7   Q.    In fact, the clerks office in Suffolk Superior
 8         Court were issuing subpoenas to witnesses prior
 9         to trial and during the trial?
10   A.    As I recall, that was one of the things that I
11         really appreciated about Judge Alberti. He
12         wanted to make it as easy on the lawyers as
13         possible so they could pay attention to what
14         was going on in the courtroom.
15   Q.    In fact, you had access to the subpoenas and
16         knew who was being subpoenaed to come in to
17         testify, correct?
18              MS. SCAPICCHIO: Objection.
19   A.    I don't recall any major surprises.
20   Q.    If Phil Beauchesne during the course of the
21         trial was issuing subpoenas to witnesses, he
22         was providing that information to you?
23   A.    As I just said, I don't recall being surprised
24         by any witnesses that appeared.
```

## Page 144

```
 1         (Exhibit No. 59, Affidavit, marked for
 2         Identification.)
 3   Q.    Showing you what's been marked as Exhibit
 4         No. 59.
 5   A.    This is the affidavit that was submitted in
 6         December, I believe, of 2002.
 7   Q.    Did you draft this affidavit?
 8   A.    I know I signed and dated it. I don't know
 9         whether or not that was produced on my machine
10         or whether or not -- but it does look like it's
11         from my machine.
12   Q.    Is it fair to say that you have searched your
13         computer for any documents?
14   A.    Oh, yeah. It would be --
15   Q.    I make a representation to you, and you can
16         review the documents if you choose, that that
17         affidavit is not contained in the documents
18         that you provided today.
19   A.    Okay. Then it wasn't produced on my computer.
20   Q.    If you produced it personally, you or someone
21         at your request, it would be on your computer?
22   A.    If I had actually drafted it or a secretary or
23         associate or partner had drafted it, it should
24         be on my computer, and it's not.
```

## Page 145

```
 1   Q.    You don't have any files on your personal
 2         computer at home --
 3   A.    No.
 4   Q.    -- relative to Drumgold?
 5   A.    Absolutely not.
 6   Q.    There's no other computers other than your work
 7         computers that would contain any of the
 8         Drumgold files? I'm not talking about old
 9         computers --
10   A.    I want to say in 2002 I left my partnership
11         that I had been in at the time of the Drumgold
12         trial.
13   Q.    Who was your partnership?
14   A.    It would have been Rappaport, Pinta, and
15         Eggert, E-G-G-E-R-T.
16   Q.    Are they still in existence?
17   A.    Pinta and Eggert exist right around the corner
18         on Milk Street.
19   Q.    Did you inquire of Pinta and Eggert whether or
20         not there was any files from the Drumgold --
21   A.    I think I have -- I'm positive that all the
22         files that existed in the old office I
23         presently have.
24   Q.    Do you have a problem with us communicating
```

## Page 146

```
 1         with Pinta and Eggert to determine whether or
 2         not there is any documents, hard files or
 3         computer files, in existence in their office
 4         relative to Shawn Drumgold?
 5   A.    I have no problem.
 6   Q.    If necessary, would you authorize them to
 7         disclose that information to us?
 8   A.    Sure. That's not a problem.
 9   Q.    Who would be the best person to contact there?
10   A.    I don't think they like me very much. That's
11         the problem. Eggert would probably be the one
12         because Eggert has no axe to grind. Pinta
13         wouldn't be so happy to do anything that
14         involved me.
15   Q.    Do you acknowledge that this is an affidavit
16         that was prepared --
17   A.    Yes, absolutely. I signed and dated that.
18   Q.    Do you acknowledge this is an affidavit
19         prepared by Ms. Scapicchio for you to execute
20         for the purposes of the motion for new trial
21         hearing?
22              MS. SCAPICCHIO: Objection.
23   A.    As I said before, I don't know who prepared it.
24   Q.    Is it fair to say it wasn't David Meier or the
```

## Page 147

```
 1         Commonwealth of Massachusetts that prepared
 2         this affidavit?
 3   A.    It was not David Meier and the Commonwealth of
 4         Massachusetts.
 5   Q.    If it was not David Meier and the Commonwealth
 6         of Massachusetts or your office --
 7   A.    It would have been Ms. Scapicchio's office.
 8   Q.    Is it fair to say that you reviewed the
 9         affidavit and signed it?
10   A.    Yes, I did.
11   Q.    At the time you executed this affidavit, you
12         believed it to be accurate?
13   A.    That's correct.
14   Q.    Is it fair to say you didn't have the luxury of
15         viewing your file?
16   A.    No. I had the luxury of reviewing documents
17         that Mr. Meier had in his file. One of those
18         documents, I believe, was a letter that I had
19         drafted just prior to trial to Mr. Beauchesne.
20   Q.    I'm talking about when you executed this, not
21         at the hearing, you did not have the luxury of
22         reviewing the documents, witness statements or
23         any correspondence?
24   A.    I didn't have any.
```

**148**

Q. Based on the time of your willingness to cooperate in Shawn Drumgold seeking a new trial, you read this, believed it to be accurate, and executed it?
A. That's correct.
Q. Subsequent to that you were produced and provided transcripts and correspondence that determined that you, in fact, had in your possession Olisa Graham's statement?
A. My memory is that prior to the beginning of the actual hearing Mr. Meier was a gentleman and said, Look, Steve, take a look at this. I said, Oh, I guess I was wrong.
Q. When you were shown by Mr. Meier the correspondence of Phil Beauchesne and letter from Phil Beauchesne, that verified that, in fact, you were aware of Olisa Graham and you were aware that she supported Shawn Drumgold's alibi?
   MS. SCAPICCHIO: Objection.
A. Obviously I was aware of Olisa Graham. If Mr. Beauchesne sent me a tape, I listened to the tape. At some point I was aware of Olisa Graham. I don't remember what she said.

**149**

That's why I said when you said the part about it supported Drumgold's alibi I don't remember the substance.
Q. Prior to the trial you were in possession of Olisa Graham's transcribed statement and tape of that statement?
A. I believe so.
Q. As supported by correspondence from you to Phil Beauchesne and from Phil Beauchesne to you?
A. Yeah. As we sit here today, I agree with the statement that I had that information.
Q. As you sit here today, you agree that any statement that was provided to you you read and listened to the tape?
A. Correct.
Q. If the substance of that statement supported Shawn Drumgold's alibi at the time of the trial, you acknowledge that you had that information relative --
   MS. SCAPICCHIO: Objection.
Q. -- to Olisa Graham supporting the alibi of Shawn Drumgold?
   MS. SCAPICCHIO: Objection.

**150**

A. Yeah. A flows to B flows to C, but getting back into whether or not at that point -- whether or not at trial I would present it, if Olisa Graham was associated with Terrance Taylor that would have been -- I imagine that would have been a reason why I would not have presented it.
Q. In fact, if she was a resident or associated with 23 Sonoma Street, you would not have called her?
   MS. SCAPICCHIO: Objection.
A. Probably correct, but, again, after Terrance Taylor took the action that he took.
Q. During the course of the trial, all counsel at the request of Alberti were coordinating the trial witnesses and subpoenas and summonses?
   MS. SCAPICCHIO: Objection.
A. As I've stated before, we tried to work together.
Q. In fact, any trial subpoenas that were issued were on some occasions joint subpoenas for witnesses because you shared a common witness?
   MS. SCAPICCHIO: Objection.
A. I think that occurred on some of the witnesses.

**151**

Q. Did the Commonwealth call any rebuttal --
A. I don't remember.
Q. -- witnesses?
A. I don't remember. They may have.
Q. Do you recall whether or not you rested on the last day, October 11th, or on the morning when you did your closing arguments on the 12th?
A. My memory -- my best memory is that the case closed and we argued the following day because, as I recall, there would have been a charge conference, a number of things that would have occurred before closing arguments.
Q. Do you recall whether or not Alberti held the charge conference before any of the evidence rested as some judges will do during the course of the trial when there's a break in witnesses?
A. My best memory is that did not happen, that it was at the end of the case, but again --
Q. There was no record of the charge conference, correct?
A. I don't know.
Q. Was it done in chambers without a stenographer?
A. I thought it was done in open court. But if it was done in chambers -- Judge Alberti did have

**152**

Mr. Drumgold in chambers I know during post-trial proceedings. I don't know whether -- I would hope that Mr. Drumgold would have been there.
Q. Do you have any memory of any time during the course of the trial indicating to the Court or to Mr. Beauchesne would you issue a summons to appear to any particular civilian witness?
A. I don't remember specifically.
   (Exhibit No. 60, Subpoena, marked for Identification.)
Q. Showing you what's been marked as Exhibit 60.
A. (Perusing document) I don't remember ever seeing this before. I don't know when it was issued. I don't know who it was -- I don't know at whose request it was issued. Maybe it was mine, but I don't know.
Q. For the record, Exhibit No. 60 is a copy of a summons or subpoena that was issued to Lisa Graham to appear for Wednesday, October 11th, in the matter of Commonwealth v. Shawn Drumgold. Do you acknowledge that's what this document is?
A. That's what it purports to be.

**153**

Q. In fact, this was a document that was provided in the course of discovery from the Suffolk County District Attorney's office that's Bate stamped 3002. Do you acknowledge that someone involved in the trial of Commonwealth v. Shawn Drumgold wished to call Lisa Graham and, in fact, issued this summons?
A. I have no memory of the issuance of that summons. I look at it and it says, Call Mr. Beauchesne. But I just don't know.
Q. Again, relative to Lisa Graham and her residence at 23 Sonoma Street, did you make a conscious decision to avoid calling those alibi witnesses based on strategy?
   MS. SCAPICCHIO: Objection.
A. I don't have a distinct memory as to what my thought process was with regard to Lisa Graham. However, as I said before, considering the fact that the people at 23 Sonoma Street were closer to Taylor than they were to Drumgold once Taylor asserted his Fifth Amendment privilege I would have been very wary about calling anyone from 23 Sonoma Street.
   (Exhibit No. 61, Portion of Testimony,

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333