UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SHAWN DRUMGOLD, )<br>)<br>          Plaintiff, )<br>)<br>     v. )<br>)<br>CITY OF BOSTON, ET AL., )<br>)<br>          Defendant. ) | CIVIL ACTION<br>NO.  04-CV-11193-NG |

**MEMORANDUM OF LAW OF RICHARD LEHR IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL**

### I.    INTRODUCTION

The plaintiff Shawn Drumgold ("Drumgold") was convicted in October 1989 of the first-degree murder of twelve-year-old Tiffany Moore. After spending over fifteen years in prison, Drumgold was released in November 2003, when the Commonwealth determined that the interests of justice required the entry of a nolle prosequi.

In May 2003, six months before the Commonwealth's decision to nolle pross Drumgold's conviction, The Boston Globe published three articles written by Richard Lehr ("Lehr") about the Drumgold case. As the City's moving papers assert, Lehr's articles raised serious issues about the fairness of the Drumgold prosecution. Although the Commonwealth's decision that Drumgold's conviction should not stand presumably was based on the evidence -- not on Lehr's newspaper articles -- the City now claims that it cannot defend against Drumgold's civil claims for police misconduct without obtaining Lehr's testimony.

The City's position mistakenly equates Lehr's journalistic work product with the evidence on which the Commonwealth first based its case against Drumgold

and, fifteen years later, based its decision to vacate his conviction. All of that evidence is readily available to the City and is admissible without Lehr's testimony. In addition, compelling Lehr's testimony would undermine the First Amendment protections that enabled him to inform the public about what the Commonwealth itself later determined was an unjust conviction. Under these circumstances, the City's motion to compel should be denied, and Lehr's cross-motion for a protective order granted.

Alternatively, the court should defer ruling on the City's motion to compel until after summary judgment motions have been decided (as to which Lehr's testimony bears no conceivable relevance). If the case ultimately proceeds to trial, the court should await the development of a more complete factual record before ruling on the City's motion, which raises, in addition to First Amendment concerns, significant evidentiary issues under Fed. R. Ev. 608(b) and 613(b).

## II.  ARGUMENT

### A. The First Amendment and Federal Common Law Protect the Press From Unnecessary Intrusions into the Newsgathering Process.

The First Circuit repeatedly has held that those who gather and disseminate newsworthy information to the public are entitled to qualified protections against compelled testimony concerning the newsgathering process. See Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 596, 598-99 (1st Cir. 1980) ("we find the 'special procedures' suitable for this case to be the application of Fed.R.Civ. P. 26 ('General Provisions Governing Discovery') with a heightened sensitivity to any First Amendment implication that might result from the compelled disclosure of sources"). See also In re Cusumano, 162 F.3d 708, 714 (1st Cir. 1998); United States v. LaRouche Campaign, 841 F.2d 1176, 1182 (1st Cir. 1988). Constitutional and federal common law principles therefore require courts to "balance the potential harm to the free flow of information that might result against the asserted need for

the requested information." Bruno & Stillman, 633 F.2d at 595-96; Cusumano, 162 F.3d at 716; LaRouche, 841 F.2d at 1181.[1/]

Bruno & Stillman, for example, held that a party to a civil case seeking to compel a journalist to disclose a confidential source must establish the direct relevance of the desired information and that the request is more than a "fishing expedition." 633 F.2d at 596-97. Applying that standard, the court reversed an order compelling the disclosure of sources based on an insufficient showing that the sources truly were relevant to the plaintiff's claims. 633 F.2d at 599. Simply because the claims were not frivolous, observed the court, "does not terminate the sensitive balancing process" required. 633 F.2d at 599 n.17. Observing that the "values resident in the protection of the confidential sources of newsmen certainly point towards compelled disclosure from the newsman himself as normally the end, and not the beginning, of the inquiry," the court also directed trial courts to consider less drastic alternatives to compulsory disclosure such as whether alternative sources of the information sought exist. 633 F.2d at 598, quoting Carey v. Hume, 492 F.2d 631, 638, 714 (D.C. Cir. 1974) (taking as many as 60 depositions might be a reasonable alternative to compelling disclosure of a confidential source).

The protections afforded the newsgathering process are not limited to cases involving confidential sources. In Cusumano, for example, the First Circuit affirmed a trial court's order denying discovery requested by Microsoft in the government's antitrust case against the company. 162 F.3d 708. After learning

---

[1/]See generally Branzburg v. Hayes, 408 U.S. 665, 681 (1972) ("Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out news, freedom of the press could be eviscerated."); id. at 710 (Powell, J., concurring) ("The asserted claim to privilege should be judged on its facts by the striking of the proper balance between the freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct.").

that two authors were writing a book in which employees of a Microsoft competitor were quoted as attributing their company's economic problems to "self-inflicted wounds" rather than to anti-competitive behavior, Microsoft subpoenaed the authors' notes and tape recordings concerning the interviews. Reviewing the trial court's order quashing the subpoena, the Cusumano Court found that Microsoft's need for the subpoenaed materials "admittedly is substantial in the sense that relevant information likely exists" concerning the company's "primary defense." 162 F.3d at 716. Nevertheless, because Microsoft could have obtained the same information by direct discovery of the interviewees, and in view of the fact that forced disclosure would harm the future research efforts of the authors and other similarly situated persons, the First Circuit held that the trial court "balanced the right array of factors, and acted well within its discretion in determining that the scales tipped in favor of preserving confidentiality." 162 F.3d at 717. See also Herbert v. Lando, 441 U.S. 153, 174 (1979) ("There is no law that subjects the editorial process to private or official examination merely to satisfy curiosity or to serve some general end such as the public interest; and if there were, it would not survive constitutional scrutiny as the First Amendment is presently construed.").

The inherent dangers of compelling reporters to testify -- even as to non-confidential work product -- were further elucidated by the First Circuit in LaRouche. The LaRouche Court explained that routinely allowing such requests threatens at least four legitimate newsgathering interests: (1) the risk of "'judicial intrusion' into the newsgathering . . . process"; (2) "the disadvantage of a journalist appearing to be . . . a research tool of . . . a private party"; (3) creating a "the disincentive to 'compile and preserve non-broadcast material'"; and (4) "the burden on journalists' time and resources in responding to subpoenas." United States v.

- 4 -

LaRouche Campaign, 841 F.2d 1176, 1182 (1st Cir. 1988). In the court's words:

> To the extent that compelled disclosure becomes commonplace, it seems likely indeed that internal policies of destruction of materials may be devised and choices as to subject matter made, which could be keyed to avoiding disclosure requests or compliance therewith rather than to the basic function of providing news and comment. . . . frequency of subpoenas would not only preempt the otherwise productive time of journalists and other employees, but measurably increase expenditures for legal fees.

Id.[2/] See also United States v. Shay, 21 Media L. Rep. 1415, 1993 U.S. Dist. LEXIS 4438 (D. Mass. 1993) (denying pre-trial motion to compel local TV station to produce videotape of interview with defendant); United States v. Shay, 1993 U.S. Dist. LEXIS 9172 (D. Mass. 1993) (granting prosecution's motion in same case only after it became apparent that the case would proceed to trial).[3]

The balancing process required by the First Circuit thus includes consideration of the following factors:

1.  Whether the party seeking disclosure has met its burden of demonstrating that the information sought is truly relevant, that jury issues exist on the essential elements of its case not the subject of the requested discovery, and that its request "is not a pretense for using discovery powers in a fishing expedition." Bruno & Stillman, 633 F.2d at 597; Cusumano, 162 F.3d at 716.

---

[2/] Because the evidence at issue in LaRouche was found to be relevant and admissible and concerned a key prosecution witness, the trial court's discovery order was affirmed as within its discretion. 841 F.2d at 1179-1180.

[3] Applying similar principles, several other courts have held that even when non-confidential information is at issue, the interests of a free press require that a party seeking information from a news organization make a substantial showing of need before a court should require disclosure. See, e.g., Gonzales v. Nat'l Broadcasting Co., Inc., 194 F.3d 29, 30 (2d Cir. 1999); Shoen v. Shoen, 48 F.3d 412, 414-415 (9th Cir. 1995); United States v. Cuthbertson, 630 F.3d 139, 147 (3d Cir. 1980); Kurzynski v. Spaeth, 538 N.W.2d 554, 559 (Wis. 1995).

2.      If the party seeking disclosure meets its initial burden, the court next considers whether the objecting party has shown a basis for withholding the information, as for example, by demonstrating either a reasonable expectation of confidentiality or the prospect of other harm that would result from disclosure. Bruno & Stillman, 633 F.2d at 597; Cusumano, 162 F.3d at 716. See also Larouche, 841 F.2d at 1182. See generally Herbert v. Lando, 441 U.S. 153, 174 (1979).

3.      Finally, the court considers whether the asserted interest in disclosure outweighs the resulting harm to the free flow of information and whether the competing interests may be accommodated by measures such as requiring the exhaustion of alternative sources or deferring disclosure until after summary judgment has been decided or until trial. Bruno & Stillman, 633 F.2d at 597-98; Cusumano, 162 F.3d at 716-17. See also United States v. Shay, 21 Media L. Rep. 1415, 1993 WL 128728 (D. Mass. 1993).

Moreover, in a case such as this one where discovery is sought from a non-party witness, "concern for the unwarranted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs." Cusumano, 162 F.3d at 717. In addition, "[w]hile obviously the discretion of the trial judge has wide scope, it is a discretion informed by an awareness of First Amendment values and the precedential effect which decision in any one case would be likely to have." Bruno & Stillman, 633 F.2d at 598. "Mindful that important First Amendment values are at stake," id. at 710, "detailed findings of fact and explanation of the decision would be appropriate." Bruno & Stillman, 633 F.2d at 598.[4]

---

[4] Nothing in In re Special Proceedings, 373 F.3d 37 (1st Cir. 2004) alters the legal standard governing attempts to compel a reporter's testimony. The Special Proceedings Court simply held that a subpoena issued by a special prosecutor triggers the same considerations as the grand jury subpoenas at issue in Branzburg

(Footnote Continued on Next Page.)

### B. The City Has Failed to Demonstrate Any Compelling Need for Lehr's Testimony.

According to the City, it seeks to depose Lehr for the following reasons:

> (1) [T]o obtain his notes of interviews with named (i.e., non-confidential) sources, so that any prior inconsistent statements can be identified; (2) to obtain his notes of interviews with witnesses who provided information but are not identified; (3) to obtain information from him regarding the sources of his information that suggested police or prosecutorial misconduct had occurred in the criminal case; (4) to obtain from him any description that he may have provided to the fact witnesses (named and un-named) in this case.

City's Mem. at 3-4.

In support of this sweeping request for information concerning confidential and non-confidential sources and unpublished journalistic work product, the City cites the testimony of only four potential witnesses: Michelle Graham Payne, Vantrell McPherson, Ricky Evans, and Olisa Graham. An examination of the record concerning each of these witnesses demonstrates that the City's defense is not at all dependent on Lehr's testimony, particularly at this juncture of the case. Indeed, whether Lehr's testimony might ever have any potential relevance cannot properly be decided until after summary judgment motions are decided and, should a trial eventually occur, the witnesses the City seeks to impeach have testified. See generally Fed. R. Ev. 608(b) and 613(b); United States v. Winchenbach, 197 F.3d 548, 557-59 (1st Cir. 1999). Accordingly, the City's request to depose Lehr as part of pre-trial discovery should be denied.

---

(Footnote Continued from Previous Page.)

and that, on the facts presented in that case, the evidence sought was "highly relevant to a good faith criminal investigation" and followed "reasonable efforts were made to obtain the information elsewhere." 373 F.3d at 45. This case is not, of course, a grand jury proceeding or a criminal case and, as shown below, the City cannot demonstrate any need for Lehr's testimony.

### 1.     Michelle Graham Payne

The City claims that it is "especially striking" that at least one of the individuals that Drumgold claimed to have been with at the time of his shooting, Michelle Graham Payne, was the girlfriend of his co-defendant, Terrance Taylor ("Taylor"). City Mem. at 11. According to the City, if Drumgold's alibi were true, he would have been able to identify Taylor's girlfriend as an alibi witness, "[h]owever, Lehr appears to be the only person who was able to elicit these allegations of coercion." Id.

What the City fails to address is that none of Lehr's articles mentioned Payne or cited her potentially exculpatory testimony as in any way relevant to the fairness of Drumgold's conviction. Payne's potential testimony therefore presents absolutely no basis on which to compel Lehr to testify about his journalistic work product.

### 2.     Vantrell McPherson

McPherson testified at Drumgold's trial and at the hearing on his motion for a new trial. City Mem. at 4-5. She also had at least one taped interview with the Commonwealth during the Moore investigation and executed an affidavit prior to her testimony at the new trial hearing. City Mem. Ex. A at 10; Ex. G at 22-24. The City has complete access to these prior statements by McPherson, as well as her deposition in this case. City Mem. at 5.

At trial, McPherson testified that before the shooting she heard Drumgold's co-defendant Taylor say to Drumgold, "Come on, Shawn, you know that we got to do this." City Mem. Ex. A at 10. In his May 4, 2003 article, Lehr reported that McPherson said her testimony was false and that she now claimed that "I don't remember anyone saying, 'Come on, Shawn, we got to do this.'" Id. Lehr reported that "McPherson said she did not even remember giving that testimony - because, she explained, she was 'so shook up' by the time she took the stand. During witness

preparation, she said, a member of the prosecution team berated her to the point of tears." Id. at 10-11.

During her deposition in this case, McPherson testified that before the hearing on Drumgold's motion for a new trial, Lehr appeared at her aunt's house and allegedly told her "what he knew," including that witnesses were changing their stories. Id. at 28. The City contends that it is entitled to know what Lehr said to McPherson during their conversation and how McPherson responded "in order to determine if her recantation is based on truth, on a desire to conform with the statements of others, or on any other basis that would affect her credibility." City Mem. at 5.

There already is an extensive record of testimony and official statements made by McPherson both before, during and after the Drumgold trial, all of which are well-known to the City. According to the City, there are obvious inconsistencies between what McPherson said at different times under oath and in statements to the police. See e.g., City Mem. at 11 ("witnesses have now given testimony that directly contradicts earlier testimony they had sworn to under oath"). In addition, the City notes that McPherson "was and has been unable to identify any police officer who 'coerced' her, claiming that she was yelled at by a 'fat man' in the courthouse prior to taking the stand. She has also failed to identify, or testify, that any member of the prosecutorial team -- prosecutor, police officer, witness advocate -- suggested or told her how to testify." Accordingly, by the City's own admission, there are multiple alternative sources of statements with which to impeach McPherson.

Moreover, if McPherson testifies at trial that she did not hear Taylor make an inculpatory statement to Drumgold (as the City apparently expects), her interview with Lehr would be a prior statement *consistent* with her trial testimony. Neither Rule 613(b) nor Rule 608(b) permit the admission of extrinsic evidence of

- 9 -

such statements by non-parties. See Fed. R. Ev. 613(b) ("Extrinsic evidence of a prior *inconsistent* statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.") (emphasis added); Fed. R. Ev. 608(b) ("Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence.").[5]

Finally, to the extent the City wishes to prove that McPherson's testimony was influenced by her contacts with third parties, Lehr's testimony is far from essential. In her deposition, McPherson testified that her aunt was present when she spoke to Lehr and that before the hearing on Drumgold's motion for a new trial she also spoke to two unnamed investigators, as well as counsel to Drumgold. City Mem. Ex. G at 20-21, 28. There is, in short, nothing that demonstrates that Lehr's testimony would be useful, let alone necessary, to the City's anticipated defense.[6]

### 3. Ricky Evans

Ricky Evans testified at Drumgold's trial that he saw Drumgold and Taylor carrying firearms before the shooting and heard them make incriminating statements. City Mem. at 5. Lehr reported in the May 4, 2003 article that Evans stood by his testimony, and denied any coercion. Id. at 5-6. When called as a

---

[5] See also Fed. R. Ev. 801(d)(1)(B) (permitting evidence of statements *consistent* with witness's testimony if "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive").

[6] As of the date the City's motion was filed, McPherson had failed to appear for the second day of her deposition. City's Mem. at 8. Because her testimony is the predicate for the City's argument that Lehr should be compelled to testify, McPherson's deposition should be concluded before any ruling is made with respect to Lehr's testimony.

witness at the hearing on Drumgold's motion for a new trial, however, Evans claimed both coercion and that rewards were given to him in exchange for false testimony. Id.

The City argues that it needs Lehr's testimony to determine whether Evans "lied to Lehr or to the Court, either at the original trial or at the hearing on the motion for a new trial." City Mem. at 6. How Lehr's testimony could accomplish such a task is left completely unclear. The City already has the ability to impeach Evans with his initial trial testimony, as it surely intends to do. Because those prior statements are under oath, they are admissible both to impeach and for the truth of the matters asserted. Fed. R. Ev. 801(d)(1)(A). The fact that Evans failed to recant his prior testimony in an unsworn conversation with a reporter whom he had never previously met is, at best, a collateral matter that is cumulative of other evidence. Here too, the City's myopic fascination with Lehr's investigation has skewed its assessment of the legitimate scope of impeachment which, in any event, cannot be truly assessed prior to Evan's testimony at trial. See Fed. R. Ev. 613(b) (witness must be "afforded an opportunity to explain or deny" prior statement and the opposite party "afforded an opportunity to interrogate the witness thereon" before admission of extrinsic evidence of prior inconsistent statement); see also Winchenbach, 197 F.3d at 559 ("Inasmuch as [the witness] was afforded an opportunity to explain or deny the prior inconsistent statement and the appellant had a chance to interrogate him about it, the conditions for the operation of Rule 613(b) were fully satisfied.").

    4.    **Olisa Graham**

Lehr reported that Olisa Graham was a potential alibi witness on behalf of Drumgold who said she was "frightened out of testifying on his behalf because she was threatened with arrest in a telephone conversation with an unnamed and unidentified man." City Mem. at 6. As the City concedes, however, after initially

denying knowledge of Graham's potential testimony, Drumgold's criminal defense counsel has acknowledged that prior to trial the Commonwealth disclosed her identity as an alibi witness and produced a taped statement she had given to authorities. City Mem. at 6. Under these circumstances, the City's argument that "the apparent ignorance of Drumgold's defense team as to Graham's identity and the alleged threats that were made to prevent her from testifying raise legitimate questions about how Lehr was able to identify her when they apparently were not" is a non sequitur. Id. at 6-7. The undisputed record is that defense counsel knew of Graham before trial, chose not to call her as a witness, and has acknowledged that his earlier statement to the contrary was in error. The City also has not shown how Graham's statements to Lehr are inconsistent with her anticipated testimony or might otherwise satisfy the requirements of Rule 613(b).[7] Under these circumstances, the City has failed to show how or why it needs Lehr's testimony to impeach Graham.

### C. The Harm to the Free Flow of Information Outweighs the Speculative Value of Lehr's Testimony.

Balanced against the City's attenuated need for Lehr's testimony is the harm that would result should he be forced to testify. The City's papers make it clear that it intends a sweeping inquiry into Lehr's journalistic sources and processes, including notes of interviews with persons who "who provided information but are not identified" in Lehr's articles; any information regarding sources who "suggested police or prosecutorial misconduct had occurred;" and any information Lehr

---

[7] Like McPherson, as of the time the City's motion to compel was filed, Graham had failed to appear for the second day of her deposition. Because her testimony is the predicate for the City's argument that Lehr should be compelled to testify, Graham's deposition should be concluded before any ruling is made with respect to Lehr's testimony.

provided to "named and unnamed witnesses" in this case. City Mem. at 3-4. The City has failed to demonstrate any need for such an extensive intrusion into the newsgathering process, particularly given the attenuated relationship of Lehr's potential testimony to this case and the abundance of alternative (and superior) impeachment sources.

On the other side of the equation, as in Cusumano, the First Amendment "pan of the scale is brim-full." 162 F.3d at 717. As a non-party to this litigation, Lehr's interests are entitled to "special weight." Cusumano, 162 F.3d at 717. Those interests include (1) the risk of "'judicial intrusion' into [Lehr's] newsgathering . . . process"; (2) "the disadvantage of [Lehr] appearing to be . . . a research tool of . . . a private party"; (3) the dangers of creating a "the disincentive to 'compile and preserve non-[published] material'"; and (4) "the burden on [Lehr's] time and resources in responding to subpoenas." LaRouche, 841 F.2d at 1182. In short, Lehr's continued ability to freely and independently gather news, his relationships with past, present and future sources, and his ability to objectively cover this case, all would be jeopardized were he forced to testify. Under these circumstances, "the potential harm to the free flow of information that might result [from compelling Lehr's testimony" [far outweighs] the asserted need for the requested information." Bruno & Stillman, 633 F.2d at 595-96.

The City mistakenly argues that because Drumgold's criminal defense team considered Lehr's investigation and news reporting helpful to their efforts to obtain a new trial, Lehr should be considered an agent of the plaintiff's case and therefore exempt from the protections afforded journalists against unnecessary intrusions into the newsgathering process. See City's Mem. at 3. There is no legal support for the City's argument. The fact that Lehr's journalism illustrated the principle that "[a] responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field," does not make Lehr an

- 13 -

agent for either the prosecution or the defense.  Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 560 (1976) (internal quotation and citation omitted).  After all, the Commonwealth's decision to nolle pross the Drumgold case presumably was made in the interests of justice.[8]  To the extent that Lehr's journalism was in any way supportive of the Commonwealth's decision surely does not make him an agent of the prosecution.  Similarly, statements by defense counsel about the benefits of the press investigating perceived injustices in the Drumgold case do not transform Lehr into a private investigator on behalf of the plaintiff for the purposes of discovery.

The City also mistakenly argues that Lehr's participation in a documentary about the Drumgold case waives his First Amendment rights to protect his sources and journalistic work product.  This argument simply proves too much.  The constitutional protections for newsgathering are designed to ensure the free flow of information to the public.  If the act of news reporting and commentary -- whether in print or broadcast media -- vitiated those constitutional protections, it would undermine the very purpose for which those protections exist.

### D. The City's Motion Is Premature.

As a practical matter, there are compelling additional reasons favoring the denial of the City's motion to compel at this stage of these proceedings.  Summary judgment motions have not yet been filed or ruled upon.  Until those motions are decided, granting the plaintiffs' motion to compel risks the needless disclosure of confidential information.  See Bruno & Stillman, 633 F.2d at 597, 598.  Moreover, as Judge Zobel ruled in the context of a prosecutor's request for non-confidential

---

[8] As the District Attorney stated shortly after Drumgold was released: "What I hope the public saw was my office's commitment to fairness and our willingness to do what is right based on objective factual and legal analysis."  See Boston Globe, Letters to the Editor, Daniel F. Conley, 2003 WLNR 3478701 (November 15, 2003).

journalistic materials, the mere uncertainty as to whether a case actually will be tried or whether it instead will be voluntarily resolved by the parties is ample ground to defer granting a motion to compel. <u>Shay</u>, 21 Media L. Rep. 1415, 1993 WL 128728 (D. Mass. 1993); <u>Shay</u>, 1993 U.S. Dist. LEXIS 9172 (1993) (granting prosecution's motion in same case only after it became apparent that case would proceed to trial).

In sum, even assuming that City ever could meet its burden of proving that the Lehr's testimony is truly essential to its defense, practical considerations such as the existence of alternative impeachment sources, the prospects for summary judgment, and the inherent uncertainty as to trial, all tip the scales in favor of non-disclosure. On these independent grounds, therefore, plaintiffs' motion to compel should be denied and Lehr's motion for a protective order be allowed.

## III. CONCLUSION

For each and all of the foregoing reasons, Richard Lehr respectfully requests that the City's motion to compel be denied and that his motion for a protective order be granted.

**RICHARD LEHR,**

By his attorneys,

/s/ Jonathan M. Albano, BBO #013850
Jonathan M. Albano, BBO #013850
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110-1726
(617) 951-8000

Dated: January 10, 2007

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 10, 2007.

/s/ Jonathan M. Albano, BBO #013850