**Page 1**

Volume: I
Pages: 1 - 41
Exhibits: See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-11193NG

---

SHAWN DRUMGOLD,
    PLAINTIFF
VS.
TIMOTHY CALLAHAN, ET AL,
    DEFENDANTS

---

DEPOSITION of JOHN DALEY, a witness called on behalf of the Plaintiff, pursuant to the provisions of the Federal Rules of Civil Procedure, before Nancy M. Walsh, Certified Shorthand Reporter (#118593)/Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the law office of Tommasino & Tommasino, Two Center Plaza, Boston, Massachusetts 02108, on Wednesday, November 15, 2006, commencing at 2:06 p.m.

NANCY M. WALSH
COURT REPORTING SERVICES
131 CRANE STREET
DEDHAM, MASSACHUSETTS 02026
TELEPHONE (781) 326-5062
FAX (781) 326-5072

**Page 2**

APPEARANCES:

Michael W. Reilly, Esquire
Tommasino & Tommasino
Two Center Plaza
Boston, Massachusetts 02108
and
Rosemary Curran Scapicchio, Esquire
Four Longfellow Place
Boston, Massachusetts 02114
    Attorneys for the Plaintiff

Laura M. Raisty, Esquire
Morgan, Brown & Joy, LLP
200 State Street
Boston, Massachusetts 02109-2605
    Attorney for the Defendant,
    Timothy Callahan

Hugh R. Curran, Esquire
Bonner Kiernan Trebach & Crociata, LLP
One Liberty Square
Boston, Massachusetts 02109
    Attorney for the Defendant,
    Richard Walsh

John P. Roache, Esquire
and Patrick J. Donnelly, Esquire
Roache & Malone, LLP
66 Long Wharf
Boston, Massachusetts 02110
    Attorney for the Defendants,
    City of Boston and Francis M. Roache

William M. White, Jr., Esquire
Davis, Robinson & White, LLP
One Faneuil Hall Marketplace
Boston, Massachusetts 02109
    Attorney for the Defendant,
    Estate of Paul Murphy

**Page 3**

INDEX

WITNESS                              DIRECT
JOHN DALEY
    BY MR. REILLY                       5

EXHIBITS
No.       Description             Page
        - NO EXHIBITS MARKED -

**Page 4**

PROCEEDINGS

    MR. REILLY: Read and sign within 30 days, waive notary.

    MR. DONNELLY: Yes.

    MR. REILLY: Same stipulations?

    MR. DONNELLY: Yes.

    MR. REILLY: I'll note for the record that we had testimony this morning about BIS documents. I'm going to be making a request for those documents. And I'm going forward today with today's deposition but with the understanding that if there are documents which there may have been from that testimony which haven't been produced, I may have to reopen depositions based on those documents.

    MR. CURRAN: Depositions of who?

    MR. REILLY: For example, Mr. Daley.

    MR. CURRAN: Clearly one of the issues -- we have Walsh on for Monday. One of the issues we talked about before is I want all the documents before. I don't want to have to keep dragging him back here three, four times. And you indicated you need one more full day. But one of the issues I said last time, and you agreed, we need the documents that were marked as exhibits in

**Page 5**

1   this matter at trial and at Motion For New Trial that are
2   in the custody of the Attorney General's office. I
3   prefer, and we can talk about it after this depo, that we
4   have all those records before we bring Walsh in.
5           MR. REILLY: We can talk about it. I will
6   send a request to Mr. Roache this afternoon or tomorrow
7   morning. And given the deadlines that we're all under,
8   you know, we'll request as prompt a turnaround as we can
9   on those issues.
10          MS. SCAPICCHIO: We haven't heard anything on
11  the AG's response?
12          MR. REILLY: No. I'll also call him. Those
13  were promised last week.
14          MR. CURRAN: Couldn't have been clearer on my
15  position.
16          MR. REILLY: The AG's position was very clear
17  which was, yes, you're entitled to them, I'll produce
18  them. It hasn't happened yet. That was ten days ago.
19          MR. CURRAN: If we can talk afterwards, too,
20  about the practical aspect of the looming scheduling
21  deadline.
22          MR. WHITE: We have a deadline day of
23  December the 8th?
24          MR. CURRAN: 6th.

**Page 6**

1           MR. REILLY: What's a couple of days between
2   friends.
3           MR. WHITE: We're a little behind on
4   completing all the depositions.
5           MR. REILLY: We can talk about that, but
6   let's get Mr. Daley out of here.
7           THE WITNESS: I might ask you to speak a
8   little louder.
9           JOHN DALEY,
10  a witness called for examination, having been
11  satisfactorily identified through proper identification
12  and through a Notary Public having duly sworn or affirmed
13  to tell the truth, testified as follows:
14
15  **DIRECT EXAMINATION BY MR. REILLY:**
16  Q  Could you tell me your name?
17  A  John Daley.
18  Q  And where do you live, Mr. Daley?
19  A  I live at 64 Flames Road in Marshfield, Mass., 02050.
20  Q  How long have you lived there?
21  A  Probably 30 years.
22  Q  Who do you live there with?
23  A  Excuse me?
24  Q  Who do you live there with?

**Page 7**

1   A  I live with my wife.
2   Q  And are you employed?
3   A  Not anymore.
4   Q  And you're retired from the Boston Police Department?
5   A  Yes.
6   Q  When did you start with the Boston Police Department?
7   A  In November of 1951.
8   Q  And did you start as a patrolman?
9   A  Yes.
10  Q  And how long were you a patrolman?
11  A  Probably around ten years.
12  Q  And what was the next job you had?
13  A  I was a sergeant.
14  Q  And where were you a sergeant?
15  A  I was a sergeant in Brighton, Station 14, and then I went
16     to Station 1 in the North End. Then I went to District
17     11 in Dorchester. And at some point there, I made
18     sergeant. I'm not quite sure of the date, but I'm going
19     to guess '61 -- maybe '61 or '62 I made sergeant, and
20     that's when I went to 11 when I made sergeant. I'm not
21     quite sure of the scenario.
22  Q  What was the next rank you had after sergeant?
23  A  Lieutenant.
24  Q  When was that?

**Page 8**

1   A  You know, I'm not quite sure. That would be a tough
2      answer for me without seeing the records.
3   Q  When you became lieutenant, where were you assigned?
4   A  My first assignment was in District 3 in Mattapan.
5   Q  What was the next assignment you had as a lieutenant?
6   A  District 2.
7   Q  How about after that?
8   A  From District 2, I went to an administrative job in Staff
9      Inspections.
10  Q  When was that that you went to the administrative job?
11  A  I would be guessing at dates, so I'm not quite sure.
12  Q  Are we in the '70s or the '80s? Where are we roughly?
13  A  I'd say in the low '80s.
14  Q  Were you still a lieutenant when you did the
15     administrative job?
16  A  Yes.
17  Q  What was the next job you had after that?
18  A  I went to homicide. I forgot a big period of my life as
19     a sergeant.
20  Q  Where was that?
21  A  I went to homicide, and I spent -- in 1969, and I was
22     there until 1975.
23  Q  What rank did you have when you were in homicide at that
24     time?

**Page 9**

| | | |
|---|---|---|
| 1 | A | I was a detective sergeant. |
| 2 | Q | Who was the commander of the unit then? |
| 3 | A | Edward Sherry. |
| 4 | Q | When you were a detective sergeant in the Homicide Unit, |
| 5 | | did you have any formal training in homicide |
| 6 | | investigations? |
| 7 | A | Let me see, I don't think I did. |
| 8 | Q | When was it that you became the commander of the Homicide |
| 9 | | Unit? |
| 10 | A | Once again, please? |
| 11 | Q | When did you become the commander of the Homicide Unit? |
| 12 | A | In April of 1985. |
| 13 | Q | And who did you take over from? |
| 14 | A | I don't remember. |
| 15 | Q | Did you continue -- how long did you continue as the |
| 16 | | commander from April of '85? |
| 17 | A | About three and a half years. |
| 18 | Q | And who took over from you? |
| 19 | A | Eddie McNelley. |
| 20 | Q | When did you stop as the commander of the Homicide Unit? |
| 21 | A | In August of 1989. |
| 22 | Q | Were you the head of the Homicide Unit when Tiffany Moore |
| 23 | | was murdered? |
| 24 | A | I was. |

**Page 10**

| | | |
|---|---|---|
| 1 | Q | And how many detectives did you have in your unit in |
| 2 | | August of 1988? |
| 3 | A | The best I can do is guess. I have no memory. |
| 4 | | MR. DONNELLY: Don't guess. |
| 5 | Q | Can you give me an approximation? |
| 6 | A | Maybe 12. That really is a speculative figure. |
| 7 | Q | How were they organized? |
| 8 | A | They were organized in teams with a sergeant. |
| 9 | Q | How many in each team? |
| 10 | A | It would vary, but usually it was two with each team. |
| 11 | Q | That would be a sergeant and a detective? |
| 12 | A | A sergeant and a couple of detectives. |
| 13 | Q | As the head of the Homicide Unit, were you responsible |
| 14 | | for arranging the training of the members of your unit? |
| 15 | A | Yes. |
| 16 | Q | And in 1988 and 1989, what kind of formal training was |
| 17 | | there for homicide detectives? |
| 18 | A | There was very little -- there were no schools for |
| 19 | | homicide trainings. But there were a few people who did |
| 20 | | that stuff, and one was a lieutenant detective from New |
| 21 | | York City named Vernon -- Vernon Geberth or something |
| 22 | | like that. I'm not sure of the last name. |
| 23 | Q | And did you have your detectives trained by that fellow? |
| 24 | A | Yes. |

**Page 11**

| | | |
|---|---|---|
| 1 | Q | And how did you go about arranging that? |
| 2 | A | I brought him to Boston. |
| 3 | Q | This Vernon Givens (phonetic)? |
| 4 | A | Yes. |
| 5 | Q | And how many occasions did you bring him to Boston? |
| 6 | A | I brought him once when I was there, and my memory is |
| 7 | | that everybody in homicide went to it. |
| 8 | Q | And did he run a seminar? |
| 9 | A | I suppose you could call it a seminar. |
| 10 | Q | How long a program did he run? |
| 11 | A | Maybe three days. I can't tell you. |
| 12 | Q | Was that held in Boston? |
| 13 | A | It was at a local college, but I have no memory of where |
| 14 | | it was. |
| 15 | Q | But in the local Boston area? |
| 16 | A | Yes. |
| 17 | Q | Do you remember when that was? |
| 18 | A | All I can do is make an estimate of 1988. |
| 19 | Q | All right. Did all of the members of the Homicide Unit |
| 20 | | go to that? |
| 21 | A | To my knowledge, they did. |
| 22 | Q | Did the fellow who ran that seminar give out any written |
| 23 | | materials? |
| 24 | A | He had a book. |

**Page 12**

| | | |
|---|---|---|
| 1 | Q | Do you remember the name of the book? |
| 2 | A | I can't remember the name, but it was certainly about the |
| 3 | | homicide investigation. That was the whole -- that's |
| 4 | | what the book was about. |
| 5 | Q | Did everybody who went to the seminar get a copy of the |
| 6 | | book? |
| 7 | A | I hope they did, but I don't know. |
| 8 | Q | Did you go to the seminar? |
| 9 | A | I never went to the seminar. |
| 10 | Q | Did you require that the Homicide Unit members go to the |
| 11 | | seminar? |
| 12 | A | I did. |
| 13 | Q | Do you remember any other formal homicide investigation |
| 14 | | training that was put on while you were head of the |
| 15 | | Homicide Unit? |
| 16 | A | Yes, there were other schools. I went to other schools. |
| 17 | Q | Do you remember where you went to other schools? |
| 18 | A | One was in New York with the New York State Police, and |
| 19 | | that was up in Albany or -- it was upstate New York. I'm |
| 20 | | not sure. |
| 21 | Q | Did you keep track anywhere in your records of the |
| 22 | | training that members of your unit had attended or taken? |
| 23 | A | Did I keep track of the records? |
| 24 | | THE WITNESS: Can I speak to you for a |

**13**

1  second?
2      MR. DONNELLY: Sure. Can we step outside for
3  a moment?
4      (A recess was taken at 2:18 p.m.)
5      (Resumed at 2:20 p.m.)
6  A  Once again the question?
7  Q  Did you keep any written records concerning the training
8     that members of your unit had?
9  A  We just talked about it a second ago.
10     MR. DONNELLY: If you don't understand the
11  question, you can ask him to repeat it.
12 A  I think I understand the question. I didn't keep any
13    records in homicide of the training they got.
14 Q  Were there records kept somewhere?
15 A  I don't think so. I don't know. I don't think so.
16 Q  Was there any way for you to find out what training one
17    of your members had had? How would you go about doing
18    that if you wanted to find that out?
19 A  I don't think there would be any records of any school or
20    of any department records. I'm not aware of any
21    department records of training.
22 Q  Was there any department regulations that required a
23    certain amount of training for homicide detectives?
24 A  No.

**14**

1  Q  Was there any formal procedure for you to evaluate the
2     work of members of your unit?
3  A  There was not a formal procedure, but it certainly was an
4     informal one.
5  Q  We'll get to that, but I want to start with formal. Was
6     there any formal procedure?
7  A  No.
8  Q  Did you do employee evaluations of members of your unit?
9  A  No.
10 Q  What was the informal procedure that you mentioned?
11 A  Well, one of them was how well you did on your cases. I
12    mean if you had a pretty good clearance rate and a good
13    conviction rate, that certainly was in your favor.
14 Q  And what's a clearance rate?
15 A  Well, a clearance rate was an FBI statistic of a handful
16    of crimes, major crimes, and the percentage of them that
17    were solved.
18 Q  And what constituted solving for purposes of a clearance
19    rate?
20 A  Well, there was more than one, but one of them certainly
21    was an arrest. Another category was exceptionally
22    cleared.
23 Q  What does that mean "exceptionally cleared"?
24 A  It meant that there was extenuating circumstances, or

**15**

1  there was something that the case just -- the suspect
2  couldn't be arrested for some reason, that no case could
3  be got together against an individual. In that case, it
4  was the exceptionally cleared.
5  Q  And did somebody keep track of clearance rates for the
6     individual detectives in your unit?
7  A  Well, I suppose I did.
8  Q  Did you do it -- did you write it down, or did you keep
9     track of it in your head?
10 A  Kept track of it in my head.
11 Q  You didn't have it written down anywhere?
12 A  Everything would be lumped together, but I was able to
13    pretty carefully understand what officers had the best
14    solution rates.
15 Q  When you said everything would be lumped together, there
16    would be a clearance rate calculated for the whole unit?
17 A  Yes.
18 Q  But not in writing; it wasn't broken down by team or by
19    individual?
20 A  No, no.
21 Q  It was teams that investigated the homicides, correct?
22 A  It was the team?
23 Q  Yes.
24 A  Yes.

**16**

1  Q  So the clearance rate would be determined by team; is
2     that fair?
3  A  Well, each team would contribute to the clearance rate,
4     yes.
5  Q  And you'd be able to tell which team had a higher or a
6     lower clearance rate than another team?
7      MR. CURRAN: Objection.
8  Q  Would that be fair?
9      MR. CURRAN: You can answer if you understand
10     the question.
11 A  Repeat that again.
12 Q  You could tell from keeping track in your own mind which
13    team had a higher or a lower clearance rate than another
14    team?
15 A  Pretty much so.
16 Q  But that wouldn't tell you which of the members of that
17    team was performing better or worse; would that be fair?
18     MR. WHITE: Objection.
19 A  No. The teams were very effective. If I could say two
20    people went out to do something and they both
21    accomplished it, did one do more than the other? I could
22    never --
23 Q  You wouldn't be able to tell?
24 A  No, I wouldn't be able to tell, of course not.

### Page 17

1  Q  You said the other way, informal way that you could
2     evaluate was conviction rates?
3  A  Arrest rates were one, too, and conviction rate.
4  Q  And was there any space where you kept track of
5     conviction rates in --
6  A  Yes.
7  Q  And how did you do that?
8  A  You know, I -- I can't answer the question. I don't know
9     how I did it.
10 Q  Did you do it in writing somewhere?
11 A  I don't know. I don't remember anyhow.
12 Q  Were there any other ways that you evaluated the
13    performance of the members of your unit other than their
14    arrest rates and their conviction rates?
15 A  Well, there were other ways, of course. Some people were
16    better workers than others. Some people were more
17    enthusiastic. Some people would volunteer to take a
18    case. And that always would influence my judgment.
19 Q  A better worker in what sense?
20 A  Excuse me?
21 Q  You said some people were better workers. Better workers
22    in what sense?
23 A  In all senses, they were enthusiastic and diligent.
24 Q  Were you ever asked to evaluate formally or in writing

### Page 18

1     the performance of the members of your unit?
2  A  No.
3  Q  When decisions about promotions were being made, was your
4     opinion solicited?
5  A  No.
6  Q  Was there any procedure whereby you would review the
7     status of ongoing investigations?
8  A  I would talk with all officers involved on every case, if
9     that's what you're asking.
10 Q  And that would just be part of your daily routine?
11 A  Yes.
12 Q  Was there any formal procedure whereby every certain
13    period of time or certain particular times you would sit
14    down on open cases and review them?
15 A  There was no formal procedure, but we did it all the
16    time.
17 Q  Were there ever meetings, full unit meetings?
18 A  Well, there weren't that many people there. And it was a
19    small office, a small floor, and we gathered many times
20    and talked over cases.
21 Q  As part of your day-to-day --
22 A  Yes.
23 Q  -- processing?
24 A  Yes.

### Page 19

1  Q  Do you remember the Tiffany Moore murder investigation?
2  A  I do.
3  Q  Be fair to say it was a fairly prominent case when it
4     happened?
5  A  It was a high-profile case.
6  Q  "High-profile" was the word I was looking for, thank you.
7     When did you first become aware of the murder?
8  A  I'm not sure of the day, but I think it may have been the
9     next day or the day after.
10 Q  Who decided which detectives would investigate that
11    murder?
12 A  It was decided by a schedule. It was just the schedule
13    was set up on a weekly basis where certain detectives and
14    detective sergeants were assigned to handle all cases
15    that came in.
16 Q  Who were the detectives assigned to investigate Tiffany
17    Moore?
18 A  Richie Walsh and Paul Murphy.
19 Q  At some point, did that change? Did the detectives
20    charged with investigating this murder change?
21           MR. CURRAN: Objection.
22           MR. WHITE: Objection.
23 A  Will you ask that question again?
24 Q  Sure. At some point, did the detectives charged with

### Page 20

1     investigating the Tiffany Moore murder change from Walsh
2     and Murphy to someone else?
3  A  To my knowledge?
4  Q  Yes.
5  A  No.
6  Q  Do you remember Detectives Callahan and McDonough taking
7     over the investigation of this case?
8  A  I don't.
9  Q  It doesn't ring any bells with you?
10 A  Once again?
11 Q  It doesn't ring any bells with you?
12 A  Yeah, and I know them both.
13 Q  Did you monitor Walsh and Murphy's investigation?
14           MR. CURRAN: Objection.
15           MR. WHITE: Objection.
16 A  Am I expected to answer that?
17 Q  Yes.
18 A  Yes.
19 Q  And how did you go about monitoring their investigation?
20 A  I talked with them.
21 Q  How frequently did you talk to them about this case?
22 A  At least twice.
23 Q  Do you remember the details of those conversations?
24 A  I do.

**Page 21**

1  Q  And what do you remember them saying to you?
2     MR. WHITE: Objection.
3     THE WITNESS: Can I speak to you again about
4     this?
5  Q  I let it go the first time, but you're not allowed when
6     there's a question pending. I'm entitled to the answer.
7     MR. CURRAN: If you recall, if you remember
8     anything. Don't guess.
9     MR. DONNELLY: Don't guess.
10 A  I do remember some of the conversation, yes.
11 Q  And what do you remember?
12 A  I remember talking to them either that morning or the
13    next morning. And we talked about the case, and they had
14    some targets. I'd have to look at the -- my own notes to
15    be sure.
16 Q  And what notes are those?
17 A  I had some notes of the conversation with them.
18 Q  Do you have them with you now?
19 A  I do.
20 Q  Could I see them?
21 A  Sure.
22    MR. CURRAN: Can you show them to your
23    attorney first?
24    THE WITNESS: It starts right here. This

**Page 22**

1  date is not accurate, but it starts right here
2  (indicating).
3     MR. DONNELLY: Can I step outside and review
4  these with him for a moment?
5     MS. SCAPICCHIO: I thought there was a
6  question pending.
7     MR. CURRAN: No question pending. I don't
8  know if -- you can keep it on the record. You have every
9  right to speak to your attorney. But if there's a
10 question that was asked, you have to answer any pending
11 question before you're allowed to speak to your attorney.
12    THE WITNESS: Thank you.
13    MR. CURRAN: That's the discussion of
14 everything going on here. But you have every right to
15 speak to him, that's just so you know.
16    MR. DONNELLY: Can we step outside?
17    MR. REILLY: Yes.
18    (A recess was taken at 2:33 p.m.)
19    (Resumed at 2:47 p.m.)
20    MR. DONNELLY: My understanding is you did
21 not subpoena any records from Mr. Daley.
22    MR. REILLY: That's correct.
23    MR. DONNELLY: Therefore, we are not
24 producing any of the documents that he has with him today

**Page 23**

1  or any journals or any other documents.
2     MR. REILLY: As I understand it, he has the
3  documents with him here today. Let me just ask another
4  question.
5  Q  (By Mr. Reilly) Did you review those documents before
6  today's deposition?
7  A  You have to take --
8  Q  Did you review those notes before today's deposition?
9  A  Yes.
10    MR. REILLY: I have a right to ask him --
11    MR. DONNELLY: You have a right to ask him
12 questions.
13    MR. REILLY: I have a right to see the
14 documents he reviewed. He has them with him, and he
15 reviewed them in preparation for this deposition.
16    MR. DONNELLY: But you did not subpoena them.
17    MR. REILLY: But he's got them here. I don't
18 have to. They're documents he reviewed to prepare for
19 today's deposition, and I'm insisting on my right to have
20 them. And frankly, I'm not going to go forward in this
21 deposition until they're produced. He has them here.
22 There's no need for a subpoena. He's reviewed them
23 before today's deposition. I have a right to them.
24    MR. DONNELLY: You can ask him questions.

**Page 24**

1  He's here today --
2     MR. REILLY: We're going to suspend and see
3  the Judge. I'm not going forward -- he's here with these
4  documents. He's reviewed these documents to prepare for
5  today's deposition, and I have a right to them. It's a
6  waste of time, frankly, to go forward and then come back
7  and have me subpoena them. I'm not going to do it, and
8  I'm entitled to them now. They're physically here in
9  this room because I saw them in his hand. He's reviewed
10 them. I have a right to them.
11    MR. DONNELLY: You have not subpoenaed them.
12    MR. REILLY: That's correct.
13    MR. DONNELLY: That was not part of the
14 deposition subpoena.
15    MR. REILLY: That's correct.
16    MR. DONNELLY: Therefore, we're not producing
17 them. He's here today. You can ask him --
18    MR. REILLY: He has the --
19    MR. DONNELLY: He reviewed them prior to his
20 deposition. You have the opportunity to ask him
21 questions about his memory and based on what he has
22 reviewed and his own memory.
23    MR. REILLY: I am not going forward with the
24 deposition if those aren't produced. We'll have to take

Page 25

1  it up with the Judge.
2       MR. DONNELLY: Then I'm going to object to
3  the suspension of the deposition.
4       MR. REILLY: All right.
5       MR. CURRAN: Mr. Daley, you understand what's
6  going on is a procedural issue with regards to the
7  production of those records. And we haven't spoken. I
8  don't know what's in the records at all to whatever
9  extent. You are going to be -- I just suggest for
10 everybody's benefit that those documents you have with
11 you today be given to your counsel in the form that
12 they're in today for him as an officer of the court to
13 hold those documents in his possession.
14      THE WITNESS: Who do I give them to?
15      MR. DONNELLY: Me.
16      MR. CURRAN: In fairness to Mr. Donnelly, the
17 lead in the case for the City of Boston is his colleague
18 and boss John Roache who I believe was not aware of any
19 existence of any documents --
20      THE WITNESS: Which is correct.
21      MR. CURRAN: As a result in fairness to
22 Mr. Donnelly, Mr. Roache has to make a decision as to
23 what is done. But in order to ensure the integrity of
24 that document, it's just -- I think it's prudent that you

Page 26

1  turn it over, and obviously a copy will be made and given
2  back to you for your purposes.
3       THE WITNESS: I have the originals.
4       MR. CURRAN: The other issue is, obviously in
5  fairness to Mr. Donnelly, Mr. Roache is going to have to
6  have conversations upon this discovery dispute which it
7  is, a discovery dispute meaning his right to documents or
8  not. And as a result, that will have to be discussed.
9  They're suspending, so you will have to come back on
10 another day.
11      THE WITNESS: That's all right.
12      MR. CURRAN: Do you understand that? Do you
13 have any plans to go anywhere in the near future in the
14 next couple of weeks? Because your deposition is going
15 to have to be completed within the next couple of weeks.
16      THE WITNESS: That's all right.
17 Q   (By Mr. Reilly) Let me ask you a few more questions just
18     so the record is clear. When did you prepare those
19     notes?
20 A   Within a day or two of the murder of Tiffany Moore.
21 Q   Back in 1988?
22 A   Yes.
23 Q   And what do the notes say?
24      MR. CURRAN: Objection.

Page 27

1       MR. DONNELLY: Objection.
2  Q   You can answer the question.
3       MR. CURRAN: You're backdooring around the
4  objection.
5       MR. REILLY: There's no argument. I have a
6  right to ask him what the notes say.
7  Q   What do the notes say?
8       MS. SCAPICCHIO: He reviewed them.
9       MR. DONNELLY: The objection stands.
10 Q   You can answer.
11      MR. DONNELLY: You can answer the question to
12 the best of your ability.
13 A   Without looking at the notes?
14      MR. DONNELLY: Correct.
15      MS. SCAPICCHIO: He can look at the notes.
16 Q   You can look at the notes if you need to refresh your
17     memory from them.
18      MR. DONNELLY: Why don't we have a -- why
19 don't you -- you've already reviewed the notes. Why
20 don't you answer the question to the best of your memory
21 and without looking at the notes.
22 Q   You can do that.
23 A   I had a conversation with both Paul Murphy and Richie
24     Walsh very close to the time of the Tiffany Moore case.

Page 28

1  And we talked over the case, and we talked over how the
2  case was going. And at that time, they told me they had
3  several suspects in mind. They hadn't made a conclusion
4  as to who was going to be their target.
5       Eventually they settled on Shawn Drumgold.
6  And they amassed sufficient evidence to get an arrest
7  warrant, and they got the arrest warrant. And they -- he
8  was arrested, Shawn Drumgold, and my memory is on another
9  matter that Drumgold was at court. But Murphy and Walsh
10 were not there when he was arrested on this other matter.
11 But they -- somehow they knew he was arrested and they --
12 when Drumgold was arrested, the Judge called for the
13 commander of the local station who was a Deputy Celester
14 and instructed him that the officers should not talk to
15 the suspect Drumgold. Murphy and Walsh were unaware of
16 that warning, and they encountered the suspect in the
17 I.D. section where they gave him his Miranda rights and
18 questioned him again.
19      Now, within a day or two after that, their
20 actions became known, and there was a hue and cry. And I
21 assume, and I don't know for sure, but I think the
22 statement that he made to the two officers was
23 suppressed. The case continued on. The case went to
24 trial. Shawn Drumgold was found guilty. And that

**Page 29**

1  scenario is the same as the one that I know of.
2  Q  You told me originally that there was two conversations
3     you remember with Walsh and Murphy?
4  A  Yes, there were two conversation. That's correct.
5  Q  And do you have notes as to those two conversations?
6  A  I do.
7  Q  When was the first conversation?
8  A  Within two days of the murder of -- that's my best
9     estimate, within two days of the murder of -- the second
10    conversation was sometime afterwards, but I can't even
11    give an approximate date.
12 Q  Was the first conversation before or after Drumgold was
13    arrested?
14 A  It was before.
15 Q  In that conversation, did they tell you anything about
16    any other suspects other than Drumgold?
17 A  They said they had other suspects.
18 Q  Did they say who?
19 A  No.
20 Q  Did the name Theron Davis get mentioned to you?
21 A  No.
22 Q  Apple, does that ring a bell?
23 A  No, at least I have no memory of it.
24 Q  The second conversation, was that before or after

**Page 30**

1     Drumgold's arrest?
2  A  I believe it was after.
3  Q  Was it before the trial?
4  A  I don't know.
5  Q  Do you have a memory that there was a hearing, a Motion
6     to Suppress on the statement that Walsh and Murphy --
7  A  I don't have a memory of that. That was really an
8     assumption on my part.
9  Q  Why was it that you took written notes of those
10    conversations?
11       MR. DONNELLY: Objection.
12 Q  You can answer.
13       THE WITNESS: Answer that?
14       MR. DONNELLY: Yes.
15 A  For 30 years I kept notes. I kept -- and I kept a
16    manuscript of my days as a policeman and what occurred in
17    the last -- I would sometimes go two or three days
18    without making entries, sometimes more than that. But I
19    generally kept up-to-date on my life as a policeman
20    through this journal.
21 Q  And where did you keep the journal?
22 A  At home.
23 Q  Have you had a chance to look through the journal to see
24    if you have any other entries about Tiffany Moore?

**Page 31**

1  A  I have.
2  Q  And do you have any other entries about Tiffany Moore?
3  A  No.
4  Q  So the only entries you have are the two conversations
5     with Walsh and Murphy?
6        MR. DONNELLY: Objection.
7  Q  Is that correct?
8  A  Those are the only two entries -- I'm sure I had other
9     conversations with Murphy and Richie Walsh, but those are
10    the only conversations I included in the journal.
11 Q  My question is did you search the journals and satisfy
12    yourself that the only conversations in the journal
13    having to do with the Tiffany Moore murder were those
14    two, or were there any other conversations about Tiffany
15    Moore in your journal or the murder of Tiffany Moore?
16 A  I got lost along the line.
17 Q  That's a confusing question. Let me try again. You have
18    a journal of --
19 A  Yes.
20 Q  -- a lot of stuff that you did as a police officer?
21 A  A gigantic thing.
22       MR. DONNELLY: Let him ask the question.
23 Q  And part of that journal involves two conversations you
24    had with Walsh and Murphy about the murder of Tiffany

**Page 32**

1     Moore?
2  A  Yes.
3  Q  Are there any other conversations with anyone about the
4     murder of Tiffany Moore in that journal?
5  A  Not to my knowledge.
6  Q  Did you look?
7  A  I did.
8  Q  And the only two that you found were the two with Walsh
9     and Murphy?
10 A  Correct.
11 Q  How did you decide what to put in the journal and what
12    not to put in the journal?
13 A  I decided what was important to me and what somebody else
14    might find interesting. I really had no criteria what I
15    was going to put -- like I had no -- it was like a diary.
16 Q  When you were telling me what you remembered from reading
17    the notes, you said that one of the things you remembered
18    was that Walsh and Murphy did not become aware that the
19    Judge had ordered that Drumgold not be questioned?
20 A  That's my memory.
21 Q  Who did you learn that from? Who told you that?
22 A  They did.
23 Q  Do you remember when they told you that?
24 A  It was --

**33**

1          MR. CURRAN: Objection.
2 Q  You can answer.
3 A  It was sometime afterwards, but I can't even estimate
4    when.
5          MR. REILLY: I'm going to repeat my demand
6    for these notes. These are contemporaneous notes
7    reviewed by this witness in preparation for his testimony
8    today. They are here today physically in this room, and
9    I am requesting that they be produced.
10         MR. DONNELLY: I'm not going to produce them
11   today. Attorney Roache hasn't seen them.
12         MR. REILLY: But the witness has.
13         MR. DONNELLY: Correct. However, he also has
14   the opportunity to have advice of counsel. Attorney
15   Roache hasn't had an opportunity to review these
16   documents, and you did not subpoena them as part of the
17   deposition.
18         MR. REILLY: Then I think that the thing to
19   do is suspend. Let me call Judge Gertner's session and
20   see if we can get a hold of her, do a telephone
21   conference now. We have everybody here, the witness
22   here.
23         MR. CURRAN: He doesn't have the lead counsel
24   here for the City of Boston. He's going to have to

**34**

1   partake in this discussion. He told you the witness is
2   willing to come back and suspend, allow him to consult
3   with Mr. Roache, and make a determination of this.
4   Otherwise, we wait until John gets here from his
5   emergency hearing that he's at in Middlesex.
6         MS. SCAPICCHIO: Why don't we wait to see if
7   the Judge can see us or hear us.
8         MR. REILLY: Is John expected here?
9         MR. DONNELLY: I am expecting him to come.
10   He had a hearing up in Probate & Family Court in
11   Cambridge.
12         MR. REILLY: He mentioned that to me. Why
13   don't we suspend at this point. Contact the Judge, see
14   if she's available this afternoon.
15         MS. SCAPICCHIO: You can contact John to see
16   what time he's available.
17         MR. DONNELLY: Why don't I contact John
18   before you contact the Judge regarding his availability.
19         MR. REILLY: Why don't we suspend now. You
20   can call John, and we'll see where we are.
21       (A recess was taken at 3:02 p.m.)
22       (Resumed at 3:50 p.m.)
23       (Mr. Roache joined the deposition. Mr.
24   Donnelly was no longer at the deposition.)

**35**

1         MR. REILLY: We've taken a break for about an
2   hour. Mr. Roache has had a chance to get here. And I
3   repeat my request for the notes that the witness
4   testified he reviewed prior to his deposition and he
5   prepared contemporaneously in 1988.
6         MR. CURRAN: Just for clarification, that's
7   not what my memory of the testimony was relative to the
8   contemporaneous. He said he sometimes would do it
9   contemporaneous, sometimes would do it within a few days
10   or more.
11         MR. REILLY: Why don't we clear that up for
12   the record.
13 Q  (By Mr. Reilly) The notes of your conversations with
14   Welch and Murphy --
15         MS. SCAPICCHIO: Walsh.
16 Q  -- Walsh and Murphy, how soon after your conversations
17   with them did you prepare the notes?
18 A  I can't be sure.
19 Q  Was it within a week?
20 A  Probably within a week.
21         MR. REILLY: I'd request the notes be
22   produced.
23         MR. ROACHE: Were they subpoenaed?
24         MR. REILLY: No. They were brought to the

**36**

1   deposition by Mr. Daley, and he's testified he has them
2   with him. And in fact, I've seen them.
3         MR. ROACHE: What have you seen?
4         MR. REILLY: The notes in his hands, and he
5   told me those were the notes.
6         MR. ROACHE: You saw pieces of paper. You
7   don't know what they are.
8         MR. REILLY: I take him at his word. He
9   tells me those are his notes, and he says he has them.
10         MS. SCAPICCHIO: He's under oath.
11         MR. ROACHE: I can state for the record that
12   the documents that he has, some of which have to do with
13   this case, some of which don't have to do with this case.
14   And therefore, until I have an opportunity to purge the
15   documents of those matters that don't pertain to this
16   case, I'm not producing anything.
17 Q  (By Mr. Reilly) The notes that were prepared by you, the
18   conversations with Walsh and Murphy, are they in one
19   section of the notes, or are they -- are they in one
20   section of the notes?
21 A  Yes, they are pretty much.
22 Q  So if I took the page of the notes where the Walsh and
23   Murphy conversations are, would that page have only Walsh
24   and Murphy conversations?

JOHN DALEY                                                      DRUMGOLD VS. CALLAHAN, ET AL

Page 37

1  A   There were other mentions on other pages of Walsh and
2      Murphy, too.
3  Q   But the conversations having to do with the Tiffany Moore
4      murder, are they all on one page of your notes?
5  A   No, they're not.
6  Q   Are they on several of your notes?
7  A   Couple of pages anyhow.
8  Q   Could they be separated from your other notes?
9  A   Of course.
10 Q   If you made a copy and just copied the paragraphs just
11     dealing with that, is that something you could do?
12 A   Sure.
13         MR. REILLY: I request the notes be produced.
14         MR. ROACHE: I disagree with my client. I
15     reviewed the notes. There are materials on the pages on
16     the notes that are unrelated to Walsh and Murphy or the
17     Tiffany Moore investigation. Until I have an opportunity
18     to purge the documents, notes will not be produced.
19         MR. REILLY: Why don't we suspend the
20     deposition.
21         MR. ROACHE: I'm not suspending the
22     deposition.
23         MR. REILLY: I'm not going forward.
24         MR. ROACHE: It's your deposition. You asked

Page 38

1      him to be here.
2          MR. REILLY: I'm suspending.
3          MR. ROACHE: I object to the suspension of
4      the deposition.
5          MR. REILLY: We'll take it up with the Court.
6      (Discussion off the record.)
7          MR. ROACHE: Back on the record. Apart from
8      the notes, do you have any other questions to ask of my
9      client?
10         MR. REILLY: Yes.
11         MR. ROACHE: Ask the questions.
12         MR. REILLY: No.
13         MR. ROACHE: Then you don't have any other
14     questions.
15         MR. REILLY: I have other questions, but I
16     want to first ask him about what I think is the most
17     important matter in the case, and that affects all the
18     other questions I ask. Contemporaneous conversations at
19     the time of this murder that were written down by him
20     within a couple of days at most are the most important
21     keys of evidence. I'm not going to go forward with the
22     rest of the deposition until I know what those notes say.
23         MR. ROACHE: So you're not going to ask any
24     more questions?

Page 39

1          MR. REILLY: Not today, not without the
2      notes.
3          MR. ROACHE: Then I object to the suspension.
4      (Whereupon, the deposition was adjourned at
5      3:55 p.m.)

Page 40

1  Excerpt from Rule 30(e):
2  Submission to Witness; Changes; Signing.
3     When the testimony is fully transcribed, the
   deposition shall be submitted to the witness for
4  examination and shall be read to or by him/her, unless
   such examination and reading are waived by the witness
5  and by the parties. Any changes in form or substance
   which the witness desires to make shall be entered upon
6  the deposition by the officer with a statement of the
   reasons given by the witness for making them.
7
8  ****************************************
9     I, JOHN DALEY, have examined the above transcript of
   my testimony and it is true and correct to the best of my
   knowledge, information and belief. Any corrections are
10 noted on the errata sheet.
11    Signed under the pains and penalties of perjury
   this    day of         , 2006.
12
13
14            ----------------------
              JOHN DALEY
15
16
17 Subscribed and sworn to before me this
      day of         , 2006.
18
19 ----------------------
20 Notary Public
21
22 My commission expires:
23 ----------------------
24

```
                                                    41

 1      COMMONWEALTH OF MASSACHUSETTS
        NORFOLK, SS.
 2

 3              I, Nancy M. Walsh, Certified Shorthand

 4      Reporter/Registered Professional Reporter and Notary

 5      Public duly commissioned and qualified in and for the

 6      Commonwealth of Massachusetts do hereby certify that

 7      there came before me on the 15th day of November, 2006

 8      the person hereinbefore named, who was by me duly sworn

 9      to testify to the truth of his knowledge concerning the

10      matters in controversy in this cause; that he was

11      thereupon carefully examined upon his oath and his

12      examination reduced to typewriting under my direction;

13      and that the deposition is a true and accurate record of

14      the testimony given by the witness.

15              I further certify that I am not

16      interested in the cause of this action.

17              IN WITNESS WHEREOF, I have hereunto set my

18      hand and affixed my notarial seal this 24th day of

19      November, 2006.

20

21              _____
                NANCY M. WALSH, CSR/RPR
22                     (#118593)

23      My commission expires:
24         October 26, 2012
```