**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SHAWN DRUMGOLD, )<br>    Plaintiff )<br>)<br>v. )<br>)<br>TIMOTHY CALLAHAN, FRANCIS )<br>M. ROACHE, PAUL MURPHY, )<br>RICHARD WALSH and THE CITY )<br>OF BOSTON, )<br>    Defendants )<br>_____) | 04-CV-11193-NG |

## DEFENDANTS' JOINT MOTION FOR PROTECTIVE ORDER

**NOW COME** the defendants in the above captioned action and move this Honorable Court for a protective order pursuant to Fed.R.Civ.P. 26(c) to prohibit plaintiff's counsel from communicating and/or suggesting to witnesses and/or potential witnesses how they may avoid appearing and testifying at depositions. As grounds for this motion the defendants state as follows:

1) During the deposition of Madelyne (aka "Candy") Powell Hamilton (hereinafter "Hamilton") taken March 13, 2007 in New York City, New York, Hamilton testified that prior to the date of the deposition plaintiff's counsel, Rosemary C. Scapicchio, Esq., suggested to her that she could avoid having her deposition taken by obtaining a doctor's note indicating that her current medical condition causes her memory loss such as to not make her available to testify as a percipient witness.

2) Hamilton is the mother of Rhonda Hamilton, who had two children by the plaintiff, Shawn Drumgold. The children born of this relationship are Rashawna Lewis, born October 3, 1983, and Shawn Drumgold, Jr., born August 26, 1985. Rhonda

Hamilton gave birth to her daughter, Rashawna, when she was fourteen years old. The plaintiff at that time was eighteen years old. Hamilton subsequently has adopted both of her grandchildren. Hamilton has known the plaintiff since approximately 1981 when she caught her daughter skipping school to spend time with the plaintiff. (Attached hereto as Exhibit A, Deposition Transcript of Hamilton, pp. 9, 10, 16, 17, 23, 24, 31, 133.)

3)      Based upon a newspaper article written by Kevin Cullen and published in the *Boston Globe* on August 31, 1988 (attached hereto as Exhibit B), a memorandum written by Det. Richard Dahill of the Suffolk County District Attorney's Office to ADA Phil Beauchesne dated May 22, 1989 regarding his interview of Hamilton with regard to the homicide investigation of Tiffany Moore (attached hereto as Exhibit C) (See SCDA 1462-1463) and an Affidavit of Detective Richard M. Walsh submitted in support of an application for a search warrant of 27 Olney Street in Dorchester (attached hereto as Exhibit D) (See Plaintiff's documents produced, pp. 673-681), it was expected that Hamilton would testify at her deposition as follows:

    a)      that the plaintiff arrived unexpectedly at Hamilton's New York City apartment where she resided with Drumgold's two children at 1:00 a.m. on Saturday, August 27, 1988, the day <u>after</u> his son's birthday, with another individual, later identified to be "Country", a/k/a Antonio Anthony;

    b)      that shortly after the plaintiff and Country arrived Hamilton became aware that Country was bleeding from his leg and that while she was administering first aid, she realized that it was a bullet wound;

2

    c)    that on their arrival the plaintiff and Country were both carrying handguns and that when Hamilton became aware of the presence of the handguns she made both of them turn the weapons over to her;

    d)    that Hamilton took the weapons, which were unalike, one being a pistol and the other a revolver, and placed one in a wall safe and the other behind a radiator both in her own bedroom;

    e)    that during the course of his stay with Hamilton, the plaintiff was not himself acting "depressed" and having little interaction with his children;

    f)    that during his stay at Hamilton's apartment, the plaintiff had no money;

    g)    that at some point during the day on Saturday, August 27, 1988, Shawn and Country made arrangements to leave Hamilton's apartment to meet with another individual in the Bronx to buy drugs, and that before they left the plaintiff and Country took possession of their weapons from Hamilton;

    h)    that upon their return several hours later to Hamilton's apartment, neither the plaintiff nor Country were in possession of the weapons they left the apartment with hours earlier;

    i)    that the plaintiff and Country left Hamilton's apartment at approximately 12:30 a.m. on Sunday, August 28, 1988 and returned to Boston by bus.

(See Exhibits B, C and D.)

4)    Hamilton was served with a deposition subpoena in the case-at-bar on February 28, 2007. (See Exhibit E attached hereto.) Hamilton had never been deposed in a civil case before. (Exhibit A, p. 5.)

5) After being served with the subpoena, Hamilton contacted her brother who is a lawyer in Boston with regard to the meaning of the document and whether she needed a lawyer. (Exhibit A, p. 81.) Hamilton's brother gave her the name of an attorney in Boston named "Denner" to call and speak with about the subpoena. (Exhibit A, p. 82.)

6) Hamilton contacted Mr. Denner's office, believed to be Jeffrey A. Denner who has a place of business at Four Longfellow Place, 35th Floor, Boston, Massachusetts, and spoke to a woman there who gave her the telephone number of plaintiff's counsel, Rosemary C. Scapicchio. (Exhibit A, pp. 82-83.)

7) Hamilton then contacted Attorney Scapicchio's office in the expectation of obtaining assistance with her concerns regarding testifying at the deposition. (Exhibit A, pp. 83-84.)

8) Attorney Scapicchio called Hamilton back, and Hamilton describes their conversations as follows:

> Answer)
> She called back. She said I'm returning your call. I said basically the same thing, I need a lawyer to represent, to represent me, I'm sick, I can't you know, go all over whatever. So she said that well, you can't expect your memory to be what it was 20 years ago. And I said no, I can't. So she said -- I said because I'm going to the doctor. I said I'm going to the doctor Monday morning. So she said to me that she has someone that she thinks would represent me but she wanted the letter first.
>
> Question)
> What letter?
>
> Answer)
> From the doctor.
>
> Question)
> What are you referring to, what do you mean?

4

> Answer)
> You know like I can't remember, like. I know my body is falling apart but my mind is cool.

(Exhibit A, p. 84.)

Realizing that she had not obtained any information during her first telephone conversation, Hamilton then called Attorney Scapicchio back:

> Answer)
> So I called her back and I asked her about, I said well can you give me the name of this person because I only had like few days I mean like to me time was like pushing on me. And she said well, we'll talk when you bring the letter.
>
> Question)
> And this is a letter from a doctor saying that you have memory problems?
>
> Answer)
> Yeah, that I whatever, I have memory.
>
> MS. SCAPICCHIO:  Objection.
>
> Question)
> What was this letter supposed to be?
>
> Answer)
> The letter was supposed to say that I can't, well during my illness with my problems and whatever that I can't remember, I don't remember, I don't remember things well. So when she said I had to bring the letter before I could get the name I just, you know, I said oh forget it. So then somebody named Adam – no, she called back and she spoke to Rashawna and when she was speaking with Rashawna I wasn't trying to avoid her I was on the other line cause I have three lines in my house, and she asked – Rashawna says she's on the other line and she said to Rashawna well, tell her she can call me back or she doesn't have to. So I told Rashawna, I said well that means I don't have to because I don't have, I don't have anything to give her, I don't have anything. So I started going on to the next somebody to help me."

(Exhibit A, pp. 85-86.)

Hamilton further states:

> <u>Question</u>)
> Did you tell her that you had concerns about your memory?
>
> <u>Answer</u>)
> No.
>
> <u>Question</u>)
> How did that come up?
>
> <u>Answer</u>)
> It came up because I said I don't know what they're looking for, I don't know what they want, and one thing she did ask me was, I said, no I said to her I have an idea of what, what they want, and she said the gun, and I said yes. And she said did you see the gun. And I said yes. And then I got paranoid. After I said that then I got, you know, I got kind of you know, I got scared so I called John [Gamel] (private investigator working for the defendants in the case-at-bar (Exhibit A, p. 90.)) back and I said listen, you know, all these people, I don't know who they are, I don't know who they are I don't know who I'm talking to, what am I supposed to say to who and what and whatever. And that's when he kindly explained what a deposition was and – "

(Exhibit A, pp. 86-87.)

9) Hamilton testified at her deposition that she had no further conversations with Attorney Scapicchio, but she was contacted by a person named "Adam" who identified himself as calling from Attorney Scapicchio's office. Hamilton describes her conversation with Attorney Scapicchio's employee as follows:

> <u>Answer</u>)
> Okay. He introduced, he asked for me. I said this is Madelyne, and the first thing – he asked a stupid question. He asked if the subpoena was still on. And I said well don't you know. Like that. And then the next question he asked was am I represented by – am I going to be represented by counsel. And then I said should I be, you know like should I be. I wasn't trying to be smart. He was asking the question so I figured maybe I should. Then he asked did I get a doctor's note. I said no. And he said is there any reason that you don't have one. And I said to him listen, I'll call you back in 20 minutes.

6

>   <u>Question</u>)
>   Did you call him back?
>
>   <u>Answer</u>)
>   No.

(Exhibit A, p. 89.)

10)   Hamilton confirms that Attorney Scapicchio suggested to her that she could avoid the taking of her deposition by presenting a doctor's note saying that her memory was faulty because of her health.  (Exhibit A, p. 112.)

11)   Hamilton testified that she did not know who Attorney Scappichio was in relation to the case.  (Exhibit A, p. 112.)

12)   Hamilton asserts that despite her memory being fine (Exhibit A, p. 111.), Attorney Scapicchio "couldn't supply me with an attorney unless she saw the note, she had to see the note first."  (Exhibit A, p. 112.)

13)   There are a number of potential witnesses who have failed to appear for the taking of their deposition, or who have failed to reappear after the suspension of their deposition.  Counsel for the defendants have filed a Motion to Compel the deposition testimony of these witnesses.  A number of deposition witnesses have referred to Attorney Scapicchio as "Rosemary", which infers that Attorney Scapicchio has had prior personal contact with these witnesses, at some point prior to their scheduled testimony. (See Exhibit F: 1) Deposition Transcript of Tracie Peaks, Vol. I, pp.67-69, 222-223 and Vol. II, p. 58-59; 2) Deposition Transcript of Gemini Hullum, Vol. I, p. 6 and Vol. II, pp. 314-316; 3) Deposition Transcript of Olisa Graham, p. 9; and 4) Deposition Transcript of Vantrell McPherson, p.21.)

**WHEREFORE**, defendants pray that this Honorable Court prohibit plaintiff's counsel from communicating or suggesting to any non-party witness in the case-at-bar how he or she may avoid appearing and testifying at any proceeding in this matter.

| | |
|---|---|
| **FRANCIS M. ROACHE and THE CITY OF BOSTON,** By Their Attorneys, | **TIMOTHY CALLAHAN,** By His Attorney, |
| //s//John P. Roache_____ John P. Roache, Esq. BBO#421680 Patrick J. Donnelly, Esq. BBO#651113 Roache & Malone, LLP 66 Long Wharf Boston, Massachusetts 02110 (617) 367-0330 | //s// Mary Jo Harris_____ Mary Jo Harris, Esq. Morgan, Brown & Joy 200 State Street, 11th Floor Boston, Massachusetts 02109 |
| **RICHARD WALSH,** By His Attorney, | **PAUL MURPHY,** By His Attorney, |
| //s// Hugh R. Curran_____ Hugh R. Curran, Esq. Bonner, Kiernan, Trebach & Crociata, LLP One Liberty Square, 6th Floor Boston, Massachusetts 02109 | //s// William White_____ William White, Esq. Davis, Robinson & White, LLP One Faneuil Hall Marketplace South Market Building Boston, Massachusetts 02109 |

Dated: April 10, 2007

### CERTIFICATE OF SERVICE

I, John P. Roache, hereby certify that this document was filed through the ECF system on April 10, 2007, and that a true paper copy of this document will be sent to those indicated as non-registered participants on the Notice of Electronic Filing on April 10, 2007 by First Class U.S. Mail, postage prepaid.

  //s// John P. Roache_____