# **EXHIBIT A**

Page 1

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
 2              C.A. No. 04-11193NG

 3  --------------------------------

 4  SHAWN DRUMGOLD,

 5              Plaintiff,

 6         vs.                    DEPOSITION OF:

 7  TIMOTHY CALLAHAN, FRANCIS M.   MADELYNE POWELL HAMILTON
    ROACHE,  THE ESTATE OF PAUL
 8  MURPHY, RICHARD WALSH, AND
    THE CITY OF BOSTON
 9
                Defendants.
10  --------------------------------

11

12       T R A N S C R I P T of the stenographic

13  notes of the proceedings in the above-entitled

14  matter, taken by and before DEBRA DeLOOF, a

15  Certified Shorthand Reporter and Notary Public of

16  the State of New Jersey, held at the offices of

17  McCarter & English, Esqs., 245 Park Avenue, New York,

18  New York, on Tuesday, March 13, 2007

19  at 10:00 a.m.

20

21

22

23

24

25
```

Doerner & Goldberg, New York, Inc.                    212-564-8808

Page 2

```
 1  APPEARANCES:
 2
        ROSEMARY SCAPICCHIO, ESQ.
 3      Four Longfellow Place
        Boston, Massachusetts 02114
 4      Attorneys for Plaintiff
 5
        MORGAN BROWN & JOY, LLP
 6      BY: MARY JO HARRIS, ESQ.
        200 State Street
 7      Boston, Massachusetts 02109-2605
        Attorneys for Defendant, Timothy Callahan
 8
 9      ROACHE & ASSOCIATES, P.C.
        BY: JOHN P. ROACHE, ESQ.
10      66 Long Wharf
        Boston, Massachusetts 02110
11      Attorneys for Defendant, Francis M. Roache,
        and City of Boston
12
13      DAVIS, ROBINSON & WHITE, LLP
        BY: WILLIAM M. WHITE, JR., ESQ.
14      One Fanueil Hall Marketplace
        South Market Building
15      Boston, Massachusetts 02109
        Attorneys for Defendant, Estate of Paul Murphy
16
17      BONNER, KIERNAN, TREBACH & CROCIATA, ESQS.
        BY: HUGH CURRAN, ESQ.
18      One Liberty Square
        Boston, Massachusetts 02109
19      Attorneys for Defendant, Richard Walsh
20
        MADELYNE POWELL HAMILTON, Appearing Pro Se
21
22      ALSO PRESENT: JIM ROBERTS, Videographer
23
24
25
```

Page 3

```
 1              INDEX
 2
    WITNESS          DIRECT  CROSS  REDIRECT  RECROSS
 3
    MADALYN POWELL HAMILTON
 4
 5    By Ms. Harris       5
 6    By Mr. Roache      92
      By Mr. White      114
 7    By Mr. Curran     121
      By Ms. Scapicchio 126
 8
 9
10
11            EXHIBITS
12
    NUMBER   DESCRIPTION              PAGE
13
    222      Subpoena                    8
14  223A-K   Photographs                23
    223L     Photograph and Clipping    30
15  224      Summons                    49
    225      Boston Globe Article 8/31/88  61
16  226      Handwritten Envelope       89
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1         THE VIDEOGRAPHER: We're going on the
 2  record  My name is James Roberts of Nationwide
 3  Video Productions Incorporated, located in Roseland,
 4  New Jersey. The date is March 13th 2007. The time
 5  is approximately 10:36 am. This deposition is
 6  being held in the office of McCarter & English
 7  located at 245 Park Avenue, New York City, New York.
 8         The caption of the case is Shawn
 9  Drumgold versus City of Boston, et al. in the U.S.
10  District Court District of Massachusetts, case
11  number C.A. No. 04-CV-11193-NG. The name of the
12  witness is Madelyne Powell Hamilton
13         At this time the attorneys will
14  identify themselves and the parties they represent
15  after which our Court Reporter, Debbie DeLoof of
16  Doerner & Goldberg, will swear in the witness.
17         MS. HARRIS: Mary Jo Harris for Tim
18  Callahan.
19         MR. WHITE: William White far
20  Patricia Murphy, Executrix of the Estate of Paul
21  Murphy.
22         MR.    ROACHE: John Roache representing
23  the City of Boston and Francis M. Roache.
24         MR. CURRAN: Hugh Curran representing
25  Richard Walsh.
```

Page 5

```
 1         MS. SCAPICCHIO: Rosemary Scapicchio
 2  on behalf of Shawn Drumgold.
 3         We object to the videotaping of this
 4  deposition. We weren't properly notified  Had we
 5  been properly notified both counsel, myself and
 6  attorney Reilly would have been here. Defendants
 7  gave us no opportunity to continue this deposition
 8  and refused to allow Mr. Reilly who has a son sick
 9  in the hospital to attend this deposition.
10  MADELYNE POWELL HAMILTON,
11     having been first duly sworn was examined
12     and testified as follows:
13  DIRECT EXAMINATION BY MS. HARRIS:
14     Q.  Good morning, ma'am. Can you please
15  state your full name for the record?
16     A.  Madelyne C. Powell Hamilton.
17     Q.  Ms. Hamilton, you understand that you're
18  here today for a deposition in the case that's been
19  brought by Shawn Drumgold against the City of Boston
20  and a number of police officers?
21     A.  Yes.
22     Q.  Have you ever been deposed before?
23     A.  No.
24     Q.  I'm going to give you then just some
25  guidelines. I am going to ask you questions. Other
```

2 (Pages 2 to 5)

Doerner & Goldberg, New York, Inc.                    212-564-8808

Page 6

1  counsel may also ask you questions. I would ask that
2  you give me the opportunity to finish the question
3  before you answer it even if you know what I'm asking
4  you. The Court Reporter takes down my questions and
5  your answers and if we talk over one another it makes
6  it very difficult for us to have a clean transcript.
7  Okay. You also have to give verbal responses rather
8  than shake of the head or uh-huhs, na-ah's, those
9  sorts of responses, just so we are clear on the
10 questions and your answers to those questions.
11     A.   Yes.
12     Q.   Are you taking any medication today that
13 could affect your ability to answer these questions?
14     A.   No.
15     Q.   Are you suffering from any physical
16 condition that would affect your ability to understand
17 my questions and testify truthfully today?
18     A.   No.
19     Q.   Have you spoken to anybody with — about
20 your coming here for a deposition today?
21     A.   Yes.
22     Q.   Can you just tell us who those persons
23 are?
24     A    Everybody?
25     Q.   Yes, please.

Page 7

1     A.   I spoke to John Gamel, my daughter
2  Rhonda, Roz, my granddaughter, Rashawna Lewis, I spoke
3  to someone, an attorney Denner, Denner's office.
4     Q.   That's Denner's office in Boston?
5     A.   Yes, it was a Boston number. I spoke to
6  I think it was — I can't pronounce your last name.
7         MS. SCAPICCHIO: Scapicchio.
8         THE WITNESS: Okay, Scapicchio.
9     A    I spoke to someone named Adam he was
10 from her office, Scapicchio's office. And I spoke to,
11 I don't remember their names I was going through the
12 phone book because I didn't know whether or not I
13 needed to have representation, a lawyer or not So I
14 was picking numbers and asking, you know, what do I
15 do, you know.
16     Q.   When you say you were going through the
17 phone book, do you mean to say that you were calling
18 different attorney's offices?
19     A    First I called the Bar Referral.
20     Q.   Okay.
21     A.   Is that the correct thing, the Bar on --
22 yeah, and then they gave me like three names that I
23 could call and I think I might have called one out of
24 that and my mother, I spoke to my mother, Maddy B.
25 Powell in Boston. And my brother, Joshua Powell in

Page 8

1  Boston.
2     Q.   Anyone else that you can think of?
3     A.   I think that's -- I think that's pretty
4  much it.
5     Q.   Now. I'm going to show you a document,
6  this is a subpoena and I'll ask you if you've seen
7  this before?
8     A.   Oh -- and I did speak to a person about
9  the one that was coming to do that, I'm sorry.
10    Q.   To serve the subpoena?
11    A.   Yes.
12    Q.   This is the subpoena, a copy of the
13 subpoena that he gave you?
14    A.   Yes -- she didn't, the person that first
15 gave me one I explained that I didn't want to do this.
16 I didn't want to whatever the deposition was. I told
17 her if she came I wouldn't answer the door, which I
18 didn't, and she slipped it underneath the door.
19 That's how I got the first one.
20    Q.   And then the second one you receive in
21 hand, correct, somebody gave it to you?
22    A.   Yes, yes.
23        MS. HARRIS: We're going to mark this
24 as the next exhibit and we're on No. 222.
25        (Exhibit No. 222, Subpoena, was

Page 9

1  marked for identification at this time.)
2     Q.   Ms. Hamilton, if you want to take a
3  break at any time just let us know as we explained
4  prior to starting the deposition, we'll accommodate
5  you if you want to take a break.
6     A.   Thanks.
7     Q.   Can you tell me, ma'am, where you
8  currently reside?
9     A.   The address is 535 West 51st Street,
10 Apartment 7F like Frank, New York City and the ZIP
11 code is 10019.
12    Q.   Who lives with you, if anybody, at that
13 address?
14    A.   My five grand children.
15    Q.   Can you give us their names?
16    A.   And my dog.
17    Q.   Okay. Can we get the names of your
18 grandchildren, please?
19    A.   Rashawna Drumgold Lewis, Madelyne C.
20 Powell, Kayla Dorsett Powell, Tiniah Cash Powell and
21 Tyleek Cash Powell.
22    Q.   Is Rashawna married?
23    A.   No, no.
24    Q.   But she uses the last name Lewis?
25    A.   Yes.

3 (Pages 6 to 9)

Page 10

1  Q. Can you tell me how old is Rashawna?
2  A. Rashawna is 23.
3  Q. And Madelyne Powell?
4  A. Sixteen.
5  Q. And Kayla?
6  A. Nine.
7  Q. Tiniah?
8  A. Just turned six today.
9  Q. And how old is Tyleek?
10 A. Five.
11 Q. And are these children all children of
12 your daughter Rhonda?
13 A. Yes.
14 Q. And I believe you said that her last
15 name is Ross; is that correct?
16 A. Yes, that's her married name.
17 Q. Am I correct in understanding that you
18 have adopted your grandchildren, that you're their
19 legal guardian?
20 A. I've adopted all my grandchildren except
21 Rashawna and Shawn.
22 Q. And Shawn, Jr. is the young man we were
23 just speaking about who just joined the Marines?
24 A. Right he's in the Marines.
25 Q. And those are — both Rashawna and

Page 11

1  Shawn, Jr. are adults?
2  A. Yes.
3  Q. Did you have to go through a formal
4  legal process to adopt the other four?
5  A. Yes.
6  Q. Is that done in the state courts here in
7  New York?
8  A. Yes.
9  Q. Do you know when about that took place
10 or — strike that
11     So there were different proceedings
12 for each child?
13 A. Each, yeah, they didn't come in a
14 package, they just dribbled,
15 Q. Do you know which court you were in for
16 that, for those proceedings?
17 A. All of them were in the Bronx family
18 court, the final adoption for Madelyne and Kayla was
19 in Manhattan family court and the final was in Bronx
20 family court with Judge Gail Roberts.
21 Q. Did you have to be interviewed by a
22 social worker?
23 A. All the time.
24 Q. So those sorts of visits went on with
25 your home, things of that nature?

Page 12

1  A. All the time.
2  Q. Do you know approximately how long ago
3  the last judgment on adoption occurred, and just the
4  year, I don't need anything more specific?
5  A. Last year, yeah, '06.
6  Q. How long have you lived at 535 West 51st
7  Street?
8  A. Twenty-three years.
9     MS. SCAPICCHIO: Excuse me, Mary Jo,
10 are we doing usual stipulations?
11    MS. HARRIS: Okay. Yes, I forgot to
12 put that on. We'll put on that the parties have
13 agreed to waive all objections except as to form of
14 the question until the time of trial. The witness
15 will be sent a copy of her transcript to read and
16 sign. We'll waive the notary.
17 Q. That's information that we have agreed
18 to previously in the discovery in this case, we have
19 the same rule that's bind each of these depositions.
20 So you moved to this address 23 years ago which is
21 1984, is my math correct?
22 A. No, let me see, I signed my first lease
23 there 1980, 1980.
24 Q. And at the time that you moved to this
25 apartment in 1980 who if anyone was living with you?

Page 13

1  A. Rhonda, Rhonda Ross and my boyfriend
2  Quentin Lewis.
3  Q. Have you any other children besides
4  Rhonda?
5  A. Yeah, well, yes.
6  Q. I understand that you've adopted so
7  these children are your children, but does Rhonda have
8  siblings?
9  A. One, she had one.
10 Q. Can you give me that child's name?
11 A. Tonya Mohammad.
12 Q. From the way you answered is that child
13 no longer living?
14 A. No, she passed.
15 Q. Can you tell us what your educational
16 background is?
17 A. 11th grade.
18 Q. Where did you go to high school?
19 A. Jeremiah E. Burke High School.
20 Q. Did you grow up in Boston?
21 A. Yes.
22 Q. And you mentioned speaking to your
23 mother Maddy Powell, does she still live in Boston?
24 A. Yes.
25 Q. And your brother Joshua is also a Boston

4 (Pages 10 to 13)

Page 14

1  resident?
2  A.  Yes.
3  Q.  Is the first time that you lived in New
4  York 1980 when you moved to the apartment that you're
5  currently in?
6  A.  I lived with my aunt for a short period
7  of time to get the feel and find an apartment.
8  Q.  You lived with your aunt in New York
9  City?
10  A.  Right. It was a very short period of
11  time, maybe a couple of months, and then I moved to
12  hotel, Rhonda Williams Hotel.
13  Q.  Is that also here in New York?
14  A.  That's on 31st Street right.
15  Q.  Was that also for a relatively short
16  period of time?
17  A.  It was about eight months.
18  Q.  Was that in 1979?
19  A.  That was in '78, '79, going into '79.
20  Q.  Did you ever live in Boston again after
21  moving to New York in the late seventies?
22  A.  No, never came back.
23  Q.  So your permanent address has been here
24  in New York since you moved here?
25  A.  Yes.

Page 15

1  Q.  Just a couple more preliminaries. Can
2  you give me your date of bulk, please?
3  A.  
4  Q.  And your Social Security number?
5  A.  
6  Q.  Mrs. Hamilton, are you currently
7  employed?
8  A.  No, I receive SSI.
9  Q.  Can you tell me what is the last
10  position that you held prior to being on SSI?
11  A,  As a telephone solicitor and -- briefly
12  worked with the Grandparents Association.
13  Q.  Can you tell me roughly when that was?
14  A.  Ten years.
15  Q.  Ten years ago, so like maybe 1997, '98
16  or thereabouts?
17  A.  About.
18  Q.  Now, the subpoena that was sent to you
19  fisted some documents that we had asked you to
20  provide, I'll show you the second page, and can you
21  tell me did you make a review of your records for any
22  documents that would be responsive to these requests?
23  A.  There was gobs and gobs of letters,
24  from — I didn't know which ones to bring, a lot of
25  them were directed towards Rashawna and Shawn.

Page 16

1  Q.  Why don't we go through these
2  individually. The first list of documents is any
3  correspondence between yourself and Shawn Drumgold
4  and/or any representatives of Shawn Drumgold. do you
5  have any letters that exist that either you wrote to
6  Mr. Drumgold or that he wrote to you in your
7  possession?
8  A.  No, no. There may be a couple somewhere
9  but there was a time when Shawn Drumgold and I weren't
10  seeing eye to eye and I threw a lot of, I got rid of a
11  lot of his things.
12  Q.  Do you remember when approximately it
13  was that you got rid of these things?
14  A.  Maybe in 2000. I kept them a long time.
15  Q.  Do you remember what these things were
16  that you had, were they letters, notes, things like
17  that?
18  A.  Letters.
19  Q.  And letters that he wrote to you?
20  A.  Letters he wrote.
21  Q.  Do you remember the content of any of
22  these letters?
23  A.  They were mostly thanking me for you
24  know raising his kids, thank you for bringing them
25  *from* New York to Boston to see him. Some were about

Page 17

1  Rhonda and that's basically you know.
2  Q.  Do you remember what the letters were
3  that were about Rhonda, do you remember what he wrote
4  to you?
5  A.  He always said that he loved Rhonda, you
6  know that he loved Rhonda and then if he heard
7  something or whatever then the next few letters
8  weren't very good about Rhonda, and it was back and
9  forth.
10  Q.  Back and forth in terms of his affection
11  or lack of affection?
12  A.  Right
13  Q.  Are these — do you remember any letters
14  that were about topics other man his thanking you for
15  caring for his children and about his feelings for
16  Rhonda?
17  A.  No.
18  Q.  Are these letters that you received from
19  him while he was incarcerated?
20  A.  Yes.
21  Q.  Do you recall any letters from
22  Mr. Drumgold that discussed in any way the trial of
23  Tiffany Moore?
24  MS. SCAPICCHIO: The trial of Tiffany
25  Moore?

5 (Pages 14 to 17)

Doerner & Goldberg, New York, Inc.        212-564-8808

Page 22

1  Q. Why don't we see how many you have and
2  we would like to mark these, which means we would put
3  stickers on the back; is that okay?
4  A. Yeah, sure. And this was when they were
5  living on Seaver Street in Boston with the baby, with
6  little Shawn.
7  Q. Why don't we take - are these - all of
8  these pictures have Shawn Drumgold in them. Let's
9  just get them together and then we'll identify them.
10  A. That's a --
11  MS. SCAPICCHIO: I'm sorry; that's
12  what, I didn't hear you.
13  A. — that's from a newspaper. I tried to
14  save photos for his kids. That's basically all the
15  photos that I brought
16  Q. Why don't we mark these so that we can
17  have you identify them, there are 11 photographs in
18  total, I'm counting as one photograph three that are
19  laminated together.
20  MS. HARRIS: And if we could mark
21  these I propose that we do it as a set, 223A through
22  whatever. Agreeable?
23  MR. WHITE: Very good
24  (Exhibit No. 223 A through K,
25  Photographs, were marked for

Page 23

1  identification at this time.)
2  Q. Mrs. Hamilton, I'm going to show you
3  what's been marked Exhibit 223A and ask you if you can
4  identify this for me, that is, explain to me who is in
5  these three photographs?
6  A, Okay. That's Shawn Drumgold These are
7  his two children, Rashawna and Shawn. That's Rhonda.
8  And that's Rashawna when she was born. She was born
9  3 pounds, two ounces, and she was handicapped She
10  was born with no — she was born with no -- club hands
11  and no thumbs.
12  Q. What is Rashawna's date of birth?
13  A. 10/3/83.
14  Q. Do you recall where she was born, was
15  she in New York or Boston?
16  A. She was born in Lenox Hill Hospital.
17  Q. Here in New York?
18  A. New York, yes.
19  Q. There's also a clip here looks like a
20  media clip announcing that the trial is about to
21  start?
22  A. Right.
23  Q. Is this a clip that you preserved and
24  put with these three photographs?
25  A. Yes.

Page 24

1  Q. On the back of the photograph of
2  Mr. Drumgold it reads I believe; to Rashawna from
3  daddy?
4  A. Yes.
5  Q. Is that a photograph that he gave to -
6  A. Yes, that's his writing.
7  Q. Okay. And Exhibit 223B, if you could
8  identify that for me?
9  A. Okay. That's Shawn, Rhonda, little
10  Shawn and Rashawna.
11  Q. Do you know when this photograph was
12  taken?
13  A. That was taken the day he came to my
14  house and that's the picture that was in the Boston
15  Globe.
16  Q. When you say this is the day that he
17  came to your house, do you mean in August of 1988?
18  A. Yes.
19  Q. And what is Shawn, Jr.'s date of birth?
20  A. 8/26/85.
21  Q. Do you recall if Shawn Drumgold, Sr.'s
22  visit to your house was on little Shawn's birthday?
23  A. I can't recall if it was on his birthday
24  but it was like a day or two, it was like a day or
25  two, but it was like one o'clock in the morning when

Page 25

1  he came.
2  Q. Okay. Let's go through the rest of
3  these. I'm going to show you what's been marked
4  Exhibit 223C and ask you to identify it, please?
5  A. That's a picture that Shawn sent from I
6  don't know where -- I don't know what facility he was
7  in but he was in a facility, I don't know which one.
8  Q. A correctional facility?
9  A. Uh-huh.
10  Q. I'm sorry you have to say yes or no?
11  A. I'm sorry, yes.
12  Q. Was this after he had been convicted of
13  the Tiffany Moore killing?
14  A. No, this was before.
15  Q. Do you remember when roughly in what
16  time frame this photograph was taken?
17  A. I honestly can't say.
18  Q. Same question but this is Exhibit 223D,
19  if you can tell me what that represents please?
20  A. When he was going out with Rhonda.
21  Q. Do you remember roughly when that was?
22  A. '82 maybe. This was before Rashawna,
23  Q. Do you know where that photograph was
24  taken?
25  A. It was taken in front of Blue Hill

Page 30

1  with you that reference that arrest?
2    A.  There's part -- on the paper, one of
3  those papers, that's laminated I think with Rhonda.
4    Q.  Do you have it with you today?
5    A.  I think I showed it to you. This is
6  just one. the warrant that I had for Rhonda to bring
7  her home from Boston to bring her back.
8    Q.  Okay.
9    A.  No. You must have it there, it must be
10 part of something.
11   Q.  Well, the — there is a clipping
12 attached to Exhibit 223 A hut that refers --
13   A.  No here, that one. I must have threw
14 the. the other part where it says continue from one, I
15 don't know what happened to that, to the one.
16   Q.  Okay. And can we mark this one as well?
17   A.  Sure.
18       MS. HARRIS: So why don't we make
19 this 223L.
20       (Exhibit No. L, Photograph, was
21       marked for identification at this time.)
22   Q.  Mrs. Hamilton, are there any other
23 clippings related to Shawn Drumgold, or the subject
24 matter of this deposition that you brought with you
25 today, other than these documents?

Page 31

1    A.  No.
2    Q.  The clipping that you've just produced,
3  it's missing the front page, but do you know
4  approximately when that was published?
5       MS. SCAPICCHIO: Objection.
6    A.  Most likely '84. Rashawna was already
7  born.
8       MS. SCAPICCHIO: Objection.
9    Q.  Okay, Mrs. Hamilton, when did you first
10 meet Shawn Drumgold or become aware - strike that
11      When did you first meet him?
12   A.  19 maybe 81.
13   Q.  How did it come about that you met him?
14   A.  I had got a call from Rhonda's school in
15 Newton that she wasn't —
16      MS. SCAPICCHIO: Objection.
17   A.  — attending school. And I followed her
18 to the bus stop which is Blue Hill Avenue and Seaver
19 and my parents lived on Seaver Street And I walked
20 up to the bus stop and I waited a few minutes and
21 that's when I saw Shawn, you know, meet up with her
22 and that's when I - all hell broke loose.
23      MS. SCAPICCHIO: That's what I'm
24 sorry?
25      THE WITNESS: All hell broke loose.

Page 32

1    Q.  Where were you living at that time when
2  Rhonda was going to school in Newton?
3    A.  I was living at Two New Acre Road in
4  Hyde Park.
5    Q.  So earlier you had said that you thought
6  you moved to New York in maybe '79 or so. This is I
7  believe you said in 1981 that Rhonda began seeing
8  Shawn Drumgold?
9    A.  No, she started seeing -- she started
10 seeing him before then.
11   Q.  Okay.
12   A.  That's when I caught them.
13   Q.  In 1981 were you living in Hyde Park?
14   A.  My husband was still living there,
15 Richard was still living there.
16   Q.  Did you spend time in Hyde Park and in
17 New York?
18   A.  I didn't - once I got my divorce in '76
19 I didn't go back to Richard.
20   Q.  Was Rhonda living with her grandparents?
21   A.  Yes. That's the only way that -- she
22 was eligible to get into Metco, you had to be in a
23 certain, have you know, a certain area, a certain
24 whatever.
25   Q.  You had to be in a certain geographical

Page 33

1  area?
2    A.  Right, right.
3    Q.  So in 1981 you got the call from the
4  school in Newton that Rhonda wasn't attending classes?
5       MS. SCAPICCHIO: Objection.
6    Q.  Is that right?
7    A.  That's correct.
8    Q.  And at that time in 1981 were you living
9  in Massachusetts?
10   A.  No.
11   Q.  How is it mat you were in Massachusetts
12 to-
13   A.  My mother would call me and I would take
14 Amtrak or the bus or the plane and I would come back.
15   Q.  Okay. After you found Rhonda leaving
16 the bus stop did you have any discussions then with
17 Shawn Drumgold?
18   A.  We had an argument It wasn't a
19 discussion.
20   Q.  Okay. What do you remember about that
21 encounter?
22      MS. SCAPICCHIO: Objection.
23   A.  I asked him how old he was. He
24 wouldn't — he wouldn't give me a direct answer on how
25 old he was.

9 (Pages 30 to 33)

Page 78

1  A.    No. Rashawna just, Rashawna was upset
2  because this woman was in her house all over her
3  father and so --
4      MS. SCAPICCHIO: Objection.
5  A. -- her mother had called, collect. And
6  I asked Rhonda who was and then Rhonda went in to
7  explain who she knows Micky to be and who she was and
8  tell her to get out my house because she always wanted
9  to go with Shawn Drumgold, that kind of thing, like
10 that.
11 Q.    Did you have any conversation with
12 either of the Grahams about whether or not they had
13 assisted in getting a new trial or in testifying at
14 the motion for new trial?
15     MS. SCAPICCHIO: Objection.
16 A.    No. The only thing that was — during
17 the feeding of everybody it was, there was a lot of
18 people there, Micky was trying to make me remember who
19 she was, but she didn't, she didn't know that I had
20 already talked to Rhonda.
21     MS. SCAPICCHIO: Objection.
22 A.    So I really knew who she was. And she
23 said that — no, I asked her how long have you been
24 with Shawn--
25     MS. SCAPICCHIO: Objection.

Page 79

1  A.    — and she said for a while. She said I
2  testified against Shawn. And I said testified against
3  Shawn. She said but that's all been straightened out,
4  that's all been straightened out. And I left it
5  Q.    Did you understand from this
6  conversation that she was romantically involved with
7  Shawn?
8      MS. SCAPICCHIO: Objection.
9  A.    Yeah, they were laying on my sofa, yeah.
10 Q.    Have you ever asked Shawn whether he was
11 involved in the murder of Tiffany Moore?
12     MS. SCAPICCHIO: Objection.
13 A.    No.
14 Q.    Has he ever said to you whether he was
15 involved?
16     MS. SCAPICCHIO: Objection.
17 A.    No, no.
18 Q.    Have you ever asked him if he knew who
19 was involved in the murder?
20     MS. SCAPICCHIO: Objection.
21 A.    The only thing Shawn ever said was about
22
23     MS. SCAPICCHIO: Objection.
24 A.    Humboldt, Humboldt, Castlegate, Humboldt
25 and Apple and everybody was doing this and that and

Page 80

1  somebody was riding in a car, it was like you know, I
2  don't know. I don't remember word for word cause it
3  wasn't of interest to me per se, about a car and
4  something, I don't know. I really don't remember all
5  of the other stuff, Rhonda listens intently.
6  She's into Shawn like that, I'm not.
7  Q.    Have you spoken with Mrs. Drumgold
8  Shawn's mother about his conviction or his release?
9  A.    No. He asked Rashawna to call his
10 mother while he was there.
11     MS. SCAPICCHIO: Objection.
12 A.    And Rashawna, first Rashawna said why, I
13 don't even know the lady. She's only seen
14 Ms. Drumgold maybe twice in her life. So he kept
15 telling her no, call call call call call her, call
16 her. So Rashawna did call. And she was very upset.
17 And she you know she was — and then Shawn took the
18 phone and he was, only thing I heard her yelling and
19 him saying I know, I know, I know I'm coming back, I'm
20 coming back now, I'm coming back now, I'm on my way
21 back, something like that, I'm on my way back.
22 Q.    Do you know the name or do you know the
23 person Olisa or Lisa Graham?
24     MS. SCAPICCHIO: Objection.
25 Q.    Does that name mean anything to you?

Page 81

1  A.    I've heard the name.
2  Q.    Do you, can you tell me how you've heard
3  the name?
4  A.    Through Rhonda.
5  Q.    Now, you and I spoke last week about
6  this deposition --
7  A.    Yes.
8  Q.    Right. Have you spoken with anybody
9  else representing either Mr. Drumgold or any of the
10 defendants in this case?
11 A.    After I spoke to you?
12 Q.    At any time.
13 A.    I spoke to her.
14 Q.    Okay. And by her you mean
15 Ms. Scapicchio?
16 A.    Ms. Scapicchio.
17 Q.    When did you speak with her?
18 A.    Oh God, what day was it, it was the day
19 I got this thing underneath my door.
20 Q.    The subpoena?
21 A.    _ Right. And what I did was I called my
22 brother in Boston and I asked him I said do I know
23 need a lawyer, I said, you know I'm sick and I said
24 these people are just, you know, and I explained to
25 the person that I wasn't going to accept it. Whoever

21 (Pages 78 to 81)

Page 82

1  called me and said I'm coming by your house you know
2  if you would nicely take it, it will make things easy
3  for everyone or whatever. I said no, I'm not opening
4  my door, I'm sick, I'm not coming, whatever whatever.
5  So I called ray brother. And my brother said you would
6  have, he doesn't know whether I had to have a lawyer
7  that would have to have passed the Bar in New York and
8  whatever, New York or Boston, because he — so I said
9  well, it says here that the deposition is going to be
10 in New York. So he said well, I'll give you this
11 name. So he gave me a name —
12     Q.  Is that Mr. Denner?
13     A.  Denner. All right, so I spoke to that
14 person and she said you got the wrong person that's
15 not criminal, that's something else, so she put
16 another lady on the phone and I talked to her and she
17 said you know when you talk to a lawyer it's -- what's
18 the word?
19         MS. SCAPICCHIO: Confidential.
20     A.  Yeah, It's confidential and it won't go
21 any further than this and that and whatever whatever.
22 What is this about. And I told her you know what it's
23 about and I said they claim it's a high profile case
24 and I don't even know why I'm being called I said 17
25 years ago nobody called my name, I don't know, I don't

Page 83

1  know what could I tell them that I didn't tell them 20
2  years ago.
3      Q.  Is this in a conversation with
4  Ms. Scapicchio or with another person?
5      A.  No, no.
6      Q.  This is somebody else?
7      A.  Okay. So what she said, she says well I
8  have somebody, I know somebody that would, will take
9  your, mat might, no, she didn't say would, she said
10 that might take your case. She said I know her very
11 well. She is's a very nice person, da da da. I said
12 oh God, thank you. I was just so glad to hear anybody
13 say I'm going to help you. So she said well, here's
14 her phone number. I jotted it down on the back of my
15 thing. And she said call her and I'll talk to her and
16 I'll tell her what's going on.
17     Q.  Do you know the name of this person that
18 you were speaking to who offered you assistance, this
19 woman?
20     A.  No, she just said that she was with the
21 civil, they put me to a civil and said it wasn't a
22 criminal.
23     Q.  Was this with Mr. Denner's office?
24     A.  With Mr. Denner's office. Because she
25 said they were both in the same building.

Page 84

1      Q.  And she gave you a phone number for
2  another person?
3      A.  Right
4      Q.  Was that Ms. Scapicchio?
5      A.  Yes.
6      Q.  And did you have a conversation with
7  Ms. Scapicchio?
8      A.  Yes.
9      Q.  What was that conversation?
10     A.  She called back. She said I'm returning
11 your call. I said basically the same thing, I need a
12 lawyer to represent, to represent me, I'm sick, I
13 can't you know, go all over whatever. So she said
14 that well, you can't expect your memory to be what it
15 was 20 years ago. And I said no, I can't. So she
16 said — I said because I'm going to the doctor. I
17 said I'm going to the doctor Monday morning. So she
18 said to me that she has someone that she thinks would
19 represent me but she wanted the letter first.
20     Q.  What letter?
21     A.  From the doctor.
22     Q.  What are you referring to, what do you
23 mean?
24     A.  You know like I can't remember, like. I
25 know my body is falling apart but my mind is cool.

Page 85

1      Q.  Do you have any problems with your
2  memory?
3      A.  No. I mean some things, I mean we all
4  forget, I mean you know I forgot my ex-husband. I
5  forget a lot, I forget somethings, yes I forget
6      Q.  So how did this discussion -
7      A.  I called -- I hung up and Rashawna said
8  to me well, you didn't get any information. So I
9  called her back and I asked her about, I said well can
10 you give me the name of mis person because I only had
11 like few days I mean like to me time was like pushing
12 on me. And she said well, we'll talk when you bring
13 the letter.
14     Q.  And this is a letter from a doctor
15 saying that you have memory problems?
16     A.  Yeah, that I whatever, I have memory.
17         MS. SCAPICCHIO: Objection.
18     Q.  What was mis letter supposed to be?
19     A.  The letter was supposed to say that I
20 can't, well during my illness with my problems and
21 whatever that I cant remember, I don't remember, I
22 don't remember things well. So when she said I had to
23 bring the letter before I could get the name I just,
24 you know, I said oh forget it. So then somebody named
25 Adam - no, she called back and she spoke to Rashawna

22 (Pages 82 to 85)

Page 86

1  and when she was speaking with Rashawna I wasn't
2  trying to avoid her I was on the other line cause I
3  have three lines in my house, and she asked -
4  Rashawna says she's on the other line and she said to
5  Rashawna well, tell her she can call me back or she
6  doesn't have to. So I told Rashawna, I said well that
7  means I don't have to because I don't have, I don't
8  have anything to give her, I don't have anything. So
9  I started going on to the next somebody to help me.
10    Q.   When you spoke with Ms. Scapicchio and
11 told her that you had an appointment set up to see
12 your doctor?
13    A.   Yeah, Monday.
14    Q.   Did you tell her that you had concerns
15 about your memory?
16    A.   No.
17    Q.   How did that come up?
18    A.   It came up because I said I don't know
19 what they're looking for. I don't know what they want,
20 and one thing she did ask me was, I said, no I said to
21 her I have an idea of what, what they want, and she
22 said the gun, and I said yes. And she said did you
23 see the gun. And I said yes. And then I got
24 paranoid. After I said that then I got, you know, I
25 got kind of you know, I got scared so I called John

Page 87

1  back and I said listen, you know, all these people, I
2  don't know who they are, I don't know who they are I
3  don't know who I'm talking to, what am I supposed to
4  say to who and what and whatever. And then that's
5  when he kindly explained what a deposition was and —
6         MS. SCAPICCHIO:  Who is this, John,
7             you    called    John    back.
8         MR. ROACHE:  There's no question.
9         MS. SCAPICCHIO:  I didn't hear what
10 she said. She said she called John back, John.
11    Q.   John Gamel, correct?
12         MS. SCAPICCHIO:  Is that the
13 investigator?
14         THE WITNESS:  Right
15    Q.   Go on. He told you what a deposition
16 was.
17    A.   I asked him the only thing I want to
18 know is can you explain to me what a deposition is. I
19 said you know I've been to court with Rhonda's other
20 fathers and I've never, this right here is just you
21 know. And he explained to me what was you know, he
22 said this person is going to be there, that person and
23 this person, and this person, and all you have to do
24 is tell the truth. And I said well I'm fine then.
25 I'm fine, I'm cool.

Page 88

1    Q.   Did you have any other conversations
2  with Ms. Scapicchio about your obtaining a doctor's
3  note?
4    A.   Not after that. Adam called.
5    Q.   And Adam is who?
6    A.   I have no idea.
7    Q.   Did he identify himself as?
8    A.   He said Adam from that office.
9    Q.   From Ms. Scapicchio's office?
10   A.   Right.
11   Q.   Did you actually speak with Adam?
12   A.   Yeah.
13   Q.   What did he say to you and you say to
14 him?
15   A.   He - can I look in my pocketbook cause
16 I wrote some of it down.
17   Q.   Sure.
18   A.   These are the names that the Bar
19 Referral - I did talk to this person here in depth.
20   Q.   Okay. We're not going to ask for any
21 conversations that you had with any kind of an
22 advocate, okay, that's confidential.
23   A.   Okay, okay. He called at 12:20. He
24 called at 12:20 p.m. that day.
25   Q.   You have to keep your voice up so we can

Page 89

1  get you on the recording.
2    A.   The caller ID had came up as
3  (617)263-7400.
4    Q.   Okay?
5    A.   Okay. He introduced, he asked for me.
6  I said this is Madelyne, and the first thing -- he
7  asked a stupid question. He asked if the subpoena was
8  still on. And I said well don't you know. Like that
9  And then the next question he asked was am I
10 represented by - am I going to be represented by
11 counsel. And then I said should I be, you know like
12 should I be. I wasn't trying to be smart  He was
13 asking the question so I figured maybe I should. Then
14 he asked did I get a doctor's note. I said no. And
15 he said is there any reason that you don't have one.
16 And I said to him, listen, I'll call you back in 20
17 minutes.
18   Q.   Did you call him back?
19   A.   No.
20   Q.   Can we mark this envelope.
21   A.   Yeah.
22   Q.   Thanks.
23        (Exhibit No. 226, Envelope, was
24    marked for identification at this time.)
25        MS. HARRIS: 226.

23 (Pages 86 to 89)

Doerner & Goldberg, New York, Inc.                    212-564-8808

Page 90

1  Q. Okay. Did you have any other
2  conversation with anyone else from Ms. Scapicchio's
3  office?
4  A. No.
5  Q. Are there any other documents that you
6  brought with you today that are notes of your
7  conversations with Ms. Scapicchio's office or myself?
8  A. No.
9  Q. You mentioned having conversations with
10 John Gamel?
11 A. Yes.
12 Q. And you understand Mr. Gamel to be an
13 investigator working for the defense in this case?
14     MS. SCAPICCHIO: Objection.
15 Q. Do you understand that?
16 A. I understood that when he came to my
17 house.
18 Q. On how many occasions have you met with
19 Mr. Gamel?
20 A. Two, three.
21 Q. In any of those meetings has Mr. Gamel
22 ever told you what he wanted you to testify to?
23 A. No. I didn't - that's why I was kind
24 of upset with him because he wasn't telling me
25 anything, really. I thought that when he came and he

Page 91

1  introduced himself and showed me his you know ID and
2  said he wanted to you know, talk to me about Shawn
3  Drumgold, my first comment to him was gee, I've been
4  waiting 15 years to talk to people. Like you know, a
5  kind of smart ass answer. But we just, I just started
6  talking to him asking him, you know he asked me like
7  how did Rhonda and Shawn meet, and I think I blubbered
8  more than he wrote. I mean I think he was trying to
9  catch up with my mouth.
10 Q. I don't want to get into your business
11 but you've mentioned here being sick, is there
12 anything about your health condition that impacts your
13 ability to testify truthfully?
14 A. No, no.
15    MS. HARRIS: I don't think I have any
16 other questions. Thank you very much,
17 Mrs. Hamilton. The other attorneys here may want to
18 ask a couple.
19    THE VIDEOGRAPHER: Off the record
20 1:09 p.m.
21    (There was a break in the
22    proceedings.)
23    THE VIDEOGRAPHER: We're going back
24 on the record at 1:38 p.m. This is the beginning of
25 tape three and the deposition of Madelyne Powell

Page 92

1  Hamilton.
2  CROSS-EXAMINATION BY MR. ROACHE:
3  Q. Good afternoon, Ms. Hamilton, my name is
4  John Roache?
5  A. Afternoon.
6  Q. And I represent the City of Boston and
7  former Boston Police Commissioner Francis Roache. I
8  just have a few questions to ask of you in follow up
9  to some of the questions that Ms. Harris asked and a
10 couple of other questions as well.
11 A. Okay.
12 Q. You indicated that your daughter Rhonda
13 was a student in Newton?
14 A. Yes.
15 Q. When did she begin the Metco program?
16 A. In the fourth grade.
17 Q. In the fourth grade, okay. And when she
18 met Shawn Drumgold that was approximately in what
19 year?
20    MS. SCAPICCHIO: Objection.
21 A. She was 13.
22 Q. She was 13?
23 A. Right.
24 Q. Prior to her meeting Shawn Drumgold had
25 Rhonda ever been involved in any trouble with the law?

Page 93

1     MS. SCAPICCHIO: Objection.
2  A. Nope.
3  Q. Were you aware prior to her meeting
4  Shawn Drumgold as to whether or not she had used
5  drugs?
6     MS. SCAPICCHIO: Objection.
7  A. No.
8  Q. Did Rhonda graduate from high school?
9  A. No.
10 Q. When did Rhonda stop going to high
11 school?
12    MS. SCAPICCHIO: Objection.
13 A. She stopped maybe in the 7th or 8th.
14 Q. 7th or 8th grade?
15 A. Uh-huh.
16 Q. What school in Newton was she attending
17 at that time?
18 A. The day school.
19 Q. And she would be bused in the morning
20 and bused back home in the afternoon?
21 A. Yes, right, right.
22 Q. And the bus stop was located on Blue
23 Hill Avenue and where?
24    MS. SCAPICCHIO: Objection.
25 A. Blue Hill Avenue and Pasadena Road.

24 (Pages 90 to 93)

Page 110

1  Q.    What was your response to her?
2        MS. SCAPICCHIO: Objection.
3  A.    I said yes I seen it.
4  Q.    What was attorney Scapicchio's reaction
5  to your saying yes you saw it?
6        MS. SCAPICCHIO: Objection.
7  A.    That's when we got into the doctor's
8  note.
9  Q.    Who suggested a doctor's note?
10       MS. SCAPICCHIO: Objection.
11 A.    I told her that I had an appointment
12 Monday.
13 Q.    Monday being yesterday?
14 A.    No.
15 Q.    Today is Tuesday?
16 A.    No. that Monday before then.
17 Q.    A week ago?
18 A.    Right.
19 Q.    You had a doctor's appointment a week
20 ago yesterday?
21 **A.    Right**
22 Q.    You told that to attorney Scapicchio?
23 A.    Yes.
24 Q.    What if anything did attorney Scapicchio
25 tell you?

Page 111

1        MS. SCAPICCHIO: Objection.
2  A.    She asked me if I could get a note.
3  Q.    What type of note?
4        MS. SCAPICCHIO: Objection.
5  A.    A memory -- for my memory cause I'm sick
6  and you don't, you're sick and you don't remember, you
7  can't remember that far back.
8  Q.    Whose words were they, were they your
9  words or attorney Scapicchio's words that you are sick
10 you can't remember mat far back?
11       MS. SCAPICCHIO: Objection.
12 A.    Those were her words.
13       MS. SCAPICCHIO: Objection.
14 Q.    Did you dispute those words?
15 A.    Did I dispute them, what I said to her
16 was I want to know do I have, do I need, can I get an
17 attorney.
18 Q.    And you've testified earlier there's
19 nothing about your health that impairs your memory
20 today, correct?
21 A.    No, no, no.
22       MS. SCAPICCHIO: Objection.
23 Q.    So was it attorney Scapicchio who
24 mentioned to you to try to get a doctor's note saying
25 that your memory was impaired because of your health?

Page 112

1        MS. SCAPICCHIO: Objection.
2  Q.    Is that true?
3        MS. SCAPICCHIO: Objection.
4  A.    Yes, that's true. And that she couldn't
5  supply me with an attorney unless she saw the note,
6  she had to see the note first.
7  Q.    Did attorney Scapicchio —
8  A.    I didn't know who she was.
9  Q.    Did attorney Scapicchio suggest to you
10 that you could avoid the taking of your deposition by
11 presenting a doctor's note saying that your memory was
12 faulty because of your health?
13 A.    Yes.
14       MS. SCAPICCHIO: Objection.
15 Q.    She did?
16 A.    Yes.
17 Q.    When did you receive the phone call from
18 was it Aaron?
19 A.    Adam.
20 Q.    Adam?
21 A.    Friday.
22 Q.    This past Friday?
23 A.    Friday.
24 Q.    Okay. And did you call Adam or did he
25 call you?

Page 113

1  A.    No, he called me.
2  Q.    What, if anything, did Adam say to you?
3  **A.    He asked** for **me. I** didn't **answer the**
4  phone. My granddaughter answered the phone and said
5  somebody from 617 named Adam wants to speak to you.
6  Q.    Did you speak with Adam?
7        MS. SCAPICCHIO: Objection.
8  A.    Yes.
9  Q.    What did he first say to you?
10 A.    The first thing he asked was, he was
11 calling to find out if the deposition was still on.
12 Q.    Okay.
13 A    And I said, don't you know.
14 Q.    Who do you understand Adam to be?
15 A.    From her office.
16 Q.    When you say her, are you referring to
17 attorney Scapicchio?
18 A.    Yes, because that's where he said he was
19 **from.**
20 Q.    He told you he was from attorney
21 Scapicchio's office?
22 A.    Yes, that's where he said he was from.
23 Q.    And he asked you if the deposition was
24 still on?
25 A.    Right. He asked me if I had obtained an

Page 130

1  does it include any of the children?
2    A.  No, my disability.
3    Q.  Any of the children that you have since
4  adopted receive SSI?
5    A.  Rashawna.
6    Q.  How much does she receive?
7    A.  Receives SSI 646,
8    Q.  Is that monthly?
9    A.  Monthly.
10   Q.  Any other of your children or
11 grandchildren, I'm sorry?
12   A.  Kayla Dorsett Powell.
13   Q.  What does she receive SSI for?
14   A.  She doesn't receive SSI, she receives
15 adoption subsidy.
16   Q.  Oh, okay. And what's the adoption
17 subsidy?
18   A.  $800 I think.
19   Q.  Is that a month?
20   A.  A month.
21   Q.  Anyone else?
22   A.  Madelyne.
23   Q.  Madelyne —
24   A.  Powell.
25   Q.  What does she receive?

Page 131

1    A,  The same.
2    Q.  $800 adoption subsidy per month?
3    A.  Right.
4    Q.  Anyone else?
5    A.  Tyleek.
6    Q.  What does Tyleek receive?
7    A.  600 and something maybe.
8    Q.  Is that an adoption subsidy or that's
9  SSI?
10   A.  No, that's adoption, they cant receive
11 both.
12   Q.  So Kayla, Madelyne and Tyleek all
13 receive adoption subsidies per month?
14   A.  Right, they all have special needs.
15   Q.  They all have special needs, okay.
16 Let's talk about Rashawna for a minute she receives
17 SSI of 646 per month?
18   A.  Yes.
19   Q.  And is that as a result of the birth
20 defect?
21   A.  Yes.
22   Q.  Any other issues with Rashawna that
23 require her to get SSI other than the birth defects?
24   A.  She had AD --
25   Q.  -HD?

Page 132

1    A.  Not hyper, not the hyper, ADD.
2    Q.  When was she diagnosed with ADD?
3    A.  She was two.
4    Q.  So what about Shawn, Jr., did he receive
5  any SSI or any other benefits before he went in the
6  Marines?
7    A.  He received welfare from his mother from
8  the beginning when she had him.
9    Q.  When you say welfare from his mother?
10   A.  From his mother.
11   Q.  She applied for welfare?
12   A.  Right, in Boston.
13   Q.  In Boston. Okay, so he was receiving
14 welfare check from Boston while he was living with
15 you?
16     MR. ROACHE: Objection.
17   A.  No.
18   Q.  So that was just for a short period of
19 time while he was in Boston he got welfare benefits?
20   A.  Eighteen months, exactly.
21   Q.  Okay. And you had indicated you receive
22 SSI as a result of the arthritis; is that right?
23   A.  Right.
24   Q.  Does it also include your diabetes or is
25 that not a basis for the SSI?

Page 133

1    A.  No, it's a basis for it.
2    Q.  So in addition to the arthritis the
3  other basis for the SSI is the diabetes?
4    A.  Yes.
5    Q.  Any other medical ailments that resulted
6  in your filing for an SSI claim other man the
7  diabetes and the arthritis?
8    A.  I had a sciatic nerve problem.
9    Q.  When was that?
10   A.  When I was 21, after I had my
11 hysterectomy.
12   Q.  And at mat time was it Dr. Shapiro who
13 was your doctor?
14   A.  No.
15   Q.  Who was your doctor back then for the
16 sciatic nerve problem?
17   A.  In Boston, he's dead now, Dr. Elliot
18 Finer.
19   Q.  What hospital did he practice from?
20   A.  I can't remember. The round hospital,
21 do you know, Brookline Hospital.
22   Q.  Brookline Hospital?
23   A.  Its round.
24   Q.  When did Dr. Finer treat you?
25   A.  After I had Rhonda '69.