# **EXHIBIT F**

# **(1)**

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------x

SHAWN DRUMGOLD,
      Plaintiff

V.           Case No. 04-11193NG

TIMOTHY CALLAHAN, FRANCIS
M. ROACHE, PAUL MURPHY,
RICHARD WALSH, and THE
CITY OF BOSTON,
      Defendants

---------------------------------x

DEPOSITION OF TRACIE PEAKS, a
witness called to testify by and on behalf of
the Defendants, pursuant to the applicable
rules of the Federal Rules of Civil
Procedure, before M. ELAINE GANSKA, a
Stenographic Reporter and Notary Public in
and for the Commonwealth of Massachusetts, at
the offices of Bonner Kiernan Trebach &
Crociata, Attorneys at Law, One Liberty
square, Boston, Massachusetts, on Friday,
April 28, 2006, commencing at 10:17 a.m.

FEDERAL COURT REPORTERS
781-585-6741      978-535-8333

**Page 2**

APPEARANCES

ROSEMARY CURRAN SCAPICCHIO, Attorney at Law
4 Longfellow Place
Boston, Massachusetts 02114
ON BEHALF OF: The Plaintiff

BONNER KIERNAN TREBACH & CROCIATA
BY: HUGH R. CURRAN, Attorney at Law
One Liberty Square
Boston, Massachusetts 02109
ON BEHALF OF: Defendant Walsh

DAVIS, ROBINSON & WHITE
BY: WILLIAM M. WHITE, JR., Attorney at Law
One Faneuil Hall Marketplace
Boston, Massachusetts 02109
ON BEHALF OF: Defendant Murphy

HOGAN, ROACHE & MALONE
BY: JOHN P. ROACHE, Attorney at Law
66 Long Wharf
Boston, Massachusetts 02110
ON BEHALF OF: Defendants Roache and City of
Boston

MORGAN, BROWN & JOY
BY: MARY JO HARRIS, Attorney at Law
200 State Street
Boston, Massachusetts 02109
ON BEHALF OF: Defendant Callahan

BRUCE W. CARROLL, Attorney at Law
61-65 Chatham Street
Boston, Massachusetts 02109
ON BEHALF OF: The Deponent

**Page 3**

I N D E X

| Deposition of | Page |
|---|---|
| TRACIE PEAKS | |
| Examination by Mr. Curran | 4 |

E X H I B I T S

| No. | | Page |
|---|---|---|
| 12 | subpoena and Summons | 4 |
| 13 | Map of Homestead and Humboldt | 98 |
| 14 | Diagram Drawn, Signed, and Dated by Deponent | 142 |
| 15-16 | Witness Certifications | 165 |
| 17 | Affidavit | 205 |

**Page 4**

(Subpoena and summons premarked
Deposition Exhibit Number 12 for
identification)

STIPULATIONS

    It is hereby stipulated and agreed
by and between Counsel for the respective
parties and the Deponent that the Deponent
shall read and sign the deposition transcript
within 30 days of receipt under the pains and
penalties of perjury.

    It is further stipulated that all
objections, except as to form, and motions to
strike are reserved to the time of trial.

PROCEEDINGS

    TRACIE PEAKS, a witness called for
examination by Counsel for the Defendants,
having been satisfactorily identified and
duly sworn, was examined and testified as
follows:

EXAMINATION BY MR. CURRAN

Q. Mrs. Peaks-Sandy, my name is Hugh Curran. I
represent Detective Richard Walsh.

    Before we begin today, I'm just
going to give you a few instructions, and

**Page 5**

that's for the benefit of everybody that's
here today including yourself. If at any
time you need to take a break for any reason,
whether it's to speak to your attorney, to
use the facilities, to get up and stretch,
just indicate to me that you'd like to take a
break, and we'll take a break at the
appropriate time. If at any time you do not
understand a question that I ask you, just
indicate that you don't understand the
question, and I'll try to rephrase it in a
manner to the best of my ability so you'll
understand what we're looking for. It's
presumed that if you answer a question that
you understood the question and that you're
answering it truthfully and accurately to the
best of your ability. Do you understand
that?

A. Mm-hmm.

Q. Okay. There's a few rules that we're going
to have this morning. It's very important
that you give a verbal response because if
you nod your head or shrug your shoulders,
the court reporter can't take everything

**Page 6**

down, all right? It's also important that
you wait for me to finish asking my question,
and in return I'll wait for you to finish
giving your answer to the question. If we
speak both at the same time, the court
reporter is going to yell at us because
she'll have problems keeping a transcript of
what is taking place this morning.

    Do you have any questions before
we begin?

A. No.

Q. Okay. Would you please state your full name
for the record?

A. Tracie Peaks-Sandy.

Q. Is that hyphenated?

A. Yes.

Q. Okay. What is your date of birth?

A. 3/10/72.

Q. Okay. Now, Ms. Peaks, I'm going to show you
what's been marked as Exhibit 12, and that's
the original subpoena and summons that was
sent to you in this matter, in this package
(handing document). Take an opportunity to
take a look at it.

Page 67

1  I don't want to know the substance of that.
2  Have you reviewed any documents?
3  A. I mean he sent me the transcripts, but I
4  really didn't want to read them.
5  Q. Okay. When you say "transcripts," the
6  transcripts that were provided to your
7  attorney by my office which is your grand
8  jury testimony, your trial testimony and your
9  motion for new trial testimony and your
10  affidavit that was signed?
11  A. Yes, I suppose all of that was in the
12  package.
13  Q. Okay. Did you review any of that?
14  A. Very lightly. I think the first page. I
15  don't even know which document it was.
16  Q. Okay. Did you speak with anybody about your
17  deposition testimony?
18  A. No.
19  Q. Okay. Did you speak to your mother?
20  A. No.
21  Q. Did you review your mother's deposition
22  testimony?
23  A. No.
24  Q. Okay. Did you speak with Ms. Scapicchio or

Page 68

1  her associate, Michael Reilly, or anyone in
2  their offices?
3  A. No, not about today.
4  Q. Okay. Now when you -- after you received
5  your — the notice to appear for a deposition
6  back in February, did you contact anyone?
7  A. I contacted Rosemary a little while after. I
8  don't remember exactly when I contacted her,
9  though.
10  Q. And what was the substance of your
11  conversation with Rosemary Scapicchio at that
12  time?
13  A. I just asked her, "Why am I getting called
14  again?" Why — you know, "Why do I have to
15  go through this again?" And she just said --
16  I forgot exactly. I think he's suing the
17  state or something like that, and you guys
18  are just going through the motions again or
19  something like that.
20  Q. Okay. All I need to know is what your memory
21  is today of the substance of that whole
22  conversation, if you can give it to me to the
23  best of your ability.
24  A. Yeah. It was, why again, and I think he's

Page 69

1  suing the state, and can I get a lawyer or do
2  I need a lawyer, and that was my choice
3  whether or not to get a lawyer. So I found
4  my lawyer.
5  Q. Okay. Did you discuss your previous
6  testimony at all?
7  A. No.
8  Q. Okay. Did you discuss the substance of any
9  of your previous testimony?
10  A. No.
11  Q. Okay. Did you discuss your affidavit?
12  A. No.
13  Q. Have you ever at any point after you
14  testified in the motion for new trial
15  discussed your affidavit with Shawn Drumgold
16  or any of his attorneys?
17  A. No.
18  Q. Did you speak to your mother about her
19  deposition testimony?
20  A. I didn't question her about it. She just
21  told me, "Oh, Trai, you claimed bankruptcy?"
22  She told me how you guys told her that I
23  claimed bankruptcy.
24  Q. Okay. You came for your mother- at her

Page 70

1  deposition here, correct?
2  A. Mm-hmm.
3  Q. All right. And you waited for her for a
4  period of time, and then you went home?
5  A. I went downstairs.
6  Q. Okay. And you waited for her?
7  A. (Nods head)
8  Q. And when she finished here, you had a
9  conversation of what took place?
10  A. Not really, because I mean the first thing
11  out of her mouth was I claimed bankruptcy.
12  Q. Okay. Did you speak to her at any time about
13  what her deposition testimony was?
14  A. No.
15  Q. Okay. So that was the whole substance of
16  your conversation relative to these
17  proceedings?
18  A. Yes.
19  Q. Okay. Have you spoken to anyone else?
20  A. No.
21  Q. Okay. After you graduated from high school,
22  where did you work that summer before you
23  went to Northeastern?
24  A. I don't remember. I don't remember.

Page 71

1  Q. Okay. Why don't you tell me what your work
2  history has been like since then, 1990, when
3  you went to Northeastern.
4  A. 1991 I believe I worked for the bank.
5  Q. Which bank?
6  A. At that time it was called Boston Five, I
7  think.
8  And after the bank —
9  Q. For how long did you work at the bank?
10  A. I think it was a year.
11  Q. And what was your responsibilities at the
12  bank?
13  A. A teller.
14  Q. All right. And which bank was that?
15  A. It was I think the Boston Five in Mattapan
16  Square.
17  Q. Okay. It wasn't Citizens?
18  A. No.
19  Q. Okay. And who did you report to? Do you
20  recall your supervisor or boss?
21  A. Norma.
22  Q. Norma what?
23  A. I forgot her last name.
24  Q. Was she the branch manager?

Page 72

1  A. Yes.
2  Q. Okay. Is it still the Boston Five?
3  A. No.
4  Q. What is it now, do you know?
5  A. I think -- I think Citizens. It was sold
6  like a couple of times, but I think
7  Citizens —
8  Q. Why did you leave your employment with Boston
9  Five?
10  A. Because I got robbed.
11  Q. Okay. And that was while you were a teller?
12  A. Mm-hmm.
13  Q. All right. And then because of that
14  experience you decided to quit?
15  A. Yep.
16  Q. All right. You weren't terminated?
17  A. No.
18  Q. Okay. And then where did you go next to
19  "work?"
20  A. I think I went to the post office.
21  Q. Okay. And in what capacity did you work at
22  the post office?
23  A. I did the Ellison (phonetic) machine, clerk.
24  Q. For how long did you work for the United

Page 217

1 A. I didn't think about it then.
2 Q. Okay. Well you went to the -- you had a
3     pretty shallow feeling when you left seeing
4     her on the sidewalk that evening on Humboldt,
5     correct?
6 A. Really, to be honest, you know, I was just
7     glad it wasn't my sister.
8 Q. Okay.
9 A. I'm sorry I felt -- I didn't feel, you know,
10    but I was just glad it wasn't my sister.
11 Q. So the first time you felt that in regards to
12    no one's ever going to find the killer of
13    this poor little girl was in 2003 when the
14    investigator appeared at your house?
15         MS. SCAPICCHIO: Objection.
16 A. No, I mean it's always been on my mind, you
17    know? I know what they did to me, made me
18 get on that stand, and in the streets you
19    hear that the police knew it wasn't Shawn and
20    stuff like that and --
21 Q. Okay. Well, what did you hear on the
22    streets?
23 A. Just hear people talking, just hearing them
24    saying that all the police know that it

Page 218

1    wasn't Shawn. I think it was even in the
2    paper one time, that they knew it wasn't him,
3    and I just always said, "Well, what about
4    that little girl?" You never -- you hear
5    them say that he didn't do it, but you never
6    hear them say, well, we going to try to find
7    out what happened to the little girl, who
8    really did it.
9 Q. Okay. Who did you -- did you hear people on
10    the street talk about the murder and who was
11    involved in your neighborhood?
12 A. Not really. I mean you hear people in
13    passing.
14 Q. All right.
15 A. I didn't stand on any corner with anybody and
16    talk about it.
17 Q. Okay. These people that you heard talking
18 about the -- that Shawn didn't do it, they
19    knew that you were a witness in the case?
20 A. Nope.
21 Q. So no one in the neighborhood ever knew that
22    you testified?
23 A. If they knew, they didn't let me know.
24 Q. Okay. Your name was in the paper, correct?

Page 219

1 A. Yes.
2 Q. Back in 1988, '89?       *
3 A. Yes.
4 Q. All right. And you were on TV -
5 A. My name.
6 Q.-- back in '88 and '89?
7 A. My name, not my face.
8 Q. Okay. And every night there was reports,
9    correct?
10 A. Yes.
11 Q. Your mother was watching TVs and reading the
12    paper, correct?
13 A. Yes, she was.
14 Q. And she would tell you when your name or --
15    appeared in the paper and on TV?
16 A. She didn't tell me. I'd just hear her. She
17    said she called them and told them I was a
18    minor and don't be publishing my name and my
19    face in the paper, and they still -- they
20    said they wouldn't do my face, but they
21    published my name.
22 Q. Who did she call?
23 A. I don't remember specifically who she talked
24    to. I know she was mad at the black woman on

Page 220

1    Channel 5 News.
2 Q. Okay.
3 A. I don't know her name.
4 Q. All right Did she call and talk to the DA
5    about this?
6 A. I don't know. I know she was very upset.
7 Q. All right. After the -- so the investigator
8    stayed for a half-hour?
9 A. About that.
10 Q. Okay. Anyone come in during the course of
11    your interview with the investigator?
12 A. No.
13 Q. All right. And after he left, did you speak
14    to anyone about the conversations with the
15    investigator?
16 A. No.
17 Q. Did you tell your mother that you had spoken
18    to him?
19 A. No. No.
20 Q. Did you tell Mr. Fenderson?
21 A. No, he told her.
22 Q. Okay. Did you ever talk to Ramona Brantley's
23    parents about your involvement?
24 A. No.

Page 221

1 Q. Okay. In 1988, '89 you were still going over
2    there regularly, correct?
3 A. Yep.
4 Q. And they saw your name in the paper and on
5    TV?
6 A. Probably. They never mentioned it.
7 Q. Okay. So they never talked to you about it?
8 A. No.
9 Q. All right. Do you recall the next time the
10    investigator contacted you?
11 A. No. I don't know if he did. I don't know.
12    No, I don't.
13 Q. Okay. Well you had to sign an affidavit,
14    correct?
15 A. Yeah.
16 Q. Was the affidavit sent to you in the mail?
17 A. No. No, he did come by.
18 Q. All right. And how long did he stay the
19    second time he came by?
20 A. That was a quick second, just for me to sign
21    it.
22 Q. Okay. And the extent of his involvement with
23    you on that day was just here's the
24    affidavit, sign it?

Page 222

1 A. Yes.
2 Q. Didn't talk to you about any other further
3    information that you may have?
4 A. No. I think that we even did it outside,
5    sign it and he left.
6 Q. And did you read it before you signed it?
7 A. I glanced over it.
8 Q. Okay. When you say you glanced over it, did
9    you read every --
10 A. Not every word for word.
11 Q. Okay. You glanced over it and you signed it?
12 A. (Nods head)
13 Q. Did he leave you a copy?
14 A. I'm not sure. I'm not sure if I have a
15    copy. I'm not sure.
16 Q. Okay.
17 A. No, I don't think he did that day.
18 Q. Okay. And did he ever return to speak to
19    you?
20 A. No.
21 Q. Were you advised that this was an
22    investigator that was retained by Rosemary
23    Scapicchio in defending Shawn Drumgold?
24 A. I don't think he mentioned Rosemary's name,

Page 223

1   but he said he was working for Shawn
2   Drumgold.
3 Q. Okay. And do you recall, did you ever speak
4   to Rosemary before you signed the affidavit?
5 A. I don't know if I knew her name during that
6   time.
7 Q. Okay. The question is, did you ever speak
8   with her over the phone or in person prior to
9   you signing the affidavit on May 28th, 2003?
10 A. I don't believe so.
11 Q. Okay. At any time prior to today, have you
12   met Rosemary in person outside of the
13   courtroom?
14 A. Yeah - no, not outside the courtroom.
15 Q. Okay. Had you ever spoken to her outside the
16   courtroom?
17 A. Yes.
18 Q. Okay. Why don't you tell me the first time
19   you spoke to her.
20 A. think it was this year I called her before
21   to find out, you know, what's going on.
22 Q. Okay. That's when you called her that you
23   got a subpoena and why did I get this?
24 A. Mm-hmm.

Page 224

1 Q. That you already testified earlier today
2   about?
3 A. Yes.
4 Q. Okay. Before you testified at the motion for
5   new trial where you went to court now the
6   third time, the first time the grand jury,
7   the second time the trial of Shawn Drumgold,
8   and then the third time being the motion for
9   new trial --
10 A. (Nods head)
11 Q. - had you ever spoken to Rosemary Scapicchio
12   over the phone or in person before you
13   testified?
14 A. No, I don't recall, so.
15 Q. Okay. No, you didn't, or, no, you don't
16   recall?
17 A. I don't recall.
18 Q. All right. Do you remember any conversations
19   with Rosemary outside the courtroom at any
20   tune other than the phone call you just spoke
21   about?
22 A. No.
23 Q. All right. So when you showed up at the
24   motion for new trial, you had not talked to

Page 225

1   her, and she had not prepared you as a
2   witness?
3 A. No.
4 Q. Had the investigator come back after you
5   signed the affidavit and discussed your
6   testimony?
7 A. The investigator discussed my testimony --
8 Q. Yes.
9 A. - when?
10 Q. After you signed the affidavit and before you
11   testified at the motion for new trial, did
12   anyone on behalf of Shawn Drumgold approach
13   you?
14 A. No.
15 Q. Okay. How did you know when to go to court
16   to testify at the motion for new trial?
17 A. There was a summons.
18 Q. Okay. Were you handed the summons, or was it
19   in the mail?
20 A. I believe it was in the mail. I don't
21   remember signing for anything.
22 Q. Okay. Did the summons have a name and a
23   phone number on it?
24 A. I don't remember.

Page 226

1 Q. As a result of the summons, did you call
2   anyone to discuss what this was all about?
3 A. No.
4 Q. Okay. So you just showed up at the date and
5   time that the summons indicated?
6 A. Yes.
7 Q. And who did you go to the courthouse with on
8   that day?
9 A. My mother.
10 Q. Anyone else?
11 A. No.
12 Q. When you went to the courthouse, do you
13   recall where you went?
14 A. I believe we went to the cafeteria.
15 Q. All right. And were you waiting for someone
16   in the cafeteria?
17 A. No, we were just waiting to be called.
18 Q. Okay. So you went to the courthouse and went
19   directly to the cafeteria, didn't check in
20   with anybody?
21 A. I don't remember. I know we were sitting in
22   the cafeteria forever. I'm pretty sure we
23   had to check in.
24 Q. Did you see the investigator that you had

Page 227

1   previously spoken to on that day?
2 A. I don't -- if I did, I don't remember what he
3   looks like.
4 Q. Okay.
5 A. I know he sat in my house and everything, but
6   I couldn't identify --
7 Q. Did anyone else come to your house to speak
8   to you?
9 A. No.
10 Q. Between signing the affidavit and your
11   testimony at the motion for new trial?
12 A. No.
13 Q. Did anyone from the Suffolk County District
14   Attorney's Office contact you?
15 A. I believe they did. They did.
16 Q. Okay. Do you recall who?
17 A. I don't know their names.
18 Q. Well did they come to see you in person, or
19   over the phone did they call you?
20 A. I know they came to the house.
21 Q. Okay.
22 A. A black guy and a white guy, and when I came
23   out the door, I told them, "Don't get
24   comfortable. I'm not talking to anyone.

Page 228

1   I'll be in court."
2 Q. Okay. So you didn't speak to them?
3 A. No.
4 Q. About your involvement?
5 A. No.
6 Q. At all?
7 A. No.
8 Q. Okay. Did you ask them to leave?
9 A. Yes.
10 Q. And did they leave?
11 A. Yes.
12 Q. Okay. Were they polite?
13 A. Yes.
14 Q. Okay. They give you a bad time?
15 A. No.
16 Q. Okay. And that's when they left, and you
17   went to court subsequent to that date?
18 A. Yes.
19 Q. All right. And you didn't speak to anyone
20   beforehand?
21 A. No.
22 Q. And then you testified at the motion for new
23   trial?
24 A. Yes.

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

----------------------------X

SHAWN DRUMGOLD,
            Plaintiff

V.                          Case No. 04-11193NG

TIMOTHY CALLAHAN, FRANCIS
M. ROACHE, PAUL MURPHY,
RICHARD WALSH, and THE
CITY OF BOSTON,
            Defendants

----------------------------X

CONTINUED DEPOSITION OF TRACIE

PEAKS, a witness called to testify by and on

behalf of the Defendants, pursuant to the

applicable rules of the Federal Rules of

Civil Procedure, before M. ELAINE GANSKA, a

Stenographic Reporter and Notary Public in

and for the Commonwealth of Massachusetts, at

the offices of Bonner Kiernan Trebach &

Crociata, Attorneys at Law, One Liberty

Square, Boston, Massachusetts, on Monday,

September 15, 2006, commencing at 1:10 p.m.

FEDERAL COURT REPORTERS
791-585-6741     978-535-8333

---

**Page 2**

APPEARANCES

ROSEMARY CURRAN SCAPICCHIO, Attorney at Law
4 Longfellow Place
Boston, Massachusetts 02114
ON BEHALF OF: The Plaintiff

BONNER KIERNAN TREBACH & CROCIATA
BY: HUGH R. CURRAN, Attorney at Law
One Liberty Square
Boston, Massachusetts 02109
ON BEHALF OF: Defendant Walsh

DAVIS, ROBINSON & WHITE
BY: WILLIAM M. WHITE, JR., Attorney at Law
One Faneuil Hall Marketplace
South Market Building
Boston, Massachusetts 02109
ON BEHALF OF: Defendant Murphy

HOGAN, ROACHE & MALONE
BY: JOHN P. ROACHE, Attorney at Law
66 Long Wharf
Boston, Massachusetts 02110
ON BEHALF OF: Defendants Roache and City
of Boston

MORGAN, BROWN & JOY
BY: MARY JO HARRIS, Attorney at Law
200 State Street
Boston, Massachusetts 02109
ON BEHALF OF: Defendant Callahan

BRUCE W. CARROLL, Attorney at Law
61-63 Chatham Street
Boston, Massachusetts 02109
ON BEHALF OF: The Deponent

---

**Page 3**

I N D E X

continued Deposition of          Page
TRACIE PEAKS

Examination by Mr. Roache          4
Examination by Ms. Harris         63
Examination by Mr. White          68
Examination by Ms. Scapicchio     81

E X H I B I T S

No.                              Page
99    Diagram Drawn by Witness     37

---

**Page 4**

PROCEEDINGS

TRACIE PEAKS, a witness called for
examination by Counsel for the Defendants,
having been satisfactorily identified and
duly resworn, was examined and testified as
follows:

EXAMINATION BY MR. ROACHE

Q. Good afternoon, Ms. Peaks. My name is John
Roache, and I represent the City of Boston
and Former Police Commissioner Francis M.
Roache, no relation, in this action brought
by Shawn Drumgold.
   Your deposition was taken earlier
this year, is that correct --
A. Yes.
Q. -- the beginning of your deposition?
   Do you recall what day it was
taken?
A. No.
Q. Do you recall what month it was taken?
A. I think -- no, I'm not -- I don't know. I
don't remember. It was either March or
April, I think.
Q. Okay. Where do you currently reside?

---

**Page 5**

A. 65 Capen Street.
Q. C-A-P-E-N?
A. Yes.
Q. So you've moved since your last deposition?
A. Yes.
Q. Okay. And where is Capen Street located?
A. Dorchester.
Q. What's the ZIP?
A. 02124.
Q. And your home phone number?
A. I just use my cell. 617-820-6962.
Q. And with whom do you live there?
A. Myself and my children.
Q. And just refresh my memory. What were the
names of your children?
A. Master and Rullah.
Q. And they both attend Bedford Public Schools?
A. Just the oldest.
Q. Master does?
A. Yes.
Q. What grade is Master in now?
A. Second. No, fourth.
Q. And where does Ullah (phonetic) —
A. Rullah.

---

**Page 6**

Q. -- attend school?
A. ELC on Columbia Road.
Q. Alternative Learning Center?
A. Hmm-mm, ELC, Early Learning Center.
Q. Oh, Early Learning Center.
   And that's on Columbia Road?
A. Mm-nmm.
Q. And where is Capen Street in relation to the
ELC?
A. Capen Street is closer to Dorchester.
Columbia — ELC is closer to like South
Boston, I suppose.
Q. Okay. Are you currently employed?
A. Yes.
Q. And where are you working?
A. Crispus Attucks Children's Center.
Q. So you haven't changed employment since the
last time of your deposition --
A. No.
Q. -- correct?
   Okay. Now you lived with your
mother for quite some time prior to moving to
Capen Street, correct?
A. Yes.

Page 55

```
 1  A. Yes.
 2  Q. Who attempted to speak with you?
 3  A. Two men, two police officers.
 4  Q. And were they the same police officers who
 5     you saw the first time or who showed you the
 6     photographs?
 7  A. No.
 8  Q. Okay.  Could you describe the two police
 9     officers for me?
10  A. One black, one Caucasian.
11  Q. Okay.  And where were you when they attempted
12     to speak with you?
13        MS. SCAPICCHIO: objection, asked
14     and answered.
15  A. 72 Homestead Street — I mean, excuse me, 67
16     Woolson Street in my room.
17  Q. Okay.  So there was a black police officer
18     and a white police officer?
19  A. Mm-hmm.
20  Q. Is that a yes?
21  A. Yes.
22  Q. Okay.  Did they threaten you?
23  A. No.
24  Q. Did they intimidate you?
```

Page 56

```
 1  A. No.
 2  Q. What did they say to you?
 3  A. I didn't give them a chance to say anything.
 4     I told them, "Don't even sit down.  You-all
 5     got to go."
 6  Q. Okay.  So you refused to speak with them?
 7  A. Yes.
 8  Q. And they didn't threaten you with arrest?
 9  A. No.
10  Q. How many times have you spoken to Attorney
11     Rosemary Scapicchio?
12        MS. SCAPICCHIO: Objection, asked
13     and answered.
14  A. Maybe once or twice.
15  Q. When was the first time that you spoke with
16     her?
17     MS.  SCAPICCHIO:    objection,  asked
18     and answered.
19  A. I think when that -- around that private eye
20     time, I think.  I'm not sure, but I know that
21     it was brief, whatever contact I had with
22     her.
23  Q. Did you contact her, or did she contact you?
24  A. I believe I'm always the one that would call
```

Page 57

```
 1     her office.
 2  Q. How did you have her phone number?
 3  A. I'm not sure if he left the card or I found
 4     her on my own.
 5  Q. In any event, you called Rosemary Scapicchio?
 6  A. Yes.
 7  Q. And this is at or around the time you were
 8     meeting with the investigator?
 9  A. Somewhere around there.
10  Q. Okay.  And what conversation did you have
11     with her?
12        MS. SCAPICCHIO: Objection, asked
13     and answered.
14  A. It was -- it was brief.  I don't remember the
15     conversation, but it wasn't nothing like, you
16     know, drawn put or anything like that,
17  Q. Did Ms. Scapicchio tell you that other
18     witnesses  had  been  threatened?
19        MS. SCAPICCHIO: Objection.
20  A. No.  You know, I don't even think no one
21     else -- I think we were going to court for
22     this new trial; that's when I found out about
23     other witnesses, what happened to them, like
24     being intimidated and stuff.
```

Page 58

```
 1  Q. How'd you find that out?
 2  A. In the lunchroom talking and things like
 3     that.
 4  Q. Did Ms. Scapicchio tell you anything about
 5     Mary Alexander?
 6  A. No.
 7        MS. SCAPICCHIO: objection.
 8  Q. Did Ms. Scapicchio tell you that Mary
 9     Alexander was suffering from brain cancer at
10     the time that she -- at the time of the trial
11     of Shawn Drumgold?
12        MS. SCAPICCHIO: objection.
13  A. No.
14  Q. Were you aware that --
15        MR. ROACHE: Well strike that.
16  Q. When was the next time you spoke with
17     Ms. Scapicchio?
18        MS. SCAPICCHIO: objection, asked
19     and answered.
20  A. I think before I had to come here, like the
21     first contact that I had to come here.
22  Q. All right.  So you received a subpoena to
23     appear at a deposition?
24  A. Yeah, a notice, subpoena, yeah.
```

Page 59

```
 1  Q. Okay.  And why did you contact Rosemary
 2     Scapicchio?
 3        MS. SCAPICCHIO: Objection.
 4  A. Because I wanted to know what it was about,
 5     what should I do, do I have to go.
 6  Q. Did you contact anyone else other than
 7     Ms. Scapicchio?
 8  A. No.
 9  Q. Why didn't you contact the name of the
10     attorney whose name appeared on the subpoena?
11  A. I don't know.
12  Q. How did you know to locate Ms. Scapicchio?
13  A. Because she's affiliated with the case.
14     She's on Shawn Drumgold's side, so who else
15     am I going to talk to?
16  Q. Okay.  How did you know how to contact her?
17  A. I believe that private eye left a card or
18     something, something with her name or
19     something, that he was representing her, so
20     that'show I found out about her.
21  Q. Did you speak with Ms. Scapicchio at the
22     courthouse before you testified at the motion
23     for new trial?
24        MS. SCAPICCHIO: objection, asked
```

Page 60

```
 1     and answered.
 2  A. I don't believe so.
 3  Q. At the time of the trial of Shawn Drumgold
 4     and Terrance Taylor, were you aware that Mary
 5     Alexander testified?
 6  A. After the fact.
 7  Q. Did you and Mary Alexander have any
 8     conversation before the trial about her
 9     testifying?
10  A. No.
11  Q. So when Mary Alexander testified, you had no
12     conversation with her before her testimony?
13  A. No.
14        MS. SCAPICCHIO: Objection.
15  BY MR. ROACHE:
16  Q. How did you learn that Mary Alexander
17     testified at trial?
18        MS. SCAPICCHIO: objection, asked
19     and answered.
20  A. Talk in the house.  Like you hear her mother,
21     and you just hear her talking about it.
22  Q. And did you talk to her about it?
23  A. No.
24  Q. But you overheard her talking to her mother?
```

# **EXHIBIT F**

## **(2)**

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2               DISTRICT OF MASSACHUSETTS
 3        -----------------------X
 4    SHAWN DRUMGOLD,
           Plaintiff
 5
 6    V.              Case No.  04-11193NG
 7    TIMOTHY CALLAHAN, FRANCIS
      M. ROACHE, PAUL MURPHY,
 8    RICHARD WALSH, and the
      CITY OF BOSTON,
 9          Defendants
      -----------------------X
10
11
12           DEPOSITION OF GEMINI HULLUM, a
13    witness called to testify by and on behalf of
14    the Defendants, pursuant to the applicable
15    rules of the Federal Rules of Civil
16    Procedure, before M. ELAINE GANSKA, a
17    Stenographic Reporter and Notary Public in
18    and for the Commonwealth of Massachusetts, at
19    the offices of Bonner Kiernan Trebach &
20    Crociata, Attorneys at Law, One Liberty
21    Square, Boston, Massachusetts, on Monday,
22    February 20, 2006, commencing at 11:15 a.m.
23
24        781-585-6741  FEDERAL COURT REPORTERS  978-535-8333
```

**Page 2**

```
 1    APPEARANCES
 2    TOMMASINO & TOMMASINO,
      BY: MICHAEL W. REILLY, Attorney at Law
 3    Two Center Plaza
      Boston, Massachusetts 02108-1904
 4    ON BEHALF OF: The Plaintiff
 5
 6    BONNER KIERNAN TREBACH & CROCIATA
      BY: HUGH R. CURRAN, Attorney at Law
 7    One Liberty Square
      Boston, Massachusetts 02109
 8    ON BEHALF OF: Defendant Walsh
 9    HOGAN, ROACHE & MALONE
      BY: JOHN P. ROACHE, Attorney at Law
10    66 Long Wharf
      Boston, Massachusetts 02110
11    ON BEHALF OF: Defendants City of Boston
      and Roache
12
13    MORGAN, BROWN & JOY
      BY: MARY JO HARRIS, Attorney at Law
14    200 State Street
      Boston, Massachusetts 02109-2605
15    ON BEHALF OF: Defendant Callahan
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1            I N D E X
 2    Deposition of              Page
      GEMINI HULLUM
 3
      Examination by Mr. Curran      9
 4    Examination by Mr. Roache    172
 5
 6
 7
 8
 9            E X H I B I T S
      No.                     Page
10    1-2     Subpoenas        82
11    3       Map              82
12    4       Map              82
13    5       Map              83
14    6       Affidavit       162
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1              STIPULATIONS
 2         It is hereby stipulated and agreed
 3    by and between Counsel for the respective
 4    parties and the Deponent that the Deponent
 5    shall read and sign the deposition transcript
 6    within 30 days of receipt before any Notary
 7    Public.
 8         It is further stipulated that all
 9    objections, except as to form, and motions to
10    strike are reserved to the time of trial.
11              PROCEEDINGS
12         MR. CURRAN: Ms. Hullum, my name
13    is Hugh Curran. I'm an attorney at Bonner
14    Kiernan Trebach & Crociata. I represent
15    Richard Walsh in a matter, Shawn Drumgold vs.
16    Richard Walsh, Timothy Callahan, Francis
17    Roache, and the City of Boston. You're a
18    witness in this matter, and you've been
19    subpoenaed to testify today, and that's why
20    you are here to testify.
21         MS. HULLUM: Well I plead the
22    fifth, so that's what I'm here to let you
23    know.
24         MR. CURRAN: Have you had an
```

**Page 5**

```
 1    opportunity to obtain counsel?
 2         MS. HULLUM: No, I haven't.
 3         MR. CURRAN: And would you like
 4    that opportunity to obtain counsel?
 5         MS. HULLUM: why would I need to
 6    obtain counsel? I'm not on trial for
 7    anything.
 8         MR. CURRAN: okay. Then that's
 9    the reason why you just can't say you plead
10    the fifth.
11         MS. HULLUM: why not? I've
12    already went to court. I've already
13    testified. This is a civil matter. It has
14    nothing to do with me. I'm not suing
15    anybody, so why would I not be able to plead
16    the fifth?
17         MR. CURRAN: I'm not your
18    attorney. You can decide to do what you
19    would like to do, but we are representing the
20    parties in this case. Mr. Reilly represents
21    Shawn Drumgold, and the other attorneys here
22    represent individual parties to this
23    litigation. As a result of Mr. Drumgold
24    filing a civil action, the parties are
```

**Page 6**

```
 1    entitled to discovery. Discovery includes
 2    deposing witnesses. You were a witness in
 3    this case, and we intend to go forward this
 4    morning and ask you questions relative to
 5    your knowledge about this matter. If you
 6    choose not to answer questions, then we will
 7    be forced to file a motion to compel and seek
 8    an order of the Court in the Federal Court.
 9         Are you prepared to go forward
10    today?
11         MS. HULLUM: You're Shawn's
12    lawyer?
13         MR. REILLY: I am.
14         MS. HULLUM: Where's Rosemary?
15         MR. REILLY: She's home with her
16    sick baby right now.
17         THE WITNESS: oh, she has the
18    opportunity to be home with her baby, huh?
19         MR. REILLY: If you ask me a
20    question, I'll tell you the answer.
21         MS. HULLUM: So
22    what's-her-name - why am I testifying here
23    today if I've already testified?
24         MR. REILLY: Because you testified
```

304

VOLUME   II
PAGES  304-338
EXHIBIT  18

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-11193NG

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

SHAWN  DRUMGOLD,
        Plaintiff

vs.

TIMOTHY CALLAHAN, FRANCIS M.
ROACHE, PAUL MURPHY, RICHARD WALSH,
AND THE CITY OF BOSTON,
        Defendants

* * * * * * * * * * * * * * * * * * * * * * * * * * * *


        CONTINUED DEPOSITION OF GEMINI HULLUM, a

witness called by counsel for the Defendant,

Richard Walsh, taken pursuant to the applicable

provisions of the Federal Rules of Civil

Procedure, before Joann Denning, a Shorthand

Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the offices

of Bonner Kiernan Trebach & Crociata, One

Liberty Square, Boston, Massachusetts, on

Thursday, May 11, 2006, commencing at 4 p.m.


(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

313

```
 1  A.  I don't know.
 2  Q.  Was it in the year 2003 or was it before that?
 3  A.  It's possible it could have been the same year.
 4      I really don't know.
 5  Q.  Since your last deposition on February 20th,
 6      have you reviewed your deposition transcript?
 7  A.  Yes, I have.  I just told you that.
 8  Q.  You said it contains many mistakes?
 9  A.  Yes, it does.
10  Q.  What type of mistakes does it contain?
11  A.  One, you wrote that I said Romaro Holiday hung
12      on Castlegate.  I did not say that.  Then in
13      the statement after that it says that I said he
14      traveled through there to get home.  So how
15      would I say he hung on there, but then he's
16      traveling through to get home?
17  Q.  Did you make out or fill out an errata sheet?
18  A.  No, I didn't.  It's in here, too.  I don't have
19      time to fill that out.  I barely had time to go
20      over it.  I have three children and I work and
21      I have a full life with a lot of
22      responsibilities besides this.
23  Q.  Ms. Hullum, did you speak with anyone from the
24      day of your first deposition to today
```

(781) 585-6741  FEDERAL COURT REPORTERS  (978) 535-8333

314

```
 1      concerning the contents of your deposition,
 2      what you testified to?
 3  A.  No.
 4  Q.  Have you spoken to anyone since February 20th,
 5      2006, about Shawn Drumgold?
 6  A.  No.  Rosemary, that's it.
 7  Q.  By Rosemary, are you referring to Rosemary
 8      Scapicchio?
 9  A.  Yes.  I call her Rosemary because I don't know
10      how to pronounce her name.
11  Q.  When did you speak with Ms. Scapicchio?
12  A.  Shortly after being here because I was supposed
13      to be here prior to this, but I was running
14      late and I said I would be here, but they said
15      reschedule because of the other attorneys'
16      scheduling.  I called her to ask her why do I
17      have to come back down here.  You all keep
18      repeating the same questions over and over to
19      me.  I don't want to be bothered.  I can come
20      to the trial.  I don't need to do this through.
21  Q.  Well, why did you call Ms. Scapicchio?
22  A.  Because she's Shawn's lawyer and I wanted to
23      know why am I being called down here.  That's
24      what I wanted to know, from her, not from you.
```

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

315

```
 1  Q.  Ms. Scapicchio was not present at your
 2      deposition, was she?
 3  A.  So what?
 4  Q.  Mr. Reilly is representing Shawn Drumgold.
 5  A.  I don't have his number.
 6  Q.  How did you have Ms. Scapicchio's number?
 7  A.  I don't know.  I don't remember, but I have it.
 8      Oh, you gave me your card when I left here or
 9      something like that because I don't have her
10      number just, like, in my phone book or
11      anything.  I don't contact her.
12  Q.  So Mr. Reilly gave you —
13  A.  I think you gave me your card, right, because I
14      told you I wanted to speak to Rosemary.
15          MR. REILLY:  They don't let me testify.
16  Q.  He can't testify.
17  A.  Whatever, testify.  When I spoke with him out
18      by the elevator, I was very upset as I relayed
19      to him for being here, you asking me the same
20      questions, whatever you're trying to trap me up
21      or whatever.  It's very aggravating.  Like I
22      just said, I have a full life and my hands are
23      full with my children by myself.
24          So I told him I wanted to speak to
```

(781) 585-6741  FEDERAL COURT REPORTERS  (978) 535-8333

316

```
 1      Rosemary to find out why am I going to keep
 2      coming back here because you request that I
 3      come back here with some letters from 2001 or
 4      2002, whenever it was written.
 5  Q.  So you had conversation with Mr. Reilly, and he
 6      gave you a business card?
 7  A.  I do believe so, or either he gave me
 8      Rosemary's number.
 9  Q.  He gave you Rosemary's number?
10  A.  Either one, I just said.
11  Q.  Do you have a card?
12  A.  I don't remember.
13  Q.  Apart from Ms. Scapicchio, have you spoken to
14      anyone else since February 20th of this year
15      concerning Shawn Drumgold?
16  A.  I just told my sister that I have to come down
17      here because of all this and this and that,
18      but, no, not in detail.  Like, she doesn't know
19      anything about the case other than the media.
20  Q.  Which sister did you speak with?
21  A.  My sister Adrienne.
22  Q.  Do you still currently reside in Canton —
23      Canton Street?
24  A.  Yeah.
```

(781) 585-6741  FEDERAL COURT REPORTERS (978) 535-8333

317

```
 1  Q.  In Randolph?
 2  A.  Yes.
 3  Q.  Who owns that dwelling?
 4  A.  Her name is Janet Lynch.  Why?
 5  Q.  You testified at the first deposition that you
 6      were planning on moving from there.
 7  A.  I have to move.  And what's your point?  Why
 8      are you asking me my landlord's name?  Just
 9      like in these transcripts, all these questions
10      about my mother and this and that has nothing
11      to do with this case.
12  Q.  Why do you have to move from Randolph?
13  A.  Because she wants her place back.  That's why.
14  Q.  Is it a single family home?
15  A.  No, it's not.  It's a duplex, two-sided.
16  Q.  Does Ms. Lynch live there?
17  A.  No, she doesn't.  I'm living in where she
18      lived.
19  Q.  When do you plan on moving from there?
20  A.  When I find a place.
21  Q.  Are you currently looking for a place?
22  A.  I sure am.
23  Q.  Where are you looking?
24  A.  Anywhere I want.  That's none of your business.
```

(781) 585-6741  FEDERAL COURT REPORTERS (978) 535-8333

318

```
 1      It has nothing to do with this case.  It's none
 2      of your business.
 3  Q.  It does, ma'am, because we may have to --
 4  A.  You can write that down, none of his business.
 5  Q.  Well, I beg to differ because you may be called
 6      as a witness, and we have to have the ability
 7      to locate you.
 8  A.  That has nothing to do with where I live, who
 9      my landlord is and, etc., nothing.
10  Q.  You testified at the first deposition hearing
11      that you came in contact with Shawn Drumgold
12      through Arlis Evans, is that correct?
13  A.  Yeah, it is correct.
14  Q.  What was your relationship or what is your
15      relationship with Arlis Evans?
16  A.  He has a child with Holland's sister, my kid's
17      father.  He's a friend.  I know him.  That's
18      the relationship.  I know him.  He's a friend.
19  Q.  He has a child with whom?
20  A.  With my sister-in-law.
21  Q.  How did you communicate with Arlis Evans?
22  A.  I wrote him.
23  Q.  Did he write you?
24  A.  Yeah.  I've been writing him off and on during
```

(781) 585-6741  FEDERAL COURT REPORTERS (978) 535-8333

# EXHIBIT F

## (3)

VOLUME I
PAGES 1-105
EXHIBITS 19-21

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-11193NG

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

SHAWN DRUMGOLD,
        Plaintiff

vs.

TIMOTHY CALLAHAN, FRANCIS M.
ROACHE, PAUL MURPHY, RICHARD WALSH,
AND THE CITY OF BOSTON,
        Defendants

* * * * * * * * * * * * * * * * * * * * * * * * * * * *


        DEPOSITION OF OLISA GRAHAM, a witness

called by counsel for the Defendant, Richard

Walsh, taken pursuant to the applicable

provisions of the Federal Rules of Civil

Procedure, before Joann Denning, a Shorthand

Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the offices

of Bonner Kiernan Trebach & Crociata, One

Liberty Square, Boston, Massachusetts,

on Wednesday, May 17, 2006, commencing

at 10:04 a.m.


(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

7

```
1          S T I P U L A T I O N S
2              It is hereby stipulated and agreed among
3    counsel for the respective parties that the
4    deponent shall read and sign the deposition
5    transcript under the pains and penalties of
6    perjury within 30 days of receipt and that the
7    notarization of signature is waived.
8              It is further stipulated that all
9    objections, except as to form of the question,
10   and motions to strike shall be reserved until
11   the time of trial.
12             (Exhibit No. 19, Copy of Subpoena, marked
13   for Identification.)
14             OLISA GRAHAM, having been satisfactorily
15   identified and duly sworn, on oath, deposes and
16   testifies as follows:
17   DIRECT EXAMINATION BY MR. ROACHE
18 Q.  Good morning, Ms. Graham.  My name is John
19   Roache.  I represent the City of Boston and
20   former Police Commissioner Francis Roache in a
21   lawsuit that was brought by Shawn Drumgold
22   against Timothy Callahan, former Commissioner
23   Roache, Paul Murphy, Richard Walsh, and the
24   City of Boston.
         (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

8

```
1   Q.  Attached to the subpoena is a Schedule A
2       requesting that you bring any documents that
3       may be responsive to the schedule.
4   A.  Right.
5   Q.  Did you read the Schedule A?
6   A.  Yes, I did.
7   Q.  Did you understand what you were required to
8       bring with you?
9   A.  Yes.
10  Q.  Did you search for any documents that might be
11      responsive to Schedule A?
12  A.  I don't have any documents.
13  Q.  Did you look for any documents?
14  A.  I don't have any.  I know I didn't have any.
15  Q.  I just want to make sure for the record.  We're
16      going to go through each of the document
17      requests.
18          MS. SCAPICCHIO:  Objection.  She just said
19      she didn't have any.
20  Q.  Request No. 1 asks whether or not to bring with
21      you today any and all correspondence between
22      yourself and Shawn Drumgold and/or
23      representatives of Shawn Drumgold.
24          MS. SCAPICCHIO:  Objection, asked and
         (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

5

```
1              Each of these attorneys represent one of
2    the defendants, with the exception of
3    Ms. Scapicchio who represents Shawn Drumgold.
4              Do you understand the nature of the lawsuit,
5    what it's all about?
6   A.  No.
7   Q.  Have you ever discussed the lawsuit that was
8       brought in this action?  Have you discussed it
9       with anyone?
10  A.  No.  I spoke with someone who sent me the
11      summons.  I forget her name.  But I spoke with
12      her and asked her what it was about.  She just
13      told me that.
14  Q.  Prior to your coming to the deposition today
15      you received a subpoena to appear here today?
16  A.  Yes.
17  Q.  I'm going to show you what's been marked as
18      Exhibit No. 19 and ask if that's the subpoena
19      that you received to appear here today, or a
20      copy of the subpoena.
21  A.  A copy of the subpoena.  I have the original in
22  .   my bag.
23  Q.  Would you produce the original, please?
24          (Document handed to counsel.)
      (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

8

```
1       answered,
2   Q.  Did you ever have any documents that are
3       responsive to that request?
4   A.  As far as newspaper clippings, I did.
5   Q.  Did you ever correspond with Shawn Drumgold
6       from August of 1988 to the present?
7   A.  No.  I saw him when he came home.
8   Q.  Did you ever write him any letters?
9   A.  No.
10  Q.  Did he ever write you any letters?
11  A.  No.
12  Q.  Did you ever speak to him on the telephone from
13      August of 1988 to the present?
14  A.  No.
15  Q.  Did you ever call him on the telephone from
16      August of 1988 to the present?
17          MS. SCAPICCHIO:  Objection.  She didn't
18      speak to him.  How could she call him?
19  A.  No.
20  Q.  Did he ever call you or attempt to call you —
21          MS. SCAPICCHIO:  Objection, asked and
22      answered.
23  Q.  -- from August of 1988 to the present?
24  A.  No.
         (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

6

```
1          MR. ROACHE:  We can mark that as an
2       exhibit.
3          (Exhibit No. 20, Original Subpoena with
4       Cover Letter, marked for Identification.)
5   Q.  You produced a cover letter from Bonner Kiernan
6       Trebach & Crociata as well as a subpoena that
7       you received.  Did you receive the subpoena in
8       the mail?
9   A.  It was in my home when I got home.
10  Q.  It was in your home?
11  A.  Yeah.  I assume they came in the mail.
12  Q.  Do you recall when you received the subpoena?
13  A.  A few days after I spoke with her.
14  Q.  With whom did you speak?
15  A.  I can't remember her name.
16  Q.  Was it the person who sent you this letter?
17  A.  Kate, it could have been.
18  Q.  Did you call this law firm, Bonner Kiernan?
19  A.  No.  They contacted me.
20  Q.  They contacted you?
21  A.  Yes.
22  Q.  When you received the subpoena, did you read
23      it?
24  A.  Yes.
         (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

9

```
1   Q.  Have you received any letters from any attorney
2       on behalf of Shawn Drumgold from August 1988 to
3       the present?
4   A.  When you say from — when the case -- when I
5       went to court.
6   Q.  From 1988, the day that Tiffany Moore was
7       killed, have you spoken to any attorneys on
8       behalf of Shawn Drumgold who were representing
9       Shawn Drumgold?
10  A.  Rosemary.
11  Q.  Rosemary.  Who is Rosemary?
12  A.  (Indicating).
13  Q.  Ms. Scapicchio?
14  A.  Yes.
15  Q.  You refer to her as Rosemary?
16  A.  I can't remember her last name.
17  Q.  On how many occasions did you speak with
18      Ms. Scapicchio?
19  A.  When the trial -- was it two years ago, the
20      trial?  Two years ago, probably twice.
21  Q.  When you mean the trial, are you referring to
22      the time that you testified at a motion for new
23      trial -
24  A.  Yes.
         (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

# EXHIBIT F

## (4)

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
 2
 3    ------------------------------X
      SHAWN DRUMGOLD,
 4         Plaintiff
 5
 6    V.                    Case No. 04-11193NG
 7    TIMOTHY CALLAHAN, FRANCIS
      M, ROACHE, PAUL MURPHY,
 8    RICHARD WALSH, and THE
      CITY OF BOSTON,
 9         Defendants
      ------------------------------X
10
11           DEPOSITION OF VANTRELL
12    McPHERSON, a witness called to testify by and
13    on behalf of the Defendants, pursuant to the
14    applicable rules of the Federal Rules of
15    Civil Procedure, before M. ELAINE GANSKA, a
16    Stenographic Reporter and Notary Public in
17    and for the Commonwealth of Massachusetts, at
18    the offices of Bonner Kiernan Trebach &
19    Crociata, Attorneys at Law, One Liberty
20    Square, Boston, Massachusetts, on Friday,
21    March 17, 2006, commencing at 9:40 a.m.
22
23           FEDERAL COURT REPORTERS
24       781-585-6741        978-535-8333
```

**Page 2**

```
 1    APPEARANCES
 2    TOMMASSINO, & TOMMASSINO
      BY: MICHAEL W. REILLY, Attorney at Law
 3    2 Center Plaza
      Boston, Massachusetts 02110
 4    ON BEHALF OF: The Plaintiff
 5    BONNER KIERNAN TREBACH & CROCIATA
      BY: HUGH R. CURRAN, Attorney at Law
 6    One Liberty Square
      Boston, Massachusetts 02109
 7    ON BEHALF OF: Defendant Walsh
 8
 9    HOGAN, ROACHE & MALONE
      BY: JOHN P. ROACHE, Attorney at Law
10    66 Long Wharf
      Boston, Massachusetts 02110
11    ON BEHALF OF: Defendants Roache and City
      of Boston
12
13    MORGAN, BROWN & JOY, LLP
      BY: MARY JO HARRIS, Attorney at Law
14    200 State Street
      Boston, Massachusetts 02109-2605
15    ON BEHALF OF: Defendant Callahan
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1            I N D E X
 2    Deposition of              Page
      VANTRELL MCPHERSON
 3    Examination by Mr. Roache        4
 4
 5
 6
 7
 8          E X H I B I T S
 9    No.                       Page
10     1    Subpoena             10
11     2    Affidavit of Vantrell
               McPherson          24
12     3    Map                 112
13     4    Map                 141
14     5    Document            149
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1              STIPULATIONS
 2         It is hereby stipulated and agreed
 3    by and between Counsel for the respective
 4    parties and the Deponent that the reading,
 5    signing, and filing of the deposition
 6    transcript are hereby waived.
 7         It is further stipulated that all
 8    objections, except as to form, and motions to
 9    strike are reserved to the time of trial.
10              PROCEEDINGS
11         VANTRELL MCPHERSON, a witness
12    called for examination by Counsel for the
13    Defendants, having been satisfactorily
14    identified and duly sworn, was examined and
15    testified as follows:
16         EXAMINATION BY MR. ROACHE
17    Q. Would you please tell us your name?
18    A. Vantrell Valisa McPherson.
19    Q. How do you spell that, please?
20    A. Valisa?
21    Q. How do you spell it?
22    A. V-A-L-I-S-A.
23    Q. One S, one A?
24    A. Yeah.
```

**Page 5**

```
 1    Q. Okay.  And McPherson is M-A-C?
 2    A. Yeah — no, no, no, M-C.
 3    Q. M-C, okay.  P-H-E-R-S-O-N?
 4    A. Yes.
 5    Q. Okay.  Ms. McPherson, have you ever had your
 6       deposition taken before?
 7    A. No -
 8    Q. All right.
 9    A. — not that I know.
10    Q. You're going to be asked a series of
11       questions concerning the subject matter of
12       this litigation by myself and perhaps by
13       other attorneys --
14    A. Mm-hmm.
15    Q. — and we're going to ask you to answer to
16       the best of your ability.  There will be no
17       trick questions.  We're not trying to sneak
18 up on you.  We're just going to ask you
19       simple questions.  If you answer to those
20       questions, we assume by your answering that
21       you understand the question and are answering
22       it truthfully.
23    A. Mm-hmm.
24    Q. Now in order to answer the question, as you
```

**Page 6**

```
 1       see, we have a court stenographer here --
 2    A. Yeah.
 3    Q. -- so you must verbalize your answers.  In
 4       other words, you cannot shake your head or
 5       nod your head or say mm-hmm or huh-uh.  You
 6       have to answer yes, no, or in word form so
 7       that the stenographer can take it down
 8       accurately.
 9    A. Okay.
10    Q. Do you understand that?
11    A. Yes.
12    Q. Okay.  Now since you've never had your
13       deposition taken before, you may hear at some
14       point one or more lawyers objecting to a
15       question.  You are to answer that question
16       despite the objection because we have
17       stipulated that all objections except to the
18       form of the question will be reserved until
19       time of trial.  That's legalese for saying
20       you do answer the question despite anyone
21       objecting to it.  Do you understand that?
22    A. Yes.
23    Q. Okay.  Have you consumed any drugs or
24       medication within the last 24 hours?
```

Page 19

1    testified at this motion for new trial that
2    these investigators spoke with you?
3  A. Ask me the question again?
4  Q. How long before you testified at the motion
5    for new trial did you speak to these
6    investigators?
7  A. I don't know how long it was. I don't know.
8  Q. You don't know?
9  A. No, I don't remember.
10 Q. Okay. Do you remember the date you testified
11   at the motion for new trial?
12 A. No.
13 Q. Do you remember your testimony at the motion
14   for new trial? Do you remember what you
15   testified to?
16 A. Yes.
17 Q. Okay. Now if I were to tell you that you
18 testified on July 29th of 2003, does that
19   help you remember as to when you may have
20   spoken to some investigators?
21 A. No.
22 Q. It does not?
23 A. No.
24 Q. Okay. How many investigators were there?

Page 20

1  A. Two.
2  Q. Can you describe them for me?
3  A. No.
4  Q. Were they --
5  A. They were white.
6  Q. Were they white gentlemen?
7  A. Yes.
8  Q. Were they both gentlemen?
9  A. Yeah.
10 Q. Okay. Did they wear jackets and ties?
11 A. Yes.
12 Q. Okay, Do you recall the names of either of
13   the gentlemen?
14 A. No.
15 Q. Do you recall the name of Scott Keller?
16 A. No.
17 Q. Do you recall the name of Thomas O'Leary?
18 A. No.
19 Q. Would you be able to identify these
20   investigators if you were shown pictures of
21   them?
22 A. No.
23 Q. Okay. Prior to your testifying at the motion
24   for new trial, did you have a conversation

Page 21

1    with an attorney by the name of Rosemary
2    Scapicchio?
3  A. Yes.
4  Q. On how many occasions did you speak to
5    Rosemary Scapicchio before the motion for new
6    trial?
7  A. I spoke to her the day of the -- the day of
8    the trial.
9  Q. The day of the trial?
10 A. Yes.
11 Q. And did you speak to her at any time before
12   that?
13 A. I think I did when they was -- they told me I
14   had to go to court.
15 Q. And who told you that you had to go to court?
16 A. She was -- I think I spoke to Ms. Rosemary
17   about going to court --
18 Q. Okay.
19 A. -- and I had to testify.
20 Q. On how many occasions did you speak with
21   Ms. Scapicchio about going to court?
22 A. I think it was just once.
23 Q. Okay. Where were you when you spoke with
24   her?

Page 22

1  A. It was over the phone. She was on the phone.
2  Q. And you spoke one time?
3  A. Mm-hmm.
4  Q. Did you have any conversation with
5    Ms. Scapicchio about signing an affidavit?
6  A. That sounds familiar, yeah.
7  Q. That sounds familiar?
8  A. Mm-hmm.
9  Q. Did you give either Ms. Scapicchio or any
10   investigator any information concerning your
11   knowledge about testifying at the original
12   trial of Shawn Drumgold?
13 A. Did I give the investigator?
14 Q. Right
15 A. Any information?
16 Q. Right.
17 A. No.
18 Q. Okay.
19 A. The conversation wasn't about that.
20 Q. Do you recall signing an affidavit?
21 A. Yes.
22 Q. Okay. Do you recall when it was that you
23   signed --
24 A. No.

Page 23

1  Q. -- the affidavit?
2  A. No.
3  Q. Do you recall who gave you the affidavit —
4  A. No.
5  Q. — to sign?
6        Who requested that you signed an
7    affidavit?
8  A. I don't remember.
9  Q. Was it Ms. Scapicchio?
10 A. I don't remember.
11 Q. Okay. Who prepared the affidavit?
12 A. I don't know.
13 Q. Did you prepare it?
14 A. No.
15 Q. Did you write it?
16 A. The affidavit?
17 Q. Yes.
18 A. No. Somebody must have printed it. I didn't
19   write nothing.
20 Q. Okay. Did you supply anyone any information
21   concerning the contents of the affidavit?
22 A. Ask that question again?
23 Q. Did you speak to anyone before you signed the
24   affidavit about the information that was

Page 24

1    contained in the affidavit?
2  A. No, I don't recall.
3  Q. You don't recall?
4  A. Hmm-mm.
5  Q. But you do you recall signing an affidavit?
6  A. Yes.
7  Q. Okay. Do you recall where you were when you
8    signed it?
9  A. No.
10 Q. Did you sign it at home?
11 A. I don't remember. I don't remember.
12 Q. Did you sign it at someone's office?
13 A. I don't remember.
14 Q. Okay. But you do remember signing the
15   affidavit?
16 A. Yeah.
17 Q. Okay.
18        MR. ROACHE: Mark that as the next
19   exhibit, please.
20        (Affidavit of Vantrell McPherson
21        marked Deposition Exhibit Number 2
22        for identification)
23 Q. Ms. McPherson, I'm going to show you what has
24   been marked as Exhibit Number 2 which is a