**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SHAWN DRUMGOLD, | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | ) Civ.  Action No. 04-11193-NG |
| | ) |
| CITY OF BOSTON, et al, | ) |
|     Defendants. | ) |

GERTNER, D.J.

**TABLE OF CONTENTS:**
MEMORANDUM AND ORDER RE:  GENERAL DISCOVERY
May 1, 2007

I.   **INTRODUCTION** . . . . . . . . . . . . . . . . . . . -1-

II.  BACKGROUND . . . . . . . . . . . . . . . . . . . . -8-
    A.  **Boston Globe Series** . . . . . . . . . . . . . -8-
    B.  **Drumgold's Claims** . . . . . . . . . . . . . -9-
    C.  **Defendants' Claims** . . . . . . . . . . . . -11-
        1.  **Gemini Hullum** . . . . . . . . . . -12-
        2.  **Antonio Anthony** . . . . . . . . . -17-
        3.  Lola Alexander . . . . . . . . . . -18-
        4.  **Vantrell McPherson** . . . . . . . -19-
        5.  Betty and Tracie Peaks . . . . . . -21-

III. MOTIONS TO COMPEL . . . . . . . . . . . . . . . -24-
    A.  **Witness Testimony (Except for Lehr)** . . . . -24-
    B.  **Deposition of Lehr** . . . . . . . . . . . . -25-

IV.  **DEPOSITION OF SCAPICCHIO** . . . . . . . . . . . -31-

V.   LIEUTENANT JOHN DALEY . . . . . . . . . . . . . -35-

VI.  **MOTIONS TO SEAL** . . . . . . . . . . . . . . . -40-

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHAWN DRUMGOLD, ) | |
|     Plaintiff, ) | |
| ) | |
|     v. ) | Civ.  Action No. 04-11193-NG |
| ) | |
| CITY OF BOSTON, et al, ) | |
|     Defendants. ) | |

GERTNER, D.J.

### MEMORANDUM AND ORDER RE:  GENERAL DISCOVERY
May 1, 2007

## I.    INTRODUCTION

Plaintiff Shawn Drumgold is suing defendant police officers, police commissioner, and City of Boston under 42 U.S.C. § 1983 and Mass. Gen. Laws ch.12, § 11I for violations of his rights under the Massachusetts and United States constitutions arising from his wrongful conviction and fifteen-year imprisonment for first-degree murder.  Plaintiff alleges that not only was he innocent of the crime for which he was imprisoned, but defendant police officers deliberately manipulated witnesses and withheld exculpatory information during his criminal trial.  Plaintiff also argues that the City and the Police Department facilitated this misconduct by failing to correct or punish similar misconduct for years and by failing to adequately train police officers.

Defendants have vigorously denied wrongdoing and are aggressively defending the case.  Indeed, defendants' most recent

pleadings for discovery make a series of counter-allegations, putting the shoe on the other foot, so to speak. They claim that this time it is plaintiff's counsel and, to a degree, a <u>Boston Globe</u> reporter who have manipulated and improperly influenced witnesses to change their testimony from the trial testimony, which implicated Drumgold, to the post-trial versions, which did not. Defendants' charges are serious; witness manipulation raises ethical concerns. They seek to depose Rosemary Scapicchio, Drumgold's lawyer for over ten years (document #76). If they do - if Scapicchio becomes a fact witness here - her disqualification is likely. Defendants also seek to depose Richard Lehr (document #57), the <u>Boston Globe</u> reporter who covered the matter, suggesting that he has become so embroiled in this matter that he too fed information to witnesses.

One has to stand back for a moment and analyze these charges in context: As the complaint alleges, when plaintiff speaks of <u>influence</u>, he charges the police with threatening a witness with a murder prosecution or threatening to resurrect an old shoplifting charge if the witness did not cooperate. In contrast, when defendants speak of <u>influence</u>, they refer to Scapicchio influencing the same witnesses by talking to them on the phone before her investigator interviewed them, drafting multiple versions of affidavits (apparently as her understanding

of their testimony evolved), and being called "Rosemary" by several witnesses rather than "Ms. Scapicchio."

The claims against Scapicchio do not remotely rise to the level of risking disqualification of counsel and the disruption of the attorney-client relationship.  The claims against Lehr are even more tenuous.

The defendants will not be hamstrung in their defense by these rulings protecting the attorney-client relationship and a reporter's status.  I intend to make certain that defendants will have all they need for their defense to these false imprisonment claims.  They seek to depose each and every witness to the events, apart from Scapicchio and Lehr (documents ##57, 90); I will take whatever steps are necessary to see to it those witnesses attend and complete their depositions.[1]  They can explore how each witness changed his or her testimony, who contacted them and when.  They can track all versions of the testimony, both written and oral.

Moreover, they have had access to Scapicchio's investigator, to his notes, and whatever notes were in the files of the

---

[1] Defendants have moved to prohibit plaintiff's counsel from suggesting to witnesses how they may avoid being deposed (document #88).  Again, the accusations are vague and insupportable.  Plaintiff has moved to strike that motion (document #89).  **Both motions are DENIED**.  Scapicchio is on notice, however, that should these accusations prove to be true, the Court will take action.

original counsel to Drumgold.[2]  If they show that some of those witnesses are wavering in the account that they gave to the Superior Court judge on Drumgold's motion for a new trial, they can suggest to the jury that no one knows the truth of the allegations against Drumgold, that the initial charges were in good faith, and that they did the best they could with the civilian witnesses they had.  What they cannot have -- at least on this record -- is a fishing expedition with a lawyer, the sole purpose of which is to have her disqualified.  To be sure, should the facts change -- should any information about how  Scapicchio deals with witnesses raise meaningful ethical concerns -- I will take action to stop it.  Defendant's motion to take Scapicchio's deposition (document #76) is **DENIED.**

Likewise, defendants want to depose Lehr to see if he too may have influenced these witnesses or received inconsistent versions of their statements.  This too is a fishing expedition, and, on this record, one that raises serious First Amendment concerns.  Again, defendants have access to the witnesses themselves and to their accounts of their dealings with Lehr.  Those accounts hardly meet the threshold for deposing a reporter.

---

[2] There is a question as to some information in Drumgold's criminal file.  His counsel from the original criminal trial states that he gave the file to Scapicchio, who maintains that she does not have it.  The issue as to this file is a factual one.  Defendants can surely take steps allowed by the Rules to get to the bottom of this.

Defendants' motion to take Lehr's deposition (document #57) is
**DENIED.**

Defendants have also moved to seal certain documents;
plaintiff has indicated it will seal others (documents ##75, 90).
Defendants are seriously concerned with the press that
accompanied Drumgold's release, the extent to which Scapicchio
cooperated with Lehr to get the story told, and the risk that
publicity will continue during this case as well.  Scapicchio was
explicit:  She stated in an interview for the documentary "The
System is Broken" that she "asked the media to become involved
because she was unable to uncover evidence sufficient to obtain a
new trial."  Mary Jo Harris Aff. ¶4.

But again, the defendants' concerns must be put in context:
Defendants did not complain about the publicity when Drumgold was
arrested, when he was convicted, or when numerous post trial
efforts to seek his release failed.  They did not complain about
the pre-trial publicity when Drumgold was painted as a murderer
in one of the most notorious cases in Boston.  But they now
suggest that there was something pernicious when, after that
barrage of publicity favorable to them,  Scapicchio enlisted the
Globe to shine a spotlight on the case with a new perspective,
different from the prior years' coverage of Drumgold's guilt.
This time the Globe covered Drumgold's side of the story: His
claim that he was wrongly convicted.  In some cases, after Lehr

-5-

found witnesses for his articles, Scapicchio followed up with them and vice versa.

The technique is not new.  There has hardly been an "innocence" case that has not used the press, precisely because courts, with their concerns for finality and the substantial post-conviction burdens on defendants, rarely look again at past convictions, after the appellate process has run its course.  Within ethical limits -- and that, of course, is the key -- the approach was not wrong.

I will surely take steps to make certain that, going forward, this civil trial will not be inappropriately tried in the press.  As described below, under the common law standard, judicial documents are presumptively available to the public, unless that presumption is overcome.  See infra §VI.  This is a balancing test -- the Court must exercise its discretion in weighing the factors favoring sealing against the public's right of access.  The parties have not met that test in the papers for which sealing is sought, with the sole exception of certain portions of Daley's papers (see infra § V).

Discovery materials are another matter.  Materials that are produced on discovery are not to be disclosed to the press.  A document does not become public until it has been introduced in a court of law. See In re San Juan Star Co., 662 F.2d 108, 115 (1st Cir. 1981).  By the same token, neither party is to file a

document whose sole purpose to publicize an issue rather than to advance the litigation.

The final witness whose deposition has raised questions on the plaintiff's side is Lieutenant John Daley ("Daley"). Daley is a retired Boston Police Officer. Daley is not a party in this case, but plaintiff seeks his notes bearing on the Tiffany Moore murder, the Drumgold investigation and the supervisory relationships at the Boston Police Department during this period of time. The notes were part of a potential book he sought to write, in which true facts would be interspersed with fictional references. Daley filed a motion for a protective order to prevent discovery of these notes (document #65). I ordered that certain portions of his notes dealing with this case be turned over to counsel on discovery, so that the witness may be questioned about them. As to other materials, I ordered that they be produced in camera to the Court. Plaintiff seeks clarification of the Order (document ##73, 83).

This memorandum and order addresses the following: defendants' motions to compel the testimony of Richard Lehr, Rosemary Scapicchio, and other civilian witnesses who either did not show up for or did not complete their depositions; plaintiff's motions in connection with Daley's notes, and the various motions to seal.

-7-

As to the civilian witnesses other than Lehr and Scapicchio, the Court orders that their testimony is compelled and that any and all steps be taken to make certain that they are deposed (<u>see</u> <u>infra</u> § III.A). A reporter and plaintiff's counsel are another matter: Strong -- very strong -- policy and prudential concerns militate against permitting their depositions, particularly on an inadequate record. Thus, I deny defendant' motions to compel their testimony (<u>see</u> <u>infra</u> §§ III.B, IV). With respect to Daley, the Court's order of January 22, 2007, and the subsequent protective order, stand, with some minor adjustments (<u>see</u> <u>infra</u> § V). On the question of sealing documents, further briefing is required (<u>see</u> <u>infra</u> § VI).

## II.  <u>BACKGROUND</u>

In October 1989, Shawn Drumgold was convicted of the murder of 12-year-old Darlene Tiffany Moore, who had been caught in the crossfire of a gang-related shooting in Roxbury the previous summer. He was sentenced to life in prison without parole. Drumgold maintained his innocence throughout his trial and while in prison.

### A.  <u>Boston Globe Series</u>

In May and June 2003, the <u>Boston Globe</u> published a series of articles by investigative reporter Richard ("Dick") Lehr in which several key prosecution witnesses recanted their testimony and alleged that they had been pressured by detectives from the

Boston Police Department ("BPD") to testify falsely against Drumgold.

B.  **Drumgold's Claims**

In the wake of the article, Drumgold's counsel investigated and interviewed many of the same witnesses, and, as a result of her findings, moved for a new trial.  At the November 6, 2003, hearing on the motion ("2003 hearing"), the witnesses restated their recantations on the record; the motion for a new trial was granted and the government nolle prossed Drumgold's case.  He was released after fifteen years' imprisonment.

At the 2003 hearing, former prosecution witnesses alleged serious misconduct by the three BPD officers who investigated the Moore murder.

- Tracie Peaks testified that she had initially chosen a different man from a photo array, but that defendant Officer Walsh pointed to Drumgold's photo, saying "Doesn't this one look familiar?"  She also alleged that defendant Officer Walsh threatened to have her arrested if she did not testify against Drumgold.

- Eyewitnesses Vantrell McPherson and Eric Johnson both testified that police badgered and threatened them into identifying Drumgold after they were initially unable to identify the shooter from photographs.

- Antonio Anthony ("Anthony"), a friend of Drumgold, testified that he had initially told police that he was with Drumgold at the time of the shooting, but changed his statement after the defendant officers told him that if he testified for Drumgold he himself would be charged with the murder. After he changed his statement, the police provided him with free food and lodging in a hotel for several days.

- Olisa Graham also testified that she had initially told police that she was with Drumgold and Anthony at a location some distance away from the shooting (corroborating Anthony's 2003 testimony), but that she had decided not to testify at the criminal trial after receiving an anonymous phone call in which a man told her that if she testified for Drumgold she would be prosecuted on an open shoplifting case.

- Ricky Evans ("Evans") testified that police fed him facts about the crime and Drumgold - including descriptions of Drumgold's clothes, car, and conversations - that he otherwise would not have known. He said that the police told him that if he testified against Drumgold, open cases against him would go away (after he testified, several open cases against him were dismissed in a lump order). Defendant Officer Callahan also paid for his food and lodging in a hotel for several months before the trial.

Police did not inform either defense or prosecution counsel that Evans was provided with anything in return for his testimony, and Officer Callahan was in the courtroom when Evans perjured himself by stating that he had received nothing from the police for testifying.  Evans also testified at the 2003 hearing that after he chose a different man from a photo array, Officer Callahan pointed to Drumgold's photo and said that this was the police's suggestion.

- Lola Alexander, mother of now-deceased prosecution witness Mary Alexander, testified that at the time of the trial her daughter suffered from brain cancer that affected her memory and perception so severely that she was at times unable to remember her son's name.  Police did not inform either defense or prosecution of Mary Alexander's impairment.  Mary Alexander testified at the criminal trial that she had seen and recognized Drumgold in a hockey mask at the scene of the crime.  She died of brain cancer in 1993.

## C.  **Defendants' Claims**

Defendants have now turned the tables on plaintiff, suggesting that these witnesses have recanted based on the improper influence of reporter Lehr and counselor Scapicchio.  I recount this testimony in detail because of the serious accusations:

-11-

1.   **Gemini Hullum**

Gemini Hullum ("Hullum") did not testify at the 2003 hearing but signed an affidavit in support of Drumgold's motion for a new trial.  See Ex. E. to Defs.' Mot. to Compel.  Defendants argue that Hullum made false statements in an affidavit drafted by Scapicchio.

Hullum was deposed, as was Scott Keller, Drumgold's investigator.  Keller testified:

> Question:    Do you know whether or not Attorney Scapicchio had contacted Gemini Hullum prior to?
>
> Answer:      Whether she did?
>
> Question:    Yes
>
> Answer:      No, I am not sure.

Ex. E to Defs.' Mot. to Compel at 238.

Keller also noted that he had received correspondence from Scapicchio (or her secretary) which contained the address and contact information for Hullum.  However, Keller acknowledged that he had received a letter dated September 30, 2002, from Scapicchio, which suggested she had talked to Hullum.  It stated "[a]lso, the name and telephone number of the new witness who I would like for you to interview is Gemini Hullum. . . . *I spoke with Hullum*, who told me that on the night of the murder, she was on Sonoma Street with two of her girlfriends. . . ."  Ex. Y to

Defs.' Mot. to Compel (emphasis added).  The letter goes on to elaborate on Hullum's knowledge about the events.  Id.

Hullum acknowledged that she spoke with Scappichio on the phone prior to the meeting with Keller, but denies discussing any factual circumstances with her.  Ex. F to Defs.' Mot. to Compel at 157-158. Hullum, moreover, does not indicate that she met with Attorney Scapicchio without Keller being present.  When asked whether Scappichio came to her home alone or with someone else, Hullum replied "she was with a guy."  Id.

Defendants then point to a series of affidavits, the chronology of which is as follows:  The first affidavit of Hullum is dated November 15, 2002.  Ex. H to Defs.' Mot. to Compel. Keller states in his deposition that Scapicchio was not happy with its formatting.  Ex. E to Defs.' Mot. to Compel at 271.  A second affidavit was prepared with numbered paragraphs.  Ex. I to Defs.' Mot. to Compel.  This affidavit, unsigned, has a series of handwritten notations and crossed out lines.  Id.  Keller testified that he did not draft the second affidavit, and that it was drafted by Scapicchio or someone in her office.  After receiving this second affidavit from Scapicchio's office, Keller reviewed it for accuracy.  Ex. E to Defs.' Mot. to Compel at 273. He noted that the writing on the unsigned affidavit was his, and that he struck a few lines from it.  Id. at 273-274.  He also

stated that while he was not positive, he probably called Hullum and went over the affidavit with her.  <u>Id</u>. at 273.

Hullum stated "[w]hen they sent the first one, I said it was wrong.  I didn't like how it was worded.  They sent back another one.  I believe that's the one I signed." Ex. F to Defs.' Mot. to Compel at 166.  In context, it appears that Hullum was sent the "first" affidavit,[3] refused to sign due to errors, and was then sent another one, which she signed.

The third, and apparently final affidavit was signed by Hullum on May 28, 2003.  Ex. J to Defs.' Mot. to Compel.  This affidavit is in the same format as the unsigned one that preceded it, and seems to incorporate the corrections and additions in the previous one.  Keller noted that this affidavit was based on both the corrections he had made, as well as corrections requested by Hullum.  Ex. E to Defs.' Mot. to Compel at 277.  Noting that it was possible that Scapicchio also contributed to the writing of the final affidavit, Keller stated "and whatever [Scapicchio] may have added or taken out as well because my initial affidavit wasn't sufficient."  <u>Id</u>.  Regardless of the content of the final affidavit or who contributed to its finalization, Hullum did sign

---

[3] This was in fact the second affidavit.  As discussed above, Hullum had been sent one in November of 2002 in paragraph form, which she signed. Following this, Scapicchio's office redrafted the affidavit in numbered list form.  This affidavit is the one that is unsigned and contains hand written corrections and additions.

it on May 28, 2003, under pains and penalties of perjury.  Ex. J

to Defs.' Mot. to Compel.

　　Hullum, in deposition testimony in this case, has indicated

that even the final signed affidavit contains errors.  Ex. F to

Defs.' Mot. to Compel at 164:

> Question: All right.  And you just indicated
> that the substance of that
> affidavit – a portion of the
> substance of that affidavit is
> inaccurate, is that correct?
>
> Answer:　Who is – you know what?  I ain't –
> I don't remember seeing this, but
> number 9, I did not say that.

Id. at 163.  She went on to elaborate more of what she felt were

errors in her deposition:

> Question: Okay.  What else is inaccurate
> relative to this affidavit?
>
> Answer:　It's just backwards more or less.
>
> Question: Okay.  Have you ever –
>
> Answer:　A few seconds later I saw Shawn
> Drumgold?  I saw Shawn and them
> before I saw Boo.  So number 2
> should be number 4.  Number 4
> should be number 2 and then 3 and
> then 4.  This is kind of in the
> wrong order.  But number 9 –

Id. at 164-165.

> Question: Okay.  I want to ask you to look at
> the exhibit – the affidavit that's
> in front of you.  And you said that
> this affidavit contains some
> mistakes?

Answer:    No, that's not what I said.  I said

Question: All right.  What was –

Answer:    -- it was backwards

Question: Why don't we just go through the
affidavit, if I may.  Paragraph 1
states, 'I have lived in Roxbury,
Massachusetts, most of my life.'
Is that a correct statement?

Answer:    No, but whatever.

Question: Why is it not a correct statement?

Answer:    I went there when I was 13 going on
14 or 14 already.  I left there
when I was 20, 21.

Question: Okay, So that's an incorrect
statement?

Answer:    It's a little exaggerated. . . .

Id. at 272-273.

Question: Okay.  But is the first sentence of
Paragraph 4 an accurate statement?
A few seconds later, meaning after
Obie had told you about the little
girl being shot –

Answer:    I wouldn't say it was a few
seconds, no, not at all.

Question: All right.  So that's not accurate?

Answer:    No, it's not.

Id. at 277.

Significantly, Hullum did not suggest that she was coerced
or manipulated into making false statements by Scapicchio,
Keller, or anyone else.  Rather, the deposition states:

-16-

> Question:  Okay.  Did – when you read that,
> did you tell Rosemary Scapicchio or
> Scott Keller that that statement
> was not accurate?
>
> Answer:   No, I don't even think I basically
> probably – you know what?  I
> probably didn't even look at it
> like I should have.

Id. at 273.

## 2.  Antonio Anthony

Defendants cite testimony from Keller that indicates that the affidavit, drafted by Scapicchio, which he brought to Anthony in the Old Colony Correctional Center, contained errors.  Keller testified:

> Question:  . . . But in essence you went down
> there and you had an affidavit
> already drafted?
>
> Answer:   Correct.
>
> Question:  At that point in time you made –
> your memory is did you draft the
> affidavit or did Attorney
> Scapicchio?
>
> Answer:   Attorney Scapicchio did.
>
>          . . .
>
> Question:  At that point in time, he removed
> things from the affidavit that were
> inaccurate?
>
> Answer:   What he told me, and I scratched
> them out or whatever.

Ex. E to Defs.' Mot. to Compel at 368-369.

The affidavit containing errors was never signed and Anthony was never presented with another one.  Indeed, neither this affidavit nor any other signed by Anthony has ever been offered or submitted as evidence in this case.

### 3.    <u>Lola Alexander</u>

Defendants note that the recent deposition of Lola Alexander ("Alexander") provided testimony that was contrary to the affidavit that she signed on May 28, 2003.  Specifically, defendants point to inconsistencies in Alexander's testimony about what her daughter Mary told her, compared to what was written in her affidavit.  Alexander's deposition reads:

> Question: Okay.  Did you speak with Mary about her conversations with the police after they came with the photographs?
>
> Answer:   Yes I did speak with her.
>
> Question: Okay.  And what –
>
> Answer:   I just asked her, I said, Did they – 'You saw someone in there?'  She said 'Ma, I said I don't know – I didn't see nobody.'

Ex. N to Defs.' Mot. to Compel, 106-107.  However, paragraph 11 of Alexander's affidavit states:

> [a]s time got closer to the trial of Shawn Drumgold, Mary told me that the detectives were by again and asked her to identify one of the boys fleeing the scene.  Mary said that some police officer pointed to one picture and asked 'Is that him?'  Mary said she was tired of them harassing her and they

> were going to make her testify anyway, so she
> said, 'Yes, that's him.'

Ex. O to Defs.' Mot. to Compel.  Additionally, Keller testified that Alexander was not able to provide him with the names of the police officials to whom she spoke.  Ex. E to Defs.' Mot. to Compel at 323-324.  However, the first page of Alexander's affidavit named Detective Walsh as one of the officers.  Ex. O to Defs.' Mot. to Compel at ¶¶ 7, 10.

Alexander does not account for why she signed the affidavit with these errors; she notes only that she did not look carefully at it.  Ex. N to Defs.' Mot. to Compel.  During her deposition, when shown the affidavit that she signed, she stated that she had not seen that document before.  When she was shown the second page with her signature, she testified that she did not look at the first page, and did not read the second page before signing it.  <u>Id</u>.

### 4.  <u>Vantrell McPherson</u>

Vantrell McPherson ("McPherson"), like others, has offered testimony that is contrary to some aspects of the affidavit which she signed.  Specifically, defendants note that McPherson testified at her deposition that her trial testimony at plaintiff's criminal trial was truthful, that no one forced or threatened her regarding her testimony, and that no one told her what to say during her testimony.  Ex. to Defs.' Mot. to Compel at 156-58.  Specifically, her deposition reads:

-19-

Question: And did you answer those question?

Answer:   Yes.

Question: To the best of your ability?

Answer:   Yes.

Question: And did you answer those questions
          truthfully to the best of your
          ability?

Answer:   Yes.

. . .

Question: Do you remember testifying falsely
          at the trial of Shawn Drumgold?

Answer:   No.

Question: Did you lie when you testified at
          the trial of Shawn Drumgold?

Answer:   No, not that I know of.

Id. at 157.  This testimony contradicts paragraph 6 of her

affidavit, which reads "I was so scared when I testified in court

. . . . in fact, I never heard that conversation.  I never heard

a statement like that.  I testified to that because I was

afraid."  Ex. Q to Defs.' Mot. to Compel.

    Additionally, the affidavit states that McPherson believed

that the "fat guy" whom she testified yelled at her was either a

police officer or a district attorney.  Id. at ¶5.  But McPherson

testified in her deposition that she did not know whether he was

a police officer or someone else.  Ex. P to Defs.' Mot. to Compel

at 139-140.

While it does appear that McPherson either made false statements in her deposition or in her affidavit, there is very little information as to who gave her the affidavit to sign. When asked who requested that she sign the affidavit, she said:

> Answer:    I don't remember.
>
> Question: Was it Ms. Scapicchio?
>
> Answer:    I don't remember.

Id. at 23.  Notably, McPherson testified that had she not agreed with something in the affidavit, she would not have told anyone because she was so nervous.  Id. at 49.

### 5.  Betty and Tracie Peaks

Betty Peaks ("Betty") and her daughter Tracie ("Tracie") (often incorrectly referred to as "Tracy") were also deposed. Betty stated that she never met with any investigator that was representing Shawn Drumgold and does not know who typed up her affidavit.  Ex. R to Defs.' Mot. to Compel.  Betty also stated that she never met with Scapicchio, but almost immediately afterwards stated that Scapicchio was the one who gave her the affidavit:

> Question: Who did you meet with to put that
>           information down on paper?
>
> Answer:   I didn't have a meeting.  It was
>           given to me by Attorney Scapicchio.
>           We didn't have a meeting.
> . . .
>
> Question: Did you ever meet with Attorney
>           Scapicchio in person?

Answer:    No, I have not.

Question: You just indicated to me that
          Attorney Scapicchio provided you a
          typed affidavit?

Answer:    Yes.

Question: When did that occur?

Answer:    I don't remember the date.

Question: Was it in person?

Answer:    It was in person.

Id. at 27-28.  Keller's deposition contradicts Betty's statement

that they never spoke:

Question: You interviewed [Betty] on the
          phone.  Do you know who drafted the
          affidavit?

Answer:    I probably did.

Question: Do you have a memory here today
          that, in fact, you did or did not?

Answer:    Being that quick after I
          interviewed, so soon after I
          interviewed her, I probably did.

Question: Did you provide the draft of the
          affidavit to Attorney Scapicchio
          before you went out to have it
          executed?

Answer:    I have no memory of that.

Ex. E to Defs.' Mot. to Compel at 344.

     Much like the other witnesses, Betty's affidavit contains

statements that conflict with her deposition testimony.

Defendants note that Betty made statements that she only

remembered police coming to her home on one occasion.  Ex. R to Defs.' Mot. to Compel at 68-69.  However her affidavit states that "the officers kept coming by my house."  Ex. S to Defs.' Mot. to Compel at ¶3.  Additionally, there appear to be inconsistencies in Betty's testimony about whether or not she felt intimidated by the police when they interviewed her daughter.  Her deposition reads:

> Question:  If they were rude or aggressive to your daughter, you would have interceded and asked them to leave your house?
>
> Answer:    Correct.
>
> Question:  So the only reason you felt intimated [sic] was because you just didn't have the knowledge of the Tiffany Moore  murder and your daughter's involvement, is that correct?
>
> Answer:    Correct.

Ex. R to Defs.' Mot. to Compel at 76-77.  However, her affidavit states "[i]n a very intimidating manner they said to Tracie, 'Isn't this the photo of one of the boys that walked down the street with a hood on?'"  Ex. S to Defs.' Mot. to Compel at ¶3.

Defendants also point to testimony from Keller in which he said that Betty had stated that the assistant district attorney told her that if Tracie did not cooperate, she would be taken out of school and arrested.  Ex. E to Defs.' Mot. to Compel at 341-346. However, instead of identifying the assistant district

attorney, both Betty's and Tracie's affidavits refer only to "law
enforcement" or "detectives."  Exs. S & T to Defs.' Mot. to
Compel. Keller, however, testified that he has no idea why the
affidavit did not specifically mention the assistant district
attorney, and that in drafting the affidavits he made an effort
to use specific words and names that the witnesses used.  Ex. E
to Defs.' Mot. to Compel at 345-347.

III. **MOTIONS TO COMPEL**

On November 20, 2006, defendants moved to compel the
testimony of nine witnesses:  Richard Lehr, Edrina Graham Payne,
Olisa Graham, Michelle Payne Short, Obie Graham, Tynetta Gray,
Kathy Jamison, Vantrell McPherson, and Terrance Taylor (document
#57).  All of these witnesses, except Taylor, who is in federal
custody, were subpoenaed to depositions.  All but Olisa Graham
and Vantrell McPherson failed to appear; Graham and McPherson
appeared and gave deposition testimony, but failed to reappear to
complete their depositions.  Lehr responded by counsel that he
refused to appear; he is the only witness opposing the motion to
compel.  In addition to his testimony, defendants seek to compel
production of his notes from the preparation of the 2003 Globe
articles.

A.    **Witness Testimony (Except for Lehr)**

I **GRANT** the motion to compel testimony as to Edrina Graham
Payne, Olisa Graham, Michelle Payne Short, Obie Graham, Tynetta

Gray, Kathy Jamison, and Vantrell McPherson, and to allow the deposition of Terrance Taylor in federal custody (document #57). None of them has opposed this motion, given reason why they should not appear, or responded to the subpoena or this motion in any way. In addition, Terrance Taylor is currently imprisoned at the U.S. Penitentiary in Hazelton, West Virginia; defendants cannot obtain access to him for deposition without leave of the Court under Fed. R. Civ. P. 30(a)(2).

Defendants have also filed a Motion for an Order to Witnesses Compelling Attendance at Deposition (document #90). Defendants request that I endorse orders to each witness, ordering them to appear at their depositions at the date and time indicated by defendants, and threatening that "failure of the witnesses to appear as ordered will result in the issuance of a warrant for her arrest and/or an order to show cause why she should not be held in criminal contempt. I **GRANT** this motion.

### B.  Deposition of Lehr

In their subpoena of Lehr, defendants sought "[a]ny investigative notes, taped statements, written documents, affidavits and/or correspondence relative to the investigation of Shawn Drumgold and the homicide of Tiffany Moore." Ex. E to Defs.' Mot. to Compel (document #58-6). In the instant motion, defendants seek to compel four things from Lehr: (1) his notes from non-confidential interviews in the preparation of his Globe

articles; (2) his notes from confidential interviews in the

preparation of his Globe articles; (3) information regarding his

sources on police or prosecutorial misconduct in Drumgold's case;

and (4) his testimony as to what information he gave fact

witnesses in this case.  In opposition, Lehr claims that his

journalistic work product and sources should be protected by

First Amendment concerns recognized by the First Circuit.

    Under Fed. R. Civ. P. 26(b)(1), a party is entitled to

discovery of any information relevant and not privileged.  While

the First Circuit has not recognized a reporter's privilege per

se, it has held that courts should apply Rule 26 "with a

heightened sensitivity to any First Amendment implication that

might result from the compelled disclosure of [journalistic]

sources."  <u>Bruno & Stillman, Inc. v. Globe Newspaper Co.</u>, 633

F.2d 583, 596 (1st Cir. 1980).

> In determining what, if any, limits should
> accordingly be placed upon the granting of
> such [discovery] requests, courts must
> balance the potential harm to the free flow
> of information that might result [from the
> damage to the news gathering process by
> forced disclosure] against the asserted need
> for the requested information.

<u>Id.</u>  The First Circuit outlined this balancing test in <u>Bruno</u> and

later, in <u>Cusumano v. Microsoft Corp.</u>, 162 F.3d 708, 715 (1st

Cir. 1998): First, the burden is on the moving party to show that

the information sought is relevant, not "a pretense for using

discovery powers in a fishing expedition."  <u>Bruno</u>, 633 F.2d at

597. Second, the burden then shifts to the objecting party to show the "extent to which there is a need for confidentiality." Id. Finally, if both of these burdens have been met, the Court must balance the relevance of the information against the need for protection. Id.

The Court also has wide discretion to fashion solutions that reduce the cost to either party of an adverse ruling. For example, the Court may review the requested material in camera, defer the ruling until after summary judgment rulings have been made (possibly mooting the need for it), or compel disclosure but limit dissemination of the information to counsel.

In their motion to compel, defendants state two reasons why they seek Lehr's notes, sources, and testimony: First, they hope to find inconsistent statements in his interviews with witnesses that they can use for impeachment at trial; second, they theorize that information shared by Lehr in his interactions with witnesses may have influenced those witnesses to change their stories. Defendants cite deposition testimony by McPherson (who appeared for one deposition session but did not appear for a second) that Lehr "popped up at her aunt's house and "[told] her what he thought." Ex. G to Defs.' Mot. to Compel at 16, 27 (document #58-8).

To the extent these theories support discovery at all, it is only as to interviewees who testified in 2003 and/or will testify

-27-

at this trial.  Interviewees who contributed to Lehr's articles but who did not testify in 2003 and will not testify at this trial cannot be impeached and it hardly matters whether Lehr influenced their thinking.  While materials from their interviews may still be discoverable if they can lead to the discovery of material that may be relevant at trial, that "second-degree" relevance weighs far less than the relevance of interviews with actual testifying witnesses when entered into the <u>Bruno</u> balancing test.

As to the actual testifying witnesses, it is still not enough merely to suggest that Lehr's notes "may" produce inconsistent information or that Lehr "may" have influenced witnesses.  The First Circuit has noted the existence of "a lurking and subtle threat to journalists and their employers if disclosure of out-takes, notes, and other unused information, even if non-confidential, becomes routine and casually, if not cavalierly, compelled." <u>United States v. LaRouche Campaign</u>, 841 F.2d 1176, 1182 (1st Cir. 1988); <u>see also</u> <u>Shoen v. Shoen</u>, 5 F.3d 1289, 1295 (9th Cir. 1993) (even non-confidential materials should be protected); <u>but see</u> <u>Gonzales v. National Broad. Co.</u>, 155 F.3d 618, 626 (2d Cir. 1998) (non-confidential materials should be afforded no protection).  Thus, even where Lehr's interviews were with testifying witnesses and were not

confidential, defendants' motion to compel production of his
notes must still be submitted to the <u>Bruno</u> balancing test.

The <u>Bruno</u> balancing test is "fact-sensitive," <u>Bruno</u>, 633
F.2d at 595, taking into account the "totality of the
circumstances." <u>Cusumano</u>, 162 F.3d at 715.  The Court can
consider such factors as the degree of relevance, the degree of
need for protection, and whether the information sought may be
obtained through other means. <u>Id.</u>

The instant case should be distinguished from <u>Bruno</u> itself,
a libel case in which the information sought -- the sources and
substance of a defendant reporter's knowledge  -- was the core of
the case that the plaintiff had to build.  The First Circuit
there noted that it would often be impossible for a public-figure
libel plaintiff to carry its burden of showing the requisite
malice without access to a defendant reporter's notes. <u>Bruno</u>, 633
F.2d at 594; <u>see also</u> <u>Branzburg v. Hayes</u>, 408 U.S. 665 (1972);
<u>Herbert v. Lando</u>, 441 U.S. 153 (1979).

Here, Lehr is a non-party; his state of mind is not an
element of any claim.  The burden of production falls more
heavily on non-parties than on parties who "must accept its
travails as a natural concomitant of modern civil litigation.
Non-parties have a different set of expectations. Accordingly,
concern for the unwanted burden thrust upon non-parties is a
factor entitled to special weight in evaluating the balance of

competing needs." <u>Cusumano</u>, 162 F.3d at 717.  The First Circuit
has also considered searches for inconsistent statements for
impeachment purposes to be relatively low on the need scale.  <u>Id.</u>
at 715.

In short, defendants' justification for deposing Lehr is
patently inadequate at this stage.  The case is a false
imprisonment case. Defendants can defend by showing that they had
probable cause to arrest Shawn Drumgold based on the witness
testimony available to them at the time, and that they did not
improperly influence the witnesses' testimony.  They have access
to the witnesses themselves, to all the versions of their
testimony, and to plaintiff's investigation.  If they show that
witnesses changed their testimony to support Drumgold as part of
his efforts to set aside his sentence, and have now returned to
the first version of their story or are wavering, they can
attempt to show the trial version was the one procured in good
faith -- i.e. that they did the best they could with the
witnesses of they had.  In other words, the fact of witnesses
changing their testimony multiple times, regardless of the
reasons, is all that they need.

At this juncture, on this record, I deny defendants' motion
to compel testimony and production of documents by Richard Lehr
(document #57).

IV. **DEPOSITION OF SCAPICCHIO**

Defendants contend that Scapicchio has relevant and discoverable information "regarding inconsistent witness statements, inaccurate affidavits which were submitted as evidence in support of Plaintiff's motion for a new trial, witness credibility, spoliation of evidence and factual misrepresentations material to the granting of Plaintiff's motion for a new trial and the conduct of the subject criminal trial and subsequent conviction of Plaintiff, which is critical to Defendants' defense."  Defs.' Mem. at 15.

First, defendants maintain that Drumgold has expressly waived the attorney-client privilege with respect to his criminal case.  See Ex. D to Defs.' Mot.  to Compel at 6 (deposition of Scott Keller) ("Scapicchio: 'Shawn Drumgold, who is the plaintiff in this case, has waived the attorney/client privilege for the purposes of his criminal case.  He has not waived the attorney/client privilege for the purposes of this litigation, the civil case, Drumgold v. Walsh, Murphy, Callahan, City of Boston . . . .'").  Therefore, defendants claim that they are free to depose Scapicchio on matters relating to Drumgold's criminal appeal process -- during which time Scapicchio served as his attorney.  Second, they argue that the plaintiff has impliedly waived the privilege with respect to the civil case.

Third, they argue that questions concerning Scapicchio's interactions with witnesses do not even implicate the privilege.

Finally, defendants argue that plaintiff has even waived work product privilege. She has shared work product with the media in the form of interviews and public statements. She has shared the plaintiff's entire file with Lehr of the Boston Globe. She also authorized Keller to assist Lehr with various investigative information. Lastly, she gave a long interview for the documentary "The System is Broken," in which she spoke about her litigation strategy. <u>See</u> Defs.' Mem. at 18-19.

In the alternative, defendants argue that waiver aside, they have "substantial need" for Scapicchio's testimony regarding her work product. They maintain that they cannot obtain important information from any other source. "[W]itnesses, Keller and others have not been able to provide clear information regarding investigations, information and/or documents relative to Plaintiff's cases." Defs.' Mem. at 20. Defendant contends that Scapicchio herself is a "witness" because of her conduct in drafting affidavits and interviewing witnesses without the presence of an investigator. <u>See</u> Defs.' Mem. at 20. Defendants arguments resoundingly miss the point. There are concerns -- substantial concerns -- apart from privilege and work product issues, concerns triggered by calling a lawyer as a witness. Every lawyer who has ever prepared a case called potential

witnesses, or drafted affidavits would be vulnerable.  Every
trial lawyer who is involved in the day-to-day work of trials
would be sitting a duck.

The case law plainly and appropriately disfavors the
deposition of counsel for a party.  It sets the bar for such
depositions quite high, i.e., "circumstances should be limited to
where the party seeking to take the deposition has shown that (1)
no other means exist to obtain the information than to depose
opposing counsel; (2) the information sought is relevant and
nonprivileged; and (3) the information is crucial to the
preparation of the case."  Shelton v. American Motors Corp., 805
F.2d 1323, 1327 (8th Cir. 1986); see also Bogosian v. Woloohojian
Realty Corp., 323 F.3d. 55, 58 (1st Cir. 2003)("the procurement
of trial testimony from opposing counsel is generally
disfavored." ).  As noted by the Court in Inverness Med. Switz.
GmbH v. Acon Labs., 2005 U.S. Dist. LEXIS 12332 (D. Mass. 2005):
"If . . . the evidence sought from opposing counsel could as
easily be adduced through others, or the lawyer's testimony would
be merely cumulative or marginally relevant, it may be desirable
to exclude the proffered evidence.  The reason for this disfavor
is that requiring counsel to testify will often result in
disqualification from that case."  See also Siguel v. Allstate
Life Ins. Co., 141 F.R.D. 393 (D. Mass. 1992) (Bowler, J).
Indeed, because of the problems that calling counsel to testify

may have, it has been held that "[o]ne of the paradigms for compelled disqualification is when a lawyer/witness will testify against his client."  Id.

And disqualification would be enormously prejudicial in the case at bar.  Scapicchio  has a relationship with Drumgold.  She has worked on his case for nearly ten years.  She is intimately familiar with the record.

There is no substantial need for Scapicchio's testimony here, no showing that other alternatives have not been exhausted. The witnesses have testified to version A at trial; at the motion for a new trial hearing, some testified to version B; at depositions in this case, defendants suggest that even version B is problematic.  Defendants may still impeach the trial witnesses with their prior versions and their multiple affidavits, and may, as described with Lehr, suggest that the truth is not known or that the police did what they could with witnesses who had a limited education and fundamentally did not want to be involved.
 To be sure, if there is evidence of an ethical violation in connection with the preparation of these witnesses, that would be another matter, but nothing produced thus far rises to that level.

The defenses' response is disingenuous.  It cites to Carey v. Textron, Inc., 224 F.R.D. 530 (D.Mass. 2004) (Gorton, J), for a case that has allowed testimony from counsel.  Carey was a

products liability case in which the attorney, Attorney Gelineau ("Gelineau"), was possibly the only person to examine the product in question before it disappeared. <u>Id.</u> at 534. The court in that case determined that Gelineau could be deposed because he had knowledge that no other person was known to have. <u>Id.</u> at 535. Knowledge of the condition of the product before it disappeared was a crucial piece of evidence; Gelineau was quite literally the only source for this information. <u>Id.</u>

That is not the case here. If the defendants wish to ascertain what interaction Scapicchio had with these witnesses, they may ask them. Defendants' motion to compel the testimony of Rosemary Scapicchio (document #76) is **DENIED**.

## V.    <u>LIEUTENANT JOHN DALEY</u>

Lieutenant John Daley has filed a motion for a protective order seeking to prevent discovery of diary materials from his time as a Boston Police Officer [document #65]. Daley is now retired from the BPD. He is not a party in this case but he worked for the BPD from 1951 to 1992, serving as the commander of the BPD Homicide Unit from April 27, 1985 to August 23, 1989. Daley is not a party in this case. On January 12, plaintiff served Daley with a deposition subpoena duces tecum requesting that Daley produce the following at his January 23 deposition:

> All notes, journals, diaries or writings of
> any kind authored by [Daley] during any time
> when [Daley] was head of the Homicide Unit of
> the Boston Police Department and/or any

>    notes, journals, diaries or writings of any
>    kind authored by [Daley] which concern,
>    relate to or refer to the Homicide Unit of
>    the Boston Police Department or any
>    investigation of the Homicide Unit of the
>    Boston Police Department and/or [Daley's]
>    employment in the Homicide Unit of the Boston
>    Police Department.

(Document #65-2).

For thirty of Daley's forty-one years at the BPD, he kept a diary about "his life, experiences and stories he heard as a Boston Police Officer." Daley Mot. for Protective Order at 2. In 1995, after his retirement, "Lt. Daley completely rewrote his personal diary with the hopes of publishing a work of fiction." Id. at 7. Daley argues that Drumgold's discovery request "is unduly burdensome, an invasion of . . . personal privacy, requests irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence." Id. at 3.

Fed. R. Civ. P. 26(b)(1) sets out the scope of discovery.

>    Parties may obtain discovery regarding any
>    matter, not privileged, that is relevant to
>    the claim or defense of any party, including
>    the existence, description, nature, custody,
>    condition, and location of any books,
>    documents, or other tangible things and the
>    identity and location of persons having
>    knowledge of any discoverable matter. For
>    good cause, the court may order discovery of
>    any matter relevant to the subject matter
>    involved in the action. Relevant information
>    need not be admissible at the trial if the
>    discovery appears reasonably calculated to
>    lead to the discovery of admissible evidence.

Protective orders are governed by Fed. R. Civ. P. 26(c).

-36-

Upon motion by a party or by the person from
whom discovery is sought, accompanied by a
certification that the movant has in good
faith conferred or attempted to confer with
other affected parties in an effort to
resolve the dispute without court action, and
for good cause shown, the court in which the
action is pending or alternatively, on
matters relating to a deposition, the court
in the district where the deposition is to be
taken may make any order which justice
requires to protect a party or person from
annoyance, embarrassment, oppression, or
undue burden or expense, including one or
more of the following: (1) that the
disclosure or discovery not be had; . . . (3)
that the discovery may be had only by a
method of discovery other than that selected
by the party seeking discovery; (4) that
certain matters not be inquired into, or that
the scope of the disclosure or discovery be
limited to certain matters . . . .

I granted Daley's motion for a protective order in part and
I denied it in part.  I concluded that those portions of his
diaries that were not pertinent at all to the murder of Tiffany
Moore, to Shawn Drumgold's prosecution, or to issues having to do
with the supervisory relationships of the Boston Police during
the period of either the prosecution of Drumgold or the murder of
Moore need not be produced to the plaintiff but would be reviewed
in camera.  What had to be produced for Daley's deposition were
those records that at least on their surface pertained to
relevant issues.

On March 1, 2007, Daley filed those documents pertaining to
Moore, Drumgold, etc., with the Court for in camera review in
both redacted form (Ex. B, given to plaintiff), and unredacted

-37-

form (Ex. A).  I conclude that the following redactions should also be disclosed:

(1)  Exhibit B p. 268 -- discusses a man who was wrongfully charged due to the police's shoddy forensic work.  This strikes me as being on the line of broadly relevant.

(2)  Exhibit B pp. 307-308 -- these pages are missing entirely from Exhibit B.  They describe the Tiffany Moore investigation and need to be disclosed to the plaintiff.  The last paragraph on p. 308 should remain redacted.

(3)  Additionally, the Court was not provided with pages 226, 228, 235, and 236 in unredacted form.  Daley is ordered to provide those pages for in camera review.

Plaintiff has filed a Motion to Reaffirm the Protective Order (document #73).  By its terms, the protective order in place only designates information relating to other cases or personal information as "confidential."  Information in the Daley diary that relates to the Tiffany Moore murder, Shawn Drumgold, or the supervisory practices of the Boston Police Department is not confidential.  The protective order stands, and accordingly I **GRANT** Plaintiff's Motion to Reaffirm the Protective Order (document #73).[4]  As this litigation progresses to trial, should either party want to introduce the non-confidential portions of

---

[4]Defendants' Motion to Seal Exhibits Attached to their Joint Response to Plaintiff's Motion (document #81) is therefore **MOOT**.

the Daley diary as exhibits, the parties may make a motion to seal them at that time.  Documents that have been produced to the Court in camera remain sealed (except for the pages I ordered disclosed above).

Relatedly, plaintiff has also filed a Motion to Produce the Notes of John Daley and to Conduct in Camera Review (document #83).  This motion regards the portions of Daley's diary that do not pertain to his tenure as commander of the Homicide Unit. Daley responded by filing a Motion for Reconsideration (document #85) of this Court's January 22, 2007 Order, as it pertains to those sections of the diary.  I **DENY** plaintiff's motion and **GRANT** Daley's motion.  Daley is no longer required to produce the portions of his diary regarding the period before he headed the Homicide Unit.

Lastly, Daley filed a Motion to Seal Pleadings (document #86) that contain "references to his personal diary or confidential deposition testimony."  Namely, documents #83 and #85, discussed above.  That motion is **DENIED** because those pleadings reference portions of the diary that are relevant to this litigation.  Should Daley determine that there are certain quotes in those pleadings that fall under the protective order, as reaffirmed above, he should file another motion to seal delineating them.

VI.  **MOTIONS TO SEAL**

Finally, defendants have moved to seal (document #75) documents relating to their motion to take  Scapicchio's deposition, and plaintiff has indicated that he may move to seal other documents.  A party so moving must carry a burden of showing legitimate reasons for sealing that overcome the common law presumption of the public's right of access to judicial documents.  United States v.  McVeigh, 119 F.3d, 806, 811 (10th Cir.  1997); citing Nixon v.  Warner Communications, 435 U.S. at 589, 597 (1978).  Those reasons may include prejudicial pretrial publicity, the danger of impairing law enforcement or judicial efficiency, or the privacy interests of third parties.  United States v.  Amodeo, 71 F.3d 1044, 1050 (2d Cir.  1995).

Defendants in their motion to seal have stated that sealing is necessary in order to "prevent prejudicial pretrial publicity and to protect the privacy interests of third parties."  Defs.' Mot. to Seal.  That conclusory statement is not enough to carry their burden.  Defendants may submit further briefing on the necessity of their motion to seal by May 10, 2007, and plaintiff may respond by May 24, 2007.  If necessary, the Court will schedule a hearing on the issue.

**SO ORDERED.**

Date:  **May 2, 2007**       */s/Nancy Gertner*
                            **NANCY GERTNER, U.S.D.C.**