# EXHIBIT 4

Michael D. Lyman, Ph.D.

4613 Villa Wood Ct. • Columbia, MO . 65216 • (573) 875-7472 • FAX: (573) 256.5067

---

**EXPERT REPORT OF MICHAEL D. LYMAN, PH.D.**

*RE: Sean Drumgold v. Timothy Callahan et al,*
*United States District Court, District of Massachusetts; 04-11193 NG*

August 13, 2007

---

## Introduction

The opinions set forth in this report are based on my analysis of documents and testimony provided to me in this case and as informed by my formal training, education, independent research, and experience gained over a collective 33 years as a law enforcement agent, criminal investigator, police trainer and educator.

I have been a college professor teaching and researching in the area of policing for over 20 years. I have also authored numerous articles and books dealing with different aspects of police operations for the last 20 years. In the latter capacity, I have become nationally recognized in the areas of police procedure, criminal investigation, drug enforcement and related areas. Prior to becoming an educator, I was a certified generalist police instructor for three years, training police officers and police officer candidates in various police techniques and procedures.

Before entering the field of higher education, I was employed as a special agent/criminal investigator working in both Kansas and Oklahoma for a collective period of eleven years. In that capacity, I conducted criminal investigations, made misdemeanor and felony arrests, conducted interviews of suspects, testified in state and federal criminal courts and had considerable experience in the development of police policy and procedure.

## Qualifications

My formal education includes an undergraduate and master's degree from Wichita State University in the Administration of Justice. In 1992, I received a Ph.D. from the University of Missouri-Columbia in Higher and Adult Education. My previous police training includes basic police academies certified through the Council on Law Enforcement Education Training (CLEET) in Oklahoma City, Oklahoma, and the Kansas Law Enforcement Training Academy in Hutchinson, Kansas (KLETA).

During my years as a criminal investigator, I accumulated in excess of 2000 hours of formal, in-service, police training. This training was sponsored by organizations which include the Federal Bureau of Investigation (FBI), Drug Enforcement Administration (DEA), the United States Customs Service, and numerous state and local law-enforcement organizations. Training included firearms qualification, shoot-don't shoot scenarios, practical simulations involving felony arrests, search and seizure, interview and interrogation, vehicles stops, building searches and crisis intervention.

I served for three years as a full-time, certified police instructor employed by the Law Enforcement Training Institute in Columbia, Missouri. I held generalist certification issued by the Missouri Department of Public Safety and in that capacity was awarded Police Instructor of the Year in 1989. As a police instructor I trained literally thousands of law enforcement officers serving in all levels of professional law enforcement. As a police trainer, I have taught by lecturing as well as by utilizing computer-based simulations, videos and professional writings by law enforcement officers in the field. My 20-year publishing record has also contributed greatly to my understanding of police procedures and I have brought much of that research into the police training environment.

I am currently employed as a tenured faculty member of the Columbia College Department of Criminal Justice and Social Work in Columbia, Missouri, and have been on the faculty since August 1989. My rank is that of Full Professor. I also serve as the Program Liaison for Graduate Studies for the Master of Science in Criminal Justice degree program and the Program Director for the Bachelor of Science in Forensic Science degree program.

Between August 1989 and November 2000, I served as the department chairman overseeing a faculty of seven in a department representing over 250 criminal justice majors. Between 1985 and 1994 I was a Visiting Professor for the University of Oklahoma teaching on a part-time basis during the summer and winter intercessions. In 1985 and 1986 I taught graduate classes at the University of Central Oklahoma.

Since 1987, I have authored seven books dealing with various areas of policing. These have been published by both nationally and internationally recognized publishing houses that include Prentice Hall (Upper Saddle River, NJ), Anderson Publishing (Cincinnati, OH), CRC Press (Boca Raton, FL), and Charles Thomas Publishing (Springfield, IL). The research required for these books necessitates a close working relationship with law-enforcement officers on local, state, and federal levels as well as a working knowledge of the available literature on policing.

My investigative experience includes an appointment as a Special Agent assigned to the Special Services Division of the Kansas Bureau of Investigation. This unit functioned as the special investigations unit for the State of Kansas and its members are involved in criminal investigations involving drug trafficking, organized crime and related offenses.

I have also been employed as a Senior Agent in Oklahoma, assigned to the Enforcement Division and the Intelligence Division of the Oklahoma Bureau of Narcotics and Dangerous Drugs Control (OBNDDC). In each of these units my responsibilities were to conduct intelligence, criminal and internal affairs investigations. In this capacity I also served on numerous hiring, shooting and disciplinary boards. While employed with the OBNDDC, I wrote the Standard Operating Procedure Manual for Conducting Wire Taps for the Bureau.

My responsibilities in both Kansas and Oklahoma required me to conduct criminal investigations, internal affairs investigations, assist in the establishment of agency policy and procedures in numerous areas, provide training, work closely with other law enforcement agencies on all levels and work closely with other public safety organizations as they related to my duties.

I currently maintain professional affiliations with The Academy of Criminal Justice Sciences (ACJS); the American Society of Criminology (ASC); the Textbook Author's Association; the Police Executive Research Forum (PERF); the International Association of Chief's of Police (IACP); the American Academy of Forensic Science (AAFS); the International Association for the Study of Organized Crime (IASOC) and the American College of Forensic Examiners International (ACFEI).

The documents and testimony from this case, upon which my opinions are based, include police reports and records, court records, interrogatories, depositions, training records, professional articles, books and policy-based research in the area of police procedure.

The information that I have reviewed and considered in this case is the type of information that I, and others in my field, reasonably rely upon in examining, analyzing, and determining causation, as well as rendering opinions on proper police conduct. The body of knowledge that I have reviewed over the years includes texts, research, journals, periodicals and other publications, along with my personal research, experience, training, interaction with colleagues, discussions, interviews and training with law enforcement officers, police supervisors and command staff, as well as my academic studies, teachings and nationally-recognized, peer-reviewed research all form the foundation for my opinions. As a result, my opinions, and basis for my opinions, are provided with a reasonable degree of law enforcement and police certainty.

**Facts and Background**
I have been asked by the law firm of Rosemary Curran Scapicchio, Attorney at Law to review the case of *Sean Drumgold v. Timothy Callahan et al* and render independent professional opinions. The following is my written report regarding the above referenced case as of the date of this report. My opinions are based on the documents provided to me in this case to date as well as my training, education, experience and research in the field of policing. I realize that the discovery process is ongoing in this case and reserve the right to amend or modify my opinions based on additional information that is provided to me, including additional deposition testimony and/or documents.

On August 19, 1988, just after 9:00 p.m., twelve-year-old Tiffany Moore was playing with friends in front of her home when two armed males dressed in black Adidas running suits and wearing masks approached and fired somewhere between five and twelve shots toward members of the group. As a result, Tiffany was shot three times and died as a result of her wounds.

The investigation of the incident began immediately with the assignment of Detective Richard Walsh and his partner, Detective Paul Murphy. It soon became known that the shooting was the result of a gang feud between the Humboldt and the Castlegate gangs and that Tiffany was accidentally shot while the shooter was attempting to shoot Humboldt members Chris Chaney and Mervin Reese.

Within ten days of the shooting, Shawn Drumgold was assumed to be one of the shooters and on August 29, 1988 was charged with Tiffany's murder. This occurred in spite of an abundance of information and evidence that identified other persons possibly responsible for the shooting. From the time of Tiffany's death to May 1989, Walsh and Murphy conducted little if any additional investigation into the shooting. In May 1989, Walsh and Murphy were reassigned. Replacing them was the new investigative team of Sergeant Timothy Callahan and Detective Paul McDonough.

Between May 1989 and the time of Drumgold's criminal trial in October of that year, Callahan and McDonough became active in the re-investigation of the Tiffany Moore murder and identified numerous persons that had information regarding Drumgold. Some of this information was used in Drumgold's prosecution while other sources of information cast doubt on Drumgold as one of the shooters.

In October 1989, Shawn Drumgold was convicted of Tiffany Moore's murder. He served fifteen years and four months in prison when he was released on November 6, 2003 after an evidentiary hearing. During the course of the hearing, many of the witnesses and informants identified by Detectives Walsh, Murphy, Callahan and McDonough testified that they were intimidated and coerced into providing incriminating information against Drumgold. This evidence was the basis for Drumgold's release.

A careful review of the case file in this matter revealed numerous investigative transgressions performed by defendant officers, and in this expert's opinion those transgressions are clearly the driving force behind Drumgold's wrongful conviction. The investigative shortcomings in this case were pervasive throughout almost every stage of the Tiffany Moore investigation. In fact, the pervasive misconduct in this case is a strong indicator of a greater systemic problem throughout the Boston Police Department where high-ranking administrative personnel were or should have been aware of such actions. The practices and procedures used by defendant officers in this case are the focus of this report.

## Opinions: Basis and Reasoning

All of my opinions are stated within a reasonable degree of certainty within my field. My opinions are based on the totality of my specialized knowledge, skill, education, research, literature, training and information I have reviewed. My opinions are based on sufficient facts and data reviewed; are the product of reliable law enforcement principles and methods; and I have applied these law enforcement principles and methods reliably to the facts and circumstances of this case.

There is a body of knowledge and literature about the practice and standards to which modern, professionally administered police agencies should adhere. These standards and accepted practices have evolved over time in the interest of fostering and maintaining police agencies that are professional, effective and whose practices and policies are observant of the law. The standards have evolved, in part, as a response of reported cases of police misconduct and as tools to limit police discretion and ensure that police behavior is within acceptable professional, legal and constitutional limits.

There is a substantial body of literature and knowledge regarding the types of causes of police misconduct. I am well familiar with and have contributed to the literature and body of knowledge regarding the types and causes of police misconduct. Within the broad range of criminal justice, my area of study and practical experience is and has been police misconduct and its relationship with police policy, procedure, training, and supervision and accountability mechanisms. I am currently an active member of the International Association of Chiefs of Police (IACP), Academy of Criminal Justice Sciences (ACJS) the American Society of Criminology (ASC) and the American College of Forensic Examiners International (ACFEI).

## Discussion and Opinions

Shawn Drumgold was convicted in 1989 of a violent crime he didn't commit. A careful review of this case shows that the Boston Police Investigators Walsh, Murphy and Callahan failed to conduct a thorough, timely and objective investigation of Tiffany Moore's murder.

For decades the professional literature in criminal investigation has consistently held that a properly conducted homicide investigation requires a timely response, thorough documentation, proper communication and an observation of evidentiary and procedural protocols that are recognized in the field. This is because a proper police response to a homicide is for patrol and investigative units in the field to work closely together – from their very first actions at the scene. This is not only because physical evidence must be identified and protected but witnesses and suspects alike must be identified as soon as possible.

Many procedures and principles in criminal investigations have remained the same for a number of decades. Proper investigative procedures and principles essentially address the "who, what, when, where, why and how" of a crime. This very point, for example, is made by Vernon Geberth in his authoritative text *Practical Homicide Investigation*. Geberth stated:

> "...all police officers have a responsibility to actively and skillfully contribute to the crime solving process. Whether it be the operator who initially takes the call and obtains a crucial piece of information or the officer in a patrol car who responds to a homicide run and detains a key witnesses or suspect, the fact is that practical homicide investigation is based on the cooperation of patrol officers and detectives working together toward the common goal of solving the homicide."[1]

These observations not only speak to the importance of a thorough investigation but to the fact that homicide investigation is more than just a function performed by investigative personnel. Rather, it is a department-wide responsibility.

The materials reviewed with regard to this report are listed in Appendix #1. Based on this review, this expert opines that there were numerous operational problems with regard to the investigation of the shooting of Tiffany Moore. Furthermore, it is this expert's opinion that the flawed investigation of the Tiffany Moore shooting should and could have been prevented with proper administrative oversight and establishment of policies relating to homicide investigations. Concerns identified in this report are as follows:

## The initial police response:

A review of the case file shows the initial response by the Boston Police Department after the shooting included approximately 30-40 emergency personnel converging on the scene. These included technical support police personnel, police identification and ballistics personnel as well members of the Boston Fire Department. The general area of the crime scene was lit up to search for evidence. The fire department dispatched a ladder to light up the Edison Plant rooftop for evidence. The scene was processed for 3-4 hours but no physical evidence was found, other than a spent bullet located between a group of mailboxes and a fence.

---

[1] Geberth, V. (1983). Practical Homicide Investigation: Tactics, Procedures, and Forensic Techniques. Elsevier Publisher: New York, NY.; p. 1

Also called to the scene was Detective Richard Walsh, the only homicide detective at the scene that night. Walsh was assigned as the lead investigator in the case and was assigned to work with Detective Paul Murphy. Walsh stated that upon his arrival at the scene, he checked to be sure the scene was secure and gathered a list of potential witnesses. Walsh also stated that his function at the scene was to find the persons who witnessed the shooting…that was his ultimate objective in this case. [2]

But Walsh also stated that after conducting his initial assessment of the scene, he went home to get some sleep. Furthermore, the file shows that Walsh only spoke with a few potential witnesses on the night of the shooting and that there were numerous potential eyewitnesses that were not interviewed until almost one year later.

Specifically, the record shows that the young women who were at the mailbox at the time of the shooting were Tanoi Curry, Coryn Delahunt, Cherrie Walker, Shamia Clemons and Trell McPherson. These persons were the most likely witnesses to the crime but were not interviewed until June 1989 by Detectives Callahan and McDonough. The failure of Walsh and Murphy to interview these eyewitnesses on a timely basis represents a serious breakdown in the investigative process and one that could have been avoided.

In 1988 it was widely known that eyewitnesses to a shooting should be interviewed on a timely basis. For example in his nationally recognized book *Practical Homicide Investigation*, Vernon Geberth states that while homicide scenes offer an abundance of information and evidentiary material. He states, "The identity of the perpetrator will usually be uncovered through the intelligent interviewing of witnesses."  He states further, "The homicide detective should determine the identity of all witnesses who have been at the scene… it is imperative that the witnesses be separated and each one should be interviewed individually as soon as possible after the event."[3]

There is no evidence that Walsh's partner Paul Murphy was even contacted on the night of the shooting. As the lead homicide investigator, Walsh could and should have called Murphy to assist while directing other officers to assist in locating and identifying witnesses. Another vitally important step in Walsh's initial investigation on the night of the shooting would have been to contact the watch commander and determine if the patrol division had learned anything about persons leaving the area after the shooting. Had Walsh done so, he would have learned about Officer Smith's traffic stop of a white Suzuki approximately four minutes after the shooting and approximately one-half mile away. The record fails to show that any such inquiry was made.

Walsh failed to properly identify possible eyewitnesses and interview the most obvious witnesses to the shooting during his initial response. Furthermore, Walsh failed to inquire as to whether the patrol division had made any efforts to identify suspects leaving the shooting scene. As such, the initial response by the Boston Police Department was not conducted with any sense of order or thoroughness and resulted in the overlooking or ignoring of valuable investigative leads. A reasonable officer would have taken the necessary steps to identify any and all witnesses and to communicate with other divisions while on the scene the night of the shooting.

**The white Suzuki:**
One of most disturbing and egregious procedural oversights in this case was the failure of Officer Smith to detain a stopped vehicle that fit the description of the suspects responsible for the shooting.

The importance of investigative personnel working closely with patrol officers was known in 1988 and stressed in police training curricula. This expert served as a certified police trainer from 1986

---

[2] Walsh testimony, Day 7 of trial transcript; p. 137
[3] Geberth, V. (1983). Practical Homicide Investigation: Tactics, Procedures, and Forensic Techniques.  Elsevier Publisher: New York, NY.; p. 68-69

to 1989 during which time literally hundreds of uniformed and investigative police personnel were taught in homicide investigative techniques. One of these techniques was for all officers to immediately communicate any information between divisions that might assist in the capture of persons escaping the crime scene. This principle was identified by Vernon Geberth who stated, "…successful homicide investigation often depends on the initial action taken by patrol officers responding to any given scene."[4]

The record shows that in this case, one of the first responders to the shooting scene was Officer Lisa Holmes who later testified that there was a suspect vehicle - a white or red jeep. A broadcast was made of the suspect vehicle and that it might be occupied by two or three males. This information was known almost immediately after the initial police emergency response. In fact, the broadcast was heard by Anti-crime League Officer Tony Smith who initiated a stop of a white Suzuki Samurai four minutes and 10 seconds after the shooting - less than one half mile from the shooting scene. [5]

Smith, who was riding with Officer Mark DeLucca in an unmarked police vehicle, stated that he overheard the radio broadcast of the shooting which included physical descriptions of persons who might be involved. At the time of the stop (1) the jeep and occupants fit the radio description; (2) the jeep was located contemporaneous with the time and location of the shooting; (3) the actions of the jeep (pulling over for unmarked police car without using emergency equipment) was consistent with vehicle operators who knew they were wanted.

The fact that the Suzuki pulled over on its own is noteworthy. Smith stated that he never had to activate his emergency lights because once behind the Suzuki, it pulled over on its own. Smith characterized this as suspicious.[6] Accordingly, both officers approached the Suzuki with their guns drawn. A check of the occupants showed that the vehicle was being driven by London Williams and a passenger, Theron "Apple" Davis.

Disturbingly, there is no record of any contemporaneous report being made by Smith as a result of the stop. Furthermore there is no record that they or their vehicle was searched or that there was any documentation of what the occupants were wearing. Worse yet, there is no evidence that Smith ever communicated to Walsh or his commander that the stop was made. All of these actions could and should have been undertaken by Smith and DeLucca.

The understanding that a white jeep vehicle was associated with the shooting and that Williams and Davis were stopped immediately after the shooting in the general area of the shooting was an extremely important investigative lead. Not only should Smith have communicated immediately that the stop had taken place, but he should have held the vehicle for homicide until it was released by investigators. Furthermore, there was no record that even in a subsequent roll call or shift meeting, information about the stop of the white Suzuki was ever shared with Walsh or other investigative personnel. In fact, Walsh was not even made aware of the Suzuki stop until over a year later when Celester requested that Smith write a report about it.

It is clear to this expert that Smith was uncertain what to do with the Suzuki once he had it stopped. A reasonable officer would conclude that Williams and Davis would be primary suspects in the shooting and would warrant further investigation. The stop of the white Suzuki was a major investigative turning point in the murder and failure on the part of Officer Smith to report it on a timely basis was an opportunity lost.

Another concern regarding Officer Smith's stop is the fact that after clearly identifying the vehicle and its occupants as possibly connected to the shooting, Smith failed to hold it for homicide and

---

[4] Geberth, V. (1983). Practical Homicide Investigation: Tactics, Procedures, and Forensic Techniques.  Elsevier Publisher: New York, NY.; p. 1
[5] Smith report to Celester (no date)
[6] Smith testimony transcript Day 5, July 31, 2003 p. 11; 14

permitted it to drive away. A stopped vehicle matching the physical description of homicide suspects should have been held for homicide investigators until such time investigators authorized its release.

Conversely, lead investigator Walsh also had a responsibility to make timely inquires as to the activities of the patrol division as soon as he was made aware of the shooting. Doing so would have helped compensate for Smith's failure to communicate with investigators and would have informed Walsh on a timely basis about the two suspects located in the area of the shooting at the approximate time of the shooting. Failure on the part of Walsh to do so represents a serious investigative oversight.

It is this expert's opinion that failure on the part of the patrol and investigative divisions within the Boston Police Department to properly communicate suggests a serious and systemic problem. The professional literature is clear that patrol officers play a major role in their response to a homicide because they are in the best position to identify and detain possible suspects who might be attempting to escape. This was well known in 1988. Failure to respond properly is a clear indicator of a need for training along with the establishment of written policy and procedure. At the time of the Tiffany Moore shooting, no such policy existed. This problem could have been avoided if a homicide policy specifying protocols for response to homicide calls was in place.

It is also noteworthy that on August 9, 1989, Callahan and McDonough interviewed Allen Dougherty and Joyce Lord who stated that on the night of Tiffany's murder they observed a white Suzuki parked at the curb at approximately 9:00 p.m. When they returned at approximately 9:25 p.m. the Suzuki was gone.[7]

It is significant that Callahan and McDonough were aware of the Suzuki and its connection to the shooting. A proper investigation would have clearly identified Theron Davis and London Williams as the occupants of the white Suzuki and likely suspects in the Tiffany Moore murder.

<u>Follow-up investigation:</u>
In 1988, police training practices were clear that homicide investigations must be conducted on a timely basis. In addition to a timely initial response and the identification and initial interviews with key personnel and witnesses, the second stage of the investigation is the follow-up which must take place as soon as practical.

Walsh and Murphy began their investigation of the shooting the following day and they learned almost immediately that Tiffany Moore's was not the intended target of the shooting. She was seated on a mailbox while a person or persons were shooting at witness Chris Chaney, who had lunged behind the very mailbox on which Tiffany was seated. Tiffany Moore was shot twice in the back and once in the head. Walsh and Murphy also learned that the shooting was most likely the result of a dispute between members of two territorial gangs – the Humboldt Gang and the Castlegate Gang.

The realization that the shooting was gang-related is a vastly important investigative lead and one that should have focused the investigation toward known gang members that were seen in the area. In fact, numerous persons identified on the scene were gang members but the investigation conducted by Walsh and Murphy failed to but should have revealed this. For example, witnesses that were identified in the days following the shooting included:

Travis Johnson was interviewed two days after the shooting, on August 20th. Johnson told investigators that there were two shooters wearing Adidas sweat suits and the he saw the shooters leave in a white "jeep" Suzuki.

---

[7] Memo from Callahan and McDonough to Lt. John Daley (no date)

Another witness also interviewed on August 20th was Tyronne Brewer who also stated that there were two shooters wearing Adidas sweat suits and that the shooting was gang-related. In fact, it was Brewer who told investigators that members of the Humboldt Boys were hanging around the mailbox at the time of the shooting and that they were fighting with the Castlegate Gang. Brewer said that it was Chris Chaney who dove behind the mailbox and that Chaney had a problem with Theron Davis - aka Apple. Note that on June 28, 1989, Brewer was interviewed by Callahan, McDonough and Walsh at the Middlesex House of Corrections. Brewer told officers that Apple (Theron Davis) was going to get Chris Chaney because Apple blamed him for a stabbing.[8]

The following day, August 21st, Chris Chaney, the alleged target of the shooting was interviewed. Chaney also said there were two shooters both wearing black Adidas sweat suits and that they were approximately the same size.

On August 24th, six days after the shooting, Eric Johnson was interviewed by Walsh and Murphy. Johnson's statement was consistent with previous witnesses in that there were two shooters. It is noteworthy that Johnson later became a key prosecution witness against Shawn Drumgold but at the time of his initial interview with Walsh and Murphy, he never mentioned Drumgold's name. Rather, the record shows that it was Johnson who, in a statement on August 16, 1989, almost a year after the shooting, told investigators that Drumgold was one of the shooters.[9] Evidence in the case fails to support this and it appears as though Johnson was not being truthful when testifying at trial.

The following day, August 25th, another witness, Kevin Lucas was interviewed by Walsh & Murphy. Lucas not only agreed with other witnesses that there were two shooters but also stated that about an hour and a half before the shooting he saw a white jeep Suzuki driving by. Theron Davis was seen as a passenger "giving the finger" to Chaney who returned the gesture. Lucas further said that after the shooting, he ran with Troy Jenkins through an alleyway and when they came out they saw a white jeep Suzuki speeding away.

To summarize, during the course of the first six days following the shooting, Walsh obtained a number of important investigative leads. These included:

- A white Suzuki was seen before the shooting (Kevin Lucas).
- A white Suzuki was seen leaving the area after the shooting (Travis Johnson; Kevin Lucas).
- There were two shooters (Travis Johnson; Tyronne Brewer; Chris Chaney; Eric Johnson; Kevin Lucas).
- Both shooters were approximately the same size (Chris Chaney).
- Both shooters were wearing black Adidas running suits (Travis Johnson; Tyronne Brewer; Chris Chaney).
- Both shooters were wearing masks.
- The shooting was gang-related (Tyronne Brewer).
- There was a dispute between Davis and Chaney (Tyronne Brewer; Kevin Lucas).

These investigative leads were known to Walsh and Murphy before the arrest of Shawn Drumgold and should have focused the investigation toward the two gangs and identifying members of those gangs.

A concern is that Walsh and Murphy failed to conduct a records search of known gang members to learn the identities of the members of the Humboldts and Castlegates. In fact, in 1983 the International Association of Chiefs of Police (IACP) published training guidelines stating that as part of the follow-up investigation, investigators should "conduct a records search."[10] It is significant to note that information regarding the names of those belonging to both gangs was

---

[8] Memorandum from Callahan, McDonough and Walsh to Lt. John Daley (no date)
[9] Statement of Eric Johnson dated August 16, 1989 (by Callahan)
[10] IACP Training Key Volume 14; Training Key 332: Follow-up Investigation, p. 117 (1983)

readily available to Walsh and Murphy at the earliest points in the investigation. This is evidenced by testimony from the criminal trial on October 1989 which shows that the Boston Police Department had begun documenting gang members a number of months prior to the shooting. For example, Deputy Superintendent William Celester, Head of Roxbury Area "B" said the department had compiled gang information for 1 ½ - 2 years. Superintendent Joseph Saia, Chief of Detectives, testified in the criminal trial that Davis, Williams, Chaney and Reese (among others) appeared in the BPD gang books.[11] Furthermore, Deputy Superintendent Gerald O'Rourke of the Intelligence Unit stated that if someone is a known member of a gang, their name will probably be in the gang book.[12] It is also noteworthy that Shawn Drumgold's name did not appear in any of these books.

Determining "who's who" is extremely important when investigating a gang-related murder. This is because most gang-related conflicts are based, one way or the other on disagreements over territory or "turf." This fact was widely known in 1988. Consequently, if two gangs are at conflict then one can reasonably infer that members of one or both of the gangs were responsible for the shooting. Accordingly, because Drumgold was not identified as a gang member in BPD intelligence records, his candidacy as a suspect in the shooting should have been significantly diminished. A reasonable investigator would have known this. This expert opines that failure on the part of Walsh and Murphy to sort out persons on or near the crime scene by checking with the BPD Intelligence Unit represents a serious investigative oversight.

<u>Davis' and Chaney's street fight.</u> In addition to determining whether witnesses to the shooting were gang affiliated, Walsh and Murphy should have also learned of a confrontation approximately 5 weeks earlier between Theron Davis and Chris Chaney.

On July 15, 1988 Officer Garvey encountered a group of kids on Humboldt Avenue One of them had thrown a rock at a vehicle occupied by Theron "Apple" Davis. Davis got out of the car and was attacked by the group of people. Garvey intervened with his baton and fought off a subject who was armed with a knife and another who was armed with an axe. When Garvey asked Davis who stabbed him, he replied, Chris Chaney. Garvey obtained an arrest warrant for Chaney and brought him in only to discover that Chaney was not the one who stabbed Davis. What matters, however, is that Davis thought Chaney was the one who stabbed him. As such, Davis' retribution was the clear motive to retaliate against Chaney.

If Walsh and Murphy would have checked to see if these persons were gang members, and determined their gang affiliations, they could have reasonably inferred that Williams and Davis were either responsible for or involved in the shooting. This expert sees no evidence that any efforts were made by Walsh or Murphy to determine any gang affiliations for Williams, Davis, Chaney or Reese. A reasonable investigator would have done so and information learned through taking these steps should have guided the course of the investigation.

As indicated earlier in this report, the record shows that on June 28, 1989, Brewer was interviewed by Callahan, McDonough and Walsh at the Middlesex House of Corrections. During that interview, Brewer told officers about the revenge motivation for Davis.[13] This memorandum, written before Drumgold's trial, is proof that defendant officers were keenly aware of Davis' revenge motivation against Chaney. It is also proof that police commanders at the highest levels were also made aware of Davis' motivation.

The knowledge that Tiffany Moore's murder was gang-related and that Theron "Apple" Davis sought revenge against Chris Chaney not only identifies Davis and other members of the Castlegate gang as suspects but effectively serves to eliminate Drumgold as a likely suspect. A

---

[11] Saia trial testimony transcript – Day 9; p. 88
[12] O'Rourke trial transcript, Day 9; p. 100
[13] Memorandum from Callahan, McDonough and Walsh to Lt. John Daley (no date)

reasonable officer would have focused the investigation away from Drumgold and on the most likely suspects – Theron Davis and London Williams.

Identification and interviews of possible witnesses: There is evidence in this case that even though some persons were identified as possible witnesses, others who may have witnessed the shooting or related events were not identified on a timely basis, if at all. Proper identification of persons who may have seen or heard something relative to the shooting is essential and must be done on a timely basis. This is because eyewitness identification can distort over time. In this case, Walsh and Murphy failed to interview key witnesses. Specifically, the young girls seated with and near Tiffany Moore at the time she was shot. In fact, these girls were not interviewed until the late spring and summer 1989 – almost one year after the shooting. Identifying and interviewing witnesses and potential witnesses was a standard practice in 1988.[14]

The best procedure is to take informal witness statements immediately upon arrival at the scene. This ensures that a witness's statement is taken before deterioration of memory takes place either because of a time lapse or because a witness simply doesn't want to get involved. These are followed up by a subsequent formal interview typically at the police department.

The record shows that Callahan interviewed the following girls during the late spring and summer months of 1989: (1) Tanoi Curry (interviewed on June 10, 1989); (2) Shamia Clemons (June 13, 1988);[15] (3) Rachelle Roisten (interviewed on June 25, 1989); (4) Michelle Blalock (interviewed on August 8, 1989); (5) Candice Kelsey (interviewed on August 18, 1989); (6) Tara Grant (August 19, 1989); and, (7) Vantrell McPherson (interviewed on June 10, 1989)

Failure on the part of Walsh and Murphy to identify and interview these witnesses on a timely basis demonstrates how the Tiffany Moore murder investigation lacked thoroughness and taking proper investigative steps in an expedient manner.

Defendant officers ignored fundamental steps in responsible homicide investigations by failing to fully and properly investigate each and every person known to be present on the scene at the time of the shooting in order to determine motive. This is evidenced by their failure to interview the young women seated near Tiffany at the time she was shot, and failing to conduct background investigations on those persons that they did identify as being on the scene.

**Identification procedures:**
In the criminal trial, the prosecution relied, in part, on testimony from witnesses Mary Alexander, Tracie Peaks and Ricky Evans. The record indicates that during the initial stages of the investigation, more than one photo array was shown to Alexander and Peaks but this is refuted by Walsh who stated that he and Murphy only showed one array to each witness. There is evidence that the photo array presented by Callahan to Evans was also suggestive and as such unfairly implicated Drumgold.

As a general rule, the police use three methods in witness identification of suspects: lineups, show ups, and photographic identifications. In photographic identification, the police show photographs of possible suspects to the victim or witnesses. In this case, photographic identification was used to identify Shawn Drumgold as a suspect in the Tiffany Moore homicide. Photographic identification procedures if conducted properly, can be helpful in suspect identification. However, the police must be careful not to unfairly suggest any individuals in the photo array that the police have identified as suspects.

The professional literature addressing proper photographic lineups by police has been consistent for over two decades in that lineups must be presented in a fashion to avoid suggestiveness.

---

[14] IACP Training Key Volume 14; Training Key 332: Follow-up Investigation, p. 117 (1983)
[15] Note that because Callahan was not assigned to the case until May 1989, it is likely that this report is incorrectly dated as 1988).

Among the many authoritative works in the police professional literature that address proper photographic arrays and lineups, are those offered by the International Association of Chiefs of Police (IACP). Other books and articles also identify long-standing standards of care for photographic arrays. One of the most widely recognized procedural guidelines for conducting photographic arrays is discussed in the IACP model policy and companion paper titled, *Show-ups, Photo Identification and Lineups.*"

These documents reflect procedural guidelines in place in 1988 and specifically address proper police procedure with regard to photographic arrays. The IACP guideline addressing photo arrays states:

> "...police officers conducting a [photo] lineup must use caution to avoid suggestive influences."[16]

The IACP also cautions that witnesses are easily influenced during the identification process and may assume that the guilty party must be one of the persons in the lineup. Furthermore, they state that witnesses can be strongly influenced by subtle clues conveyed by the officers, indicating that the officer believes that a particular individual in the lineup is the perpetrator. This makes it imperative that the lineup be conducted in a non-suggestive manner.[17]

The IACP also clearly states,

> "Statements [by the officer] that may cause the witness to focus on a particular individual should be avoided...Any statement made by the officers that is designed to prompt a witness is patently suggestive and improper.[18]

In addition to the IACP publications, the standard of care for police photo arrays can be found in authoritative texts. For example, the guidelines for photo identification of suspects was clearly established in 1988 and stated by Lawrence Taylor in his book, *Eyewitness Identification*. Taylor states,

> "Suggesting that the photo of one individual represents a prime suspect would be grossly prejudicial, as would pointing at a photo and asking if that was not the person the witness saw."[19]

Taylor further states, "The use of suggestive words can result in the incorporation of the interrogator's views into the witness's memory."[20]

Also, in their authoritative text titled *Eyewitness Testimony*, Gary Weston & Elizabeth Loftus state,

> "The influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor."[21]

During the course of their investigation, Walsh and Murphy spoke with a number of possible witnesses to the shooting. Consistent among most of the witnesses was that that there were two shooters, they were wearing masks and black Adidas running suits. There is no evidence that any witness saw either shooter's face. Among the witnesses identified by Walsh and Murphy were Mary Alexander and Tracie Peaks. According to Walsh, both Alexander and Peaks were spoken to the same day, on August 29, 1988.

---

[16] IACP Concepts and Issues <u>Paper: Showups, Photo Identification and Lineups</u> and, May 1993, p. 3
[17] IACP Concepts and Issues <u>Paper: Showups, Photo Identification and Lineups</u> and, May 1993, p. 3
[18] IACP Concepts and Issues <u>Paper: Showups, Photo Identification and Lineups</u> and, May 1993, p. 4
[19] Taylor, L. (1982). *Eyewitness Identification.* The Michie Company Publisher: Charlottesville, VA, p. 123
[20] Taylor, L. (1982). *Eyewitness Identification.* The Michie Company Publisher: Charlottesville, VA, p. 58
[21] Weston, G. & E. Loftus (1984). Eyewitness Testimony. Cambridge University Press: Cambridge, Massachusetts

**Mary Alexander**: Alexander stated that upon hearing the gunfire, she ran to the front of her residence, grabbed her children and returned inside but then looked back and saw two people coming up from the Edison plant wearing Adidas sweat suits – one was sticking a gun in his waist. Again, because the shooters were wearing masks and their faces were covered up, Alexander was unable to positively identify anyone as a suspect. Instead, Alexander described the physical stature of the two persons she saw. One was about 6' 1" to 6' 2" and the second one was about 5' 10" to 5' 11".

Alexander was also shown a photo array by Walsh and Murphy on the same day to identify the men saw climbing the rear fence of the Edison plant. The photo array consisted of 16 photographs of possible suspects in the shooting. Shawn Drumgold's photo was among them.

The case file shows that when Alexander was shown the photo array, Murphy pointed to a photo and asked, "Is that him?" [22] Mary then looked at Drumgold's photo, picked it up and said "I can't be sure about this person. I'd like to see some more photographs of more people." Mary's mother, Lola Alexander, stated that she was standing right beside Mary when she heard this.[23] If it is to be believed that Drumgold's photograph was specifically pointed out to Mary Alexander, doing so is a gross breach of accepted police procedure and nationally recognized standards of care in 1988.

Alexander also testified that she saw Drumgold's picture in the paper and on TV within a week after she saw Shawn's photo. One week before trial, defense counsel went to Alexander and showed her Drumgold's picture. If it is true that defense counsel did show Drumgold's photo to Mary Alexander before trial, it is reasonable to assume that her in-court identification of him could have been based on her recollection of that photo and not her memory of what she observed on the night of the shooting.

In summation, at the criminal trial, Alexander was certain that she saw Shawn Drumgold, but the person she saw was not wearing an Adidas running suit. There is further evidence that Alexander's identification of Drumgold was tainted because she had seen photos of him over and over before the trial: first by Walsh and Murphy; then in the newspapers and on television, and finally by defense counsel before trial. If this is to be accepted as true, it is possible if not likely that Alexander's in-court identification of Shawn Drumgold was mistaken.

**Mary Alexander's medical condition**. Another concern in this case is that at the time Mary Alexander was being considered as a witness she was suffering from brain cancer that, according to her mother, dramatically affected her memory. Lola Alexander stated that her daughter can't even remember what is going on from one day to the next and that she told detectives that Mary was sick with malignant cancer of the brain and she was not able to participate in [the investigation].

In spite of this, officers insisted that they had to speak to her.[24] The concern is that if investigators were aware of memory problems associated with Mary Alexander's medical condition, then she should not have been used as an identification witness in this case. Furthermore, if investigators were aware of Mary's medical condition prior to Drumgold's trial, such information should have been disclosed to the court or opposing counsel. Based on Lola Alexander's statement, Walsh and Callahan were or should have been aware of Mary's medical condition before the Drumgold trial.

**Tracie Peaks**: In the grand jury hearing, Peaks testified that after the shooting, she saw Shawn Drumgold and another man walking (not running) up Homestead from where the shooting occurred. She specifically testified that Drumgold was NOT wearing an Adidas sweat suit but was

[22] Lola Alexander's testimony transcript; Day 2; July 31, 2003, p. 10-11
[23] Lola Alexander's testimony transcript; Day 2; July 31, 2003, p. 12
[24] Lola Alexander's testimony transcript; Day 3; July 31, 2003, p. 8; 12-13

wearing a black t-shirt or turtleneck. Peaks put Drumgold at the scene but her clothing description was different from everyone else's. This should have been a concern to investigators and a "red flag" that Peaks' identification of Drumgold was incorrect.

The photo array: On August 26, 1988, Walsh and Murphy met with Peaks at her residence at 72 Homestead Street for the purpose of showing her photographs to see if she could identify anyone in the photo array. Peaks' mother was also present. Walsh stated that he was aware that Peaks' mother did not want her daughter involved in the investigation but Walsh had the impression that Peaks had seen something.[25] The investigators laid 16 photographs out on her dining room table and asked her to look at the photos to see if she could pick out the photograph of the person she saw climbing the fence. Walsh stated that the photo array was previously made up at District Two by himself and Murphy. Walsh stated that he and Murphy put photographs in the array of suspects whose names had come up.[26]

The display environment: It should also be noted that according to Tracie Peaks, Mary Alexander was in the same room when Peaks picked out a photo of Drumgold as a person she ostensibly saw in the area that night. If this is true, it is patently improper to permit one eyewitness to observe and overhear suspect identification by another eyewitness. Doing so taints the objectivity of the process and is highly suggestive in nature. A reasonable officer would have shown photo arrays to eyewitnesses separately to avoid suggestiveness.

Yet another concern is evidence that while viewing the photo array, Walsh and Murphy "set it up like two rows of pictures but they put Shawn's picture in front of me and was like, doesn't this one look familiar, doesn't this one look familiar? So then I just said yes."[27] Furthermore, there is evidence that Peaks was pressured to make her selection of Drumgold. For example, during the showing of the photo array, Peaks stated she selected Drumgold because, "they made me feel like I had to, you know…it was a lot of pressure."[28] Note that in her affidavit, Peaks stated,

> "…Walsh placed one picture of Shawn Drumgold close to me. He then placed a number of other photographs further away from me. He then asked if any of the photos look familiar. I said yes and pointed to the picture of Shawn Drumgold. I did not say he was one of the ones that passed by the night of the murder. I had known Shawn from the neighborhood prior to the murder."[29]

This clearly shows that Walsh's photo array was not only suggestive but misleading. Walsh knew or should have known that by asking Peaks if anyone looked "familiar" she would reasonably have selected Drumgold as a neighbor with whom she was "familiar." Using this statement to implicate Drumgold in the murder is improper. A reasonable and professional investigator would know this.

There is also evidence that Walsh threatened to arrest Peaks if she didn't cooperate. For example, Peaks stated, " I never wanted to come to court or be involved in any of this and they told my mother that if I didn't come to court, they were going to come to my school and arrest me."[30]

If it is to be believed that suggestive and/or threatening statements or actions were made by Walsh or Murphy during the showing of the photo array, it is reasonable to assume that this would account for Peaks' selection of Drumgold as one of the shooters. A reasonable officer would know that presenting a suggestive and threatening photo array was improper. If Alexander and Peaks were pressured to select Drumgold's photo then not only is the identification of no value

---

[25] Walsh's testimony transcript Day 3; July 31, 2003, p. 99
[26] Walsh's testimony transcript Day 3; July 31, 2003, p. 104
[27] Peaks' testimony transcript Day 3; July 31, 2003, p. 109; 139
[28] Peaks' testimony transcript Day 3; July 31, 2003, p. 101
[29] Peaks' affidavit, May 28, 2003
[30] Ibid

but this is evidence of witness intimidation, manipulation and essentially manufacturing evidence against an innocent citizen.

<u>Ricky Evans</u>: In 1989, informant Evans was shown a photo array by Callahan. Evans stated, at one point…they approached me with three photos: Drumgold, Taylor and Theron Davis (Apple)…they put three photos in front of me. Detectives said, "these are the suspects here." Evans told detectives that he heard Apple was the one who did the shooting – the detectives moved Apple's photo away and said, "…no, these are the suspects here." Detectives pointed to Drumgold and Taylor. When asked if they pointed to the photos, Evans said, "Yes they did."[31]

Evans statement suggests that Callahan not only pressured him to change his mind but that the photo array was only three photos. A three-photo array is improper. Stating that "these are our suggestions" is also patently improper as it unfairly suggests to the witness what to choose.

> It is this expert's opinion, based on a reasonable degree of professional certainty that defendant officers used suggestive and coercive means in the showing of photo arrays to prosecution witnesses Alexander and Peaks. Defendants Walsh, Murphy and Callahan knew or should have known this. As such, the actions of defendant officers were contrary to accepted police practices and procedures commonly known to officers in 1988 and 1989.

<u>**Walsh, Murphy and Celester's misconduct**</u>

The record shows that Shawn Drumgold was arrested on August 28, 1988 on a drug charge. The following day, Walsh and Murphy were preparing to charge him with Tiffany Moore's murder. Drumgold was arraigned on the drug charges at approximately 9:30 a.m. and at some point shortly after that Public Defender Leslie Walker became aware that Drumgold was about to be charged in the Moore murder. Walker met with Drumgold in a holding cell and told him that he was about to be charged with a serious crime and that he shouldn't speak with anyone about it until his court appointed attorney arrived. Somewhere between 11:00 a.m. and 12:00 noon that same day, Steven Rappaport was officially appointed as Drumgold's attorney.

The record shows that at some point during a morning recess, Judge Martin was advised by Court Officer Jay Crowley that the police wanted to remove Drumgold from the courthouse. Judge Martin told Crowley that a senior police officer must appear in person to advise the court why they wanted to remove Drumgold.

At about 12:00 p.m., during a sidebar, Judge Martin spoke with Deputy Superintendent William Celester, Commanding officer of Area B; Detective Walsh; Attorney Paul Hadely and Assistant District Attorney Canavan. Attorney Leslie Walker was close enough to overhear.

The specifics of the sidebar appear to be in dispute but the record shows that Judge Martin, concerned about Drumgold's right to remain silent and right to counsel, told the officers not to interrogate Drumgold and that he was releasing him only for the purpose of obtaining additional photographing and fingerprinting because of Drumgold's impending homicide charges. During the sidebar, Judge Martin asked Celester, "You're not going to question him are you?" Celester replied, "No, I'm not."[32] Celester later stated that he didn't tell Walsh and Murphy about the judge's order because he thought it pertained only to him. The record also shows, however, that Judge Martin's orders were overheard by Attorneys Harris and Hadley.

Shortly after 12:00 p.m., Walsh and Murphy met with Drumgold in a small interview room adjacent to his cell. Walsh told Drumgold that he had obtained an arrest warrant for him for Tiffany Moore's murder. Walsh asked if Drumgold wanted to make a statement and he declined, asking if a lawyer had been appointed for him. The officers stated, "Not at the moment." The record shows that during the course of that meeting, in spite of Judge Martin's caution not to

[31] Evans testimony, Motion hearing, July 31, 2003; Day three, p. 21-23
[32] Commonwealth of Massachusetts Superior Court Criminal Action, Nos. 071882183-83 dated May 18, 1989

interrogate Drumgold, Walsh and Murphy took a tape-recorded statement from Drumgold regarding the shooting.

Of great concern is evidence of professional misconduct by Walsh and Murphy that was validated on May 18, 1989, in an order signed by Justice Guy Volterra. In the order Judge Volterra stated,

> "I find that nothing in the record indicates that there was any immediate need to obtain Drumgold's fingerprints and photograph. I draw the inference that police insistence on taking additional fingerprints and photographs was a ruse to get Drumgold out of the courthouse so that he could be interrogated in the more coercive environment of a small detective's office at Area B police station, free from the assistance of his court-appointed lawyer or any other legal advice."[33]

In his statement, Judge Volterra noted that it was not even possible to take full body photos and palm prints of a suspect at Area B. Rather, such documentation needed to be done at the Identification Section at Division 4. The Judge further stated,

> "...egregious prosecutorial misconduct occurred when the authorities questioned Drumgold at the Area B police station in direct contravention of a judge's order and that the interrogation was conducted in violation of Drumgold's Fifth Amendment rights...I find that there was a deliberate decision on the part of the police to interrogate Drumgold in spite of his earlier desire to remain silent."[34]

The finding by Judge Volterra has great implications for this case for a couple of reasons. First, it is proof, as stated by the Judge himself, of a conscious decision by Walsh and Murphy to violate the constitutional rights of Shawn Drumgold, and in direct conflict with a judge's orders not to do so. Secondly, Walsh and Murphy's action on August 20th is consistent with actions and behaviors performed by them during the course of the Tiffany Moore shooting investigation whereby this expert opines that constitutional violations of Drumgold's rights were also committed. Third, Judge Volterra stated that there was "a pattern of conduct engaged in by the police and district attorney's office from the outset."

An especially disturbing aspect to this case, as it relates to Walsh, Murphy and Callahan's misconduct as noted by Justices Martin and Volterra, is the fact that nowhere in the case file does it suggest that any punitive, corrective or disciplinary action was taken against either Walsh or Murphy as a result of the court's finding. Failure to discipline Walsh and Murphy as a result of their violating Drumgold's constitutional rights is equivalent to ratification of that behavior.

Stated differently, Justices Martin and Volterra noted serious breaches of investigative protocol and outright dishonesty on the part of Walsh, Murphy and Callahan. Furthermore, there is evidence that this behavior is supported, if not encouraged by the highest levels of administration within the police department. This behavior is also consistent with other types of investigative misconduct identified in this report.

### The replacement of Walsh and Murphy with Callahan and McDonough
The record shows that in May 1989, Walsh and Murphy were taken off the Tiffany Moore investigation and Detectives Timothy Callahan and Paul McDonough were assigned to develop any new leads in the case. From the time of Drumgold's indictment in September 1988 to the reassignment of the case in May 1989, there is evidence in the file that little if any additional investigative efforts were taken by Walsh and Murphy.

---

[33] Commonwealth of Massachusetts Superior Court Criminal Action, Nos. 071882183-83 dated May 18, 1989
[34] Commonwealth of Massachusetts Superior Court Criminal Action, Nos. 071882183-83 dated May 18, 1989

After their assignment to the case, Callahan and McDonough developed two important witnesses: Chris Cousins and informant Ricky Evans. A review of the manner in which these witnesses were developed and the role they played in Drumgold's criminal conviction is a serious concern.

Chris Cousins was never spoken to by Walsh or Murphy. In fact, Callahan and McDonough first developed Cousins as a prosecution witness in August 1989 – more than a year after the shooting. There is evidence that Callahan may have coached Cousins due to the circumstances surrounding Callahan's interview with Cousins. For example, the record shows that there was an initial 20 minute conversation with Cousins that was not tape recorded. Callahan said that during this initial conversation Cousins said nothing about Drumgold, nor were the names Chaney or Reese mentioned. Callahan then recorded Cousins' statement and once again, he said nothing about Drumgold nor did he mention the names of Mervin Reese or Chris Chaney – only some general remarks about retaliation. According to the record, Callahan then turned the tape off and spoke with Cousins, giving him an opportunity to change or add anything to his statement. Cousins made no changes. At Drumgold's trial, however, Cousins changed his story and implicated Drumgold.

At trial, the Commonwealth argued that the cause for the shooting stemmed from the earlier shooting of Humboldt gang member Romero Holliday by Castlegate members Mervin Reese and Chris Chaney. Drumgold was connected to this theory because of testimony from Cousins who stated that he was nearby Holliday's hospital room while a number of people were gathering around Holliday's bed discussing what should be done about Holliday being shot. Cousins testified at trial that he heard Drumgold state that he (Drumgold) was going to retaliate against whoever shot Holliday.

There is evidence in this case file to refute Cousins' statement, as nowhere does the file show that Drumgold was ever a member of the Humboldts. In fact, there is evidence to the contrary. Furthermore, Terrance Taylor stated that he was one of those who was visiting Holliday and that Drumgold was waiting downstairs.

Cousins said he was friends with Theron Davis. If this is true, Cousins had an ulterior motive himself to deflect suspicion away from his associates, in particular his friend Theron "Apple" Davis. Furthermore, if the Castlegates believed that retribution was needed for Holliday's shooting, then it is logical that members of the Castlegates would carry out the retribution – not someone such as Drumgold who is unrelated to the gang. Because there were no masks or guns seized to link Drumgold to the shooting, all the prosecution had was the motive of retribution for Holliday's shooting.

### Intimidation of witnesses

There is evidence in this case that two alibi witnesses were developed before Drumgold's trial. Both witnesses told Callahan and McDonough that Drumgold was at or near 23 Sonoma Street at the time of the shooting. The discovery of alibi witnesses is an important investigative finding because information provided by them may move suspicion away from one suspect to another. In this case, witnesses provided statements to Callahan and McDonough that Drumgold was not even on Humboldt Street at the time of the shooting.

Olisa Graham: Graham was an alibi witness who corroborated Drumgold's alibi but decided not to testify after receiving a phone call that she would be arrested if she testified. Graham lived at 23 Sonoma. On the night of shooting she was going into her house and saw Drumgold next door at 27 Sonoma with "Country" (Antonio Anthony) sitting on the stairs. They were there for about 30-40 minutes before leaving – this means they were at the Sonoma address roughly between 8:50 p.m. and 9: 30 to 9:45 p.m.[35] Callahan stated that Graham told him that she saw Drumgold at the residence from 9:00 to 9:30 p.m.[36] After about 20 minutes she left her house and went across the

---

[35] Graham testimony transcript; Motion hearing; Day 1; p. 17
[36] Callahan deposition, Vol. II, p. 172

street to 18 Sonoma and sat on the steps. She could see Shawn from where she was. While sitting on the steps she could see Country on the stairs of 23 Sonoma and Shawn in the next building.

Graham stated that her brother Obie and his girlfriend came around the corner and said there was a shooting on Humboldt. Graham stated that she assumed that the shooting had just occurred and that at the time she could see Shawn in front of 23 Sonoma Street.[37] After being told about the shooting, Shawn, Country and Lug allegedly walked toward Maple Street.

Graham stated that two Boston police Detectives Callahan and McDonough came to talk to her in July 1989. She told them that Shawn was in front of 23 Sonoma on the day of the shooting and that they recorded the statement.[38]

Graham stated that some time after giving her statement to the detective, she received a phone call from someone she thought to be a detective, telling her that she had a warrant and if she testified, she would be arrested after getting off the stand. She said that she was aware of a shoplifting warrant that was out for her at the time of the call and the time of trial. She said that before she got the phone call she was planning to come to court to testify.[39]

Antonio Anthony: Anthony (also known as "Country") was another alibi witnesses who initially stated that he was with Drumgold the night of the murder but changed his story after defendant officers threatened to charge him with murder if he supported Drumgold's alibi. Shawn Drumgold made a statement to Walsh at District 2 that he was at 23 Sonoma Street at the time of the shooting with Terence Taylor and Antonio Anthony. The record shows that Drumgold's statement was corroborated by Olisa Graham. Walsh stated that at some point "we concluded that he was at 23 Sonoma Street."[40]

Anthony said that on the night of August 19, 1988 he was hanging out with Drumgold at his Drumgold's girlfriend's (Rachelle Roisten) apartment on Humboldt. He said he remained there until the three left and went to Sonoma Street where Anthony's girlfriend, Dreena Payne lived. He said that before they left, Lisa Graham came over and said that a little girl got shot on Humboldt. Shawn was worried that it was his sister so he left and went over there. Anthony stated that when he found out Drumgold was arrested, he was scared that he too might be arrested.[41]

The record shows that Anthony was interviewed by Walsh and Murphy on August 31, 1988 at Area B Station. At the motion hearing on July 30, 2003 Anthony stated, one of them (Walsh or Murphy) screamed at him and accused him of "holding back." He said, "I always maintained that Drumgold was with me..."[42]
At some later time, Anthony was interviewed by Callahan and McDonough at a police station in south Boston. He stated, "I remember telling them that Drumgold was with me...[at the time of the shooting]".[43] Anthony stated that Callahan was aggressive during the interview and wanted him to say that Shawn did it. Callahan accused him of "holding back." Anthony said that he was scared during the interview.[44]

The record shows that during the time Anthony was incarcerated at Deer Island Correctional Center, he was brought to court to testify at a pre-trial hearing. He stated that he told his lawyer, Mr. Haney, that Shawn wasn't involved in Tiffany's shooting but he was told by the attorney to

[37] Graham testimony transcript; Motion hearing; Day 1; p. 20
[38] Graham testimony transcript; Motion hearing; Day 1; p. 21; 43; 52; See also transcript of Graham interview on July 1, 1989
[39] Graham testimony transcript; Motion hearing; Day 1; p. 23; 29; 66; 85
[40] Walsh testimony transcript, Day 5; July 31, 2003, p. 172
[41] Anthony testimony transcript from Motion hearing; Day 2; July 30, 1988; p. 142
[42] Anthony testimony transcript from Motion hearing; Day 2; July 30, 1988; p. 135
[43] Anthony testimony transcript from Motion hearing; Day 2; July 30, 1988; p. 105
[44] Anthony testimony transcript from Motion hearing; Day 2; July 30, 1988; p. 106; 108-109

plead the Fifth. Other than his lawyer, Anthony made no effort to tell anyone that he could help Shawn because he was advised to take the "Fifth."[45]

There is evidence in the record that Antonio Anthony was present with Drumgold and Taylor on Sonoma Street on the night of the shooting. Anthony's statement that Drumgold was not on Humboldt at the time of the shooting is consistent with Olisa Graham's statement. A concern is that when interviewed by Walsh and Murphy on August 31, 1988 and then by Callahan and McDonough in the summer of 1989, Anthony told them he was with Drumgold and they were on Sonoma Street. Anthony stated that Defendant officers pressured and intimidated him during interviews to say that Drumgold was responsible. There is also evidence that when called for a pre-trial hearing, Anthony was told to take the Fifth and not testify that Drumgold was not on Humboldt Street at the time of the shooting.

The jury in this matter will have to decide whether to believe Anthony that he was with Drumgold at the time of the shooting or to believe the tape-recorded statement by Walsh and Murphy where Anthony allegedly stated that he was not with Shawn. In either case, however, there is evidence that Walsh, Murphy, Callahan and McDonough placed pressure on Anthony to state that he was not with Drumgold at the time of the shooting. Doing so is tantamount to manufacturing evidence and is at the very least, a gross abuse of accepted police authority and public trust.

Vantrell McPherson: McPherson was one of the girls present with Tiffany Moore at the time of her murder. The record shows that Callahan stated that he told Vantrell McPherson's mother that if she failed to show up for court, she could be arrested.[46] Telling a witness that he or she will be arrested is coercive. Callahan knew or should have known this.

Tracie Peaks: Peaks was one of the prosecution's identification witnesses. Peaks stated that as Drumgold's trial approached, "Detectives told my mother that if I did not show up to court and cooperate with them they would come to my school and arrest me and put me in jail."[47] If this is true, the threat of being arrested, at school would be a powerful motivator for Peaks (or anyone) to testify exactly as investigators wanted her to.

There is evidence in this case that witnesses were intimidated and manipulated by defendant officers. If it is to be believed that witnesses were intimidated by defendant officers, such behavior represents egregious manipulation of evidence and is contrary to professional police practices in 1988 and 1989.

> *It is this expert's opinion, based on a reasonable degree of professional certainty that defendant officers intimidated and threatened witnesses to cooperate with the Commonwealth's case against Drumgold. Intimidation of witnesses is tantamount to manufacturing evidence and was well-known in 1988 and 1989 to be improper. As such, the actions of defendant officers were contrary to nationally recognized and accepted police practices and procedures.*

**The development and management of Ricky Evans represents a gross departure from established informant management protocols known to investigators in 1988-1989.**
A serious concern in this case is the recruitment and management of Ricky Evans as a primary prosecution witness against Shawn Drumgold. The record is clear that even though Evans provided incriminating testimony about Drumgold, in fact he knew nothing about who shot Tiffany. Evans was merely willing to testify against Drumgold because of benefits provide to him by Callahan and McDonough. The record also shows that Callahan and McDonough coached Evans by feeding him details about Tiffany's murder and Shawn Drumgold.

---

[45] Anthony testimony transcript from Motion hearing; Day 2; July 30, 1988; p. 147; 149-151
[46] McPherson testimony from Motion hearing, Day 6; August 6, p. 101
[47] Affidavit of Tracie Peaks, May 28, 2003