Nationally recognized standards of care addressing informant management are found in policing guidelines and standards that include publications by the International Association of Chief's of Police (IACP) in their Model Policy and Concepts and Issues Paper on *Confidential Informants*, the Department of Justice in their monograph titled *Managing Confidential Informants* and the Commission on Accreditation for Law Enforcement Agencies (CALEA). Furthermore, research supportive of these guidelines is found in numerous academic publications such as the book *Confidential Informant: Law Enforcement's Most Valuable Tool,* CRC Press by John Madinger.

These are authoritative works identifying proper police procedure as they relate to informant management. Specifically, they identify the procedures necessary to evaluate, document and effectively control a confidential informant. A law enforcement officer's failure to observe nationally recognized guidelines regarding informant management can result in an informant that is unreliable, dishonest and out of control. Worse yet, knowingly and willing misdirecting an informant and manipulating him to provide false evidence and testimony is reckless and dangerous. That is what occurred in this case. Defendant officers in this case failed to observe nationally recognized informant management protocols by improperly employing the services of a homeless informant.

The professional and training literature in informant management is replete with cautions about informants who cooperate with expectation of reward. The greater the need for food, shelter or financial payments, the greater the possibility of him or her lying to acquire the reward. For example, in his authoritative book *Confidential Informant*, John Madinger states that "…informants will, "lie, cheat and steal to get what they want," and, "their motivation to lie is … great."[48] He further states, "Extreme skepticism, coupled with earnest attempts to corroborate every detail of the jailhouse informant's statement, should be standard procedure in this type of situation."[49] Furthermore, Madinger states, "Absolutely everything reported by the informant should be subject to corroboration by the officer."[50] In other words, by providing information, truthful or otherwise to authorities, a jailhouse informant has everything to gain and virtually nothing to lose.

Similar cautions are found in nationally recognized operational guidelines for informant management. For example, *Department of Justice* guidelines for informant management state that because informants are often criminals themselves officers should anticipate the worst and direct and monitor the CI accordingly.[51] The *International Association of Chief's of Police (IACP)* states, [informants] may "deceive or mislead, entrap, or provide seemingly valuable information that takes many hours to prove or disprove;" and "when information is scarce, the CI may become 'creative' to maintain the flow of funds;" "and, "CI's may exaggerate or fabricate the criminal acts of targets. Some may report truthfully, but may lie about having used illegal methods to obtain the information."[52]

The record shows that Evans was eighteen-years old and homeless when first contacted by Callahan and McDonough. This initial contact was approximately ten months after Tiffany's murder when the detectives interviewed him in December 1998 following an unrelated shooting incident where his cousin Roy "Willie" Evans was shot and killed. Evans was with Willie at the time and was also shot and wounded.

---

[48] Madinger, John (2000). <u>Confidential Informant: Law Enforcement's Most Valuable Tool</u>. Boca Raton, FL: CRC Press, p. 29.
[49] Madinger, John (2000). <u>Confidential Informant: Law Enforcement's Most Valuable Tool</u>. Boca Raton, FL: CRC Press, p. 194.
[50] Madinger, John (2000). <u>Confidential Informant: Law Enforcement's Most Valuable Tool</u>. Boca Raton, FL: CRC Press, p. 132.
[51] Nugent, Hugh, Frank Leahy & Edward Connors (1991) <u>Managing Confidential Informants</u>, Narcotics Control Technical Assistance Program, Bureau of Justice Assistance, U.S. Department of Justice, July, p. 27.
[52] IACP National Law Enforcement Policy Center's <u>Confidential Informants Concepts and Issues Paper</u>, June 1990.

Callahan and McDonough interviewed Evans on August 6, 1989 at which time he told them that he along with Willie and Drumgold were standing on the corner of Sonoma and Elm Hill at an undesignated time, when he saw "Lug" Taylor coming up Skyler Street. Evans said Taylor told Drumgold, "I know where we can get Mervin and Chaney." Evans further stated that he saw guns (a black gun and a silver gun) in the possession of Taylor and Drumgold. They allegedly walked toward Skyler street and returned about 45 minutes later in a white Taurus. Note that Evans was specifically asked if the car was a Taurus. This is tantamount to feeding the informant information. Evans further said that he met with Taylor and Drumgold later and Taylor said the guns were "hot."[53]

After speaking to Evans, Callahan and McDonough took Evans to a local Howard Johnson's hotel where he ended up residing during the Drumgold trial and afterwards, for a total period of at least three to four weeks.[54] Note, if Evans is to be believed, he resided in the hotel room for up to six months. Evans was also provided spending money and meals.[55] The record shows that financing for Evans' relocation as well as his meals and expenses, was paid for either by the Suffolk County District Attorney's Office or the Boston Police Department or a combination of both.

Subsequent to Drumgold's conviction, Evans recanted his earlier statements about Drumgold and Taylor and stated that during the course of the conversation about Willie, Tiffany Moore's name "came up" and detectives began questioning him about Tiffany's murder. Evans stated that he didn't tell Callahan and McDonough anything about Tiffany's murder other than word on the street was that "Apple" was bragging about having done the shooting. Otherwise, Evans stated, he knew nothing about it.

It is widely known in police work that while sometimes useful, informants have always been a volatile and unstable tool for criminal investigators and great care in recruiting and managing them is important. An ongoing theme in the professional literature on handling informants as well as in federal training manuals outlining how to use them is "control." As such, the responsible officer must take measures at every level of involvement with the informant to monitor his actions and verify and corroborate any information rendered.

The perverse motivations of Evans were not so much the issue in this case because it is logical that a homeless informant is greatly motivated to receive virtually anything. What is more at issue is that a homeless informant would have an enormous and immediate reason to lie and careful steps must be taken to verify any information rendered by them. There is no evidence that any such steps were taken in this case which suggests that defendants were aware of Evans' untruthfulness but chose to utilize him anyway.

It is well known in law enforcement circles that informants generally act in what they perceive to be in their best interest, fulfilling the needs most important to them at the time. Considering the many categories of informants, the operational use of homeless informants is problematic because they are highly motivated. They possess little of anything and are in want (and need) of virtually everything, the least of which being shelter and food. In Evans' case, he was also wanted for criminal charges and was therefore highly motivated to have these charges reduced or dismissed. Homeless informants are opportunists and it should not be surprising that informants who are homeless will lie, cheat and steal to get what they want. Of all of the various types of informants, the homeless informant is one, if not the most, unstable because of their compelling motivation to lie to get what they want. This is pointed out by John Madinger, in his book, *Confidential Informant*. Madinger states that the perversely motivated informant is one who is "working especially hard for themselves, trying to gain some advantage or benefit." Madinger

---

[53] Evans' statement dated August 6, 1989, p. 2
[54] Callahan testimony transcript: Motion: Day 6: August 6, 2003; p.68-69
[55] Callahan testimony transcript: Motion: Day 5: August 5, 2003; p. 241; 244; Note that Callahan stated that Deputy Joseph Dunford and Assistant District Attorney O'Meara met regarding the payment of the bill for Evans.

further cautions that "the personal, professional and legal hazards of working with perversely motivated informants are so substantial that they should be used only with the greatest of care."[56]

This raises yet another issue in the case. That is, the motivation of defendants in their decision to continue the use of Evans as an informant and base a criminal case on information provided by him. The above observations assume that a reasonable officer would be concerned with developing a case that meets with legal, ethical and professional standards. However, there is compelling evidence in the record to suggest that Callahan and McDonough, while aware of the questionable motivations of Evans, elected to not only ignore the numerous indicators that he was lying but to take advantage of the fact that he was a liar and fabricate a case against Drumgold.

Coaching: There is evidence in this case that Callahan and McDonough provided Evans with information regarding Drumgold. For example, Evans stated, "At one point...they approached me with three photos: Drumgold, Taylor and Theron Davis...they put three photos in front of me. Detectives said, "These are the suspects here."[57] Evans told detectives that he heard Apple was the one who did the shooting – the detectives moved Apple's photo away and said, "...No, these are the suspects here." Detectives pointed to Drumgold and Taylor.[58]

Evans stated that the testimony he provided at Drumgold's trial was not truthful. For example, He stated that other than them (Callahan and McDonough) telling him that Shawn and Taylor were suspects, he would have no way of knowing that.[59] Evans also stated that his testimony about seeing Shawn before the shooting with a silver gun and Taylor with a black gun was not truthful. When asked why, Evans said, "It was like I was coerced ...it was like it was the only way I could get off the streets"[60] Finally, Evans stated that he recalled when he was testifying, he couldn't remember Taylor's last name so someone took him off the stand and in the hallway told him Taylor's name – he couldn't remember who it was.[61]

The lies told by Evans are consistent with cautions about use of a perversely motivated informant and were widely known in 1988-1989. This expert observed no BPD policy addressing the considerations provided to informants or prohibiting the coaching of informants. It is this expert's opinion that if such a policy existed at the time of this investigation, the likelihood of Callahan mismanaging Evans would have been greatly reduced if not totally avoided.

Lack of Corroboration: There is no evidence in this case that Callahan ever appropriately corroborated information provided by Evans. Corroboration of informant information was a cornerstone in informant management in 1988 as it is today, and is one of the best ways to determine the truthfulness of information provided by them. Failure on the part of Callahan and McDonough to properly corroborate information provided by Evans suggests a gross lack of training in informant management or a willful and conscious attempt to manufacture evidence to be used against Drumgold.

Consideration: Defendants Callahan and McDonough knew in this case that Evans the provision of a hotel room, meals and cash was an excessive consideration. A reasonable officer would know that a homeless informant who literally has few if any material possessions and no place to live would be tempted to lie to continue to receive such benefits. The list of benefits provided by Callahan and McDonough included:

   1.  A room at Howard Johnson's

---

[56] Madinger, J. (2000). Confidential Informant: Law Enforcement's Most Valuable Tool. CRC Press: Boca Raton, FL., p. 54-55
[57] Evans transcript testimony from Motion Hearing, p. 21
[58] Evans transcript testimony from Motion Hearing, p. 22-23
[59] Evans transcript testimony from Motion Hearing, p. 25
[60] Ibid, p. 30-31
[61] Ibid, 29

2. Cash amounting to $35-$45 per week
3. Dismissal of criminal charges pending against him

The benefits and consideration provided to Evans in this case were clearly excessive and far exceeded mere reimbursement for living expenses. A reasonable officer would know this.

Especially egregious is the fact that at trial Evans testified that he was not promised anything in exchange for his testimony but he later stated that he did so because he didn't want to loose everything. [62] Callahan stated that he was present in the courtroom when Evans stated that he was not promised anything, but Callahan failed to inform the court that Evans was lying.

Furthermore, the fact that this information was not previously disclosed by Defendants demonstrates their desire to hide Ricky Evans' true motivation for providing falsified testimony against Shawn Drumgold.

Lack of motive: Even Evans' testimony fails to provide a motive to Drumgold's alleged involvement in the murder.

Need for Informant management policy. It is clear to this expert that the manner in which Callahan mismanaged Evans could have been controlled and even avoided with the establishment of informant management protocols specifically addressing informant considerations and prohibitions against "coaching" an informant. This expert opines that the degree of inducements provided to Evans by Callahan as well as the coaching of Evans by Callahan should have been specifically prohibited by departmental policy.

At the time of the Tiffany Moore investigation the Boston Police Department lacked a comprehensive informant policy that clearly identified prohibited such investigative practices. Failure on the part of the Boston Police Department to establish a comprehensive informant management policy demonstrates indifference on the part of the administration at the highest levels.

> *It is this expert's opinion, stated within a reasonable degree of professional certainty, that Callahan and McDonough knew or should have known that statements provided Ricky Evans regarding Drumgold's involvement in the Tiffany Moore shooting were false and misleading. Failure on the part of Callahan and McDonough to properly manage Evans is a gross departure from accepted informant management principles known in 1988 and 1989 and was a contributing factor in the wrongful conviction of Shawn Drumgold.*

**Walsh, Murphy and Callahan failed to disclose information to Drumgold's attorney that would have aided in his defense against homicide charges.**
A criminal investigation is a search for the truth. Its purpose is not to target a suspect and gather evidence against him but rather, to identify any and all evidence that pertains to the case and disclose all to defense counsel. In this case, defendant officers failed to disclose important information useful to Drumgold in his defense.

The requirement to disclose exculpatory evidence is found in *Brady v. Maryland*. 373 U.S. 83 (1963). Police training in 1988 included instruction regarding a police officer's responsibilities to disclose exculpatory information. There is evidence in this case that defendant officers failed to provide exculpatory evidence as required under "Brady."

Callahan: Mary Alexander's medical condition. There is evidence in this case that defendant officers knew that Alexander had brain cancer affecting her memory/perception. Specifically, Lola Alexander told investigators that her daughter had problems with her memory. Mary Alexander's condition was so severe that, according to Lola, Mary was unable to remember the name of her

---

[62] Evans' transcript testimony from Motion Hearing, p. 33

own son. This information should have been shared with Drumgold' attorney because the prosecution relied, in part, on Alexander's identification of Drumgold. There is no evidence that this information was disclosed to prosecutors or defense council.

<u>Callahan: Ricky Evans testimony that he was not promised anything</u>. Callahan stated that he was present in the courtroom when Evans testified in Drumgold's trial that he was not promised anything in exchange for his testimony. This was patently false, as the record shows that Evans was not only given a room at Howard Johnson's Hotel, free meals and spending money, but that his pending criminal charges would be dropped in exchange for his cooperation. Failure on the part of Callahan to speak up regarding benefits promised to Evans is tantamount to permitting him to lie under oath. A reasonable officer would have informed the court of Evans' dishonesty.

> *It is this expert's opinion, stated within a reasonable degree of professional certainty, that Walsh, Murphy and Callahan knew or should have known of their obligation to disclose exculpatory information to the defense. Failure to do so, is an egregious violation of accepted police conduct in 1988 and 1989. A reasonable officer would have known to report such investigative information.*

**Failure on the part of BPD administrators to develop written homicide policy**
A policy is a statement of principles that guides operational decisions in the field. Policies not only provide guidance; they also help maintain organizational control and ensure accountability within an organization. In addition, they provide a basis for fair discipline. Written policies can and should be viewed as extensions of training that give officers direction toward a specific goal. With regard to larger police departments, it is essential that the right hand know what the left is doing.

When the crime of homicide occurs in a community, it creates considerable public attention and concern. As such, the investigation of a homicide should represent one of the highest priority functions of a police department. Therefore, departmental resources must be utilized to the fullest extent possible to increase the chances of identifying evidence and suspects on a timely basis. For example, it makes little sense for a patrol officer to successfully locate and stop a suspect vehicle wanted in a homicide that has occurred only moments earlier only to release that vehicle without first alerting homicide detectives. Doing so can not only impede further investigative efforts but may result in important evidence being destroyed and suspects being difficult to later identify. Police departments must have written policy for high-priority crimes such as homicide.

The importance of written policies was stressed almost two decades ago by the *National Advisory Commission on Criminal Justice Standards and Goals*.[63] The Commission stated,

> "Every police executive should have available written policies in those areas of police operations in which guidance is needed to direct the department's officers toward the attainment of the department's goals and objectives. These written policies should be in those areas in which directions are needed."[64]

Once a policy has been written, however, it must be made known. Policy dissemination is a responsibility of police administrators at the highest levels of command. It is vital for members of all operational units within the department to be aware of written policy and how function within their unit intersects with the functions of others in different units to achieve the same goal.

In this case, a number of critical areas with regard to conducting homicide investigations failed to have written policy. For example,

• Patrol officer responsibilities relating to homicide investigations

---

[63] Hess, K. & H. Wrobleski (1993). Police Operations. West Publisher, p. 20
[64] NACCJSG, p. 54

- Reporting and communication of investigative leads
- Utilization of department records
- Methods of interviewing witnesses
- Methods of conducting photo line-ups
- Informant management
- Following judicial directives

In 1988 it was known that the crime scene extends from the location where the suspect changed intent into action [and] through the escape route..."[65] Officer Smith knew or should have known this because a logical escape route for the person or persons responsible for Tiffany's shooting death was when Officer Smith stopped the jeep. A homicide policy should have been in place to guide the officer's actions.

Shawn Drumgold was wrongfully targeted for investigation and prosecution in Tiffany Moore's murder. It is likely, if not probable that if the Boston Police Department had established written policies relating to homicide investigations, the true perpetrators of this crime would have been identified and captured on a timely basis.

➢ *It is my opinion, based on a reasonable degree of professional certainty, that at the time of the Tiffany Moore murder, the Boston Police Department failed to establish written policies relating to homicide investigations that were consistent with nationally recognized management principles. Doing so resulted in the wrongful investigation and conviction of Shawn Drumgold and was directly responsible for the failure of the department to capture the person or persons truly responsible for the crime.*

**The Boston Police Department ratified the conduct of Walsh, Murphy, Celester, Callahan and McDonough by not holding them accountable for ongoing breaches of professional conduct in the Tiffany Moore murder investigation.**
Ratification of misconduct, whether the misconduct as a violation of policy, procedure, training curriculum, directives, Law, or the United States Constitution, is a strong indicator of the orientation, customs, and practices of a department. Police administrators throughout our nation acknowledge that a law enforcement agency is controlled not only by the law, written and verbal directives, and training curriculum, but also by the customs of the department.

Administrators within the Boston Police Department have demonstrated their unwillingness to address indiscretions that were clearly made by defendant officers. This creates a venue for continued misconduct, and it also sends a clear message to rank and file officers that such behavior is acceptable and that punishment for violations are minimal if not entirely absent.

In this case there are numerous accounts of dishonesty, deceit, manipulation and coercion of witnesses and an ongoing pattern of disregard for nationally recognized investigative principles by Walsh, Murphy, Celester, Callahan and McDonough. For example:

**Walsh**: Improper response to the initial crime scene: failure to properly communicate with patrol division on a timely basis to identify Williams and Davis as likely suspects;

**Walsh and Murphy**: Improper and suggestive identification procedures used to target Drumgold as a suspect;

**Walsh, Murphy and Celester**: Ignoring direct court orders from Judge Martin to not interrogate Drumgold resulting in violations of Drumgold's Fifth and Sixth Amendment rights.

---

[65] Geberth, V. (1983). Practical Homicide Investigation: Tactics, Procedures, and Forensic Techniques. Elsevier Publisher: New York, NY.; p. 11

**Callahan and McDonough**: Mismanagement and manipulation of informant Ricky Evans who provided false testimony at Drumgold's trial; ignoring or manipulating witness statements from persons who knew Drumgold was not on the scene of the shooting when it occurred.

**Callahan**: Failure to disclose information that Evans had received considerable levels of consideration in exchange for his testimony; coaching Evans regarding his testimony against Drumgold.

It is my professional opinion, based upon a reasonable degree of certainty that Walsh, Murphy, Celester, Callahan and McDonough demonstrated their unfitness for duty but there was never any effort to discipline or even provide remedial training to them. By ignoring these errant behaviors, administrators effectively validated and ratified their conduct. It is likely if not probable that proper and timely identification of these behaviors along with swift and certain punitive measures would have prevented the wrongful conviction of Shawn Drumgold.

Shockingly, in addition to administrators not taking disciplinary action against Walsh and Murphy, these same officers were actually rewarded for their "work" in the Drumgold investigation. Evidence of this is the "Commissioner's Special Citation" to Walsh and Murphy dated December 22, 1988 that reads,

> "The Department is pleased to recognize the diligence, persistence and investigative skills of Detectives Murphy and Walsh in solving this brutal murder of an innocent eleven-year-old child."[66]

In addition, the file shows a letter of commendation from Assistant District Attorney Phillip Beauchesne to Callahan and McDonough dated October 31, 1989, commending their "exceptional professional abilities" in the Tiffany Moore investigation.[67] The record also shows that Callahan was subsequently promoted to the rank of Lieutenant. Commending and promoting officers for their good work in a case, when administrators knew or should have been aware of professional and investigative transgressions is tantamount to ratification of that conduct.

> ➢ *It is my professional opinion, based upon a reasonable degree of certainty that defendant officers in this case demonstrated their total disregard for acceptable and professional police conduct but never took any steps to discipline them. In fact, there is evidence in this case that their behavior in this case was rewarded through letters of commendation and promotion. By ignoring obvious inappropriate behaviors and failing to discipline officers for indiscretions, administrators effectively validated and ratified their conduct. Doing so demonstrates that misconduct within the Boston Police Department was deliberate, systemic and pervasive.*

**<u>The problem of police misconduct was pervasive and systemic because administrators of the highest rank within the Boston Police Department were aware of the inappropriate conduct by defendant officers.</u>**

A review of this case not only reveals inappropriate conduct on the part of investigators assigned to the Tiffany Moore investigation but there is also evidence that high-ranking supervisors and administrators were aware, and in some cases contributed to, professional misconduct that led to Shawn Drumgold's wrongful conviction. For example, Callahan himself held the rank of Sergeant as he conducted his duties; Lieutenants John Daley and Edward McNelley were the recipient of reports and memoranda regarding the steps of the investigation; William Celester, Deputy Superintendent, also had a "hands-on" role in aspects of the investigation and was even the subject of a judicial reprimand for dishonesty; Assistant District Attorney Phillip Beauchesne prosecuted the case and knew or should have known enough about the case to be aware of misconduct; and the very existence of Walsh and Murphy's Commissioner's Special Citation

---

[66] Commissioner's Special Citation, Dated December 22, 1988
[67] Beauchesne letter of commendation to Callahan and McDonough dated October 31, 1989

suggests that administrators at the highest ranks not only were aware of investigative misconduct but were willing to reward officers for it.

Defendant officers regularly and continually demonstrated a clear pattern of inappropriate and illegal behavior during the course of the Drumgold investigation. The evidence that high-ranking supervisors and administrators were aware of it and didn't intervene is highly indicative of a system-wide problem of police misconduct and corruption. Police behavior that is willful and which ultimately violates the rights of citizens should not be tolerated. This is especially true when an innocent citizen is wrongfully sent to prison for over fifteen years. The actions and behaviors of the administration of the Boston Police Department in this case, demonstrate total and absolute indifference to the very citizenry they are sworn to protect.

➢ *It is my professional opinion, based upon a reasonable degree of certainty that defendant officers in this case along with knowledge and support of supervisory and high-ranking administrators, knew or should have known that Shawn Drumgold was not responsible for the death of Tiffany Moore. Their indifference is evidence of a pervasive and system-wide pattern of behavior that condones officer misconduct. Doing so is an egregious violation of professional conduct and police practices.*

This concludes my report at this time.

**Fees and Previous Experience**

policereview@gmail.com

This report contains the opinions I am prepared to express at trial in this matter. My fees in this case are at the rate of $200 per hour and an initial retainer of $3000. I charge $2300 per day plus expenses for depositions and any work conducted out of town.

I have testified as an expert witness fifty-seven occasions including hearings, depositions and trials. These are listed in Appendix #2.

Respectfully submitted,


Michael D. Lyman, Ph.D.
August 13, 2007

**APPENDIX #1 – MATERIALS REVIEWED**

1. Complaint (civil)
2. Complaint (criminal)
3. Superior Court transcript; motion hearing Day one (July 29, 2003)
4. Superior Court transcript; motion hearing, Day two (July 30, 2003)
5. Superior Court transcript; motion hearing, Day three (July 31, 2003)
6. Superior Court transcript; motion hearing, Day four (August 4, 2003
7. Superior Court transcript; motion hearing, Day five (August 5, 2003)
8. Superior Court transcript; motion hearing, Day six (August 6, 2003)
9. Superior Court transcript; Day three (September 29, 1989; 170 pgs)
10. Superior Court transcript; Day four (October 2, 1989)
11. Superior Court transcript; Day five (October 3, 1989)
12. Superior Court trial transcript; Day seven (October 5, 1989)
13. Superior Court transcript; Day nine
14. Superior Court transcript; Day 10
15. Superior Court transcript; Day 11 (October 12, 1989)
16. Judge Volterra's opinion (May 1989)
17. Letters of commendation: Walsh; Murphy; Callahan
18. Tony Smith report
19. R. Evans statement of August 6, 1989
20. Affidavit of B. Peaks; May 28, 2003
21. Affidavit of B. Peaks: July 29, 2003
22. T. Peak's statement
23. Affidavit of T. Peaks: May 28, 2003
24. Affidavit of T. Peaks: July 29, 2003
25. Statement of A. Anthony: August 31, 1988
26. Statement of L. Graham: July 1, 1989
27. Statement of Angelo Perkins
28. Dunford deposition
29. Daley deposition #1: November 15, 2006
30. Daley deposition #2: January 23, 2007
31. Daley deposition #3: February 21, 2007
32. Merner deposition
33. Roache deposition
34. Roache testimony (Yarbough v. DeLuca)
35. Evans deposition (1, 2 & 3); June 26, 2006
36. B. Peaks deposition: March 2, 2006
37. O. Graham deposition: May 17, 2006
38. L. Alexander deposition (1, 2, & 3): April 7, 2006
39. Callahan deposition #1: September 8, 2006
40. Callahan deposition #2: March 2, 2007
41. Callahan deposition #3: May 31, 2007
42. Walsh deposition Vol. I: September 14, 2006
43. Walsh deposition Vol. II: November 28, 2006
44. Letters of commendation: Walsh, Murphy, Callahan, McDonough
    interview transcripts: Evans, Graham, Curry, Clemons, Roisten, Blalock, Johnson, Jenkins,
    Kelsey, Cousins, Biggs, McPherson, Reese, Graham (statement), Perkins, Anthony,
45. Affidavit: Tracie Peaks; Betty Peaks
46. Miscellaneous Boston police memoranda
47. St. Clair Report of January 14, 1992
48. 30-day Implementation Report of March 4, 1992
49. Implementation Report of January 22, 1993
50. Report of Justice Hennessey of March 20
51. International Association of Chief's of Police (IACP), "Confidential Informants," Training Key
    #404; Volume 18

52. International Association of Chiefs of Police (IACP), "Follow-up Investigation," Training Key #332; Volume 14 (1983)

53. International Association of Chiefs of Police (IACP), <u>Showups, Photo Identifications and Lineups</u>, Concepts and Issues Paper, May, 1993

54. International Association of Chiefs of Police (IACP), <u>Showups, Photo Identifications and Lineups</u>, Model Policy, February 1992

55. Madinger, J. (2000). <u>Confidential Informant: Law Enforcement's Most Valuable Tool</u>. CRC Press: Boca Raton, FL.

56. Geberth, V. (1983). Practical Homicide Investigation: Tactics, Procedures, and Forensic Techniques. Elsevier Publisher: New York, NY

57. Wells, G. & Loftus (1984). <u>Eyewitnesses Testimony</u>. Cambridge University Press: Cambridge, Massachusetts

58. Taylor, L. (1982). <u>Eyewitnesses Identification</u>. The Michie Company. Contemporary Litigation Series. Charlottesville, VA

59. Hess, K. & H. Wrobleski (1993). <u>Police Operations</u>. West Publishing Co.

**APPENDIX #2 – EXPERT TESTIMONY**

Depositions given:

1.  Frenzen, et al. vs. Grady County, et al. U.S. District Court – Western District (Case # CIV-00-1089-A)
    For defense
    Investigative practice / informant management
    Deposition: 8/01

2.  Helen Eves vs. Anaconda-Deer Lodge County U. S. District Court – District of Montana, Butte Division (Case # CV-00-17-BU-CCL)
    For defense
    Forseeability
    Deposition: 3/03

3.  Aiels v. City of Cedar Rapids; Havlicek; and Keiller, U.S. District Court for the Northern District of Iowa Cedar Rapids Division (Case # C01-76MJM)
    For plaintiff
    Use of force
    Deposition: 3/03

4.  Ernesto Acevedo Guerra vs. Montgomery County, Maryland, et al.
    The Circuit Court for Montgomery County, Maryland
    Case # AW-02-CV-1995
    For plaintiff
    Use of force
    Deposition: 3/03

5.  Debra Smith, et al., v. James Allen Barber, et al.,
    United States District Court For the District of Kansas,
    Case No. 01-2179-CM
    For plaintiff
    Informant management / Use of force
    Deposition: 4/03

6.  Mary Jane Blossom vs. Jeff Yarbrough et al.
    Northern Oklahoma U.S. District Court. Case # 2002-CV-373
    For plaintiff
    Use of deadly force
    Deposition: 6/03

7.  Richard Molina et al vs. County of Pima et al. CIV02-078-TUC-WDB (Case # C20015392; State Court, Tucson)
    For plaintiff
    Arrest / Pat down / Use of force
    Deposition: 8/03

8.  Estate of Floyd Wayne Houston et al v. Tom Mosley; City of Wilburton Police Department; and City of Wilburton Defendants (Federal Court, 10th Circuit: Tulsa)
    Case # CIV-01-323-S
    For plaintiff
    Use of deadly force
    Deposition: 6/04

9.  Estate of Roger D. Owensby, Jr. v. City of Cincinnati, et al
       Case # 01-CV-769; S.D. Ohio
       For plaintiff
       Use of deadly force
       Deposition: 3/04

10. Dominic Corigliano and Andrew Corigliano v. Polk County, Iowa, Jay Evans and Jeff Funaro;
       U.S. No. 4:02-CV-20422 (Federal Court: West Des Moines, IA)
       For plaintiff
       Use of force
       Deposition: 8/04

11. Irasema C. Gomez v. State of Arizona et al
       Case # C20025939
       For plaintiff (State Court: Tucson)
       Forseeability / Training
       Deposition: 7/04

12. Erick Dunn, a minor by his adoptive parents, Linda Rivera and James Rivera v. City of
       Walsenburg, et al (Colorado Springs, CO)
       Case # 01-B-1820
       For plaintiff
       Investigative procedures
       Deposition: 6/04

13. Hastings v. Barnes, et al
       (US District Court for Northern District of Oklahoma)
       Case # 03-CV-538 EA (M)
       For plaintiff
       Use of deadly force
       Deposition: 6/04

14. Hester et al v. Wal-Mart Stores, Inc.
       Case No. 2:03-cv-02447-JWL-JPO (US District Court for the District of Kansas)
       For defense
       Arrest
       Deposition: 7/04

15. State of Iowa v. Jared James York
       Case #FECR05-402
       For defense (Iowa District Court in and for Washington County)
       Investigative procedures / Interview & interrogation
       Deposition: 9/04

16. Sigley v. City of Parma Heights (OH)
       Case # 1:03CV0595
       For plaintiff
       Use of deadly force
       Deposition: 10/04

17. Steven Manning v. Gary Miller, et al,
       United States District Court Northern District of Illinois, Eastern Division, Case
       No. 02 C 0372;
       For plaintiff
       Investigative procedures / Informant management
       Depositions (2): 11/04

18. Sallenger v. City of Springfield, et al. U.S. Dist. Ct. Central Dist. Of Ill, Springfield Division.
    Case # 03-3093
        For plaintiff
        Use of deadly force
        Deposition: 01/05

19. Deborah Golder et al v. City of Corpus Christi. Cause No. 04-771-E (US District Court:
    Corpus Christi, TX)
        For plaintiff For Plaintiff
        Use of deadly force
        Deposition: 3/05

20. Jack Whitaker v. Dan Bowers, United States District Court for the Central District of Illinois,
    Springfield, Illinois
        Case No. 03-3133; 13822
        For plaintiff
        Use of force
        Deposition: 11/04

21. Cynthia Jones v. City of Clearwater, et al. Circuit Court of the Sixth District in and for Pinellas
    County, State of Florida. Case No. 8-03-CV 501-T-26EAJ
        For plaintiff
        Retention / Supervision
        Deposition: 3/05

22. Maria Guadalupe Nevarez et al vs. the County of Finny County, Kansas et al (Federal court,
    Kansas City)
        For plaintiff
        Use of deadly force
        Deposition: 10/05

23. Neil Miller v. City of Boston et al. Case No. 03-10805-JLT(Federal Court, Boston,
    Massachusetts)
        For defense
        Identification procedures/investigative process
        Deposition: 1/06

24. Robert E. Rohrback v. Jorey Bailey et al. No. LACV064930, Iowa District Court in and for
    Johnson County
        For plaintiff
        Use of force
        Deposition: 3/06

25. Timothy Michael Fry, Deceased by and through his heirs at law and Tammy Lynn Fry, et al,
    v. City of Galena, Kansas; No. 05-2248-JWL (10th Circuit)
        For plaintiff
        Use of deadly force
        Deposition: 4/06

26. Joseph D. Amrine v. George Robert Brooks, et al. Case No. 04-4300-CV-C-NKL. U.S. District
    Court for the Western District of Missouri Central Division
        For defense
        Investigative process & procedure
        Depositions (2): 6-9-06

27. Hoffman v. Smithfield City et al, Case No. 1:05CV00072 DB U.S. District Court for the District of Utah, Northern Division
     For plaintiff
     Use of force
     Deposition: 6/06

28. Alicia Mendez, Administratrix v. Wal-Mart Stores, Inc. et al., Civil Action No. 04-C-442, Circuit of Berkley County, WV
     For plaintiff
     Investigative process / dealing with mentally ill
     Deposition: 7/06

29. Cheri Bruce and Robert Bruce v. City of Sunset Hills, et al; In the Circuit Court of the County of St. Louis of Missouri, Cause No. 05CC-004007
     For plaintiff
     Pursuits
     Deposition: 11/06

30. James Saville v. Maricopa County, et al, No. CV2004-010518; Superior Court of the State of Arizona; County of Maricopa
     For plaintiff
     Investigative process / informant management / undercover operations
     Deposition: 11/06

31. Dean Rickabaugh Sr. and Jackie Ashley husband and wife, Individually and As Next Friend of Dean Rickabaugh v. Wal-Mart Stores et al, In the Iowa District Court for Polk County; Law No. CL100555
     For defense
     Forseeability / Physical security
     Deposition: 12/06

32. Marion J. Ashley and Leanna Ashley v. City of Poughkeepsie et al; United States District Court Southern District of New York, 03CIV 9360 (CLB)
     For defense
     Use of force
     Deposition: 12/06

33. Lawrence B. Tirreno et al v. Barbara Mott a/b/a Barbara's Bail Bonds; Case NO. 3: 03 –CV-1322 (RNC). United States District Court, District of Connecticut
     For plaintiff
     Search and seizure
     Deposition: 1/07

34. James Elliott and Teresa Guiler v. City of Clarksville et al, United States District Court for the Middle District of Tennessee Nashville Division, Case No. 3:05-0138
     For defense
     Investigative practices / search and seizure / use of force
     Deposition: 1/07

35. Estate of Kyle Wasson v. Warkentin, City of North Liberty, Iowa U.S. District Court, Southern District of Iowa, Davenport Division 05-104
     For plaintiff
     Use of deadly force
     Deposition: 5/07

36. Ralph H. Cloaninger v. John T. McDeavitt, et al W.D.N.C. ; Case No. 1:06-CV-00135
    For plaintiff
    Use of force
    Deposition: 6/07

37. Alicia Beckett-Crabtree v. Robert Hair & Washington County Sheriff's Department; United
    States District Court Case No. 06-CV-683-CVE-FHM
    For plaintiff
    Use of deadly force
    Deposition: 8/07

38. Louise Jones and Fred Jones v. Van Deusen, et al., Case No.: 0616-CV16131; Division
    Three; In the Circuit Court of Jackson County, Missouri at Kansas City
    For plaintiff
    Use of force/Arrest
    Deposition: 8/07

Hearings:

1. State of Arizona vs. James Bryan Saville. Case # CR2002-006589 (State Court: Maricopa
    County, AZ)
    For defendant
    Informant Management / Investigative Procedures

2. Deborah Golder et al v. City of Corpus Christi. Cause No. 04-771-E (US District Court:
    Corpus Christi, TX)
    For plaintiff
    Use of deadly force
    Deposition, 3/05

3. State v. Kelvin Smith (State Court: Fulton County, GA)
    For prosecution
    Use of force
    Grand Jury, 3/05

4. Humphrey v. Ronnie Leatherman, et al. Case No. 04-CV-339 (C) Tenth Circuit
    For plaintiff
    Use of deadly force
    9/05

5. Illinois v. Aubrey D. Tucker; Lawrence County Case 05-CF-19
    For defense
    Interview and Interrogation
    Motion hearing: 1/07

Trial testimony:

1. Brooks v. Maury County et al
    1983 action: Federal Court, Columbia, Tennessee
    For plaintiff (defense verdict)
    Use of deadly force
    Trial date: 9/03

2.  Aiels v. City of Cedar Rapids; Havlicek; and Keiller. U.S. District Court for the Northern
    District of Iowa Cedar Rapids Division (Case # C01-76MJM)
        For plaintiff (defense verdict)
        Use of force
        Trial date: 2/04

3.  Jonathan White v. State of Mississippi. NO. 03-10, 129 (3) (State Court: Pascagoula, MS)
        For defense (prosecution verdict)
        Road blocks
        Trial date: 10/04

4.  Steven Manning v. Gary Miller, et al, United States District Court Northern District of Illinois,
    Eastern Division, Case No. 02 C 0372
        For plaintiff (plaintiff verdict)
        Investigative procedures / Informant management
        Trial date: 01/05

5.  State of Iowa v. Jared James York. Case #FECR05-402 (Iowa District Court in and for
    Washington County)
        For defense (prosecution verdict)
        Investigative procedure / Interview & interrogation
        Trial date: 2/05

6.  Ferryman v. United States. Case No. 3:03-cv-1030-J-20TEM (US District Court: Jacksonville,
    FL)
        For plaintiff (plaintiff verdict)
        Arrest tactics / Investigative procedures / Use of deadly force
        Trial date: 9/05

7.  Hester et al v. Wal-Mart Stores, Inc. Case No. 2:03-cv-02447-JWL-JPO (US District Court for
    the District of Kansas)
        For defense (defense verdict)
        False arrest / racial profiling
        Trial date: 10/05

8.  Georgia Fuston-Lounds and Lula Lounds as Co-Personal Representatives of the Estate of
    Alford Lounds vs. Frank Torres, et al. Case No. CIV-03-1519-T (United States District Court,
    Western District of Oklahoma)
        For plaintiff (defense verdict)
        Use of deadly force
        Trial date: 3/06

9.  Arvin Carsell McGee, Jr. v. Randy Lawmaster, et al., Case No. 03-CV-704(H) (C), filed in
    United States District Court for the Northern District of Oklahoma.
        For plaintiff (plaintiff verdict)
        Wrongful conviction / investigative process / photo lineups
        Trial date: 3/06

10. Alicia Mendez, Administratrix v. Wal-Mart Stores, Inc. et al., Civil Action No. 04-C-442, Circuit
    of Berkley County, WV
        For plaintiff (defense verdict)
        Investigative process
        Trial date: 8/06

11. Lionel Trepanier v Cook County Forest preserve District, et al; United States District Court Northern District of Illinois Eastern Division
       For plaintiff (defense verdict)
       Use of force
       Trial date: 9/06

12. Naluan v. City of Philadelphia, et al, Civil Action NO.: 05-CV-6186, IN the United States District Court for the Eastern District of Pennsylvania
       For plaintiff
       Use of force
       Trial date: 9/06

13. Dean Rickabaugh Sr. and Jackie Ashley husband and wife, Individually and As Next Friend of Dean Rickabaugh v. Wal-Mart Stores et al, In the Iowa District Court for Polk County; Law No. CL100555
       For defense (defense verdict)
       Forseeability / Physical security
       Trial date: 12/06

14  State of Alaska vs. Shawn W. Rogers; Case NO. 3KN-S04-1762-CR
       For defense (prosecution verdict)
       Investigative practices
       Trial date: 3/07

### APPENDIX #3 - CURRICULUM VITAE: <u>MICHAEL D. LYMAN, PH.D.</u>

### <u>CURRENT POSITION</u>

Columbia College of Missouri
4613 Villa Wood Ct.
Columbia, MO 65203
Office (573) 875-7472

**Rank:**        Professor of Criminal Justice
             Service from: August 1989 to Present

**Responsibilities:**

- Director of Graduate Studies Program
- Founder and Departmental Liaison for the Forensic Science Program
- Former department chairman from 1989 to 2001.
- Developed the curriculum for the Master of Science in Criminal Justice (MSCJ) program and the curriculum for the Bachelor of Science in Forensic Science program.
- Undergraduate courses taught include Introduction to Criminal Justice; Policing in America; Criminal Investigation; Management of Criminal Justice Agencies. Graduate courses taught include: Development of Standard Operating Procedure; Police Development and Evaluation; Current Issues and Future Directions in Criminal Justice.

### <u>PREVIOUS EMPLOYMENT</u>

<u>General Background:</u>

As a law enforcement officer I have participated in over 600 felony arrests and testified in over 250 criminal trials and hearings. I also regularly sat on shooting and disciplinary boards and served as lead investigator in numerous internal affairs investigations.

I have also been the lead investigator in cases involving numerous crimes. These include but are not limited to: murder, extortion, arson, drug trafficking, corruption, rape, burglary, robbery, assault, organized crime investigations. In this capacity I have been involved with informants, witnesses, victims, newspaper reporters, federal agencies and working undercover with criminals. Duties have included surveillance operations, interviews of witnesses, interrogations of suspects, arrests, searches & seizures, etc.

<u>Certified Generalist Instructor – The University of Missouri-Columbia</u>

                 Law Enforcement Training Institute - School of Law
                 321 Hearnes Center
                 Columbia, Missouri 65211
                 From - 7-15-86 to 8-15-89

*Responsibilities:*      Instructed police office recruits in police academy in the
                 areas of criminal investigation, interviews & interrogations,
                 informant management, use of force, felony arrests,
                 professional ethics Police academy program
                 coordinator keynote speaker at academy graduation
                 ceremonies

**Sr. Agent - The Oklahoma Bureau of Narcotics and Dangerous Drugs (state police bureau)**

4545 North Lincoln Blvd.
Oklahoma City, Oklahoma  73102
Phone (405) 521-2885
Position - Sr. Agent, Intelligence Division / Sr. Agent, Training and
Education Division

*Responsibilities*:  Originated and managed large-scale criminal investigations
throughout the State of Oklahoma; testified in criminal court
on both the federal and state level; made arrests; served
search warrants; conducted interrogations; served on
personnel hiring boards; disciplinary boards; shooting review
and promotion boards; conducted background investigations
of prospective recruits and conducted numerous internal
affairs investigations as Sr. investigator; testified in two
congressional hearings.

I also served as training and field training officer (FTO) for new
recruits for over four years.

From - 10/1/81 to 7/9/86

**Special Agent - The Kansas Bureau of Investigation (state police investigative bureau)**

1620 Tyler
Topeka, Kansas  66612
Phone - (913) 232-6000
Position -Special Agent, Intelligence and Organized Crime
                    Division (IOCD) / Special Services Division

*Responsibilities*:  Originated and managed large-scale criminal investigations
throughout the State of Kansas; testified in criminal court on
both the federal and state level; made arrests; served search
warrants; conducted interviews and interrogations; conducted
numerous internal affairs and pre-employment background
investigations.

From - 6/75 to 10/80

**Agent – City County Investigative Squad (Johnson County, Kansas)**

Johnson County Courthouse, Olathe, Kansas (Kansas City
Metro Area) Task Force concept utilizing officers on loan
from 13 jurisdictions. This unit is no longer in existence as it
operated on grant money which was depleted during the
early 1980s.

*Responsibilities*:  Initiated full-scale criminal investigations at the direction of
the unit Manager; enforced the laws of the State of Kansas; assisted in
conducting arrests and serving search warrants; developed and
managed informants; testified in criminal hearings and trials; conducted
interviews and interrogations.

From - 6/74 to 6/75

**Visiting Professor – University of Oklahoma**

Norman, Oklahoma
From 1986-1989

In this capacity I was brought to Oklahoma three times each year for nine years (December, May and August intercessions) to teach courses in the law Enforcement Administration Program.

## PUBLICATIONS

**Textbooks:**

Lyman, M. D. (2008). Criminal Investigation: The Art and the Science, 5th ed. Prentice Hall: Upper Saddle River, NJ.

Lyman, M. & G. Potter (2007). Organized Crime, 4th ed . Prentice Hall: Upper Saddle River, NJ

Lyman, M. D. (2007) Practical Drug Enforcement, 3rd ed. CRC Press: Boca Raton, FL

Lyman, M. D. (2005) The Police: An Introduction, 3rd ed. Prentice Hall: Upper Saddle River, NJ.

Lyman, M. D. (2003). Drugs in Society: Causes, Concepts and Control, 4th ed. Anderson Publishing: Cincinnati, OH.

**Articles / Essays:**

Lyman, M. (2005). "Drug Enforcement in the United States." An essay for The Encyclopedia of Law Enforcement, Sage Publications: Thousand Oaks, CA.

Lyman, M. (2005). "Undercover Operations." An essay for The Encyclopedia of Law Enforcement, Sage Publications: Thousand Oaks, CA.

Lyman, M. (2004). The Decision to Chase: Revisiting Police Pursuits and the Appropriateness of Action. The Police Forum Journal.

Lyman, M. (2004). "Transnational Organized Crime." An essay for The Encyclopedia of Murder & Violent Crime; Eric Hickey Editor. Sage Publications: Thousand Oaks, CA.

Lyman, M. (2004). "Domestic Organized Crime." An essay for The Encyclopedia of Murder & Violent Crime. Sage Publications: Thousand Oaks, CA.

## AWARDS

- 2004 Community Partner Award presented by the Columbia Missouri Police Foundation, February 2004.

- Police Instructor of the Year Award presented by the Missouri Department of Public Safety, Peace Officer's Standards and Training (POST). Presented April 1989.

- Meritorious Award for Independent Study Course presented by the National University Continuing Education Association. April 1989.

## ACADEMIC BACKGROUND

Doctor of Philosophy (1992) Higher and Adult Education and Foundations. University of Missouri-Columbia, Columbia, Missouri

Master of Science in Administration of Justice – Police Agency Management (1979) Wichita State University Graduate School, Wichita, Kansas

Bachelor of Science in Administration of Justice (1977) Wichita State University, Wichita, Kansas

## CONSULTING

- I have been practicing as an expert witness/consultant since 2001 and as such have sat on both sides of the table evaluating cases for both plaintiff and defense. My case breakdown is approximately 60 percent plaintiff and 40 percent defense. Thus far, I have reviewed approximately 65 cases in twenty-seven states and have provided expert testimony on approximately 30 occasions. I have also testified in at trial numerous 1983 civil federal actions. I have never been disqualified as an expert. For the most part, my expertise is in the area of use of force but I have provided testimony in the areas of proper investigative procedures and police supervision.

- I have served as consultant for the Federal Research Division of the U.S. Library of Congress and the Director of Central Intelligence Crime and Narcotics Center in Washington DC (in January 2003.)

- I have conducted police training seminars for the Public Agency Training Council located at 5101 Decatur Blvd. Ste. L., Indianapolis, IN. Topics included: criminal investigation; undercover operations and informant management (in Columbus, OH (1989-1991).

- In 2006 I co-wrote a model policy and companion paper on digital imaging for the International Association of Chiefs of Police (IACP). This is a nationally recognized police procedures guideline for police policy development.

## ORGANIZATIONAL AFFILIATIONS

- The International Association for the Study of Organized Crime (IASOC)
- International Association of Chief's of Police (IACP)
- Academy of Criminal Justice Sciences (ACJS)
- American Society of Criminology (ASC)
- American Academy of Forensic Science (AAFS
- American College of Forensic Examiners International (ACFEI)

28

### Fees and Previous Experience

This report contains the opinions I am prepared to express at trial in this matter. My fees in this case are at the rate of $200 per hour and an initial retainer of $3000. I charge $2300 per day plus expenses for depositions and any work conducted out of town.

I have testified as an expert witness fifty-seven occasions including hearings, depositions and trials. These are listed in Appendix #2.

Respectfully submitted,

Michael D. Lyman, Ph.D.
August 13, 2007