UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-CV-11193-NG

| | |
|---|---|
| SHAWN DRUMGOLD, | ) |
| Plaintiff | ) |
| vs. | ) |
| CITY OF BOSTON, ET AL., | ) |
| Defendants | ) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION FOR SANCTION OR INSTRUCTION
BASED ON PLAINTIFF'S SPOLIATION OF EVIDENCE**

I.   INTRODUCTION

One of the critical issues in this wrongful conviction case is what information was known by the Drumgold defense team, and when. As the Court is aware, the Plaintiff alleges that potentially exculpatory information – specifically, the health condition of one witness, Mary Alexander was withheld from his counsel at the 1989 trial. Plaintiff also alleges that witnesses were threatened or coerced by police into giving fabricated evidence against him, or into remaining silent when their testimony would have helped his defense. Defendants have sought discovery from Plaintiff with regard to these allegations, and during the course of discovery, a set of materials have been identified but have never been produced. Defendants now bring the instant motion since it appears that Plaintiff can not, or will not, produce the requested materials.

There are two types of documents that have been withheld or destroyed, the propriety of which the Defendants now seek a ruling from the Court. Those materials

are: (1) the investigative and trial notes kept by Plaintiff's original trial counsel, Steven Rappaport, and (2) witness statements taken by a "friend" of Plaintiff, who "assisted" Plaintiff's current counsel at the 2003 Motion for New Trial, Gatewood West. No objection has been made to production of these documents.

Plaintiff's current counsel takes the position that these materials do not exist, although Drumgold's previous counsel has testified that they <u>did</u> exist, and were produced to current counsel (the "Rappaport notes"). With regard to the second category of material, there was no disclosure that they ever were created; Ms. West mentioned these documents, and her role at the 2003 hearing, for the first time in her deposition of July 23, 2007 (the "West notes").

II.  STATEMENT OF RELEVANT FACTS

A.  Rappaport's Notes

From the beginning of discovery in this litigation, the Defendants have attempted to obtain the trial file, including attorney notes, of Plaintiff's trial counsel, Steven Rappaport. Plaintiff has not raised attorney-client or work product privileges to shield discovery of his trial attorney's files; indeed, Rappaport testified without objection at two days of deposition in this case[1]. At deposition, Rappaport testified that he did take copious notes of his investigation into the charges brought against Drumgold, and during the course of the trial itself. (Ex. A, Deposition of Rappaport, at Vol. I, pps. 28-29, 44, and Vol. II, p. 272). Rappaport testified that his investigator, Jay Groob, also prepared notes that were maintained in the file. (Ex. A, Vol. I, 48). Rappaport testified that he turned over his entire case file – including his notes – to successor counsel, Rosemary Scapicchio. (Ex. A, Vol. I, 44 – 49). However, not a single note was produced to

---

[1] The deposition notices to Rappaport and his former law firm, Pinta & Eggert, with accompanying schedules of documents sought, are attached hereto as Exhibits F and G, respectively.

2

Defendants during discovery in this case. Ms. Scapicchio has informed Defendants that she received copies of pleadings from Rappaport, but nothing more. She has specifically denied receipt of any attorney or investigator notes. (Ex. B, Affidavit of Counsel).

The issue of Rappaport's knowledge at the time of the 1989 trial is critically important – and his testimony, both in 2003 and during his depositions on August 4, 2006 and February 3, 2007 amply demonstrates that his recollection of those events is poor:

1. <u>The Olisa Graham Statement</u>

At the hearing in 2003, Rappaport submitted an affidavit, signed under pains and penalties of perjury, that he had never been given a police interview of one Olisa Graham, who was interviewed prior to the 1989 murder trial by Defendant Timothy Callahan**.** In this statement, tape recorded and transcribed, Graham testifies to being with Drumgold on Sonoma Street at the time that Tiffany Moore was shot and killed on Humboldt Street, some few blocks away. Rappaport attested in the affidavit that, had he known that Graham supported Drumgold's alibi, he would have called her as a witness at trial. (Ex. C, Rappaport Affidavit dated 12/16/02).

When he was called at the motion hearing, Rappaport acknowledged that prior to testifying, prosecutor David Meier gave him correspondence from the original prosecutor's file that showed the tape and transcript of the Graham interview had, in fact, been disclosed to him prior to trial. In 2003, Rappaport acknowledged that his affidavit was erroneous, that he had "forgotten" that the Graham statement (supporting Drumgold's alibi defense) had been disclosed before trial. He did not testify at the motion for new trial (nor was he asked) why he chose not to call Graham at trial. (Ex. D, Rappaport testimony at Motion for New Trial, at pps. 46-47, 66 - 70).

At his deposition in this civil suit, Rappaport explained that he now assumed that the reason he failed to call Olisa Graham at trial was because he became "wary" of the

3

individuals at Sonoma Street, since they were, in his mind, more closely affiliated with Drumgold's co-defendant, Terrance Taylor. Rappaport testified that he had been blindsided when, after the court directed a verdict in his favor, Taylor took the stand (in front of the jury) and invoked his Fifth Amendment rights. Rappaport testified (at deposition) that Taylor's invocation was unexpected, and therefore, he assumed (though he cannot remember) that the decision not to call Graham in support of Drumgold's testimony was a tactical decision based on his mistrust of those who were associated with Taylor. (Ex. A, Vol. I, pps. 147 – 155).

    2.    <u>Knowledge of Mary Alexander</u>

At the 2003 hearing, Rappaport testified that the Drumgold defense was also devastated by the eyewitness identification by Mary Alexander of Drumgold as one of two individuals she saw leaving the scene (tucking a gun into his waist). Mary Alexander had given a statement to the police prior to trial (and there is no allegation that this statement was withheld) in which she informed them that she had observed two black males, in black clothing, walk past her building on Homestead Street, one with a gun, but that she could not make a positive identification of either. Rappaport did not consider this information to be inculpatory. (Ex. A, Vol. II, pps. 280 - 282 ).

Prior to 2003, Rappaport testified that, after receiving this statement but before trial, he went to Homestead Street and showed Mary Alexander a photograph of Drumgold to see if she could identify (or exclude) him as one of the two individuals she saw after the shooting that night. Alexander told Rappaport that Drumgold was one of the men – the one with the gun. At Drumgold's second Motion for New Trial (in which he claimed inefficient assistance of counsel), Rappaport testified that showing Alexander the photograph was a strategic choice made by him, one that would have been "brilliant"

4

if she had failed to identify Drumgold, but which was devastating when she did identify him. *See Comm. v. Drumgold*, 423 Mass. 230, 263 (1996).

In 2003, the issue was not whether Rappaport's suggestive identification procedure affected the fairness of Drumgold's trial (indeed, at the Second Motion for New Trial, the court ruled that it did not). Instead, the issue was the health of Mary Alexander: to wit, whether it had been disclosed to the Drumgold defense that she suffered from an inoperable, and ultimately fatal, brain tumor. Rappaport testified that he had no idea of her health condition – but if he had, he would have had her examined by a medical doctor with regard to her capacity to observe and to remember. (Ex. D, pps. 37 - 38).

There was no correction by the Assistant District Attorney to Rappaport's testimony on this point. However, a review of Alexander's trial testimony reveals the following exchange between Rappaport and Alexander:

> Q: There was a period of time last year when you were ill?
>
> A: Yes.
>
> Q: You had an operation in February, right?
>
> A: Yes.
>
> Q: And you weren't feeling too well at that time?
>
> A: Yes.
>
> Q: And the police would come by and they'd … see how you were doing?
>
> A: Yes. And I told them, I don't care if I'm dying. I'll still go and tell them what I saw.

(Ex. A, Vol. II., pps. 290 – 292).

5

Rappaport was asked at deposition what information had been revealed to him about Mary Alexander's hospitalization and surgery in February 1989  He testified that he had absolutely no recollection of what had led him to ask Alexander about her February 1989 hospitalization. (Ex. A 290 – 295).  It is undisputed that in February, 1989, Mary Alexander was hospitalized, underwent brain surgery, and was diagnosed with an inoperable and incurable brain cancer[2].

B.   Gatewood West's Notes

Gatewood West became acquainted with Drumgold when he was incarcerated, and appeared at least some of the 2003 motion hearing.  While she was at the court, she interviewed some of the witnesses at Ms. Scapicchio request ("…Rosemary said, "Would you go and take an affidavit?'  I said, 'well, what does that mean?'  She said, 'Just get them to tell their story and write it down.'").   These notes were given to Ms. Scapicchio, and have never been produced or even identified.  (Exhibit E, Deposition of Gatewood West, at pp. 78 – 85;  105 – 108, 121).

III.   ARGUMENT

A.   Standard of  Review

Where a document "relevant to an issue in a case is destroyed," the trier of fact may infer that "the party who obliterated it did so out of a realization that the contents were unfavorable." *Blinzler v. Marriott Int'l, Inc.,* 81 F.3d 1148, 1158 (1st Cir. 1996) *citing Nation-Wide Check Corp. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 217 (1st Cir.1982)(Breyer, J.).  *See also Testa v. Wal-Mart Stores, Inc.,* 144 F.3d 173, 177 (1st Cir.1998); *Taydus v. Cisneros*, 902 F.Supp. 288 (D.Mass.,1995); *Pelletier v. Magnusson,* 195 F.Supp.2d 214 (D.Me.,2002.  As the First Circuit stated in *Nationwide,* the

---

[2] To undersigned counsel's best understanding, the medical records themselves have not been made part of a public record in this case and accordingly, they are not filed as exhibits to this motion.

6

"conscious abandonment of potentially useful evidence is, at a minimum, an indication that [the spoiling party] believed the records would not *help* his side of the case…." *Nation-Wide* at 219.

The negative inference that a trier of fact may draw "springs from the commonsense notion that a party who destroys a document (or permits it to be destroyed) when facing litigation, knowing the document's relevancy to issues in the case, may well do so out of a sense that the document's contents hurt his position." *Testa,* 144 F. 3d. 173, 177 *citing Beil v. Lakewood Eng'g & Mfg. Co.,* 15 F.3d 546, 552 (6th Cir.1994). The District court of Maine further examined the rationale for the negative inference in *Pelletier v. Magnusson:*

> There are at least three rationales for allowing the inference. There is the general evidentiary rationale, in that the document must have some relevance to the claim(s) if the party charged with the spoliation went to the trouble to destroy it. *Nation-Wide Check Corp., Inc. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 218 (1st Cir.1982). There are also policy-based prophylactic and punitive reasons for permitting the inference, in that allowing the inference by the fact-finder deters future pre-trial destruction of documents and penalizes the spoiler by placing it at risk of an erroneous judgment that it might avoid if it had preserved the document. *Id.   See also Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998) (adding to the evidentiary, prophylactic and punitive rationales, a "remedial rationale" suggesting that the adverse inference should function for the purpose "of restoring the prejudiced party to the same position he would *236 have been in absent the wrongful destruction of evidence by the opposing party").

*Pelletier v. Magnusson,* 195 F.Supp.2d 214, 235 (D.Me.,2002).

The negative inference, however, is "permissive," and the trier of fact is not required to draw a negative inference from non-production. *Testa,* 144 F. 3d. 173, 177. Nonetheless, non-production remains relevant: "[t]he fact of destruction satisfies the minimum requirement of relevance: it has some tendency, however small, to make the existence of a fact at issue more probably than it would otherwise be." *Nationwide,* 692 F.2d at 218 *citing* Fed. R. Evid. 401.

To receive a spoliation instruction, a party must show that a rational jury could conclude that the opposing party "knew of (a) the claim (that is, the litigation or the potential for litigation), and (b) the document's potential relevance to that claim. *Testa,* 144 F. 3d. 173, 177 *citing Blinzler,* 81 F.3d at 1159. Moreover, this standard is not strict. " Indeed, holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence would subvert the prophylactic and punitive purposes of the adverse inference, and would allow parties who have intentionally destroyed evidence to profit from that destruction." *Kronisch v. U.S.* 150 F. 3d 112, 128 (2nd Cir. 1998). "There need not be direct "evidence of a cover-up," rather, "[c]ircumstantial evidence will suffice." *Blinzler,* 81 F.3d at 1159. Even then, the First Circuit has intimated that very little evidence at all is needed, "Wigmore has asserted that nonproduction is not merely "some" evidence, but is sufficient by itself to support an adverse inference even if no other evidence for the inference exists." *Nationwide* at 217 *citing* 2 *Wigmore on Evidence* § 291, at 228 (Chadbourn rev. 1979).

In *Pelletier,* the court found that there was easily enough evidence of spoliation to survive summary judgment, as "it is almost self-evident that a prison death might lead to criminal or civil charges, and, as happened here, at minimum a state police investigation." *Pelletier* at 236. So too, in *Blinzler,* 81 F.3d at 1159, the court found that the district court did not abuse its discretion when it found a the hotel that destroyed a security log was on notice of litigation after a guest had a heart attack and requested that the hotel get emergency assistance. *Blinzler,* 81 F.3d at 1159. In *Kronsisch,* the Second Circuit found that even where a document was destroyed to protect identities, and "prevent paper overflow," where the spoiling party had notice of potential litigation, a negative inference was appropriate. *Kronsich,* 150 F. 3d 112, 127. *See also Testa,* 144 F.3d at 178 ("Whether the particular person who spoils evidence has notice of the

8

relationship between that evidence and the underlying claim is relevant to the factfinder's inquiry, but it does not necessarily dictate the resolution of that inquiry. The critical part of the foundation that must be laid depends, rather, on institutional notice--the aggregate knowledge possessed by a party and its agents, servants, and employees.")

Even where the spoiling party did not act in bad faith, the prejudiced party may still be entitled to an inference. "Certainly bad faith is a proper and important consideration. . . [b]ut bad faith is not essential." *Kelley v. United Airlines, Inc.,* 176 F.R.D. 422, 427 (D. Mass. 1997); *See also Nationwide* at 219 (finding that even where evidence was destroyed without malice, this "[does] not destroy the relevance of the acts together.").

B.      Defendants Are Entitled To An Instruction With Regard To The Spoliation Of
        The Non-Produced Notes

It is uncontested that Steven Rappaport created notes during the investigation and representation of Shawn Drumgold. He has testified that everything in his files regarding the Drumgold murder trial was produced to current counsel for Mr. Drumgold, Rosemary Scapicchio. Therefore, there is argument to be made that the Rappaport notes did, at one time, exist. It is also uncontested that these notes have never been produced, and that Ms. Scapicchio claims never to have received these notes.

Rappaport testified that he believed in Drumgold's innocence, and believed that Drumgold's conviction was based, in part, on the testimony of Mary Alexander and Ricky Evans. Clearly, Rappaport knew that any documents in his possession that related to either of these witnesses would remain critical to Drumgold's efforts to reverse his conviction. *See Testa*, 144 F.3d at 177 (party "knew of … the document's potential relevance to that claim…"). The destruction, or failure to preserve, Rappaport's

9

investigation and trial notes with regard to these witnesses compels the conclusion that these materials did not help Drumgold's cause.

The Rappaport notes go directly to the heart of the issues presented in this case: whether Drumgold's trial testimony had knowledge with respect to key prosecution witnesses in this case. The loss or destruction of the notes are tremendously prejudicial to the defendants, as the circumstances surrounding the Olisa Graham issue demonstrate.

Rappaport prepared an affidavit in which he not only denied any prior knowledge of Graham as an alibi witness for Drumgold, but further claimed that had he knowledge of her existence (and her recorded statement, given to police investigators), he would have made different tactical issues at trial – including, he claimed, putting effort into police coercion of witnesses.

However, Rappaport was completely wrong about his awareness, in 1989, of Olisa Graham. Not only was the existence of this alleged alibi not withheld from him, he was provided a transcript of her potentially exculpatory statement, and, when he requested it, a tape recording of that statement. After ADA Meier "refreshed" Rappaport's recollection with documents from the ADA's trial file, Rappaport "recalled" that Graham had, in fact, been known to him. Now, instead of claiming that he failed to call Graham at trial because her existence had been wrongfully withheld by the prosecution, Rappaport "remembered" that he had made the tactical decision to avoid any of the alleged alibi witnesses when presenting Drumgold's defense.

Likewise, it is uncontested that Rappaport visited the Alexander household, spoke with Mary Alexander, and showed her a photograph of Drumgold during his pretrial investigation. It is also a matter of record that Rappaport inquired of Alexander about her health condition in February 1989, and the medical records produced at the 2003 hearing show that her brain tumor was diagnosed, and operated upon, at that time.

Thus, it is entirely probable that Mary Alexander's medical condition was disclosed, to Rappaport, either by Mary Alexander herself during his interview of her at her home pre-trial, or by some member of the prosecution team. It cannot be disputed that Rappaport knew <u>something</u> had caused Mary Alexander to be hospitalized and surgically operated upon in February 1989. However, in the absence of his notes of the interview and/or of his trial strategies, it is impossible to say <u>how</u> he became aware of her medical issues, who told him of her condition, or the reasons he declined to probe her at trial on the effects her illness had on her capacity to observe or testify. At this point, as he did with Olisa Graham in 2003, Rappaport denies any knowledge whatsoever of Alexander's condition, and cannot explain how he came to question her about it.

It is anticipated that Plaintiff will argue that the Defendants may cross examine Rappaport about his failures of memory, and can then suggest to the jury that his lack of memory should be considered when assessing his credibility. Respectfully, this argument misses the point entirely. Drumgold has filed this law suit based on what he contends were egregious acts of malfeasance by police and prosecutors. Are Drumgold's claims of an unfair trial valid? Was information withheld from his counsel? Or did his counsel make tactical decisions – as he now acknowledges he did in declining to interview, or call as trial witnesses, the alleged alibi witnesses – that Drumgold now wants to impute to the prosecution? These questions could be answered, definitively, had Rappaport's notes been preserved and produced. The notes would have "made the existence of a fact at issue more probable than it would otherwise be" without the notes. *Nationwide,* 692 F.2d at 218. The fact that the notes have not been preserved compels the conclusion that the content thereof would have been fatal to his claims.

The notes of West stand on slightly different footing. These notes may reflect differing versions of events offered by witnesses who are now either recanting, or who

11

are coming forward for the first time since the murder of Tiffany Moore to offer exculpatory evidence on behalf of Drumgold. The West notes are relevant, certainly, inasmuch as they may demonstrate that the witness's version of "truth" may have evolved over time, and depending upon whom they were speaking to. As such, the notes would be prior statements, critical for impeachment of witnesses on whose credibility much of this case depends. There is a valid request for this material, no objection to production has been made, and the failure to produce these materials has, as of the date of this filing, been unexplained and unexcused.

Finally, the fact that it is Drumgold's representatives, rather than he, himself, who either failed to maintain or destroyed these materials does not impact the Defendants' entitlement to relief. The *Testa* court noted that "[w]hether the particular person who spoils evidence has notice of the relationship between that evidence and the underlying claim is relevant to the factfinder's inquiry, but it does not necessarily dictate the resolution of that inquiry. The critical part of the foundation that must be laid depends, rather, on institutional notice--the aggregate knowledge possessed by a party and its agents, servants, and employees." 144 F.3d at 178. No person was more aware of relationship between the records reflecting witness testimony and competency and Drumgold's civil rights actions than his legal representatives. The notice requirement is met.

IV.   RELIEF REQUESTED

For the reasons stated herein, Defendants request that the Court instruct the jury as follows:

Drumgold has failed and refused to make available, and has presumably destroyed, documents that once were in his possession that described: (1) his trial counsel's interviews of witnesses, record of trial strategies, and knowledge with regard to

12

Mary Alexander's surgery in February, 1989; and (2) written statements of witnesses who have testified on behalf of Drumgold at the motion for new trial.

You can infer that these documents have been withheld or destroyed because they would have negatively impacted Drumgold's claims that the police withheld evidence from him or his legal team in order to violate his civil rights. The fact that these documents were in Drumgold's lawyers' possession, but now have disappeared, is evidence that you may rely upon in considering the credibility of the witnesses in this case, and you may draw an adverse inference with regard to each claim Drumgold has made with regard to the issue of Mary Alexander's medical condition, her counsel's awareness of her condition, and the truthfulness of the statements given by witnesses in support of Drumgold's civil action. That is to say, you may conclude that Drumgold's lawyer knew that Mary Alexander had undergone brain surgery, but declined to cross examine her about the extent to which her condition compromised her cognitive abilities. You may conclude that other witnesses gave varying accounts of events, and that the versions that were hurtful to Drumgold's claims were deliberately withheld from you.

You are entitled to decide this case on a full and fair record, and because of the destruction of these documents, you have been denied information that may well have been helpful to the defendants in this case. You may factor this in when you consider the credibility of the witnesses who have appeared before you.

V.  CONCLUSION

For the reasons stated herein, Defendants request that the Court find that Drumgold spoliated evidence, and grant the relief sought herein.

|  |  |
|---|---|
|  | Respectfully submitted, |
| TIMOTHY CALLAHAN | RICHARD WALSH, |
| By his attorney, | By his attorney, |
| __/s/ Mary Jo Harris _____ | ___/s/ Hugh R. Curran _____ |
| Mary Jo Harris, BBO # 561484 | High R. Curran, BBO # 402057 |
| Morgan, Brown & Joy, LLP | Bonner Kiernan Trebach & Crociata |
| 200 State Street | One Liberty Square |
| Boston, MA 02109 | Boston, MA 02109 |
| (617) 523-6666 | (617) 426-3900 |
| THE CITY OF BOSTON | PAUL MURPHY |
| ___/s/ John Roache_____ | ____/s/ William M. White _____ |
| Roache & Malone | Wm. White & Associates |
| 66 Long Wharf | One Faneuil Hall Marketplace |
| Boston, MA 02110 | Boston, MA 02109 |

CERTIFICATE OF SERVICE

      I hereby certify that on September 25, 2007 I served a copy of Defendants' Motion to Compel upon the following counsel of record by filing with the ECF/Pacer Case Management System:

            Rosemary Curran Scappiccio
            Four Longfellow Place, Ste. 3703
            Boston, MA 02114

            Michael W. Reilly
            Tommasino & Tommasino
            Two Center Plaza
            Boston, MA 02108


            _____/s/ Mary Jo Harris_____