EXHIBIT C

Volume: I

Pages: 1 - 66

Exhibits: See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-11193NG

- - - - - - - - - - - - - - - - -x

SHAWN DRUMGOLD,

                    PLAINTIFF

VS.

TIMOTHY CALLAHAN, ET AL,
                    DEFENDANTS

- - - - - - - - - - - - - - - - -x

DEPOSITION of FRANCIS M. ROACHE, a witness
called on behalf of the Plaintiff, pursuant to the
provisions of the Federal Rules of Civil Procedure, before
Nancy M. Walsh, Certified Shorthand Reporter (#118593)/
Registered Professional Reporter and Notary Public in and
for the Commonwealth of Massachusetts, at the law office
of Tommasino & Tommasino, Two Center Plaza, Boston,
Massachusetts 02108, on Monday, February 12, 2007
commencing at 2:08 p.m.

NANCY M. WALSH
COURT REPORTING SERVICES
131 CRANE STREET
DEDHAM, MASSACHUSETTS 02026
TELEPHONE (781) 326-5062
FAX (781) 326-5072

1   A   Seven years.

2   Q   What's your educational background?

3   A   I have a bachelor's degree from Boston State College, a

4       master of arts in public management from Boston State

5       College.

6   Q   When did you get your undergraduate degree?

7   A   1975.

8   Q   When did you get your master's?

9   A   I think it was like 1980, something like that. Also a

10      graduate of the FBI National Academy.

11  Q   When was that?

12  A   1982.

13  Q   When did you go to work for the Boston Police Department?

14  A   August 28, 1968.

15  Q   What position did you go in as?

16  A   Called patrolman then.

17  Q   How long were you a patrolman?

18  A   About seven years.

19  Q   What did you do next?

20  A   I was promoted to sergeant.

21  Q   And how long were you a sergeant?

22  A   About seven years, approximately.

23  Q   And what was the next rank after that that you held?

24  A   I was appointed acting lieutenant in 1983.

6

1  Q   And where did you serve as an acting lieutenant?

2  A   I served in an investigative unit which was called

3      Community Disorders Unit.

4  Q   During the time that you were a patrolman or a sergeant,

5      did you ever serve in the Homicide Unit?

6  A   No, I did not.

7  Q   How long did you serve in the Community Disorder Unit?

8  A   Approximately seven years.

9  Q   And then what did you next do for the Boston Police?

10 A   I continued to -- continued the CDU, Community Disorders

11     Unit.  In other words, I think -- I stayed in the same

12     assignment.

13 Q   Did you change rank?

14 A   I already mentioned lieutenant.  I became an acting

15     lieutenant.

16 Q   What happened after you were a lieutenant.  What was your

17     next job?

18 A   Appointment to Police Commissioner.

19 Q   When was that?

20 A   February 1, 1985.

21 Q   And who appointed you?

22 A   Mayor Raymond L. Flynn.

23 Q   And am I following correct that you had been in the CDU

24     for the two years previous to that?

7

1   A   Yes. I was in CDU when the Mayor appointed me.

2   Q   And how long did you serve as Commissioner?

3   A   Eight years and approximately five months.

4   Q   So was that up until 1993?

5   A   Yes, June 26, 1993.

6   Q   And who was your successor?

7   A   William Bratton.

8   Q   What position did William Bratton hold while you were the

9       Police Commissioner?

10          MR. JOHN ROACHE:  During the entire time he

11      was Police Commissioner?

12          MR. REILLY:  Yes.

13  A   I'd like to hear the question again about the time frame.

14  Q   During the time that you were the Commissioner of the

15      Boston Police, what position or positions did William

16      Bratton hold?

17          MR. JOHN ROACHE:  If any.

18          MR. REILLY:  I know he had some.

19          MR. JOHN ROACHE:  I don't know.

20          MR. REILLY:  I do.

21  A   The only thing I can say is I referred to him as a

22      Number 2 person, a superintendent.

23  Q   Was he superintendent of any particular division or unit?

24  A   He basically was the Number 2 man in charge.  As a

8

1      result, he oversaw all the bureaus and the chiefs.

2  Q  Do you remember when you first learned that a young girl

3      by the name of Tiffany Moore had been murdered?

4  A  No, I do not.

5  Q  Do you remember whether you learned shortly after the

6      murder of Tiffany Moore about the murder?

7  A  Yes, I would say it's fairly soon after.  That's the best

8      I can do.

9  Q  Do you remember any personal involvement you had with the

10     Tiffany Moore murder in the first couple of weeks after

11     the murder?

12  A  No, I do not.

13  Q  Did you receive any briefings or information from any of

14     your officers concerning the Tiffany Moore murder in the

15     first couple of weeks after the murder?

16  A  I do not remember.

17  Q  Do you know who was in charge of the Homicide Unit in

18     August?  I suggest to you that Tiffany Moore was murdered

19     on August 19th of 1988.  Do you know who was in charge of

20     the Homicide Unit at that point?

21  A  I don't remember.

22  Q  If I suggest to you John Daley, does that refresh your

23     memory?

24  A  No, that's not how --

1    Q    Did you know John Daley in 1988?

2    A    Yes, I did.

3    Q    And how long had you known John Daley?

4    A    Since about 1975.

5    Q    Who appointed the head of the Homicide Unit?

6    A    Those decisions are made by the District Attorney's

7         office in consultation with sometimes the various bureau

8         chiefs.  It all depends what part of the police

9         department you're talking about.  If it's the Homicide

10        Unit, that would be the Bureau of Investigative Services.

11   Q    Who actually makes the appointment?

12             MR. JOHN ROACHE:  Objection.

13   A    In my position as Commissioner, I delegated

14        responsibilities to bureau chiefs.  And I do not remember

15        who, but it would be the person who served as the bureau

16        chief for basically the investigative unit.  And of

17        course, homicide is one division under the broad command

18        of the Bureau of Investigative Services.

19   Q    Was the appointment ultimately your appointment that you

20        then delegated to someone else?

21   A    It was not my appointment -- I don't remember.

22   Q    I'm asking in terms of the way your -- the powers of your

23        office worked.  Did you ultimately have the power to make

24        the appointment to the head of the Homicide Unit?

A    The Homicide Unit was different than other units.

2    Because of the statute of law, the District Attorney

3    directly controlled homicide investigations. I never

4    really got involved with selecting people. I left that

5    to the bureau chief and then the District Attorney

6    depending upon if he or she would have some thoughts

7    about personnel. But I stayed away from those issues.

8    Q    Was the bureau chief exercising your discretion when he

9    got involved in that, or was he exercising his own

10    discretion?

11         MR. JOHN ROACHE:   Objection.

12    A    Again, I delegated my -- the authority to other bureau

13    chiefs. If from time to time, they may, they would come

14    to me and talk about issues. But I never really would

15    make a decision. Sometimes I would -- the District

16    Attorney would contact me, too.

17    Q    I guess my question and I think it's kind of a narrow

18    question just as I think you've answered it, it was your

19    authority that you then delegated to the bureau chiefs;

20    is that accurate?

21    A    Yes.

22    Q    Now, do you remember District Attorneys ever asking

23    you -- directly in connection with who should be head of

24    homicide at any point while you were Commissioner?

11

```
 1   A    No.

 2   Q    Who was the District Attorney or who were the District

 3        Attorneys when you were Commissioner?

 4   A    Newman Flanagan and Ralph Martin.

 5             (Ms. Scapicchio joined the deposition.)

 6   Q    Did you know Detective Richard Walsh when you were

 7        Commissioner?

 8   A    I knew of him, not to be -- in other words, I knew of

 9        him.  I could probably visualize him.

10   Q    Had you ever supervised him or worked with him directly?

11   A    No, I did not.

12   Q    Did you know Detective Paul Murphy?

13   A    Yes, I remember him, also.

14   Q    And how did you know Detective Paul Murphy?

15   A    I just knew he was a detective.  He was in the bureau.

16   Q    Had you ever had any personal dealings with him?

17   A    No, I did not, sir.

18   Q    Did you know Timothy Callahan?

19   A    Yes.

20   Q    And how did you know Timothy Callahan?

21   A    I reduced him in rank, and that's how I remember him

22        because he was an acting sergeant when I took over the

23        department.  A year later we had promotions to sergeant,

24        and he didn't pass the civil service exam.  And I
```

12

1    Q    remember he was a gentleman about that particular event.

2         He had been appointed as an acting sergeant in lieu of an

3         exam?

4    A    Yes.

5    Q    And then when the exam happened, he didn't qualify?

6    A    That's correct, sir.

7    Q    Do you know what unit he was in when that happened?

8    A    No, I do not.

9    Q    Do you know when that was that Sergeant Callahan was

10        reduced in rank?

11   A    Approximately 19 -- somewhere in 1986.

12   Q    That would be about a year after you got appointed

13        Commissioner?

14   A    That's an approximate.

15   Q    When you were appointed as Commissioner in 1985, is it

16        correct that there had been a period of almost eight

17        years without any promotional exams, civil service exams,

18        in the Boston Police Department?

19             MR. JOHN ROACHE:    Objection.

20   A    That is correct, eight years, if perhaps not more.

21   Q    And how soon after you were appointed Commissioner were

22        there civil service promotional exams held?

23   A    Probably within a few months of 1985.

24   Q    Was there a Civil Service Commission order to the Boston

13

1    Police Department to hold the exams?

2  A    Well, again, at that time -- in terms of delegating

3    authority, I called in personnel chief of human resources

4    and other command staff members and saying simply that I

5    want to start the process to promote sergeants, to start

6    the promotional process back.

7  Q    Was there an order in effect though from the Civil

8    Service Commission ordering the Boston Police Department

9    to hold promotional exams?

10 A    I don't remember that. I remember myself taking

11   initiative to hold them.

12 Q    You don't have a memory -- do you have a memory of a

13   court order or a Civil Service Division order?

14 A    No, I don't recall.

15 Q    And how soon after you started the process was it that

16   you were actually able to promote sergeants pursuant to

17   the civil service process?

18 A    I'd say approximately a year after I was -- assumed the

19   role of Commissioner. I think that was the first

20   promotion ceremony.

21 Q    So that would be sometime around 1986?

22 A    Yes, sir.

23 Q    Do you remember having any personal involvement in the

24   investigation of the Tiffany Moore murder or the

1      prosecution of Shawn Drumgold?

2   A   No, I had no involvement whatsoever.

3   Q   Do you ever remember being briefed -- do you remember

4      being briefed by anyone concerning either that murder or

5      that prosecution?

6   A   I don't recall.

7   Q   Did you have a process where you would periodically meet

8      with the Investigative Services concerning pending cases?

9   A   I would meet with bureau chiefs which were

10     superintendents, the highest rank, with the exception of

11     superintendent chief.   I would meet on matters that

12     related to the police -- many matters, all kinds of

13     matters.

14   Q   Were those regular meetings with the bureau chiefs, as

15     were they scheduled on a regular basis?

16   A   The bureau chiefs knew I had an open-door policy.   They

17     could come in if they felt it was a matter -- if

18     something is important.

19   Q   But in addition to those kind of meetings, were there

20     regularly monthly or weekly meetings with the bureau

21     chiefs?

22   A   Yes, there were regular meetings.

23   Q   Were there any minutes kept of the meetings do you know?

24   A   I don't remember.

15

1   Q   Do you ever remember the murder of Tiffany Moore or the

2       prosecution of Shawn Drumgold being discussed at any of

3       those meetings of the bureau chiefs?

4   A   No. Generally if I had the bureau chiefs together, we'd

5       discuss a range of issues of different -- anything to do

6       with homicide, that would be -- I wouldn't be involved in

7       it. It would be separate discussions between Assistant

8       ADAs perhaps and police detectives assigned to homicide.

9           MR. REILLY: Why don't we mark this as the

10      next exhibit.

11          (Discussion off the record.)

12  Q   Let me show you Commissioner's Special Citation dated

13      December 22, 1988, which will be marked as an exhibit as

14      soon as we get the exhibit number, and ask you if you're

15      familiar with that special citation.

16  A   I don't remember it. I see it in front of me now. I see

17      the names.

18  Q   Was there a procedure whereby on a yearly basis the

19      Commissioner -- you would make special citations?

20  A   Yes.

21  Q   What was the criteria for special citations?

22  A   Again, I -- there was a group of police officers, command

23      staff and police officers who had an awards board, and I

24      delegated that to them. And Paul Evans who was then

16

17

1    superintendent, was the person I would delegate that to.

2  Q  Did you receive any briefing or folder with the

3    information concerning special citations before you

4    agreed to award a special citation?

5  A  Yes.

6  Q  What type of information typically would you receive to

7    backup or explain a recommendation for a special

8    citation?

9  A  That would probably start wherever it initiated, whoever

10   decided to right up the initial report.  There are

11   follow-up reports.  I would delegate it to the Paul

12   Evans, who would get it to awards board.  They would

13   review all that.  They would select a certain award, wide

14   range of awards for the Policemen's Ball, and basically

15   they would be narratives that I would read of the event

16   whether it was a heroic event or saving a life.

17  Q  Would the narratives be narratives that were prepared by

18   the board, or would they be the original police reports?

19  A  I don't remember.

20  Q  Do you have any memory of giving Detectives Murphy and

21   Walsh a special citation in connection with their work on

22   the Tiffany Moore murder?

23  A  I do not remember that.

24  Q  Typically who would recommend, make the original

```
 1             seen this opinion of Judge Volterra on a Motion to

 2        Suppress before today?

 3                  MR. JOHN ROACHE:   Before you answer that

 4        question, go through the document and familiarize

 5        yourself with the document before you answer the

 6        question.

 7

 8        A     I do not remember.

 9                  (Witness peruses the document.)

10        Q     Do you ever remember being informed that Judge Volterra

11             had suppressed statements by Shawn Drumgold who was the

12             Defendant in the Tiffany Moore case?

13        A     No, I do not.

14        Q     Did you ever remember being informed, and I'm looking

15             here at Page 2 of Exhibit 186, that Judge Volterra had

16             made a finding, that I conclude that in Drumgold's case,

17             egregious prosecutorial misconduct occurred when the

18             authorities questions Drumgold at the Area B police

19             station in direct contravention of a Judge's order, and

20             that the interrogation was conducted in violation of

21             Drumgold's Fifth Amendment rights?

22                  Did you ever learn that Judge Volterra made

23             that finding?

24        A     I do not remember that.

         Q     When you were Commissioner, was there any procedure
```

20

1   whereby you would receive feedback if Judges made

2   findings that your officers had done something improper?

3        MR. JOHN ROACHE:    Objection.

4   A    At some point, I would probably hear from the legal

5   office, perhaps, informing me of something like that.

6   Q    Who was in charge of the legal office when you were

7   Commissioner?

8   A    The first person was Nicholas Foundas, F-o-u-n-d-a-s.

9   The second legal adviser was James Hart.    And the third

10  legal adviser, last name I don't remember right -- Nancy

11  Albano.

12  Q    And did they represent the police department when the

13  police department was subject to legal proceedings, that

14  is if somebody sued the police department?

15  A    They were considered assistant corporation counsel.    They

16  would be involved, and also we worked closely with

17  corporate counsel, the lawyer of the city, yes.

18  Q    Was it your understanding that they were involved in

19  criminal prosecutions where the District Attorney was

20  prosecuting a case?

21        MR. JOHN ROACHE:    Objection.

22  A    I can't answer that.

23  Q    Was there any formal procedure where you received

24  information if police officers in a criminal case were

21

1    accused or found by a Judge to have committed misconduct?

2              MR. JOHN ROACHE:  Objection.

3    Q    And a criminal case as opposed to a civil case.

4              MR. JOHN ROACHE:  Objection.

5    A    At some point, somebody from the legal office of the

6    Boston Police Department at some point would probably

7    share with me or provide me with any information

8    concerning matters like that.

9    Q    Do you have any knowledge of how the Boston Police legal

10   department would learn of findings in a criminal case

11   that an officer may have committed misconduct?

12             MR. JOHN ROACHE:  Objection.

13   A    That would be a delegation of authority.  That kind of

14   information would probably come by way of the legal

15   office or maybe the corporation counsel.  And then I

16   would probably be informed.

17   Q    Did you personally ever take any action to make sure that

18   you learned about any findings made by Judges in criminal

19   cases that officers were doing anything improper?

20             MR. JOHN ROACHE:  Objection.

21   A    I had the resource of the legal department in the city,

22   the lawyer of the city, the corporation counsel, and I

23   depended upon them to inform me of legal matters on

24   things I should be concerned about.

                                                              22

23

1   Q   And you relied on the fact that you believed they would

2       inform you if it was appropriate?

3               MR. JOHN ROACHE:  Objection.

4   Q   The legal department; is that correct?

5               MR. JOHN ROACHE:  Objection.

6   A   To the best of my knowledge, that's how I remember the

7       process.

8   Q   Do you have any memory of learning that a Judge had

9       criticized Boston Police in any way in connection with

10      the prosecution of Shawn Drumgold or the murder of

11      Tiffany Moore?

12  A   I don't recall.

13  Q   Do you have any memory of ever revisiting the special

14      citation, Exhibit 185, after the fact?

15  A   No, I don't remember.

16  Q   Are you familiar with a report prepared by James

17      St. Clair?

18  A   Yes.

19  Q   And who appointed James St. Clair to prepare a report in

20      connection with the Boston Police Department?

21  A   To the best of my recollection, the Mayor of the City of

22      Boston, Raymond L. Flynn.

23  Q   What was your understanding as to the circumstances that

24      led to Mayor Flynn appointing James St. Clair to prepare

36

1  can't answer whether or not that's true or not.  That's

2  hearsay.

3  Q.    Did you have any reason to doubt the accuracy of that

4  finding by the committee?

5  A    I had a different opinion.  One thing I can say clearly,

6  strongly is the relationship with the community was good.

7  There was no doubt about that.

8  Q    And how about the relationship with most officers?

9  A    That I don't know.  No officer ever came up to me to let

10  me know how he or she felt.

11  Q    If you can look at Page 7, which is Bates stamped 1626,

12  the last full paragraph, the last sentence, full sentence

13  says, As a result, there are no department-wide systems

14  to gauge the performance of police officers or hold

15  supervisors, patrol officers, or detectives accountable

16  for their actions and performance.  In your opinion, was

17  that finding by the committee correct?

18  A    I don't think so.

19  Q    And why do you think it's not correct?

20  A    As far as I'm concerned, as Commissioner, all personnel

21  in the department were held accountable under my term as

22  Commissioner.

23  Q    Were there any department-wide systems to gauge the

24  performance of officers?

1    A    I don't recall.

2    Q    The next sentence says, Further, there are no real

3    efforts made to set goals, objectives, and priorities on

4    a department-wide basis or hold bureau, division, and

5    units accountable for meeting those goals. In your

6    opinion, was that finding by the Commission accurate?

7    A    I don't think so.

8    Q    And why do you believe it's not accurate?

9    A    Because as a command staff, on a regular basis, we

10   discussed goals and objectives. We put in plans. We did

11   pilot programs. We were constantly adjusting to the

12   ever-changing -- the ongoing changes in the City of

13   Boston to meet the needs of the public that we served.

14   Q    Did you ever go back to Mr. St. Clair and his committee

15   and say words to the effect of, you've made a mistake,

16   here are the goals, plans, and priorities we have in

17   place?

18            MR. JOHN ROACHE:    Objection.

19   A    I never saw the man again.

20   Q    Did you try to contact him?

21   A    No, I did not.

22   Q    Did you ever advise the Mayor as to what you considered

23   to be inaccuracies in the St. Clair Report?

24   A    I don't remember.

37

1  Q    Look at Page 9, Bates stamp 1628, the top of the page,

2       sentence begins, Moreover, we found a lack of commitment

3       to in-service training, most particularly a near total

4       absence of supervisory skills and management training for

5       superior officers and command staff members.  Was that

6       accurate in 1992?

7  A    I don't think it's accurate in my opinion.

8  Q    Why do you believe it's not accurate?

9  A    I felt we had an outstanding academy which included

10      in-service training.

11  Q   You were aware of the criticism of the service academy in

12      the St. Clair Report; is that fair?

13  A   I don't remember that.

14  Q   If you can turn to Page 70 of the report -- actually --

15      yes, Page 70.  Is it fair to say that Page 70 and the

16      next three pages of the report is a discussion of the

17      Boston Police Academy.

18           MR. REILLY:  You've got the wrong Page 70,

19      John, 1698.  Evidently there's more than one Page 70

20      because I'm looking at Page 70, and it's 1698.

21           MR. JOHN ROACHE:  Apparently the St. Clair

22      Commission Report is inaccurate.

23           MR. REILLY:  Could be, could be.  I never

24      said perfect I've been told.

38

1    Q    In your opinion, was in-service training in the Boston

2         Police Department in 1992 a joke?

3    A    I would disagree with that statement.

4    Q    And other than the Boston Police Academy, training

5         academy which you told me about, what else would you base

6         your disagreement with that statement on?

7    A    We had an outstanding commander in charge. His name was

8         Robert Dunford. He had a good relationship, he

9         coordinated well with the Massachusetts Training Council.

10        He had a stellar reputation. And he ensured not only the

11        quality of the training for the time that the recruits

12        would spend there but also was involved with other

13        training including in-service.

14   Q    So were you satisfied in 1992 with the in-service

15        training in the Boston Police Department?

16             MR. JOHN ROACHE: Objection.

17   A    I'm sorry?

18   Q    Were you satisfied with the in-service training in the

19        Boston Police Department in 1992?

20             MR. JOHN ROACHE: Objection.

21   A    I'm never satisfied. So we constantly tried to improve

22        our training at all times.

23   Q    If you could look at Page 61, which is Bates stamped.

24        1685?

40

1          MR. JOHN ROACHE:  Going backwards?

2          MR. REILLY:  Yes.  Want to make sure you're

3     paying attention.

4     Q     The paragraph in the middle of the page begins, Unlike

5     many major police departments, the BPD does not have a

6     policies and procedure manual.  Was that accurate in

7     1992?

8          (Witness peruses the document.)

9     A     I have no comment.

10    Q     Do you know if that's accurate?

11    A     I can't say.  I don't know who come up with this

12    assessment.

13    Q     Was there a policies and procedure manual for the Boston

14    Police Department in 1992?

15    A     Superintendent Paul Evans I delegated to him to maintain

16    the rules and regulations of the department.  He headed

17    up that committee for policies and procedure manuals.

18    From the very first day that Paul Evans I promoted him to

19    superintendent, he was involved in that important

20    committee.  The rules and regulations has to do with

21    policies and procedures, and I delegated it all to him.

22    Q     Do you know yourself whether there was a policies and

23    procedure manual in place in 1992?

24    A     I cannot speak to that issue right now except to say I

41

42

1    know that we did have a policy and procedures manual, but

2    this specific I can't say. I still have mine at home.

3 Q    When you say you know you had a policies and procedures

4    manual, what are you referring to? What is it that you

5    remember?

6 A    At the beginning, it was revising rules and regulations

7    in terms of pursuit driving, sometimes handling

8    investigations.

9 Q    Do you remember -- I didn't mean to interrupt you.

10 A    That's all right.

11 Q    Do you remember that the Commission made a finding that

12    there was a large collection of written rules,

13    regulations and orders, but they were not organized in

14    any sensible or retrievable way? Do you remember that

15    criticism being made?

16 A    I don't remember. It's probably here.

17 Q    Do you remember the Commission saying that most officers

18    did not have a set of the rules of the Boston Police

19    Department, and they recommended they be made available?

20 A    I don't remember.

21 Q    Take a look at Page 63 which is 1687, the section,

22    Performance Analysis. The Commission says --

23         MR. JOHN ROACHE: What did you say?

24         MR. REILLY: Performance Appraisals.

1    Q    -- Unlike the overwhelming majority of urban police

2         departments, the Boston Police Department does not have a

3         department-wide personnel performance appraisal system.

4         Was that accurate?

5              MR. JOHN ROACHE:    Is your reading of it

6         accurate or --

7              MR. REILLY:    No, is that an accurate

8         statement of fact.    I know my reading of it is accurate.

9              MR. JOHN ROACHE:    You said something other

10        than appraisals.

11             MR. REILLY:    I was just giving you an opening

12        there.

13   Q    Go ahead.

14   A    I can't comment on this because apparently his knowledge

15        was obtained through interviews that I'm not -- I would

16        not know who they were.

17   Q    Was it accurate that the Boston Police Department did not

18        have a department-wide personnel performance appraisal

19        system.    Is that a correct statement of fact?

20   A    I can't say.

21   Q    You don't remember?

22   A    I have a different opinion.

23   Q    What's your opinion?

24   A    I think we constantly appraised the performance of our

43

1      personnel from promotions to detectives to sergeant,

2      lieutenant, captain.  And generally I delegated all -- a

3      lot to the bureau chiefs to see the needs of personnel

4      under their command, particularly in terms of performance

5      appraisals.

6   Q  Do you understand any difference between what you just

7      outlined to me and a department-wide personnel

8      performance appraisal system?

9   A  In my opinion, we had a department-wide because

10     Superintendent Paul Evans was again a Number 2, if you

11     will, at that time, and he was very much involved with

12     that.

13  Q  Further on in that paragraph, the Commission says,

14     Commissioner Roache acknowledged to the committee that

15     the department had yet to develop a performance appraisal

16     system for the whole department.  Was that correct?  Did

17     you, in fact, acknowledge that to the committee?

18  A  I don't remember that at all where that comes from.  I

19     just don't know.

20  Q  Is it your testimony today that that -- that that's not

21     accurate that the department had yet to develop a

22     performance appraisal system for the whole department?

23  A  As I indicated earlier, I remember two meetings, and I do

24     not remember any discussion about performance appraisal.

44

1   Q    And you don't recall the statement that's attributed to

2        you here on Page 63?

3   A    No, I do not.

4   Q    If you can turn to Page 74 which is Bates stamped 1702,

5        the section that says C, Training For Detectives. The

6        committee found there appears to be no special training

7        for detectives. When patrol officers are promoted, they

8        are simply assigned to a unit and expected to learn,

9        quote, on the job, quote. Was that accurate?

10                  (Witness peruses the document.)

11                  MR. JOHN ROACHE:  Was that accurate in 1992?

12                  MR. REILLY:  Yes, 1992 when the report was

13       produced.

14                  MR. JOHN ROACHE:  Was this first sentence

15       accurate in 1992 or do you know?

16   A    In my opinion, it's not accurate.

17   Q    And why not?

18   A    It's my understanding that we constantly were training.

19       Wherever there was a need for a detective, homicide or

20       the District Attorney who, as you know, directly controls

21       homicide investigations, he or she, a District Attorney

22       knows the tools they need. And training is critically

23       important to stay up with the state of the art, if you

24       will, of homicide investigation.

45

1    Q    Were you aware of what training was given to homicide

2         detectives during the time you were Commissioner?

3    A    I delegated that to the superintendent in charge of the

4         Bureau of Investigative Services.

5    Q    Who was that?

6    A    I don't recall.

7    Q    When this report was produced by the St. Clair

8         Commission, did you do anything to investigate the

9         allegations that were made in this paragraph on Page 74,

10        that is the allegations concerning a lack of training for

11        detectives?

12   A    I don't remember.

13   Q    Did you call --

14   A    I delegated that to Superintendent Ann Marie Doherty.

15   Q    Did you call the superintendent that you had delegated

16        the job of training detectives and say, what's your

17        response to this claim?

18   A    No. Again, Superintendent Doherty, I had her working

19        with the command staff members to respond to all the

20        issues that were in the St. Clair Report.

21   Q    Do you remember Superintendent Doherty telling you

22        anything about her investigation of these allegations

23        concerning training for detectives?

24   A    No, I don't recall.

46

47

1    Q    How did she report back to you?  How did Superintendent

2         Doherty report back to you?

3    A    At the completion of her review of the St. Clair Report,

4         she provided me with a document which outlined our

5         responses to Mr. St. Clair and his concerns.

6    Q    Do you remember the title of the document, or how she

7         described the document?

8    A    No, sorry, I do not.

9    Q    Was she the author of the document?

10   A    I would say she's the primary author.  But again, in

11        consultation with others, she put the final report

12        together.

13   Q    Did you distribute that report from her to anybody else?

14   A    I don't recall.

15   Q    The next sentence on Page 74 says, The committee was told

16        that homicide detectives received no special training

17        when they joined the unit, quote, because only

18        experienced investigators are chosen to be homicide

19        detectives.  Was that accurate in 1992?

20             MR. JOHN ROACHE:  Objection.

21   A    Some of that language is pretty vague, grammatically.  I

22        can't understand this here.

23   Q    Let me ask you this way.  Do you know in 1992 whether

24        homicide detectives received any special training when

1    they joined the unit?

2    A    I don't remember, but again, I would delegate that to the

3        chief of Bureau of Investigative Services because at

4        least the personnel in the Homicide Unit would work with

5        the District Attorney's office to provide the necessary

6        training.

7    Q    Did you have an understanding that the District

8        Attorney's office was responsible for training homicide

9        detectives?

10   A    Again, I looked at the statute, and the District Attorney

11       has a statutory authority to direct and control the

12       investigations.  But I also believe they understood the

13       importance of up-to-date training.  Beyond that, I cannot

14       say because I delegated that to Bureau of Investigative

15       Services, and they were worked closely with the District

16       Attorney's office.

17   Q    But as the Commissioner of police, who did you believe

18       had the responsibility of providing training to the

19       homicide detectives, the Boston Police Department or the

20       District Attorney's office?

21   A    Boston Police Department.

22   Q    And do I understand it correctly that in 1992 when this

23       report was prepared, you had no personal knowledge as to

24       what type of training was being provided to homicide

48

1    detectives in the Boston Police Department?

2    A    I don't recall right now.  I don't recall.

3    Q    And you have no memory of -- do you have any memory of

4         changing the training for homicide detectives after the

5         St. Clair Report?

6    A    I have no memory other than that that was delegated to the

7         appropriate command staff people and the District

8         Attorney's office.

9    Q    Would that be Ann Marie Doherty?

10   A    No, but I don't remember.  Whoever the chief detective

11        was worked closely with the District Attorney's office.

12   Q    Who appointed detectives to the Homicide Unit?

13              MR. JOHN ROACHE:    Objection.  You've already

14        asked and answered this.  Go ahead.

15   A    Again, if it came to somebody being transferred at the

16        Homicide Unit, that request, if it came from the District

17        Attorney's office or it came from the bureau chief, it

18        came to homicide, I would remove myself from that process

19        until they came up with a selection of a person or

20        personnel.

21   Q    "They" being the District Attorney's office or Bureau of

22        Investigative Services?

23   A    I was not very much involved other than if it required a

24        personnel order that somebody is being transferred I

49

```
 1    chief of the investigative services, Superintendent Saia

 2    would be discussing issues like that.  That's all I can

 3    say.

 4  Q  When you say it's a collaborative process, what role do

 5    you see the District Attorney's office having in the

 6    Boston Police Department homicide department?

 7         MR. JOHN ROACHE:  Okay.

 8  A  I see the role as the primary prosecutor of those crimes.

 9  Q  Did they decide which cases will be assigned to which

10    homicide detectives?

11  A  I have no knowledge.

12  Q  Did they decide what the homicide detectives will do in

13    their day-to-day investigations of homicides?

14  A  I don't know.  They're assigned to the Homicide Unit.

15  Q  Who are assigned to the --

16  A  The homicide detectives.  The DA is basically -- he kind

17    of oversees them.  It's a cooperative collaborative

18    relationship between the DA and the Boston Police

19    Department.

20  Q  As Commissioner of the police, did you understand that

21    District Attorneys had day-to-day supervision over

22    homicide detectives?

23         MR. JOHN ROACHE:  Objection.

24  A  I'd say the primary role of the DA's office was to
```

58

1    prosecute cases. But working with whoever headed up the

2    Bureau of Investigative Services, I stood out of that and

3    let them discuss issues that were germane to the Homicide

4    Unit.

5    Q    Would it be fair to say that the primary job of the

6    Homicide Unit was to investigate homicides and the

7    primary job of the DA's office was to prosecute

8    homicides?

9                MR. JOHN ROACHE:    Objection.

10   A    Yes, with both parties united in approaching that

11   particular homicide.

12   Q    And the investigative unit of the police department would

13   work with and cooperate with the District Attorney's

14   office who was prosecuting it; is that fair?

15   A    Yes, sir.

16   Q    And in terms of chain of command, the homicide detectives

17   answered to the head of the homicide bureau; is that

18   correct?

19   A    All the detectives report to the bureau chief,

20   superintendent, or the Bureau of Investigative Services.

21   I cannot be crystal clear in the relationship between

22   homicide because, again, I see that as a cooperative

23   venture between the police department and the District

24   Attorney's office.

59

1    Q   Do you remember him being in charge of the District

2       Attorney's Homicide Unit at some point when you were

3       Commissioner?

4    A   I recall him working in the District Attorney's office.

5       Right now I'm not absolutely sure what he was doing.

6    Q   Do you ever remember discussing any homicide detectives

7       with Frannie O'Meara?

8    A   No.

9    Q   Did you ever know if there was any friendship between

10      Lieutenant McNelley and Frannie O'Meara?

11           MR. JOHN ROACHE:  Objection.

12    A   I have no knowledge of that.

13    Q   Who would make the recommendation to you for appointment

14      to the head of the Homicide Division?

15    A   The best I can recall would be the chief of the Bureau of

16      Investigative Services who probably had conversations

17      with personnel under the District Attorney at his level

18      discussing those matters, and he would probably present

19      it to me.

20    Q   And would the chief of the Bureau of Investigative

21      Services at least at some point while you were

22      Commissioner be Joseph Saia?

23    A   At one point, Joseph Saia was the chief of the Bureau of

24      Investigative Services.

62