EXHIBIT J

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CAROL CURRAN, et al,

Plaintiffs,

v.

CITY OF BOSTON, et al,

Defendants.

CIVIL ACTION
NO. 90-11594-MA

MEMORANDUM AND ORDER

Mazzone, D.J.                                                    November 2, 1993

Plaintiffs Carol Curran and her son, Mark Curran bring this action against the city of Boston (the "City"), the Commissioner of the city of Boston Police Department (the "Commissioner" of the "Department") and Raymond D'oyley, a Boston police officer.[1] The suit arises out of an alleged assault on Mrs. Curran by Officer D'oyley on September 27, 1988 in Dorchester, Massachusetts.

The Complaint, in seven separate causes of action, alleges that D'oyley violated Plaintiffs' civil rights in contravention of 42 U.S.C. § 1983 and also charges him with state law claims of assault and battery and malicious prosecution.[2] In addition, in

---

[1] In their Complaint, Plaintiffs also named as defendants the Boston Police Department, the Internal Affairs Department of the Boston Police Department, and Boston Police Officer Gladys Frias. On November 14, 1991, this court entered an order dismissing the Boston Police Department and the Internal Affairs Department as non-persons and therefore not proper party defendants. Defendant Gladys Frias was dismissed by agreement on December 30, 1991.

[2] This court dismissed the Third Cause of Action, alleging state civil rights claims pursuant to Mass. Gen. Laws ch. 12 § 111, on November 14, 1991.

1



the same seven causes of action, Plaintiffs allege that the city and the Commissioner did not adequately train Officer D'Oyley or investigate the complaint Mrs. Curran filed with the police department, and that these failures caused Plaintiffs' constitutional injury, in violation of 42 U.S.C. § 1983 . The Currans also claim that, under Mass. Gen. Laws ch. 258, the City is liable to Plaintiffs for the torts D'Oyley allegedly committed. Finally, Plaintiffs charge the city with negligence in hiring, supervising and training its police officers and in investigating citizen complaints.

The City and the Commissioner (collectively, the "Defendants") have moved for summary judgment on the entire Complaint pursuant to Fed. R. Civ. P. 56, arguing that Plaintiffs have failed to allege facts which would support a verdict in their favor and thus that these Defendants are entitled to judgment as a matter of law. After careful consideration of the motions, affidavits and exhibits, I conclude that Plaintiffs have failed to raise a genuine issue of material fact as to Defendants' liability under any of the claims Plaintiffs have alleged against them. Consequently, Defendants' motion for summary judgment is granted.

I.    FACTUAL BACKGROUND

The pleadings, affidavits and exhibits filed by the parties establish the following facts. On September 27, 1988 at around 11:00 p.m., Officers D'Oyley and Gladys Frias received a radio call, while on patrol, to report to the corner of Moseley and

2

Crescent streets in Dorchester on a complaint of a group of youths drinking alcohol at that location. Defendants' Motion for Summary Judgment (Def. Motion) at Ex. B. Upon the officers' request, the group dispersed but reassembled and continued drinking on the front stairway and in the first floor hallway of 10 Crescent Avenue. Id. According to the findings of Boston Police Sergeant John Gallagher, who investigated the incident, Officer D'Oyley entered the hallway and attempted to place under arrest a suspect subsequently identified as Mark Curran; Mr. Curran reportedly resisted the arrest. Id. Around this time, Mrs. Curran, who lived on the second floor of 10 Crescent, appeared in the hallway. Id. The various Boston Police investigative summaries state that Mrs. Curran attempted to interfere with her son's arrest by pulling on D'Oyley's uniform jacket, and that her close proximity to the struggle resulted in her being inadvertently knocked down onto the hallway floor. Id. By contrast, Plaintiffs allege that D'Oyley intentionally beat Mrs. Curran about her face and body without provocation. Complaint at ¶ 15. In the confusion, Mark Curran evaded Officer D'Oyley's custody. Def. Motion at Ex. B. D'Oyley did, however, arrest one of Curran's companions, Michael Watson, for public drinking, disorderly person, and assault and battery on a police officer. Id.

At some point during this incident, Mrs. Curran requested D'Oyley's badge number. D'Oyley advised her to obtain the requested information at the police station. Id. The next day, September 28, 1988, Mrs. Curran, accompanied by her husband, filed

3

a complaint against Officer D'Oyley with the Internal Affairs Division of the Boston Police Department.[3] Id.; Complaint at ¶ 20.

The case against Michael Watson was dismissed on October 20 for want of prosecution, as Officers Frias and D'Oyley failed to appear to testify. Id. The Department instructed D'Oyley to obtain new complaints against Watson and also to obtain complaints against Mark Curran, who had since been identified as the suspect who escaped D'Oyley's attempted arrest on September 27. Id. On November 7, 1988, Mark Curran was charged with assault and battery on a police officer, disorderly person, and public consumption of alcohol. Complaint at ¶ 23-24. On February 8, 1989, Curran was found not guilty on all charges. Id. at ¶ 28. Boston Police reports indicate that the charges against Mark stemmed from his alleged conduct on September 27, 1988. Def. Motion at Ex. B. Plaintiffs, though, allege that D'Oyley falsely brought the charges in an attempt to harass the Curran family after Mrs. Curran filed her Internal Affairs complaint. Complaint at ¶ 25-26.

In response to Mrs. Curran's September 28, 1988 complaint, Sergeant Gallagher gathered and reviewed reports from each of the officers involved in the September 27 incident and conducted interviews of each. He also interviewed Mrs. Curran and several

---

3  Plaintiffs' Complaint asserts that Mrs. Curran brought her Internal Affairs grievance against Officer Frias as well as against Officer D'Oyley; it also states claims against both D'Oyley and Frias for assault and battery and maliciously prosecution. The Department apparently viewed the Internal Affairs complaint as implicating only D'Oyley, however, and Plaintiffs have agreed to dismiss their allegations against Frias. Thus, I will treat Plaintiffs' allegations against the two officers as if they involve D'Oyley alone.

4

witnesses in her behalf. Def. Motion at Ex. B. Gallagher summarized his findings in a report to Paul Bankowski, Deputy Superintendent for Commanding Area C. Id. Bankowski reviewed and analyzed Gallagher's report. He then wrote his own summary of the investigation which he sent to Arthur Morgan, Jr., Deputy Superintendent for the Bureau of Internal Affairs, along with his recommendation that the complaint be filed as not substantiated. Id. Lieutenant Robert Francis also reviewed all of the reports and conducted further investigation of his own. Id. He, too, concluded that the complaint of physical abuse against D'Oyley lacked support and recommended to Deputy Superintendent Morgan that it be declared unsustained. Francis also recommended, however, that the complaint against D'Oyley for not identifying himself be sustained. Id.

Morgan adopted Francis' recommendations and submitted them to the Commissioner on January 3, 1989. Id. The Commissioner has attested that he has no independent knowledge of the September 27, 1988 incident apart from the documents and reports generated by the Internal Affairs investigation. Commissioner's Ans. to Plaintiffs Interrogs. at No. 4.

On June 5, 1989, Morgan informed D'Oyley in writing that, after investigating the incident, the Internal Affairs Division classified Mrs. Curran's complaint regarding D'Oyley's failure to identify himself, in violation of Boston Police Rule 102, § 20, as sustained. Def. Motion at Ex. B. In a separate memorandum, Morgan informed D'Oyley that the portion of Mrs. Curran's complaint

using D'Oyley of assault and battery had been classified as sustained. __Id.__ Both matters were placed on file. __Id.__

Additionally, D'Oyley received an oral reprimand for his violation of Rule 102, § 20. __Id.__ Officer D'Oyley had not been the subject of any Internal Affairs complaints prior to that which Mrs. Curran filed. D'Oyley Dep. at 73; Commissioner's Ans. to Plaintiffs' Interrogs. at No. 4.

In a letter dated May 26, 1989 and signed by the Commissioner, the Boston Police Department informed Mrs. Curran that her complaint of misconduct against Officer D'Oyley had been thoroughly investigated, that the investigation revealed that D'Oyley did violate the Rules of the Department, and that her complaint therefore had been classified as sustained. Def. Motion at Ex. B. In addition, the letter invited Mrs. Curran to contact Deputy Superintendent Morgan should she have any questions regarding the disposition or investigation of her complaint. __Id.__

## DISCUSSION

### __A. Summary Judgment Standard__

Summary judgment serves "as a means of avoiding full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways." __Mesnick v. General Elec. Co.__, 950 F.2d 816, 822 (1st Cir. 1991), __cert. denied__, 112 S.Ct. 2965 (1992). It is an appropriate disposition where, after studying the parties' evidentiary proffers and giving the benefit of reasonable doubt to those against whom the motion is

directed," the court determines that there is no genuine issue of material fact and that the motion's proponent is entitled to judgment as a matter of law. Stella v. Town of Tewksbury, No. 93-1295, slip op. at 4 (1st Cir. Sept. 14, 1993) (citing Fed. R. Civ. P. 56).

While a court must take the record in the light most hospitable to the party opposing the summary judgment motion, "Rule 56 does not invite a court to enter the realm of surmise." Local 48 v. United Broth. of Carpenters & Joiners, 920 F.2d 1047, 1051 (1st Cir. 1990). The nonmovant-plaintiff may not prevent summary judgment by resting upon conclusory allegations, improbable inferences and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Further, evidence that is "merely colorable" or is "not significantly probative" will not deter operation of the rule; nor will the "mere existence of a scintilla of evidence in support of the plaintiff's position." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57 (1986). Additionally, evidence that would not be admissible at trial may not play into a court's consideration of a summary judgment motion. Horta v. Sullivan, No. 92-1962, slip op. at 8 (D. Mass. Aug. 31, 1993). Instead, in order to retain the right to proceed to trial, the plaintiff must set forth specific, competent evidence from which a jury reasonably could find in her favor. Anderson, 477 U.S. at 256; Garside v. Osco Drug, Inc. 895 F.2d 46, 48 (1st Cir. 1990). Rule 56 mandates the entry of summary judgment against a party who fails to meet this burden. Celotex Corp. v.

7

<u>Catrett</u>, 477 U.S. 317, 322 (1986).

B.   <u>Counts I and II--The § 1983 Claims</u>

The Complaint is not artfully drawn; in the interest of clarity, I have accepted the Defendants' renaming the Causes of Action as substantive counts. With this in mind, Counts I and II of Plaintiff's Complaint appear to allege liability on part of the City and the Commissioner for violation of Plaintiffs' constitutional rights, pursuant to the federal civil rights law, 42 U.S.C. § 1983.[4]   Initially, to prevail on a § 1983 claim, "a plaintiff must show that he or she was deprived of a right, privilege or immunity secured by the constitution or laws of the United States by a person acting under color of state law." <u>Pittsley v. Warish</u>, 927 F.2d 3, 6 (1st Cir.), <u>cert. denied</u>, 112 S.Ct. 226 (1991) (citations omitted).

Presumably, the conduct on part of Officer D'Oyley that Plaintiffs contend resulted in a violation of their constitutional rights consists of 1) the alleged assault and battery upon Mrs. Curran; and 2) the alleged false charging of Mark Curran with various criminal offenses.  <u>See</u> Complaint at ¶¶ 14, 23-28, 37. Certainly, Mrs. Curran's claim that D'Oyley beat her without cause,

---

4   Section 1983 provides in relevant part:

Every person who, under color of any [law]... subjects, or causes to be subjected...any person...to the deprivation of any rights, privileges, or immunities secured by the constitution and laws, shall be liable to the party injured...

42 U.S.C. § 1983.

8

if proven, could result in a finding of liability under § 1983. See Landrigan v. City of Warwick, 628 F.2d 736, 741-42 (1st. Cir. 1980). The malicious prosecution claim in this case, however, does not provide such solid grounding for a § 1983 action.

Malicious prosecution standing alone does not implicate federally protected rights. Torres v. Superintendent of Police of Puerto Rico, 893 F.2d 404, 409 (1st. Cir. 1990). Consequently, a § 1983 claim based on malicious prosecution "requires conduct so egregious and conscience shocking that it violates the plaintiff's due process rights." Ayala-Martinez v. Anglero, 982 F.2d 26, 27 (1st Cir. 1992) (citing Torres, 893 F.2d at 409). To constitute a violation of due process, a malicious prosecution must either result in a deprivation of life, liberty, or property, or violate another constitutional right. Id. The filing of charges solely to "vex and harrass" does not rise to a constitutional violation. Torres, 893 F.2d at 410 (citing Whatley v. Philo, 817 F.2d 19, 22 (5th Cir. 1987).

Plaintiffs do not claim that Mark Curran suffered a deprivation of life, liberty or property as a result of the charges filed against him. They do allege, however, that D'Oyley brought the charges in response to Mrs. Currans' filing her Internal Affairs complaint and to induce her to drop the complaint.[5]

_____

[5]    Plaintiffs' Complaint alleges that Mrs. Curran and her husband together filed the Internal Affairs complaint. See ¶ 20, 26-27. However, while her husband may have accompanied Mrs. Curran to the Police Department, the complaint form bears her signature alone, and all of the relevant police reports and records of correspondence reflect that the Police Department regarded Mrs. Curran as the sole complainant in the matter. See Def. Motion at

9

Plaintiffs' Complaint at ¶ 26-27. Thus, one may read Plaintiff's Complaint as alleging an interference with Mrs. Curran's First Amendment rights. The First Circuit Court of Appeals has held, in dictum, that a defendant's prosecution of a plaintiff in order to prevent free speech may generate a constitutional claim. Anglero, 982 F.2d at 27. It has not spoken on whether prosecution in retaliation for an exercise of free speech may also violate one's constitutional rights. But see Losch v. Borough of Parkesburg, 736 F.2d 903, 907-08 (3d. Cir. 1984) (holding that the "institution of criminal action to penalize the exercise of one's First Amendment rights is a deprivation cognizable under § 1983").

Yet even if the First Circuit were to hold that to prosecute someone in retaliation for that person's exercise of his or her First Amendment privileges creates a basis for a § 1983 action, Plaintiffs' allegations do not state a cognizable claim. Plaintiffs do not maintain that the D'Oyley brought charges against Mark Curran either to penalize or to prevent the exercise of his First Amendment rights. Nor do they allege that Mrs. Curran, who filed the Internal Affairs complaint, was charged--falsely or otherwise--with any crime. Thus, neither Mark nor Carol Curran can argue that he or she was the subject of a prosecution intended to quell his or her exercise of his or her own First Amendment rights. A party cannot bootstrap his or her § 1983 claim to another person's First Amendment rights. Thus, even if Plaintiffs could

_____

Ex. B. Thus, I refer to the Internal Affairs complaint as Mrs. Curran's alone.

10

prove that Officer Doyley intentionally brought false charges against Mark Curran, this asserted basis for Plaintiffs' federal civil rights claims fails.

More fundamentally, even assuming that Officer D'Oyley's actions resulted in a deprivation of Plaintiffs' constitutional rights, Plaintiffs have failed to put forth evidence which would allow a finding of corresponding liability on part of either the city or the Commissioner. A § 1983 plaintiff may not sue a local government or its officials under a theory of respondeat superior.[6] Monell v. Dept. of Social Serv., 436 U.S. 658, 691 (1978). Instead, to succeed against a municipality in a § 1983 case, a plaintiff must prove that the alleged constitutional injury directly resulted from an official policy or well-settled practice. Id. at 690-94; see also Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203 (1st Cir. 1990), cert. denied, 111 S.Ct. 2266 (1991) ("A municipality or its supervisory personnel can be held liable for the constitutional misconduct of its employees only on the basis of an 'affirmative link' between their acts and those of the offending employee.").

A local government need not affirmatively adopt an unconstitutional policy in order for liability to attach. City of Canton v. Harris, 489 U.S. 378, 387 (1989). A city can, for instance, be held liable for constitutional wrongs resulting from

_____
6    An action against a municipal official in his or her official capacity serves as "only another way of pleading" an action against the municipality itself. Monell v. Dept. of Social Servs., 436 U.S. 658, 690 n. 55 (1978).

the inadequate training of its police officers. <u>Id.</u> To establish liability, however, a plaintiff must show that the acts or omissions of the municipality's policymakers evidence "deliberate indifference" to the rights of the city's inhabitants. <u>Id.</u> at 389-90; <u>Gaudreault</u>, 923 F.2d at 209. Only then may the constitutional wrong be said to result from "city policy." <u>Harris</u>, 489 U.S. at 389-90. Establishing the "deliberate indifference" necessary to sustain § 1983 liability under a failure to train theory requires proof "that the municipal decision-makers knew or should have known of the officers' misconduct and that they failed to take reasonable measures to rectify the situation." <u>Hathway v. Stone</u>, 687 F. Supp. 708, 710 (D. Mass. 1988) (citations omitted).

A similar burden of proof faces a plaintiff who alleges § 1983 liability against a public official in his personal capacity for conduct perpetrated by someone under the official's supervision. A supervisor, like the city itself, "may be found liable only on the basis of his own acts or omissions." <u>Gutierrez-Rodriguez v. Cartagena</u>, 882 F.2d 553, 562 (1st Cir. 1989) (citations omitted). In order to defeat the defense of qualified immunity, a plaintiff must show that the supervisor's conduct or inaction amounted to a deliberate, reckless or callous indifference to the constitutional rights of others. <u>Id.</u>; <u>Stratton v. City of Boston</u>, 731 F.Supp. 42, 48-49 (D. Mass. 1989). Moreover, an "affirmative link" must exist between the street-level misconduct and the action or inaction of the supervisory official. <u>Cartagena</u>, 882 F.2d at 562 (citations omitted).

12

To make this showing, a plaintiff must prove that the official had actual or constructive notice of the alleged violations, "for one cannot make a 'deliberate' or 'conscious' choice...to act or not to act unless confronted with a problem that requires the taking of affirmative steps." Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 902 (1st Cir. 1988) (citations omitted). See also Voutour v. Vitale, 761 F.2d 812, 820 (1st Cir. 1985), cert. denied, 474 U.S. 1100 (1986) (plaintiff could establish causation element of § 1983 claim against chief of police by showing "a pattern of police violence so striking as to allow an inference of supervisory encouragement, condonation, or even acquiescence") (dictum). Where a plaintiff fails to provide facts indicating that the charged official personally and knowingly violated the plaintiff's constitutional rights, summary judgment will lie for the official. See Stratton, 731 F. Supp. at 49.

In this case, Plaintiffs' Complaint does not allege in even a conclusory fashion that the city customarily failed to train, discipline or supervise its police officers. Instead, it alleges deficiencies in these areas only with respect to the September 27, 1988 incident and only with respect to the immediate officers. (D'Oyley and Frias) involved. See Complaint at ¶ 30-33, 54, 58-59. Manifestly, these allegations, even if proven, would not support a finding of § 1983 liability against Defendants. See, e.g., Santiago, 891 F.2d 373, 381-82 (1st. Cir. 1989) (plaintiff's claims that the city failed to discipline a police officer both for the incident in question and for an earlier incident was insufficient

to defeat summary judgment, where the city had a policy of discipline was not appropriate in either of the incidences discipline was not appropriate in either of the incidences involving the officer in question).

While the Complaint does allege generally that the City displays indifference to citizen complaints concerning civil rights violations by police officers, *id.* at ¶ 35-36, it does so in a purely conclusory manner without alleging any specific facts which would support the vague charge. Finally, the Complaint does not indicate that Plaintiffs' alleged harms resulted from any action or inaction on part of the Commissioner personally.

Undoubtedly aware that their Complaint provides them scant ammunition with which to defend against Defendants' summary judgment motion, Plaintiffs attempt to create a genuine issue of material fact as to Defendants' liability in their Opposition to Defendants' motion. With regard to the Commissioner's liability, Plaintiffs point out that the Commissioner signed a letter the Boston Police Department sent to Mrs. Curran which stated that her complaint against D'Oyley had been sustained. Opposition at ¶ 1. Standing alone, however, this letter lacks the significance with which Plaintiffs struggle to endow it. First, the letter does not state that the complaint was sustained in its entirety; since part of Mrs. Curran's complaint against D'Oyley was sustained, the letter at most is ambiguous. Second, Plaintiffs did not suffer a constitutional deprivation as a result of their receipt of the letter; their alleged harms had long since occurred. Finally,

14

regardless of whether it can be said to have caused constitutional harm, this single correspondence fails to establish callous indifference by the Commissioner to Plaintiffs' constitutional rights. See, e.g., Santiago, 891 F.2d at 382.

Also in their Opposition, Plaintiffs do allude to customs and policies on part of the City and the Commissioner evidencing deliberate indifference to the constitutional rights of Boston's citizens. Opposition at ¶ 2-3. As sole evidence that such policies exist, Plaintiffs proffer the Report of the Boston Police Department Management Review Committee (the "St. Clair Report" or "Report"). As discussed below, however, the St. Clair Report constitutes inadmissible hearsay which may not bear upon my consideration of Defendants' summary judgment motion. See Garside, 895 F.2d at 50 ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment.").

In the spring of 1991, Boston Mayor Raymond Flynn established the Boston Police Department Management Review Committee (the "Committee") to review the inner workings of Boston Police Department and submit recommendations based upon its findings. James D. St. Clair, a local attorney, agreed to chair the eight-member committee at the request of the Mayor. All of the Committee's members contributed their time and efforts to the project on a pro bono basis. See St. Clair Report, Plaintiff's Opp. at Ex. B.

In conducting its investigation, the Committee interviewed

15

more than eighty-five Boston police officers and civilian employees, all of whom were promised confidentiality in exchange for their cooperation. The Committee also interviewed various federal, state, county and city law enforcement officials; all received the same promise of anonymity. Additionally, the Committee obtained access to confidential police documents, predicated upon the Committee's assurance that the information would remain confidential. Memorandum of Law in Support of Deponent James D. St. Clair's Motion to Quash Subpoena Requiring Production of Documents and Deposition Testimony at 3, Curran v. City of Boston (No. 90-11594-MA). Neither Mr. St. Clair nor his Committee purport to have any personal knowledge of the events and conditions upon which they base their conclusions. See id.

On January 14, 1992, the Committee submitted a final written Report to Mayor Flynn. The Report concluded, essentially, that systematic deficiencies plagued the functioning of the Boston Police Department. Specifically, the Committee found inadequacies in the recruitment, training, evaluation and supervision of police officers. Additionally, the Committee found the Department's handling of citizen complaints regarding police misconduct "particularly troubling." St. Clair Report at iii. The body of the Report details the Committee's findings and proposes various recommendations for improving the Department's operations. See id.

The St. Clair Report is an out-of-court statement which Plaintiffs would offer for the truth of its conclusions. As such, it constitutes hearsay under Fed. R. Evid. 801. Moreover, because

16

it bases its conclusions on out-of-court statements by various anonymous sources, the Report actually represents hearsay within hearsay. See Fed. R. Evid. 805. Under the Federal Rules of Evidence, hearsay is not admissible unless it qualifies as "nonhearsay" under Rule 801 or fits within one of the exceptions to the hearsay rule listed in Rules 803 and 804. Fed. R. Evid. 802.

Plaintiffs offer various theories in support of their contention that the Report is admissible, despite the apparent hearsay problems. First, they assert summarily that the Report is admissible as "statements against interest of a party opponent."

Fed. R. Evid. 804(b)(3) creates an exception to the hearsay rule, in situations where the declarant is unavailable as a witness, for any statement

which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless it were true.

The Report plainly does not come within this exception. Neither the St. Clair Commission nor any of its individual members risked any pecuniary or proprietary interest by issuing the Report, nor did they subject themselves to liability of any kind. Neither, in fact, did the city employees who spoke with the Commission place themselves in any risk by doing so, as all spoke on the condition that their statements would remain confidential.

Possibly, Plaintiffs are attempting to argue that the Report qualifies as "not hearsay" under Rule 801(d)(2) in that it

17

represents a vicarious admission on part of Defendants. The
strongest case for a representative or vicarious admission exists
where the principal-party expressly has authorized an agent to
speak for him on a particular subject or expressly has adopted
another's prior statement. Graham C. Lilly, Evidence § 7.4 (2d ed.
1987). See also Fed. R. Evid. 801(d)(2)(B)-(C). In this case, no
evidence suggests that the Mayor, in establishing the Committee,
authorized it to speak on behalf the city or any of its employees,
nor that the City adopted the findings and recommendations
contained in the Report.

Rule 801(d)(2) also contemplates the admission of an out-of-
court statement by the party's agent during the course of the
agency relationship and concerning a matter within the scope of the
agency. Fed. R. Evid. 801(d)(2)(D). Yet this exemption, too,
is unavailing to Plaintiffs.

In determining whether an agency relationship exists, courts
give primary consideration to whether the principal-party had a
right to control the subsidiary party with respect to matters
within the scope of the relationship. Sabel v. Mead Johnson & Co.,
737 F. Supp. 135, 138 (D. Mass. 1990). The relationship between
the City and the Committee in this case lacks the indices of
control characteristic of a principal-agency relationship. See id.
at 138-39 (listing relevant factors). The Mayor made a very
general request that the committee review the management and
supervision systems of the Boston Police Department; from that
point forward, the Committee possessed unfettered discretion as to

the manner in which it carried out its mission. As the City did not pay the Committee's expenses, it had no ability to exert financial control over the Committee. In fact, no evidence exists that the City or any of its employees attempted to control the Committee's investigation in any way.

Where, as here, Defendants did not control the Committee's work, where the Committee lacked the power to legally bind Defendants through their statements and actions, and where the Committee did not enter into a fiduciary relationship with Defendants, "the factors which support attribution of an agent's statement to her principal are completely missing." <u>Id.</u> at 139 (refusing to admit hearsay evidence pursuant to Fed. R. Evid. 801(d)(2)). Thus, the Report may not come into evidence under Rule 801(d)(2).

Next, Plaintiffs maintain that the Report is admissible under Fed. R. Evid. 803(8), which states an exception to the hearsay rule for public records and reports. That Rule allows a judge to admit into evidence "reports...of public offices or agencies setting forth...factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Fed. R. Evid. 803(8)(C).

Plaintiffs cite <u>Gentile v. County of Suffolk</u>, 926 F.2d 142 (2nd Cir. 1991) in support of this contention. In that § 1983 case, the Second Circuit Court of Appeals held that the trial court, acted within the scope of its discretion in admitting selected

portions of a report by a state investigatory commission which concluded that the County Police Department and District Attorney's office had systematically mismanaged their offices, had tolerated and even ratified employee misconduct and had failed to investigate or punish such misconduct. Id. at 146. Critical distinctions exist between that case and this, however.

In Gentile, the investigatory report was prepared by an "executive-legislative Commission" established in accordance with the New York State Constitution and pursuant to its enabling legislation. Gentile v. County of Suffolk, 129 F.R.D. 435, 442 (E.D.N.Y. 1990). State law required an annual report to the governor and legislature. Id. In addition, state procedural law governed the commission's investigation; the commission had authority to subpoena documents, compel testimony, swear witnesses and grant immunity. Id. at 442, 451. The trial court noted that Rule 803 recognizes "the reliability of most reports written and published by government agencies as part of their official duties under...law." Id. at 448.

Unlike the Gentile commission, the St. Clair Committee was not a public agency acting pursuant to authority granted by law. Instead, the Committee consisted of an independent group of citizens who volunteered their efforts to the project. It is true that the Mayor, himself a public officer, requested the Committee to conduct the investigation. This fact alone, however, does not transform the Committee into a public agency, nor its investigation into one "made pursuant to authority granted by law." Ricciuti

v. New York City Transit Auth., 754 F. Supp. 980, 985 (S.D.N.Y. 1990), vacated on other grounds, 941 F.2d 119 (1991). The St. Clair Report, therefore, does not qualify for admission into evidence under Fed. R. Evid. 803(8).

Lastly, Plaintiffs argue that I should admit the Report under Fed. R. Evid. 803(24), the residual exception to the hearsay rule. That Rule permits a court, in its discretion, to admit into evidence a hearsay statement not covered by any of the specific exceptions if the statement meets certain conditions. The legislative history behind Rule 803(24) reveals that Congress did not expect courts liberally to invoke the residual exception. The Report of the Senate Committee on the Judiciary states:

It is intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances. The committee does not intend to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions contained in rules 803 and 804(b).

To qualify for admission under Rule 803(24), a statement, in addition to being relevant, must: 1) possess strong circumstantial guarantees of trustworthiness; 2) be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts;" and 3) best serve the general purposes of the Federal Rules of Evidence and the interests of justice. Polanski v. CNA Ins. Co., 852 F.2d 626, 631 (1st Cir. 1988) (quoting Fed. R. Evid. 803(24)). The most significant of these requirements is that the statement possess guarantees of trustworthiness equivalent to those of statements admitted under the specific hearsay exceptions. M. Graham, Federal Practice and

21

Procedure: Evidence § 6775 (Interim Edition). Cf., Idaho v. Wright 497 U.S. 805, 826-27 (noting the "presumptive unreliability" of accusatory hearsay statements not admitted pursuant to a firmly rooted hearsay exception).

In rare circumstances, an out-of-court statement which does not fall within any of the traditional hearsay exceptions may carry such strong indicia of reliability as to overcome the presumption of inadmissibility. For instance, in United States v. Donlon, 909 F.2d 650 (1st Cir. 1990), the First Circuit Court of Appeals held that the trial court properly admitted the grand jury testimony of a witness who invoked the "spousal" privilege against testifying at trial.[7]  In assessing the probable trustworthiness of the prior testimony, the court noted that: 1) the witness gave the grand jury testimony under oath; 2) the testimony concerned matters within the witness' personal knowledge; 3) the witness never recanted her testimony; 4) no evidence suggested that she was unreliable; and 5) she did not give her testimony under a grant of immunity.  See also S.E.C. v. First City Financial Corp., Ltd., 890 F.2d 1215, 1224-25 (D.C. Cir. 1989) (admitting, under Rule 803(24), a written chronology of events submitted by a brokerage firm and based upon the deposition testimony of the CEO of the firm, since defendants' ability to cross-examine the CEO during his

---

[7]  The trial court admitted the statement under Fed. R. Evid. 804(b)(5).  Rule 804(b)(5) is a residual exception identical to that of Rule 803(24) with the additional requirement that the declarant be unavailable. Cases decided under Rule 804(b)(5) serve as significant authority with respect to Rule 803(24) and vice versa. M. Graham, Federal Practice and Procedure: Evidence §6775.

depositions offset "the primary rationale for the hearsay rule--the inability to cross-examine the out-of-court declarant on the veracity of his statement").

This, however, is not one of those rare cases in which the residual hearsay exception applies. I question neither the integrity nor the methodology of the St. Clair Committee. Nevertheless, even assuming that the St. Clair Report fulfills the other conditions of Rule 803(24), it lacks the requisite objective guarantees of trustworthiness to qualify it for admission into evidence.

The Committee, for instance, has no personal knowledge of the events and conditions which form the bases of their findings. The persons the Committee interviewed were not under oath, nor were they exposed to cross-examination which might have revealed weaknesses in their perceptions, memories or veracity. The Committee did not conduct hearings wherein opposing viewpoints might have been aired. These factors by themselves dispute plaintiffs' contention that the Report carries guarantees of trustworthiness sufficient to justify its admission. See, e.g., Osterneck v. E.T. Barwick Industries, Inc., 106 F.R.D. 327, 331-34 (N.D. Ga. 1984) (holding that an investigative report did not meet the trustworthiness requirements of Fed. R. Evid. 803(8) or 803(24), where the investigating committee had no subpoena power, where the witnesses interviewed were not under oath or subject to any penalty for perjury, where no opportunity existed for cross-examination of witnesses, and where the committee could not vouch

23

for the credibility of the witnesses it interviewed or the authenticity of the documents it reviewed).

Perhaps even more importantly, though, the Report bases its findings upon statements by unknown persons who will remain anonymous.[8] As the First Circuit Court of Appeals has recognized, "[a]n unknown source is hardly trustworthy." Ricciardi v. Children's Hosp. Medical Center, 811 F.2d 18, 23 (1st Cir. 1987) (in medical malpractice case, doctor's handwritten note regarding an occurrence during surgery did not meet trustworthiness requirements of Fed. R. Evid. 803(6) or 803(24), where doctor did not have personal knowledge of incident and could not remember from whom he obtained the information).

All of these considerations contribute to the necessary conclusion that the Report does not fall within the narrow category of hearsay evidence so inherently trustworthy as to justify its admission under the residual exception to the hearsay rule. The Report therefore may not come into evidence.

I note that, in addition to being required by the Federal Rules of Evidence, this outcome also alleviates strong policy concerns. If litigants could use the St. Clair Report to prove the existence of a City policy of inadequate police training or indifference to civil rights violations, the City and its officials would be barred from ever obtaining summary judgment in any action

_____

8  In Orders dated June 5, 1992, I denied Plaintiffs' Motion to Compel Appearance of Witness at Deposition and allowed Deponent James D. St. Clair's Motion to Quash Subpoena Requiring Production of Documents and Deposition Testimony, on grounds of qualified privilege.

alleging police misconduct. The Report, in and of itself, would provide a prima facie case against the city and the Commissioner in every case, no matter how frivolous the suit or how isolated the particular incident of misconduct, thereby effectively shifting the burden of proof from the plaintiff to the defendant. Such a grave change in the established system of proof should emanate from the legislature, not from the workings of a an independent investigative committee or from an evidentiary ruling of this court. See Anderson v. City of New York, 657 F. Supp. 1571, 1579 n. 7 (S.D.N.Y. 1987) (in a § 1983 action, refusing to admit a congressional report on police misconduct in New York City because of concerns about the report's trustworthiness and because of "the serious policy implications" outlined above).

Aside from the conclusions in the St. Clair Report, the record is barren of facts which would support a finding that either the City or the Commissioner personally caused Plaintiffs' alleged constitutional deprivations. No admissible evidence justifies an inference that the City or the Commissioner exhibited deliberate indifference to citizens' constitutional rights. On the contrary, the record reveals that the Boston Police Department did have a training program which D'Oyley successfully completed. See Def. Motion at Ex. E; Doyle's Ans. to Plaintiffs' Interrogs. at No. 10. Additionally, the undisputed facts establish that, prior to Mrs. Curran's complaint, O'Doyley had been the subject of no Internal Affairs complaints. D'Oyley Dep. at 73; Commissioner's Ans. to Plaintiffs' Interrogs. at No. 4. Consequently, no basis exists for

25

concluding that either Defendant knew or should have known that O'Doyley might violate Plaintiffs' rights. Finally, contrary to Plaintiffs' conclusory allegations, the record evinces that the Boston Police Department undertook a thorough investigation of Mrs. Curran's complaint which included review by several officials of varying positions. See Def. Motion at Ex. B.

In sum, Plaintiffs have not proven themselves entitled to proceed to trial on their § 1983 claims against Defendants. See Gaudreault, 923 F.2d at 209 (where § 1983 plaintiffs "failed to set forth even a scintilla of evidence" that the city or its officials failed to train its police officers and that this failure amounted to deliberate indifference to constitutional rights, summary judgment for the city and its officials was "manifestly appropriate"). Defendants' motion for summary judgment as to the § 1983 claims, Counts I and II, is therefore allowed.

C.  State Law Claims

1.  Count IV

In addition to their § 1983 claims against the city, the Currans allege liability against the city pursuant to the Massachusetts Tort Claims Act, Mass. Gen. Laws ch. 258 (the "Act"). This statute states in pertinent part:

> Public employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment...

Mass. Gen. Laws ch. 258, § 2.

First, Plaintiffs suggest that the Act makes the city

vicariously liable for the acts of assault and battery and malicious prosecution they allege against D'Oyley. Complaint at Count IV. Section 10 of the Act, however, excludes from the Act's coverage "any claim arising out of an intentional tort, including assault, battery...false arrest...[or] malicious prosecution." Plaintiffs' Complaint expressly alleges that D'Oyley acted "intentionally, willfully, knowingly, maliciously, and purposefully." Id. at ¶ 38. Thus, as a matter of law, the City cannot be held liable for the D'Oyley's alleged misconduct. The City's motion for summary judgment as to Count IV is therefore allowed.

### 2. Counts V-VII

Additionally, Plaintiffs claims that the city was negligent in its hiring and training of Officer D'Oyley, and in its investigation of Mrs. Curran's internal affairs complaint. Id. at Counts V-VII. While the Complaint does not so state, these negligence claims also arise under Mass. Gen. L. ch. 28, § 2; in effect, Plaintiffs charge the city with liability for allegedly tortious omissions on part of the Boston Police Department. See, e.g., Cyran v. Town of Ware, 413 Mass. 452 (1992) (claim of liability against town for negligence on part of town fire department); Nickerson v. Commonwealth, 397 Mass. 476 (1986) (claim of liability against Commonwealth for negligence on part of the Registrar of Motor Vehicles).

In order to recover against the City for negligence, Plaintiffs must show four elements: 1) a legal duty owed by the

Defendant to Plaintiffs; 2) a breach of that duty; 3) injury; and 4) a causal relationship between the breach of duty and the harm suffered. Jorgensen v. Mass. Port Auth., 905 F.2d 515, 522 (1st Cir. 1990); Dinsky v. Town of Framingham, 386 Mass. 801, 804 (1982). None of these required showings come easily to Plaintiffs.

Plaintiffs must first establish that the Boston Police Department owed them a specific duty of care. Prevailing Massachusetts law espouses the public duty rule, "which holds that the employment duties of public servants are generally owed only to the public, and are enforceable only administratively or by criminal proceedings," and not through civil actions by individual plaintiffs. A.L. v. Commonwealth, 402 Mass. 234, 254 (1988) (O'Connor, J., dissenting). Under this basic rule, "no liability attaches for failure to use due care in carrying out general governmental functions such as police or fire protection...because the duty of due care is owed to the general public and not to any specific individual." Dinsky, 386 Mass. at 807 (quoting Tuffley v. Syracuse, 82 App. Div. 2d 110, 114 (N.Y. 1981)). But see Jean W. v. Commonwealth, 414 Mass. 496, 499 (1993) (announcing court's intention to abolish the public duty rule prospectively).

In Irwin v. Ware, 392 Mass. 745 (1984), the Supreme Judicial Court created a "special relationship" exception to the public duty rule. In that case, the court held that a special relationship existed between a police officer who negligently failed to remove an intoxicated motorist from the highway and a member of the public who suffered injury as a result of that failure. Id. at 762. The

court based this conclusion upon the "legislative intent [expressed in various statutes] to protect both intoxicated persons and other users of the highway," and upon "the risk created by the negligence of a municipal employee...of immediate and foreseeable physical injury to persons who cannot reasonably protect themselves from it." _id._, at 756, 762.    _See also Cyran_, 413 Mass. at 458-59 (restating the basis for _Irwin's_ holding).

Since _Irwin_, considerable confusion has surrounded the question as to what circumstances engender a special relationship sufficient to displace the operation of the public duty rule.    _See Jean W._, 414 Mass. at 510 (commenting that, in attempting to draw a line between immune public duties and actionable government negligence, court must engage in a "speculative and unwieldy exercise"); _Cyran_, 413 Mass. at 460-69 (O'Connor, J., concurring) (finding irreconcilable cases decided pursuant to _Irwin_ and expressing desire to overrule _Irwin_).

Unquestionably, though, Massachusetts courts interpret the "special relationship" exception narrowly.    _Carleton v. Town of Framingham_, 34 Mass. App. Ct. 686, 690, _review granted_, 416 Mass. 1102 (1993).    As the court noted in _Jean W._, 414 Mass. at 503, the S.J.C. has allowed potential recovery on the basis of a special relationship in only one case other than _Irwin_.    _See A.L._, 402 Mass. 234.    In both _Irwin_ and _A.L._, moreover, the court's conclusion that a special relationship" existed depended upon the presence of extraordinary factors--statutes in _Irwin_ and a probation agreement in _A.L._--which imparted upon the public servant

a duty to the plaintiffs beyond that owed to the public as a whole.
Cyran, 413 Mass. at 459 (finding no liability against town for
negligence of fire department, since "there is nothing here
comparable to the statutes and the special agreement which were at
the core of those decisions").

Like the plaintiffs in Cyran, the Currans have alleged no
facts which would suggest that a special relationship existed
between themselves and the Boston Police Department such that the
Department owed the Currans a special duty of care beyond the duty
it owed to the public at large.  Consequently, under prevailing
Massachusetts law, the City cannot be held liable for the
negligence with which Plaintiffs charge it.

My decision that summary judgment is appropriate as to these
claims, however, does not hinge upon the absence of a special
relationship between Plaintiffs and the Police Department.  Even
assuming that the Department and its Commissioner owed Plaintiffs
a special duty of care with respect to the Department's hiring and
training of its police officers and with respect to its
investigation of citizen complaints, Plaintiffs have not proven a
possibility of success on their negligence claims.  "The mere
existence of a duty does not create liability: there must also be
a breach of that duty, causation and harm."  Jean W., 414 Mass. at
511.

Plaintiffs have produced no admissible evidence to support
their allegations that the Department failed to exercise reasonable
care in hiring, training or disciplining officers D'Oyley or in

30

investigating the Plaintiffs' grievances. On the contrary, as discussed above, the undisputed evidence shows that D'Oyley completed a significant number of training courses and that his job performance triggered no citizen complaints prior to Mrs. Curran's. Commissioner Ans. to Plaintiffs' Interrogs. at No. 4; D'Oyley's Ans. to Plaintiffs' Interrogs. at No. 10; Def. Motion at Ex. E. In addition, the record demonstrates that the Department undertook an extensive investigation of Mrs. Curran's complaint. Def. Motion at Ex. B. On the basis of that investigation, the Department reasonably found D'Oyley guilty of a single infraction, for which D'Oyley received rebuke. Id.

In sum, even assuming the Department had an enforceable duty to Plaintiffs in this case, Plaintiffs have failed to create a triable issue as to whether the Department breached that duty. Consequently, the city's motion for summary judgment as to Counts V, VI and VII must be granted.

CONCLUSION

As discussed above, Plaintiffs have failed to tender admissible evidence which would support a judgment in their favor on any of their claims against these Defendants. Thus, Defendants' motion for summary judgment is allowed as to all counts; the complaint against these Defendants is dismissed.

SO ORDERED.

_____
United States District Judge

31