UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                              )
SHAWN DRUMGOLD,               )
     Plaintiff                )
                              )
v.                            )   CIVIL ACTION NO. 04-11193-NG
                              )
TIMOTHY CALLAHAN, et. al.,    )
     Defendants               )
_____)

### DEFENDANTS FRANCIS M. ROACHE AND THE CITY OF BOSTONS' STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants, Francis M. Roache (hereinafter "Roache) and the City of Boston, hereby submit the following Statement of Uncontested Material Facts In Support of Their Motion for Summary Judgment in accordance with Local Rule 56.1. The Defendants hereby incorporate and adopt by reference those statements of uncontested material facts submitted in support of motions for summary judgment filed by the other defendants in the case-at-bar.

1. Roache was, at all times relevant to this action, the commissioner of the Boston Police Department. (Exhibit A, Plaintiff's Complaint, ¶ 4).

2. Defendant Richard Walsh (hereinafter "Walsh") was, at all times relevant to this action, a Detective of the Boston Police Department assigned to the Homicide Unit. (Exhibit A, Plaintiff's Complaint, ¶ 7).

3. Defendant Paul Murphy (hereinafter "Murphy") was, at all times relevant to this action, a Detective of the Boston Police Department assigned to the Homicide Unit. (Exhibit A, Plaintiff's Complaint, ¶ 6).

4. Defendant Timothy Callahan (hereinafter "Callahan") was, at all times relevant to this action, a Detective Sergeant of the Boston Police Department assigned to the Homicide Unit. (Exhibit A, Plaintiff's Complaint, ¶ 5).

5. Rule 109 of the Boston Police Department Rules and Procedures outlines the "discipline procedure" of the Boston Police Department. (Exhibit B, Rule 109).

6. Specifically, Rule 109 outlines the procedure of the Boston Police Department when a written complaint is filed, including notification of the Internal Affairs Division. (Exhibit B, Rule 109).

7. Further, Rule 109 provides a detailed account of how investigations regarding complaints should be carried out. (Exhibit B, Rule 109).

8. Roache was appointed as a Boston Police Officer on August 28, 1968. (Exhibit C, Roache Depo, p. 6).

9. Roache obtained a bachelors degree from Boston State College in 1975 and a master's degree in public management, also from Boston State College, in 1980. (Exhibit C, Roache Depo, p. 6).

10. Roache also graduated from the National Academy of the Federal Bureau of Investigation in 1982. (Exhibit C, Roache Depo, p. 6).

11. Roache was promoted to the rank of sergeant in or about 1975. (Exhibit C, Roache Depo, p. 6).

12. Roache was appointed as an acting lieutenant in 1983 and assigned to the Community Disorders Unit. (Exhibit C, Roache Depo, pp. 6-7).

13. Roache was appointed Commissioner of the Police Department on February 1, 1985 and held that position within the department until he left on June 26, 1993. (Exhibit C, Roache Depo, pp. 7-8).

14. Roache was succeeded as police commissioner by his second-in-command, Superintendent William Bratton. (Exhibit C, Roache Depo, p. 8).

15. The decision for who would be assigned as the head of the Homicide Unit of the Boston Police Department was made in consultation with the Suffolk County District Attorney's office and the superintendent in charge of the Bureau of Investigative Services which oversaw the operations of the Homicide Unit. (Exhibit C, Roache Depo, pp. 9-10).

16. In his position as Commissioner, Roache delegated responsibilities to the various bureau chiefs under his command. (Exhibit C, Roache Depo, p. 10).

17. By statute, the district attorney for Suffolk County has direct control over all homicide investigations within his jurisdiction. (Exhibit C, Roache Depo, p. 11; M.G.L. c. 38, § 4).

18. It was Roache's practice not to involve himself with personnel issues pertaining the Homicide Unit because of the unique status of that unit within the Boston Police Department in relation to the Suffolk County District Attorney's office though he was open to discuss any issues that they might bring to him. (Exhibit C, Roache Depo, pp. 11, 58-59, 62).

19. During Roache's tenure as Commissioner, Newman Flanagan and Ralph Martin served as the District Attorneys for Suffolk County. (Exhibit C, Roache Depo, p. 12).

20. Roache came to know Callahan when he ordered Callahan's reduction in rank from acting sergeant due to Callahan's failure to pass the sergeant's civil service exam some time in 1986. (Exhibit C, Roache Depo, p. 13).

21. Within one year of Roache being appointed Commissioner, he caused to be reinstated the holding of civil service promotional examinations which had not been held for the previous eight years. (Exhibit C, Roache Depo, pp. 13-14).

22. Roache did not have any personal involvement in the investigation of the homicide of Tiffany Moore and the prosecution of Shawn Drumgold. (Exhibit C, Roache Depo, pp. 14-15).

23. In addition to having an "open-door policy" with his bureau chiefs, Roache and his command staff would hold regular meetings to discuss a wide range of issues for the Boston Police Department and to set goals, objectives and priorities and hold the department and its various subdivisions accountable for meeting those goals. (Exhibit C, Roache Depo, pp. 15-16, 37, 62).

24. Among the various responsibilities Roache delegated within the department, the awards board, comprised of officers and command staff and Superintendent Paul Evans, would handle the issuance of awards and citations to officers. (Exhibit C, Roache Depo, pp. 16-17).

25. If an issue of officer misconduct arose with regard to testimony in court or if a civil or criminal complaint was brought against an officer, Roache relied on

the legal department for the City of Boston and its corporation counsel to inform him of any issues that required his attention. (Exhibit C, Roache Depo, pp. 20-23).

26. Roache asserts that as Commissioner, all personnel in the department were held accountable for their performance . (Exhibit C, Roache Depo, p. 36).

27. Roache asserts that during his tenure as Commissioner he felt the Boston Police Academy which offered in-serve training to personnel to be outstanding. (Exhibit C, Roache Depo, p. 38).

28. Roache asserts that while he believed Robert Dunford who was in command of the Boston Police Academy during his tenure as Commissioner did an outstanding job, Roache still was never satisfied with the state of training and committed to constantly improving the training regimen. (Exhibit C, Roache Depo, p. 40).

29. Roache delegated to Superintendent Paul Evans the responsibility of maintaining the rules and regulations of the department and heading up the committee charged with producing policies and procedures manuals for the department. (Exhibit C, Roache Depo, p. 41).

30. During his tenure as Commissioner, the Boston Police Department had a policy and procedures manual. (Exhibit C, Roache Depo, pp. 41-42).

31. Roache delegated all responsibility for performance appraisals to his bureau chiefs and that the department constantly appraised the performance of its personnel. (Exhibit C, Roache Depo, pp. 43-44).

32. Roache asserts that the department was constantly training its personnel and recognized the need for detectives, especially the critical need for those investigating homicides, to be state of the art in the training they received. (Exhibit C, Roache Depo, pp. 45, 47-49).

33. Roache delegated the responsibility of training homicide detectives to the superintendent charge of the Bureau of Investigative Services. (Exhibit C, Roache Depo, p. 46).

34. Callahan attended the MBTA Police Academy prior to becoming a patrolman for the MBTA Police in 1968. (Exhibit D, Callahan Depo, p. 6).

35. Callahan attended the Boston Police Academy prior to becoming a police officer for the City of Boston. (Exhibit D, Callahan Depo, p. 7).

36. Callahan was appointed as a Boston Police Officer on October 7, 1970. (Exhibit E, Callahan Personnel Information, p. cob0015).

37. Callahan obtained a bachelor of science degree from Northeastern University in 1971. (Exhibit D, Callahan Depo, p. 5; Exhibit E, Callahan Personnel Information, pp. cob0086, cob0092).

38. Callahan obtained a master's degree in public/urban affairs from Boston State College in 1982. (Exhibit D, Callahan Depo, pp. 7-8; Exhibit E, Callahan Personnel Information, pp. cob0086, cob0092).

39. Callahan obtained a law degree from Massachusetts School of Law in 1992. (Exhibit D, Callahan Depo, p. 8; Exhibit E, Callahan Personnel Information, pp. cob0086, cob0088).

40.  Callahan was promoted to detective in the mid-1970's. (Exhibit D, Callahan Depo, pp. 11-12).

41.  Callahan attended a two day seminar in search and seizure which was sponsored by the Massachusetts Criminal Justice Training Council at Suffolk University in Boston on December 14-15, 1978. (Exhibit E, Callahan Personnel Information, p. cob0232)

42.  Callahan also attended in-service training at the Boston Police Academy for a period of 2-3 days each year with regard to changes in state laws affecting police officers and to update his CPR certification. (Exhibit D, Callahan Depo, pp. 13-14).

43.  When Callahan became a detective, in addition to receiving on the job training from experienced officers, he also attended a "gambling school" offered by the Federal Bureau of Investigation. (Exhibit D, Callahan Depo, p. 12).

44.  Callahan became a sergeant in 1988 and attended a training program for sergeants at the Boston Police Academy that lasted several weeks wherein he took classes on criminal law, constitutional law, administrative procedures, first aid and investigations. (Exhibit D, Callahan Depo, pp. 21-25).

45.  When Callahan was assigned as a detective to the Homicide Unit, he attended a "homicide school." (Exhibit D, Callahan Depo, pp. 12-13).

46.  Callahan was assigned to the Homicide Unit in August 1988. (Exhibit D, Callahan Depo, p. 20).

47.  Callahan was promoted to the rank of Sergeant Detective in or about November 1989. (Exhibit D, Callahan Depo, pp. 26-27).

48. When Callahan was first assigned to the Homicide Unit in 1988, Lt. John Daley was the head of the Homicide Unit. (Exhibit D, Callahan Depo, p. 28).

49. Lt. Daley left the Homicide Unit in August 1989, prior to the trial of Shawn Drumgold for the murder of Tiffany Moore, and was replaced by Lt. Edward McNelley. (Exhibit D, Callahan Depo, p. 29).

50. Officers in the Homicide Unit were organized into six (6) squads, three on days and three on nights. (Exhibit D, Callahan Depo, pp. 29-30).

51. Each squad in the Homicide Unit was comprised of three people, one sergeant and two detectives. (Exhibit D, Callahan Depo, p. 30).

52. The detectives in each squad would report to the sergeant in their squad, and the squad sergeant would report to the lieutenant in charge of the Homicide Unit. (Exhibit D, Callahan Depo, p. 31).

53. When Callahan was assigned to the Homicide Unit, he attended a homicide school or program for law enforcement officers out of Poughkeepsie, New York at the behest of the Boston Police Department. (Exhibit D, Callahan Depo, pp. 31-32).

54. This program in Poughkeepsie, New York included training relative to homicides and their investigations, forensics, crime labs and interviewing. (Exhibit D, Callahan Depo, p. 22).

55. It was mandatory for all investigatory personnel in the Homicide Unit to attend a course regarding homicide investigations. (Exhibit D, Callahan Depo, pp. 34, 84).

56. Callahan was never the subject of an investigation by Internal Affairs as he had no complaints against him. (Exhibit D, Callahan Depo, pp. 38-39).

57. The head of the Homicide Unit reported to both the head of the homicide unit for the Suffolk County District Attorney's office and Captain Mills, the captain detective in charge of the citywide units of the Boston Police Department. (Exhibit D, Callahan Depo, pp. 50-52).

58. Captain Mills, in turn, reported to an assistant chief of the Bureau of Investigative Services and that assistant reported to Deputy Superintendent Joseph Saia who was the head of that bureau. (Exhibit D, Callahan Depo, pp. 51-52).

59. When Callahan first started at the Homicide Unit in 1988 there were regular meetings of the squads with the head of the Homicide Unit, but over time those meetings stopped because of the increased workload of the unit. (Exhibit D, Callahan Depo, p. 53).

60. Callahan was personally assigned by Deputy Superintendent Joseph Saia to become active in the investigation of the homicide of Tiffany Moore in May or June of 1989. (Exhibit D, Callahan Depo, pp. 61-63).

61. Walsh was appointed as a Boston Police Officer on October 7, 1970. (Exhbit F, Walsh Depo, p. 12; Exhibit G, Walsh Personnel Information, p. cob0540).

62. Walsh became a detective of the Boston Police Department in the mid-1970's. (Exhibit F, Walsh Depo, p. 16).

63. Walsh obtained a bachelor of science degree from Northeastern University in 1979 in criminal justice. (Exhibit G, Walsh Personnel Information, pp. cob0586-0590).

64. Walsh was assigned to the night unit of the Homicide Unit of the Boston Police Department in 1980. (Exhibit F, Walsh Depo, p. 16).

65. When Walsh joined the Homicide Unit, Lt. John Daley was the head of the Unit. (Exhibit F, Walsh Depo, pp. 16-17).

66. When Walsh started with the Homicide Unit he received on the job training and took classes at Northeastern University towards a degree in criminal justice. (Exhibit F, Walsh Depo, pp. 17-18).

67. Walsh received formal training annually at the Boston Police Academy by participating in mandatory in-service training where seminars were also available. (Exhibit F, Walsh Depo, pp. 18-19).

68. Walsh also participated in various seminars, including at the University of Massachusetts in forensic science, one at Babson College and a homicide seminar at the University of Delaware from July 14-16, 1986. (Exhibit F, Walsh Depo, pp. 19-20; Exhibit G, Walsh Personnel Information, p. cob0661).

69. Superior officers on a daily basis reviewed the performance of their subordinates. (Exhibit F, Walsh Depo, pp. 22-23).

70. Lt. Daley would, as a matter of routine, confer with the detectives of the Homicide Unit on a daily basis. (Exhibit H, Daley Depo, p. 18).

71. Walsh received formal training on photo identification at both the law enforcement academy and during in-service sessions provided by the Boston Police Department. (Exhibit F, Walsh Depo, pp. 65-66).

72. Walsh received a textbook on homicide investigations while at the seminar at the University of Delaware authored by Vernon J. Geberth and believing it to be of value to the department gave it to Lt. Daley. (Exhibit F, Walsh Depo, pp. 20-22; Exhibit H, Daley Depo, pp. 10-12).

73. Daley believed the course and text to be of such value that he decided to send as many people as he could to the course. (Exhibit F, Walsh Depo, pp. 21-22; Exhibit H, Daley Depo, pp. 10-12, ).

74. Murphy was appointed as a Boston Police Officer on October 7, 1970. (Exhibit I, Murphy Personnel Information, p. cob0265).

75. Murphy obtained a bachelor of science degree in law enforcement from Northeastern University in 1978. (Exhibit I, Murphy Personnel Information, pp. cob0318, cob0322-0323).

76. Murphy later obtained a law degree from Southern New England School of Law in 1997. (Exhibit I, Murphy Personnel Information, pp. cob0318, cob0320-0321).

77. Murphy attended a course on the collection and preservation of physical evidence offered by the Federal Bureau of Investigation from October 6-10, 1986. (Exhibit I, Murphy Personnel Information, p. cob0390).

78. Murphy also attended a seminar on homicide investigations offered by the National Law Enforcement Institute on August 4-5, 1986. (Exhibit I, Murphy

       Personnel Information, p. cob0391) and the practical homicide investigation seminar offered at the University of Delaware, and taught by Vernon Geberth, from December 2-4, 1985.  (Exhibit I, Murphy Personnel Information, p. cob0411).

79.    Murphy also attended five separate classes offered by the Massachusetts Criminal Justice Training Council from November 1978 through March 1979 in K-9 drug detection and dog handling.  (Exhibit I, Murphy Personnel Information, pp. cob0422-0428).

80.    Murphy was promoted to detective on January 24, 1979 and assigned to various specialized units including the Vice Control Unit and Homicide. (Exhibit I, Murphy Personnel Information, p. cob0265).

81.    On February 14, 1995, Murphy was promoted to the rank of Sergeant and assigned to Area C-6.  (Exhibit I, Murphy Personnel Information, p. cob0265).

82.    From September 18-25, 1995, Murphy participated as an oral examiner for the City of Baltimore Civil Service Commission with regard to their police sergeant oral examination.  (Exhibit I, Murphy Personnel Information, pp. cob0329-0330).

83.    While serving in the Homicide Unit of the Boston Police Department, Murphy and Walsh were "partners" assigned to the same squad of detectives.  (Exhibit D, Callahan Depo, p. 61; Exhibit F, Walsh Depo, p. 17).

84.    Walsh and Murphy were the original detectives assigned with the investigation of the homicide of Tiffany Moore beginning on August 19, 1988.  (Exhibit D, Callahan Depo, p. 61).

85. At the time of his death on January 4, 2001, Murphy held the rank of Sergeant Detective and was assigned to the Internal Affairs Division. (Exhibit I, Murphy Personnel Information, p. cob0265).

Respectfully submitted,
**Defendants, Francis M. Roache and the City of Boston**
By their attorneys,

/s/ John P. Roache_____
John P. Roache (BBO# 421680)
Patrick J. Donnelly (BBO# 651113)
Roache & Associates, P.C.
66 Long Wharf
Boston, Massachusetts 02110
Tel.: (617) 367-0330

Dated: October 1, 2007

CERTIFICATE OF SERVICE

I, John P. Roache, hereby certify that on October 1, 2007, I served a copy of the above document upon counsel of record by filing with the ECF/Pacer Case Management System.

/s/ John P. Roache_____
John P. Roache