# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

SHAWN DRUMGOLD
       Plaintiff, )

v. )       C.A. NO.: 04-11193NG

TIMOTHY CALLAHAN, FRANCIS M.
ROACHE, PAUL MURPHY, RICHARD
WALSH, and THE CITY OF BOSTON,
       Defendants.

_____)

## CONSOLIDATED STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTIONS FOR SUMMARY JUDGMENT OF DEFENDANTS RICHARD WALSH AND PAUL MURPHY

The Defendant, Richard Walsh ("Walsh"), hereby submits this statement of undisputed material facts in support of his Motion for Summary Judgment against the Plaintiff, Shawn Drumgold ("Drumgold").

## I.    BACKGROUND

### A.  Murder of twelve-year-old Darlene Tiffany Moore

1.  On August 19, 1988, twelve-year-old Darlene Tiffany Moore ("Moore") was shot and killed. **Exhibit ("Ex.") 1**, Complaint, dated June 3, 2004 at ¶ 9; **Ex. 2**, (Search Warrant) Affidavit of Detective Richard W. Walsh at 1. *See also Commonwealth v. Drumgold*, 423 Mass. 230, 233 (1996).

2.  Just prior to the shooting, Moore was sitting on a mailbox near the corner of Humboldt Avenue and Homestead Street in Roxbury, MA and was surrounded by a group of teenagers. **Ex. 2** at 1. *See also Commonwealth v. Drumgold*, 423 Mass. at 233.

3.  The Edison plant was directly behind the mailboxes and enclosed by a chain-link fence. **Ex. 2** at 1. *See also Commonwealth v. Drumgold*, 423 Mass. at 233.

4.  Witnesses in the group of teenagers observed two or three males approach them from behind the chain-link fence, fire several shots towards the group and flee through the Edison property in the direction of Homestead Street. **Ex. 2** at 1. *See also Commonwealth v. Drumgold*, 423 Mass. at 233.

5. Three bullets struck and killed Moore. *See Commonwealth v. Drumgold*, 423 Mass. at 233.

6. Witnesses in the group of teenagers observed that the shooters were wearing black Adidas sweat suits and Halloween-type masks. **Ex. 2** at 1. *See infra* Section I(B).

**B.  Initial Investigation**

7. Murphy was not on duty the night of August 19, 1989.  **Ex. 15(F)** at 35

8. Walsh and co-defendant Paul Murphy ("Murphy"), were assigned to the investigation of the Moore homicide. **Ex. 25(A)**, November 15, 2006 Deposition of John Daley at 19. **Ex. 37**, October 1, 2007 Affidavit of Richard Walsh ¶ 1.

9. During the initial investigation, Walsh and Murphy obtained recorded statements and interviewed numerous witnesses. *See infra*. *See also* **Ex. 37** at ¶¶ 2-3.

10. Tyron Brewer, Travis Johnson, Chris Cheney ("Cheney"), Eric Johnson, Troy Jenkins, Kevin Lucas, Vantrell McPherson, Corinne Delahunt, Dwight Morris, and Mike Watson were among the group of teenagers near mailboxes at the corner of Homestead and Humboldt at the time of the Moore homicide. *See* **Ex. 4**, August 20, 1988 Recorded Statement of Tyron Brewer at 2; **Ex. 5**, August 20, 1988 Recorded Statement of Travis Johnson at 1; **Ex. 6**, August 21, 1988 Recorded Statement of Chris Cheney at 1; **Ex. 7**, August 24, 1988 Report of Investigation.

11. Travis Johnson observed 2 people who were wearing masks and black Adidas suits and observed white on one of the running suits. **Ex. 5** at 2-3, 7.

12. At approximately 2:00 p.m. on August 19, 1988, Travis Johnson observed Drumgold wearing a black running suit with white on the back. **Ex. 5** at 5-7.

13. Cheney observed 2 males who were running towards the mailboxes and shooting and who were wearing masks and black Adidas sweat suits with the Adidas mark on the side of the hip. **Ex. 6** at 4-7.

14. Cheney stated that he had observed Drumgold wearing a black sweat suit with a hood about 3 or 4 hours before the shooting. **Ex. 6** at 7.

15. Mervin Reese ("Reese") had observed Drumgold wearing a black Adidas suit with white marks down the side of the pants and Adidas printed in red on the back on August 19, 1988. **Ex. 8**, August 20, 1988 Recorded Statement of Mervin Reese at 7.

16. Reese believed the shooting happened because Drumgold and/or Terrance Taylor a/k/a Lug ("Taylor") thought Reese, Cheney and Troy Jenkins shot Romero Holiday ("Holiday"). **Ex. 8** at 9-10.

17. When Christopher Cousins ("Cousins") went to visit Holiday at the Boston City Hospital, Drumgold and Taylor were in Holiday's room. **Ex. 3**, August 25, 1989 Recorded Statement of Christopher Cousins at 5.

18. At that time, Cousins overheard a conversation regarding "who did it, and if they [were going] to get them" and retaliate. **Ex.** 3 at 5-6.

19. On August 26, 1988, Walsh and Murphy interviewed and showed a photo array to Tracie Peaks who identified Drumgold as the male that she observed coming from the direction of the Edison building after hearing gunshots. **Ex. 2** at 3.

20. The array contained 16 photos and contained photos of Drumgold, Taylor, London Williams and Theron Davis a/k/a Apple. **Ex. 2** at 3; **Ex. 9**, August 26, 1988 Report of Investigation; **Ex. 15(E)**, February 19, 2007 Deposition of Richard Walsh at 165; **Ex. 20(C)**, July 17, 2007 Deposition of Shawn Drumgold at 196-198.

21. On August 26, 1988, Walsh and Murphy interviewed Mary Alexander who, after hearing gunshots, observed 2 males climbing over the back fence of the Edison plant – she observed one of the males place a handgun in his waistband and that both were wearing dark clothing. **Ex. 9**. *See also* **Ex. 15(C)**, October 6, 1989 Trial Testimony of Richard Walsh at 19; **Ex. 21(B)**, October 3, 1989 Trial Testimony of Mary Alexander at 153-159.

22. Upon showing Mary the photo array, Walsh and Murphy observed Mary pick up Drumgold's photo several times but did not make an identification. **Ex. 9**; **Ex. 23(B)**, October 6, 1989 Trial Testimony of Paul Murphy at 20-21; **Ex. 15(B)**, October 5, 1989 Trial Testimony of Richard Walsh at 156-157; **Ex. 15(D)**, August 5, 2003 New Trial Testimony of Richard Walsh at 69, 75-76.

23. On August 30, 1988, Walsh received information that Drumgold and Anthony went to the home of Madelyn and/or Rhonda Hamilton in New York from August 26 to 27, 1988. **Ex. 2** at 5. *See also* **Ex. 10(A)**, March 7, 2007 Affidavit of Madelyn Powell Hamilton at ¶ 4; **Ex. 10(B)**, March 13, 2007 Deposition of Madelyn Powell Hamilton at 24-25, 41-43, 51, 53, 62; **Ex. 11**, May 22, 1989 Memorandum to Phil Beauchesne from Richard Dahill.

24. At the time of their visit to New York, both Drumgold and Anthony were observed with guns. **Ex. 2** at 5. *See also* **Ex. 10(A)** at ¶ 4; **Ex. 10(B)** at 44-47, 51-54, 62, 86, 91, 109-110, 126; **Ex. 11**.

25. On August 31, 1988, Walsh and Murphy took Anthony's recorded statement. **Ex. 12(A)**, August 31, 1988 Recorded Statement of Antonio Anthony; **Ex. 2** at 6-8.

3

26. Anthony stated that he observed Drumgold and Taylor with guns on August 19, 1988. **Ex. 12(A)** at 1-3. *See also* **Ex. 12(C)**, July 30, 2003 New Trial Testimony of Antonio Anthony at 110.

27. Anthony further stated that he observed Drumgold wearing a black Adidas suit. **Ex. 12(A)** at 5, 15.

28. Anthony stated that he next saw Drumgold when they went to New York and that he and Drumgold took the two guns to New York that Anthony had observed Drumgold and Taylor with on August 19, 1988. **Ex. 12(A)** at 8-9.

29. Walsh also obtained information regarding Drumgold from other police officers who were getting information from the street. **Ex. 15(D)** at 102-105, 131-132; *see also* **Ex. 15(B)** at 132-159.

30. In May 1989, co-defendant Timothy Callahan ("Callahan") took over the investigation of the Moore homicide. **Ex. 15(B)** at 162; **Ex. 13(A)**, October 10, 1989 Trial Testimony of Timothy Callahan at 111; **Ex. 13(D)**, May 31, 2007 Deposition of Timothy Callahan at 265; **Ex. 37** at ¶ 4.

31. As of that time, Walsh and Murphy were no longer involved in the investigation. **Ex. 13(D)** at 265-266; **Ex. 37** at ¶ 5.

32. Walsh did not participate in any manner in the trial preparation relative to the prosecution of Drumgold. **Ex. 13(D)** at 267, 270-271; **Ex. 14(C)**, August 4, 2006 Deposition of Steven Rappaport, Esq., at 78; **Ex. 37** at ¶ 6.

33. Walsh does not recall receiving any further information on the Moore case after the grand jury, prior to turning over the file to Callahan. **Ex. 15(C)** at 16-17.

## C. <u>Criminal Proceedings</u>

34. On August 29, 1988, a recorded statement of Drumgold was taken by Walsh and Murphy from approximately 1:30 p.m. to 2:20 p.m. **Ex. 20(A)**, August 29, 1988 Recorded Statement of Shawn Drumgold.

35. Prior to making a statement, Drumgold was read, acknowledged and waived his *Miranda* rights. **Ex. 20(A)** at 1-2, 19. *See also* **Ex. 2** at 4; **Ex. 23(A)**, March 2, 1989 Testimony of Paul Murphy at 112, 115-116.

36. Drumgold has testified that the statement he gave was accurate and truthful. **Ex. 20(C)** at 193-194.

37. In this civil action, Drumgold claims that he is entitled to recovery from Walsh because Walsh and Murphy willfully disregarded a district court order by Judge Martin not to interrogate Drumgold. **Ex. 1** at ¶ 15.

38. Prior to taking Drumgold's statement, Walsh had no knowledge that there was an order not to interrogate Drumgold. *See* **Ex. 15(A)**, March 2, 1989 Testimony of Richard Walsh at 53-101 *generally* and at 87-88, 93, 99-100 *specifically*. *See also* **Ex. 25(A)** at 28, 32; **Ex. 25(B)**, February 21, 2007 Deposition of John Daley at 194, 196; **Ex. 37** at ¶¶ 7-9.

39. Drumgold moved to suppress his recorded statement and to dismiss the indictment entered against him based on alleged "prosecutorial misconduct" in obtaining the statement. *See* **Ex. 24**, *Commonwealth v. Drumgold and Taylor*, Crim. A. Nos. 071882/83, at 1 (Mass. Super. May 18, 1989) (Consolidated Memorandum on Defendant Shawn Drumgold's Motion to Dismiss for Prosecutorial Misconduct; Defendants' Motions to Suppress Statements; Defendants' Motions to Dismiss for Insufficient Evidence Before Grand Jury and Impairment of Grand Jury Proceedings) (Volterra, J.).

40. On May 18, 1989, Judge Volterra granted Drumgold's motion to suppress. **Ex. 24** at 2.

41. However, Judge Volterra denied Drumgold's motion to dismiss. **Ex. 24** at 2.

42. In doing so, Judge Volterra made no findings of fact with respect to Walsh's knowledge, or lack thereof, of the district court's order not to interrogate Drumgold. *See* **Ex. 24** *generally* at 8- and *specifically* at 24 n. 13.

43. Moreover, Judge Volterra specifically stated: "the conduct of the police in this case does not deprive [Drumgold] of a fair trial since suppression of the statement is sufficient to cure any prejudice." **Ex. 24** at 2.

44. On July 16, 1996, the Massachusetts Supreme Judicial Court ("SJC") affirmed Drumgold's conviction and found that Judge Volterra "correctly denied [Drumgold's] motion to dismiss the indictment on account of prosecutorial misconduct." *See Commonwealth v. Drumgold*, 423 Mass. at 240-246.

45. The Suffolk County District Attorney's office presented evidence to the grand jury on September 8, 1988. *See* **Ex. 17(A)**, September 8, 1988 Grand Jury Testimony of Tracie Peaks.

46. Drumgold was represented by Steven Rappaport, Esq. ("Attorney Rappaport") in the underlying criminal matter. **Ex. 14(C)** at 18-19.

47. Drumgold also moved to dismiss the indictment on grounds of insufficiency of evidence and impairment of grand jury proceedings. *See* **Ex. 16**; **Ex. 24** at 1.

48. Judge Volterra denied Drumgold's motion to dismiss on this ground as well on May 18, 1989. **Ex. 16**; **Ex. 24** at 2, 28.

49. In doing so, Judge Volterra specifically found "that there was sufficient circumstantial evidence before the grand jury amounting to probable cause to arrest [Drumgold] for the crime." **Ex. 24** at 28.

50. Judge Volterra also found "that the prosecution's failure to present other evidence in this case did not impair the integrity of the grand jury proceedings." **Ex. 24** at 28.

51. On July 16, 1996, the SJC affirmed Drumgold's conviction and found that Judge Volterra "did not err in refusing to dismiss the indictment against [Drumgold] on the ground that the grand jury proceedings were impaired." *See Commonwealth v. Drumgold*, 423 Mass. at 235-240.

52. Taylor was also indicted for the Moore homicide.  Taylor was represented by Bob George, Esq., in the underlying criminal trial. *See* **Ex. 14(C)** at 66-67, 130-132; **Ex. 14(D)** at 209-211.

53. Jury selection began on September 27, 1989. **Ex. 16**.

54. Trial commenced on October 2, 1989 and concluded on October 13, 1989 when the jury returned a verdict of guilty for first-degree murder and Drumgold was sentenced to life in prison. **Ex. 1**, ¶ 12; **Ex. 16**.

55. During the course of the trial, the Commonwealth called 17 witnesses to testify and Drumgold called 34 witnesses, including Drumgold, to testify.  *See* **Ex. 35**, Criminal Trial Witness Indices.

56. The District Attorney's office made the decisions regarding what witnesses would be called on behalf of the Commonwealth and prepared said witnesses. **Ex. 13(D)** at 267.

57. On July 18, 1996, the Supreme Judicial Court affirmed Drumgold's conviction and orders denying Drumgold's two post-conviction motions for a new trial. *See Commonwealth v. Drumgold*, 423 Mass. 230 (1996).

58. On March 11, 2002, Drumgold filed a third motion for a new trial. **Ex. 16**.

59. An evidentiary hearing on Drumgold's motion commenced on July 29, 2003 and concluded on August 6, 2003. **Ex. 16**.

60. Among the witnesses who testified at Drumgold's new trial hearing were Tracie Peaks, Vantrell McPherson and Ricky Evans, who had also testified at the underlying criminal trial.  Other witnesses included Olisa Graham, Gemini Hullum, Lola Alexander and Antonio Anthony, who did not testify at Drumgold's criminal trial. **Ex. 34**, Commonwealth's Motion for Evidentiary Hearing on Defendant's (Third) Motion for New Trial Witness List; **Ex. 35**.; **Ex. 36**, New Trial Witness Testimony Indices.

61. Drumgold was released in November 2003 after being granted a new trial and after the district attorney entered a *nolle prosequi*. *See* **Ex. 1**, ¶ 13; **Ex. 16**.

62. Attorney Rappaport testified that he shared investigative tasks with Taylor's defense team. **Ex. 14(B)**, August 4, 2003 New Trial Testimony of Steven Rappaport, Esq., at 28; **Ex. 14(C)** at 63-67.

63. Attorney Rappaport testified that his emphasis at trial was a third-party culprit defense to show the jury that there was some other person or persons with motive, means and opportunity to commit the crime. **Ex. 14(C)** 66, 95; **Ex. 14(D)**, February 3, 2007 Deposition of Steven Rappaport, Esq., at 187-191.

64. Attorney Rappaport testified that he was not as prepared with respect to Drumgold's alibi defense as he would have been had Robert George, Esq., counsel for Taylor, not been involved into the case and that he was not relying on an alibi defense. **Ex. 14(C)** at 66-67, 133; **Ex. 14(D)** at 209-210.

65. Attorney Rappaport testified that Attorney George took primary responsibility for the 23 Sonoma Street alibi defense, in part, because Taylor was more linked to the address than Drumgold. **Ex. 14(C)** at 65-66, 130-131.

66. Attorney Rappaport testified that after Taylor pleaded the Fifth Amendment at trial, he lost all trust and faith in Attorney George and decided not to trust anything Attorney George had done in the case. **Ex. 14(C)** at 130, 132; **Ex. 14(D)** at 210-211; **Ex. 33,** *Commonwealth v. Drumgold*, Crim. A. No. 071882-3, at 2, 5 (Mass. Super. June 30, 1994) (Memorandum of Decision on Defendant's Motion for Reconsideration of Motion for a New Trial).

67. Attorney Rappaport testified that, as a result, he had concern whether there would be further damage to the case if he called the residents of 23 Sonoma Street as witnesses because of Taylor's association with that address. **Ex. 14(C)** at 131-132, 140-141, 149-150, 153; **Ex. 14(D)** at 216-217, 234.

68. Attorney Rappaport made a tactical decision not to call anyone from Sonoma Street as a defense witness. **Ex. 14(C)** at 153-155.

69. In or before 1993, Rosemary Curran Scapicchio, Esq. ("Attorney Scapicchio") took over as Drumgold's criminal counsel. *See* **Ex. 16**.

70. Investigator Scott Keller assisted Scapicchio with respect to Drumgold's motion for a new trial. *See* **Ex. 19(A); Ex. 19(B)**.

71. Drumgold agrees he was provided with all police reports relative to the investigation of the case prior to trial. **Ex. 20(C)** at 297.

## II.  TESTIMONY AND EVIDENCE RELEVANT TO CLAIMS AND DEFENSES

### A.  Tracie Peaks

72.  Drumgold claims that Walsh pressured Tracie Peaks ("Tracie") to identify Drumgold and that Walsh threatened to arrest Peaks and put her in jail if she did not cooperate. **Ex. 1** at ¶ 14(i)(h).

73.  On August 26, 1988, Walsh and Murphy spoke to Tracie Peaks. **Ex. 2** at 3.

74.  This is the only time that Tracie recalls speaking to police or law enforcement regarding the Moore homicide. **Ex. 17(C)**, July 31, 2003 New Trial Testimony of Tracie Peaks at 94-95; **Ex. 17(D)** April 28, 2006 Deposition of Tracie Peaks at 153, 160-161; **Ex. 17(E)**, September 15, 2006 Deposition of Tracie Peaks at 43. *See also* **Ex. 15(D)** at 95-100.

75.  At that time, Tracie was shown a photo array of 16 color photos. **Ex. 2** at 3.

76.  Tracie testified that she was shown a series of photos that were placed in two rows. **Ex. 17(E)** at 32-36, 70-71.

77.  Tracie picked out the photo of Drumgold as somebody that she knew from around the neighborhood. **Ex. 17(E)** at 74.

78.  On September 8, 1988, Tracie testified before the grand jury. **Ex. 17(A)**.

79.  Tracie testified that she answered questions before the grand jury to the best of her ability. **Ex. 17(E)** at 41-42.

80.  On October 3, 1989, Tracie testified at Drumgold's criminal trial. **Ex. 17(B)**, October 3, 1989 Trial Testimony of Tracie Peaks.

81.  Tracie testified that she testified to the best of her ability at Drumgold's criminal trial. **Ex. 17(E)** at 45; **Ex. 17(C)** at 122-123.

82.  No one threatened or intimidated Tracie or suggested to Tracie what she should say when called as a witness. **Ex. 17(C)** at 123; **Ex. 17(D)** at 160-161; **Ex. 17(E)** at 53-56.

83.  During the underlying criminal proceedings, Tracie testified that prior to the Moore homicide she had known Drumgold from the neighborhood and had seen him frequently. **Ex. 17(A)** at 127-128; **Ex. 17(B)** at 205, 208-209.

84.  Tracie testified that at approximately 9:20 or 9:30 p.m. on August 19, 1988, she was in her home at 72 Homestead Street when she heard gunshots. **Ex. 17(A)** at 125-126; **Ex. 17(B)** at 202-203; **Ex. 17(E)** at 13, 17. *See Commonwealth v. Drumgold*, 423 Mass. at 234.

85. Tracie testified that she then went downstairs where she observed 2 males coming from the direction of the Edison plant. **Ex. 17(A)** at 125-126; **Ex. 17(B)** at 202-203. *See Commonwealth v. Drumgold*, 423 Mass. at 234.

86. Tracie testified that she recognized Drumgold as one of the two men. **Ex. 17(B)** at 203-209. *See Commonwealth v. Drumgold*, 423 Mass. at 234.

87. Tracie testified that Drumgold was walking, not running. **Ex. 17(B)** at 204, 206-207. *See Commonwealth v. Drumgold*, 423 Mass. at 234.

88. Tracie testified that Drumgold was wearing black jeans, a black turtleneck and black sneakers. **Ex. 17(A)** at 127-128; **Ex. 17(B)** at 211-216. *See Commonwealth v. Drumgold*, 423 Mass. at 234.

89. Tracie testified that she spoke to Walsh and co-defendant Murphy about a week after the shooting. **Ex. 17(B)** at 209.

90. Tracie testified that when they asked if she saw anyone coming from the area of Humboldt Avenue, she responded that she saw Drumgold walking down the street. **Ex. 17(B)** at 209.

91. Tracie further testified that she knew who Drumgold was before she saw any photos of him and that she had no problem picking out Drumgold's photo. **Ex. 17(B)** at 209-211.

92. On cross-examination by Drumgold's lawyer, Tracy did not retreat from her direct testimony and testified that she saw Drumgold as she looked out her door. **Ex. 17(B)** at 208-209.

93. Tracy acknowledged correcting the prosecutor when she believed that her description of the assailants was described incorrectly. **Ex. 17(B)** at 212.

94. At Drumgold's new trial hearing, Tracie testified that she did not recall telling the jury that she had seen Drumgold right after the Moore homicide or that the photo she picked out was a photo of one of the men she saw that night. **Ex. 17(C)** at 98-99, 123-124.

95. Attorney Rappaport testified that he initially felt that Tracie's testimony was exculpatory because she testified that Drumgold was not wearing clothing that the shooters were observed to be wearing. *See* **Ex. 14(C)** at 37, 68-69; **Ex. 14(D)** at 180-182, 206; **Ex. 14(A)**, March 31, 1994 New Trial Testimony of Steven Rappaport, Esq., at 62.

96. At Drumgold's 1994 new trial hearing, Attorney Rappaport testified that he knew what Tracie was going to say and that nobody was going to put words in her mouth. **Ex. 14(D)** at 60-61.

97. On February 3, 2007 Attorney Rappaport testified: "Tracie Peaks knew Shawn Drumgold before the incident. There would have been no need to show her the photograph." **Ex. 14(A)** at 173.

98. At Drumgold's criminal trial, Tracie pointed to and identified Drumgold. **Ex. 17(B)** at 203-205

99. Tracie does not know who told her she had to point at Drumgold during the criminal trial. **Ex. 17(D)** at 176, 186-187; **Ex. 17(E)** at 77-78.

100. Tracie testified that the officers were polite and cordial to her mother, Betty Peaks ("Betty"). **Ex. 17(D)** at 129-130, 135-136.

101. Tracie testified that the police officer who showed her the photo array did not throw anything at her and did not put the photos up to her face. **Ex. 17(E)** at 34.

102. Tracie testified that she looked at the photo array for approximately 10 minutes. **Ex. 17(C)** at 139-140.

103. Tracie testified that she had no reason to be upset with the police officers when they showed her the pictures. **Ex. 17(E)** at 38.

104. Betty Peaks ("Betty") is Tracie Peaks' mother. **Ex. 18**, March 2, 2006 Deposition of Betty Peaks at 16.

105. Betty testified that she never spoke with Scapicchio or an investigator on behalf of Drumgold and that she does not know who typed the affidavit on her behalf in support of Drumgold's motion for a new trial. **Ex. 18** at 27, 29, 74-75, 121-122.

106. Betty testified that she only has a recollection of police coming to her home on one occasion. **Ex. 18** at 68-69, 74.

107. Betty testified that the only reason she felt intimidated was because she did not have any knowledge regarding the murder or her daughter's involvement. **Ex. 18** at 76-77.

108. Investigator Keller testified that Betty unequivocally stated that Assistant District Attorney Phil Beauchesne told her (Betty) that if her daughter (Tracie) did not cooperate, she (Tracie) would be taken out of school and locked up. **Ex. 19(B)**, October 19, 2006 Deposition of Scott Keller at 341-342, 345-347, 356. *See also* **Ex. 17(D)** at 151-152.

109. Keller testified that he has no idea why the affidavit does not specifically reference the assistant district attorney and that, in drafting affidavits, he made every effort to use the specific words, names and terms that the witnesses used as opposed to his own. **Ex. 19(B)** at 345.

110. Keller testified that neither Betty nor Tracie ever referenced Boston police officials. **Ex. 19(B)** at 342-343.

111. Betty testified that she has no memory that any member of the Boston Police Department threatened Tracie with arrest. **Ex. 18** at 128-130.

## B. **Mary Alexander**

112. Drumgold claims that the police officer defendants knew, but did not disclose, that Commonwealth witness Mary Alexander ("Mary") suffered from a rare form of brain cancer that can affect a person's memory, perception and cognition function. **Exhibit 1**, ¶ 14(a)-(b).

113. Walsh did not maintain contact with Mary after he interviewed her in August 1988. **Ex. 15(C)** at 16-18; **Ex. 15(D)** at 82-84.

114. Walsh accompanied Callahan to speak with Mary on May 31, 1989 at the request of ADA Beauchesne to have Mary call Beauchesne. **Ex. 13(D)** at 267-269; **Ex. 15(E)** at 202-203.

115. On February 4, 1989, Mary was admitted to Carney Hospital after suffering a seizure. **Ex. 21(A)**, Carney Hospital Medical Records for Mary Alexander.

116. Medical records from February 4, 1989 indicate that Mary had a three month history of severe headaches and blurred vision. **Ex. 21(A)**.

117. On February 10, 1989, Mary underwent surgery to remove a malignant tumor from her brain. **Ex. 21(A)**.

118. On February 20, 1989, Mary was discharged from the hospital and began post-operative radiation therapy. **Ex. 21(A)**.

119. Walsh was not aware of any health issues of Mary. **Ex. 37** at ¶ 10.

120. At the time of Drumgold's criminal trial, Attorney Rappaport was aware that Mary had an operation in February 1989 and that she was not feeling too well at that time. **Ex. 21(B)** at 196-197.

121. Specifically, Attorney Rappaport questioned Mary as follows:

> Q:    Okay, people come by.  And actually there was a period of time last year when you were ill?
> A:    Excuse me?
> Q:    There was a period of time last year when you were ill?
> A:    Yes.
> Q:    You had an operation in February, right?

A:   Yes.

Q:   And you weren't feeling too well at that time?

A:   Yes.

Q:   And the police would come by and they'd say – the detective would come by to see how you're doing?

A:   Yes.  And I told them I don't care if I'm dying, I'll still go and tell them what I saw.

**Ex. 21(B)** at 196-197.

122. Lola Alexander ("Lola") is Mary's mother. **Ex. 22** April 4, 2006 Deposition of Lola Alexander at 18.

123. Lola testified that Mary did not have any health problems other than headaches. **Ex. 22** at 60.

124. Lola does not recall Mary having any memory problems before her first seizure occurred and does not know if Mary had memory problems at any time. **Ex. 22** at 60, 184-185, 210-212.

125. Lola cannot recall if Mary suffered from headaches before the Moore homicide or when Mary began treating with a doctor for her headaches. **Ex. 22** at 178-180.

126. Prior to 1990 and prior to Drumgold's trial, Tracie Peaks saw Mary on a regular basis as they both lived at 72 Homestead Street. **Ex. 17(D)** at 237-239, 242-243.

127. Tracie had no knowledge that Mary was sick until August or September 1990. **Ex. 17(D)** at 239-241, 243-244.

128. After Tracie learned that Mary was sick, Tracie observed that Mary was the normal Mary that she was used to speaking to. **Ex. 17(D)** at 247-249.

129. At Drumgold's criminal trial, Mary testified that after hearing gunshots she observed 2 males climbing over the back fence of the Edison plant. **Ex. 21(B)** at 153-156. *See Commonwealth v. Drumgold*, 423 Mass. at 234.

130. Mary testified that the men were walking, not running. **Ex. 21(B)** at 156. *See Commonwealth v. Drumgold*, 423 Mass. at 234.

131. Mary testified that she observed the lighter of the 2 males put a gun in his belt area and cover it with his sweatshirt. **Ex. 21(B)** at 158-159. *See Commonwealth v. Drumgold*, 423 Mass. at 234.

132. Mary testified that she saw the face of the lighter skinned male. **Ex. 21(B)** at 159.

133. Mary testified that she saw a picture of the lighter skinned gunman on the night of the Moore homicide when police came to her home and showed her a group of photos. **Ex. 21(B)** at 159-160.

134. Mary testified that although she went back to the same picture more than three times, she could not pick out the gunman from the group of photos. **Ex. 21(B)** at 160-161.

135. Mary testified that she was trying to be 100% truthful on the night of the homicide and believed that she could have picked out the gunman in person, like they do on TV. **Ex. 21(B)** at 160-161, 175-178.

136. Mary testified that when Attorney Rappaport came to speak with her the week before trial, he showed her an 8" X 10" photo of Drumgold which she identified as the man she saw on the night of the Moore homicide. **Ex. 21(B)** at 161-162, 167, 187-188.

137. Mary testified that when Attorney Rappaport came to speak with her the week before trial, he showed her a photo of Drumgold which she identified as the man she saw on the night of the Moore homicide. **Ex. 21(B)** at 161-162, 187-188.

138. From her window during the October 2, 1989 jury view of the crime scene, Mary identified Drumgold as the person she saw on the day of the Moore murder. **Ex. 14(A)** at 26-27, 29-30; **Ex. 33** at 4; **Ex. 35**.

139. Attorney Rappaport made a tactical decision to show Mary the photo of Drumgold prior to the jury view of the scene of the crime. **Ex. 14(A)** at 19-20; **Ex. 14(B)** at 105. *See* **Ex. 33** at 2; *Commonwealth v. Drumgold*, 423 Mass. at 321.

140. Mary testified that she had seen the same photo of Drumgold on television and knew at that time that Drumgold was the lighter skinned male that she observed coming over the gate on the night of the Moore homicide. **Ex. 21(B)** at 156-159, 178-179, 187-188.

141. At the hearing on Drumgold's motion for a new trial, Attorney Rappaport testified that he would not dispute the basic honesty of Mary, that she was trying to do the best she could, and that he appraised her as an honest woman. **Ex. 14(A)** at 76-77.

142. Investigator Scott Keller interviewed Lola in his effort to assist Drumgold with his motion for a new trial. *See* **Ex. 19(B)** at 320.

143. Keller testified that Lola was not able to provide him with the names of any of the police officials that Lola spoke to regarding the Moore homicide. **Ex. 19(B)** at 323-324.

144. In April 2006, Lola testified that she had never before seen the first page of her affidavit which was submitted in support of Drumgold's motion for a new trial in 2003. **Exhibit Ex. 22** at 35-36, 39-41, 283-285.

145.Lola also testified that she did not read the second page of the affidavit before signing it. **Ex. 22** at 39-40, 283-285.

146.Lola has no knowledge regarding whether Mary was pressured or threatened by the police in connection with the Moore murder investigation. **Ex. 22** 193-194, 213-214.

C.  **Antonio Anthony**

147.Drumgold claims that the defendants pressured Anthony into claiming that he was not with Drumgold on the night of the Moore homicide, despite his initial claim that he was. **Ex. 1** at ¶ 14(j).

148.Drumgold further claims that the defendants threatened to charge Anthony with murder if he supported Drumgold's alibi. **Ex. 1** at ¶ 14(j).

149.Drumgold also claims that in exchange for his statement that he was not with Drumgold at the time of the murder, the defendants paid for Anthony to stay at a hotel for several days. **Ex. 1** at ¶ 14(j).

150.The police did not contact Anthony directly, but Anthony became aware they were looking for him. **Ex. 12(C)** at 102-103.

151.On August 30, 1988, Walsh and co-defendant Murphy were informed that Anthony was trying to reach them, so Walsh contacted Anthony and made an appointment to see him on August 31, 1988. **Exhibit 2** at 5.

152.On August 31, 1988, Anthony provided a recorded statement to Walsh and Murphy. **Ex. 12(A)**.

153.At that time, Anthony stated that he observed Drumgold and Taylor with guns on August 19, 1988. **Ex. 12(A)** at 1-3; **Ex. 12(C)** at 110.

154.Anthony further stated that he observed Drumgold wearing a black Adidas suit. **Ex. 12(A)** at 5, 15.

155.Anthony stated that at approximately 7:00 or 7:30, while it was still light out, Anthony, Drumgold, Taylor and Paul Durand ("Durand") drove to Columbia Road to drop off Mike Sloan ("Sloan"). **Ex. 12(A)** at 4-5.

156.Anthony stated that after dropping off Sloan, Anthony, Drumgold, Taylor and Durand drove to Dudley Station by Zeigler Street where Anthony was dropped off. **Ex. 12(A)** at 4-6.

157.Anthony stated that he next saw Taylor after Taylor had spoken to the police regarding the Moore homicide. **Ex. 12(A)** at 6-7; **Ex. 12(C)** at 111-112.

158. Anthony stated that Taylor told Anthony to tell the police that he (Anthony) was with Taylor and Drumgold. **Ex. 12(A)** at 6-7.

159. Anthony stated that he next saw Drumgold when they went to New York. **Ex. 12(A)** at 8.

160. Anthony stated that he and Drumgold took the two guns to New York that Anthony had observed Drumgold and Taylor with on August 19, 1988. **Ex. 12(A)** at 8-9; **Ex. 2** at 7.

161. Anthony stated that after they returned from New York and after Drumgold was arrested, Anthony again saw Taylor. **Ex. 12(A)** at 12; **Ex. 2** at 8.

162. At that time, Taylor told Anthony to tell the police that at the time of the shooting they were at Sonoma Street. **Ex. 12(A)** at 12; **Ex. 2** at 8-9.

163. The recorded statement was played for Anthony. **Ex. 12(A)** at 14-15.

164. Thereafter, Anthony stated that he had had an opportunity to listen to the tape, that it was a true statement, that nobody forced him to make the statement and that he gave the statement of his own free will. **Ex. 12(A)** at 14-15.

165. It appears that Anthony may have been put up at the Howard Johnson's Motor Lodge from September 2, 1988 through September 6, 1988. **Ex. 12(B)**, September 2, 1988 correspondence from Detective Murphy to Deputy Superintendent Joseph Dunford.

166. Walsh testified that Murphy's report would have been in the police file and turned over to the district attorney. **Ex. 15(D)** at 179-186.

167. Walsh does not have a memory of seeing the report in the file or discussing it with anyone. **Ex. 15(D)** at 179-186.

168. At the time of the grand jury proceedings, Anthony was represented by counsel who advised Anthony to plead the Fifth Amendment and not to testify before the grand jury. *See* **Ex. 12(C)** at 146-152.

169. Prior to Drumgold's trial, Callahan attempted to speak to Anthony and Anthony would not cooperate. **Ex. 13(B)**, August 6, 2003 New Trial Testimony of Timothy Callahan at 36, 42-44.

170. At the time of Drumgold's underlying criminal trial, Anthony was represented by counsel who advised Anthony to plead the Fifth Amendment and not to testify at trial. **Ex. 12(C)** at 146-152; **Ex. 12(D)**, September 26, 1989 Voir Dire of Antonio Anthony.

171. The defendants have been unable to depose Anthony in conjunction with this civil action.

172. At Drumgold's new trial hearing, prior to hearing his recorded statement, Anthony testified that he told the police the truth. **Ex. 12(C)** at 106-107, 138, 142.

173. Anthony testified that he did not recall making the statements referenced above. **Ex. 12(C)** at 111-112, 162-164.

174. Investigator Keller testified that Anthony stated that police did <u>not</u> threaten to indict him if he (Anthony) did not help them (the police). **Ex. 19(A)**, September 19, 2006 Deposition of Scott Keller at 173-174.

175. Anthony testified that he does not recall telling the police that he left Drumgold or was not with Drumgold at the time of the Moore shooting. **Ex. 12(C)** at 110-112, 167.

176. Anthony testified that he does not recall his conversation with the police being recorded. **Ex. 12(C)** at 106-107, 112-113, 130-133, 162-164.

177. Anthony testified that Walsh never made any personal threats against Anthony or his family. **Ex. 12(C)** at 134-135, 137-138.

178. Anthony testified that in August 1988 he was getting high every day, was smoking an ounce of crack cocaine daily and was also sniffing heroin. **Ex. 12(C)** at 165-166.

## D. <u>Vantrell McPherson</u>

179. Drumgold claims that the police detective defendants badgered and intimidated Commonwealth witness Vantrell McPherson ("McPherson") into testifying when, initially, she could not make an identification. **Ex. 1**, ¶ 14(j).

180. McPherson does not know and has never heard of Walsh. **Ex. 26(C)**, March 17, 2006 Deposition of Vantrell McPherson at 39.

181. On June 10, 1989, McPherson provided a recorded statement to Callahan. **Ex. 26(A)**, June 10, 1989 Recorded Statement of Vantrell McPherson.

182. Walsh was not present. **Ex. 26(A)**.

183. McPherson was among the group sitting around the mailbox with Moore on August 19, 1988. **Ex. 26(A)** at 2.

184. McPherson had seen Drumgold earlier that day, at approximately 6:00 p.m., about 2 blocks away from the location of the shooting. **Ex. 26(A)** at 5-6; **Ex. 26(B)**, October 3, 1989 Trial Testimony of Vantrell McPherson at 63-64. *See Commonwealth v. Drumgold*, 423 Mass. at 234.

185. At the time, McPherson observed Drumgold wearing a black and white Adidas suit. **Ex. 26(A)** at 5-6; **Ex. 26(B)** at 64-65. *See Commonwealth v. Drumgold*, 423 Mass. at 234.

186. At that time, McPherson heard Taylor say to Drumgold, "Come on, Shawn, you know we got to do this." **Ex. 26(B)** at 65, 95-96. *See Commonwealth v. Drumgold*, 423 Mass. at 234.

187. At her deposition on March 17, 2006, McPherson testified that someone wrote the affidavit in support of Drumgold's motion for a new trial for her, that she does not know who wrote the affidavit, and that she does not recall giving anyone information concerning the contents of the affidavit. **Ex. 26(C)** at 22-24, 136-137.

188. McPherson testified that had she not agreed with something in the affidavit, she probably would not have told anyone because she was so nervous. **Ex. 26(C)** at 49.

189. McPherson only recalls one time that she was yelled at. **Ex. 26(C)** at 136, 138, 149.

190. At the time, she was at the courthouse during the criminal trial and two men were in the room with her. **Ex. 26(C)** at 136, 149.

191. McPherson does not know whether the "fat guy" who yelled at her was a police officer or some other person. **Ex. 26(C)** at 139-140.

192. McPherson does not recall any place that police officers may have been upset with her other than the courthouse. **Ex. 26(C)** at 138.

193. McPherson testified that she testified truthfully at Drumgold's criminal trial, that no one forced or threatened her regarding her testimony, and that no one told her what to say during her testimony. **Ex. 26(C)** at 157-158, 170.

## E.  **Eric Johnson**

194. Drumgold claims that the defendants badgered and intimidated Eric Johnson ("Johnson") into identifying Drumgold when he initially stated that he could not make an identification, that the defendants pressured Johnson for over a year to implicate Drumgold in the Moore homicide, and that one of the defendants coached him to say "yes to whatever question they ask you about Shawn." **Ex. 1** at ¶ 14(j).

195. Johnson does not know who Walsh is. **Ex. 27(B)**, October 4, 1989 Trial Testimony of Eric Johnson at 66-67, 72-74, 78-80.

196. Walsh interviewed Johnson on or about August 24, 1988. **Ex. 7**.

197. This was the only time that Walsh spoke with Johnson. *See* **Ex. 27(B)**, October 4, 1989 Trial Testimony of Eric Johnson at 66-67, 72-80.

198. Walsh did not show photos to Johnson. **Ex. 27(B)** at 72-78, 80-81.

199. At the underlying criminal trial, Walsh testified that Johnson never identified Drumgold. **Ex. 15(C)** at 5-6. *See also* **Ex. 7**.

200. Thereafter, he began speaking to co-defendant Callahan and McDonough. **Ex. 27(B)** at 66-67, 72-74, 80-81.

201. On August 16, 1989, Johnson provided a recorded statement to co-defendant Callahan. **Ex. 27(A)**, August 16, 1989 Recorded Statement of Eric Johnson; **Ex. 13(C)**, March 2, 2007 Deposition of Timothy Callahan at 200.

202. Walsh was not present. **Ex. 27(A)**.

## F. <u>Ricky Evans</u>

203. Drumgold does not claim that Walsh engaged in any misconduct with respect to Commonwealth witness Ricky Evans ("Evans"). **Exhibit 1** at ¶ 14 (c) – (g).

204. Walsh never had any contact with Evans nor did he ever speak to Evans about the Moore homicide. **Ex. 15(C)** at 19; **Ex. 37** at ¶ 11.

205. June 1989 was the first time that Evans spoke to anyone regarding the Moore murder. **Ex. 13(B)** at 224-225, 234-236, 241-242, 249-252, 254-255. *See also* **Ex. 13(A)** at 175-177.

206. Walsh did not participate in any interviews of Evans. **Ex. 13(D)** at 278.

207. Callahan never provided any information about Evans to Walsh prior to Drumgold's conviction. **Ex. 13(D)** at 278.

208. On August 6, 1989, Evans provided a recorded statement to co-defendant Callahan and McDonough. **Ex. 28(A)**, August 6, 1989 Recorded Statement of Rick Evans.

209. Walsh was not present. **Ex. 28(A)**.

210. Evans does not know Walsh and does not recall having any contact with Walsh. **Ex. 28(B)**, June 26, 2006 Deposition of Ricky Evans at 172-173; **Ex. 28(C)**, July 10, 2006 Deposition of Ricky Evans at 513.

211. Walsh did not arrange for Evans to stay at a hotel. *See* **Ex. 13(C)** at 164-165; **Ex. 13(D)** at 257-259. *See also* **Ex. 28(D)**, January 30, 1990 Memorandum from Assistant District Attorney Paul F. Connolly to Victim Witness Advocate Laura Scherz; **Ex. 37** at ¶ 11.

212. Walsh did not provide Evans with any money for expenses or food. **Ex. 13(C)** at 194-195; **Ex. 13(D)** at 260-261; **Ex. 37** at ¶ 11. *See also* **Ex. 28(D)**.

### G.  Olisa Graham

213. Drumgold claims that Graham corroborated his alibi defense that he was at 23 Sonoma Street at the time of the Moore homicide. *See* **Ex. 1**, ¶ 14(k).

214. Drumgold claims that the police detective defendants intimidated Graham. **Ex. 1**, ¶ 14(k).

215. Specifically, Drumgold claims that Graham did not testify at his criminal trial because an unknown male warned her that if she came to court to testify she would be arrested because she had open cases in Suffolk County. **Ex. 1**, ¶ 14(k).

216. Drumgold did not tell Attorney Rappaport that Graham had information relevant to where he was at the time of the Moore murder. **Ex. 20(B)**, November 30, 2006 Deposition of Drumgold, at 227-229.

217. On July 1, 1989, Graham provided a recorded statement to co-defendant Callahan and McDonough. **Ex. 29(A)**, July 1, 1989 Statement of Olisa Graham; **Ex. 29(C)**, May 17, 2006 Deposition of Olisa Graham, at 97-100.

218. Walsh was not present. **Ex. 29(A)**.

219. This is the first time that Graham recalls speaking to police detectives regarding the Moore homicide. **Ex. 29(B)**, July 30, 2003 New Trial Testimony of Olisa Graham, at 20-21, 23.

220. Sometime after providing the recorded statement to Callahan and Murphy, Graham was contacted via telephone by a male regarding her testifying at trial. **Ex. 29(B)** at 23.

221. The male told Graham that she had an outstanding warrant and that if she testified at trial she could be arrested after getting off of the stand. **Ex. 29(B)** at 23.

222. In 1989, Graham had an outstanding warrant for her arrest for a shoplifting incident. **Ex. 29(B)** at 29-30.

223. Graham does not know if the male who called her was a police officer or a prosecutor. **Ex. 29(B)** at 25-27, 31-33.

224. Graham's July 1, 1989 recorded statement was provided to Drumgold's criminal defense attorney, Attorney Rappaport. **Ex. 14(C)** at 148-149; **Ex. 14(B)** at 46-47, 67-72.

225. Prior to Drumgold's trial, Graham was never contacted by Drumgold's attorney or any investigator assisting with Drumgold's defense. **Ex. 29(B)** at 27-32, 67, 81; **Ex. 14(B)** at 79.

226. Investigator Scott Keller interviewed Graham in his effort to assist Drumgold with his motion for a new trial. *See* **Ex. 19(B)** at 285-287, 301-304.

227. During the interview, Graham told Keller that at some point in time, she was contacted by two assistant district attorneys. **Ex. 19(B)** at 287-289, 301-304.

228. Graham also told Keller that one of the assistant district attorneys later contacted her and said they would not need her because of a shoplifting warrant. **Ex. 19(B)** at 287-288, 301-304.

229. Keller testified that Graham never provided any indication that either of the two men that she spoke to were Boston police officials. **Ex. 19(B)** at 301-304.

230. On July 23, 2003, Graham spoke to investigators McLaughlin and O'Leary. **Ex. 30**, Homicide Unit Investigative Report re: Interview of Olisa Graham.

231. At that time, Graham stated that she was unsure whether the person who contacted her via telephone about the warrant was a police officer or a prosecutor. **Ex. 30**.

232. Graham stated that she did not view this phone call as threatening and did not believe that it was delivered in a threatening manner. **Ex. 30**.

233. Graham stated that she was young and so she just left it alone. **Ex. 30**.

234. Attorney Rappaport testified that he made a strategic decision not to call Graham as an alibi witness. **Ex. 14(C)** at 152-155.

## I. **Gemini Hullum**

235. Since May 2003, Hullum has provided statements and testimony that she observed Drumgold at 23 Sonoma Street around the time of the Moore homicide. **Ex. 31(A)**, July 29, 2003 New Trial Testimony of Gemini Hullum, at 115-117; **Ex. 31(B)**, February 20, 2006 Deposition of Gemini Hullum at 242.

236. Hullum testified that the police did not threaten or intimidate her, that they did not say anything to her, and that she does not remember hearing any questions they asked anyone else. **Ex. 31(A)** at 143-144, 152-154.

237. Hullum never spoke to any police detectives regarding the Moore homicide. **Ex. 31(A)** at 120-121, 141-143.

238. Hullum never got involved in regards to the Moore homicide. **Ex. 31(B)** at 138-139, 166-167.

239. After learning that Drumgold was arrested, Hullum did not do anything to contact his attorney. **Ex. 31(A)** at 122-123.

240. After learning that Drumgold was found guilty, Hullum did not do anything about it. **Ex. 31(A)** at 136.

241. Hullum testified that her life has been a "hard road" and that there has been "[a] lot of past trauma [that] has impacted [her] memory of that one specific incident." **Ex. 31(C)**, May 11, 2006 Deposition of Gemini Hullum at 335.

242. Hullum had consumed crack cocaine on August 19, 1988, prior to the Moore homicide. **Ex. 31(B)** at 74, 76-77.

243. Hullum was identified as a possible witness in the recorded statement that Olisa Graham taken by co-defendant Callahan on July 1, 1989. **Ex. 29(A)** at 4-5.

244. Olisa Graham's July 1, 1989 recorded statement was provided to Attorney Rappaport. **Ex. 14(C)** at 147-149; **Ex. 14(B)** at 46-47, 67-72

245. Hullum testified that she was never contacted by anyone from Drumgold's defense team regarding Drumgold's whereabouts at the time of the Moore homicide. **Ex. 31(A)** at 120-123; **Ex. 31(B)** at 155-156.

246. Hullum wrote letters to Drumgold in prison wherein she mentioned that she knew Drumgold was at her house at the time of the Moore homicide. **Ex. 31(A)** at 123.

247. Drumgold did not tell Attorney Rappaport that Hullum had information relevant to where he was at the time of the Moore murder. **Ex. 20(B)** at 227-229.

## III. OTHER RELEVANT EVIDENCE

248. Murphy is now deceased, having died on January 4, 2001, as evidenced by the certified copy of Certificate of Death. **Ex. 23(C).**

**Defendant,**
**RICHARD WALSH,**
By his attorney,

DATED: October 1, 2007

/s/ Hugh R. Curran_____
Hugh R. Curran (BBO# 552623)
Bonner, Kiernan, Trebach & Crociata, LLP
One Liberty Square, 6th Floor
Boston, Massachusetts 02109
(617) 426-3900
(617) 426-0380 fax

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing document has been mailed, this 1st day of October, 2007 to all counsel of record:

Michael W. Reilly, Esq.
Tommassino & Tommasino
Two Center Plaza
Boston, MA 02108-1904

Rosemary Curran Scapicchio, Esq.
Four Longfellow Place, Suite 3703
Boston, MA 02114

Susan Weise, Esq.
Chief of Litigation
Assistant Corporate Counsel
City of Boston/Law Department
City Hall, Room 615
Boston, MA 02201

John P. Roache, Esq.
Hogan, Roache, & Malone
66 Long Wharf
Boston, MA 02110

MaryJo Harris, Esq.
Morgan, Brown & Joy
200 State Street, 11th Floor
Boston, MA 02109

/s/ Hugh R. Curran_____