# CALLAHAN EXHIBIT A

```
00001
 1                    Volume:  II

 2                    Pages:   156 - 208

 3                    Exhibits: See Index

 4

 5         UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
 6
                  C.A. NO. 04-11193NG
 7

 8 -----------------------------x
   SHAWN DRUMGOLD,
 9           PLAINTIFF

10 VS.

11 TIMOTHY CALLAHAN, ET AL,
             DEFENDANTS
12 -----------------------------x

13

14
           CONTINUED DEPOSITION of TIMOTHY CALLAHAN, a
15   witness called on behalf of the Plaintiff, pursuant to the
     provisions of the Federal Rules of Civil Procedure, before
16   Nancy M. Walsh, Certified Shorthand Reporter (#118593)/
     Registered Professional Reporter and Notary Public in and
17   for the Commonwealth of Massachusetts, at the law office
     of Tommasino & Tommasino, Two Center Plaza, Boston,
18   Massachusetts  02108, on Friday, March 2, 2007,
     commencing at 10:06 a.m.
19

20

21
              NANCY M. WALSH
22        COURT REPORTING SERVICES
             131 CRANE STREET
23       DEDHAM, MASSACHUSETTS  02026
          TELEPHONE (781) 326-5062
24           FAX (781) 326-5072
```

00020
1    were in two places at once?
2        MR. CURRAN: Objection.
3        MR. WHITE: Objection.
4        MS. HARRIS: Objection. I'm going to
5    instruct the witness to read the entire report rather
6    than read it piecemeal.
7        MR. REILLY: I'm asking the witness to answer
8    the question that's in front of him. You have a right to
9    cross-examine him.
10       MR. CURRAN: You showed him a document that
11   he has every right to read the entire document that you
12   handed him.
13       MS. HARRIS: And he'll answer after he --
14       MR. REILLY: The question that's pending for
15   the witness is why was it that you suggested to Lisa
16   Graham that there was some reason to believe that these
17   witnesses were -- somebody was saying these witnesses
18   were in two places at once.
19       MS. HARRIS: Tim, I want you to read the
20   entire document from the beginning before you answer the
21   question.
22       MR. REILLY: I'm going to object to it, and
23   it's improper. You have a right to cross-examine, and I
24   have a right to ask questions. My question to this

```
00001
 1                  Volume:  III

 2                  Pages:   209 - 280

 3                  Exhibits: See Index

 4

 5         UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
 6
                  C.A. NO. 04-11193NG
 7

 8 -----------------------------x
   SHAWN DRUMGOLD,
 9         PLAINTIFF

10 VS.

11 TIMOTHY CALLAHAN, ET AL,
           DEFENDANTS
12 -----------------------------x

13

14
         CONTINUED DEPOSITION of TIMOTHY CALLAHAN, a
15   witness called on behalf of the Plaintiff, pursuant to the
     provisions of the Federal Rules of Civil Procedure, before
16    Nancy M. Walsh, Certified Shorthand Reporter (#118593)/
     Registered Professional Reporter and Notary Public in and
17    for the Commonwealth of Massachusetts, at the law office
     of Tommasino & Tommasino, Two Center Plaza, Boston,
18    Massachusetts 02108, on Thursday, May 31, 2007,
     commencing at 1:16 p.m.
19

20

21
              NANCY M. WALSH
22        COURT REPORTING SERVICES
              131 CRANE STREET
23        DEDHAM, MASSACHUSETTS 02026
          TELEPHONE (781) 326-5062
24            FAX (781) 326-5072
```

Callahan 053107                                              Page 1

00061
1  A  Not that I recall, sir.
2  Q  During the course of your tenure in the Homicide Division
3     of the Boston Police Department, were there occasions
4     when witnesses were interviewed by members of the
5     District Attorney's office outside the presence of the
6     investigators from the Boston Police Department?
7  A  Yes, sir.
8  Q  Is it fair to say that in the course of investigations or
9     trial preparation that that was a common occurrence due
10    to the busy scheduling issues of the members of the
11    Homicide Division in the Boston Police Department?
12        MR. REILLY: Objection.
13 A  Yes, sir.
14 Q  Do you know who was responsible for transporting
15    witnesses to the Suffolk County District Attorney's
16    office or to the courthouse during the course of the
17    trial of Commonwealth versus Shawn Drumgold and Terrance
18    Taylor?
19 A  The District Attorney's office.
20 Q  Did the District Attorney's office make arrangements for
21    the transportation of all the witnesses involved in --
22    that testified in the Commonwealth versus Shawn Drumgold
23    and Terrance Taylor?
24 A  Yes, sir.

00074

1  A   Yes, sir.

2  Q   Did Lola tell you why she did not want Mary involved in

3      the trial?

4  A   No, sir.

5  Q   Did Lola tell you about any health problems that Mary

6      Alexander had?

7  A   No.

8  Q   Did Mary Alexander ever tell you that she had any health

9      problems?

10 A   No, sir, with one exception.

11 Q   What was that?

12 A   When she fell through the porch.

13 Q   When was that?

14 A   I think it was a few days before the trial.

15 Q   How did you find out about that?

16 A   I was out investigating, and I heard a call relative to I

17     think it was 72 Homestead Street. And I knew that was

18     the residence of Alexander and Peaks. So I drove up, and

19     when I drove up, there was the fire department. I

20     believe the ambulance came a few minutes later. And I

21     looked on the porch --

22          MS. HARRIS: Wait for the next question, Tim.

23 Q   What did you do next?

24 A   I looked on the porch, and she had fallen -- one side of

```
00075
 1   her body had fallen through the porch, and she was stuck.
 2 Q  Did you have any conversation with her or say anything to
 3   her?
 4 A  Not at that time. There were three or four firefighters
 5   trying to extricate her from the -- from the porch.
 6 Q  And what happened after that?
 7 A  They took her to the Carney Hospital.
 8 Q  Did you go to the Carney?
 9 A  Yes, sir.
10 Q  Did you talk to her there?
11 A  Yes, sir.
12 Q  And what was the conversation when you talked to her at
13   the Carney?
14 A  I brought her mother over with me to the Carney Hospital.
15   She was in on the stretcher. And I went in, and she said
16   something to the effect -- I believe about the case
17   coming up.
18 Q  Mary or Lola?
19 A  Mary. And I said to her, Forget about the case, just get
20   better.
21 Q  Do you remember what she said about the case coming up?
22 A  I think it was where it was coming up so fast. And then
23   I left, and I went out to her mother. And someone else
24   from Homestead Street had arrived, and I asked the mother
```

00076
1   if she would like a ride back home. And she said no, she
2   had a ride.
3 Q  Did you find out what injuries Mary had suffered?
4 A  I thought she had a broken leg, but no, I did not.
5 Q  Did you talk to any of the doctors?
6 A  No, sir.
7 Q  Or nurses at the Carney?
8 A  There was a nurse there, but I didn't speak to her.
9 Q  When was the next time after that that you talked to Mary
10   Alexander?
11 A  I think it was a day or two after she testified.
12 Q  Were you involved in getting her to court when she
13   testified?
14 A  No, sir.
15 Q  Do you know who did that?
16 A  No, sir.
17 Q  Were you involved in getting her served with a subpoena
18   or arranging for her to appear at trial in any way?
19 A  Other than finding her at Tennis Court, I had no
20   arrangements of bringing Mary Alexander or Tracie Peaks
21   to court.
22 Q  How did you find her at Tennis Court?
23 A  I don't recall.
24 Q  What was the conversation you had with her several days

00077
1   after the trial?
2  A   After she had testified, we were over in Roxbury. She
3      was out there, and she had told me how the people had
4      come -- the people, a jury or someone had come to her
5      porch and how she had looked out and yelled at her mother
6      that she saw the murderer.
7  Q   And this was after the -- after her testimony?
8  A   Yes, sir.
9  Q   Was the trial still ongoing?
10 A   I believe it was, sir.
11 Q   What did you do when she told you that?
12 A   Nothing. I just said, Oh, okay.
13 Q   Did Lola ever tell you that at any time until today that
14     her daughter was sick as opposed to having a broken leg,
15     that her daughter had any illness?
16 A   The only knowledge I have in regards to the illness is
17     the newspapers.
18 Q   And when was the first time you learned that Mary
19     Alexander had cancer?
20 A   I'm not -- cancer?
21 Q   Yes.
22 A   I thought it was -- I didn't know it was cancer. I don't
23     know what it was, but I read in the newspapers about Mary
24     having problems. And to the best of my recollection,

```
00001
  1                  Exhibits: See Index
            UNITED STATES DISTRICT COURT
  2            DISTRICT OF MASSACHUSETTS
                  C.A. NO. 04-11193NG
  3  ------------------------------
     SHAWN DRUMGOLD,          :
  4         PLAINTIFF
                              :
  5  VS.

  6                           :

  7  TIMOTHY CALLAHAN, ET AL,

  8         DEFENDANTS :

  9  ------------------------------

 10         DEPOSITION of TIMOTHY CALLAHAN, a witness

 11  called on behalf of the Plaintiff, pursuant to the

 12  provisions of the Federal Rules of Civil Procedure, before

 13  Nancy M. Walsh, Certified Shorthand Reporter (#118593)/

 14  Registered Professional Reporter and Notary Public in and

 15  for the Commonwealth of Massachusetts, at the law office

 16  of Tommasino & Tommasino, Two Center Plaza, Boston,

 17  Massachusetts 02108, on Friday, September 8, 2006,

 18  commencing at 10:27 a.m.

 19              NANCY M. WALSH

 20          COURT REPORTING SERVICES

 21              131 CRANE STREET

 22          DEDHAM, MASSACHUSETTS 02026

 23          TELEPHONE (781) 326-5062

 24              FAX (781) 326-5072
```

Callahan 090806                                        Page 1

00122
1   Q   When did you first meet Ricky Evans?

2   A   I believe it was around December of 1988.

3   Q   And what was the occasion for you meeting him?

4   A   He was shot and his uncle was killed.

5   Q   And what was his uncle's name?

6   A   I think it was Willie.

7   Q   Evans?

8   A   Yes, sir.

9   Q   And were you the detective in charge of the investigation

10      of the shooting of Willie Evans?

11  A   Yes, sir.

12  Q   What involvement did Ricky Evans have in that

13      investigation?

14  A   He was the main witness in the case, sir.

15  Q   And did he identify someone as the shooter?

16  A   Yes, sir.

17  Q   And who did he identify?

18  A   An individual known as Chilly. I believe his true name

19      was Trea Carter, T-r-e-a C-a-r-t-e-r.

20          MR. ROACHE: Treas, T-r-e-a-s.

21  Q   And was Treas Carter charged with that murder?

22  A   Yes, sir.

23  Q   And was he convicted of that murder?

24  A   Yes, sir.

00123
1  Q   Was there a trial or did he plea?

2  A   I believe he pled, sir.

3  Q   When was it that he pled?

4  A   I don't remember.

5  Q   Was it before or after the Drumgold trial?

6  A   After, sir.

7  Q   So at the time Shawn Drumgold was tried, the Treas Carter

8      case was pending; is that correct?

9  A   Yes, sir.

10 Q   Did Ricky Evans testify before the grand jury in

11     connection with the Treas Carter case?

12 A   I believe he did.

13 Q   And do you remember roughly when that grand jury was?

14 A   No, sir.

15 Q   How many times did you speak to Ricky Evans from the time

16     of the shooting in December of 1988 until your first

17     conversation with him about the Tiffany Moore case?

18 A   I had spoken to him a number of times trying to get an

19     identification of the perpetrator involving his incident.

20     I don't recall exactly how many, but it was more than

21     two.

22 Q   Did he know Treas Carter before the shooting?

23 A   He knew him as Chilly, sir.

24 Q   When was it you first learned that Ricky Evans had any

00124
1    information concerning the Tiffany Moore shooting?
2  A  I believe it was June 21, 1989.
3  Q  And what helps you fix that date in your mind?
4  A  I read over a transcript of Mr. Rappaport questioning me,
5    and he referred to a report on June 21st. And I believe
6    that's the original conversation I had.
7  Q  Do you know whose report that was referring to?
8  A  I believe it's going to be mine, but I have not been able
9    to see that report.
10         MR. CURRAN: Can we go off the record?
11         MR. REILLY: Yes.
12         (Discussion off the record.)
13 Q  Do you have any memory of writing a report on June 21 of
14    '89 concerning Ricky Evans?
15 A  My best memory is when I spoke to him on the telephone I
16    believe it was a weekend or a Friday and where he gave
17    significant information. I don't have a direct memory
18    that I sat down and typed it. But during the normal
19    course of business, I would have typed a quick report,
20    and I believe I did --
21 Q  And this --
22 A  -- based upon reading that questioning by Attorney
23    Rappaport.
24 Q  I guess what I'm asking though is other than what you

00125

1    read in the cross-examination from Attorney Rappaport, do
2    you have any independent memory of preparing such a
3    report?
4  A  I believe I did. I believe I did.
5  Q  Do you know any reason why a copy of that report wouldn't
6    be present in the Boston Police Department records on
7    this case?
8  A  No, sir, I don't.
9  Q  Do you keep any copies yourself of reports that you
10   prepare in connection with investigations?
11 A  It would be in the file. I mean everything I do would be
12   in the file in the Boston Police case.
13 Q  When you retired, did you take any copies of reports with
14   you?
15 A  Not to my knowledge.
16 Q  Do you know any other place that a report of June 21,
17   1989 would be located other than in the Homicide Unit
18   record on this case?
19 A  I don't know, sir.
20 Q  Have you personally made any efforts to search for a June
21   21, 1989 report?
22        MR. ROACHE: Regarding Ricky Evans.
23 Q  Any report by you dated June 21, 1989?
24 A  No, just the records that were furnished and my readings.

00142
1  A   No, I had no idea who he was. I assumed he was a private
2      investigator based upon what Ricky had told me, but I had
3      no knowledge of who he was.
4  Q   Did you know a Lawrence Fallon at that point?
5  A   No, sir.
6  Q   Did you do anything to find out who he was?
7  A   No, sir.
8  Q   What did Ricky ask you to do, if anything?
9          MS. HARRIS: Can he see the report that we're
10     referring to?
11         MR. REILLY: No.
12         MS. HARRIS: I'll object. That is
13     unreasonable.
14         MR. REILLY: I'm not asking him about what's
15     in the report. I'm asking him about something different
16     than the report. I'm holding a report, but I'm asking
17     him a different question.
18 A   When I got there, Ricky had told me that he had been
19     thrown out. I had asked him, Well, where are you going,
20     because I know it was a couple of weeks before the trial.
21     And he said, I don't know. I says, Where can you go,
22     where are we going to reach you, what's going to happen?
23     And he said, I don't know, I don't know. And I was
24     absolutely aware that there were two other shooters from

00143
1   the first incident and possibly other suspects on the
2   other incident. And I was concerned for his appearance
3   in court and for his safety.
4 Q  So what did you say?
5 A  I said to him, Well, if you're not -- if you're going to
6   be living in a doorway, we can't allow this to happen.
7   So I took him to Howard Johnson's.
8 Q  What was the reason or reasons that you took him to
9   Howard Johnson's?
10 A  I just felt a duty and a moral obligation to make sure
11   that this person came forward for the trial both safely
12   and his attendance was assured.
13 Q  Was the visit by Lawrence Fallon a reason you took him to
14   Howard Johnson's?
15 A  That was one of the reasons, yes, sir.
16 Q  What was the connection between that and taking him to
17   Howard Johnson's?
18       MS. HARRIS: Again, I'm going -- you're
19   asking him about the substance of his report. You're
20   asking him about the experience of Fallon. It's
21   unreasonable for you to expect this man to memorize 6,000
22   pages of documents.
23       MR. REILLY: I understand the objection.
24       MR. CURRAN: Well, provide him with the

00144
1   report.
2 Q   What was the connection between Lawrence Fallon appearing
3     at the house and your decision to put him into Howard
4     Johnson's?
5 A   It was my impression based upon what Mr. Evans told me
6     that he was getting undue pressure from a private
7     investigator relative to a serious crime, number one.
8 Q   What other reasons did you want to put Ricky Fallon into
9     Howard Johnson's?
10          MS. SCAPICCHIO:  Ricky Evans.
11 Q   Ricky Evans.
12 A   Another reason was to have his attendance before the
13     court.
14 Q   Any other reason?
15 A   Yes, and his safety.
16 Q   How did you know to bring him to Howard Johnson's?
17 A   I didn't.  It was just the closest place going back to
18     homicide.
19 Q   Had you ever heard of any other witness involved with the
20     Boston Police Department being put up at Howard
21     Johnson's?
22 A   In regards to this matter?
23 Q   In any case.
24 A   I don't have a present memory, no.