# CALLAHAN EXHIBIT D

00001

1          Volume:  I

2          Pages:   1 - 102

3          Exhibits: See Index

4

5          UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS

6          C.A. NO. 04-11193NG

7

8 ----------------------------x

SHAWN DRUMGOLD,

9          PLAINTIFF

10 VS.

11 TIMOTHY CALLAHAN, ET AL,
           DEFENDANTS

12 ----------------------------x

13

14          DEPOSITION of PAUL F. CONNOLLY, a witness

15 called on behalf of the Plaintiff, pursuant to the
   provisions of the Federal Rules of Civil Procedure, before

16 Nancy M. Walsh, Certified Shorthand Reporter (#118593)/
   Registered Professional Reporter and Notary Public in and

17 for the Commonwealth of Massachusetts, at the law office
   of Tommasino & Tommasino, Two Center Plaza, Boston,

18 Massachusetts 02108, on Friday, January 5, 2007,
   commencing at 9:13 a.m.

19

20

21          NANCY M. WALSH

22          COURT REPORTING SERVICES
           131 CRANE STREET

23          DEDHAM, MASSACHUSETTS 02026
           TELEPHONE (781) 326-5062

24          FAX (781) 326-5072

**Connolly 010507**                    **Page 1**

00026

1    Evans family, be they related to -- the Esau Evans people

2    family were very generally nice people, affable,

3    friendly.  And the situation went to hell in hand basket

4    upon that guilty verdict.  Otherwise, nice people got

5    very emotional, and as I say, all hell broke loose.  I

6    did not want her to get blind-sided -- Laura is a very

7    unassuming quiet reserved young lady.  I didn't want her

8    to be kind of in an awkward position with them if

9    something blew up basically.

10 Q   And then going down to the third full paragraph, on the

11    second page, towards the middle a sentence that says,

12    "Since we had, in effect, relocated him" -- which I

13    believe is referring to Ricky Evans.  "Since we had, in

14    effect, relocated him to a hotel, his family had gotten

15    repeated inquiry from his 'friends' wondering where he

16    was."  Do you know what that refers to?

17 A   Which part of the sentence?

18 Q   "Relocated him to a hotel."

19 A   The "we" is a collective we, we the District Attorney's

20    office as opposed to we, her and I, because she would not

21    have been involved in that nor was I.  The second part --

22 Q   What do you know about him being relocated to a hotel?

23 A   I don't really have a particular memory of it now.

24 Q   Did you relocate him to a hotel in connection with him

**Connolly 010507**            **Page 26**

00027

1    being a witness in your case?

2  A    No.

3  Q    Do you know whether he was relocated to a hotel in

4        connection with him being a witness in the Tiffany Moore

5        case?

6  A    No.  I don't have a memory of it from back then, no.

7  Q    It would be fair to say for some reason you believed that

8        when you wrote this memo in January of 1990 that he had

9        been relocated to a hotel by the DA's office?

10  A    I'm sorry, say it again.

11  Q    It would be fair to say in January of 1990, for some

12        reason you believe that Ricky Evans had been relocated to

13        a hotel.  Is that a fair reading of this memo?

14  A    I think it speaks for itself, yes.

15  Q    Do you have any memory today of where you got that

16        understanding or how you got that understanding?

17  A    I'm hesitant to answer absolutely yes.  I have a vague

18        memory of it being Laura, but I can't -- I'm not

19        absolutely certain.  So my answer should, for safety, be

20        no.

21  Q    Fair enough.  The vague memory is of something about

22        Laura arranging to relocate him to a hotel?

23  A    No.  The memory is of Laura indicating that at some point

24        to me in the context of this.

**Connolly 010507**                    **Page 27**

00028

1  Q   Being the person that might have given you that

2      information?

3  A   Yes, right.

4  Q   But you're sure it wasn't you who relocated him to a

5      hotel?

6          MR. ROACHE:  Objection.

7  A   I'm positive it was not me, yes.

8          MR. REILLY:  That's all I have.  Thank you.

9          (Interruption by the stenographer.)

10          (A recess was taken at 9:58 a.m.)

11          (Resumed at 10:03 a.m.)

12      CROSS-EXAMINATION BY MR. CURRAN:

13  Q   As you are aware, my name is Hugh Curran.  I represent

14      retired Boston Police Detective Richard Walsh.  I just

15      have some questions.  How many murder cases did you

16      handle in your career?

17  A   It was in excess of 250, 250 because -- and we stopped

18      counting, I stopped counting, overall.  You're saying in

19      my career or a specific year?  Overall 250, more than

20      250.

21  Q   Do you recall back in 1988 and 1989 the workload relative

22      to the Suffolk County District Attorney's office Homicide

23      Division team leaders, the number of homicides they were

24      handling?

**Connolly 010507**                    **Page 28**

00029

1  A   It had exploded -- it exploded here in Boston and

2      throughout the country generally.  It exploded here in

3      Boston.  We set records I think as the largest homicide

4      rate in history of keeping data like that.

5  Q   1988 how many homicide investigations were you handling

6      as an individual prosecutor in the Suffolk County DA's

7      office?

8  A   Let me separate -- I don't know.  I can tell you how many

9      I prosecuted.  Often you would be investigating cases to

10     which an arrest was not made or an identification was not

11     made.  I can tell you at that time span that that given

12     time span it was 26 homicide cases disposed of.

13  Q   In regards to 1988, you disposed of approximately 26

14     homicide cases.  That's from investigation stage to a

15     verdict or a plea?

16  A   Yes.

17  Q   In addition to the 26 that you disposed of in 1988, how

18     many other homicide cases were you spearheading the

19     investigation of?

20  A   Don't know.  I honestly don't know.  I had other cases.

21     At that time, I was not handling just homicides.  I had

22     felonies, too, felony cases.

23  Q   How many felony cases were you handling?

24  A   No idea.  You didn't keep stats of that.

00030

1  Q    In regards to homicide investigations, do you have a

2        memory of more than five, less than five, other

3        investigations on top of the 26?

4  A    I can't be certain.  That number probably sounds about in

5        that range, but I don't know.  I don't have a memory

6        today of that.

7  Q    Were there records maintained in the Suffolk County

8        District Attorney's office in 1988 in regards to who was

9        assigned in handling investigations, unsolved murders?

10 A    I'm sorry, the -- just repeat that, please.

11 Q    I'll break it up.  In 1988, were there records that were

12       kept in regards to the homicides that were assigned to

13       individual Assistant District Attorneys?

14 A    Yes.  There were always records maintained in that regard

15       be they assistants up in homicide or other people

16       handling homicides.  Yes, records were maintained that

17       way.

18 Q    Even in regards to the investigations that did not lead

19       to an indictment or an arrest?

20 A    Are you asking whether there'd be data maintained

21       generally in that regard?

22 Q    Yes.

23 A    I can't answer it.  I'm not trying to be evasive.  There

24       were open cases, I'll call them open cases, that were not

**Connolly 010507**                                    **Page 30**

00031

1    necessarily assigned to a specific assistant either in

2    homicide or otherwise.  Normally it would have been

3    overseen preliminarily by either the head of homicide, be

4    it John Kiernan or Frannie O'Meara or, quote, the number

5    two person up in homicide.  At one point when John was

6    there, it would have been me.  And when Frannie was

7    there, I think it was Phyllis Broker.  So that there'd be

8    continuity or whatever.

9  Q   Is it fair to say that the Suffolk County District

10    Attorney's office by statute was in charge of all

11    homicide investigations in 1988?

12  A   It was unique to Suffolk County, yes, and I believe that

13    to be so by statute, yes.

14  Q   And when you were a team leader in 1988, did you report

15    to anyone relative to any of the homicide cases that you

16    were prosecuting?

17  A   Explain "report" or define "report."

18  Q   There were a number of individual Assistant District

19    Attorneys that were assigned to the homicide team,

20    Homicide Division within the Suffolk County DA's office

21    in 1988?

22  A   Up in homicide itself?

23  Q   Yes.

24  A   Yes.

00032

1 Q    And those Assistant District Attorneys reported to the

2      head of homicide, Francis O'Meara?

3 A    At that time, it was Frannie, yes, that's correct.

4 Q    And Frannie O'Meara had oversight in charge of those

5      Assistant District Attorneys that were assigned to the

6      Homicide Division?

7 A    Correct.

8 Q    And at the same time in 1988 and 1989, there were team

9      leaders that were in charge of the felony teams

10      throughout Suffolk County?

11 A    Also handling homicides.

12 Q    Yes.

13 A    Yes.

14 Q    The cases that were assigned to individual team leaders,

15      did they report to Francis O'Meara, or did they handle

16      their cases on their own?

17 A    I'm having trouble with the use of the term "report."  At

18      all times, everyone would, if you had a homicide case,

19      you would keep whoever the head of homicide was apprised

20      of any new developments or the status of cases.  That was

21      constantly happening.  It was just standard operating

22      procedure for want of a better phrase.  I don't think of

23      it in terms of reporting.  You weren't assigned to

24      Frannie in reporting, you weren't -- in that sense, but

00033

1    you absolutely were required to keep him updated.

2  Q    In regards to the progress of the case?

3  A    Yes.

4  Q    Did you have a civilian investigator in 1988 assigned to

5    your felony team?

6  A    I'm not certain that I had one assigned as such to my

7    felony team.  I don't believe that's correct.  There were

8    those available in general, but not specifically assigned

9    that way.

10  Q    Do you have a memory in regards to any particular

11    civilian investigator that you would use in homicide

12    cases?

13  A    Absolutely I do, yes.

14  Q    Who was that?

15  A    Probably the best I've ever come in contact with, Richie

16    DeMeo, but he was specifically assigned to homicide --

17    specifically was his assignment.  He would have done

18    other investigations for other people such as say Tom

19    Mundy on non-homicide cases.

20  Q    Did you utilize the services of any other civilian

21    investigators in 1988 and 1989?

22  A    I believe so.  I don't have a specific memory.  We had --

23    there were other civilians up there.  Richie was the

24    most -- Richie was the best.  There were at various times

**Connolly 010507**                                    **Page 33**

00034

1   others who were -- had that, quote, title.  I don't know

2   if they had that ability.

3 Q   Do you know whether or not Phil Beauchesne had an

4   investigator assigned to the Roxbury felony team that he

5   was the team leader on?

6 A   I don't.

7 Q   Do you know whether or not Phil Beauchesne worked closely

8   or directly with any particular civilian investigator?

9 A   My memory is that if we had one, it would have been a

10   multiple team assignment, if that makes sense.  We didn't

11   have one as part assigned -- assigned specifically as

12   part of my team.  And my memory is I don't think he had

13   one specifically assigned to his team.  You may have

14   shared the use of one, like sometimes you would a

15   secretary.

16 Q   Did you use civilian investigators to go out and get

17   witnesses and bring them to the office for interviews or

18   bring them to court for appearances for testimony?

19 A   Did I ever on any kind of a case?

20 Q   In 1988 and 1989.

21 A   I'm sure that I did, yes.

22 Q   And were they in the same pool of investigators that you

23   were referring to, the civilian investigators?

24 A   Yes, they generally were.  The civilian investigators my

00035

1    memory is, I don't know the table of organization, a

2    chart for that, but they generally connected up to

3    homicide, generally.  A couple may have been doing

4    others, non-homicides.  But when you say civilian

5    investigators as such, it generally connected to

6    homicide.  Otherwise you were expected to use police.

7  Q    You indicated that your offices were next to Phil

8    Beauchesne's in 1988 and 1989?

9  A    We were on the same floor.  There was a small room -- we

10    abutted each other, but there was a small room in between

11    where they had the computer-backed switchboard and

12    electronics in there.  But we were on the same floor at

13    the same end of the floor.

14  Q    Was it your common practice in 1988 and 1989 that if --

15    in regards to any case if you shared witnesses, material

16    witnesses, that you would communicate between yourself

17    and the other District Attorney handling the other case?

18  A    Material witnesses, more likely than not.  I just

19    generally have to say more likely than not.  You let

20    somebody know about it.  Or if you had a case and I had a

21    case, we had a commonality, you'd in passing mention it.

22  Q    And it's clear that back in 1988, '89 you were aware that

23    Ricky Evans, a material witness in the Treas Carter case,

24    was also a witness in the Drumgold case?

**Connolly 010507**                    **Page 35**

00036

1  A   I don't have a memory of that today.  When you -- could

2      you repeat your question?  Maybe I misunderstood it.

3  Q   In 1988 to 1989, you acknowledge that Ricky Evans was a

4      material witness in the Commonwealth versus Treas Carter?

5  A   Absolutely, yes.

6  Q   And in 1988 and 1989, you were aware that Ricky Evans was

7      also a witness in the Drumgold case?

8  A   '88 or '89, perhaps I was.  I don't have a memory of it

9      though.

10  Q   Would it have been your practice if a material witness of

11      yours was a witness in another case that you would have a

12      conversation with the Assistant District Attorney

13      handling the other matter just to let them know that you

14      share a witness in common?

15  A   It would come up if there were a problem.  I mean you'd

16      do it very casually.  It wasn't as though there was some

17      standard operating procedure, you know, a policy rule or

18      requirement to do it.  It would come up in casual

19      conversation.  Unless there were problems, then you'd

20      have, quote, team back.  You'd get together in a

21      conference room and meet and talk about it.

22  Q   What would you characterize as problems that would

23      require you to have a further more in-depth conversation?

24  A   Well, if you had a situation where all of a sudden you

00037

1   didn't have a witness or if you had a situation where a

2   witness was flip-flopping or a witness was being

3   intimidated or if problems arose that something was going

4   to interrupt your ability to try a case.  It could be

5   any -- it could be an illness or any number of reasons.

6  Q   Would safety of a witness be an issue?

7  A   Absolutely, always was.

8  Q   And would homelessness of a witness potentially be an

9      issue due to unavailability?

10  A   Yes, but the -- "homelessness" is a funny term.  But yes,

11     it would be.  You'd have to able to know where they are

12     to locate them.  Accessibility I think I'd prefer to say,

13     access.

14  Q   Relative to the facts pertaining to the Commonwealth

15     versus Treas Carter prosecution, how would you

16     characterize the facts of the murder in your experience?

17  A   In my case?

18  Q   Yes.

19  A   Chilly, I don't know his official name, but that nickname

20     Chilly fit him.  I don't have a memory of Ricky Evans if

21     he was seated at the table.  I'm not sure, other than

22     looking at scars, if I'd remember him.  Carter was --

23     I'll always remember him and his eyes.  He had kind of

24     bug eyes, I mean poppy eyes that bulged out.  He was a

00038

1    killer.  There are people that kill.

2            Many homicides we had in that time frame were

3    stupid kids doing stupid things, doing a stick-up and

4    panicking and somebody ends up dead; getting in a gun

5    fight and not knowing what the hell they're doing, and

6    somebody ends up dead.  And then there were people, not

7    often, there were some that were just stone-cold killers.

8    Carter was one.  Carter -- it sounds trite, but Carter

9    was one of the Defendants that I prosecuted, there

10    weren't many, that you were in the presence of evil when

11    you were in his company, and he had that sense with me.

12    He was cold-blooded, Chilly Carter.

13  Q   You just used the term "cold-blooded."  Would you

14    characterize the murder of Willie Evans and the shooting

15    of Ricky Evans as cold-blooded execution?

16  A   It was an execution.  I believe it to be cold-blooded.

17    The one thing -- I don't know now, and we talked about,

18    "we" being homicide cops in general, talked about Carter

19    was on the lam, and you want to let any description of

20    him and tendencies let other people know.  That was one

21    we wanted to let people know about.  The other was during

22    the murder -- he was very cranked up.  He was very hyper

23    during the killing.  That's --

24  Q   When you indicate that when Treas Carter was identified,

**Connolly 010507**                              **Page 38**

00039

1    he was on the lam, you want people -- to let them know

2    about his description, his tendencies, and his actions,

3    did you as a professional prosecutor have a concern about

4    the safety of Ricky Evans, your material witness, during

5    that time period before the time period he was located

6    and arrested?

7  A    Generally, yes.  In general terms, yes.

8  Q    Did you speak to -- when you interviewed Ricky Evans, did

9    you speak to him about keeping a low profile and if

10    anything was to occur to immediately contact the police

11    or the District Attorney's office?

12  A    Early -- I have a memory talking to him really early,

13    early to the event and at which point I wasn't really

14    able to communicate because he was under the influence of

15    prescriptions or whatever.  I normally would not make it

16    a practice to plant the concerns of fear in a witness.  I

17    was with -- memory of that particular witness, Ricky

18    Evans, was he was pretty forthright.

19            My experience in homicide cases, witnesses,

20    Hey, I saw the whole thing, let me come and testify.

21    That looks good in Hollywood.  That rarely happened.

22    Everybody was, I don't know nothing, basically was how it

23    happened.  It was always great reluctance.  Ricky Evans

24    made it either by words or -- Ricky was unusual in that

**Connolly 010507**                              **Page 39**

00040

1    he was not going -- he knew this Chilly Carter.  There

2    was some familiarity between them.  He did not want

3    Carter to think he was a chump I guess for want of a

4    better -- that was unusual.

5        MR. KATZ:  Just a minute.

6        (The witness conferred with his attorney off

7    the record.)

8  A   Go ahead.

9  Q   Do you acknowledge that there were also two unidentified

10    and two unnamed suspects that participated in the

11    execution of Willie Evans and the shooting of Ricky Evans

12    in this matter that you prosecuted?

13  A   There were two other people, yes, with Chilly Carter.

14  Q   And they were associates of Chilly Carter based on your

15    investigation?

16  A   They connected up with Chilly Carter, yes.

17  Q   You're aware that Chilly Carter was running drugs from

18    New York to Boston, and that was the basis of why the

19    execution occurred because two women at that location

20    were siphoning off some of the drugs and proceeds?

21  A   It was believed that was the motive behind it all, yes.

22  Q   Did you have a concern in regards to the safety of your

23    material witness, Ricky Evans, due to the fact that there

24    were two other unknown or unidentified suspects still out

**Connolly 010507**                    **Page 40**

00047

1  Q    You can answer.

2  A    I'm not sure -- if you could repeat it.  Just repeat your

3       question.

4  Q    Sure.  In light of the facts of this case, the execution

5       of Willie Evans --

6  A    Okay.

7  Q    -- and the shooting of Ricky Evans, based on the

8       information that's contained in this memorandum that

9       Ricky Evans' whereabouts were being reported back to

10      Treas Carter and his compatriots, would you have taken

11      steps to relocate the witness?

12             MR. REILLY:  Objection.

13             MR. KATZ:  Are you asking him would he have

14      or did he?

15             MR. CURRAN:  Would he have.

16  A    If I understand your question to be if I felt that Ricky

17      Evans' personal safety was jeopardized somehow by friends

18      of Carter, would I have relocated him?

19  Q    Yes.

20  A    Yes, I would have.

21  Q    And based on the memorandum that was drafted and sent to

22      Laura Scherz, the paragraph I just read, do you have a

23      memory that you or someone within the Suffolk County

24      District Attorney's office relocated Ricky Evans in the

00048

1    prosecution of Commonwealth versus Treas Carter?

2  A   Do I have a specific memory of making arrangements to

3    relocate specifically Ricky Evans? No. I'm almost

4    positive I did not.

5  Q   Based on this memo, you were aware of it back in 1989

6    that he was relocated?

7          MR. REILLY:  Objection.

8          MR. KATZ:  If you remember that.

9  A   I don't remember that.

10  Q   And you write, "Since we had, in effect, relocated him to

11    a hotel."  Who are you referring to with "we"?

12         MR. REILLY:  Objection.

13  A   The pronoun "we" is a collective in that not meant to be

14    Laura and I as opposed to "we" being the Suffolk County

15    District Attorney's offices is how that "we" is to be --

16  Q   The Suffolk County District Attorney's office relocated

17    him to a --

18  A   -- right, or police, one or the other.

19  Q   Based on this memorandum and the way it's written, the

20    Suffolk County DA's office had knowledge that he had been

21    relocated in 1989?

22         MR. REILLY:  Objection.

23  A   I'm not sure what your question is.  You're asking me to

24    corroborate the contents of this?

**Connolly 010507**                **Page 48**

00054

1    But John had dealt with the defense lawyer trying to make

2    arrangements for a surrender or something like that, and

3    there would have been -- he would have agreed to things.

4    But generally it was whoever handled the assistant

5    handling the specific case.  From the point in time it

6    was assigned to you, it was you.

7  Q   And the assistant that was assigned the case upon

8    assignment made all decisions relative to disclosures of

9    reports, promises, rewards, and inducements, any other

10    discovery that was dictated by pretrial conference report

11    or by law or statute?

12  A   Yes, if -- yes.  You had cases that -- I indicated in a

13    situation before you're assigned say the head may have

14    had negotiations with the lawyer.  But there were cases

15    that people would -- there was transition in the office,

16    that you may end up, unfortunately, have the experience

17    of getting a case out in a trial session from some other

18    assistant who had left the office.  That could be awkward

19    because they may or may not have and whatever.

20  Q   But that's not the case when you have an assistant that

21    was assigned the case pre-indictment, took the case to

22    the Grand Jury, and ultimately prosecuted the case, that

23    all responsibilities during that time period relative to

24    disclosures rested solely with the assistant who was

**Connolly 010507**              **Page 54**

00055

1    prosecuting the case?

2  A    As a general proposition, that would be accurate.

3  Q    Would you expect law enforcement police officers to make

4       determinations relative to what consisted of a promise,

5       reward, or inducement in any disclosures as such?

6  A    Can you just repeat that?

7  Q    Sure.  In your experience, would you expect -- would you,

8       as an assistant handling a matter, expect law

9       enforcement, police officers, to make determinations

10      relative to discovery disclosures including promises,

11      rewards, and inducements for the other side?

12 A    I don't think I can answer that yes or no.

13 Q    Let me rephrase it then.  If information was provided to

14      you relative to considering whether something actually

15      was a promise, reward, or inducement, who would

16      ultimately make that decision as the representative of

17      the Commonwealth in the prosecution of any criminal

18      matter?

19 A    Who should make that would be the Assistant District

20      Attorney handling the individual case or a superior above

21      him.

22 Q    And if certain factual representations were provided to

23      the Assistant District Attorney relative to default

24      removals, pending cases, safety concerns, and housing of

**Connolly 010507**                                     **Page 55**

00056

1    witnesses, whose obligation was it to turn that

2    information over to defense counsel?

3  A   It would be the obligation of the assistant handling the

4    case to provide any information he was aware or in

5    knowledge or possession of.

6  Q   In your practice, you refer to an open-file policy.  What

7    was -- would you describe what your practice was relative

8    to discovery?

9  A   I didn't fight -- generally I didn't fight motions for

10   discovery.  It had always been normally, not without

11   exception, but generally I found open discovery to be

12   preferred.  It just made life easier, and you get down to

13   brass tacks quicker.

14  Q   Was it something that you trained the Assistant District

15   Attorneys that you supervised relative to open

16   disclosure?

17  A   Yes, I would -- yes, as a general proposition, that's --

18   at various times, things became issues that became

19   office-wide policy, if you will, that would be the

20   exception.  The norm was just yes, give it up.

21  Q   What was your relationship with -- what was your

22   relationship with the criminal defense attorney who

23   defended Treas Carter, your professional relationship?

24  A   Joan Stanley?