# CALLAHAN EXHIBIT F

```
                    COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                        SUPERIOR COURT DEPARTMENT
                                    OF THE TRIAL COURT
                                    SUCR 071882
```

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

COMMONWEALTH OF MASSACHUSETTS

   -vs-                               MOTION HEARING
                                                                                     DAY SIX

SHAWN DRUMGOLD

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TRANSCRIPT OF PROCEEDINGS


BEFORE: ROUSE, J


August 6, 2003
Boston, Massachusetts


APPEARANCES:

    DAVID MEIER, Esquire, Assistant District
    Attorney, for the Commonwealth

    ROSEMARY SCAPICCHIO, Esquire, for the Defendant


Mary M. Wrighton
Official Court Reporter

I N D E X

WITNESSES:                                                          PAGE

TIMOTHY CALLAHAN
    direct examination by Mr. Meier (cont.)                 4
    cross examination by Ms. Scapicchio                    28
    redirect examination by Mr. Meier                     129

PHILLIP T. BEAUCHESNE
    direct examination by Mr. Meier                       131
    cross examination by Ms. Scapicchio                   157

FRANCIS O'MEARA
    direct examination by Mr. Meier                       182
    cross examination by Ms. Scapicchio                   202

ROMERO HOLLIDAY
    direct examination by Mr. Meier                       225

* * * * *

EXHIBITS:

No. 29 – tape cassette
    marked and admitted                                    13

No. 30 – tape cassette
    marked and admitted                                    17

No. 31 – letter
    marked and admitted                                   210

No. 32 – letter
    marked and admitted                                   212

No. 33 – medical records
    marked and admitted                                   254

```
 1        that it was my obligation to give them full and
 2        complete discovery and I tried to fulfill that
 3        with the problem, if you didn't, the case would
 4        be reversed and that would be kind of a silly
 5        reason for a reversal and it would be on me. So
 6        I was rather cautious about that.
 7   Q    Do you recall the trial of the ████ late
 8        September and early October of ████?
 9   A    Just fragments of it. I remember the very last
10        of it best of all.
11   Q    Do you have a recollection of your ─ strike
12        that. Do you have a recollection of certain
13        witnesses being called to testify on behalf of
14        the Commonwealth?
15   A    I have a fairly good recollection of a lot of
16        missing witnesses to the point where most of the
17        people who testified in the grand jury weren't
18        around at the time of trial and my recollection
19        is, we practically had to re-investigate the case
20        and come up with some more witnesses and that was
21        done. And then at the time of trial some of the
22        new witnesses were amongst the missing and you
23        can draw whatever inference you want from that.
24        I drew my own inferences but to the point where,
```

1   as the case progressed to a conclusion, there was
2   almost a complete failure of proof to the extent
3   that Mr. Taylor's case was a directed verdict and
4   the only reason there wasn't a directed verdict
5   in this case was the testimony of Mary Alexander
6   which came as a complete surprise on the every
7   last day of trial.
8 Q   Mr. Beauchesne, with respect to one of the
9   witnesses who did testify at trial, a gentleman
10  by the name of Ricky Evans, does that name mean
11  anything to you in terms of having your memory
12  refreshed or having reviewed various
13  correspondence and discovery requests and letters
14  back and forth between yourself and Mr. Rappaport
15  and Mr. George?  Does that name, Ricky Evans, or
16  the testimony of Ricky Evans bear any
17  significance to you?
18 A   Not at the present time.
19 Q   Do you have any recollection of whether or not at
20  the time that he testified, Mr. Evans was staying
21  at the Howard Johnson's in South Boston?
22 A   Well, from everything I've heard, I believe he
23  was but I don't really have a memory that he was
24  staying there, but -- I'll just say the record

147

1        appears that that's where he was staying, yes,
2        but I don't know that I recall it.
3    Q   If you could do your best, just for purposes of
4        this hearing, as difficult as it might be to
5        divorce yourself or put aside what you may have
6        heard or read or seen in the last several days,
7        and, as best you can, if you can recall back to
8        the time of trial, are you able to tell Justice
9        Rouse anything about your knowledge or any
10       statements made to you by anybody, whether police
11       officers or other members of the District
12       Attorney's office, to the effect that Mr. Evans
13       was staying at a hotel at the time of trial?  Do
14       you remember having any, in effect?
15   A   I would have to say that before I came in for
16       this hearing, I had absolutely no memory of it.
17       I now have a little bit of a memory and I tried
18       to express it, the reason he was taken there was,
19       the safe house, I think the safe house wasn't
20       available and that's why they had to put him up
21       there.  Ordinarily he would have been a lot safer
22       at our safe house.  It's very -- it's way out of
23       the way.  He wouldn't bump into anybody, no one
24       would see him, and he'd be much more protected

1  there. That was the most desirable solution at
2  that time.
3  Q  Do you have any sense, based upon your memory
4  being refreshed over the last several days, as to
5  the approximate length of time, whether it was
6  days, weeks, or months, that Mr. Evans may have
7  stayed at a hotel?
8  A  I have a rather dim sense that it probably was a
9  few months but I'm not sure.
10 Q  And do you have any recollection either
11 independently or having memory refreshed because
12 of events in the last several days about whether
13 or not Mr. Evans' meals were paid for?
14 A  I don't have a memory but I assume that if he was
15 being put up, his meals were provided. I assume,
16 I have some limited recollection, he wouldn't be
17 able to work, he wouldn't be able to go out in
18 the community and do whatever he did for a living
19 and survive, in my opinion, at that time, so you
20 would have had to feed him and house him and have
21 a police officer basically around at all times to
22 make sure he survived.
23 Q  Independent or other than this particular
24 situation, this case and this particular witness,

1     could you describe for Her Honor generally the
2     procedure internally, as best you understand it
3     today, that is, within the District Attorney's
4     office at the time by which a witness such as Mr.
5     Evans would be housed somewhere other than his
6     usual residence?
7  A  The case would be assigned to me, to an assistant
8     DA and I knew all of the members of the homicide
9     unit very well and most of them were very
10    experienced officers, very credible, I had
11    personal relationships with them, so when I had a
12    homicide officer come to me and say, look, this
13    guy is going to get hit, we believe that there is
14    a serious threat, I would act on it and I would
15    go to my superiors and basically say that,
16    Sergeant Hudson, for example, has said that there
17    is a serious threat and I believe him and we
18    should put this guy down on the island or the
19    family down on the island. Usually it would be
20    just the individual, it might be his mother, his
21    sister, it could be a female witness, but you'd
22    have to take care of the people to make sure that
23    they could do their duty as you want them to do
24    it and they survived, and it was no fooling, it

150

```
 1              was the real McCoy.
 2     Q        Internally who would you go to and who would
 3              approve such a relocation and who would authorize
 4              the funds and pay for it?
 5     A        Normally I would, I might have discussed it with
 6              whoever was running homicide at the time and they
 7              may or may not have had the final say but
 8              generally I would end up probably talking to the
 9              first assistant district attorney himself because
10              it was a considerable expense and we didn't do it
11              lightly but when it was needed, it had to be
12              done.
13     Q        Do you have any recollection of doing anything of
14              that sort with respect to Mr. Evans in this case?
15     A        I don't have a recollection.  I know I must have
16              done it, I believe I did it, but do I remember on
17              a particular day I spoke to a particular person?
18              I do not.
19     Q        Do you recall, sir, that when you first were
20              assigned or received the case that two homicide
21              detectives by the names of Walsh and Murphy were
22              the individuals working the case?
23     A        I know they, when -- I know they were on the
24              case.  I don't know whether -- I think they were
```

151