UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-CV-11193-NG

| | |
|---|---|
| SHAWN DRUMGOLD, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| vs. | ) |
| | ) |
| CITY OF BOSTON, ET AL., | ) |
| | ) |
| Defendants | ) |

**DEFENDANT TIMOTHY CALLAHAN'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT**

**I.   INTRODUCTION**

Defendant Timothy Callahan (hereafter "Callahan") hereby moves for partial summary judgment on those allegations and claims against him to which there is no genuine dispute of material fact, such that he is entitled to judgment on those claims. In so moving, Callahan incorporates and adopts Walsh and Murphy's Statement of Facts filed October 1, 2007, and also files a separate Statement of Facts herewith.

**A.   Summary of Claims Pled Against Callahan**

Plaintiff filed a four count complaint in this matter. Count I, pled against the individual defendants, alleges violation of the Plaintiff's right to due process and to a fair trial. Count II alleges conspiracy to violate Plaintiff's rights to a fair trial and to receive exculpatory evidence. Count III is Plaintiff's *Monell* claim against the City of Boston. Count IV alleges that the individual defendants violated Plaintiff's state constitutional law rights by the use of threats, intimidation and coercion.

**B.      Summary of Relevant Facts Pled or Alleged Against Callahan**

Callahan incorporates the Statement of Material Facts filed by co-defendants Walsh and Murphy in this matter, and refers to those facts as "WMSMF." Callahan also files a separate Statement of Material Facts referencing additional allegations that pertain to him specifically. That document will be referred to as "CSMF."

Callahan was not involved in the initial investigation into the Tiffany Moore murder. CSMF ¶ 1. Callahan was assigned to the investigation of the Tiffany Moore murder sometime in late May or early June, 1989 and had no involvement in the case prior to that time. WMSMF ¶ 30, CSMF ¶ 1.

1.      Ricky Evans

In December 1988, Callahan was assigned to investigate the shooting death of Willie Evans and the wounding of Ricky Evans. This shooting occurred on Elm Hill Avenue, and was essentially an execution of Willie Evans. A suspect, Treas Carter, was identified as the shooter and remained at large for some time. CSMF ¶ 2, 10.

Callahan interviewed Ricky Evans in June 1989, and during the interview asked if Evans had any information about the Tiffany Moore case. Evans said he did, and Callahan drafted a report reflecting that conversation. That report has since been lost, although the trial transcript reflects that Drumgold's attorney, Steven Rappaport, examined Callahan about the report. CSMF ¶¶ 3, 4.

Callahan also conduced a tape recorded interview of Ricky Evans on August 6, 1989. In that statement, Evans said that he had been with Terrance Taylor and Shawn Drumgold on the day of the Moore murder. WMSMF ¶ 209.

On September 12, 1989, Evans told Callahan that a private investigator, Laurence Fallon, had come to Evans' brother's house to speak to Evans, and told him that he did not have to testify at the Moore trial and that it was better if he did not. CSMF ¶ 6, 7.

Evans also told Callahan that his family, with whom he was living, were throwing him out of the house because he was cooperating with law enforcement and because the investigator had come to the house. CSMF ¶ 7. Thereafter, Callahan moved Evans to the Howard Johnson's hotel, to ensure his appearance at trial, to keep him from being intimidated into failing to testify at the Evans trial, and because he was concerned about Evans's safety since two suspects in the Willie Evans murder case had not been apprehended. CSMF ¶ 8.

  2. <u>Vantrell McPherson</u>

Callahan took the recorded statement of McPherson on June 10, 1989. McPherson stated that she saw Drumgold and Taylor earlier on the day that Tiffany Moore was shot. WMSMF ¶ 182. McPherson testified at trial that she heard Taylor say to Drumgold, "Come on, Shawn, you know we got to do this." WMSMF ¶ 187. At deposition, McPherson testified that she had testified truthfully at the criminal trial, that no one had forced or threatened her with regard to her testimony, and that no one had told her what to say during her testimony. WMSMF ¶ 194.

  3. <u>Mary Alexander</u>

Callahan visited Mary Alexander on May 31, 1989 to arrange for her to meet with Phil Beauchesne. WMSMF ¶ 96. Just prior to trial, Callahan heard on the police radio that a woman had been injured at the Alexander address, and responded. Callahan drove Mary Alexander's mother, Lola, to the hospital. CSMF ¶ 14. Callahan was never informed that Mary Alexander had a brain tumor. CSMF ¶ 14.

  4. <u>Knowledge of Drumgold's Attorney Steven Rappaport</u>

Steven Rappaport visited Mary Alexander the week before trial, and showed her Drumgold's photograph. WMSMF ¶ 117. When Rappaport cross examined Mary

Alexander at trial, he asked her about her hospitalization in February. WMSMF ¶ 102. Rappaport referenced her surgery. WMSMF ¶ 102.

Steven Rappaport was provided with Callahan's recorded interview of Olisa Graham, which referenced others who allegedly were at 23 Sonoma Street (with Drumgold) at the time of the Moore shooting. WMSMF ¶ 54. Rappaport did not attempt to interview Graham or Gemini Hullum. WMSMF ¶ 54. Rappaport did not intend to rely on an alibi defense at trial. WMSMF ¶ 49. Rappaport testified that Terrence Taylor's attorney, Robert George, took responsibility for the 23 Sonoma Street alibi defense, in part because Taylor had stronger connections to that address than did Drumgold. WMSMF ¶ 50. Rappaport testified that, after Taylor invoked his fifth amendment rights at trial, he decided he could not trust the other witnesses associated with Taylor, and decided not to call any of the Sonoma Street witnesses in Drumgold's defense. WMSMF ¶ 51 – 54.

5. Knowledge of the District Attorney's Office

Paul Connolly, the ADA prosecuting Treas Carter for the Willie Evans murder, was aware that Evans had been placed in a hotel pending the trial of that case. He wrote a memo to the victim witness advocate referencing Evans's being housed and relocated. CSMF ¶ 10 – 12. The District Attorney's Office was aware that Evans was placed in a hotel for safekeeping. WMSMF ¶ 212. Phil Beauchesme recollected at the motion for new trial that he had been aware that Evans had been placed in housing. CSMF ¶ 13. It was ADA Connolly's understanding that the decision as to what constituted a promise, reward or inducement was made by the prosecuting district attorney, and it was the duty of the prosecutor to disclose such to defense counsel. CSMF ¶ 11.

The District Attorney's office, acting through its victim witness advocate unit, also knew that Mary Alexander had a seizure disorder. CSMF ¶ 15.

II.     **ARGUMENT**

A.      **Standard of Review**

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file … show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Mitchell v. City of Boston, et al., 130 F.Supp.2d 210, 208 (D.Mass.2001).  To prevail on a motion for summary judgment, the moving party must show that there is an absence of evidence to support the non-moving party's position; and once the moving party has satisfied this requirement, the burden shifts to the non-moving party to establish the existence of at least one factual issue that is both genuine and material.  The non-moving party must not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial.  The court must view the facts in the light most favorable to the non-movant, drawing all reasonable inferences in that party's favor Id. (citations omitted).

A genuine issue of fact, for purposes of summary judgment, is more than "a metaphysical doubt." *Matushita Elec. Ind. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  "[B]rash conjecture, coupled with earnest hope that something concrete will eventually materialize, is insufficient to block summary judgment." *Maldonado-Denis v. Castillo-Rodriguez,* 23 F.3d 576, 581 (1st Cir. 1994)( citations omitted).

B.      **Count I – The Due Process Claims**

It is well settled that that, in order to successfully bring a civil rights action against Callahan, Drumgold must demonstrate that the conduct of which he complains was attributable to Callahan, and not some other cause. *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999); *Baker v. McCollan,* 443 U.S. 137 (1979). "In order for a state officer to be properly brought into suit individually under § 1983, the officer must be shown to

have been in some manner personally involved in the alleged deprivation of rights."
*Feliciano v. Dubois*, 846 F.Supp. 1033 (D.Mass.1984).

Drumgold's due process claims are predicated on the theory that Callahan withheld exculpatory information. Callahan does not dispute that the deliberate and intentional withholding of exculpatory information from a criminal defendant that results in prejudice to that defendant is actionable as a constitutional violation. *See Rock v. Arkansas*, 483 U.S. 44 (1987), *Strickland v. Washington*, 466 U.S. 668 (1984), and *Brady v. Maryland*, 373 U.S. 83 (1963). Thus, in order to maintain this suit against Callahan, Drumgold must show that Callahan, personally, withheld exculpatory evidence, <u>and</u> that the withholding of that evidence was prejudicial to him. In order to prove prejudice, the evidence allegedly withheld must be of such significance that "there is a reasonable probability that the … evidence would have produced a different verdict" had it been provided to the jury. *Strickland*, 466 U.S. at 694.

### 1. <u>Mary Alexander and Ricky Evans</u>

First, there is no evidence that Callahan knew Mary Alexander had a brain tumor. "[C]onclusory allegations, improbable inferences, and unsupported speculation" cannot withstand a properly pled motion for summary judgment. Drumgold has no proof of Callahan's knowledge on this point, but Callahan does have proof that Drumgold's counsel was aware of Mary Alexander's being unwell. There can be no attribution to Callahan of Rappaport's decision not to explore this issue. Callahan can only be find liable under Section 1983 for actions that he, himself, took.

Drumgold may argue that Callahan had the opportunity to learn of Mary's health prior to the trial, especially since he responded to her home when she was injured in the fall on the porch and took her mother to the hospital. However, based upon the information contained in the victim witness file at the District Attorney's office, it is

clear that neither Mary nor her mother were forthcoming about the specifics about her health, and that her abilities were not yet so compromised as to make her illness manifest to others. The record reveals that the most the Alexander family revealed to the authorities – including those most in a position to provide help and assistance to her – was that she was unwell. The only evidence in the record that anyone knew of Mary Alexander's unfortunate health circumstance with any degree of familiarity was that Steven Rappaport, Drumgold's representative, knew. For whatever reason, Rappaport declined to examine Mary Alexander more fully, and declined to request a voir dire to examine her competency.

Summary judgment should also issue for Callahan on so much of the complaint as alleges that Callahan withheld evidence that Ricky Evans was housed at the Howard Johnson's and promised favorable treatment in his pending criminal cases in exchange for his testimony at the Moore murder trial. The evidence adduced in discovery demonstrates that the District Attorney's office knew that Evans was being housed, and under well established case law, it was the burden of the District Attorney, not the investigating officer, to disclose such information to the defense. There is also no evidence that Ricky Evans was promised anything in exchange for his testimony, except for bringing his cooperation to the attention of the District Attorney's office, and on this point Evans was thoroughly cross examined at trial.

Callahan was investigating both the Treas Carter murder and the murder of Tiffany Moore, and Evans was a witness in both. On September 12, 1989, after Evans had given a recorded statement, Evans told Callahan that he had been approached by a private investigator who suggested Evans did not have to testify. Callahan moved him to a hotel to ensure that he would be available as a witness.

Phil Beauschesme testified that he was aware that Evans was housed in a hotel. The memo from Paul Connolly to the Victim-Witness advocate also reflect that "Perhaps you'll remember that our witness Ricky Evans was in need of housing … Since we had, in effect, relocated him to a hotel, his family had gotten repeated inquiry from his 'friends' wondering where he was …" CSMF ¶ 12.

Once Callahan delivered the information regarding Evans' housing and the recall of his warrants to Beauschesme, Callahan's obligations to disclose information to Drumgold were satisfied. *See Baker v. McCollan*, 439 U.S. 1114 (1979). *Baker* "venerates the separation of functions among various government actors." *Brady v. Dill*, 187 F.3d 104, 111 (1st Cir. 1999) (noting that the duty of the investigating officer differs from that of the prosecutor in determining whether to continue to hold a suspect on a facially valid warrant, notwithstanding the officer's subjective suspicion that the suspect was actually innocent of the crime charged in the warrant). As *Brady* explains, even where the police have such suspicions, "the Constitution imposes no … burdens" on them to take it upon themselves to determine guilt or innocence.

It follows that the police have no obligation to correct a prosecutor who does not disclose the housing of a witness, or to inform defense counsel that the cooperation of a testifying witness would be made known to the Commonwealth. As Callahan testified at the motion for new trial and at deposition, he did not believe housing Evans at the Howard Johnson's constituted a promise, reward or inducement. If the prosecuting attorney did not determine that this was information that ought to have been disclosed, it follows that the investigating detective is even less likely to have been aware of such an obligation[1]. And, as Connollly testified, it was his understanding that the prosecutor, and

---

[1] *See Comm. v. Abrew*, 68 Mass.App.Ct. 1108 (2007), holding that a witness's "hope" for favorable treatment in exchange for cooperation with the prosecution does not constitute a promise, reward or

not the police investigators, were the appropriate persons to determine what constituted a promise, reward or inducement and whether disclosure was mandated. His understanding is consistent with the status of the law. CSMF ¶ 11.

### 2. Sonoma Street Witnesses

Drumgold's claim that he was prevented from presenting alibi defenses at trial because of police misconduct should be rejected out of hand. Callahan interviewed Olisa Graham and disclosed the transcript and tape recording to the prosecutor, who in turn disclosed it to Rappaport. Thus, the unrebutted evidence adduced in discovery reveals that Drumgold's counsel was, in fact, aware of the "Sonoma Street" alibi witnesses, yet chose, for strategic purposes, not to call them at trial. Olisa Graham's recorded statement, provided to Rappaport, as he conceded at the Motion for New Trial in 2003, identified not only herself, but also Gemini Hullum and (others) who were allegedly in Drumgold's company at the time that Tiffany Moore was murdered.

Furthermore, even if the Court were to credit the claims that Graham was threatened that she would be subject to arrest for outstanding warrants if she appeared at trial, there is no evidence suggesting that Callahan had any role to play in this alleged intimidation. Given this undisputed testimony, Callahan is entitled to summary judgment on so much of this case as alleges that he pressured witnesses not to cooperate in Drumgold's defense.

### C. Count II – Conspiracy to Violate Civil Rights

Callahan was assigned to the investigation of the murder of Tiffany Moore in late May or early June of 1989. By that time, the investigation undertaken by co-defendants Walsh and Murphy had been quiescent since the presentation to the Grand Jury in

---

inducement, and indeed, it is not clear that provision of housing was considered a promise, reward or inducement in 1989. *See Comm. v. Fuller*, 394 Mass.251, 262-63 (1985), finding no effort to intimidate, coerce or induce false testimony by placing witnesses in housing and paying for out of state moves.

September, 1988. Although Callahan testified that he reviewed the investigation notes compiled by Walsh and Murphy, the evidence in the record is that Callahan took a fresh look at the interviews they had conducted and went on, with Paul McDonough (not a defendant in this case) and that Walsh and Murphy no longer had an active role in the investigation.

In order to establish a civil conspiracy under § 1983, Drumgold must establish that an "actual conspiracy existed (in other words, that people agreed to injure him), that its purpose as to deprive [him] of his constitutional rights, that an act was committed in furtherance of the conspiracy, and that he was injured." *Alexander v. City of South Bend*, 433 F.3d 550, 556-57 (7th Cir.2006). In order to withstand summary judgment on this count, Drumgold must put forth specific, non-conclusory allegations in support of his conspiracy claims. *Jones v. Cannon*, 174 F.3d 1271, 1288-89 (11th Cir. 1999).

The evidence is bereft of any such evidence. Callahan succeeded Walsh and Murphy as the investigator on the Moore murder, and there is no evidence that Walsh or Murphy continued to work on the investigation with Callahan. In the absence of any evidence that the named defendants conspired in any respect, or indeed, even worked together in bringing this case to trial, Callahan is entitled to summary judgment on Count II in its entirety.

D.      **Count IV – The Massachusetts Civil Rights Act**

Drumgold generally alleges that the actions described in the Complaint constituted a deprivation of his rights, under state law, to be free from civil rights violations through the use of threats, intimidation or coercion. See Count IV.

To establish a claim under the Massachusetts Civil Rights Act ("MCRA"), Drumgold must establish that (1) his exercise or enjoyment of rights secured by the Constitution or the laws of the United States or the Commonwealth (2) have been

interfered with, or attempted to be interfered with, (3) by the use of threats, intimidation or coercion. *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 395 (1996). *See also Mitchell v. City of Boston*, 130 F.Supp.2d 201, 213-14 (D.Mass. 2001).

This claim is time barred. The MCRA claim accrues at the point that Drumgold knew, or should have known, of the alleged use of threats, intimidation or coercion to convict him. *See Mitchell*, 130 F.Supp.2d at 214, citing *Messere v. Murphy*, 32 Mass.App.Ct. 917, 918 (1992). In *Mitchell*, following *Messere*, Judge Saris concluded that for purposes of the MCRA, the plaintiff's cause of action for wrongful conviction accrued when he was put on trial, convicted, and incarcerated, since these were events that "were likely to put him on notice" of the alleged wrongs.

Presumably, Drumgold will argue that his MCRA claim must survive based on *Heck* and the discovery rule (arguing that he was unaware of the alleged conspiracy to intimidate witnesses to testify falsely until 2003). This argument is unavailing, and *Mitchell* is not distinguishable from this case. In *Mitchell*, plaintiff was convicted of a forcible sexual assault and was later exonerated by DNA evidence. The plaintiff alleged that his conviction was procured by police misconduct, including suggestive photo identification procedures, a fabricated confession, and perjured police testimony. The Court rejected the *Heck* argument in *Mitchell*, reasoning that since the Massachusetts Appeals Court had already ruled on this matter of state law in *Messere*, the district court would not second guess the state court's reasoning.

Even if the claim were not barred by the statute of limitations, there is no evidence that Callahan threatened, intimidated or coerced any witness that testified at the criminal trial. There was never contact between Callahan and Drumgold, who was already in custody and charged with the murder when Callahan took over the case. Ricky Evans testified that he was never forced to do anything by Callahan. CSMF ¶ 16. To the

extent that other witnesses claimed coercion, no witness has identified Callahan as being one of the persons doing so. As Drumgold has no evidence that Callahan engaged in conduct prohibited by the MCRA, Callahan is entitled to summary judgment on Count IV.

E.      **Callahan is Entitled To Qualified Immunity**

Even if the allegations against Callahan with regard to Mary Alexander and Ricky Evans's housing did not fail as a matter of law, Callahan is entitled to qualified immunity as to those claims.

Qualified immunity shields government officials who perform discretionary functions from civil liability so long as their conduct does not violate any "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In conducting the inquiry, the Court must ask whether the right asserted by the plaintiff is recognized by the Constitution at the time of the alleged constitutional injury. *Savard v. Rhode Isl.*, 338 F.3d 23, 28 (1st Cir. 2003) (en banc), *cert. denied* 540 U.S. 1109 (2004). The qualified immunity defense should prevail unless the unlawfulness of the challenged conduct was "apparent" when undertaken. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Here, the right asserted by Drumgold is the right to disclosure of Mary Alexander's health and Ricky Evans's housing <u>by Callahan</u>. Drumgold presses this right against Callahan, despite that all the evidence adduced in this case demonstrates that the prosecution had knowledge both that Mary Alexander was ailing, and that Evans had been placed in a hotel. Callahan submits that the law has not required action by an investigating officer in such circumstances, and no reasonable police officer would have understood otherwise. *See Brady, supra.*

**III.    CONCLUSION**

For the foregoing reasons, Callahan respectfully requests that he is entitled to partial summary judgment, and that he is entitled to qualified immunity.

                        Respectfully submitted,
                        Defendant Timothy Callahan
                        By his attorney,


                        __/s/ Mary Jo Harris_____
                        Mary Jo Harris, BBO # 561484
                        Morgan, Brown & Joy, LLP
                        200 State Street
                        Boston, MA 02109-2605
                        (617) 523-6666

Dated:  October 1, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I served a copy of the within pleading via filing with the ECF system