# EXHIBIT A

# Rappaport Deposition

# Vol. I, II

00001

```
 1                    VOLUME I
                   PAGES 1-159
 2                 EXHIBITS 52-61
            UNITED STATES DISTRICT COURT
 3          DISTRICT OF MASSACHUSETTS

 4              C.A. No. 04-11193NG

 5        ****************************

 6   SHAWN DRUMGOLD,

 7       Plaintiff

 8   vs.

 9   TIMOTHY CALLAHAN,

10    FRANCIS M. ROACHE,

11    PAUL MURPHY, RICHARD WALSH,

12    AND THE CITY OF BOSTON,

13       Defendants

14        ****************************

15       DEPOSITION OF STEVEN RAPPAPORT, a

16   witness called by counsel for the Defendant,

17   Richard Walsh, taken pursuant to the applicable

18   provisions of the Federal Rules of Civil

19   Procedure, before Joann Denning, a Shorthand

20   Reporter and Notary Public in and for the

21   Commonwealth of Massachusetts, at the offices

22   of Bonner Kiernan Trebach & Crociata, One

23   Liberty Square, Boston, Massachusetts, on

24   Friday, August 4, 2006, commencing at 10 a.m.
```

**Rappaport 080406**                    **Page 1**

00028

1    those motions and prepare him for any

2    particular hearing in Roxbury District Court

3    outside of your initial intake?

4  A.    Well, I know I would have met with him.  I

5    don't think that I would have had to have

6    prepared him to testify at any hearing, as I

7    think back.  I don't have a memory of it, but

8    there would have been no reason for

9    Mr. Drumgold to testify at any such hearing.

10  Q.    As a seasoned criminal defense attorney at the

11    time, you didn't want to put your client on the

12    stand to testify without you knowing all the

13    facts in the case?

14        MS. SCAPICCHIO:  Objection.

15  A.    No.  That certainly is part of the thought

16    process, but if there's no need to put your

17    client on the stand generally you don't put

18    your client on the stand.  In this case I

19    didn't think that there was any need to put my

20    client on the stand based upon the fact that my

21    best witness as to what had transpired was the

22    judge, who I trusted.

23  Q.    After the initial intake of Shawn Drumgold,

24    when you met with him on the subsequent

**Rappaport 080406**                    **Page 28**

00029

1  occasions would you take notes of any

2  interviews?

3  A.   Probably.

4  Q.   What would you do to secure and retain those

5  notes?

6  A.   The notes were on yellow pads like we all have

7  in this room right now.  And I maintained the

8  file.  The yellow pads would have been kept in

9  the file.

10  Q.   At any point in time, did you yourself transfer

11  the notes into a computer file --

12  A.   No.

13  Q.   -- by scanning or inputting?

14  A.   No.

15  Q.   Did you have anyone do it on your behalf?

16  A.   No.

17  Q.   Relative to the Shawn Drumgold case, who did

18  you have working with you during the course of

19  your investigation up through trial until you

20  filed a withdrawal?

21  A.   I had an associate, Roseanne Ciardiello, and I

22  have a memory of making use of an investigator.

23  The investigator's name was Jay Groob, but he

24  had an agency, and he assured me that he had

00044

1  Q.   When you received that information, would you

2       **take notes during the course of your review --**

3  A.   Yes.

4  Q.   -- in regards to a task list and what

5       information you needed to follow up on?

6  A.   I tended to take notes on all the discovery

7       that I received.

8  Q.   Would you retain those notes?

9  A.   Certainly through trial.

10 Q.   Did you in this case?

11 A.   I don't have them anymore.

12 Q.   The question is, did you retain them through

13      trial on this case?

14 A.   I have to believe I retained them through

15      trial.

16 Q.   Do you have any memory of who the attorney was

17      that replaced you in representing Shawn

18      Drumgold on appeal?

19 A.   I think it was Ms. Scapicchio.

20 Q.   At that point in time, did she request a

21      complete copy of your file?

22 A.   I'm sure she did.

23 Q.   Did you provide her a copy of everything that

24      was contained in your file relative to your

**Rappaport 080406**                    **Page 44**

00045

1    representation of Shawn Drumgold?

2  A.   My best memory is I did.

3  Q.   Fair to say there's no reason why you would

4    have kept the notes out?

5     MS. SCAPICCHIO:  Objection.

6  A.   There would have been no reason for me to do

7    that.

8  Q.   Do you have a memory that you did not keep the

9    notes out?

10  A.   No.

11  Q.   You have no memory one way or the other?

12  A.   I thought I turned over my files.  Actually not

13    just copies, I thought I turned over the files.

14    I knew it by the time -- I won't get into it.

15    I was rooting very hard for Ms. Scapicchio in

16    this case.

17  Q.   I understand that.  When you received notice of

18    Ms. Scapicchio's representation of Shawn

19    Drumgold on the appeal, you obviously wanted to

20    do everything that you could do to help Shawn

21    Drumgold and assist Ms. Scapicchio, correct?

22  A.   I think that's fair.

23  Q.   As a seasoned criminal defense attorney, you

24    know how important, one, your notes were?

**Rappaport 080406**          **Page 45**

00046

1  A.    For purposes of appeal?  I don't know if that's

2        it.  My sense is that I'd want the attorney to

3        have everything that might help her.

4  Q.    Which were your notes?

5        MS. SCAPICCHIO:  Objection.

6  A.    I just don't remember.

7  Q.    You made sure that she had a copy of all the

8        discovery?

9        MS. SCAPICCHIO:  Objection.

10  A.   I would imagine I did.

11  Q.    During the course of the pretrial phase, you

12       had your investigator conduct certain tasks,

13       whether they be interviews, obtaining

14       intelligence, criminal records, a variety of

15       things, is that correct?

16  A.   I know that I would have hoped that that's what

17       my investigator would do.

18  Q.    Do you have a memory of what you instructed

19       your investigator to do in this matter?

20  A.   No.

21  Q.    What was your standard operating procedure in

22       murder cases regarding the use of investigators

23       and what you would have them do?

24       MS. SCAPICCHIO:  Objection.

**Rappaport 080406**                    **Page 46**

00048

1          MS. SCAPICCHIO:  Objection.

2  A.    He most likely did, and I remember the form of

3          his reports, AI, whatever, American

4          Investigative, AIS, would say on it, but I

5          don't have any of those reports.

6  Q.    I'll represent to you that Mr. Groob has

7          testified initially -- he has to come back --

8          that he generated reports during the course of

9          his work and bills and submitted a copy of

10        those reports to you.  Would you acknowledge

11        that that is accurate?

12  A.    I would acknowledge that he submitted reports

13        and bills to me.

14  Q.    As a result of your continued assistance for

15        Shawn Drumgold and Ms. Scapicchio, you would

16        have turned over those reports of Investigator

17        Jay Groob to Ms. Scapicchio for the purposes of

18        appeal?

19          MS. SCAPICCHIO:  Objection.

20  A.    I can't imagine any reason why I wouldn't.  I

21        don't have any memory of specifically what I

22        turned over to Ms. Scapicchio, but I thought I

23        had turned over what I had.

24  Q.    You would acknowledge that there's no privilege

**Rappaport 080406**                              **Page 48**

00049

1    that attaches to the reports that would prevent

2    you from turning them over to Shawn Drumgold

3    and his attorneys for the purposes of the

4    appeal?

5  A.    This was as far as I was concerned Shawn

6    Drumgold's property.

7  Q.    Including your notes?

8        MS. SCAPICCHIO:  Objection.

9  A.    In this case, probably yes.  In some cases I

10    would say no, that all my notes are not the

11    property of the client.  But in this case I

12    would have had the attitude or the -- well, it

13    would have been my position that whatever I had

14    was his.

15  Q.    Since the entering of an appearance by

16    Ms. Scapicchio on behalf of Shawn Drumgold, you

17    continued to cooperate and assist Shawn

18    Drumgold in his appeal?

19        MS. SCAPICCHIO:  Objection.

20  A.    I know that if Ms. Scapicchio ever called

21    requesting my view of something, I was more

22    than happy to assist Ms. Scapicchio.  I don't

23    know that I had very many discussions other

24    than in passing with Shawn Drumgold after

00050

1    Ms. Scapicchio took over the representation.  I

2    remember seeing him in court, I guess, during

3    the first hearing on motion for new trial,

4    seeing him in court during the second hearing

5    on motion for new trial.

6  Q.    Did you visit him between the time of his --

7  A.    I don't know if I visited him after I no longer

8    represented him.

9  Q.    You just have to wait until I finish the

10    question.

11  A.    I'm sorry.

12  Q.    But you answered it.  After you withdrew and

13    Ms. Scapicchio entered an appearance, did you

14    visit him or have any contact with him?

15  A.    Well, there's two different questions.  I don't

16    know that I ever visited him.  I may have had

17    contact with him.  Prisons being what they are,

18    I might be in a prison visiting somebody else

19    and Shawn Drumgold would be in the visiting

20    room.

21        Any conversations that Shawn and I would

22    have had after my representation concluded were

23    more sort of social pep talk, social like hi,

24    how are you, I know Rose is breaking her ass

00148

1 Q.    Based on the time of your willingness to

2        cooperate in Shawn Drumgold seeking a new

3        trial, you read this, believed it to be

4        accurate, and executed it?

5 A.    That's correct.

6 Q.    Subsequent to that you were produced and

7        provided transcripts and correspondence that

8        determined that you, in fact, had in your

9        possession Olisa Graham's statement?

10 A.    My memory is that prior to the beginning of the

11       actual hearing Mr. Meier was a gentleman and

12       said, Look, Steve, take a look at this.  I

13       said, Oh, I guess I was wrong.

14 Q.    When you were shown by Mr. Meier the

15       correspondence of Phil Beauchesne and letter

16       from Phil Beauchesne, that verified that, in

17       fact, you were aware of Olisa Graham and you

18       were aware that she supported Shawn Drumgold's

19       alibi?

20       MS. SCAPICCHIO:  Objection.

21 A.    Obviously I was aware of Olisa Graham.  If

22       Mr. Beauchesne sent me a tape, I listened to

23       the tape.  At some point I was aware of Olisa

24       Graham.  I don't remember what she said.

**Rappaport 080406**                    **Page 148**

00149

1    That's why I said when you said the part about

2    it supported Drumgold's alibi I don't remember

3    the substance.

4  Q.    Prior to the trial you were in possession of

5    Olisa Graham's transcribed statement and tape

6    of that statement?

7  A.    I believe so.

8  Q.    As supported by correspondence from you to

9    Phil Beauchesne and from Phil Beauchesne to

10    you?

11  A.    Yeah.  As we sit here today, I agree with the

12    statement that I had that information.

13  Q.    As you sit here today, you agree that any

14    statement that was provided to you you read and

15    listened to the tape?

16  A.    Correct.

17  Q.    If the substance of that statement supported

18    Shawn Drumgold's alibi at the time of the

19    trial, you acknowledge that you had that

20    information relative --

21        MS. SCAPICCHIO:  Objection.

22  Q.    -- to Olisa Graham supporting the alibi of

23    Shawn Drumgold?

24        MS. SCAPICCHIO:  Objection.

00150

1  A.    Yeah.  A flows to B flows to C, but getting

2        back into whether or not at that point --

3        whether or not at trial I would present it, if

4        Olisa Graham was associated with Terrance

5        Taylor that would have been -- I imagine that

6        would have been a reason why I would not have

7        presented it.

8  Q.    In fact, if she was a resident or associated

9        with 23 Sonoma Street, you would not have

10       called her?

11           MS. SCAPICCHIO:  Objection.

12  A.    Probably correct, but, again, after Terrance

13       Taylor took the action that he took.

14  Q.    During the course of the trial, all counsel at

15       the request of Alberti were coordinating the

16       trial witnesses and subpoenas and summonses?

17           MS. SCAPICCHIO:  Objection.

18  A.    As I've stated before, we tried to work

19       together.

20  Q.    In fact, any trial subpoenas that were issued

21       were on some occasions joint subpoenas for

22       witnesses because you shared a common witness?

23           MS. SCAPICCHIO:  Objection.

24  A.    I think that occurred on some of the witnesses.

00151

1    Q.    Did the Commonwealth call any rebuttal --

2    A.    I don't remember.

3    Q.    -- witnesses?

4    A.    I don't remember.  They may have.

5    Q.    Do you recall whether or not you rested on the

6          last day, October 11th, or on the morning when

7          you did your closing arguments on the 12th?

8    A.    My memory -- my best memory is that the case

9          closed and we argued the following day because,

10         as I recall, there would have been a charge

11         conference, a number of things that would have

12         occurred before closing arguments.

13   Q.    Do you recall whether or not Alberti held the

14         charge conference before any of the evidence

15         rested as some judges will do during the course

16         of the trial when there's a break in witnesses?

17   A.    My best memory is that did not happen, that it

18         was at the end of the case, but again --

19   Q.    There was no record of the charge conference,

20         correct?

21   A.    I don't know.

22   Q.    Was it done in chambers without a stenographer?

23   A.    I thought it was done in open court.  But if it

24         was done in chambers -- Judge Alberti did have

**Rappaport 080406**                         **Page 151**

00152

1    Mr. Drumgold in chambers I know during

2    post-trial proceedings.  I don't know

3    whether -- I would hope that Mr. Drumgold would

4    have been there.

5 Q.    Do you have any memory of any time during the

6    course of the trial indicating to the Court or

7    to Mr. Beauchesne would you issue a summons to

8    appear to any particular civilian witness?

9 A.    I don't remember specifically.

10        (Exhibit No. 60, Subpoena, marked for

11        Identification.)

12 Q.    Showing you what's been marked as Exhibit 60.

13 A.    (Perusing document)  I don't remember ever

14    seeing this before.  I don't know when it was

15    issued.  I don't know who it was -- I don't

16    know at whose request it was issued.  Maybe it

17    was mine, but I don't know.

18 Q.    For the record, Exhibit No. 60 is a copy of a

19    summons or subpoena that was issued to Lisa

20    Graham to appear for Wednesday, October 11th,

21    in the matter of Commonwealth v. Shawn

22    Drumgold.  Do you acknowledge that's what this

23    document is?

24 A.    That's what it purports to be.

00153

1 Q.    In fact, this was a document that was provided

2       in the course of discovery from the Suffolk

3       County District Attorney's office that's Bate

4       stamped 3002.  Do you acknowledge that someone

5       involved in the trial of Commonwealth v. Shawn

6       Drumgold wished to call Lisa Graham and, in

7       fact, issued this summons?

8 A.    I have no memory of the issuance of that

9       summons.  I look at it and it says, Call

10      Mr. Beauchesne.  But I just don't know.

11 Q.    Again, relative to Lisa Graham and her

12      residence at 23 Sonoma Street, did you make a

13      conscious decision to avoid calling those alibi

14      witnesses based on strategy?

15      MS. SCAPICCHIO:  Objection.

16 A.    I don't have a distinct memory as to what my

17      thought process was with regard to Lisa Graham.

18      However, as I said before, considering the fact

19      that the people at 23 Sonoma Street were closer

20      to Taylor than they were to Drumgold once

21      Taylor asserted his Fifth Amendment privilege I

22      would have been very wary about calling anyone

23      from 23 Sonoma Street.

24      (Exhibit No. 61, Portion of Testimony,

**Rappaport 080406**                    **Page 153**

00154

1    marked for Identification.)

2 Q.    Showing you what's been marked as Exhibit 61, a

3    copy of a portion of your testimony from the

4    motion for new trial on March 31st, 1994, I'm

5    just going to ask that you read these pages and

6    then I'm going to have a few questions.

7 A.    (Perusing document.)

8 Q.    Based on your review of your motion for new

9    trial testimony, what was your reasoning in

10    calling Shawn Drumgold to the stand in his

11    defense?

12 A.    Well --

13        MS. SCAPICCHIO:  Objection.

14 A.    I think as I indicated before in, whenever that

15    was, '92, '93, '94, initially Shawn wasn't

16    going to take the stand.  He did have a prior

17    record.  We did have a sense that that prior

18    record was going to come out if he testified.

19    Certainly once Taylor was directed out, being

20    aware of Taylor's statement it was a way to get

21    Drumgold's story as to where he was before the

22    jury without putting Drumgold on the stand.

23    Now Taylor claims the Fifth, and I can't

24    remember the exact thought process, but we must

00155

1      have felt it was significant to place

2      Mr. Drumgold elsewhere at the time of the

3      shooting. I have to tell you honestly I don't

4      know what my strategy was at that time.

5  Q.   Were you able to elicit the alibi from Paul

6      Durand?

7  A.   I don't remember Mr. Durand's testimony.

8  Q.   Your memory today is you made a conscious

9      decision to avoid 23 Sonoma Street?

10        MS. SCAPICCHIO: Objection.

11  A.   My testimony today is that that makes sense,

12      that once Taylor claimed his privilege I would

13      have not -- I would have been very wary about

14      any of these potential witnesses from 23 Sonoma

15      Street. I think they would have been more

16      concerned about Taylor than Drumgold.

17  Q.   In your previous testimony of the motion for

18      new trial, you indicated that you lived this

19      case for 13 months, is that correct?

20  A.   It's fair.

21  Q.   Relative to the amount of time on a weekly

22      basis you put in, it took up the majority of

23      your practice?

24  A.   I don't know if -- it certainly took up more

VOLUME II
PAGES 160-339
EXHIBITS 171-184

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-11193NG

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

SHAWN DRUMGOLD,
        Plaintiff

vs.

TIMOTHY CALLAHAN,
FRANCIS M. ROACHE,
PAUL MURPHY, RICHARD WALSH,
AND THE CITY OF BOSTON,
        Defendants

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

CONTINUED DEPOSITION OF STEVEN

RAPPAPORT, a witness called by counsel for the

Defendant, Richard Walsh, taken pursuant to the

applicable provisions of the Federal Rules of

Civil Procedure, before Joann Denning, a

Shorthand Reporter and Notary Public in and for

the Commonwealth of Massachusetts, at the

offices of Bonner Kiernan Trebach & Crociata,

One Liberty Square, Boston, Massachusetts,

on Saturday, February 3, 2007, commencing

at 10:17 a.m.

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

272

```
 1        just tell him everything that I asked.  I
 2        forget his name.  There was one ME in Suffolk
 3        County that used to like to ride around with
 4        the cops.
 5  Q.    In your experience Stanley Bogdan would talk to
 6        both sides?
 7  A.    Yes.  I told you there was only one ME that I
 8        had a problem with.
 9  Q.    He'd answer your questions if you had any?
10  A.    If I had them.
11  Q.    Do you have any memory of a conversation with
12        Stanley Bogdan?
13  A.    No, I don't.
14  Q.    Is it your memory today that you took notes
15        throughout the investigation and the trial?
16  A.    I definitely took notes during the trial when I
17        wasn't questioning.  I tend to take copious
18        trial notes.  I'm sure I wrote things down.
19  Q.    Did you take notes at any time during the
20        course of your interview of Shawn Drumgold?
21  A.    I'm sure I did, certainly in the initial stages
22        of our interview, of our relationship.
23  Q.    Would there be any times that you would ask a
24        Court to conduct a voir dire of a witness due
```

273

```
 1        to a health concern?
 2  A.    I think I probably have.
 3  Q.    Under what circumstances would you then have
 4        the Court conduct a voir dire relative to the
 5        witness' ability to perceive, remember, and
 6        describe?
 7  A.    For some reason I recall a case -- it was a
 8        Suffolk County case back in the '80s when you
 9        could still file a motion based upon certain
10        mental health issues that would arise and you
11        could actually get someone examined for
12        competency prior to trial.  You could get a
13        complainant in a rape case sometimes examined
14        depending upon the judge.
15  Q.    Is that again a strategy issue, whether you do
16        it or don't?
17  A.    It would be a strategy issue.  They don't allow
18        it anymore.  I don't think you --
19  Q.    There's got to be a foundation for it?
20  A.    It's very difficult to get a complaining
21        witness examined for competency merely because
22        they have a mental health history, whereas 30
23        years ago you could.
24  Q.    If a health --
```

274

```
 1  A.    It's been that long.
 2  Q.    If a health issue goes to a witness' ability, a
 3        percipient witness' ability to perceive, to
 4        remember, to describe --
 5  A.    Excuse me.  Yesterday was the 30th anniversary
 6        of me starting my practice, my first practice,
 7        out of law school.
 8  Q.    If a witness' health issue goes directly to a
 9        percipient witness' ability to remember,
10        ability to describe, or ability to perceive,
11        would you conduct a voir dire of that witness?
12  A.    And the witness is going to be offering
13        inculpatory testimony against my client?
14  Q.    Yes.
15  A.    I would try to get such a hearing, most often.
16        I'd say the general response would be yes.
17  Q.    How did you characterize Mary Alexander's
18        testimony prior to the identification
19        procedure?
20  A.    I don't remember.
21  Q.    Prior to the identification procedure Mary
22        Alexander did not select Shawn Drumgold in a
23        photo array, is that correct?
24  A.    In the initial stages of the investigation,
```

275

```
 1        Mary Alexander had stated that she had seen the
 2        assailants.  She was presented with a photo
 3        array.  And my understanding is, my memory is,
 4        that she did not pick Shawn Drumgold's photo
 5        out of an array.  My memory is also that I saw
 6        the array, and I had no problem picking out
 7        Shawn Drumgold.
 8  Q.    Based on those facts did you consider Mary
 9        Alexander's testimony to be inculpatory or
10        exculpatory regarding Shawn Drumgold?
11  A.    Without -- but I knew it was coming.  The
12        bottom line is I knew when Mary Alexander
13        walked into that courtroom she was going to
14        pick Shawn Drumgold out.
15  Q.    I understand that, but I'm saying prior to you
16        showing the photo --
17  A.    I thought she was an exculpatory witness.
18        There would have been no reason for me to have
19        her examined at that point.
20  Q.    After you showed her the photograph and after
21        it was disclosed to you that she identified
22        Shawn Drumgold while there was a view, how did
23        you consider her testimony, inculpatory or
24        exculpatory?
```

276

```
 1  A.    As I was stating about daggers before, I was
 2        just waiting for the dagger to go in and
 3        wondering whether -- not whether, but how much
 4        it would be twisted.
 5  Q.    So it's fair to say that your answer is that
 6        after the identification of Shawn Drumgold when
 7        you showed Mary Alexander the photo and her
 8        identification of him at the view that her
 9        testimony then was inculpatory?
10  A.    Correct.
11  Q.    Did you then take steps to attempt to minimize
12        the inculpatory nature of her testimony?
13  A.    I don't recall.
14  Q.    It's fair to say you knew about -- let's back
15        up a little.  After she identified Shawn when
16        you showed her a picture of Shawn, that alone,
17        did you consider that alone that her testimony
18        would be inculpatory or exculpatory?
19  A.    Inculpatory.
20  Q.    It was clearly a trial strategy and tactic in
21        regards to showing her that photograph one on
22        one?
23  A.    It was -- I'll call it a stupid, careless
24        mistake on my part.  There was no need to show
```

277

```
 1        her the photo.  I had to put an extra nail in
 2        the coffin, and it ended up being a coffin in
 3        my view.
 4  Q.    Therefore, when this was disclosed in the lobby
 5        conference that's when you felt, for lack of a
 6        better term, the pressure of the knife going
 7        in?
 8  A.    I actually felt the -- when she testified in
 9        court is when I felt the knife go in, but I
10        knew the knife was coming for a while.
11  Q.    What did you do to take steps to eliminate or
12        soften the damage of her testimony?
13  A.    I was just trying to figure out how to
14        accomplish what you just said, soften the blow.
15        I don't know that I ever came up with a way to
16        soften the blow because it was a bone-head
17        error on my part that I don't think I ever
18        figured out a way to calculate.
19  Q.    Did you disclose prior to Mary Alexander's
20        testimony her identification of Shawn to Shawn?
21        Did you disclose to your client?
22  A.    I believe so.
23  Q.    After the last --
24  A.    Actually I believe that Mrs. Drumgold was
```

278

| | | |
|---|---|---|
| 1 | | there. |
| 2 | Q. | When you disclosed it? |
| 3 | A. | No, no, when it happened. As I recall, |
| 4 | | Mrs. Drumgold was my guide in the neighborhood |
| 5 | | that night. It really wasn't like the safest |
| 6 | | place for a guy like me to be out there alone. |
| 7 | | In fact, I remember Beauchesne reading me the |
| 8 | | riot act the next day because he had to send |
| 9 | | cops out there or something to protect me |
| 10 | | because there was some white dude walking |
| 11 | | around the neighborhood. I felt perfectly safe |
| 12 | | because I had Mrs. Drumgold with me. She was |
| 13 | | my guide. |
| 14 | Q. | How many days did the trial last from the |
| 15 | | view -- |
| 16 | A. | I don't remember. How many days did the trial |
| 17 | | last? I always thought it was much longer than |
| 18 | | it was. |
| 19 | Q. | -- from the view until Mary Alexander |
| 20 | | testified? |
| 21 | A. | I don't know. I keep hearing you talk about |
| 22 | | Day 7, Day 8, Day 9 and the charge being on Day |
| 23 | | 10. I remember -- |
| 24 | Q. | 11. |

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

279

| | | |
|---|---|---|
| 1 | A. | Or 11. I remembered the case -- maybe it was |
| 2 | | because it was a locked-up jury, but it just |
| 3 | | seemed like the case was a -- I recently |
| 4 | | completed a three-and-a-half week murder case. |
| 5 | | This one seemed at least as long. |
| 6 | Q. | Needless to say, from the time that you showed |
| 7 | | Mary Alexander the photograph until the time |
| 8 | | she testified there was a few days? |
| 9 | A. | Yeah. I think I stewed for a while. |
| 10 | Q. | It's fair to say that the day it occurred |
| 11 | | Ms. Drumgold knew that Mary Alexander |
| 12 | | identified Shawn? |
| 13 | A. | My best memory is that Mrs. Drumgold was with |
| 14 | | me when I spoke to Mary Alexander out in the |
| 15 | | field. I'm not positive that she actually went |
| 16 | | up the stairs with me. I know she was with me |
| 17 | | that evening. |
| 18 | Q. | From the time Mary Alexander identified Shawn |
| 19 | | in the photograph until the disclosure in the |
| 20 | | lobby conference that the government knew about |
| 21 | | it, did you take steps to reopen any plea |
| 22 | | negotiations with Phil Beauchesne? |
| 23 | A. | No. |
| 24 | Q. | Did you consult with Shawn Drumgold regarding |

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

280

| | | |
|---|---|---|
| 1 | | the ramifications of Mary Alexander's |
| 2 | | identification and whether or not he should |
| 3 | | reconsider the plea negotiations? |
| 4 | A. | I don't recall, but frankly I would tend to |
| 5 | | think that the answer is no. I don't recall, |
| 6 | | but I really have no memory of any discussions |
| 7 | | regarding plea negotiations once the trial |
| 8 | | started. |
| 9 | | (There was a discussion off the record.) |
| 10 | Q. | After Mary Alexander testified, did you discuss |
| 11 | | with Shawn Drumgold the impact of her |
| 12 | | testimony? |
| 13 | A. | I have no specific memory of doing that. |
| 14 | | However, I felt that Shawn and I spent a lot of |
| 15 | | time talking before, during, and after this |
| 16 | | case. So I don't have a specific memory of |
| 17 | | saying we just got murdered, but I shared with |
| 18 | | him my thoughts on how the case was going as |
| 19 | | the case came in. |
| 20 | Q. | You previously -- tell me if I'm wrong. You |
| 21 | | referred to the identification by Mary |
| 22 | | Alexander of Shawn Drumgold was like putting |
| 23 | | the final nail in the coffin. |
| 24 | A. | I said I felt like I had to put a final nail in |

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

281

| | | |
|---|---|---|
| 1 | | the coffin. I mean, she was, as far as I was |
| 2 | | concerned, an exculpatory witness. I thought |
| 3 | | things were going to go well and it was my |
| 4 | | putting the final nail in the coffin that I |
| 5 | | overdid it. I didn't have to put that final |
| 6 | | nail in the coffin. So I wasn't discussing her |
| 7 | | being the final nail in the coffin of the case. |
| 8 | | I was talking about my questioning of her being |
| 9 | | the final nail in the coffin of losing her as |
| 10 | | an exculpatory witness and turning her into an |
| 11 | | inculpatory witness. I still felt when the |
| 12 | | jury got the case that the evidence did not |
| 13 | | support a conviction. |
| 14 | Q. | How did you feel about your cross-examination |
| 15 | | of Mary Alexander or the recross-examination? |
| 16 | A. | I don't remember. My sense is I wasn't |
| 17 | | happy with it, but I don't remember. |
| 18 | Q. | If you knew she was dying, would you have done |
| 19 | | anything differently than you did? |
| 20 | A. | I think I've already said if I knew she was |
| 21 | | dying I would have made an effort to secure |
| 22 | | medical records, make a determination as to |
| 23 | | whether or not the cause of her dying had any |
| 24 | | impact upon her as a witness. |

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

282

| | | |
|---|---|---|
| 1 | Q. | When you first met Mary Alexander, how long did |
| 2 | | that process take place -- strike the question. |
| 3 | | When is the first time you met Mary |
| 4 | | Alexander? |
| 5 | A. | That night. |
| 6 | Q. | That's the night of the identification |
| 7 | | procedure you performed with her? |
| 8 | A. | Hm-hm. Yes. |
| 9 | Q. | How long did you speak to her before you showed |
| 10 | | her the photo? |
| 11 | A. | Less than five minutes. |
| 12 | Q. | After you showed her the photo, did you |
| 13 | | continue to speak with her for a period of |
| 14 | | time? |
| 15 | A. | I don't recall. I would have been courteous. |
| 16 | | I didn't like what she had to say, but it |
| 17 | | didn't mean I didn't like her. I would have |
| 18 | | been courteous before. I would have been |
| 19 | | courteous after. |
| 20 | Q. | She had no problem speaking to you? |
| 21 | A. | No, I don't think so. |
| 22 | Q. | During that evening, did you make any |
| 23 | | observations of her that concerned you relative |
| 24 | | to her health or anything else? |

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

283

| | | |
|---|---|---|
| 1 | A. | No, not that night. |
| 2 | Q. | During the course of your interview of her, did |
| 3 | | you see anything that raised any level of |
| 4 | | concern about her ability to perceive, ability |
| 5 | | to remember, and her ability to describe? |
| 6 | A. | I did not, but, as I say, I don't think I was |
| 7 | | with Mary Alexander for more than five minutes |
| 8 | | total, and that would be the outside allotted |
| 9 | | time. |
| 10 | Q. | During that five-minute period -- |
| 11 | A. | Up to five minutes. |
| 12 | Q. | -- did you make any observations of her that |
| 13 | | you had some level of concern about her mental |
| 14 | | capacity or her health? |
| 15 | A. | No. |
| 16 | Q. | What time of day was this interview? |
| 17 | A. | It was after court. My memory is that it was |
| 18 | | either -- it may have started -- my day in the |
| 19 | | field may have started at dusk, but I seem to |
| 20 | | remember being out there that might as well. |
| 21 | | Then I seem to remember Beauchesne actually |
| 22 | | complaining about having to send cops out last |
| 23 | | night because some white guy was walking around |
| 24 | | the streets. |

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

284

| | |
|---|---|
| 1 Q. | Was there any lighting problems where you were |
| 2 | conducting this identification? |
| 3 A. | No.  I was inside her -- it was their house. |
| 4 Q. | She invited you inside the house? |
| 5 A. | It may have been at the door.  I don't recall |
| 6 | actually going into her apartment. |
| 7 Q. | Physically how close were you to her? |
| 8 A. | Closer than you and I are now. |
| 9 Q. | We're a conference table away in feet. |
| 10 A. | I was able to hand her a photo, close enough to |
| 11 | hand her something, within 2 feet. |
| 12 Q. | Where was your focus of attention when you were |
| 13 | talking to her? |
| 14 A. | I don't know.  I don't remember. |
| 15 Q. | Were you looking in her eyes so you could |
| 16 | measure her up? |
| 17 A. | I don't remember. |
| 18 Q. | Fair to say you weren't looking away from her? |
| 19 A. | I don't remember.  I may have been looking |
| 20 | around the apartment.  It was a curious night |
| 21 | for me. |
| 22 Q. | When you showed her the photo, were you looking |
| 23 | at her for her reaction? |
| 24 A. | I don't remember. |

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

285

| | |
|---|---|
| 1 Q. | Do you recall making any observations of her |
| 2 | physical appearance or facial characteristics? |
| 3 A. | I really have a hard time remembering what she |
| 4 | looked like. |
| 5 Q. | Do you recall seeing any scars? |
| 6 A. | I have a hard time remembering even what she |
| 7 | looked like.  I have no memory of any |
| 8 | distinctive physical markings. |
| 9 Q. | If you saw any large scar on her head |
| 10 | indicative of brain surgery, would you have |
| 11 | inquired of the scar? |
| 12 A. | Gee, I don't know.  I don't know because that |
| 13 | could be something, especially some women could |
| 14 | be very self-conscious about, scarring to their |
| 15 | faces.  It might not be a topic of discussion |
| 16 | that they welcome.  At this point I'm looking |
| 17 | to make as many allies in the neighborhood as I |
| 18 | can. |
| 19 Q. | If a witness was dying and you observed a large |
| 20 | scar on her cranial aspect of the head -- |
| 21 Q. | And I knew the witness was dying at the time? |
| 22 Q. | Yes.  Would you have inquired? |
| 23 A. | I might inquire as to whether or not it was a |
| 24 | recent scar. |

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

286

| | |
|---|---|
| 1 Q. | And the cause of the scar? |
| 2 A. | Yeah. |
| 3 Q. | Clearly out of concern of whether they had the |
| 4 | ability to perceive, remember, describe? |
| 5 A. | I don't know if I look at somebody's face and |
| 6 | see a scar I think that's going to impact their |
| 7 | ability to remember something and adequately |
| 8 | describe it, but if I knew the person was ill |
| 9 | and had something wrong with their brain and I |
| 10 | saw the scars, a scar, under those |
| 11 | circumstances I would wonder what was going on |
| 12 | and I probably would have followed up on it |
| 13 | with questions. |
| 14 Q. | Did you speak with Mary Alexander at the |
| 15 | courthouse prior to her testifying? |
| 16 A. | I don't think so. |
| 17 Q. | Did you observe her at the courthouse in and |
| 18 | about the courtroom before she testified? |
| 19 A. | I never saw her come into -- my memory is |
| 20 | seeing her come into the courtroom. |
| 21 Q. | Not now based on what you read in the paper or |
| 22 | anywhere else, but at the time that Mary |
| 23 | Alexander testified did you make any |
| 24 | observations that rose your level of concern in |

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

287

| | |
|---|---|
| 1 | regards to her ability to perceive, remember, |
| 2 | or describe? |
| 3 A. | No.  The only thing that struck me as odd was |
| 4 | when she identified me as a police officer. |
| 5 Q. | And that's based on what you know now? |
| 6 A. | No, no, no.  It struck me odd at the time.  But |
| 7 | I must say there was a period of time when |
| 8 | people confused me with a police officer quite |
| 9 | often.  I was a younger lawyer.  I'd go to |
| 10 | court without a suit on, neat but I'd show up |
| 11 | and I'd be talking to a client, and I once had |
| 12 | a judge say, Step away from that defendant. |
| 13 | Why are you talking to him when he has an |
| 14 | attorney?  Magistrate Cohen got very upset once |
| 15 | because I was talking to a kid from Southie |
| 16 | actually.  Excuse me?  Oh, Mr. Rappaport, I'm |
| 17 | sorry. |
| 18 | It struck me as odd at trial when she |
| 19 | identified me as a police officer.  My memory |
| 20 | is that she pointed to Shawn and she said, The |
| 21 | young boy standing -- or sitting next to the |
| 22 | police officer.  That's just a memory I have. |
| 23 | Maybe it didn't -- you guys probably reviewed |
| 24 | the transcript that she thought I was a cop |

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

288

| | |
|---|---|
| 1 | when a short time earlier I had introduced |
| 2 | myself as the attorney working for Shawn |
| 3 | Drumgold, the boy who was accused of the crime. |
| 4 Q. | When you were doing the identification |
| 5 | procedure? |
| 6 A. | There's no question that I would have |
| 7 | introduced myself as the lawyer for the |
| 8 | accused. |
| 9 Q. | If you knew that a witness was dying and the |
| 10 | same circumstances happened that they then |
| 11 | confused you with a police officer, what would |
| 12 | you have done in those circumstances? |
| 13 A. | The mere fact of her dying --look, it could be |
| 14 | pancreatic cancer for all I knew.  But if I |
| 15 | knew that she had an illness of her brain and |
| 16 | within a week or so or a few days or a week or |
| 17 | ten days, whatever, of the time when I had |
| 18 | spoken to her and introduced myself I would |
| 19 | think that she wasn't a very worldly woman, I |
| 20 | wonder how many white people have come to her |
| 21 | house over the past couple of weeks, and I |
| 22 | would say how come she can't remember that I'm |
| 23 | a defense lawyer and she thinks I'm a cop?  It |
| 24 | would have caused a further red flag.  There |

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

289

| | |
|---|---|
| 1 | already was a red flag when she identified me |
| 2 | as I recall as a police officer.  That was the |
| 3 | only red flag.  It just seemed odd. |
| 4 Q. | That would have caused you a further red flag? |
| 5 A. | If I knew that she had a brain disorder, yes. |
| 6 Q. | And if you knew she was dying? |
| 7 A. | I don't think it's the dying as much as it's |
| 8 | the brain disorder.  Like I say, you could be |
| 9 | dying of congestive heart failure.  I don't |
| 10 | think that's necessarily going to affect your |
| 11 | ability to perceive something. |
| 12 Q. | As a seasoned criminal defense attorney, if you |
| 13 | knew a witness was dying you'd want to know |
| 14 | why? |
| 15 A. | As I say, if I knew -- |
| 16 | MR. REILLY:  Objection.  This is the 15th |
| 17 | time this question has been asked.  And this is |
| 18 | 40 minutes after you had five or ten minutes |
| 19 | left.  You've plowed this ground at least 15 |
| 20 | times, and you should move on. |
| 21 A. | Once again, if I knew that she had a brain |
| 22 | problem, I would have endeavored to determine |
| 23 | what the problem was and what the effect of |
| 24 | that problem was on her ability to testify |

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

**290**

```
1         accurately about any situation she'd be called
2    to testify to.
3  Q.   Did you know she was dying at the time of
4    trial?
5  A.   No.
6              MR. CURRAN:  Can I have this marked, Mary
7    Alexander's testimony at 195 through 199.
8              MR. ROACHE:  Day 5.
9          (Exhibit No. 184, Excerpt of Transcript
10   from Trial Day 5, marked for Identification.)
11 Q.   Have you had a chance to review Exhibit
12   No. 184?
13 A.   Hm-hm.
14 Q.   Particularly you had started cross-examining
15   Mary Alexander on the issue of whether or not
16   she -- pretrial publicity and the photograph of
17   Shawn Drumgold being in the paper, is that
18   correct?
19 A.   That seems to be.
20 Q.   In fact, you cross-examined her --
21         "QUESTION:  When you spoke to them, did
22   you tell them that you had seen a photograph of
23   the person that had done it either on TV or in
24   the newspaper?
           (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

**291**

```
1          "ANSWER:  No one asked me if I seen the
2    picture in TV or in the paper.  You know, they
3    come by and see how you're doing, and knowing
4    me I'd just always tell them, you know.
5          "QUESTION:  Okay, people come by, and
6    actually there was a period of time last year
7    when you were ill?
8          "ANSWER:  Excuse me?
9          "QUESTION:  There was a period of time
10   last year when you were ill?
11         "ANSWER:  Yes.
12         "QUESTION:  You had an operation in
13   February, right?
14         "ANSWER:  Yes.
15         "QUESTION:  And you weren't feeling too
16   well at that time?
17         "ANSWER:  Yes.
18         "QUESTION:  And the police would come by
19   and they'd say the detective would come by to
20   see how you were doing?
21         "ANSWER:  Yes.  And I told them, I don't
22   care if I'm dying.  I'll still go and tell them
23   what I saw.
24         "QUESTION:  And during that period of
           (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

**292**

```
1    time, though, did you tell them you had seen
2    anyone's photograph either in the newspaper or
3    on the TV?
4          "ANSWER:  While I was sick?
5          "QUESTION:  Well, any time that the
6    officers came by to see you to see how you were
7    doing.
8          "ANSWER:  Yeah.  I mean, like I just told
9    you, go over the same thing over and over
10   again."
11         Did I read that accurately?
12 A.   I wasn't following as you read it, but I have
13   no reason to think you didn't.
14 Q.   In fact, you knew that Mary Alexander was
15   dying?
16             MR. REILLY:  Objection.
17 A.   No, I didn't.  That's not what that says.
18             MR. REILLY:  That's absolutely not what
     that says.
19 A.   I did not know she was dying.  She said
20   something to the effect, I don't care if I was
21   dying.  I would come in and still tell them
22   what I knew.  In fact, the indication there is
23   that she wasn't dying, frankly.  The indication
24             (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

**293**

```
1    there is that she had been ill in the past, in
2    February.
3  Q.   You knew she had an operation in February?
4  A.   Let me say this.  As I review this, it's
5    obvious that I knew she had had an operation in
6    February.  What the operation was for, I don't
7    have any memory of it.  As I sat here until
8    two minutes ago, I had no memory of even
9    knowing that she had been ill at any time.  But
10   I've just read what you put in front of me, and
11   that does not say she was dying.
12 Q.   Doesn't say, I don't care if I'm dying?
13 A.   No, no.  It says -- the way I read that is, I
14   told the police, I don't care if I'm dying.
15   I'm still going to come in and say what I saw.
16         So I never got any impression from
17   reading that or at the time that she was saying
18   that she was dying.  She had been ill.  In the
19   past, and, frankly, her illness is discussed as
20   past tense in that testimony.
21 Q.   How did you know and get the information that
22   she had an operation?
23 A.   She may have told me.
24 Q.   Did you ask her what type of operation?
           (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

**294**

```
1  A.   I don't know that I did.  I don't even
2    remember.
3  Q.   Do you think it was a significant thing to ask
4    if a witness told you they were hospitalized
5    for a period of time and had an operation, to
6    inquire whether or not the type of operation?
7  A.   You know, it does seem like it's something that
8    one would ask.  I don't have a memory of asking
9    it.  There could be reasons why I would not ask
10   a woman who I didn't know to explain to me the
11   specifics of some surgery she may have had.
12 Q.   Why wouldn't you have asked?
13 A.   I may want to keep this witness as a very
14   favorable witness to my cause, and certain
15   questions can be very embarrassing.
16 Q.   Did you make a strategic decision not to ask
17   Mary Alexander what the operation was for?
18 A.   Don't know.
19 Q.   Do you have a memory of inquiring?
20 A.   No memory.
21 Q.   When you had an opportunity to interview a
22   friendly witness, Tracie Peaks, did you inquire
23   of Tracie Peaks relative to what Mary
24   Alexander's health was?
           (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```

**295**

```
1  A.   For all I know, it was Tracie Peaks who told me
2    that Mary Alexander had had an operation.
3  Q.   Do you have any notes in regards to where you
4    obtained this information from?
5  A.   No.
6  Q.   Did you take any steps to determine where this
7    operation took place?
8  A.   Not that I recall.
9  Q.   Did you have an opportunity to -- did you at
10   any time ever ask anyone from the Commonwealth,
11   from the DA's office, or the police department
12   whether or not -- what the operation was for?
13 A.   I don't remember whether I asked or not, but
14   based upon the little knowledge I had I would
15   not have thought that there was a -- I'm
16   positive that I didn't make the connection
17   that it was a brain illness.
18 Q.   Did you ever speak to Lola Alexander at any
19   time prior to the conviction of Shawn
20   Drumgold?
21 A.   Is that the mother?
22 Q.   Yes.
23 A.   I have no memory of it.
24 Q.   Did you speak with Betty Peaks, Tracie Peaks'
           (781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333
```