# EXHIBIT D

# Rappaport Testimony

# 2003

```
                    COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                         SUPERIOR COURT DEPARTMENT
                                     OF THE TRIAL COURT
                                     SUCR 071882

* * * * * * * * * * * * * * * * * * * * * * * * * *

COMMONWEALTH OF MASSACHUSETTS

    -vs-                                     HEARING
                                             DAY FOUR
SHAWN DRUMGOLD

* * * * * * * * * * * * * * * * * * * * * * * * * *




                    TRANSCRIPT OF PROCEEDINGS




                                BEFORE:   ROUSE, J



APPEARANCES:

      DAVID MEIER, Esquire, Assistant District
      Attorney, for the Commonwealth

      ROSEMARY SCAPICCHIO, Esquire, for the Defendant


                                     August 4, 2003
                                     Boston, Massachusetts




                    Mary M. Wrighton
                    Official Court Reporter
```

1  identification, but I certainly would have
2  brought that out in front of the jury during my
3  cross examination of Ms. Peaks.
4  Q  Would you have filed a motion in limine to
5  exclude Ms. Peaks from her in-court
6  identification of Mr. Drumgold?
7  A  Well, what I would have attempted to do is show
8  that any in-court identification was tainted by
9  that highly suggestive procedure of pointing to
10 the photograph.
11 Q  Okay. And with respect to Mary Alexander, if you
12 were made aware prior to trial that Mary
13 Alexander suffered from any brain ailment what,
14 if anything, would you have done in preparation
15 for Mr. Drumgold's trial?
16 A  Well, the advantage of working for CPCS on these
17 cases is, you're provided with the resources to
18 properly investigate and what I probably -- what
19 I assume I would have done at that time was
20 determine what it was she was suffering from,
21 hired a qualified physician, whether it was in
22 that area of illness that she was suffering from,
23 and attempted to make a determination as to
24 whether not the illness affected her ability to

```
 1        perceive, her ability to remember, and her
 2        ability to describe events at a later date.
 3   Q    Okay. And during the discovery that you
 4        conducted in the case, were you made aware of the
 5        fact that when Mary Alexander was shown a photo
 6        array by members of the Boston Police, that a
 7        certain photograph was singled out when she
 8        looked at the photo array?
 9   A    I was not aware of that happening.
10   Q    Okay. What, if anything, would you have done if
11        you did become aware of that in a pretrial
12        posture?
13   A    Well, under those circumstances, I definitely
14        would have filed a motion to suppress her in-
15        court identification of Mr. Drumgold. As I
16        recall, she was a devastating witness against us.
17   Q    Okay. And with respect to an individual by the
18        name of Vantrell McPherson, did you receive any
19        discovery in conjunction with Ms. McPherson prior
20        to trial?
21   A    I remember the name. I don't remember what the
22        specific discovery was unless she was one of the
23        people who described the Adidas suits, but I'm
24        not sure she is as of now.
```

38

| | | |
|---|---|---|
| 1 | A | I was never informed of that. |
| 2 | Q | Did you ever investigate whether or not Ms. |
| 3 | | Graham had any outstanding warrants? |
| 4 | A | I don't believe I did. |
| 5 | Q | Okay. Did you ever either personally or your |
| 6 | | investigator speak to any of the individuals at |
| 7 | | the 23 Sonoma Street address? |
| 8 | A | As I recall, the investigation with regard to 23 |
| 9 | | Sonoma Street was primarily Mr. George's |
| 10 | | responsibility in our division of labor. |
| 11 | Q | When you say Mr. George's responsibility, can you |
| 12 | | explain to the Court why it would have been Mr. |
| 13 | | George's responsibility? |
| 14 | A | Well, as I reviewed the statement and it appears |
| 15 | | that Terrance Taylor had a connection to 23 |
| 16 | | Sonoma Street and the people at 23 Sonoma Street, |
| 17 | | a connection which was much greater than Mr. |
| 18 | | Drumgold's connection, and therefore, it would |
| 19 | | have been Mr. George who would have taken on that |
| 20 | | aspect of the investigation. |
| 21 | Q | As you sit here today, do you have a memory of |
| 22 | | signing an affidavit saying that you never |
| 23 | | received the Olisa Graham statement? |
| 24 | A | I did sign such an affidavit. |

46

1  Q  Okay. And that's not true?
2  A  Well, I made a mistake. .
3  Q  Okay. And with respect to your trial theory, do
4     you have a memory as you sit here today what the
5     theory of the defense was in October of '89 when
6     the case went to trial?
7  A  Well, the defense on behalf of Mr. Drumgold, the
8     primary defense on behalf of Mr. Drumgold, was
9     what I would, by shorthand, call a third party
10    culprit defense; that is, in order to show that
11    Mr. Drumgold did not commit the crime, to show
12    that somebody else had motive, means, and
13    opportunity to commit the crime and I would add
14    that this was a case that everybody would agree
15    was gang related in a sense. Tiffany Moore was
16    not an intended victim in this particular case.
17    My memory was that Tiffany Moore was sitting on
18    the mailbox in close proximity to a young
19    gangster by the name of Chris Chaney and Chris
20    Chaney and Mervin Reese were the leaders of this
21    Humboldt Street gang which was at war, for lack
22    of better words, with the Castlegate Street gang
23    and it was my theory, or at least the defense
24    theory on behalf of Mr. Drumgold, that it was

47

1   THE COURT: It shall be marked and
2   admitted.
3              (Exhibit No. 16, being a letter, as
4   described above, was marked and admitted into
5   evidence.)
6   BY MR. MEIER:
7   Q   Do you have a memory, Mr. Rappaport, about nine
8       days later, on September 22, 1989 -- and by the
9       day, or do you recall that the trial had
10      originally been scheduled for early September but
11      due to some of the discovery issues and other
12      pretrial issues, that Judge Alberti continued the
13      case from early September to late September, I
14      believe September 26 or 27?
15  A   I do remember the case being continued for a
16      period of time.
17  Q   Do you remember, after you sent that letter to
18      Mr. Beauchesne, that thereafter he went you some
19      additional discovery to which you sent him a hand
20      delivered letter on September 22 of 1989 in which
21      you said: Dear Mr. Beauchesne, thank you for the
22      most recent discovery package, and then you
23      stated, if you remember, I'm asking you do you
24      remember, with regard to the cassette recordings

```
 1              of statements, I have received the following, and
 2              you list twelve people including number five,
 3              Lisa Graham.
 4                   Do you remember at least sending that
 5              letter and receiving twelve cassette tapes
 6              including one of Lisa Graham?
 7      A       I have no present memory of that, but, again, I
 8              don't dispute that that's what happened if that's
 9              what's in the letter.
10      Q       Would you agree that when you signed your
11              affidavit back in December, 2002, relative to
12              Olisa Graham and when you stated under the pain
13              and penalty of perjury on the sixteenth day of
14              December, 2002, that, I have reviewed Ms.
15              Graham's affidavit, that is, the affidavit filed
16              by Ms. Graham with Her Honor, Judge Rouse, and
17              then you stated in paragraph seven:  The
18              Commonwealth never provided me with any statement
19              from an Olisa Graham.  In fact, I was unaware
20              that she was interviewed until I received her
21              affidavit.  Had the Commonwealth informed me
22              prior to trial that Olisa Graham could
23              corroborate Shawn Drumgold's alibi, I would have
24              called her as a witness for the defense.
```

1  Would you agree, Mr. Rappaport, that at
2  least those were the words on the affidavit that
3  you signed in December of 2002?
4  A  Those are certainly the word on the affidavit.
5  Q  Let me ask you this, now having refreshed your
6  recollection, you would agree with me, sir, that
7  not only did you receive a transcript for Olisa
8  Graham, a copy of which has been marked as an
9  exhibit in this case, not only did you receive
10 the cassette tape reflecting that interview of
11 Olisa Graham, but that you also had the statement
12 of Mr. Drumgold, the statement of the co-
13 defendant, Terrance Taylor?
14 And would you also agree with me as to
15 the fact that Lisa Graham's name was on the list,
16 consolidated witness list put together by
17 yourself and Mr. George which was read to all the
18 jurors before they were impaneled?
19 Would you agree with each of those five
20 facts?  Just yes or no.
21 A  Can we take them seriatim?
22 Q  Just -- I'm sorry?
23 A  I'm having problems with the last --
24 Q  Let me show you another document.

```
 1   A    I mean, you've asked me a multiple.
 2              THE COURT:  Why don't you bring them
 3   out, Mr. Meier.  That might facilitate it.
 4   BY MR. MEIER:
 5   Q    I'm sorry.  Did I show you this second letter?
 6   Just yes or no.
 7   A    I don't believe so.
 8   Q    Why don't you take a look at the second document,
 9   for the record, a letter dated September 22,
10   1989.
11   A    I'm sure I sent this letter.
12              MR. MEIER:  The Commonwealth would
13   offer that second letter from this witness.
14              MS. SCAPICCHIO:  No objection.
15              THE COURT:  It shall be marked and
16   admitted.
17              (Exhibit No. 17, being a letter, as
18   described above, was marked and admitted into
19   evidence.)
20   BY MR. MEIER:
21   Q    Sir, having looked at those last two exhibits,
22   Exhibits 16 and 17, I believe, for purposes of
23   this hearing, you would agree with me, would you
24   not, sir, that before the trial began you had a
```

1  copy of the actual -- a duplicate copy of the
2  cassette tape reflecting the interview of a Lisa
3  Graham by the Boston Police? Would you agree
4  with me about that?
5  A  Yes, I would.
6  Q  And with respect to the second of the five things
7  that I discussed, sir, you would agree with me,
8  would you not, sir, now having an opportunity to
9  review those last two letters from you and Mr.
10  Beauchesne, that in addition to the duplicate
11  copy of the cassette tape, you also had a copy of
12  the purported transcript of Ms. Graham's
13  statement to the police, correct?
14  A  I agree with that.
15  Q  That's two of those five?
16  A  Correct.
17  Q  With respect to, sir, the statement of your
18  client, Mr. Drumgold, you would agree with me
19  that long before that, when you moved to suppress
20  the statement, you had a copy of both the
21  cassette tape -- strike that. You had a copy of
22  the transcript, transcript of his statement to
23  the police?
24  A  Correct.