VOLUME I
PAGES 1-159
EXHIBITS 52-61

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-11193NG

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SHAWN DRUMGOLD,
    Plaintiff

vs.

TIMOTHY CALLAHAN,
FRANCIS M. ROACHE,
PAUL MURPHY, RICHARD WALSH,
AND THE CITY OF BOSTON,
    Defendants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF STEVEN RAPPAPORT, a witness called by counsel for the Defendant, Richard Walsh, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Joann Denning, a Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Bonner Kiernan Trebach & Crociata, One Liberty Square, Boston, Massachusetts, on Friday, August 4, 2006, commencing at 10 a.m.

(781) 585-6741  FEDERAL COURT REPORTERS  (978) 535-8333

COPY

I N D E X

| Witness | Direct | Cross |
|---|---|---|
| STEVEN RAPPAPORT | 4 | -- |

E X H I B I T S

| No. | | Page |
|---|---|---|
| 52 | Subpoena | 4 |
| 53-A to 53-YYY | Pleadings | 4 |
| 54 | Affidavit of Steven Rappaport dated 12/16/02 and 7/1/92 and Transcript of Motion for New Trial 2003 | 4 |
| 55 | Portion of Opening Statement | 79 |
| 56 | Transcription of Pretrial Hearings | 80 |
| 57 | Report dated 9/12/89 | 110 |
| 58 | Pretrial Hearing Testimony | 110 |
| 59 | Affidavit | 144 |
| 60 | Subpoena | 152 |
| 61 | Portion of Testimony | 153 |

|   |   |   |
|---|---|---|
| 1 |   | for over 25 years -- just in case there was |
| 2 |   | anything on Shawn Drumgold, but I was unable to |
| 3 |   | find any hard file other than what's in the |
| 4 |   | computer. |
| 5 | Q. | Did you form any opinion in regards to why |
| 6 |   | there wasn't the existence of the hard file? |
| 7 | A. | Well, I didn't represent Mr. Drumgold on |
| 8 |   | appeal, and I probably would have provided |
| 9 |   | anything related to the case to successor |
| 10 |   | counsel.  It's also been 14 years since I tried |
| 11 |   | the case, and I can't say that all my old files |
| 12 |   | are totally intact.  There was a flood in my |
| 13 |   | basement about six or seven years ago.  I don't |
| 14 |   | remember losing anything with regard to |
| 15 |   | Drumgold.  It's just the amount of time that's |
| 16 |   | passed, I don't have any files on Mr. Drumgold. |
| 17 | Q. | Is it fair to say that back in 1988 and 1989 |
| 18 |   | that the murder of Tiffany Moore was probably |
| 19 |   | one of the most sensationalized cases of that |
| 20 |   | era? |
| 21 | A. | There was a lot of publicity, yes. |
| 22 | Q. | At that time was that one of the highest |
| 23 |   | profile cases that you handled as a criminal |
| 24 |   | defense attorney? |

|    |    |                                                                 |
|----|----|-----------------------------------------------------------------|
| 1  |    | station for a period of time, the first chance                  |
| 2  |    | I got to see him he was in a common area on a                   |
| 3  |    | stairwell with a number of other people, and I                  |
| 4  |    | wasn't about to interview him in public.                        |
| 5  | Q. | At some point in time --                                        |
| 6  | A. | Considering at that point, remember it's about                  |
| 7  |    | a week after the Moore incident.                                |
| 8  | Q. | In the old Roxbury District Court they used to                  |
| 9  |    | off the First Session based on your experience                  |
| 10 |    | line everybody up for --                                        |
| 11 | A. | Again, I'm not that experienced in Roxbury.                     |
| 12 |    | I've had a dozen cases over the course of my                    |
| 13 |    | career there, but I do remember this day.  That                 |
| 14 |    | was the only time I was ever in that part of                    |
| 15 |    | the courthouse.  It just seemed kind of absurd                  |
| 16 |    | that this is where a lawyer would meet a client                 |
| 17 |    | on a murder case for the first time, amongst a                  |
| 18 |    | group of people on a stairwell.                                 |
| 19 | Q. | You could not conduct an interview with other                   |
| 20 |    | people standing by listening?                                   |
| 21 | A. | I was unable to conduct an interview at that                    |
| 22 |    | time.                                                           |
| 23 | Q. | At some point in time, did you conduct an                       |
| 24 |    | intake or an interview of Shawn Drumgold?                       |

1    case?
2  A.   There was. I think Judge Barton presided over
3       that hearing. It was in the Lowell Superior
4       Court. It would have been around 1987, maybe
5       '86.
6  Q.   In relationship to the interview of witnesses,
7       besides having an investigator present or
8       someone present to be a witness to any
9       interview would you reduce any interviews to
10      notes? Would you tape witnesses? What was
11      your standard operating procedure prior to your
12      appointment in the Drumgold case?
13           MS. SCAPICCHIO: Objection.
14 A.   Prior to my appointment in the Drumgold case it
15      was not my procedure to tape witnesses.
16      Occasionally I would take notes. It would be
17      rare that I would have the witness sign a
18      statement unless that statement were reduced to
19      typewritten form and then brought to the
20      witness.
21           Although I can't say that there weren't
22      times when the witness didn't just say
23      something so wonderful that I didn't reduce it
24      to writing in front of the witness and have the

```
 1            witness sign the statement, but for the most
 2            part I don't think I had a standard policy
 3            frankly.
 4    Q.      Would you acknowledge that it was important to
 5            reduce to writing, even if it's in your own
 6            handwriting or the witness to be interviewed
 7            handwriting, the substance of interviews?
 8                  MS. SCAPICCHIO:  Objection.
 9    A.      Sometimes.
10    Q.      In relationship to your representation of Shawn
11            Drumgold, did you reduce to writing the
12            substance of any interviews with any witnesses
13            you conducted?
14    A.      I don't have a distinct memory.  I do believe
15            that there was a day during the trial when I
16            spoke to certain witnesses, the trial had
17            already begun, did not have an investigator
18            with me and did not reduce to writing.
19    Q.      Who was that?
20    A.      Who did I interview?
21    Q.      Yes.
22    A.      There was a gentleman, I believe, who lived
23            across the street from the electrical station
24            where the shooting occurred who actually had
```

|    |    |    |
|----|----|----|
| 1  |    | been able to view from his window, second-story |
| 2  |    | window, part of the occurrence, and I wanted to |
| 3  |    | see what he had seen. |
| 4  |    | I don't know if I did that before trial or |
| 5  |    | after the trial had begun, but I do remember |
| 6  |    | speaking to both Tracie Peaks and Mary |
| 7  |    | Alexander after the trial had already begun. |
| 8  |    | At that time I did not have an investigator |
| 9  |    | with me. |
| 10 | Q. | If I was to suggest that the individual that |
| 11 |    | lived across the street was a man by the name |
| 12 |    | of Simms, does that refresh your memory? |
| 13 | A. | It does. |
| 14 | Q. | In fact, you showed him a photograph of your |
| 15 |    | client? |
| 16 | A. | I don't remember if I showed him a photograph |
| 17 |    | or not. I don't remember him making any |
| 18 |    | identification of my client. I do know I had a |
| 19 |    | photograph of my client with me. |
| 20 | Q. | On that particular day, you showed a photograph |
| 21 |    | to Mary Alexander? I'm going to get into that |
| 22 |    | later. |
| 23 | A. | I do recall showing a photograph to Mary |
| 24 |    | Alexander. |

|   |   |   |
|---|---|---|
| 1 |    | pretrial phase where you reduced the interviews |
| 2 |    | to writing? |
| 3 | A. | I may have interviewed either Chris Chaney or |
| 4 |    | Mervin Reese at the jail.  Again, I may have |
| 5 |    | reduced that to writing.  I just don't have a |
| 6 |    | memory of reducing any statements to writing. |
| 7 | Q. | In regards to the hearings that were conducted |
| 8 |    | in this case, did you take notes during the |
| 9 |    | course of the hearings? |
| 10 | A. | It's my standard practice.  I would imagine I |
| 11 |    | did. |
| 12 | Q. | In some degree the notes helped assist you more |
| 13 |    | than just reading a transcript? |
| 14 |    | MS. SCAPICCHIO:  Objection. |
| 15 | A. | Sure. |
| 16 | Q. | During the course of the hearings, would you |
| 17 |    | write notes in regards to things -- a task |
| 18 |    | list, things that you needed to do in the case? |
| 19 | A. | As I recall, the pretrial hearings which were |
| 20 |    | substantial in this case did not really bear on |
| 21 |    | the facts of the Commonwealth's case against my |
| 22 |    | client.  The pretrial hearings I remember in |
| 23 |    | this case dealt more with police misconduct as |
| 24 |    | a basis for suppressing a statement, whether |

| | | |
|---|---|---|
| 1 | | representation of Shawn Drumgold? |
| 2 | A. | My best memory is I did. |
| 3 | Q. | Fair to say there's no reason why you would |
| 4 | | have kept the notes out? |
| 5 | | MS. SCAPICCHIO: Objection. |
| 6 | A. | There would have been no reason for me to do |
| 7 | | that. |
| 8 | Q. | Do you have a memory that you did not keep the |
| 9 | | notes out? |
| 10 | A. | No. |
| 11 | Q. | You have no memory one way or the other? |
| 12 | A. | I thought I turned over my files. Actually not |
| 13 | | just copies, I thought I turned over the files. |
| 14 | | I knew it by the time -- I won't get into it. |
| 15 | | I was rooting very hard for Ms. Scapicchio in |
| 16 | | this case. |
| 17 | Q. | I understand that. When you received notice of |
| 18 | | Ms. Scapicchio's representation of Shawn |
| 19 | | Drumgold on the appeal, you obviously wanted to |
| 20 | | do everything that you could do to help Shawn |
| 21 | | Drumgold and assist Ms. Scapicchio, correct? |
| 22 | A. | I think that's fair. |
| 23 | Q. | As a seasoned criminal defense attorney, you |
| 24 | | know how important, one, your notes were? |

1  A.   For purposes of appeal? I don't know if that's
2       it. My sense is that I'd want the attorney to
3       have everything that might help her.
4  Q.   Which were your notes?
5       MS. SCAPICCHIO: Objection.
6  A.   I just don't remember.
7  Q.   You made sure that she had a copy of all the
8       discovery?
9       MS. SCAPICCHIO: Objection.
10 A.   I would imagine I did.
11 Q.   During the course of the pretrial phase, you
12      had your investigator conduct certain tasks,
13      whether they be interviews, obtaining
14      intelligence, criminal records, a variety of
15      things, is that correct?
16 A.   I know that I would have hoped that that's what
17      my investigator would do.
18 Q.   Do you have a memory of what you instructed
19      your investigator to do in this matter?
20 A.   No.
21 Q.   What was your standard operating procedure in
22      murder cases regarding the use of investigators
23      and what you would have them do?
24      MS. SCAPICCHIO: Objection.

1         MS. SCAPICCHIO:  Objection.

2  A.  He most likely did, and I remember the form of

3      his reports, AI, whatever, American

4      Investigative, AIS, would say on it, but I

5      don't have any of those reports.

6  Q.  I'll represent to you that Mr. Groob has

7      testified initially -- he has to come back --

8      that he generated reports during the course of

9      his work and bills and submitted a copy of

10     those reports to you.  Would you acknowledge

11     that that is accurate?

12  A.  I would acknowledge that he submitted reports

13     and bills to me.

14  Q.  As a result of your continued assistance for

15     Shawn Drumgold and Ms. Scapicchio, you would

16     have turned over those reports of Investigator

17     Jay Groob to Ms. Scapicchio for the purposes of

18     appeal?

19        MS. SCAPICCHIO:  Objection.

20  A.  I can't imagine any reason why I wouldn't.  I

21     don't have any memory of specifically what I

22     turned over to Ms. Scapicchio, but I thought I

23     had turned over what I had.

24  Q.  You would acknowledge that there's no privilege

| | | |
|---|---|---|
| 1 | A. | I know I was seeking a lot of gang information |
| 2 | | at that time which was pretty novel to be |
| 3 | | looking for intelligence information that the |
| 4 | | Boston Police Department was maintaining.  I |
| 5 | | don't think that I spoke to anybody in the |
| 6 | | probation department or related to parole.  I |
| 7 | | don't recall whether or not I interviewed any |
| 8 | | police officers. |
| 9 | Q. | Did you interview any street workers, any youth |
| 10 | | workers? |
| 11 | | MS. SCAPICCHIO: Objection. |
| 12 | A. | I may have spoken to -- not workers, but I may |
| 13 | | have spoken to some gang kids.  I do have a |
| 14 | | memory of speaking to gang kids. |
| 15 | Q. | Would you have taken notes? |
| 16 | A. | I don't think they would have spoken to me if I |
| 17 | | was taking notes. |
| 18 | Q. | Did you reduce the substance of those |
| 19 | | interviews into notes after you left them? |
| 20 | A. | Probably not. |
| 21 | Q. | Did you at least reduce to writing the identity |
| 22 | | of the individual that you spoke to? |
| 23 | | MS. SCAPICCHIO: Objection. |
| 24 | A. | I would have kept a list, I'm sure.  But, like |

|   |   |   |
|---|---|---|
| 1 |    | potential witnesses, correct? |
| 2 | A. | Certainly anybody whose name may have come up during the course of the trial was put on the witness list, whether they were intended to be witnesses or not. |
| 6 | Q. | As a seasoned criminal defense attorney, do you have a file on each particular witness? |
| 8 |    | MS. SCAPICCHIO: Objection. |
| 9 | A. | I don't know. A file? No. There may have been scene witnesses, a file with people that would be expected to testify about the same incident. I would keep them together. I didn't keep a trial notebook. |
| 14 | Q. | In this case and the pretrial discovery phase, you filed a motion for a list of witnesses, correct? |
| 17 | A. | I'm sure. |
| 18 | Q. | In fact, you filed a consolidated witness list with Attorney George and then a subsequent witness list with the government to be read to the jury? |
| 22 | A. | I believe that's so. I think I remember Mr. George and I putting one together and then -- there was not a problem. I think many of |

|    |    |                                                                 |
|----|----|-----------------------------------------------------------------|
| 1  |    | they were interviewed, that you would have                      |
| 2  |    | reduced the interview to notes --                               |
| 3  |    | MS. SCAPICCHIO: Objection.                                      |
| 4  | Q. | -- in this case?                                                |
| 5  | A. | If I spoke to somebody on the phone, I probably                 |
| 6  |    | would have taken notes. If I was out in the                     |
| 7  |    | field, notes may have been taken, may not have                  |
| 8  |    | been taken.                                                     |
| 9  | Q. | Is it fair to say with the number of witnesses                  |
| 10 |    | and how confusing this case was that you would                  |
| 11 |    | have reduced to writing those field interviews                  |
| 12 |    | to notes at some point in time?                                 |
| 13 |    | MS. SCAPICCHIO: Objection.                                      |
| 14 | A. | Other than Tracie Peaks and Mary Alexander and                  |
| 15 |    | Mr. Simms who you mentioned before, I don't                     |
| 16 |    | have any memory of whether or not I took notes                  |
| 17 |    | of any interviews, whether I conducted the                      |
| 18 |    | interviews, whether I reduced interviews to                     |
| 19 |    | writing. With regard to those three that I                      |
| 20 |    | just mentioned, I recall interviewing them. I                   |
| 21 |    | don't recall reducing the notes -- the                          |
| 22 |    | interviews to note form. I just don't have any                  |
| 23 |    | memory.                                                         |
| 24 | Q. | Did you interview or have anyone interview on                   |

```
1   Q.   Christopher Chaney?
2   A.   I think I interviewed Christopher Chaney
3        actually at Charles Street jail once.
4   Q.   Do you know if you took any notes of that
5        interview?
6   A.   I don't know.
7   Q.   Mervin Reese?
8   A.   Maybe it was Mervin Reese that I interviewed at
9        the Charles Street jail. I have a recollection
10       of interviewing one of these two kids at the
11       Charles Street jail.
12  Q.   Romero Holiday?
13  A.   I may have interviewed Romero Holiday. I know
14       that Romero Holiday was a Castlegate who may
15       have been -- he may have been the kid that was
16       hospitalized and was part of the reason for the
17       ongoing dispute between the Humboldts and the
18       Castlegates.
19  Q.   If I was to tell you that one of the theories
20       was that this was retribution, that was put
21       forth at trial, was that this was retribution
22       for the stabbing of Romero Holiday or shooting
23       of Romero Holiday --
24  A.   I don't know if it was a stabbing or a
```

```
 1             present?
 2   A.        Don't remember.
 3   Q.        Do you know if he had an attorney at any time?
 4   A.        I don't remember.
 5   Q.        Did you take notes at that interview?
 6   A.        I don't remember.
 7   Q.        Do you acknowledge that Paul Durand was an
 8             important witness to support the alibi defense
 9             of Shawn Drumgold?
10             MS. SCAPICCHIO:  Objection.
11   A.        I believe so.
12   Q.        Do you acknowledge that it was prudent to write
13             down any notes of any interviews of Paul
14             Durand?
15             MS. SCAPICCHIO:  Objection.
16   A.        As I recall, Paul Durand was somebody that was
17             friendly with either Taylor or Drumgold, and it
18             would not have been imperative to write
19             anything down.
20   Q.        Did you interview Rena Roisten or any of the
21             Roistens?
22   A.        I don't remember.
23   Q.        Did you interview Lisa Graham?
24   A.        I don't think so.
```