VOLUME II
PAGES 160-339
EXHIBITS 171-184

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-11193NG

* * * * * * * * * * * * * * * * * * * * * * * * * * *

SHAWN DRUMGOLD,
        Plaintiff

vs.

TIMOTHY CALLAHAN,
FRANCIS M. ROACHE,
PAUL MURPHY, RICHARD WALSH,
AND THE CITY OF BOSTON,
        Defendants

* * * * * * * * * * * * * * * * * * * * * * * * * * *

CONTINUED DEPOSITION OF STEVEN

RAPPAPORT, a witness called by counsel for the

Defendant, Richard Walsh, taken pursuant to the

applicable provisions of the Federal Rules of

Civil Procedure, before Joann Denning, a

Shorthand Reporter and Notary Public in and for

the Commonwealth of Massachusetts, at the

offices of Bonner Kiernan Trebach & Crociata,

One Liberty Square, Boston, Massachusetts,

on Saturday, February 3, 2007, commencing

at 10:17 a.m.

(781) 585-6741 FEDERAL COURT REPORTERS (978) 535-8333

COPY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

### I N D E X

| Witness | Continued Direct | Cross |
|---|---|---|
| STEVEN RAPPAPORT | | |
| (By Mr. Curran) | 164 | -- |
| (By Mr. Roache) | -- | 302 |
| (By Mr. White) | -- | 328 |

### E X H I B I T S

| No. | | Page |
|---|---|---|
| 171 | Excerpt of Transcript from Trial Day 8 | 165 |
| 172 | Excerpt of Transcript from Trial Day 7 | 168 |
| 173 | Excerpt of Transcript from Trial Day 9 | 168 |
| 174 | Excerpt of Transcript from Trial Day 7 | 190 |
| 175 | September 26, 1989, Pretrial Motions | 200 |
| 176 | Interview of Eric Johnson | 201 |
| 177 | Notice of Alibi | 210 |
| 178 | Excerpt of Transcript from Trial Day 9 | 211 |
| 179 | Side Bar Conference | 221 |
| 180 | Trial Testimony of Travis Johnson | 223 |

```
 1              attorney, if you had any information that a
 2              witness' faculties were impacted in some
 3              degree what steps would you do to investigate
 4              that or to inquire before a witness would be
 5              placed on the stand?
 6    A.        The rules today under Lampron are pretty simple
 7              in a sense.  I forget what the rules were in
 8              '88, '89.  I was at that point in certain
 9              situations, as I do today, hiring experts who
10              could provide testimony with regard to a person
11              having a certain condition, their ability to
12              perceive, remember, and explain what it is that
13              they perceived and remembered, what the effects
14              of their condition would be.
15                   I imagine if I had known about Mary
16              Alexander's situation I would have attempted to
17              get her medical records in order to be able to
18              provide to an expert to assist me and perhaps
19              even use those medical records affirmatively if
20              one doesn't see something in records that one
21              would expect to see.  Maybe she had discussed
22              the shooting.  Maybe she had discussed the
23              shooting and not mentioned being able to
24              identify anybody.
```

```
 1              If I had known of Mary Alexander's

 2         diminishing mental faculties, I would have

 3         conducted an examination into what her

 4         abilities were to see and remember.

 5    Q.   If you knew she was dying, you would have done

 6         further investigation?

 7    A.   If I knew that she had a condition that

 8         impacted her brain, I would have done more.  I

 9         didn't know.

10    Q.   Clearly if someone has brain cancer the

11         inevitable is that they're dying?

12              MR. REILLY:  Objection.

13    A.   Once again, if I would have known that there

14         was any brain illness I would have scoured

15         every record with regard to her with the

16         assistance of an expert.

17    Q.   The question I had is if a witness -- if you

18         had information that a witness was dying, as a

19         seasoned criminal defense attorney would you

20         inquire in regards to why she was dying, why he

21         or she was dying, and the cause?

22    A.   I don't know.  Sometimes that's a good thing as

23         a seasoned criminal defense attorney.

24    Q.   It's a good thing where if a key witness is --
```

1  A.    I had a case last week where a key witness went

2        before a grand jury, was going to testify

3        against my client, and then died of cancer.

4        The case went bye-bye.

5  Q.    What I'm saying is if you have a witness that

6        you have information that they're dying, that

7        clearly if they're going to be called as a

8        witness at trial as a seasoned criminal defense

9        attorney you would want to further investigate

10       the cause for the health concerns?

11 A.    Not necessarily.

12 Q.    Why?

13 A.    In the last case I knew the witness was dying.

14       The DA didn't.  I file a motion seeking

15       records, now the DA knows the witness is dying.

16       Perhaps the DA has a Rule 35 deposition to

17       preserve testimony, and I don't win my case.

18       So why would I tip the DA off to the fact that

19       I know the witness has incurable brain cancer

20       and is dying, when the DA doesn't do his or her

21       job in the first place and stay up with their

22       witness?

23 Q.    The case you just had where the witness died of

24       cancer before they got to the grand jury --

```
 1   A.      No.  They went to the grand jury, but I didn't
 2           go to the grand jury so they couldn't use the
 3           grand jury, before trial.
 4   Q.      Before trial you had knowledge that that
 5           witness had cancer?
 6   A.      Correct.
 7   Q.      Clearly then one of the strategies is not to
 8           disclose to the Commonwealth this ailment; you
 9           have no obligation to?
10   A.      I have no obligation.
11   Q.      As a result the witness died before testifying
12           and being subject to cross-examination;
13           therefore, the testimony was not admissible?
14   A.      Correct.
15   Q.      So clearly you didn't have an obligation, and
16           clearly there was a strategy involved regarding
17           that decision you made?
18   A.      Clearly.
19   Q.      In that particular case, if the witness did
20           survive up until the trial and was called as a
21           witness you were prepared to take steps to
22           protect your client to make sure that -- I
23           wrote down what you said before -- to test or
24           challenge the witness' ability to perceive,
```

1           ability to remember, and ability to describe,

2           you would have taken those steps?

3   A.      Not in this case.  I didn't need to.

4   Q.      Because he died?

5   A.      No.  There was no identification issue because

6           my client and the individual were known to each

7           other.  I might have taken advantage of the

8           fact that the person was debilitated and would

9           have looked like a very poor witness for the

10          government without any explanation because of

11          the person's diminishing mental faculties.

12          Different situations call for different methods

13          of operation.

14  Q.      So clearly then that's another strategy

15          decision that you make relative to --

16  A.      In that case I know that's the strategy

17          decision I would have made rather than seeking

18          to --

19  Q.      Discredit the witness?

20  A.      No, I don't think it necessarily would have

21          discredited the witness.  The indication could

22          have been that at the time of the grand jury

23          the witness was not suffering from as bad a

24          problem at time of trial.  I don't want to give

1    the jury a reason to understand why the

2    witness' testimony has changed drastically if

3    it would.  I was going to just cross-examine in

4    this case.

5         In a murder case very often we go about

6    things differently.  We do touch all the bases.

7    We do out of an abundance of caution sometimes

8    things that we wouldn't do in an assault and

9    battery case or a small drug case or just --

10   you know, it's a question of how much time do

11   you have, how many resources do you have.

12        When I try a murder case, generally

13   speaking I have unlimited resources for

14   experts, for testing, kind of like when you

15   guys represent insurance companies, you know.

16   Sometimes you have deep pockets, and certainly

17   when I'm doing a -- the only advantage to doing

18   an assigned case for the committee in a murder

19   situation is that at least I know I'm going to

20   have the resources to try the case properly.  I

21   may not get paid what I'm supposed to get paid,

22   but my client isn't going to be shortchanged

23   when it comes to expert services.

24        So, as I say, in a murder case where I

1          know I have unlimited resources to do that

2          which I need to do for the client, I'm more

3          likely to do it than in a case where my client

4          either doesn't have money and I have to go

5          before a judge and try to convince a judge that

6          I have a need for money above what my client

7          can pay when I'm not assigned to the case, and

8          the next thing I know the DA gets hold of my

9          pleadings, so many different things that can

10         happen.  In this case had I known Mary

11         Alexander was ill I would have no doubt hired

12         an expert to assist me.

13    Q.   You indicated that in murder cases the issue of

14         a dying witness would be handled differently.

15         Would your strategy be any different?

16    A.   I don't know.

17    Q.   Would you have some level of concern of

18         cross-examining a witness that may not have had

19         the ailment at the grand jury but now at trial

20         is suffering the ailment --

21    A.   Yeah, I --

22    Q.   Let me finish the question.  Would you weigh

23         the fact if you cross-examine on a particular

24         issue like someone dying of cancer that it may

1       elicit sympathy from the jury and have an

2       adverse impact?

3   A.  Not in a situation like this.  I didn't think

4       Mary Alexander was on anybody's side.  Mary

5       Alexander was a witness, as opposed to Rickey

6       Evans.  There are people who in this world are

7       witnesses.  They don't have any stake in the

8       action.  I think Mary Alexander was that kind

9       of person.

10          In 1988 Mary Alexander was not an

11      individual who would have inculpated Shawn

12      Drumgold.  In fact, she failed to pick his

13      photo out of an array as I recall in 1988.  By

14      1989 when she was ill she suddenly became very

15      inculpatory in the case.  I would have wanted

16      the jury to know that she was healthy or

17      healthier in '88 when she could not identify

18      the client than she was in '89 when she did.

19      Just that in and of itself is something that

20      I'd want the jury to know.  I don't think I'm

21      going after the witness by dealing with an

22      objective fact of her illness and that her

23      illness may have impacted her memory.

24  Q.  If you knew --

```
 1   A.    And I think it did frankly.

 2   Q.    If you knew she was ill and dying, what would

 3         you have done?

 4   A.    Well, I would have hired a neurologist, and I

 5         would have looked for an expert who could have

 6         told me whether or not the particular problems

 7         she had would have impacted her memory.  And I

 8         certainly would have done that -- I think that

 9         I might have dealt with the in-trial

10         investigation differently if I knew she was

11         ill.

12   Q.    How would you have dealt with the in-trial

13         investigation?

14   A.    I probably wouldn't have spoken to her.

15   Q.    Excuse me?

16   A.    I probably would not have spoken to her under

17         the circumstances that I did.  That is, when I

18         went to speak to Tracie Peaks and she said,

19         Would you like to meet Mary Alexander, if I

20         would have known that Mary Alexander was as ill

21         as they say she was I probably would have

22         handled it differently.  I don't know how I

23         would have done it, but I would have done it

24         differently.
```

254

```
 1  Q.   Prior to going out with Mrs. Drumgold you made
 2       a decision to show Mary Alexander the
 3       photograph of Shawn Drumgold?
 4  A.   I don't think that's so.  I made a decision
 5       after speaking to Tracie Peaks to show Mary
 6       Alexander the photograph.  I think I went to
 7       speak to Tracie Peaks to that house.  I don't
 8       think I went to speak to Mary Alexander.  I
 9       think it was Tracie Peaks who said to me at
10       some point, Would you like to speak to Mary
11       Alexander?  She's right upstairs.  At that
12       point I said -- well, I don't remember exactly
13       what I said, but basically, Would you introduce
14       me to her?  Sure, no problem.  I'll go talk to
15       her.
16  Q.   Prior to going to 72 Homestead Street you knew
17       that Tracie Peaks and Mary Alexander lived in
18       the same house?
19  A.   I did, but I don't think that Mary Alexander
20       was really viewed as anything other than a
21       positive in the case at that particular time
22       because all I knew about Mary Alexander was she
23       was shown a photo array.  Shawn Drumgold's
24       picture was in the photo array, and she
```

```
 1              couldn't select Shawn Drumgold's photo from the

 2              array.

 3    Q.        Prior to speaking to her did you make a

 4              tactical decision to show her the photograph?

 5    A.        I did.

 6    Q.        At which point in time -- why don't you

 7              describe the circumstances of how that

 8              occurred.

 9    A.        I don't remember other than the fact that I had

10              a single photo of Shawn Drumgold taken at

11              around the time of -- I don't know if it was a

12              booking photo from his arrest on the Tiffany

13              Moore case or a booking photo from an arrest

14              prior thereto, but in the photo Shawn Drumgold

15              was this skinny kid.

16                   By the time of trial, almost 13 months

17              after he was arrested, he put on a lot of

18              weight, went from being what I thought was

19              really sort of a skinny kid to being what I

20              would call a fireplug.  He did nothing but

21              calisthenics in his cell for about a year, and

22              he just built himself up into this very

23              powerful-looking young man and then, of course,

24              shaved his head which made him look a little
```

1    bit more scary I'd say, or at least

2    distinctive.

3        A stupid defense lawyer thought it would

4    be a good idea for his client to go out on the

5    view, and Mary Alexander indicated to me that

6    she identified him on the view.  He looked

7    nothing on the view like he looked 13 months

8    earlier.  I should have picked up on that.

9        I also should have picked up on the fact

10   when she did identify him finally in the

11   courtroom and identified him as sitting next to

12   that police officer, meaning me, when she had

13   met me a short time earlier and knew I wasn't a

14   police officer.  I should have picked up on

15   that, also.

16  Q.   How were you dressed when you went to

17       72 Homestead Street to speak to Tracie Peaks

18       and subsequently Mary Alexander?

19  A.   Could have been in a suit.  Wasn't in uniform,

20       that's for sure.

21  Q.   You were in a suit?

22  A.   Could have been.  As you can see, I don't

23       always wear a suit.

24  Q.   Do you have any memory that at any time police

1        officers in a uniform interviewed Tracie Peaks

2        or Mary Alexander based on the discovery in

3        this case?

4   A.   I know that Mary Alexander was interviewed

5        early in the case because she was shown a photo

6        array and couldn't pick out Shawn Drumgold.  I

7        don't know that she was -- I to this day don't

8        know if she was spoken to from then, the

9        initial investigation, until the time of trial.

10       In fact, I have reason to suspect that she was

11       not spoken to during the trial because

12       Beauchesne didn't know about my faux pas in

13       interviewing her.  Tracie Peaks, as far as I

14       knew she was -- I didn't know whether or not

15       anybody spoke to her after she went to the

16       grand jury.

17  Q.   During the course of trial, you took steps to

18       clearly make it appear to the jury that

19       Shawn Drumgold wasn't in custody, correct?

20  A.   Well, Judge Alberti was very kind, and he

21       allowed Shawn to go on the bus not in

22       handcuffs, not in ankle chains.  As long as he

23       stood between me and one of the court officers,

24       he was permitted to leave the bus to walk

1          around the view with the rest of us, and that

2          was one effort made.  We sequestered the jury,

3          and that was another effort made to keep the

4          jury from knowing that Mr. Drumgold was in

5          custody.

6              I just -- the problem, of course, although

7          this was probably just a voir dire, I mean,

8          when Chaney or Reese -- I forget which one was

9          actually examined on voir dire -- mentioned

10         that, well, you know, we never had a problem

11         with Shawn before the incident and we've been

12         in Charles Street with him since the incident

13         and we don't have a problem with him, but that

14         may have only come out on voir dire.

15             So as in any case, you try to keep it from

16         the jury that the guy's in custody, but I don't

17         know if the jurors are stupid.  I think they're

18         pretty smart, smarter than we give them credit

19         for.

20  Q.     In your examination of Shawn Drumgold, did you

21         want to make it clear that there's been a

22         physical change of his appearance from a skinny

23         kid to the person who's put on 40 pounds?

24  A.     I probably did.

1   Q.      You acknowledge that during the course of your

2           examination you, in fact, elicited from Shawn

3           Drumgold the fact that he was doing a thousand

4           push-ups a day in his jail cell at the Charles

5           Street jail?

6   A.      If I said it, I said it.

7   Q.      Was that a strategic tactical decision that you

8           elicited that information from Shawn Drumgold?

9   A.      It may have been not so much strategic as much

10          as an acceptance that the jury knew that he was

11          not on the street.

12  Q.      Like in any murder case?

13  A.      No.  I've had murder cases where I've managed

14          to get my clients on the street.  You better

15          believe that the client's sitting in the

16          courthouse at 8:15 as the jurors may start to

17          come in.

18  Q.      So the image is portrayed that he's not in

19          custody?

20  A.      If I can do it, I do it.  It's not the image

21          portrayed to let the jury know that the guy's

22          on the street.  How dangerous could he be if

23          he's on the street?

24  Q.      Do you have any memory today of what your

1        tactical decision was to elicit that testimony

2        from Shawn Drumgold?

3   A.   No, other than to show that he had changed his

4        appearance.

5   Q.   Do you have a memory in regards to when you

6        showed the photograph of Shawn Drumgold to Mary

7        Alexander?

8   A.   It was during trial.

9   Q.   Do you have any memory of whether it was before

10       the voir dire or after?

11  A.   I don't remember.

12            MR. ROACHE:  You mean before the jury

13       view?

14  Q.   The jury view.

15  A.   After.

16  Q.   That's your memory as you sit here today?

17  A.   It's my memory that Mary Alexander indicated to

18       me that she recognized him from the jury view.

19  Q.   You did not take steps to disclose the

20       identification of Shawn Drumgold by Mary

21       Alexander to the Commonwealth?

22  A.   No, I did not.

23  Q.   In your mind you didn't have any obligation to

24       provide that information to the Commonwealth?

1    A.    I don't think I have any obligation.

2    Q.    As you sit here today, you take the same

3          position, that you don't have any obligation to

4          turn that over to the Commonwealth?

5    A.    That's my position.  I could be wrong today.

6          There's been some recent case law that seems to

7          indicate I've got to do some work for the

8          government every now and then, but I'd rather

9          not.

10   Q.    You'd take the same position today --

11   A.    I would take the same position today.

12   Q.    Did you have any contact with Mary Alexander's

13         mother at any time?

14   A.    I don't remember having any contact with her.

15   Q.    Do you recall the age of Mary Alexander when

16         you --

17   A.    I think she appeared older than she was.  For

18         some reason my memory is she was in her 20's.

19         She might have looked like she was in her early

20         30's.  I don't really remember.  I don't

21         remember.

22   Q.    How do you remember the identification by Mary

23         Alexander of Shawn Drumgold being elicited,

24         being discovered by the Commonwealth?

```
1    A.    It was during her testimony.  She was on the
2          stand.
3    Q.    During or prior to?
4    A.    I don't think the Commonwealth found out about
5          it until -- maybe Beauchesne found out about it
6          when he brought her in that day, but I don't
7          think the Commonwealth knew about it prior to
8          the date that she testified.  Perhaps they
9          interviewed her prior to her testimony and
10         found out about it, but if that happened it
11         happened the day of her testimony.
12              (There was a discussion off the record.)
13              MR. CURRAN:  I'm just going to have marked
14         a lobby conference, Pages 101 to 106, where
15         Mr. Beauchesne discloses to the Court the
16         identification by Mary Alexander of Shawn
17         Drumgold.  I ask that be marked and that be
18         provided to the witness for review.  It was
19         actually right after Vantrell McPherson
20         completed her testimony and before Travis
21         Johnson testified, I believe.
22              (Exhibit No. 183, Transcript of Lobby
23         Conference, marked for Identification.)
24              (A brief recess was taken.)
```

1  Q.    Have you had a chance to review the transcript

2        of the lobby conference, Exhibit No. 183?

3  A.    I have.

4  Q.    Does that refresh your memory that, in fact,

5        the government, the Commonwealth, and the

6        former district attorney's office knew about

7        Mary Alexander's identification of Shawn

8        Drumgold prior to her being called as a

9        witness?

10  A.   I think I had said initially that it might have

11       been the same day when they brought her in to

12       prep her for her testimony that they found out.

13       It seems to be what happened.

14  Q.   And that was she was being prepped by Assistant

15       District Attorney Phyllis Broker at the time?

16  A.   The Honorable.

17  Q.   Did she have an active role in this case that

18       you're aware of?

19  A.   Until I read this, I didn't know that Phyllis

20       was involved in the case.

21  Q.   There is a pleading in regards to supplemental

22       witness list with a tag name of Phyllis Broker.

23       Does that --

24  A.   I've known Phyllis ever since she was a DA in

1           Middlesex County.  We had our first case

2           against each other in 1980 or '81, and I did

3           not recall that she was in any way involved in

4           this case.

5    Q.     Did you see her around the courtroom during the

6           course of the trial before she came in on the

7           lobby conference?

8    A.     If Phyllis was in the Suffolk County DA's

9           office at the time, I used to see her around

10          all the time.  She was involved in the homicide

11          unit at one point.  But, frankly, I had no

12          memory until five minutes ago that Phyllis had

13          anything to do with this case.

14   Q.     It's clear based on the transcript that she was

15          preparing witnesses for Phil?

16   A.     I'm not denying she was involved.  I'm just

17          saying I didn't remember.

18   Q.     Is it fair to say, does this refresh your

19          memory that Mary Alexander had indicated to the

20          government that the photo identification

21          procedure that you directed with her occurred

22          before the view took place?

23   A.     No.  My memory is that the view had occurred

24          first.  I could be wrong, but that's my memory.

1    Q.    Clearly the record would dictate what occurred

2          back in 1989 at the trial?

3    A.    I don't think I could answer that question.

4    Q.    Getting back to the aspect of if you had

5          knowledge that a witness was dying, would you

6          inquire and investigate, before you made a

7          strategic decision how to handle it, the reason

8          why the witness was dying; is that a fair

9          statement?

10   A.    I think early on I'd want to know, yeah, why

11         she was dying.

12   Q.    That would play a role into how you handled it

13         strategically?

14   A.    Well, I would have to consult with an expert,

15         and I think I would have to take my strategy

16         from there depending upon what an expert would

17         say to me.

18   Q.    If you didn't have the luxury of getting an

19         expert, would you take steps in the form of a

20         voir dire of a witness to determine whether or

21         not there's any impact on their ability to

22         remember, perceive, or describe?

23            MR. REILLY:  Objection.

24   A.    The test for competency to testify, the bar is

1    so low that I don't know that I would risk good

2    cross-examination grounds for a foolish, what I

3    view as sometimes a foolish competency

4    determination in court.

5        If the government was aware of the

6    witness' condition and didn't tell me, I would

7    insist on time to procure an expert and with

8    the assistance of that expert attempt to make a

9    determination as to how, if in any way, the

10   person's condition is affecting their

11   abilities, their testimonial abilities.  That

12   would be memory, perception, things of that

13   nature.

14       If the government was unaware of it and we

15   all discovered it at that point, I would hope

16   that the judge would exercise discretion to

17   allow both the government and the defendant to

18   hire experts to make a determination as to how

19   this impacts the witness' competency.  I would

20   think the government would have an equal if not

21   greater interest in determining that the

22   evidence they place before a jury was

23   competent.

24       I can't imagine not seeking the assistance

1                of an expert to determine what the effect of

2                the witness' condition would be on her

3                competency as a witness, her memory, her

4                perception, things of that nature.

5        Q.      The question I have now is not what the

6                Commonwealth would do or the Court.  If you had

7                knowledge that a witness was dying that was

8                being called or has been called at trial as a

9                witness, what would you do as a criminal --

10       A.      Is the witness an exculpatory witness or

11               inculpatory witness?  So much depends upon what

12               the witness' role in the case is.  If the

13               witness was potentially inculpatory, I would

14               seek funds to have an expert assist me in

15               determining whether or not there's a fertile

16               area of cross-examination.

17       Q.      If the witness was exculpatory, not

18               inculpatory, what would you do?

19       A.      Does the government know about it?

20       Q.      Assume no.

21       A.      It would depend upon the circumstances of the

22               case.

23       Q.      If you became aware prior to a witness -- if

24               you became aware in the course of a trial that

268

1        the witness was dying, what would you do as a

2        criminal defense attorney?

3        MR. REILLY:  Objection.

4  Q.  Again, using inculpatory versus exculpatory.

5  A.  I would try to secure the relevant medical

6        records.  I would ask for the assistance of an

7        expert, at least make a preliminary

8        determination as to whether or not there might

9        be something there, and if there was something

10       there at that point I might ask for a voir dire

11       of the witness.  But I think lacking the

12       expertise to read medical records and know

13       specifically what a particular condition and

14       its effects would be on a potential witness I

15       would want the services of an expert.

16       And, frankly, in the last close to 25

17       years of trying murder cases on an assigned

18       basis it's amazing the amount of money the

19       Commonwealth has given me to do this.  I've

20       never been denied funds.  I've actually never

21       been denied funds by a judge in a murder case.

22  Q.  If you were in the middle of a trial and a

23       witness is on the stand and if you didn't have

24       time --

1  A.    Sometimes you got to move quickly.  There are a

2        number of expert lists that are available to

3        anybody that does work for CPCS in the murder

4        list.  There are experts who will make

5        themselves available in a reasonably short

6        period of time.  And even during the course of

7        a trial we sometimes have to do these things

8        and decisions that we make and moves we have to

9        make during trial.  There's not a lot of sleep

10       that goes on during a trial.

11  Q.    Did you consult with any experts in preparation

12       for your defense of Shawn Drumgold?

13  A.    Not that I remember.

14  Q.    Did you consult with any identification

15       experts?

16  A.    No.

17  Q.    Did you consult with any medical experts?

18  A.    Not that I remember.  I may have spoken to --

19       I'm sure I spoke to the ME at some point, and

20       very often in murder cases what I'll do is I'll

21       consult with an ME on my own, but in this

22       particular case I have no memory of needing any

23       experts.

24  Q.    Did you interview the ME's that participated in

270

```
 1              the autopsy of Tiffany Moore?
 2    A.     I may have.  I don't have a specific memory,
 3              but cause of death was never an issue in this
 4              case.  Identity was the issue.  There are cases
 5              I have where the ME can and often will provide
 6              you with an objective view that can differ from
 7              what alleged percipient witnesses say.  I
 8              generally consult with ME's on every case.
 9              Whether I did on this particular case I don't
10              know because I don't remember there being any
11              issue in the case as I sit here that the ME
12              would have provided me assistance with.
13                   But it's my general practice to consult
14              with ME's in cases, and I can think of a case
15              back in '84 where Dr. Katzis (phonetic) had
16              said he was shocked at how few defense
17              attorneys would actually call him up and speak
18              to him because he was willing to speak to
19              anybody about anything.  I always took that as
20              an invitation to call the ME.  You never know
21              what you're going to get.
22    Q.     You think you followed your --
23    A.     I don't remember.  I just don't remember.
24              There was one ME, as I recall, working Suffolk
```

271

```
 1              County at around this time who did not share

 2              Dr. Katzis' view that he was a mere witness and

 3              not a party to the -- I forget his name.  There

 4              was one ME who was very, very difficult to deal

 5              with.

 6   Q.         Do you recall in this case that there was

 7              actually an ME that conducted the autopsy, an

 8              assistant ME, conducted the autopsy under

 9              Stanley Bogdan and that that ME was now in

10              Texas and not available at trial and Stanley

11              Bogdan was called?

12   A.         I don't remember that.

13   Q.         Did you have a relationship with Stanley

14              Bogdan?

15   A.         No relationship whatsoever.

16   Q.         Did you ever consult with him on cases?

17   A.         I don't know.

18   Q.         Was he that medical examiner who took the

19              position that he was not a witness for both

20              sides?

21   A.         Oh, no, no.  It was Dr. Katzis.  No, no, no.

22              Stanley Bogdan was not the guy I was talking

23              about that I wouldn't because I would be afraid

24              that he would go back to the prosecutor and
```

```
 1              just tell him everything that I asked.  I

 2              forget his name.  There was one ME in Suffolk

 3              County that used to like to ride around with

 4              the cops.

 5    Q.        In your experience Stanley Bogdan would talk to

 6              both sides?

 7    A.        Yes.  I told you there was only one ME that I

 8              had a problem with.

 9    Q.        He'd answer your questions if you had any?

10    A.        If I had them.

11    Q.        Do you have any memory of a conversation with

12              Stanley Bogdan?

13    A.        No, I don't.

14    Q.        Is it your memory today that you took notes

15              throughout the investigation and the trial?

16    A.        I definitely took notes during the trial when I

17              wasn't questioning.  I tend to take copious

18              trial notes.  I'm sure I wrote things down.

19    Q.        Did you take notes at any time during the

20              course of your interview of Shawn Drumgold?

21    A.        I'm sure I did, certainly in the initial stages

22              of our interview, of our relationship.

23    Q.        Would there be any times that you would ask a

24              Court to conduct a voir dire of a witness due
```

1              to a health concern?

2    A.        I think I probably have.

3    Q.        Under what circumstances would you then have

4              the Court conduct a voir dire relative to the

5              witness' ability to perceive, remember, and

6              describe?

7    A.        For some reason I recall a case -- it was a

8              Suffolk County case back in the '80s when you

9              could still file a motion based upon certain

10             mental health issues that would arise and you

11             could actually get someone examined for

12             competency prior to trial.  You could get a

13             complainant in a rape case sometimes examined

14             depending upon the judge.

15   Q.        Is that again a strategy issue, whether you do

16             it or don't?

17   A.        It would be a strategy issue.  They don't allow

18             it anymore.  I don't think you --

19   Q.        There's got to be a foundation for it?

20   A.        It's very difficult to get a complaining

21             witness examined for competency merely because

22             they have a mental health history, whereas 30

23             years ago you could.

24   Q.        If a health --

214

```
 1   A.    It's been that long.
 2   Q.    If a health issue goes to a witness' ability, a
 3         percipient witness' ability to perceive, to
 4         remember, to describe --
 5   A.    Excuse me.  Yesterday was the 30th anniversary
 6         of me starting my practice, my first practice,
 7         out of law school.
 8   Q.    If a witness' health issue goes directly to a
 9         percipient witness' ability to remember,
10         ability to describe, or ability to perceive,
11         would you conduct a voir dire of that witness?
12   A.    And the witness is going to be offering
13         inculpatory testimony against my client?
14   Q.    Yes.
15   A.    I would try to get such a hearing, most often.
16         I'd say the general response would be yes.
17   Q.    How did you characterize Mary Alexander's
18         testimony prior to the identification
19         procedure?
20   A.    I don't remember.
21   Q.    Prior to the identification procedure Mary
22         Alexander did not identify Shawn Drumgold in a
23         photo array, is that correct?
24   A.    In the initial stages of the investigation,
```

1          Mary Alexander had stated that she had seen the

2          assailants.  She was presented with a photo

3          array.  And my understanding is, my memory is,

4          that she did not pick Shawn Drumgold's photo

5          out of an array.  My memory is also that I saw

6          the array, and I had no problem picking out

7          Shawn Drumgold.

8    Q.    Based on those facts did you consider Mary

9          Alexander's testimony to be inculpatory or

10         exculpatory regarding Shawn Drumgold?

11   A.    Without -- but I knew it was coming.  The

12         bottom line is I knew when Mary Alexander

13         walked into that courtroom she was going to

14         pick Shawn Drumgold out.

15   Q.    I understand that, but I'm saying prior to you

16         showing the photo --

17   A.    I thought she was an exculpatory witness.

18         There would have been no reason for me to have

19         her examined at that point.

20   Q.    After you showed her the photograph and after

21         it was disclosed to you that she identified

22         Shawn Drumgold while there was a view, how did

23         you consider her testimony, inculpatory or

24         exculpatory?

```
 1   A.    For all I know, it was Tracie Peaks who told me

 2         that Mary Alexander had had an operation.

 3   Q.    Do you have any notes in regards to where you

 4         obtained this information from?

 5   A.    No.

 6   Q.    Did you take any steps to determine where this

 7         operation took place?

 8   A.    Not that I recall.

 9   Q.    Did you have an opportunity to -- did you at

10         any time ever ask anyone from the Commonwealth,

11         from the DA's office, or the police department

12         whether or not -- what the operation was for?

13   A.    I don't remember whether I asked or not, but

14         based upon the little knowledge I had I would

15         not have thought that there was a -- I'm

16         positive that I didn't make the connection

17         that it was a brain illness.

18   Q.    Did you ever speak to Lola Alexander at any

19         time prior to the conviction of Shawn

20         Drumgold?

21   A.    Is that the mother?

22   Q.    Yes.

23   A.    I have no memory of it.

24   Q.    Did you speak with Betty Peaks, Tracie Peaks'
```

```
 1            client said to me that he's HIV positive, I
 2            might not turn that over to somebody.
 3   Q.       Do you have a storage facility for your old
 4            files?
 5   A.       No.
 6   Q.       Where do you keep your old homicide files?
 7   A.       I either keep files in my office or in the
 8            basement of my home.  I would say that the last
 9            five -- most of the last five years' files are
10            in my office.  I have files that have survived
11            from the '70s, but I had a flood.
12   Q.       I learned about the flood.
13   A.       I lost, really, truly, I lost a lot of files.
14   Q.       Did you lose any homicide files?
15   A.       I don't think I lost anything from the Drumgold
16            case.  I don't think I did.  There are certain
17            files that I've maintained over -- I don't know
18            how many years we're supposed to keep files,
19            but certain files and generally relating to
20            homicide cases I have from the '70s frankly.
21   Q.       In any homicide file that resulted in a
22            conviction, you would be reluctant to destroy
23            those files, would you not?
24   A.       I think that any homicide case that I worked
```