Page 1

```
           UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS

------------------------x
SHAWN DRUMGOLD,
     Plaintiff

v.                       Case No. 04-11193NG

TIMOTHY CALLAHAN, FRANCIS
M. ROACHE, PAUL MURPHY,
RICHARD WALSH, and THE
CITY OF BOSTON,
     Defendants
------------------------x


         DEPOSITION OF GATEWOOD WEST, a
witness called to testify by and on behalf of
the Defendants, pursuant to the applicable
rules of the Federal Rules of Civil
Procedure, before M. ELAINE GANSKA, a
Stenographic Reporter and Notary Public in
and for the Commonwealth of Massachusetts, at
the offices of Bonner Kiernan Trebach &
Crociata, Attorneys at Law, One Liberty
Square, Boston, Massachusetts, on Monday,
July 23, 2007, commencing at 2:06 p.m.

          FEDERAL COURT REPORTERS
     781-585-6741        978-535-8333
```

Page 2

APPEARANCES

ROSEMARY SCAPICCHIO, Attorney at Law
4 Longfellow Place
Boston, Massachusetts 02114
ON BEHALF OF: The Plaintiff

BONNER KIERNAN TREBACH & CROCIATA
BY: PAULA J. CLIFFORD, Attorney at Law
One Liberty Square
Boston, Massachusetts 02109
ON BEHALF OF: Defendant Walsh

WILLIAM M. WHITE, JR. and ASSOCIATES
BY: WILLLIAM M. WHITE, JR., Attorney at Law
One Faneuil Hall Marketplace
Boston, Massachusetts 02109
ON BEHALF OF: Defendant Murphy

JOHN P. ROACHE and ASSOCIATES
BY: JOHN P. ROACHE, Attorney at Law
66 Long Wharf
Boston, Massachusetts 02110
ON BEHALF OF: Defendants Roache and City
of Boston

MORGAN, BROWN & JOY
BY: MARY JO HARRIS, Attorney at Law
200 State Street
Boston, Massachusetts 02109
ON BEHALF OF: Defendant Callahan

Page 3

I N D E X

| Deposition of GATEWOOD WEST | Page |
|---|---|
| Examination by Mr. Roache | 4 |
| Examination by Ms. Harris | 72 |
| Examination by Mr. White | 94 |
| Examination by Ms. Clifford | 107 |
| Further Examination by Mr. Roache | 119 |

E X H I B I T S

| No. | | Page |
|---|---|---|
| | No Exhibits | |

Page 4

STIPULATIONS

It is hereby stipulated and agreed by and between Counsel for the respective parties that the Deponent shall read and sign the deposition transcript within 30 days of receipt under the pains and penalties of perjury.

It is further stipulated that all objections, except as to form, and motions to strike are reserved to the time of trial.

PROCEEDINGS

GATEWOOD WEST, a witness called for examination by Counsel for the Defendants, having been satisfactorily identified and duly sworn, was examined and testified as follows:

EXAMINATION BY MR. ROACHE

Q. Good afternoon, Ms. West. My name is John Roache. I'm an attorney involved in this litigation, and I represent the City of Boston and Former Police Commissioner Francis M. Roache.
    Would you please state your full name for the record?

Page 5

A. First name Gatewood, last name West.
Q. And, Ms. West, are you here pursuant to a subpoena?
A. Yes.
Q. Have you ever had your deposition taken before?
A. No.
Q. Okay. I am going to ask you a series of questions concerning the underlying cause of action that brought you here today. There will be no trick questions, be no questions that you shouldn't or should not be able to understand. If you don't understand a question, I would ask that you have me rephrase the question.
A. Mm-hmm.
Q. If you answer the question, I will assume that you understood the question --
A. Mm-hmm.
Q. -- that I asked, okay?
A. Mm-hmm. Yes, yes.
Q. Now I just noticed you're saying mm-hmm, mm-hmm.
A. (Nods head)

Page 6

Q. You cannot say mm-hmm or huh-uh in answer to questions. You must verbalize by yes, no, or whatever --
A. Mm-hmm.
Q. -- your answer is to questions so that they can be taken down by the stenographer.
A. (Nods head)
Q. Do you understand that?
A. Yes.
Q. If at any time you need to use the facilities, just let me know, and I'll be more than happy to accommodate you.
A. Mm-hmm.
Q. You may hear at certain times the word "objection" used by any of the attorneys in this room. You are still to answer the question despite an objection that's being raised.
    MR. ROACHE: We're having the usual stipulations?
    MS. SCAPICCHIO: Usual stipulations.
    MR. ROACHE: Okay.
BY MR. ROACHE:

Page 19

1   her. Shawn had asked me to call her and
2   offer her a ride.
3   Q. Had you known Shawn --
4   A. Yes.
5   Q. -- before you met Juanda?
6   A. Yes.
7   Q. Okay. When did you first come in contact
8      with Shawn Drumgold?
9   A. I think I met him in the visiting room at Bay
10     State when I was visiting another prisoner,
11     Arlis Evans. He and Arlis were friends, and
12     when Shawn was taken off to Norfolk Prison
13     and put in protective --
14         THE WITNESS: Was it protective
15     custody or --
16  Q. You really can't ask --
17         MS. SCAPICCHIO: I can't answer
18     the question.
19  Q. -- any questions.
20  A. It was called the RB. It was the equivalent
21     of solitary, although he was there for his
22     own protection.
23  Q. And do you know why he was sent to Norfolk?
24  A. No, I don't know why.

Page 20

1          Arlis was concerned about him
2   being lonely and just emotionally stirred up
3   by being suddenly taken out of Bay State
4   where he'd been for a number of years.
5   Q. Did you visit Shawn at Norfolk?
6   A. In the RB, yes, two or three times.
7   Q. How many times had you met with Shawn at Bay
8      State?
9   A. Maybe once for five minutes.
10  Q. And that was in the visiting room?
11  A. Yes.
12         It may have been even less than
13     that. I don't know that I would have even
14     remembered what he looked like. I went to
15     see him because Arlis wanted me to go and see
16     him.
17  Q. How did you meet Arlis Evans?
18  A. I am part of a Quaker Meeting in Cambridge
19     that has a mission to put our faith into
20     action and to do what we can to people who
21     are -- to do what we can to support people
22     who are in need, and we knew there were some
23     prisoners at Bay State who were going through
24     the BU program, getting a bachelors at BU,

Page 21

1   and they were asking for people to come and
2   mentor them on their studies.
3   Q. So you were a mentor for Arlis Evans?
4   A. Right.
5   Q. When did you first meet Arlis Evans?
6   A. I think it was 2000, June of 2000. Could
7      have been 2001. I'm not sure.
8   Q. At any point in time, did Arlis Evans live at
9      your home?
10  A. No.
11  Q. So you visited with Shawn Drumgold two times
12     while at Norfolk?
13  A. Mm-hmm.
14  Q. When was the next time --
15  A. Yes.
16  Q. When was the next time that you visited with
17     Shawn Drumgold?
18  A. When he was moved to OCCC.
19  Q. And how many times did you visit with him
20     there?
21  A. I'd say a year and a half.
22  Q. Over the course of a year and a half?
23  A. Yes.
24  Q. And how many times during that course of a

Page 22

1   year and a half did you visit with him?
2   A. Every two weeks.
3   Q. And what was the purpose of the visits?
4   A. Support.
5   Q. Were you there in a professional capacity or
6      just as a person being supportive of him?
7   A. Well, I was not his social worker. He
8      referred to me as his godmother. I was also
9      there to support his mother who was in her
10     late 60s, early 70s, who had some health
11     problems and who had six children and worried
12     a lot about all of them. It was a spiritual
13     accompaniment.
14  Q. Okay. When you visited with Shawn Drumgold
15     at Norfolk, how long would these visits last?
16  A. Forty-five minutes.
17  Q. And this was while he was in solitary
18     confinement?
19  A. Yes. He would be brought in in handcuffs and
20     chains on his feet, chains around his waist,
21     in an orange jumpsuit, and he would come into
22     a room, and I would be on the other side of a
23     glass partition. He would talk on a phone,
24     and I would talk on a phone (gesturing).

Page 23

1   Q. And did you have to formally request
2      permission from the institution in order to
3      visit with Shawn Drumgold?
4   A. No, I just called and made an appointment.
5   Q. Okay.
6   A. You had to call 24 hours in advance to find
7      out if there were open slots and schedule an
8      appointment.
9   Q. Okay. And you met with him approximately
10     twice while at Norfolk?
11  A. (Nods head)
12  Q. What did you talk about?
13  A. Well I remember at one point we were talking
14     about dancing, and he was laughing and I was
15     laughing. He was a very cheerful person in
16     those days.
17  Q. What else did you discuss?
18  A. I'd send him a newspaper. We would talk
19     about what was in the newspaper.
20  Q. Which newspaper?
21  A. Boston Globe.
22  Q. Did you send it to him daily?
23  A. Mm-hmm, Monday --
24  Q. Is that a yes?

Page 24

1   A. Monday through Saturday, yes.
2   Q. Besides dancing, what else did you discuss?
3   A. You know, I knew you were going to ask me
4      this. I can't remember what we talked
5      about. We talked about food. We talked
6      about details of day-to-day life.
7   Q. Did you talk to him about his family?
8   A. At that point the only family member I knew
9      was his mother. No, I hadn't even met his
10     mother at that point. We probably talked
11     about Arlis.
12  Q. Okay.
13  A. That's what we had in common.
14  Q. Did you talk about his wife and child?
15  A. Yeah, probably.
16  Q. When you say "probably," do you have a
17     memory?
18  A. I don't -- no, I don't have a specific
19     memory.
20  Q. Okay. Do you know who his wife was or is?
21  A. Well I met her later. I had not met her at
22     that point.
23  Q. Okay.
24  A. He talked a lot about his daughter, Kiara.

Page 79

1 Q. Okay.
2 A. Because I was not interested in the legal
3     facts. I was interested in trying to help
4     Rosemary get whatever information she needed
5     and trying to be calm and reassuring --
6 Q. Okay.
7 A. -- to these young people and to their
8     mothers.
9 Q. Do you recall if you were speaking to them in
10     order to elicit information from them about
11     the facts of what they observed --
12 A. Right.
13 Q. -- or whether you were trying to reassure
14     them or calm them prior to testifying?
15 A. No. I was -- Rosemary said, "Would you go
16     and take an affidavit?"
17        I said, "Well what does that
18     mean?"
19        She said, "Just get them to tell
20     their story and write it down."
21 Q. Okay.
22 A. "Just let them dictate to you what they
23     remember."
24 Q. Okay. And do you remember how many of these

Page 80

1     individuals you spoke to?
2 A. Just two.
3 Q. Just two.
4        And you're clear that there were
5     two?
6 A. I think it's just two.
7        It was in the cafeteria at the
8     courtroom.
9 Q. Okay.
10 A. And she was going to use those notes before
11     she interviewed them on the witness stand if
12     she decided to interview them.
13 Q. Okay. Do you recall -- and forgive me if I'm
14     repeating myself, but do you recall that
15     these were two women?
16 A. Yes.
17 Q. Okay. And is it your recollection that they
18     were two of the witnesses who had been young
19     women at the time of the original trial?
20 A. I believe so, yes.
21 Q. Were they both accompanied by their moms when
22     you spoke with them?
23 A. I believe so.
24 Q. Do you recall the name Vantrell McPherson?

Page 81

1 A. I think he asked me that. I don't remember
2     that name.
3 Q. Okay. So you don't recall that being one of
4     the witnesses --
5 A. It could have been.
6 Q. -- one way or the other?
7 A. I don't remember the name.
8 Q. Okay. Do you remember whether you saw them
9     on the same day?
10 A. Yes.
11 Q. Were they seated together when you spoke with
12     them?
13 A. No.
14 Q. So you saw them --
15 A. There was one daughter and mother and then
16     another daughter and mother.
17 Q. Okay, fair enough.
18        Do you recall the substance of
19     what the first young woman said to you when
20     you began speaking with them?
21 A. I don't remember the substance at all.
22 Q. Okay. Do you recall whether you were given
23     any kind of a script or a list of questions
24     to ask the witnesses?

Page 82

1 A. I must have been, but I don't remember what
2     it was.
3 Q. Do you recall whether it was typewritten or
4     handwritten?
5 A. Handwritten.
6 Q. Do you recall how many pages it was?
7 A. I think probably it was three or four
8     questions.
9 Q. In total?
10 A. Yes.
11 Q. Okay. Forgive me, I know -- do you remember
12     anything about these questions?
13 A. No.
14 Q. Do you remember if it was --
15 A. Just basic background information, name and
16     address, and then what did they remember
17     about --
18 Q. Okay.
19 A. -- what happened to them.
20 Q. Do you recall whether the questions that you
21     were given were tailored to the witnesses
22     that you were speaking to?
23 A. Well it was the same for both of them.
24 Q. The questions were the same for both of them?

Page 83

1 A. Mm-hmm.
2 Q. And you have to give her a verbal answer.
3 A. The same for both of them.
4 Q. Do you recall how you recorded the
5     information that the witnesses gave to you?
6 A. Longhand on paper.
7 Q. Okay. And did you tape-record these
8     conversations?
9 A. No.
10 Q. What did you do with the notes after you
11     wrote them, after interviewing these women?
12 A. Gave them to Rosemary.
13 Q. Did you keep a copy for yourself?
14 A. No.
15 Q. Do you know whether those notes were reduced
16     to a typewritten affidavit?
17 A. No, I don't know.
18 Q. Okay. So you were never shown a typewritten
19     document and asked to review it for its
20     accuracy?
21 A. No.
22 Q. Did you ever have any information about what
23     happened to those notes after you turned them
24     over to Attorney Scapicchio?

Page 84

1 A. No.
2 Q. Do you recall at what stage in the
3     proceedings in the motion for new trial it
4     was that you spoke to these witnesses?
5 A. Well it wasn't the first day, and it wasn't
6     the sixth day, so it was somewhere between
7     the second and the fifth day.
8 Q. Okay. How do you remember it wasn't the
9     first day?
10 A. Because I would have remembered that.
11 Q. You would have remembered it being the --
12 A. The first day.
13 Q. -- first day of the hearing?
14 A. Yes.
15 Q. Did you know prior to going to court that you
16     were going to be playing this role,
17     interviewing witnesses?
18 A. It didn't seem like much of a role to me. It
19     was just doing a couple of short interviews.
20 Q. Okay. Did you know that this was a task that
21     you would be asked to perform?
22 A. No.
23 Q. Had Ms. Scapicchio or anybody else spoken to
24     you about the need to gather information from

### Page 103

1  to see Mr. Connolly, did the receptionist
2  make a telephone call or call anyone to let
3  Mr. Connolly know that you were there?
4  A. I think she went -- he or she went and spoke
5  to him.
6  Q. And after some period of time, did the
7  receptionist communicate a response to you?
8  A. Yes, right away.
9  Q. What did the receptionist tell you?
10 A. He's not interested in meeting with you.
11 Q. Was that what the receptionist told you?
12 A. Mm-hmm. Well she may -- he or she may have
13 said it a little more politely. He's not
14 available right now was probably the reply.
15 Q. Did you at that point attempt to make an
16 appointment with Mr. Connolly?
17 A. I think we had originally tried to make an
18 appointment and were not able to do so, so we
19 just dropped the petitions off and left them
20 with him.
21 Q. So you left the petitions there?
22 A. Mm-hmm.
23 Q. Yes?
24 A. Yes.

### Page 104

1  Q. Thank you.
2      At any point did you ever have any
3  communication with the family of the little
4  girl who was murdered in this case --
5  A. No.
6  Q. -- Tiffany Moore?
7  A. No.
8  Q. Did you ever have any communication or anyone
9  you know of have any communication with
10 anyone in the Moore family?
11 A. I think the Drumgold family knew the Moore
12 family. Shawn knew Tiffany Moore, and he
13 knew Tiffany Moore's grandmother.
14 Q. How about you yourself, though, did you
15 ever --
16 A. No.
17 Q. -- request information so that you could --
18 A. No.
19 Q. -- verify it?
20 A. Verify what?
21 Q. Verify any of the details of the
22 investigation --
23 A. No.
24 Q. -- from their perspective.

### Page 105

1  A. (Shakes head)
2  Q. I'm sorry if I asked this question earlier.
3  You were mentioning that at some point you
4  were in a -- quote, in a cafeteria, I
5  believe, preparing some affidavits for
6  Ms. Scapicchio?
7  A. Mm-hmm.
8  Q. Is that yes?
9  A. (No response)
10 Q. Is that yes?
11 A. Yes.
12 Q. And with respect to those affidavits, you
13 said that you took some notes down about what
14 the individuals had to say?
15 A. Mm-hmm, correct.
16 Q. And when you completed your first affidavit,
17 did you show that to the person you were
18 interviewing and ask them if you had written
19 down what they said correctly?
20      MS. SCAPICCHIO: She hasn't said
21 it was an affidavit, has she?
22      MR. WHITE: That's my
23 recollection.
24 A. I don't remember.

### Page 106

1  Q. Okay. With respect to the second individual,
2  after you had written down what they had to
3  say, do you remember if you ever showed it to
4  them and said, you know, would you look this
5  over and tell me if I got it right?
6  A. If Rosemary had asked me to do that, I would
7  have done that. I don't remember now.
8  Q. And --
9  A. Affidavit may have been the wrong word. It
10 may have just been she wanted me to go and
11 sit down with them and take it down.
12 Q. So a statement, take a statement down?
13 A. Take a statement so that she would then have
14 it, and she could use that for her notes.
15 Q. Okay. Well as you were asking the questions
16 from the -- from the script and the
17 individual was giving you the answers, you
18 were writing --
19 A. Correct.
20 Q. -- it down?
21 A. Correct.
22 Q. And you were trying to take it down to the
23 best of your ability?
24 A. Right.

### Page 107

1  Q. And at any point while you were taking
2  information down, did you ever show it to
3  either of the witnesses to see if you had --
4  see if they agreed with what you had written?
5  A. Normally when I write a letter for a client,
6  I read it back to the client before I type it
7  up, so I may have done that --
8  Q. You may have --
9  A. -- with these women.
10 Q. You may have read it back?
11 A. Yes.
12 Q. And then they --
13 A. And given them a chance to edit it if they
14 wanted.
15 Q. Did you --
16 A. But I don't remember, to be honest, whether I
17 did that or not.
18 Q. Okay. You don't recall any particular edits
19 at this point in time?
20 A. I don't remember any.
21 Q. Thank you. I don't have any further
22 questions.
23      EXAMINATION BY MS. CLIFFORD
24 Q. Ms. West, I just have a few questions. My

### Page 108

1  name is Paula Clifford, and my office
2  represents Retired Lieutenant Richard Walsh.
3  Have you ever heard that name?
4  A. No.
5  Q. Okay. Have you ever -- has Mr. Drumgold ever
6  mentioned that name to you in the years that
7  you've known Mr. Drumgold?
8  A. No.
9  Q. You had mentioned earlier that it was your
10 belief that Shawn was with Rachelle when the
11 murder of Tiffany Moore occurred, is that
12 correct?
13 A. Yes.
14 Q. And you base that belief on what Shawn had
15 told you, is that correct?
16 A. Yes.
17 Q. Approximately how many different times did
18 Shawn tell you that, that he was with
19 Rachelle when Tiffany Moore was murdered?
20 A. Probably once or twice. It's such an
21 important fact, I remember it.
22 Q. And how many times, if ever, did Rachelle
23 tell you that she was with Shawn when Tiffany
24 Moore was murdered?

**Page 121**

```
1  Q. Were you aware at that time that they had
2     prepared written affidavits?
3  A. No.
4  Q. That's all I have.  Thank you.
5  A. Okay.
6        [Whereupon, at 4:15 p.m., the
7        deposition was concluded.]
```

**Page 122**

```
                    CERTIFICATE

        I, GATEWOOD WEST, hereby certify
that I have read the foregoing deposition
transcript of my testimony, and further I
certify under the pains and penalties of
perjury that said transcript is a true and
accurate record of said testimony.



Dated this _____ Day of _____,
20_____.



              _____
                 Gatewood West
```

**Page 123**

```
               CERTIFICATE
    COMMONWEALTH OF MASSACHUSETTS
    PLYMOUTH, SS.

        I, M. ELAINE GANSKA, a Notary
Public in and for the Commonwealth of
Massachusetts, do hereby certify that:
        GATEWOOD WEST, having been duly
sworn to testify upon her oath, did so
testify, and that this transcript is a full,
true, and accurate record to the best of my
knowledge, skill, and ability of the
testimony taken at Boston, Massachusetts, on
Monday, July 23, 2007.
        I further certify that I am a
disinterested person to the action in which
this deposition is taken.
        IN WITNESS WHEREOF, I have
hereunto set my hand and seal this 9th Day of
August, 2007.
                    Notary Public
My commission expires:
June 19, 2009
THE FOREGOING CERTIFICATION OF THIS
TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
OF THE SAME BY ANY MEANS UNLESS UNDER THE
DIRECT CONTROL AND/OR DIRECTION OF THE
```