UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SHAWN DRUMGOLD,  )  C.A. NO. 04-11193NG
    Plaintiff  )
                                                   )
v.  )
                                                   )
TIMOTHY CALLAHAN, ET AL.  )
    Defendant(s)  )
                                                   )

**Plaintiff's Memorandum in Opposition to**

**Defendant Callahan's Motion for Partial Summary Judgment**

**Table of Contents**

I.   **INTRODUCTION**……………………………………………………………….2
          A.  KEY TO REFERENCES……………………………………..…………2
          B.  SUMMARY JUDGMENT STANDARD…………...…..……………....3

II.  **ARGUMENT**……………………………………………………………………….4
          A. CALLAHAN WITHELD EXCULPATORY EVIDENCE
             CONCERNING MARY ALEXANDER AND RICKY EVANS AND
             THEREFORE IS NOT ENTITLED TO SUMMARY JUDGMENT…...4

             1.  Mary Alexander………………………………..…………………….5
             2.  Ricky Evans…………………………………………………………..6

          B. THE JURY COULD FIND THAT CALLAHAN USED THREATS
             AND INTIMIDATION TO PREVENT ALIBI WITNESSES FROM
             TESTIFYING……………………………………………………...……8

             1.  Olisa Graham…..……………………………………………………8
             2.  Vantrell McPherson……………………………………………..…10

          C. CALLAHAN IS NOT ENTITLED TO SUMMARY JUDGMENT ON
             THE CLAIM OF CONSPIRACY TO VIOLATE CIVIL RIGHTS..….11

    D.  CALLAHAN IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE MASSACHUSETTS CIVIL RIGHTS CLAIM…………..………12

        1.  Callahan Threatened, Intimidated Or Coerced Witnesses……......12
        2.  The MCRA Claims Are Not Time Barred……………………….12

    E.  CALLAHAN IS NOT ENTITLED TO QUALIFIED IMMUNITY…16

III.   **CONCLUSION**………………….....……………………………….....…………16

I.    **INTRODUCTION**

    A.  KEY TO REFERENCES

The Plaintiff has attempted to use the following consistent reference in his responses to the four Summary Judgment Motions filed by the Defendants.

| Reference: | Source: |
|---|---|
| WMF- | Consolidated Statement of Undisputed Material Facts In Support of Motions for Summary Judgment of Defendants Richard Walsh and Paul Murphy |
| CMF- | Defendant Timothy Callahan's Concise Statement of Undisputed Material Facts |
| PMF- | Plaintiff's Concise Statement of Material Facts |
| RWMF- | Plaintiff's Response To Undisputed Material Facts of Defendants Walsh and Murphy |
| RCMF- | Plaintiff's Response to Callahan's Statement of Material Facts |
| W Ex- | Consolidated Exhibits In Support of Defendants Motions for Summary Judgment |
| C Ex- | Exhibits in Support of Callahan's Concise Statement of Undisputed Material Facts |

  B Ex-    Exhibits Attached To City of Boston's Memorandum In Support of Motion for Summary Judgment

  P Ex-    Plaintiffs Exhibit In Support of Its Concise Statement of Disputed Material Facts

  B.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant ... would permit a rational fact finder to resolve the issue in favor of either party." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990) (internal citations omitted). A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir.1996) (internal citations and quotation omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. See id. at 324, 106 S.Ct. at 2553. In evaluating motions for summary judgment, however, the court will not consider "conclusory allegations, improbable inferences, and unsupported speculation." Galloza v. Foy, 389 F.3d 26, 28 (1st Cir.2004) (internal citation omitted).

When the issue in dispute is the credibility of the moving party's witness, the nonmoving party must allege supporting evidence to establish a genuine issue of material fact. Moreau v. Local Union No. 247, Int'l Bhd. of Firemen & Oilers, AFL-CIO, 851 F.2d 516, 519 (1st

3

Cir.1988) (citing Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[A] bare assertion that the opposing party's uncontroverted evidence might be disbelieved is insufficient." Favorito v. Pannell, 27 F.3d 716, 721 (1st Cir.1994).  Rather, to withstand a properly supported motion for summary judgment, the opposing party must present enough competent evidence to enable a factfinder to decide in its favor on the disputed claim." Carroll v. Xerox Corp., 294 F.3d 231, 236-37 (1st Cir.2002) (internal punctuation and citations omitted).  "Where, however, the non-moving party has produced more than that, trial *328 courts should 'use restraint in granting summary judgment' where discriminatory animus is in issue." DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir.1997) (quoting Valles Velazquez v. Chardon, 736 F.2d 831, 833 (1st Cir.1984)).

II.   ARGUMENT

A. CALLAHAN WITHHELD EXCULPATORY EVIDENCE CONCERNING MARY ALEXANDER AND RICKY EVANS AND IS THEREFORE NOT ENTITLED TO SUMMARY JUDGMENT.

Callahan denies that there is a material issue of fact concerning whether he withheld exculpatory evidence about Mary Alexander and Ricky Evans.  Callahan agrees that if there is a material issue of fact concerning whether he withheld exculpatory evidence then he is not entitled to Summary Judgment.  As set out in the Memorandum in support of Callahan's Motion, "Callahan does not dispute that the deliberate and intentional withholding of exculpatory

4

information from a criminal defendant that results in prejudice to that defendant is actionable as a constitutional violation" (Defendant's Memorandum of Law, p. 6).  Callahan does contest that he withheld exculpatory evidence and that the withheld evidence was prejudicial.

1. Mary Alexander

It is simply not correct for Callahan to argue that "the record reveals that the most the Alexander family revealed to the authorities…was that she was unwell" (Defendant's Memorandum, p. 7 of 13).

Lola Alexander, Mary Alexander's mother, testified in detail that on multiple occasions she told Boston Police officers that her daughter was suffering from brain cancer, that her daughter didn't remember "nothing that goes from day to day" and that her daughter "don't remember things" because of her medical condition.  Lola Alexander testified that she told this to the Boston Police Detectives on numerous occasions (PMF 16-18)

Callahan had personal contact with Mary Alexander on several occasions during the summer of 1989 and rode with Lola Alexander to the Carney Hospital to bring Mary to the hospital about a week prior to the trial (RCMF 14).  A jury could reasonably infer that Callahan was one of the officers to whom Lola explained Mary Alexander's health problems, particularly when Callahan was driving Lola to the hospital in order to seek further medical care for Mary Alexander.

The contemporaneous medical records indicate that prior to Mary testifying at trial she had severe mental and memory problems.  On May 29, 1989 Lola complained of an episode of amnesia where she was forgetting the name of her sons and forgetting where she was (PMF 14).

5

On September 24, 1989, the day that Callahan responded to the Alexander home and brought Lola to the hospital with Mary, the medical records indicate that Mary suffered from a seizure disorder with a 60% removal of a brain tumor and was non-compliant with the Dilantin prescribed for her condition (PMF 15).  There is substantial evidence from which a jury can infer that Lola Alexander told Callahan about Mary Alexander's brain injury and medically caused memory problems and that her problems would have been apparent to someone who accompanied her to the hospital.  In light of Callahan's denial that knew of Mary Alexander's health problems (CMF 4), it is clear that Callahan failed to reveal that information to either the District Attorney or Defense Counsel.

2.   Ricky Evans

The jury could find that Callahan arrived unannounced at the home where Ricky Evans was staying and brought him to the Howard Johnson's Hotel (PMF 43).  At the time Evans was brought to the hotel, Evans had no concerns as to his safety (RCMF 8) and Assistant District Attorney Connolly, who was handling the Treas Carter case, had no particularized concern as to Evans' safety (RCMF 10).

Evans saw Callahan at multiple occasions at the hotel (PMF 44).  On many occasions Callahan provided Evans with cash at the hotel (PMF 44).  All of Evans' meals at the Hotel were paid for, as were the meals of friends and family who came to visit him (PMF 45).

Evans told Callahan that if Callahan was going to take care of him in this way at the hotel, Evans would "say what you ask me to say" (PMF 46).  Callahan then fed Evans information concerning the alleged location of a conversation with Drumgold and Taylor, the

6

types of guns Drumgold and Taylor allegedly used and the type of car allegedly involved in the murder (PMF 47). Evans used the information given by Callahan as the basis for testifying falsely at trial (PMF 46-47).

Callahan does not claim that he told Assistant District Attorney Beauschesne that he provided money to Rickey Evans on many occasions, that he was paying for meals for Evans and his family, that he was feeding information to Evans, or that Evans had told him that he would testify to whatever Callahan wanted in exchange for Callahan putting him up at the hotel. The summary judgment record does not support the proposition that Beauschesne was aware of any of those facts. In fact, Beauschesne's testimony at the Motion for New Trial was that he did not remember knowing that Ricky Evans was put up at a hotel (RCMF 13).

Callahan also took Evans to the Roxbury District Court and arranged to have six pending cases dismissed (PMF 49). He informed Evans that the cases had been "taken care of" (PMF 49). Callahan did not tell Beauschesne he had cleared up pending cases on behalf of Evans (PMF 53).

Callahan argues that any duty to disclose exculpatory evidence was a duty of the District Attorney and not a duty of Callahan's. The argument ignores the fact the jury could find that Callahan did not inform the District Attorney about the exculpatory evidence known only to Callahan. Beauschesne did not know that Evans had been provided with cash and other benefits, that meals for Evans, his friends and family had been paid for, that Evans had agreed to provide whatever testimony Callahan wanted in exchange for being put up at the hotel and that Callahan had fed information for Evans to use in his false testimony (RMCF 13) or that Callahan had taken care of cases for Evans (PMF 53). Beauschesne could not reveal to the criminal

7

Defendants information that he did not know because Callahan had not told him. Callahan withheld the exculpatory evidence concerning Evans from Beauschesne and from the Defendant.

## B. THE JURY COULD FIND THAT CALLAHAN USED THREATS AND INTIMIDATION TO PREVENT ALIBI WITNESSES FROM TESTIFYING

### 1. Olisa Graham

The Jury is entitled to find that Callahan was the lead investigator for the Boston Police Department at the time the case went to the trial (WMF 30, RWMF 30)

In June of 1989 Defendant Callahan took a recorded statement from Ms. Graham in which she indicated that she could provide an alibi to Shawn Drumgold (PMF 55, WMF 217, W Ex 29A). Her statement was made to Detective Callahan and Detective McDonough (W Ex 29A). In the statement Olisa Graham told Callahan and McDonough that she had seen Shawn Drumgold with Terrence Taylor outside 23 Sonoma Street at the time the shooting occurred. She explained how she saw the shooting and how Shawn Drumgold and Terrence Taylor were on Sonoma Street at the time of the shooting (P Ex 13, Affidavit of Olisa Graham). After explaining this to the detectives she received a phone call from "one of them" informing her that she had an outstanding warrant and could not testify or she would be locked up (PMF 56-59). She did not come forward to testify because she did not want to get arrested (PMF 61). The jury would be entitled to infer that Callahan, as the lead investigator at the time, made or caused to be made, the telephone call. Callahan was in charge of the investigation and McDonough reported

to him on his activities (PMF 31).  Callahan's actions violate clearly established constitutional norms.  The Supreme Judicial Court explained in 1979, "witnesses may decline of their own to talk to either side or to both, but their choice should not be constrained, and when it is the state that interferes, we consider the vice to be constitutional…"  Com v. St. Pierre, 377 Mass. 650, 658, 387 N.E.2d 1135, 1140 (1979).

  Callahan argues that any intimidation or threats to Olisa Graham were not material because Drumgold's lawyer, Stephen Rappaport, was aware of Ms. Graham's testimony from her recorded statement and made a strategic decision not to call her.  The argument ignores the fact that the strategic decision by Rappaport was made while Rappaport was unaware that the case he was trying was premised, in whole, on false and coerced testimony.  Had Rappaport known that the Commonwealth had housed, paid, and suborned Ricky Evans (PMF 43-47), had housed and given promises to Antonio Anthony (PMF 26-31), had failed to disclose exculpatory evidence concerning Mary Alexander (PMF 12-23) and had threatened and intimidated Olisa Graham (PMF 53-61), it would be reasonable for the jury to find that he would have made substantially different strategic decisions and in fact, it is abundantly clear that had all of the material facts been known by Rappaport the most likely grounds for defending this case would have been that the Commonwealth had intentionally  concocted this case by means of threats and intimidation and Olisa Graham would have been a key witness in that trial.  The Defendants cannot be allowed to hide evidence from Defense attorney and then argue that decisions made by Defense attorney, based upon a lack of evidence, should bar Drumgold from prevailing once the evidence is known.

B. <u>Vantrell McPherson</u>

Ms. McPherson was among the group of teenagers near the mailbox at the corner of Homestead and Humboldt at the time of the Moore homicide (WMF 10). Vantrell McPherson testified at Drumgold's murder trial that prior to the murder she heard Shawn Drumgold say, "come on we've got to do this". That testimony was false (PMF 32).

At the time of the murder Ms. McPherson was 13 years old (PMF 34). The police came to her house right after the murder and then continued to come to her house on multiple occasions after that (PMF 33-35). She told the police on those occasions that she did not know who had shot Tiffany Moore (PMF 35). Ms. McPherson was brought to the court for the purposes of testifying at the trial. She was brought into a dark room by two police officers. The police officers were yelling at her. She told them that she did not know who the shooters were. She became upset and began crying (PMF 37). She "just went blank". She was brought into court immediately after being scared by the police officers and testified falsely that she had heard Drumgold make the statement "come on we've got to do this" (PMF 39). She had made no mention of that statement in the recorded statement taken by Callahan on June 10, 1989 (PMF 38).

The jury could reasonably infer that Callahan was one of the officers who intimidated Ms. McPherson. The Defendant has tried to suggest that Ms. McPherson was dealing with the District Attorney's office. It is clear that Ms. McPherson was dealing with males. Then Assistant District Attorney Phyllis Broker was working with Mr. Beauschesne and handling the preparation of witnesses. Mr. Beauschesne testified he had no knowledge of any witness being threatened (PMF 40).

Callahan was the person in charge of the investigation among Boston police officers at the time of the trial (WMF 89) and the person who dealt with Vantrell McPherson on behalf of the Boston Police Department (PMF 30). The jury could reasonably infer that Callahan intimidated and threatened Ms. McPherson and caused her to testify in a manner that he knew was untruthful.

### C.  CALLAHAN IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE CLAIM OF CONSPIRACY TO VIOLATE CIVIL RIGHTS

The Plaintiff agrees with the Defendant that the evidence establishes a civil conspiracy when a jury can find that persons have agreed to injure the defendant, the purpose of the agreement is to deprive him of his constitutional rights, an act is committed in furtherance to conspiracy and the Plaintiff is injured. Alexander v. The City of South Bend, 433 F.3d 540, 556-57 (7th Cir. 2006)  Because of the inherent secretive nature of a conspiracy a jury is allowed to make the determination as to the conspiratorial intent of the members of the conspiracy based upon circumstantial evidence, "moreover, agreement between the conspirators—the glue of conspiracy—can be inferred from all of the factual circumstances alleged" Charles v. City of Boston, 365 F.Supp.2d 82, 90 (D.Mass. 2005). As the court in Hanthem v. Hanrahan, 600 F.2d 600, 620-21 (1st Cir. 1979) explained,

> A plaintiff is not required to provide direct evidence of the agreement between conspirators; circumstantial evidence may provide adequate proof of conspiracy…the question of whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can "infer from the circumstances (that the alleged conspirators) had a "meeting of the minds) and thus reaching an understanding to achieve the conspiracy's objective (Id at 620-621).

In this case, Callahan is not correct when he alleges that, "there is no evidence that Walsh or Murphy continued to work on the investigation with Callahan". In fact, Walsh and Murphy reviewed the entire file with Callahan when he took over the investigation (RWMF 30-31) and Walsh continued to be involved in interviews with witnesses after the time that Callahan took over the case (RWMF 30-31). Murphy worked with Callahan in his handling and manipulation of Ricky Evans (PMF 41).

The evidence establishes that Walsh and Murphy began a course of conduct designed to unfairly convict Drumgold. Sometime in May of 1989 Callahan took over the lead in that investigation. Callahan used the witnesses and information gathered by Walsh and Murphy to carry to fruition the goal of the conspiracy of unlawfully convicting Drumgold. The actions of these Defendants in using the same means, methods and witnesses to obtain the identical goal of an unfair conviction is a classic so-called "chain conspiracy" whereby one Defendant starts carrying out the goals of the conspiracy and a second Defendant finishes the goals of the conspiracy, e.g. U.S. v. Sepulveda, 15 F.3d 1161, 1190-91 (1st Cir. 1993). There is ample evidence for a jury to determine these Defendants were motivated by a conspiratorial agreement to arrive at the end of an unfair conviction.

D. **CALLAHAN IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE MASSACHUSETTS CIVIL RIGHTS ACT CLAIM**

    1. **Callahan Threatened, Intimidated Or Coerced Witnesses**

Callahan argues there is no evidence that he threatened, intimidated or coerced anyone in connection with the investigation of this case and therefore he has no liability pursuant to M.G.L. ch. 12 § 11I.

As an initial matter, Callahan is charged in count four with conspiring with the other Defendants to carry out the plan of threatening, intimidating, and coercing witnesses. As set out above in section C herein there is ample evidence for the jury to determine that Callahan was a part of the conspiracy to produce this result. As set out in the opposition to Defendant Walsh and Murphy's Motion for Summary Judgment, there is sufficient evidence for the jury to find that, for example, the witnesses Tracie Peaks and Mary Alexander were threatened or intimidated. As set out above in the discussion of Olisa Graham (Section B1) there is sufficient evidence for the jury to find that Callahan in fact threatened Olisa Graham with arrest if she appeared to testify at trial.

The evidence also establishes that Callahan took Evans from his home, placed him in the Howard Johnson's Hotel (PMF 43) and that Evans understood that his continued presence at the hotel and receipt of benefits from Callahan was premised on telling Callahan what Callahan wanted to he hear (PMF 46). If the jury believes Callahan's claim that one of the reasons for keeping Rickey Evans at the hotel was to preserve his safety from individuals who wanted to do him harm (CMF 8) the jury could infer that Callahan, in effect, threatened Evans with the cutting off of his financial benefits and a removal of the safety of the hotel room if Evans did not testify as Callahan wished him to. The threat to remove future economic gains, when tied to the exercise of a constitutional right, can constitute coercion for purposes of Mass Civil Rights Acts. Acciaztti v. Professional Services Group, Inc., 982 F.Supp. 69 (D.Mass. 1997). There is a material issue of fact as to whether Callahan used threats, intimidation, or coercion or conspired to use them in connection with this case.

Callahan's actions towards Evans constitute "coercion" pursuant to the MCRA. Coercion under the statute is the "application to another of such force, either physical or moral, as to

13

constrain him to do against his will something he would not otherwise have done" Planned Parenthood League of Mass. V. Blake, 417 Mass. 467, 474 (1994). The jury would be entitled to find that Evans would not have testified falsely unless Callahan had applied moral force to constrain him to do so. The statute does not require that physical force or coercion be applied. Economic coercion, in appropriate circumstances, is sufficient to satisfy the coercion requirement. Buster v. George W. Moore, Inc., 438 Mass. 635, 783 N.E.2d 399, 410 (2003) Lecrenski Bros. Inc. v. Johnson, 312 F.Supp.2d 117 (D.Mass. 2004). In this case a young homeless man who was being supported with free meals and room and cash was uniquely susceptible to economic coercion.

### 2. MCRA Claims Are Not Time Barred

Callahan secondly argues that he is entitled to summary judgment on the grounds of the statute of limitations. All parties agree that no Massachusetts court has determined whether Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) applies to determining the appropriate statute of limitations pursuant to M.G.L. ch. 12 § 11I, the Massachusetts Civil Rights Act. The Massachusetts Appeals Court decision in Messere v. Murphy, 32 Mass.App.Ct. 917 (1992), cited by the Defendant for the proposition that the Heck rule does not apply to the MCRA, does not stand for that proposition. Heck was decided in 1994 and Messere was decided in 1992. The Appeals Court could not have ruled on the issue of whether the Heck rule applies to actions brought pursuant to the Mass Civil Rights Act. The Defendants are correct that Judge Saris in Mitchell v. City of Boston, 130 F.Supp.2d 201, 214 (2001) ruled that, in her opinion, the Messere case, which she acknowledged to be a pre-Heck

14

decision, could not be "second guessed" by her with respect to deciding whether the Heck rule applied to the MCRA (Id at 214).  Judge Saris was incorrect because applying the Heck rule to the MCRA would not be "second guessing" the Appeals Court decision in Messere v. Murphy since that question was not before the Appeals Court.

Judge Saris was correct in noting that the Massachusetts courts often look to federal interpretations of Section 1983 when interpreting the Massachusetts Civil Rights Act (Id at 214), Duarte v. Healey, 405 Mass. 43, 47, 537 N.E.2d 1230, 1232 (1989).  Judge Saris was also correct when she noted that "the Heck decision announces a sound policy against permitting civil damages actions that undermine the validity of criminal convictions" Mitchell at 214.  This court should resolve the undecided issue and hold that the Heck rule applies to actions brought pursuant to the Massachusetts Civil Rights Act.

Secondly, the statute of limitations for MGL ch. 12 § 11I does not begin to run until a Plaintiff knows or should know "all of the facts necessary to make out civil rights claim" Pagliuca v. City of Boston, 35 Mass.App.Ct. 820, 823, 626 N.E.2d 625, 627 (1994).  The statute of limitations may be tolled under the discovery rule when a Defendant conceals the basis for the claim Sampson v. Town of Salisbury 441 F.Supp.2d 271 (D.Mass. 2006).

The Messere case relied upon by the Defendants was not a case involving concealment of evidence from the Plaintiff.  In Messere v. Murphy 32 Mass.App.Ct. 917, 585 N.E.2d 350 the Plaintiff alleged that he was the victim of a conspiracy involving a witness named Cerasulo (Id at 917).  That alleged conspiracy was known to Mr. Messere in 1982 and is discussed in his direct appeal. Com v. Messere 14 Mass. App.Ct.1, 436 N.E.2d 414 (1982).  The Appeals Court in 1992 had a firm basis for finding that Messere "knew or should have known of the alleged conspiracy" at the time of his direct appeal in 1982.

In this case, despite every effort by the Defendant, he did not become aware of the use of threats, intimidation, or coercion by the Defendants to deprive him of his right to a fair trial until he was finally granted an evidentiary hearing in July and August of 2003. The Plaintiff's civil rights claim is based on the misconduct of the Defendants in connection with, for example, the witnesses Ricky Evans, Mary Alexander, Olisa Graham, Antonio Anthony, and Vantrell McPherson. The information concerning that misconduct was concealed by the Defendants until the hearing in 2003. The statute of limitations pursuant to Mass. General Laws ch. 12 Sec. 11I must be tolled until that time.

### E.    CALLAHAN IS NOT ENTITLED TO QUALIFIED IMMUNITY

There is no substantial qualified immunity issue in this case as to Callahan. This is not a case where there is a dispute as to whether, if the defendant did what the plaintiff says he did, the defendant should have know that he was violating clearly established constitutional rights of the plaintiff. Savard v. Rhode Island, 338 F.3d 23, 28 (1st Cir. 2003). In this case the Defendant concedes that "the deliberate and intentional withholding of exculpatory information from a criminal defendant that results in prejudice to that defendant is actionable as a constitutional violation" (Defendant's Memorandum at 6). The Defendant cites cases from 1963, 1984, 1987 for that proposition. Clearly, Callahan knew in 1988 that deliberately and intentionally withholding exculpatory information was a constitutional violation. If Callahan withheld exculpatory evidence, Callahan is not entitled to qualified immunity.

16

As set out in Section A of this Memorandum, there is ample evidence for the jury to find that Callahan failed to disclose the exculpatory evidence he had to the District Attorney or the Defendant. The argument that the District Attorney should have produced the withheld evidence fails, since the District Attorney was not aware of it because of Callahan's actions. Callahan is not entitled to Summary Judgment on qualified immunity grounds.

### III.     CONCLUSION

This court should deny Callahan Motion for Summary Judgment.

Respectfully submitted,

By His Attorneys,

 /s/ Michael Reilly

Michael W. Reilly, Esq.
Tommasino & Tommasino
Two Center Plaza
Boston, MA   02108
617 723 1720
BBO 415900

/s/ Rosemary Curran Scapicchio

Rosemary Curran Scapicchio, Esq.
Four Longfellow Place
Boston MA 02114
617 263 7400
BBO 558312