UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHAWN DRUMGOLD,  ) | C.A. NO. 04-11193NG |
| Plaintiff  ) | |
| ) | |
| v  ) | |
| ) | |
| TIMOTHY CALLAHAN, ET AL.  ) | |
| Defendant(s)  ) | |
| ) | |

## Plaintiff's Memorandum in Opposition to City of Boston

## and Francis M. Roache's Motion for Summary Judgment

### Table of Contents

I.    **INTRODUCTION**…………………………...…………………………………2

        A.  KEY TO REFERENCES …………….…..……………..……………..2
        B.  SUMMARY JUDGMENT STANDARD…………...……………..…....3

II.   **ARGUMENT**………………………………………………………………….5
        A.  THE MOTION FOR SUMMARY JUDGMENT BY THE CITY AND
           ROACHE SHOULD BE DENIED FOR FAILURE TO COMPLY
           WITH FED. R. CIV. PROC. 56 AND LOCALE RULE 56.1…………..5

        B.  BECAUSE A JURY COULD FIND EVIDENCE OF A 1983 CIVIL
           RIGHTS VIOLATION BY THE INDIVIDUAL DEFENDANTS THE
           CITY IS NOT ENTITLED TO SUMMARY JUDGMENT ………...…5

        C.  THE CITY'S POLICIES OR CUSTOMS WERE A MOVING FORCE
           BEHIND THE PLAINTIFF'S INJURIES………………………………5

           1.  The City of Boston's Failure To Implement Investigative Policies
               or Procedures In Connection With Homicide Investigations Was
               A Moving Force In The Injury To Shawn Drumgold……………6

2.  The City Of Boston's Failure To Provide Proper Training Or Supervision Of the Homicide Detectives Was a Moving Force In the Injury To Mr. Drumgold…………...………………….……8

3.  The City of Boston's Failure To Evaluate Or Hold Officers Accountable Was A Moving Force In the Injury To Mr. Drumgold………………………………………………………9

4.  The St. Clair Report, The 30 Day St. Clair Implementation Report And The Neighborhood Policing Report Are Admissible To Prove The City's Practices And Procedures………………...…...12

   a.  The Reports Are Admissible As Public Reports Under Federal Rules of Evidence 803(8)(C)……………………12

   b.  The Reports Are Admissible As Admissions Under Federal Rules of Evidence Rule 801(d)(2)…………………….…18

5.  The Jury Could Find That The City Had Knowledge Of A Practice And Custom Of Allowing Boston Police To Wrongfully Convict Black Males……………………………………………...….22

D.  ROACHE IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE §1983 CLAIM…………………………………..…………...…24

E.  ROACHE IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE MASSACHUSETTS CIVIL RIGHTS CLAIM…………………27

III.  **CONCLUSION**………………………………………………………..……28

# I.     INTRODUCTION

## A.  KEY TO REFERENCES

The Plaintiff has attempted to use the following consistent reference in his responses to the

four Summary Judgment Motions filed by the Defendants.

Reference:          Source:

1. WMF-    Consolidated Statement of Undisputed Material Facts In Support of Motions for Summary Judgment of Defendants Richard Walsh and Paul Murphy

2. CMF-    Defendant Timothy Callahan's Concise Statement of Undisputed Material Facts

3. PMF-    Plaintiff's Concise Statement of Material Facts

4. W EX-    Consolidated Exhibits In Support of Defendants Motions for Summary Judgment

5. C Ex-    Exhibits in Support of Callahan's Concise Statement of Undisputed Material Facts

6. B Ex-    Exhibits Attached To City of Boston's Memorandum In Support of Motion for Summary Judgment

7. P Ex-    Plaintiffs Exhibit In Support of It's Concise Statement of Material Facts

8. RWMF-    Plaintiff's Response To Undisputed Material Facts of Defendants Walsh and Murphy

9. RCMF-    Plaintiff's Response to Callahan's Statement of Material Facts

## B.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant ... would permit a rational fact finder to resolve the issue in favor of either party." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990) (internal citations omitted). A material fact is one which has the

"potential to affect the outcome of the suit under the applicable law." Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir.1996) (internal citations and quotation omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. See id. at 324, 106 S.Ct. at 2553. In evaluating motions for summary judgment, however, the court will not consider "conclusory allegations, improbable inferences, and unsupported speculation." Galloza v. Foy, 389 F.3d 26, 28 (1st Cir.2004) (internal citation omitted).

When the issue in dispute is the credibility of the moving party's witness, the nonmoving party must allege supporting evidence to establish a genuine issue of material fact. Moreau v. Local Union No. 247, Int'l Bhd. of Firemen & Oilers, AFL-CIO, 851 F.2d 516, 519 (1st Cir.1988) (citing Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[A] bare assertion that the opposing party's uncontroverted evidence might be disbelieved is insufficient." Favorito v. Pannell, 27 F.3d 716, 721 (1st Cir.1994).  Rather, to withstand a properly supported motion for summary judgment, the opposing party must present enough competent evidence to enable a factfinder to decide in its favor on the disputed claim." Carroll v. Xerox Corp., 294 F.3d 231, 236-37 (1st Cir.2002) (internal punctuation and citations omitted).  "Where, however, the non-moving party has produced more than that, trial *328 courts should 'use restraint in granting summary judgment' where discriminatory animus is in issue." DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir.1997) (quoting Valles Velazquez v. Chardon, 736 F.2d 831, 833 (1st Cir.1984)).

## II.     ARGUMENT

### A.     THE MOTIONS FOR SUMMARY JUDGMENT BY THE CITY AND ROACHE SHOULD BE DENIED FOR FAILURE TO COMPLY WITH FED. R. CIV. PROC. 56 AND LOCAL RULE 56.1

The Motions filed by the Defendant City of Boston and Francis M. Roache contain no concise statement of undisputed material facts.  The memorandum is accompanied only by a series of exhibits.  It is appropriate for the court to deny the Motion because of the failure to present the summary judgment issues as required by Rule 56(d) and (e) and by Local Rule 56.1.

### B.     BECAUSE THE JURY COULD FIND EVIDENCE OF A 1983 CIVIL RIGHTS VIOLATION BY THE INDIVIDUAL DEFENDANTS THE CITY IS NOT ENTITLED TO SUMMARY JUDGMENT

The city argues that the Plaintiff must establish that a Constitutional violation has occurred as a prerequisite for establishing that the city's policies or customs caused a deprivation of right. Albright v. Oliver, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994).

In this case the Plaintiff has set out, in detail, in it's opposition to Summary Judgment Motions filed by Defendants Walsh, Murphy, and Callahan the multiple basis on which a jury could find that those Defendants committed Constitutional violations which caused injury to the Defendant.

**C.      THE CITY'S POLICIES OR CUSTOMS WERE A MOVING FORCE**
**BEHIND THE PLAINTIFF'S INJURIES.**

The City argues that a single incident of unconstitutional activity by Boston Police officers is not sufficient to impose liability on the city.  The Plaintiffs must provide evidence of a policy or custom of the city which caused the resulting injury or deprivation of right.  <u>Judge v. City of Lowell</u>, 160 F.3d 67, 78 (1st Cir. 1998) In this case, the city's policies, customs or practices which caused the injury to the defendant include a complete failure to provide any particularized homicide training, a failure to have any homicide investigative policy to guide detectives, a failure to have any supervisory evaluation of Boston Police detectives, a failure to investigate, follow up or discipline Detectives, and a policy of failing to investigate, follow up or discipline known examples of misconduct by homicide detectives.  In addition the jury could find that the city followed a custom or practice of targeting black criminal defendants to be wrongfully convicted.  Each of the policies will be discussed below.

The City is liable for the injury to the Defendant if it's policies, practices, customs or procedures are the moving force behind the constitutional violation.  <u>Whitefield v. Melendez-Rivera</u> 431 F.3d 1, 13 (1st Cir. 2005)  <u>Bordanaro v. McLeod</u> 871 F.2d 1151, 1157 (1st Cir. 1989)

1.      <u>The City of Boston's Failure To Make Officers Aware Of Any</u>
<u>Investigative Policies Or Procedures In Connection With</u>
<u>Homicide Investigation Was A Moving Force In The Injury To</u>
<u>Mr. Drumgold.</u>

Detective Edward McNelly was the head of the Boston Police Homicide Department at the time of the Shawn Drumgold trial. He testified that the Boston Police Department probably did not have any policies or procedures as to how to investigate homicides (PMF 63). Defendant Callahan testified that he was unable to remember any regulations concerning how homicide investigations should be conducted (PMF 63).

As set out in the Plaintiff's Motion for Sanctions for Failure to Properly Comply with Discovery Obligation filed on 9/12/2007 (Docket No. 101) there is a material issue of fact as to whether the city now claims to have certain procedures in regards to informants or as to other investigative techniques but the city has not produced to date, despite targeted document requests, any written homicide policy.

Doctor Michael D. Lyman has been retained by the Plaintiff. He is highly qualified to testify on the subject of police policies and practices (P Ex 36, pgs. 2-3). Dr. Lyman opined that the City of Boston in "a number of critical areas with regards to conducting homicide investigations failed to have written policy". Dr. Lyman also opined that, "once a policy has been written, however, it must be made known. Policy dissemination is a responsibility of police administrators at the highest level of command" (Id at 24). The jury could reasonably infer that the need to provide written homicide policy to homicide detectives was "common knowledge in the police community" and that this type of training was required to lessen the risk of constitutional violations by homicide detectives. Young v. City of Providence, 404 F.3d 4, 28-29 (1st Cir. 2005) Dr. Lyman, after his review of facts in the case, opined that if the Boston Police Department had adopted and implemented a proper homicide policy, "the two perpetrators of this crime would have been identified and captured on a timely basis" and he concludes that failing to adopt homicide investigative policies consistent with nationally recognized

management policies "resulted in the wrongful investigation and conviction of Shawn Drumgold and was directly responsible for the failure of the department to capture the person or person truly responsible for the crime" (Id at 25).

There is a material issue of fact as to whether the city failed to properly adopt homicide procedures and whether that policy or procedure caused harm to the Defendant.

> 2.    The City of Boston's Failure To Provide Proper Training Or Supervision of the Homicide Detectives Was A Moving Force In The Injury To Mr. Drumgold.

The St. Clair report, the admissibility of which will be discussed below, after an extensive review of the Boston Police Department concluded that:

> There appears to be no special training for detectives:  when patrol officers are promoted, they are simply assigned to a unit and expected to learn "on the job".  The committee was told that Homicide detectives receive no special training when they join the unit "because only experienced investigators are chosen to be homicide detectives".  Certain units, including homicide, team new investigators with more experienced investigators.  However, these informal training programs are not subject to documentation, review, or accountability" (P Ex 31 at p. 74).

The conclusion of the St. Clair report is consistent with the testimony of the Boston Police detectives who were in the homicide unit at the time of the Tiffany Moore murder.  Lt. Daly, who was in charge of the unit in 1988 and 1989, testified that there was very little formal training for homicide detectives at that time (PMF 64).  Detective Callahan testified that the only formal training that he received was an outside homicide school, which will be discussed below

(PMF 64).  The only formal training that any of the officers were able to point to was a class run by a New York state police trooper named Vernon Gerbeth.  Daly testified that he knew that Vernon Gerbeth lacked legitimacy with the detectives who attended the course because they viewed him as being "academic" (PMF 65).

Dr. Lyman opined that it is not sufficient to have a policy in place, but that dissemination of the policy is vital for proper response.  As he explained, "Written policies can and should be viewed as extensions for training to give officers direction towards a specific goal" (P Ex 36, p. 24).

There is a material issue of fact as to whether the failure to provide homicide training, combined with the failure to have any written homicide policies, was a moving force behind the violation of Drumgold's civil rights.  Young v. City of Providence, 404 F.3d 4, 28-29 (1st Cir. 2005)

3.    The City of Boston's Failure To Evaluate or Hold Officers Accountable Was A Moving Force In The Injury To Mr. Drumgold

The St. Claire report found that the City of Boston had a systematic failure of any formal evaluative procedure for it's police officers (P Ex 31, p.7, 63-66).  The Boston Police Department, in it's 30 day St. Claire Implementation Report prepared by William Bratton, the Superintendent Chief, on March 4, 1992 admitted that "the Department agrees that a system of performance evaluations that is consistently employed for every department employee, sworn or

civilian, must be adopted" (P Ex 32, p. 22). The two chiefs of the homicide department both agree that there was no formal written evaluation process (PMF 62).

A specific and extreme example of the failure to supervise or hold the Boston Police officers accountable was the failure of the Boston Police Department to have any process or procedure to investigate or discipline officers who were found by the Courts to have committed even egregious misconduct. Commissioner Roache testified that he was not aware of any procedure by which the Boston Police would routinely become aware of or monitor misconduct by Boston Police officers as found by judges reviewing the officers actions (PMF 67). Lt. Daly, the supervisor of the homicide department, agreed there was no procedure by which that information became known to the Boston Police (PMF 67).

In this case, the City of Boston affirmatively condoned egregious misconduct by Walsh and Murphy. In December of 1988, Superintendent Roache issued a citation of commendation to Walsh and Murphy for their work in connection with the Drumgold case (PMF 73, P Ex 11). In May of 1989 Judge Volterra of the Superior Court issued an opinion finding that Detective Walsh and Murphy's conduct was "deceitful" and "deplorable" and found that on multiple occasions and on multiple grounds they violated the Defendant's rights (W Ex 24). The commendation to Walsh and Murphy was never rescinded by Commissioner Roache (PMF 73). Callahan testified that he was aware that the statements taken by Walsh and Murphy were suppressed (PMF 74). Detective Callahan continued to work with Walsh and Murphy during the summer after the findings by Judge Volterra (RWMF 31). The jury could infer that Callahan was aware that no adverse consequences were imposed by the City on Walsh or Murphy for their egregious misconduct.

Walsh and Murphy's supervisor, Lt. Daly, testified that he knew of Judge Volterra's opinion and that he formed the opinion that Walsh and Murphy were right and Judge Volterra was wrong (PMF 69) despite the fact that he never saw or reviewed Judge Volterra's ruling. Daly did not discipline Walsh or Murphy in any way as a result of Judge Volterra's findings (PMF 71).

Lieutenant John Daly, was the head of the Homicide Unit during the Tiffany Moore murder investigation. He kept a journal (PMF 81-84), which is admissible as an admission by the City of Boston (Fed R. Ev. 801(d)(2)(d)), as a present sense impression (F.R.Ev. 803(1)), and as recorded recollection (F.R.Ev. 803(5)). Daly was the most senior City of Boston employee in charge of Homicide investigations. He completely rejected Judge Volterra's findings, after a full evidentiary hearing, that Walsh and Murphy engaged in "egregious misconduct" (W Ex 24). Daly believed that Walsh and Murphy "actually did a very good job in this case" and were "offered as a sacrifice to the black community" (PMF 84). When asked at his deposition why he wrote that Walsh and Murphy were "sacrificed to the black community", Daly admitted, "because I believed it" (P Ex 34B, Daly Deposition, p. 101). The senior City employee in charge of Homicide investigations explicitly condoned Walsh and Murphy unconstitutional actions and attributed the criticism of their actions not to any failing on the Detective's part, but to pressure from the "black community". There can be no clearer example of the city's willingness not only to condone misconduct toward black defendants, but to actually encourage it.

The failure to supervise or evaluate Boston Police officers is particularly clear in this case. Walsh testified that for the year prior to the Tiffany Moore murder he and Murphy were unsupervised. They reported only to Lt. Daly, who was not their direct supervisor (PMF 77).

Daly testified that he had only two conversations with Walsh and Murphy during the Tiffany Moore investigation, the first one of which was the day after the murder (PMF 77).

Dr. Lyman explains in his report, the ratification of misconduct by police administrators "is a strong indicator of the orientation, customs, and practices of a department". Dr. Lyman opines that, "Administrators within the Boston Police Department have demonstrated their unwillingness to address indiscretions that were clearly made by defendant officers" (P Ex 36 at 25). He also finds that,

> It is my professional opinion, based upon a reasonable degree of certainty that Walsh, Murphy, Celester, Callahan, and McDonough demonstrated their unfitness for duty but there was never any effort to discipline or even provide remedial training to them. By ignoring these errant behaviors administrators effectively validated and ratified their conduct. It is likely if not probable that proper and timely identification of these behaviors along with swift and certain punitive measures would have prevented the wrongful conviction of Shawn Drumgold (Id at 26).

It is striking in this case that the City of Boston was on actual notice that Walsh and Murphy had engaged in egregious misconduct in connection with the investigation of Shawn Drumgold. A jury would be entitled to infer that the failure to investigate or discipline Walsh and Murphy in May of 1989 was a moving force behind Callahan's decision in May of 1989 through October of 1989 to engage in a pattern of misconduct which followed up and expanded upon the misconduct started by Walsh and Murphy.

The City of Boston adopted a city-wide policy of failing to supervise or evaluate its homicide detectives. It made no effort to determine whether it's detectives were engaged in misconduct as found by Superior Court judges. The failure to supervise or evaluate the detectives and the failure to follow up on findings of misconduct led directly to Walsh and Murphy's misconduct in connection with Shawn Drumgold being condoned and Callahan's conduct being implicitly approved by the City of Boston.

4.     The St. Clair Report, The 30 Day St. Clair Implementation

Report And The Neighborhood Policing Report Are Admissible

To Prove The City's Practices And Procedures

a.   The Reports Are Admissible as Public Reports Under
Federal Rules of Evidence 803(8)(C).

The Report of the Boston Police Department Management Review Committee ("St. Clair

Report") (P Ex 31) is admissible as a public report under the Federal Rules of Evidence

803(8)(C), which provides an exception to the hearsay rule for certain public records and reports.

The Rule provides in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is
> available as a witness:
>
> (8) Public records and reports. Records, reports, statements, or data
> compilations, in any form, of public offices or agencies, setting forth...(C)
> in civil actions and proceedings and against the Government in criminal
> cases, factual findings resulting from an investigation made pursuant to
> authority granted by law, unless the sources of information or other
> circumstances indicate lack of trustworthiness.

The United States Supreme Court in Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 109

S. Ct. 439 (1988), resolved a long-standing conflict as to the admissibility, under Rule 803(8)(C),

of evaluations, conclusions, and opinions contained in investigative reports.  The Court held that

portions of investigatory reports otherwise admissible under Rule 803(8)(C) are not inadmissible

merely because they state a conclusion or opinion.  As long as the conclusion is based on a

factual investigation and satisfies the Rule's trustworthiness requirement, it is admissible along

with other portions of the report.  Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 170, 109 S. Ct.

439 (1988) (Judge Advocate General report concerning the cause of an air crash, which was not

barred from admission in civil proceedings by any act of Congress).  The Court held that the rule should be interpreted broadly in favor of admissibility;

> A broad approach to admissibility under Rule 803(8)(C), as we have outlined it, is also consistent with the Federal Rules' general approach of relaxing the traditional barriers to "opinion" testimony…We see no reason to strain to reach an interpretation of Rule 803(8)(C) that is contrary to the liberal thrust of the Federal Rules.

Id., at 450.

The key issue on admissibility is whether the report is "satisfies the Rule's trustworthiness requirement." Schwartz v. United States, 149 F.R.D. 7, 9 (D.Mass. 1993); Beech Aircraft Corp. v. Rainey, 488 U.S. at 170.  See also O'Dell v. Hercules, Inc., 904 F.2d 1194, 1204 (8th Cir. 1990) cited with approval by the First Circuit in Lubanksi v. Coleco Industries, 929 F.2d 42, 46 (1st Cir. 1991); Schwartz v. United States, 149 F.R.D. 7, 9 (D.Mass. 1993).

In Limone v. United States, 497 F. Supp. 2d 143, 156-157 (D.Mass. 2007), this Court admitted a report of the United States House of Representatives Committee on Government Reform under Rule 803(8).  The report, entitled "Everything Secret Degenerates: The FBI's Use of Murderers as Informants", concerned an investigation into FBI misconduct in the Deegan case.  Although the government contested both the admissibility and the weight to be given to the report, this Court admitted the evidence as a public record, leaving open the question of its weight, to be given in the final opinion. (Id at 156, n. 16).

City-wide Police Department investigations ordered by a mayor are admissible as "public reports", pursuant to Rule 803(8)(C).  In Montiel v. City of Los Angeles, 2 F.3d 335, 341 (9th Cir. 1993), the Ninth Circuit discussed the admissibility of the Report of

the Independent Commission on the Los Angeles Police Department 168 (1991) ("the

Christopher Commission Report"), which was an examination of police practices in Los

Angeles after the beating of Rodney King by uniformed police officers.  Id.;  Like the St.

Clair Report, which was prepared by a Commission formed by Mayor Flynn, and led by

Attorney James D. St. Clair (P Ex  38, Roache Deposition, page 23), the Christopher

Commission Report was prepared by a commission formed by the then-mayor of Los

Angeles, Tom Bradly, and headed by a prominent local attorney Warren Christopher.

Montiel, supra, at 341; See also Powell v. Superior Court, 232 Cal.App.3d 785, 790-

92,  283 Cal.Rptr. 777 (1991).  The Court in Montiel held that, "[T]he district court's

cursory denial of Montiel's Rule 803(8)(C) motion concerns us.  The district court should

have presumed the Christopher Commission Report was trustworthy and,…shifted the

burden of establishing its untrustworthiness to the City."  Montiel, supra, at 341.  See

also Blair v. City of Pomona, 223 F.3d 1074, 1081 (9th Cir. 2000) (Court took judicial

notice of the Christopher Commission Report).

   The Plaintiff in this case has met its burden in proving that the St. Clair Report meets the

elements of Rule 803(8)(C).  Admissibility under Rule 803(8)(C) requires: (1) that the report is a

report of a public office or agency; (2) that the document set forth "actual findings"; and (3) that

the findings contained in the report result from an "investigation made pursuant to authority

granted by law."  Rule 803(8)(C) (2007); United States of America v. Davis, 826 F.Supp. 617,

621-622 (D.R.I. May 7, 1993); Beech Aircraft Corp. v. Rainey, 488 U.S. at 170.

   The St. Clair Report satisfies all three prerequisites for presumptive admissibility under

Rule 803(8)(C).  First, the St. Clair Report, was created both at the direction and request of the

Mayor's Office.  .  (P Ex  38, Roache Deposition, p. 23; P Ex 31, St. Clair Report, Appendix A,

Letter of Mayor Flynn, May 3, 1991, Bates p. 1773). The St. Clair Report is therefore a report of

a public office. See also <u>Blair v. City of Pomona</u>, 223 F.3d 1074, 1081 (9th Cir. 2000); <u>Montiel</u>

<u>v. City of Los Angeles</u>, 2 F.3d 335, 341 (9th Cir. 1993). Second, the Mayor's committee made

evaluations and conclusions based on the results of its investigation, which fit within the

Supreme Court's broad interpretation of "factual findings" F.R.E. 803(8)(C). <u>Beech Aircraft</u>

<u>Corp. v. Rainey</u>, 488 U.S. 153, 170 (1988). Third, these findings were the result of an

investigation made pursuant to the mayor's authority. See, for example, <u>Blair</u>, *supra*, at 1081;

<u>Montiel</u>, *supra*, at 341.

Once the requirements of the rule are met, the proffered evidence should be

admitted unless the party opposing the admission of the evidence makes an affirmative

showing of untrustworthiness. <u>Kehm v. Proctor & Gamble Mfg. Co.</u>, 724 F.2d 613, 618

(8th Cir. 1983). In <u>Gentile v. County of Suffolk</u>, 926 F.2d 142 (2d Cir. 1991), the Court

found no error in the lower court's decision to admit selected portions of a report by a

state investigatory commission concerned with past misconduct of the County Police

Department and the District Attorney's Office. The Second Circuit noted that under Fed.

Rule Evid. 803(8) (C), government investigatory reports are presumed to be admissible

and the party opposing the admission of the report has the burden of going forward with

"negative factors" that would outweigh the presumption of admissibility. <u>Id</u>., at 148.

The Defendant disputes the admissibility of the St. Clair Report and thus bears the burden

of satisfying the court that the Report is untrustworthy and should be excluded. <u>Kehm v.</u>

<u>Proctor & Gamble Mfg. Co.</u>, 724 F.2d 613, 618 (8th Cir. 1983).

There is nothing in the record indicating that the St. Clair Report does not meet the

trustworthiness requirement of Rule 803(8)(C). It is not necessary that findings of the report be

based on sworn testimony.  See Robbins v. Whelan, 653 F.2d 47 (1st Cir. 1981) (District court erred when it excluded a vehicle safety performance report offered into evidence by the passengers).  The Report was prepared by a Commission, headed by an appointee of Mayor Flynn, James St. Clair, Esq. (P Ex 38, Roache Deposition, page 23).  There is no evidence that those preparing the Report lacked experience or were biased in favor of one party or prejudiced against another.  See Schwartz, *supra*, at 8-11.  There is no evidence that the information contained within the Report is unreliable.  See Schwartz, *supra*, at 8-11.  See also Blair v. City of Pomona, 223 F.3d 1074, 1081 (9th Cir. 2000); Montiel v. City of Los Angeles, 2 F.3d 335, 341 (9th Cir. 1993).

The Defendant relies on Curran, et al. v. City of Boston, et al., 90-11594-MA (D.Mass. 1993), which is easily distinguished from this case.  In Curran, the Plaintiffs offered the St. Clair Report "as sole evidence that such [unconstitutional] policies exist".  Id.; (B Ex J, Memorandum and Order, page 15).  Mr. Drumgold does not base his claims solely on the evidence contained within the St. Clair Report.  Unlike the Plaintiffs in Curran, Mr. Drumgold presents competent evidence that the Defendant Roache and his staff not only participated in Mr. St. Clair's investigation, but also accepted and embraced the St. Clair Report and its findings.  (P Ex 37, Roache Deposition, pp. 29-30) (P Ex 32, 30 Day St. Clair Implementation Report).

The Plaintiff also offers two additional public documents, admissible under F.R.E. 803(8)(C), which adopt the January 14, 1992 St. Clair Report:  (1) the March 4, 1992 "30 Day St. Clair Implementation Report"("30 Day Implementation Report"), issued and authorized by Defendant Roach in the form of a signed letter to Mayor Flynn (P Ex 32; P Ex 37, Roache Deposition, pp. 53-54;) and (2) the September 1992 "Neighborhood Policing – A Plan of Action for the Boston Police Department" Report ("Neighborhood Policing Report"), prepared at the

instruction of Defendant Roache by his second in command, Superintendent William J. Bratton, during the time that Defendant Roache was Commissioner (P Ex 33; P Ex 38, Roache Deposition, pp. 51-52).

The information contained within the St. Clair Report is corroborated in large part by these two additional documents and by the sworn testimony of Defendant Roache. In fact, Former Commisioner Roache, through the "30 Day Implementation Report", accepts as accurate the findings contained within the St. Clair Report. In his letter to Mayor Flynn on the third page of the "30 Day St. Clair Implementation Report", Defendant Roache acknowledges the reliability of the St. Clair Report when he informs the mayor that:

> Herewith is the 30-Day Implementation Report of the Boston Police Department Management Review ("St. Clair"), Committee. The Boston Police Department embraces the theme of enhanced management accountability that ties together specific recommendations in this report, by committing to 31 of the 36 specific recommendations for change.

(P Ex 32, Letter to Mayor Flynn, March 4, 1992, Bates p. 1561). Further, the Introduction to the Implementation Report provides that:

> This Report is the Boston Police Department's formal response to the report of the Boston Police Department Management Review Committee submitted to Mayor Flynn on January 14, 1992. As Boston citizens will note in what follows, we accept with few exceptions the committee's recommendations.

(P Ex 32, Bates p. 1566; P Ex 38, Roache Deposition, p. 54).

Another indication that the Defendant accepted the St. Clair Report, is the "Neighborhood Policing" Report, prepared by Superintendent Bratton, at the instruction of Defendant Roache, to address the community policing issue. (P Ex 33, Bates pp. 1825-1826; P Ex 38, Roache Deposition, pp. 51-52). The lack of neighborhood policing under Commissioner Roache was one of the main focuses of the St. Clair Report. (P Ex 32, pgs. 9, 29-53).

Roache implicitly conceded that he had no disagreements with the St. Clair Report.
Roache testified at his deposition that he delegated to Superintendent Ann Marie Doherty and her
staff, the duty of preparing on his behalf, any criticisms or disagreements regarding the St. Clair
Report, for the purpose of "respond[ing] to every issue that might have appeared in that
document."  (P Ex 37, Roache Deposition, p. 32).  When asked in Plaintiff's Request for
Production of Documents to produce those documents relating Superintendent Doherty's review
of the St. Clair Report, the Defendant admitted that there was no such report.  (PMF 42).   A fact
finder is entitled, therefore, to find that Roache had no disagreements with the report.  The St.
Clair Report, 30 Day Report, and Neighborhood Policy Reports meet all the criteria for
admissibility under Fed. R. Evid. Rule 803(C) and the City has not met its burden of establishing
that they are not trustworthy.

        b.   The Reports Are Admissible as Admissions Under Federal
           Rules of Evidence Rule 801(d)(2).

The St. Clair Report, the "30 Day Implementation Report" and the  "Neighborhood
Policing Report" also qualify as admissions under Rule 801(d)(2), which provides in relevant
part:

      (d) Statements which are not hearsay. A statement is not hearsay if--

          (2) Admission by party-opponent. The statement is offered against
          a party and is (A) the party's own statement in either an individual
          or a representative capacity or (B) a statement of which the party
          has manifested an adoption or belief in its truth, or (C) a statement
          by a person authorized by the party to make a statement
          concerning the subject, or (D) a statement by the party's agent or
          servant concerning a matter within the scope of the agency or
          employment, made during the existence of the relationship, or (E)
          a statement by a coconspirator of a party during the course and in
          furtherance of the conspiracy.

The "30 Day Implementation Report" and the "Neighborhood Policing Report" are admissions by Roache and the City under 801(d)(2)(D), because those reports were generated, issued, and authorized by employees of the City, including Former Commissioner Roache and Former Superintendent William J. Bratton, concerning police matters, which were made during the employment relationship. (P Ex 37, Roache Deposition, pp. 7-8, 32-33, 51-54). As to the Defendant Roache, the "30 Day St. Clair Implementation Report" and the "Neighborhood Policing Report" are admissible under Rules 801(d)(2)(A), as Former Commissioner Roache's own statements in his individual capacity, and under subsection (C), as statements by a person authorized by Roache to make such statements, since Roache delegated the preparation of the responses to the St. Clair Report to Superintendent Ann Marie Doherty and Superintendent Bratton. (P Ex 37, Roache Deposition, pp. 7-8, 32-33, 51-54; P Ex 32, 30 Day St. Clair Implementation Report).

Because the "30 Day Implementation Report" and the "Neighborhood Policing Report" assume the reliability and accuracy of the St. Clair Report, the St. Clair Report is an adoptive admission under 801(d)(2)(B). The First Circuit has long recognized adoptive admissions, including admissions by silence or acquiescence, as admissible against a party-opponent pursuant to Fed. R. Evid. 801(d)(2)(B). United States v. Fortes, 619 F.2d 108, 115 (1st Cir. 1980); United States v. Miller, 478 F.3d 48, 51 (1st Cir. 2007). Rule 801(d)(2)(B) provides that when the evidence shows a party to have manifested a belief in the truth of a statement made by another, the statement loses its hearsay character and becomes admissible if offered against the adopting party. See also, United States v. Paulino, 13 F.3d 20, 24-25 (1st Cir. 1994); United States v. Higgs, 353 F.2d 281, 309-10 (4th Cir. 2003); United States v. Miller, 478 F.3d 48, 51 (1st Cir. 2007).

Admissions are not limited to verbal language, but instead may exist in document form. For example, a one-page document that was purportedly a projected profit-and-loss statement was admissible, based on foundational testimony, as an admission by a party opponent. Fed. R. Evid. 801(d)(2)(B); Computer Systems Engineering, Inc. v. Qantel Corp., 740 F.2d 59, 66 (1st Cir. 1984); See also, for cases involving possession of a written statement as an adoption of what its contents reveal, United States v. Ospina, 739 F.2d 448, 451 (9th Cir.) (involving a receipt for a hotel room), cert. Denied, 469 U.S. 887 (1984) and 471 U.S. 1126 (1985); United States v. Marino, 658 F.2d 1120, 1124-25 (6th Cir. 1981) (involving possession of airline tickets).

Although the District Court in Curran, et al. v. City of Boston, et al., 90-11594-MA (D.Mass. 1993), rejected admission of the St. Clair Report as an adoptive admission under Rule 801(d)(2)(B) because "no evidence suggests…that the City adopted the findings and recommendations contained in the Report" (B Ex J, Memorandum and Order, page 18), here the Plaintiff presents competent evidence that Roache and the City expressly adopted the recommendations and findings, by way of the "30 Day St. Clair Implementation Report" and the "Neighborhood Policing Report" (P Ex 32; P Ex 32; P Ex 37, Roache Deposition, pp. 7-8, 32-33, 51-54).

Because the Plaintiffs in Curran presented the St. Clair Report as their sole evidence of unconstitutional policies, the District Court examined only the relationship between the City of Boston and the Boston Police Department Management Review Committee, in rejecting the admissibility of the St. Clair Report as an admission under Rule 801(d)(2). (B Ex J, Memorandum and Order, page 15, 17-19). The Plaintiffs in Curran argued only that the "Mayor, in establishing the Committee, authorized it to speak on behalf [of] the City or any of its employees" (B Ex J, Memorandum and Order, p. 18). In this case, Roache and the other City

employees prepared the two responses to the St. Clair Report, which are admissible as admissions under 801(d)(2)(A), (C), and (D).  They are duly authorized to make statements on behalf of Roache and the City and those statements embraced the contents of the St. Clair Report (P Ex 37, Roache Deposition, pgs. 7-8, 32-33, 51-54).

By issuing both the "30 Day St. Clair Implementation Report" and "Neighborhood Policing Report", in response to the recommendations contained within the St. Clair Report, Former Commissioner Roache and the Boston Police Department expressly manifested their acceptance of the report and its findings.  (P Ex 32, 30 Day St. Clair Implementation Report; P Ex 37, Roache Deposition, p. 54).  See, for example, United States v. Kattar, 840 F.2d 118, 130-31 (1st Cir. 1988) (Where the Justice Department has clearly manifested its belief in the substance of the contested documents, statements contained therein were admissible under 801(d)(2)(B) as statements of which the party-opponent "has manifested an adoption or belief in its truth.").  Because those responses to the St. Clair Report are admissions by the Defendant Roach pursuant to Rules 801(d)(2)(A) and (C), and by the City of Boston under Rule 801(d)(2)(D), the St. Clair Report is therefore admissible as an adoptive admission, or "a statement of which the party has manifested an adoption or belief in its truth."  Rule 801(d)(2)(B).

     5.     <u>The Jury Could Find That The City Had Knowledge Of A Practice And Custom Of Allowing Boston Police To Wrongfully Convict Black Males</u>

The Complaint alleges a consistent City of Boston policy of condoning the use of perjured evidence and the withholding of exculpatory evidence in order to wrongfully obtain convictions of black males.  The Complaint, in paragraphs 32A-G, provides multiple examples of that conduct all occurring at or around the time of the prosecution of this case.  For example, Christopher Harding (par. 32), was arrested in August of 1989, the use of force, threats, intimidation and coercion to produce false witnesses against Charles Bennett occurred in October of 1989, and the indictment of Tarahn Harris occurred in November of 1991.  The factual basis for these allegations and the basis for the jury to find that the City had actually knowledge of these wrongful convictions is set out in PMF 80(a-e).

The City's only argument in opposition to this evidence is its argument that because many of the incidents occurred shortly after the Drumgold trial they are not admissible to prove the policies, practices or customs of the Boston Police Department.  That argument was squarely rejected by the First Circuit in Foley v. the City of Lowell, 948 F.2d 10 (1st Cir. 1991).  The court in that case considered a § 1983 claim where evidence of similar police misconduct occurred after the time of the incident which was the focus of the complaint.  The evidence was offered to prove the city's policies or practice.  The First Circuit concluded,

> we do not believe that the probative value of the testimony can seriously be disputed…contrary to the city's exhortation that the date an incident occurred marks the outside date for evidence gathering on such an issue, we think that actions taken subsequent to an event are admissible if, and to the extent that, they provide reliable insight into the policy in force at the time of the incident (id at 14).

see Bordanaro v. McLeod, 871 F.2d 1151, 1167 (1st Cir. 1989) (post-event evidence can shed light on what policies existed in the city on the date of an alleged deprivation of constitutional rights).

There is substantial evidence of misconduct very similar to exactly what occurred in this case, i.e. the use of false coerced evidence to obtain convictions of black defendants in 1989. This evidence is admissible to establish that as of September and October of 1989, when the Defendant's trial for murder occurred, the City of Boston had a well established policy and practice of knowingly using false, coerced, and intimidated evidence to obtain convictions of black defendants.

Additional evidence of the policy or custom is contained in the journal and deposition of the head of the homicide unit from 1985 to 1989, Lieutenant John Daly.  Lieutenant Daly was of the opinion that the serious problem for the Boston Police Department was the hiring of minority officers (PMF 83).  Daly was of the opinion that Walsh and Murphy's egregious misconduct was "actually a very good job" (PMF 84) and he believed that Walsh and Murphy were not fairly held accountable for misconduct but instead that they were "offered as a sacrifice to the black community" (PMF 84) (P Ex 34B, Daly Deposition, p. 101).  The City's decision to place Daly in charge of the Homicide Unit is consistent with, and evidence of, the City's policy and practice of abusing the rights of black defendants.

The City argues that not only is the evidence offered as to policy and procedure too far into the future, it is also too far into the past.  In fact, what the evidence offered by the Defendant establishes is that from 1981, when Detective Linsky lied before the grand jury in the case of Com v. Salmon, 387 Mass. 160, 439 N.E.2d 245 (1982) (PMF 80a), continually through and beyond Mr. Drumgold's murder trial, the City of Boston had a custom and practice of condoning it's homicide detectives wrongfully convicting black males.  The two cases cited by the Defendants to exclude cases occurring before Drumgold's conviction simply do not support the proposition.  Neither Bordanaro v. McCloud, 871 F.2d 1151 at 1161 note 8 (1st Cir. 1989), as

cited by the Defendants, nor <u>Armstrong v. Lamy</u>, 938 F.Supp 1018 (D.Mass. 1996) support

exclusion of this evidence.  The City's policies and procedures are established by the multiple

examples of wrongful convictions by the Boston Police Department.


> ### D.        FRANCIS M. ROACHE IS NOT ENTITLED TO SUMMARY
> ### JUDGMENT ON THE § 1983 CLAIMS


Paragraph 4 of the Complaint sets out that Roache is "being sued in his individual as well

as his official capacity" (W Ex 1).  The Plaintiff has not sued Francis M. Roache solely in his

official capacity.  The Plaintiff alleges that Francis M. Roache is personally liable because of his

supervisory encouragement, condemnation, acquiescence, gross negligence, and deliberate

indifference which was affirmatively linked to the constitutional injury to the Plaintiff.

Accordingly, Roache is not entitled to Summary Judgment on the grounds that he has been sued

solely in his official capacity.  <u>Stratton v. City of Boston</u>, 731 F.Supp 42, 46 (D.Mass. 1989).

<u>Powell v. Alexander</u>, 391 F.3d 1, 22 (1st Cir. 2004) (Look to the substance of the pleadings and

course of the proceedings to determine if public official is an individual Defendant)

A supervisor is liable under § 1983 not on general theories of respondiat superior but on

the basis of his own acts or omissions <u>Barreto-Rivera v. Medina-Fargas</u>, 168 F.3d 42, 48 (1st Cir.

1999).  There are two possible grounds for liability of a supervisor in a § 1983 action.

"Supervisory liability can be grounded either on the supervisor's direct participation in the

unconstitutional conduct, or through the conduct that amounts to condemnation or tacit

authorization" <u>Camilo-Roblis v. Zapata</u>, 175 F.3d 41, 41 (1st Cir. 1999).

In this case Drumgold does not argue that Roche was a direct participant in the unconstitutional investigation and prosecution of Shawn Drumgold. Drumgold instead argues that Roache is liable under § 1983 because of his actions as a supervisor. A supervisor is liable pursuant to § 1983 when; "One, the behavior of his subordinates results in a constitutional violation and two, the (supervisors) action or inaction was affirmatively linked to the behavior in the sense that it could be characterized as supervisory encouragement, condemnation or acquiescence or gross negligence amounting to deliberate indifference" Whitfield v. Melendez-Rivera, 431 F.3d 1, 14 (1st Cir. 2005); Hegarty  v. Somerset County 53 F.3d 1367, 1379-80 (1st Cir. 1995).

In this case the evidence of Roach's condemnation of the unconstitutional acts of the detective Defendants is stark. Roche issued a citation of commendation to Walsh and Murphy for their conduct in connection with investigating the Tiffany Moore murder (P Ex 12) and then failed to rescind that citation even after Walsh and Murphy's conduct was harshly criticized by Judge Volterra (PMF 73). Roache's personal approval of Walsh and Murphy's conduct, even after it was so harshly criticized by a Justice of the Superior Court, could certainly be found by the jury to have been a compelling message to Detective Callahan when he took over the investigation of the case that the type of conduct engaged in by Walsh and Murphy would be condoned by Commissioner Roache if continued by Callahan. Additionally it would be foreseeable to Roache that his commendation to Walsh and Murphy would encourage the type of unconstitutional behavior in trials of black defendants which ultimately resulted in the withholding of exculpatory evidence from the Defendants in this case.

It should be noted that Roache is being sued as an individual Defendant. The requirement that a pattern of conduct be established applies only to municipal Defendants. A

plaintiff suing an individual Defendant for supervisor's liability need only establish that "the Defendant's acts or omissions were the product of reckless or callous indifference to his constitutional rights and that they, in fact, caused his constitutional deprivations" <u>Gutierrez-Rodriguez v. Cartagena</u>, 882 F.2d 553, 567 (1st Cir. 1989).

Secondly, the evidence establishes a substantial history of high profile miscarriages of justice all involving black defendants during the period when Roache was Commissioner of Police (PMF 80 a-f).  The evidence would allow the jury to make a finding of gross negligence amounting to deliberate indifference on the part of Roache.  Roache should have been aware of at least four egregious cases of misconduct by the Boston Police leading to wrongful convictions of black defendants in 1989;  Christopher Harding (PMF 80e), Albert Lewin (PMF 80b), William Bennett (PMF 80c) and Shawn Drumgold.

Roache's deliberate indifference to the lack of policy and training for homicide detectives and the resulting practice and custom of wrongfully convicting black defendant is established on this record.  Roache testified that in 1992, when he reviewed the St. Claire's report, he was not aware of what training was given to homicide detectives because he had delegated that responsibility and he could not remember doing anything in connection with the finding that the detectives were not properly trained (P Ex 37, Roache Deposition, p. 46).  His testimony was that in 1992, three years after the Drumgold conviction and the other improper convictions of black defendants, he could not recall whether he had any personal knowledge, even at that point, as to what type of training was being provided to homicide detectives of the Boston Police Department (P Ex 37, Roache Deposition, pgs. 48-49).  This type of indifference, even in light of multiple findings of horrific violations of rights by the Boston Police Department, could clearly be found the by jury to be "tacit approval of, acquiescence, or purposeful disregard of, rights

violating conduct." <u>Camilo-Robles v. Hoyos</u>, 151 F.3d 1, 7 (1st Cir. 1998). It is appropriate to look at post-incident conduct in order to determine whether a supervisor has engaged in gross negligence amounting to deliberate indifference <u>Bordanaro v. McCloud</u>, 871 F.2d 1151, 1166-67 (1st Cir. 1989); <u>Grandstaff v. City of Borger</u>, 767 F.2d 161, 171 (5th Cir. 1985).

The issue as to Roache's liability in this case is similar to that presented to this court in <u>Britton v. Maloney</u>, 901 F.Supp. 444 (D.Mass. 1995).  In that case, when Commissioner Roache moved to dismiss the complaint, this court refused to dismiss because, "the Complaint also alleges that Commissioner Roache was aware of and condoned an unwritten policy of the Boston Police Department of ignoring the constitutional rights of criminal suspects and African-Americans, particularly with respect to searches and seizures as well as unwritten policy or practice of the "code of silence" among Boston Police Officers.  All of these allegations are sufficient to state a claim under Section 1983" (id at 452). In this case, at the Summary Judgment stage, there is an equal basis for finding that the jury could infer that Roche was aware of and condoned the policies which led to the acts of the detective Defendants.


E.        **ROACHE IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE**
          **MASSACHUSETTS CIVIL RIGHTS CLAIM**


Roache initially argues that since he is sued only in his official capacity, he has no personal liability pursuant to MCRA.  As set out above, Roache is also sued in his individual capacity.

Roache next argues that he is not liable under the theory of supervisory liability because the Plaintiff must establish that Roache personally engaged in acts that constitute threats,

intimidation, or coercion in order to state a MCRA claim against him.  The Massachusetts and Federal courts have rejected Roache's argument.  The Supreme Judicial Court has held that the Massachusetts Legislature "intended to provide a remedy under the MCRA co-extensive with 42 § 1983, except that the Federal statute requires state action, whereas its state counterpart does not".  Batchelder v. Allied Stores Corp., 393 Mass. 819, 473 N.E.2d 1128, 1131 (1985).  Clearly if Roache is liable because of his supervisory liability under § 1983, he is also liable pursuant to MGL ch. 12 § 11A.

The First Circuit addressed this question more directly in Lyons v. National Car Rental Systems, Inc., 30 F.3d 240 (1st Cir. 1994).  In that case the court held that, as with § 1983, there was no vicarious liability for employers under MCRA.  The court went on to explain that the question of the scope of liability under the MCRA should be decided based on to the federal law concerning the liability for municipalities and supervisors under § 1983 (id at 245-246).  Thus, if Roache is liable under § 1983, Roche is also liable under the MCRA.

It should be noted that, if anything, the scope of MCRA liability is broader than the scope of § 1983 liability.  The Appeals Court in Sarvis v. Boston Safe Deposit and Trust Company, 47 Mass.App.Ct. 86, 94-98, 711 N.E.2d 911 (1999) held that even the restriction on liability imposed by the court in Lyons v. National Car Rental is too narrow, and, that a theory of respondiat superior is available under the MCRA.


### III.     CONCLUSION

This court should deny the Motion for Summary Judgment filed by the City of Boston and by Roache.

Respectfully submitted,

By His Attorneys,

 /s/ Michael Reilly

Michael W. Reilly, Esq.
Tommasino & Tommasino
Two Center Plaza
Boston, MA   02108
617 723 1720
BBO 415900

/s/ Rosemary Curran Scapicchio

Rosemary Curran Scapicchio, Esq.
Four Longfellow Place
Boston MA 02114
617 263 7400
BBO 558312