UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SHAWN DRUMGOLD, | ) | C.A. NO. 04-11193NG |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TIMOTHY CALLAHAN, ET AL. | ) | |
| Defendant(s) | ) | |
| | ) | |

## Plaintiff's Memorandum of Law

## In Opposition to Richard Walsh and Paul Murphy's Motion for

## Summary Judgment

### Table of Contents

I.   **INTRODUCTION**……………………………………………………………3
        A. KEY TO REFERENCES ………………………………..…………3
        B. CONSOLIDATED RESPONSE TO WALSH AND MURPHY……….3
        C. SUMMARY JUDGMENT STANDARD…………...……………….....4

II.  **ARGUMENT**………………………………………………………………6
        A. BECAUSE WALSH AND MURPHY UNCONSTITUTIONALLY
            INTERVIEWED DRUMGOLD AND TOOK A RECORDED
            STATEMENT FROM HIM IN VIOLATION OF HIS SIXTH
            AMENDMENT RIGHTS TO COUNSEL THEY ARE NOT
            ENTITLED TO SUMMARY JUDGMENT……………………………6

            1. Walsh and Murphy Violated Drumgold's Constitutional Rights
               When They Interrogated Him On The Day Of His Arrest…..……6

            2. Drumgold Is Not Estopped From Proving He Was Denied A Fair
               Trial By Walsh and Murphy's Actions In Taking His Statement…7

1

B.  WALSH'S LIABILITY ARISES FROM HIS MISCONDUCT AS A POLICE OFFICER NOT FROM HIS TESTIMONY BEFORE THE GRAND JURY…………………………………………………..…….11

C.  THE CLAIMS AGAINST WALSH AND MURPHY ARE NOT TIME BARRED………………………………………………………….12

    1.  <u>The § 1983 Claim Is Not Time Barred Because The Statute Was Tolled Pursuant To Heck v. Humphrey Until Drumgold's Murder Conviction Was Vacated</u>…………………………………………12

    2.  <u>Murphy Is Not Entitled To Summary Judgment Based On The Estate Statute Of Limitations, MGL ch. 197 § 9A</u>……………....15

    3.  <u>Drumgold's Claim Pursuant To Mass. Civil Rights Act Is Not Time Barred</u>……………………………………………………...17

D.  THERE IS A MATERIAL ISSUE OF FACT AS TO WHETHER WALSH AND MURPHY VIOLATED DRUMGOLD'S CONSTITUTIONAL RIGHTS IN THEIR DEALINGS WITH WITNESSES…………………………………………………….…..18
    1.  <u>Tracie Peaks</u>……………………………………………………..19
    2.  <u>Mary Alexander</u>…………………………………………………..20
    3.  <u>Antonio Anthony</u>………………………………………….…..…22
    4.  <u>Vantrell McPherson</u>……………………………………………..26
    5.  <u>Eric Johnson</u>…………………………………………………...27
    6.  <u>Olisa Graham</u>……………………………………………………28

E.  WALSH AND MURPHY ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE CONSPIRACY COUNT……………………28

F.  WALSH AND MURPHY ARE NOT ENTITLED TO SUMMARY JUDGMENT ON GROUNDS OF QUALIFIED IMMUNITY……....30

III.  **CONCLUSION**…………………………………………………..……31

# I.     INTRODUCTION

## A. KEY TO REFERENCES

The Plaintiff has attempted to use the following consistent references in his responses to the

four Summary Judgment Motions filed by the Defendants.

| Reference: | Source: |
|---|---|
| WMF- | Consolidated Statement of Undisputed Material Facts In Support of Motions for Summary Judgment of Defendants Richard Walsh and Paul Murphy |
| CMF- | Defendant Timothy Callahan's Concise Statement of Undisputed Material Facts |
| PMF- | Plaintiff's Concise Statement of Material Facts |
| RWMF- | Plaintiff's Response To Undisputed Material Facts of Defendants Walsh and Murphy |
| RCMF- | Plaintiff's Response to Callahan's Statement of Material Facts |
| W Ex- | Consolidated Exhibits In Support of Defendants Motions for Summary Judgment |
| C Ex- | Exhibits in Support of Callahan's Concise Statement of Undisputed Material Facts |
| B Ex- | Exhibits Attached To City of Boston's Memorandum In Support of Motion for Summary Judgment |
| P Ex- | Plaintiffs Exhibit In Support of His Concise Statement of Disputed Material Facts |

## B.  CONSOLIDATED RESPONSE TO WALSH AND MURPHY

The Defendants Walsh and Murphy have raised similar argument as to why they are

entitled to Summary Judgment.

3

In order to avoid unnecessary duplication of an already large Summary Judgment record the Plaintiff is filing this consolidated response to both Motions. When a defendant raises an argument unique to himself, this memorandum discusses it separately. For example, section C2 discusses Murphy's claim that he is entitled to Summary Judgment on the estate statute of limitations.

## C. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant ... would permit a rational fact finder to resolve the issue in favor of either party." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (internal citations omitted). A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir.1996) (internal citations and quotation omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. See id. at 324, 106 S.Ct. at 2553. In evaluating motions for summary judgment, however, the court will

4

not consider "conclusory allegations, improbable inferences, and unsupported speculation." Galloza v. Foy, 389 F.3d 26, 28 (1st Cir.2004) (internal citation omitted).

When the issue in dispute is the credibility of the moving party's witness, the nonmoving party must allege supporting evidence to establish a genuine issue of material fact. Moreau v. Local Union No. 247, Int'l Bhd. of Firemen & Oilers, AFL-CIO, 851 F.2d 516, 519 (1st Cir.1988) (citing Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[A] bare assertion that the opposing party's uncontroverted evidence might be disbelieved is insufficient." Favorito v. Pannell, 27 F.3d 716, 721 (1st Cir.1994). Rather, to withstand a properly supported motion for summary judgment, the opposing party must present enough competent evidence to enable a factfinder to decide in its favor on the disputed claim." Carroll v. Xerox Corp., 294 F.3d 231, 236-37 (1st Cir.2002) (internal punctuation and citations omitted). "Where, however, the non-moving party has produced more than that, trial *328 courts should 'use restraint in granting summary judgment' where discriminatory animus is in issue." DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir.1997) (quoting Valles Velazquez v. Chardon, 736 F.2d 831, 833 (1st Cir.1984)).

## II.    ARGUMENT

### A.    BECAUSE WALSH AND MURPHY UNCONSTITUTIONALLY INTERVIEWED DRUMGOLD AND TOOK A RECORDED STATEMENT FROM HIM IN VIOLATION OF HIS SIXTH AMENDMENT RIGHTS TO COUNSEL THEY ARE NOT ENTITLED TO SUMMARY JUDGMENT

#### 1.    Walsh And Murphy Violated Drumgold Constitutional Rights When They Interrogated Him On The Day Of His Arrest

The Supreme Judicial Court in Com. v. Drumgold, 423 Mass. 230, 668 N.E.2d 300 (1996) summarized the testimony at the hearing on the Defendant's Motion to Suppress in 1989 and Judge Volterra's findings (W Ex 24).  The court explained that Drumgold had been arrested on a drug case and was being held in the Roxbury District Court.  Walsh and Murphy were at the court to file a murder complaint against Drumgold:

> Walsh asked Drumgold if he wanted to make a statement.  Drumgold responded, "Ms. Leslie Walker [staff attorney for Roxbury defendants] told me I don't have to talk to nobody".  Drumgold asked if a lawyer had been appointed to represent him and the officer responded "no, not at the moment" (Id. at 241).

At 12 pm Judge Martin of the Roxbury District Court held a sidebar conference. Defendant Murphy was present at the conference.  Judge Martin "directed the police not to interrogate Drumgold".  Drumgold was brought across the street to the Area B Police Station. When Drumgold was told he was going to be questioned he answered, "for what, there was

supposed to be a lawyer representing me".  Drumgold asked whether a lawyer had been

appointed to him and Walsh responded that there was "no one to represent him" (Id. at 242).

Walsh and Murphy then took a recorded statement from Drumgold in violation of judge's order

and in violation of Drumgold's specific request for counsel.  Judge Volterra found, and the

Supreme Judicial Court agreed, that both the Boston Police and District Attorney "engaged in an

intentional deceit upon a judge of the District Court Department who was attempting, under the

most trying of circumstances, to protect Drumgold's constitutional rights.  Drumgold was

removed from the courthouse under false pretenses and questioned in Area B in direct

contravention of Judge Martin's order.  I find that this type of conduct is deplorable and cannot

be countenanced" (Id. at 244, W Ex 24, p. 24-25).

There is clearly a material issue of fact as to whether Walsh and Murphy violated

Drumgold's constitutional rights when they took his statement in violation of his due process

rights, his <u>Miranda</u> rights and in violation of his sixth amendment right to counsel.


2.      <u>Drumgold Is Not Estopped From Proving He Was Denied A Fair</u>
        <u>Trial By Walsh and Murphy's Actions In Taking His Statement</u>


Drumgold is not collaterally estopped from pursuing his rights in this case because the

only remedy granted in the state proceedings was suppression of his statement.  The Defendants

note that the Supreme Judicial court in <u>Com v. Drumgold</u> discussed whether dismissal was an

appropriate remedy as a result of the Commonwealth's misconduct (423 Mass. at  246).  The

Defendants argue that because the SJC found that Drumgold was not denied a fair trial because

his statements were suppressed, Drumgold cannot argue here that he suffered additional

prejudice.  Collateral estoppel on that issue is not appropriate unless the prior court fully and

fairly considered the issue to be estopped.  The defensive use of collateral estoppel is not

appropriate when the party against whom it is asserted "lacked a full and fair opportunity to

litigate the issue in the first action or other circumstances justify affording him an opportunity to

relitigate the issue" Martin v. Ring, 401 Mass. 59, 62, 514 N.E.2d 663, 665 (1985).  As the court

in Martin v. Ring explained, the first question to be answered when analyzing a collateral

estoppel issue is; "was the issue decided in the prior adjudication identical with the one presented

in the action in question?" (Id. at 62).

        The Supreme Judicial Court did not fully and fairly consider the question of whether

Drumgold suffered prejudice as the result of all of the misconduct by Murphy and Walsh.  At the

time the Supreme Judicial Court considered Drumgold's appeal in 1996 the Boston Police had

yet to reveal the full extent of the denial of a fair trial to Drumgold.  The Supreme Judicial Court

was not aware, for example, that the Boston Police had provided undisclosed hotel rooms and

cash to witnesses Antonio Anthony (PMF 28-29) and Ricky Evans (PMF 43-45), had secretly

fixed cases for Ricky Evans (PMF 49-54) had failed to disclose the witness Mary Alexander was

suffering from brain disease when she testified (PMF 12-23), or that the witness Olisa Graham

had been threatened and intimidated by the police (PMF 55-61).  The Supreme Judicial Court's

determination that dismissal was not necessary and that suppression was a sufficient remedy was

based upon its finding that the Commonwealth's actions had not affected "the ability of the

Defendant to obtain a fair trial after, and in light, of the impropriety" (423 Mass. at 246).  The

Supreme Judicial Court did not have significant material facts available to it to evaluate whether

the Defendant was denied a fair trial because the Boston Police Department failed to disclose

that information at trial.  The issue of whether Drumgold was denied a fair trial by the

Commonwealth's misconduct in illegally obtaining his statement has not been fully and fairly

litigated in the state court.  Drumgold is not barred by collateral estoppel from litigating that

issue in this case.

The First Circuit indicated, in the case cited by the Defendant, that the issue for collateral

estoppel purposes is whether the party to be estopped had the opportunity to fully present the

issue to the state court. Willhauk v. Halpin, 953 F.2d 689, 705 (1st Cir. 1991).  In this case

Drumgold did not have the opportunity to fully and fairly litigate the question of whether he

received a fair trial after the unconstitutional actions of the plaintiff.

The First Circuit in Johnson v. Mahoney, 424 F.3d 83 (1st Cir. 2005) outlined the type of

record necessary to apply a state court finding of no prejudice to a federal § 1983 case.  In the

state proceeding reviewed in Johnson the Supreme Judicial Court had before it all of the

withheld exculpatory evidence (Id. at 94).  The SJC analyzed, at length, whether the Defendant

was prejudiced when all of the withheld exculpatory evidence was considered (Id. at 94).  On

that record, the federal court held that collateral estoppell was appropriate.  In this case the SJC

did not know of the exculpatory evidence and, by definition, had no chance to analyze whether,

in light of all the misconduct, the Defendant received a fair trial

Because the SJC did not have access to the evidence developed in 2003 at the hearing on

the Motion for New Trial it made a finding which is directly contradicted by the record in this

case.  The court held that dismissal was not appropriate because "nothing in this records

suggests, nor is there good reason to suppose, that unless this court provides a prophylactic

remedy, police officers are likely to repeat the type of conduct that occurred in this case".  Com

v. Drumgold, 423 Mass. 230, 246, 668 N.E.2d 300, 313 (1996), (quoting Com v. King, 400

Mass. 283, 290, 508 N.E.2d 1382 (1987)).  In fact Judge Volterra's decision not to dismiss the case encouraged Callahan, who inherited the case from Walsh and Murphy after Judge Volterra had suppressed the Defendant's statement, to continue to engage in police misconduct in order to wrongfully convict Drumgold.  The Defendants, by the conduct discovered in 2003, proved that the SJC, working on a partial record in 1996, was wrong when it supposed that absent a prophylactic remedy the Boston Police would commit no further misconduct.  The Supreme Judicial Court did not have a chance to fully and fairly consider whether Drumgold received a fair trial

It should also be noted that the Supreme Judicial Court did not consider the issue of unfairness arising from the fact that the Commonwealth learned about a witness, Rena Roiston, who was a potentially very powerful rebuttal witness for the Commonwealth, from the unconstitutional interrogation of Shawn Drumgold.  Ms. Roiston was called to rebut Drumgold's testimony that he was home with his girlfriend after the murder.  Ms. Roiston is Drumgold's girlfriend's sister.  The Commonwealth learned that Drumgold was at his girlfriend's house through the illegally obtained statement (W Ex 20A at 26).  Although the Supreme Judicial Court indicated that theoretically the Commonwealth could have learned the identity of Antonio Anthony and Paul Durant by use of the Mass. R. Crim. Proc. Rule 14B obligation to disclose alibi witnesses (Id. at 245), information concerning Drumgold's whereabouts after the shooting was not alibi evidence.  The Supreme Judicial Court mentioned Ms. Roiston but did not rule on the impact of the Commonwealth unfairly learning of her testimony (Id. at 245).  Rena Roiston would not have been known to the Commonwealth even if disclosure of alibi information had been required.  The Commonwealth learned of this information and received an unfair advantage over the Defendant by means of taking an illegal statement from him.

The First Circuit held that a plaintiff establishes constitutional harm when a government defendant impermissibly impedes his Sixth Amendment right and gathers information concerning a potential alibi witness which would not have otherwise been known to the government.  Cinnelli v. City of Revere, 820 F.2d 474 (1st Cir. 1987).  The Supreme Judicial Court has never considered the unfairness of obtaining that information, in light of the total picture of unfairness created by the Boston Police Department.  This court has held that a Defendant is not entitled to collateral estoppell in a 1983 case when the state court opinion does not establish that the state court actually decided the issue which the Defendant seeks to estop Wade v. Brady, 460 F.Supp.2d 226, 241-43 (D.Mass. 2006).  Drumgold is not estopped from trying that issue in this case.

**B.       WALSH'S LIABILITY ARISES FROM HIS MISCONDUCT AS A POLICE OFFICER NOT FROM HIS TESTIMONY BEFORE THE GRAND JURY**

The Plaintiff does not argue that Walsh's liability arises from his testimony before the Grand Jury or at trial.  The liability of Walsh, as set out below, arises from his conduct in intimidating witnesses and violating the Defendant's Constitutional Rights, from knowingly and intentionally procuring false identification and from withholding exculpatory evidence.  Walsh argues that he is entitled to absolute immunity from claims arising solely from his testimony at trial or grand jury.  Briscoe v. Laltue, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).  The argument fails in this case because Walsh's liability arises from his extra-judicial acts.

This court explained the distinction in its opinion in <u>Charles v. City of Boston</u>, 365 F.Supp.2d 82, 90 (D.Mass. 2005), "where the wrongdoing extends beyond perjury, including extra judicial acts, the conspiracy defendant cannot use <u>Briscoe</u> immunity as a shield to protect an entire course of unlawful conduct merely because at one point the defendant took the stand."

Walsh is attempting to do exactly what the Defendant in the <u>Charles</u> case tried to do. Walsh's liability arises from his extrajudicial acts in this investigation, not from his testimony. It should be noted that Walsh's testimony at the Grand Jury and trial is admissible and relevant in order to prove the various extra-judicial violations of constitutional rights by Walsh.

Secondly, Walsh's argument that Drumgold is collaterally estopped from holding him responsible for his violations of constitutional rights because the issue has been fully and fairly litigated by Drumgold in the state court in <u>Com v. Drumgold</u>, 423 Mass. 230, 668 N.E.2d 300 (1996) does not prevail because, as set out above, the issues in this case were not fully litigated in the state court since the Supreme Judicial Court was not aware when it issued it's opinion of the undisclosed evidence which ultimately led to the Commonwealth agreeing to nol pros the original conviction.

**C.    THE CLAIMS AGAINST WALSH AND MURPHY ARE NOT TIME BARRED**

1.    <u>The § 1983 Claim Is Not Time Barred Because The Statute Was Tolled Pursuant To Heck v. Humphrey until Drumgold's Murder Conviction Was Vacated</u>

In Wallace v. Cato, 127 S.Ct. 1091 (2007) the court held that in an action for false arrest the statute of limitations accrues at the time a claimant becomes detained pursuant to legal process (Id. at 1100). This claim is not an action for false arrest. Counts 1 and 2 of the Complaint allege that the Constitutional violations by the Defendants resulted in denial of a fair trial to the Defendant. Count 3 alleges that the City of Boston's actions led to denial of a fair trial for the Defendant. Count 4 alleges that for the reasons set out in Counts 1 through 3, the Defendant was denied his rights pursuant to Mass. General Law Ch. 12 § 11 I. As set out in detail in the Complaint, the gravamen of this Complaint is not that the plaintiff was illegally arrested, it is that the Defendant's conduct deprived him of his right to a fair trial.

The claim in this case is the same type of claim that the court addressed in Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). In that case the court ruled that,

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination or called into question by a federal courts issuance for writ of habeas corpus (Id. at 486-487).

The Court went on to explicitly recognize that the statute of limitations in such cases does not begin to run until the conviction or sentence had been invalidated because the cause of action would not accrue until that time (Id. at 489-490).

Here the murder conviction was nol prossed on November 6, 2003 and this action was filed on June 3, 2004, well within the statute of limitations. The court in Hill v. City of Chicago 2007 WL 1424211 (N.D.Ill. 2007) analyzed the relationship between the Wallace case and the Heck case. That court held that a count arising solely from a claim of false arrest should be dismissed under Wallace but claims alleging that the Plaintiff's conviction was caused by the

Defendant coercing confessions, depriving minority suspects of equal rights, conspiracy and failing to intervene in unconstitutional acts all accrued at the time the Plaintiff's conviction was vacated (Id. at 3-4).

The statute of limitations defense is also not available to these Defendants because the Plaintiff is entitled to equitable tolling and to tolling of the statute of limitations because of fraudulent concealment by these Defendants. In Salois v. Dime Savings Bank of New York, FSB 128 F3d 20, 25 (1st Cir. 1997) the First Circuit outlined the two conditions under which a statute of limitations will be equitably tolled. The Defendant must have engaged in fraud or concealment of the material facts relating to the wrongdoing and the plaintiff must have failed to discover those facts within the normal limitation despite his or her exercise of due diligence.

It is the essence of the Plaintiff's claim in this case that the Defendants deliberately concealed the material facts of police misconduct. Walsh and Murphy, for example, intentionally concealed their improper conduct in intimidating Tracie Peaks (PMF 1-11) and Mary Alexander (PMF 19-23). Similarly, the providing of cash and free rooms to Ricky Evans (PMF 43-45) and Antonio Anthony (PMF 28), and the undisclosed fixing of cases for Ricky Evans (PMF 49-54) was intentionally concealed by the Defendants. Because the Defendants deny committing these improper acts they necessarily agree that they never informed Drumgold, his counsel, or the District Attorney about the acts they deny committing.

The due diligence of the Plaintiff is established by his appeals through the State Court system, his filing of three unsuccessful Motions for New Trial and his filing of a Federal Habeas Petition, all before he was able to discover that concealed material. Drumgold did not learn the factual basis for the complaint in this case until the Motion for New Trial hearing before Judge

Rouse in July and August of 2003.  This action was filed within the statutory period after the time of that hearing.


2.  Murphy Is Not Entitled to Summary Judgment Based on The Estate Statute of Limitations, MGL ch. 197 § 9A


The Defendant Patricia Murphy is executrix of the estate of Paul Murphy.  She has moved this court to enter summary judgment on the grounds that the claim against Paul Murphy's estate was not brought within one year of the date of the death of the deceased as required by Mass. General Laws Ch. 197 Sec. 9A.  What is striking about Mrs. Murphy's claim is that the Plaintiff's cause of action could not have been brought with one year of the death of Mr. Murphy.  Paul Murphy died on January 4, 2001.  The Plaintiff was unable to pursue this claim until the underlying murder case against him was terminated favorably.  Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).  Plaintiff also did not discover the grounds for the claim against Murphy until the Motion for New Trial evidentiary hearing in late July and early August of 2003.  Mrs. Murphy argues that Paul Murphy was sheltered from any claim ever being brought against him since he passed away more than one year before Drumgold's claim accrued.

The result suggested by Mrs. Murphy is not required by the laws of the Commonwealth of Massachusetts.  The legislature provided in Mass. General Laws Ch. 197, § 10 a procedure to deal with exactly these types of situations.  Section 10 provides that when justice and equity require it, and when the creditor is not charged with culpable neglect, a claim may be prosecuted against an estate outside the time limits provided section 9 and 9A.

This court, in <u>Mullins v. Garthwait</u>, 875 F.Supp. 14 (Mass. 1994), set out the appropriate analysis for applying § 10 in an action brought in the Federal District court. This court first noted that § 10's requirement that an action pursuant to Section 10 be filed in the Supreme Judicial Court is a procedural requirement which cannot defeat federal jurisdiction (Id. at 18). Similarly this court held that the requirement that a § 10 Plaintiff bring a "bill in equity" is a state procedural requirement which has no relevance to the form of a complaint which should be used in a Federal action (Id. at 19).

The Defendant has filed a Motion to Amend the Complaint to formally add Patricia Murphy as a party. Mrs. Murphy can have no complaint as to prejudice in this action since she has been actively involved in this litigation. Counsel, William White, Esq. has appeared for Mrs. Murphy and over the last two years and has attended every deposition. He has spent literally hundreds of hours representing Mrs. Murphy in this claim. The Defendant has never filed a suggestion of death pursuant to Fed. R. Civ. Proc. 25. The amendment simply confirms the pleadings to the reality of the litigation over the last two years.

There are two requirements for relief under § 10. First, the court must determine whether justice and equity require that a creditor of an estate be allowed to pursue the claim. In this case, as set out in the body of this opposition to summary judgment, there is a substantial meritorious claim to be brought against Mr. Murphy. The estate of Mr. Murphy has been on notice of this claim since the moment it was filed. There can be no claim of prejudice. <u>In Re Estate of Grabowski</u>, 444 Mass. 715, 719, 831 N.E.2d 291, 294 (2005).

The Second requirement of § 10 is that the claimant against the estate is not chargeable with culpable neglect in not prosecuting his claim within the time so limited. The Massachusetts courts have imposed a relatively high burden on estates attempting to argue that a failure to bring

a claim arises from culpable neglect.  For example, when an attorney missed the statute of limitations, the Appeals Court held that it did not rise to the level of culpable neglect <u>Hastoupis v. Gargas</u>, 9 Mass.App.Ct. 27, 398 N.E.2d 745 (1980).

In this case, as set out above, the claim against the estate could not have been brought within one year of Mr. Murphy's death on January 4, 2001 since the Plaintiff was not aware of the claim and, in any case, the Plaintiff was barred from bringing the case pursuant to the <u>Heck</u> Rule since his murder conviction had not been terminated favorably as of January 4, 2002 when the statute would have run pursuant to Mass. General Laws Ch. 197 Section 9. The Defendant Murphy is not entitled to Summary Judgment on the grounds of the statute of limitations arising from Mass. General Laws Ch. 197 Section 9.


3.  <u>Drumgold's Claim Pursuant to the Mass. Civil Rights Act Is Not Time Barred</u>


As an initial matter, it appears that the question of whether the <u>Heck</u> Rule, as to when a claim accrues, would be applied by the Massachusetts courts to a claim pursuant to Mass. General Laws Ch. 12 § 11I, is undecided. The policy considerations raised in <u>Heck v. Humphrey</u>, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) strongly suggest that the Massachusetts State Court would follow the United States Supreme Court and rule that an action for wrongful conviction arising from an unfair trial does not accrue until the underlying conviction has been reversed, particularly since the Massachusetts courts have held that in interpreting MGL Ch. 12 § 11I they will be guided by the Federal court's interpretation of § 1983.  <u>Batchelder v. Allied Storm Corp</u>, 393 Mass. 819, 822-23, 473 N.E.2d 1128 (1985).

In any case, the statute of limitation pursuant to MGL Ch. 12, § 11I does not begin to run until the Plaintiff knows or has reason to know of the alleged wrongful act resulting in the violation of civil rights.  <u>Simpson v. Salisbury</u>, 441 F.Supp.2d 271, 275 (D.Mass. 2006).  As Judge Tauro explained in that case, when the alleged injury is "inherently unknowable the applicable statute of limitation may be tolled under the discovery rule".  In this case the wrongful acts of the Defendant were inherently unknowable because the essence of the claims are that the Defendants failed to disclose information which should have been disclosed to the Defendant. The fraudulent concealment and equitable tolling provisions which apply to the analysis under 41 USC 1983 also apply to the analysis of statute of limitation pursuant to MGL Ch. 12, § 11 I. The Defendants are not entitled to a summary judgment on statute of limitation grounds.  (See Also Plaintiff's Memorandum In Opposition to Callahan's Motion for Summary Judgment sec. D).

**D.    THERE IS A MATERIAL ISSUE OF FACT AS TO WHETHER WALSH AND MURPHY VIOLATED DRUMGOLD'S CONSTITUTIONAL RIGHTS IN THEIR DEALINGS WITH WITNESSES**

Walsh and Murphy have not denied that the conduct they are alleged to have committed would have violated the Defendant's Constitutional Rights if committed.  Walsh and Murphy instead argue that there is no material issue of fact as to whether they committed the conduct. The material issue of fact as to each witness is discussed below.

1.      Tracie Peaks

Walsh and Murphy argue that they are entitled to summary judgment in connection with the allegations concerning Tracie Peaks.  They argues first that the photographic identification by Tracie Peaks was irrelevant because Tracie had made an identification of Mr. Drumgold as a person she saw running from the Edison Plant without a photograph.  Peaks unequivocally denies that claim and says that she never told Walsh or Murphy that Shawn Drumgold was a person she saw after the shooting but rather that he was simply a person she knew from the neighborhood (PMF 4, 10-11).  The Defendants correctly point out that because Ms. Peaks knew Shawn Drumgold, she could point out Shawn Drumgold in a photo identification as a person from the neighborhood.  In fact, she did this.  The crucial issue, however, is that Walsh and Murphy intimidated and threatened her into making an unduly suggestive identification of Shawn Drumgold as the person she saw immediately after the shooting (RWMF 75, 101), which testimony was untrue (RWMF 94), and which testimony, the jury can infer, Walsh and Murphy should have known was untrue.

Secondly, there is a material issue of fact as to whether Ms. Peaks was threatened or intimidated.  Ms. Peak has testified in detail that she was in fact threatened and intimidated by the actions of Walsh and Murphy.  At her Deposition Ms. Peaks said that she identified Drumgold only because she feared if she did not she would end up in prison (RCMF 81).  She said that when she testified she was doing what she was told to do (RCMF 79).  Betty Peaks' testified that the police officers told her daughter, "if you don't identify one of these people,

you're going to be arrested" (PMF 3).  Clearly there is a material issue of fact as to whether Walsh or Murphy, who are the only police officers who visited Tracie Peaks, threatened or intimidated Ms. Peaks.

2.    <u>Mary Alexander</u>

Mary Alexander was the second witness, after Tracie Peaks, to identify Shawn Drumgold as the individual running from the scene of the shooting. Ms. Alexander, at the time she was testifying, suffered from a malignant brain tumor, seizures, and memory loss which was known to the Defendants and concealed from Mr. Drumgold.

On February 9, 1989 Mary Alexander was brought to the Carney Hospital as the result of a motor vehicle accident.  She had a malignant brain tumor removed (PMF 13).  The Carney Hospital medical records establish that Mary Alexander complained of headaches six months before February 5, 1989, prior to the shooting of Tiffany Moore on August 19, 1988 (RWMF 116, P Ex 18).  The records also indicate that she had been seen four months prior to February 5, 1989 because of headaches at Carney Hospital, which is consistent with her having had that condition in August of 1988, two months before seeing the doctor (RWMF 116, P Ex 18).

After her brain operation in February of 1989 Ms. Alexander continued to have serious medical problems.  On May 29, 1989 the Carney Hospital medical records indicate Ms. Alexander was having an episode of amnesia.  She was forgetting her son's name and where she was (PMF  14).  On September 24, 1989, ten days before testifying at trial, Mary Alexander was brought to Carney Hospital as a result of a fall.  Her medical records indicate that she suffered

from a seizure disorder with a 60% removal of a brain tumor and that she was non compliant with the Dilantin prescribed for that condition (PMF 15).

Mary Alexander's mother, Lola, testified that she told Detectives Walsh and Murphy that her daughter was being treated for a malignant cancer of the brain, that Mary was not up to "all this stuff" and that her daughter didn't remember "nothing that goes on from day to day, so how can she remember who's who from whatever" (PMF 16). She further testified that she spoke to the detectives numerous times, asking them, "not to harass my daughter, because my daughter was real sick and she don't remember things and I said that put more pressure on my daughter's head to try to be aggravated with something that went on out on the street which she don't know anything about" (PMF 17). Lola Alexander also testified that she told the detectives when they first started questioning her daughter, "that my daughter's memory wasn't good because she had malignant cancer of the brain and she didn't need any more pressure on her, she didn't remember from one day to another or from one incident to the other that happened during that day" (PMF 18).

On the multiple occasions when Walsh and Murphy showed photographs to Mary Alexander, Mary Alexander told them that she could not identify any of the photographs and that "she didn't see nobody's face." (P Ex 2, Motion for New Trial Day 2, p. 11). Ms. Alexander testified that the police came to her house so many times they "might as well have had a bed there" (PMF 21). Mary Alexander told her mother, "Ma, I didn't see nobody" in the pictures shown by Walsh and Murphy (PMF 22). Lola Alexander testified that when the officers were questioning Mary Alexander she "couldn't even remember her phone number" (PMF 23).

The Defendants deny being aware of Mary Alexander's memory issues (WMF 119) and therefore it is clear that the Defendant Detectives did not disclose to any District Attorney or to

the Defendant that Mary Alexander had brain cancer or that her mother had indicated that she had any problems with her memory (RWMF 120).

Walsh and Murphy are not entitled to Summary Judgment as to Mary Alexander since there is clearly material issues of fact as to whether Walsh and Murphy were told about Ms. Alexander's problems and failed to disclose them. The testimony of Lola Alexander, as well as the medical records from July of 1989, clearly establish that Mary was having serious cognitive problems at the time she testified. At a minimum, the evidence now known to all parties would have been relevant to the cross-examination of Mary Alexander. Drumgold was denied that information because of the Defendant's failure to disclose the relevant evidence.

Attorney Rappaport's knowledge that Mary had had an operation February of 1989 is a red herring. Rappaport testified that he had no knowledge that the operation created any issue with Mary Alexander's brain or her ability to testify. He testified that had he known the truth, he would have pursued the issue including seeking a medical examination of Mary Alexander (RWMF 120).

3.    Antonio Anthony [1]

Antonio Anthony testified at the Motion for New Trial that he was interrogated by the Boston Police immediately after the shooting (W Ex 12C, p. 104). Although Anthony originally remembered that it was Defendant Callahan who interviewed him, (Id at 104) he eventually recalled that it was Walsh and Murphy who interrogated him (Id at 133-134), which is consistent with the statement of Antonio Anthony offered by the Commonwealth (P Ex 39).

---

[1] W Ex 12A, August 31, 1988 Recorded Statement of Antonio Anthony appears to have been copied incorrectly. The first page is correct, the remaining pages are from a different transcript. An accurate copy of the statement is included at Plaintiff Exhibit 39.

Anthony told the police that he was with Shawn Drumgold at the time of the shooting. He kept telling them that he was with Shawn Drumgold at the time of the shooting (PMF 26).

The police were extremely aggressive towards him in their questioning.  The actions of the police made it clear to him that "something very well could happen to me, you know what I mean.  If I didn't cooperate or tell them what they wanted to hear" (RWMF 177) and that the police "wanted me to say Shawn did it, that's what they wanted" (W Ex 12C, p. 108).  Anthony was threatened, nervous and scared as a result of the police actions.  He was scared that he would be locked up or become a target (W Ex 12C, p. 109).  Defendant Walsh kept screaming at him (RWMF 177).  The use of threats, intimidation to produce false statements against a Defendant by a police officer violates the Defendant's due process rights of fair trial Hysler v. Florida, 315 U.S. 411, 413, 62 S.Ct. 688, 86 L.Ed.2d 932 (1942).

After being subjected to coercion by Walsh and Murphy, Anthony allegedly gave a second statement to Walsh and Murphy.  Anthony denies that he gave the statement (RWMF 152).  In the recorded statement Anthony falsely says that he was dropped off by Shawn Drumgold and Terrance Taylor at about 7:30 on the night of the murder (P Ex 39, Statement of Antonio Anthony, pgs. 5-6), although he was in fact with them at the time of the murder (PMF 24-26).  He also falsely says that after the murder Taylor asked him to say he was with Taylor and Drumgold (P Ex 39, Statement of Antonio Anthony, p. 6), when, in fact, Taylor told him to tell the truth (W Ex 12C, p. 169).

Walsh and Murphy worked as a team throughout this investigation.  They arranged to have Anthony placed in a Howard Johnson's Hotel on the days just prior to presenting the case to the Grand Jury (W Ex 27B).  Although Murphy wrote the memorandum concerning the placement of Anthony at the hotel, Walsh testified that he was in charge of the investigation at

the time and that Murphy kept him informed.  He and Murphy discussed on a routine basis the progress of the investigation they were working on together (PMF 29).  It would be reasonable to infer that Walsh was aware of Murphy placing a crucial witness in a hotel just prior to the Grand Jury.

Anthony ultimately was not called before the Grand Jury.  In light of Anthony's testimony at the Motion for New Trial that he was with Drumgold at the time of the murder and could provide an alibi, it would be reasonable for a jury to infer that Walsh and Murphy did not make this witness available to the District Attorney and to the Grand Jury, despite having described him as a "crucial" witness and put him up in a hotel in the period just prior to the Grand Jury (W Ex 12B), because he would provide exculpatory evidence of the Defendant.  The failure to disclose that clearly exculpatory evidence violates Drumgold's due process rights under the Federal Constitution. Brady v. Maryland 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)

In addition, the Boston Police's failure to disclose that it had paid for hotels and provided cash to Antonio Anthony in order to procure false testimony from him, and that the evidence that the witness ultimately refused to provide that testimony, would be strong exculpatory evidence at trial.  The Defendant would have the right at trial to introduce evidence of the Commonwealth's unsuccessful attempts to procure false evidence, which would be powerful evidence establishing that the Commonwealth was attempting to falsely convict Mr. Drumgold.

The Defendants argue that Drumgold was not damaged by Anthony's coerced false statement because Anthony claimed his Fifth Amendment privilege at trial.  The procuring of a false statement from Antonio Anthony prejudiced the Defendant Drumgold for several reasons.  As an initial matter, it in effect, deprived the Defendant of exculpatory evidence.    The

Massachusetts Appeals Court has explained that "we think it should be obvious that…where a defendant himself locates a witness, the Commonwealth also has a duty to refrain from interfering or hindering access to that witness' testimony".  <u>Com. V. Miller</u>, 29 Mass.App.Ct. 392, 407, 560 N.E.2d 732, 740 (1989); <u>Com v. St. Pierre</u>, 377 Mass. 650, 657-658, 387 N.E.2d 1135, 1140 (1979); <u>U.S. v. Pinto</u>, 850 F.2d 927, 932 (2nd Cir. 1988).

Once the Boston Police Department had coerced a false inculpatory statement from Anthony it, as a practical matter, destroyed Anthony's effectiveness as a Defense witness willing to truthfully testify that he was with Drumgold at the time of the shooting.  Mr. Anthony was astute enough to recognize this when he was cross-examined at the Motion for New Trial concerning why he was not called by the Defendant.  The Assistant District Attorney asked him why he wasn't called as a witness for the state or for the Defendants.  Mr. Anthony explained, "well, the Defense, because of this paper right here, you know" (Referring to his statement which have been placed before him) (W Ex 12C p. 148).

Similarly, Mr. Anthony testified that the reason he took the Fifth at trial and did not testify in favor of the Defendants was because of concerns arising from the coerced statement obtained by Defendant Walsh.  When asked, "did someone tell you why you weren't called as a witness?", Anthony explained, "that's why, that's why they gave me the advice to take the Fifth, because of this paper right here, you know" (referring to the statement obtained by Defendant Walsh) (W Ex 12C, p. 149).  Walsh and Murphy forced Anthony to take the Fifth by procuring, by threats and intimidation, a false statement from Anthony, and thereby deprived Drumgold of the opportunity to produce that exculpatory evidence at trial.

Failure to produce this clearly exculpatory evidence to the Defendants prior to trial violates the Defendant's right to a fair trial.  Both Walsh and Murphy's activities in threatening

and intimidating a false statement from Anthony, and then providing promises and rewards to Anthony and failing to disclose them to the Plaintiff, deprived Drumgold of his right to a fair trial.

    4.    <u>Vantrell McPherson</u>

Vantrell McPherson testified at the Motion for New Trial that just prior to her testifying at trial she was brought into a dark room by two Boston Police officers.  She was thirteen years old (PMF 34).  The officers yelled at her and intimidated her (PMF 37).   Ms. McPherson testified that she "went blank" (PMF 37).  Immediately after that session she testified falsely at trial to a statement allegedly made by Shawn Drumgold which she had never previously mentioned (P Ex 23, Affidavit of Vantrell McPherson).  She now admits that the statement was false and says that she testified to it because she was afraid and scared as a result of the intimidation by the police officers (P Ex 23).

Detectives Walsh and Murphy argue that they had no involvement with Vantrell McPherson.  Although it is correct that Ms. McPherson testified that she did not recognize the name of Detective Walsh, it is not correct that they had no involvement with her.  Ms. McPherson's testimony was that she was visited by the police "right after the murder happened" (PMF 33) and that she was then visited "pretty often" and that she talked to the police about 20 times in her house (PMF 35).

Walsh and Murphy were the detectives investigating the murder for the first eight months.  It would be reasonable for the jury to infer that the visit, immediately after the murder,

and the multiple visits at Ms. McPherson's home were conducted by Walsh and Murphy, who

worked together.  In addition, as discussed below, there will be sufficient evidence for the jury to

infer that there was a conspiracy among all of the officers involved in this case to wrongfully

deprive Mr. Drumgold of his constitutional right to fair trial.  Ms. McPherson, whose first police

contact was multiple visits from Walsh and Murphy, and whose last police contact was with

Defendant Callahan, would be a perfect example of the type of joint activity which would

support a conspiracy finding.

    5.    Eric Johnson

Eric Johnson was a witness who did not identify Shawn Drumgold when he originally

talked to Walsh (W Ex 15C, Trial Testimony of Walsh p. 6).  Mr. Johnson was then subjected to

a series of visits where "they (Detectives) kept coming to my house-they were pressuring me,

they kept saying 'we want you to say this'".  One of the detectives said to him "whatever the DA

asks you, just say yes, say yes to whatever they ask you about Shawn" (P Ex 25, Boston Globe,

May 15, 2003).  Mr. Johnson then, for the first time, in a statement of August 16, 1989,

identified Shawn Drumgold, who he knew from the neighborhood, as one of the individuals

involved in the shooting (W Ex 25, pgs. 5-6).

Given that Walsh and Murphy acted as lead investigators from August of 1988 through

May of 1989 and that Johnson claimed that the detectives kept coming to his house, the jury

would be entitled to infer that Walsh and Murphy were the detectives who intimidated Eric

Johnson and informed him that "whatever the DA asks you, just say, yes.  Say yes to whatever

questions they ask you about Shawn" (P Ex 25).

6.  Olisa Graham

It is correct that at this point that there is no direct evidence that Walsh and Murphy had personal dealings with Olisa Graham.  In fact, Walsh and Murphy failed to interview Olisa Graham along with many other material witnesses in the immediate aftermath of the murder of Tiffany Moore (RWMF 9).  As set out in response to Callahan's Motion for Summary Judgment, the jury can infer that Callahan threatened and intimidated Ms. Graham from testifying after she indicated that she would provide an alibi for Drumgold (PMF 56-61).  Callahan's actions were part of the conspiracy which Walsh and Murphy entered into with Callahan.

**E.        WALSH AND MURPHY ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE CONSPIRACY COUNT.**

Walsh and Murphy correctly note that a civil rights conspiracy requires proof of two or more persons acting in concert to commit an unlawful act or to commit a lawful act by unlawful means.  The principle element of a civil rights conspiracy is an agreement between the parties to inflict a wrong on the plaintiff that results in damages.  Earle v. Benoit, 850 F.2d 836, 844(1st Cir. 1988).  One of the leading cases concerning civil rights conspiracies, Hampton v. Hanrahan 600 F.2d 600, 621 (7th Cir. 1979), explains:

> In order to prove the existence of a civil conspiracy, a plaintiff is not required to provide direct evidence of the agreement between the conspirators; "circumstantial evidence may provide adequate proof of conspiracy"…the question of whether an agreement exists

28

should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can "infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus reached an understanding" to achieve the conspiracy's objective.

In this case, Walsh and Murphy began the process of obtaining false testimony from, among others, Mary Alexander, Tracie Peaks, Antonio Anthony, Eric Johnson, and Vantrell McPherson (Section D 1-5 above). In each instance, Defendants Walsh and Murphy worked in conspiracy with each other towards the conspiracy's goal of a wrongful conviction of Shawn Drumgold. In each instant, Defendant Callahan built on and expanded the work begun by Defendants Walsh and Murphy, all towards the same goal. When Callahan took over the case he reviewed the entire file with Walsh and Murphy (RWMF 31). Walsh continued to work with Callahan after Callahan took over the lead in the investigation (RWMF 31). Walsh's involvement included visiting the Deer Island House of Correction and the Middlesex House of Correction to conduct interviews in the summer of 1989 and visiting with Mary Alexander in the summer of 1989 (RWMF 31). Ricky Evans testified that Detective Paul Murphy worked with Detective Callahan to bring him to the Howard Johnson's hotel and to prepare him to testify falsely (PMF 41).

Clearly, all three Defendants worked towards the same result when they continued to work with each other throughout the process of the investigation and used the same witnesses. The jury would be entitled to infer that the Defendants were motivated by a conspiratorial intent. The question of intent is one which should normally be resolved by a jury rather than by way of Motion for Summary Judgment or directed verdict, e.g. Earle v. Benoite (Id. at 845) (Error to take conspiracy issue from jury); Santiago v. Fenton, 891 F.2d 373, 389 (1st Cir. 1989) (error to take conspiracy issue from jury).

This is a case analogous to the ruling of this court on the Defendant's Motions to Dismiss in Charles v. City of Boston, 365 F.Supp.2d 82 (D.Mass. 2005). This court was faced with a "series of mutually reinforcing actions undertaken by law enforcement before during and after" a prosecution of a criminal Defendant (Id. at 90). This court found that actions of the three individual Defendants in Charles were alleged to be "mutually reinforcing actions undertaken by law enforcement before, during and after Charles' prosecution" (Id. at 90) to produce an unlawful conviction. In this case, as in the Charles case, the conspiratorial agreement can be inferred from all of the factual circumstances alleged.


F.            WALSH AND MURPHY ARE NOT ENTITLED TO SUMMARY
              JUDGMENT ON GROUNDS OF QUALIFIED IMMUNITY


Walsh and Murphy essentially concede that if there is a material issue of fact as to whether they withheld exculpatory evidence or engaged in conduct which unconstitutionally deprived the Defendants of a fair trial, they are not entitled to qualified immunity. As set out above in detail, Walsh and Murphy engaged in such conduct on multiple occasions.

The violations by Walsh and Murphy were of Constitutional rights which were clearly established at the time of the alleged violation. For example, the unconstitutional taking of Mr. Drumgold's statement was found to be unconstitutional by Judge Volterra in 1989. The failure to disclose exculpatory evidence concerning Mary Alexander's health was held to be as unconstitutional as early as 1963. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The use of force or threats or intimidation to procure false testimony was known to

be unconstitutional in 1988.  Hysler v. Florida, 315 U.S. 411, 413, 62 S.Ct. 688, 690, 86 L.Ed.2d

932 (1942)

 This is not a case where there is a live issue of qualified immunity based on an argument

that the conduct alleged by the police may or may not have been unconstitutional at the time it

was committed.  In this case, the alleged conduct was clearly unconstitutional.  There is no

summary judgment issue as to qualified immunity in regards to Detectives Walsh or Murphy.


**III. CONCLUSION**

 This court should deny the Motion for Summary Judgment filed by Walsh and Murphy.


   Respectfully submitted,

   By His Attorneys,

   /s/ Michael Reilly

   Michael W. Reilly, Esq.
   Tommasino & Tommasino
   Two Center Plaza
   Boston, MA   02108
   617 723 1720
   BBO 415900


   /s/ Rosemary Curran Scapicchio

   Rosemary Curran Scapicchio, Esq.
   Four Longfellow Place
   Boston MA 02114
   617 263 7400
   BBO 558312