UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SHAWN DRUMGOLD, <br>    Plaintiff | ) <br> ) <br> ) | C.A. NO. 04-11193NG |
| v. | ) <br> ) | |
| TIMOTHY CALLAHAN, ET AL. <br>    Defendant(s) | ) <br> ) <br> ) | |

## Plaintiff's Responses to Defendant Callahan's Statement of Undisputed Material Facts

1. Agreed.

2. Agreed.

3. Not agreed. The Plaintiff agrees that no such report has ever been produced. Callahan's testimony that such a report exists is equivocal at best. The best he could say as to an independent memory of preparing such a report is that he believes he did, but he does not know why a copy of that report would not be present in the Boston Police Department records and that he would expect such a report to be in the records (C Ex A, pgs. 124-125). There is a material issue of fact as to whether such a report exists. The reference to cross-examination by Drumgold's original trial counsel is not supported by any reference to the record which would clarify what counsel was referring in the 1989 trial.

1

4. Not agreed. The Plaintiff agrees that no such report has ever been produced. Callahan's testimony that such a report exists is equivocal at best. The best he could say as to an independent memory of preparing such a report is that he believes he did, but he does not know why a copy of that report would not be present in the Boston Police Department records and that he would expect such a report to be in the records (C Ex A, pgs. 124-125). There is a material issue of fact as to whether such a report exists. The reference to cross-examination by Drumgold's original trial counsel is not supported by any reference to the record which would clarify what counsel was referring in the 1989 trial.

5. Agreed, the Plaintiff also notes that Evans testified that he remembered the tape recorder being stopped and started when the statement was being recorded (P Ex 3, Motion for New Trial, Day 3, p. 50).

6. Not agreed. Evans testified that he remembered staying at his brother's house. One night there was a knock on the door and he was "whisked away" to the Howard Johnson's Hotel by Defendant's Callahan and Murphy (P Ex 3, Motion for New Trial, Day 3, pgs. 74-75). Evans testified that he did not remember calling Detective Callahan and telling him that an investigator had found him (P Ex 12A, Evans Deposition Vol. I, p. 223).

7. Not agreed. Evans testified that Callahan came to his brother's house unannounced and Detective Callahan "told me to come with him". The Detectives then drove him to the Howard Johnson's Hotel (P Ex 12A, Evans Deposition Vol. I, pgs. 205-206). Evans testified that Callahan initiated the contact in regards to moving to the Howard Johnson's Hotel (P Ex 12A, Evans Deposition Vol. I, pgs. 205-206).

8. Not agreed. Callahan was asked at the Motion for New Trial whether he placed Evans in Howard Johnson's because of concern about his safety. He testified that "the main

2

reason I did it was, I didn't want to have to go looking for him in a couple of weeks for the trial" (P Ex 6, Motion for New Trial, day 6, p. 67). Evans testified that he was not concerned about his safety in 1988-1989 (P Ex 12A, Evans Deposition Vol. I, pgs. 124-125, 225-226). Evans testified that while he was staying at the Howard Johnson's Hotel he was free to come and go as he pleased, which clearly suggests he was not in any kind of protective custody (P Ex 12B, Evans Deposition Vol II, p. 530).

9. Not agreed. As outlined above, Evans testified that Callahan and Murphy brought him to the Howard Johnson's for unexplained reasons and Callahan testimony was that it was in order to make him available for trial.

10. First sentence, agreed. Second sentence, not agreed. Connolly testified that his concern for Rickey Evans' safety was "in general terms". When asked about concerns about Ricky Evans' safety he answered, "you always have concerns, yes, so I presume that I did have concerns, but yeah" (C Ex D, p. 40). He also testified that he would relocate witnesses if he thought it was necessary (C Ex D, p. 40) and that he is almost positive that they did not relocate Ricky Evans (C Ex D, p. 47-48).

11. Agreed. Plaintiff notes that the District Attorney cannot disclose information which police officers know, but do not tell to the District Attorney.

12. Agreed. Plaintiff further notes that the memorandum referred to is dated January 30, 1990 and refers to a conversation in December of 1989, approximately two months after the Drumgold murder trial. Connolly testified that he did not relocate Ricky Evans, and that the pronoun 'we' in the sentence "since 'we' he in effect relocated him to a hotel" did not refer to Laura Scwerz and Paul Connolly, but rather to the Suffolk County District Attorney's Office (C Ex, p. 48).

13. Not agreed.  Beauschesne testified that he had no evidence that any witnesses were threatened prior to their testimony in the murder trial (P Ex 6, Motion for New Trial, Vol. VI, p. 181).  Beauschesne could not identify any witnesses available earlier but who were not available or could not be located at the time of the trial (P Ex 6, Motion for New Trial, Vol. VI, p. 174).  Beauschesne testified at Motion for New Trial "I am embarrassed on how little I recall of that case", referring to the murder trial (P Ex, Motion for New Trial Vol 6, p. 135).  Beauschesne testified he had a dim recollection of a witness in connection with the case being put up at the Howard Johnson's "under police protection" (P Ex 6, Motion for New trial, Vol. VI, 139-140).  Beauschesne was not referring to Ricky Evans in that testimony since Ricky Evans has testified he was not under police protection.  When asked specifically whether he had any recollection of Ricky Evans staying at the Howard Johnson's, Beauschesne testified,

> "Well from everything I've heard, I believe he was, but I don't really have a memory that he was staying there, but—I'll just say the record appears that that's where he was staying, yes, but I don't know that I recall it" (P Ex 6, Motion for New Trial VI, pgs. 147-148).

14. Not agreed.  Callahan testified to meeting Ms. Alexander and talking to her on the street in the summer of 1989.  He then talked to her a second time when Ms. Alexander's mother, Lola, told him that she, Lola, did not want her daughter Mary involved in the case.  He talked to Mary Alexander a third time when Mary Alexander injured herself falling through the porch at 72 Holmes Street.  Callahan heard the police call and responded.  He brought Lola Alexander to the Carney Hospital and went in to talk to Mary Alexander at the Carney Hospital (P Ex 29A, Callahan Deposition Vol. I, pgs. 70-75).

4

      A jury could reasonably infer that Callahan knew of Mary Alexander's problems since Lola Alexander testified that she spoke to the detectives as they "came to my house numerous of times, and I asked them not to harass my daughter…because my daughter was really sick and she don't remember things" (P Ex 2, Motion for New Trial Day 2, p. 15). Lola Alexander specifically explained to Detective Walsh her daughter's health problems (PMF 16-23). The medical records from the summer of 1989 clearly establish that Mary Alexander was suffering severe medical disabilities during the time that Callahan was dealing with her (PMF 12-15) and during the time that Lola Alexander was telling every Boston Police officer she dealt with that her daughter was sick and had memory problems (PMF 16-23).

15. Not agreed. Exhibit G is two pages of unverified handwritten notes by unknown persons. It is not information which can be relied upon by the court pursuant to Federal Rules of Civil Procedure 56(e) since it is not sworn or averred and is of unknown provenance.

16. Not agreed. Evans testified that he told Callahan "listen, if you're gonna put me up…if you're gonna put me up in…you're gonna put me up in a nice hotel like this, shower me with whatever I want, whatever I need, sure no problem, I'll say what you ask me to say" (P Ex 12A, Evans Deposition, Vol. I, pgs. 272-273). Evans testified that Callahan fed him the information that he should say that he met the Drumgold on Schuyler Street, the information concerning the types of guns he testified Drumgold was allegedly using and the description of a white car (P Ex 3, Motion for New Trial, Day 3, pgs. 87-89). In general Callahan and Murphy fed him information that he testified to (P Ex 12B, Evans Deposition, Day 2, pgs. 512-515).

Respectfully submitted,

By His Attorneys,

/s/ Michael Reilly

Michael W. Reilly, Esq.
Tommasino & Tommasino
Two Center Plaza
Boston, MA   02108
617 723 1720
BBO 415900


/s/ Rosemary Curran Scapicchio

Rosemary Curran Scapicchio, Esq.
Four Longfellow Place
Boston MA 02114
617 263 7400
BBO 558312