UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SHAWN DRUMGOLD, | ) | C.A. NO. 04-11193NG |
|     Plaintiff | ) | |
| | ) | |
| v | ) | |
| | ) | |
| TIMOTHY CALLAHAN, ET AL. | ) | |
|     Defendant(s) | ) | |

## Plaintiff's Response to Consolidated Statement of Undisputed Material Facts of Defendants Walsh and Murphy

### I.    BACKGROUND

**A.    Murder of Tiffany Moore**

1.    Agreed.

2.    Agreed.

3.    Agreed.

4.    Not agreed.  The cited affidavit states that two males approached the mailbox and that they fled through the Edison property.  It does not indicate that there were three males or that they approached from behind the chain link fence.

5.    Admit.

6.    Plaintiff admits that some witnesses so testified.  There was conflicting testimony concerning what the individuals were wearing. For example, Eric Johnson testified

1

that one had on black jeans and a black hood top with white sleeves and the other had

on a black suit with green gloves (W Ex 27A, p. 4).  Tyron Brewer testified the

individuals were wearing black jeans and a black t-shirt (W Ex 4, p. 4).  Tanoi Curry

said she saw three people one has on a black mask, one had on a green mask with

orange hair and one had on a white Jason mask (P Ex 24A Trial Day 4, p. 89).

Cherry Walker said one had on a skeleton mask and one had on a mask with hair

coming out (Id at p. 123). Shamia Clemons said both shooters had on black masks (Id

at p. 138-139).

**B.**     <u>**Initial Investigation**</u>

7.     Agreed.

8.     Agreed.

9.     Not agreed.  They interviewed only four of the ten witnesses listed in paragraph 10

herein.  (W Exs 4, 5, 6, 7).

10.     Not Agreed. Exhibits 5 through 7 are not sworn statements.  They do not satisfy the

requirements of Fed. R. Civ. Proc. Rule 56(e) as to affidavits in support of undisputed

material facts.

11.     Not agreed.  Exhibit 5 is not a sworn statement.  It does not satisfy the requirements

of Fed. R. Civ. Proc. Rule 56(e) as to affidavits in support of undisputed material

facts.

12.     Not agreed.  Exhibit 5 is not a sworn statement.  It does not satisfy the requirements of Fed. R. Civ. Proc. Rule 56(e) as to affidavits in support of undisputed material facts.

13.     Not agreed.  Exhibit 6 is not a sworn statement.  It does not satisfy the requirements of Fed. R. Civ. Proc. Rule 56(e) as to affidavits in support of undisputed material facts.  Additionally Cheney stated that they could have been wearing a sweatshirt or a sweat jacket with a hood (W Ex 6, p. 5-6).

14.     Not agreed.  Exhibit 6 is not a sworn statement.  It does not satisfy the requirements of Fed. R. Civ. Proc. Rule 56(e) as to affidavits in support of undisputed material facts.  In addition, Cheney testified that he could not say that Drumgold was wearing the same clothes as the person who did the shooting (W Ex 6, p. 7).

15.     Not agreed.  Exhibit 8 is not a sworn statement.  It does not satisfy the requirements of Fed. R. Civ. Proc. Rule 56(e) as to affidavits in support of undisputed material facts.

16.     Not agreed.  Exhibit 8 is not a sworn statement.  It does not satisfy the requirements of Fed. R. Civ. Proc. Rule 56(e) as to affidavits in support of undisputed material facts.  In addition, the testimony cited is simply Reese's opinion as to street gossip.

17.     Not agreed.  Exhibit 3 is not a sworn statement.  It does not satisfy the requirements of Fed. R. Civ. Proc. Rule 56(e) as to affidavits in support of undisputed material facts.  Drumgold testified that he never went to Romero Holiday's hospital room (P Ex 26A, Drumgold Deposition Vol. II, pgs. 71-73).  Holiday testified that he did not

talk to any one in the hospital about who shot him and that only family visited him in the hospital. (P Ex 6, Motion for New Trial Day 6, pgs. 258-261, 267-268).

18. Not agreed. Exhibit 3 is not a sworn statement. It does not satisfy the requirements of Fed. R. Civ. Proc. Rule 56(e) as to affidavits in support of undisputed material facts. Drumgold testified that he never went to Romero Holiday's hospital room (P Ex 26A, Drumgold Deposition Vol II, pgs. 71-73). Holiday testified that he did not talk to any one in the hospital about who shot him and that only family visited him in the hospital. (P Ex 6, Motion for New Trial Day 6, pgs. 258-261, 267-268).

19. Not agreed. "I couldn't identify anybody in those pictures to say that this is a person walked by my house that night" (P Ex 8, Peaks Deposition, Vol. I, p. 146).

20. Not agreed. Peaks suggests she was shown 10 photographs (P Ex 8, Peaks Deposition, Vol. I, p. 142-143).

21. Agreed.

22. Defendant agrees Walsh and Murphy so testified. Mary Alexander did not testify that she picked up the photo. (W Ex 21B, pgs. 160-161).

23. Agreed.

24. Not agreed. Drumgold testified that he did not have guns in New York (P Ex 26A, Drumgold Deposition Vol III, pgs. 258-259).

25. Not agreed. Anthony testified that there was no tape recording when he was interviewed. Even after hearing a playing of what was reported to be the tape, he testified he had no memory the tape recording (W Ex 12C, p. 132-134, 164).

26.     Not agreed.  W Ex 12A is not a sworn statement.  It does not satisfy the requirements

of Fed. R. Civ. Proc. Rule 56(e) as to affidavits in support of undisputed material

facts.  The cited portion of W Ex 12C states only that there were guns "in the room".

27.     Not agreed.  Anthony disputes that he was taped (see paragraphs 25 herein).  W Ex

12A is not a sworn statement and does not satisfy the requirements of Fed. R. Civ.

Proc. Rule 56(e) as to affidavits in support of undisputed material facts.

28.     Not agreed.  Anthony disputes that he was taped (see paragraphs 25 herein).  W Ex

12A is not a sworn statement and does not satisfy the requirements of Fed. R. Civ.

Proc. Rule 56(e) as to affidavits in support of undisputed material facts.  See above.

29.     Not agreed.  Walsh agreed that, in fact, what he was receiving from other officers

were "rumors", which he did not reduce to a report, from individuals whose names he

could not remember (W Ex 15D, pgs. 102-105).

30.     Not agreed.  Callahan took over as lead investigator, but Walsh and Murphy remained

involved and assisted in the investigation.  (See paragraph 31 herein).

31.     Not agreed.  Walsh and Murphy's involvement with the investigation continued

during the time that Callahan was the lead investigator.  Walsh and Murphy reviewed

the entire file with Callahan when he got involved in the case.  (P Ex 9B, Walsh

Deposition Vol. III, p. 191).  Walsh and Murphy continued to work on the case with

Callahan.  Walsh traveled to Deer Island House of Correction to interview Mervin

Reese (P Ex 9B, Walsh Deposition Vol II, p. 192-193), and traveled to the Middlesex

House of Correction on June 28, 1989 to interview Tyrone Brewer (Id at 101-102).

On May 31, 1989 Walsh visited Mary Alexander with Tim Callahan (Id at 201-203). In general, Walsh was with Callahan on or two of the interviews in 1989, but not all of them (Id at 204).  Murphy was extensively involved with housing Ricky Evans at the Howard Johnson Hotel, and provided him with undisclosed benefits and procured his false testimony.  (P Ex 12A, Evans Deposition Vol. I, pgs. 116, 278-279) (P Ex 12B, Evans Deposition Vol. II, pgs. 295-296, 543-544).  In addition, Walsh testified as a Commonwealth witness at the trial on the eighth day of the trial.

32.    Not agreed.  See 31.

33.    Defendant agrees that Walsh so testified.


**C.    Criminal Proceedings**


34.    Agreed that Walsh and Murphy took a recorded statement of Drumgold after Judge Martin ordered them not to interrogate him because he was appointed counsel  (W Ex 24, Opinion of Volterra J.).

35.    Not agreed.  The waiver of Miranda rights obtained by Walsh and Murphy was not knowing and voluntary and was obtained in violation of Drumgold's sixth Amendment rights to counsel and in direct disobedience of an order of Judge Martin (W Ex 24, Opinion of Volterra J. pgs. 20-24).

36.    Drumgold agreed that he gave an accurate and truthful statement, not that Walsh and Murphy's version of his statement is accurate.

37.    Agreed.

38.    Not agreed.  Judge Volterra held an evidentiary hearing and issued a lengthy opinion

concerning this matter (W Ex 24).  He indicated in the opinion that Judge Martin told

Detective Murphy that Drumgold was not to be questioned and was only to be

fingerprinted (W Ex 24, pgs. 13, 17-18, 24). Judge Volterra found Judge Martin's

testimony to that affect to be credible and fully supported by the evidence (Id at 17-

18).  Volterra found that Murphy, Walsh and Celeste's testimony on this issue not

credible  (FN 13).  The Judge found that  "Based on the evidence and all the

reasonable inferences to be drawn there from, I find that there was a deliberate

decision on the part of the police to interrogate Drumgold in spite of his earlier desire

to remain silent.  I find that the police purposefully created and place Drumgold in a

situation designed to undermine his decision to remain silent…Not only was this

done in violation of a District Court Judge's order, but I also find that the police

conduct was contrary to the letter and spirit of the Miranda decision."  (Id at 22-23).

Murphy and Walsh worked together on this case and it was Detective Murphy's

responsibility to keep Walsh appraised of developments on the Tiffany Moore case (P

Ex 9B, Walsh Deposition, Vol. III, p. 176, 182).  A jury could reasonably infer that

Walsh and Murphy were both aware of Judge Martin's order not to interrogate

Drumgold.  Walsh and Murphy unconstitutionally took Drumgold's statement at the

Roxbury District Court after Drumgold was in custody, without a voluntary waiver of

Miranda Rights and after Drumgold had asserted his right to remain silent (W Ex 24

at 20-21). Walsh and Murphy took Drumgold's statement at Area B in violation of his constitutional right to remain silent and without a voluntary waiver of Miranda Rights (W Ex 24 at 22-24).

39. Agreed to the extent that the prosecutorial misconduct complaint on is premised upon Boston Police detectives' deliberate acts in violating a judge's order and the law.

40. Agreed.

41. Agreed.

42. Not agreed. Judge Volterra specifically found that Murphy had knowledge of the order not to talk to Drumgold (W Ex 24, p. 24, footnote 13) and found that Walsh and Murphy were working together in obtaining the statement from Drumgold at the police station they day he was arrested (W Ex 24, pgs. 9-20).

43. Defendant agrees that Judge Volterra so stated in his opinion.

44. Agreed to the extent that the SJC said "the only reason to dismiss criminal charges because of nonprejudicial but egregious police misconduct would be to create a climate adverse to repetition of that misconduct that would not otherwise exist. Nothing in the record suggests, nor is there good reason to suppose, that unless his court provides a prophylactic remedy, police officer are likely to repeat the type of conduct that occurred in this case. In the absence of a demonstrated need for deterrence, a prophylactic remedy is inappropriate" Com v. Drumgold 423 Mass 230, 246, 668 N.E.2d 300, 313 (1996).

45. Agreed that the District Attorney presented two witnesses to the Grand Jury, Walsh

and Peaks.  (W Ex 17A).

46.    Agreed.

47.    Agreed.

48.    Agreed.  The Defendant further notes that the Supreme Judicial Court found that

when Walsh testified before the Grand Jury, "we accept that Walsh's version of the

Defendant's statement was incorrect" <u>Com v. Drumgold</u> (Id at 238)

49.    Agreed.

50.    Agreed.

51.    Agreed.

52.    Agreed.

53.    Agreed.

54.    Agreed.

55.    Agreed.

56.    Agreed, based upon the reports and investigation done by police and the information

revealed by the Police to the District Attorney.

57.    Agreed.

58.    Agreed.

59.    Agreed.

60.    Agreed.

61.    Agreed.

62.    Agreed.

63.    Not agreed.  Rappaport testified that he and co-counsel split up the work but that "I don't think there was any—I don't think I would have divided the labor in that situation.  I wouldn't have wanted to abdicate my ability to do whatever I had to do in the courtroom to the Commonwealth's case" (W Ex 14C, Rappaport Deposition, p. 65).

64.    Not agreed.  Rappaport testified that in the original division of work co-Defendant counsel Robert George was going to handle the alibi part of the case but "of course, things changed when Taylor got directed out" (W Ex 14D, Rappaport Deposition, pgs. 209-210).

65.    Not agreed.  Robert George, counsel for co-defendant Taylor, testified that there was no such split of responsibility  (P Ex 10, George Deposition, pgs. 57-58).  Rappaport testified that George took the lead on the Sonoma Street witnesses until co-Defendant Taylor was directed out.  At that point Rappaport took responsibility for the entire defense (W Ex 14B, pgs. 209-210).

66.    Agreed.

67.    Agreed.  However, the tactical decision made by Rappaport was made based upon the information know to him at that time.  Rappaport did not know, for example, at that time that Ricky Evans had been provided undisclosed rewards and had been coached by the Defendant's to testify falsely (PMF 41-54), that Alibi witness Olisa Graham had been threatened and intimidated by the Defendants (PMF 55-61), that Antonio Anthony had received undisclosed lodging and cash (PMF 24-31), or that the

Defendants knew, but did not disclose, that Mary Alexander had brain cancer which caused her memory problems (PMF 12-23) or that Tracie Peaks had been threatened and intimidated (PMF 1-11). A jury could reasonably infer that Rappaport would have made different strategic decisions if he was aware of these facts.

68.    Agreed. However, the tactical decision made by Rappaport was made based upon the information know to him at that time. Rappaport did not know, for example, at that time that Ricky Evans had been provided undisclosed rewards and had been coached by the Defendant's to testify falsely (PMF 41-54), that Alibi witness Olisa Graham had been threatened and intimidated by the Defendants (PMF 55-61), that Antonio Anthony had received undisclosed lodging and cash (PMF 24-31), or that the Defendants knew, but did not disclose, that Mary Alexander had brain cancer which caused her memory problems (PMF 12-23) or that Tracie Peaks had been threatened and intimidated (PMF 1-11). A jury could reasonably infer that Rappaport would have made different strategic decisions if he was aware of these facts.

69.    Agreed.

70.    Agreed.

71.    Not agreed. The cited transcript contains an ambiguous question as to whether any further reports were received "after you were convicted". The Defendants concede that reports concerning, for example, Ricky Evans being placed at the Howard Johnson's and Antonio Anthony being placed at the Howard Johnson's, were received by Drumgold after he was convicted.

## II.    TESTIMONY AND EVIDENCE RELEVANT TO CLAIMS AND DEFENSES

### A.  Tracie Peaks

72.    Agreed.

73.    Agreed.

74.    Not agreed.  Tracie testified that the police came to her house at least twice if not more (P Ex 8B, Tracie Peaks Deposition, Vol. II, pgs. 22-23)

75.    Not agreed.  Peaks drew a diagram of the photographs that were shown to her and illustrated that 10 photographs were shown to her (P Ex 14, Exhibit 14 from Peaks Deposition).  She testified she was not sure exactly how many photographs were shown to her (P Ex 8A, Tracie Peaks Deposition Vol I, p. 142).  Walsh put Drumgold's picture right in front of her and pointed at it and said "doesn't this one look familiar."  (P Ex 3, Motion for New Trial Day 3, p. 97-98).

76.    Not agreed.  Peaks drew a diagram of the photographs that were shown to her and illustrated that 10 photographs were shown to her (P Ex 14, Exhibit 14 from Peaks Deposition).  She testified she was not sure exactly how many photographs were shown to her (P Ex 8A, Tracie Peaks Deposition Vol I, p. 142).  Walsh put Drumgold's picture right in front of her and pointed at it and said "doesn't this one look familiar."  (P Ex 3, Motion for New Trial Day 3, p. 97-98).

77.    Agreed.

78.    Agreed.

79.    Not agreed.  Tracie testified that her identification of Shawn Drumgold before the

Grand Jury was "not truthful" and was a lie (P Ex 3, Motion for New Trial, Vol. III,

p. 142).  When asked whether she was testifying truthfully to the Grand Jury, Tracie

answered, "when someone is making you do something, you know, you're doing

what you're told to do" (W Ex 17E at p. 40).  She also testified that she did not

remember whether she corrected inaccurate facts at the Grand Jury (W Ex 17E at p.

42).

80.    Agreed.

81.    Not Agreed.  Tracie testified that when she testified at trial she identified Shawn

Drumgold as the person who she saw running through the stairs because she was told

to do so by police officers (P Ex 8A, Peaks Deposition, Vol. I, pgs. 159-160, 186).

She testified falsely because, " I feared if I did not, I would end up in prison" (P Ex

15, Affidavit of Tracie Peaks, paragraph 7).

82.    Not agreed.  Prior to testifying at trial Tracie was brought into a room by police

officers and was told that she had to point at Shawn Drumgold when she went in to

testify (P Ex 8A, Peaks Deposition Vol. I, pgs. 159-160).  She testified in that manner

because she was afraid she would go to jail (P Ex 15, Affidavit of Tracie Peaks,

paragraph 7).  She testified that she did not want to point at Shawn Drumgold, but she

had to point at him (Id at 186).  Police intimidated her and she felt guilty for years

after she testified.  She testified that she "had a demon in her soul" because of how she had testified (P ex 8B, Peaks Deposition Vol. II, p. 49).

83.     Not agreed.  Peaks testified she had only seen Shawn Drumgold once prior to the shooting (P Ex 8A, Peaks Deposition, Vol. I, p. 56).

84.     Agreed.

85.     Not agreed.  Peaks testified that she did not know if she saw one or two males.  She saw "a group" of guys coming from the direction of the Edison plant (P Ex 8A, Peaks Deposition, Vol. I, p. 108).

86.     Agreed that Peaks so testified.  She then recanted her identification of Drumgold. (Exhibit 16, Affidavit of Tracie Peaks).

87.     Agreed that Peaks so testified.  She then recanted her identification of Drumgold. (Exhibit 16, Affidavit of Tracie Peaks).

88.     Agreed that Peaks so testified.  She then recanted her identification of Drumgold. (Exhibit 16, Affidavit of Tracie Peaks).

89.     Agreed that Peaks so testified.

90.     Agreed that Peaks so testified.  She then recanted her identification of Drumgold. (Exhibit 16, Affidavit of Tracie Peaks).

91.     Agreed that Peaks so testified.   She then recanted her identification of Drumgold. (Exhibit 16, Affidavit of Tracie Peaks).

92.     Agreed that Peaks so testified.  She then recanted her identification of Drumgold. (Exhibit 16, Affidavit of Tracie Peaks).

93.     Agreed that Peaks so testified.

94.     Not agreed.  Tracie testified that she did recall saying that she had seen Shawn

        Drumgold right after the Moore homicide and that her testimony to that effect was a

        lie (P Ex III, Motion for New Trial Day 3, p. 142).

95.     Not agreed.  Rappaport testified that although Peaks described Drumgold's clothing

        as not consistent with the shooter, he was concerned about Tracie Peaks (W Ex 14C,

        p. 37).  He also testified in regards to Tracie Peaks that "I think by the time we went

        to trial the exculpatory nature of that statement may have been eaten up by placing

        him at the crime scene or near the crime scene" (W Ex 17D, 180).

96.     Agreed that Rappaport so testified.  Rappaport explained that he knew what Tracie

        Peaks was going to say because he had interviewed her (W Ex 14A, 61).  As set out

        above from the testimony of Ms. Peaks, Rappaport was incorrect in his belief that

        nobody could put words in her mouth.

97.     Not agreed.  The cited testimony does not refer to police officers showing

        photographs to Tracey Peaks but rather refers to whether Rappaport would himself

        show photographs to Tracie Peaks.

98.     Agreed that she testified and later recanted

99.     Not agreed.  Peaks has testified that it was police officers who told her that she had to

        point at Shawn Drumgold (P Ex 8A, Peaks Deposition Vol. I, p. 160).  She never met

        with any District Attorneys either at her home or at the District Attorneys office (Id at

        pgs. 161-162).  The Boston Police "came down hard on her" (P Ex 8B, Peaks

Deposition Vol. II, p. 52-53). It was her assumption that the individuals who met

with her prior to her trial testimony were police officers (Id at II, p. 75).

100.    Not agreed. Betty Peaks testified that the police intimidated and threatened her. (P
        Ex 16, Betty Peaks Deposition, p. 76-79).

101.    Not agreed. Peaks drew a diagram of the photographs that were shown to her and
        illustrated that 10 photographs were shown to her (P Ex 14, Exhibit 14 from Peaks
        Deposition). She testified she was not sure exactly how many photographs were
        shown to her (P Ex 8A, Peaks Deposition Vol. I, p. 142). Walsh put Drumgold's
        picture right in front of her and pointed at it and said "doesn't this one look familiar."
        (P Ex 3, Motion for New Trial Day 3, p. 97). Betty Peaks testified that she
        remembered the police "bringing photos of some black suspects and shoving them in
        our faces…" (P Ex 16, Betty Peaks Deposition, p. 58).

102.    Not agreed. Peaks testified that she did not know how long she looked at the
        photographs and that it could have been a long time or it could have been a short time
        (P Ex 8B, Tracie Peaks Deposition Vol. II, pgs. 71-74).

103.    Not agreed. Peaks testified that when the police came to her house they intimidated
        her and "came down hard" on her (P Ex 8B, Peaks Deposition Vol II, pgs. 49, 52-53).

104.    Agreed.

105.    Disagreed. Mrs. Peaks testified that she signed her affidavit after her daughter had
        testified at the hearing of the Motion for New Trial when her daughter was leaving
        the courthouse (P Ex 16, Betty Peaks Deposition, pgs. 28-29). Mrs. Peaks' memory

16

was incorrect.  The Affidavit (P Ex 7) was signed by Mrs. Peaks on March 28, 2003 and Tracie Peaks testified at the Motion for New Trial on July 31, 2003.  The Defendants acknowledge that Drumgold's investigator Keller talked to Ms. Peaks prior to her signing the affidavit (WMF pgs. 108-109).  Ms. Peaks testified that she reviewed the affidavit before signing it and it was accurate (P Ex 16, Betty Peaks Deposition, pgs. 29-30).

106.    Not agreed.  Mrs. Peaks testified that she did not remember how many times the police had come to her house (P Ex 16, Betty Peaks' Deposition, pgs. 41, 83).

107.    Not agreed.  Mrs. Peaks testified that she felt intimidated and that the police told her daughter "if you don't identify one of these people you're going to be arrested" (P Ex 16, Betty Peaks Deposition, p. 78-79).

108.    Agreed that Keller so testified.  Walsh testified that when he visited Peaks the only people present were Betty, Tracie Peaks and three Boston Police officers (P Ex 9A, Walsh Deposition 1, p. 145).

109.    Agreed Keller so testified.

110.    Not agreed.  The cited reference makes no reference to what Tracie Peaks told Keller.

111.    Not agreed  (P Ex 7, Affidavit of Betty Peaks).

B.  **Mary Alexander**

112.    Admit.

113.    Deny.  Walsh met at least once with Mary Alexander on May 31, 1989 (P Ex 9B, Walsh Deposition Vol III, p. 203).

114.    Agreed.

115.    Agreed.

116.    Not agreed.  The handwritten interview notes from the Carney Hospital for February 5, 1989 indicate "she has a Hx of headaches during the past 6 mo which may be worse".  The February 5, 1989 admission notes from the Carney Hospital indicate "21 y/o R Ø was seen 4 months ago at CHER go(?) to frontal H/A and doublevision RX c̄ Motrin c̄ some relief" (P Ex 17, pgs. 4-5).

117.    Agreed.

118.    Agreed.

119.    Not agreed.  Lola Alexander averred that she told detectives that Mary was very sick and was having severe headaches (P Ex 18, Affidavit of Lola Alexander, paragraph 9) (P Ex 2, Motion for New Trial, Day II, pgs. 8, 15).

120.    Agreed that Rappaport had knowledge that Mary had had an operation in February of 1989.  Rappaport did not know that Mary Alexander had any issues involving her brain.  If he had, he would have obtained all her medical records, hired an expert and requested a medical examination  (P Ex 20, Rappaport Vol. II, pgs. 245-246).

121.    Agreed.

122.    Agreed.

123.    Not agreed.  Lola testified that she informed Walsh that Mary was really sick, had severe headaches and memory loss.  (P Ex 2, Motion for New Trial, II, pgs. 7-8, 11-12).

124.    Not agreed.  Lola testified that at the time of the Moore homicide she had a conversation with Detective Murphy when she told him that her daughter "don't remember nothing going on from day to day" (Id at p. 13) and that her daughter was being treated at Boston Medical Center and Carney Hospital (Id at p. 12).  Lola also testified that Mary's problems with headaches and memory occurred prior to the diagnosis of cancer (Id at p. 48).

125.    Not agreed.  Lola testified that at the time of the Moore homicide she had a conversation with Detective Murphy when she told him that her daughter "don't remember nothing going on from day to day" (Id at p. 13) and that her daughter was being treated at Boston Medical Center and Carney Hospital (Id at p. 12).  Lola also testified that Mary's problems with headaches and memory occurred prior to the diagnosis of cancer (Id at p. 48).

126.    Agreed.

127.    Agreed.

128.    Agreed.  Plaintiff further notes that Tracie did not consider Mary Alexander to be a friend, but rather an "associate" (P Ex 8A, Peaks Deposition 1, p. 235).  Tracie did not go out anywhere with Mary, would not go over her house and watch T.V. or sit in the apartment and talk (Id at 105-106).

129.    Agreed.

130.    Agreed.

131.    Agreed.

132.    Agreed.

133.    Not agreed.  Mary could not pick out Drumgold's picture and could not identify
        anyone she saw coming from the Edison Plant (P Ex 2, Motion for New Trial Day 2,
        p. 10).  Mary testified in the cited pages that she followed the media attention on this
        case closely, that she saw a photograph of Shawn Drumgold on television or in the
        newspaper and that when she was shown a photograph by Mr. Rappaport of Mr.
        Drumgold, Drumgold was wearing the same clothing that he was wearing in the
        photograph that was in the newspaper and she knew she had seen the photograph
        identified as Shawn Drumgold in the newspaper (W Ex 21B, pgs. 178-179, 187-188,
        196). Lola Alexander testified that she did not remember if photographs were shown
        the first time the police came to the house (P Ex 19, Lola Alexander Deposition, p.
        100).  Walsh testified that he first showed the photographs to Mary Alexander on
        August 26, 1988, the week after the murder (P Ex 9A, Walsh Deposition, Vol I, p.
        147).

134.    Agreed.

135.    Agreed.

136.    Agreed that Mary so testified.  Defendant further notes that Lola Alexander testified
        that prior to Rappaport showing the photograph to Mary Alexander, Mary Alexander

was telling Detective Murphy that she could not identify anyone and that Murphy kept pointing to a particular photograph, saying, "is this him, is this him?" (P Ex 2, Motion for New Trial Day 2, pgs. 10-11).

137.    Agreed that Mary so testified.  Defendant further notes that Lola Alexander testified that prior to Rappaport showing the photograph to Mary Alexander, Mary Alexander was telling Detective Murphy that she could not identify anyone and that Murphy kept pointing to a particular photograph, saying, "is this him, is this him?" (P Ex 2, Motion for New Trial Day 2, pgs. 10-11).

138.    Agreed she so testified

139.    Agreed.

140.    Not agreed.  Mary testified in the cited pages that she followed the media attention on this case closely, that she saw a photograph of Shawn Drumgold on television or in the newspaper and that when she was shown a photograph by Mr. Rappaport of Mr. Drumgold, Drumgold was wearing the same clothing that he was wearing in the photograph that was in the newspaper and she knew she had seen the photograph identified as Shawn Drumgold in the newspaper (W Ex 21B, pgs 178-179, 187-188, 196).

141.    Agreed.  However, Rappaport was not aware that Mary Alexander was suffering from a brain injury that affected her memory at that time (P Ex 20, Rappaport Deposition Vol. II, pgs. 245-246).

142.    Agreed.

143.    Agreed.

144.    Agreed that she so testified.  Defendant further notes that upon review of the affidavit Lola testified that the averments in it were true  (P Ex 19, Lola Alexander Deposition, pgs. 40-45) and later testified that she had no memory of the circumstances of her signing of the affidavit (Id at p. 295).

145.    Not agreed.  Lola testified she had no memory of her circumstances of signing that affidavit (Id at p. 295).

146.    Not agreed.  Lola testified that she told the police officers who came to the house that her daughter was sick with malignant cancer of the brain and was not able to participate with them and that she requested that the officers stop harassing her daughter because her daughter was sick (P Ex 2, Motion for New Trial Day 2, pgs. 7-8).  She further testified that when Mary told the police she didn't see anybody the police continued to point at a photograph asking, "is this him, is this him?" (Id at p. 10).  She further testified that she told the police that her daughter was really sick, that her daughter didn't really remember things and that her daughter's memory was not good  (Id at p. 15).

C.  **Antonio Anthony**

147.    Agreed.

148.    Agreed.

149.    Agreed.

150.    Agreed.

151.    Agreed.

152.    Not agreed.  Antonio Anthony testified that there was no tape recording when he was interviewed.  Even after hearing the playing of what was reported to be the tape, he testified that he had no memory of a tape recording (W Ex 12C, pgs. 132-134, 164).

153.    Plaintiff agrees that the statement provided by the Commonwealth contains these statements.

154.    Defendants agree that the statement provided by the Commonwealth contains these statements.

155.    Defendants agree that the statement provided by the Commonwealth contains these statements.

156.    Defendants agree that the statement provided by the Commonwealth contains these statements.

157.    Defendants agree that the statement provided by the Commonwealth contains these statements.

158.    Defendants agree that the statement provided by the Commonwealth contains these statements.

159.    Defendants agree that the statement provided by the Commonwealth contains these statements.

160.    Defendants agree that the statement provided by the Commonwealth contains these

statements.  Drumgold denies Anthony's claim.  (P Ex 26B, Drumgold Deposition Vol III, pgs. 258-259).

161.    Defendants agree that the statement provided by the Commonwealth contains these statements.

162.    Defendants agree that the statement provided by the Commonwealth contains these statements.  At the Motion for New Trial, Anthony testified that Taylor told him to tell the truth (W Ex 12C, p. 103).

163.    Defendants agree that the statement provided by the Commonwealth contains these statements.

164.    Not agreed.  Anthony denied making the statement.  See paragraph 152 herein.

165.    Not agreed.  Anthony was, in fact, put up at a Howard Johnson's Motor Lodge (P Ex 9B, Walsh Deposition, Vol. II, p. 177).

166.    Not agreed.  The report was produced by the Boston Police Department for the first time on Day Five of the hearing on the Motion for New Trial.  The cited testimony does not indicate that Walsh testified that the report would have been in the file. Walsh testified only that, "if it was in our file, it was turned over".  Walsh testified at the Motion for New Trial, July, 2003, in reference to this report, "I'm sure I've seen it before" (P Ex 5, Motion for New Trial, Day 5, p. 179).  At his Deposition in February of 2007 Walsh testified that he had first seen the document a month or two before February of 2007 (P Ex 9B, Walsh Deposition, Vol. III, p. 177-178).

167.    Not agreed.  Walsh so testified, but as set out in response to paragraph 166 Walsh's

testimony concerning his knowledge of this report has been inconsistent. The Boston Police Department produced the report at the Motion for New Trial. (P Ex 5, Motion for New Trial Day 5, p. 186).

168.   Not agreed. The citation does not refer to Anthony's failure to testify before a grand jury. There is no evidence that Anthony refused to testify on the ground of his Fifth Amendment privilege before the Grand Jury. Page 146 of the cited testimony makes it clear that the testimony concerned Anthony's trial testimony.

169.   Not agreed. The citation at page 42-43 indicates that, in fact, Anthony was interviewed on one occasion by Callahan and on that occasion Anthony did not say that he would refuse to testify.

170.   Agreed.

171.   Agreed that Anthony has not been deposed. There is no basis on this record for the claim that the Defendant's have been "unable" to depose Anthony.

172.   Not agreed. Anthony testified that he did not tell the truth on the taped conversation (W Ex 12C, p. 169).

173.   Not agreed. In the cited testimony Anthony denied making the statement described in paragraph 152.

174.   Not agreed. In the cited transcript Keller does not explain why he removed that particular language from his draft.

175.   Agreed. Further, Plaintiff notes that Anthony testified that he kept saying that he was with Shawn Drumgold at the time of the Tiffany Moore Shooting (W Ex 12C, pgs.

135-136).

176. Agreed.

177. Not agreed.  Anthony testified that Walsh was aggressive, that he made it clear that "something very well could happen to me, you know what I mean.  If I didn't cooperate or tell them what they wanted to hear" (W Ex 12C, p. 107) and that Walsh was screaming at him (Id at 135).

178. Agreed.

### D.  Vantrell McPherson

179. Agreed.

180. Not agreed. McPherson does not know Walsh by name and does not know if she had contact with Walsh (P Ex 21B, Vantrell McPherson Vol. II, p. 44), however, McPherson testified she had contact with the investigating officer right after the murder during the period when Walsh and Murphy were in charge of the investigation (P Ex 1, McPherson, Motion for New Trial, Day 1, p. 177).

181. Not agreed.  McPherson had no memory of providing any such recorded statement (P Ex 1, Motion for New Trial, Day 1, p. 175).

182. Plaintiff agrees that Walsh was not present on June 10, 1989 when Callahan interviewed McPherson.

183.    Agreed.

184.    Not agreed.  McPherson has testified at various times that she saw Shawn Drumgold at around 6:00 pm (Id at p. 187) and that she saw Shawn Drumgold about 10 minutes before the shooting (Id at p. 185), which was at dusk in August, and that she does not remember exactly what time she saw Drumgold that night (Id at p. 188).

185.    Not agreed.  Ms. McPherson has testified that she did not know whether there were stripes on Drumgold's clothes (P Ex 21A, McPherson Deposition Vol. I, p. 57).

186.    Not agreed.  McPherson has testified that she did not hear that statement and her testimony that she did hear the statement was not truthful (P Ex 1, Motion for New Trial, Day 1, p. 171) (P Ex 22, Affidavit of Vantrell McPherson, ¶ 6)(P Ex 21A, Vantrell McPherson Deposition, Vol. I, p. 169)

187.    Not agreed.  Plaintiff agrees that McPherson testified that she did not know who drafted the Affidavit.  McPherson did not indicate at the pages cited that she had any disagreement with any of the contents of the Affidavit.

188.    Not agreed.  At the page cited, McPherson testified that she was nervous when she signed the Affidavit.  She also testified that she was equally nervous when she testified at the Deposition from which this is cited.

189.    Not agreed.  McPherson testified that police officers were "yelling in my face when they had me at the station, probably in my apartment too" (P Ex 21A, McPherson Deposition, Vol. I, p. 135).

190.    Not agreed.  She was both at the station and courthouse when they were yelling at her

(P Ex 21A, McPherson Deposition Vol. I, p. 135).

191.    Not agreed.  McPherson testified at the Motion for New Trial that the two men in the

        room were police officers and were not Assistant District Attorneys (P Ex 1, Motion

        for New Trial, Day I, p. 165).

192.    Not agreed.  As indicated in response to paragraph 189, McPherson indicated she was

        probably also yelled at her home and at the station (P Ex 21A, McPherson

        Deposition, Day 1, p. 135).

193.    Not agreed.  McPherson testified that she did not testify truthfully concerning the

        statement allegedly made by Shawn Drumgold.  She testified she so testified because

        she was scared and afraid (P Ex 22, McPherson Affidavit, ¶ 6).


**E.  <u>Eric Johnson</u>**


194.    Agreed.

195.    Not agreed.  Johnson identified Walsh and Murphy in person at a Pre-Trial Hearing

        (P Ex 23, Voir Dire, pgs. 36-37).  Johnson testified in Pre-Trial proceedings in 1989

        that he had picked out a photograph of Drumgold with Detectives Walsh and Murphy

        (P Ex 23, pgs. 45-46).  That testimony is consistent with the report produced by the

        Commonwealth in which Walsh and Murphy claim to have interviewed Johnson on

        August 16, 1988 (W Ex 27).

196.    Agreed. Johnson did not mention Shawn Drumgold's name to Walsh and in fact at

trial said he was not sure if the person he saw was Drumgold.  The only reason he
thought it was Drumgold was that the person had bow legs.  He first described the
shooters as one wearing all white, the other wearing a green jogging suit (P Ex 24B,
Trial Day 6, pgs. 79-82).

197.    Not agreed. Johnson testified in reference to Walsh and Murphy that he had been
talking to them ever since her first met them and that he had been talking to them all
along, and that he had talked to them a number of times (P Ex 23, Voir Dire p. 37).
Johnson told a Boston Globe reporter that "they (Detectives) kept coming to my
house-they were pressuring me, they kept saying, 'we want you to say this'" (P Ex
25, Boston Globe 5/15/03).

198.    Not agreed.  Johnson testified he was shown photographs by Walsh and Murphy (P
Ex 23, Voir Dire, p. 45-46).

199.    Agreed.

200.    Plaintiff is unclear what "thereafter" refers to.  Defendant agrees that after Johnson
talked to Walsh he talked to Co-Defendants Callahan and McDonough.

201.    Not agreed.   (P Ex 25, Boston Globe 5/15/03).

202.    Defendant agrees Walsh was not present when Johnson gave the statement
memorialized in W Ex 27A.


F.  **Ricky Evans**

203.    Not agreed.  Walsh was aware that Evans was being housed at the Howard Johnson's

29

and did not disclose that fact to either the District Attorney or the defense.  (P Ex 9B, Walsh Deposition, Vol. III, p. 183).

204.    Not agreed.  Walsh was aware that Evans was being housed at the Howard Johnson's and did not disclose that fact to either the District Attorney or the defense.  (P Ex 9B, Walsh Deposition Vol. III, p. 183).

205.    Agreed.

206.    Agreed.

207.    Agreed that Callahan so testified.

208.    Agreed. But The tape was constantly being stopped during the taping (P Ex 3, Motion for New Trial, p. 50)

209.    Agreed.

210.    Agreed.

211.    Not agreed.  Walsh was aware that Evans was being housed at the Howard Johnson's and did not disclose that fact to either the District Attorney or the defense.  (P Ex 9B, Walsh Deposition Vol. III, p. 183).

212.    Not agreed.  Walsh was aware that Evans was being housed at the Howard Johnson's and did not disclose that fact to either the District Attorney or the defense.  (P Ex 9B, Walsh Deposition, Vol. III, p. 183).


G.  **Olisa Graham**

213.    Agreed.

214.    Agreed.

215.    Agreed.

216.    Not agreed.  Mr. Drumgold did not know Olisa Graham very well (P Ex 26A,

       Drumgold Deposition, Vol. II, p. 128).  Mr. Drumgold did not remember seeing Olisa

       Graham on the day of the murder (Id at p. 211) and did not recall whether he had told

       Mr. Rappaport about Olisa Graham (Id at pgs. 265-266).

217.    Agreed.

218.    Agreed.

219.    Agreed.

220.    Agreed.

221.    Agreed.

222.    Agreed

223.    Not agreed.  In her testimony in Motion for New Trial, Ms. Graham testified that "the

       detectives told me that I had a warrant so I wouldn't be able to testify.  If I was to

       testify, I could be arrested once I, I came off the stand" (P Ex 1, Motion for New

       Trial, Day 1, p. 23).

224.    Agreed.

225.    Agreed.

226.    Agreed.

227.    Not agreed.  Keller testified that at one point Ms. Graham identified them as District

       Attorneys.  Later on, he thought she may have said she wasn't sure if they were

"cops" (W Ex 19B, pgs. 301).

228. Not agreed. Keller testified that at one point Ms. Graham identified them as District
     Attorneys. Later on, he thought she may have said she wasn't sure if they were
     "cops" (W Ex 19B, pgs. 301).

229. Not agreed. Keller said that she may have indicated they were police officers (W Ex
     19B, pgs. 301).

230. Agreed.

231. Not agreed. Exhibit 30 is a police report, not verified under oath, which is not a valid
     basis for establishing a material fact pursuant to Rule Federal Civil Procedure 56.

232. Not agreed. Exhibit 30 is a police report, not verified under oath, which is not a valid
     basis for establishing a material fact pursuant to Rule Federal Civil Procedure 56.

233. Not agreed. Exhibit 30 is a police report, not verified under oath, which is not a valid
     basis for establishing a material fact pursuant to Rule Federal Civil Procedure 56.

234. Agreed. However, the tactical decision made by Rappaport was made based upon the
     information know to him at that time. Rappaport did not know, for example, at that
     time that Ricky Evans had been provided undisclosed rewards and had been coached
     by the Defendant's to testify falsely (PMF 41-54), that Alibi witness Olisa Graham
     had been threatened and intimidated by the Defendants (PMF 55-61), that Antonio
     Anthony had received undisclosed lodging and cash (PMF 24-31), that the
     Defendants knew, but did not disclose, that Mary Alexander had brain cancer which
     caused her memory problems (PMF 12-23) or that Tracie Peaks had been threatened

and intimidated (PMF 1-11).  A jury could reasonably infer that Rappaport would have made different strategic decisions if he was aware of these facts.

**H.    Gemini Hullum**

235.    Agreed.

236.    Not agreed.  Hullum knew that the Police had threatened to arrest Olisa Graham, her friend, if Olisa testified.  Hullum did not come forward to testify because she was scared and did not want to be arrested.  (P Ex 27, Affidavit of Gemini Hullum).

237.    Agreed.

238.    Agreed.

239.    Agreed.

240.    Agreed.

241.    Agreed, however, at the Motion for New Trial hearing she testified that she did recall the night and she knows she saw Shawn at Sonoma Street.  (P Ex 1, Motion for New Trial Day 1, pgs. 139-140).

242.    Agreed.

243.    Not Agreed.  The cited statement does not indicate that Hullum saw Drumgold at the time of the Tiffany Moore murder.

244.    Agreed.

245.    Agreed.

246.    Agreed.

247.    Not agreed.  The cited transcript does not indicate that Drumgold was aware that

Hullum had seen him on the night of the murder.


## III.  OTHER RELEVANT EVIDENCE

Agreed.


Respectfully submitted,

By His Attorneys,

 /s/ Michael Reilly

Michael W. Reilly, Esq.
Tommasino & Tommasino
Two Center Plaza
Boston, MA   02108
617 723 1720
BBO 415900



/s/ Rosemary Curran Scapicchio

Rosemary Curran Scapicchio, Esq.
Four Longfellow Place
Boston MA 02114
617 263 7400
BBO 558312