UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SHAWN DRUMGOLD,    )    C.A. NO. 04-11193NG
   Plaintiff      )
            )
v            )
            )
TIMOTHY CALLAHAN, ET AL.  )
   Defendant(s)     )
            )

## Plaintiff's Concise Statement of Disputed Material Issues of Fact

### TABLE OF CONTENTS

Tracie Peaks…(1-11)…...……………………………….…1
Mary Alexander…(12-23)………………………………......3
Antonio Anthony…(24-31)…………………………….……6
Vantrell McPherson…(32-40)…………………….…………7
Ricky Evans…(41-54)……………………………………..…9
Olisa Graham…(55-61)…………………………………..…13
City of Boston…(62-84)……………………………………14

<u>Tracie Peaks</u>

1. Walsh and Murphy came to Tracie Peaks' home and shoved photographs in front of her face (P Ex 16, Betty Peaks Deposition, p. 57-58).

2. The photographs shown to Tracie Peaks included a picture of Shawn Drumgold. Walsh put the picture of Shawn Drumgold closest to Ms. Peaks (P Ex 15, Tracie Peaks Affidavit, par. 5).

3. The detectives told Tracie Peaks, "if you don't identify one of these pictures you're

1

going to be arrested" (P Ex 16, Betty Peaks Deposition, p. 78).

4.      Tracie Peaks identified a picture of Shawn Drumgold as somebody she knew from the neighborhood, but did not say that he was one of the persons who had passed her on the night of the murder (P Ex 15, Affidavit of Tracie Peaks, par. 5).

5.      Defendants Walsh and Murphy then prepared a police report of August 26, 1988 falsely claiming that Tracie Peaks had identified Shawn Drumgold as one of the individuals she had seen on the evening of August 19, 1988 coming from the direction of the Edison plant immediately after shots were fired (P Ex 38, Report of August 26, 1988).

6.      Tracie peaks testified that when Walsh and Murphy showed her the photograph of Shawn Drumgold, one of them "pushed the photograph [of Shawn Drumgold] right in front of me" (P Ex 8A, Peaks Deposition Vol. I, p. 150).

7.      As Drumgold's trial approached, detectives told Tracie Peaks' mother that if Tracie did not show up in court and cooperate with them, they would come to school and arrest her and put her in jail (P Ex 15, Tracie Peaks Affidavit, par. 6).

8.      When Tracie went to court to testify at the trial the detectives who were dealing with her told her that she had to point at Shawn Drumgold (P Ex 8, Peaks Deposition Vol. I, p. 160).

9.      Tracie Peaks testified that she never met any District Attorneys in connection with the case (P Ex 8A, Peaks Deposition Vol. I, pgs. 161-162).  Tracie Peaks was referring to Boston Police Detectives and not Assistant District Attorneys when she

testified that prior to testifying at trial she was brought into a room by detectives and told that she had to point at Shawn Drumgold when she went into court to testify (P Ex 8A, Peaks Deposition, Vol. I, pgs. 159-160).

10.     When Tracie Peaks identified Shawn Drumgold at the trial her testimony was untrue and a lie (P Ex 3, Motion for New Trial, Vol. III, p. 142).  She testified untruthfully because "when someone is making you do something, you know you're doing what you're told to do" (W Ex 17E, p. 40).

11.     Tracie Peaks testified that the police had intimidated her when she testified and that she felt guilty about it for years, and that she had a "demon in her soul" because of how she testified (P Ex 8B, Peaks Deposition Vol. II, p. 49).  In summary, she testified that she did not want to point at Shawn Drumgold at his trial, but she had to point at him (P Ex 8A, Peaks Deposition Vol. I, p. 187).

Mary Alexander

12.     Mary Alexander had been having severe headaches at least six months prior to her diagnosis in February of 1989 (P Ex 17, p. 4-5) (RWMF 116).  Mary Alexander's severe headaches and memory loss occurred prior to being diagnosed as having malignant brain cancer (P Ex 2, Motion for New Trial Day 2, p. 48).

13.     On February 9, 1989 Mary Alexander was brought to the Carney Hospital as a result of a motor vehicle accident.  She was diagnosed as having a malignant brain tumor. She was operated on and the tumor was removed (WMF 117).

14. On May 29, 1989 Ms. Alexander was treated at the Carney Hospital. She reported having episodes of amnesia where she was forgetting her son's name and forgetting where she was (P Ex 17, p. 7).

15. On September 24, 1989, ten days before testifying at trial, Mary Alexander was brought to the Carney Hospital as a result of a fall. Her medical records indicate that she suffered from a seizure disorder with a 60% removal of a brain tumor and that she was non-compliant with the Dilantin prescribed for that condition (P Ex 17, pgs. 10-11).

16. Lola Alexander, Mary's mother, told detectives Walsh and Murphy that her daughter was being treated for a malignant cancer of the brain and that Mary was "not up to be tolerated with all this stuff" and that her daughter did not remember "nothing that goes on from day to day so how can she remember who's who from whatever" (P Ex 2, Motion for New Trial, Vol. II, pgs. 12-13).

17. Lola Alexander spoke to the detectives numerous times and asked them "not to harass her, but not to keep coming to my house, bothering my daughter, because my daughter was really sick and she don't remember things and I said that put more pressure on my daughter's head to try to be aggravated with something that went out on the street which she don't know anything about" (P Ex 2, Motion for New Trial, Vol II, p. 15).

18. Lola Alexander told the Boston Police Detectives when they first started questioning her daughter "that my daughter's memory wasn't good because she had malignant

4

cancer at the brain and she didn't need any more pressure on her, she didn't

remember from one day to another or from one incident to the other that happened

during that day" (P Ex 2, Motion for New Trial Vol II, p. 15-16).

19.    On five different occasions Detectives either came to the house and asked Mary

Alexander to look at photographs or asked her to look at them at the police station (P

Ex 2, Motion for New Trial Day 2, p. 9).

20.    When detectives were showing the photographs to Mary Alexander she told the

detectives she did not see anyone who she could identify.  The detectives "kept

saying 'is this him, is this him', kept pointing to the photo album".  Lola Alexander

told the detectives "don't make her say that it's someone and it's not." (P Ex 2,

Motion for New Trial Day 2, p. 10).

21.    Ms. Alexander testified that the police came to her house so many times "they may as

well have had a bed there" (P Ex 19, Lola Alexander Deposition, pgs. 97-98).

22.    Mary Alexander told her mother "Ma, I don't see nobody" in the pictures shown by

Walsh and Murphy (P Ex 19, Lola Alexander Deposition, p. 105).

23.    When Mary Alexander was questioned by the officers her memory as a result of her

brain tumor was so bad that she "couldn't even remember her phone number" (P Ex

19, Lola Alexander Deposition, p. 305).

Antonio Anthony

24.    On August 19, Antonio Anthony went to his girlfriend, Trina Payne's house, on

Sonoma Street with Shawn Drumgold.  They were there for about an hour.  Shawn

Drumgold was downstairs while Anthony was with his girlfriend (W Ex 12C, pgs.

97-98).

25.    Anthony testified that while they were on Sonoma Street, Lisa Graham came over

and said that a little girl had been shot on Humboldt Street.  Shawn Drumgold was

worried that it might have been his sister who was shot, and left (W Ex 12C, pgs.

100-101).

26.    Antonio Anthony told Walsh and Murphy that Shawn Drumgold was with him on

Sonoma Street at the time of the shooting (W Ex 12C, pgs. 105, 135-136).

27.    When the Walsh and Murphy were interrogating Anthony they made it clear to him

that they wanted him to say that Shawn Drumgold "did it", i.e. committed the murder.

 They continued to pressure him.  He felt threatened, scared, and nervous (W Ex 12C,

pgs. 108-109).

28.    Anthony was housed at the Howard Johnson's motor lodge, at the request of Murphy

on September 2 though September 6, 1988 (W Ex 12B).  The Grand Jury presentation

occurred on September 8, 1988 (WMF 17A).  Anthony was put up at the expense of

the Boston Police Department at Howard Johnson's from September 12 through

September 6, 1988 because Detective Paul Murphy considered him to be a "crucial

witness" in the murder of Tiffany Moore (W Ex 12B).  Anthony was provided with

$100.00 in expense money at the request of Defendant Paul Murphy to Deputy

Superintendent Joseph Dunford of the Boston Police Department (W Ex 12B).

29.    Defendant Walsh was the officer in charge of the investigation at the time of the

presentation to the Grand Jury (P Ex 9B, Walsh Deposition, Vol. III, p. 176).  It was

Detective Murphy's responsibility to keep Walsh appraised of developments on the

Tiffany Moore case in 1988 (Id at 182).

30.    It was Walsh's practice to have a conversation with a witness before turning on a tape

for recording a statement (P Ex 5, Motion for New Trial Day 5, p. 177).

31.    Assistant District Attorney Beauschesne prosecuted the original murder case.  He did

not have a copy of Detective Murphy's report concerning payment to Antonio

Anthony in his file and did not provide a copy of the report to Defense Counsel (P Ex

6, Motion for New Trial, Day 6, p. 164).

Vantrell McPherson

32.    Ms. McPherson never heard Shawn Drumgold say, "Come on, we've got to do this"

(P Ex 1, Motion for New Trial, Vol. I, pgs. 171, 183).

33.    The police came to her house right after the murder (Id at 177).

34.    Ms. McPherson was 13 years old at the time of the murder (P Ex 21 A, Deposition of

Vantrell McPherson, Vol. I, p. 154).

35.    The police continued to come to her house.  She told the police that she did not know

who the shooters were. The police continued to come to her house "pretty often" (P Ex 1, Motion for New Trial, p. 162).

36.    McPherson talked to the police approximately 20 times at her house (P Ex 21B, Deposition of Vantrell McPherson, Vol. II, p. 22).

37.    When McPherson went to court to testify, two police officers had her in a dark room and were yelling at her (P Ex 1, Motion for New Trial, Day 1, p. 164).  She told them that she did not know who the shooter was.  They were upset at her.  She began crying (Id at  168).  She just "went blank and was crying" (Id at 166).

38.    In the recorded statement taken by Defendant Callahan on June 10, 1989 there is no mention of the alleged statement by Shawn Drumgold to the effect of "come on, let's do it" (W Ex 26A).

39.    Immediately after the two police officers had her in the room and were yelling at her, Ms. McPherson was brought into court and testified falsely that she had heard Shawn Drumgold make the statement "come on, we've got to do this" (W Ex 26B).

40.    The Commonwealth's case in the original murder trial was tried by Assistant District Attorney Philip Beauschesne with the assistance of Assistant District Attorney Phyllis Broker (P Ex 6, Motion for New Trial, Vol. VI, p. 154-155).  Mr. Beauschesne would speak briefly to witnesses before they testified at the trial.  Ms. Broker primarily dealt with witnesses (Id at 177).  Mr. Beauschesne had no knowledge of any witness being threatened prior to their testimony in the case (Id at 181)

Ricky Evans

41.    After Evans' initial conversation with Callahan about Tiffany Moore, Evans had a
        second conversation where Callahan showed him three photographs of Shawn
        Drumgold, Terrance Taylor (Lug), and Theron Davis (Apple) (P Ex 12A, Evans
        Deposition, Vol. I, p. 259-260).  Evans testified on multiple occasions that Detective
        Murphy was assisting Detective Callahan in dealing with Evans (P Ex 12A, Evans
        Deposition Vol I, pgs. 116, 278-279) (P Ex 12B, Evans Deposition Vol 2, pgs. 295-
        296, 543-544).

42.    Evans pointed to the picture of Apple as the person he had heard was involved in the
        murder. Callahan pushed Apple's picture away and drew Evans' attention to the
        pictures of Drumgold and Taylor and said,  "these are the two, these are the two
        pictures that I'm showing you here, and these are the two people that…".  Evans
        stated that, "it was like he was possessed…he wanted to know about these two people
        here.  He didn't want to know nothing about that person there", referring to Apple (Id
        at 260).

43.    Some time after that, Evans was at home at his brother's house on Trull Street when
        Detective Callahan and another Detective came to his house without prior
        arrangement.  They put him in car and took him to a hotel.  They took him upstairs to
        a room on the fifth floor (P Ex 12A, Evans Deposition, Vol. I, p. 205-206).  The hotel
        they took him to was the Howard Johnson's on Boston Street in Dorchester (Id at
        119).

44.    During the time that Evans stayed at the hotel, on quite a few occasions, he would

call Callahan to tell him that he needed some money and Callahan would bring

money and give it to him.  This occurred on approximately fifty occasions (Id at 230-

233).  Evans was provided with whatever he needed while he was at the hotel by the

Boston Police (Id at 233).

45.    On multiple occasions Evans had people come to visit him at the hotel.  He and his

invited his guests would simply sign the charge slip and the bills would be paid.  He

ate every day at the hotel without paying for it.  He was never asked to make any

payment (Id at 237-243).  Evans testified, "when I needed something, the only thing

I'd do was call him (Callahan) on the phone, anything.  I mean there wasn't anything

that I didn't…that I didn't wish for that I didn't get from them guys, them two guys"

(Id at 268).

46.    Evans testified untruthfully against Shawn Drumgold because,

> "You know I didn't have anything to lose.  I had—I didn't have one thing
> to lose back then.  Listen, if you're gonna put me up—if you're gonna put
> me up in—you're gonna put me up in a nice hotel like this, shower me
> with whatever I want, whatever I need, sure no problem, I'll say what you
> ask me to say"
> Q:  "Did you tell them that?"
> A:  "I told them that"  (P Ex 12A, Evans Deposition Vol. I, pgs. 272-273).

Evans was referring to Detective Callahan.

47.    Evans testified that Callahan and Murphy were "feeding him things to say" in

preparation for his testimony (P Ex 3, Motion for New Trial Day 3, p. 26).  They told

him about Schuyler Street.  They told him about the silver and black guns that

10

Drumgold allegedly was carrying, and they told him about the white car which he

testified he saw in the area (Id at 25-28). Evans testified that although Callahan did

not directly tell him what to say, Callahan gave him the information (P Ex 3, Motion

for New Trial Day III, pgs. 87-89).

48.     Callahan knew it was bad practice for a homicide detective to talk about the details of

a case with another detective in the presence of a witness because of the risk that the

witness will be "parroting back" that information (P Ex 29, Callahan Deposition Vol

I, p. 140)

49.     Evans testified that around the time of his testimony in the Tiffany Moore murder

case he had six unresolved cases. Callahan took him to the Roxbury District court

and Evans waited outside. Callahan came out and told him the cases had all been

taken care of (P Ex 12A, Evans Deposition Vol. I, pgs. 163-167). This occurred

while he was staying at the Howard Johnson's motel (P Ex 12A, Evans Deposition

Vol. I, p. 166). Evans testified that his record in Roxbury District Court was "wiped

clean" when Callahan brought him to the Roxbury District Court (P Ex 3, Motion for

New Trial Day 3, p. 28). When Evans was arrested after June of 1989 and prior to his

involvement with the Motion for New Trial, he was told he had no pending cases (P

Ex 12A, Evans Deposition Vol I, pgs.164-165).

50.     The records of the Roxbury District Court, produce as exhibits at the Motion for New

Trial, indicate that on June 27, 1985, Detective McDonough, Callahan's partner,

removed defaults for Ricky Evans by falsely telling the court that he had been

arrested (P Ex 41).

51.     Officer McDonough testified that he worked with Callahan in connection with the
investigation of the Tiffany Moore case (P Ex 28, McDonough Deposition, pgs. 18-
19) and that "he knew everything I did" (P Ex 28, McDonough Deposition, p. 40) and
that on June 27, 1989 he took Ricky Evans to the Roxbury District Court and
removed defaults which were pending against Evans (P Ex 28, McDonough
Deposition 30-42).

52.     Counsel for Drumgold was never informed that a witness was being put up at a hotel
in connection with the Drumgold case (P Ex 20, Rappaport Deposition Vol. II, pgs.
222-223) or that Ricky Evans had received any promises, rewards or inducements (P
Ex 4, Motion for New Trial, p. 33). Assistant District Attorney Beauschesne did not
recall hearing that Ricky Evans was put up at a hotel (RCMF 13).

53.     McDonough told Callahan that he had cleared up warrants for Evans (P Ex 28,
McDonough Deposition, pgs. 40-41).  Callahan did not tell Beauschesne that Ricky
Evans had outstanding cases cleared up for him (P Ex 29, Callahan Deposition, Day
1, pgs. 46-47, 131-133) (P Ex 6, Motion for New Trial VI, pgs. 152-154).

54.     McDonough claims to have cleaned up the warrants for Ricky Evans at the request of
Assistant District Attorney Paul Connolly (P Ex 28, McDonough Deposition, p. 31).
ADA Connolly denied that he ever asked Detective McDonough to do so (P Ex 30,
Connolly Deposition, pgs. 16-17).  Callahan says McDonough told him that the
warrants were cleared up at the request of Assistant District Attorney Francis

O'Meara (P Ex 29, Callahan Deposition, Vol I, p. 48).  O'Meara denied that he asked

McDonough to clear up Ricky Evans' warrants (P Ex 40, Deposition of O'Meara, p.

39).

Olisa Graham

55.    In June of 1989 Defendant Callahan took a recorded statement from Ms. Graham

where she indicated that she could provide an alibi to Shawn Drumgold (WMF 217-

218, W Ex 29A).

56.    After giving that statement, and just prior to trial, Ms. Graham received a call from

the Boston Detectives who had taken her statement who told her that if she testified

she would be arrested on an open shoplifting warrant as she walked off the stand (P

Ex 13, Affidavit of Olisa Graham, P Ex 1, Motion for New Trial Day 1, p. 23).

57.    The jury can infer that the telephone call was not from the Assistant District Attorney

since the two Assistant District Attorneys handling the case were Philip Beauschesne

and Phyllis Broker.  Phyllis Broker was a female and Ms. Graham made it clear that it

was a man who called her.  Phillip Beauschesne has testified that he had no

knowledge of any witnesses being threatened prior to testimony in this case (PMF

40).

58.    Callahan and McDonough are the officers who took a statement from Olisa Graham

on July 1, 1989 (W Ex 29A).  Olisa Graham told the detectives that she was with

Shawn Drumgold on Sonoma Street at the time the shooting occurred (W Ex 29A, P

Ex 13, Affidavit of Olisa Graham ¶ 12).

59.     After explaining this to the detectives she received a phone call from one of the

detectives informing her that she had an outstanding warrant and she could not testify

or she could be locked up (P Ex 13, Affidavit of Olisa Graham, par. 13).

60.     The call telling her that she would be arrested when she got off the stand because she

had a warrant out came from a detective (P Ex 1, Motion for New Trial Vol I, p. 23).

61.     Olisa had an outstanding warrant for shoplifting at the time she received the

telephone call from the detective (P Ex 1, Motion for New Trial 1, p. 29).  She was

planning to testify before she received that telephone call (P Ex 1, Motion for New

Trial, p. 66)


City of Boston

62.     In 1988 and 1989 there was no formal Boston Police Department system to gauge the

performance of police officers or hold supervisors, patrol officers, or detectives

accountable for their actions and performances (P Ex 31, Report of the Boston Police

Department Management Review Committee Exhibit, p. 7) (P Ex 34A, Daly

Deposition Vol I, pgs. 14-18) (P Ex 35, McNelly Deposition, pgs. 125-128) (P Ex

9A, Walsh Deposition Vol I, pgs. 22-23) (P Ex 32, 30 Day St. Clair Implementation

Report, pgs. 22-24).

63.     There were no written homicide investigative policies known to homicide detectives

in 1988-1989 (P Ex 29, Callahan Deposition, Vol. I, p. 35) (P Ex 36, Report of Doctor Lyman, pgs. 24-25) (P Ex 34A, Daly Deposition, p. 13).

64.     The Boston Police Department did not provide any particularized training for homicide detectives (P Ex 31, Report of the Boston Police Department Management Review Committee, p. 74) (P Ex 34A, Daly Deposition Vol I, p. 13) (P Ex 29, Callahan Deposition Vol I, pgs. 31-32) (P Ex 36, Report of Doctor Lyman, pgs. 24-25).

65.     The only formal outside homicide training provided by the Boston Police Department was a course taught by a Detective Vernon Gerbeth in New York.  The head of the homicide police department knew that his officers believed the course "lacked legitimacy" and that the instructor was not respected by the Detectives because he was viewed as an academic and not a "doer" (P Ex 34A, Daly Deposition Vol III, p. 213).

66.     The in-service training provided by the Boston Police Department was considered a joke.  Many officers stopped going to in-service training and many officers patrolling the streets of Boston did not know the recent changes in the law (P Ex 31, Boston Police Department Management and Review Committee, p. 73).

67.     The City of Boston had no formal monitoring or method of learning of findings by state judges that Boston Police officers had engaged in illegal or unconstitutional behavior in criminal cases (P Ex 37, Roche Deposition, p. 22-23) (P Ex 9A, Walsh Deposition Vol I, pgs. 85-86) (P Ex 34A, Daly Deposition, pgs. 90-94).

68.    Lt. Daly, the head of the homicide unit in 1988 and 1989, was aware of Judge

Volterra's findings suppressing Drumgold's statement (P Ex 34A, Daly Deposition

Vol 3, pgs. 114-115).  In that finding Judge Volterra found that Walsh and Murphy

had taken a statement from Drumgold without complying with Miranda Requirements

(W Ex 24D at 21) and after Drumgold had indicated he was not willing to talk, (Id at

21).  Judge Volterra also found they took a second statement from the Defendant in

violation of his previously asserted right to remain silent (Id at 22) and that they

"purposely created and placed Drumgold in a situation designed to undermine his

decision to remain silent" (Id at 23) and that Walsh and Murphy took a statement

from Drumgold "in violation of a district court Judge's order" (Id at 23).  Judge

Volterra found that Walsh and Murphy "engaged in intentional deceit of a judge of

the District Court Department" (Id at 24) and that Drumgold was removed from the

courthouse under false pretenses and questioned at Area B in a direct contravention

of Judge Martin's order (Id at 24).  Judge Volterra found the conduct to be

"deplorable" and held that "it cannot be countenanced" (Id at 24-25).

69.    Daly decided that he believed Detectives Walsh and Murphy's explanation that "they

were right" and concluded "I still believe that they were right, the judge saw it as

wrong.  I'm not sure I agree with that" (P Ex 34C, Daly Deposition Vol III at 194).

70.    Although Daly learned that Drumgold's statement was suppressed because of the

actions of Walsh and Murphy he never saw the actual findings from Judge Volterra

(P Ex 34B, Daly Deposition Vol II, pgs. 114-115).

71.     No disciplinary action was ever brought against Walsh or Murphy in connection with their taking of Drumgold's statement (P Ex 34B, Daly Deposition Vol II, pgs. 97-98). Supervisors never talked to Walsh or Murphy about the suppression of the Drumgold and Taylor statements (P Ex 9A, Walsh Deposition, pgs. 84-87).

72.     The failure to establish written policies relating to homicide investigations that were consistent with nationally recognized management principles resulted in the wrongful investigation and conviction of Shawn Drumgold and was directly responsible for the failure of the Department to capture the person or persons truly responsible for the crime (P Ex 36, Report of Doctor Lyman, p. 25).

73.     On November 27, 1988 Commissioner Francis Roche of the Boston Police Department issued a special citation recognizing the "diligence, persistence, and investigative skills of Detectives Murphy and Walsh" in connection with Murphy and Walsh's work on the Tiffany Moore Case (P Ex 11). Even after Judge Volterra's opinion, the citation was never rescinded (P Ex 37, Roche Deposition, p. 23).

74.     Callahan was aware that Shawn Drumgold's statement taken by Walsh and Murphy had been suppressed (P Ex 29, Callahan Deposition Vol. I, pgs. 61-62).

75.     By ignoring the obvious inappropriate behaviors and failing to discipline officers for indiscretions, administrators of the Boston Police Department effectively validated and ratified their conduct. Doing so demonstrates that misconduct within the Boston Police Department was deliberate, systematic, and pervasive (P Ex 36, Report of Doctor Lyman, at 26).

76.    The problem with policemen's conduct was pervasive and systematic in the Boston
       Police Department because administrators of the highest rank within the Boston
       Police Department, who were aware of the inappropriate conduct by the Defendant
       officers, failed to prevent it.  Doing so is an egregious violation of professional
       conduct and police practices (P Ex 36, Report of Doctor Lyman at 26-27).

77.    In August of 1988 Walsh and Murphy had been working for over a year without a
       direct supervisor.  Lt. Daly was the supervisor at the level above their direct
       supervisor and was the person that they were reporting to directly (P Ex 9, Walsh
       Deposition Vol I, pgs. 30-31).  Lt. Daly's monitoring of Walsh and Murphy's
       investigation of the Tiffany Moore Case consisted of having two conversations with
       them, the first one on the morning of the murder (P Ex 34A, Daly Deposition Vol I,
       pgs. 20-21) and the second was sometime afterwards.  Daly could not give an
       approximate date (P Ex 34A, Daly Deposition Vol I, p. 29).

78.    The police officers who investigated the Tiffany Moore case were not aware of any
       written policies concerning photo identifications (P Ex 29, Callahan Depositions Vol
       I, pgs. 35-36) (P Ex 9A, Walsh Deposition, p. 65).

79.    Roache delegated the responsibility for outlining any opposition or disagreements
       which he had with the St. Clair Report to Superintendent Ann-Marie Doherty (P Ex
       37, Roache Deposition 32).  After conducting her review, Ann-Marie Doherty never
       produced any criticisms or disagreement with the report (P Ex 42).  A fact finder
       could reasonably infer that Roache had no criticisms or disagreements with the

report.

80.  From 1982 through at least 1994 the City of Boston had a custom and practice of using threats, intimidation, perjured evidence and withholding of exculpatory evidence in order to convict black males of felonies.  The custom or practice was known or should have been known to administrators of the City of the Boston since the details were available in publicly available records and court filings.  Examples of the policy include but are not limited to;

a.  <u>Keith D. Salmon</u>.  The Supreme Judicial Court upheld the dismissal of charges against Mr. Salmon because the Superior Court Judge who had held an evidentiary hearing on that the evidence "suggested that a number of the indictments may indeed have been obtained on the basis of testimony that was false" and that "the information available to the judge was such as to raise a suspicion that certain indictments may have been obtained on the basis of knowingly false testimony.  Detective Linsky (a Boston Police Department Detective) who gave the testimony was also primarily responsible for procuring most of the other indictments.  Substantial doubts were thus raised about the validity of those other indictments" <u>Com v. Salmon</u> 387 Mass. 160, 166 439 N.E.2d 245 (1982).

b.  <u>Albert Lewin</u>.  On August 14, 1989, approximately a month before the beginning of Shawn Drumgold's murder trial, the Supreme Judicial Court found the prosecution of Mr. Lewin "involves perfidious Boston Police Officers whose

perjurous and fraudulent conduct has threatened the Commonwealth's right to try

the defendant for the murder of Detective Sherman C. Griffiths of the Boston

Police Department" <u>Com v. Lewin</u> 405 Mass. 566, 566 542 N.E.2d 275 (1989).

The Supreme Judicial Court found that the Boston Police had engaged in

reprehensible perjurous police conduct (Id at 585) and warned the Boston Police

department that "it is vital that the demonstrated omissions be corrected and that

supervisory authorities insist on the protection of the constitutional and other

rights of all person" (Id at 585-586).

c.  <u>Willie Bennett</u>.  On October 27, 1989 Charles Stewart shot his wife Carol Stuart

on Francis Street in Mission Hill.  The shooting occurred several weeks after

Drumgold had been convicted of murder.  The Boston Police homicide detectives

utilized almost exactly the same tactics and practices in order to attempt to frame

a black male, Willie Bennett, for that murder.  The similarities included;

- coercion and intimidation of civilian witnesses through actual or

  implied threats of arrest and imprisonment (as with Olisa Graham,

  Vantrell McPherson, and Tracie Peaks)

- supplying witnesses with crucial facts previously unknown to them for

  purposes of enhancing the witnesses knowledge (as with Ricky Evans)

- use of abusive, profane, and threatening language to witnesses who are

  interrogated (as with Graham, Peaks and McPherson) (P Ex 43, p. 19).

Plaintiff's Exhibit 43 is a report prepared by then Assistant Ralph Martin pursuant

20

to authority granted to him by law (P Ex 46, Martin Deposition, pgs. 8-16), and is admissible pursuant to Rule 803 8(c).

d. <u>Tarahn Harris</u>.  In 1991 Tarahn Harris was charged with murder.  Judge Borenstein, of the Massachusetts Superior Court, held an evidentiary hearing and dismissed the charges against Mr. Harris.  Judge Borenstein found that Boston Police homicide detectives made reckless and misleading statements to the Grand Jury concerning Harris (P Ex 44, Finding of Fact and Ruling of Law on Defendant's Motion to Dismiss, p. 5), provided false testimony to the Grand Jury (Id p. 6), grossly distorted Harris' statement to the police (Id p. 6), testified falsely "at best knowingly and recklessly, and at worst deceptively in order to mislead the Grand Jury…" (Id p. 8), created evidence to misled the Grand Jury (Id p. 10), engaged in a "egregious fabrication of evidence" (Id p. 12), and multiple other findings of substantial misconduct by Boston homicide Detectives in the investigation of this black male (P Ex 44).

e. <u>Christopher Harding</u>.  On August 18, 1989, several weeks prior to Drumgold's murder trial, Christopher Harding was charged with committing a murder.  Judge Volterra held an evidentiary hearing concerning the prosecution of Mr. Harding. Judge Volterra found that supervisory officers at the Boston Police Department ordered a Boston Police officer not to go to the courthouse as a witness for the Defense despite the fact that he was a necessary witness for the Defense (P Ex 45, Memorandum and Order on Defendant's Motion for New Trial, at 13) which was

an unconstitutional deprivation of the use of compulsory process by the

defendant.  The judge further found that police supervisors, who ordered the

officer not to appear, lied to prosecutors and to the judge to cover up their

misconduct (Id at 17).

81.  John Daly was the Lieutenant in charge of the Boston Homicide Unit from 1985

through August of 1989 (P Ex 34A, Deposition of Daly, p. 9).  He was in charge of

the unit from the time of the Tiffany Moore murder in August of 1988 until the eve of

the trial in September of 1989.

82.  For thirty years Daly kept notes in a journal about his police work (Id at 30).  He

would generally make the notes every two or three days.  In his journal he "generally

kept up-to-date on my life as a policeman" (Id at 30).

83.  He indicated in his journal that he believed the Boston Police Department was having

"serious problems with some of the more recently hired minority police officers.  We

have been getting the bottom of the barrel in our search for minorities and it is

beginning to show" (Ex 47, December 24, 1985).

84.  In his journal Daly "says that Walsh and Murphy were "incredibly scrupulous in their

observation of the defendant's rights" (P Ex 47, May 17, 1989) and says, despite the

explicit ruling by Judge Volterra, that Walsh and Murphy did not know of the Judge's

order not to interrogate Drumgold (P Ex 47, May 19, 1989).  Daly's overall opinion

of the actions with Judge Volterra found to be egregious misconduct was that Walsh

and Murphy "were offered as a sacrifice to the black community and transferred from

22

Homicide.  It did not matter that they actually did a very good job in this case" (P Ex 48, p. 251).  Daly wrote that Walsh and Murphy were sacrificed to the black community "because he believed it" (P Ex 34B, Daly Deposition, p. 101).

Respectfully submitted,

By His Attorneys,

 /s/ Michael Reilly

Michael W. Reilly, Esq.
Tommasino & Tommasino
Two Center Plaza
Boston, MA   02108
617 723 1720
BBO 415900

/s/ Rosemary Curran Scapicchio

Rosemary Curran Scapicchio, Esq.
Four Longfellow Place
Boston MA 02114
617 263 7400
BBO 558312