### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

———————————————————————

|  |  |  |
|---|---|---|
| **SHAWN DRUMGOLD** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **C.A. NO.: 04-11193NG** |
| | ) | |
| **TIMOTHY CALLAHAN, FRANCIS M.** | ) | |
| **ROACHE, PAUL MURPHY, RICHARD** | ) | |
| **WALSH, and THE CITY OF BOSTON,** | ) | |
| **Defendants.** | ) | |

———————————————————————

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
### RICHARD WALSH'S MOTION TO STRIKE PLAINTIFF'S EXHIBITS
### AND CONCISE STATEMENT OF DISPUTED MATERIAL ISSUES OF FACT

Defendant Richard Walsh ("Walsh"), respectfully submits this Memorandum of Law in

Support of his Motion to Strike Plaintiff Shawn Drumgold's ("Plaintiff"), Exhibits, and Concise

Statement of Disputed Material Issues of Fact (hereinafter "Plaintiff's Statement"), filed in

opposition to Walsh's motion for summary judgment.  Walsh further requests that the Court

deem the Statements in the Consolidated Statement of Undisputed Material Facts ("Consol.

Statement"), <u>admitted</u> for purposes of Walsh's motion for summary judgment.

As grounds, Walsh states that Plaintiff's Exhibits and Plaintiff's Statement do not comply

with the requirements of Fed. R. Civ. P. 56 and Local Rule 56.1 for a party opposing summary

judgment.  Indeed, throughout his Statement, Plaintiff sets forth self-serving allegations which

are not supported by any competent and/or admissible evidence.  As such, it is appropriate for

the court to strike Plaintiff's Exhibits and Plaintiff's Statement as indicated below and to deem

admitted Walsh's statements of fact.[1]  As further grounds, Walsh states the following:

**A.     Plaintiff's Exhibits 1-7, 13, 15, 18, 22, 25 and 27 should be stricken from the summary judgment record on Walsh's motion for summary judgment.**

---

[1]     *See Stonkus v. City of Brockton Sch'l District*, 322 F.3d 97, 102 (1st Cir. 2003); *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 12 (1st Cir. 2003); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49-51 (1st Cir. 1990); *Rodio v. R.J. Reynolds Tobacco Co.*, 416 F. Supp. 2d 224 (D. Mass. 2006).

1.  <u>Plaintiff's Exhibit 25:  The Boston Globe newspaper article should be stricken.</u>

In support of his Opposition to Walsh's motion for summary judgment, Plaintiff has submitted as Exhibit 25, an article published in the Boston Globe.  This article must be stricken because it is inadmissible hearsay and may not be considered on summary judgment.[2]

2.  <u>Plaintiff's Exhibits 7, 13, 15, 18, 22, and 27:  The affidavits prepared in support of Plaintiff's motion for a new trial should be stricken.</u>

In support of his Opposition to Walsh's motion for summary judgment, Plaintiff has submitted as Plaintiff's Exhibits 7, 13, 15, 18, 22, and 27, six (6) affidavits which were prepared in support of his motion for a new trial.  These affidavits, however, should be stricken.

First, the affidavits should be stricken because they are not reliable and/or are insufficient to create a triable issue of fact.[3]

Second, the affidavits should be stricken because they are not admissible and because they do not contain evidence that will be presented in an admissible form at trial. *See Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001); *see also* Fed. R. Civ. P. Rule 56(e).  This is because a nonmoving party cannot "create issues of fact" by submitting and relying on affidavits which have been contradicted by later deposition testimony. *Darnell v. Target Stores*, 16 F.3d 174, 177

---

[2]      *See Fitzgerald v. Town of Kingston*, 13 F. Supp. 2d 119, 123 (D. Mass. 1998); *Articulate Systems, Inc. v. Apple Computer, Inc.*, 53 F. Supp. 2d 62, 75 (D. Mass. 1999); *Scosche Indus., Inc. v. Visor Gear Inc.*, 121 F.3d 675, 680-681 (Fed.Cir. 1997); *Finn v. Consolidated Rail Corp.*, 782 F.2d 13, 16 (1st Cir. 1986)). *See also Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993) (noting that newspaper articles contain hearsay within hearsay, are inadmissible at trial to establish the truth of the reported facts, and cannot be considered in deciding whether a nonmoving party has raised a genuine issue of material fact).

[3]      *See Santos v. Murdock*, 243 F.3d 681 (2d Cir. 2001) (affirming summary judgment against plaintiff's § 1983 claims, holding that affidavit of non-party witness which contradicted his probable cause hearing testimony was insufficient to create factual issue precluding summary judgment); *Bader v. Warden, N.H.*, No. 02-CV-508-JD, 2005 WL 1528761 (D. N.H. June 29, 2005) (noting that "[r]ecantations of trial testimony are viewed with skepticism and suspicion" and "[r]ecantations that are inconsistent with other trial testimony, when the original testimony was consistent are particularly unreliable") (citing *Hysler v. Florida*, 315 U.S. 411, 413 (1942), *U.S. v. Rouse*, 410 F.3d 1005, 1009 (8th Cir. 2005), *Mendiola v. Schomig*, 224 F.3d 589, 593 (7th Cir. 2000), *U.S. v. DiPaolo*, 835 F.2d 46, 48 (2d Cir. 1987), and *Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir. 2005).

(7th Cir. 1994).[4]  When such inconsistencies occur, depositions inherently carry an increased level of reliability because they are adversarial in nature, providing the opportunity for direct and cross-examination. *See id.* at 176.  Further, while an affidavit which is inconsistent with later sworn testimony *may* be admissible at trial, (1) it is only admissible as a prior inconsistent statement for impeachment purposes, and (2) then only if it was made at "a trial, hearing or other proceeding, or in a deposition." *Santos v. Murdock*, 243 F.3d at 684; Fed. R. Evid. 801(d)(1)(A).

Here, the affidavits should be stricken because they are not admissible, and do not contain evidence which could be presented in an admissible form, at trial in the instant action. This is because: (1) the witnesses who signed the affidavits have been deposed in this case; (2) during the depositions the witnesses were questioned at length about the statements made in the affidavits; and (3) the witnesses provided testimony which contradicted many of the statements in the affidavits.  Moreover, here, just as in *Santos*, *supra*, each of the purported affiants met with Plaintiff's attorney and/or signed an affidavit prepared by Plaintiff's attorney.  As such, as in *Santos*, the circumstances under which the purported affiants signed the affidavits in this case were not made at "a trial, hearing or other proceeding, or in a deposition" as is required by Rule 801(d)(1)(A).  Thus, Plaintiff's Exhibits 7, 13, 15, 18, 22 and 27 should be stricken.

3.     Plaintiff's Exhibits 1-6:  The transcript segments from the hearing on Plaintiff's motion for a new trial should be stricken.

In support of his Opposition to Walsh's motion for summary judgment, Plaintiff has submitted as Exhibits 1 through 6, segments of the transcript from the hearing on Plaintiff's motion for a new trial.  These exhibits should be stricken.

---

[4]     *See also Torres v. E.I. DuPont De Nemours & Co.*, 219 F.3d 12, 20 (1st Cir. 2000) (quoting *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994)); *John Beaudette, Inc. v. Sentry Ins. A. Mut. Co.*, 94 F. Supp. 2d 77, 89 n.4 (D. Mass. 1999) (quoting *Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 706 (3d Cir. 1988)).

First, the testimony cited was prompted and "fed" to the witnesses by questioning counsel – Plaintiff's current counsel, Rosemary Scapicchio, Esq.  Indeed, during the new trial motion hearing, Attorney Scapicchio was reprimanded by the court for her tactics in not following the law or rules of evidence.  For example, during Lola Alexander's testimony, the Court addressed Attorney Scapicchio stating:

> I object to your leading questions to these witnesses which are on significant issues in the case.  They can testify in their own words without you suggesting the answers to them because this is very important, and you also have a habit of summarizing testimony they haven't given.  So I want to make very clear, since I am the fact finder, that the testimony is, indeed, the witness's and not being suggested to them by you. . . . I just want to make sure the testimony they give is their own.  Obviously we all have a vested interest in that and I think your questions are leading and suggestive of the answers and I really want to hear from the witness. **Consol. Ex.** ("Consol. Ex.") **22(B)** at 13-14.

While questioning Olisa Graham, the Court again addressed Attorney Scapicchio stating:

> I'm going to caution you about several things.  You are going to have to follow the rules of evidence.  The rules of evidence require that testimony be elicited upon the competent and personal knowledge of the witness.  You are asking leading questions.  You have not identified how she knew it was a police officer on the telephone call and I will not be able to consider any of this testimony unless it comes in competent form.  So I would just caution you that we have to follow the law, the rules of evidence.  You're getting to some very important material.  **Consol. Ex. 29(B)** at 23-26.

Second, Exhibits 1-6 should be stricken because Plaintiff misrepresents and takes out of context the witnesses' complete testimony. *See infra* Section C.

Finally, Exhibits 1-6 should be stricken because Walsh did not have the opportunity to cross examine the witnesses at Plaintiff new trial motion hearing, and thus, Walsh would be prejudiced if Plaintiff were permitted to rely on such testimony, particularly as there is no indication that the witnesses will be unavailable at trial. *See Biggers v. Southern Railway Co.*, 820 F.Supp. 1409, 145 (N.D. Ga. 1993) (citing Fed. R. Civ. P. 56(c) and Fed. R. Evid. 801(b)(1).

**B.**      **Paragraphs ¶¶ 2, 4, 7, 10, 12, 16-20, 30-33, 35, 37, 47, 49, 52-53, 56, 58-59 and 60-61 of Plaintiff's Statement should be stricken to the extent that the allegations therein**

**are supported by the affidavits and/or testimony in support of Plaintiff's motion for a new trial.**

In support of the various allegations set forth in ¶¶ 2, 4, 7, 56 and 58-59 of Plaintiff's Statement, Plaintiff cites to the affidavits prepared in support of his motion for a new trial.  In support of the various allegations set forth ¶¶ 10, 12, 16-20, 30-33, 35, 37, 47, 49, 52, 53, 56 and 60-61 of Plaintiff's Statement, Plaintiff cites to various segments of the transcript of the hearing on Plaintiff's motion for a new trial.  These allegations should be stricken as, for the reasons discussed *supra* Section A(2) and (3), they are without sufficient support on summary judgment.

**C.     Paragraphs 1-14, 16-27, 30-39 and 41-84 of Plaintiff's Statement should be stricken from the summary judgment record on Walsh's motion for summary judgment.**

In opposing Walsh's motion for summary judgment, Plaintiff "cannot content himself with unsupported allegations; rather, he must set forth specific facts, in suitable evidentiary form, in order to establish the existence of a genuine issue for trial." *See Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell, a Partnership v. Medfit International, Inc.*, 982 F.2d 686, 689 (1st Cir. 1993) (quoting *Rivera-Muritent v. Agosto-Alicea*, 959 F.2d 349, 352 (1st Cir. 1992)); *see also In re Hale*, 289 B.R. at 792 ("Creating a genuine issue of material fact requires hard proof rather than spongy rhetoric.") (citing *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)).  Here, as more specifically set forth below, ¶¶ 1-14, 16-27, 30-39 and 41-84 of Plaintiff's Statement should be stricken as the allegations contained therein are not in an "evidentiary form" sufficient to create a triable issue of fact. *See Dale v. H.B. Smith Co., Inc.*, 910 F. Supp. 14, 18 (D. Mass. 1995) (noting that the nonmoving party's burden is to establish the existence of a genuine issue of material fact, that disputed facts must be material, and that a "material" fact is one that will affect the outcome of the case).

In general, Plaintiff's Statement contains inaccuracies and misrepresentations of the evidence and record.  Often, in an effort to create an issue of material fact where none exists,

5

Plaintiff (1) fails to provide record support for his allegations; (2) distorts the record by citing only to self-serving portions of a witness's testimony in a manner that is clearly out of context and inaccurate in light of the witness's complete testimony; (3) omits testimony and/or transcript pages which would place a witness's testimony in its proper context; and (4) sets forth self-serving opinions, legal conclusions and/or legal arguments which are not supported by the cited references and which are not proper as "statements of material facts."  Walsh also notes that many of the allegations in Plaintiff's Statement are immaterial and irrelevant in deciding Walsh's motion for summary judgment.

More specifically, Walsh moves to strike the following statements for the reasons below:

1.    **Tracie Peaks ¶¶ 1-11[5]**

Paragraph 1:  Citing to Betty's deposition testimony, Plaintiff states: "Walsh and Murphy came to Tracie Peaks' home and shoved photographs in front of her face."  **This is a blatant misrepresentation of the record.**  The testimony cited is as follow:

Q:    What do you recall when the police officers came to your home at 72 Homestead Street?
A:    The one time that they came that I remember, I don't remember which one it was, what his name was or what he looked like.  All I remember is him bringing photos of some black suspects and shoving them in our faces on my dining room table.  **Plaintiff's Ex.** 16 at 57-58.

Thus, contrary to Plaintiff's statement, Betty does <u>not</u> identify Walsh and Murphy by name.

Paragraph 2:  Plaintiff cites only to the 2003 affidavit in support of his motion for a new trial. *See supra* Section A(2).

---

[5]    As a preliminary matter, Walsh notes that when the testimony of Betty and Tracie Peaks is viewed in its entirety, it is clear that their negative characterizations with regards to underlying criminal investigation and proceedings is based on their general desire not to have been involved in any way with the investigation, prosecution or defense relative to the Moore homicide despite Tracie's civic duty to report any information she had which could be relevant.  That Tracie and Betty did not want to be involved does <u>not</u> change Tracie's observation of Plaintiff coming from the direction of the Edison building after hearing gunshots – an observation which she reported to the police on August 26, 1988 and which she testified as to before the grand jury on September 8, 1988 and at trial on October 3, 1989. *See* Consol. Statement ¶¶ 19, 73-74, 78-81, 83-92 and supporting exhibits.

Paragraph 3:  Plaintiff misrepresents Betty's testimony in that Betty only "vaguely" remembers such a statement being made.  Moreover, Betty's testimony regarding the photo array is entirely irrelevant and insufficient to create a triable issue of fact as Tracie unequivocally testified before the grand jury on September 8, 1988 and at trial on October 3, 1989 that she observed Plaintiff coming from the direction of the Edison plant after hearing gunshots and that she told police about this observation prior to viewing the photo array. *See* **Consol. Exs. 17(A)** at 125-128; **17(B)** at 202-209, 211-216.  In fact, Attorney Rappaport, Plaintiff's defense counsel, specifically questioned Tracie to ensure that she had told police that she observed Plaintiff before she saw the photo array. **Consol. Ex. 17(B)** at 209, lns. 14-24.

Paragraph 4:  Plaintiff cites only to the 2003 affidavit in support of his motion for a new trial in support of his statement that: "Tracie Peaks identified a picture of Shawn Drumgold as somebody she knew from the neighborhood, but did not say that he was one of the persons who had passed her on the night of the murder." *See supra* Section A(2).  However, Tracie unequivocally testified before the grand jury on September 8, 1988 and at trial on October 3, 1989 that she observed Plaintiff coming from the direction of the Edison plant after hearing gunshots and that she told police about this observation prior to viewing the photo array. *See* **Consol. Exs. 17(A)** at 125-128; **17(B)** at 202-209, 211-216.  Indeed, Attorney Rappaport, Plaintiff's defense counsel, specifically questioned Tracie to ensure that she had told police that she observed Plaintiff before she saw the photo array. **Consol. Ex. 17(B)** at 209, lns. 14-24.

Paragraph 5:  Walsh moves to strike the self-serving term "falsely claiming" from ¶ 5. The police report cited does not support Plaintiff's self-serving allegation that said report was false.  Moreover, Tracie unequivocally testified before the grand jury and at trial that she observed Plaintiff coming from the direction of the Edison plant after hearing gunshots and that

she told police about this observation prior to viewing the photo array. *See* **Consol. Exs. 17(A)** at 125-128; **17(B)** at 202-209, 211-216.

Paragraph 6:   In response to questioning by Plaintiff's defense counsel at the criminal trial, Tracie unequivocally testified that prior to being show the photo array, she had already identified Plaintiff as one of the males that she observed coming from the direction of the Edison plant after hearing gunshots. *See* **Consol. Ex. 17(E)** at 209.

Paragraph 7:   Citing solely to Tracie's 2003 affidavit in support of his motion for a new trial, Plaintiff states: "As Drumgold's trial approached, detectives told Tracie Peaks' mother that if Tracie did not show up in court and cooperate with them, they would come to school and arrest her and put her in jail."   First, this must be stricken for the reasons set forth *supra* Section A(2) and because Tracie's affidavit statement as to what her mother was told is inadmissible hearsay. Second, there is no evidence that Walsh made any such statements to Tracie's mother.   Rather, Plaintiff's investigator, Keller, testified that Betty unequivocally stated that Assistant District Attorney Phil Beauchesne told her that if her daughter (Tracie) did not cooperate, she (Tracie) would be taken out of school and locked up. **Consol. Exs. 19(B)** at 341-342, 346-347, 356.  Also of significance, Betty testified that she did not remember police telling her that Tracie would be arrested if she (Tracie) did not go to court:

Q:     If any member of the Boston Police Department had told you that your daughter
         would be arrested for not going to court, you would remember that, would you
         not?
A:     Possibly.
Q:     Do you remember that happening?
A:     Vaguely remember it.
Q:     What do you remember vaguely?
A:     Police were coming bringing these pictures to my house.
Q:     … At that time was Tracie told that she would be arrested if she didn't go to
         court?
A:     **I don't remember that.  Consol. Ex.** 18 at 128-130 (emphasis added).

Paragraphs 8, 9:  **These "statements" are blatant falsehoods, are <u>not</u> supported by the testimony cited and are complete misrepresentations of Tracie's testimony.**  First, contrary to Plaintiff's statements, Tracie <u>never</u> testified that Walsh, "the detectives who were dealing with her" or "Boston Police Detectives" told her that she had to point to Plaintiff when testifying at his criminal trial. *See* **Plaintiff's Ex. 8(A)** at 160-162, *cited in* Plaintiff's Statement ¶¶ 8, 9.  In fact, Tracie testified that she did not know who told her to point at Plaintiff during the criminal trial. **Consol. Exs. 17(D)** at 176, 186-187; **17(E)** at 77-78.  Second, Plaintiff states that Tracie "testified that she never met any District Attorneys in connection with the case." **Tracie did <u>not</u> so testify.**  Rather, Tracie testified that: (i) She does not remember, but does not think that, she met Assistant District Attorney Phil Beauchesne; (ii) She does not believe that he ever went to her house to interview her; and (iii) She does not believe that anyone from the DA's office or law enforcement ever took her to meet ADA Beauchesne at his office. *See* **Plaintiff's Ex. 8(A) 160-162**, *cited in* Plaintiff's Statement ¶¶ 8, 9.

Paragraph 10:  First, citing solely to a response by Tracie to Attorney Scapichio's leading question, Plaintiff states: "When Tracie Peaks identified Shawn Drumgold at the trial her testimony was untrue and a lie."  This statement should be stricken for the reasons set forth *supra* Section A(3).  Further, while Walsh did not have the opportunity to cross examine Tracie as to this testimony, he notes that prior to being asked this highly suggestive question, Tracie testified that no one told her what to say and no one did anything or said anything about what she should say when she was asked questions at Plaintiff's criminal trial. **Consol. Ex. 17(C)** at 122-123. Walsh also notes that Tracie did not remember her testimony at Plaintiff's criminal trial that she selected Plaintiff's photo as being one of the two men she observed walking by her house after hearing gunshots. *Id.* at 124.  Additionally, in conjunction with this civil action, Tracie has testified that she testified to the best of her ability before the grand jury and at trial and that no

one threatened or intimidated her or suggested to her what she should say when called as a witness. **Consol. Exs. 17(D)** at 160-161; **17(E)** at 41-42, 45, 55-56.

Second, Plaintiff states: "She testified untruthfully because 'when someone is making you do something, you know you're doing what you're told to do.'" **This is a complete misrepresentation of Tracie's deposition testimony, which is accurately:**

> Q:   Now when you testified at the grand jury, you testified truthfully, did you not?
> A:   When someone is making you do something, you know, you're doing what you're told to do.

**Consol. Ex. 17(E)** at 40.  This does <u>not</u> support Plaintiff's statement.  Rather, Tracie's testimony is merely indicative of her strong desire not to have to be involved in any way with the investigation of, or prosecution relative to, the Moore homicide.  It does <u>not</u> change or otherwise undermine Tracie's trial testimony that she observed Plaintiff coming from the Edison building after she heard gunshots on the night of the Moore homicide.

Paragraph 11:  Plaintiff misrepresents Tracie's deposition testimony.  Tracie testified:

> Q:   Why was a demon over your soul?
> A:   Because I know about the whole situation, about the police came to my house without me calling them.  They intimidated me, they intimidated by family, **you know, telling me I'm going to jail**. ..."  **Plaintiff's Ex. 8(B)** at 49 (emphasis added).

First, Plaintiff's statement that police intimidated Tracie when she testified at trial is a blatant misrepresentation of Tracie's testimony.  Rather, Tracie testified that police intimidated her by saying that she would go to jail.  And, as already addressed above, there is <u>no</u> evidence that Walsh made any such statement to Tracie or her mother. *See supra* (discussing ¶¶ 7-10).  Second, there is <u>no</u> there any evidence that Walsh told Tracie that she had to point at Plaintiff at trial. *Id.*  Finally, Tracie's testimony is merely indicative of her desire not to be involved with the investigation or prosecution of the Moore homicide.  That Tracie did not call the police to report her observation does <u>not</u> change the fact that she observed Plaintiff coming from the direction of

the Edison plant after hearing gunshots.  Indeed, it appears Plaintiff's defense counsel and Tracie both felt that Tracie's testimony was exculpatory because she testified that Plaintiff was not wearing clothing that the shooters were observed to be wearing. **Consol. Exs. 17(B)** at 206-209; **14(C)** at 37, 68-69; **14(D)** 180-182.

### 2.    <u>Mary Alexander ¶¶ 12-14, 16-23</u>

<u>Paragraph 12</u>:  First, Plaintiff misrepresents the medical record cited which only indicate that Mary had a history of headaches during the past 6 months and that she would have intermittent "mild" headaches occurring once or twice a week – there is no reference to the frequency or severity of the headaches. **Plaintiff's Ex. 17** at 4-5.  Further, Mary's medical records from February 1989 indicate only a 2 to 3 month history of severe/diffuse headaches. **Consol. Ex. 21(A)** at 1, 3, 4, 6.

Second, Plaintiff cites solely to the 2003 new trial motion hearing testimony of Mary's mother, Lola, in support of the allegation that Mary experienced memory loss prior to being diagnosed with a brain tumor. *See supra* Section A(3).  However, there is absolutely <u>no</u> support in Mary's medical records that she had memory loss prior to being diagnosed with a malignant brain tumor in February 1989.  Indeed, Mary's February 1989 medical records note that Mary only reported blurred vision, that Mary denied any other neurological deficits, and that Mary was in excellent health until her seizure in February 1989. **Consol. Ex. 21(A)** at 1, 3.  Moreover, in conjunction with this action, Lola has testified that she does not recall Mary having memory problems before her first seizure and does not know if Mary had memory problems at any time. *See* **Consol. Ex. 22** at 60, 184-185, 210-212, 178-180.

<u>Paragraph 13</u>:  Plaintiff's statement that Mary was brought into Carney hospital on February 9, 1989 as a result of a motor vehicle accident is wrong, plain and simple.  Rather, Mary had a seizure on or about February 3, 1989; she was admitted into Carney Hospital on

February 4, 1989; she was diagnosed with a malignant brain tumor; surgery was performed on February 10, 1989; and Mary was discharged on February 20, 1989.

Paragraph 14:  **Plaintiff blatantly misrepresents the medical record cited.**  First, there is no legible date.  Second, while Plaintiff suggests that Mary had numerous instances of forgetfulness, the record cited indicates only a single episode of amnesia where Mary forgot her son's name and could not remember where she was. **Plaintiff's Exhibit 17** at 7.

Paragraphs 16, 17, 18:  First, Plaintiff cites only to Lola's unreliable 2003 new trial motion testimony in support of the statements in ¶¶ 16-18. *See supra* Section A(3).  Walsh again notes that the Court called Plaintiff's counsel, Attorney Scapicchio, to sidebar regarding her leading questions and suggesting answers to Lola – specifically with respect to the questioning and testimony which Plaintiff cites to in support of ¶¶ 16-18. *See* **Plaintiff's Ex. 2** at 13-14.

Second, to any extent that Lola's 2003 testimony was her own, it is clearly faulty in light Mary's medical records.  Indeed, there is only one 1989 record which indicates that Mary had a single episode of amnesia where she forgot her son's name.  There are no other records dated prior Plaintiff's criminal trial that indicate any other memory problems and even the aforementioned record is without a legible month.

Third, Lola's 2003 testimony is clearly inaccurate in light of Lola's own testimony. Indeed, Plaintiff omits Lola's testimony that: (1) Mary remembered the circumstances surrounding the Moore homicide; (2) Mary did not have any health problems other than headaches; and (3) Lola does not recall Mary having any memory problems before her first seizure and does not know if Mary had memory problems at any time. **Consol. Ex. 22(A)** at 60, 184-185, 193-194, 210-214.

Fourth, Plaintiff cites to Lola's testimony that she told "them when they first started questioning [Mary] that [Mary's] memory wasn't good because she had malignant cancer at the

brain." **Plaintiff's Ex. 2** at 15.  Assuming that Lola is referring to the first time that Walsh and

Murphy interviewed Mary in August 1988, this testimony is clearly unreliable as there would

have been no basis for Lola to tell anyone that Mary had brain cancer prior to February 1989

when Mary had a seizure and was first diagnosed as having a brain tumor. **Consol. Ex. 21(A)**.

Paragraphs 19, 20:  First, Plaintiff cites only to Lola's unreliable 2003 new trial motion

testimony in support of the statements in ¶¶ 19-20. *See supra* Section A(3).  Walsh again notes

that the Court called Plaintiff's counsel, Attorney Scapicchio, to sidebar regarding her leading

questions and suggesting answers to Lola – specifically with respect to the questioning and

testimony which Plaintiff cites to in support of ¶¶ 19-20. **Plaintiff's Ex. 2** at 13-14.

Second, to any extent that Lola's testimony was her own, Plaintiff omits Lola's testimony

that she has no knowledge regarding whether Mary was pressured or threatened by police in

connection with the Moore murder investigation.  Third, Lola's testimony as to the number of

times that Mary was shown photographs and as to the conduct of the persons showing Mary the

photographs is unreliable as it is entirely inconsistent with Mary's detailed testimony at

Plaintiff's criminal trial as to (i) her observations on the night of the Moore homicide, (ii) police

conduct in showing her the photographs, and (iii) her identification of Plaintiff. *See* **Consol. Ex.**

**21(B)**.  Indeed, Mary, who was 22 years old and a mother at the time of Plaintiff's criminal trial,

testified that police only showed her photos on one occasion, within about a week of the

shooting, and that they told her to be 100% honest:

> Q:  (by ADA Beauchesne) When is the first time that you saw a picture of the light-skinned man who was tucking the gun in his belt?
> A:  The first night that the police came over to our house.
> Q:  … Were you shown a group of photos.
> A:  Yes, sir.
> Q:  And can you give us an idea of how many [photos] there were?  More than ten?
> A:  Yes, it was a lot of pictures.
> Q:  And when you looked at them, did you pick out a picture of the man that you saw putting a gun in his belt?

A:      Not really, sir. **The guy told us to be one hundred percent honest** and that's what I'm trying to be. I looked at the picture. I went back to the same picture more than three times, you know, but I told the police officer I wanted to be honest, …."

Q:      At sometime did you have another opportunity to see a picture of the man that you saw putting the gun in his belt?

A:      Yes, sir.

Q:      Would you tell us who showed you the picture and when and where that was?

A:      It was in front of our house. A guy came out – I forget his name, but he was a – I don't know if he was a police officer or not. I thought he was. I think it was that man right there [– identifying Plaintiff's defense counsel, Attorney Rappaport]. **Consol. Ex. 21(B)** at 160-161 (emphasis added).

Q:      (by Attorney Rappaport) Now, during the period of time from the day that we came to your house, about a week after the incident, until the time that you spoke to me a week ago, did anybody show you – did any police show you any photographs of Shawn Drumgold?

A:      No, sir.

Q:      Is it fair to say, though, is it not, that you had seen Shawn Drumgold's picture independent of any police showing?

A:      Everybody did, in the paper.

Q:      It's fair to say, ma'am, that you saw Shawn Drumgold on T.V. as well?

A:      Yes. **Consol. Ex. 21(B)** at 178-182. *See also id.* at 185-186.

Q:      [by Attorney Rappaport] Now, when I came to speak to you last week, that was the very next time anybody either showed you Mr. Drumgold or showed you a photograph of Mr. Drumgold, right?

A:      Right. **Consol. Ex. 21(B)** at 187.

Of significance, when addressing the Court at sidebar regarding admission of a news article with Plaintiff's photograph, Attorney Rappaport pointed out to the court that:

> [Mary] has stated that she has seen no photos between the time that the officers came to her house and last week when I showed her a photograph of Shawn Drumgold wearing the same clothes depicted in that picture. **I'm certainly not saying, and I was very careful to say that there was no police suggestion in this particular case,** but human nature being what it is, it's my theory that this is why she was able to identify the photo. **Consol. Ex. 21(B)** at 184 (discussing theory that Mary identified Plaintiff because she had seen his photograph numerous times in on T.V. and in newspapers) (emphasis added).

Paragraphs 21-23: In support of the allegations set forth in ¶¶ 21-23, Plaintiff cites only to Lola's deposition testimony. *See supra* Section A(3). First, these allegations are insufficient to create an issue of material fact to defeat summary judgment in light of evidence with respect

to Mary's health and Mary's testimony at Plaintiff's criminal trial and for the reasons already discussed in detail above. *See supra* Section C(2) (discussing ¶¶ 12-14 and 16-20).

Second, in ¶ 21, Plaintiff misrepresents Lola's complete testimony as Lola testified that she has no knowledge regarding whether Mary was pressured or threatened by police in connection with the Moore murder investigation. **Consol. Ex. 22** at 193-194, 213-214.

Third, in ¶ 23, Plaintiff states: "When Mary Alexander was questioned by the officers her memory as a result of her brain tumor was so bad that she couldn't even remember her phone number." **This is a blatant falsehood and is not supported by the testimony cited.  Rather, Lola testified:**

> Q:    (by Attorney Scapicchio) Do you remember – when the police officers were asking Mary questions about the Tiffany Moore murder, do you remember what her physical condition was back then?
> A:    **I – I can't remember**.
> Q:    Okay.  But you remember that she had some memory problems, is that right?
> A:    Yes.
> Q:    Okay.  Can you give us some examples of her memory problems?
> A:    Sometimes she couldn't even remember her phone number or she can put her purse down and don't remember where she put it, that quick or whatever, you know.
>       …
> Q:    … Were there any occasions where her memory got significantly worse?
> A:    **I don't remember.  I can't say.**
>       …
> Q:    … While that was happening, did you try to protect Mary from further investigation by the police?
> A:    No, I didn't.  **Plaintiff's Ex. 19** at 305-306.

Further, although Lola has testified that Mary had memory problems, she did not, and has not provided any competent testimony indicating that the memory issues occurred prior to trial. *See supra* Section C(2) (discussing ¶¶ 12, 14, 16-18).

### 3.    <u>Antonio Anthony ¶¶ 24-27, 30-31</u>

<u>Paragraphs 24-27</u>:  First, Plaintiff cites only to Anthony's unreliable 2003 new trial motion testimony in support of the allegations in ¶¶ 24-27.  Walsh notes that he did not have the

opportunity to cross examine Anthony at the new trial motion hearing, that the defendants have been unable to depose Anthony in conjunction with this case and that there is no reason to believe that Anthony will appear to testify at trial. *See supra* Section A(3).

Second, it is of significance that, on the advice of counsel, Anthony pleaded the Fifth Amendment and did not testify at Plaintiff's criminal trial. *See* **Consol. Ex. 12(D)**. Very importantly, Attorney Mahaney, who represented Anthony's interests with respect to pleading the Fifth Amendment at the criminal trial, stated to the Court:

> Your Honor, this was a statement not under oath at the time and he was not represented by counsel. **Now, I've had considerable conversations with Mr. Antonio Anthony regarding the nature of the statements and where and when they were made.** Your Honor, in conversations with him, I feel at this time that the statements made by Mr. Anthony could incriminate himself in this case. … Therefore your Honor, after instructing him of his options, he informs me that he wishes not to testify. **Consol. Ex. 12(D)** at 11.

Consequently, Plaintiff cannot seriously expect to rely on Anthony's new trial motion testimony during which Anthony claimed that he had no knowledge regarding the recorded statement and that had he known about it, he would have come forward. *See* **Consol. Ex. 12(C)** at 112-113.

Third, at the 2003 new trial hearing, Anthony unequivocally testified that he told police the truth and that Walsh never made any personal threats against Anthony or his family. *Id.* at 106-107, 134-135, 137-138, 142. It is highly significant that Anthony's attempt to recant his recorded statement did not occur until <u>after</u> Anthony listened to the recorded statement at the new trial motion hearing. Notably, Anthony testified that he did not recall telling officers what Plaintiff was wearing, or that he left Plaintiff's company at some point, on the night of the homicide. *Id.* at 110-112. Moreover, when asked "But assume for the sake of my questioning that there is a taped statement that exists, even if you didn't see it. How do you explain –" Anthony could only explain, "If it's a taped statement, it ain't me talking. It ain't me saying that. It ain't me. It's somebody else." **Consol. Ex. 12(C)** at 113. Anthony goes so far to claim that

police fabricated the recorded statement and that he never told police the things that were in the recorded statement. **Consol. Ex. 12(C)** at 113-114.   It is also of significance that in his recorded statement, Anthony stated that on 2 occasions Taylor told him to tell police that he was with Plaintiff and Taylor on Sonoma Street at the time of the shooting. **Consol. Ex. 12(A)** at 6-7, 12.

Fourth, Plaintiff misrepresents Anthony's complete new trial motion testimony. **Contrary to the allegation in ¶ 26, Anthony does <u>not</u> testify that he was with Plaintiff "at the time of the shooting."** *See* **Consol. Ex. 12(C)** at 105, 135-136, *cited in* Plaintiff's Statement ¶26.   Rather, Anthony merely testified: "We was together [that night] – I don't remember the exact hours that we was together but we was together for a long time, you know." *Id.* at 105-106.

<u>Paragraph 30</u>:  In alleging that "[i]t was Walsh's practice to have a conversation with a witness before turning on a tape for a recorded statement," Plaintiff completely misrepresents Walsh's testimony.  Contrary to Plaintiff's statement, Walsh testified:

> A:       … We would sit down and speak to them about what we were going to do.
> Q:       (by Attorney Scapicchio) Okay.  But would you get details of the events before you actually turned on the tape recorder?
> A:        I may have had a short conversation with them before we turned the tape recorder on.
> Q:       Okay.  And at some point you and your partner made the determination that the tape recorder should be turned on, is that right?
> A:       We had the same procedure on all homicide cases when it came to using the tape recorder, ma'am.
> Q:       And what was that procedure, Detective?
> A:       We would, if it was a witness, we would play – we would tape the interview, let them know that the interview is being taped, tape the interview, at the end of the tape, prior to shutting the tape off, we would instruct them that we were going to start the tape again and that we were going to give them an opportunity to listen to what they had just said to myself and my partner.  Then we would replay the tape and come back on the tape and ask them if they would want to add or change anything that they had said to us and if they did, we would add it.  If they didn't, we would end the tape.  We also time stamped it or we would say the time prior to and usually at the end of the tape.  **Plaintiff's Ex. 5** at 177-178.

<u>Paragraph 31</u>:  **Plaintiff completely misrepresents the testimony cited.**  Assistant District Attorney Beauchesne did <u>not</u> testify that he did not have a copy of Murphy's report

regarding Anthony.  Rather, ADA Beauchesne testified that *he did not recall* if he received a copy of Murphy's report concerning Anthony and that *he did not recall* if he provided it to defense counsel. **Plaintiff's Ex. 6** at 164.

### 4.    Vantrell McPherson ¶¶ 32-39

Paragraphs 32, 38, 39:  Plaintiff is clearly trying to confuse the Court and create an issue of fact where none exists in stating that "McPherson never heard Shawn Drumgold say, 'Come on, we've got to do this,'" in ¶¶ 32, 38 and 39 (emphasis added).  Paragraphs 32, 38 and 39 must be stricken because at the criminal trial, McPherson unequivocally stated that she observed Taylor say to Shawn Drumgold (Plaintiff), "Come on, Shawn, you know we got to do this." **Consol. Ex. 26(B)** at 65, 95-96.  Thus, it is entirely irrelevant that Plaintiff did not say this.

Paragraph 39:  In addition to the foregoing, ¶ 39 must be stricken because the cited Exhibit does not support Plaintiff's self-serving and conclusory allegations.  At a minimum, the self-serving term "falsely" should be stricken from ¶ 39 because the testimony cited does not support Plaintiff's contention that the testimony was false. *See* **Consol. Ex. 26(B).**  Moreover, there is absolutely no evidence that Walsh had Tracie in a room and yelled at her at the time of Plaintiff's trial. *See infra* Section C(4) (discussing ¶ 37, 39).

Paragraphs 33-37:  Paragraphs ¶¶ 33-37 should be stricken because they do not create any issue of material fact to defeat summary judgment as to Walsh.  This is evidenced by Tracie's testimony that: (1) she testified truthfully at Plaintiff's criminal trial; (2) no one forced or threatened her regarding her testimony; (3) no one told her what to say during her testimony; (4) McPherson does not know and has never heard of Walsh; and (5) McPherson only recalls one time that she was yelled at and she does not know whether the "fat guy" that yelled at her was a police officer or some other person. **Consol. Ex. 26(C)** at 39, 136, 138-140, 149, 157-158, 170.

Further, Plaintiff's statement in ¶¶ 35 and 37 that McPherson told police that she did not know who the shooters were is entirely irrelevant because no one ever suggested that she knew who the shooters were. This, however, does not change her trial testimony as to her observations of Plaintiff on the day of the murder and of Taylor telling Plaintiff, "Come on, Shawn, you know we got to do this."

Additionally, in stating that the police came to "her house" "pretty often" and "approximately 20 times" in ¶¶ 35 and 36, Plaintiff misrepresents McPherson's complete testimony. Contrary to Plaintiff's statements, McPherson testified that officers came to talk to her "pretty often," meaning "a couple of times" and/or "probably once a month." *See* **Plaintiff's Ex. 1** at 162. McPherson also testified:

> Q:    Do you remember how many times you spoke to the police before you testified at trial?
> A:    No.
> Q:    Was it more than once?
> A:    I don't know, probably more than 20. …."
> Q:    I'm sorry?
> A:    I don't know.
> Q:    You said probably –
>        …
> Q:    Where were you when you spoke to the police?
> A:    I don't know, probably in the house. Who knows. **Plaintiff's Ex. 21(B)** at 22.

Paragraphs 37, 39: First, Plaintiff cites to McPherson's 2003 new trial motion testimony. *See supra* Section A(3). Second, Plaintiff misrepresents McPherson's complete testimony. Contrary to Plaintiff's statements, McPherson only recalls one time that she was yelled at and she does not know whether the "fat guy" that yelled at her was a police officer or some other person. *See* **Consol. Ex. 26(C)** at 136, 138-140, 149, 157-158, 170. Regardless, there is absolutely no evidence that Walsh was the person who yelled at her. Further, McPherson did <u>not</u> state that she "went blank and was crying," as Plaintiff alleges. Rather, McPherson testified that she did not remember the conversation she had with police because: "That's a blank to me. I

don't remember none of that." *See* **Plaintiff's Exhibit 1** at 166. *See also supra* Section C(4) (addressing ¶¶ 32, 38, 39 and ¶¶ 33-37).

**5.    Ricky Evans ¶¶ 41-54**

Plaintiff's statements in ¶¶ 41 through 54 should be stricken from the record on Walsh's motion for summary judgment because the uncontroverted evidence is that: (i) Walsh never had any contact or communications with Evans, that June 1989 was the first time that Evans spoke to anyone regarding the Moore homicide; (ii) Walsh did not arrange for Evans to stay at a hotel or to be provided with money for food and expenses; and (iii) Walsh was never provided with any information regarding Evans. *See* **Consol. Statement** at ¶¶ 203-212 and supporting exhibits. Further, Plaintiff makes no statements relative to Walsh in ¶¶ 41-54.

**6.    Olisa Graham ¶¶ 55-61**

Plaintiff's statements in ¶¶ 55-61 should be stricken from the record on Walsh's motion for summary judgment because there is no evidence that Walsh had any communications or contact with, or knowledge regarding, Graham. *See* **Consol. Statement** at ¶¶ 213-234 and supporting exhibits.   In fact, in his Opposition to Walsh's motion for summary judgment, Plaintiff concedes that there is no evidence that Walsh engaged in any conduct with respect to Graham which rises to a constitutional magnitude. *See* Opposition at 28.  Further, Plaintiff makes no statements relative to Walsh in ¶¶ 55-61.

**7.    City of Boston ¶¶ 62-84**

Paragraphs 62 through 84 of Plaintiff's Statement should be stricken from the record on Walsh's motion for summary judgment because the allegations contained therein relate solely to Plaintiff's claims against the City of Boston, are entirely irrelevant to Walsh's motion, and do not create any triable issue of fact as to Plaintiff's claims against Walsh.

WHEREFORE, for the above stated reasons, the Defendant, Richard Walsh, respectfully requests that his Motion to Strike the Plaintiff, Shawn Drumgold's, Exhibits and Concise Statement of Disputed Material Issues of Fact be GRANTED.

Defendant,
**RICHARD WALSH,**
By his attorney,

DATED: December 26, 2007                    /s/ Hugh R. Curran
                                            Hugh R. Curran (BBO# 552623)
                                            Bonner, Kiernan, Trebach & Crociata, LLP
                                            200 Portland Street, Suite 400
                                            Boston, Massachusetts 02114
                                            (617) 426-3900
                                            (617) 426-0380 fax

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 26th day of December, 2007, I electronically filed with within document with the Clerk of the United States District Court for the District of Massachusetts, using the CM/ECF System.  The following participants have received notice electronically:

**For Plaintiff Shawn Drumgold,**
Michael W. Reilly, Esq.
Tommassino & Tommasino
Two Center Plaza
Boston, MA 02108-1904

**For Plaintiff Shawn Drumgold,**
Rosemary Curran Scapicchio, Esq.
Four Longfellow Place, Suite 3703
Boston, MA 02114

**For Defendant, City of Boston**
Susan Weise, Esq.
Chief of Litigation
Assistant Corporate Counsel
City of Boston/Law Department
City Hall, Room 615
Boston, MA 02201

**For Defendants City of Boston and**
**Francis M. Roache,**
John P. Roache, Esq.
Hogan, Roache, & Malone
66 Long Wharf
Boston, MA 02110

**For Defendant Timothy Callahan,**
MaryJo Harris, Esq.
Morgan, Brown & Joy
200 State Street, 11th Floor
Boston, MA 02109

**For Defendant Paul Murphy,**
William White, Esq.
One Faneuil Hall Marketplace, 3rd Floor
Boston, MA 02109

                                            /s/ Hugh R. Curran