# EXHIBIT 1

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                              Superior Court
Nos. 071882-83                           Volterra, J
     073128

COMMONWEALTH OF MASSACHUSETTS

vs.

SHAWN DRUMGOLD and TERRANCE TAYLOR

APPEARANCES:

  Philip T. Beauchesne, Esq., Assistant District
      Attorney, on behalf of the Commonwealth.

  Steven J. Rappaport, Esq., on behalf of the Defendant
      Shawn Drumgold.

  Robert George, Esq., on behalf of the Defendant,
      Terrance Taylor.

                         Suffolk Superior Courthouse
                         Boston, Massachusetts
                         Thursday, March 2, 1989

                    MOTION TO DISMISS

                        VOLUME I

                    Pages 1 to 143

                    ANN M. DONNELLY
                 OFFICIAL COURT REPORTER

I-2

I N D E X

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Gordon A. Martin, Jr. | 4 | 15 | | |
| Leslie E. Harris | 24 | 31 | | |
| Leslie Walker | 38 | 45 | | |
| Richard Walsh | 50 | 88 | 96 | |
| Paul Hadley | 102 | 107 | | |
| Paul J. Murphy | 110 | 113 | | |
| Shawn Drumgold | 121 | 132 | | |

E X H I B I T S

| No. | | In Evidence |
|---|---|---|
| 1 | District Court tapes (3) | 14 |
| 2 | Incident report | 65 |
| 3 | Advice of rights form | 68 |
| 4 | Transcript of tape recorded statement by Defendant | 72 |
| 5 | Booking sheet | 83 |
| 6 | Incident report and booking sheet (8/28/88) | 89 |
| 7 | Affidavit and search warrant | 102 |

(Chalk 1 - diagram -- page 33)

I-53

1    A    Yes, sir.

2    Q    Then you did what?

3    A    Then I would have went to the Roxbury District

4         Court, and went to the lower court District

5         Attorney's office, and speak to the supervisor,

6         informing them why I was there, and having him

7         initial the complaint.

8         And I would bring the complaint down to the Clerk's

9         office to have the warrant issued.

10   Q    Okay.

11        The warrant is issued after the complaint is issued.

12        Is that it?

13   A    Well, the warrant and the complaint would be the

14        same.

15   Q    In this particular case what happened on the 29th

16        of August?

17   A    On that morning, after signing into the court, I

18        went to the District Attorney's office, and spoke

19        to Assistant District Attorney Canavan, and

20        informed him that I had cleared this process

21        through the Suffolk County District Attorney's

22        office; and that I was there to seek an arrest

23        warrant for murder, relative to the Tiffany Moore

24        case, against one Shawn Drumgold.

25        He informed me at that time that Drumgold was

I-54

1    in fact in court under another name, or he had

2    been arrested under another name.

3  Q  Mr. Canavan was aware already at that time that

4    Mr. Drumgold was in court?  Even though he was

5    in court under an alias, it was Mr. Drumgold

6    that was in court?

7    Correct?

8  A  He was aware -- yes, he was aware of it.

9  Q  So that Mr. Drumgold's real identity was -- at

10   least Mr. Canavan, the Assistant District

11   Attorney, knew Mr. Drumgold's real identity when

12   you arrived to speak with him that morning?

13 A  Only by looking down at a piece of paper that

14   was on his desk.

15 Q  You came in; you said: Look, I want to get -- I

16   need you to initial this application for a

17   complaint in a murder case against Shawn

18   Drumgold?

19 A  Yes, sir.

20 Q  Or words to that effect?

21 A  Yes, sir.

22 Q  And he at thatpoint said to you: Shawn Drumgold?

23   I think Shawn Drumgold is already locked up in

24   this building, or words to that effect?

25 A  Yes, sir.

1   Q   And he looked at a piece of paper, and he had

2        apparently seen from an alias, that is a Shawn

3        Drumgold known alias, that you had arrested --

4        or somebody had been arrested under a known

5        alias?

6   A   Yes, sir.

7   Q   What did you do at that point?  Did you go down

8        to the Clerk's office?

9   A   I would have went down and started the paper

10       work, dropped the application off at the Clerk's

11       office, and started that paperwork.

12   Q   Is that what you did in this case?

13   A   Yes, sir.

14   Q   Did you in fact receive the warrant or the complaint

15       that morning?

16   A   Yes, sir.

17   Q   And is it fair to say that you received that

18       warrant or complaint had issued on Mr. Drumgold

19       charging him with murder -- I believe that was

20       Warrant No.  8486?

21   A   Yes, sir.

22   Q   And that had occurred by sometime around 10:00 a.m.

23       Correct?

24   A   I'm not exactly sure of the time.  Somewhere around

25       10:00 a.m. about.

1   Q   That's a fair approximation?

2   A   Somewhere around that time.  Yes, sir.

3   Q   And, sir, were you present for the conversation

4       that occurred between -- by the way, did you

5       request of Mr. Canavan or anybody else an oppor-

6       tunity to do further identification procedures

7       of Mr. Drumgold?

8   A   The only -- I informed him that I was going to be

9       in the courtroom when they called Mr. Drumgold's

10      first case, the first call of the list.  I was in

11      the courtroom then, and I physically wanted to

12      observe him.

13  Q   Now, you observed him.  Was an attorney not appointed

14      for him at that time?

15  A   I believe -- that's when they first called the list --

16      there was not an attorney appointed.  One would

17      have been appointed for him at that time.

18  Q   That particular time -- I mean, you've been in court

19      hundreds, if not thousands of times. Correct?

20  A   Yes, sir.

21  Q   And that's the standard procedure, is it not?

22  A   Yes, sir.

23  Q   Now, after that first case was called, and you

24      had an opportunity to observe Mr. Drumgold -- well,

25      as of that time you had already applied for the

I-57

1    complaint?

2    A    Yes, sir.

3    Q    Had you already received the complaint?

4    A    I'm not sure if I had physically picked it up from

5         the Clerk's office.

6    Q    But you had picked up the complaint some time around

7         10:00 -- approximately 10:00?

8    A    Yes, sir.

9    Q    Were you present in the courtroom -- well, let

10        me ask you this.

11        Did you request of either the Court, or the DA,

12        or anybody in the courthouse that day -- did you

13        request custody of Mr. Drumgold so you could do

14        further identification procedures?

15   A    I requested custody of him so I could speak to

16        him.

17   Q    You requested -- who did you make that request to?

18   A    To one of the court officers.

19   Q    One of the court officers?

20   A    Yes, sir.

21   Q    You didn't speak to Mr. Canavan about that?

22   A    I may have told Mr. Canavan that I was going to

23        attempt to talk to him.

24   Q    Did you make any attempt to find out who his

25        lawyer was at that particular time?

I-58

1    A    No, sir.

2    Q    You say he had already been brought into the court-

3         room for the first call.  Correct?

4    A    Yes, sir.

5    Q    And based upon your experience you knew that counsel

6         is -- at least in your experience -- appointed for

7         Defendants at the first call of the list, when

8         they're brought into court.

9         Correct?

10   A    Yes, sir.  For the case that he was being arraigned

11        on.  Yes, sir.

12   Q    But you -- that's right.

13        You knew that counsel had been at least appointed

14        on that, or assumed that counsel had been appointed

15        on that?

16   A    I would have assumed that counsel would have been

17        appointed for him on that.

18   Q    Now, were you present in the courtroom during the

19        discussion between Mr. Celester and Judge Martin?

20   A    No, sir.

21   Q    Were you aware of any discussion between Judge

22        Martin and Deputy Celester?

23   A    I was aware that Deputy Celester was in the build-

24        ing, and that we were going to request -- we were

25        requesting him to be rebooked at Area B, and have --

1    to continue the booking process.

2    Q   What was the purpose of having him rebooked?

3    A   Seeing this was a felony case, a major felony case,

4    different photographs are taken -- standup photo-

5    graphs.  It's not just a standard type photograph

6    of a mug shot.  There's other photographs that are

7    added.  They're standup, full length photographs,

8    left and right.

9    Q   So that was the purpose of wanting to have him

10    rebooked, so that you could take further photo-

11    graphs of him?

12    A   Yes, sir.

13    Q   You already had his fingerprints.  Correct?

14    A   Yes, sir. They already had his fingerprints.  I

15    don't know if they took felony fingerprints of

16    the Defendant or not.  Sometimes they take major

17    fingerprints -- major case prints.

18    Q   I don't understand, sir.  Perhaps you could just

19    explain.  When you say major case prints, aren't

20    -- when you take a person's fingerprints don't

21    you take prints of each finger?

22    A   Some agencies -- I'm not sure if our own agency

23    takes a major case print, which would be a whole

24    palm print.

25    Q   Let me ask you this, sir?

I-60

1      In your investigation of this case that led up

2      to gathering what you believed was enough

3      evidence to secure a complaint in a murder case,

4      hadn't you checked through your identification

5      bureau or various procedures to see whether or

6      not you had these prints?

7   A  I'm sure that I -- we had a copy of his----

8   Q  You checked to see if you had his prints?

9   A  Yes, sir.

10  Q  And were they major prints or not major prints?

11  A  The only thing I would have seen or obtained would

12     have been an eight by eight, which we call an

13     eight by eight record card of the Defendant.  And

14     it would only have two fingerprints on it. And I

15     don't obtain the whole set of fingerprints.

16  Q  I understand.

17     So you're saying as of this time you're seeking the

18     murder complaint you personally had not secured

19     the whole set of prints?

20  A  No, sir.

21  Q  But they may have been on record in the Boston

22     Police Department identification bureau, none-

23     theless.

24     Correct?

25  A  I would believe they would be on file.

I-61

1   Q   And you had this belief at that time.  Correct?

2   A   Yes, sir.

3   Q   So it's fair to say that the reason -- the further

4        identification procedures that you felt were

5        necessary as of the 29th of August were full photo-

6        graphs as opposed to just mug shots?

7   A   Yes, sir.

8   Q   Now, you worked pretty closely on this case with

9        Detective Murphy?

10   A   Yes, sir.

11   Q   And do you and Detective Murphy often work together

12        as a team on cases?

13   A   Yes, sir.

14   Q   Do you know if Detective Murphy was in the building

15        that day?

16   A   At----

17   Q   At the Roxbury Court that day?

18   A   At some point in time Detective Murphy arrived at

19        Roxbury Court.  Yes, sir.

20   Q   Do you know if he was in the courthouse when

21        Detective Celester was there?

22   A   Yes, sir.

23   Q   Do you know if he was in the courtroom with Detective

24        Celester?

25   A   I don't know that, sir.

I-62

1 Q Well, let me ask you this.

2   At a certain point during the course of that day

3   you actually took Mr. Drumgold into custody.

4   Correct?

5 A Yes, sir.

6 Q And you brought him over to Area B.  Correct?

7 A Yes, sir.

8 Q As of that point in time -- at that point in time

9   did you know whether or not Murphy had been in

10   the courtroom with Celester?

11 A I wasn't physically in the courtroom.  I know that

12   they were in the courtroom.   Yes, sir.

13 Q So you weren't there, but to the best of your know-

14   ledge, at the time that you took Mr. Drumgold

15   physically into custy and brought him over to

16   Area B, you were apprised of the fact that Detective

17   Murphy had been in the courtroom with Detective

18   Celester?

19 A It was -- I was under the impression that at some

20   point in time Detective Murphy had been ben in

21   the courtroom.

22   Yes, sir.

23 Q I'm asking: Was it your impression that he had been

24   there with Detective Celester?

25 A I can't say that.  I don't know that.  I know they

1    were both in -- probably both in the courtroom.

2 Q  Let me ask you this, sir.

3    Did you have any discussions -- approximately what

4    time did you take physical custody of Mr. Drumgold?

5 A  It would have to be in the afternoon.  I'm not

6    exactly quite sure of the physical time.  Possibly

7    some time after 1:00 o'clock.

8 Q  Okay.

9    Well, was it right around the time that he was

10    rebooked?

11 A  Yes, sir.

12 Q  Let me show you this document, sir, which purports

13    to be a booking sheet (showing document to witness),

14    dated August 29, 1988.

15    And take a look at the time listed up there on the

16    right-hand corner.  Would that refresh your recollec-

17    tion as to the approximate time that you took Mr.

18    Drumgold into custody?

19 A  We would have took him a couple of minutes before

20    that, walked him through the building, upstairs to

21    the second floor -- approximately five or ten

22    minutes prior to this.

23 Q  So would it be fair to say that it was approximately

24    1:00 p.m. that you took physical custody of Mr.

25    Drumgold?

I-64

1    A    Yes, sir.

2    Q    However, sir, it is also fair to say you had served

3         him with the warrant prior thereto?

4         Or, did you not serve him with the warrant?

5    A    (No response.)

6    Q    In other words, do you remember what time you served

7         him with the warrant?

8    A    Physically served him with the warrant?

9    Q    Yes?

10    A    I don't believe I ever physically served him with

11         the warrant.  I spoke to him relative to my inten-

12         tions of the warrant. The warrant hadn't been

13         issued yet.  At some point in time it would have

14         caught up to his court papers.

15    Q    Sir, I want you to take a look at this Boston Police

16         incident report (showing document to witness) with

17         a date of occurrence 8/19/88?

18    A    (Pause.)

19    Q    Sir, just take a look at this document, if you

20         would, and read it over to yourself?

21    A    (Pause.)

22         Yes, sir.

23    Q    Sir, is it fair to say that this document I just

24         showed you is a Boston Police incident report

25         which describes the arrest of Shawn Drumgold on

I-65

1      August 29, 1988?

2   A   I wouldn't say that it describes the arrest.  No,

3       sir.

4   Q   Okay.

5       You have written on this report -- type of incident

6       -- correct?  Or typed -- this is your report, is

7       it not?

8   A   Yes, sir.

9           MR. RAPPAPORT:  May this be marked for

10  identification?

11          MR. BEAUCHESNE:  No objection.

12          THE COURT: Do you want to make it an

13  exhibit?

14          MR. RAPPAPORT:  Yes, I would like to make

15  it an exhibit.

16          THE COURT: Any objection to making it an

17  exhibit?

18          MR. BEAUCHESNE:  No objection, your Honor.

19          THE COURT:  It may be marked.

20          (Document was marked Exhibit

21           No. 2, and was received in

22           evidence.)

23          THE COURT:  That's a 1-1 report?  Is that

24  what it is?

25          THE WITNESS:  Yes, sir. There should be

I-66

1    a Supplementary Report to an initial incident report.

2        BY MR. RAPPAPORT:

3    Q    Now, sir, viewing this report, there is a particular

4        space for the type of incident, is there not?

5    A    Yes, sir.

6    Q    Do you have a copy of this report with you, by

7        the way?

8    A    I don't have a copy of that specific report.  No,

9        sir.

10   Q    And on this particular report, sir, you typed in:

11       Homicide; and then, in parentheses, thereafter:

12       Arrest.

13       Is that not correct?

14   A    Yes, sir.

15   Q    And thereafter you wrote the time of the occurrence.

16       Correct?  Or there's a space for the time of the

17       occurrence, is there not (showing document to

18       witness)?

19   A    Yes, sir.

20   Q    And the time of the occurrence relating to the

21       arrest on the homicide -- it says 10:00 a.m., does

22       it not?

23   A    Ye, sir.

24   Q    And, sir, this relates, does it not, to the arrest

25       of Shawn Drumgold on August 29, 1988?

I-67

1   A    That incident report does relate to that.  Yes,
2        sir.
3   Q    And you wrote this incident report out, did you
4        not?
5   A    Yes, sir.
6   Q    And did you you not state -- at least type out at
7        the bottom of the report -- that at about 10:00
8        a.m. this date -- referring to 8/29/88 --
9        Detectives Paul Murphy and Richard Walsh of the
10       Homicide Unit arrested No. 25 -- which refers to
11       Shawn Drumgold at Roxbury District Court on
12       Warrant No. 8802CR8486, issued by Roxbury
13       District Court for the murder of Tiffany Moore,
14       which took place on August 19, 1988, at 9:24 p.m.
15       at Homestead Street and Humboldt Ave.  He was
16       taken to Area B, where he was advised of his rights
17       and booked.
18       Is that not what you put on this report?
19  A    Yes, sir.  That's what I put in the report.
20  Q    Now, after you got to Area B you not only advised
21       him of his rights, sir, you in fact showed him or
22       explained to him an interrogation advice of rights
23       form, did you not?
24  A    Yes, sir.
25  Q    And I show you this form, sir (showing document to

I-68

1    witness), and I ask you whether or not you recog-

2    nize that?

3    A    Yes, I do.

4    Q    And, sir, was that not the advice of rights form

5    which you presented to Mr. Drumgold some time

6    between 1:15 p.m. and 1:30 p.m. on August 29,

7    1988?

8    A    Yes, sir.

9    Q    And you had him read that.  Correct?

10   A    Yes, sir.

11   Q    And he signed it.  Correct?

12   A    Yes, sir.

13              MR. RAPPAPORT:  Your Honor, may this be

14   marked, please?

15              MR. BEAUCHESNE:    No objection.

16              THE COURT: Exhibit No. 3.

17              (Document was marked Exhibit

18               No. 3, and was received in

19               evidence.)

20              THE COURT:  That was at 1:15, was it?

21              MR. RAPPAPORT:  Some time between

22   1:15 and 1:30.

23              THE COURT:  We'll take a short recess at

24   this time.

25              (Brief recess taken.)

I-69

1     MR. RAPPAPORT:  Your Honor, with the

2 Court's permission, Mr. Drumgold is trying to do some

3 reading and writing.  Would it be possible to take his

4 cuffs off?

5     THE COURT:  I'll talk to the court

6 officers.

7     (Bench conference off the record.)

8  BY MR. RAPPAPORT:

9 Q The booking report that you had reviewed before

10   showed that Mr. Drumgold was rebooked at

11   1:15.

12   Correct?

13 A No, sir.  Our booking sheet -- yes, sir.  That

14   would have been 1:15.  Yes, sir.

15 Q And it was some time shortly thereafter that Mr.

16   Drumgold signed that particular rights form.

17   Correct?

18 A Yes, sir.

19 Q Is it fair to say, sir, that you conducted an

20   interview of Mr. Drumgold some time around 1:30

21   on August 29, 1988?

22 A Yes, sir.

23 Q And that interview was conducted at the same time

24   or immediately after he had signed that rights

25   form.

1    Correct?

2  A   Yes, sir.

3  Q   And, sir, I show you -- I want you to take a look

4     at this document (showing document to witness),

5     if you would, and tell me if you recognize that

6     document?

7  A   Yes, I do.

8  Q   And what do you recognize that document to be?

9  A   This would have been a typed-up version of a

10     taped statement that we took at Area B, on the

11     second floor.

12  Q   Now, in addition to that typed-up statement you made

13     a tape recording, did you not?

14  A   Yes, sir.

15  Q   And you made certain copies of that tape recording?

16  A   I myself, no, sir.

17  Q   Do you know if another officer working on your team

18     in this investigation made up other copies of

19     that?

20  A   I'm not sure if he made up other copies.  He may

21     have.

22          THE COURT:  In other words, through

23  discovery you got a tape.

24          Right?

25          MR. RAPPAPORT:   That's correct.

I-71

1          THE COURT: Do you agree that it's

2     authentic?

3          MR. BEAUCHESNE:  Well, I haven't listened

4     to the one that he wants to offer, but if he represents

5     to me that it's the same one that I gave him, I'll accept

6     his representation.

7          MR. RAPPAPORT:  It's the one I got.

8          THE COURT:  It's what?

9          MR. RAPPAPORT:  It's Copy Number 5, the

10    one that I received.

11         THE COURT:  That's the one that you

12    received pursuant to discovery.

13              Right?

14         MR. RAPPAPORT:  That's correct.

15         MR. BEAUCHESNE:  And it hasn't been changed

16    since he got it.  Is that the representation?

17         MR. RAPPAPORT:  It hasn't been changed

18    since I got it.  I listened to it, Judge, and it

19    sounded like----

20         THE COURT:  He doesn't look like Rosemary

21    Woods to me.

22         MR. BEAUCHESNE:  No, he doesn't to me,

23    either, your Honor; but I just like to have these things

24    on the record.

25              THE COURT: Do you want to mark it?  Is

I-72

1      that the idea?

2                      MR. RAPPAPORT:  I tell you what, Judge.

3      First I'd like to have the----

4                      THE COURT: Any objection to the transcrip-

5      tion?

6                      MR. BEAUCHESNE:  No, your Honor.  There

7      isn't.

8                      THE COURT: Exhibit No. 4.

9                      (Document was marked Exhibit

10                     No. 4, and was received in

11                     evidence.)

12                     MR. RAPPAPORT:  Your Honor, I'll listen

13     to this again, before I have it marked.

14                     THE COURT:  Okay.

15         BY MR. RAPPAPORT:

16     Q     Now, sir, to the best of your knowledge is there

17           any other rights form that was signed by Mr.

18           Drumgold at any other time on August 29, 1988,

19           other than the one that was just marked?

20     A     I believe he would have signed the booking sheet,

21           which also has a brief statement of his rights.

22     Q     And that would have been at approximately 1:15.

23           Correct?

24     A     Yes, sir.

25     Q     But as far as a specific form, interrogation form

I-73

1    or anything of that nature, there's no other

2    document that you're aware of, other than the copy

3    I had shown you and had marked?

4    A    Other than him verbally having the rights----

5    Q    Sir, my question to you right now is: Is there

6    any other rights form in existence, other than

7    the one that I just had marked, that you're

8    aware of?

9    A    Yes, sir.

10   Q    There is another rights form?

11   A    The beginning of the tape recording conversations.

12   Q    While you began the tape recording you showed Mr.

13   Drumgold that particular rights form.   Correct?

14   A    Yes, sir.

15   Q    And you had him read that. Correct?

16   A    Yes, sir.

17   Q    And perhaps it was read to him as well.   Correct?

18   A    Yes, sir.

19   Q    And you then asked him if he would sign that form.

20   Correct?

21   A    Yes, sir.

22   Q    And that all comes out in the interview, does it

23   not?

24   A    Yes, sir.

25   Q    What I'm saying is you had him sign a waiver of

I-74

1      rights form of sorts.

2      Correct?

3   A  Yes, sir.

4   Q  And other than that waiver of rights form, which

5      he executed at the beginning of his statement to

6      you at approximately 1:30 on August 29, 1988, is

7      there any other waiver of rights form that was

8      executed by Mr. Drumgold, that you're aware

9      of?

10  A  No other written waiver of rights form.  No,

11     sir.

12  Q  Okay.

13     Other than that tape recording of Mr. Drumgold

14     at 1:30, is there another taped waiver of rights?

15  A  No, sir.

16  Q  Do you have any document, tape, any physical item

17     which memorializes a waiver of rights by Mr.

18     Drumgold at any time other than at approximately

19     1:30 on August 29, 1988?

20  A  I am not sure.  I'm trying to see if I had written

21     another report prior to that.

22  Q  But as far as you know right now you have

23     nothing else?

24  A  No, sir.

25  Q  There is no other taped statement certainly?

1    A    No, sir.

2    Q    There's no other written statement?

3    A    I'm not sure, sir.

4    Q    You're saying that somewhere there may be a written

5         statement by Mr. Drumgold, other than the statement

6         he gave at 1:30?

7    A    I may have done another report, sir.  I'm not sure.

8    Q    Sir, I'm asking you: First, is there any statement

9         -- written statement by Mr. Drumgold any time other

10        than approximately 1:30 on August 29th?

11   A    Written?

12   Q    Written?

13   A    No, sir.

14   Q    And you're saying now that -- I assume, sir, you're

15        saying that you spoke to Mr. Drumgold some time

16        prior to 1:30?

17   A    Yes, sir.

18   Q    Which he was still at the Roxbury District Court?

19   A    Yes, sir.

20   Q    And that you questioned him at that time?

21   A    I had a brief conversation with him.  Yes, sir.

22   Q    You had a brief conversation with him at that time

23        concerning the events of August 19th, or at least

24        events pertaining to him, on August 19th, 1988?

25   A    It would have been -- the conversation I would have

I-76

1    had would have been why I was appearing in the court,

2    informing him that I was in the court seeking a

3    complaint against him.

4  Q  Okay.

5    But other than informing him of that, are there

6    any other statements that you're aware of that

7    we haven't discussed yet, meaning a statement

8    informing him at that time, some time, that you

9    were going to seek a complaint against him; and

10   a statement that he gave you in response to

11   questions at 1:30?  Any other statements that you're

12   aware of?

13  A  I have not found any other statements.  No, sir.

14  Q  Well, let me ask you this.

15   Have you given Mr. Beauchesne any other statements,

16   or any other District Attorney any statements,

17   other than -- well, first of all, let me ask you

18   this.

19   There are no other written statements, are there?

20  A  I am not sure if there is not any other written

21   statements.

22  Q  Well, sir, while you -- during the break did you

23   manage to get a copy of the Supplemental Arrest

24   Report, which has been marked Exhibit 2?

25  A  I believe I already have that.

I-77

1 Q You do have a copy of this available, sir (indi-

2   cating)?

3 A That, no. I don't have that, either.  I don't

4   have that.  No, sir.

5 Q Sir, do you have an earlier report in which you

6   described advising Mr. Drumgold of certain

7   rights?

8 A I don't have that here.  No, sir.

9 Q Well, sir, you're saying you don't have it, but

10   there is one that exists; you actually have a

11   report that you had produced?

12   When I say produced, that you had written or

13   typed, and signed, which indicates that at some

14   time prior to 1:00 o'clock on August 29, 1988

15   you had advised Mr. Drumgold of his rights?

16     MR. BEAUCHESNE:  If I might, your Honor,

17 in an attempt to expedite the matter.

18     I think I read such a report.  And we're

19 looking for it now in a very voluminous folder that the

20 detectives left with me last week.

21     MR. RAPPAPORT:  Well, I will state for

22 the record, your Honor, that I have recieved no such

23 report.

24     MR. BEAUCHESNE:  I don't believe I sent him

25 such a report.  I think that's perhaps the first I saw of

1  it, and I wasn't aware I hadn't sent it.  If we find it,

2  he'll get it immediately.

3      BY MR. RAPPAPORT:

4  Q   You may have prepared a report in which you

5      indicated that you read Mr. Drumgold his rights

6      some time during the morning of August 29th?

7  A   I may have.  Yes, sir.

8  Q   Okay.

9      And did you tell any brother officers about this

10     encounter with Mr. Drumgold when you may have

11     read him his rights?

12 A   I was in the presence of another officer at that

13     time.

14 Q   And who was that other officer?

15 A   Detective Murphy.

16 Q   Do you know if Detective Celester -- excuse me,

17     Deputy Celester -- was ever apprised, when he

18     appeared in court on the 29th of August, that

19     you had spoken to Mr. Drumgold earlier and

20     read him his rights?

21 A   I'm not aware of that.  No, sir.

22 Q   When did you first tell that to Mr. Beauchesne?

23 A   Tell what, sir?

24 Q   Well, that you had met with Mr. Drumgold at an earlier

25     time, some time during the morning of August 29th,

1      and that you had read Mr. Drumgold his rights?

2  A   Some time within the first -- previous few weeks

3      to this day I've had conversation of what

4      happened that day with Mr. Beauchesne.

5  Q   You have nothing to memorialize that, though,

6      certainly -- you didn't have Mr. Drumgold execute

7      any waiver, did you?

8  A   At the first time, no, sir.

9  Q   And you didn't tape him agreeing to talk to you,

10     or you didn't tape your reading of his rights to

11     him?

12 A   No, sir.

13 Q   What rights did you relate when you first saw him?

14             THE COURT: This would be in the morning.

15             MR. RAPPAPORT:  Judge, I don't know.

16             THE WITNESS:  It would have been in the

17 morning.

18     BY MR. RAPPAPORT:

19 Q   Well, sir, at approximately what time did you first

20     advise Mr. Drumgold of his rights?

21 A   It would have been right after they first called

22     Mr. Drumgold's case.

23 Q   Right after you saw him appear in court and have

24     an attorney appointed on the other case?

25 A   Yes, sir.  He was brought back into the docket and

I-80

1   I asked the court officer if I could go into the

2   docket and speak to him.

3   Q   And you proceeded into the dock to speak to him?

4   A   Yes.

5   Q   And you say that at that time you advised him of

6   his rights?

7   A   I informed him, as the paper work was probably

8   not caught up to him at that point in time, that

9   -- why I was there; that I was there, and I was

10  seeking a warrant that would eventually catch

11  up to him during the day, charging him with

12  murder.

13  And then I would have verbally gave him his rights.

14  Q   What did you say to him?

15  A   I informed him that I was in the court to seek a

16  complaint for murder against him, relative to the

17  Tiffany Moore incidents.

18  Q   Which rights did you tell him?

19  A   I gave him his Miranda rights.

20  Q   Could you repeat those, please?

21  A   I would have read them from the card.

22  Q   Do you have the card with you?

23  A   Yes, I do.

24  Q   And it's your memory that you specifically ready

25  the Miranda rights from a card to him at that

I-81

1      time?

2    A    Yes, sir.

3    Q    Did you ask him to initial that card, or sign

4         that card?

5    A    It's a plastic card, sir.  I wouldn't have asked

6         him that.

7    Q    Well, did you have a pad and a piece of paper with

8         you at that time?

9    A    I don't now if I had anything in my -- any paper

10        work on me, no, sir.

11   Q    So, at that time, when you say that you read him

12        his rights, you did not have him memorialize that

13        in any way?

14   A    No, sir.

15   Q    And you may or may not have written a report

16        concerning that?

17   A    Yes, sir.

18   Q    You're not sure?

19   A    No, sir.  I'm not sure.

20   Q    And how long did that discussion occur -- go on

21        for?

22   A    It was a very brief discussion, probably ten minutes.

23        Maybe less.

24   Q    As little as two minutes?

25   A    Longer.

I-82

1    Q    Five minutes?

2    A    Five to ten minutes.   We weren't in there that

3         long.   I don't believe we were in there that long

4         with him.

5    Q    Now, at some point later in the day you prepared

6         this report, which has been marked as Exhibit 2.

7         Correct?

8    A    That's the supplementary, sir?

9    Q    The supplementary report -- that was prepared,

10        was it not, some time on -- well, the report's

11        dated, is it not, August 29, 1988?

12   A    This would have coincided -- this report would have

13        went along with a booking process.   Yes, sir.   There

14        would have been a booking sheet and this sheet

15        made out approximately the same time.

16   Q    And is this the booking sheet that you referred

17        to, sir (showing document to witness)?

18   A    Yes, sir.

19   Q    Okay.

20        This booking sheet----

21                  MR. RAPPAPORT:   Your Honor, may the booking

22   sheet be marked?

23                  THE COURT:  Do you have any objection,

24   Mr. Beauchesne?

25                  MR. BEAUCHESNE:   No, your Honor.

I-83

THE COURT: All right.

It may be marked Exhibit No. 5.

(Document was marked Exhibit

No. 5, and was received in

evidence.)

THE COURT: We're going to have to take
-- I think we should put him back into custody.  We're
going to recess until 2:00 o'clock, because I have
another matter.

(Court recessed.)

I-84

AFTERNOON SESSION

MR. RAPPAPORT:  May I proceed, your

Honor?

THE COURT: Certainly.

RICHARD. WALSH, Resumed

Direct Examination, Continued

BY MR. RAPPAPORT:

Q   Mr. Walsh, when you had your first conversation

with Mr. Drumgold at approximately 10:00 o'clock

that morning, you didn't know at that time,

did you, that you were going to get custody of

him at some point, did you?

A   At some point in time I knew we would possibly

be doing another booking.  Usually we do another

booking for the new charge that we take out for.

Q   So at that time you believed that you would

eventually receive custody of Mr. Drumgold?

A   Yes, sir.

Q   The supplemental police report and booking sheet

that described your activities vis a vis Mr.

Drumgold on August 29, 1988 -- is there any

indication at all on either of those documents

that you had had a discussion with Mr.

Drumgold earlier in the day?

A   No, sir.

I-85

1   Q  And is there any contemporaneous report -- when

2       I say contemporaneous report, is there any

3       report that you produced on August 29, 1988

4       which shows or states that you had discussions

5       with Mr. Drumgold earlier in the day?

6   A  No, sir.

7   Q  There's no reference to that in the taped state-

8       ment, is there?

9   A  No, sir.

10   Q  In fact, sir, you had mentioned before that there

11       was some document, you believed there was some

12       document which existed which spoke of a discus-

13       sion you had with Mr. Drumgold during the

14       morning of August 29th.

15       Correct?

16   A  It was brought to my attention that a document

17       may exist.  Yes, sir.

18   Q  Sir, you sought a search warrant for 27 Olney Street

19       in Dorchester on August 31, 1988?

20   A  Yes, sir.

21   Q  And you submitted an affidavit, did you not, in

22       support of that search warrant?

23   A  Yes, sir.

24   Q  And, again, you submitted that affidavit on August

25       31st, 1988.  Correct?

1    A    I'm not exactly sure of the date.  It would be

2        right around there.  Yes, sir.

3    Q    Well, let me show you this document; and take a

4        look, and see whether or not this refreshes your

5        recollection as to when you submitted the affidavit

6        in support of that serach warrant (showing

7        document to witness)?

8    A    Yes.  It says August 31, 1988.

9    Q    And that was two days after the taped interview

10       with Mr. Drumgold.  Correct?

11    A   Yes, sir.

12    Q   That was that 1:30 in the afternoon interview.

13       Correct?

14    A   Yes, sir.

15    Q   And, sir, you were in the courtroom, were you not,

16       in Judge Martin's courtroom, late in the day on

17       August 29, 1988, after Mr. Drumgold was brought

18       back to court?

19    A   About what time, sir?

20    Q   Mr. Drumgold was interrogated at approximately

21       1:30 on August 29th.  Correct?

22    A   Yes, sir.

23    Q   And after that interrogation he was then brought to

24       have more pictures and prints taken.

25       Correct?

I-87

1    A    Yes, sir.

2    Q    And he was then returned to the courtroom?

3    A    Yes, sir.

4    Q    Did you find yourself in the courtroom when he was

5         brought back there?

6    A    I believe I was in the courtroom at that time.

7    Q    And you were at that time, sir, that Judge

8         Martin was rather upset that he had been

9         interrogated, were you not?

10   A    I became aware of that. Yes, sir.

11   Q    At that time at least?

12   A    At that time. Yes, sir.

13   Q    And that was on August 29th, 1988?

14   A    Yes, sir.

15   Q    And you -- at least as of late in the day on August

16        29th, 1988 you were aware of the fact that Judge

17        Martin did not want to have Mr. Drumgold interro-

18        gated that day?

19   A    The first time I became aware of it was back at

20        the courtroom, after the----

21   Q    On August 29th?

22   A    On August 29th, after the interrogation.

23   Q    Late in the day on August 29th?

24   A    Yes, sir.

25   Q    And the only reference, or written reference you

I-88

1   made to any discussion with Mr. Drumgold on the

2   morning of the 29th occurred in your affidavit

3   submitted on August 31st?

4   A   Yes, sir.

5           MR. RAPPAPORT:   I have no further

6   questions of the officer.

7                   Cross-Examination

8   BY MR. BEAUCHESNE:

9   Q   Now, Officer, I think you stated that when you

10      came to the Roxbury Court at some time you

11      learned that the Defendant Drumgold was in

12      court that day?

13  A   Yes, sir.

14  Q   Is it -- was he in there under the name Drumgold

15      or some other name?

16  A   I was informed that he was in there under the

17      name of Royston.

18  Q   And, in fact, sir, had he been arrested under the

19      name of David Royston?

20  A   Yes, sir.

21  Q   And you have seen a Boston House Police incident

22      report and a booking sheet, I believe a Boston

23      Police Department booking sheet?

24  A   Yes, sir.

25

I-89

1    Q    And I show you what appears to be a copy of

2         them (showing documents to witness), and ask

3         if that's the incident report and the booking

4         sheet that he was in there under?

5    A    Yes, sir.  This is dated the day before, on

6         August 28th, 1988, which is what he was

7         arrested for.

8    Q    And in fact there's his signature there of -- or

9         a signature purportedly by the person who was

10        arrested, David Royston?

11   A    Yes, sir.

12                 (Document shown to counsel.)

13                 MR. BEAUCHESNE:  Your Honor, for the

14   purposes of this hearing only, I'd offer a copy of

15   the incident report and arrest sheet.

16                 THE COURT:  All right.

17                 It may be marked Exhibit 6.

18                 (Document was marked Exhibit

19                 No. 6, and was received in

20                 evidence.)

21        BY MR. BEAUCHESNE:

22   Q    I think, sir, you told us that -- strike that.

23        At the time that you went to the courtroom,

24        the so-called First Session in the Roxbury

25        District Court, you went there for what

I-90

1         purpose, sir?

2    A    To look at the Defendant.

3    Q    And prior to that you hadn't seen this Defendant

4         that day?

5    A    No, sir.

6    Q    And in fact he was there under another name, but

7         somebody thought that he was in fact the Defendant

8         Drumgold?

9    A    Yes, sir.

10   Q    And at some time you told the Court that you went

11       and you talked to him in the dock?

12   A    In the holding area, the cell area of the court-

13       house.

14   Q    And when you talked to him you say -- before you

15       talked to him what did you say to him with regard

16       to his rights, if anything?

17   A    I read him his rights and informed him why I

18       was there.

19   Q    Do you have -- I think you told us you read him

20       his rights off a plastic card?

21   A    Yes, sir.

22   Q    Do you have that card with you today?

23   A    Yes, sir.

24   Q    Same card?

25   A    Yes, sir.

I-91

1    Q    Would you produce it, please?

2    A    (Pause.)

3    Q    I'd ask you to read into the record those rights

4          that you read to the Defendant Drumgold before you

5          spoke to him in the dock that morning?

6    A    It's a Miranda warning.  And it states:

7          "Before we ask you any questions it is my duty

8          to advise you of your rights.  You have a

9          right to remain silent.  If you choose to

10        speak, anything you say may be used against

11        you in a court of law or other proceedings.

12        You have the right to counsel with a lawyer before

13        answering any questions, and you may have him

14        present with you  during questioning.  If you

15        cannot afford a lawyer, and you want one, a lawyer

16        will be provided by the Commonwealth without

17        any cost to you.

18        You may also waive that right to counsel and your

19        right to remain silent, and you may answer any

20        questions or make any statement you wish.

21        If you decide to answer questions you may stop at

22        any time to consult with a lawyer."

23    Q    And after you read him that card, did he indicate

24        he understood it?

25    A    Yes, sir.

I-92

1    Q    What did he say with regard to his understanding?

2    A    He said that he understood it.

3    Q    Did you have a conversation with him?

4    A    Yes, sir.

5    Q    Would you tell us what you said to him and what

6         he said to you?

7    A    Again, I informed him why I was there, seeking

8         an arrest warrant for his arrest.  And he made

9         a statement to me roughly that he was in the area

10        some time that evening, and that he had left the

11        area and went to Grove Hall after the incident.

12        He had seen the incident.  He had left the area.

13        He was in company of other people, and went to

14        the Grove Hall area and had something to eat.

15    Q    Did he tell you whose company he was in?

16    A    Yes, sir.

17    Q    Whose company did he say he was in?

18    A    May I refresh my memory?

19    Q    Yes, you may?

20    A    (Pause.)

21        He told me he was in the company of Terrance

22        Taylor, Antonio Anthony, and a person only known

23        to him as Paul.

24    Q    And where did he say he'd gone?

25    A    He had said he went -- he said he observed the

I-93

1    crowd standing around the girl that had been shot

2    in the head. He informed me that he never left

3    the motor vehicle; and he left the area, and went

4    to Grove Hall, and had something to eat.

5    Q    And is that, in sum and substance, the entire

6         statement that he gave to you concerning his

7         activities on the night in question?

8    A    Yes, sir.

9    Q    And now with regard to the statement that was

10        taken from him and taped in the afternoon----

11   A    Yes, sir.

12   Q    I believe you testified that you were not present

13        in the courtroom when Detective Murphy and

14        Superintendent Celester addressed the Court?

15   A    Yes, sir.

16   Q    You were not there?

17   A    No, sir.

18   Q    And at some time you came into the company of

19        the Defendant Drumgold?

20   A    Yes, sir.

21   Q    Now, at any time that day were you told of any

22        judicial order concerning interrogating or not

23        interrogating him?

24   A    No; sir.

25   Q    Were you present when this Defendant was arraigned

I-94

1        in court on this case?

2    A   Yes, sir.

3    Q   And what time was that?

4    A   It was some time in the afternoon, after we inter-

5        viewed him -- 3:00 o'clock, 3:30.  I'm not really

6        sure.  It was later on, after our interview.

7    Q   This is after your interview?

8    A   Yes, sir.

9    Q   And prior to your interview had you seen a complaint

10       in this case?

11   A   Yes, sir.

12   Q   Had you actually been given a copy of or seen the

13       original complaint in this case, as issued by the

14       Court?

15   A   No, sir.

16   Q   So when you're talking about a complaint, you

17       applied for a complaint?

18   A   Yes, sir.

19   Q   And what time do you say you applied, physically,

20       for that complaint?

21   A   I would have physically brought the complaint down

22       as soon as I could, which is after I brought it

23       to Canavan and had him initial it.

24   Q   That's the application for a complaint?

25   A   The application.  Yes, sir.

I-95

Q    The actual court document and/or warrant -- did
     you see that at any time that day?

A    I'm not sure if it was brought forward with his
     papers.  I don't believe it was given to me.
     I believe it was brought up and put with his
     papers.

Q    I don't know if I understood you.  Did you say:
     "I don't believe it was given to me."?

A    Yes.

Q    So, to the best of your knowledge did you ever
     have physical custody of the actual court
     complaint that day?

A    The actual court complaint -- no, sir.

          THE COURT:  He wouldn't have had as a
matter of law. Right?

          MR. BEAUCHESNE:  Yes, your Honor.  That's
the point.  I believe earlier on his direct testimony
there was some talk about him having a complaint.

          THE COURT:  He might have had a copy,
but he certainly wouldn't have had the complaint.

          BY MR. BEAUCHESNE:

Q    How about a copy of the complaint on that day --
     the actual complaint now, not the application?

A    I believe we would have copied the complaint, at
     some point in time got a copy of the complaint.

I-96

1    Q    You say you believe it.   Now, do you have a memory

2         of actually having physical possession of that

3         complaint?

4    A    No, sir.

5    Q    And with regard to the warrant, do you have a

6         memory of actually having physical possession of

7         a warrant in this case?

8    A    No, sir.

9    Q    And in fact the Defendant was arraigned in the

10        afternoon on the actual complaint, after your

11        interrogation?

12   A    Yes, sir.

13             MR. BEAUCHESNE:  Just one moment, your

14   Honor.

15             THE COURT:  Yes.

16             (Pause.)

17             MR. BEAUCHESNE:  I have nothing further.

18                   Redirect Examination

19        BY MR. RAPPAPORT:

20   Q    Sir, did you not state in your police report,

21        prepared back on -- well, first of all, the

22        events of August 29, 1988 were fresher in

23        your mind on August 29, 1988 than they are

24        today?

25   A    Yes, sir.

1    Q   Did you not state in your report, which was

2         prepared on August 29, 1988, that at about

3         10:00 a.m. you arrested Mr. Drumgold on Warrant

4         8802CR8486, issued by the Roxbury District

5         Court?

6    A   Yes, sir.

7    Q   And that was the murder warrant.  Correct?

8    A   Yes, sir.

9    Q   Now today you say you don't remember whether or

10        not you actually had a warrant or a copy of a

11        complaint in your possession.

12        Right?

13    A   (No response.)

14    Q   Today you don't have a memory.  Is that correct?

15    A   I'm sure I had to sign it at some point in time.

16    Q   Sir, back when the events of that day were fresh

17        in your mind you said that you had arrested him

18        at 10:00 pursuant to a warrant.

19        Correct?

20    A   Yes, sir.

21    Q   Issued by the Roxbury Court?

22    A   Yes, sir.

23    Q   On that complaint number.  Correct?

24    A   Yes, sir.

25    Q   And that's the murder complaint in this case?

I-98

1   A    Yes, sir.

2   Q    Now, you at some point took custody of Mr.

3        Drumgold's body, and physically removed him

4        from the courthouse?

5   A    Yes, sir.

6   Q    What authority did you have to remove him from

7        the courthouse?

8   A    It would have been the warrant, sir.

9   Q    Now, you have testified that you specifically

10       were not aware of the discussion which was had

11       between Judge Martin, and Mr. Celester, and

12       Mr. Murphy.

13       Correct?

14  A    Yes, sir.

15  Q    Wasn't Mr. Murphy present, though, during your

16       interrogation of Mr. Drumgold?

17  A    Yes, sir.

18  Q    He was in the courtroom with Mr. Celester.  Right?

19  A    I was not in the courtroom at that time.

20  Q    But Mr. Murphy was certainly present during your

21       interrogation of Mr. Drumgold.  Correct?

22  A    Yes, sir.

23  Q    Now, Mr. Beauchesne had asked you what had Mr.

24       Drumgold stated to you at 10:00 -- during the

25       morning of August 29th.

I-99

1       Do you remember he asked you that question?

2   A   Yes, sir.

3   Q   And you asked him could you refresh your recollec-

4       tion?

5   A   Yes, sir.

6   Q   And you proceeded to look at a document?

7   A   Yes, sir.

8   Q   Is the document you just looked at the affidavit

9       which you prepared on August 31st?

10  A   Yes, sir.

11  Q   Again, two days afterwards.  Correct?

12  A   Yes.

13  Q   At least two days after the statement that you

14      say was made by Mr. Drumgold. Correct?

15  A   Yes, sir.

16  Q   And two days after you learned, during the after-

17      noon of the 29th, that you had interrogated Mr.

18      Drumgold against the wishes of the Court.

19      Right?

20  A   I had learned that -- I had learned that there

21      was a problem in the afternoon.  Yes, sir.

22  Q   Well, you were in court in the afternoon when

23      Judge Martin stated in open court that: I had

24      only let this man go to the police for purposes

25      of identification; and I specifically said, "He's

I-100

1    not to be interrogated."

2    You were in the courtroom, weren't you, when he said

3    that?

4    A    I don't recall if those are his words.  No, sir.

5    I was in the courtroom.

6    Q    And you understood that to be the gist of what he

7    was saying. Correct?

8    A    Somewhat the gist.  Yes, sir.

9    Q    Now, I would imagine, sir -- and correct me if

10    I'm wrong -- that any statement that Mr. Drumgold

11    would have given you on the 29th, pertaining to

12    his activities on the night of the Tiffany Moore

13    murder would have been pretty important.

14    Correct?

15    A    Yes, sir.

16    Q    In fact, when you interrogated him at Area B in

17    the afternoon you had a tape recorder going.

18    Correct?

19    A    Yes, sir.

20    Q    And you very carefully, as best you could, had

21    him sign a waiver of rights form.  Correct?

22    A    Yes, sir.

23    Q    When you spoke to him in the morning you didn't

24    know that he was going to give you a statement

25    in the afternoon.

I-10 1

1          Right?

2   A    No, sir.

3   Q    Did you take notes of that statement that he made

4          in the morning?

5   A    No, sir.

6   Q    And you certainly didn't record it?

7   A    No, sir.

8   Q    And you didn't have him write anything out?

9   A    No, sir.

10   Q    And you knew at that time that any statement he

11          gave you would be very important.  Correct?

12   A    Yes, sir.

13   Q    In fact when Mr. Beauchesne just asked you what

14          was that statement, you didn't even remember

15          without looking at something you had prepared

16          two days after this whole turn of events.

17          Correct?

18   A    That's correct.

19            MR. RAPPAPORT:  No further questions.

20            THE COURT:  Was the search warrant and

21 affidavit ever introduced as an exhibit?

22            MR. RAPPAPORT:  In this particular matter?

23            THE COURT:  Yes.

24            MR. RAPPAPORT:  It hasn't been, Judge.

25            THE COURT:  Are you going to offer it?