# EXHIBIT 5

Page 1

Volume:   I

Pages:    1 - 104

Exhibits: See Index


UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 04-11193NG


------------------------------x
SHAWN DRUMGOLD,
              PLAINTIFF

VS.

TIMOTHY CALLAHAN, ET AL,
              DEFENDANTS
------------------------------x



DEPOSITION of FRANCIS O'MEARA, a witness
called on behalf of the Plaintiff, pursuant to the
provisions of the Federal Rules of Civil Procedure, before
Nancy M. Walsh, Certified Shorthand Reporter (#118593)/
Registered Professional Reporter and Notary Public in and
for the Commonwealth of Massachusetts, at the law office
of Tommasino & Tommasino, Two Center Plaza, Boston,
Massachusetts  02108, on Thursday, December 14, 2006,
commencing at 10:13 a.m.



NANCY M. WALSH
COURT REPORTING SERVICES
131 CRANE STREET
DEDHAM, MASSACHUSETTS  02026
TELEPHONE (781) 326-5062
FAX (781) 326-5072

1  Q    When did you pass the bar?  The questions get harder.

2  A    December of -- I was notified in December of '78.

3  Q    Where did you go to law school?

4  A    Suffolk Law School.

5  Q    Where did you go to college?

6  A    University of Massachusetts.

7  Q    What was the first job you had as a lawyer?

8  A    I was employed at the Suffolk County District Attorney's

9       office.

10  Q    What years were you employed at the Suffolk DA's office?

11  A    From 1976 until 1992.

12  Q    Could you tell me just in summary fashion the jobs that

13       you held as Assistant District Attorney?

14  A    Yes.  I became Assistant District Attorney on January 3rd

15       of 1979.  From then until September of 1983, I was

16       assigned to a felony team -- major felonies in Suffolk

17       Superior Court.  From 1983 September until August of

18       1992, I was assigned to the homicide team for the Suffolk

19       County District Attorney's office?

20  Q    And did you hold a position on the homicide team other

21       than member or in addition to being a member?

22  A    Yes, ultimately, not originally.

23  Q    When did you --

24  A    February of '89.

Page 6

1    Q    And what was that position?

2    A    I was chief of the Homicide Division.

3    Q    And did you stay in that position until August of '92?

4    A    I did.

5    Q    And when you left the District Attorney's office in

6         August of 1992, what did you do for employment?

7    A    Private practice.

8    Q    And have you continued in private practice since leaving

9         the District Attorney's office?

10   A    I have.

11   Q    In February of 1989 when you became chief of the homicide

12        team -- is it the homicide team or the Homicide Division?

13        What's the right terminology?

14   A    It's Homicide Division and -- one moment, please.  I want

15        to say February of '88, not '89.

16   Q    If I suggest to you that the homicide we're talking about

17        here occurred in August of '88, were you the --

18   A    On my watch.

19   Q    Were you the chief of Homicide Division at that time?

20   A    Yes.

21   Q    So it would be February of '88?

22   A    Yes.

23   Q    When you became chief of the Homicide Division, how many

24        attorneys were in that division?

Page 11

1  Q   Do you remember being in the Roxbury District Court on

2      the day he was arrested?

3  A   I may have been, but I don't remember.

4  Q   Do you remember on the day that Mr. Drumgold was arrested

5      there was an issue about him being interrogated by Boston

6      police officers?

7  A   I do remember that.

8  Q   What do you remember about your involvement, if any, with

9      that situation?

10 A   I remember being contacted by an Assistant District

11     Attorney in the Roxbury District Court, contacted by

12     phone.  I was in my office, the courthouse was behind us.

13     And this assistant called me and indicated there was an

14     individual in the dock area who wished to -- he

15     understood wished to speak about the Tiffany Moore murder

16     case and that the -- one of the Justices of the Roxbury

17     District Court, Judge Martin, had indicated that he

18     didn't want the individual spoken to while he was in the

19     court dock by police.

20 Q   So why was he calling you?

21 A   To ask me for advice as to what this was -- this was a

22     somewhat unusual circumstance that a Judge would do this,

23     and he was asking me for advice as to what, if anything,

24     he should do.

Page 12

1    Q    What did you tell him?

2    A    I told him that I wasn't able to get out to Roxbury that

3         morning but that I wanted to give him -- pretty much

4         dictate to him a message that I wanted him to put before

5         Judge Martin to see if we could convince him the order

6         ordering us not to be able to speak to people in the

7         Roxbury District Court dock was I didn't think at the

8         time an accurate order.  And I was hoping we could

9         convince Judge Martin to reverse himself.

10   Q    Why was it that you thought that Judge Martin's order was

11        not the correct order?

12   A    The practice I had been familiar with over the many, many

13        years was there were often times when docks, dock areas

14        where people are locked up, have people who want to speak

15        to law enforcement, and it's routinely done.  And I was

16        never aware that any Judge who took the position up until

17        that day that we couldn't speak to people when they were

18        in courthouses.

19   Q    Did you understand that the individual they were talking

20        about had been charged with a drug offense?

21   A    I can't remember that right now.  I didn't even remember

22        it was Drumgold.  I remember there was someone who we

23        wanted to speak to.

24   Q    Did you understand that the person they were talking

Page 13

1  about was about to be charged with first degree murder?

2 A I don't remember that today.

3 Q If you had known that the individual this Assistant

4  District Attorney was talking about was represented by

5  counsel, would you have given the same advice?

6    MR. KATZ:  Objection.

7 A Yes.

8 Q And in your opinion, was it appropriate for the District

9  Attorney's office to talk to a Defendant represented by

10  counsel in the dock?

11    MR. KATZ:  Objection.

12 A If the individual wished to speak to law enforcement, it

13  would be my belief that whether he was -- if he had been

14  assigned a lawyer or retained a lawyer, if he chose to

15  waive his rights not to speak to us and speak to us, I

16  think we could speak to him.

17 Q Was it your opinion that you could do that without

18  talking to his lawyer to satisfy that there was a waiver?

19    MR. KATZ:  Objection.

20 A If I were involved in the case and there was a lawyer

21  present, I wouldn't do anything to go around the lawyer.

22  But if it came to my attention that somebody wanted to

23  speak to us and didn't want to have his lawyer present or

24  wanted to speak regardless of the fact that he had a

Page 14

1       lawyer, then we'd listen to him.

2   Q   And again, in that hypothetical situation, would your

3       opinion be any different if that individual had

4       previously said he wanted to have his lawyer present?

5   A   That would change it.

6   Q   If the witness at some point had said they wanted to have

7       a lawyer present, would it be correct that your advice

8       would be you needed to go through the lawyer?

9   A   My advice would be that the law on that point is opened

10      to some interpretation as to whether the person could

11      still then waive their right to counsel.  It wasn't a

12      clear area in my mind at the time.

13  Q   In your role as supervising the homicide -- members of

14      the homicide team, would you advise a member of the

15      homicide team to take a statement from a witness who had

16      previously said in court that he wanted to talk only

17      through his lawyer?

18                  MR. KATZ:  Objection.

19                  MR. CURRAN:  Objection.

20  A   Possibly.

21  Q   In this case, do you remember which Assistant DA it was

22      that called you?

23  A   I do.

24  Q   And who was that?

Page 15

1  A    Judge Jack Canavan.

2  Q    And did then Mr. Canavan tell you that the individual

3        that you were discussing was a suspect in the Tiffany

4        Moore murder?

5  A    I can't remember if that's the case.  I don't remember

6        whether it was a suspect or a potential witness or a

7        potential suspect.  It was somebody who was somehow

8        involved in the case and wanted to speak to the police.

9  Q    But you don't have a memory one way or the other whether

10       you were told that this person was, in fact, the prime

11       suspect at that point in the murder?

12  A   I don't remember right now that I was told that.  I

13       imagine if it was the case I would have been.

14  Q   But you don't remember that being the case?

15  A   I don't remember that being the case now.

16  Q   Did Mr. Canavan tell you why it was that Judge Martin had

17       entered this order that this person was not to be talked

18       to?

19  A   No, just that he had entered it that he didn't want

20       people spoken to in the court dock area.

21  Q   Did Mr. Canavan tell you that this individual had been

22       charged with murder and that they were waiting for an

23       appointed counsel to appear to talk to him?

24  A   I don't remember that today.

Page 16

1  Q    If you had been told that the individual that you were

2         discussing had been charged with first degree murder,

3         that counsel had been appointed, and that they were

4         waiting for the counsel to appear, would you still have

5         instructed Mr. Canavan that he should -- that, in your

6         opinion, the order of Judge Martin was not correct?

7                   MR. CURRAN:  Objection.

8                   MR. KATZ:  Objection.

9                   MR. WHITE:  Objection.

10  A    I would have instructed Mr. Canavan, as I believe I did,

11        if there was an individual who wanted to speak to us and

12        waive his right to counsel that we would listen to him,

13        "we," meaning the police.

14  Q    Did you tell Mr. Canavan whether he should obey the order

15        of Judge Martin?

16  A    Absolutely I did.

17  Q    Did you ever suggest to Mr. Canavan that because, in your

18        opinion, the order of Judge Martin was not correct he

19        didn't have to follow it?

20  A    No, I never suggested that.

21  Q    What was it that you told Mr. Canavan to tell Judge

22        Martin?

23  A    That it was my opinion that we did have the right to

24        speak to people who wanted to speak to us about any

Page 17

1    homicide case, particularly this one, and that I didn't

2    see any difference between whether the individual was in

3    the dock area in the police station or in the courthouse

4    which is connected by a common corridor, that if an

5    individual wished to speak to us that we should be able

6    to hear what he has to say.  And I wanted to ask

7    Mr. Canavan to impress that upon Judge Martin and see if

8    we could convince him to allow the police to speak to

9    him.

10   Q    Did you talk to Phil Beauchesne about this call from

11        Canavan?

12   A    I don't remember today.

13   Q    Did you talk to any Boston police officers about this

14        situation of the person down the Roxbury District Court

15        who wanted to talk about the Tiffany Moore murder?

16   A    Eventually I did, yes.

17   Q    Who did you eventually talk to?

18   A    I believe it was Detective Richard Walsh or Detective

19        Paul Murphy.  I can't remember which one I talked to.

20   Q    When was it that you talked to them?

21   A    It had to be some significant time, maybe a hour or more

22        after I spoke to Mr. Canavan.

23   Q    Was that --

24                    MR. CURRAN:  If I can put an objection on the

Page 19

1     stated your objection.

2  Q  Was the conversation with Walsh or Murphy the next

3     conversation you had on this subject after you talked to

4     Canavan?

5  A  I don't remember.

6  Q  Do you remember talking to anyone between Canavan and

7     Walsh and Murphy?

8  A  I don't remember.

9  Q  Or Walsh or Murphy?  What do you remember about the

10    conversation with Walsh or Murphy?

11 A  That advising whichever one I was speaking to that we had

12    been unable to persuade Judge Martin to lift the order,

13    if that's what we call it, and that, therefore, I expect

14    they, therefore, had to follow the Judge's order and

15    couldn't speak to the witness or the Defendants or

16    whatever it was, they can't speak to them.

17 Q  Do you remember Walsh or Murphy telling you, we've

18    already talked to him?

19 A  That is exactly what I was told.

20 Q  At that point, did they tell you what that person said?

21 A  I don't recall.

22 Q  Did you call them, or did they call you?

23              MR. WHITE:  Objection.

24 A  The conversation that I believe I had with one or the

Page 18

1    record for the purposes today, and it would be an ongoing

2    objection.  I know this is a discovery deposition for

3    you.  But the objection is this, to the extent this is a

4    case that is 18 years old that Mr. O'Meara has already

5    been subject to testimony at a hearing, then based on

6    testimony today in regards to his lack of memory, I'm

7    going to object to the extent that any of his answers

8    today are going to be -- which are inconsistent with what

9    was testified earlier would be adverse to any of the

10   Defendants in this case.

11              MR. WHITE:  I'll join the objection.

12              MR. DONNELLY:  I'll join the objection.

13              MS. HARRIS:  Me, too.

14              MR. REILLY:  I don't understand the

15   objection, but you've stated the objection.

16              MR. CURRAN:  In a nutshell, the testimony,

17   which I'm sure was clearer and better memory that

18   occurred back in 1988 and '89, was the subject of an

19   extensive hearing and a finding by a Judge, and it's been

20   established.  And now for you to get into questioning

21   this witness and change that testimony because of lack of

22   memory creates problems for everybody here.

23              MR. REILLY:  I don't think I've changed

24   anything.  I don't understand your objection, but you've

1        other of them, they called me.

2  Q    And why did they say they were calling you?

3  A    I think because they knew I was looking for them.

4  Q    And how did they know that?

5  A    I don't know.  I just know I was looking for them, and

6        they somehow must have learned that I was looking for

7        them, and they called me.

8  Q    Why were you looking for them?

9  A    To tell them we were unable to convince Judge Martin to

10       lift that order, and therefore, they could not speak to

11       this person.

12  Q   You had the conversation with Canavan where you asked him

13      to go back to the Judge to try to get him to change his

14      mind?

15  A   Yes.

16  Q   Did you hear back that the Judge refused to change his

17      mind?

18  A   Yes.

19  Q   And who told you that?

20  A   Mr. Canavan.

21  Q   Did he tell you anything else about what happened when he

22      went back before Judge Martin?

23  A   Not that I remember today.

24  Q   And why was it that you, as opposed to Canavan, were

Page 21

```
 1       trying to get a hold of Walsh or Murphy?

 2  A    Because I wanted to tell them that we were unable to

 3       convince the Judge to remove his order, and that as such

 4       I did not want them to talk to the individual.

 5  Q    Did Canavan tell you whether he had previously told Walsh

 6       or Murphy about the order?

 7  A    I don't remember.

 8  Q    Did Canavan tell you whether he had previously told any

 9       of the Boston Police Department, any of the members of

10       the Boston Police Department about Judge Martin's order?

11  A    I don't remember.

12  Q    What did Walsh and Murphy tell you about their contact

13       with this person?

14                   MR. WHITE:   Objection.

15  Q    Walsh or Murphy?

16  A    I don't remember.

17  Q    Do you remember learning at that point in the

18       conversation with Walsh or Murphy that the individual you

19       had been talking about had been charged with the murder

20       of Tiffany Moore?

21  A    I don't remember that.

22  Q    Did you learn that at some point?

23  A    I'm sure I did.

24  Q    Do you know when?
```

1   A   No, I don't.

2   Q   Did Walsh or Murphy tell you that this individual had

3       made a statement to them?

4   A   Yes.

5   Q   Did they tell you whether the statement was helpful to

6       them in their investigation?

7   A   I don't remember.

8   Q   What did they say to you when you told them that Judge

9       Martin hadn't changed his order, and you didn't want them

10      to talk to him?

11                  MR. WHITE:  Objection.

12                  MS. HARRIS:  Objection.

13                  MR. DONNELLY:  Objection.

14  A   That they had already spoke to him.

15  Q   What did you say to them?

16  A   Well, don't speak to him anymore.

17  Q   Was there anything else said during that conversation

18      with Walsh or Murphy?

19  A   Not that I remember.

20  Q   Having gone through it, do you have any better memory of

21      whether it was Walsh or Murphy that you were talking to?

22  A   No.

23  Q   What was the next conversation you had with anybody about

24      this situation in the Roxbury District Court?

Page 47

1  Q    Were there monthly meetings or yearly meetings between

2       the DA's office Homicide Division, and the Boston Police

3       Homicide Division on a regular basis as opposed to

4       meeting on particular cases?

5  A    Not that I remember.

6  Q    Do you remember ever having discussions with either Daley

7       or McNelley about training for homicide detectives?

8  A    I don't remember that.

9            MR. REILLY:  Those are all the questions I

10      have for you.

11           MR. CURRAN:  I have a few questions.

12      CROSS-EXAMINATION BY MR. CURRAN:

13  Q    Mr. O'Meara, is it fair to say that your memory was

14      clearer back in 1988 and '89 in regards to the

15      circumstances of the Tiffany Moore murder and your

16      involvement in the investigation in any hearings?

17  A    Yes.

18  Q    And did you, in fact, testify at a Motion to

19      Dismiss/Motion to Suppress before Judge Volterra?

20  A    Yes, I did.

21           MR. CURRAN:  And can I have this marked as an

22      exhibit?

23           (Document marked Exhibit No. 156 for

24           identification.)

Page 48

1    Q    Is it fair to say that your answers to Mr. Reilly's

2         questions today regarding the circumstances of the arrest

3         and arraignment of Shawn Drumgold were to the best of

4         your ability as it is here today?

5    A    Yes.

6    Q    And that day of events was the subject of an extensive

7         hearing conducted by Judge Volterra in this case?

8    A    Yes.  The day of events, yes.

9    Q    And would your testimony that you provided to the Court

10        back in 1989 refresh your memory in regards to the events

11        of that particular day?

12   A    I imagine it would.

13             MR. CURRAN:  I'd ask you to take time with

14        counsel to review the full document.  Take as much time

15        as you need.

16             (Witness peruses the document.)

17             (Discussion off the record.)

18   Q    Mr. O'Meara, have you had a chance to review your

19        transcript of your testimony from the Motion to Dismiss

20        hearing before Judge Volterra?

21   A    Yes, I have.

22   Q    Does that refresh your memory relative to the

23        procedures -- procedurally what took place on the day of

24        Shawn Drumgold's arraignment?

Page 49

1    A    Somewhat, yes.

2    Q    Would you acknowledge that the accuracy of your testimony

3         was far more accurate and clearer back in 1989 when the

4         hearing was held before Judge Volterra?

5                    MR. REILLY:   Objection.

6    A    It certainly appears that way.

7    Q    Based on your review of that, do you want to clarify any

8         of your previous testimony here today?

9    A    I would say where my testimony either is inconsistent

10        with a lack of memory today with what I said then, I

11        believe what I said then is my better memory and more

12        accurate than what my memory or accuracy would be here

13        today.

14   Q    And do you acknowledge that the first phone call that you

15        received was from the Assistant District Attorney Jack

16        Canavan, Judge Canavan, who was the supervisor of Roxbury

17        District Court at that time?

18   A    I believe that's the case, yes.

19   Q    And that was in regards to the fact that Shawn Drumgold,

20        who was under a different alias on a drug charge, was in

21        the dock, and there was an effort to get Shawn Drumgold

22        booked and photographed and fingerprinted and potentially

23        interviewed for the purposes of the murder charge?

24   A    That's correct, sir.

Page 50

1  Q    At which point in time there was an issue in regards to

2       Judge Martin wanting the Defendant back at that

3       particular time?

4  A    I hadn't recalled that earlier, but I do now, yes.

5  Q    At which point in time there were several conversations

6       that took place during the course of that day with John

7       Canavan, the supervisor of Roxbury District Court?

8  A    More than one conversation I had with Mr. Canavan, yes.

9  Q    And there was a subsequent order from Judge Martin to

10      Mr. Canavan relative to the interview of Shawn Drumgold;

11      is that correct?

12 A    That's correct.

13 Q    And once that information was relayed to you, you

14      requested Mr. Canavan to go back down and request of the

15      Judge permission to interview Shawn Drumgold; is that

16      correct?

17 A    To be allowed to go through the standard booking

18      procedure which would include asking him if he wanted to

19      speak to us.

20 Q    And at that point in time, Shawn Drumgold had been

21      released to the members of the Boston Police Department

22      for the purposes of the booking procedure?

23 A    That was my understanding.

24 Q    And these were conversations that were taking place

Page 51

1    between John Canavan and the Court and yourself and the

2    booking procedure was underway; is that correct?

3 A   That's correct.  As I understood, that's what was then

4    going on.

5 Q   And subsequently, Judge Martin ordered that an interview

6    not take place; is that correct?

7 A   Based upon my review of that document, he ordered that

8    the Defendant be back by 2:30 and I -- as that document

9    refreshes my memory, I told Jack that I wasn't sure that

10   we would be finished booking him by 2:30, and he should

11   alert the Judge to that.

12 Q  In fact, you had previously testified that if he wishes

13   to speak to the detectives, we're going to let him speak

14   as long as he wants to speak.  That could be an hour,

15   could be an hour and a half, could be more.  Is that

16   correct?

17 A  That's correct.

18 Q  And when that information was related to Judge Martin at

19   that time is when Judge Martin entered an order; is that

20   correct?

21 A  I believe that's the correct chronology.

22 Q  And at that point in time, Assistant District Attorney

23   Jack Canavan relayed that information to you as head of

24   homicide?

Page 52

1  A    That's correct.

2  Q    And what did you do at that point in time with regards to

3       the receipt of that information with regard to the

4       detectives that were investigating the murder of Tiffany

5       Moore?

6  A    Once I determined that was the order and it wasn't going

7       to be reversed and it was going to stand as such, I

8       immediately started to reach out to Detectives Walsh and

9       Murphy to let them know of the order and to complete the

10      booking but not to talk to him.

11 Q    Did you eventually have contact with one of the

12      detectives?

13 A    Consistent with the testimony in the transcript, yes, I

14      did after much attempts to get him in -- get them at

15      Roxbury or Roxbury Court, the police station downstairs,

16      upstairs, and the courthouse both floors, not being an

17      easy place to get to given the business in that place.

18 Q    At the time you had the conversation with one of the

19      detectives, had they completed the interview with Shawn

20      Drumgold?

21 A    Whichever one spoke with me in response to my telling

22      them not to talk to him said, We already did.

23 Q    Based on that conversation you had with them, were you

24      aware whether or not they had had knowledge of that order

Page 53

1        by Judge Martin?

2                    MR. REILLY:  Objection.

3   A    I wasn't aware that they were.  That's the reason I was

4        trying to get to them and tell them of it.

5   Q    In order to comply in good faith with the Court's order?

6   A    Yes.

7   Q    Based on your assignment -- strike the question.  In

8        August of 1988 after the arrest of Shawn Drumgold, Phil

9        Beauchesne was responsible for the prosecution of Shawn

10       Drumgold and a codefendant Terrance Taylor; is that

11       correct?

12  A    That's correct.

13  Q    And based on legal principle and the statutes in the

14       Commonwealth of Massachusetts, who was responsible for

15       the investigation of any potential homicides in Suffolk

16       County?

17  A    In Boston, it's, by designation, the Boston Police

18       Homicide Unit.  Other parts of Suffolk County are

19       different designees.

20  Q    But in regards to the statute, the legal statute, who was

21       in control of all homicide investigations in the City of

22       Boston.

23  A    The District Attorney's in the various counties, in this

24       case, Suffolk County.