# EXHIBIT 6

17

## COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss.**

SUPERIOR COURT
CRIMINAL ACTION
Nos. 071882-83

### COMMONWEALTH

### <u>vs.</u>

### SHAWN DRUMGOLD & TERRANCE TAYLOR

<u>CONSOLIDATED MEMORANDUM ON DEFENDANT SHAWN DRUMGOLD'S
MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT; DEFENDANTS'
MOTIONS TO SUPPRESS STATEMENTS; DEFENDANTS' MOTIONS TO
DISMISS FOR INSUFFICIENT EVIDENCE BEFORE GRAND JURY
AND IMPAIRMENT OF GRAND JURY PROCEEDINGS</u>

## A. <u>INTRODUCTION</u>

The defendants Shawn Drumgold ("Drumgold") and Terrance Taylor ("Taylor") have been indicted for the murder of Darlene Tiffany Moore. Both defendants have brought Motions to Suppress Statements. Taylor's motion is predicated on the interrogating officers' failure to advise him of his <u>Miranda</u> rights prior to questioning; Drumgold claims that the authorities questioned him in violation of his Fifth and Sixth Amendment rights. Drumgold has brought a Motion to Dismiss the Indictment on the ground that the Commonwealth engaged in prosecutorial misconduct. Both Drumgold and Taylor have brought Motions to Dismiss the Indictments on the grounds of insufficient evidence before the grand jury and impairment of the grand jury proceedings.

SCDA2196

2

After conducting an extensive hearing, I find that on August 20, 1988, Taylor was subject to custodial interrogation, and that the police were required but failed to give Taylor <u>Miranda</u> warnings prior to questioning him. Accordingly, Taylor's statement and all evidence derived from that statement are suppressed.

I conclude that in Drumgold's case, egregious prosecutorial misconduct occurred when the authorities questioned Drumgold at the Area B police station in direct contravention of a judge's order, and that the interrogation was conducted in violation of Drumgold's Fifth amendment rights. Therefore, the statements and evidence derived therefrom are suppressed.

I agree with Drumgold that "prosecutorial misconduct that is egregious, deliberate, and intentional, or that results in a violation of constitutional rights may give rise to presumptive prejudice" and that, in some cases, dismissal of pending indictments may indeed be an appropriate remedy for official misconduct. <u>Commonwealth</u> v. <u>Cronk</u>, 396 Mass. 194, 198-199 (1985). However, the conduct of the police in this case does not deprive the defendant of a fair trial since suppression of the statement is sufficient to cure any prejudice. Accordingly, I decline to dismiss the murder indictment against Drumgold.

Taylor and Drumgold's motions to dismiss the indictments on the grounds that the evidence before the grand jury was insufficient to warrant indictment, and that the grand jury process was impaired, are also denied.

B. **BACKGROUND**

SCDA2197

3

On Friday, August 19, 1988, at approximately 9:30 p.m., two masked men wearing black Adidas jogging suits ran up behind a group of young people who were gathered beside two mail boxes in front of the Boston Edison Plant near 211 Humboldt Avenue, Roxbury. The men were carrying handguns and fired approximately four to six shots. The masked gunmen fled the scene, running through the Boston Edison Plant in the direction of Homestead Street.

Darlene Tiffany Moore, an 11 year old girl who had been sitting on top of a mail box, fell to the pavement mortally wounded. She had been shot twice; one bullet hit her head, and another penetrated her back. Tiffany was pronounced dead at 9:50 p.m. at the Boston City Hospital.

C. **FINDINGS ON DEFENDANT TERRANCE TAYLOR'S INTERROGATION**

Immediately after the shooting, the police began to interview the bystanders. The police learned that at approximately 7:30 p.m. on August 19, 1988, Terrance "Lug" Taylor and Shawn Drumgold had been seen leaving the apartment of Drumgold's girlfriend, Michelle Royston, located at 218 Humboldt Avenue, Roxbury. Taylor and Drumgold were both observed to be wearing black Adidas sweat suits and were seen getting into a black Chevrolet Corsica operated by another black male. Eyewitnesses to the shooting also reported that two masked males dressed in black Adidas sweats fired the shots.

At approximately 1:30 p.m. on August 20, 1988, police officers from Area B found Terrance "Lug" Taylor on Humboldt Avenue. They informed him that they were investigating the shooting of the

4

little girl and that the detectives at Area B wanted to talk to him
about what he knew concerning the shooting. Taylor was placed into
an unmarked cruiser with the physical assistance of one of the
officers and driven to the Area B station.

Upon arrival, Taylor was brought to a small office on the
second floor and interrogated by Detective Richard Walsh and
Detective William Fogerty of the Homicide Unit. There were three
or four other officers present at the interrogation. Walsh, and
to a limited extent Fogerty, questioned Taylor for three and one-
half hours. At no time prior to or during the interrogation was
Taylor advised of his Miranda rights. The interview was pointed
and the police had complete control over the interrogation.
Although the interview was moderately long, there was no evidence
that the defendant was mentally or physically coerced or
intimidated. During the course of the interrogation, Taylor made
statements which placed him at the scene of the shooting in the
company of the other alleged gunman, and described the automobile
in which he had been riding.

The police tape recorded only a portion of the interrogation
and subsequently reduced it to ten typewritten pages. Based on
the length of the typewritten transcript, I infer that the recorded
portion of the interrogation was approximately thirty minutes in
length.

At 5:00 p.m., the officers concluded the interview and Taylor
was permitted to leave the police station. The police drove him
back to Humboldt Avenue. Taylor was arrested on August 31, 1988,

SCDA2199

5

eleven days after the interrogation.

**D. RULINGS ON DEFENDANT TERRANCE TAYLOR'S MOTION TO SUPPRESS**

August 20, 1988, at 1:25 p.m., Detectives Richard Walsh and William Fogerty questioned the defendant Terrance Taylor regarding Tiffany Moore's death. The questioning took place in a second floor room at the Area B Police Station. The defendant was not given Miranda warnings prior to being questioned. The issue before the court is whether in fact Taylor was subject to custodial interrogation thereby triggering his rights under Miranda v. Arizona, 384 U.S. 436 (1966). See Commonwealth v. Bryant, 390 Mass. 729, 736-737 (1984).

Miranda warnings are necessary when a person has been taken into custody or deprived of his freedom of action in any significant way. Miranda, supra at 444. "Setting aside obvious cases in which a suspect has been formally arrested," there is no specific formula for determining whether a person is in custody or his freedom is sufficiently curtailed so as to require Miranda warnings. Bryant, supra at 736. Inquiry focuses on "(1) the place of the interrogation; (2) whether the investigation has begun to focus on the suspect, including whether there is probable cause to arrest the suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the suspect; and (4) whether, at the time the incriminating statement was made, the suspect was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced

6

by whether the interview terminated with the defendant's arrest." Bryant, supra at 737. See also Commonwealth v. Gil, 393 Mass. 204, 212 (1984). "Rarely is any single factor conclusive." Bryant, supra at 737.

Applying the Bryant analytical framework to the facts of this case, I find that the defendant was subjected to "'incommunicado interrogation...in a police-dominated atmosphere' for which the Miranda protections were tailored." Id., quoting Miranda v. Arizona, 384 U.S. 436, 445 (1966). The defendant was approached by two plain clothed police detectives on Humboldt Avenue in Roxbury.[1] The police identified themselves, asked Taylor to come with them to the Area B Police Station, placed him in the backseat of a police car and delivered him to the station. Cf. Gil, supra at 213 (no custody where defendant appeared at station voluntarily); Commonwealth v. Harris, 387 Mass. 758, 764-765 (1982) (no custody where defendant selected day on which to appear at the station); Commonwealth v. Simpson, 370 Mass. 119, 125 (1976) (no custody where defendant went to station voluntarily, unaccompanied by the police). Upon arrival at the station, Taylor was taken directly to a second floor room where Detectives Walsh and Fogerty began the questioning with three or four other officers present.

It is clear that the investigation had focused on Taylor at the time he was picked-up and questioned. In fact, the following

---

[1]The defendant was picked-up for questioning at Detective Walsh's behest.

7

excerpt from the transcript of Taylor's tape recorded statement is a clear indication that, at the time of the interrogation, Taylor was a suspect in the Tiffany Moore murder investigation.

> **Question by Detective Fogerty:** "Did anybody talk to you today about they thought it might have been you that was driving by last night, you were responsible for the shooting?"

> **Answer by the defendant:** "No."

> **Question by Detective Fogerty:** "Did some lady come up and say to you that you were the one that they thought was the one that did it?"

> **Answer by the defendant:** "No."

> **Question by Detective Fogerty:** "A lady didn't come up and speak to you about that this morning?"

> **Answer by the defendant:** "When she stopped me, when we was in the hallway talking she just came in and she asked me was that my car out there. That's it."

> **Question by Detective Fogerty:** "But nobody spoke to you this morning and said. No lady spoke to you this morning and said she thought you were the one that was responsible for the shooting of the little girl last night?"

> **Answer by the defendant:** "No, not that I can remember."

This dialogue suggests, and I infer, that the police previously had interviewed a witness who implicated Taylor in the shooting.

The aforementioned dialogue also indicates that the Detectives aggressively questioned Taylor and that Taylor had no influence on the contours of the interrogation which lasted three and one-half hours. Finally, I note that although Taylor was allowed to leave at 5:00 p.m., he was never afforded the opportunity to leave during the interview.

Accordingly, based on the officers' statements and conduct, as well as the circumstances preceding and attendant to Taylor's

SCDA2202

8

interrogation, I find that Taylor was in custody at the time he was interrogated.  See Bryant, supra at 739, n. 11.  Since Taylor made a statement without first being warned of his Miranda rights, the statement and any evidence derived therefrom must be suppressed. See Commonwealth v. Haas, 373 Mass. 545, 554 (1977).

**E.  FINDINGS ON DEFENDANT SHAWN DRUMGOLD'S INTERROGATION AND ALLEGATIONS OF PROSECUTORIAL MISCONDUCT**

At 9:00 p.m. on August 26, 1988, Detectives Richard Walsh and Paul Murphy of the Homicide Unit interviewed Tracy Peeks at her home at 72 Homestead Street which is located only one house away from the Edison plant.  She informed the police that at approximately 9:30 p.m. on August 19, 1988, she was in her second floor apartment when she heard what she thought were gun shots. She went downstairs to her front door and observed two males coming from the direction of the Edison plant walking in the direction of Walnut Park.  She got a good look at them as they walked under a street light.  She recognized one of the men as an individual who had a girlfriend who lived over the Humboldt Avenue Superette. Peeks was shown a photo array of 16 color pictures and selected Boston Police photo #304159, a photograph of the defendant Shawn Drumgold, as one of the men she had seen immediately after hearing gun shots.  Peeks told the police that Drumgold was wearing a black Adidas sweat suit when she observed him walking on Homestead Street in the direction of Walnut Park.

At approximately 9:15 a.m. on August 29, 1988, Detectives Walsh and Murphy arrived at Assistant District Attorney John

9

Canavan's office in the Roxbury District Court for the purpose of obtaining approval for a complaint against Drumgold for the murder of Darlene Tiffany Moore.[2]  Canavan informed the Detectives that Drumgold, under the alias David Royston, was already in custody at the Roxbury courthouse on drug charges.  The Detectives telephoned Assistant District Attorney Francis O'Meara, Chief of the Suffolk County District Attorney's Office Homicide Division, and informed him of Drumgold's presence in the courthouse.  O'Meara instructed the Detectives to obtain the complaint, place Drumgold under arrest, and process Drumgold through the booking procedure which included fingerprinting and photographing.  O'Meara also instructed the Detectives to "give [Drumgold] his Miranda rights and inquire of him whether or not he wished to make a statement."

On Monday, August 29, 1988, Justice Gordon A. Martin, Jr. of the District Court Department was presiding over the First Criminal Session at the Roxbury District Court.  It was Judge Martin's responsibility that morning to handle initial appearances, arraign defendants, set bail, hear motions, set trial dates, handle a juvenile session during his lunch hour, and hear spousal abuse petitions.  Judge Martin handled approximately 85 separate matters during this sitting.  The magnitude of his caseload is exemplified by the fact that in addition to the aforementioned duties, he was scheduled to arraign and appoint counsel to three adults and one

---

[2] Walsh indicated on a police report that Drumgold's arrest occurred at 10:00 a.m.; however, Walsh testified that he never actually served Drumgold with the murder complaint.

SCDA2204

10

juvenile in a murder case, and also arraign and appoint counsel in the Tiffany Moore matter.

Boston Housing Authority Police arrested Drumgold on a drug charge at approximately 2:30 a.m. on Sunday, August 28, 1988. At the time of his arrest, Drumgold had given the false name of Royston; however, he was immediately recognized at the Roxbury Division as Shawn Drumgold. Drumgold had been in custody pending arraignment on the drug charge.

At Drumgold's initial appearance around 9:30 a.m., the court appointed Attorney Paul Hadley to represent him on the drug charges.[3] Hadley and Canavan approached the bench and Canavan informed Judge Martin that Drumgold was to be charged with murder, and that the police wished to take him to Area B for booking.

I infer that the matter was passed pending the arrival of Drumgold's court appointed attorney, Steven J. Rappaport.[4] I drawn this inference because it is standard operating procedure in the Roxbury Division for the first session judge, through court personnel, to call the Committee for Public Counsel Services to obtain the appointment of a lawyer for a defendant prior to his arraignment. At approximately 11:00 a.m., the Committee contacted

---

[3] Detective Walsh testified that he was present in the courtroom when Drumgold made his initial appearance for the appointment of counsel on the drug charge.

[4] The efforts of the Roxbury Division of the District Court to assure that a lawyer appear to represent Drumgold's interests on the murder charge is consistent with that court's obligation pursuant to Mass. R. Crim. P. 7 (a)(1) and 8. See also Section 310.1 (5) of the Model Code of Pre-Arraignment Procedure.

11

Attorney Steven J. Rappaport's office requesting that he represent Drumgold. Rappaport agreed to represent Drumgold, and told the Committee that they should inform Judge Martin that he would appear for Drumgold as soon as he could get to court. At 12:10 p.m., the Committee contacted the court to confirm Mr. Rappaport's appointment.

Sometime early in the court's day after Drumgold's arraignment on the drug charge, Ms. Leslie Walker, a staff attorney for the Roxbury Defenders Unit of the Committee for Public Counsel Services, became aware that Drumgold had been or was about to be charged with murder.[5] Walker spoke with Drumgold who, after his arraignment, had been moved from the general holding cell to an isolated cell on the third floor of the courthouse. She informed him that he was to be charged with a serious offense, and that he should not speak to anyone until his court appointed attorney arrived. Drumgold told her that he understood.

Thereafter at approximately 10:00 a.m., Detectives Walsh and Murphy gained access to the detention area where Drumgold was being held. Walsh had Drumgold removed from the holding cell and placed in a small interviewing room adjacent to the cell. Walsh informed Drumgold that he had obtained a complaint against him for the murder of Tiffany Moore. Walsh asked Drumgold if he wanted to make a statement. Drumgold responded, "Ms. Leslie Walker told me I didn't have to talk to nobody." Drumgold asked if a lawyer had

---

[5] Ms. Walker had represented Drumgold on two prior occasions for offenses unrelated to this matter.

SCDA2206

12

been appointed to represent him, and the officers responded "no, not at the moment." Walsh informed Drumgold that he would be back later to book him on the murder charge. According to Walsh's testimony, the defendant then made some statements regarding the Tiffany Moore shooting.[6] At approximately 10:30 a.m., the Detectives returned to Canavan's office and telephoned O'Meara who authorized their application for a warrant.

During a morning recess, Judge Martin was again told that the police wished to remove Drumgold from the courthouse. The messenger was Court Officer Jay Crowley. The judge told Court Officer Crowley to inform the police that if the police wanted to remove Drumgold, a senior police officer must appear in person to advise the court as to why they wanted to remove Drumgold.

At approximately 12:00 p.m., Judge Martin was asked to go to the sidebar to discuss the Drumgold matter. Deputy Superintendent William Celester, the Commanding Officer of Area B, Canavan, Detective Murphy, and Attorney Paul Hadley, were present at this conference. Close by and within earshot was Attorney Leslie E. Harris of the Roxbury Defenders Unit of the Committee for Public Counsel Services.

The testimony regarding the content of this crucial side bar conference is divergent.

---

[6] Canavan testified that at approximately 10:30 a.m., Walsh and Murphy returned to his office and told him that Drumgold made a statement. Although Canavan was unable to remember the substantive content of the statement, he testified that is was his recollection that Drumgold's statement was not an admission to the crime.

SCDA2207

13

Judge Martin's testimony, corroborated by two defense lawyers, is that he directed the police not to interrogate Drumgold and that he was releasing him to their custody only for photographing and fingerprinting.  The version put forth by the Commonwealth is that the Judge was only interested in seeing to it that Drumgold was arraigned before the end of the court day, and as an afterthought, the Judge had some concern that the police would interrogate Drumgold in violation of his right to remain silent and his right to counsel.  After hearing the witnesses and weighing their testimony, I conclude that the Commonwealth's version of the event lacks credibility and that the Judge's version is the truth.

Assistant District Attorney Canavan testified that at approximately 12:00 p.m., he, Deputy Superintendent Celester, Detective Murphy, and Attorney Hadley had a sidebar conference with Judge Martin.  Canavan testified that he told the Judge that the police wanted to remove Drumgold from the courthouse for booking; however, since Canavan was unfamiliar with police procedures, he stepped back from the bench (out of ear-shot) to let Celester and Murphy explain to the Judge what they intended to do with Drumgold. Canavan testified that the only thing he could remember was that the Judge wanted Drumgold returned by 3:30 p.m.: he testified that he had no memory of the rest of the conversation.

Canavan further testified that at approximately 1:30 p.m., he had another sidebar conference with Judge Martin in the presence of Attorney Hadley.  It was at this time, according to Canavan, that Judge Martin first told Canavan that the police were not to

SCDA2208

14

interrogate Drumgold.  Canavan then proceeded to call Assistant District Attorney Francis O'Meara and told him to order the Detectives to comply with the court's order.[7]

O'Meara claims that he first heard of the court's order that Drumgold not be interrogated when he received Canavan's phone call. O'Meara testified that although he respectfully disagreed with the court's order, he intended to comply with it.  O'Meara stated that he repeatedly called telephone numbers 247-2470 and 247-4275 at Area B in an attempt to stop any interrogation.  He tried these numbers five or six times but the downstairs desk telephone (247-2470) was always busy, and the detective's phone (247-2475) was not being answered.  At approximately 1:50 p.m., O'Meara left his office in the Old Court House to drive to the Police Commissioner's Office to speak at a press conference called to announce Drumgold's arrest for the murder of Tiffany Moore.  O'Meara claimed that during the ten minute drive from the Old Courthouse to police headquarters he was constantly on his car telephone in an effort to stop the interrogation.  Finally, a female answered the phone.

---

[7] The Commonwealth's position regarding compliance with Judge Martin's order is demonstrated by the following testimony given by Assistant District Attorney Canavan:

Q.  (By Assistant District Attorney Philip Beauchesne) What communication did O'Meara want you to give to Judge Martin?

A.  He wanted me to tell Judge Martin pretty much to let the police do their job, and then let the courts do their job, and then let the press do their job, and not be dictated by the press, who had been there to cover another murder arraignment that day.

SCDA2209

15

O'Meara asked to speak with Detective Murphy but the wrong Murphy responded.  He thanked the female, and hung up.  Then he repeatedly called 247-2475 but failed to get through.  After O'Meara had parked his car at police headquarters at approximately 2:04 p.m., he finally succeeded in reaching one of the detectives.  O'Meara could not recall whether he spoke to Murphy or Walsh, but he instructed the detective on the phone not to interrogate Drumgold. The detective told him that it was too late as Drumgold had already given them a tape recorded statement.

Detective Murphy testified that the only statement he heard the Judge make was that Drumgold was to be returned by 3:30 p.m. Murphy said that he explained to the Judge that they needed to take full hand prints and total body photographs of Drumgold.  Murphy testified that his specific memory was that the Judge had no other concern save having Drumgold back in the courthouse within three hours. I do not find Murphy's testimony credible.

Celester testified that he went to the courthouse because Judge Martin wanted a ranking police officer to assure him that if Drumgold was released for booking, he would be back by a certain time.   Celester testified that he told the Judge that it was necessary for the homicide detectives to take Drumgold out of the courthouse for booking.  Celester testified that Judge Martin asked him if they could have Drumgold back by 2:30 p.m.  Celester said that he told the Judge that it would be impossible to get him back that fast.  Celester then testified that the Judge said, "Well I want him back by 3:30 at the latest."  Celester said that the

SCDA2210

16

Homicide Unit detectives left, and as Celester started to leave the courtroom, the Judge called for Celester to return to the bench for a second discussion.  Celester testified that at the second sidebar conference he was alone with the Judge.  The Judge told Celester, "You're not going to question him, are you?"  Celester answered, "No, I'm not."

Celester further testified that he did not advise Detective Murphy or Detective Walsh of the Judge's order.  In his testimony before me, Celester insisted that he failed to advise the Detectives not to interrogate Drumgold because he had interpreted the Judge's order as applying only to him personally and not to other police officers.  On the other hand, the Deputy Superintendent admitted that he fully understood that the Judge had summoned him to the courthouse for the singular purpose of receiving an assurance from a ranking superior officer of the Department that the Judge's order would be obeyed.

Judge Martin testified that Celester told him that the police wished to remove Drumgold from the building to book him for the murder and to perform additional photographing and fingerprinting. Celester told Judge Martin that the police wanted to delay Drumgold's arraignment until the following day.  The Judge said he questioned the necessity of further fingerprinting and photographing since the defendant previously had been brought to the identification section for the drug charge.  However, Celester insisted that because this was a homicide case, the police needed

SCDA2211

17

additional fingerprints and photographs.[8] The Judge testified that he told Superintendent Celester and Detective Murphy that Drumgold was not to be questioned and that he was permitting them to take Drumgold only for the purpose of fingerprinting and photographing.

Attorney Harris overheard these conversations, and corroborated the Judge's testimony regarding the side bar discussions and the Judge's order to the police. Attorney Paul Hadley was also present at the discussion and his testimony corroborates the Judge's specific memory of the side bar conference and his order to the authorities not to question Drumgold. In fact, Hadley testified that soon after the bench conference, he visited Drumgold in the holding cell and told him that he was being taken to Area B for booking, that his court appointed attorney would be arriving around 2:00, and further advised Drumgold not to speak with anyone about the case until he had a chance to talk with his attorney. I specifically find that Judge Martin's testimony

---

[8] I find that nothing in the record indicates that there was any immediate need to obtain Drumgold's fingerprints and photograph. I draw the inference that police insistence on taking additional fingerprints and photographs was a ruse to get Drumgold out of the courthouse so that he could be interrogated in the more coercive environment of a small detective's office at Area B police station, free from the assistance of his court appointed lawyer or any other legal advice.

It is interesting to note that the additional identification procedures allegedly needed – full body photographs and palm prints – could not have been performed at the Area B station. Such identification procedures can only be done at the Identification Section of the Boston Police Department which is located at Division 4 on Warren Street. In this case, Drumgold was not brought to the Warren Street Identification Section until after he was interrogated at Area B.

SCDA2212

18

is credible and is fully supported by the evidence.[9]

I infer that sometime relatively soon after the 12:00 p.m. bench conference, Drumgold was transported to the Area B Police Station, ostensibly for the purpose of additional photographing and fingerprinting. He inquired as to why he was being removed, and the police told him that he was going to be booked and questioned. In response, Drumgold said, "For what? There is supposed to be a lawyer representing me." Drumgold asked whether a lawyer had been appointed to him and Walsh responded that there was no one to represent him.

At Area B, Drumgold was brought to a room on the second floor. The officers played a tape of Taylor's statement, and indicated that one individual told them "he heard that [Drumgold] was the one that shot the little girl", and another said that Drumgold had been seen at a picnic with two pistols. At 1:30 p.m., Drumgold signed a written waiver of rights form. The police tape recorded Drumgold's oral waiver of his rights and his statement concerning the shooting of Darlene Tiffany Moore.

---

[9] The Commonwealth and defense counsel agreed that an attempt should be made to enhance the quality of the District Court recording of the relevant sidebar conference. Accordingly, with their consent, I engaged the assistance of Dietrich Group, Inc. of Waltham. However, Dietrich Group reported that even after the tape had been enhanced, the sidebar conference remained unintelligible. I listened to the enhanced tape myself and was unable to hear anything substantive. Dietrich Group suggested that the court could contact the FBI if it wanted to pursue the matter further. However, instead of delaying this matter any longer, I've made my findings of fact based on traditional principles of credibility.

SCDA2213

19

Attorney Rappaport arrived at the Roxbury Division at approximately 1:15 p.m. where he spoke with Attorney Leslie Walker of the Roxbury Office of the Committee. She informed Rappaport that she had represented Drumgold in the past and that when she learned Drumgold had been served with a murder warrant, she advised Drumgold not to speak with the police until his attorney arrived to represent him. Rappaport went to the First Session Court Room where he learned that his client had been taken from the building by Boston police officers for fingerprinting and photographing.

Hadley told Rappaport that Judge Martin had permitted the police to take Drumgold out of the court for the purpose of fingerprinting and photographing. Hadley went on to tell Rappaport that Judge Martin had ordered the police and Assistant District Attorney Canavan not to interrogate Drumgold until his attorney arrived at the court to consult with him. Hadley also told Rappaport that he had advised Drumgold not to make any statements to the police until his appointed attorney for the murder complaint arrived.

At approximately 2:05 p.m., Rappaport went to the Area B Police Station to see if he could find his client. The station is located 200 yards from the courthouse. He identified himself to a detective as Drumgold's attorney and requested to speak with Drumgold. The detective confirmed that Drumgold was at the station and asked Rappaport to wait a few minutes. Rappaport then spoke to Drumgold's family who told Rappaport that police officers had just taken Drumgold out of the station through a secondary door.

SCDA2214

20

At approximately 2:15 p.m., Rappaport observed Detectives Walsh and Murphy of the Homicide Unit leaving the station. He asked them if they had been assigned to the Tiffany Moore murder case. When they responded in the affirmative, Rappaport told them that he did not want either of them to interrogate Drumgold. They told him that they had already tape recorded Drumgold's statement. When Rappaport asked to see his client, the officers informed him that Drumgold was being brought downtown to the identification section for photographing and fingerprinting.

Rappaport returned to the Roxbury Division and at approximately 2:45 p.m., he spoke to Judge Martin and reported that Detectives Walsh and Murphy had tape recorded a statement from his client. Judge Martin told Rappaport that he had permitted the police to remove Drumgold from the court house on their representation that he would not be interrogated.

**F. RULINGS ON DEFENDANT SHAWN DRUMGOLD'S MOTION TO SUPPRESS**

Drumgold has moved to suppress statements made to the authorities at the District Court and at the Area B station on the grounds that both statements were obtained in violation of his Fifth and Sixth Amendment rights. In response, the Commonwealth contends that Drumgold voluntarily, knowingly, and intelligently waived his Fifth Amendment rights and that his statements were voluntary. In addition, the Commonwealth argues that there was no violation of Drumgold's 6th Amendment right to counsel.

    (1)   **Drumgold's alleged statements made at the Roxbury District Court.**

21

Where a defendant challenges an officer's compliance with the dictates of <u>Miranda</u>, the Commonwealth bears the burden of proving compliance with <u>Miranda</u>. <u>Commonwealth</u> v. <u>Smith</u>, 2 Mass. App. Ct., 821, 822 (1974). The Commonwealth must prove beyond a reasonable doubt that the defendant made a knowing and intelligent waiver of his <u>Miranda</u> rights, and that the statements were voluntary beyond a reasonable doubt. <u>Commonwealth</u> v. <u>Day</u>, 387 Mass. 915, 921 (1983); <u>Commonwealth</u> v. <u>Tavares</u>, 385 Mass. 140, 152 (1982).

I find that Drumgold's alleged statements made to the officers at the District Court were the product of custodial interrogation. Although the Detectives maintain that they read Drumgold his rights, I find that the Commonwealth has not proved "beyond a reasonable doubt" that the police complied with <u>Miranda</u> or that the defendant knowingly, intelligently, and voluntarily waived his rights. Accordingly, any statements made by Drumgold to the police at this initial interrogation are suppressed.

As additional grounds for suppression, I find that Drumgold's statement was made in response to interrogation conducted after he had indicated an express unwillingness to talk. "It is clear that a defendant has not only the right to remain silent from the beginning but also a continuing right to cut off, at any time, any questioning that does take place." <u>Commonwealth</u> v. <u>Bradshaw</u>, 385 Mass. 244, 265 (1982) citing <u>Commonwealth</u> v. <u>Brant</u>, 380 Mass. 876, 884 (1980). Admissibility of statements obtained after the person in custody has decided to remain silent depends on whether his right to cut off questioning has been scrupulously honored.

22

<u>Michigan</u> v. <u>Mosely</u>, 423 U.S. 96, 104 (1975); <u>Brant</u>, <u>supra</u> at 884.

Drumgold expressed a clear unwillingness to talk to the officers the moment they mentioned the murder charges.[10]  Cf. <u>Commonwealth</u> v. <u>Pennellatore</u>, 393 Mass. 382, 386-388 (1984) (defendant's statement "Can we stop, please?" not a request to halt questioning when viewed in context of defendant's willingness to speak immediately prior to and subsequent to a break). Nevertheless, I infer that the officers continued to question Drumgold and that he made some statements in response to this interrogation.  Based on these findings of fact, I rule that the officers failed to scrupulously honor Drumgold's assertion of his right to remain silent; therefore, any statement made by Drumgold at the Roxbury District Court must be suppressed.

(2) <u>Drumgold's statements made at Area B.</u>

A review of the circumstances leading up to Drumgold's statements made at Area B reveals that, here too, Drumgold's decision to remain silent and cut off questioning was not scrupulously honored.

I find that when the police conducted Drumgold's interrogation at the Area B police station, they did so in violation of his previously asserted right to remain silent.  Based on the evidence and all the reasonable inferences to be drawn therefrom, I find that there was a deliberate decision on the part of the police to

---

[10] The evidence indicates that Attorneys Walker and Hadley advised Drumgold to remain silent until his court appointed attorney arrived, and that Drumgold told Walsh and Murphy that he had been advised to remain silent.

23

interrogate Drumgold in spite of his earlier desire to remain silent. I find that the police purposefully created and placed Drumgold in a situation designed to undermine his decision to remain silent. Jackson, supra at 325-327. See also Commonwealth v. Harvey, 390 Mass. 203 (1983); Commonwealth v. Taylor, 374 Mass. 426 (1978). They brought Drumgold from the courthouse to Area B, temporarily insulated him from further legal advice, presented him with allegedly incriminating information, and questioned him about the same crime which was the subject of the earlier interrogation.[11] Cf. Mosely, supra at 105 (suspect questioned on an unrelated crime). Not only was this done in violation of a District Court Judge's order, but I also find that the police conduct was contrary to the letter and spirit of the Miranda decision. In the factual circumstances of this case, there was an insufficient passage of time between the interrogation at the court and the interrogation at Area B to constitute a scrupulous observance of Drumgold's earlier assertion of his right to remain silent. Commonwealth v. Gallant, 381 Mass. 465, 468 (1980).

Even if I were to find that the interrogation at Area B did not violate Drumgold's earlier asserted right to remain silent, the statement must nevertheless be suppressed. Since Drumgold's statement was made after he had been given Miranda warnings and in the absence of counsel, the admissibility of the statement depends

---

[11] Defense counsel does not argue, nor is there any evidence that the police dispensed misinformation. See Commonwealth v. Nero, 14 Mass. App. Ct. 714 (1982).

24

on whether his waiver of his constitutional rights was made voluntarily, knowingly, and intelligently. Commonwealth v. Jackson, 377 Mass. 319, 325 (1979). Based on the totality of circumstances, I find that the Commonwealth has failed to satisfy its heavy burden of showing beyond a reasonable doubt that Drumgold made a knowing, intelligent and voluntary waiver. Day, supra at 921; Tavares, supra at 152.[12]

## G. RULINGS ON DEFENDANT SHAWN DRUMGOLD'S MOTION TO DISMISS INDICTMENT DUE TO PROSECUTORIAL MISCONDUCT

Drumgold has moved to dismiss the indictment on the grounds that egregious prosecutorial misconduct has resulted in irremedial prejudice.

Based on all the credible evidence presented at the suppression hearing, I find that the pattern of conduct engaged in by the police and the district attorney's office from the outset was designed to compromise Drumgold's rights.[13] In so doing, these two agencies engaged in an intentional deceit upon a judge of the District Court Department who was attempting under the most trying of circumstances to protect Drumgold's constitutional rights. Drumgold was removed from the courthouse under false pretenses and questioned at Area B in direct contravention of Judge Martin's order. I find that this type of conduct is deplorable and cannot

---

[12] Because this issue is disposed of on Fifth Amendment grounds, I need not address Drumgold's Sixth Amendment contentions. Brant, supra at 882.

[13] As noted earlier, I specifically find that Judge Martin instructed Detective Murphy and Superintendent Celester not to interrogate Drumgold.

SCDA2219

25

be countenanced.

In light of my findings, the sole question before the court is whether the police misconduct warrants dismissal of the indictment.

"Dismissal of indictments is a drastic remedy for official misconduct." Commonwealth v. Cinelli, 389 Mass. 197, 210 (1983). Whether an indictment should be dismissed "turns primarily on the ability of the defendant to obtain a fair trial after, and in light of, the impropriety." Commonwealth v. Lam Hue Tu, 391 Mass. 301, 312-313 (1984). "Absent egregious misconduct or at least a serious threat of prejudice, the remedy of dismissal infringes too severely on the public interest in bringing guilty persons to justice." Cinelli, supra at 210. Although the Supreme Judicial Court noted that "prosecutorial misconduct that is egregious, deliberate, and intentional, or that results in a violation of Constitutional rights may give rise to presumptive prejudice," Commonwealth v. Cronk, 396 Mass. 194, 199 (1985), the Court has "never ordered dismissal of an indictment for misconduct in the absence of prejudice." Commonwealth. v. King, 400 Mass. 283, 290 (1987).

The burden of proof is on the Commonwealth to show that the defendant will not be prejudiced by the improper conduct of the police. Commonwealth v. Fontaine, 401 Mass. 491, 495 (1988). "There must be a showing that, for any future proceedings, the improper police conduct neither improves the Commonwealth's case nor prevents adequate protection of the defendant's position." Id.

However, judicial responses to official misconduct should be

26

limited to remedial rather than punitive measures. <u>Commonwealth</u> v. <u>Hine</u>, 393 Mass. 564, 573 (1984). "[C]ourts should not adopt prophylactic remedies for police misconduct which needlessly frustrate law enforcement and public interests in the sphere." <u>Id</u>. Judicial remedies for official misconduct "should be tailored to cure the prejudice to the defendant." <u>Id</u>. See also <u>King</u>, <u>supra</u> at 292-292.

I do not agree with Drumgold's contention that, as a result of Drumgold's statement, the prosecution obtained an improper advantage in anticipating defense trial strategy thereby causing irremediable prejudice to the defense. See <u>Fontaine</u>, <u>supra</u> at 497. However, I find that Drumgold would be prejudiced by the Commonwealth's use at trial of the improperly obtained statement. Therefore, independent of my decision to suppress Drumgold's statements made at the Area B station on Fifth Amendment grounds, I find that prosecutorial misconduct in questioning Drumgold in violation of Judge Martin's order warrants suppression of the statement. I find that the remedy of suppression is sufficient to cure any prejudice occasioned by the deliberate misconduct of the authorities; therefore, dismissal of the indictment is unwarranted. See <u>Commonwealth</u> v. <u>Carlson</u>, 17 Mass. App. Ct. 52, 60 n. 6 (1983) ("a claim of prejudice will usually fail if the taint caused by the misconduct can be identified and neutralized by relief appropriate in the circumstances, such as suppression of the evidence obtained as a result of the misconduct").

SCDA2221

27

## H. RULING ON DEFENDANTS' MOTIONS TO DISMISS INDICTMENTS DUE TO INSUFFICIENCY OF EVIDENCE AND IMPAIRMENT OF GRAND JURY PROCEEDINGS

Both defendant's have moved to dismiss the indictments on the grounds that there was insufficient evidence before the grand jury to indict, and that the Commonwealth's selective presentation of evidence impaired the integrity of the grand jury proceeding.

Generally, the court will not inquire into the adequacy or competency of the evidence before the grand jury. Commonwealth v. McCarthy, 385 Mass. 160, 162 (1983) citing Commonwealth v. Robinson, 373 Mass. 591, 592 (1977). However, the court will consider whether grand jury evidence was sufficient to warrant a finding of probable cause and whether the defendant has shown that the integrity of the grand jury proceedings was impaired. Commonwealth v. Mayfield, 398 Mass. 615, 619-620 (1983). "[A]t the very least the grand jury must hear sufficient evidence to establish the identity of the accused and probable cause to arrest him." McCarthy, supra at 163 (citations omitted). The prosecution is not required to present all exculpatory evidence to the grand jury. Commonwealth v. Connor, 392 Mass. 838, 854 (1984). "The issue is not whether evidence exculpatory to the defendants was withheld from the grand jury; rather, it is whether dismissal of the indictments is required because 'the integrity of [the] grand jury...[was] impaired.'" Commonwealth v. McJunkin, 11 Mass. App. Ct. 609, 613 (1981)

SCDA2222

28

I have carefully reviewed the grand jury testimony of Detective Walsh and Tracy Peeks. Based on all the evidence presented to the grand jury, I find that there was sufficient circumstantial evidence before the grand jury amounting to probable cause to arrest both defendants for the crime. Furthermore, I find that the prosecution's failure to present other evidence in this case did not impair the integrity of the grand jury proceedings; therefore, dismissal of the indictments is not warranted.

## ORDER

Based on the foregoing considerations, the defendant Terrance Taylor's motion to suppress statements and all evidence derived therefrom is **ALLOWED**; defendant Shawn Drumgold's motion to suppress statements and all evidence derived therefrom is **ALLOWED**; defendant Shawn Drumgold's motion to dismiss the indictment due to prosecutorial misconduct is **DENIED**; and both defendants' motions to dismiss indictments due to insufficiency of the evidence and impairment of the grand jury proceedings are **DENIED**.

Guy Volterra
Justice of the Superior Court

DATED: May /8, 1989

SCDA2223