# EXHIBIT 7

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                              Superior Court
Nos. 071882-83                            Volterra, J
     073128

COMMONWEALTH OF MASSACHUSETTS

vs.

SHAWN DRUMGOLD and TERRANCE TAYLOR

APPEARANCES:

   Philip T. Beauchesne, Esq., Assistant District
       Attorney, on behalf of the Commonwealth.

   Steven J. Rappaport, Esq., on behalf of the Defendant
       Shawn Drumgold.

   Robert George, Esq., on behalf of the Defendant,
       Terrance Taylor.

                              Suffolk Superior Courthouse
                              Boston, Massachusetts
                              Thursday, March 2, 1989

                     MOTION TO DISMISS

                        VOLUME I

                     Pages 1 to 143

                   ANN M. DONNELLY
                 OFFICIAL COURT REPORTER

I-2

I N D E X

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Gordon A. Martin, Jr. | 4 | 15 | | |
| Leslie E. Harris | 24 | 31 | | |
| Leslie Walker | 38 | 45 | | |
| Richard Walsh | 50 | 88 | 96 | |
| Paul Hadley | 102 | 107 | | |
| Paul J. Murphy | 110 | 113 | | |
| Shawn Drumgold | 121 | 132 | | |


E X H I B I T S

| No. | | In Evidence |
|---|---|---|
| 1 | District Court tapes (3) | 14 |
| 2 | Incident report | 65 |
| 3 | Advice of rights form | 68 |
| 4 | Transcript of tape recorded statement by Defendant | 72 |
| 5 | Booking sheet | 83 |
| 6 | Incident report and booking sheet (8/28/88) | 89 |
| 7 | Affidavit and search warrant | 102 |

(Chalk 1 - diagram -- page 33)

I-4

1    Hadley, an attorney who was the bar advocate on August 29th,

2    1988, in the Roxbury Municipal Court.

3                And it's my understanding as well that Mr.

4    Beauchesne has a number of police witnesses as well.

5                Without further ado, if I may, your Honor,

6    I'll call Justice Gordon Martin.

7                      GORDON MARTIN, Sworn

8                       Direct Examination

9    BY MR. RAPPAPORT:

10   Q    Will you state your name for the record, please,

11        sir?

12   A    Gordon A. Martin, Jr.

13   Q    And you are employed, sir, as?

14   A    I'm a District Court Judge, based in Roxbury,

15        Massachusetts.

16   Q    Judge Martin, directing your attention to August 29,

17        1988, do you recall whether you were sitting in

18        Roxbury District Court on that date?

19   A    I was.

20   Q    And during the course of that day, sir, did a

21        particular Defendant, one Shawn Drumgold -- was his

22        case brought to your attention?

23   A    Two cases were brought to my attention.

24   Q    You say two cases involving Mr. Drumgold?

25   A    Yes.

1        you -- either did you assign counsel, or did you

2        learn that counsel had been assigned to represent

3        Mr. Drumgold on the murder case?

4   A   Yes.  I think I made the designation of Mr. Hadley.

5        Occassionally a Clerk will do that, but I'm pretty

6        sure that morning that I picked Mr. Hadley.

7   Q   That was for the drug case?

8   A   Yes.

9   Q   And you learned, prior to having discussions with

10       any senior members of the Boston Police Department

11       that counsel had been assigned by the Committee

12       for Public Counsel Services to represent Mr.

13       Drumgold on the murder case?

14   A   I'm not sure that I learned that counsel had been

15       assigned, but I was advised that a murder complaint

16       was going to be sought against Mr. Drumgold; and I

17       requested that the Committee for Public Counsel

18       be contacted, so that counsel would be assigned,

19       specifically, for the murder charge.

20   Q   And at a certain point, sir, did you in fact have

21       discussions with a senior member of the Boston

22       Police Department?

23   A   Two -- two senior members.

24   Q   Do you know who they were, sir?

25   A   One was Deputy Superintendent William Celester.  The

I-8

1        other -- I was advised of his name at the time, I

2        think.  I don't recall it at this point.  I believe

3        it was a detective.

4  Q    Now, sir, would the names Detective Walsh or Detective

5        Murphy -- do you know if it was either of those

6        people?

7  A    I do not personally know that for sure.

8  Q    Have you seen that detective that day?

9  A    I may well have.  I see detectives every day.

10  Q    At a certain point, sir, you did have a discussion,

11        did you not, with Mr. Celester at the sidebar?

12  A    And with the detective.

13  Q    And with that other detective as well?

14  A    Yes.

15  Q    And do you recall what the content of that conversation

16        was, sir?

17  A    They advised me that they wished to remove Mr.

18        Drumgold from the building, and delay his arraignment

19        until the following court day.  I raised question as to

20        why that was necessary, since it was my understanding

21        that he had already been to ID; and my belief was that

22        proper ID procedures were taken with persons accused of

23        a drug offense.  I was advised, I believe primarily

24        by Deputy Superintendent Celester, that inadequate ID

25        occurred, that there was a need in his, or their,

```
1    judgment for additional fingerprinting and photograph-
2    ing of Mr. Drumgold.
3  Q  Did the issue of interrogation of Mr. Drumgold ever
4    come up during the course of the discussions with Mr.
5    Celester and this other detective?
6  A  Yes.
7  Q  And specifically what was said with regard to
8    interrogation of Mr. Drumgold?
9  A  I told them that I was permitting him to leave the
10   building for a specific, limited amount of time,
11   solely for the purposes of the additional identifica-
12   tion procedures, the photographing and the fingerprint-
13   ing that I had been advised was necessary.
14   I told them that it was not, in my judgment, adequate
15   for him to be returned the next day; that it seemed
16   to me that everything that was being sought could be
17   completed in three to three and a half hours.  And my
18   belief is that we set 3:30 as the deadline by which Mr.
19   Drumgold would be returned to our courthouse.
20 Q  Sir, at----
21              THE COURT: Do you have a memory as to
22   when this conversation at the sidebar took place?
23              THE WITNESS:  My memory, Judge Volterra,
24   is based on the three-and-a-half to three-hour period;
25   and thus I believe it was about noontime.
```

I-20

1     Q     And in response to that did you take any action?

2     A     That was when I asked that either the Committee

3          for Public Counsel be advised, or whether they had

4          in fact already been advised.  I did one or the

5          other.

6     Q     Who did you direct that order to?

7     A     To either Mr. Silva or Mr. Freeman, or both.

8     Q     It was not to a representative of the Committee for

9          Public Counsel; it was one of your clerks?

10    A     Yes.

11    Q     And when you had the conversation with Deputy

12         Celester, who else, if anybody, was present at that

13         sidebar conference?

14    A     There was a detective with him.  I don't recall

15         whether Mr. Silva moved over.  I don't think he did.

16         Whether he could hear what we were saying, I don't

17         know.

18    Q     Would you recognize the officer if you saw him?

19    A     I'm not sure.

20            MR. BEAUCHESNE:  Officer Murphy, would you

21   stand up, sir?

22           (Officer Murphy stood.)

23     BY MR. BEAUCHESNE:

24    Q     Is that the officer that was at sidebar that morning,

25         your Honor?

I-21

1   A   It may well have been.  I can't make a positive

2       identification.

3   Q   You just don't know.

4   A   I'm not sure.

5   Q   All right.

6       It could have been?

7   A   Yes.

8   Q   Was there anybody else, other than you and Celester,

9       and this officer, at that conference?

10  A   Well, as I said, I can't recall specifically, since

11      my back was to him at that point, at least partially,

12      whether my Clerk, Joe Silva, moved over or not.

13  Q   But excluding Joe Silva, any other person?

14  A   I don't think so.  No.

15  Q   Who raised the interrogation, sir?

16  A   I think I did.  Yes.

17  Q   Sua sponte, so called?

18  A   Yes, as part of the conversation as to why they wanted

19      to remove him.

20  Q   And do you recall -- can you give us your best memory,

21      in verbatim form, the conversation as you now recall

22      it?

23  A   They came up to the left; and I noticed them there,

24      and moved over.  I know Deputy Celester by sight.

25      I don't remember the order of the conversation, and I

I-22

1   can't really give a verbatim account, except as to

2   the elements that -- my expression of surprise that

3   additional identification was needed, if someone had

4   in fact already been through ID; the assurance I

5   got, primarily from Deputy Celester, that in a

6   murder case, such as the one that was being

7   investigated here, much more would be done for iden-

8   tification purposes; specifically: more photographs,

9   different types of photographs, more fingerprinting

10  than was one on the ordinary case involving someone

11  accused of selling or possessing illegal drugs with

12  the intent to sell.  That was the explanation as to

13  why they wanted to remove him.

14  I believe that I stated, before they left, no

15  interrogation, and that there was a clear agreement

16  that he was being removed solely for the purpose of

17  this additional identification.

18  Q    At that particular time had you been advised of any

19       particular counsel that was to be appointed by the

20       Committee for Public Counsel Services?

21  A    I'm not sure, but I don't think so.

22  Q    And at that time you had not appointed anybody to

23       represent him on the murder charge?

24  A    No.  No, I'd appointed Paul Hadley for the drug case.

25  Q    Had Hadley been appointed prior to your agreeing to

# EXHIBIT 8

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                          Superior Court
Nos. 071882-83                        Volterra, J
     073128

COMMONWEALTH OF MASSACHUSETTS

vs.

SHAWN DRUMGOLD and TERRANCE TAYLOR

APPEARANCES:

    Philip T. Beauchesne, Esq., Assistant District
        Attorney, on behalf of the Commonwealth.

    Steven J. Rappaport, Esq., on behalf of the Defendant
        Shawn Drumgold.

    Robert George, Esq., on behalf of the Defendant,
        Terrance Taylor.

                            Suffolk Superior Courthouse
                            Boston, Massachusetts
                            Tuesday, March 7, 1989

MOTION TO DISMISS

VOLUME III

Pages 1-191

ANN M. DONNELLY
OFFICIAL COURT REPORTER

2

I N D E X

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Denise Simonini Hall | 7 | 8 | 10 | |
| Terrance Taylor | 48 | 53 | 59 | |
| Richard Walsh | 60 | 69 | 93 | 97 |

E X H I B I T S

| No. | In Evid. | For Iden. |
|---|---|---|
| 11   CPCS appointment form | 7 | |

------------------------------

Motion Challenging Integrity of Grand Jury Process

No. 1    Statements of witnesses    Page 21

A for ID. News articles    Page 35

B for ID. Supplemental news articles Page 35

127

pattern that's as close to this fact pattern as I could
possibly get.  In Estelle vs. Smith the Defendant was in
custody, as this Defendant was.  He had been indicted
in that case.  In this case this Defendant had been
complained against.  And he had counsel appointed for him,
as in this case. Certainly at the time of the afternoon
statement, counsel----

         (Discussion off the record.)

      MR. RAPPAPORT:  As I say, Judge, Estelle
vs. Smith is a Supreme Court case, where the Defendant wa
in custody, had counsel appointed to represent him, and
he had been indicted, as opposed to complained against.
In that particular case the fact pattern-- the Court
doesn't say whether or not a plea had been entered by the
Defendant.  But the case arises out of the appointment of
a psychiatrist to examine the Defendant as to his compe-
tency at that particular time.

      So perhaps the Court didn't actually take
a plea in thatparticular case -- Estelle vs. Smith.
The Sixth Amendment right to counsel had attached at that
particular time.

      There's no question that in this case,
on the murder charge, that there had not been an actual
plea of guilty or not guilty.  However, if you take a look

128

at the record, Judge -- and the record consists of the

tapes, as well -- I ask the Court to take a look at what

Mr. Beauchesne provided the Court by way of a chalk.

        Judge, when Mr. Hadley was testifying,

it was his memory that he was appointed to represent Mr.

Drumgold, and that Mr. Drumgold was arraigned in the

morning; and the bail hearing was put over for some other

time.  This was certainly on the first charge, on the

drug charge.

        It was Judge Martin's memory that the

arraignment -- when he testified here that the arraignment

hadn't taken place -- Judge, what I'm going to ask the

Court to do is take a look at, first, page 6 of the

chalk that Mr. Beauchesne supplied to the Court.  And

you'll see that they being with the murder complaint.

        And it says: Shawn Drumgold, arraignment.

They begin with the murder complaint, and a not guilty --

a plea of not guilty is entered by the Court on behalf of

Mr. Drumgold.  That's at page 6, on the murder charge.

        Then they go into the question of the

bail.  And after going into the question of bail, at

page 11, Judge, at the bottom, I state to the Court:

        "Yes, your Honor.  I should state that at

        approximately 11:00 o'clock this morning

129

1

2      I received a call from the Committee for

3      Public Counsel Services, asking if I would

4      be willing to represent Mr. Drumgold."

5          On to page 12, the Judge then responds:

6      "And that was following the Court having

7      been advised that a murder complaint was

8      being sought today by the Commonwealth

9      against Mr. Drumgold, who had been pre-

10     viously arraigned on drug charges, to

11     which Mr. Hadley was appointed to represent

12     him."

13         Judge, if you then go on to page -- I

14   guess it's page 19.  It's after page 18 in what I have

15   here, and it's an unmarked page.  It then says again:

16   Arraignment of Shawn Drumgold.  And you'll see there that

17   the Clerk says that on Shawn Drumgold, that complaint

18   number, the possession of Class A with intent to distrib-

19   ute: Is the Commonwealth asking for bail on that

20   complaint?

21         There's never any plea entered or asked

22   for in that particular instance.  And I ask the Court to

23   make a finding of fact, based upon what Mr. Hadley

24   testified to, and based upon what the record appears to

25   indicate, that at least for purposes for the Court's

130

rulings of law at a later point, that Mr. Drumgold had in

fact been arraigned early on the morning of August 29th,

when Mr. Hadley was appointed to represent him on that

drug case.  So that he had been arraigned, at least on

that case, with counsel appointed.  And I ask the Court

to make that finding of fact.

I also ask the Court to consider, if it

will, the testimony by Mr. O'Meara.  Mr. O'Meara testified

that early on that morning he received a call from the

Roxbury Municipal Court that Mr. Drumgold was in custody.

He spoke to either Walsh, or both; and he told them at

that point, before they'd ever spoken to Mr. Drumgold, he

told them at that point what he wanted them to do.

What Mr. O'Meara very forthrightly said

was: I want the full booking procedure, which included

pictures, prints, and have him Mirandized and ask him

whether or not he wants to give you a statement.  Mr.

O'Meara directed these two detectives very early in the

morning that: Look, if we can get a statement from this

guy, let's get a statement from this guy.

Well, Judge, that's not the way the

testimony comes out from Mr. Walsh and Mr. Murphy.

According to Judge Martin he says that a detective, who

we now know is Murphy, in the presence of Celester,

131

came to him at the sidebar, saying: We want Mr. Drumgold. What do you want him for?  Judge, we have identification procedures that we have to take care of.  We need pictures.  We need prints.

Now, Judge, at this stage of the game there's absolutely nothing that they would have to match his prints up against.  At this stage of the game, even in March, there's nothing to match his prints up against. At this stage of the game, in March, there's no identification been made by anybody other than people that already knew Mr. Drumgold.

This was a ruse, Judge.  This was a ruse by these two detectives to get Mr. Drumgold out of that courthouse, so that they could get a statement from him. Judge, there was clearly no indication to Judge Martin by any officers-- and Mr. Murphy was present, he's Walsh's partner -- that there had already been some sort of interrogation earlier that day.  They made the representation that all they wanted him for was prints and photos, ID purposes.

Now, Judge Martin seems to recall bringing up the question of interrogation, and having had it represented to him very clearly that there would be no interrogation of this particular Defendant.  Now, I submit to the

132

Court that Judge Martin would seem to have absolutely no
reason to fabricate his testimony.   Certainly if there are
problems with memory, that's understandable, because,
after all, judges, lawyers, police officers -- we're all
human beings, and there are certain frailties of human
nature.  And one of them is that memory fades after a
period of time.

         But I submit to the Court that you might
be able to say: Well, maybe it never came up between
Judge Martin and Celester, and this detective, who we now
know as Murphy, if it wasn't for Celester himself.
Celester came into this courtroom and said: Well, there
was a preliminary discussion about booking, and when we
could get him back here.  And I really didn't know what we
needed for booking, and we had to bring him someplace
else, although the testimony is clearly that he was brought
to Area B first, despite the fact that they didn't have
the ability to do the ID procedures at Area B.  He was
still brought to Area B.

         So, what happens?   Celester knows that
a senior police official was requested in the courtroom
by Judge Martin.  Judge Martin wanted certain representa-
tions.  And Celester says at a certain point Judge Martin
does call him back to the bench and says: Look, you're not

133

going to question this guy, are you?  And Celester's response is: No, I'm not.

Judge, once again, a deception -- an intentional deception of the Court, a ruse to get possession of this man's body so that they can do what they will with him at thatpoint.  Judge Mr. Celester is the commander of Area B, and as the Court well knows he has overall supervision of the police officers operating within his section.

After being told by the Court in no uncertain terms that you're not to question this man, Mr. Celester did not even bother to tell the detectives, who hadn't even taken Mr. Drumgold from the courtroom yet -- and as you listen to the tape you know that Mr. Drumgold wasn't taken immediately from the courthouse, because he was then given a period of time to confer with Mr. Hadley before he was taken from the courthouse -- that Mr. Celester never communicated this to his brother officers.

If you want to believe that Murphy didn't hear it in the first place, Mr. Harris -- who was an attorney working for the Roxbury Defenders Committee -- was sitting in the courtroom some 12 feet away.  He heard what the Judge had to say.

134/135

Mr. Hadley was up at the bench, your

Honor, with the police officers and the judge; and he

heard what the judge had to say.  He remembers the judge

shaking his finger, or Harris -= they remember the judge

shaking his finger: Look, you're not to interrogate this

guy.  I'm only giving him up for ID purposes.

Judge, number one, the representation that

it was only for ID purposes was a misrepresentation, based

upon what Mr. O'Meara says.  Mr. O'Meara said: Look, if

you can get a statement from this guy, get the statement.

THE COURT:  Assuming that everything you

say is true, and without in any way denigrating from the

ability of Judge Gordon Martin, I ask a rhetorical

question.

What business did --  two rhetorical

questions.  What business did Judge Martin have in

permitting Drumgold to go?  One.  Two: If he did, does

that free up the police to do whatever they want?

MR. RAPPAPORT:  No.  This is the unique

nature of the situation.  You're talking about actions by

representatives of the Commonwealth.  Whether you're talk-

ing about the police, or you're talking about the Judge,

you're still talking about the Commonwealth.  The Judge,

as an agent of the Commonwealth, gives the Defendant up to