UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SHAWN DRUMGOLD<br>   Plaintiff,<br><br>v.<br><br>TIMOTHY CALLAHAN, FRANCIS M.<br>ROACHE, PAUL MURPHY, RICHARD<br>WALSH, and THE CITY OF BOSTON,<br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. NO.: 04-11193NG |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
JOINT MOTION IN LIMINE TO EXCLUDE
CERTAIN WITNESSES AND PRECLUDE REMARKS DURING TRIAL[1]**

The Defendants, Richard Walsh ("Walsh"), Timothy Callahan ("Callahan"), Francis M. Roache and the City of Boston (hereinafter collectively referred to as "Defendants"), hereby submit this memorandum in support of their motion that the Court exclude certain witnesses and preclude Plaintiff himself, or by way of counsel, from making any remarks or references to such witnesses in the presence of the jury as indicated herein. Specifically, Plaintiff should be precluded from admitting any evidence or making any reference: (1) to purported alibi witnesses Olisa Graham, Gemini Hullum and Antonio Anthony; (2) suggesting that Callahan engaged in any conduct with regard to Commonwealth witnesses Tracie Peaks; (3) suggesting that Walsh engaged in any conduct with regard to Commonwealth witnesses Vantrell McPherson or Ricky Evans; (4) suggesting that Walsh engaged in any misconduct with regard to Commonwealth witnesses Eric Johnson; (5) suggesting that Walsh or Callahan told Tracie Peaks and/or her mother, Betty Peaks, that Tracie would be taken out of school and locked up if Tracie did not

---

[1] As the Exhibits cited herein are voluminous and have already been provided to the Court in the *Consolidated Exhibits in Support of Defendants' Motion for Summary Judgment*, Defendants do not attach exhibits to this Motion and instead cite to and refer the Court to the Consolidated Exhibits ("Consol. Exs."), already on file.

1

cooperate; and/or (6) suggesting that Walsh knew that Mary Alexander suffered from a brain tumor or any problems with her cognitive functioning.

Based on the complex nature of the claims, factual allegations and fact record in this case, the Order requested is necessary to ensure that there are no misrepresentations of fact in the presence of the jury and that Defendants receive a fair trial. As further grounds, Defendants state as follows:

**A.   Plaintiff should be precluded from admitting any evidence or making any reference to purported alibi witnesses Olisa Graham, Gemini Hullum and/or Antonio Anthony.**

1. <u>The identity of Graham and Hullum and their relevance as purported alibi witnesses was disclosed to Plaintiff's criminal defense counsel, Steven Rappaport, Esq., prior to the start of criminal trial.</u>

During pretrial discovery in the underlying criminal matter, the prosecution provided Plaintiff, through his counsel, Attorney Rappaport, a copy of the transcript and audio tape of Olisa Graham's ("Graham") July 1, 1989 recorded statement, in which Graham identified Gemini Hullum ("Hullum") as a possible witness. *See* **Consol. Ex. 14(B)**, August 4, 2003 New Trial Testimony of Steven Rappaport, Esq., at 46-47, 67-72; **Consol. Ex. 14(C)**, August 4, 2006 Deposition of Steven Rappaport, Esq., at 147-149; **Consol. Ex. 29(A)**, July 1, 1989 Statement of Graham. Indeed, Attorney Rappaport has acknowledged that he was aware of Graham and the substance of her statement. **Consol. Ex. 14(B)** at 46-47, 67-72; **Consol. Ex. 14(C)** at 148-150. Moreover, Attorney Rappaport has acknowledged that he did not make any effort to, and consciously chose not to, present her as a witness at trial. **Consol. Ex. 14(B)** at 79; **Consol. Ex. 14(C)** at 152-155. *See also infra*; **Consol. Ex. 29(B)**, July 29, 2003 New Trial Testimony of Graham at 27-32, 67, 81 (testifying that she was never contacted by Drumgold's attorney or any investigator assisting with Drumgold's defense).

2

Specifically, Attorney Rappaport has testified that after Terrance Taylor ("Taylor") invoked his Fifth Amendment privilege against testifying before the jury, he was "wary" of those associated with Taylor:

> [W]hether or not at trial I would present it [Graham], if Olisa Graham was associated with Terrance Taylor that would have been – I imagine that would have been a reason why I would not have presented it. … I don't have a distinct memory as to what my though process was with regard to Lisa [sic] Graham. However, as I said before, considering the fact that the people at 23 Sonoma Street were closer to Taylor than they were to Drumgold once Taylor asserted his Fifth Amendment privilege I would have been very wary about calling anyone from 23 Sonoma Street. **Consol. Ex. 14(C)** at 150, 153, 155.

Additionally, Attorney Rappaport has testified that he considered the "Sonoma Street" witnesses to be the responsibility of his colleague, defense counsel Robert George, who represented Taylor:

> As I recall, the investigation with regard to 23 Sonoma Street was primarily Mr. George's responsibility in our division of labor. … [I]t appears that Terrance Taylor had a connection to 23 Sonoma Street and the people at 23 Sonoma Street, a connection which was much greater than Mr. Drumgold's connection, and therefore, it would have been Mr. George who would have taken on that aspect of the investigation. **Consol. Ex. 14 (B)** at 46.

Simply, the Commonwealth was under no obligation to call Graham or Hullum as witnesses, particularly where Plaintiff received all evidence regarding Graham and Hullum during pretrial discovery. If Plaintiff believed Graham and Hullum supported his alibi defense, it was Plaintiff's responsibility to call them as witnesses. However, Plaintiff made no effort to interview or present Graham or Hullum as witnesses at trial. And, Graham could not offer herself as a witness absent any involvement of the prosecutor or defense attorney (especially since, as Graham testified, Graham was not even aware the trial was taking place). Consequently, where Plaintiff did not even bother calling the purported alibi witnesses to testify

3

on his behalf, he cannot establish the requisite causal connection between their failure to appear and some conduct by Defendants.

> 2. There is no evidence that Callahan or Walsh was the unknown male who purportedly called Graham and told her that she could be arrested on an outstanding warrant if she appeared and testified at the criminal trial. Nor is there any evidence that this call was delivered in a threatening or intimidating manner.

Plaintiff alleges that "police detective defendants" intimidated Graham who Plaintiff claims corroborated his alibi defense. *See* Complaint at ¶ 14(k). Specifically, Plaintiff claims that Graham did not testify at his criminal trial because an unknown male warned her that if she came to court to testify she would be arrested because she had open cases in Suffolk County. *Id.* Plaintiff should be precluded from presenting evidence of or making any reference to Graham in support of his § 1983 claims because there is absolutely no evidence that the unknown male was Callahan or Walsh. There is not even evidence that the unknown male was a police officer. Nor is there any evidence that the phone call was delivered in a threatening or intimidating manner.

Specifically, assuming the telephone call took place, Graham has admitted that she has no idea who it was who called her. **Consol. Ex. 29(B)** at 23-26, 32-33. Moreover, Graham has testified that she does not know if the male who called her was a police officer or a prosecutor. *Id.* at 25-27, 31-33. Also of significance, Scott Keller, Drumgold's investigator, testified that Graham unequivocally told him that it was an assistant district attorney who called her. **Consol. Ex. 19(B)**, October 19, 2006 Deposition of Scott Keller at 285-289, 301-304. Of note, it is uncontroverted that Graham did in fact have an outstanding warrant for shoplifting at the time of Drumgold's trial and that Graham did not view the phone call as threatening. **Consol. Ex. 29(B)** at 29-30; **Consol. Ex. 30**, Homicide Unit Investigative Report re: Interview of Olisa Graham, dated July 23, 2003.

Finally, on summary judgment, Plaintiff conceded that there is no evidence that Walsh engaged in any conduct with respect to Graham which rises to a constitutional magnitude. *See* Plaintiff's Memorandum of Law in Opposition to Richard Walsh and Paul Murphy'28.

For these reasons, Defendants' Motion should be granted and Plaintiff should be precluded from introducing evidence or making any reference to Graham. Allowing such "evidence" or allowing Graham to testify is wholly prejudicial to Defendants and does nothing to aid the fact finding in this case (i) as there is a complete absence of competent evidence as to who the caller was or that the call was delivered in an intimidating manner, (ii) and in light of Attorney Rappaport's testimony that he never intended to pursue the alleged Sonoma Street alibi defense. *See supra*.

    3.    <u>There is no competent evidence in support of any claim by Plaintiff with respect to purported alibi witness Hullum.</u>

Hullum was called by Plaintiff at his motion for a new trial as one of the purported Sonoma Street alibi witnesses. As indicated above, her identify was disclosed to Plaintiff's criminal defense attorney by way of Graham's recorded statement. *See supra*. Plaintiff should be precluded from introducing any evidence or making any reference to Hullum because there is no competent evidence that any of the individual defendants had any contact with Hullum.

Specifically, during the course of discovery, Hullum has testified that: (1) The police did not threaten or intimidate her, they did not say anything to her, and she does not remember hearing any questions they asked anyone else. **Consol. Ex. 31(A)**, July 29, 2003 New Trial Testimony of Gemini Hullum at 143-144, 152-154. (2) She never spoke to any police detectives regarding the Moore homicide. *Id.* at 120-121, 141-143. (3) She never got involved in regards to the Moore homicide. **Consol. Ex. 31(B)**, February 20, 2006 Deposition of Hullum at 138-139, 166-167. (4) And, after learning that Plaintiff was arrested, Hullum did not do anything to

5

contact his attorney. **Consol. Ex. 31(A)** at 122-123. (5) Nor did she do anything after learning that Plaintiff was found guilty of first-degree murder. *Id.* at 136.

Of significance, Hullum testified that her life has been a "hard road" and that there has been "[a] lot of past trauma [that] has impacted [her] memory of that one specific incident." **Consol. Ex. 31(C)**, May 11, 2006 Deposition of Gemini Hullum at 335. Moreover, Hullum testified that she had smoked crack cocaine on August 19, 1988, prior to the Moore homicide. **Consol. Ex. 31(B)** at 74, 76-77.

Based on Hullum's testimony, it is clear that she has no competent or relevant evidence to offer at the trial of this action. Moreover, as with Graham, Hullum was never sought by Plaintiff as a defense witness, although her identity was made known to Attorney Rappaport. *See* **Consol. Ex. 31(A)** at 120-123; **Consol. Ex. 31(B)** at 155-156. Nothing offered by Hullum suggests that she was ever interviewed by Callahan or Walsh, or that Callahan or Walsh engaged in any conduct whatsoever which would have affected Hullum's testimony or willingness to testify at trial. Consequently, Defendants' Motion should be granted and Plaintiff should be precluded from introducing evidence or making any reference to Hullum.

    4.    <u>There is no competent evidence that Walsh or Callahan engaged in any conduct of a constitutional magnitude with regard to purported alibi witness Antonio Anthony.</u>

First, of significant import, when called as a witness at Drumgold's criminal trial, Antonio Anthony ("Anthony") pleaded the Fifth Amendment and did not testify. And, there is absolutely no evidence that Anthony pleaded the Fifth Amendment at Drumgold's criminal trial as a result of any conduct by Walsh or Callahan. Rather, Anthony was represented by counsel, James Mahaney, Esq., at Drumgold's trial. **Consol. Ex. 12(C)** at 146-152; **Consol. Ex. 12(D)**, September 26, 1989 Voir Dire of Antonio Anthony. With the advice of counsel, Anthony

6

invoked his Fifth Amendment right against self incrimination. **Consol. Ex. 12(C)** at 146-152; **Consol. Ex. 12(D)**. The only reasonable inference is that Anthony was in fear that his testimony would subject him to criminal charges. Consequently, there is no evidence that Walsh or Callahan engaged in any conduct which prevented Anthony from testifying at the criminal trial in Plaintiff's defense.

Second, contrary to Plaintiff's claims, there is no evidence that Walsh, Callahan or any other police official threatened to charge Anthony with murder. **Consol. Ex. 19(A)**, Sept. 19, 2006 Deposition of Keller at 173-174. Rather, Keller, Drumgold's investigator, testified that Anthony unequivocally stated that police did <u>not</u> threaten to indict him. *Id.*

Third, although it appears that Anthony may have been put up at a hotel from September 2 through 6, 1988, there is no evidence or reasonable inference that it infringed upon Drumgold's right to a fair trial. Whether or not Anthony was put up in a hotel before his grand jury appearance is of no impact because he did not testify at trial. Furthermore, his alleged alibi testimony was redundant as Paul Durand, Terrence Taylor and the Reverend Sadberry provided similar, if not identical testimony and thus Anthony's testimony would have been duplicative.

Fourth, there is no credible evidence that Plaintiff's right to a fair trial was in any way affected due to Walsh's conduct in taking Anthony's August 31, 1988 recorded statement. Specifically, on August 31, 1988, Anthony provided a recorded statement that: (i) although he had been with Drumgold on August 19, 1988, Anthony was dropped off and went his separate way shortly after 7:00 or 7:30 p.m. – approximately two hours prior to the shooting; (ii) on August 19, 1988 Anthony observed Drumgold and Taylor with guns and Drumgold wearing a black Adidas sweat suit; and (iii) when he went with Drumgold to New York shortly after the Moore homicide, Drumgold took the two guns that Anthony had observed Drumgold and Taylor

with on August 19, 1988. **Consol. Ex. 2**, (Search Warrant) Affidavit of Walsh at 7-9; **Consol. Ex. 12(A)**, August 31, 1988 Recorded Statement of Anthony; **Consol. Ex. 12(C)**, July 30, 2003 New Trial Testimony of Anthony at 110-112. Afterwards, the recorded statement was played for Anthony. **Consol. Ex. 12(A)** at 12; **Consol. Ex. 2** at 8-9. Anthony then went back on the record and stated that he had had an opportunity to listen to the tape, that it was a true statement, that nobody forced him to make the statement and that he gave the statement of his own free will. **Consol. Ex. 12(A)** at 14-15.

Significantly, in July 2003 at Drumgold's new trial hearing, Anthony claimed that if there was a recorded statement of his interview, it was fabricated by the Boston Police. When confronted with the audiotape, he authenticated his voice and claimed that he was smoking an ounce of crack cocaine daily and sniffing heroin in 1988, and could not recall making any of the statements above or that the statements were recorded. **Consol. Ex. 12(C)** at 106-107, 110-113, 130-133, 162-167. Moreover, prior to hearing his recorded statement, Anthony unequivocally testified that he told the police the truth and that Walsh never made any personal threats against him. **Consol. Ex. 12(C)** at 106-107, 134-135, 137-138, 142. Consequently, there is no credible evidence that Anthony's statement was untrue or was procured against his will. In addition, it is clear from his testimony that Walsh did not do anything wrong, nor did he intimidate or threaten Anthony as Drumgold claims.

For these reasons, Plaintiff should be precluded from introducing any evidence or making any reference to Anthony.

**B.     Plaintiff should be precluded from admitting any evidence or making any reference suggesting that Walsh engaged in any conduct with regard to Commonwealth witnesses Vantrell McPherson or Ricky Evans.**

   1.     <u>There is no evidence that Walsh had any contact or communications with Commonwealth witness Vantrell McPherson.</u>

8

In this case, Plaintiff claims that police detective defendants badgered and intimidated Commonwealth witness Vantrell McPherson into testifying when, initially, she could not make an identification. *See* Complaint at ¶ 14(j). However, during the course of discovery, Plaintiff has adduced no evidence that Walsh engaged in any conduct with respect to, or had any contact or communications with, McPherson. Indeed, McPherson testified that she does not know and has never heard of Walsh. **Consol. Ex. 26(C)**, March 17, 2006 Deposition of Vantrell McPherson at 39. Moreover, there is no evidence that Walsh was the "fat guy" who purportedly "yelled at" McPherson at the courthouse. *See id.* at 136, 138-140, 149. In fact, there is no evidence that the male who purportedly yelled at McPherson was a police officer. *Id.* Thus, Plaintiff should be precluded from introducing evidence or otherwise suggesting that Walsh engaged in any conduct with regard to McPherson.

2.   <u>There is no evidence that Walsh had any contact or communications with Commonwealth witness Ricky Evans.</u>

Plaintiff should be precluded from admitting any evidence or making any reference in the presence of the jury suggesting that Walsh engaged in any conduct with regard to Commonwealth witness Ricky Evans. First, of import, Plaintiff did not allege in his Complaint that Walsh engaged in any misconduct as to Evans. *See* Complaint at ¶ 14 (c) – (g).

Second, the uncontroverted evidence is that Walsh never had any contact with Evans. Nor did Walsh ever speak to Evans about the Moore homicide. **Consol. Ex. 13(A)**, October 10, 1989 Trial Testimony of Timothy Callahan at 175-177; **Consol. Ex. 13(B)**, August 6, 2003 New Trial Testimony of Timothy Callahan at 224-225, 234-236, 241-242, 249-252, 254-255; **Consol. Ex. 13(D)**, May 31, 2007 Deposition of Timothy Callahan at 278; **Consol. Ex. 15(C)**, October 6, 1989 Trial Testimony of Richard Walsh at 19; **Consol. Ex. 15(E)**, February 19, 2007 Deposition

9

of Richard Walsh at Errata Sheet; **Ex. 28(A)**, August 6, 1989 Recorded Statement of Ricky Evans; **Consol. Ex. 28(C)**, July 10, 2006 Deposition of Ricky Evans at 13; **Consol. Ex. 37**, October 1, 2007 Affidavit of Richard Walsh at ¶ 11.

Finally, the uncontroverted evidence is that Walsh did not arrange for Evans to stay at a hotel and did not provide Evans with any money for food or expenses. **Consol. Ex. 13(C)**, March 2, 2007 Deposition of Timothy Callahan at 164-165, 194-195; **Consol. Ex. 13(D)** at 257-261; **Consol. Ex. 28(D)**, January 30, 1990 Memorandum from Assistant District Attorney Paul F. Connolly to Victim Witness Advocate Laura Scherz; **Consol. Ex. 37** at ¶ 11.

For these reasons, Plaintiff should be precluded from introducing any evidence or otherwise suggesting that Walsh engaged in any conduct with regard to Eric Johnson.

**C.  Plaintiff should be precluded from admitting any evidence or making any reference suggesting that Walsh engaged in any misconduct with regard to Commonwealth witnesses Eric Johnson.**

Drumgold claims that the "police defendants" badgered and intimidated Eric Johnson ("Johnson") into identifying Drumgold when he initially stated that he could not make an identification, that the defendants pressured Johnson for over a year to implicate Drumgold in the Moore homicide, and that one of the defendants coached him to say "yes to whatever question they ask you about Shawn." *See* Complaint at ¶ 14(j).

However, there is no credible evidence that Walsh engaged in any misconduct with regard to Johnson. Rather, Walsh only spoke with Johnson on one occasion, on August 24, 1988. **Consol. Ex. 7**, August 24, 1988 Report of Investigation; **Consol. Ex. 27(B)**, October 4, 1989 Trial Testimony of Eric Johnson at 66-67, 72-80. At that time, Johnson did not identify Drumgold and Walsh did not show Johnson any photos of Drumgold. **Consol. Ex. 27(B)** at 66-67, 72-78, 80-81; **Consol. Ex. 15(C)** at 5-6. Moreover, Johnson does not know who Walsh is.

**Consol. Ex. 27(B)** at 66-67, 72-74, 78-80. And, Walsh did not assist in any preparation of witnesses for trial. **Consol. Ex. 15(C)** at 16-17. Thus, there is no evidence that Walsh badgered, intimidated or pressured Johnson for any duration of time. Nor is there any evidence that Walsh coached Johnson regarding his trial testimony. For these reasons, Plaintiff should be precluded from introducing any evidence or otherwise suggesting that Walsh engaged in any misconduct with regard to Eric Johnson.

D. **Plaintiff should be precluded from admitting any evidence or making any reference suggesting that Walsh or Callahan told Tracie Peaks and/or her mother, Betty Peaks, that Tracie would be taken out of school and locked up if Tracie did not cooperate.**

Plaintiff claims that Walsh threatened to arrest Tracie and put her in jail if she did not cooperate. Complaint ¶ 14(i). However, there is no evidence that Walsh (or any other police official) threatened to arrest Tracie if she did not cooperate. To the contrary, Tracie testified that she only spoke with police on one occasion regarding the Moore homicide, when she was shown the photo array on August 26, 1988 by Walsh and Murphy. **Consol. Ex. 17(C)**, July 31, 2003 New Trial Testimony of Tracie Peaks at 94-95; **Consol. Ex. 17(D)** April 28, 2006 Deposition of Tracie Peaks at 153, 160-161; **Consol. Ex. 17(E)**, September 15, 2006 Deposition of Tracie Peaks at 43. *See also* **Consol. Ex. 15(D)** at 95-100. Moreover, the uncontroverted evidence is that it was an assistant district attorney who allegedly told Tracie's mother, Betty Peaks, that Tracie would be taken out of school and locked up if she did not cooperate. **Consol. Ex. 19(B)**, October 19, 2006 Deposition of Scott Keller at 341-343, 345-347, 356. *See also* **Ex. 17(D)** at 151-152; **Consol. Ex. 18**, March 2, 2006 Deposition of Betty Peaks at 128-130. There is no evidence that Callahan ever met or spoke with Tracie Peaks. Consequently, Plaintiff should be precluded from introducing any evidence or otherwise suggesting that Walsh (or Callahan) told

11

Tracie Peaks and/or her mother, Betty Peaks, that Tracie would be taken out of school and locked up if Tracie did not cooperate.

**E.    Plaintiff should be precluded from admitting any evidence or making any reference suggesting that Walsh knew that Mary Alexander suffered from a brain tumor or any problems with her cognitive functioning.**

Plaintiff claims that Walsh knew, but did not disclose, that Mary suffered from a rare form of brain cancer that can affect a person's memory, perception and cognitive function. However, there is no competent evidence that Walsh knew that Mary suffered from a brain tumor. Nor is there any competent evidence that Walsh knew or had reason to know that Mary had any problems with memory, perception or cognitive function prior to Drumgold's criminal trial. **Consol. Ex. 15(C)** at 16-18; **Consol. Ex. 15(D)** at 82-84; **Consol. Ex. 21(A)**, Carney Hospital Medical Records for Mary Alexander; **Consol. Ex. 37** at ¶ 10.

Of significance, Walsh only met with Mary on one occasion, on August 26, 1988, before Callahan took over the investigation. **Consol. Ex. 15(C)** at 16-18; **Consol. Ex. 15(D)** at 82-84. And, it was not until over 5 months later in February 1989 that Mary, as indicated by her medical records, suffered from a seizure and underwent surgery to remove a malignant brain tumor. **Consol. Ex. 21(A)**. Indeed, Mary's medical records dated prior to Drumgold's criminal trial do not indicate any memory, perception or cognitive dysfunction.

Moreover, although Walsh accompanied Callahan to briefly speak with Mary on May 31, 1989 at the request of Assistant District Attorney Phil Beauchesne ("ADA Beauchesne"), to have Mary call ADA Beauchesne, Callahan had already taken over the investigation of the Moore homicide. **Consol. Ex. 13(D)** at 267-269; **Consol. Ex. 15(E)** at 202-203. Walsh had no further contact with Alexander after that date. Moreover, there is simply no evidence which suggests that Mary appeared to have any health issues with respect to her memory, perception and/or

12

cognitive functioning in May 1989 or that Walsh knew of the same. **Consol. Ex. 21(A)**; **Consol. Ex. 37** at ¶ 10.

Further, there is no credible evidence that Mary had any problems with memory, perception or cognitive function prior to or at the time of Drumgold's criminal trial. Indeed, there is no indication in any of Mary's medical records dated prior to Drumgold's criminal trial that she suffered any memory, perception or cognitive impairments. **Consol. Ex. 21(A)**. Moreover, in conjunction with this civil action, Mary's mother, Lola Alexander ("Lola"), testified that Mary did not have any health problems other than headaches and that she (Lola) does not recall if Mary had memory problems at any time. **Consol. Ex. 22** April 4, 2006 Deposition of Lola at 18, 60, 66, 184-185, 210-212. Additionally, Tracie Peaks, who saw Mary on a regular basis prior to 1990 and prior to Drumgold's trial, testified that she had no knowledge that Mary was sick until August or September 1990 and that after learning that Mary was sick, Tracie observed that Mary was the normal Mary that she was used to speaking to. *Id.* at ¶¶ 126-128. **Consol. Ex. 17(D)** at 237-244, 247-249.

Also of import, it is clear that at the time of Drumgold's criminal trial, Attorney Rappaport was aware that Mary had an operation in February 1989 and that she was not feeling too well at that time. **Consol. Ex. 21(B)** at 196-197. This is evidenced by Attorney Rappaport's cross-examination of Alexander at the underlying criminal trial:

>   Q: Okay, people come by. And actually there was a period of time last year when you were ill?
>   A: Excuse me?
>   Q: There was a period of time last year when you were ill?
>   A: Yes.
>   Q: You had an operation in February, right?
>   A: Yes.
>   Q: And you weren't feeling too well at that time?
>   A: Yes.

Q: And the police would come by and they'd say – the detective would come by to see how you're doing?

A: Yes. And I told them I don't care if I'm dying, I'll still go and tell them what I saw. *Id.*

For these reasons, Plaintiff should be precluded from admitting any evidence or making any reference suggesting that Walsh knew that Mary Alexander suffered from a brain tumor or any problems with her cognitive functioning.

## **CONCLUSION**

WHEREFORE, for all of the foregoing reasons, the Defendants, request that this Court grant their Joint Motion in Limine to Exclude Certain Witnesses and Preclude Remarks during Trial as indicated herein. Defendants request any further relief deemed fair and just.

| | |
|---|---|
| **Defendant,** <br> **RICHARD WALSH,** <br> By his attorney, | **Defendant,** <br> **TIMOTHY CALLAHAN,** <br> By his attorney, |
| /s/ Hugh R. Curran<br>Hugh R. Curran (BBO# 552623)<br>Bonner, Kiernan, Trebach & Crociata, LLP<br>200 Portland Street, 4th Floor<br>Boston, MA 02114<br>(617) 426-3900 | /s/ Mary Jo Harris<br>Mary Jo Harris (BBO# 561484)<br>Morgan, Brown & Joy, LLP<br>200 State Street<br>Boston, MA 02109<br>(617) 523-6666 |

**Defendants,**
**FRANCIS M. ROACHE and**
**THE CITY OF BOSTON,**
By their attorneys,

/s/ John P. Roache
John P. Roache (BBO# 421680)
Patrick J. Donnelly (BBO# 651113)
The Law Offices of John Roache
66 Long Wharf
Boston, MA 02110
(617) 367-0330

DATED: January 28, 2008

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 28th day of January, 2008, I electronically filed with within document with the Clerk of the United States District Court for the District of Massachusetts, using the CM/ECF System. The following participants have received notice electronically:

**For Plaintiff Shawn Drumgold,**
Michael W. Reilly, Esq.
Tommassino & Tommasino
Two Center Plaza
Boston, MA 02108-1904

**For Plaintiff Shawn Drumgold,**
Rosemary Curran Scapicchio, Esq.
Four Longfellow Place, Suite 3703
Boston, MA 02114

**For Defendant, City of Boston**
Susan Weise, Esq.
Chief of Litigation
Assistant Corporate Counsel
City of Boston/Law Department
City Hall, Room 615
Boston, MA 02201

**For Defendants City of Boston and Francis M. Roache,**
John P. Roache, Esq.
The Law Offices of John P. Roache
66 Long Wharf
Boston, MA 02110

**For Defendant Richard Walsh,**
Hugh R. Curran, Esq.
Bonner Kiernan Trebach & Crociata, LLP
200 Portland Street, Suite 400
Boston, MA 02114

/s/ Mary Jo Harris