

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT DEPARTMENT
NO. 1988-071882

COMMONWEALTH

v.

SHAWN DRUMGOLD



## COMMONWEALTH'S POST-HEARING MOTION TO VACATE CONVICTION AND GRANT NEW TRIAL

Now comes the Commonwealth in the above-captioned matter and in the interests of justice respectfully moves this Honorable Court, pursuant to M. R. Crim. P. Rule 30(b), to vacate the conviction of the defendant and grant a new trial.

As grounds therefor, the Commonwealth respectfully states that after a careful and thorough review of (1) the facts and circumstances surrounding the investigation into the murder of Darlene Tiffany Moore on August 19, 1988, (2) the facts and circumstances surrounding the subsequent prosecution and trial of the case in 1988 and 1989, (3) the various issues addressed by the Supreme Judicial Court in its decision affirming the defendant's conviction in 1996, Commonwealth v. Drumgold, 423 Mass. 230 (1996), and (4) the evidence adduced at the motion hearing before this Court in 2003, "it appears that justice may not have been done." M. R. Crim. P. Rule 30(b). See also, Commonwealth v. Pike, 431 Mass. 212, 218 (2002); Commonwealth v. Grace, 397 Mass. 303, 305 (1986).

A list of the specific items reviewed and factors considered -- individually and collectively -- by the Commonwealth during the course of that review is attached hereto as Exhibit A. The Commonwealth makes further reference to the Commonwealth's

Post-Hearing Memorandum in Support of Motion to Vacate Conviction and Grant New Trial, and accompanying exhibits.

As set forth in the Commonwealth's Post-Hearing Memorandum, the Commonwealth specifically states that, due to the nature of the investigation in 1988 and the subsequent prosecution and trial in 1988 and 1989 -- as reflected in part by the evidence adduced at the motion hearing in 2003 -- the Commonwealth respectfully cannot now determine and therefore does not now comment on the factual guilt or innocence of the defendant of the crime charged.    Evidence introduced at the motion hearing did not exonerate the defendant; it did establish that he did not receive a fair trial.

Respectfully Submitted
For the Commonwealth,

DANIEL F. CONLEY
DISTRICT ATTORNEY

By:    _____
DAVID E. MEIER
Assistant District Attorney
Homicide Unit
One Bulfinch Place
Boston, MA  02114
(617) 619-4242

Dated:  November 3, 2003

## COMMONWEALTH v. SHAWN DRUMGOLD

### Hearing on Defendant's Third Motion for New Trial

### ITEMS REVIEWED AND FACTORS CONSIDERED BY COMMONWEALTH

1. BPD Investigative Reports + Witness Interviews  (1988 - 1989)

2. Grand Jury Proceedings  (1988)

3. Motion to Suppress: Testimony and Court Rulings (Volterra, J.)  (1989)

4. Motion to Dismiss: Testimony and Court Rulings (Volterra, J.)  (1989)

5. Discovery Issues and Correspondence  (1988 - 1989)

6. Trial Testimony  (September - October, 1989)

7. Closing Arguments  (October, 1989)

8. Defendant's First Motion for New Trial (Alleged Extraneous Influences on Jury)  (1989)

9. Defendant's Second Motion for New Trial (Alleged Ineffective Assistance of Counsel) (1994)

10. Supreme Judicial Court Decision  (1996)

11. Defendant's Federal Habeas Petition  (1997)

12. Defendant's Third Motion for New Trial  (2003)

13. Testimony and Exhibits at Evidentiary Hearing  (July - August, 2003)

14. Applicable Law

15. Commonwealth's Ethical Obligations

16. Darlene Tiffany Moore's Family

17. Interests of Justice

18. Sense of Finality

**EXHIBIT A**

<u>Commonwealth</u> v. <u>Shawn Drumgold</u>

**Hearing on Defendant's Third Motion for New Trial**

**WITNESSES**

<u>July 29, 2003</u>

<u>Defendant</u>

1.   Olisa Graham
2.   Gemini Hullum
3.   Vantrell McPherson

<u>July 30, 2003</u>

4.   Lola Alexander
5.   True See Allah
6.   Antonio Anthony
7.   Theron Davis

<u>July 31, 2003</u>

8.   Ricky Evans
9.   Tracie Peaks
10.  Detective Frederick Waggett
11.  Officer Gregory Brown
12.  Superintendent Paul Joyce

<u>August 4, 2003</u>

13.  Steven Rappaport, Esquire
14.  Shawn Mells
15.  Officer Rosemary McLaughlin

<u>August 5, 2003</u>

16.  Detective Tony Smith

**[Defendant Rests]**

**EXHIBIT A**

**August 5, 2003**

**Commonwealth**

1. Detective Richard Walsh
2. Troy Jenkins
3. Lieutenant Timothy Callahan

**August 6, 2003**

3. Lieutenant Timothy Callahan (continued)
4. Phillip Beauchesne, Esquire
5. Francis O'Meara, Esquire
6. Romero Holliday

**[Commonwealth Rests]**

## Commonwealth v. Shawn Drumgold

### Hearing on Defendant's Third Motion for New Trial

### EXHIBITS

1. Transcript of Olisa Graham Statement to BPD   (7/1/89)
2. Affidavit of Olisa Graham   (12/7/02)
3. Enlarged Map of Crime Scene and Surrounding Areas (Aerial View)
4. Enlarged Map of Crime Scene and Surrounding Areas (Streets)
5. Transcript of Vantrell McPherson Statement to BPD  (6/10/89)
6. Enlarged Diagram of Crime Scene
7. Enlarged Calendar of Month of August, 1988
8. Five (5) Certified District Court Complaints/Docket Entries of Ricky Evans (1987, 1988)
9. Transcript of Grand Jury Testimony of Tracie Peaks   (9/8/88)
10. BPD Homicide Investigative Report of Superintendent Paul Joyce  (May, 1999)
11. Boston Medical Center Records of Mary Alexander (5/4/90 – 2/17/93)
12. Certified Indictments/Docket Entries: Commonwealth v. Treas Carter
13. Findings and Rulings on Defendant's Motion to Suppress (Volterra, J.) (5/18/89)
14. Transcript of Shawn Drumgold Statement to BPD  (8/29/88)
15. Handwritten BPD Report of Officer Rosemary McLaughlin re: Shawn Rowell  (8/23/88)
16. Discovery Correspondence/Letter of Steven Rappaport, Esquire  (9/13/89)
17. Discovery Correspondence/Letter of Steven Rappaport, Esquire  (9/22/89)
18. List of Prospective Trial Witnesses
19. Discovery Motions and Letter of Steven Rappaport, Esquire  (12/16/88)
20. Transcript of Testimony of Steven Rappaport, Esquire at Motion for New Trial Hearing #2 (3/31/94)
21. Handwritten BPD Report of Detective Tony Smith re: Theron Davis  (8/30/89)
22. Carney Hospital Records of Mary Alexander  (4/13/88 – present)
23. Cassette Tape of Antonio Anthony Statement to BPD
24. Transcript of Antonio Anthony Statement to BPD  (8/31/88)
25. BPD Memorandum re: Antonio Anthony Hotel/Meals Expenses  (9/2/88)
26. BPD Report of Dets. Fogarty/Walsh re: Interview of Theron Davis  (8/20/88)
27. Transcript of Ricky Evans Statement to BPD  (8/6/89)
28. Cassette Tape of Ricky Evans Statement to BPD
29. Cassette Tape of Vantrell McPherson Statement to BPD
30. Cassette Tape of Olisa Graham Statement to BPD
31. Correspondence/Letter of ADA Francis O'Meara re: Yolanda Alexander Housing (6/1/90)
32. Correspondence/Letter of ADA Francis O'Meara re: Mary Alexander Housing  (11/15/89)
33. Boston City Hospital Records of Romero Holliday  (8/9/88 – 8/17/88)

### EXHIBIT B

## <u>Commonwealth</u> v. <u>Shawn Drumgold</u>

### Hearing on Defendant's Third Motion for New Trial

### ITEMS MARKED FOR IDENTIFICATION

A.  Cassette Tape of Olisa Graham Statement to BPD  (Exhibit #30)
B.  Transcript of Antonio Anthony Statement to BPD  (Exhibit #24)
C.  Cassette Tape of Antonio Anthony Statement to BPD  (Exhibit #23)
D.  Transcript of Ricky Evans Statement to BPD  (Exhibit #27)
E.  Cassette Tape of Ricky Evans Statement to BPD  (Exhibit #28)
F.  List of Individuals Named by Ricky Evans as Hotel Visitors (7/31/03) (Impounded by Court)
G.  DA's Office Notes of VWA Laura Scherz re: Communications with Mary Alexander
H.  United States Attorney's Office Report of AUSA Ralph C. Martin re: Charles Stuart Investigation  (7/10/91)
I.  Defendant's Subpoena to DA's Office for Financial Records re: Ricky Evans  (8/1/03)
J.  DA's Office Memorandum of ADA Paul Connolly re: <u>Commonwealth</u> v. <u>Treas Carter</u> and Victim/Witness Ricky Evans  (1/30/90)

**EXHIBIT B**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                          SUPERIOR COURT DEPARTMENT
                                                     NO. 1988-071882

COMMONWEALTH

v.

SHAWN DRUMGOLD

---

**COMMONWEALTH'S POST-HEARING MEMORANDUM IN SUPPORT OF MOTION
TO VACATE CONVICTION AND GRANT NEW TRIAL**

---

## INTRODUCTION

Over six days in July and August, 2003, the Court (Rouse, J.) heard testimony

from twenty-two (22) witnesses and received thirty-three (33) exhibits during the course

of an evidentiary hearing on the defendant's third motion for new trial.[1]

After a careful and thorough review of (1) the facts and circumstances surrounding

the investigation into the murder of Darlene Tiffany Moore on August 19, 1988, (2) the

facts and circumstances surrounding the subsequent prosecution and trial of the case in

1988 and 1989, (3) the various issues addressed by the Supreme Judicial Court in its

decision affirming the defendant's conviction in 1996, Commonwealth v. Drumgold, 423

Mass. 230 (1996), and (4) the evidence adduced at the motion hearing before this Court

in 2003, the Commonwealth respectfully states that it appears that justice may not have

been done. Accordingly, the Commonwealth respectfully moves this Honorable Court to

---

1.    A list of the witnesses who testified and the exhibits that were introduced (and
      marked for identification) are attached hereto as Exhibits A and B, respectively.

vacate the defendant's conviction and grant a new trial.[2]    The Commonwealth specifically further states that, due to the nature of the investigation in 1988 and the subsequent prosecution and trial in 1988 and 1989 -- as reflected in part by the evidence adduced at the motion hearing in 2003 -- the Commonwealth respectfully cannot now determine and therefore does not now comment on the factual guilt or innocence of the defendant of the crime charged.    Evidence introduced at the hearing did not exonerate the defendant; it did establish that he did not receive a fair trial.

## PROCEDURAL BACKGROUND

After trial by jury in September and October, 1989 (Alberti, J., presiding), the defendant Shawn Drumgold was convicted of murder in the first-degree, arising out of the August 19, 1988 shooting death of Darlene Tiffany Moore, age 12, in the Roxbury section of the City of Boston.

In 1989, following the defendant's conviction -- and after conducting an evidentiary hearing -- the trial judge (Alberti, J.) denied the defendant's first motion for new trial (alleging extraneous influences on the jury deliberations).    In 1994 -- after conducting another evidentiary hearing -- this Court (Rouse, J.) denied the defendant's second motion for new trial (alleging ineffective assistance of counsel at trial).    In 1996, the Supreme Judicial Court affirmed the defendant's conviction and the orders denying his two motions for new trial.    Commonwealth v. Drumgold, 423 Mass. 230, 233-235 (1996) (extensive summary of the evidence presented at trial).

---

2.    Upon review of the Commonwealth's motion and memorandum, should the Court, in its discretion, grant the defendant a new trial, it is the Commonwealth's intention -- in the interests of justice and in order to bring some sense of finality to these proceedings -- to enter a nolle prosequi with respect to the indictment then pending against the defendant, who, as of this date, has served some fifteen (15) years imprisonment on the charge.

3

In 1997, the defendant filed a petition in the United States District Court for the District of Massachusetts (Gertner, D. J.) seeking federal habeas relief. The petition was based, in part, upon various post-conviction discovery material and information provided to the defendant by the Commonwealth. See, Commonwealth's Notices of Discovery I – V, dated May 12, 1999, June 14, 1999, August 17, 1999, August 28, 2000, and June 28, 2002, respectively.

In March, 2002, the defendant filed a third motion for new trial in state court, based, in part, upon the same post-conviction discovery material and information.[3] Throughout 2002 and 2003, the defendant filed various supplemental pleadings with this Court in support of his third motion for new trial. In substance, the pleadings alleged that (1) the recantations of certain trial witnesses, (2) certain newly discovered evidence, and (3) certain non-disclosed exculpatory evidence required a new trial.

In May, 2003, the Commonwealth filed a motion seeking an evidentiary hearing on the defendant's third motion for new trial. The Commonwealth recognized that the issues raised by the defendant in his third motion for new trial (and supplemental pleadings) warranted a complete and thorough review in order to determine with finality whether any such allegations cast a "real doubt on the justice of the defendant's conviction." Commonwealth v. Grace, 397 Mass. 303, 305 (1986). See also, M. R. Crim. P. Rule 30(b). Moreover, submitted the Commonwealth, the most fair, expeditious, and public manner in which to conduct that review and to make that determination -- based upon the facts and the law -- was by means of an evidentiary hearing under oath, during which the credibility of the witnesses and the potential significance of those and

---

3.    The defendant's federal habeas petition was stayed pending the resolution of the defendant's third motion for new trial in state court.

any other allegations could be properly and thoroughly evaluated. In July and August, 2003, this Court conducted such a hearing.

## DISCUSSION

### A. Motions for New Trial Generally

Rule 30(b) of the Massachusetts Rules of Criminal Procedure provides that a new trial may be granted at any time "if it appears that justice may not have been done." M. R. Crim. P. Rule 30(b). As outlined in the Reporter's Notes, "[t]he basis for a new trial can either relate [1] to the conduct of the trial [citations omitted] ... or [2] to the discovery of new facts that bear on the question of guilt [citations omitted]." M. R. Crim. P. Rule 30, Reporter's Notes.

A motion for new trial may be decided on the basis of affidavits and without an evidentiary hearing "if no substantial issue is raised by the motion or affidavits." M. R. Crim. P. Rule 30(c)(3), 378 Mass. 900 (1979). "The decision on a motion for new trial, as well as the decision whether to decide the motion on the basis of affidavits or to hear oral testimony, is left largely to the sound discretion of the judge." Commonwealth v. Toney, 385 Mass. 575, 579 (1982), citing Commonwealth v. Stewart, 383 Mass. 253, 257 (1981). See also, Commonwealth v. Martinez, 437 Mass. 84, 96-98 (2002); Commonwealth v. Jones, 432 Mass. 623, 632-634 (2000).

Here, as set forth more fully below, the issues raised during the course of the hearing on the defendant's third motion for new trial -- by the defendant and by the Commonwealth -- implicate both prongs of the new trial analysis, that is, (1) the alleged conduct of the trial in September – October, 1989 and (2) the alleged discovery of new facts in 2003 that bear on the question of guilt.

## B. Alleged Recanting Trial Witnesses

An affidavit by a material witness that alleges the recantation of the witness' trial testimony "warrants 'serious consideration from the [motion for new trial] judge'", but does not automatically require an evidentiary hearing, never mind a new trial. Commonwealth v. Raymond, 424 Mass. 382, 397 (1997), quoting Commonwealth v. Watson, 377 Mass. 814, 837-838 (1979). "The determination whether such evidence warrants a new trial is left to the sound discretion of the [motion] judge." Id. at 397. See also, Commonwealth v. Lopez, 433 Mass. 406, 416 (2001) ([motion] judge in best position to determine if witness' alleged recantation is "credible" or "believable"); Commonwealth v. Jones, 432 Mass. 623, 632-633 (2000) (affidavit that key prosecution witness lied at murder trial deemed "simply not credible" by motion judge).

Here, to varying degrees, three witnesses -- Tracie Peaks, Vantrell McPherson, and Ricky Evans --- recanted their 1989 trial testimony at the 2003 motion hearing. That there are three recanting witnesses carries considerable weight and indeed warrants "serious consideration". Commonwealth v. Watson, supra at 837-838. The witnesses' recantations and related allegations of police pressure and prosecutorial coercion, however, respectfully submits the Commonwealth, did not hold up under cross-examination or in the face of other, independent evidence introduced at the motion hearing. Simply stated, neither the recantations nor the allegations of law enforcement coercion are credible.

Ms. Peaks was interviewed by police investigators and positively identified the defendant's photograph from a photographic array on August 26, 1988, some seven (7) days after the incident. She appeared and testified under oath before the grand jury on September 8, 1988, some nineteen (19) days after the incident. She testified under

oath on direct and cross-examination at trial on October 3, 1989.    The transcripts reflecting Ms. Peaks' 1988 grand jury testimony (Motion Exhibit No. 9) and her 1989 trial testimony -- as well as her demeanor at the motion hearing -- belie any suggestion in 2003 that her original identification of the defendant or her trial testimony were the product of law enforcement coercion.    In and of themselves, Ms. Peaks' recantations are not credible.

Ms. McPherson provided a tape-recorded statement to police investigators on June 10, 1989 and testified under oath on direct and cross-examination at trial on October 3, 1989.  The cassette recording tape reflecting her 1989 interview (Motion Exhibit No. 29) and the transcript of her 1989 trial testimony -- as well as her demeanor at the motion hearing -- refute any allegation in 2003 that her trial testimony was the result of pressure by law enforcement.    In and of themselves, Ms. McPherson's recantations are not credible.

Mr. Evans provided a tape-recorded statement to police investigators on August 6, 1989 and testified under oath on direct and cross-examination at trial on October 4, 1989.  The cassette recording tape reflecting his 1989 interview (Motion Exhibit No. 28) and the transcript of his 1989 trial testimony are devoid of coercion – whether subtle or otherwise.    While the testimony (and demeanor) of Mr. Evans at the motion hearing with respect to certain promises, rewards, or inducements allegedly made to him by law enforcement authorities in 1989 may arguably ring true, see Part D (3) below, that his trial testimony implicating the defendant was purely the result of law enforcement coercion does not.

**C.  Alleged Newly Discovered Evidence**

It is well-settled that "[a] defendant seeking a new trial on the ground of newly discovered evidence must establish both that the evidence is [1] newly discovered and that it is [2] [material], cast[ing] real doubt on the justice of the conviction...." Commonwealth v. Grace, 397 Mass. 303, 305 (1986).   See also, Commonwealth v. Evans, 439 Mass. 184, 201-203 (2003); Commonwealth v. Martinez, 437 Mass. 84, 97 (2002); Commonwealth v. Jones, 432 Mass. 623, 633 (2000); Commonwealth v. Pike, 431 Mass. 212, 218 (2000).

In order to be newly discovered (in the legal sense), the evidence at issue must have been (a) unknown to the defendant or the defendant's counsel and (b) undiscoverable through reasonable diligence at the time of trial or at the time of any earlier motion for new trial. Commonwealth v. Pike, 431 Mass. 212, 218 (2000), citing Commonwealth v. Grace, 397 Mass. 303, 306 (1986).  It is only after the defendant makes this threshold showing that the Court then considers whether the new evidence is material, casting real doubt on the justice of the defendant's conviction.  Grace, 397 Mass. at 306-307.

To be material, the new evidence must be "'weighty and of such nature as to its credibility, potency, and pertinency to fundamental issues in the case as to be worthy of careful consideration.'"  Commonwealth v. Markham, 10 Mass. App. Ct. 651, 654 n.1 (1980), quoting Davis v. Boston Elevator & Railway, 235 Mass 482, 495 (1920).   The new evidence must be material and credible, and "carry a measure of strength in support of the defendant's position."  Commonwealth v. Grace, 397 Mass. 303, 305-306 (1986).  "The motion judge [ultimately] decides not whether the verdict would have been different, but rather whether the new evidence would have probably been a real

factor in the jury's deliberations.   This process of judicial analysis requires a thorough

knowledge of the trial proceedings and can, of course, be aided by a trial judge's

observation of events at trial."    <u>Commonwealth</u> v. <u>Moore,</u> 408 Mass. 117, 126-127

(1990), <u>quoting</u> <u>Commonwealth</u> v. <u>Grace,</u> 397 Mass. 303, 305-306 (1986).

Here, the defendant alleges that newly discovered evidence relating to (1) certain

cooperating federal drug defendants, (2) certain alibi witness, and (3) certain aspects of

Mary Alexander's health warrants a new trial.  As reflected by the testimony and exhibits

introduced at the motion hearing, the first two bases of alleged new information are

neither "newly discovered" nor material and credible.   They do not cast any real doubt

on the justice of the defendant's conviction.

The third basis -- alleged new information relating to the medical condition of

Mary Alexander, a critical identification witness for the Commonwealth at trial -- stands

in a markedly different position.   While arguably discoverable through "reasonable

pretrial diligence" at the time of the defendant's trial or at the time of the presentation

of the defendant's earlier motions for new trial, <u>Commonwealth</u> v. <u>Pike</u>, 431 Mass. 212,

218 (2000), and therefore not "newly discovered" -- in the true legal sense -- the

evidence regarding Ms. Alexander's health is nonetheless material, credible, and -- in the

interests of justice -- worthy of careful consideration.

**(1)  <u>Cooperating Federal Defendants</u>**

The original basis of the defendant's third motion for new trial is his claim that

certain alleged members of the so-called "Castlegate" gang possess newly discovered

evidence of the defendant's innocence.   In short, the defendant alleges that information

from these individuals, defendants-turned-cooperating-witnesses in a federal drug

investigation and prosecution, establishes (a) that the defendant was neither a member

of the Castlegate gang nor involved in the gang-related murder of Darlene Tiffany Moore and (b) that somebody else, namely Theron "Apple" Davis, actually committed the murder.

As reflected by the testimony adduced at the motion hearing (and at trial), these claims -- in and of themselves -- do not warrant a new trial.   As to the defendant's gang status, the alleged "new" information is merely cumulative of evidence provided to the defendant during pretrial discovery and elicited by defense counsel from numerous witnesses at trial, including police officers and members of the rival "Humboldt Street" gang.   See, Commonwealth v. Evans, 439 Mass. 184, 203 (2003) (evidence that would have been cumulative of evidence presented or available at trial not "newly discovered").   As such, the information is not newly discovered.

As to the identity of the individuals who were actually responsible for the murder of Tiffany Moore, the testimony at the motion hearing from various former gang members (whether cooperating federal defendants or otherwise) -- including Shawn Mells (called by the defendant), True See Allah (called by the defendant), Troy Jenkins (called by the Commonwealth), or Romero Holliday (called by the Commonwealth) -- established beyond any doubt that the alleged "new" information was based solely upon conjecture, hearsay, and street rumor.   Commonwealth v. Martinez, 437 Mass. 84, 96-97 (2003) (motion for new trial in murder case, based upon evidence that another person had allegedly admitted to the crime, properly denied where alleged admission both unreliable and inadmissible hearsay).

Moreover, to the extent that such conjecture, hearsay, and street rumor includes the name of Theron "Apple" Davis as one of the participants in the murder of Tiffany Moore, it is neither the first time in a courtroom that Mr. Davis' name has allegedly been

connected to the murder nor mutually exclusive of that of the defendant, Shawn Drumgold.    Indeed, not only was there repeated reference at the defendant's trial to Mr. Davis' alleged presence in and around the crime scene and to his alleged role in the shooting, but, as the Supreme Judicial Court itself noted, "[t]he fact that [Theron] Apple [Davis] may have been one of several shooters did not undermine the Commonwealth's theory that the defendant was one of two or three of them." Commonwealth v. Drumgold, 423 Mass. 230, 239 (1996).[4]    Indeed, "[r]egardless of whether the defendant or a companion, not necessarily [his co-defendant Terrance] Taylor, shot Moore, the evidence [at trial] was sufficient to warrant a finding that the defendant was guilty of murder with deliberate premeditation as a joint venturer." Drumgold, 423 Mass at 254 (emphasis supplied).

### (2) Alibi Witnesses

The second prong of the defendant's motion as it relates to alleged newly discovered evidence centers around two "new" alibi witnesses -- Olisa Graham and Gemini Hullum -- both of whom testified at the motion hearing.    Based upon the evidence adduced at the motion hearing, however, this claim warrants little, if any, consideration.

The testimony of Ms. Graham and Ms. Hullum at the motion hearing was cumulative of other alibi evidence offered by the defendant at trial.    More importantly, their testimony at the hearing was consistent with certain discovery material provided by the Commonwealth to the defendant's trial counsel, Steven Rappaport, Esquire, several weeks prior to trial.    See, Motion Hearing Exhibit Nos. 16, 17, and 19 (various discovery

---

4.    In addition to alleged gang members Troy Jenkins and Romero Holliday, called as witnesses by the Commonwealth at the motion hearing, the defendant called Theron "Apple" Davis.    Mr. Davis asserted his Fifth Amendment privilege and refused to answer any questions put to him.

correspondence and motions of Mr. Rappaport).    As Mr. Rappaport himself

acknowledged during cross-examination at the motion hearing, he had been provided a

duplicate cassette recording tape of Ms. Graham's July 1, 1989 interview with Boston

police investigators, as well as a 28-page transcript of her tape-recorded statement, in

advance of trial.  See, Motion Hearing Exhibit No. 30.  In addition, the list of prospective

witnesses submitted to the trial judge by the Commonwealth and the defendant

(together with his co-defendant Terrance Taylor) included as Prospective Witness No.

121 the name of Olisa Graham.   Motion Hearing Exhibit No. 18.

Given that the tape-recorded statement (and transcript) of Olisa Graham

provided to Mr. Rappaport prior to trial set forth an alleged alibi for the defendant -- and

made specific reference to one Gemini Hullum also being present -- it can hardly be said

that Ms. Graham and Ms. Hullum are now "newly discovered" alibi witnesses.[5]

### (3)  Mary Alexander's Health

The defendant also contends that alleged new information regarding the medical

condition of Mary Alexander warrants a new trial.   That Mary Alexander was a critical

witness for the Commonwealth at trial is undisputed; together with Eric Johnson and

Tracie Peaks, she provided testimony identifying the defendant as one of the gunmen

involved in the murder.    When initially shown a photographic array by police

investigators on August 26, 1988, one week after the murder, Ms. Alexander could not

make a positive identification of any suspect, including the defendant.   Shortly before

---

5.    To the extent that Ms. Graham alleges that she was threatened with arrest on an
      outstanding warrant if she appeared at trial, such testimony was neither credible
      nor material.   The defendant made no showing that his trial counsel undertook
      any efforts to summons Ms. Graham as a witness, and Ms. Graham herself
      testified at the hearing that she had no interest in appearing at trial even before
      receiving the alleged threat.

trial, in September, 1989, she identified the defendant from a single eight-by-ten inch photograph displayed to her by the defendant's trial counsel; on October 2, 1989, during the jury view of the crime scene, she again identified the defendant, who had accompanied counsel on the view.  Between August 26, 1988 and September, 1989, Ms. Alexander had seen the defendant's photograph on television and in the newspapers. [6]

The defendant now alleges that newly discovered evidence that Ms. Alexander suffered from brain cancer (and its attendant symptoms) during the relevant time period requires a new trial.   Whether such evidence is indeed "newly discovered" for purposes of the defendant's third motion for new trial is open to debate.  Arguably, the defendant could have learned of Ms. Alexander's illness through reasonable pretrial diligence at the time of trial; given that Ms. Alexander died in September, 1993, see, Death Certificate of Mary Alexander, appended as an exhibit to the defendant's third motion for new trial, the defendant certainly could have learned of her condition by the time he filed (in July, 1992), prepared (in 1993), or, after an evidentiary hearing before this Court, argued (in March, 1994) his second motion for new trial -- particularly since the motion (and the evidentiary hearing) focused primarily on Ms. Alexander's identifications of the defendant.  Commonwealth v. Pike, 431 Mass. 212, 218 (2000).

The interests of justice, however, counsel against precluding a full and fair evaluation of the credibility and materiality of Ms. Alexander's alleged medical condition

---

6.      The circumstances surrounding the September, 1989 and October 2, 1989 identifications of the defendant by Ms. Alexander were fully explored on cross-examination at trial and during the course of a hearing on the defendant's second motion for new trial before this Court in March, 1994.    See, Motion Hearing Exhibit No. 20 (transcript of March 31, 1994 evidentiary hearing on defendant's second motion for new trial); Memorandum of Decision on Defendant's Motion for Reconsideration of Motion for New Trial (Rouse, J.), dated June 30, 1994.

and, if otherwise admissible, the effect that such (new) evidence may have had on the jury's deliberations.    Commonwealth v. Grace, 397 Mass. 303, 305-306 (1986).    Given the sequence of events and circumstances under which Ms. Alexander's initial non-identification of the defendant from a photographic array was supplanted -- quite literally on the eve of and then at trial -- by positive photographic and in-person identifications of him, the various medical records introduced as exhibits during the 2003 motion hearing that reflect Ms. Alexander's symptoms, diagnosis, and course of treatment in 1988 and 1989 are worthy of careful consideration.    See, Carney Hospital Records of Mary Alexander (Motion Hearing Exhibit No. 22); Boston Medical Center Records of Mary Alexander (Motion Hearing Exhibit No. 11).

Irrespective of the weight to be accorded the motion hearing testimony of Lola Alexander (Mary Alexander's surviving mother) or any police investigators regarding their personal observations of and interactions with Mary Alexander during the relevant time period, the medical records themselves are significant.    Notwithstanding the absence of any expert medical testimony offering an explanation as to what effect, if any, such a condition would likely have had on Ms. Alexander's ability to perceive, recall, and relate (neither the defendant nor the Commonwealth offered any such testimony at the motion hearing), the following dates and entries in the neurology consults, discharge summaries, and other records of the Carney Hospital are of particular note:

February 4, 1989:    Ms. Alexander admitted to the hospital after suffering a seizure; three month history of severe headaches and blurring of vision.

February 10, 1989:    Surgical procedure to remove malignant tumor from brain.

February 20, 1989:    Discharged from hospital; post-operative radiation therapy.

March 29, 1989:    Involved in motor vehicle accident and told by police to seek medical attention at hospital.

May 13, 1989:          Complained of amnesia; forgot son's name and could not
                       remember where she was; forgetting things; did not know
                       where she was; frequency of headaches increasing.

September 24, 1989: Admitted to hospital after fall from porch; police
                       responded.

Although the defendant made no showing at the motion hearing -- by means of

expert medical testimony or otherwise -- that such a condition necessarily would have

affected Ms. Alexander's visual or cognitive abilities during the relevant time period from

August, 1988 through October, 1989 (and therefore have potentially impacted the

weight to be given by the jury to her identification of the defendant), the very nature of

the symptoms themselves renders them material and "carr[ies] a measure of strength in

support of the defendant's position." Commonwealth v. Grace, 397 Mass. 303, 305

(1986).    While the introduction of such evidence at trial may not have caused the

verdict to be different, candor suggests that -- given the circumstances surrounding

Mary Alexander's evolving identification of the defendant and her role in the

Commonwealth's case at trial (and during its closing argument) -- the evidence may

arguably have "been a real factor in the jury's deliberations."  Id. at 305.

**D.    Alleged Non-Disclosure of Exculpatory Evidence**

The third general ground upon which the defendant's third motion for new trial is

based arises out of the alleged failure of the Commonwealth to disclose exculpatory

evidence at trial.    In particular, the defendant contends that the non-disclosure of

exculpatory evidence relating to (1) certain alibi witnesses, (2) Mary Alexander's health,

see Part C (3) above, and (3) alleged promises, rewards, or inducements made to

certain witnesses requires a new trial.

"'[T]he rule of Brady v. Maryland, 373 U.S. 83, 87 (1963) .... [is] that suppression by the prosecution of requested material evidence which is favorable to the accused is a denial of due process.'"  Commonwealth v. Healy, 438 Mass. 672, 678 (2003), quoting Commonwealth v. Ellison, 376 Mass. 1, 21 (1978) (citations omitted). "'The Brady obligation comprehends evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material .... element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.'"  Id. at 679, quoting Ellison, 376 Mass at 22.  "To prevail on a [Brady] claim .... the defendant must first prove that the [withheld] evidence was, in fact, exculpatory."  Id. at 679, citing Commonwealth v. Wilson, 381 Mass. 90, 107 (1980).  "'[E]xculpatory in this context is not a narrow term connoting alibi or other complete proof of innocence, but rather comprehends all ~~evidence which tends to negate the guilt~~ of the accused .... or, stated affirmatively, supporting the innocence of the defendant.'"  Id. at 679, quoting Commonwealth v. St. Germain, 381 Mass. 256, 261 n.6 (1980) (citations and internal quotation marks omitted).

~~Where the defendant specifically requested the withheld information, he~~ "'need only demonstrate that a substantial basis exists for claiming prejudice from the nondisclosure.'"  Id. at 679-680, quoting Commonwealth v. Tucceri, 412 Mass. 401, 407 (1992).  Nonetheless, "the burden of establishing the requisite 'substantial basis' for a claim of prejudice rests with the defendant."  Id. at 680.  The reviewing court will "look to the record to determine 'whether we can be confident that, even if the prosecution had supplied the [withheld evidence] to the defendant in a timely fashion, the

[evidence] would not have influenced the jury.'" Id. at 680, quoting Commonwealth v. Daye, 411 Mass. 719, 729 (1992).

Here, the credible testimony and relevant exhibits introduced at the motion hearing conclusively established that the Commonwealth neither (1) withheld any exculpatory evidence relating to alleged alibi witnesses nor (2) was even aware of Mary Alexander's medical condition (or its potential effects), much less withheld such information from the defendant.    Conversely, the same testimony and exhibits established with equal force that the Commonwealth -- and in particular the district attorney's office -- withheld from the defendant (3) certain promises, rewards, and inducements made to Ricky Evans, a significant witness for the Commonwealth at trial.[7]

### (1)   Alibi Witnesses

Notwithstanding the allegations of the defendant in his various pre-hearing pleadings, including those set forth by his trial counsel, Steven Rappaport, Esquire, in an affidavit filed in support of the defendant's motion, the testimony and exhibits introduced at the motion hearing revealed unequivocally that any alibi evidence in the possession of the Commonwealth -- whether the tape-recorded statement of Olisa Graham (in which Gemini Hullum's name appeared as another potential alibi witness) or any other material -- was provided in its entirety to the defendant during the course of

---

7.    That exculpatory evidence relating to Mr. Evans was not provided to the defendant at trial is clear; the circumstances surrounding the Commonwealth's failure to disclose such evidence -- and whether the withholding of the evidence was knowing and intentional, negligent, inadvertent, unknowing, or otherwise -- are far less clear.   In arriving at its ultimate conclusion here, it is the fact of the non-disclosure, not the manner in which it occurred, that compels the Commonwealth.    In so doing, the Commonwealth need not, and specifically does not, characterize legally the circumstances surrounding the non-disclosure of such evidence.

pretrial discovery.   Mr. Rappaport himself acknowledged as much from the witness stand.   No alibi evidence was withheld from the defendant at trial.

### (2) Mary Alexander's Health

The defendant contends as well that the Commonwealth withheld exculpatory evidence relating to Mary Alexander's brain cancer.   While the failure to disclose Ms. Alexander's medical condition, if known to the Commonwealth, might well be deemed a material Brady error, the credible evidence at the motion hearing suggests that law enforcement -- both police and prosecutors -- were wholly unaware of it.

Police investigators first met with Ms. Alexander in August, 1988; her cancer was not diagnosed until February, 1989.   Neither Boston Police Detective Richard Walsh (who testified that he worked on the case from August, 1988 through the following spring) nor Boston Police Lieutenant Timothy Callahan (who testified that he in essence took over as the lead investigator during the summer of 1989) had any knowledge of or observed anything unusual about Ms. Alexander during their interactions with her.   Both Lieutenant Callahan and the trial prosecutor testified that Ms. Alexander appeared perfectly healthy to them at trial.   Ms. Alexander's extensive testimony on direct and cross-examination before the jury on October 3, 1989 offers no insight into the illness from which she was apparently then suffering.   Simply stated, there is no credible evidence that the Commonwealth knew of Ms. Alexander's medical condition at the time of trial.

### (3) Promises, Rewards, or Inducements

It was in 1963 that the United States Supreme Court first articulated the general Brady principles set forth above.   Brady v. Maryland, 373 Mass. 83, 87 (1963). It was in 1980 -- and again in 1982 -- that the Massachusetts Supreme Judicial Court

first articulated the application of those general principles to specific alleged interactions between the Commonwealth and it witnesses.   Commonwealth v. Gilday, 382 Mass. 166 (1980); Commonwealth v. Baldwin, 385 Mass. 165 (1982); Commonwealth v. Collins, 386 Mass. 1 (1982).    Understandings, agreements, promises, or any similar arrangements between the government and a significant government witness is exculpatory evidence that must be disclosed.   Commonwealth v. Gilday, 382 Mass. 166, 175 (1980).   "Evidence tending to impeach the credibility of a key prosecution witness is clearly exculpatory."   Commonwealth v. Collins, 386 Mass. 1, 8 (1982), citing Commonwealth v. Baldwin, 385 Mass. 165, 175 (1982).    "[A]ny understanding or agreement between the government and a key government witness is exculpatory .... provided it is material."   Commonwealth v. Collins, 386 Mass. 1, 8-9 (1982).

It was in 2000 that the Supreme Judicial Court most recently "[took the] occasion to emphasize that any communication that suggests preferential treatment to a key government witness in return for that witness's testimony is a matter that must be disclosed by the Commonwealth.   Commonwealth v. Gilday, 382 Mass. 166, 175 (1980). The fact that the terms of the agreement are not clearly delineated does not insulate the arrangement from disclosure.  Indeed, the very nature of the situation may well require that its terms be vague as the consideration given may be dependent upon the degree of cooperation.   But even without precise terms, the government easily can induce a witness to believe that his treatment is dependent on his testimony.   Thus, if any communication is reasonably susceptible of such an interpretation, it must be disclosed to the defense."   Commonwealth v. Hill, 432 Mass. 704, 716-717 (motion judge's order granting defendant's motion for new trial in murder case affirmed).

Here, there was conflicting testimony at the motion hearing -- among and between police officers, prosecutors, trial defense counsel, and the witness himself -- as to (1) what, if any, arrangements or communications to Ricky Evans, a Commonwealth witness at trial, had been made by law enforcement regarding various cases then pending against him and (2) what, if any, arrangements or communications to Mr. Evans had been made by law enforcement regarding the payment of certain housing and meals for him.   There was equally conflicting testimony at the motion hearing about what, if anything, the trial prosecutor (and others within the district attorney's office) knew about any such arrangements or communications.   See footnote 7 above.

At a minimum, the testimony and exhibits introduced at the hearing established that, with respect to (1) Mr. Evans' pending cases, see Motion Hearing Exhibit No. 8, the police had (a) accompanied Mr. Evans to court in order to remove an outstanding default warrant and (b) advised him that they would bring to the attention of the assistant district attorney prosecuting those cases -- and, if so requested, the judge presiding over them -- the fact of Mr. Evans' cooperation with law enforcement in the case against the defendant.[8]

The extent to which the trial prosecutor had knowledge of the arrangements and communications to Mr. Evans made by the police regarding his pending cases was the subject of particularly conflicting testimony at the motion hearing.   But whether the trial prosecutor knew, should have known, or did not know is not controlling here.

---

8.    As reflected by the testimony and exhibits introduced at the motion hearing, the conversation with Mr. Evans about his pending cases occurred on August 6, 1989, just before police investigators conducted a tape-recorded interview of him regarding his knowledge of the August 19, 1988 murder of Tiffany Moore.   See Motion Hearing Exhibit Nos. 27 and 28.

What is compelling is that the witness knew of the arrangements and communications -- and defense counsel (and the jury charged with assessing his credibility) did not.[9]

With respect to (2) the payment of housing and meals for Mr. Evans, there was also conflicting testimony at the motion hearing regarding the purpose, extent, and duration of such an arrangement, as well as which law enforcement agency -- the police, the district attorney's office, or a combination of the two -- devised of the arrangement and bore the financial cost.   At a minimum, the testimony and exhibits introduced at the hearing established the fact that (a) prior to and while testifying at the defendant's trial, Mr. Evans spent <u>some</u> period of time (for whatever reason and for however long) residing in a Howard Johnson's motel and eating meals at the motel restaurant, and (b) the cost of such expenses (whatever they included and whatever their amount) was borne by <u>law enforcement</u>.   As with the communications to Mr. Evans about his pending cases, the degree to which the trial prosecutor had knowledge of such an arrangement was the subject of equally conflicting testimony.

The application of the general <u>Brady</u> principles to substantially similar arrangements with government witnesses has been done on a case-by-case basis.   <u>See e.g.</u>, <u>Chavis</u> v. <u>North Carolina</u>, 637 F.2d 213, 214, 220-221, 225-226 (4th Cir. 1980) (trial judge committed reversible error by precluding defendant from cross-examining

---

9.    During a voir dire examination of Mr. Evans conducted in the middle of his testimony before the jury on October 4, 1989, defense counsel first learned (from Mr. Evans) of the circumstances surrounding the default removal; it was not until the motion hearing before this Court in 2003 that defense counsel learned of the communications regarding the potential disposition of Mr. Evans' pending cases.   The latter issue was compounded at trial when no representative of the Commonwealth (neither the trial prosecutor nor a police officer sitting with him at counsel table) sought to correct Mr. Evans' voir dire testimony -- at best inaccurate -- that he had not had any conversations or communications with law enforcement concerning the potential disposition of his pending cases.

government witnesses about being housed in hotel, at government's expense, during trial).  Contrast, United States v. Wicker, 933 F.2d 284, 292-293 (5th Cir. 1991) (where defendant did not specifically request discovery information about witness fees, government's failure to disclose that it was paying hotel expenses of witness deemed not Brady violation).

Here, given all of the attendant circumstances, information regarding (1) the communications made by law enforcement to Mr. Evans about his pending cases and (2) the arrangements made by law enforcement regarding Mr. Evans' housing and meals constituted exculpatory evidence that should have been disclosed to the defendant. Commonwealth v. Hill, 432 Mass. 704, 715-717 (2000) and cases cited.   In addition to legal precedent, the Commonwealth's ethical obligations dictate as much.

In light of the nature of the testimony that Mr. Evans provided at trial, including alleged incriminating observations of and statements by the defendant (and his co-defendant, Terrance Taylor) just before and just after the shooting death of Tiffany Moore -- allegedly at locations just near the murder scene, as well as the role his testimony played in the Commonwealth's closing argument, the failure of the Commonwealth to disclose such exculpatory evidence arguably prejudiced the defendant by depriving him of his constitutional right to cross-examine Mr. Evans effectively to show potential bias before the jury at trial.[10]

The Commonwealth's failure to disclose such evidence following a "specific and relevant request for exculpatory evidence .... [is] excused only if 'the error did not influence the jury, or had but very slight effect.'"  Commonwealth v. Collins, 386 Mass.

---

10.    Such a conclusion is based not on the particular characterization of Mr. Evans as a "critical" or "key" or "important" witness for the Commonwealth, but rather constitutional due process and fundamental fairness.

1, 9 (1982), quoting Commonwealth v. Gilday, 382 Mass. 166, 178 (1980).    Moreover,

"[w]here, either through misfeasance or nonfeasance by the prosecutor, false testimony

is introduced concerning an arrangement between the witness and the prosecutor, a

strict standard of materiality is applied.    A conviction will be set aside if there is 'any

reasonable likelihood that the false testimony could have affected the judgment of the

jury." Id., quoting Commonwealth v. Gilday, 382 Mass. 166, 178 (1980).


**E.    Analysis**

Standing alone, none of the grounds alleged by the defendant -- whether the

recantations of certain trial witnesses, certain newly discovered evidence, or certain non-

disclosed exculpatory evidence -- necessarily compels a new trial.

Collectively and cumulatively, however, the allegations as a whole warrant

~~serious, serious consideration -- particularly when analyzed along with all of the other~~

items reviewed and factors considered by the Commonwealth here.  See, those specific

items and factors set forth in Exhibit A to the Commonwealth's Post-Hearing Motion to

Vacate Conviction and Grant New Trial.

~~Indeed, with all due respect to the twelve fair and impartial jurors who dutifully~~

listened to the evidence and applied the law at the defendant's trial in 1989, when

evaluated in the context of the entire case -- from start to finish, beginning to end,

August 19, 1988 to November 3, 2003 -- the testimony and exhibits introduced at the

motion hearing in 2003 lead to one inescapable conclusion:  that justice may not have

been done.

## CONCLUSION

For the reasons set forth above, the Commonwealth respectfully submits that this Honorable Court ought grant the Commonwealth's Motion to Vacate Conviction and Grant New Trial.

Respectfully Submitted
For the Commonwealth,

DANIEL F. CONLEY
DISTRICT ATTORNEY

By: _____
DAVID E. MEIER
Assistant District Attorney
Homicide Unit
One Bulfinch Place
Boston, MA  02114
(617) 619-4242

Dated:  November 3, 2003