

**BRIGHAM AND WOMEN'S HOSPITAL**

**HARVARD MEDICAL SCHOOL**

Division of Cognitive & Behavioral Neurology
Department of Neurology
221 Longwood Avenue
Boston, Massachusetts 02115
Tel: 617 732-8060, Fax: 617 738-9122
E-mail: kdaffner@partners.org

Kirk R. Daffner, M.D.
*Chief, Division of Cognitive
& Behavioral Neurology
Associate Professor of Neurology*

September 18, 2007

Hugh R. Curran
Bonner, Kiernan, Trebach & Crociata, LLP
One Liberty Square
Boston, MA  02109

RE:    Shawn Drumgold v. City of Boston, et al.

Dear Attorney Curran:

Thank you very much for asking me to review the records regarding the Shawn Drumgold case. As part of my review, I examined the following:
1. medical records of Mary Alexander from Carney Hospital and Boston Medical Center;
2. transcript of the trial testimony of Mary Alexander, dated October 3, 1989;
3. transcript of the testimony of Lola Alexander from the Motion Hearing taken on July 3, 2003;
4. transcript of the deposition of Tracie Peaks taken on April 28, 2006 and September 15, 2006;
5. transcript of the deposition of Attorney Steven Rappaport taken on February 3, 2007;
6. transcript of the deposition of Robert George taken on February 13, 2007;
7. copy of the Affidavit of Diane Hall, dated May 2, 2007.

I focused my analysis on two major questions.  1) Is there evidence to suggest that between 8/19/88, the date of the alleged shooting, and 10/3/89, the date of Mary Alexander's trial testimony, Ms. Alexander's brain tumor resulted in ongoing impairment of cognitive capacities that would have prevented her from processing, recalling, or communicating information about this case? 2) Is there evidence to suggest that Ms. Alexander's brain tumor led to neurological impairments that would have been obvious to people who interacted with her between the date of the alleged shooting on 8/19/88 and the date of her trial testimony on 10/3/89.

The ideal way in which to address the first question would be to have conducted a detailed face-to-face evaluation of Ms. Alexander to assess her mental status and neurological condition during the period under consideration.  Since this is not possible, I must rely on inferences from the records that are available for review.  In my opinion, the most pertinent primary data available are from the transcript of Ms. Alexander's trial testimony on 10/3/89.  A review of the

transcript reveals that Ms. Alexander was alert and oriented. Without hesitation, she named several people who lived in the apartment above her. Her language appeared to be fluent, and without obvious word finding pauses or evidence of aphasia (language disturbance). Her memory seemed to be reasonably intact. For example, she identified Defense Attorney Rappaport as someone who had visited her prior to the trial and showed her a picture of Mr. Drumgold. To the best of my knowledge, this event did, in fact, take place. She shared details about her interaction with Mr. Rappaport. She also recalled the time in which she saw members of the Court, including the defendants, police officers, and lawyers in front of her house while they conducted a 'site visit' to the alleged scene of the crime. To the best of my knowledge, this event did take place. Ms. Alexander's difficulty retrieving the names of specific police officers did not strike me as reflecting a clinical amnestic syndrome, because this kind of difficulty is commonly seen in individuals who would be considered normal.

In summary, it is my opinion, to a reasonable degree of medical certainty, that there is nothing in the transcript of Ms. Alexander's testimony to suggest aphasia, amnesia, or other major cognitive disorders that could significantly undermine her capacity to serve as a witness and provide an account of her observations.

Ms. Alexander's medical records suggest that she had a very large left hemisphere tumor, with considerable mass. Based on the reports that I reviewed, it sounds as if the radiological abnormalities appeared to be quite dramatic. Given the size of her tumor, it may seem logical that she would have had significant neurological impairments that would have been obvious to anyone who spent time with her. However, this is not necessarily the case.

Ms. Alexander reportedly had a biopsy proven high grade glioma (i.e., brain tumor). Such tumors often grow very slowly, over years to decades. The slow growth of these kinds of tumors seems to allow the brain to adjust and compensate. In fact, such individuals can manifest few, if any, neurological signs for very long periods of time. In support of this notion, I would cite the neurological consult note by Dr. Mark Weiner who evaluated Ms. Alexander on 2/5/89, the day after Ms. Alexander was admitted to the Carney Hospital for a generalized seizure. This examination appears to have been conducted just prior to acquiring the CT scan that would reveal her very large left hemisphere tumor. According to Dr. Weiner, an experienced neurologist, Ms. Alexander's speech was fluent and her comprehension was good. He found her cranial nerves (e.g., eye movements, facial strength, facial sensation, etc.) to be intact. He described her muscle tone and strength as being normal. In addition, he reported no sensory or cerebellar (coordination) deficits. He noted that her gait was normal. He found her deep tendon reflexes to be 1+ and symmetric (normal) and her plantar response, a very subtle measure of damage to the central nervous system, to be normal bilaterally. In short, an experienced neurologist who conducted a detailed neurological examination, found no clear signs of neurological abnormality. Thus, it is not surprising that non-neurologists and lay individuals in general who spent time with Ms. Alexander during the period in question may have had no awareness that Ms. Alexander was suffering from a neurological condition/brain tumor.

A review of the medical records during her hospitalization in Carney in February of 1989 includes observations that the patient had some difficulties with aspects of orientation and memory. However, these mental state changes occurred during a period in which Ms. Alexander

underwent a left hemisphere craniotomy and removal of a portion of the tumor. In addition Ms. Alexander had been acutely receiving many medications, including Dilantin (for seizures) and steroids (to reduce brain swelling). Subsequent reports from the Carney Hospital between February and October of 1989 do not suggest clear evidence of cognitive impairments in this patient.

A review of the transcript testimony of Lola Alexander, Mary's mother, taken from the Motion Hearing on 7/3/03, raises concerns that Ms. Alexander was significantly impaired neurologically during the period of time between the date of the alleged murder, 8/19/88 and the date of Ms. Alexander's trial testimony, 10/3/89. However, a review of many of the statements made by Lola Alexander in this transcript raises serious doubts about the veracity of her recollections. For example, she stated that when the police first questioned her daughter (which apparently took place within a week of the alleged murder) she (Lola Alexander) told the officers that "my daughter's memory wasn't good because she had malignant cancer at the brain and she didn't need any more pressure on her, she didn't remember from one day to the other or from one incident to the other, or what happened during the day" (page 15). On another occasion, she stated that during the time of questioning her daughter had "severe headaches" (page 11). To the best of my knowledge, the initial questioning by the police occurred in August of 1988. However, the patient's diagnosis of a malignant brain cancer did not occur until she was admitted to Carney Hospital in February of 1989 (approximately six months later). In addition, according to the Carney Hospital records, the patient had been experiencing headaches for approximately two months, which would suggest that their onset occurred around December of 1988, which is four months after the time of the presumed initial questioning by the police. For reasons that are not clear, it appears that Ms. Lola Alexander misremembered the time course of her daughter's neurological illness. In short, Lola Alexander's recollection of her daughter's neurological condition in August of 1988 does not accord with available medical records.

A review of the transcript of the deposition of Tracie Peaks, taken on 4/28/06 and 9/15/06 suggests that Ms. Peaks saw no indication that her neighbor, Mary Alexander, was sick until she found out about it in August of 1990. It is my understanding that Ms. Peaks was Ms. Alexander's upstairs neighbor at 72 Homestead Street.

A review of the Affidavit of Diane Hall, dated May 2, 2007, indicates that Mary Alexander and Ms. Hall were friends since they were 14 years of age and until the death of Ms. Alexander. She was the godmother of Ms. Hall's daughter. She reported that between August of 1988 and the death of Mary Alexander in 1993, she saw her frequently and had contact approximately three times per week. Ms. Hall reports that she had no awareness that Ms. Alexander suffered from health problems during the period from 1988 to 1989. Moreover, Ms. Hall indicated that she did not observe Ms. Alexander to have any memory problems during that time.

Based on my review of available information, it is my opinion, to a reasonable degree of medical certainty, that despite Ms. Alexander's large left hemisphere brain tumor, during the period between the alleged shootings on 8/19/88 and Mary Alexander's trial testimony on 10/3/89, Ms. Alexander did not appear to exhibit obvious signs of neurological impairment. As discussed earlier, even when examined carefully by an expert neurologist, neurological impairments were not observed.

Again, thank you very much for asking me to review these records. If I can be of further assistance, please feel free to contact me.

Enclosed is a copy of a recent curriculum vitae. It summarizes my education, training, and clinical experience. Currently, I serve as the Chief of the Division of Cognitive and Behavioral Neurology at the Brigham and Women's Hospital, Harvard Medical School, and I am an Associate Professor of Neurology at Harvard Medical School. My expertise is in the field of cognitive and behavioral neurology, which focuses on impairments in attention, memory, executive functions, perception, language, mood, etc. that result from injury or dysfunction of the nervous system.

I have received a $4,000 retainer to date.

Sincerely,


Kirk R. Daffner, M.D.