UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SHAWN DRUMGOLD,    Plaintiff | ) ) ) | C.A. NO. 04-11193NG |
| v. | ) ) | |
| TIMOTHY CALLAHAN, ET AL.    Defendant(s) | ) ) ) | |

**JOINT PRETRIAL MEMORANDUM OF**
**PLAINTIFF AND DEFENDANTS WALSH AND CALLAHAN**

The parties submit the following Joint Pretrial Memorandum, pursuant to the Order of the Court dated January 25, 2008. The parties reserve the right to amend this Pretrial Memorandum upon receipt of the Court's rulings on the pending motions in limine, and as otherwise necessary.

**I.    Trial Counsel**

**Plaintiff's Counsel**

Rosemary Scapicchio
Four Longfellow Pl
37th floor
Boston MA 02114
617-263-7400

Michael Reilly
2 Center Plaza
Boston, MA 02108
617-723-1720

**Defense Counsel**

Mary Jo Harris
Morgan, Brown & Joy, LLP
200 State Street
Boston, MA 02109
(Office): (617) 523-6666
(DD): (617) 788-5011

William M. White
William M. White & Associates
One Faneuil Hall Marketplace
Boston, MA 02109
(617) 720-2002

Hugh Curran
Bletzer & Bletzer
300 Market Street
Brighton, MA 02135
(617) 254-8900

John Roache
Roache & Associates
66 Long Wharf
Boston, MA 02109
(617) 367-0330

II.     **The Parties Agree That The Case Is To Be Tried To A Jury.**

III.    **Concise Summary Of Position Of The Parties**

A.      **Plaintiff**

On August 19, 1988 Darlene Tiffany Moore was shot and killed while she was sitting on a mailbox surrounded by a group of teenagers near the corner of Humboldt Ave. and Homestead St. in Roxbury, Massachusetts.  On August 29, 1988 The

Plaintiff, Shawn Drumgold, was arrested by Defendant Walsh and his partner Paul Murphy. Walsh and Murphy interrogated Drumgold after the arrest despite a direct order from Roxbury District Court Judge Martin not to interrogate Drumgold and despite Drumgold's request for an attorney. On May 18, 1989 Judge Volterra granted Drumgold's Motion to Suppress that statement.

Defendant Timothy Callahan joined the Boston Police investigation of this murder. On October 13, 1989 Drumgold was convicted of First Degree Murder for the murder of Tiffany Moore. The evidence at the trial was coerced testimony as result of intimidation by the Defendants and/or was fabricated by the Defendants. The actions of the Defendants in connection with trial witnesses include the following:

- Tracie Peaks was shown a suggestive photographic identification by Defendant Walsh and his partner Murphy and was threatened that she would be arrested if she did not make an identification. Walsh and Murphy then prepared a false report concerning an alleged identification by Peaks. Peaks was threatened by the police through her mother that if she did not appear to testify she would be arrested. Peaks was threatened by the Defendants when she appeared at Court and was told she had to point out Shawn Drumgold. As a result of all of the above Peaks testified falsely at the trial and the Defendants Walsh and Callahan knew or should have known that her testimony was false.

3

- Mary Alexander was suffering from a brain tumor causing cognitive and severe memory problems at the time she testified at trial and at the time she allegedly made observations in connection with this case.  Ms. Alexander's mother, Lola, told both Defendant Walsh and his partner Murphy and Defendant Callahan about her daughter's physical condition and her daughter's poor memory.  Defendant's Walsh and Murphy made a suggestive photographic identification to Mary Alexander.  They made multiple visits to her house.  Neither Defendant Walsh nor Callahan revealed exculpatory evidence concerning Mary Alexander's mental condition or procedures for identification to either the District Attorney or to the Defense.

- Defendant Walsh and his partner Murphy intimidated Antonio Anthony into falsely denying that he could provide an alibi to Drumgold. They arranged to have him housed at the Howard Johnson's at the Commonwealth's expense. Anthony ultimately failed to agree to testify to the Grand Jury as the Commonwealth wished and, as a result Anthony was not called as a witness to the Grand Jury.  Neither Walsh nor Callahan revealed to either the District Attorney or the Defense that Anthony had been housed at Howard Johnson's and given money by the Commonwealth.

- Vantrell McPherson was 13 years old at the time of the murder.  Police came to her house shortly after the murder.  Police continued to come to her house approximately 20 times.  Just prior to being brought into court to testify, she was brought into a dark room where two police officers yelled at her.  She told them she did not know who the shooter was.  She was upset and she began

4

crying. She was then brought into court and testified falsely that she heard Co-Defendant Terrance Taylor make a statement, "Come on, we've got to do this". Defendant Callahan, it can be inferred, was the detective who yelled at Ms. McPherson. Defendant Callahan did not reveal to either Assistant District Attorney who was trying the case or to the Defense Attorney that Ms. McPherson had been threatened prior to testifying or that she had told the officers that she did not know who the shooter was. McPherson's testimony that Taylor made a statement, "Come on, we've got to do this", was false.

- Eric Johnson changed his testimony and identified Drumgold at trial. Johnson's testimony was a result of Walsh and Murphy continually coming to his house and pressuring him, telling him "we want you to say this". His testimony was false. Defendant Walsh and Callahan knew it was false and threatened and coerced Johnson into so testifying.

- Ricky Evans testified at trial for the Commonwealth. Defendant Callahan arranged to have outstanding default warrants remove and continued Evans pending criminal cases until after the criminal trial and promised assistance on the cases. Prior to Ricky Evans testifying he was housed at a Howard Johnson's Hotel by Defendant Callahan for a substantial period of time. During that time, Callahan visited him on multiple occasions and provided him with funds as well as authorizing Evans to have free food and "walking around" money. Callahan fed information to Ricky Evans concerning the details of the Commonwealth's case and coached Ricky Evans as to how to testify concerning that information which Callahan provided him. Callahan

5

knew that Evans' testimony was false and had been coached.  Neither Walsh nor Callahan disclosed to the District Attorney or to Defense Counsel that Evans had been housed at the Commonwealth's expense at the Howard Johnson's and had been provided with money and meals, nor did they disclose that Evans had been fed information and coached as to his testimony.

- Olisa Graham informed Defendant Callahan that she was with Drumgold on Sonoma St. at the time the shooting occurred and therefore Drumgold could not have done the shooting.  After giving that statement to Callahan, Ms. Graham received a call from a Boston Detective, who the jury can infer was Callahan, telling her that if she testified she would be arrested for an open shop lifting warrant as she walked off the stand.  She was planning to testify before she received that telephone call.  She did not testify because of receiving that threat from Callahan.  Callahan did not disclose that threat to either the District Attorney or Defense Counsel.

- Additional witnesses will testify that Drumgold was in fact at Somona St. at the time of the shooting, including Michelle Payne Short, Gemini Hullum, and Obie Graham.

The Wrongful acts of Callahan and Walsh were the result of the policies, practices, and rules of the City of Boston.  The evidence concerning the City will include:

- In 1988 and 1989 there was no formal Boston Police Department system to gauge the performance of police officers or to hold them accountable for their actions. There was no written homicide investigative policies and no particularized training for homicide detectives. The only outside training lacked legitimacy with the officers and the in-service training was considered a joke.

- The City of Boston had no formal way of learning, monitoring or following up on officers who had been found to engage in illegal or unconstitutional behavior in criminal cases.

- In the Drumgold case the City of Boston condoned and encouraged the improper activities of the Defendants. The City was aware that Defendant Walsh had been found to have illegally procured a statement from the Defendant and was sharply criticized by a Superior Court Judge in connection with his actions, including being charged with engaging in intentional deceit of a District Court Judge. Despite that, Walsh's supervisor, Lieutenant Daley, continued to believe that neither officer did anything wrong. Daley did not reprimand, punish or counsel Walsh or Murphy as a result of their misconduct.

- Defendant Roache, who failed to provide any supervision of homicide detectives or homicide policies, specifically commended Walsh for his actions in the Drumgold case and failed to make any attempt to correct or rescind that commendation after Walsh's conduct was found to be illegal and egregious.

- The actions of Defendant Callahan, who joined the case after Walsh had been commended by the Commissioner of police and condoned by the head of the homicide department, followed directly from the City of Boston's official approval of Walsh's actions.

- From 1982 through at least 1994 the City of Boston had a custom or practice of using threats, intimidation, perjured evidence and withholding of exculpatory evidence in order to convict black males of felonies.  The policy was known or should have been known to administrators of the City of Boston since it was available in publicly available records and court filings.  The city made no attempt to correct or stop that policy.

- The City appointed Lt. John Daley as the head of the Boston Homicide Unit from 1985 through August of 1989.  Daley was in charge of the homicide unit at the time of the investigation of Drumgold.  Daley condoned and encouraged Walsh and Murphy, and Callahan in their violation of the Defendant's rights and attributed any criticism of them as being a "sacrifice to the black community".

- The City had a policy and practice of wrongfully convicting black males by means of false and coerced testimony in the 1980s and 1990s.

Drumgold was wrongfully incarcerated from August of 1988 through November of 2003.  Drumgold, his wife, and family members will testify concerning the devastating effect that the wrongful incarceration had on him during the period of

8

incarceration and on the continuing adverse effects incarceration during most of his adult life has had on Mr. Drumgold and his family.

**B.    Defendants**

<u>As to liability</u>: the Defendants' position is that the Plaintiff's due process rights were not violated by any action or inaction of either Walsh or Callahan. Walsh and Callahan deny that they intimidated, threatened, or gave information to any witness with which to provide false testimony against the Plaintiff at trial. Walsh and Callahan deny any knowledge of the health status of Mary Alexander, and thus deny that they intentionally or with deliberate indifference withheld any allegedly exculpatory information about her health or competency as a witness. Callahan denies that he provided false information to Ricky Evans, that he coached or influenced his testimony in any manner, and denies that he provided Evans with housing, money or other benefits without the knowledge and approval of the District Attorney's Office and the Boston Police Department. Callahan also denies that he had any knowledge about any favorable treatment provided to Evans by any law enforcement agency.

<u>As to damages</u>: the Defendants' position is that the evidence provided in 1988 and 1989, and adduced at trial, links Plaintiff to the murder of Tiffany Moore. The Defendants' position is that Plaintiff has not been exonerated, nor has demonstrated that he is actually innocent of the crime with which he was charged.

IV. **Stipulations**

1. On August 19, 1988 12 year old Darlene Tiffany Moore was shot and killed while sitting on a mail box while surrounded by a group of teenagers on the corner of Humboldt Ave. and Homestead St. in Roxbury, Massachusetts. She was struck by three bullets.

2. Defendant Richard Walsh, a Boston Police Homicide Detective, was assigned to the investigation of the Moore homicide on August 19, 1988.

3. On August 29, 1988 23 year old Shawn Drumgold was arrested by Walsh and his partner Defendant Paul Murphy and charged with the murder of Tiffany Moore.

4. On September 8, 1988 Drumgold and Terrance Taylor were indicted by the Suffolk County Grand Jury and charged with the murder of Tiffany Moore.

5. Defendant Timothy Callahan, a Boston Police Homicide detective, was assigned to the Moore murder investigation in late May/early June, 1989.

6. On October 2, 1989 Drumgold and Taylor went to trial on the charge of murder.

7. On October 13, 1989 the Suffolk County jury convicted Drumgold of first degree murder. Drumgold was sentenced to a mandatory term of life in prison without the possibility of parole.

8. Drumgold was released from incarceration on November 6, 2003

9. The Defendants Walsh and Callahan were acting under color of State law while they were involved in the investigation of the murder of Tiffany Moore

and prosecution of Shawn Drumgold. Defendant Roache was acting under color of State law as Commissioner of the Boston Police Department during the time of the investigation of the murder of Tiffany Moore and the prosecution of Shawn Drumgold.

### V. Contested Issue Of Fact

As set out in detail in connection with the Motions for Summary Judgment, the Defendants have denied that any of their actions violated the Plaintiff's civil rights.

### VI. Jurisdictional Questions

The parties are not aware of any jurisdictional questions.

### VII. Anticipated Issues Of Law

The anticipated issues of law are set out in the various Motions In Limine that have been filed by the parties.

### VIII. Amendments To Pleadings

The parties are not making any requests for amendments to pleadings at this time.

### IX. Motion In Aid Of Disposition Of Trial

        The Court has a variety of Motions pending to aid in the disposition of the action.

**X.    Length Of Trial**

Plaintiff expects the trial to last approximately three weeks. Defendants estimate, depending on the Court and jury's decisions, a six week trial.

**XI.   Jury Issues**

    a. See proposed Voir Dire questionnaire.

    b. See attached witness lists to be read to jury.

    c. The parties will submit proposed voir dire introductions based on the Court's rulings on the various pending motions.

**XII.  Witness Lists**

See Parties Witness Lists filed with the Motion.

**XIII. List of Proposed Exhibits**

The parties are filing their respective exhibit lists with this Motion. The parties will submit to the Court a list of agreed exhibits and a list of non-agreed exhibits with a brief description of the grounds for any objection.