UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SHAWN DRUMGOLD, | ) | C.A. NO. 04-11193NG |
|     Plaintiff | ) | |
| | ) | |
| v | ) | |
| | ) | |
| TIMOTHY CALLAHAN, ET AL. | ) | |
|     Defendant(s) | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO EXCLUDE CERTAIN WITNESSES AND PRECLUDE REMARKS DURING TRIAL**

**INTRODUCTION**

The Plaintiff will refer throughout this Motion to the various exhibits offered in support of Opposition to Motion for Summary Judgment rather than resubmit exhibits in connection with this Motion .

**I.   There Is No Basis For Excluding The Testimony Of Olisa Graham and Gemini Hullum**

The Defendants seek an order from this Court forbidding the Plaintiff from calling Olisa Graham and Gemini Hullum as witnesses on the grounds, initially, that their alibi testimony was disclosed to defense counsel prior to the criminal trial.

As an initial matter, the Defendants appear to be taking inconsistent positions. The Defendants' position has been that they intend to prove, as part of their case, that Mr. Drumgold, in fact, murdered Tiffany Moore. They have indicated their intention to offer testimony which is

1

only relevant on that issue and is not relevant on question of misconduct by the police. If it is the intention of the Defendants to argue, as part of their case, that Mr. Drumgold committed the murder, they cannot object to witnesses offered by the Plaintiff to respond to that argument. Olisa Graham and Gemini Hullum will both testify that they can provide an alibi to Shawn Drumgold at the time of the murder and will provide him with an alibi for the murder. The testimony is clearly relevant on the issue of whether or not Mr. Drumgold committed the murder. They should be allowed to testify.

  Secondly, the Plaintiff is entitled to establish that the actions of the Defendants in depriving him of exculpatory evidence and of fabricating inculpatory evidence was prejudicial to Mr. Drumgold because it caused him to be wrongfully convicted of murder. The First Circuit in Limone v. Condon, 372 F.3d 39 (1st Cir. 2004) explained that "if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit" (at 44-45). Plaintiff is entitled to prove the that he did not commit this crime and was framed by the Defendants. The evidence of Graham and Hullum is relevant to prove that the Plaintiff did not commit the crime charged. The Defendants now seek to argue that because they successfully misled Mr. Rappaport into not appreciating the significance of the testimony of Graham and Hullum at the original trial, the Defendants should be not now allowed to have those witnesses testify to this jury.

At the time Rappaport made his decisions concerning whether or not to call Olisa Graham and Gemini Hullum, he was not aware that the Commonwealth had housed, paid and suborned Ricky Evans's testimony, had housed Antonio Anthony and failed to disclose it, had failed to disclose exculpatory evidence concerning Mary Alexander and had threatened and intimated Olisa Graham. It would be reasonable for the jury to find that Rappaport would have made substantially different strategic decisions had he been aware of that information. If all of the material facts been known to Rappaport, his most likely grounds for defending the case would have been that the Commonwealth had intentionally fabricated the case by means of threats and intimidation. Olisa Graham would have been a key witness in that trial.

It is correct that Mr. Rappaport testified that he initially considered the Sonoma Street alibi part of the case as something Co-Counsel Mr. George would handle in the original criminal trial. Mr. George's client, Terrance Taylor, was directed out of that case. Thus at the time of the defense case, Mr. Rappaport was making the decision as to calling witnesses. Rappaport's decisions were necessarily affected by his false impression that there had been no coercion or intimidation of witnesses. That false impression was caused by the Defendants in this case.

**II.    There Is Evidence From Which The Jury Can Infer That Callahan Called Olisa Graham And Threatened Her.**

In June of 1989, Callahan took a recorded statement from Olisa Graham (Walsh Exhibit 29A). In that statement, she told Callahan that she had seen Shawn Drumgold with Terrance Taylor outside 23 Sonoma Street at the time of shooting.

Ms. Graham explained, referring to the men who took her statement, that after giving the statement "I received a phone call from one of them informing me that I have an outstanding warrant and I could not testify or I could be locked up." The Assistant District Attorney prosecuting the case, Mr. Phil Beauchsene, testified that he had no knowledge of any witnesses being threatened prior to their testimony at trial (Plaintiff's Exhibit 6, Motion for New Trial, Volume 6, pages 154-155). The other District Attorney involved in this case was Phyllis Broker (Plaintiff's Exhibit 6, Motion for New Trial, Volume 6, pages 154-155). She could not have been one of the "men" who visited Olisa Graham. The jury can reasonably infer that Callahan, who was the lead investigator at the time and who, by his own admission, was the man taking the statement from Olisa Graham, was the individual who called Olisa Graham and made that threat.

It should be noted that Ms. Graham's testimony about the call is admissible even if there were no specific evidence of a threat by Callahan. The Defendants intend to argue that the testimony of Ms. Graham and the other defense witnesses should not be credited because they failed to come forward at trial in 1988. Plaintiff should be allowed to offer evidence showing why witnesses did not come forward in 1988, including the fact they were threatened.

**III.    The Evidence Of Gemini Hullum Is Admissible To Establish The Plaintiff's Alibi.**

As set out above, Plaintiff intends to argue in this case that he was an innocent man convicted as a result of fabricated evidence, intimidated witnesses and undisclosed exculpatory

evidence. Gemini Hullum will testify as an alibi witness to establish that Drumgold did not commit the murder of Tiffany Moore. As discussed above, the Defendants have clearly indicated their intention to argue that Drumgold did commit the murder. Ms. Hullum's testimony is relevant on that issue.

### IV.     Antonio Anthony Should Be Allowed To Testify At Trial

As an initial matter, Antonio Anthony will provide an alibi to Shawn Drumgold. He is expected to testify that he was with Shawn Drumgold on Somona Street when Olisa Graham came from Humboldt Street and said that a little girl had just been shot (Walsh Exhibit 12C, page 100-101).

On August 31, 1988 Anthony was interrogated by Walsh (Walsh Exhibit 12A). Anthony's testimony at the Motion for New Trial was that "the officers want me to say Shawn did it, that's what they want." (Walsh Exhibit 12C, page 108) He testified that the officers "kept pressuring on me". (Id.) He also testified that he was nervous and scared when he was interrogated because "I know Mr. Drumgold hadn't did it, you know, I'm scared for myself. I'm scared now, I can become a target, I can get locked up for the charge." Anthony denied that he remembered what Drumgold was wearing on the night of the murder. (Id. 110-111) The evidence of Walsh intimidating and threatening Antonio Anthony is clearly relevant.

The argument that Anthony's claim of the Fifth Amendment to the grand jury makes his

evidence inadmissible ignores the fact that Anthony testified that the reason he was scared for himself and scared that he would become a target was because he was nervous as a result of the pressure put on him by the Defendants (108-109). Walsh and Murphy interrogated Anthony. (Walsh Exhibit 12C, page 133-134) This is the case where Commonwealth actions had the effect of interfering or hindering access to witnesses' testimony by using improper tactics which resulted in the witness becoming unavailable. Commonwealth v. McMiller, 29 Mass.App.Ct. 392, 407, 560 N.E.2d 732 (1990).

Walsh's threats and intimidation of Anthony are also admissible of evidence as overt acts in futherance of the consipiracy to deny Drumgold's civil rights. Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988). Direct evidence of overt acts in furtherance of the conspiracy are "generally admissible as direct evidence of the conspiracy". U.S. v. Arboleda, 929 F.2d 858, 866 (1st Cir. 1991).

The Defendants argue that Anthony's testimony may potentially be impeached either by the statement he allegedly made to Mr. Keller or by his recorded statement. That argument goes to the weight of Mr. Anthony's testimony or to potential impeachment. It is not argument for excluding Mr. Anthony from testifying at trial.

Finally, the Defendants argue that the failure to disclose that Anthony was put up at Commonwealth's expense at Howard Johnson is not relevant. Plaintiff is entitled to argue to the

jury that Anthony originally provided an alibi to the Defendant for the time of the murder (Walsh Exhibit 12C). Defendant Walsh then obtained what is alleged to be an inculpatory recorded statement of Anthony, as a result of threat and intimidation (Walsh Exhibit 12A). The Commonwealth then put Anthony up in a hotel prior to the grand jury. Taylor then refused to cooperate with the Commonwealth and instead claimed his Fifth Amendment right not to testify.

The evidence of Anthony refusing to cooperate even after being provided with housing by the Commonwealth wase exculpatory evidence which should have been disclosed to the Defendant. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The decision to provide benefits to Anthony can fairly be attributed to Walsh, acting through his partner Murphy. There is no evidence that the reward was ever disclosed to the District Attorney, thus the failure to disclose the benefit was the responsibility of Defendant Walsh. That evidence is admissible against Walsh as evidence which establishes his personal scheme to wrongfully convict Drumgold and as evidence of an act as part of the conspiracy to wrongfully convict Drumgold.

**V.    The Court Should Defer Ruling On The Motion In Limine In Regards To Vantrell McPherson.**

The Plaintiff will not argue in his opening argument that Defendant Walsh had any involvement with Vantrall McPherson. Ms. McPherson testified at the Motion for New Trial that

she was approached by Boston Police officers right after the murder and there may be a reasonable inference that the officer who talked to her was Walsh (Plaintiff's Exhibit 1, Motion for New Trial, Day 1, page 177). The Plaintiff will examine Ms. McPherson involving her contact with Walsh. The Court should reserve its ruling on whether there is a reasonable inference that Mr. Walsh was involved with Ms. McPherson until it hears the testimony from the witness McPherson.

**VI.    There Is A Basis For The Jury To Find That Walsh Was Aware That Evans Was Put Up In Howard Johnson And Did Not Disclose That Fact To The Prosecution or Defense Counsel.**

Walsh alleges that he had no involvement or knowledge that Ricky Evans was housed at the Howard Johnson's and therefore has no responsibility for the failure to disclose that Ricky Evans was put up in a hotel prior to trial. Walsh's testified as follows. (Plaintiff's Exhibit 9(B) p183)

> Q:   Have you ever learned of the Boston Police Department putting up any other witnesses in Howard Johnson's Motor Lodge in Boston Street in South Boston?
> A:   Again, at some point of the time, I became aware of another witness being put up.
> Q:   Was that Ricky Evans?
> A:   I believe it was, yes, Sir.
> Q:   When did you learn of that?
> A:   I believe it was some time prior to the trial, but I am not exactly sure.
> Q:   Prior to the original trial?
> A:   That someone was put up, yes, sir.

Walsh now argues that in his errata sheet he changed his testimony and said that he did

not become aware of Evans' being put up in a hotel until just prior to the Motion for New Trial, fourteen years after the original trial. It should be noted that the original deposition testimony was not a slip of the tongue. After Walsh first said that he learned "some time prior to trial", he was specifically asked "prior to the original trial?" and answered "That someone was put up, yes, Sir". Mr. Walsh changed his considered and repeated testimony at his deposition by way of the errata sheet.

The attempt to change the substance of testimony by way of an errata sheet, at minimum, creates a jury issue. In interpreting Rule 30(e) of the Federal Rules of Civil Procedure, the federal courts have determined that corrections that alter the substance of a deponent's testimony cannot be made through the correction process set out in Rule 30(e). S.E.C. v. Parkersburg Wireless Ltd. Liab. Co., 156 F.R.D. 529, 535 & n.11 (D.D.C. 1994); Greenway v. International Paper, 144 F.R.D. 322 (W.D.La. 1992) ("the Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses"); Rios v. Bigler, 847 F. Supp. 1538 (D.Kan. 1994) ("Although the errata sheet may be used to correct errors or to clarify or change an answer when a question is misunderstood, it may not be used to allow a person to alter what has been said under oath"); ; Garcia v. Pueblo Country Club, 299 F.3d 1233, 1242 n.5 (10th Cir. 2002) ("'The Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home

examination.' ")

Judge Kravchuk explained in *Great N. Storehouse, Inc. v. Peerless Ins. Co.*, 2000 WL 1901266 (D. Me. Dec. 29, 2000):

> Rule 30(e) allows deponents to provide revised answers to deposition questions, including answers contradictory to those provided at the deposition. The Rule does not require a judge to examine the sufficiency, reasonableness, or legitimacy of the reasons for the changes -- even if those reasons are unconvincing. The Rule merely requires that the deponent abide by a restricted time frame for making the changes and recite the reasons for any changes. However, when a party amends his testimony under Rule 30(e), the original answer to the deposition questions will remain part of the record and can be read at the trial.

A change in testimony by use of errata sheet creates an issue of fact for a jury to resolve. The jury has the right to hear both versions and decide which to believe. "If the original answers as well as the changes are made available to the jury when and if the deposition testimony is used at trial, the jurors should be able to discern the artful nature of the changes." Elwell v. Conair, Inc., 145 F. Supp. 2d 79 (D.Me. 2001). Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 103 (2nd Cir. 1997) (Rule 30(e) places no limitation on the changes a deponent may make to her deposition, and holding that although the Court will not strike the errata sheet, the answers given at the deposition remain part of the record and may be admitted into evidence at trial.) The admission of the original testimony is the consequence a deponent faces when she makes substantive changes to his testimony after the fact:

> The witness who changes his testimony on a material matter between the giving of his deposition and his appearance at trial may be impeached by his former answers, and the cross-examiner and the jury are likely to be keenly interested in the reasons he changed his testimony. There is no apparent reason why the witness who changes his mind between the giving of the deposition and its transcription should stand in any better case. (Lugtig v. Thomas, 89 F.R.D. 639, 642 (N.D.Ill.1981))

**VII.    The Jury Is Entitled To Hear Eric Johnson's Testimony Concerning His Involvement With Walsh And Callahan.**

Eric Johnson failed to identify Shawn Drumgold when he originally talked to Walsh (Walsh Exhibit 15, Trial Testimony of Walsh, page6). The anticipated testimony of Eric Johnson is that detectives kept coming to his house and "they were pressuring me, they kept saying 'we want you to say this.'" He was told by a detective "whatever the DA ask, just say yes, say yes to whatever they ask you about Shawn." After that pressure, Mr. Johnson for the first time in his statement to Callahan of August 16, 1989 identified Shawn Drumgold as one of the individuals involved in the shooting. (Plaintiff's Exhibit 25, Boston Globe, May 5, 2003; Walsh Exhibit 25, pages 5-6)

Mr. Johnson has not been deposed in this case. His trial testimony will establish which of the Defendants he can identify. In any case, Mr. Johnson's testimony is admissible to establish that in fact, Plaintiff did not commit the crime he was charged with and that Mr. Johnson testified untruthfully at trial concerning his identification of Drumgold. Again, if the Defendants intend to argue that Mr. Johnson's recantation of his testimony is false, Mr. Johnson must be allowed to

testify concerning why he testified as he did at trial.

### VIII. Evidence That Tracie Peaks Was Told She Would Be Taken Out Of School And Locked Up If She Did Not Cooperate, Is Admissible.

As set out in the Response to Motion for Summary Judgment, Ms. Peaks was presented with a suggestive identification procedure by Defendant Walsh (Plaintiff's Exhibit 15, Plaintiff's Exhibit 8A, Peaks Deposition Volume 1, page 150). Betty Peaks, her mother, will testify to Ms. Peaks being told "if you don't identify one of these pictures, you are gonna be arrested." (Plaintiff's Exhibit 16, Betty Peaks Deposition, page 78)Tracie Peaks in her affidavit averred that "As the trial of Shawn Drumgold approached, the detectives told my mother that if I did not go to court and cooperate with them, they will come to my school and arrest me and put me in jail." (Plaintiff's Exhibit 15) Betty Peak was asked

Q: If any member of the Boston Police Department had told you that your daughter would be arrested for not going to court, you would remember that, would you not?
A: Possibly.
Q: Do you remember that happening?
A: Vaguely remember it. (Walsh Exhibit 18, pages 128-129)

It is undisputed that Walsh and Callahan were the detectives dealing with the witnesses in this case. The jury has the right to hear the testimony of Tracie and Betty Peaks and evaluate it.

### IX. There Is Ample Evidence From Which The Jury Can Find That Walsh Knew That Mary Alexander Had Memory Problem.

This argument in the Motion In Limine attempts to simply ignore the expected testimony

of Lola Alexander. Mrs. Alexander testified at the Motion for New Trial.

Q: Okay. And did you have any conversations with the Boston Police detectives, specifically, Detective Murphy, regarding your daughter's treatment at this medical ?
A: Yes. I said that to both the detectives.
Q: When you said it, what did you specifically say?
A: I said to them that my daughter's being treated for malignant cancer at the brain, she's not up to be tolerated with all this stuff. I have to sit up with her every night, hold her head in my lap and my daughter don't remember nothing that go on from day to day so how she going to remember who's who from whatever. (Plaintiff's Exhibit 2, page 12-13)

This is one of the multiple occasions when Lola Alexander so testified both at the Motion for New Trial and in her deposition. Walsh was told specifically by Lola Alexander that Mary Alexander had serious brain problems that affected her memory. That evidence is admissible against Walsh.

The question of the nature and extent of Mary Alexander's brain injury goes to the weight of the evidence, but not to the admissibility. Walsh's duty was to disclose exculpatory evidence he received from Lola Alexander. His failure to provide that exculpatory evidence to the defense counsel would not be excused, even in the unlikely event that the court were to allow a twenty year retroactive neurological analysis to claim that Ms. Alexander's problems were not as bad as her mother thought. Walsh knew that Lola Alexander told him that her daughter Mary Alexander, a key witness in the case, had serious memory problems. He was obliged to disclose that information and did not. The jury is entitled to hear that testimony.

Finally, as argued in Response to Defendants' Motion for Summary Judgment, the

evidence at trial was that Mr. Rappaport knew that Mary Alexander had an operation of some type in February of 1989. There is no evidence that Rappaport knew, as Walsh knew, that Mary Alexander had a serious neurological problem affecting her memory.

## CONCLUSION

The Defendants' Motion In Limine should be denied.

Respectfully submitted,

By His Attorneys,

 /s/ Michael Reilly

Michael W. Reilly, Esq.
Tommasino & Tommasino
Two Center Plaza
Boston, MA   02108
617 723 1720
BBO 415900

/s/ Rosemary Curran Scapicchio

Rosemary Curran Scapicchio, Esq.
Four Longfellow Place
Boston MA 02114
617 263 7400
BBO 558312