# EXHIBIT 1

Case 1:04-cv-11193-NG  Document 209-2  Filed 02/08/2008  Page 1 of 17

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.                                           Superior Court
Nos. 071882-83                                         Volterra, J
     073128

COMMONWEALTH OF MASSACHUSETTS

vs.

SHAWN DRUMGOLD and TERRANCE TAYLOR

APPEARANCES:

   Philip T. Beauchesne, Esq., Assistant District
      Attorney, on behalf of the Commonwealth.

   Steven J. Rappaport, Esq., on behalf of the Defendant
      Shawn Drumgold.

   Robert George, Esq., on behalf of the Defendant,
      Terrance Taylor.

Suffolk Superior Courthouse
Boston, Massachusetts

MOTION TO DISMISS

VOLUME I

Pages 1-142

ANN M. DONNELLY
OFFICIAL COURT REPORTER

# TESTIMONY OF
# JUDGE GORDON MARTIN

| | | |
|---|---|---|
| 1 | | you -- either did you assign counsel, or did you |
| 2 | | learn that counsel had been assigned to represent |
| 3 | | Mr. Drumgold on the murder case? |
| 4 | A | Yes. I think I made the designation of Mr. Hadley. |
| 5 | | Occassionally a Clerk will do that, but I'm pretty |
| 6 | | sure that morning that I picked Mr. Hadley. |
| 7 | Q | That was for the drug case? |
| 8 | A | Yes. |
| 9 | Q | And you learned, prior to having discussions with |
| 10 | | any senior members of the Boston Police Department |
| 11 | | that counsel had been assigned by the Committee |
| 12 | | for Public Counsel Services to represent Mr. |
| 13 | | Drumgold on the murder case? |
| 14 | A | I'm not sure that I learned that counsel had been |
| 15 | | assigned, but I was advised that a murder complaint |
| 16 | | was going to be sought against Mr. Drumgold; and I |
| 17 | | requested that the Committee for Public Counsel |
| 18 | | be contacted, so that counsel would be assigned, |
| 19 | | specifically, for the murder charge. |
| 20 | Q | And at a certain point, sir, did you in fact have |
| 21 | | discussions with a senior member of the Boston |
| 22 | | Police Department? |
| 23 | A | Two -- two senior members. |
| 24 | Q | Do you know who they were, sir? |
| 25 | A | One was Deputy Superintendent William Celester. The |

Case 1:04-cv-11193-NG    Document 209-2    Filed 02/08/2008    Page 5 of 17

I-8

| | | |
|---|---|---|
| 1 | | other -- I was advised of his name at the time, I |
| 2 | | think. I don't recall it at this point. I believe |
| 3 | | it was a detective. |
| 4 | Q | Now, sir, would the names Detective Walsh or Detective |
| 5 | | Murphy -- do you know if it was either of those |
| 6 | | people? |
| 7 | A | I do not personally know that for sure. |
| 8 | Q | Have you seen that detective that day? |
| 9 | A | I may well have. I see detectives every day. |
| 10 | Q | At a certain point, sir, you did have a discussion, |
| 11 | | did you not, with Mr. Celester at the sidebar? |
| 12 | A | And with the detective. |
| 13 | Q | And with that other detective as well? |
| 14 | A | Yes. |
| 15 | Q | And do you recall what the content of that conversation |
| 16 | | was, sir? |
| 17 | A | They advised me that they wished to remove Mr. |
| 18 | | Drumgold from the building, and delay his arraignment |
| 19 | | until the following court day. I raised question as to |
| 20 | | why that was necessary, since it was my understanding |
| 21 | | that he had already been to ID; and my belief was that |
| 22 | | proper ID procedures were taken with persons accused of |
| 23 | | a drug offense. I was advised, I believe primarily |
| 24 | | by Deputy Superintendent Celester, that inadequate ID |
| 25 | | occurred, that there was a need in his, or their, |

judgment for additional fingerprinting and photograph-
ing of Mr. Drumgold.

Q   Did the issue of interrogation of Mr. Drumgold ever come up during the course of the discussions with Mr. Celester and this other detective?

A   Yes.

Q   And specifically what was said with regard to interrogation of Mr. Drumgold?

A   I told them that I was permitting him to leave the building for a specific, limited amount of time, solely for the purposes of the additional identifica-tion procedures, the photographing and the fingerprint-ing that I had been advised was necessary.

I told them that it was not, in my judgment, adequate for him to be returned the next day; that it seemed to me that everything that was being sought could be completed in three to three and a half hours. And my belief is that we set 3:30 as the deadline by which Mr. Drumgold would be returned to our courthouse.

Q   Sir, at----

THE COURT: Do you have a memory as to when this conversation at the sidebar took place?

THE WITNESS: My memory, Judge Volterra, is based on the three-and-a-half to three-hour period; and thus I believe it was about noontime.

I-10

BY MR. RAPPAPORT:

Q   In any event, sir, it was before 1:00 or 1:30 that afternoon?

A   Oh, yes.

Q   Now, sir -- by the way, at a certain point you did learn that Stephen Rappaport -- myself -- that I had been appointed----

A   Yes.

Q   ----or assigned to represent Mr. Drumgold?

A   Yes.

Q   Now, during the course of your discussions with Mr. Celester and this other senior detective, did either Mr. Celester or the other detective make representation to you that there would be no interrogation of Mr. Drumgold?

A   That was certainly my understanding. Yes.

Q   And, by the way, sir, was Mr. Hadley present during those discussions, as far as you recall?

A   Mr. Hadley was not at the sidebar to the best of my knowledge at that point; though there were times when I called him up.
I recall, however, directing him to speak to Mr. Drumgold prior to Mr. Drumgold being taken from the courthouse. And I remember his getting up, presumably to do that.

1  Q    Now, at a certain point, sir, did you receive in some
2       manner, shape or form that morning, or at least prior
3       to 1:00 o'clock, a communication from Francis O'Meara,
4       Assistant District Attorney in Suffolk County?
5  A    Yes.
6  Q    Would you describe how you received that communication,
7       and what that communication was?
8  A    Jack Canavan was then, as he is now, the Assistant
9       District Attorney in charge of those prosecutors
10      assigned to the Roxbury District Court. Mr. Canavan
11      approached me at the sidebar and asked if I would
12      leave the bench to take a telephone call.
13      And my recollection was that he said someone in the
14      Homicide Unit. I inferred -- I think erroneously --
15      that he was speaking about the police homicide unit.
16      I declined to leave the bench, but I said I'd be happy
17      to talk to someone in court.
18      And Mr. Canavan did, at a later point -- in the
19      morning, but prior to the lunch recess -- return with
20      a message from -- it turned out to be Mr. O'Meara --
21      which he read to me.
22 Q    And do you recall what the content of that message
23      was, sir?
24 A    The basic thrust of the message, as I remember it at
25      this time, was asking if I would in fact permit the

# TESTIMONY OF LESLIE HARRIS

I-28

```
 1   A    Both detectives sitting in the front row, to the
 2        far right -- my far right.
 3             MR. RAPPAPORT: Will you please stand up
 4   and identify yourselves?
 5             DETECTIVE WALSH: Detective Walsh of the
 6   Homicide Unit.
 7             THE WITNESS: I'm not as sure about
 8   Detective Walsh.
 9             THE COURT: Excuse me, sir.
10             Your name is Richard Walsh?
11             DETECTIVE WALSH: Yes, your Honor.
12             THE COURT: Thank you.
13        BY MR. RAPPAPORT:
14   Q    And you're not sure whether Mr. Walsh was there or
15        not?
16   A    I'm not as sure. No. I believe he was, but I'm
17        not positive.
18             MR. RAPPAPORT: Sir, will you please stand
19   and identify yourself?
20             DETECTIVE MURPHY: Detective Paul Murphy.
21             THE WITNESS: Detective Murphy I've seen
22   around and know; and he was there -- I believe both
23   discussions, but definitely at the second discussion.
24        BY MR. RAPPAPORT:
25   Q    That was the discussion between Mr. Celester and
```

I-29

1   Judge Martin?
2 A Yes, sir.
3 Q At that conversation you say Mr. Murphy was definitely
4   there?
5 A Yes.
6 Q Sir, did you hear that discussion that occurred
7   between Judge Martin and Detective Celester?
8 A Most of what was said. Yes.
9 Q And to the best of your memory, sir, what was that
10   conversation? What did Judge Martin say, and what
11   did Deputy Celester say?
12 A Judge Martin was being adamant about identification
13   issues. I was upset that they were going to take
14   Mr. Drumgold out before an attorney appointed by the
15   Committee for Public Counsel Service arrived.
16   So, I was paying close attention.
17   And Judge Martin was moving his hand, and saying:
18   This is for -- He said, "I want to be very clear.
19   This is for identification purposes only." And
20   Superintendent Celester, I believe, did most of the
21   talking, in response said they would be taken for
22   identification purposes, that there were identifica-
23   tion issues that hadn't been resolved. That's not
24   his exact wording, but the gist of what was said.
25           MR. RAPPAPORT: One moment, your Honor.

1        (Pause.)
2        MR. RAPPAPORT:  No further questions.
3        THE COURT:  Excuse me.
4        The first discussion -- right?
5        THE WITNESS:  Yes, sir.
6        THE COURT:  You said that you were present
7   in court when there were two discussions between the
8   Judge -- right?
9        THE WITNESS:  Yes, sir.
10       THE COURT:  And that discussion also
11  involved police officials?
12       THE WITNESS:  Yes. The first discussion
13  I believe Jack Canavan and one of the police officers
14  at least was there.
15       THE COURT:  But you can't identify which
16  one?
17       THE WITNESS:  I believe it was Murphy,
18  but I can't be sure.
19       THE COURT:  And the Judge?
20       THE WITNESS:  Yes, sir.
21       THE COURT:  And what was that discussion
22  about?  Taking the man out of the courthouse?
23       THE WITNESS:  Yes, sir.
24       THE COURT:  Do you know the gist of that
25  discussion, sir?

I-31

1    THE WITNESS: They had some identification
2    issues, that he was being charged with murder and that
3    they needed to take him to Identification.
4    THE COURT: What did the Judge say? Did
5    you overhear it?
6    THE WITNESS: That he wanted to talk to a
7    senior----
8    THE COURT: Police official?
9    THE WITNESS: Police official, because he
10   had concerns.
11   THE COURT: All right. Thank you.
12   Cross-Examination
13   BY MR. BEAUCHESNE:
14   Q    You've told us now what you heard --were you seated
15        or standing when you heard the sidebar?
16   A    There are two sets of seats facing the Judge's
17        bench. I was to the seat to the right, which is
18        where the sidebar took place. The DAs sit on one
19        side; and the Roxbury Defenders sit on the second
20        side of the bar -- of the table.
21   Q    And if you're facing the Court, you were seated on
22        the left side of he set of tables in front of the
23        bench?
24   THE COURT: Can you draw us a little
25   picture, sir?

# TESTIMONY OF PAUL MURPHY

I-111

| | | |
|---|---|---|
| 1 | | assigned to the homicide unit, Boston Police |
| 2 | | Department. |
| 3 | Q | Sir, at some point were you assigned to investigate |
| 4 | | the murder of Darlene Tiffany Moore? |
| 5 | A | Yes, sir. |
| 6 | Q | And when was that, approximately? |
| 7 | A | I returned from vacation on Monday -- I think it |
| 8 | | was the 22nd of August, and that's when I was |
| 9 | | assigned to the murder. |
| 10 | Q | Sir, directing your attention to August 29, 1988, |
| 11 | | Monday morning, do you recall being in the |
| 12 | | Roxbury District Court that day? |
| 13 | A | Yes. |
| 14 | Q | Do you recall what time you arrived in court? |
| 15 | A | I was in the Dorchester District Court on another |
| 16 | | matter; and I heard that Detective Walsh obtained |
| 17 | | a warrant, and that Shawn Drumgold was in custody |
| 18 | | at the court under another name. And then I left |
| 19 | | the Dorchester Court -- I think it was Dorchester; |
| 20 | | I'm not quite sure of that. It could have been |
| 21 | | another court -- and I went over to Roxbury to |
| 22 | | assist him in case he needed any help in the pro- |
| 23 | | cessing of Mr. Drumgold. |
| 24 | Q | At a certain point, sir, were you in the courtroom |
| 25 | | with Deputy Superintendent Celester during a |

I-112

1   conversation with Judge Martin?
2  A   Yes.
3  Q   Concerning Mr. Drumgold?
4  A   Yes.
5  Q   And during the course of that conversation, sir,
6      do you recall whether or not Judge Martin stated
7      anything to Mr. Celester or to you with regard
8      to whether or not Mr. Drumgold should or could
9      be interrogated that day?
10 A   I don't recall him ever saying anything of that
11     matter of interrogation at all.
12 Q   It's your memory that the term interrogation of
13     Mr. Drumgold never arose?
14 A   It didn't occur, sir, in my -- I don't remember
15     it. It didn't occur, as far as I know. I don't
16     remember hearing that.
17 Q   And you were present, sir, were you not, during
18     the interrogation of Mr. Drumgold that was taped
19     at approximately 1:30 at Area B?
20 A   Yes. I informed him of his rights; and I person-
21     ally booked him for the charge of murder. I
22     filled out the sheet, the booking sheet.
23          MR. RAPPAPORT: I have no further
24 questions.
25          THE COURT: Cross-examine.

I-113

Cross-Examination

BY MR. BEAUCHESNE:

Q  Officer, were you up at the bench when the discussion took place with the Judge?

A  Yes, sir.

Q  Were you in a position where you could hear the conversation? Could you hear what the Judge had to say?

A  Oh, yes, sir.

Q  And what Celester had to say?

A  Yes, sir.

Q  Can you tell us today, as best you recall, the entire discussion -- everything that you presently remember of what was said between the parties that day?

A  The Judge was concerned about the logistics of getting him to ID in Area B, and getting him back before the court closed for the day, so he could be arraigned on that day.
Myself and Deputy Celester told the Judge that maybe, you know, it would take a while to do this. And he gave us a specific time limit.

Q  What time limit did he give you?

A  About three hours.

Q  He wanted you back there before what -- 3:30?