# EXHIBIT 3

```
 1   Laymon who represents Theron Davis who will be next
 2   called as a witness and who we intend to voir dire.
 3   It's my understanding from just listening to counsel
 4   talking that he's going to take the Fifth.
 5           MR. LAYMON: That's correct, Your Honor.
 6           THE COURT: All right. So I guess the answer
 7   is we swear him in and he tells us what he's going to
 8   tell us and then you make your pitch. Okay? That's
 9   the ground rules. I have a motion to quash the subpoena.
10   When he's ready, bring in Mr. Davis.
11
12           THERON DAVIS, a witness for the defense,
13   was sworn and testified as follows, outside the
14   presence of the jury:
15
16   VOIR DIRE EXAMINATION
17   By Mr. Rappaport:
18   Q   Sir, would you state your name for the record, please?
19   A   Theron Davis.
20           THE COURT: Is that T-h-e-r-o-n?
21           THE WITNESS: Yes.
22           THE COURT: Okay.
23   BY MR. RAPPAPORT:
24   Q   Mr. Davis, do you have a nickname?
25   A   I would like to invoke my Fifth Amendment right under
```

1  the Constitution of the United States.
2  Q  Mr. Davis, do you know a Romero Holliday?
3  A  I invoke my Fifth Amendment under the Constitution of
4     the United States.
5  Q  Mr. Davis, do you know a Chris Cousins?
6  A  I revoke my Fifth Amendment under the United States --
7     under the Constitution of the United States.
8          THE COURT:  I think he meant to say, invoke.
9     Did you not?
10         THE WITNESS:  Yes.
11 BY MR. RAPPAPORT:
12 Q  Sir, do you know Shawn Drumgold?
13 A  I invoke my Fifth Amendment right under the Constitution
14    of the United States.
15 Q  Sir, do you know a London Williams?
16 A  I invoke my Fifth Amendment under -- I invoke my Fifth
17    Amendment right under the Constitution of the United
18    States.
19 Q  Sir, directing your attention to the night of August 19,
20    1988, were you ever on Humbold Ave. in the vicinity of
21    Homestead Street that night?
22 A  I invoke my Fifth Amendment right under the Constitution
23    of the United States.
24 Q  Sir, directing your attention to August 19, 1988,
25    were you in a white jeep or white Suzuki Samurai that

```
 1        night?
 2   A    I invoke my Fifth Amendment right under the Constitution
 3        of the United States.
 4              MR. RAPPAPORT:  I have no further questions.
 5              THE COURT:  Mr. Laymon, perhaps you could
 6        clear the air for me as to why your client is invoking
 7        his Fifth Amendment right?  For the record, this is
 8        Mr. John Laymon who is counsel for Mr. Theron Davis.
 9              MR. LAYMON:  Your Honor, Mr. Davis is
10        presently indicted here in Suffolk County on several
11        charges, those charges being unlawfully carrying a
12        firearm on his person, second and subsequent offense,
13        unlawful possession of ammunition, receiving stolen
14        goods, and an assault and battery on a police officer.
15        That case may be going to trial within the next week
16        or two.  It is the belief of myself and my client that
17        he is being prejudiced by his name being brought up in
18        this action.  He has no information of any value
19        to give to either the Commonwealth in this case or the
20        defense.  It is our belief that anything he may say
21        may tend to incriminate him.
22              So, for all of those reasons, Your Honor, he
23        is invoking his Fifth Amendment rights.
24              THE COURT:  Incriminate him as to what, sir?
25        As to the other offenses or as to this offense?
```

1  MR. LAYMON: It may incriminate him as to
2  this offense, it may have something to do with his
3  present offenses. So for all of those reasons, he is
4  invoking his Fifth Amendment right.
5  MR. RAPPAPORT: If I may, Your Honor, certain
6  questions that I've asked him, question number one,
7  were you ever in a white jeep Suzuki Samurai on the
8  night of August 19, 1988, although Mr. DeLuca who was
9  just in the courtroom couldn't himself remember the
10  identity of certain individuals that he stopped in that
11  vehicle, I do have in my possession an incident report
12  prepared by his partner, and his partner, in fact,
13  did discover the identity of the passenger in that
14  particular vehicle, and in Mr. Smith's report, Officer
15  Smith's report on that night, he states that Officers
16  investigated both black males in the Samurai, able to
17  identify one Theron "Apple" Davis as the passenger
18  of the motor vehicle.
19  Judge, I can see no way in which his answer
20  to that question could possibly incriminate him any
21  further than he would already be incriminated simply
22  by the police officers who stopped the vehicle and
23  identified that person in the vehicle.
24  Number two, with regard to the question,
25  were you ever on Humboldt Ave. in the vicinity of

Homestead Street on the night of August 19, 1988, I have had supplied to me by my brother Beauchesne, a Boston Police incident report from the homicide unit prepared by Detective William Fogarty, who spoke to Mr. Davis on a prior occasion along with Detective Walsh. They spoke to Mr. Davis on Saturday, August 20, and they state in their report, Davis was asked if he was on Humboldt or Homestead or Sonoma Streets Friday night, this being Saturday when the report was written, and Davis stated "no." If I may show the Court both documents --

I state to the Court as follows: When asked previously by police officers whether or not he was ever on Homestead or Humboldt or Sonoma on the night of August 19, he already has responded to the police officers that, in fact, he was not there. If he said he was there, I could understand how that might tend in some way - I can't even understand how that would tend to incriminate him - but he's already been asked the question by the police and he's already responded to that question in the negative.

As far as whether or not he was in a particular vehicle that night, Your Honor, I submit that that can be shown by an independent source and I don't see where that answer would tend to incriminate him.

1  THE COURT: I have to deal with the evidence
2  before me now, and on the state of the evidence at
3  this point, I do not have any of that information that
4  you suggest is operative, so that all I have is the
5  representations by you and the copies of the police
6  reports.
7  MR. RAPPAPORT: Well, at this juncture, Your
8  Honor, I can only make my representations based upon
9  the information that's been supplied to me by the
10 government. I have a good faith reason for asking the
11 two specific questions that we just discussed, and
12 quite frankly, Judge, I do not see how, assuming that
13 the officer's reports are accurate and I submit to
14 the Court that's a fair assumption at this point --
15 THE COURT: Were the officer's reports
16 statements by this witness under oath?
17 MR. RAPPAPORT: One report is an observation
18 by an officer. Another report, I don't believe the
19 witness was under oath.
20 THE COURT: That puts it, I think, in a new
21 light because the witness is now under oath and believes
22 that and has represented through counsel, that the
23 information would tend to incriminate him and I have
24 heard a bit about a white Suzuki in the testimony in
25 this case in chief.

1    MR. RAPPAPORT: I understand that, Your
2  Honor. However, I state to the Court that it's one
3  thing for the witness and for his counsel to try to
4  imagine that this could incriminate him. I submit,
5  Your Honor, that he's already made the statement that
6  he's made, he's already been observed where the report
7  indicates he was observed, and I don't see where his
8  statement would incriminate him.
9    THE COURT: I have your point. Mr. Beauchesne,
10 anything you would care to say?
11   MR. BEAUCHESNE: I think I should, in all
12 fairness, I should add that it is the theory of the
13 Commonwealth the white Suzuki was involved in this
14 case and that London Williams was the driver, that
15 my best information is that there were three shooters
16 and I believe one of them is sitting right next to
17 you.
18   THE COURT: I think then on this theory,
19 your argument I understand, but in light of that --
20   MR. LAYMON: Your Honor --
21   THE COURT: Mr. Laymon, I'm not disagreeing
22 with a thing you've said. I would think at least as
23 to that question and anything that relates to that,
24 with those events that surrounded the intersection of
25 those two streets on that night, particularly in the

light of the white Suzuki, that it might very well tend to incriminate him.

MR. RAPPAPORT: Your Honor --

THE COURT: Sure.

MR. RAPPAPORT: With respect to the questions regarding, does Mr. Davis know Shawn Drumgold, question, does he know Chris Cousins, does he know Romero Holliday, and did he ever visit -- well, I didn't ask the question but I know that I would ask, did he ever visit Romero Holliday in the hospital, and if the answer to that question was yes, was Mr. Drumgold present and was Mr. Cousins present, those would be further questions that I would ask him, once again, his knowledge of Romero Holliday, his knowledge of Chris Cousins, his knowledge of Mr. Drumgold, would not tend to incriminate him in any way, manner, shape or form. Whether or not he visited Mr. Holliday, again, I don't see where that would tend to incriminate him.

THE COURT: Were it not for the evidence in this case that came in the case in chief, I might agree with you that this is a matter of benign interest to the Court, but if because of some import relating to the defendant Taylor and Drumgold as to a particular visit and I would suggest that probably the next question, in addition to going to the hospital, would

be the particular visit, was whether the defendant and former defendant, Drumgold and Taylor respectively, were present.

So far, I will consider it on a question by question basis, but I think it clearly could tend to incriminate, particularly on the representation of this Assistant District Attorney who is in charge of the case.

MR. RAPPAPORT: Judge, with all due respect to my brother, Mr. Beauchesne, that technically could be a response by Mr. Beauchesne to almost any person that was brought into the Court.

THE COURT: Not from Mr. Beauchesne.

MR. BEAUCHESNE: I would object to that.

MR. RAPPAPORT: When I say that, I don't mean -- I would like to correct that statement.

THE COURT: Sure.

MR. RAPPAPORT: And I withdraw any intimation that Mr. Beauchesne has any nefarious or malevolent motives in this. So that the record be clear, what I'm saying now, Your Honor, is that there are many witnesses who could be called in this case who could be tangentially involved in one way or another, certainly. The Commonwealth could indicate in one way or another that perhaps, perhaps people were involved. If I were

1  to call an individual by the name of Paris Phillips,
2  if I were to call a person by the name of London
3  Williams, these are persons, that through testimony to
4  date, have been identified as associates of this
5  individual. The Commonwealth could make the same
6  argument, yet they might have exculpatory information
7  to offer.
8         I do believe, Judge, if I were to ask this
9  individual the question, did you ever visit Romero
10 Holliday in the hospital, and he were to say, yes,
11 and I were to ask him, was Mr. Cousins present, I believe
12 that his answer would be no. I believe that, based
13 upon what Mr. Cousins said yesterday, Mr. Cousins came
14 in here and said that he had heard some talk about
15 some retaliation, however he says, before that talk
16 came down, Theron David had left the room. He was
17 going out as Mr. Cousins came in, so the mere fact of
18 whether or not he had seen Christopher Cousins at
19 that room would not tend to incriminate him because,
20 even in the light most favorable to the Commonwealth,
21 or for the evidence in the light most favorable to the
22 Commonwealth as it's come in to date, Mr. Davis was
23 out of the room by the time the conversation took
24 place.
25        So I submit to the Court that by asking him

the question as to whether or not he had ever seen Christopher Cousins present when visiting Romero Holliday, based upon what the Commonwealth has elicited from Mr. Cousins, it wouldn't be incriminating, because according to Mr. Cousins, Mr. Davis left prior to any of the discussions that Mr. Cousins described, and I do not see where that's incriminating.

If, if I were to ask this individual, did you ever visit Romero Holliday while he was in the hospital and he said yes, that in and of itself, would not be incriminating. If I said to him, was Mr. Drumgold present when you visited Romero Holliday, and he answered, no, which I believe would be his answer, then again it would not incriminate him in any way. What it would do, Judge, what it would do, it would contradict and impeach the credibility of what is a very key Commonwealth witness right now, Mr. Cousins, and on that basis I don't see where Mr. Davis would be incriminating himself.

MR. BEAUCHESNE: If I might, Your Honor. There has been testimony, I believe, in the trial that at least one of the shooters was dressed in white. If that didn't come out in the trial, I know I have it in my file that one of the shooters was dressed in white. This gentleman was seen in the car. His

```
 1    trademark is white, white Adidas.  He was seen in the
 2    white Suzuki dressed in white.  He was stopped ten
 3    minutes and forty seconds later in the white Suzuki
 4    dressed in white.
 5            There were three shooters, most of the
 6    witnesses focused on the first two, the ones that were
 7    up front.  There was one back, off to one side and I
 8    believe he was dressed in white.  I think it's this
 9    man here.  If I had a case to present to the grand
10    jury I would do it, and the test, of course, is
11    whether or not anything he says might lead to or tend
12    to incriminate him.  What I would object to doing is
13    bringing him in, putting him on in one very small area,
14    and then having him take the Fifth when I try to
15    cross examine him.
16            I have to say, in my opinion, that it would
17    be well in his behalf that he take the Fifth.
18            THE COURT:  I understand.  I am a believer in
19    the metaphor of Pandora's box.  I think that that
20    metaphor applies in this particular case, and I would
21    think that opening the door on a small series of
22    questions is, at some point, going to open that box
23    and the aducee will come out.
24            So I am going to allow the Fifth to be invoked
25    in this particular case, particularly on the
```

1  representation that in the judgment of the Assistant
2  District Attorney this person is a target of their
3  investigation as to this crime.
4      MR. RAPPAPORT: With all due respect, Your
5  Honor, if I were to limit the questions to not the
6  evening that Tiffany Moore was killed, but if I were
7  to limit the questions to whether or not he had ever
8  seen Christopher Cousins at Romero Holliday's hospital
9  room and whether or not he had ever seen Shawn Drumgold
10 at Romero Holliday's hospital room, would that not --
11 and I say this, if I just ask him the questions with
12 regard to impeachment of Christopher Cousins, as opposed
13 to anything dealing with specific events of August 19,
14 I'd stay away from August 19, but as Mr. Cousins has
15 said he saw a certain person leaving that hospital
16 room when he went in, and that Mr. Drumgold was present
17 when he went into that room, if this witness were
18 allowed to answer and answer truthfully, I believe
19 he would say that, number one, he never saw Christopher
20 Cousins when he went to visit Romero Holliday -- I could
21 leave it at that, quite frankly.
22     MR. BEAUCHESNE: But I have a right to cross
23 examine and I am not, most respectfully, bound by his
24 ideas of the limitations of the case and, for him, and
25 every party in a criminal case has a right to adequately

1  confront the witnesses. For him to call the witness
2  and say, I'm just going to put on this small,
3  microscopic section of what I'd like you to testify
4  to but you, Mr. Beauchesne, representing the
5  Commonwealth will not be allowed to go into other
6  areas which I might deem to be relevant and proper
7  because he would take his Fifth Amendment, I suggest
8  would give a totally distorted picture to the jury.
9           THE COURT: I agree. Your objection is noted,
10 Mr. Rappaport. The witness may be excused. The
11 witness is excused.
12          What's next? Mr. Rappaport, do you have
13 another witness?
14          MR. RAPPAPORT: Your Honor, if Mr. Smith is
15 here, I'd like to call him first. Otherwise, I can
16 call Detective Walsh.
17          THE COURT: I'm anxious to move along. I'm
18 going to go off the bench for just a minute but don't
19 anybody go away.
20          MR. BEAUCHESNE: Could I be heard? After you
21 come back could I be heard on the issue of Officer
22 Smith at side bar?
23          THE COURT: Should we go to side bar first?
24 BENCH CONFERENCE
25          THE COURT: Do you have somebody here? Can

127