

U.S. Department of Justice



*United States Attorney*
*District of Massachusetts*

1107 J.W. McCormack Post Office and Courthouse
Boston. Massachusetts 02109

## PRESS RELEASE

July 10, 1991

This release summarizes the results of the joint investigation by the United States Attorney's Office and the Federal Bureau of Investigation into allegations of violations of the Federal Criminal Civil Rights statutes, 18 U.S.C. §§241 and 242, by members of the Boston Police Department during their investigation of the homicide of Carol Stuart.

## I. BACKGROUND

On Monday, October 23, 1989, Charles and Carol Stuart were shot in the Mission Hill neighborhood of Boston shortly before 8:42 p.m.[1] The shooting resulted in the death of Carol Stuart and her unborn fetus, and the severe injury and near death of Charles Stuart.

The heinous nature of the crime that resulted in the death of Carol Stuart and her unborn child resulted in a massive police investigation that was fueled by public outcry and intense local and national media coverage. Charles Stuart described his assailant as being a black male, age 28-34, with a raspy voice, and with the following physical traits: 5 ft. 10 in.; 150-160 lbs.; thin and gaunt; brown skin; black short afro; brown eyes; shaggy, splotchy, facial hair; and a bony structured jaw with high cheek bones. Additionally, the assailant wore a black baseball hat, and a black jogging suit jacket, zippered, with 2 to 3 red stripes running down the length of the sleeves. The assailant also wore a dark shirt underneath the jacket, and black jogging gloves with the knuckles exposed. Stuart stated that the assailant used a silver snub-nosed revolver during the shooting.

---

[1] The time of Charles Stuart's incoming phone call from his car phone to the 911 dispatcher was logged at 8:42 p.m.

Willie-Bennett became a suspect in the Boston Police Department's homicide investigation as a result of two "hotline" calls to the Boston Police Department dated October 27, 1989, and one other such call dated October 30, 1989.  Also, Willie Bennett became a suspect because he "had a criminal record consisting of shooting police and civilians, indicating he is capable of the crime of shooting and robbing Charles and Carol Stuart".[2] Although, the collective law enforcement speculation focused on Willie Bennett as a possible suspect during the first ten days after October 23, there was no solid evidence linking him to the Stuart shooting during this period of time.  Other named and unnamed suspects were focused on as well during this same period of time, based on other "hotline" calls and police investigation.

Bennett's status as a prime suspect dramatically increased after the Boston Police Department became aware of a meeting that occurred on October 24, 1989 at 7 Alton Court, the residence of Joey "Toot" Bennett.  Joey Bennett is the fifteen year old nephew of Willie Bennett.  According to witnesses, various Boston Police Department detectives and officers, including Peter O'Malley, Billy Dunn, and Trent Holland, were instrumental in generating three or more versions of what was discussed in Joey Bennett's room, as well as who was present during the course of the discussion.  The civilian witnesses have claimed that O'Malley, Dunn, Holland and others jointly engaged in coercive, threatening conduct directed at several civilian witnesses that was designed to elicit information that incriminated Willie Bennett. Ultimately, the police conduct succeeded in attaining its goal, albeit through the following dubious means:

* Forcing witnesses to give false statements incriminating Willie Bennett;

* Pressuring witnesses to give false testimony incriminating Willie Bennett before the Suffolk County grand jury investigating the Stuart homicide;

* Pressuring witnesses to give false information that was relied upon by the Boston Police Department and utilized by Peter O'Malley and others to obtain search warrants for entry into various homes that where searched for evidence incriminating Willie Bennett.

---

[2] Taken from investigative narrative of Captain Joseph Mills, Captain of Detectives, Boston Police Department.

Additionally, civilian witnesses cited facts in support of a claim that Trent Holland may have initiated a false prosecution of Joey Bennett by attempting to falsely plant cocaine among the possessions of Joey Bennett, and then causing Joey Bennett to be arrested for possession of cocaine.

Finally, the FBI's investigation has revealed some evidence that Homicide Detective Paul Murphy may have used a false statement regarding the description of the clothing worn by the Stuart's assailant within an affidavit submitted in support of a search warrant.

## II.    WILLIE BENNETT

Initially, the principal witness providing information about coercive efforts by members of the Boston Police Department was Derek Jackson who was interviewed by the FBI.

The FBI also interviewed Erick Whitney, and his girlfriend Angela Brittle. Taken together, Jackson, Whitney and Brittle described a series of events where first Whitney, and then Jackson and Whitney together, were dissuaded by threats of physical harm, immediate imprisonment at Charles Street jail, and twenty years in prison, from telling a version of events that they claimed to be truthful.

The backdrop that Whitney, Jackson and Brittle's allegations about the coercive efforts by the police should be evaluated against is provided by analyzing the following evidence: the two separate tape recordings of statements made by Jackson and Whitney on November 3, 1989; the tape recording of Whitney's statement on November 4, 1989;[3] the transcripts of Whitney and Jackson's first appearance before the Suffolk County grand jury on November 15, 1989; the transcripts of Jackson and Whitney's second appearance before the Suffolk County grand jury on November 22, 1989; and, the interviews of Jackson and Whitney by the FBI.

> 1.    Erick Whitney
>        Tape Conversation #1
>        (Friday, November 3, 1989 at 10:39 p.m.)

This interview was conducted by Detective Peter O'Malley and Miller Thomas of the Boston Police Department Homicide Unit. O'Malley suggested to Whitney that he went to the Mission Hill projects on Wednesday, October 25, 1989, two days after the Stuart shooting. Whitney responded affirmatively. Whitney states that as he and Jackson were walking toward the Mission

---

[3] In each of the tape recordings made on November 3 and 4, Detective Peter O'Malley is the principal interrogator.

Hill projects, Jackson stated that "William Bennett" committed the shooting in Mission Hill two nights earlier. Toot (Joey Bennett) told Jackson that Willie Bennett killed the "Stokes family". Additionally, William Bennett told Jackson and others present in Toot's bedroom on October 24, 1989 that he killed the "Stokes family". William Bennett told them that "he was in a car, he got out the car, and got into the Stokes' family's car". He told them "give me your money and your wallet. So he sees the watches, he took that. So he got out, he saw the Stokes man reach for whatever. He thought he was 5-0 "and he shot both of them".

Jackson also told Whitney that William Bennett was wearing a black Adidas suit with red stripes on October 24 when he confessed to the shooting, and that Toot was passing around a silver handgun during Bennett's description of how he shot the "Stokes family".

Toward the end of the interview, Miller Thomas asked Whitney if he saw the gun. Whitney responded affirmatively, and when asked what did anybody say about the gun, he stated that Toot told him (Whitney) that John Henry gave him the gun. Whitney also stated that Toot passed the gun around to various people in the room while Whitney was present; that Toot was holding two bullets while the gun was being passed around; and, that Toot brought down a BayBank charge card and an American Express card while he was there.

This interview lasted for approximately twenty minutes.

2.  Derek Jackson
    Interview
    (Friday, November 3, 1989 at 9:29 p.m.)

This interview was conducted by Boston Police Department Homicide Detectives Peter O'Malley and Miller Thomas.

At the outset of the interview, O'Malley asked Jackson how he came to the homicide unit that evening. Jackson replies "of my free will." Jackson goes on to say that on October 24th, the day after the Stuart shooting, Toot told him, David Brimage, and Mike Williams that his uncle (Willie Bennett), told him that he shot the Stuart family. On the following day, October 25th, Jackson was at Toot's house again, with Ron Ferguson, Mike Williams, David Brimage and Leroy Cox. There is no mention of Whitney being at Toot's house on either occasion. On October 25th, Bennett described to the boys how he shot the Stuarts. Bennett claimed that he asked the Stuarts for a ride to the projects, and that the Stuarts agreed to give him a ride. At this meeting, Toot brought his uncle in the room, who told the boys that he got in the Stuart's car, told them "don't look behind in the rear view mirror...the guy made a motion and Mr.

4

Bennett said you're 5-0 and he shot them." While Bennett was telling the boys how he shot the Stuarts, he physically demonstrated how he shot them.

During this interview, Jackson stated that Bennett never made any mention of a watch or jewelry taken from the Stuarts. According to Jackson, Bennett told them he was wearing a black jogging suit (Adidas) with red stripes.

> 3.    Erick Whitney
>       Taped Interview #2
>       (Saturday, November 4, 1989 at 4:00 p.m.)

This interview was conducted by Detectives Peter O'Malley and Robert Ahearn of the Boston Police Department Homicide Unit.

In this second statement taken the day after Whitney's first statement, Whitney attempts to retract portions of the recorded and unrecorded statements he gave to the police on November 3rd. Specifically, he tells O'Malley and Ahearn, contrary to what he told the police the day before, that he wasn't in Toot's room; that Derek never told him that Willie Bennett confessed to him; that he met Derek Jackson at his girlfriend's house on October 25th, and not at Ruggles; and, that Joey Bennett never gave Derek and Erick any credit cards.

When O'Malley asked Whitney why he lied, Whitney says: "Well, my girl said you was going to come by...and give me twenty years in Walpole. I mean, I flipped out. I was scared, you know, I came and said anything, you know, to try to get me out." Whitney states on the tape on at least five occasions that he was "scared" or "afraid" before coming to the police station based upon what his girlfriend (Angela Brittle) told him O'Malley was going to do to him, and that he was afraid, even as he was talking to O'Malley during the course of the taped interview.  On each occasion when Whitney stated that he was afraid, O'Malley suggests that he never told Angela Brittle that anything was going to happen to Whitney, and that all he ever told Whitney was that O'Malley was interested in the truth. On each occasion when he suggest this to Whitney, Whitney answers affirmatively.

Reading the transcript of interview number two, and listening to the actual recording conveys two different impressions.  Reading the transcript leaves one with the impression that O'Malley was trying to convey to Whitney that all he was ever interested in was the truth.  While listening to the recording, one can observe Whitney trying to tell his story about why he lied.  On each occasion when he tries to explain that he was afraid of what O'Malley was going to do to him, O'Malley interrupts him with self-serving suggestions about only being interested in the truth, which Whitney invariably adopts. However, it is clear from the recording that Whitney is

frightened. At one point, after Whitney has stated that he was and is afraid, O'Malley is trying to suggest to Whitney that he and Jackson are trying to concoct a lie. O'Malley states "does that mean you your (sic) nervous if your hands are sweating?" Whitney replies "it means I'm scared." O'Malley: "Your (sic) scared. Do I look like I'm going to beat you up?" Whitney: "No." O'Malley: "What are you scared of?" Whitney: "Going to jail."

Equally important, is the following statement by O'Malley: "So now you go home last night, obviously, I'm in possession of the knowledge that you weren't there when Willie allegedly did these things: show them how he held the gun, show them how the man made a movement reaching for something, how he robbed and how he did all those things, how he was getting out of the car when he said these things. I knew that you weren't present when he said these things didn't I. You told me, and we didn't put it on the tape."

  4.    **Erick Whitney**
        **Suffolk County Grand Jury Testimony**
        **(November 15, 1989)**

Erick Whitney testified before the Suffolk County Grand Jury on November 15, 1989. Present during the grand jury session were ADA's Tom Mundy and Francis O'Meara.

At the outset of Whitney's grand jury appearance, he was asked if he was present in Toot's Bennett's house on October 24th, the day after the Stuarts were shot. Whitney responded affirmatively. Whitney then went on to state that Toot told Whitney, Jackson, and other unnamed friends that his uncle shot the Stuarts. When Whitney and the rest of his friends expressed disbelief, Toot brought his uncle in, who told the boys that he shot the Stuarts. Bennett said that he got out of one car, and got into their car. Once inside, he asked for their money and watches and told them not to look in the rear view mirror. After he got out of the car, he told them to drive straight. Whitney then went on to testify that Bennett stated that the Stuart man made a sudden movement to dial the radio or start the car, and Bennett shot him because he thought he was 5-0. Whitney also testified that Toot asked if anybody wanted to buy a watch that Willie took from the Stuarts.

  5.    **Derek Jackson**
        **Suffolk County Grand Jury Transcript**
        **(November 15, 1989)**

Jackson's grand jury examination was conducted by ADA's Tom Mundy and Francis O'Meara.

Jackson testified that he was at Toot's apartment on Tuesday, October 24, and the following Wednesday.  Present in Toot's apartment on Wednesday were Toot, David Brimage, Mike Williams, and Erick Whitney.  Much later in his testimony, Jackson stated that Ron Ferguson was there in response to a suggestion by a grand juror.  Jackson stated Willie Bennett came into Toot's room in the presence of each of the aforementioned boys and told them that he got in the back of the Stuart's car and told them to drive to the Mission Hill area, and not to look in the rear view mirror.  Bennett also stated that as he got out of the car, he turned around and saw Stuart make "a motion".  He then stated "you're 5-0" and he shot the Stuarts.

Jackson testified that Toot wasn't trying to sell a watch.

6.    Derek Jackson and Erick Whitney –
      Suffolk County Grand Jury Testimony
      (November 22, 1989)

On **November 21st** a meeting at the Suffolk County District Attorney's office was held.  The following people were present:

1.    Erick Whitney;
2.    Derek Jackson;
3.    Bill Crowe, Jackson's attorney;
4.    Tom Mundy;
5.    Francis O'Meara;
6.    Marylinda Whitney
7.    Peter O'Malley; and,
8.    Trent Holland.

Erick Whitney admitted to all present that he had lied about his knowledge of the events that occurred in Toot's room.  He admitted that he embellished the story he told his mother, who subsequently related it to Trent Holland.  Whitney lied to his mother in an effort to impress her by making her believe that he personally knew who the murderer was.  Whitney stated that he continued to lie when Trent Holland asked him what he knew about the story because he was afraid of Holland[4].  Whitney explained to the assembled group that he embellished the lie even further when he was interviewed by Holland by adding additional information that he gleaned from the news, and from the questions that Holland asked him.  Whitney obtained information about the assailant's use of the words "don't look back" and descriptions of the jewelry stolen by the murderer from Holland.

---

[4] It should be noted that Holland has a long standing relationship with the Whitney family.  He served as a "Big Brother" for Erick's older brother, Frank.  Holland has also utilized Whitney's mother and fifteen year old sister to make undercover drug buys.

Both Jackson and Whitney testified in the Suffolk County grand jury the next day, November 22, 1989. During his appearance, Jackson told the grand jurors that he was present in Toot's room when Toot told him that his uncle shot the Stuarts. That was the extent of Jackson's truthful and accurate knowledge of any involvement of Willie Bennett in the shooting. When asked by ADA Mundy and a Suffolk County grand juror why he lied to the police and why he lied to the grand jury on November 15th, Jackson stated that he tried to tell the authorities the truth, but they insisted he was wrong and that they did not want to hear his initial version of events. He further described how Erick Whitney gave him hints in O'Malley's presence, and that when Jackson revised his story to incorporate the facts given to him by Whitney, O'Malley and the other officers expressed approval.

Before Jackson changed his story, O'Malley insisted that he was lying. Jackson indicated that he would take a lie detector test, and O'Malley told Jackson "the only lie detector I have here is this guy sitting next to me" indicating that Billy Dunn was the lie detector that O'Malley would be relying on. According to Jackson, he changed his story to appease the interrogating police officers, and because he wanted to avoid an encounter with Billy Dunn. Jackson also stated that he and Erick Whitney were given a booking sheet and threatened with arrest if they tried to change their story.

Whitney told the Suffolk County grand jury that he was never present in Toot's apartment, that he exaggerated what really occurred, falsely placed himself in Toot's room, and that he embellished the story with lies that he concocted or information he obtained from the news.

   7.   Derek Jackson, Erick Whitney and Angela Brittle -
        Interviews by the FBI

Jackson, Whitney, and Brittle were interviewed by the FBI regarding the allegations of police coercion during the Stuart homicide investigation. Both Derek and Erick stated that O'Malley threatened them with physical harm and immediate imprisonment on November 3rd when they originally attempted to tell the truth; and, on November 4th when they went back to the homicide unit to retract their previous false statements given under duress. O'Malley threatened to arrest them and send them to Charles Street Jail.

Erick Whitney was transported to the homicide unit in South Boston by Wilbur Brittle, a Boston police officer who is the uncle of his girlfriend, Angela Brittle. Angela Brittle accompanied Erick to this first meeting at Homicide.

8

Before visiting Homicide, Angela Brittle had been transported to that office by her uncle. There, O'Malley told Angela Brittle that he heard Erick had some information about who shot the Stuarts. He offered to help Erick clear up two outstanding warrants (for larceny and attempted B&E into an automobile) if Erick came down. If not, he told Angela Brittle that he would make sure that Erick got twenty years with Willie Bennett. After leaving Homicide, Angela convinced Erick to go to Homicide and talk to O'Malley. Wilbur Brittle gave Angela and Erick a ride to Homicide that same day, November 3rd.

O'Malley asked Whitney if he knew anything about Charles Stuart, and Erick said all he knew was what Derek told him. According to Angela and Erick, O'Malley began to accuse him of being a "fucking liar", and to tell Erick "don't fucking lie to me." Erick insisted that he was telling the truth and that he wasn't in Toot's apartment when the statements were made. O'Malley showed him a flyer about the watch, pocketbook, and credit cards that were taken from the Stuarts, and Erick told O'Malley that he had never seen these items before. O'Malley told him that he was "bullshitting" and "you know more than you're telling me." At that point, Erick began to change his story to conform to the answers he thought O'Malley wanted to hear. He placed himself in the room when Toot made the statement about his uncle shooting the Stuarts. Since Erick didn't know where Toot lived, having never been to his apartment before, or other details of the crime and the conversation in Toot's room, O'Malley and Dunn had to feed him information to assist him in constructing a story about what happened in Toot's room. At various points, O'Malley complained that Erick wasn't telling them (the police) anything, and that they were "feeding" the information to Erick. Erick was also telling the story with inconsistent facts and Dunn and O'Malley had to correct him from time to time.

Ultimately, O'Malley told Erick that Derek was the person he wanted to talk with and to have Derek call him.

When Angela and Erick arrived home, they called Derek, and Erick pleaded with Derek to talk to O'Malley. Derek agreed, and he went to meet Angela and Erick at Erick's house. Before the police arrived to take the three of them to Homicide, Angela and Erick were telling Derek what to say to the police when he got to Homicide. Angela and Erick didn't have enough time to fully inform Derek about the story that Erick had concocted before Billy Dunn and two other officers had arrived to take them to Homicide.

When they arrived at Homicide, Derek talked to O'Malley and four other officers: Dunn, Trent Holland, Miller Thomas, and one other officer with salt and pepper shaggy hair. At this point, Derek did not know that Erick had given a statement to the

police. O'Malley told Derek not to be scared and tell the truth.
Derek told the truth as he knew it: Derek, Mike Williams
("Black" or "Black Mike"), David Brimage ("Junior") and Joey
("Toot") Bennett were in Toot's room smoking marijuana and
drinking beer. Toot directed Derek's attention to an article
about his uncle's previous criminal activity. Derek read the
article and said to Toot "this guy is ruthless." He then asked
Toot if his uncle had anything to do with the Stuart shooting the
night before. Derek stated that Toot said "yeah" and giggled.
At that point, Derek and perhaps one of the other boys began to
press Toot about whether or not his uncle actually did the
shooting and Toot kept saying "yeah" while laughing about it.
When Derek related this version of events to the police officers
in the room, O'Malley called him a "fucking liar." O'Malley then
said he believed Erick, not Derek. At that point, O'Malley also
told Derek that he would pin Derek to the wall for twenty years
if Derek didn't tell him the truth.

    Derek and O'Malley went back and forth for approximately one
and a half hours with Derek adhering to his version of the story,
and O'Malley calling him a "fucking liar" and telling Derek he
was going to get twenty years if he didn't tell the truth. After
this one and a half hour period of time, Derek told O'Malley that
he would take a lie detector test. At that point, O'Malley said
the only lie detector test he had for Derek was him (Derek) and
Billy Dunn in a small dark room. At that point, Derek says
O'Malley was sweating, cursing, chain smoking and Derek thought
O'Malley was serious about putting him in the room with Billy
Dunn. When O'Malley threatened to put Derek in the room with
Dunn, Dunn said "I'll go get the room ready". Derek was also
familiar with Dunn's reputation around the Mission Hill projects
and has seen Dunn hurt people in the past.

    After the threat, O'Malley became exasperated and brought
Erick into the room and told Derek to listen to what Erick had to
say. At that point, Erick began to hint to Derek what the story
should be. Derek began to realize that this was a continuation
of the story that Erick and Angela began to tell him before Dunn
came to get them. Erick said "remember Dee how Bennett said how
he shot them and came in the room and told you, and his eyes were
bloodshot..." At first, Derek denied the truth of this version
of events, but Erick continued to press him, and O'Malley kept
telling Derek to listen to Erick. Erick kept making suggestions,
O'Malley kept telling Derek to listen to Erick and making
suggestions of his own, and Derek began to agree to the version
of events suggested by Erick and O'Malley. Before O'Malley's
threats about putting Erick in a room with Dunn, O'Malley had
been asking him "yes" or "no" questions that suggested the
answers that O'Malley wanted. Derek began answering O'Malley's
questions in a way that he thought would make O'Malley happy.
For instance, O'Malley asked him "did Willie Bennett tell you he
did it himself?" Derek answered "yes". Derek began answering

O'Malley's questions, one after another, with a "yes" answer
because he could see that the "yes" answers were what O'Malley
wanted to hear.

Erick, Derek, and Angela arrived at the police station
between 3 or 4 p.m. on November 3rd and didn't leave until
approximately 11 p.m.  They only taped Derek's statement after
O'Malley was happy with Derek's story.

The next day, November 4th, Derek called Erick and told him
that they had to go back to the police station to tell the truth
because they had lied about Bennett.  Trent Holland and another
officer came to Derek's house with Erick to pick him up and take
them to Homicide.  While they were driving to Homicide, Trent and
the other officer kept asking Derek what he was going to say.
Derek only told them that he wanted to talk with O'Malley.  When
they arrived at Homicide, O'Malley called Erick in alone and left
Derek with Trent Holland and the other officer in a separate
room.  While Derek was waiting to talk with O'Malley, both
officers repeatedly mentioned that people go to jail if they
change their stories during a homicide investigation, and how
young guys go to jail and become "faggots."

After Erick was in with O'Malley for approximately one half
hour, O'Malley came out and told Derek that he and Erick were
going one-on-one together and the two of them were left alone.
Erick was crying and holding a booking sheet.  Erick told Derek
they (the police) were going to arrest the two of them and they
would be sent to Charles Street if they didn't stick to the story
they told O'Malley on the previous evening.  Erick pleaded with
Derek to "just stick to the story."

After a period of time, O'Malley came in and pointed to
Erick and asked him if Erick's story was the truth.  Erick said
yes.  O'Malley then looked at Derek and asked him if Erick's
version was the truth.  Erick said yes.  At that point, O'Malley
took away the booking sheet.

Both Erick and Derek described how O'Malley pasted together
a version of events surrounding the incident in Joey Bennett's
room that was labeled by O'Malley as "Part A" and "Part B".
According to Derek, Part A was what actually happened in Joey's
room, and Part B was the story supplied to Derek by Erick and
O'Malley during the period of time when they were coaching him
about what to say, and was the version of events that Derek most
closely testified to on November 15, 1989, before the Suffolk
County Grand Jury.  Derek remembers this coaching occurring on
Friday, November 3rd.  Erick remembers it occurring on Saturday,
November 4th.

11

Erick and Derek appeared before the Suffolk County grand jury on November 15, 1989. Before going into the grand jury, Erick met with O'Malley, Holland, and Miller Thomas. O'Malley refreshed Erick's memory about the version of events that he wanted Erick to testify to, and told him that he wanted "the second story" that Erick had told them. Erick testified in the grand jury before Derek, and testified that he was at Joey Bennett's house on Tuesday, October 24th, and that Bennett admitted to Erick, Toot and others present that he shot the Stuarts.

According to Derek, his understanding of Part A and B was that Erick wasn't present on Tuesday, October 24th when Toot told Derek, David Brimage, and Mike Williams that his uncle shot the Stuarts. According to Part B, Erick was present the next day, October 25th, when Willie Bennett admitted to Erick, Derek, Toot, and others that he shot the Stuarts.

Before arriving at the grand jury, Derek had consulted with a lawyer who told him that he should ask for an attorney when he got to the grand jury and "plead the fifth" until he obtained an attorney. When Derek arrived at the grand jury and told O'Malley that he wanted to "take the fifth" and wanted a lawyer, O'Malley told him he didn't need a lawyer, and that a lawyer couldn't go in the grand jury with him. According to Derek, he was standing outside the grand jury room waiting for his turn to testify when ADA O'Meara came out of the grand jury while Erick was testifying. O'Meara said to O'Malley "the asshole's now saying that he was there" (in Toot's room). O'Malley looked at Derek and said in a suggestive manner "he's saying he was there." Derek said that he told O'Malley "if he's saying he was there, then he was there." At that point, O'Meara turned around and went back into the grand jury room "real fast". When Derek went into the grand jury to testify, he revised the story of Part A & B to include Erick based on what O'Meara told him Erick was testifying to in the grand jury, and O'Malley's suggestion to him.

On November 21, 1989, Derek Jackson, Erick Whitney and his mother, Marylinda Whitney, and Jackson's attorney William Crowe, met with ADAs Mundy and O'Meara, and Boston Police Department detectives Peter O'Malley and Trent Holland. At that meeting, Crowe advised the other parties that Derek Jackson intended to recant his Suffolk County grand jury testimony of November 15, 1989.

8.    Additional witnesses

The following individuals corroborate the version of events that Jackson, Whitney, and Brittle have testified to concerning the gathering in Joey Bennett's room, or the tactics engaged in by O'Malley, Dunn, and others.

### A.    David Brimage

David Brimage testified before the Suffolk County grand jury.  The witness admitted that he was present in Joey Bennett's room with Joey, Mike Williams, and Derek Jackson.  He confirmed that a silver hand gun was passed around, that Toot tried to convince the three boys that his uncle shot the Stuarts, and that the boys kept telling Toot that they didn't believe him.

In his interview with the FBI, Brimage testified that he was escorted to Homicide Headquarters by two police officers that Brimage was familiar with.  He stated that when he got to Homicide, O'Malley and Dunn started to question him.  Brimage told them that he didn't want to talk, prompting O'Malley to state that when Brimage left the police station, he was going to Charles Street.  He said "we're going to press charges against you for withholding information".  At that point, Brimage told them what he knew.  In addition to describing the meeting, Brimage told them that Toot had shown the boys an octagon shaped watch during the time they were in his room.  O'Malley tried to persuade Brimage that the watch was square in shape and not octagon.  However, Brimage did not retreat from his position.

Brimage was at Homicide from approximately 10:00 a.m. to 5:00 p.m.  O'Malley told Brimage that he was telling him a story that was different from what other witnesses had told him.  From time to time, O'Malley left the room and Brimage could hear him listening to tapes.  Upon returning, O'Malley would tell Brimage that he was lying.

It was apparent to Brimage that O'Malley was dissatisfied with his answers, but Brimage did not change his answers.  At one time, O'Malley threatened Brimage with the same amount of time that Bennett received.

### B.    Ronald Ferguson

Ronald Ferguson testified before the Suffolk County grand jury.  He stated that he was friendly with Toot, and although he might have been in Toot's apartment on the Tuesday and Wednesday after the shooting, he didn't really remember.  Ferguson stated that he has seen a silver revolver in Toot's possession, and that he was in Toot's room on one occasion when Toot showed the gun to Mike Williams, however, this was on an occasion before the Stuart shooting.

When the Suffolk County ADA asked Ferguson about who he talked to before coming to the grand jury, Ferguson stated that he asked David Brimage how he (Ferguson) was named as a witness. Brimage told Ferguson that he didn't know, and that Brimage's

name was mentioned because he had been in Toot's room with Mike, Derek, and Toot when Toot told the three boys that he thought his uncle shot the Stuarts.

### C.   Leroy Cox

Cox testified before the Suffolk County grand jury. He testified that he was not in Toot's room on the Tuesday or Wednesday after the shooting.

### D.   Barry Smith

Barry Smith was interviewed by Boston Police Detectives Randall Halstead and William Fogerty on November 3, 1989 at the DYS center on Canterbury Street in Roslindale. The report prepared by Halstead/Fogerty states that Smith went to Toot's apartment on Tuesday, October 23, 1989.[5] The report further states that "while sitting in the bedroom with Toot and Smith was Derek Jackson, Erick Whitney, Ronald Ferguson, Leroy Cox. Toot showed Smith two flat gold chains and asked Smith if he wanted to buy them. Toot also showed Smith a gold watch he had on his wrist. When Smith asked him where did he get it, Toot replied, don't worry about it. Toot reached under the mattress of the big bed in his room next to the bunk beds and pulled out a hand gun, color black with dark colored hand grips. The barrel was short. Detective Fogerty showed Smith the snubbed nose caliber .38 and Smith stated that it was the same size and kind. The gun was then passed around from youth to youth."

Barry Smith testified before the Suffolk County grand jury, however, he was not asked any questions concerning his presence in Toot's bedroom on October 23.

Smith told the FBI during an interview, that when he arrived at the Suffolk County grand jury, he informed ADA O'Meara that he gave a false statement to Police when he was interviewed at the DYS facility because of the pressure exerted on him by the police.

Smith stated to the FBI that he repeatedly told the detectives that he wasn't in Joey Bennett's apartment on the date in question, and that the detectives repeatedly told him that he was there. Smith stated that the detectives exerted a lot of pressure on him, and offered to help him get out of DYS. In response to the pressure and the offer of assistance, Smith changed his statement and told the detectives that he was in Toot's apartment. By virtue of his previous association with Toot Bennett, Smith knew some of Toot's friends. When the detectives asked him who else was present in Toot's room, Smith

---

[5] Tuesday's date was October 24.

14

begin to recite Toot's friends name one by one.  On each occasion
that he mentioned a friend of Toot's, the detectives would either
nod their head, or reply "go on".  When the detectives asked him
what kind of gun was shown around the room, Smith said he didn't
know.  At the point, one of the detectives pulled his gun from
its holster, showed it to Smith and asked him if it was similar
to the gun that was shown in Toot's room.  Smith told him that it
was.

        E.   Mary Smith

     Mary Smith recalls seeing Willie Bennett in her home on the
evening of October 23 between 7:30 p.m. and 8:00 p.m.  When
Bennett was in her home, he had on a dress shirt, dark slacks,
and slippers.  Smith saw Bennett again at approximately 9:30
p.m., at an outdoor location within the Mission Hill projects.
On this second occasion, Bennett was dressed in a short black
leather jacket, with a white hooded sweatshirt underneath.  In
one hand, he was holding a silver colored handgun.

     Smith was approached by two unknown police officers sometime
around the end of October, 1989.  They asked her to describe what
she knew of Bennett's possession of a hand gun on October 23, and
the type of clothing he wore that evening.  When she described
what she had seen that evening, they told her she was lying and
that Bennett was wearing a black sweat suit.  She repeated what
she had seen, and the two police officers persisted in telling
her that Bennett was wearing a black sweat suit and sneakers.

     On the following day, Billy Dunn came to Smith's house and
took her to the Homicide office in South Boston.  On the way to
Homicide, he informed her that if she cooperated, the Boston
Police would send her out of town and get her son (Barry Smith)
out of jail.  He then began to suggest to her the type of
clothing that she saw Bennett wearing: a black sweat suit.  She
insisted that she didn't see Bennett wearing that type of
clothing.

     When they got to the police station, Mary Smith was
questioned by Lt. McNelley.  McNelley told her that she was the
"key" to the investigation, and that she should cooperate.  They
also told her that they would give her money, get her son out of
jail, and get her out of town until the case "came up" if she
told them what they wanted to hear.  She again repeated what she
had seen Bennett wearing on the night of October 23, and McNelley
told her she was "a goddamn liar."  He repeatedly told her that
she was a "goddamn liar" when she insisted that Bennett didn't
have on a black sweat suit.

     During this period of time, one of the police officers
called Barry Smith on the phone at the DYS facility.  Once Barry
was on the other end of the phone, McNelley held the phone and

talked into it, while trying to convince Mary Smith that Barry was stating that Mary told him (Barry) that Bennett wore a black sweat suit on October 23. Smith didn't retreat from her original description, and McNelley hung up the phone. He told Smith that she and her son were "both telling a goddamn lie."

III. <u>YVONNE JENKINS</u>

Yvonne Jenkins and Shannon Jenkins have provided information about events surrounding the execution of a search warrant at their home located at 338 Warren Street on November 22, 1989. The affidavit in support of the search warrant for the Jenkins' home, together with the actions and statements of the police officers involved in the search (Peter O'Malley, Edward McNelley, Trent Holland and Miller Thomas) reveal that the police fabricated evidence to obtain the search warrant, and used the threat of prosecution based on falsely planted evidence to intimidate, threaten and coerce Yvonne Jenkins.

The officers obtained a search warrant for Jenkins' apartment that was identified by Peter O'Malley as <u>340 Warren Street</u> (Jenkins lived at 338 Warren Street) that was supported by an affidavit written by O'Malley. The affidavit stated, in part, the following: "Jackson stated that he was in Joey Bennett's room with David Brimage, Mike Williams and Joey Bennett, when Joey Bennett said his uncle told him he shot the Stuart family." O'Malley cites his November 3, 1989 interview of Derek Jackson as the source of this information. Regardless of any confusion concerning whether or not Part A or Part B, or any other version of events actually occurred in Joey Bennett's room, it is clear that as of November 21, 1989, Peter O'Malley knew that Jackson and Whitney would recant the aspect of their testimony related to any admission by Willie Bennett that he shot the Stuarts. Additionally, Jackson testified before the Suffolk County Grand Jury on November 22, 1989 when he recanted much of his original grand jury testimony. Jackson's testimony concerning Bennett's involvement in the shooting was limited to stating that Toot told him that his uncle shot the Stuarts. There was no mention or inference that could be drawn concerning the source of Toot's knowledge.

The search warrant was executed by O'Malley, Edward McNelley, Trent Holland, Miller Thomas and other Boston police officers. Jenkins states that O'Malley and McNelley kept her isolated in the back room for a good deal of time while they berated and chastised her, calling her a "stupid Bitch" for being involved with Willie Bennett; telling her that Bennett was going to be "old and gray" before she ever saw him again; that her daughter Whitney (Bennett's daughter also) was going to grow up without a father; berating her about the location of the sweat suit; telling her they were going to "get" Bennett for the Stuart shooting or the video store robbery; and, otherwise harassing her

16

and using profane language while they searched the house. When she asked to go to the bathroom, they refused to let her go, ultimately causing her to urinate on herself. Only after she urinated on herself did they call a policewoman, who eventually came and accompanied her to the bathroom.

During the period of time that O'Malley and McNelley had Jenkins confined in the back room, Holland and Thomas were in the livingroom with Jenkins' eleven year old daughter, Shannon. She could hear other police officers cursing at her mother, calling her "Bitch". Shannon observed Trent Holland remove a brown paper bag from his pocket and spill the contents out onto the coffee table. Another officer described by Shannon Jenkins as being fat and white, smoking a cigar, spread the contents across the table and asked her if she knew what it was. She told him she knew that one of the things on the table was reefer, but that she didn't know what the other item was. She began yelling to her mother that the police were putting drugs on the table. At that point, the fat white officer with the cigar removed the drugs from the table. As he was walking out of the apartment, he told Shannon Jenkins that he would be back with DSS. Shortly afterwards, Holland and Thomas came back inside and brought a paper bag to O'Malley and McNelley. O'Malley looked inside the paper bag and told Yvonne Jenkins that she should call DSS because she was going to jail for a long time if the contents of the bag had her fingerprints on it. However, they never showed Jenkins the contents of the bag. Jenkins also recalls hearing one of the other white officers suggest that they ought "not to do it now" because Jenkins' daughter might have seen it.

IV.   **JOEY BENNETT**

The investigation reveals an attempt by Trent Holland to prosecute a criminal case against Joey Bennett that was based on false evidence and false testimony. This incident relates to the execution of a search warrant in the early morning hours of November 11, 1989, when members of the Boston Police Department executed a search warrant at Joey Bennett's home, located at 7 Alton Court; and, the arrest and prosecution of Bennett that stemmed from the search.[6]

Veda Bennett, Joey Bennett's aunt, stated that as the search was concluding, she and her daughter were allowed to walk up the carpeted set of stairs leading from the first floor to the second floor. When they got to the top of the stairs, they looked in

---

[6] It should be noted that the supporting affidavit for the search warrant was signed by O'Malley, and that the affidavit incorporated those portions of Derek Jackson's November 3, 1989 statement that referred to the admissions about the Stuart shooting made by Willie Bennett.

17

Joey Bennett's room and saw Trent Holland standing in front of
Joey's bureau.  Joey kept a small jewelry box on top of his
bureau, and Trent Holland was preparing to put an item that they
described as a folded lottery ticket into the jewelry box.  When
Veda Bennett asked Holland what he was doing, he became flustered
and said that there were drugs in the box.  He then put one
folded lottery ticket in the box and another folded lottery
ticket in his shirt pocket.  Veda said that Holland then called
for an officer who put the entire jewelry box with its contents
into a bag.  It is apparent that the process that Veda Bennett
observed was the seizing and inventory of the jewelry box.  After
the box was seized, Holland informed some of the other police
officers that he found some cocaine in Joey Bennett's room, and
Joey Bennett was arrested for possession of cocaine.
Significantly, the seized powder was not determined to be
cocaine, or any other controlled substance, and the charges
against Joey Bennett were dismissed.

     Joey Bennett has stated that the cocaine was not his, and
that although he has sold cocaine in the past, he sold crack
cocaine - not the powdered kind that he was ostensibly arrested
for possessing.

## V.    ALBERT SWANSON

     A review of the 911 transcript of Charles Stuart's incoming
call, and the Boston Police Department interviews of Charles
Stuart supplied to the FBI by Inspector McNelly reveals that
Stuart told police that the man who shot him and his wife wore a
black running suit with red stripes.  On October 29, 1989,
Homicide detective Paul Murphy applied to the Roxbury District
Court for a search warrant to search an abandoned Mission Hill
apartment that Alan Swanson was illegally using as shelter.
Murphy's affidavit states that Charles Stuart described a black
jogging suit with red or white stripes as the attire worn by his
assailant.  The transcript, reports, and other information
provided to the FBI are devoid of any reference to a white
striped jogging suit.  In fact, Stuart specifically stated that
the stripes of his assailant's jogging suit were red.

     In the supporting affidavit for the search warrant used to
enter the apartment that Swanson was found in, detective Murphy
notes that "a black jogging suit with white stripes..." was found
in the apartment during an earlier entry.  He then states "it is
my belief that the black jogging suit observed in the bathroom
sink of apartment 987, located at 8 Cornelia Court, Roxbury, is
the same suit worn by the person who shot and murdered Carol
Stuart on October 23, 1989."

     Swanson was arrested for breaking and entering a dwelling
before the search warrant was issued.  Swanson was ultimately
found not guilty of the charge.  It is apparent from the search

warrant affidavit that Swanson was the prime suspect in the death of Carol Stuart before Willie Bennett emerged as the target. Swanson was held on $5,000 cash bail.  Swanson was ultimately found not guilty on all charges related to the 8 Cornelia Court search, seizure and arrest (after the charge had first been enhanced to unarmed burglary, then reduced to simple trespass).

## VI.  CONCLUSIONS

The civil rights investigation into allegations of misconduct by members of the Boston Police Department during the Stuart homicide investigation has disclosed evidence of police misconduct directed against civilian witnesses, and individuals who were targets of the Stuart homicide investigation.

The evidence of police misconduct is identified as follows:

1.  Coercion and intimidation of civilian witnesses by investigating police officers through the use of actual or implied threats of arrest, imprisonment, and physical beatings;

2.  Efforts to supply witnesses with crucial facts, previously unknown to them, for the purpose of enhancing the witnesses' knowledge of incriminating facts;

3.  Efforts to trick witnesses into adopting incriminating facts or information that the witness previously rejected;

4.  Apparent attempts to "plant" controlled substances in the home of one witness;

5.  Apparent attempts to "plant" controlled substances in the home of one witness, followed by the arrest of the witness for possession of the same contraband;

6.  The use of abusive, profane and threatening language to witnesses who were interrogated;

7.  The use of coerced statements within affidavits used to obtain search warrants; and,

8.  The use of an apparently false statement within an affidavit used to obtain a search warrant.

This evidence was developed through an extensive and thorough review of investigations conducted by the Suffolk County District Attorney, the Massachusetts Attorney General, and a joint FBI and federal grand jury investigation conducted by this office, which consisted of interviews, re-interviews, testimony

under oath, as well as utilizing investigative tools such as immunity.

The decision not to prosecute was based primarily upon the lack of admissible evidence relating to the specific elements of the narrowly defined federal civil rights statutes.

In order to prevail in a case charging violations of federal criminal civil rights under 18 U.S.C. §241, the government must establish beyond a reasonable doubt by way of admissible evidence, direct or indirect, that there was an agreement by two or more individuals to violate the civil rights of another. The object and purpose of that conspiracy must be defined, and acts in furtherance of the conspiracy proven. In addition, the conduct must be willful and intentionally calculated to deprive an individual of his civil rights. A review of the evidence falls short of those requirements.

More specifically, while the evidence does indicate a number of instances of police misconduct, the investigation was not able to establish that the police officers violated 18 U.S.C. §§241 or 242, because of the failure of the evidence to show the following:

1.   That the investigating police officers knew, or should have known, that the version of events first told to them was false; and,

2.   That the investigating police officers specifically agreed to violate certain individuals' civil rights by prosecuting them on the basis of evidence that they knew, or had good reason to know was false.

There does not exist at the federal level a civil remedy which can be initiated by the U.S. Attorney's Office to address police misconduct and thus we had to confine our review of the conduct within the framework of federal criminal civil rights statutes which are explicit and provide narrow jurisdictional possibilities.

While we have concluded that the investigation revealed evidence of police misconduct, that, standing alone, is insufficient to responsibly bring federal criminal charges but rather warrants that the evidence be brought to the attention of the Boston Police Commissioner for possible disciplinary action.

It is the responsibility of this Office not to recommend a federal criminal prosecution unless we believe that the admissible evidence will be sufficient to obtain and sustain a conviction. As a matter of fundamental fairness, this office will not prosecute unless we believe that the person probably will be found guilty by an unbiased jury.

20