1                  IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF MASSACHUSETTS

3

4

5        SHAWN DRUMGOLD,          )  C.A. No. 04-11193-NG

6                    PLAINTIFF    )  Courtroom No. 2

7        VS.

8        TIMOTHY CALLAHAN, ET AL.,)  1 Courthouse Way

9                    DEFENDANTS   )  Boston, MA  02210

10

11                       JURY TRIAL DAY 3

12                     SEPTEMBER 10, 2009

13                        10:30 a.m.

14

15

16

17

18

19            BEFORE THE HONORABLE NANCY GERTNER

20            UNITED STATES DISTRICT COURT JUDGE

21

22

23

24                    VALERIE A. O'HARA

25                  OFFICIAL COURT REPORTER

1        A P P E A R A N C E S:

2             ROSEMARY CURRAN SCAPICCHIO, ATTORNEY, Four
         Longfellow  Place, Boston, Massachusetts  02114, for the
3        Plaintiffs;

4             Tommasino & Tommasino, by MICHAEL W. REILLY, ESQ.,
         Two Center Plaza, Boston, Massachusetts  02108, for the
5        Plaintiff;

6             Roache & Malone, LLP, by JOHN P. ROACHE, ESQ., 66
         Long Wharf, Boston, Massachusetts  02110, for the
7        Defendants.

8             Bletzer and Bletzer, P.C., by HUGH R. CURRAN, ESQ.,
         300 Market Street, Brighton, Massachusetts  02135, for
9        the Defendants.

10            Morgan, Brown & Joy, LLP, by MARY JO HARRIS, ESQ.,
         200 State Street, Boston, Massachusetts  02109-2605, for
11       the Defendants.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                               INDEX

2      **EXAMINATION**

3      **Witness Name    Direct Cross Re-Direct Re-Cross**

4      **RICKY LEE EVANS**
          By Ms.        45
5         Scapicchio

6      **OPENING STATEMENTS**

7      **BY MS. SCAPICCHIO                    7**

8      **BY MR. CURRAN                       25**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2          THE COURT:  You can all be seated.  Welcome.

3     Here's what we're going to do today.  First you'll be

4     sworn in as jurors.  It's a different oath than you took

5     when you were sworn in as perspective jurors, so we'll

6     swear you in as jurors.  You each have notebooks that

7     you'll be able to have during the course of the trial.

8     After you're sworn in as jurors, I'll give you a few

9     instructions and then the case will begin.  Ordinarily we

10    start at nine.  Today I had the pleasure of swearing in

11    citizens at the JFK Library, which is one of the

12    unambiguously wonderfully things I do, so that's why

13    we're starting a little late.  So, Maryellen, would you

14    proceed.

15          (Jurors were sworn)

16          THE COURT:  You can be seated.  This is a civil

17    case, as we indicated to you, and in a civil case, the

18    plaintiff, Mr. Drumgold here, bears the burden of proof

19    by what we call a fair preponderance of the evidence.  I

20    want to note this to you at the beginning.  This is not

21    the criminal standard, it's not the standard of beyond a

22    reasonable doubt.

23          Fair preponderance of the evidence is a lower

24    standard.  It means, and I'll explain this later on, more

25    probable than not.  If the case is a scale, it means it's

1    tilting in favor of the plaintiff if you so find that the

2    evidence amounts to that.  So we call it a fair

3    preponderance of the evidence.

4            The lawyers will address you first, and they'll

5    begin with what we call their opening statements.  Bear

6    in mind that the opening remarks are simply statements of

7    what the lawyers anticipate the evidence will be, and

8    then at the end of the case, they address you again with

9    the closing argument, and the closing argument is when

10   they argue to you, yes, we think the evidence has proven

11   that.

12           The beginning is a statement, a road map, a

13   description of what they think will come out.  The ending

14   is an argument as to whether or not they think they in

15   fact have made the points they said they would make.  The

16   comments of the lawyers in the opening statement and in

17   the closing arguments and the comments to the lawyers,

18   the comments of the lawyers in their questions, because

19   sometimes they try to talk to you through their questions

20   as well, this is not evidence.  The only evidence in the

21   case is the words that come out of the mouths of the

22   witnesses and the exhibits.  That's the only evidence in

23   this case.

24           Think of this room as a hermetically sealed

25   room.  The only thing you're going to learn about this

1    case has to come from the four corners of this room and

2    no place else and in that regard from the mouths of the

3    witnesses and from the exhibits.

4         What this also means is you are not to hear

5    about this case from any other source.  That means you

6    can't ask my staff about it, you certainly can't do your

7    own research, you can't go online, you can't talk to your

8    husband or wives or friends about this case, oh, have you

9    heard about this case because if you do that, then you're

10   bringing into your jury room information that has not

11   come from the four corners of this room, information not

12   tested by the rules that we apply.

13        So this is the only place you're going to learn

14   about this case.  We also ask you not to deliberate in

15   advance.  In other words, there's an enormous desire to

16   talk about the case at lunch or whatever.  We ask you not

17   to begin as a group to talk about the case until you get

18   it for your decision, and the reason is there are two

19   sides to the story.  The more you talk about one side,

20   because that's all that you've heard, the more you're

21   likely to be in a track about that side and be focused on

22   that side.

23        We want you to begin deliberating only when the

24   case is completely over and when you've been instructed

25   as to what the law is, and at that point you can begin to

1      deliberate.  Again, don't talk to my staff about the

2      case.  Don't talk to anyone about the case.  Don't talk

3      amongst yourselves.  When you get home in the evening,

4      just relax.  Just don't talk about anything other than

5      this.

6              In the course of the jury selection, lawyers

7      may have asked you questions which seem to present a view

8      of the case.  Again, that's not remotely evidence.  That

9      is the jury selection.  They were trying to find out what

10      your attitudes are.  The only evidence is what comes out

11      of the mouths of the witnesses or the exhibits.  The

12      lawyers will object to one another's -- from time to time

13      they'll object.  This is part of what lawyers do.  It's

14      entirely appropriate.  It's a way of screening the

15      evidence.  Don't hold objecting against anyone.

16              For the most part, we're going to try to make

17      sure that there are no breaks in the presentation of

18      evidence here.  We do take, I love to describe this, I

19      love to kid Maryellen, we take a break mid-morning for

20      snacks, right, we're all grownups here, but she calls

21      them snacks, other people in the world call them a coffee

22      break, so we'll have a break about 11:30.  Ms. Molloy

23      makes sure that you are well taken care of.  See, what

24      happens is, you'll have a coffee break and oftentimes we

25      don't.  We're a little more grumpy than you are.

1          We will stop at 1:00.  There may be times if it

2     looks like the case is not proceeding at the pace that I

3     promised you that we would want to open up afternoons.

4     There's no reason to believe that that's going to happen,

5     but we'd give you warning.  We understand that being a

6     juror sometimes means allowing someone else to take over

7     your life, and we try to minimize that.  If there's any

8     change in the schedule, we will surely let you know what

9     that is so that your responsibility can be carried out in

10    a way that doesn't do violence to the rest of your life,

11    so we're going to begin now with the opening statements

12    of counsel.

13                      OPENING STATEMENT

14          MS. SCAPICCHIO:  Thank you, your Honor.  Good

15    morning, again, ladies and gentlemen, my name is Rosemary

16    Scapicchio, and I represent Shawn Drumgold.

17    Shawn Drumgold, you'll hear, spent 15 years in jail

18    because he didn't get a fair trial, and the reason he

19    didn't get a fair trial is because the defendant in this

20    case, Detective Callahan, hid evidence from the criminal

21    trial, hid evidence about an important witness from the

22    criminal trial so that when the jurors, like you in the

23    criminal case, sat there and heard the evidence, they

24    didn't get the whole story.

25          The evidence will be fair in this case,

1    Detective Callahan knew the whole story.  He knew exactly

2    what happened with Ricky Evans.  You'll hear that

3    Detective Callahan sat in that courtroom during the

4    criminal trial, and he heard Ricky Evans testify, and he

5    knew that Ricky Evans was lying, and he did nothing.  He

6    didn't alert the Court, he didn't talk to the prosecutor,

7    he didn't even talk to Ricky Evans.

8            Now, ladies and gentlemen, you'll hear a lot

9    about what we call exculpatory evidence in this case and

10   why is exculpatory evidence so important, and I expect

11   you're going to hear from attorneys who will tell you

12   what the importance of exculpatory evidence is, but I'm

13   going to try to simplify it for you.  If this was a

14   regular traffic case where two cars got in an accident at

15   an intersection and one witness said the black car went

16   through the red light and another witness said no, no,

17   no, the blue car had the red light and you were supposed

18   to evaluate those two testimonies, how do you tell who's

19   telling the truth?  How do you know which one of those

20   two people are telling the truth?

21           Well, you'd want to know what would motivate a

22   witness to come in and testify.  You'd want to know

23   what's in it for them to come in and testify, are they

24   just standing on a corner and they see something happen

25   and they tell you what it is because certainly if that's

1    the case, it seemed to be more credible, or is there

2    something in it for them?  That's where the exculpatory

3    evidence comes in.

4         What if they found out that witness who said

5    the black car went through the red light was paid money?

6    What if you found out that witness was put up in the

7    Howard Johnson's, what if you found out that that witness

8    had some pending cases and the pending cases, there were

9    promises that those cases would go away, what if you

10   found out that that witness was shown some photos that

11   nobody ever knew about?

12        Of course it would make a difference as to

13   whether or not you believe that witness.  That's the

14   importance of exculpatory evidence, but in a criminal

15   setting, it's even more important.  In a criminal

16   setting, there's nothing wrong with a prosecutor

17   promising a witness or a police officer promising a

18   witness consideration for their testimony.  It happens

19   all the time.

20        You can promise a witness that you're going to

21   fix their cases, you can promise a witness that you're

22   going to be able to give them some money, you can promise

23   a witness that you're going to be able to put them in a

24   hotel, but you have to tell the defendant because you

25   have to let the defendant have the opportunity to tell

1      that criminal jury to say can you really believe this

2      witness?  Look at all the things they did for him.  They

3      put him in a hotel.  They gave him money.  They fed him

4      information.  Can you believe what he said?

5           In the context of a criminal case without

6      exculpatory evidence, you can't have a fair trial because

7      the criminal jurors don't get to evaluate the witnesses

8      the same way that they would if they actually had the

9      evidence.

10          Now, you're going to hear a lot about the

11     original criminal trial in this case.  You're going to

12     hear that a 12 year-old girl was sitting on a mailbox on

13     the corner of Homestead Street and Humboldt Avenue and

14     she was shot in the head.  You're going to hear evidence

15     that 10 days later Shawn Drumgold was arrested.

16          About a year later Detective Callahan takes

17     over the case.  When Detective Callahan takes over the

18     case, there's one witness by the name of Tracie Peaks who

19     says anything at all about Shawn Drumgold.  She says she

20     sees Shawn Drumgold in a red turtleneck.  That's the

21     trial testimony.  You'll hear the trial testimony of what

22     she says, but they have no motive for Shawn Drumgold to

23     be involved in this.  They have no statements from

24     Shawn Drumgold.  They have no physical evidence that

25     connect Shawn Drumgold to this case.  They have no gang

1     affiliation.

2          You'll hear that the Commonwealth's theory was

3     that Humboldt and Castlegate were two gangs who were

4     fighting with one another and that the intended target,

5     Mervin Reese and Chris Chaney, were the intended targets

6     and this little girl got hit because she happened to be

7     there.  She was never the intended target.  Back in 1989

8     when Detective Callahan took over this investigation,

9     they couldn't connect Shawn with any of that.  He wasn't

10    a gang member.  There was no motive.  There were no

11    statements.  There's no physical evidence.

12          Detective Callahan hits the jackpot.  He comes

13    up with a witness by the name of Ricky Evans.  You'll

14    find out that Ricky Evans about six months after

15    Tiffany Moore was killed was shot himself and his cousin

16    was killed, and Detective Callahan was working on that

17    case.

18          You'll hear that Ricky Evans was 19 years old

19    at the time, victim of a gunfire and homeless.  You'll

20    hear evidence of what Detective Callahan did to get him

21    to testify against Shawn Drumgold.  This is what he did,

22    ladies and gentlemen, he took Ricky Evans when he was

23    homeless and he put him in the Howard Johnson's and he

24    let him charge his meals and he let him bring friends

25    over, and he gave him money, and he promised he was going

1    to fix his pending cases, then he fed him details of the

2    Tiffany Moore murder that would implicate Shawn Drumgold

3    and his co-defendant.

4           He told Ricky Evans, "Remember the car was

5    white."  It just so happened that a 9-1-1 call would say

6    the car was white.  "Remember Shawn had a silver gun and

7    Lug had a black gun," it just so happens there were two

8    guns in the case.  "Remember they went in a certain

9    direction."  "Remember they went Chris Chaney and

10   Mervin Reese," details of the crime Ricky Evans knew

11   nothing about.  Detective Callahan fed him those details

12   so that he could come in and testify against

13   Shawn Drumgold and they would get their conviction.

14          That you'll hear is exactly what happened.

15   Ricky Evans took the stand in the criminal trial and spit

16   out exactly what Detective Callahan had fed him.  He said

17   he saw Shawn Drumgold before the crime with Terrance

18   Taylor, he said Shawn Drumgold was in a white car, he

19   said he saw a firearm in Shawn Drumgold's pants, he said

20   he heard Terrance Taylor, a kid by the name of Lug who

21   was a co-defendant, make a statement I know where Reese

22   and Chaney are at, the intended targets of the homicide

23   in this case.

24          Then you'll hear evidence that after the

25   homicide Ricky Evans will say he heard from

1    Shawn Drumgold and Terrance Taylor again, that they come

2    up to see him again and they told him the guns were hot,

3    devastating evidence in a criminal trial all provided by

4    Detective Callahan, and Detective Callahan, as I told

5    you, sat in the courtroom while Ricky Evans testified,

6    and when the lawyers were doing the best job they could

7    to try to shake Ricky Evans' testimony, because you'll

8    hear from the lawyers, and they will tell you no one ever

9    told me he was put up in the Howard Johnson's, no one

10   ever told me he was promised anything regarding his

11   pending cases, no one ever told me Detective Callahan

12   gave him money, no one ever told me Detective Callahan

13   showed him pictures of Shawn Drumgold and Terrance Taylor

14   and pointed to their pictures and tell Ricky Evans who

15   they were.  I didn't know any of that, and the lawyers

16   will tell you had I known that, I would have asked him

17   about it at trial.

18          My whole theory of the case would have switched

19   from a mistaken identity to police misconduct.  How do

20   you trust an investigation where an officer is feeding a

21   main witness details of the crime?  How do you trust

22   anything about that?  You'll hear from Bob George who

23   represented Terrance Taylor, and you'll hear from

24   Steve Rappaport who represented Shawn Drumgold.  They'll

25   both tell you they tried this case and they did their

1       best, and they never got the information from anyone

2       about Ricky Evans.

3              All they knew about Ricky Evans during the

4       first criminal trial back in 1989 was that Detective

5       McDonough, Callahan's partner, took Ricky Evans to

6       Roxbury District Court to remove some default warrants

7       and that his cases were continued until some time in

8       October after the Drumgold criminal trial.

9              That's all they knew about Ricky Evans, and try

10      as hard as they could to shake his story, they couldn't

11      because he hid what really happened.  When

12      Steve Rappaport, Attorney Rappaport, who's representing

13      Shawn Drumgold asked Ricky Evans as he sat on that

14      witness stand, "What did you get?  What's in it for you?

15      Were you promised anything in exchange for your

16      testimony?  Any rewards from anyone?"  He said that right

17      in front of Detective Callahan sitting right at a table

18      just like this, and you know what Ricky Evans told the

19      criminal trial, "I wasn't promised anything.  I wasn't

20      promised anything, I'm doing this because I have a

21      daughter, and I would never want anything like this to

22      happen to my daughter."

23             Now, Detective Callahan knows that's wrong.  He

24      knows he put him up in the Howard Johnson's, he knows he

25      paid him money, he knows he showed him photos.  He knows

1    he's made promises about pending cases.  He won't be able

2    to explain to you, ladies and gentlemen, why he just sits

3    there.  If everything he's telling you is true, why does

4    he just sit here?  You're going to hear me ask him a lot

5    of questions about that because he's not only a

6    detective, but he's a lawyer, so he knows the rules.  He

7    knows what he's supposed to do.  I don't think there's

8    any question that if his story is true, he allowed a

9    witness to commit perjury in a homicide trial and did

10   nothing about it.

11          Then we jump forward 15 years in 2003.  You'll

12   hear evidence in the interim as to what was in the D.A.'s

13   file and not in the D.A.'s file, but we jump forward to

14   2003.  There's a motion for a new trial, and Ricky Evans

15   gets subpoenaed.  He shows up.  In 2003, when Ricky Evans

16   shows up, he's not represented by any lawyers, he hasn't

17   spoken to anybody, shows up at the courthouse because

18   he's subpoenaed to show up, and he drops a bombshell.

19          He tells the Court in 2003, "I never saw

20   Shawn Drumgold, I never talked to him that night, I was

21   homeless, Detective Callahan helped me, he wanted me to

22   do this, and I would have done anything for him.  I lied.

23   Detective Callahan fed me the details of the

24   Tiffany Moore homicide, and I testified about them

25   because he took me from being a homeless 19 year-old kid

1  and put me in the Howard Johnson's and took care of my

2  criminal cases and paid me money and I'm sorry."

3       In 2003, you'll also hear Detective Callahan

4  testify, and in 2003, his story was, let's see, "Yeah, I

5  think I remember putting him up at the Howard Johnson's.

6  Yeah, I think I remember saying something to him about

7  pending cases, but I never told the prosecutor.  I never

8  told anybody in the district attorney's office what I did

9  for Ricky Evans, it never happened.  I did put him in the

10  Howard Johnson's."

11       "As a matter of fact, I think I paid with my

12  own credit card.  I never wrote a report about it.  I

13  don't have any documentation in my file about it.  As I

14  sit here under oath, I can't recall a single conversation

15  that I had with Phil Beauchesne," who was the prosecutor

16  prosecuting Shawn Drumgold back in 1989, "or with any

17  other prosecutor in the district attorney's office about

18  the promises I made to Ricky Evans.  I didn't discuss it

19  with anybody, and I never paid him any money."  He was

20  asked several questions about money, "never paid him any

21  money."  That was his story in 2003.

22       You'll hear evidence that we pushed him on it,

23  "Could he have been there in relation to any other case?

24  What about that case where his cousin got murdered?"

25  You'll hear the name of that case is Treas Carter.

1    "Could he have been there in relation to the Treas Carter

2    case?  Is that maybe why you were confused?"  Detective

3    Callahan will say, "No, I put him in there in

4    relationship to this case, and I got him out of there

5    before the Treas Carter case went to trial," so it wasn't

6    Treas Carter, that wasn't the reason, at least not in

7    2003.

8         And he was asked questions, "What about

9    security?  Were you worried that somebody could have hurt

10   him, is that the reason why you put him in the Howard

11   Johnson's?"  "No, not worried about security at all, he

12   could come and go as he pleased, he could invite people

13   over, he could do all of those things.  We weren't

14   worried about security."

15        Let me flash forward to 2008.  Shawn Drumgold's

16   released from prison, and there's this civil suit.  In

17   2008, you'll hear the story totally changes because the

18   standard in the civil suit, you'll hear, is that

19   Detective Callahan has an obligation if he makes promises

20   to a witness to tell the district attorney.

21        If you don't tell the district attorney, you're

22   going to be personally liable.  You can't promise witness

23   things and not tell the district attorney because the

24   district attorney has to tell the defense attorney.  So

25   in 2008, when Detective Callahan is being held

1    responsible, being sued as a result of his conduct,

2    here's the story, "I have a specific, absolute memory of

3    telling Phil Beauchesne about Ricky Evans.  I told him

4    about the Howard Johnson's, I told him about the pending

5    cases, I didn't tell him about the money, forgot about

6    the money, but I did tell him about those other things.

7    I have a specific memory of telling him those things."

8        You'll hear he was asked, "Where did you get

9    the money?"  Because the thing that's the most strange in

10   order for you to believe Detective Callahan's story is

11   that there is not a single piece of paper in the file of

12   the Boston Police Department that suggests Ricky Evans

13   was put up in the Howard Johnson's, that suggests he was

14   shown photographs of Shawn Drumgold and Terrance Taylor

15   that suggests he was paid money or that suggests he was

16   promised things in relation to his pending criminal

17   matters, not a single piece of paper.

18       But Detective Callahan, I expect, will come in

19   here and tell you when I testified in 2003 and I said I

20   didn't tell the D.A., what I really meant is I couldn't

21   tell them the exact date and the exact time that I told

22   them about these things, but I definitely told them about

23   these things.

24       When I said under oath that I didn't tell them

25   about those things, I said I didn't have a memory about

telling them those things but now I do 20 years later, I

have an absolute memory of telling them, my memory is

clear.  You're going to hear me ask him questions, what

did you review to clear up that memory, because you'll

hear evidence, ladies and gentlemen, that there is not a

single piece of paper in the district attorney's file

that would suggest Detective Callahan told them anything,

not a single piece of paper about Ricky Evans being put

up in the Howard Johnson's, about him being paid money,

about fixing his pending cases, making promises about his

pending cases and showing him photo arrays, but there's

more.

        In 2008, when Detective Callahan is being held

personally responsible for what happened to

Shawn Drumgold because Shawn Drumgold didn't get a fair

trial because he hid evidence, his story is let me

explain about the Howard Johnson's.  It wasn't just so

that I could find Ricky Evans for trial, that's not the

real reason I put him in the Howard Johnson's.

        I know I said that under oath in 2003, but I

didn't have a chance to review this file that has no

documentation in it, but let me tell you what really

happened, there were four reasons that I put him in the

Howard Johnson's, and I told the prosecutor about all

four, one was security, which in 2003 he said wasn't an

1    issue, one was the Treas Carter case, which in 2003 he

2    said wasn't an issue, one was because he wanted to find

3    him, didn't know if he could find him or not find him,

4    and another one he'll tell you is because a defense

5    witness went to go find Ricky Evans, and this is the guy

6    Larry Fallon, and he'll say when Fallon showed up where

7    Ricky Evans was, I thought maybe I should get him out of

8    there.

9          It wasn't his story in 2003, but that's his

10   story now when we're trying to hold him personally

11   responsible for hiding evidence that resulted in an

12   unfair trial for Shawn Drumgold.

13         You'll hear disputing evidence about how long

14   Ricky Evans was in the Howard Johnson's, how much money

15   he got paid, and I expect the defendants are going to

16   introduce the whole trial transcript in this case and say

17   look over here, look over here, he would have been

18   convicted anyhow.  It doesn't matter.  He would have been

19   convicted anyhow, take Ricky Evans out of the equation,

20   he would have been convicted anyhow, but I suggest to you

21   that the evidence will be the entire trial strategy would

22   have changed if they knew, defense attorneys back in 1989

23   knew what Detective Callahan knew.

24         The entire defense strategy would have changed.

25   Those lawyers would have been able to tell the criminal

1          jury trial about the promises that Detective Callahan

2          made to Ricky Evans, about the fact that he fed

3          Ricky Evans information.

4                  What does that do to a criminal case?  You find

5          out that the lead detective needs to feed a witness

6          information to commit perjury, would you believe anything

7          that that detective did in that case?  Would you start to

8          doubt it?  Because that's what I expect the defense

9          attorneys will tell you how their strategy would have

10         changed if they knew, so it's not as simple as taking

11         Ricky Evans out of the picture because you still don't

12         get the trial that you would have had if Detective

13         Callahan didn't hide that information, so they're going

14         to play trial transcript after trial transcript and this

15         one said this and this one said that, and they're going

16         to say, see, we think he would have been convicted

17         anyhow.

18                 I want you to listen very, very carefully to

19         what Attorney George and what Attorney Rappaport will

20         tell you about how hard they tried during the 1989 trial

21         and that they had no explanation for Ricky Evans, and I

22         expect you're going to hear from two other witnesses, a

23         district attorney by the name of Paul Linn and a district

24         attorney by the name of David Meier.

25                 Both of those district attorneys had the file

after Phil Beauchesne, who was the trial prosecutor, and
you won't hear from Phil Beauchesne.  I expect that the
evidence will be that he's sick and he's unable to
testify, but you'll hear from Paul Linn, who I expect
will tell you that he represented the Commonwealth for a
period of time while Shawn was incarcerated and that he
had an ongoing duty to disclose exculpatory evidence and
that he didn't disclose anything about Ricky Evans.

I expect you're going to hear from David Meier
who will say he took over the file in 1999 and he had an
ongoing duty to disclose exculpatory evidence and he sent
five letters, none of which said anything about
Ricky Evans, and I expect that you're going to have the
trial file or prosecutor's file, I'm sorry, prosecutor's
file, and there won't be a single document in that file
regarding Ricky Evans in the Howard Johnson's, regarding
payments to Ricky Evans, regarding promises about pending
cases and regarding those photographs that
Detective Callahan showed him.

Ladies and gentlemen, you're going to hear a
lot of evidence in this case regarding how bad the
criminal trial was and how tragic it is that this little
girl is dead, and that's not what we're here for.  The
focus of this trial is to hold Detective Callahan
responsible for hiding evidence that resulted in an

1    unfair trial, to hold Detective Callahan responsible for

2    what he did with Ricky Evans.

3              Now, you're going to hear that Ricky Evans has

4    a long criminal record, he's made some inconsistencies,

5    you're going to hear all of that, he's not a perfect

6    witness by any stretch of the imagination, but he was the

7    key.  He was a substantial contributing factor to Shawn's

8    conviction, and if he was a substantial contributing

9    factor to Shawn's conviction and Detective Callahan hid

10   that information and didn't turn it over to the

11   prosecutors in this case, then Shawn's entitled to

12   recover damages for the 15 years he spent in jail.

13             I'm going to ask you at the end of this trial

14   that after 21 years hold Detective Callahan responsible

15   for what he did.  Hold him responsible for what he did.

16   Thank you.

17             MR. CURRAN:  Your Honor, may we approach

18   sidebar for a minute?

19             THE COURT:  All right.

20             ( THE FOLLOWING OCCURRED AT SIDEBAR:)

21             MS. HARRIS:  Your Honor, I'd place on the

22   record an objection to the extent that Ms. Scapicchio

23   said that Detective Callahan has a burden of proving

24   anything to this jury, which is what I understood her to

25   say, that he has to prove that he disclosed this

1    information.  The burden of proof should not ever be put

2    on the defendant in this case.  That's why I stood to

3    object.

4              THE COURT:  Okay.  I said that at the

5    beginning.  At the conclusion of your opening, I'll say

6    it again.

7              MS. HARRIS:  Thank you.

8              MS. SCAPICCHIO:  Thank you.

9              (SIDEBAR CONFERENCE WAS CONCLUDED)

10             MR. CURRAN:  May I, your Honor?

11             THE COURT:  Yes, of course.

12                     OPENING STATEMENT

13             MR. CURRAN:  Police misconduct, perjury, that's

14   what we just heard about.  When she said how do you trust

15   an investigation with police misconduct and perjury, how

16   do you trust it, you follow the evidence.  When you

17   follow the evidence, the evidence leads to one person,

18   Shawn Drumgold who sits right there.  You've heard about

19   perjury and Tim Callahan feeding information concerning

20   perjury.  Perjury in a murder case carries the penalty of

21   life in prison without the possibility of parole.

22             I want you to consider that when you evaluate

23   the credibility of Tim Callahan and his conduct.

24   Mr. Callahan, please stand up.  Thank you.

25             Ladies and gentlemen, I'm Hugh Curran, and I

have the honor with Ms. Harris to represent

Timothy Callahan.  Our civil justice system is the best

justice system in the world because of people like you,

men and women who bring it to this courtroom when they

walk through that door, the life experiences and their

common sense who are prepared to wait to hear both sides

of the story and all the evidence before they reach any

conclusion, any conclusion in this case.

I submit to you that there's one agreement, and

there's one agreement amongst both parties in this case

that Ricky Evans is a liar.  It's going to be your job to

evaluate Ricky Evans on that stand and evaluate

Ricky Evans' testimony throughout the stage of this

process, the criminal trial, the motions for new trial

and the trial we're here now, Shawn Drumgold vs. Timothy

Callahan and the City of Boston.

I wish I could tell you what Ricky Evans is

going to say when he takes that stand under oath.  I wish

I could.  I wish I could tell you, but you know what, his

story changes every day minute by minute.  There's one

thing that hasn't changed that's consistent.  In 1988 and

1989, the City of Boston was besieged with violence,

record numbers of homicides and shootings and the fact

that men and women like Tim Callahan were entrusted to

diligently investigate those homicides and bring a

1    conclusion to the families of those victims.

2           On August 19, 1988, Tiffany Moore was living at

3    the time on Humboldt Avenue with her mother.  Her mother

4    testified at trial as she had sent her down to

5    South Carolina to live with her sister, and she had

6    returned for a little vacation for a doctor's

7    appointment.  The next day she was scheduled to go back

8    to South Carolina.

9           She left her apartment that night to say

10   goodbye to some friends, and she walked out to the corner

11   of Homestead and Humboldt Avenue, and she was with a

12   group of young girls.  There were older boys at the

13   corner.  She was sitting on a mailbox.  Two to three

14   masked men, depending on the description given by the

15   witnesses at the scene, were wearing either a black

16   Adidas running suit or black clothing, and they were

17   masked, and they snuck up along the Edison plant.

18          You will have an opportunity to see the

19   pictures of this crime scene.  As they snuck up along the

20   Edison plant, these two to three masked gunmen opened

21   fire on a group of kids near the mailbox.

22          Tiffany Moore had her back to these gunmen.

23   Two bullets entered her back.  One struck her in the back

24   of the head killing her.  Tiffany Moore became a record

25   number, the 75th homicide in Suffolk County at that

1    time.

2          Now, Ms. Scapicchio has made a lot of

3    accusations.  There is one thing that does not change

4    throughout this trial.  The plaintiff, Mr. Drumgold, has

5    a burden of proof to prove his case, and she made a lot

6    of promises.  I want you to remember that.  I want you to

7    write them down because at the end of this trial I submit

8    that she cannot meet that burden.

9          She stated about a witness, Tracie Peaks.  I

10   want you to remember because I'm going to touch on this

11   later, she stated that Tracie Peaks testified that

12   Shawn Drumgold came by her house after the shooting and

13   he was wearing a red turtleneck.  A red turtleneck.

14   Absolutely not true, never evidence at any time from any

15   witness in any courtroom anywhere in this country.

16          She talks to you about the trial transcript,

17   and she says in the trial transcript, in the trial

18   transcript that you're going to have to listen to all

19   these parts of the trial transcript.  She doesn't want

20   you to listen to the evidence and where it led and what

21   caused the conviction.  That's why she is highlighting

22   the pain staking process it's going to take to put the

23   trial transcript before you, but that's why we chose each

24   and every one of you because of your patience, because of

25   your intelligence, because of your life experiences to

look and evaluate testimony of witnesses on that stand
under oath.

In October, 1989, Shawn Drumgold and Terrance
Taylor stood at trial before 14 men and women, just like
you, who had the best ability to evaluate the credibility
of the witnesses and the evidence.

Ms. Scapicchio failed to tell you a few things.
She failed to tell you that on August 19, 1988, Detective
Richard Walsh, a seasoned investigator in the Boston
Police homicide responded to the scene and he responded
to the scene to charge and to report to the Suffolk
County District Attorney's Office who was in charge of
all homicide investigations.

You'll hear by statute and by law, the
Suffolk County D.A.'s Office is in charge.  For that
reason they send an Assistant D.A. out to the scene of
every shooting that there is a potential homicide.
You'll hear evidence that Matthew King, an Assistant D.A.
responded that evening and he assisted Detective Richard
Walsh.

Detective Richard Walsh gathered evidence at
the scene.  He interviewed and gathered information from
a myriad of detectives and patrolmen.  He canvassed the
scene of this murder, and he interviewed witnesses from
August 19, 1988 to September 8th, the day this case was

1      presented to the grand jury in Suffolk County.

2             Detective Walsh interviewed 15 witnesses,

3      taking recorded statements, some recorded statements

4      within the presence of the assistant district attorney,

5      and he reported his progress in the investigation to the

6      head of homicide, Francis O'Meara, and he kept him

7      informed because the D.A.'s Office was in charge.

8             In October, 1989, when Terrance Taylor and

9      Shawn Drumgold stood before you, Ms. Scapicchio failed to

10     tell you the evidence, the evidence that this was a

11     retaliatory shooting for a young man by the name of

12     Romero Holliday.  She failed to tell you that Romero

13     Holliday was in the hospital from his shooting within two

14     weeks of the murder of Tiffany Moore, that a witness,

15     Christopher Cousins, took the stand and testified, and he

16     testified that, "I was in that hospital room.

17     Shawn Drumgold was there and Terrance Taylor, and they,

18     Shawn Drumgold and Terrance Taylor, talked to Romero

19     Holliday about retribution, retribution."

20            You'll read the trial transcripts, and you'll

21     see that the intended targets for this shooting were

22     Mervin Reese and Christopher Chaney.  You'll hear

23     evidence that Mervin Reese was at the mailbox within a

24     half hour of the shooting and that Chris Chaney was

25     standing right next to Tiffany Moore.

1             She failed to tell you about

2     Vantrell McPherson, a young woman who knew

3     Shawn Drumgold.  She saw Shawn Drumgold about 6:30 that

4     evening.  What was he wearing?  Black Adidas sweatsuits.

5     Terrance Taylor came up to him, talked and said, "Shawn,

6     you know we have to do this," and off they went down

7     Brookledge Street just a few blocks from the murder of

8     Tiffany Moore.

9             She failed to tell you that seven days after

10    the murder of Tiffany Moore, Detective Richard Walsh had

11    information about two young women who had information

12    about the murder of Tiffany Moore.  These two young

13    women, Tracie Peaks and Mary Alexander, lived at

14    72 Homestead Street.

15            The evidence is clear and undisputed that these

16    two to three masked gun men after they shot ran along the

17    Edison plant, climbed over the fence and headed down

18    Homestead Street, two houses away from that lot and that

19    fence where they climbed over lived Tracie Peaks and

20    Mary Alexander.

21            Tracie Peaks and Mary Alexander were in their

22    home when they heard gunshots.  Mary Alexander had a

23    young child.  Tracie Peaks had a younger sibling who were

24    out on the front porch.  They ran to the porch to get

25    these young children.  Mary Alexander saw two black males

1    coming over the fence.

2         The evidence is one is short, one tall, one

3    dark-skinned, one light-skinned, and they walked right by

4    her house, as close as I am to that witness stand.  She

5    looked at the smaller one, the light-skinned one, and he

6    was putting a gun away in his waistband.

7         Tracie Peaks saw two black males within a

8    minute of the shots fired coming by at the same time.

9    She knew Shawn Drumgold from the neighborhood.  She knew

10   Shawn Drumgold's girlfriend's sister, and she recognized

11   Shawn Drumgold.  Ten days after Richard Walsh went and

12   showed them a photo array.  In the photo array was a

13   picture of Shawn Drumgold.  Tracie Peaks identified

14   Shawn Drumgold.  When Mary Alexander got to the picture

15   of Shawn Drumgold, she picked it up three times and put

16   it down.

17        She testified at trial, "The detective told me

18   to be 100 percent sure," and she talked about the

19   darkness of the photographs, but what she didn't tell you

20   is strategically Shawn Drumgold's lawyer a couple days

21   before the trial started went out to interview

22   Tracie Peaks who testified that Shawn Drumgold that night

23   was wearing black clothing, a black turtleneck and black

24   pants.

25        When he went out there, he had an 8 by 10

glossy photograph of Shawn Drumgold.  He wanted to see if
she was going to be able to identify him at trial, and
she showed the photograph of Shawn Drumgold to
Mary Alexander, the woman who testified that the
detectives told me to be 100 percent sure, the woman who
picked the photograph up three times, and she said,
"That's him, that's the young man who came over the
fence, came by my house and put the gun in his bulge."
What does she testify to at trial?  "I'll never forget
those eyes.  I'll never forget those eyes."

Mary Alexander and Tracie Peaks identified
Shawn Drumgold in front of the jury.  There's another
witness, Eric Johnson, one of the young boys who was at
the mailbox, he testified, "I ran away and I fell down.
I had seen someone get out of a car on Homestead wearing
dark clothing, didn't get a good look at him, just the
shape of his body.  When I hit the ground and got up and
started to run, I did look at the shooters.  I recognized
the shape."  At trial he identified Shawn Drumgold.

Now, Detective Richard Walsh handled this case
and in May to June, beginning June, 1989 Tim Callahan was
especially assigned to this investigation.  You'll hear
evidence a record number of homicides, multiply that with
every time there's a potential death or sudden death, the
homicide detectives have to go to the scene.  There's no

1    question about it, the detectives, homicide detectives in

2    this city were spread thin.

3         The city, in this case, there was a comment,

4    this case, the murder of Tiffany Moore was important to

5    the City of Boston.  It was also important to the Boston

6    Police Department, but to the men and women who served in

7    the homicide division, it was no more important than any

8    other case that they handled, no more important than any

9    other homicide because they answer for those families,

10   and they have to go out there and do their job.

11        Now, Tim Callahan, you'll hear testimony, and

12   it's important that you know that when Tim Callahan gets

13   assigned to this case, they want him to follow up on all

14   the leads and all the information that exists and find

15   new information if it exists.

16        You heard reference to Treas Carter, Chilly.

17   Detective Callahan never knew Ricky Evans before

18   December, 1988, a year before.  You'll hear testimony

19   about Ricky Evans and his cousin Willie being on Elm Hill

20   Ave., a block from where Tiffany Moore was murdered, and

21   how they were on the street together, a New York drug

22   dealer by the name of Chilly.

23        Why?  It's the temperature of the blood in his

24   veins, pulled him off the street at gun point with two of

25   his henchmen, and he brought Ricky Evans up into an

1    apartment on Elm Hill Ave. because he thought that Ricky

2    either did rip him off or was going to rip him off, and

3    he put Ricky and his cousin Willie next to each other in

4    this apartment, took out his gun, put it to the back of

5    Willie's head, pulled the trigger and blew his head off.

6            He then took the gun and turned to Ricky, and

7    he shot, Ricky put up his hand, and it got deflected on

8    his hand, it took off a piece of his ear, and he fell to

9    the ground and he played posse.  The gunman walked over,

10   put the gun to the back of his head, pulled the trigger,

11   and it jammed, and they ran out.  Chilly and his two

12   henchmen ran out.

13           Detective Callahan visited him in the hospital,

14   worked with him and his homicide team and knew him by

15   name.  They did good police work.  They found out there's

16   a Chilly in New York, a drug dealer.  They put together a

17   photo array.  They interviewed other witnesses that knew

18   him and described him.  Ricky Evans picked out the photo

19   of Chilly.  He knew Chilly from the neighborhood, knew

20   who he was.  He left the hospital, and you'll hear

21   testimony, he got out of that area.

22           Ricky was into everything, and you'll hear that

23   from him, dealing drugs, doing things, and he got out.

24   He got out because he knew if he kept, stayed there, he

25   wouldn't last long.

1          Now, Detective Callahan works with Ricky, meets

2     with him.  On May 24th, Ricky Evans testified before the

3     grand jury.  You'll hear evidence from Paul Connolly and

4     from Tim Callahan that Paul Connolly was assigned to this

5     murder case, assistant district attorney with years of

6     experience, previously a criminal defense lawyer, and

7     they worked together to bring justice to Ricky Evans and

8     Willie Evans.  Treas Carter was arrested, indicted and

9     was awaiting trial in Suffolk Superior Court, and these

10     cases were running parallel.  They had the same track.

11     They were both scheduled for trial in September of 1989.

12     There's a lot of allegations here about Tim Callahan and

13     what he did with Ricky Evans.

14          Now is the right time for you to know about

15     Tim Callahan, and the reason you should know about

16     Tim Callahan, he's a man, a person, just like you and me.

17     I invite you to evaluate his credibility, and, yes, the

18     credibility of Ricky Evans.  We encourage you.

19     Tim Callahan is 62 years old, happily married for 26

20     years, five children between the ages of 16 and 26.  Do

21     the math.  He had three young kids at the time he

22     investigated this case on a public servant salary, and

23     they want you to believe that he was a human ATM for

24     Ricky Evans.

25          I submit you will find that not to be credible

1    at all.  Tim Callahan born and raised in the city and

2    educated in the city, graduated in 1971 from Northeastern

3    University.  He joined the police department in 1970

4    after serving for a year on the MBTA police department.

5    He took an oath to protect and serve the citizens of this

6    city, and he did so admirably for 34 years.

7         During the course of his career, he continued

8    his education.  In 1980, he got a master's from Boston

9    State College in urban planning.  In 1988, he went to law

10   school, and he received a law degree in 1993.  I submit

11   to you that Tim Callahan pursued this education because

12   he believed in this city, community policing and he

13   wanted to improve himself not only as a person but also

14   as a police officer.

15        In 1989, when he investigated this case, he

16   brought a wealth of experience and training.  In the

17   1970s, he was promoted to detective.  He has served on

18   almost every single position in the Boston Police

19   Department.  He served as a detective in the intelligence

20   unit.  He served as a detective in the vice control,

21   organized crime, prostitution, sexual assault unit, and

22   the homicide division.

23        He took competitive civil service exams to

24   advance.  In the 1980s, he was named as a sergeant.  Then

25   in 1993, from '88 to '93 he served in homicide; in 1993,

1      he was promoted to lieutenant.  From 1970 until his

2      retirement in 2005, he was in the reserves, Army

3      Reserves.  He served this country for 25 years, 35 years.

4      He was deployed on two occasions to the Middle East, the

5      last time in 2003.

6           Tim Callahan will take that stand, and I

7      encourage you to evaluate his testimony.  He will tell

8      you in 2003, when he was called to testify, he didn't

9      have the benefit of reviewing all of his file.  He didn't

10     have the benefit of the Treas Carter file either.  After

11     he testified, he had that opportunity and he reviewed it.

12     He reviewed it and he saw things that he forgot about.

13          Now, Ricky Evans, in this case, let's not

14     forget, that's what it's about, it's about Ricky Evans

15     vs. Timothy Callahan.  That's what it's about, all right.

16     Ricky Evans, when Tim Callahan took over this case in the

17     end of May, beginning of June, he will tell you that he

18     reviewed the file, the Drumgold file.  He had assigned a

19     patrolmen who had knowledge of that area, a detective,

20     and that detective was assigned to him, and they

21     continued to investigate the case, unfortunately had to

22     respond to other calls, had to testify at other trials,

23     had to deal with other cases as well.

24          From May of 1989, until this trial, he

25     interviewed 45 witnesses, and he conducted numerous tape

1    recorded statements where he and his detective, a

2    partner, will interview a witness.  He will also tell you

3    that he worked closely with the Assistant D.A. in both

4    the Treas Carter case, Paul Connolly and Phil

5    Beauchesne.

6            Now, in June, after the grand jury, the

7    Treas Carter case, Ricky Evans calls him or Timmy called

8    Ricky Evans.  They're having a conversation.  Like a good

9    detective who knows that Ricky Evans, who lived in the

10   area, a block away from the murder, who was out there in

11   the streets and active, like any good detective, he asked

12   him, "What did you hear?  What did you see?  What do you

13   know?"  Ricky Evans started to talk, and when he started

14   to talk, Timothy Callahan will tell you he hears a voice

15   in the back, "Don't talk to the police."

16           Ricky hangs up.  He eventually called Detective

17   Callahan back.  Detective Callahan talks to him on the

18   phone, and he tells him what he knew.  What does

19   Detective Callahan do?  He immediately calls Assistant

20   D.A. Phil Beauchesne, and on June 21st,

21   Detective Callahan brings Ricky Evans in to meet with

22   Phil Beauchesne.  We know that because there was a report

23   drafted.  We don't have that report because it's been

24   lost by the D.A.'s Office.  It's contained in the

25   records.

1          MS. SCAPICCHIO:  Objection, your Honor.

2          THE COURT:  Objection, ladies and gentlemen,

3     there's an objection to the facts as presented by

4     counsel.  You understand that the facts will be yours to

5     determine, so neither side is giving the version of the

6     facts that you ought to accept.  It will be their

7     versions.  You have to decide if the evidence supports

8     it.  Go on, counsel.

9          MR. CURRAN:  You'll hear evidence in the trial

10     transcript there's a reference to the June 21st report.

11     We don't have it; either do they.  It would be your

12     decision to find out what happened to it.

13          After June 21st, and Phil Beauchesne knew about

14     Ricky Evans, Ricky Evans is brought back on August 6th,

15     he was brought back on August 6th to the D.A.'s Office,

16     and he gave a tape recorded statement, a tape recorded

17     statement about what he knew.

18          What Ms. Scapicchio failed to tell you is that

19     the discovery obligations in any criminal case starts and

20     stops with the D.A.'s Office, the D.A.'s Office are the

21     ones that marshal the information, then they determine

22     what information, if any, is turned over to the

23     defendant.  The police obligation is to report to the

24     D.A.'s, and that's what Tim Callahan did.

25          Now, you're going to hear evidence that on

1     September 12th, two weeks before the Tiffany Moore murder

2     and a couple weeks before Treas Carter was scheduled for

3     trial that Tim Callahan got a call from Ricky Evans.

4          Ricky Evans was bouncing around from his

5     girlfriend's house to his stepmother's house, to his

6     brother's house, was all over the place.  He got a call

7     that they found him, that an investigator by the name of

8     Larry Fallon found him in Dorchester and went to his

9     house.

10         Now, Ricky claims that Fallon made some

11    statements to him, "It's not too late to change your

12    mind," things of that nature.  He was spooked, called

13    Callahan, said, "Where I'm staying they won't let me stay

14    here anymore," so Detective Callahan, like any good

15    detective, got right to where he was on September 12th,

16    spoke to him, he had to make a quick decision, which he

17    made, and he took Ricky Evans to a hotel for two reasons,

18    to ensure that this witness is going to be available for

19    the two upcoming murder cases that he's a witness on, and

20    also for safety reasons.

21         You're going to hear a lot of testimony about

22    that.  You're going to hear from Paul Connolly.  Paul

23    Connolly's going to tell you, and he's going to have the

24    luxury of a memo he wrote and put in the file, and he's

25    going to tell you, "I don't remember the specifics, but I

1    remember that we, the district attorney's office,

2    relocated Ricky Evans to a hotel.  We, the district

3    attorney's office, relocated Ricky Evans to a hotel," and

4    he's going to tell you that there were some friends

5    visiting Ricky Evans' family members.  He's going to say,

6    I put that word in facetiously, and he's going to tell

7    you there was a safety and security issue, that the

8    D.A.'s Office knew.

9           Unfortunately you're not going to have the

10   luxury of having Phil Beauchesne, the trial prosecutor,

11   here because of an illness, but you're going to have the

12   luxury of his testimony at the previous hearing in 2003,

13   and he's going to say, "I tried a lot of cases, 19 years

14   ago is a long time, but I have a memory of putting him in

15   the hotel."  You're going to hear from Detective Callahan

16   that that night he went to his supervisors and then he

17   told the D.A. that he put Ricky Evans in the hotel.

18          He made a lot of hay about defense attorneys

19   not being able to cross-examine Ricky Evans on the hotel

20   issue, and I'd submit to you, and I'd ask you to

21   evaluate, do you really think that a seasoned criminal

22   defense attorney is going to cross-examine Ricky Evans

23   about being in a hotel and why if there were safety and

24   security reasons?  Wouldn't you think the inference would

25   be drawn that he might not have gotten here because of

1       the defendants in this case vs. Treas Carter?

2                   MS. SCAPICCHIO:  Objection, your Honor.

3                   MR. CURRAN:  You heard a lot of other issues.

4                   THE COURT:  The same instruction with respect

5       to this.  Go on.  Mr. Curran, you only have a few more

6       minutes.

7                   MR. CURRAN:  I understand, your Honor, I'm

8       wrapping up.  You're going to hear a lot of other

9       evidence about Ricky Evans.  Tim Callahan is going to get

10      on that stand and say, "That night when I put Ricky Evans

11      in the hotel, he had no money for food and he only had

12      the clothing on his back.  I gave him $20."  Is a police

13      officer not supposed to be human?  I can tell you this,

14      he never gave Ricky Evans the money that he claims he

15      gave him like a human ATM, and he didn't give him that

16      $20 to induce any testimony.

17                  You're going to hear a lot about Ricky Evans

18      that the detectives made his cases go away.  Absolutely

19      false.  He took the stand at the last hearing and claimed

20      that he went out with Detective Callahan, not McDonough,

21      Detective Callahan went into the probation in Roxbury

22      District Court where he had cases pending, he never even

23      went into a courtroom, never went in to see a Judge,

24      never saw probation, and that poof, all his cases went

25      away.

1    When we move back and you look at the docket

2 and you look at the trial testimony and he says, "I had

3 my default removed," and you'll see the docket, "I got my

4 defaults removed prior to the trial, that was disclosed

5 to the other side, and I'm scheduled to go back there

6 October 18th after the trial."

7    He went back October 18th, and you're going to

8 see the cases, trespass, possession, and you'll hear

9 testimony about those types of cases in Roxbury District

10 Court, the normal dispositions, dismissed on court costs,

11 community service, continued without a finding, and

12 that's what he got.

13    I want to thank you in advance for the patience

14 and the attention that you're going to give not only to

15 Tim Callahan and to his lawyers but Shawn Drumgold and

16 his lawyers but also to the Judge.  I am confident after

17 you've had the ability to hear all the evidence and then

18 let Judge Gertner instruct you on the law that when you

19 have then heard all the evidence and let Judge Gertner

20 instruct you on the law pertaining to this case that you

21 will find that Shawn Drumgold had a fair trial and that

22 Tim Callahan did not violate any of his constitutional

23 rights.  Thank you.

24    THE COURT:  We'll take a brief morning break,

25 ladies and gentlemen.  All rise for the jury.  We'll be

1    back at noon.  Have your coffee break, snacks.  Leave

2    your notes, please, on your chair.  This is a time not

3    for discussion of the case, this is just to have a coffee

4    break.  Go on.

5                  (A recess was taken.)

6                  THE CLERK:  All rise for the jury.

7                  THE COURT:  You can be seated.  Call your first

8    witness.

9                  MS. SCAPICCHIO:  Thank you, your Honor.

10    Plaintiff calls Ricky Evans.

11                  RICKY LEE EVANS, having been duly sworn by

12    the Clerk, testified as follows:

13                        DIRECT EXAMINATION

14    BY MS. SCAPICCHIO:

15    Q.  Good afternoon, Mr. Evans.

16    A.  Good afternoon.

17    Q.  In a loud, clear voice, can you please state your

18    name for the jurors and the Court.

19    A.  Ricky Lee Evans.

20    Q.  Could you spell your last name, Mr. Evans?

21    A.  Evans, E-v-a-n-s.

22    Q.  How old are you, Mr. Evans?

23    A.  Forty.

24    Q.  Do you have any children?

25    A.  Yes.

1    Q.   How many children do you have?

2    A.   Two.

3    Q.   How old are they?

4    A.   21 and 11.

5    Q.   Do you have boys or girl?

6    A.   One boy, one girl.

7    Q.   And is your daughter 21?

8    A.   Yes.

9    Q.   And how old is your son?

10   A.   Eleven.

11   Q.   Okay.  And where do you currently live, Mr. Evans?

12   A.   Long Island Transitional Housing.

13   Q.   Say that again.

14   A.   Long Island Transitional Housing.

15   Q.   Long Island Transitional Housing?

16   A.   Yes.

17   Q.   Is that a shelter?

18   A.   Yes.

19   Q.   How long have you lived at Long Island Transitional

20   Shelter?

21   A.   Two months.

22   Q.   And I'm going to direct your attention, Mr. Evans,

23   back to December of 1988.  Were you the victim of a crime

24   in December of 1988, Mr. Evans?

25   A.   Yes.

1    Q.  Can you tell the jury what crime you were a victim

2    of?

3    A.  I was shot, and my cousin was killed.

4    Q.  Okay.  Let me just take that in small pieces, if you

5    don't mind.  Could you tell the jury first where you were

6    living back in 1988.

7    A.  Elm Hill.

8    Q.  Elm Hill?

9    A.  Yes.

10   Q.  And what section, is that in Boston?

11   A.  Yes.

12   Q.  And what section of Boston is Elm Hill?

13   A.  Grove Hall.

14   Q.  Grove Hall?

15   A.  Yes.

16   Q.  And had you grown up in the area of Grove Hall?

17   A.  Yes.

18   Q.  And did you live in that area prior to 1988?

19   A.  Yes.

20   Q.  Let me ask you this, when you say you grew up in the

21   Grove Hall area, do you have brothers and sisters?

22   A.  Yes.

23   Q.  And do they live or did they live in the Grove Hall

24   area in 1988?

25   A.  Yes.

1    Q.   Okay.  Now, directing your attention to December of

2    1988, you had indicated that you were the victim of a

3    crime, a shooting; is that right?

4    A.   Yes.

5    Q.   Okay.  Can you tell the jurors where you were when

6    you were shot and your cousin was killed?

7    A.   I was up at actually we went up at 118 Elm Hill.

8    Q.   118 Elm Hill Ave.?

9    A.   Yes.

10   Q.   And that's in Roxbury?

11   A.   Yes.

12   Q.   Grove Hall area?

13   A.   Yes.

14   Q.   Can you tell the jurors what happened in that case

15   when you were a crime victim?

16   A.   Yes.

17   Q.   Could you explain that to them, Mr. Evans?

18   A.   What happened that night?

19   Q.   What happened that night that you got shot and your

20   cousin was killed?

21   A.   Me and my cousin, we were standing at 118 Elm Hill on

22   the first staircase, and three guys walked in the

23   hallway, so we saw the guys a couple times before walking

24   on the street, so we didn't think anything of it, so they

25   walked in the hallway where we was at, and one of them

1    had grabbed my cousin, Roy, and had put a machine gun to

2    his back, and one of the other guys had put a

3    semiautomatic out and put it to my back, and they brought

4    us out the hallway from 118 Elm Hill, and they walked us

5    from 118 across Sonoma Street down four more buildings up

6    to the second floor.

7    Q.  Do you know what building you went into on the second

8    floor, Mr. Evans?

9    A.  Yes, 102 Elm Hill.

10   Q.  102 Elm Hill?

11   A.  Yes.

12   Q.  When you say you went in, who was there?

13   A.  It was me, Roy, my cousin and three guys, the one

14   that did the shooting.

15   Q.  Okay.  What happened when they brought you to 102 Elm

16   Hill Ave.?

17   A.  They put up to the second floor and pushed us inside

18   the apartment.

19   Q.  And did you say they pushed you inside an

20   apartment?

21   A.  Yes.

22   Q.  Were you taken at gun point at that point?

23   A.  Yes.

24   Q.  And that was by three people?

25   A.  Yes.

Q.   Okay.  Can you tell the jurors what happened next?

A.   They pushed us inside the apartment of the second floor at 102, and Roy was standing by the door.  He was standing by the door 'cause when you open the door, it opens up, like it comes in, so after they pushed us inside the apartment, one of the guys was standing, he was holding Roy, and my back was like facing the door, and my back was facing like a room door there, and I looked at Roy -- no, the guy that had the gun to Roy's head, I looked over my shoulder to these girls that were standing behind me.

Q.   Can you slow down a minute.  You said that there was a guy that had a gun to Roy's head?

A.   Yes.

Q.   And that guy was directly behind you?

A.   No, there were two girls behind me that lived in the apartment --

Q.   Okay.

A.   -- that was standing behind me.

Q.   What happened next?

A.   And so the guy looked over my shoulder, and he asked, he was like, "Are these the ones?"  And I don't know what she said behind my back, but by this time, me and Roy, we were at least two feet from each other, and I looked at Roy, and the next thing you know, I seen his brains come

1       out of the side of his head.

2       Q.   When you say you saw his brains come out of the side

3       of his head, what happened to Roy?

4       A.   The guy shot Roy and shot him in the head.

5       Q.   Somebody shot him in the head?

6       A.   Yes.

7       Q.   Did you know the person that shot your cousin Roy in

8       the head?

9       A.   Yes.

10      Q.   What was his name, Mr. Evans?

11      A.   Chilly, Chilly Carter.

12      Q.   Chilly Carter?

13      A.   Chilly.

14      Q.   After that what happened?

15      A.   He ran, he ran after he shot Roy, and Roy fell in

16      between in front of the door.  He ran up to me, he ran up

17      to me, and he was about a foot away from me, and he threw

18      the gun to my forehead, and he had pulled the trigger,

19      and when he pulled the trigger, I threw up my hand like

20      this, and the bullet entered my left hand and shattered

21      my finger, the second finger, and it ricocheted it off

22      this finger here.

23      Q.   When you say this finger here, can you tell the

24      jurors which finger that is?

25      A.   Middle finger.

1    Q.  Okay.

2    A.  And it ricocheted off that bone and came up the back

3    of my head right there and it tore off a piece of my

4    ear.

5    Q.  And as a result of being shot, did something happen

6    to you?  Did you fall down?

7    A.  Yes, I fell, and the guy walked -- when I fell, I

8    fell backwards, and I laid -- I landed on my stomach, and

9    the guy walked up behind me and put the gun to the back

10   of my head and tried to pull the trigger, but the gun had

11   jammed.

12   Q.  Slow down for one minute.  After you were shot in the

13   head and you put your hands up to protect yourself, then

14   you fell down, there was somebody who came and tried to

15   shoot you again?

16   A.  Yes.

17   Q.  Okay.  And at that point did you say that the gun

18   jammed?

19   A.  Yes, the gun jammed.

20   Q.  And then what's the next thing you remember

21   happening?

22   A.  The next thing I remember, I hear them running out

23   the -- one of the guys yelled to the other guy, "Come on,

24   let's go," and by this time they had moved Roy, the other

25   two guys had moved Roy out from in front of the door, and

1    the guy Chilly, the one that did the shooting, he had ran

2    out behind him, had ran down the hall and ran down the

3    downstairs.

4    Q.  And as a result of being shot yourself and your

5    cousin Roy being shot, did the police respond to

6    102 Elm Hill Ave.?

7    A.  Yes.

8    Q.  And were you taken somewhere as a result of your

9    injuries?

10   A.  I was taken to Boston Medical Center.

11   Q.  Okay.  And when you were at the Boston Medical

12   Center, Mr. Evans, did members of the Boston Police

13   Department come to talk to you?

14   A.  Yes.

15   Q.  Okay.  And did you cooperate with them?

16   A.  Yes.

17   Q.  Okay.  And at some point were you released from the

18   Boston Medical Center?

19   A.  Yes.

20   Q.  And did you have to have any operations or do you

21   remember how long you were there?

22   A.  I think I left the next day.

23   Q.  You left the next day?

24   A.  Yes, the next day or the day after that.

25   Q.  And at that point in time, you had given your name to

1     the police; is that right?

2     A.  Yes.

3     Q.  Okay.  And you had cooperated with them about who had

4     shot you and who had shot your cousin; is that right?

5     A.  Yes.

6     Q.  Okay.  Now, at some point after that first night, did

7     you meet Detective Tim Callahan?

8     A.  Yes, after that, yes.

9     Q.  Can you tell the jury when it was you first met

10    Detective Timothy Callahan?

11    A.  It was about going -- it was about the investigation

12    with me and my cousin.

13    Q.  Okay.  So you met him in conjunction -- was he one of

14    the detectives that was working on your shooting?

15    A.  Yes.

16    Q.  And you were a victim in that case; is that right?

17    A.  Yes.

18    Q.  Okay.  And so when you first met Detective Callahan,

19    were you talking to him about your experience as a victim

20    in the Treas Carter case?

21    A.  Yes.

22    Q.  Okay.  And do you remember when you met with

23    Detective Callahan whether or not you were ever shown --

24    well, in conjunction with the Treas Carter case, were you

25    ever shown any photographs?  Do you remember being shown

1       photographs?

2       A.   Of Treas Carter, yes.

3       Q.   Do you remember picking out a photo?

4       A.   Yes.

5       Q.   Whose photo did you pick out, Mr. Evans?

6       A.   Treas Carter, Chilly.

7       Q.   And when you picked out that photo, do you remember

8       whether or not you signed it?

9       A.   I don't remember.

10      Q.   Okay.  And that was when Detective -- do you remember

11      whether or not it was Detective Callahan who was working

12      on the case or not working on the case?

13      A.   Yes, Mr. Callahan was there that night.

14      Q.   After you picked out Treas Carter's picture, did you

15      testify in front of the grand jury on the Treas Carter

16      murder case?

17      A.   I think I did, yes.

18      Q.   Okay.  And was Detective Callahan working on the case

19      at that time?

20      A.   Yes, I think he was.

21      Q.   Okay.  And the time that you got shot is some time

22      around December of 1988; is that right?

23      A.   Yes.

24      Q.   And from December of '88 through June of '89, were

25      you working together with Detective Callahan in

1    conjunction with the Treas Carter case?

2    A.  Yes, I think so.

3    Q.  Okay.  And did you respond when they called you to

4    talk about the case or things like that?

5    A.  Yes.

6    Q.  Okay.  And in conjunction with the Treas Carter case,

7    when you left the hospital that day, do you remember

8    anyone from the Boston Police Department ever asking you

9    if you wanted to stay at a hotel or if you needed any

10   protection as a result of the Treas Carter case?

11   A.  No.

12   Q.  Do you remember, Mr. Evans, as a result of your

13   cooperation in the Treas Carter case whether or not

14   Detective Callahan ever gave you any money?

15   A.  After the Treas case?

16   Q.  Yes.

17   A.  Afterwards?

18   Q.  No, no, no, while he was working on the Treas Carter

19   case and before the Tiffany Moore case, did

20   Detective Callahan give you any money when you were just

21   dealing with the Treas Carter case?

22   A.  No, I don't remember.  I don't remember it.

23   Q.  He didn't give you any money?

24   A.  I don't recall at the time.

25   Q.  Okay.  Now, do you remember when you were working on

1    the Treas Carter case and when you were a victim in the

2    Treas Carter case when Detective Callahan was

3    investigating that case, do you remember Detective

4    Callahan making any promises to you regarding any of your

5    pending cases on the Treas Carter case?

6    A.  No.

7    Q.  Okay.  Now, at the time that you were shot, Ricky,

8    you had some other outstanding problems with the law; is

9    that fair to say?

10   A.  Yes.

11   Q.  Did you have some pending cases in the Roxbury

12   District Court?

13   A.  Yes.

14   Q.  Do you remember what types of cases you had in the

15   Roxbury District Court back in December of 1988?

16   A.  I think it was stolen property.  I don't remember all

17   of them.

18   Q.  Okay.  Do you remember that you had a number of cases

19   pending at the Roxbury District Court back in December of

20   1988?

21   A.  Yes.

22   Q.  And in conjunction with you being a victim in the

23   Treas Carter case and Detective Callahan working on that

24   case, did Detective Callahan ever make any promises to

25   you about assistance on your pending cases in Roxbury

1    when you were just dealing with the Treas Carter case?

2              MS. HARRIS:  May I object to the leading, your

3    Honor?

4              THE COURT:  Sustained.

5    Q.  Well, let me ask you this, when you were talking to

6    Detective Callahan about the Treas Carter case, did he

7    ever promise you anything?

8              MS. HARRIS:  Objection.

9              THE COURT:  Overruled.

10   A.  No.

11   Q.  But you still had the pending cases at the time; is

12   that right?

13   A.  Yes.

14   Q.  Now, some time in June of 1989 -- well, let me ask

15   you this, when do you remember first speaking to

16   Detective Callahan about the Tiffany Moore murder?

17   A.  I think it was on Chaney Street.

18   Q.  At 40 Chaney Street?

19   A.  Yes.

20   Q.  And what do you remember about that conversation?  Do

21   you remember, first of all, whether or not it was in

22   person or on the phone?

23             MS. HARRIS:  Objection.

24             THE COURT:  Overruled.

25   A.  It was in person.

1    Q.  It was in person?

2    A.  Yes.

3    Q.  And what do you remember Detective Callahan saying to

4    you, if anything, about the Tiffany Moore case?

5    A.  What I can remember is he was at 40 Chaney one day,

6    and he hold up some pictures, and the pictures consisted

7    of Shawn Drumgold, I think Terrance Taylor, I'm not too

8    sure and four other guys.

9    Q.  Let me stop you there, Mr. Evans.  I'm talking about

10   the very first time that you had any conversation with

11   Detective Callahan regarding the Tiffany Moore murder.

12            MS. HARRIS:  Objection.

13            THE COURT:  Overruled.  Go on.

14   Q.  Do you ever remember -- first of all, do you have a

15   memory of the very first time you spoke to Detective

16   Callahan about the Tiffany Moore case?

17   A.  I think it was on 40 Chaney Street, yes.

18   Q.  And with respect to your conversation with Detective

19   Callahan, do you ever remember having a conversation with

20   him on the phone about Tiffany Moore and someone in the

21   background yelling, "Don't talk to the cops"?

22            MR. ROACHE:  Objection.

23            MS. HARRIS:  Objection.

24            THE COURT:  Overruled.

25   Q.  Do you have a memory of that ever happening?

1      A.   I don't remember.

2      Q.   You don't remember that happening?

3      A.   No.

4      Q.   Okay.  Now, at some point in time, when you

5      began -- was there a time you began to speak to Detective

6      Callahan about the Tiffany Moore murder?

7      A.   I think it was on Chaney Street.

8      Q.   Okay.  And with respect to the photographs, I think

9      you said there was a photograph of Shawn Drumgold, you

10     think there was a photograph of Terrance Taylor, and do

11     you remember a third person being in that photo array?

12     A.   I remember there was six photos.

13     Q.   Not the Chilly Carter one, we're talking about the

14     Shawn Drumgold.

15            MR. ROACHE:  Objection.

16            THE COURT:  Rephrase the question.

17     Q.   Sure.  Do you remember ever being shown a photograph

18     of Theron Davis?

19            MS. HARRIS:  Objection.  Your Honor.

20     A.   Yes.

21            THE COURT:  Overruled, go on.

22     Q.   Do you remember Detective Callahan showing you a

23     photograph of Theron Davis?

24     A.   Yes.

25     Q.   Okay.  And do you remember together with the

1    photograph of Theron Davis I think you told us there was

2    a photograph of Shawn Drumgold and a photograph of you

3    think Terrance Taylor; is that right?

4    A.   Yes.

5    Q.   Okay.  And can you tell the jury what conversation

6    you had with Detective Callahan when he pulled out those

7    three photos and told you -- well, what conversation did

8    you have about them?

9    A.   Yes.  He was in the park one day, one night, and he

10   asked me if I could pick out the person that did the

11   shooting on Tiffany Moore, and I told him that everybody

12   in the neighborhood, you know, said it was, you know,

13   Theron.

14   Q.   And who was Theron?

15   A.   Apple.

16   Q.   And he was one of the photographs that were in the

17   three photographs?

18   A.   Yes.

19   Q.   Okay.

20   A.   And he -- it was like he was possessed with

21   Shawn Drumgold because, I mean, I picked out Apple's

22   photo.

23   Q.   Hold on right there.  When he put the three photos

24   down and asked you whether or not you recognized anyone

25   or what you knew about them, is it your testimony that

1       you told him everybody in the neighborhood said

2       Theron Davis did it?

3              MS. HARRIS:  Your Honor, objection.

4              MR. ROACHE:  Your Honor, sidebar, please.

5              THE COURT:  No.  Go on.

6       Q.  And what was Detective Callahan's reaction to you

7       when you pointed to the picture of Theron Davis and said

8       that's the person that everybody in the neighborhood said

9       committed this homicide?

10      A.  He was like the only person that he wanted to hear

11      about was Mr. Drumgold.  He didn't want -- it was like he

12      didn't want to hear anything about Apple, he wanted to

13      finger Shawn.

14      Q.  Okay.  Let me ask you not what your opinion was about

15      what Detective Callahan did, but tell me physically what

16      he did to make you come to the conclusion that he wanted

17      you to pick out Shawn Drumgold.  What did

18      Detective Callahan do, if anything?

19      A.  I don't recall.

20      Q.  Okay.  When he showed you those three photographs and

21      you pointed to the photograph of Theron Davis, do you

22      remember any conversation that you had with

23      Detective Callahan?

24      A.  Not that I recall.

25      Q.  Okay.  When you told him it was Theron Davis, you

1    told us that you said he wanted -- he was possessed?

2    A.  Because --

3            MS. HARRIS:  Objection.  Is there a question?

4            THE COURT:  There's no question.  Sustained.

5    Put a question to him.

6    Q.  You said he was possessed.  What did he do to make

7    you come to the conclusion that he was possessed with

8    Shawn Drumgold?

9    A.  I showed him the picture of Theron that was on the

10   table, and I said, "This is the picture everybody in the

11   neighborhood is saying that did the shooting," and he was

12   like, "I don't think so.  If I'm correct," he was like,

13   "I don't think, this is the picture here."  He kept

14   pointing at the picture of Shawn.

15   Q.  Stop right there.  So when you told him that this is

16   the guy, Theron Davis, that everyone in the neighborhood

17   is saying committed this homicide, you recall

18   Detective Callahan pointing to Shawn Drumgold's

19   photograph?

20   A.  Yes.

21   Q.  And what do you recall him saying about

22   Shawn Drumgold's photograph?

23   A.  I don't actually remember what he said.  I don't

24   remember word for word what he said.

25   Q.  Did you just tell us you thought he said something

1      along the lines of, "This is the guy who did it"?

2              MR. ROACHE:  Objection.

3      A.  He was pointing --

4              THE COURT:  Wait, wait.  When there's an

5      objection, you don't answer.  There's an objection.  Can

6      you rephrase the question?  I understand the objection.

7      Go on.

8      Q.  Sure.  What made you believe or come to the

9      conclusion that -- what physically did Detective Callahan

10     do to Shawn Drumgold's picture to draw it to your

11     attention at that time?

12     A.  He pointed at it.

13     Q.  He pointed at it?

14     A.  Yes.

15     Q.  And when Detective Callahan pointed at the photograph

16     of Shawn Drumgold, what's your best memory of what

17     Detective Callahan said?

18     A.  I don't remember.  I don't recall the conversation.

19     Q.  Okay.  After Detective Callahan said whatever he

20     said, did you have some understanding of what

21     Detective Callahan, why Detective Callahan was pointing

22     at that picture?

23             MS. HARRIS:  Objection.

24             MR. ROACHE:  Objection.

25             THE COURT:  Sustained.

1    Q.  Well, let me ask you this:  Did you talk again to

2    Detective Callahan about Theron Davis?

3    A.  About Theron, I think I did, but I'm not sure.

4    Q.  Okay.  After Detective Callahan pointed to the

5    photograph of Shawn Drumgold and after he made whatever

6    comment he made that you can't remember, do you have a

7    memory, sir, of whether or not you went somewhere

8    different?  It's a bad question.  Let me start again.

9    After Detective Callahan pointed to the photograph of

10   Shawn Drumgold, did you have any further discussion with

11   him about the murder of Tiffany Moore and

12   Shawn Drumgold's alleged involvement?

13   A.  Alleged involvement?

14   Q.  At that time?

15   A.  Not that I can remember, no.

16   Q.  So was there another occasion where you had some

17   conversation with Detective Callahan about

18   Shawn Drumgold's involvement?

19   A.  I can remember he had mentioned to me about Shawn, he

20   was in a white car.

21   Q.  In a white car?

22   A.  Yes.

23   Q.  Okay.  Let me back you up for one second because it's

24   probably getting confusing.  You testified at the

25   criminal trial in this case; do you remember that?

1 A. Yes.

2 Q. And you testified, according to the transcript, that

3 you saw Shawn Drumgold prior to the murder of

4 Tiffany Moore together with Terrance Taylor; do you

5 remember that testimony?

6     MS. HARRIS: Objection.

7 A. Yes.

8     THE COURT: Overruled.

9 Q. Okay. And did you ever see Shawn Drumgold together

10 with Terrance Taylor prior to the murder of

11 Tiffany Moore?

12 A. No.

13 Q. And you testified at the criminal trial that you saw

14 Shawn Drumgold in a white car. Back on August 19th of

15 1988, did you ever see Shawn Drumgold in a white car in

16 August of 1988?

17 A. No.

18 Q. Where did you get the information, Mr. Evans,

19 regarding Shawn Drumgold in a white car?

20     MS. HARRIS: Objection.

21     THE COURT: Overruled.

22 A. I received it from Mr. Callahan.

23 Q. What do you mean you received it from Mr. Callahan?

24 A. He would say things, but he would say things around

25 me but he wouldn't say directly like, for instance, about

1   the white car, he said Shawn must have been driving the

2   white car.

3   Q.  So, in front of you Detective Callahan said Shawn and

4   Terrance were in a white car?

5   A.  Yeah.

6   Q.  And that was on the night of -- referring to the

7   night of August 19, 1988?

8   A.  Yes.

9   Q.  Okay.  And where did these conversations take place,

10  Mr. Evans?

11  A.  I think it was on 40 Chaney Street.  I'm not sure.

12  Q.  At some point did you move from 40 Chaney Street to

13  the Howard Johnson's?

14  A.  Yes.

15  Q.  Okay.  And was that some time after you began

16  discussing the Tiffany Moore murder?

17  A.  Yes.

18  Q.  And the photographs with Detective Callahan?

19  A.  Yes.

20  Q.  Okay.  So, some time after Detective Callahan showed

21  you those three photos and some time after you had

22  discussions about the white car with Detective

23  Callahan?

24          MS. HARRIS:  I object to the leading, your

25  Honor.

1          THE COURT:  Sustained.  Actually, overruled.

2     You can situate this and then ask a question.

3          MR. CURRAN:  Can we get some time frames,

4     Judge, as opposed to after?

5     Q.  I don't know the exact time frame.  Let me clear this

6     up.  Some time after you had the conversations with

7     Detective Callahan about the photos and some time after

8     you had the conversations with Detective Callahan about

9     Shawn being in a white car, did you arrive at the

10    Howard Johnson's?

11    A.  Not right afterwards.

12    Q.  Okay.  But how long -- can you give us a time frame

13    how long after you started to talk about the

14    Shawn Drumgold case with Detective Callahan and he was

15    giving you that information that you ended up at the

16    Howard Johnson's?

17    A.  When I moved from Elm Hill, I moved to Dorchester.

18    Q.  Okay.

19    A.  And I had a few conversations with Callahan during

20    that time, but I don't remember what the conversation was

21    about.

22    Q.  That's not the question, it was probably a poor

23    question.  I'm just trying to find in reference to the

24    time Callahan showed you those three photos and pointed

25    to Shawn's photo and said, "This is the guy" and then he

1    told you about the white car, do you know how long after

2    that you ended up at the Howard Johnson's?

3    A.   Not long.

4    Q.   Not long, okay.

5    A.   Not long.

6    Q.   Was it a matter of days, was it a matter of weeks, do

7    you know?

8    A.   It could have been a week.

9    Q.   Okay.

10   A.   Could have been a week.  I'm not sure.

11   Q.   And at the time that you went to the

12   Howard Johnson's, how did you get there?  Who brought you

13   there?

14   A.   Mr. Callahan.

15   Q.   And at the time that Mr. Callahan brought you to the

16   Howard Johnson's, did you have a place to live before he

17   brought you to the Howard Johnson's?

18   A.   No.

19   Q.   Where were you living at that time?

20   A.   At that time I was sleeping wherever I possibly

21   could.

22   Q.   You were sleeping wherever you possibly could?

23   A.   Yes.

24   Q.   And do you remember any of the places you were

25   sleeping back in 1989 before you went to the

1 Howard Johnson's?

2 A. I was just staying anywhere I could stay.  I didn't

3 have a specific place to stay.

4 Q. Okay.  And when you got to the Howard Johnson's with

5 Detective Callahan, did you get a room?

6 A. Yes.

7 Q. Did you pay for it?

8 A. No.

9 Q. Do you know who did?

10 A. No.

11 Q. Okay.  Who signed you into the hotel?

12 A. Mr. Callahan.

13 Q. And do you remember where your room was?

14 A. It was on the fifth floor.

15 Q. On the fifth floor?

16 A. Yes.

17 Q. Okay.  Did Detective Callahan take you up to your

18 room?

19 A. Yes.

20 Q. Okay.  And was there ever a police officer stationed

21 outside your room?

22 A. No.

23 Q. Did Detective Callahan give you any instructions when

24 you were taken to the Howard Johnson's?

25 A. No.

1    Q.  Did he ever tell you not to go back to your

2    neighborhood?

3    A.  No.

4    Q.  Did he ever tell you not to contact any family

5    members?

6    A.  No.

7    Q.  Did he ever tell you not to associate with any

8    friends in Dorchester or Roxbury?

9              MR. ROACHE:  I object.

10             THE COURT:  She's already been through it.

11   Overruled.  Go on.

12   Q.  Did he ever tell you not to associate with any

13   friends from Roxbury or Dorchester?

14             MR. CURRAN:  Objection.

15             THE COURT:  Overruled.

16   A.  No.

17   Q.  How did you pay for your meals, Mr. Evans, when you

18   were at the Howard Johnson's?

19   A.  Just went to the restaurant and ordered whatever I

20   wanted.

21   Q.  Can you explain to the jurors what do you mean by

22   went to the restaurant, was there a restaurant at the

23   hotel?

24   A.  Yes, there was a Howard Johnson's, and instead of

25   going outside, you just walk down through the hallway

1    into the big restaurant.

2    Q.  Okay.  So inside the hotel you could come down from

3    your room and enter a restaurant?

4    A.  Go through a little hall and then you enter the

5    restaurant.

6    Q.  And is that where you -- let me ask you, where did

7    you eat your meals when you staying at the

8    Howard Johnson's?

9    A.  The restaurant.

10    Q.  Did you pay for your meals when you were staying at

11    the Howard Johnson's?

12    A.  No.

13    Q.  How did that work?

14    A.  I would -- whenever I wanted to eat or anything, I

15    just go and order what I want, and when I ordered, I

16    signed, got a receipt, and that was it.

17    Q.  Did you sign it to your room?

18    A.  No.

19    Q.  You just signed it?

20    A.  Just signed it.

21    Q.  And did anyone ever then come and ask you to pay your

22    bill?

23    A.  No.

24    Q.  Okay.  How many meals would you eat at the restaurant

25    at the Howard Johnson's when you were staying there?

1    A.  As many as I wanted.

2    Q.  I'm sorry?

3    A.  As many as I wanted.

4    Q.  As many as you wanted?

5    A.  Yes.

6    Q.  So you could eat breakfast, lunch and dinner; is that

7    right?

8    A.  Yes.

9    Q.  Did Detective Callahan place any restrictions on you

10   about how much money you could spend at the restaurant?

11   A.  No.

12   Q.  Did you have a limit of $20 a day, $30 a day, $40 a

13   day, anything like that?

14   A.  No, I didn't.

15   Q.  Were you told that you could eat alone, or were you

16   allowed to bring friends?

17   A.  I could bring whoever I wanted.

18   Q.  What do you mean by that?

19   A.  If I wanted to take somebody out for dinner or lunch

20   or anything, I just go to the hotel and just go down to

21   the restaurant, order whatever I wanted.

22   Q.  And how would you pay for it, Mr. Evans?

23   A.  I would sign for it.

24   Q.  Just sign it?

25   A.  Just sign it.

1      Q.   And did anyone ever ask you to pay for those bills,

2      the ones where your friends came to the restaurant?

3      A.   Never.

4      Q.   Did you ever have any family members over to your

5      hotel room?

6      A.   Yes.

7      Q.   On how many occasions, Mr. Evans, did you have family

8      members come to your hotel room?

9      A.   It was quite a few times.

10     Q.   Okay.  And when they were at the hotel room, would

11     you treat them to dinner as well?

12     A.   Yes.

13     Q.   Okay.  And during that time period, did

14     Detective Callahan ever come back to you and say stop

15     spending all this money?

16     A.   No.

17     Q.   Did he ever tell you don't take people out to the

18     restaurant?

19     A.   No.

20     Q.   Did he ever tell you not to associate with the people

21     in the neighborhood and treat them to dinner?

22     A.   No.

23     Q.   Now, while you were in the hotel at the

24     Howard Johnson's, did you ever have any conversations

25     with Detective Callahan?

1      A.   I think, if I'm not mistaken, he came to my room

2      once, and that's when we was checking in.  Whenever me

3      and Mr. Callahan met up again, we would meet in the

4      restaurant.

5      Q.   So he wouldn't come up to your room, you would meet

6      him down in the restaurant?

7      A.   Yes.

8      Q.   How would you know that Detective Callahan was there

9      at the hotel?

10     A.   He would either call or have the person downstairs in

11     the lobby would call.

12     Q.   So somebody would call your room and tell you

13     Detective Callahan is down there?

14     A.   Yes.

15     Q.   And you would come down?

16     A.   Yes.

17     Q.   And how many occasions do you remember meeting

18     Detective Callahan in the restaurant area of the

19     Howard Johnson's?

20     A.   Quite a few times.

21     Q.   Okay.  And when you met with Detective Callahan in

22     the restaurant area of the Howard Johnson's, did you pay

23     that bill?

24     A.   No.

25     Q.   Who paid that bill?

1      A.   I have no idea.

2      Q.   You don't know.  But nobody ever asked you to pay for

3      whatever you ate while you were talking to

4      Detective Callahan?

5      A.   Never.

6      Q.   And just for the jury's information because I forgot

7      to ask, where was the Howard Johnson's?

8      A.   It was right off Boston Street.

9      Q.   Right off Boston Street, the old expressway?

10      A.   Yes, the old expressway.

11      Q.   And do you remember approximately when you got to the

12      Howard Johnson's?  Do you have a time frame at all of

13      when you got to the Howard Johnson's other than some time

14      after you talked to Detective Callahan and you pointed to

15      the picture of Shawn Drumgold?

16      A.   No, I don't.

17      Q.   Okay.  Now, while you were at the Howard Johnson's,

18      did Detective Callahan ever give you any money?

19      A.   Yes.

20      Q.   Can you tell the jurors how it would be that

21      Detective Callahan would give you money?

22      A.   If I needed anything, the only thing I do is call

23      him, and he would come and have somebody call me

24      upstairs, and I would go downstairs to the lobby, and I

25      would meet him in the lobby or in the restaurant next

1        door, and he would just give it to me.

2        Q.  So Detective Callahan would meet you and give you

3        money?

4        A.  Yes.

5        Q.  How much money would he give you, Ricky?

6        A.  $40, $45.

7        Q.  Okay.  And how often would Detective Callahan give

8        you $40 or $45?

9        A.  Whenever I needed it.

10               THE JUROR:  I'm sorry, your Honor, I didn't

11       hear that answer.

12               THE COURT:  He said whenever I needed it is

13       what he said.

14       Q.  Whenever you needed it?

15       A.  Yes.

16       Q.  Okay.  And how often would you need money while you

17       were staying at the Howard Johnson's?

18       A.  If I needed anything or if I ran out of money, I

19       would just call him.

20       Q.  Well, did you have a job when you were staying at the

21       Howard Johnson's?

22       A.  Yes.

23       Q.  Okay.  And what types of things would you spend the

24       money on that Detective Callahan gave you while you were

25       staying at the Howard Johnson's?

1    A.   Sneakers.

2    Q.   Sneakers?

3    A.   Yes, sneakers, outfits, whatever I needed, whatever I

4    needed to buy.

5    Q.   So you would buy clothes or sneakers or whatever you

6    wanted with the money?

7    A.   Yes.

8    Q.   Did Detective Callahan ever say anything to you when

9    he gave you this money?

10   A.   No.

11   Q.   Okay.  Do you have an idea or what's your best memory

12   as to how many times Detective Callahan gave you money

13   while you were staying at the Howard Johnson's?

14   A.   I was at the Howard Johnson's about eight months, and

15   I can't recall how many times he actually brought

16   money.

17   Q.   Okay.  Now, let's talk a little bit about the

18   conversations that you would have with Detective Callahan

19   in the restaurant downstairs at the Howard Johnson's

20   right on Boston Street.  What types of things would you

21   talk about with Detective Callahan while you were in the

22   restaurant at the Howard Johnson's?

23   A.   I would meet him where we usually meet at, where we

24   usually meet at when you come downstairs, you walk in the

25   hallway, and then you go into the restaurant, there was a

1    table sitting right to the side, that's where I usually

2    meet him at, and he could be sitting there.  It's usually

3    three of us.

4    Q.  Stop right there.  When you say three of us, do you

5    remember who the third person was, it was you, Detective

6    Callahan and who else?

7    A.  Mr. McDonough.

8    Q.  Mr. McDonough?

9    A.  Yes.

10   Q.  So the three of you were sitting in the restaurant

11   downstairs at the Howard Johnson's.  What were you

12   discussing?

13   A.  They wouldn't -- they wouldn't directly say it to

14   me.

15   Q.  Wouldn't say what to you, Mr. Evans?

16   A.  They would have conversations like amongst

17   themselves.

18   Q.  Conversations about what?  What was the topic of the

19   conversations that Detective Callahan and

20   Detective McDonough were having in front of you at the

21   Howard Johnson's on Boston Street?

22   A.  About Shawn, Terrance, guns.

23   Q.  Okay.  Let's take them one at a time.  What do you

24   remember Detective Callahan saying to you about guns?

25            MR. ROACHE:  Objection.

1              THE COURT:  Overruled.  Overruled.  Go on.

2    Q.  What do you remember, Ricky, Detective Callahan

3    saying to you about guns?

4    A.  We would sit there, he wouldn't directly say it to

5    me, he would say it to Mr. McDonough, but he was like,

6    "Yeah, Shawn had the silver gun and Terrance had the

7    black gun."

8    Q.  Stop right there.  So, in front of you at the

9    Howard Johnson's on Boston Street while were you staying

10   there, you had a conversation with Detective Callahan,

11   Detective Callahan had a conversation in front of you

12   where he said to Detective McDonough, "Remember that

13   Shawn had the silver gun and Terrance had the black

14   gun"?

15   A.  Yes, in a sense, yes.

16              MS. HARRIS:  Objection.

17              THE COURT:  Overruled, go on.

18   Q.  What did you understand that conversation to mean?

19   A.  By the way they was talking, by the way they was

20   talking, it was like they was feeding me information.

21   Q.  Why did you come to that conclusion?

22   A.  Because, I mean, why when he was sitting there and

23   talking to Detective McDonough about the guns and I was

24   sitting right there across the table from me and the way

25   they were saying it was like they were feeding me things

1    to say.

2    Q.  Did Detective Callahan ever specifically say you have

3    to testify that Shawn Drumgold has a silver gun and

4    Terrance Taylor has a black gun?

5    A.  No.

6    Q.  So, where did you learn that?

7    A.  Through Mr. Callahan.

8    Q.  And was that documents at the Howard Johnson's?

9    A.  Yes.

10   Q.  In the restaurant?

11   A.  Yes.

12   Q.  Okay.  And do you remember how many times you

13   discussed or Detective Callahan discussed the fact that

14   Shawn Drumgold, "Remember Shawn Drumgold had a silver gun

15   and Terrance Taylor had a black gun"?

16   A.  Yeah.  Do I remember how many times?

17   Q.  Yes.

18   A.  No, I don't recall how many times it was.

19   Q.  Prior to Detective Callahan having that conversation

20   in front of you at the Howard Johnson's about

21   Shawn Drumgold having a silver gun and Terrance Taylor

22   having a black gun, did you have any idea what the facts

23   of the Tiffany Moore case were at that time?

24   A.  No.

25   Q.  Had you ever seen Shawn Drumgold on August 19, 1988

1    with a silver gun?

2    A.  No.

3    Q.  Had you ever seen Terrance Taylor on August 19, 1988

4    with a black gun?

5    A.  No.

6    Q.  So, Mr. Evans, the information regarding the silver

7    gun and the black gun, you testified to that at

8    Shawn Drumgold's criminal trial; do you remember that?

9    A.  I think I do, yes.

10    Q.  Okay.  Where did you get the information about

11    Shawn Drumgold having a silver gun and Terrance Taylor

12    having a black gun?

13    A.  I picked it up from Mr. Callahan and Mr. McDonough

14    talking about it in the hotel.

15    Q.  Okay.  Now, when Mr. McDonough and Detective Callahan

16    talked in front of you, "Remember Shawn has the silver

17    gun and Terrance has the black gun," did you talk about

18    anything other than the Tiffany Moore case during those

19    meetings?

20    A.  Not that I recall, no.

21    Q.  Okay.  And other than him telling you that

22    Shawn Drumgold had a black gun, I'm sorry, a silver gun

23    and Terrence Taylor had a black gun, do you remember

24    having any discussions with Detective Callahan about the

25    type of car that was supposed to have been used on the

1    night of August 19, 1988?

2              MS. HARRIS:  Objection.

3              THE COURT:  Overruled.

4    Q.  Ricky, do you remember having any conversations with

5    Detective Callahan or I shouldn't say that, do you

6    remember Detective Callahan having any conversations in

7    front of you about the type of car that was alleged to

8    have been used on August 19th of 1988 in the

9    Tiffany Moore case?

10   A.  I could probably, but I don't recall it right now.

11   Q.  Do you ever remember Detective Callahan mentioning a

12   white car?

13             MR. ROACHE:  Objection.

14             THE COURT:  Overruled.

15   A.  Not that I remember.

16   Q.  Do you remember testifying at trial about a white

17   car?

18   A.  No.

19   Q.  Okay.  You told us before that before you went to the

20   hotel you had a conversation with Detective Callahan

21   regarding the white car.  Is that the only conversation

22   that you had with Detective Callahan about the white car,

23   or did you have other conversations?

24   A.  It could have been.  I don't remember.

25   Q.  Okay.  On how many occasions did Detective Callahan

1          ask you to come down to the restaurant at the

2          Howard Johnson's to discuss the Tiffany Moore case?

3                    MS. HARRIS:  Objection.

4                    THE COURT:  Overruled.

5          A.  I don't remember exactly how many times, but whenever

6          he came and they would call upstairs, I would go

7          downstairs and meet him.  It was quite a few times I

8          would go down and meet him.

9          Q.  And the one conversation you told about the silver

10         gun and the black gun and the other conversation before

11         you got to the hotel about the white car, were there

12         conversations about Chris Chaney and Mervin Reese?

13         A.  Chris Chaney, I don't recall.

14         Q.  Other than the conversation about the white car and

15         the conversation about Shawn Drumgold having the silver

16         gun and Terrance Taylor having a black gun, do you

17         remember whether or not Detective Callahan ever talked to

18         you about the clothing that the suspects were supposed to

19         be wearing the night of August 19, 1988?

20                    MS. HARRIS:  Objection.

21                    THE COURT:  Overruled.

22         A.  I don't remember.

23         Q.  When you had the conversation with Detective Callahan

24         in the restaurant at the Howard Johnson's and you talked

25         about the firearms in this case and you talked about the

1       white car, do you remember specifically any other

2       conversations that Detective Callahan had in front of you

3       regarding the Tiffany Moore murder and Shawn Drumgold?

4       A.   Not that I can remember, no.

5       Q.   Okay.  Do you remember -- I didn't want to get into

6       his trial testimony now, but let me ask you this, when

7       you discussed with Detective Callahan the details of the

8       Tiffany Moore case, you had described earlier that you

9       felt like he was feeding you information.  What do you

10      mean by that?

11      A.   Because, I mean, whenever we would talk, he wouldn't

12      directly talk to me, you know, he would talk to

13      Mr. McDonough about certain things about the case, and I

14      would pick it up, you know, and like he would talk, he

15      would discuss something with Mr. McDonough, I would pick

16      it up, and what he's telling me, that's what they wanted

17      me to say at the case.

18      Q.   So, when Detective McDonough talked in front of you

19      about the details of the Tiffany Moore murder and

20      Shawn Drumgold's alleged involvement, you came to the

21      conclusion that he wanted you to say that?

22      A.   Yes.

23      Q.   What gave you that idea?

24      A.   Because I was getting everything that I wanted, I

25      mean, everything that I wanted, all I had to do was call

1    him and ask him.

2    Q.  So, did you believe -- at that time, Mr. Evans, what

3    did you believe the reason you were in the hotel at that

4    time was?

5    A.  At first, I don't know.  I don't recall.

6    Q.  That wasn't my question, I'm sorry.  When you were

7    having these conversations with Detective Callahan in the

8    restaurant and he was discussing the details of the

9    murder of Tiffany Moore and Shawn Drumgold's alleged

10   involvement, did you have any personal knowledge of what

11   happened the night of August 19, 1988?

12   A.  No.

13   Q.  Where did you learn the details that you provided in

14   your testimony, Mr. Evans?

15   A.  Mr. Callahan.

16   Q.  Did you, in fact, ever meet with Shawn Drumgold on

17   the night of August 19, 1988?

18   A.  No.

19   Q.  But you testified at the criminal trial that you did?

20   A.  Yes.

21   Q.  Why did you do that?

22   A.  Because, I mean, I don't know, I just did it because

23   I was getting -- at the time I was getting everything I

24   wanted, and I thought that if I didn't do it, it all

25   would be taken away.

1    Q.   So you thought if you didn't go to the criminal trial

2    the way you think Detective Callahan wanted you to, you

3    wouldn't be able to stay at the Howard Johnson's

4    anymore?

5    A.   Yes.

6    Q.   You wouldn't be able to get any money anymore?

7    A.   Yes.

8    Q.   Now, other than the money and the Howard Johnson's

9    and the friends that you brought over and the meals that

10   you had, did Detective Callahan make any promises about

11   your pending cases?

12   A.   Yes.

13   Q.   What did Detective Callahan promise you about your

14   pending cases?

15   A.   That he would wipe them out, that he would have them

16   all taken care of.

17   Q.   Okay.  Did you know what Detective Callahan meant by

18   wipe them out?

19   A.   Yes.

20   Q.   Okay.  So the conversation that you had with

21   Detective Callahan about wiping out your criminal pending

22   charges, did that take place before you testified in the

23   Shawn Drumgold murder trial?

24   A.   Yes, I think it was.

25   Q.   Okay.

1    A.  I'm not too sure.

2    Q.  And when you testified a minute ago that you were

3    afraid if you didn't go through and testify at the

4    criminal trial that all of these things would be taken

5    away, is one of the other things you were worried about

6    those pending criminal cases?

7    A.  Yes.

8    Q.  Okay.  So, when Detective Callahan met with you

9    downstairs and told you about the guns and told you about

10   the white car, do you remember him discussing -- any

11   other details stick out in your mind in terms of what he

12   discussed with you downstairs in the Howard Johnson's

13   with Detective McDonough?

14   A.  Not that I can remember right now.

15   Q.  Okay.  Now, let me ask you this, was

16   Detective McDonough always present?

17   A.  Not always.

18   Q.  Okay.  Were there occasions when Detective Callahan

19   came on his own without Detective McDonough?

20   A.  Yes.

21   Q.  Okay.  And during those occasions, Mr. Evans, would

22   Detective Callahan have an actual conversation with you,

23   not a conversation in front of you?

24   A.  No, Mr. Callahan came, he was by himself, the two of

25   us would sit and have dinner, the two of us.

1    Q.  Dinner?

2    A.  Dinner or whatever time of day.

3    Q.  Did you consider Detective Callahan a friend back

4    then?

5    A.  Yes.

6              THE COURT:  Why don't we stop at this point.

7    It is one o'clock.  We'll see you all at 9:00 on Monday

8    morning.  We're not going to be sitting tomorrow.

9              MS. SCAPICCHIO:  Before you release the jury,

10   can I see you for a minute?

11             THE COURT:  Yes, counsel at sidebar.

12             (THE FOLLOWING OCCURRED AT SIDEBAR:)

13             MS. SCAPICCHIO:  I just want to remind the

14   Court, I'm not sure what the Court's schedule is, but on

15   Tuesday, the 15th, I argue a case before the

16   First Circuit at 9:30.

17             THE COURT:  I was thinking that I would work

18   with you to rearrange that and I would work with you to

19   rearrange so it would be the last thing in the morning.

20             MS. SCAPICCHIO:  I moved it to the first, your

21   Honor.

22             THE COURT:  That's because you didn't know

23   because I have another naturalization in Lawrence.

24   Unfortunately I have to leave slightly earlier.  If both

25   of us, we went to 12:30.  You could work with Maryellen

1        the First Circuit will do what we want to do in terms of

2        scheduling.

3                  MS. SCAPICCHIO:  I got a revised order that had

4        me first in the pecking order.

5                  THE COURT:  Don't worry, we'll see if we can

6        take care of it.

7                  ( THE SIDEBAR CONFERENCE WAS CONCLUDED.)

8                  THE COURT:  So you'll have a break now tomorrow

9        and Saturday and Sunday.  Again, we urge you, let me

10       change that, I order you not to read anything about this

11       case, not to go online, not to talk to anyone about this

12       case, not to do anything that would undermine the work

13       we've already put into it in your selection and in you

14       beginning, so just go home and have a good time.

15                  Again, even with these breaks I want you to

16       know we will monitor the progress of the case so your

17       obligations will end when we said they will end.  Leave

18       your notes on your chair and all rise for the jury,

19       please.

20                  (Jurors exited the courtroom.)

21                  THE COURT:  Thank you, all.

22                  MR. REILLY:  Can we have a moment after the

23       witness is excused?

24                  THE COURT:  Everybody can be seated.  What is

25       the issue?

1              MS. HARRIS:  Two issues, first, during the

2    opening, it's my understanding that Ms. Scapicchio called

3    into the question the integrity of the entire

4    investigation, and I would suggest that that means that

5    we can put in through Detective Callahan everything he

6    did and the substance of everything he turned over and

7    that was delivered to the district attorney's office and

8    to the defense counsel so that would be the 45, however

9    many investigatory reports that contain tons of

10   exculpatory information that have to do with alibis,

11   different witnesses who contradict.

12             All of this contradictory evidence I think is

13   now in fairly and squarely, so I think the suggestion was

14   had they known Ricky Evans, rewards, inducements, that

15   would call into question the question of the entire

16   investigation.  I think we're entitled to show this jury

17   brought this man everything he found into his

18   investigation and put all of it, good, bad in front of

19   the jury.

20             THE COURT:  You don't disagree this information

21   shouldn't have been turned over to the prosecutor?

22             MS. HARRIS:  Which information?

23             THE COURT:  That is to say, these promises and

24   awards and inducements to Ricky Evans, you don't disagree

25   that it would have been something that should have been

1    turned over to the prosecution at the beginning of the

2    trial?

3              MS. HARRIS:  I don't agree with Ms. Scapicchio

4    about what she believes given, told or promised.

5              THE COURT:  My point is the suit here was there

6    was an obligation to turn over X material to the

7    prosecutor.

8              MS. HARRIS:  Yes.

9              THE COURT:  That obligation existed regardless

10   of what else was turned over to the prosecution, to the

11   prosecutor.

12             MS. HARRIS:  I agree.

13             THE COURT:  So I understood what she was

14   saying, it should have been turned over, had it been

15   turned over, the cross-examination of Ricky Evans would

16   be different.  That's all I had understood her to say.

17             MS. HARRIS:  I understood her to say that would

18   bring into question all of the other evidence that the

19   jury shouldn't be concerned about, all of that is adduced

20   at trial is now under a cloud of suspicion.

21             THE COURT:  I don't think she opened the door

22   to that degree.  What is your second point, Ms. Harris?

23             MS. HARRIS:  My second point, I would like some

24   guide on the leading because this man is the most

25   important witness in this case, and the fact I can't make

1    one statement or remember one thing about what was

2    promised or given to him, what suggestion was made to

3    him, I think that this jury and that we have a right to

4    hear it out of his mouth, and I honestly, your Honor, in

5    every transcript that has preceded in the past six years

6    he has not been able to pointedly identify a single

7    person or identify a single thing that was said to him,

8    and I think that it is incredibly misleading for this

9    story to come out through counsel.

10           THE COURT:  It seemed to me that questions

11   begin relative to your meetings with, just take a few

12   examples of what we're objecting to, "During those

13   occasions, Mr. Evans, would Detective Callahan have an

14   actual conversation in front of you?"  That's not

15   leading, that's asking, that's the only way you can frame

16   the question.

17           With respect to sometimes she would direct his

18   attention to what he testified at trial and then said,

19   "Did you ever see these, the details with respect to the

20   white car and the gun, had you ever seen that?"  "No."

21   "Who referred that to you?"  "Callahan."  What's wrong

22   with that?

23           MS. HARRIS:  Your Honor, we started with

24   Mr. Evans saying he showed me six pictures that went down

25   to when they showed you Shawn Drumgold, maybe Terrance

1   Taylor and Theron Davis, what did they do then?  Every

2   error that is made by Mr. Evans is corrected and restated

3   questions by Ms. Scapicchio.  That's why I'm objecting,

4   your Honor.

5             THE COURT:  I understand.  Well, my ruling

6   stands.  I'll be attentive to this going forward, but I

7   didn't hear anything as dramatic as you heard, that's why

8   I was making the rulings that I was making so I will be

9   more attentive to that even going forward, but I'm not

10  going to say anything at this point.  Anything else?

11            MR. CURRAN:  Judge, just quickly on the first

12  issue because the argument that was made is how do you

13  trust this investigation, if defense knew the case would

14  have been about police misconduct?  That was argued in

15  her opening statement.  It now calls into question the

16  whole investigation and the conduct of Tim Callahan.

17            THE COURT:  I don't think it does.  You, on the

18  other hand, also it seems to me made a comment during the

19  course of your examination, your argument vouching,

20  vouching for witnesses in this case, and there was no

21  objection to that, and I can highlight that.  I think at

22  this point with respect to the opening statements the

23  sides are even.  Anything else, Mr. Roache, did you have

24  anything?

25            MR. ROACHE:  Your Honor, just, again, on the

1      leading part of questions, I agree with my Sister, I got

2      up and objected when Mr. Evans said he was shown six

3      photographs that all of a sudden turned into three

4      photographs by Ms. Scapicchio.  I got up and objected.

5      You overruled me on that, your Honor, and I find that

6      that is very important evidence.

7              THE COURT:  I understand.  My rulings were

8      within my judgment of what was going on in the case.  If

9      you object again, I'll take a look at it.  The rulings

10     stand.  Is there anything else I have to address?

11             MS. SCAPICCHIO:  No, your Honor.

12             THE COURT:  Thank you.

13             (Whereupon, the hearing was suspended at

14     1:12 p.m.)

1                    C E R T I F I C A T E

2

3     UNITED STATES DISTRICT COURT )

4     DISTRICT OF MASSACHUSETTS    )

5     CITY OF BOSTON               )

6

7              I, Valerie A. O'Hara, Registered Professional

8     Reporter, do hereby certify that the foregoing transcript

9     was recorded by me stenographically at the time and place

10    aforesaid in No. 04-11193-NG, in re:  Shawn Drumgold vs.

11    Timothy Callahan and thereafter by me reduced to

12    typewriting and is a true and accurate record of the

13    proceedings.

14                         /S/ VALERIE A. O'HARA

15                         _____

16                         VALERIE A. O'HARA

17                         REGISTERED PROFESSIONAL REPORTER

18

19                         DATED SEPTEMBER 10, 2009

20

21

22

23

24

25