1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

3

4

5    SHAWN DRUMGOLD,          )  C.A. No. 04-11193-NG

6           PLAINTIFF      )  Courtroom No. 2

7    VS.

8    TIMOTHY CALLAHAN, ET AL.,)  1 Courthouse Way

9           DEFENDANTS     )  Boston, MA  02210

10

11              JURY TRIAL DAY 4

12              SEPTEMBER 14, 2009

13                 9:14 a.m.

14

15

16

17

18

19        BEFORE THE HONORABLE NANCY GERTNER

20        UNITED STATES DISTRICT COURT JUDGE

21

22

23

24           VALERIE A. O'HARA

25         OFFICIAL COURT REPORTER

1    A P P E A R A N C E S:

2        ROSEMARY CURRAN SCAPICCHIO, ATTORNEY, Four Longfellow
     Place, Boston, Massachusetts  02114, for the Plaintiffs;
3
4        Tommasino & Tommasino, by MICHAEL W. REILLY, ESQ.,
     Two Center Plaza, Boston, Massachusetts  02108, for the
     Plaintiff;
5
6        Roache & Malone, LLP, by JOHN P. ROACHE, ESQ., 66 Long
     Wharf, Boston, Massachusetts  02110, for the Defendants.
7
         Bletzer and Bletzer, P.C., by HUGH R. CURRAN, ESQ.,
8    300 Market Street, Brighton, Massachusetts  02135, for the
     Defendants.
9
         Morgan, Brown & Joy, LLP, by MARY JO HARRIS, ESQ., 200
10   State Street, Boston, Massachusetts  02109-2605, for the
     Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

**EXAMINATION**
**Witness Name** **Direct Cross Re-Direct**
**Re-Cross**

RICKY LEE EVANS
    By Ms. Scapicchio          4
    By By Ms. Harris                    13
    By Mr. Roache                       97

**EXHIBITS**

**Exhibit      Description               Identification**
**Evidence**

No. 10        Sanitized version of                    16
              2006 document

Nos. 3, 4     Docket sheets from                      28
and 5         Roxbury District Court

```
 1                         PROCEEDINGS
 2              THE CLERK:  All rise for the jury.
 3              THE COURT:  You can all be seated.  Good morning,
 4     everybody.  Has anyone read, seen or heard anything about
 5     this case between the time we last saw you and now?  There
 6     are no affirmative responses.  I also neglected to mention
 7     something about the ceremony of the courtroom.  If you
 8     notice, we all stand for you when you come into the
 9     courtroom, not for me, but for you, and that's because you
10     are the judges of the facts and because of your singularly
11     important role in this case.
12              So with that, proceed, Ms. Scapicchio.
13              MS. SCAPICCHIO:  Thank you, your Honor.
14                    RICKY LEE EVANS, RESUMED
15                    DIRECT EXAMINATION, CONTINUED
16     BY MS. SCAPICCHIO:
17     Q.  Good morning, Mr. Evans.  In a loud clear voice, could
18     you please state your name again for the record.
19     A.  Ricky Evans.
20     Q.  How do you spell your last name, Mr. Evans?
21     A.  E-v-a-n-s.
22     Q.  Okay.  When we last spoke last Thursday, we were
23     talking about your relationship with Detective Callahan,
24     and I believe that you had indicated you believed Detective
25     Callahan was a friend of yours; is that right?
```

1     A.  Yes.

2     Q.  And that was back in --

3               THE COURT:  When was that?

4               MS. SCAPICCHIO:  I'm sorry.

5               THE COURT:  When was that?

6     Q.  When did you believe Detective Callahan was a friend of

7     yours?

8     A.  Back in 1988 and '89.

9     Q.  '88 and '89?

10    A.  Yes.

11    Q.  Now, are you the same Ricky Evans who in July of 2006

12    pled guilty to carrying a dangerous weapon?

13    A.  Yes.

14    Q.  And, Mr. Evans, when we were talking last Thursday, you

15    told us that you testified at the criminal trial of

16    Commonwealth vs. Shawn Drumgold; is that right?

17    A.  Yes.

18    Q.  The testimony at the criminal trial of Shawn Drumgold,

19    do you remember specifically telling the criminal injury

20    that you saw Shawn Drumgold on the night of August 19th of

21    1988?

22    A.  Yes.

23    Q.  And did you in fact see Mr. Drumgold on August 19,

24    1988?

25    A.  No, I didn't.

1    Q.  And do you recall telling the criminal injury that when

2    you saw Mr. Drumgold he was with Lug; do you remember

3    telling the criminal jury that?

4           MS. HARRIS:  Objection.

5           THE COURT:  Overruled.

6    Q.  And did you in fact see Shawn Drumgold with Lug on

7    August 19, 1988?

8    A.  No, I didn't.

9    Q.  And do you remember telling the jury back in 1989 that

10   when you saw Shawn Drumgold and Lug that Shawn had a silver

11   gun and Lug had a black gun?  Do you remember telling the

12   criminal jury that back in 1989?

13   A.  Yes.

14   Q.  And did you in fact see Shawn with a silver gun and Lug

15   with a black gun back in 1989?

16   A.  No, I did not.

17   Q.  Where did you get that information?

18   A.  Detective Callahan.

19   Q.  Do you remember telling the jury back in 1989 that Lug

20   made some statements I know where Chris Chaney and

21   Mervin Reese are?

22   A.  Yes.

23          THE COURT:  Are you quoting from the transcript?

24          MS. SCAPICCHIO:  I'm paraphrasing from the

25   transcript.  Do you want me to quote from the transcript?

1          THE COURT:  I think that would be better.

2          MS. SCAPICCHIO:  Okay.

3     Q.  At page 110 of the criminal transcript, do you remember

4     being asked the question, this is line 4, "You walked up to

5     Shawn and said what?"  And do you remember your answer

6     being, "I know where Mervin and Chaney are at"?

7     A.  Yes.

8     Q.  Okay.  And did you in fact ever hear Lug Taylor back on

9     August 19th of 1988 say anything like I know where Chaney

10    and Reese are at?

11    A.  No.

12    Q.  And you indicated at the trial of Commonwealth vs.

13    Shawn Drumgold that after this conversation that you say

14    you hear between Mr. Drumgold and Mr. Taylor that they left

15    and went to Schuyler Street; do you remember telling the

16    criminal jury that?

17    A.  I don't recall.

18    Q.  Okay.  At some point in time do you remember telling

19    the criminal jury that Shawn Drumgold and Lug Taylor left

20    Elm Hill Ave. and came back about 30 to 45 minutes later?

21         MR. ROACHE:  Your Honor, again I ask that she

22    refer to the trial testimony.

23         THE COURT:  Yes.  Sustained.

24    Q.  This is day 6, October 4th, 1989.  Do you remember,

25    Mr. Taylor -- I'm sorry, do you remember, Mr. Evans, this

1    is page 187 that you indicated upon a question, he said, "I

2    know where we can find Mervin and Chaney?"  Do you remember

3    saying that at the criminal trial on October 4th of 1989?

4    A.  Yes.

5    Q.  And then do you remember being asked at page 188, line

6    10, did you see them again some time that night?

7    A.  I don't remember.

8         MS. SCAPICCHIO:  May I approach the witness, your

9    Honor?

10        THE COURT:  Yes.

11   Q.  This is line 10, page 188, October 4th, 1989.  Can you

12   read that highlighted portion to yourself from line 10 to

13   24, Mr. Evans.

14   A.  Did you see them --

15   Q.  No, no, just to yourself, I'm sorry.

16   A.  I don't remember saying it.

17        MS. SCAPICCHIO:  May I approach the witness?

18        THE COURT:  Yes.

19   Q.  After having read that, Mr. Evans, does it refresh your

20   memory as to whether or not you told the criminal jury in

21   Commonwealth vs. Shawn Drumgold back on October 4th of 1989

22   that you saw -- when you were asked the question, "Did you

23   see them again some time that night," your response, "Yes;"

24   do you remember that?

25   A.  No, I don't.

1    Q.  And do you remember the next question being, "How much

2    later was that, if you can help us," your answer,

3    "Forty-five minutes to an hour, something like that"?

4              MR. ROACHE:  Objection.

5    Q.  Do you remember testifying to that back on October 4th,

6    1989?

7              THE COURT:  Overruled.

8    A.  Yes.

9              THE COURT:  The answer is yes.  Go on.

10   Q.  Do you remember being asked the question, "When you saw

11   them, where did you see them?"  Your answer, "They were

12   coming up Elm Hill"?

13   A.  Yes.

14   Q.  "And were they on foot or in a car?"  Your answer, "In

15   a car"?

16   A.  Yes.

17   Q.  Okay.  Did you at some point see Shawn Drumgold and

18   Terrance Taylor in a car coming up Elm Hill Ave. on

19   August 19th of 1988?

20   A.  No, I didn't.

21   Q.  Where did you get the information regarding the type of

22   car you were in, Mr. Evans?

23   A.  It wasn't directly said to me, it was said in my

24   presence.

25   Q.  Said by whom, Mr. Evans?

1      THE COURT:  Can you speak a little closer to the

2  Mike.

3  Q.  Where did you get the information, Mr. Evans, regarding

4  the car that you testified to on October 4th of 1989?

5  A.  Detective Callahan and Detective McDonough.

6  Q.  Okay.  And do you remember testifying, this is page

7  189, that there was some conversation between you and

8  either of these two defendants concerning guns they had?

9  Do you remember that testimony, sir?

10 A.  No.

11 Q.  This is day 6, October 4th, 1989, lines 14 through 24

12 at page 189.  Could you read lines 14 through 24 to

13 yourself, please, Mr. Evans.

14      MS. SCAPICCHIO:  May I approach the witness, your

15 Honor?

16      THE COURT:  Yes, you may.

17 Q.  Mr. Evans, after having read that, does that refresh

18 your memory as to whether or not back on October 4th, 1989,

19 in the case of Commonwealth vs. Shawn Drumgold, you were

20 asked a question about whether or not you had any

21 conversation with these two defendants, and your answer

22 being yes, first I asked, I said, "Where's the guns?"  Do

23 you remember that?

24 A.  I remember a little bit of it, yes.

25 Q.  The next question was, "Who did you ask where's the

1   gun?"  Your answer being Lug; do you remember that, sir?

2   A.  A little bit, yes.

3   Q.  And do you remember at page 190 indicating to the

4   criminal jury that Lug said something, he said something,

5   this is line 6, he said something like they were hot, the

6   guns is hot or something; do you remember testifying to

7   that?

8   A.  Yes, I remember that, yes.

9   Q.  And did you in fact ever see Terrance Taylor and

10  Shawn Drumgold with guns after the shooting of

11  Tiffany Moore on August 19, 1988?

12  A.  No.

13  Q.  And tell us again, Mr. Evans, where you got the

14  information regarding the guns?

15  A.  Some of the information I got I made up, some I got --

16  Q.  Just focus on the guns.  Where did you get the

17  information regarding the guns?

18  A.  Detective Callahan and McDonough.

19  Q.  Detective Callahan and McDonough?

20  A.  Yes.

21  Q.  Now, when you indicated, Mr. Evans, that some of the

22  information you made up, did you tell us back on Thursday

23  that Detective Callahan never actually said words to you,

24  "say Shawn Drumgold had a gun," right?

25  A.  Right.

1    Q.  Can you tell us what he would say in front of you to

2    give you the information that you otherwise didn't have?

3    A.  He would talk -- could you repeat that, please?

4    Q.  Sure.  Can you tell us what Detective Callahan would

5    say in front of you to give you the information about the

6    August 19, 1988 shooting that you otherwise didn't have?

7    A.  He wouldn't say it directly to me, he would sit across

8    the table or he would discuss it with Detective McDonough,

9    and what I would do, I would just pick up from their

10   conversations.

11   Q.  Okay.  That was when you were in the restaurant

12   downstairs at the Howard Johnson's on Boston Street?

13   A.  Yes.

14   Q.  And that would be when Detective Callahan would come in

15   and call you downstairs; is that right?

16   A.  Yes.

17   Q.  And other than learning these details from Detective

18   Callahan, did you have any idea what happened on the night

19   of August 19, 1988 with respect to the shooting death of

20   Tiffany Moore?

21   A.  No, I did not.

22   Q.  Do you ever remember describing what Detective Callahan

23   was doing to you regarding the details of the crime as

24   feeding you information?

25   A.  Excuse me?

1     Q.  Sure.  Do you ever describing when you were trying to

2     describe what Detective Callahan was doing to you with

3     these conversations, do you ever remember describing that

4     as he was feeding you information?

5            MR. ROACHE:  Objection.

6            MS. SCAPICCHIO:  Objection.

7            MR. ROACHE:  Objection, we've been through

8     this.

9            THE COURT:  Sustained.

10           MS. SCAPICCHIO:  I have nothing further.  Thank

11    you.

12                  CROSS-EXAMINATION

13    BY MS. HARRIS:

14    Q.  Good morning, ladies and gentlemen.  Good morning,

15    Mr. Evans.

16    A.  Good morning.

17    Q.  Mr. Evans, are you represented by an attorney as you

18    appear here today?

19    A.  Yes.

20    Q.  What's the name of your attorney?

21    A.  Attorney Patrick Troy.

22    Q.  Excuse me.

23    A.  Patrict Troy.

24    Q.  Patrick Troy?

25    A.  Yes.

1    Q.  Were you previously represented by Jim McCall?

2    A.  Yes.

3    Q.  And when did your representation change from Mr. Jim

4    McCall to Mr. Patrick Troy?

5    A.  They're partners.

6    Q.  They work together?

7    A.  Yes.

8    Q.  They work in the same office space as Ms. Scapicchio,

9    correct?

10   A.  Yes.

11   Q.  Now, you testified just a moment ago that you pled

12   guilty in July of 2007 to carrying a dangerous weapon, a

13   doubled-edged knife; is that right?

14   A.  Yes.

15   Q.  And, in fact, when you pled guilty, you were

16   represented by Mr. McDonough at that time, correct?

17   A.  Yes.

18   Q.  And after you pled guilty, you then defaulted on the

19   terms of your release, correct?

20   A.  Yes.

21   Q.  And you were called back into court in February of 1988

22   to clear up that matter; is that right?

23   A.  Yes, I think it was around the time.

24   Q.  Because a default warrant had issued for your arrest in

25   February of 2008; isn't that right?

1    A.  Yes.

2    Q.  And Mr. McCall went with you to court in February of

3    2008, correct?

4    A.  Mr. McCall was going to court with me since the matter

5    started.

6    Q.  So he was with you in February of 2008?

7    A.  It was either Mr. McCall or Patrick Troy.

8    Q.  And then again in August of this year, you had to go

9    back again in because you had again defaulted on the terms

10   of your release; is that right?

11   A.  August?

12   Q.  August of 2009?

13   A.  No.

14   Q.  And it was only at that point that you cleared up that

15   case, correct?

16   A.  Actually, it wasn't a default, it wasn't a default, I

17   had to pay a court fine.

18   Q.  Well, a warrant issued for your arrest in July of 2009,

19   didn't it?

20   A.  It was a court fine I had to pay.

21   Q.  So you still hadn't complied with the terms of your

22   release until another default warrant had issued for you;

23   is that right?

24   A.  Excuse me.

25   Q.  You had not complied with the terms of your release

1      until another default warrant had issued for your arrest in

2      July of 2009?

3      A.   I didn't know I had a default on me.

4               MS. HARRIS:  May I approach, your Honor?

5               THE COURT:  Yes, you may.

6      Q.   Mr. Evans, I'm showing you what I believe is the fourth

7      page of criminal docket No. CR-0121, and I'll turn your

8      attention to the notation on July 2d of 2009, do you see

9      where it says "warrant issued"?

10     A.   Uh-hum.

11     Q.   Is it your testimony that you don't believe a warrant

12     had been issued for your arrest?

13     A.   I said it was a fine that I had to pay.

14               MS. HARRIS:  Your Honor, I believe this is an

15     agreed exhibit but we'd like to offer a sanitized version

16     of the 2006 document.

17               THE COURT:  It's agreed upon?

18               MS. SCAPICCHIO:  Yes.

19               THE COURT:  It may be admitted.  What is the

20     number of the exhibit?

21               MS. HARRIS:  No. 10.

22               ( Sanitized version of 2006 document was marked

23     and admitted into evidence as Exhibit No. 10.)

24     Q.   Mr. Evans, during the time that Mr. McCall has been

25     representing you, have you paid for his services?

1     A.  Yes.

2     Q.  Did you prepare with Mr. McCall for your testimony last

3     week and today?

4          MS. SCAPICCHIO:  Objection.

5     A.  No.

6          THE COURT:  Overruled.

7     A.  No, I did not.

8     Q.  Did you review anything in preparation for your

9     testimony?

10    A.  I just was told I had to be in court, I got a subpoena

11    to be here, yes, Thursday.

12    Q.  Did you speak to anybody about your testimony prior to

13    coming to court today?

14    A.  No, I did not.

15    Q.  I believe you testified last week you had some

16    outstanding warrants back in 1989?

17    A.  Yes.

18    Q.  And Detective Callahan told you he was going to wipe

19    those cases out for you; is that right?

20    A.  Correct.

21    Q.  Now, do you recall testifying in 1989 about the

22    substance of your pending warrants?

23    A.  No, I don't.

24          MS. SCAPICCHIO:  Your Honor, may I be heard?

25          THE COURT:  All right.  Sidebar.

1          (THE FOLLOWING OCCURRED AT SIDEBAR:)

2          THE COURT:  This is a retrial.  In what respect

3     is anything about your cross-examination a surprise that

4     required a sidebar?

5          MS. SCAPICCHIO:  Judge, my concern is that the

6     defendants are now going into the testimony regarding

7     whether or not his warrants were actually cleared up or not

8     cleared.  I believe that with respect to the 1983 violation

9     it doesn't matter if his warrants were cleared up or not,

10    it's the promise that Detective Callahan made to this

11    before he testified.  The fact that Detective Callahan

12    didn't follow through on his promise is not relative to

13    whether or not there was a violation.

14         THE COURT:  But the question, whether or not they

15    were cleared up, bears it seems to me on whether or not the

16    promise was made in the first case, and so that it seems to

17    me is what you're talking about so it's perfectly

18    legitimate.

19         MS. HARRIS:  Note my objection.

20         (SIDEBAR CONFERENCE WAS CONCLUDED)

21    Q.  Mr. Evans, do you recall testifying about your warrants

22    back in 1989?

23    A.  No, I do not.

24         MS. HARRIS:  One moment, your Honor.  Mr. Bailey,

25    could I have TR page 500.  This is stipulated.

1              THE COURT:  This is stipulated to?

2              MS. HARRIS:  It is, your Honor.

3              MS. SCAPICCHIO:  What day?

4              MS. HARRIS:  It's page 218, it's transcript page

5       500.

6              THE COURT:  There should be one screen per two

7       jurors.  If your screen isn't working, let us know.

8       Q.  Mr. Evans, can you seen the screen?  Is that on for

9       you?  Mr. Evans, I'm going to direct your attention to line

10      7 where the question is put to you, "Now are these cases

11      still open, Ricky?"  Can you read your answer, please?

12      A.  "Yes."

13      Q.  "Now, how about on October 19, 1987, do you remember

14      then?"  What was your answer?

15      A.  "What happened that day?"

16      Q.  "Do you have an open larceny case from that date?"

17      Your answer?

18      A.  "Larceny?"

19      Q.  "Out of Roxbury that's still pending?"  Your answer?

20      A.  Yes.

21      Q.  And that's currently still pending?

22      A.  It's the 8th of this month, yes.

23      Q.  Then the question is put to you, "Sir, all of those

24      cases I went through with you, is it your testimony you

25      don't expect anything in return for your testimony here

1    today?"

2    A.   "No."

3    Q.   "And those matters have never been discussed with you

4    before you came in here today?"

5    A.   "Well, when I went to get my warrants cleared up."

6    Q.   The next page.  At the top the question is, "Who took

7    you to get your warrants cleared up?"

8    A.   "Sergeant McDonough."

9    Q.   And if you could continue reading.

10   A.   "He didn't go.  I went by myself.  He just drove me

11   there."

12   Q.   And then now at the bottom of the page at line 18, "Did

13   you clear up anything else with Detective McDonough before

14   you testified here?"  What was your answer?

15   A.   "I have to go back the 8th of this month."

16   Q.   And then the attorney says, "I'm sorry, Ricky, I didn't

17   hear you, your answer."

18   A.   "I have to go back the 8th of this month."

19   Q.   "Where do you have to go on the 8th of this month?"

20   The next page, please.

21   A.   "Roxbury court."

22   Q.   "Okay.  What's that for?"

23   A.   "The charges that I didn't go to court I messed up on."

24   Q.   "And what kind of charges are those?"

25   A.   "Trespassing, the larceny and the Class B."

1    Q.  Thank you, Mr. Bailey.  Mr. Evans, when you testified

2    in 1989, you told the criminal defense attorneys and the

3    court and jury that you were going back to clear up those

4    cases after October 8th of 1989; do you remember that

5    testimony you just read?

6    A.  I don't recall that, no.

7    Q.  You don't recall that?

8    A.  No.

9    Q.  Can I use the document camera or the Elmo, please.

10   Mr. Evans, I'm showing you a document, it's a docket 12175.

11   First I'll indicate at the top the name Tyronne Corey.  Can

12   you tell the jury who Tyronne Corey is?

13   A.  An alias.

14   Q.  Whose alias?

15   A.  Mine.

16   Q.  And above Tyronne Corey it says Ricky Evans, correct?

17   A.  Correct.

18   Q.  And this docket sheet reflects three different charges.

19   I apologize for the copy, but this will be in evidence.

20   The first charge, disorderly person, do you see that, where

21   the arrow is?

22   A.  Yes.

23   Q.  The second charge is trespassing on land and dwelling;

24   do you see that?

25   A.  Yes.

1    Q.  The third one is illegal possession of a Class B

2    substance; do you see that?

3    A.  Yes.

4    Q.  And these are charges that were pending against you in

5    1989; is that correct?

6    A.  Correct.

7    Q.  And these are the charges that you're testifying that

8    Detective Callahan was going to wipe out for you?

9    A.  I don't remember the charges.

10   Q.  You don't remember the charges?

11   A.  No, I don't.

12   Q.  But you remember that Detective Callahan was going to

13   wipe them out for you; is that your testimony?

14   A.  Yes.

15   Q.  Now, I'm going to direct your attention to the lower

16   portion of this document where we have various dates.  Now,

17   on this document, the date of the offense is December 13th

18   of 1988, and you see at the bottom there's a date,

19   March 28th, 1989.  Do you see that date?

20   A.  Yes.

21   Q.  And then below it there's another date, October 18th,

22   1989; do you see that date?

23   A.  Yes.

24   Q.  And, in fact, you went back to court on December 18th,

25   didn't you?

1    A.  I don't recall.

2    Q.  You don't recall?  Well, do you recall that Detective

3    Callahan, excuse me, that Detective McDonough brought you

4    into the court to have those defaults removed and a new

5    date scheduled?

6    A.  It was Detective Callahan at the time, Mr. McDonough

7    could have been there.

8    Q.  I can't hear you, sir.

9    A.  I was with Sergeant Callahan.  Sergeant McDonough could

10   have been there.  My memory is that I was with

11   Mr. Callahan.

12   Q.  Well, you testified in 1989 that it was Mr. McDonough,

13   correct?

14   A.  I said with my memory I was with Mr. Callahan.

15   Mr. McDonough could have been there.

16   Q.  Well, is there a reason that in 1989 you said

17   Mr. McDonough and you didn't say Mr. Callahan?

18   A.  I don't remember that.

19   Q.  You don't remember that.  Do you remember when you went

20   to court with Mr. McDonough in 1989 that there was an

21   attorney represented to appoint you, appointed to represent

22   you?

23   A.  I don't recall.

24   Q.  I'm showing you another page of this document that's

25   dated June 27th of 1989, and then it says, "Notice of

1     appearance, I enter my appearance as counsel in the case

2     captioned on the reverse of this sheet," and the name is

3     Richard Smith with an address on Huntington Avenue.  Do you

4     remember appearing in front of a Judge in June of 1989 and

5     having an attorney appointed to represent you on these

6     cases?

7     A.  No, I do not remember that.

8     Q.  Then I'm going to show you the docket entries.  I

9     direct you to October 18th, 1989 where the docket entry

10    indicates that you appeared in front of Judge Martin and a

11    final continuance was granted.  Do you see that?

12    A.  What date?  What date?

13    Q.  I'm sorry, do you see that?

14    A.  What date?

15    Q.  October 18th, 1989?

16    A.  Yes.

17    Q.  And then it indicates that the next date is

18    January 12th, 1990, and you didn't appear and a default

19    entered; do you see that?

20    A.  Yes.

21    Q.  So, according to these records from the Roxbury

22    District Court, on June 27th of 1989 you appeared in court,

23    the Court assigned counsel to represent you and gave you

24    new dates to appear to answer those charges?

25    A.  Yes.

1    Q.   And that date was after the trial of Tiffany Moore;

2    isn't that right?

3    A.   I don't remember, no.

4    Q.   Do you remember when the trial of Tiffany Moore was?

5    A.   Yes.

6    Q.   Do you remember that it occurred in the early part of

7    October, 1989?

8    A.   This is over 22 years ago.  I don't remember everything

9    that happened back then.

10   Q.   I can't hear you, sir.

11   A.   This is over 22 years ago.  I don't remember everything

12   that happened in 22 years.

13   Q.   Well, looking at this document, sir, do you have any

14   recollection of Detective Callahan going with you to court

15   in October of 1989 and wiping out these cases?

16   A.   Yes.

17   Q.   You do?

18   A.   I remember Mr. Callahan going to court with me.

19   Q.   And I'm asking you, sir, after you testified in the

20   Tiffany Moore case, and you, according to these documents,

21   appeared in court again to answer these charges in October

22   of 1989?

23   A.   I don't recall.

24   Q.   You don't recall?

25   A.   No.

1    Q.   Now, were you also known as Tyronne Bickford in 1989?

2    A.   Yes.

3    Q.   And you had charges outstanding for trespass, correct,

4    under that name?

5    A.   Yes.

6    Q.   And you were also known as Raicky Brigham?

7    A.   Yes.

8    Q.   And that was another name that you used that was not

9    your legal name, correct?

10   A.   No.

11   Q.   And the purpose in using these aliases was to make sure

12   it was difficult for the courts to catch up with you; isn't

13   that correct?

14   A.   Can you repeat that, please?

15   Q.   Why don't you tell us what was the purpose of using

16   these aliases back in 1989?  Why did you do that?

17   A.   Why did I use aliases?

18   Q.   Yes.

19   A.   I didn't want to go to jail back then.

20   Q.   You figured if you used different names when you were

21   arrested for these charges, it would be harder for the

22   police and the Court system to catch with you?

23   A.   No, I wouldn't go to jail at the time when the police

24   stopped me, that's why I gave the aliases.

25   Q.   I'm sorry, sir, I can't hear you.

1    A.  That's why I game them aliases, so I wouldn't go to

2    jail at the time.

3    Q.  So they wouldn't know that they had cases that were

4    outstanding against you?

5    A.  Yes.

6    Q.  And Attorney Smith was appointed to represent you on

7    all of these pending cases; isn't that right?

8    A.  I don't recall.

9    Q.  I'll show you the last page of docket No. 12175.  Where

10    it lists larceny of property, trespass, illegal possession

11    of Class B, disorderly person trespass and it indicates

12    that counsel has been retained, Richard Smith, does that

13    refresh your recollection?

14    A.  No.

15    Q.  That Judge Banks assigned counsel for you?

16    A.  I don't remember that, no.

17    Q.  You don't remember that.  Finally, sir, on this

18    assignment, notice of assignment form, do you see that the

19    Court indicates that your next court date is October 18th,

20    1989?

21    A.  Yes.

22    Q.  And that's what you testified to in the trial of

23    Tiffany Moore, isn't it, that you were going back to court

24    to answer these cases on October 18th of 1989?

25    A.  I don't recall that.

```
 1              MS. HARRIS:  Your Honor, these docket sheets from
 2    the Roxbury District Court are stipulated Exhibits 3, 4 and
 3    5, and I'd like to move them in.
 4              THE COURT:  Stipulated?
 5              MS. SCAPICCHIO:  Stipulated, your Honor.
 6              THE COURT:  They may be so moved.
 7              ( Docket sheets from Roxbury District Court for
 8    Ricky Evans were marked and admitted into evidence as
 9    Exhibit Nos. 3, 4 and 5.)
10    Q.  Now, Mr. Evans, you testified on Thursday that one of
11    the things that you were worried about in 1989 was that you
12    had these cases pending against you; do you remember that
13    testimony?
14    A.  I could have said it, yes.
15    Q.  But recently as 2007, 2008, 2009, you routinely default
16    on your pending criminal cases, don't you, sir?
17              MS. SCAPICCHIO:  Objection.
18              THE COURT:  Overruled.
19    A.  Yes.
20    Q.  So it's not that big a worry, is it?
21    A.  Yes, it is.
22    Q.  When you appeared in Roxbury District Court this
23    October of 1989 with your counsel, you didn't tell the
24    Court that these cases had been wiped out, did you?
25    A.  I don't recall.
```

1    Q.   That's because they weren't wiped out, were they,

2    sir?

3    A.   They weren't wiped out?

4    Q.   They were not wiped out, correct?

5    A.   They were supposed to be, yes.

6    Q.   Do you remember testifying in Suffolk Superior Court in

7    2003?

8    A.   Yes, I have a memory of some of it, yes.

9    Q.   Do you remember being asked in 2003 whether anybody had

10   made you any promises to get your cases taken care of?

11   A.   At that time?

12   Q.   Do you remember in 2003 the assistant district attorney

13   asking you did anybody promise you anything for your cases?

14   A.   I think I do, yes.

15   Q.   And do you remember what your answer was?

16   A.   I think it was no.

17   Q.   Your answer was no?

18   A.   Yes.

19   Q.   And your testimony now in 2009 is that somebody did

20   offer you something for your testimony; is that right?

21   A.   For current, no.

22   Q.   I'm sorry, sir.

23   A.   Not the cases I had now, no, I wasn't promised

24   anything.

25   Q.   No, sir, I'm asking you about your testimony in 2003

1   about your pending cases in 1989, the assistant district

2   attorney asked you did anybody promise you anything in

3   exchange for your testimony at the trial of Shawn Drumgold?

4   A.  I don't recall that, no.

5   Q.  You don't recall being asked that?  I'm going to refer

6   to page 53 at the motion for new trial testimony.  You were

7   asked, do you remember one of the police officers, whether

8   it was Callahan or anybody else, do you remember any of the

9   police officers telling you that they would do something

10  for you on the cases that were still pending against you,

11  and your answer was, "I don't remember, I don't remember

12  them saying that."  Do you remember that testimony?

13  A.  No, I don't.

14  Q.  You don't remember that?

15  A.  I don't remember saying it.

16  Q.  On page 54 of your 2003 testimony, the question was put

17  to you, "Do you remember either of the police officers,

18  Murphy or Callahan or any other police officer, never mind

19  their names, do you remember anybody talking to you about

20  anything that they would do for you on those cases if you

21  came into court and testified in a certain way?"  And your

22  answer was, "I don't remember?"

23  A.  I don't.  I don't recall it, no.

24  Q.  So you didn't tell the Court in 2003 that Detective

25  Callahan was going to wipe out your cases?

1    A.  No.

2    Q.  You said, "I didn't remember anybody saying that they

3    were going to do anything for me"?

4    A.  I don't recall it, no.

5    Q.  You don't recall that?

6    A.  No.

7    Q.  Do you recall being in court in 2003?

8    A.  Yes.

9    Q.  But your testimony is that you don't recall this

10   testimony?

11   A.  I don't recall what I said, everything I said, no.

12   Q.  Again, on page 55 at the bottom, "To the best of your

13   memory, had any police officer said anything to you about

14   those cases which led you to have that hope, that hope

15   being that something would happen with those cases?"  Your

16   answer was, "I don't remember."

17   A.  I don't.

18   Q.  Then you were asked, "Do you remember whether or not

19   the prosecutor, the lawyer, the assistant district attorney

20   who was working with the police and Tiffany Moore's family

21   and all the witnesses, do you remember that person, or

22   anybody working with him, anybody from the district

23   attorney's office had any conversations with you about

24   those pending cases?"  And your answer, sir, was, "I don't

25   remember"?

1    A.  I don't remember, no.

2    Q.  But now you're telling this jury in 2009 that Detective

3    Callahan promised that he was going to wipe those cases

4    out?

5    A.  It was Detective Callahan that went with me.  It was

6    Detective Callahan I was dealing with the majority of the

7    time back then.

8    Q.  I'm sorry, I can't hear a word you're saying.

9    A.  It was Detective Callahan I was dealing with back in

10   1988 and 1989.

11   Q.  Do you remember you told the truth in 2003?

12   A.  Everything I have been testifying to was the truth.

13   Q.  Was it the truth in 2003?

14   A.  I don't recall everything I testified to in 2003.

15   Q.  In 1989, you told the Court Detective McDonough took

16   you to the court and you got your warrants wiped out and

17   you were going back to court on October 18th.  Was that

18   true?

19   A.  I don't recall.

20   Q.  You don't recall.  Then in 2003, you told the Court

21   that you don't have a memory of anybody promising you

22   anything in exchange for your testimony.  Was that true?

23   A.  I don't recall.

24   Q.  And now in 2009 you're telling this jury that Detective

25   Callahan was going to take care of your cases?

1    A.  Since 1989, since 1989, I went to get my driver's

2    license, I've been stopped by the police --

3            MS. HARRIS:  Your Honor, could I have the witness

4    answer the question?

5            THE COURT:  Sustained.  Repeat the question and

6    the witness will answer.  Go on.

7    Q.  The question is in 2009, you're telling this jury after

8    your testimony in 1989 that you were promised nothing,

9    after your testimony in 2003 where you said you were

10   promised nothing in exchange for your testimony, now you're

11   saying Detective Callahan promised to wipe those cases out?

12   Yes or no, sir, is that your testimony?

13   A.  I don't recall.

14   Q.  And that is despite these records that indicate that

15   you went before a Judge, you were assigned counsel and you

16   appeared as indicated on October 18th of 1989?

17   A.  I didn't have no cases until recently.  The cases that

18   were back in 1988 and 1989 --

19   Q.  Thank you, sir, thank you.  Now, back in 1989, sir, do

20   you remember if you were employed?

21   A.  Yes.

22   Q.  And can you tell us what you were employed doing?

23   A.  Meat packing.

24   Q.  Do you recall testifying in 1988 that in 1989 you were

25   selling drugs?

1    A.  I was living on the street, yes.

2    Q.  So you were working at Pearl Meat Packing?

3    A.  Yes.

4    Q.  And you're living on the street and you're selling

5    drugs?

6    A.  Could have been, yes, I don't remember everything I was

7    doing.

8    Q.  You testified on Thursday to the incident in December

9    of 1988 where you and your cousin Willie were abducted by

10   three men and taken to an apartment?

11   A.  Yes.

12   Q.  Do you remember that testimony?

13   A.  Uh-hum.

14   Q.  Now, on Thursday when you testified, you said that you

15   were taken by a man that had a machine gun.  Do you

16   remember that testimony?

17   A.  It was a machine gun and two handguns, yes.

18   Q.  You never testified before Thursday that anybody had

19   abducted you with a machine gun, correct?

20   A.  I don't recall.

21   Q.  That was new on Thursday?

22   A.  No.

23   Q.  Do you recall testifying before the grand jury in the

24   case against Treas Carter back in May of 1989?

25   A.  It could have been a machine gun.  It was three guns

1    they had.

2    Q.  You testified in May of 1989 that he had a gun in his

3    pocket?

4    A.  No, I don't recall he having it in his pocket.

5    Q.  Well, in any event, you testified that you were

6    assaulted and your cousin was killed.  Do you remember that

7    testimony?

8    A.  Yes.

9    Q.  And one of the detectives who was assigned to

10   investigate that crime was Detective Callahan, correct?

11   A.  Correct.

12   Q.  So you first met Detective Callahan in December or

13   January of 1989, excuse me, December of '88 or January of

14   1989, correct?

15   A.  I met Detective Callahan back then, yes.  I don't

16   remember what date I met him, but I met him back then,

17   yes.

18   Q.  Now, you had never encountered Detective Callahan in

19   any of your criminal activities, correct, he had never

20   arrested you?

21   A.  No.

22   Q.  You had never met him before you met him as a victim of

23   a crime, correct?

24   A.  Correct.

25   Q.  And when you met with him, you answered his questions,

1  didn't you?

2  A.  If he asked me, yes, I answered.

3  Q.  And you told him the details of the crime of the

4  abduction of you and the murder of your cousin, correct?

5  A.  I could have, yes.

6  Q.  And you told him the names of the people that were in

7  the apartment where you were assaulted, correct?

8  A.  I could have, yes.

9  Q.  Well, did you or you think you could have, but do you

10  remember giving him that information?

11  A.  I don't remember giving that information, no, I don't

12  recall.

13  Q.  Do you recall Detective Callahan asking you if there

14  were any witnesses to the crime that occurred that took

15  your cousin's life and wounded you?

16  A.  No, I don't remember, no.

17  Q.  You don't remember that?

18  A.  If he asked me who did the shooting, of course I told

19  him, but I don't remember the exact date that it was on.

20  Q.  But do you remember telling him that you knew the

21  identity of the women who were in the apartment where you

22  were shot?

23  A.  I think I did.  I don't have a vivid memory of it at

24  the time, no.

25  Q.  Do you recall telling him that you knew the person who

1   had shot you or at least knew him by his street name,

2   right?

3   A.   Yes.

4   Q.   And Detective Callahan gave you a photo array?

5   A.   A what?

6   Q.   He showed you a photo array of pictures of the

7   individuals as part of the investigation into the

8   Treas Carter case?

9   A.   Yes, I don't recall that.

10  Q.   You don't recall him showing you photographs?

11  A.   I remember, yes, he showed me a photo array, yes.

12  Q.   And he showed you a lot of photographs, he didn't just

13  show you one?

14  A.   I think it was about six.  It was a couple of times I

15  remember seeing photo arrays of people.

16  Q.   And when he showed you that photo array, you were able

17  to pick out the person who had shot your cousin and had

18  shot at you, correct?

19  A.   Yes.

20  Q.   And you also were with two other individuals that had

21  guns that were part of that crime?

22  A.   Yes.

23  Q.   And you have never been able to identify who those

24  people are?

25  A.   No, I haven't.

1    Q.  You have never seen them before?

2    A.  I haven't seen them.  I don't remember what they looked

3    like.

4    Q.  And are you aware that in 1989 although Chilly was

5    apprehended that the other two men were never apprehended;

6    isn't that right?

7    A.  Correct.

8    Q.  Now, when you met with Detective Callahan, you gave him

9    information about the case, he showed you a photo array,

10   you identified your assailant and then Mr. Callahan took

11   you to the grand jury to meet with the assistant district

12   attorney; is that correct?

13   A.  I don't recall.

14   Q.  You don't recall testifying at the grand jury about the

15   shooting death of your cousin and the maming of yourself?

16   A.  I remember a little bit of it, yes.

17   Q.  You remember that there was an assistant district

18   attorney named Paul Connolly who was assigned to that

19   case?

20   A.  No, I don't remember that.

21        MS. HARRIS:  One moment, your Honor.

22   Q.  Mr. Evans, I'll represent to you that the record

23   indicates that on May 24th of 1989, you testified before

24   the grand jury about the assault that you had experienced.

25   Do you recall that?

1    A.  No.  I don't remember the date it was.  I tried to

2    forget it.

3    Q.  Leaving aside the date, do you recall testifying at the

4    grand jury, sir?

5    A.  No, I don't.

6         MS. HARRIS:  May I approach, your Honor?

7         THE COURT:  Yes, you may.

8         MS. HARRIS:  This is the excerpt of the grand

9    jury.

10        MS. SCAPICCHIO:  This is in relationship to the

11   Treas Carter case?

12        MS. HARRIS:  Yes.

13   Q.  Showing you a document, sir, I'll ask you to look at

14   the middle of the page.

15   A.  Yes.

16   Q.  Okay.  Does looking at this document refresh your

17   recollection that you did testify at the grand jury?

18   A.  If it's on paper, yes.

19   Q.  And I'm going to show you on page 22 of this document

20   there is a notation Mr. Connolly asking questions.  Does

21   that refresh your recollection that Attorney Connolly was

22   prosecuting this case on behalf of the Commonwealth?

23   A.  I don't remember.

24   Q.  You don't remember that.  Do you remember preparing to

25   testify before the grand jury?

```
 1    A.  No.
 2    Q.  Do you remember whether anybody told you what to say at
 3    the grand jury?
 4    A.  At the trial with me and Willie's trial?
 5    Q.  That's right.
 6    A.  No.
 7    Q.  You don't remember anybody telling you what to say?
 8    A.  Why would they?
 9    Q.  You told the truth, right?
10    A.  Yes.
11    Q.  Now, shortly after you testified at the grand jury in
12    May of 1989, you had a conversation with Detective Callahan
13    and he asked you if you knew anything about the murder of
14    Tiffany Moore; isn't that right?
15    A.  I don't recall.
16    Q.  You don't recall Detective Callahan calling you to tell
17    you that Treas Carter, Chilly Carter had been indicted for
18    the murder of your cousin and the shooting of you and
19    asking you if you knew anything about the murder of
20    Tiffany Moore?
21    A.  I don't remember him calling me and telling me that
22    Chilly was apprehended.
23    Q.  How did you find out that he was apprehended?
24    A.  Uncle.
25    Q.  Your uncle told you Chilly was arrested?
```

1    A.  Yes, that's what I think, yes.

2    Q.  So nobody from the district attorney's office told you

3    that Treas Carter had been arrested?

4    A.  Not that I recall, no.

5    Q.  And nobody from the police department told you that

6    Treas Carter had been arrested?

7    A.  Not that I recall.

8    Q.  But your aunt knew?

9    A.  Excuse me.

10   Q.  Your aunt knew and told you about it?

11   A.  It could have been my aunt or uncle, yes.

12   Q.  Mr. Evans, in June of 1989, you talked to Detective

13   Callahan about the murder of Tiffany Moore, correct?

14   A.  I could have.

15   Q.  And in June of 1989, you were living with your brother

16   on Trull Street; is that right?

17   A.  Well, I wasn't living with him.  I was mostly living on

18   the street and I would go by there and spend time with him,

19   yes.

20   Q.  Mr. Evans, you told the grand jury in May of 1989 that

21   you lived at 3 Trull Street in Dorchester, didn't you?

22   A.  That's the only address I had to use.

23   Q.  And that's where your brother lived and where your

24   stepmother lived?

25   A.  Yes.

1    Q.  That's where you lived?

2    A.  That's the only address I had to say where I was

3    living, I wasn't living there, that was the only address I

4    had to give.

5    Q.  And in June of 1989, you talked to Detective Callahan

6    at 3 Trull Street about the murder of Tiffany Moore; isn't

7    that right?

8    A.  I could have.  I don't recall when it was.

9    Q.  Do you recall that you were not living at the

10   Howard Johnson's in June of 1989?

11   A.  I don't recall.

12   Q.  Do you recall telling us at a deposition in 2007 that

13   your birthday is August 13th and that you knew you weren't

14   living in the Howard Johnson's by the time your birthday

15   rolled around?

16   A.  I could have.  I don't recall that.

17   Q.  You don't recall that?

18   A.  I could have, but I don't recall it.

19        MS. HARRIS:  Just a moment, your Honor.

20   Q.  I'll get back to that.  Mr. Evans, when you and your

21   cousin were shot, you had been living with him on Elm Hill,

22   correct?

23   A.  Yes.  We were staying in the area, yes.

24   Q.  Well, you lived at 63 Elm Hill, correct?

25   A.  I grew up at 63 Elm Hill.

1    Q.  And then you moved with your cousin Willie to 118 Elm

2    Hill, correct?

3    A.  118, I wasn't -- I was a street kid, so wherever I

4    could lay my head, I laid my head.

5    Q.  So you stayed with your cousin, you stayed with your

6    brother, you stayed with your stepmother, you stayed with

7    your girlfriends?

8    A.  I also stayed on the street.

9    Q.  They wouldn't take you in, any of those people?

10   A.  Well, the life I was living back then, nobody take me

11   in.

12   Q.  How many siblings do you have?

13   A.  Two.

14   Q.  Haven't you previously testified that you've got 13?

15   A.  Excuse me.

16   Q.  Haven't you previously testified to us that you had 13

17   siblings?

18   A.  I thought you said kids, I'm sorry.

19   Q.  Brothers and sisters.

20   A.  Yes, I have 13, 13, yes.

21   Q.  And do you recall telling us that after you were shot

22   when you were living on Elm Hill, after your cousin was

23   shot, that you left the area because you didn't feel safe

24   anymore and you moved to your brother's place on Trull

25   Street in Dorchester?

44

1    A.  I moved around, yes.

2    Q.  And you left the whole Grove Hall area after you were

3    shot?

4    A.  I moved around.  I stayed where I could stay.

5    Q.  Well, you stayed outside of the Grove Hall area after

6    you were shot, correct?

7    A.  No, it was right outside of Grove Hall area, yes.

8    Q.  And you told us that you left Grove Hall because you

9    were afraid that if you stayed there, you were going to be

10   killed; do you remember saying that?

11   A.  I could have, yes.

12   Q.  And do you recall telling us that you living at Trull

13   Street, you were speaking to Detective Callahan on the

14   phone and Detective Callahan told you that he was

15   investigating the murder of Tiffany Moore?

16   A.  I don't recall that.

17   Q.  Do you remember being deposed in this case, sir?

18   A.  Excuse me.

19   Q.  Coming to the offices with all of the attorneys, do you

20   remember that?

21   A.  Could you repeat that, please?

22   Q.  Do you remember being deposed in this case?

23   A.  Deposed meaning?

24   Q.  Meaning that you were sitting with all of us and we

25   were asking you questions about this case?

1     A.  At the deposition?

2     Q.  Yes.

3     A.  I remember that, yes.

4     Q.  And do you recall being asked about how the question of

5     the Tiffany Moore murder came up?

6     A.  A little bit, yes.

7          MS. HARRIS:  Mr. Bailey, could you bring up just

8     for the witness' view, not for the whole court, not for the

9     jury, bring up the deposition.

10         THE COURT:  He can't control the access.

11         MS. HARRIS:  Excuse me, your Honor.

12         THE COURT:  He can't control it, and I can

13    control it.  What is being portrayed here?

14         MS. HARRIS:  The second day.

15         THE COURT:  Of what?

16         MS. HARRIS:  Of deposition.  Page 289.

17         THE COURT:  Does the witness have it on your

18    screen?

19         THE WITNESS:  Yes.

20         THE COURT:  Go on.

21         MS. HARRIS:  I don't have it.

22         THE COURT:  It doesn't appear on your screen.

23    It's a flaw in the system.

24    Q.  All right.  I'm directing you to line 12, Mr. Evans,

25    and I'm going to ask you to read line 12, the question was

1    put to you, "Do you recall where you were when you first

2    had the conversation with Detective Callahan?"  Can you

3    read your answer?

4    A.   I think I was on the phone discussing my cousin's

5    murder, somehow Tiffany came up.

6    Q.   And the question was you recall this was a phone

7    conversation?

8    A.   It must have been a phone call, yes.

9    Q.   And then on line 20, "How long had you talked about

10   your cousin's murder over the phone with Detective Callahan

11   before you started talking about Tiffany Moore?"

12   A.   I don't recall about how long the conversation was.

13   Q.   Thank you, Mr. Bailey.  Mr. Evans, does that refresh

14   your recollection that you told us at deposition that you

15   spoke with Detective Callahan on the phone about your

16   cousin's murder and that then the question of Tiffany Moore

17   came up?

18   A.   I don't recall that.

19   Q.   That doesn't refresh your recollection?

20   A.   No.

21   Q.   Do you recall being deposed in 2007?

22   A.   Yes, I remember being there, yes.

23   Q.   And when you were deposed in 2007, you were under oath,

24   correct?

25   A.   Correct.

1    Q.  And you were sworn to tell the truth at that

2    deposition, correct?

3    A.  Correct.

4    Q.  And when you testified that you had been asked about,

5    excuse me, that Detective Callahan had asked you about the

6    Tiffany Moore case, you recall that you told him he had

7    been assigned to that case to investigate that case,

8    correct?

9    A.  He could have.

10   Q.  I'm sorry.

11   A.  He could have.  I don't recall it.

12   Q.  And do you recall that after you spoke to Detective

13   Callahan about the Tiffany Moore case that he brought you

14   to meet with an assistant district attorney in June of

15   1989; do you remember that?

16   A.  No.  I don't recall.

17        MS. HARRIS:  Mr. Bailey, could I have the trial

18   transcript at page 528.  This is J-F.

19        MS. HARRIS:  Your Honor, this is a stipulated

20   exhibit so everybody can see it.

21   Q.  Now, Mr. Evans, I'll represent to you this is the

22   cross-examination by Mr. Drumgold's attorney, and I'm going

23   to direct your attention to line 10 on this page, and the

24   question reads, "When I say statement, Mr. George, I'll

25   represent to you the other criminal defense attorney,

1     Mr. George, has asked you about a couple of statements.  Is

2     it fair to say that in June of this past year, which I'll

3     represent to you is 1989, in June of this past year,

4     June 21st, you accompanied Mr. Callahan and Paul McDonough

5     as well to the district attorney' office?"  Your answer?

6     A.  "Yes."

7              MS. SCAPICCHIO:  That's the question.

8              THE COURT:  Wait, I'm sorry, what was the

9     objection?

10             MS. SCAPICCHIO:  Judge, the answer is June 21st.

11    The question is yes.  His answer is no.

12             THE COURT:  If that's what it says, that's what

13    it says.

14             MS. HARRIS:  I'm asking him what to read is in

15    the transcript.

16    Q.  The answer, "June 21st," do you see that, Mr. Evans?

17    A.  Yes.

18    Q.  And the question, "Yes," meaning on June 21st, your

19    answer?

20    A.  "No."

21    Q.  The question, "Some time in June, and I understand you

22    might not remember the exact date, but some time in June,

23    you and Sergeant Callahan and his partner, Mr. McDonough,

24    came to the D.A.'s Office?"  Your answer?

25    A.  Yes.

1    Q.   And the question, "Correct?"  Your answer?

2    A.   "Correct."

3              MS. HARRIS:  The top of the next page, please,

4    Mr. Bailey.

5    Q.   And at the top of the page, the question, "And you met

6    with an assistant district attorney at that time, correct?"

7    A.   "Yes."

8    Q.   "And was that Assistant District Attorney Paul

9    Connolly?"

10   A.   "Paul Connolly."

11   Q.   "Well, let me ask you this, was it Mr. Beauchesne that

12   you met with that day?"

13   A.   "I think it was Beauchesne."

14   Q.   Off the transcript for a moment.  Do you recall,

15   Mr. Evans, that Mr. Beauchesne was the assistant district

16   attorney who was prosecuting the case brought against

17   Shawn Drumgold and Terrance Taylor?

18   A.   I don't recall, no.

19   Q.   You don't recall?

20   A.   No.

21   Q.   Do you recall that there was a prosecutor in that case

22   that you had met with?

23   A.   There must have been.

24   Q.   Whether or not you remember his name?

25   A.   I don't remember his name.

1    Q.  But you remember there was an assistant district

2    attorney who was prosecuting the case?

3    A.  There might have been.  I don't remember.

4    Q.  And do you recall that you met with him prior to giving

5    your testimony?

6    A.  I don't remember his name.

7    Q.  Whether you remember his name or not, do you recall

8    meeting with him before you testified in the case?

9    A.  No.

10   Q.  And back on the transcript, please.  "Your best memory

11   of who you met with were those two police officers the

12   first day you came to talk to someone was

13   Mr. Beauchesne"?

14   A.  "Yes."

15   Q.  "Were there any other D.A.s, when I say D.A.s, any

16   other district attorneys as opposed to police officer"?

17   A.  "I don't remember, I remember talking to

18   Mr. Beauchesne."

19   Q.  "Prior to that particular meeting, you had spoken to

20   Sergeant Callahan about cooperating in the investigation of

21   Tiffany Moore, of the Tiffany Moore murder, correct?"

22   A.  "Excuse me."

23   Q.  "Prior to that meeting with the assistant district

24   attorney, Mr. Beauchesne, you had spoken to Mr. Callahan

25   about cooperating in the Tiffany Moore murder?"  Then the

1    next page, please, sir.

2    A.   Yes.

3    Q.   And then the question, "And when you came to the

4    district attorney's office that day and you met with the

5    assistant district attorney and the police officers, you

6    gave a statement at that time, correct?"

7    A.   "Yes."

8    Q.   And then question, "When I say a statement, you had

9    talked about what you had to say?"

10   A.   "Yes, I talked about it."

11   Q.   We can go off the transcript, please.  Mr. Evans,

12   having read part of your testimony from 1989, does that

13   help you remember that you had spoken with Sergeant

14   Callahan in June of 1989 about the Tiffany Moore murder?

15   A.   I don't know exactly what time around it was when I

16   spoke to him.

17   Q.   Do you recall when you spoke to Sergeant Callahan he

18   brought you in to meet with an assistant district attorney

19   so you could tell the assistant district attorney the

20   information that you had about the Tiffany Moore murder?

21   A.   I had no information about Tiffany Moore, everything

22   that I said about it I made up.

23   Q.   Right, I understand that you're saying that all of the

24   testimony that you offered was made up, but whether it was

25   made up or not, do you have a recollection of meeting with

1    the assistant district attorney and telling him what you

2    had told Sergeant Callahan in June of 1989?

3    A.   No, I do not.

4    Q.   You don't remember that?

5    A.   No.

6    Q.   And reading this testimony does nothing to refresh your

7    recollection?

8    A.   No, it don't.

9    Q.   When you met with the assistant district attorney in

10   June of 1989, did you tell him that your statement was a

11   lie?

12   A.   I don't recall.

13   Q.   Did you tell him that your statement was true?

14   A.   I don't recall.

15   Q.   Do you recall anything that you told the assistant

16   district attorney?

17   A.   No.

18   Q.   Did the assistant district attorney tell you anything

19   to say?

20   A.   No, not that I recall, no.

21   Q.   Did he try to feed you any information in that meeting

22   in June of 1989?

23   A.   No.

24   Q.   Now, you testified that as soon as you talked about the

25   murder of Tiffany Moore that Sergeant Callahan whisked you

1    away to the Howard Johnson's; do you recall that

2    testimony?

3    A.   Yes, I remember at the time, yes.

4    Q.   And do you recall telling us that the time you believe

5    you entered the Howard Johnson's was after your birthday on

6    August 13th of 1989?

7    A.   I don't remember now.

8    Q.   Do you recall, sir, that when you were deposed and we

9    asked you where the information came from that you had

10   given to Sergeant Callahan, do you recall saying that after

11   the murder of Tiffany Moore that everybody in the

12   neighborhood was talking about it?  Page 253.  Do you

13   remember telling us at deposition?

14   A.   Repeat that, please.

15   Q.   Yes.  Do you remember telling us at the deposition that

16   everybody in the neighborhood had been talking about this

17   case, correct?

18   A.   Correct.

19   Q.   And you knew from all of the talk in the neighborhood

20   that the word was that there were two or three shooters who

21   were involved in this crime, correct?

22   A.   I don't recall.

23   Q.   For the witness' eyes only, please, your Honor, could I

24   have the first page of the deposition at page 263.  Can you

25   see that on your screen in front of you?

1    A.  No.

2    Q.  It's a pretty bad copy.  If I may, your Honor, I'm

3    going to approach.

4         MS. HARRIS:  May I approach, your Honor?

5         THE COURT:  Yes, you may.

6    Q.  Day 1, page 263.  Mr. Evans, excuse me for coming up on

7    the podium, but I'm going to direct your attention to page

8    263, the line 6, question:  "Do you recall it was being

9    reported that there were between two and three individuals

10   involved in the murder of Tiffany Moore?"  Then the

11   question, "Where did you get that information?"  What was

12   your answer?

13   A.  "The streets."

14   Q.  Okay.  Then the question is, "What other information

15   did you get from the streets?"  Can you read your answer?

16   A.  "Where?"

17   Q.  Right here.  Line 15.

18   A.  "It was like back then, back then it was mostly -- it

19   was mostly like -- it was mostly like Humboldt, mostly like

20   Humboldt against Castlegate and mostly Humboldt against

21   Castlegate, and Mervin and Chris, what their gang name

22   could have been, what they had got into a squabble with

23   Castlegate, and the next thing you know, Tiffany had got

24   shot and the people started talking about Apple.  He went

25   for the retaliation against, he went for retaliation

1  against the argument that Mervin and Chris, they had

2  against Castlegate, and they was going to take care of

3  business, and the next thing you know, Tiffany ended up in

4  their path."

5  Q.  And I'm going to direct you to the next question is,

6  "Okay.  What other information did you get from the

7  street?"  Your answer?

8  A.  "I can't recall everything.  I can't recall everything

9  you hear.  I can't recall everything you hear on the

10  street."

11  Q.  Okay.  The next question was, "Do you recall whether or

12  not you got any information on the street relative to the

13  getaway car?"

14  A.  "Yeah, it was a white car or something."

15  Q.  Okay.  So when you were deposed in June of 2006, you

16  told us that you had heard on the street that there were

17  two or three shooters and that the motive for the case was

18  a retaliation between two gangs and that the shooters were

19  in a white getaway car; is that what your testimony was in

20  2006?

21  A.  Reading it, yes.

22  Q.  Reading it, yes.  That information came to you from the

23  street, right?

24  A.  Not all of it.

25  Q.  Well, you testified --

1    A.  That's what I testified, but not all of it, no.

2    Q.  In this deposition you said you heard about two or

3    three shooters, you heard about the fight between

4    Castlegate and Humboldt Avenue and you heard that the car

5    was a white getaway car from the street?

6    A.  I don't recall it.

7    Q.  You just read it, you don't recall?

8    A.  No.

9    Q.  You didn't say in 2006 that the information from the

10    white getaway car was fed to you by Detective Callahan?

11    A.  Excuse me.

12    Q.  You didn't say in the deposition you just read that the

13    information you got about the white getaway car was fed to

14    you by Detective Callahan, did you, you said you got it

15    from the street?

16    A.  No, not that I recall it, no.

17    Q.  Not that you recall what?

18    A.  That I testified.

19    Q.  You don't recall this testimony?

20    A.  Not all of it, no.

21    Q.  Do you recall that the information that you offered

22    about the white getaway car was information that you had

23    heard from rumor swirling around on the street?

24    A.  No.

25    Q.  Now, after Detective Callahan and you had a

1    conversation in June of 1989 where you told him the

2    information that you had about the Tiffany Moore case, do

3    you recall Detective Callahan showing you some

4    photographs?

5    A.  He showed me a number of photographs back then.

6    Q.  He showed you a number of photographs back then?

7    A.  Yes.

8    Q.  And let's be clear.  At the time you and Detective

9    Callahan began talking about the Tiffany Moore case, you

10   knew who Shawn Drumgold was, right?

11   A.  I didn't know him, I seen him on the street a few

12   times.  I didn't know him like walk up to him and speak,

13   talk, have conversations with him, no.

14   Q.  But you knew who he was?

15   A.  I seen him on Humboldt when I went -- that was the only

16   store that was around, when I go to the store, I see him on

17   Humboldt, I glanced at him.  Other than that, I didn't know

18   him.

19   Q.  And you knew who Terrance Taylor was even though you

20   knew him by his street name?

21   A.  I knew Shawn and Lug about the same.

22   Q.  You knew them not to be buddies, but you knew who they

23   were?

24   A.  I didn't speak to them.

25   Q.  You knew them by sight?

1     A.  Yes.

2     Q.  And when Detective Callahan came to you with a number

3     of photographs, and I believe you testified on Thursday,

4     you were shown six photographs, Shawn Drumgold, Terrance

5     Taylor, Theron Davis and a couple of other photographs, do

6     you remember your testimony?

7     A.  Yes.

8           MS. SCAPICCHIO:  Objection.

9           THE COURT:  Overruled.

10    Q.  When he showed you those photographs, you knew who

11    Shawn Drumgold was, right?

12    A.  Yes.

13    Q.  And you knew who Terrance Taylor was, correct?

14    A.  Same, yes.

15    Q.  And, in fact, you testified in 1989 that you were shown

16    photographs, didn't you?

17    A.  Could have, yes.

18    Q.  Well, let's be clear about this.  Mr. Bailey, if you

19    would bring up the trial transcript.  Let's see, it's page

20    TR 1225.

21          THE COURT:  This is agreed upon?

22          MS. HARRIS:  This is agreed upon.  This is the

23    voir dire.

24    Q.  Okay.  Mr. Evans, I'm going to direct you to the

25    testimony, this is examination by the Assistant District

1     Attorney, Mr. Beauchesne, he's asking questions of you, and

2     I'm going to direct you down to line 9, the question is, "I

3     think you told us first his name was?"  And your answer

4     is?

5     A.  "Terrence Carter."

6     Q.  And continue reading, please.

7     A.  "I know him by Lug, not Terrence."

8     Q.  And the question is put to you, "You know him by Lug?"

9     A.  "Yes."

10    Q.  "And that's the street name?"

11    A.  "Yes."

12    Q.  "Did you know him at that time by his full so-called

13    Christian name?"

14    A.  "No."

15    Q.  "So the name that you knew of the individual that

16    you've identified here in court today, was his name Lug?"

17    A.  "Yes."

18    Q.  "And when you attempted to add to it, when is the first

19    time that you heard his so-called Christian name?"

20    A.  "When I picked him out of a photo."

21    Q.  "You picked him out of photos?"

22    A.  "Yes."

23    Q.  "As being the man who came up to you?"

24    A.  "Yes."

25    Q.  "And at that time you learned from the photo or from

1    the police?"

2    A.   "Yes."

3    Q.   "That his real name was Terrance Taylor?"

4    A.   "Yes, Taylor."

5    Q.   Thank you.  So, according to the trial transcript from

6    your testimony in 1989, you testified that you had been

7    shown photographs and that you picked out Terrance Taylor

8    from that photograph array, correct?

9    A.   Correct, could have.

10   Q.   So, that's as we've just read, this is questioned by

11   the assistant district attorney, correct?

12   A.   Correct.

13   Q.   So when you first began speaking to Sergeant Callahan

14   in June of 1989 and you told him what you knew about the

15   murder of Tiffany Moore, he showed you a photo array,

16   correct?

17   A.   Could have.

18   Q.   And then he brought you in to meet with the assistant

19   district attorney to talk about that information,

20   correct?

21   A.   I don't recall.

22   Q.   Do you recall when you met -- strike the question.  Do

23   you recall speaking with the assistant district attorney at

24   any point prior to taking the stand in 1989?

25   A.   No, I don't.

1    Q.  Do you recall anybody preparing you to testify in

2    1989?

3    A.  No.

4    Q.  You don't.  Do you recall telling anybody in

5    1989 -- strike the question.  Do you recall, sir, that at

6    some point Sergeant Callahan asked you to put your

7    statement on tape?

8    A.  Could have.  I don't recall, no.

9    Q.  Now, we just read from your testimony in 1989 where the

10   questions that were put to you by Mr. Rappaport about

11   speaking to the assistant district attorney in June, he

12   asked you if there had been a tape recorder when you met

13   with the assistant district attorney; do you remember

14   that?

15   A.  There could have been but I don't remember.

16   Q.  Okay.  Well, do you recall that at some point you met

17   with Detective Callahan and gave your statement that that

18   statement was tape recorded?

19   A.  It could have been.

20   Q.  Do you remember ever listening to that tape

21   recording?

22   A.  I think it was here.

23   Q.  And you recognized the voice on that tape recording?

24   A.  Yes.

25   Q.  Mr. Bailey, could we pull up the transcript and the

1     audit cassette.  This is a stipulated exhibit, although I

2     don't have the number.  I'm going to play this and ask you

3     if you recognize this.  No. 5.

4              (Audio recording was played)

5     Q.  Mr. Evans, was that your voice we just heard?

6     A.  Yes.

7     Q.  Do you recall having that conversation that was tape

8     recorded by Mr. Callahan and Detective McDonough?

9     A.  I remember some of it, yes.

10    Q.  The statement starts off saying that it's August 6th of

11    1989, and you were asked where you were living, and

12    according to the transcript, you said you were living at

13    3 Charles Street in Dorchester; do you recall that?

14    A.  Yes.

15    Q.  Is that your brother's address?

16    A.  No.

17    Q.  Do you recall that in August of 1989 that you were not

18    staying at the Howard Johnson's yet?

19    A.  I don't remember when I went into the

20    Howard Johnson's.

21    Q.  I'm sorry.

22    A.  I don't remember what date I went into the

23    Howard Johnson's.

24    Q.  Do you recall that you gave that tape recorded

25    statement prior to going to the Howard Johnson's?

63

1    A.  I don't remember when I gave that statement.

2    Q.  I can't hear you, sir.

3    A.  I don't remember when I gave the statement.

4    Q.  Well, the statement was dated August 6th of 1989, and

5    you said you were living at Charles Street.  Does that help

6    refresh your recollection of whether you were staying at

7    the Howard Johnson's or not?

8    A.  Charles Street is one of the addresses I used.

9    Actually it was my aunt's address, she lived on Charles

10   Street.

11   Q.  Do you recall telling us that you were not living at

12   the Howard Johnson's on August 13th?

13   A.  No, I don't remember it.

14        MS. HARRIS:  May I approach, your Honor?

15        THE COURT:  Yes.  This is the second volume of

16   the deposition, page 534.

17   Q.  And, Mr. Evans, is this a transcript from your

18   deposition taken on July 10th of 2006?  On page 534,

19   directing to the bottom of the page, the question is put to

20   you, "Were you staying at the Howard Johnson's on August

21   13th?"  What was your answer?

22   A.  "I don't think so."

23   Q.  I'll direct you to page 535 at the top.  The question

24   is, "Do you recall you spent your birthday in 1989 staying

25   at the Howard Johnson's?"

1   A.  "I don't recall.  I don't recall.  I don't recall, I
2   don't think I was."
3   Q.  "Okay.  Then the question is you don't think that you
4   were staying at the hotel at that time?"
5   A.  "I don't think I was staying there at the time."
6   Q.  Does reviewing your deposition testimony help refresh
7   your recollection that in August of 1989 you were not
8   staying at the Howard Johnson's?
9   A.  "No, it does not.  I don't remember."
10  Q.  "The statement that we just played here in the
11  courtroom, Mr. Evans, was a tape recorded statement taken
12  from you on August 6th of 1989, and can you tell us the
13  information that you gave in that statement, that
14  information was true, wasn't it?"
15  A.  "No, it was not."
16  Q.  Well, is it true that you were staying at 3 Charles
17  Street in Dorchester?
18  A.  I wasn't staying there, that was the address I used.
19  Q.  It was an address that you used?
20  A.  Yes.
21  Q.  That's not a piece of information that was fed to you
22  by Mr. Callahan, correct?
23  A.  3 Charles Street?
24  Q.  Right.
25  A.  Not that I remember.

Q.  You were asked by Mr. Callahan, did we talk before, and

your answer was that, yes, you had talked about the

Tiffany Moore murder before August 6th, correct?

A.  Everything, most everything that came out of my mouth

on that tape was a lie.  None of that happened.

Q.  And at the time that you were telling these stories to

the police, you were not living at the Howard Johnson's,

correct?

A.  That was me meeting with Detective Callahan and

Detective McDonough, correct.

Q.  I can't hear you, sorry, sir.

A.  I was meeting with Detective Callahan and McDonough,

yes.

Q.  You can't tell us -- we just looked at your deposition

testimony, sir, and you said as of August 13th of 1989, you

don't believe you were living at the Howard Johnson's

yet?

A.  When I made that statement I was with Mr. Callahan.

Q.  Yes, you were with Mr. Callahan, that's correct, you

were not yet staying at the Howard Johnson's?

A.  I don't recall, no.

Q.  And you had made a statement similar to this one in

June of 1989 when you met with the assistant district

attorney, correct?

A.  I don't recall.

1    Q.  Do you recall that in September of 1989 that a private

2    investigator came to your brother's house on Trull Street

3    looking for you?

4    A.  No.

5    Q.  Do you recall, Mr. Evans, that during the summer of

6    1989 that the case that was being brought against Treas

7    Carter was scheduled for trial in September of that year?

8    A.  I don't remember the date that the trial was, no.

9    Q.  Do you recall meeting with an assistant district

10   attorney to prepare for your testimony at the trial of the

11   Treas Carter case in September of 1989?

12   A.  No.

13   Q.  You don't remember that?

14   A.  No.

15   Q.  Do you recall meeting with anybody at the district

16   attorney's office by the name of Paul Connolly?

17   A.  Not that I remember.

18   Q.  Do you recall speaking with Assistant District Attorney

19   Phil Beauchesne about your anticipated testimony in the

20   Tiffany Moore case?

21   A.  I don't remember.  I could have.

22   Q.  Do you remember that you did in fact testify at the

23   Tiffany Moore trial?

24   A.  Yes.

25   Q.  And do you recall when you testified at the

1    Tiffany Moore case that you were summons into court and you
2    had to sign in as a witness; do you remember that?
3    A.  No.
4    Q.  Do you remember meeting with anybody prior to getting
5    on the stand in October of 1989?
6    A.  Prior to getting on the stand?
7    Q.  Prior to getting on the stand.
8    A.  Not that I can remember.  Not that I can remember.
9            MS. HARRIS:  Your Honor, with the Court's
10   permission, I'd like to go through the testimony of
11   Mr. Evans at the 1989 trial.
12           THE COURT:  You may.
13           MS. HARRIS:  Mr. Bailey, I'd ask you to go to the
14   trial transcript, page 432.  Actually, Mr. Bailey, before
15   we get to that stage, I'd like to use a chalk, your Honor,
16   which has been shown to the other side.  If I may, just to
17   get the locations.
18           THE COURT:  No objection, I take it?
19           MS. SCAPICCHIO:  None, your Honor.  Sorry.
20           THE COURT:  All right.  Go on.
21   Q.  Is that up on your screen, Mr. Evans?
22   A.  Yes.
23   Q.  Mr. Bailey, could you focus in on the first square,
24   please.  This is a closeup of a map.  Do you recognize the
25   streets Humboldt and Homestead?

1    A.  Yes.

2    Q.  And I'm going to point to a corner.  Do you recollect

3    that that's the corner of Homestead and Humboldt Avenue?

4    A.  Yes.

5    Q.  Now, I think that you had testified earlier that you

6    knew who Shawn Drumgold was because you had seen him by the

7    supermarket.

8    A.  I seen him.

9    Q.  Okay.  And where I've just put the arrow, is that where

10   you recollect that Mr. Drumgold lived at the time back in

11   1988, 1989?

12   A.  I don't remember where he lived, I used to see him on

13   the street.

14   Q.  Did you testify a little bit earlier you had seen him

15   when you had gone to the store on Humboldt Avenue?

16   A.  Yes.

17   Q.  Did you know he lived near or above that store?

18   A.  No, I did not.

19   Q.  Let's stop at this slide, if we could.  I'm just going

20   to put a pointer there.  That first block, Mr. Evans, that

21   was the intersection we were just looking at in the

22   closeup.  Now we're going to look at this block over here,

23   and do you see that this is Elm Hill Avenue?

24   A.  Yes.

25   Q.  And it's running, Seaver Street is running up on one

1  side and Brookledge runs up to Elm Hill Ave.; is that

2  right?

3  A.  Yes.

4  Q.  And is that consistent with how you recollect that

5  neighborhood, that's how those streets are laid out?

6  A.  Yes.

7  Q.  Now, there's a red building here, 118, and that's the

8  building where your cousin Willie lived, correct?

9  A.  Excuse me.

10  Q.  118 Elm Hill, that's the building where your cousin

11  Willie lived there?

12  A.  He didn't live there, my other cousin lived there.

13  Q.  118 is the place where you sometimes stayed?

14  A.  Yes.

15  Q.  And beside it we have Sonoma Street and one street up

16  from there is Seaver Street, correct?

17  A.  Right.

18  Q.  Now, this neighborhood is bordered by Franklin Park.

19  Is this the area that's shown on this photograph, is this

20  the neighborhood that you were referring to as Grove Hall?

21  A.  That's Seaver Street.

22  Q.  Okay.  Seaver Street runs along Franklin Park,

23  correct?

24  A.  Correct.

25  Q.  And this up here, that's Humboldt and Homestead,

1    correct, and then over here about a block away is Elm Hill,

2    correct?

3    A.  Excuse me, repeat that please.

4    Q.  Yes.  Up here where I put this purple mark at the top

5    of the screen, where that purple mark is, that's the

6    Humboldt and Homestead intersection, correct?

7    A.  Yes.

8    Q.  And then down here we have Seaver Street, right, that

9    runs along the park?

10   A.  Yes.

11   Q.  And then over here we have Elm Hill Avenue, correct?

12   A.  Yes.

13   Q.  So we can all be oriented.

14        MS. HARRIS:  Thank you, Mr. Bailey.

15   Q.  Could you start with the transcript, please.

16   Mr. Evans, I'm going to direct you to the screen now that's

17   up in front of you, and I'm going to represent to you that

18   this is the direct, excuse me, this is the testimony that

19   you provided in 1989, and I'm going to ask the questions,

20   and I'm going to ask you to read your answers, okay?

21   A.  Uh-hum.

22   Q.  All right.  So this is the direct examination by

23   Mr. Beauchesne, and we begin in asking you to tell us your

24   name, sir, and your answer, please.

25   A.  Ricky Evans.

1    Q.  How old are you, Mr. Evans?

2    A.  I'm 20.

3    Q.  Back in 1988 --

4           THE COURT:  I'm sorry, I didn't understand are

5    you going through his entire testimony?

6           MS. HARRIS:  Yes, your Honor.

7           THE COURT:  Is there some reason we have to do

8    that rather than skipping around or letting the jury read

9    about this?  The jury will have this testimony.  Why do we

10   need to go through it?

11          MS. HARRIS:  I can skip through it, your Honor,

12   if you'd like me to simplify it.

13          THE COURT:  I would like you to simplify it.

14          MS. HARRIS:  I would like the jury to hear the

15   background information, where he establishes his age and

16   where he was living and when he became involved in it,

17   yes.

18          THE COURT:  I'll let you do that to a degree,

19   yes.  We'll see where we're going.  The transcript will be

20   available to the jury, and you can argue from it.  The

21   question is whether or not he has a comment to make on the

22   transcript.  That's the only purpose for which it should be

23   offered if you'd skip around.

24   Q.  With that, looking at the transcript, sir, so you're

25   asked, "How old are you, Mr. Evans," and can you give us

1    your answer, please?

2    A.   "I'm 20."

3    Q.   Then on line 12, on line 9, "Back in 1988, August 19th,

4    do you recall the night Tiffany Moore was shot?"

5    A.   "Yes."

6    Q.   "And during that evening, at some time did you happen

7    to be in the company of an individual by the name of

8    Shawn Drumgold?"

9    A.   "Yes."

10   Q.   "And do you see here today the individual that you were

11   with that evening?"

12   A.   "Yes."

13   Q.   And then the transcript reflects that you identified

14   Mr. Drumgold in open court.  Go to the next page, please.

15   On line 16, the question was, "Where were you at the time,

16   at the time that you saw Mr. Drumgold?"  Can you answer,

17   please.

18   A.   What number?

19   Q.   Line 17.

20         MS. SCAPICCHIO:  Judge, is there a question?

21         THE COURT:  I'm waiting for a question.

22   A.   118 Elm Hill, the corner of Sonoma and --

23         THE COURT:  You've asked him to recite what he

24   has recited which the jury will have.

25         MS. HARRIS:  I'm going to ask him now, your

1    Honor, the 118 Elm Hill Avenue that he testified to in 1989

2    is the location that was just identified by me.

3             THE COURT:  You can have it.

4    Q.  Mr. Evans, you answered 118 Elm Hill Avenue, the corner

5    of Sonoma and Elm Hill, and that's the area we just looked

6    at on the map; is that right?

7    A.  Yes.

8    Q.  And 118 Elm Hill Avenue is where one of your cousins

9    lived; is that right?

10   A.  Yes.

11   Q.  So when you were asked if you had seen Mr. Drumgold on

12   the night of the Tiffany Moore murder, you indicated that

13   you saw him at the apartment building where your cousin

14   lived?

15   A.  I never seen Mr. Drumgold.

16   Q.  I'm asking you what you said when you were testifying

17   under oath in 1989, is that what you told the jury that you

18   saw him at the apartment building where your cousin was

19   living where you sometimes stayed?

20   A.  I don't remember everything I testified.  Everything

21   was a lie.

22   Q.  The next line on page 19 is how far is that from the

23   corner from Humboldt and Homestead, and your answer was two

24   blocks?

25   A.  About two blocks.

1    Q.  That's correct, right, what we just looked at, the

2    corner of Elm Hill and Sonoma is about two blocks from the

3    corner of Homestead and Humboldt, correct?

4    A.  Yes.

5    Q.  And then you indicated that your cousin Willie Evans

6    was also there with you?

7    A.  Uh-hum.

8    Q.  Your cousin Willie Evans that you testified to in 1989

9    was the individual that you testified that was shot in

10   December of '88, correct?

11   A.  Yes.

12   Q.  And now we're at the Tiffany Moore murder some few

13   months before the incident where you and your cousin were

14   shot, correct?

15   A.  Could have.  I'm not for sure.

16   Q.  Do you remember that the shooting of yourself and your

17   cousin occurred in December of 1988?

18   A.  I don't remember what date it was we got shot.

19   Q.  Do you remember what year it was that you got shot?

20   A.  It must have been '88 or '89.

21   Q.  Okay.  It was after the shooting death of

22   Tiffany Moore, wasn't it?

23   A.  I don't recall.  I don't remember the majority of

24   things that happened that I testified about Tiffany.

25   Q.  On the page 434 that's up on your screen, you testified

1    that you were with your cousin and that he was shot and

2    that he had been killed.  Now, when you testified to that

3    in 1989 on page 434, when you testified that you were

4    present and your cousin was shot, that was truthful

5    testimony, wasn't it, sir?

6    A.  Excuse me.

7    Q.  That testimony was truthful when you told the jury in

8    1989 that you and your cousin had been shot?

9    A.  True.

10   Q.  That was true, right?

11   A.  Uh-hum.

12   Q.  Now, if I could go, please, to page TR 1227, and do you

13   recollect answering the district attorney in 1989 that when

14   you were with Shawn Drumgold and Terrance Taylor on the

15   evening of August 19th of 1988 that you heard Terrance

16   Taylor say to Shawn Drumgold, I know where Chris and Mervin

17   and Chaney are?  Do you recollect that you testified to

18   that effect?

19   A.  No.

20   Q.  On page 1227, there was a question at line 15 that

21   says, "Did you hear a conversation between the man you know

22   as Lug and the individual that you know as Shawn Drumgold?"

23   And your answer was?

24   A.  "Yes."

25   Q.  "And would you tell us what you heard?"

1    A.  "He walked with Shawn," and he said, "I know where

2    Chris and Mervin and Chaney."

3    Q.  And they asked you to repeat that testimony, and on the

4    next page at line 6, can you read your answer?

5    A.  I know where Mervin and Chaney, yes, that's what he

6    said, Mervin and Chaney.

7    Q.  Thank you.  Now, off the transcript, Mr. Evans, we

8    looked at your deposition testimony where you said that the

9    word on the street was that Mervin and Chris were running a

10   retaliation and that that's what led to the shooting that

11   Tiffany Moore had been caught up in, do you remember your

12   testimony from the deposition?

13   A.  I don't remember saying there was retaliation.

14   Everything is on the screen here.  I barely remember it

15   because most everything here on the Tiffany Moore was made

16   up back then.  I don't remember everything I said.

17   Q.  Okay.  But I'm asking you what you said in 2007 when we

18   asked you what information you got from the street, and you

19   told us that you had heard on the street that there was a

20   beef going on between Castlegate and Humboldt involving

21   Mervin and Chris Chaney and that Tiffany Moore got shot as

22   a result.  Do you remember testifying to that effect in

23   2007?

24   A.  I could have.  I don't recall.

25            MS. HARRIS:  Just one minute, your Honor.

1    Q.  In any event, you had heard on the street that there

2    was a beef between Castlegate and Humboldt.  That wasn't

3    anything that was fed to you by Detective Callahan; isn't

4    that right?

5    A.  I don't recall.

6    Q.  And when you testified in 1989 that you heard Terrance

7    Taylor say to Shawn Drumgold I know where Mervin and

8    Chaney's at, that was information that was not prompted,

9    not given to you or fed by Detective Callahan; isn't that

10   right?

11   A.  It could have been said in front of me and I picked up

12   on it and I testified to it, yes.

13   Q.  So, is it your testimony, Mr. Evans, that this

14   information was said to you and then you went in and talked

15   to the assistant district attorney and gave him the

16   information that was fed to you in June of 1989?

17   A.  I don't remember talking.

18          MS. SCAPICCHIO:  Objection.  He didn't say

19   that.

20          THE COURT:  Excuse me, I don't understand the

21   question either.

22   Q.  When you met with the assistant district attorney in

23   June of 1989 and you told him what you knew about the

24   Tiffany Moore murder, was that information that had been

25   fed to you by Detective Callahan?

1    A.  I don't remember talking to the assistant district

2    attorney back in '89.

3    Q.  And looking at the testimony from 1989 where you said

4    you met him in June of 1989, that doesn't help refresh your

5    recollection?

6    A.  No.

7    Q.  If you could go to page 1235, please.  At line 18,

8    Mr. Evans, you were asked, "At that particular time after

9    there was conversation and you saw their guns, what

10   happened?"  Your answer?

11   A.  "They turned around and went back down Elm Hill."

12   Q.  And the question was, "Down Elm Hill, in what

13   direction?"

14   A.  "Towards Schuyler."

15   Q.  "And did you see them again that night, the night of

16   the shooting?"

17   A.  "Yes."

18   Q.  Now, off the transcript for a moment.  We just

19   identified Schuyler Street as running off Elm Hill Avenue,

20   correct?

21   A.  Correct.

22   Q.  So when Schuyler Street when you testified you saw them

23   going from Elm Hill to Schuyler Street, you're referring to

24   about a block away from where your cousin was staying,

25   correct?

1      A.  Repeat that, please.

2      Q.  When you testified you saw Mr. Drumgold and Mr. Taylor

3      walk down towards Elm Hill towards Schuyler, you were

4      testifying that they were walking in front of your cousin's

5      building to the next block, which is Schuyler Street,

6      correct?

7      A.  They couldn't have been.  It was all made up.  I mean,

8      I know that area like the back of my hand.  I grew up

9      there.  I knew where what street is where, you know.

10     Q.  And Schuyler runs off Elm Hill, correct?

11     A.  Yes, it does.

12     Q.  Then on the next page, if I take you to line 9, "Some

13     time after you saw them in the car, did you see them

14     again?"

15     A.  "Yes."

16     Q.  And the question is, "Where was that?"  Your answer at

17     line 13.  It's page 1236, Chris.  Then at line 13,

18     Mr. Evans, you were asked, "Where did you see them after

19     you saw them in the car?"  At line 13.

20     A.  They was coming from Seaver Street.  It was coming up

21     from Seaver Street.

22     Q.  Chris, could we bring up the map again.  So, according

23     to the testimony that you gave in 1989, you saw

24     Mr. Drumgold and Mr. Taylor walk down Elm Hill towards

25     Schuyler Street?

1    A.  I didn't see them.

2    Q.  I'm asking you about what your testimony was in 1989.

3    You're going down Elm Hill Avenue towards Schuyler Street,

4    then some time later coming back up toward Elm Hill from

5    Seaver Street; is that correct?

6    A.  That was in the testimony, yes.

7    Q.  If we could, please, go to page 486.  At the bottom of

8    the page, on line 19, you state, "When Shawn turned around,

9    I think he had on a sweater or something," at line 22, you

10   state, "He had on like a sweater," then at line 24, "and he

11   had a pistol up under it."  Do you see that testimony?

12   A.  Uh-hum, yes.

13   Q.  Is it your testimony that Detective Callahan told you

14   to say he was wearing a sweater on August 19, 1988, or is

15   that one of the things you made up on your own?

16   A.  I don't recall.

17   Q.  Then on the next page at 487, you're asked at line 10,

18   "Did you see them again some time that night?"

19   A.  "Yes."

20   Q.  And then line 13, 45 minutes to an hour, excuse me, I'm

21   sorry, at line 12, "How much later was that?"  If you can

22   help us in your answer.

23   A.  "45 minutes to an hour, something like that."

24   Q.  Then on page 488 at line 6, you're asked, "Did you go

25   anywhere?"  And your answer is, "No, 118."  That means you

1    were staying at 118, right, you didn't leave 118?

2    A.  I don't understand.

3    Q.  At the top of the page when they came back, at line 2,

4    "When they came back, what, if anything, did you do?"  What

5    was your answer?

6    A.  "We bought some beer."

7    Q.  Question, "Who bought the beer?"

8    A.  "Willie."

9    Q.  "And did you go anywhere?"

10   A.  "No, 118."

11   Q.  Off the transcript.  So you mean that you stayed at

12   118?

13   A.  We stayed there for a little while.

14   Q.  Okay.  Then going down to line 20, excuse me, line 17,

15   "At some time though there was some conversation between

16   either one of these defendants concerning the guns they

17   had."  What was your answer?

18   A.  "Yes.  First I asked, I said, where's the guns?"

19   Q.  The question is, "Who do you ask where's the guns?"

20   A.  "Lug."

21   Q.  "Lug Taylor?"

22   A.  "Yes."

23   Q.  "What did he reply?"

24   A.  "At first he didn't say nothing about the guns, so he

25   had drunk another beer, and then I asked him about it, and

1    he said they was hot or something."

2    Q.  And read your answer at line 6.

3    A.  "He said something like they was hot.  The guns is hot

4    or something."

5    Q.  And then if we could go down to line 22, the question

6    was, "Where was Drumgold when that was said?"  What was

7    your answer?

8    A.  "He was standing there."

9    Q.  Question, "Did he say anything about the guns?"

10   A.  "Not that I recall."

11   Q.  And then, "Was there anything about the behavior of

12   either of these two men that attracted your attention?"

13   A.  "Nervous."

14   Q.  "Who was nervous?"

15   A.  "Shawn."

16   Q.  And going off the transcript, so the piece of testimony

17   that they just read, Mr. Evans, was this information that

18   you heard from the streets?  Was this information that you

19   made up?

20   A.  I don't recall.

21           THE COURT:  Let's take our morning break at this

22   time.  All rise for the jury.

23           (A recess was taken.)

24           THE CLERK:  All rise for the jury.

25           THE COURT:  You can be seated.

1          MS. HARRIS:  Could we see you at sidebar?

2          THE COURT:  Yes.

3          (THE FOLLOWING OCCURRED AT SIDEBAR:)

4          THE COURT:  Explain to me why you couldn't have

5     told Maryellen before the jury came out.

6          MS. HARRIS:  I apologize.  Just one second I

7     wanted to put an objection not to go into the entire

8     transcript.

9          THE COURT:  Okay.  Your objection is noted.

10          MS. HARRIS:  Thank you.

11          (SIDEBAR CONFERENCE WAS CONCLUDED)

12     Q.  Mr. Evans, before we took the break, we were talking

13     about your testimony that you offered in 1989, and I had

14     asked you if you recalled being visited by a private

15     investigator prior to your testimony in 1989.  Do you

16     recall me asking you that question?

17     A.  Yes.

18     Q.  And I believe your testimony was you had no memory of a

19     private investigator coming to see you prior to you taking

20     the stand in the Tiffany Moore murder; is that correct?

21     A.  Not that I recall.

22          MS. HARRIS:  Could I please see the transcript at

23     page 517, Mr. Bailey.

24     Q.  Turning your attention to line 5, Mr. Evans, the

25     question, first full sentence states, "Do you remember an

84

1     investigator coming to your house on September 12th at

2     about eleven in the morning?  And the Court says, "This

3     year?"  And Mr. George says, "Yes, this year."  Your

4     answer?

5     A.  "Oh, yes."

6     Q.  Do you recall as you sit here today, Mr. Evans, does

7     this transcript refresh your recollection that you were

8     visited at your house on September 12th, 1989 by a private

9     investigator?

10    A.  No.

11    Q.  Does this testimony refresh your recollection that on

12    September 12th of 1989 you were living with your brother on

13    that date?

14    A.  No.

15    Q.  Do you have a recollection, Mr. Evans, of being visited

16    by an investigator on September 12th at your brother's

17    house and then calling Detective Callahan to say that

18    somebody had come by the house and was asking you questions

19    about the Tiffany Moore murder?

20    A.  I don't remember.

21    Q.  Well, you recollect, I believe you testified last week,

22    Mr. Evans, that you were taken by Detective Callahan to the

23    Howard Johnson's, correct?

24    A.  Yes, correct.

25    Q.  Now, as you sit here today, do you recollect that the

1    day you were taken to the Howard Johnson's was

2    September 12th of 1989?

3    A.  Not for sure, I'm not sure.

4    Q.  You're not sure of the date?

5    A.  No, I don't remember.

6    Q.  And you don't remember somebody coming to your house

7    and asking you what your testimony was going to be in the

8    Tiffany Moore case?

9    A.  No.

10   Q.  Somebody other than a police officer?

11   A.  No.

12   Q.  And you don't recollect testifying in 1989 that an

13   investigator came to your house at about eleven in the

14   morning asking you about the Tiffany Moore case?

15   A.  I don't recall.

16          MS. HARRIS:  Take that down, Mr. Bailey.

17   Q.  Now, when you were taken to the Howard Johnson's, you

18   were staying with your brother, correct?

19   A.  I was at my brother's house.

20   Q.  You were at your brother's house?

21   A.  Yes.

22   Q.  And the police knocked on the door, correct?

23   A.  Correct.

24   Q.  And when the knock came at the door, your testimony is

25   that that was Detective Callahan, correct?

1    A.  Correct.

2    Q.  And you had no idea why he was there?

3    A.  Excuse me.

4    Q.  You had no idea why he was there?

5    A.  When the door was answered, the door was answered,

6    there was three cops actually, Detective Callahan, who I

7    went downstairs with, and there was a cop on the front

8    porch and a cop standing by the corner.  They put me into

9    the car, and they took me right to Howard Johnson's

10    Hotel.

11    Q.  And did you ask him why he was taking you to the

12    Howard Johnson's hotel?

13    A.  No, why would I ask Mr. Callahan?

14    Q.  Why would you ask him?

15    A.  Yes.

16    Q.  Did you know why you were going?

17    A.  I trusted him.

18    Q.  Did you call Detective Callahan earlier that day?

19    A.  No, I don't recall.

20    Q.  And report that you were having concerns that somebody

21    was coming around your house looking for you?

22    A.  No, I don't recall.

23    Q.  Do you recall that when you testified in the trial of

24    Tiffany Moore, do you recall how you got to the

25    courthouse?

1    A.  From the hotel?

2    Q.  Yes.

3    A.  I don't recall, but, no, I don't recall.

4    Q.  You don't recall?

5    A.  No.

6    Q.  Now, I believe that you testified on Thursday that when

7    you were staying at the hotel that Mr. Callahan came by and

8    gave you money?

9    A.  Yes.

10   Q.  And I believe that you testified that he gave you $45,

11   $50 whenever you asked him for it; is that your

12   testimony?

13   A.  Whenever I wanted it, whenever I needed money, I just

14   called him, and he'd bring it to me.

15   Q.  And he'd come and show up and give you money?

16   A.  Yes.

17   Q.  And do you recall testifying on Thursday that this

18   happened, you couldn't remember how many times, but you

19   said it was quite a few times; do you remember that

20   testimony?

21   A.  That he --

22   Q.  That he came to give you money when you called him and

23   asked for money?

24   A.  I seen him quite a few times, yes.

25   Q.  Do you recall that when you testified at the motion for

1    new trial that you said on page 20 that they would -- you

2    said they would give you money, 35, 40, 45, money sometimes

3    weekly, sometimes biweekly?  Do you remember your testimony

4    at the motion for new trial?

5    A.   Whenever I wanted it.

6    Q.   Was that a weekly paycheck or paid every week, every

7    biweek?

8    A.   I wouldn't say a paycheck, I'd say whenever I needed

9    it, he gave it to me, I got it.

10   Q.   And all you had to do was call him and the money would

11   show up?

12   A.   That was it.

13   Q.   For how long did that last, that arrangement?

14   A.   I was in Howard Johnson's for at least eight, at least

15   eight months, and after the trial, it was like he

16   disappeared and I didn't see anybody.  I didn't see nobody

17   no more.

18   Q.   Did you call him and say, hey, I could use $80 bucks?

19   A.   No, I was staying at the hotel and I was working at the

20   same time myself.

21   Q.   And after the trial, you didn't bother calling

22   Detective Callahan?

23   A.   I didn't see anybody.  It was just like they faded

24   away.  I did what was asked, and after they finished with

25   me, it was like they just faded away.

1    Q.  Nobody asked you to do anything, did they, Mr. Evans?

2    A.  Excuse me.

3    Q.  Nobody asked you to do anything, did they?

4    A.  What I picked up on, why sit in front of me and discuss

5    something and put me up in a hotel?  Everything I wanted --

6    Q.  When you were put up in the hotel, you had already

7    given you statement in June of 1989, hadn't you, sir?

8    A.  Excuse me.

9    Q.  When you were put up in the hotel, you had already

10   given your statement in June of 1989, had you not?

11   A.  I don't recall.

12   Q.  You had already given your tape recorded statement on

13   August 6th of 1989, hadn't you?

14   A.  I don't recall.  If it's on tape, it must have been.

15   Q.  And in the deposition, excuse me, in the trial

16   transcript when you were asked if an investigator came to

17   your house on September 12th about eleven in the morning,

18   you said yes, so on September 12th, you were living in your

19   brother's house, you weren't living at the

20   Howard Johnson's?

21   A.  No, I said I was at my brother's house.  I didn't say I

22   was living there.

23   Q.  And that's the place you went back to after you left

24   the Howard Johnson's, right, you went back and lived with

25   your brother again?

1    A.  I don't recall where I went after the

2    Howard Johnson's.

3    Q.  In any event, is it your testimony you left the

4    Howard Johnson's because you got tired of living there?

5    A.  I wasn't receiving anything, I mean, everything faded

6    away, and it was like I was on my own.  I got tired of

7    being there so I just packed up and I just left.

8    Q.  Did you ever call Detective Callahan and say, hey,

9    let's have dinner?

10   A.  No.

11   Q.  You testified earlier on Thursday that the two of you

12   would have dinner at the Howard Johnson's?

13   A.  As I was staying there, as I was staying there,

14   downstairs would call upstairs, I would go downstairs and

15   meet them and we would eat in the cafeteria.  It was always

16   the three of us.

17   Q.  Mr. Evans, you were arrested a couple of times

18   following your testimony in 1989, were you not?

19   A.  Yes.

20   Q.  And at those occasions when you were arrested, you were

21   assigned counsel, correct, to represent you, assigned an

22   attorney?

23            MS. SCAPICCHIO:  Objection, your Honor.

24            THE COURT:  Overruled.

25   A.  Yes.

1    Q.  Did you ever have anything filed with the Court that

2    said I lied in a murder trial in 1989?

3    A.  No.

4    Q.  Did you ever tell anybody in your family that you lied

5    when you testified in 1989?

6    A.  Not that I recall.  I mostly kept it to myself.

7    Q.  Did you ever tell anybody from Mr. Drumgold's family

8    that you lied in the murder trial in 1989?

9    A.  I don't know anybody in Mr. Drumgold's family.

10   Q.  Did you ever reach out to Mr. Taylor and said sorry?

11   A.  I don't know Mr. Taylor.

12   Q.  The first time you said anything to anybody in 1989 is

13   when you were approached by a reporter from the Boston

14   Globe, right?

15   A.  Reporter?  I remember I had started receiving cards,

16   business cards under my door, so I talked to him and he

17   wanted me to meet me in South Boston.  I told him I had to

18   pick my son up, my son was a couple years old, and so when

19   I met him in South Boston --

20   Q.  And you told him that everything that you had testified

21   was true?

22   A.  When I met him in South Boston, he started bringing up

23   the Shawn Drumgold case.  I said, "I have my son in the

24   car."  I wanted to get him home because I didn't want to be

25   bothered with the case anymore.

1    Q.  You told him that your testimony was true and that the

2    way you testified was the way it happened, didn't you?

3    A.  I never told him the testimony was true.

4    Q.  After this article came out, that's the first time that

5    you appeared in any court anywhere to say your testimony

6    that was false?

7    A.  No.

8    Q.  And isn't it that because you felt you had been

9    disgraced by his article?

10    A.  No, the first time I got to Court was when I got a

11    letter in the mail saying I had to be in the court.

12    Everybody have a conscious, and my conscious was I lied and

13    I had a guy locked up for a certain amount of years, and it

14    stuck with me for the longest, all my life, and I got tired

15    living with those, that guilt, that's the only time I could

16    make it up right, try to make things right.

17    Q.  That's the only time you could do anything about it.

18    You couldn't do anything about it when you were on the

19    stand?

20    A.  It was conscious.  I have a conscious, yes.

21    Q.  Where was it in 1989?

22    A.  Excuse me.

23    Q.  Where was it in 1989?

24    A.  In Mr. Callahan's pocket.

25    Q.  That wasn't very nice.  When you testified in 2003 and

1    you testified that you couldn't name a single person who

2    had fed you information --

3    A.  Excuse me.

4    Q.  When you testified in 2003 and you were asked to

5    identify who fed you information, you couldn't identify a

6    single person who had given you any information?

7    A.  I don't recall that.

8    Q.  You don't recall it?

9    A.  No, I don't.

10   Q.  Mr. Evans, in the summer of 1989, when you were a

11   witness both in the Treas Carter case and in the

12   Tiffany Moore case, do you recall meeting with a victim

13   witness advocate from the Suffolk County D.A.'s Office

14   called Laura Scherz?

15   A.  No.

16   Q.  Do you recall meeting with Laura Scherz and talking to

17   her about getting job training?

18   A.  No.

19   Q.  Do you recall meeting with Ms. Scherz and talking about

20   getting housing arrangements so you could live with the

21   mother of your child?

22   A.  I don't remember meeting her.  I could have met with

23   her, but I don't remember meeting with her.

24   Q.  Do you recall in the summer of '89 you had a little

25   girl?

94

1    A.  Yes, correct.

2    Q.  She was a couple months old?

3    A.  Yes.  She was a baby, yes.

4    Q.  And when you testified in the Tiffany Moore case and

5    the defense attorneys asked you why you suddenly developed

6    a civic duty, and you told them that you had a daughter,

7    that if somebody killed her, you would want somebody to

8    testify for her; do you recall that testimony?

9    A.  Could you repeat that?

10   Q.  Yes.  When you were asked in 1989 by the defense

11   attorneys why you had come forward to provide information

12   in the Tiffany Moore case, you told them because you were a

13   father and you had a little girl and if it happened to your

14   little girl, you'd want somebody coming to court; isn't

15   that what you told the defense attorneys in 1989?

16   A.  I could have, but I don't recall.

17   Q.  You don't recall swearing on your daughter when you

18   went to court?

19   A.  I could have, but I don't recall it.

20   Q.  Trial testimony, please, at page 523.  Mr. Evans, I'll

21   tell you that at this point in your trial testimony you

22   were describing that you knew the difference between a

23   blackjack and a knife and a gun, and then at line 11,

24   you're asked by Mr. Drumgold's attorney, "You're positive

25   that you're telling the truth here today?"  Can you read

1    your answer?

2    A.  "Today, yes."

3    Q.  And at 14, "You never told anyone this," your

4    testimony, "until June of this year?"  Your answer?

5    A.  "It wasn't my business to get into it."

6    Q.  "But it became your business in June of this year?"

7    A.  "I just felt like the lady, she lost her daughter, so

8    why not go and tell the truth when you can?"

9    Q.  And then at line 19, "Is that what you felt all of a

10   sudden, all of a sudden you felt that way, Ricky?"  Your

11   answer?

12   A.  "Well, I tell you something.  I got a daughter myself,

13   and I wouldn't want her to be sitting on the mailbox and

14   get shot."

15   Q.  So when you testified in 1989 and the defense attorneys

16   asked you if you were telling the truth, asked you if you

17   were positive that you were telling the truth, you said

18   that you were, and you said, "I tell you something, I've

19   got a daughter myself;" isn't that what you testified to?

20   A.  Yes, that's what's on here, yes.

21   Q.  That's what's on there.  And you told them about your

22   daughter because you wanted them to believe you, right?

23   A.  If -- if I wouldn't have testified, if I wouldn't have

24   testified back then in '88, '89, about the things about

25   what I was supposed to say or what was fair to me, I was

1    young, I was on the street.  I didn't know where I was

2    going to sleep the next night.  I didn't know where I was

3    going to get my next meal from.

4    Q.  And then you got tired?

5              THE COURT:  Let the witness answer.

6    A.  I didn't know where I was going to sleep the next day,

7    I didn't know where I was going to eat.  You got two

8    detectives backing you up for everything you do, of course

9    I lied.  It was a lie.

10   Q.  And, in fact, you lied to the detectives, didn't you?

11   A.  Excuse me, about?

12   Q.  You lied to the detectives about the information that

13   you gave them?

14   A.  I was taking the information from them, and I would

15   tell them what they wanted to hear.

16   Q.  I'm going to refer you to your deposition testimony of

17   July 10th, 2006, page 421.

18             MS. HARRIS:  May I approach, your Honor?

19             THE COURT:  Yes, you may.

20             MS. SCAPICCHIO:  1 or 2?

21             MS. HARRIS:  2.

22             MR. REILLY:  What page?

23             MS. HARRIS:  421, to line 19 on 421.

24   Q.  During the course of your being interviewed by the

25   detectives, I believe you said you thought you were telling

1      them what they wanted to hear.  Can you read your answer?

2      A.  "What it was, like yeah, however, how do I put this, I

3      knew I wasn't at the scene at the time of Tiffany's killing

4      and whatever I thought the cops was going to hear the truth

5      or no truth, it wasn't the truth, I started talking and

6      didn't know how to shut up."

7      Q.  In other words, you lied to the police officers when

8      they were talking to you?

9      A.  Uh-hum.

10     Q.  Is that a yes?

11     A.  Yes.

12     Q.  As a part of it you made things up that you thought

13     would satisfy them?

14     A.  I said things, yes.

15     Q.  You said things, you made things up yourself?

16     A.  Yes.

17     Q.  And nobody, not Detective Callahan or anybody else,

18     came to you and said, Ricky Evans, we'd like you to come

19     into this case and lie for us?

20     A.  Repeat that, please.

21     Q.  Nobody came to you, Detective Callahan or anybody else,

22     and said, hey, Ricky Evans, we'd like you to come in and

23     lie for us in this case, did they?

24     A.  I saw a homicide in front of me.  A young kid --

25     Q.  A young kid who could memorize all of it, go through

1    two cross-examinations, let me finish, please, two

2    cross-examinations, a direct examination by an assistant

3    district attorney in front of the Judge; is that what you

4    want this jury to believe?

5    A.  Excuse me.

6    Q.  Do you want this jury to believe that when you

7    testified in 1989, you were reciting something that had

8    been fed to you, it was a script?

9    A.  I'm not sitting here to be believed, you know what I

10   mean, what I'm saying is that I would do anything to get by

11   at that time.

12   Q.  If I could just have one moment.

13            MS. HARRIS:  Your Honor, I have nothing

14   further.

15            THE COURT:  Thank you.  Anything further?  Mr.

16   Roache.

17            MR. ROACHE:  Thank you, your Honor.

18                      CROSS-EXAMINATION

19   BY MR. ROACHE:

20   Q.  Good morning, Mr. Evans.

21   A.  Good morning.

22   Q.  Good morning, ladies and gentlemen of the jury.

23   Mr. Evans, you're no stranger to the court system, are

24   you?

25   A.  No, I'm not.

1    Q.  You've been in court on many occasions, haven't you?

2    A.  Yes, I have.

3    Q.  And on many of those occasions, you have not been

4    truthful to the Court, have you?

5    A.  Not many of them, no.

6    Q.  Well, sir, when you gave aliases on arrests, and I

7    believe you gave three aliases back in 1988; is that

8    correct, sir?

9    A.  It could have been.  It could have been more.

10    Q.  Okay.  And I believe you testified that the aliases

11    that you gave you gave because you did not want either the

12    police or the Court to know your true name for fear of

13    going to jail?

14    A.  No, when I testified is when the cops or the police

15    stopped me, I would give an alias so they wouldn't lock me

16    up.

17    Q.  Okay.  In 1988, you were given the names of was it

18    Raicky Griham?

19    A.  Griham, Corey.

20    Q.  Tyronne Corey?

21    A.  Yes.

22    Q.  And there was a third name, was there not, Wadsworth?

23    A.  That's four.

24    Q.  Four names?

25    A.  Yes, four.

Q.   Four names.  So each time you were arrested you lied to
the police as to what your name was, correct?

A.   Not each time, but if I could get away, sure.

Q.   Okay.  And then when you were arrested, sir, you were
brought to court, and you didn't tell the probation officer
your true name, did you?

A.   If I went to court, I got fingerprinted.  They did know
who I was.

Q.   Well, sir, sometimes in small cases like trespassing
cases, you would not be fingerprinted, would you?

A.   If I could turn back some of the --

Q.   Could you answer the question, sir.  Let me rephrase
it.  There are times when you were arrested that you were
not fingerprinted or photographed by the police?

A.   Yes.

Q.   That's correct?

A.   Correct.

Q.   Okay.  So every time that you are arrested, you're not
fingerprinted and photographed, correct?

A.   I wasn't taking a chance.

Q.   Well, sir, you gave four false names to the police,
correct?

A.   Correct.

Q.   And you gave four false names to the Court; isn't that
correct?

1    A.  I gave them to the police, the police.  The Court knew

2    who I was.

3    Q.  Well, when you went to the court, sir, on the docket

4    sheets that were shown to you, Exhibits 2, 3 and 4 I

5    believe they are, they were not your true name on those

6    sheets, were they?

7    A.  No.

8    Q.  We had Tyronne Corey, which is Exhibit No. 3,

9    Raicky Griham, Exhibit No. 5, and Tyronne Bickford, Exhibit

10   No. 4.  Do you recall those names, sir?

11   A.  Yes.

12   Q.  Okay.  And these appear on the official court

13   documents, and you're trying to tell this jury that the

14   Court knew your name?

15           MS. SCAPICCHIO:  Objection.  He didn't say

16   that.

17           THE COURT:  Overruled.

18   A.  Could you repeat that question, please?

19   Q.  You're telling the members of this jury that at the

20   time that these documents were prepared, the Court knew

21   your name?

22   A.  I didn't care if the Court knew my name or not, as long

23   as I didn't go to jail.

24   Q.  You didn't care if the Court knew your true name?

25   A.  No.

1    Q.  You didn't care if the Judge sitting on the bench knew

2    your true name?

3    A.  As long as I walked out of court.

4    Q.  As long as you walked out of court?

5    A.  Yes.

6    Q.  So you lied at that time, didn't you, sir, about your

7    name during each of these three occasions?

8    A.  I lied about a lot of things.

9    Q.  You lied about a lot of things?

10   A.  Yes.

11   Q.  Okay.  But you're not lying today?

12   A.  No, I'm not.

13   Q.  And you didn't lie last Thursday?

14   A.  No, I didn't.

15   Q.  Okay.  Now, I know that my sister went through each of

16   these Court documents, and I don't want to spend any more

17   time than necessary going through these court documents,

18   however, sir, Exhibit No. 3 --

19          THE COURT:  On the document camera.

20   Q.  Sir, on Exhibit No. 3, this is the docket sheet for the

21   Roxbury District Court, and it says for the date of offense

22   right there, 12-13-88.  Do you see that, sir?

23   A.  12-13, yes.

24   Q.  And it says place of offense, 118 Elm Hill Ave.  Do you

25   see that, sir?

1    A.  Yes.

2    Q.  Okay.  Then there are various charges, A, B and C, the

3    first charge being disorderly person.  Do you see that,

4    sir?

5    A.  Yes.

6    Q.  And the second charge is trespassing at 118 Elm Hill

7    Ave.?

8    A.  Yes.

9    Q.  Okay.  This offense occurred on December 13th, 1988; is

10   that correct, sir?

11   A.  Yes.

12   Q.  And you were arrested by the Boston Police for

13   trespassing at 118 Elm Hill Ave. on December 13th, 1988?

14   A.  Yes.

15   Q.  And you gave the police the name Tyronne Corey?

16   A.  Yes.

17   Q.  Okay.  And coincidentally the night you were shot was

18   three days later; is that so, sir, on December 16th,

19   1988?

20   A.  Three days later, on the 17th?

21   Q.  It was the 17th, okay.  So it was four days later?

22   A.  Three.

23   Q.  Correct?

24   A.  You said the 17th, it's three days later.

25   Q.  Okay.  Well, it was just a matter of few days later

1    that you were shot after this arrest?

2    A.  You could say that, yes.

3    Q.  And when you were taken by these gunmen, you were in

4    the hallway at 118 Elm Hill Ave., weren't you?

5    A.  Yes.

6    Q.  And you had a stay away order from the Court to stay

7    away from 118 Elm Hill Ave., didn't you?

8         MS. SCAPICCHIO:  Objection, your Honor.

9         THE COURT:  I'll allow a few more questions.  I'm

10   not sure where this is going.  Go on.

11   A.  Yes.

12   Q.  You were not supposed to be at 118 Elm Hill Ave., were

13   you?

14   A.  No.

15   Q.  And you violated that Court Order, didn't you, sir,

16   being on Elm Hill Ave. on the night that you were shot at

17   118?

18   A.  Yes.

19   Q.  Because the second charge is trespassing, correct?

20   A.  Yes.

21   Q.  Okay.  And the third charge is illegal possession of a

22   Class B substance; do you see that, sir?

23   A.  Yes.

24   Q.  And for the jury's edification, what is a Class B

25   substance?

1          MS. SCAPICCHIO:  Objection, your Honor.

2          THE COURT:  Sustained.

3     Q.  Well, is it --

4          THE COURT:  No, no, sustained.  Is this a

5     conviction to be used for cross-examination in the

6     appropriate manner, or is this just a charge?

7          MR. ROACHE:  Well, your Honor, I'm going to get

8     into what he has admitted to in the past.

9          THE COURT:  If this is not in the form of a

10    conviction, it's inadmissible.  The prior questioning with

11    respect to an order is a different issue.

12    Q.  And, sir, you were appointed counsel, were you not, on

13    December 13th or 14th by the name of Richard Smith?

14    A.  I don't remember his name.

15    Q.  Okay.  Well, when you went to court in December of

16    1988, were you appointed counsel?

17    A.  I don't recall.

18    Q.  Now, you went to Court the following day, correct,

19    December 14th, 1988?

20    A.  Yes.

21    Q.  And do you see a notice of appearance by an attorney

22    that appears to be Samuel High?

23    A.  I see a signature, yes.

24    Q.  Did you hire Samuel High?

25    A.  No.

1    Q.  So the Court appointed Mr. High to represent you; is

2    that correct?

3    A.  Must be because I didn't pay for him.

4    Q.  You didn't pay for him?

5    A.  No.

6    Q.  Now, when a person -- when you were arrested and you go

7    to court the next day, you report to the probation

8    department, correct?

9           MS. SCAPICCHIO:  Objection, your Honor.

10          THE COURT:  Overruled.

11   Q.  You report to the probation department; is that

12   correct?

13   A.  Repeat that, please.

14   Q.  When you're arrested for a crime such as what occurred

15   on December 13th, 1988, you are brought to the court the

16   following day for what we call an arraignment, correct?

17   A.  Correct.

18   Q.  Okay.  And before you appear before a Judge, you are

19   interviewed by the probation department to determine

20   whether or not you qualify for an attorney?

21   A.  I guess so, but I don't remember it.

22   Q.  You don't remember that.  In any event, sir, you were

23   appointed counsel in this case?

24   A.  Yes.

25   Q.  And you were appointed counsel because the Court made a

1    determination based upon the representations that you get

2    given to the probation department that you didn't have any

3    money to afford an attorney; isn't that correct?

4              MS. SCAPICCHIO:  Objection, your Honor.

5              THE COURT:  Keep going.  Go on.

6    Q.  Isn't that correct?

7    A.  Correct.

8    Q.  Okay.  Now, I believe you testified earlier that in

9    1988, you were working?

10   A.  Correct.  It was '88, '89, correct.

11   Q.  You were working?

12   A.  Yes.

13   Q.  And you were hustling on the streets?

14   A.  Correct.

15   Q.  You were selling drugs?

16   A.  Yes.

17   Q.  Okay.  So you had money, didn't you?

18             MS. SCAPICCHIO:  Objection.

19             THE COURT:  Sustained.

20   Q.  Well, sir, you had income coming in in 1988, didn't

21   you?

22             MS. SCAPICCHIO:  Objection.  What's the

23   relevance?

24             THE COURT:  Overruled.

25   Q.  You had income coming in?

1    A.  Yes.

2    Q.  Okay.  And yet you told the probation officer you could

3    not afford an attorney?

4         MS. SCAPICCHIO:  Objection.  He never said

5    that.

6         MR. ROACHE:  You know, this is

7    cross-examination.

8         THE COURT:  No, I understand.  Do you have

9    somewhere an indication that he said to the probation

10   officer that he could not afford an attorney?

11        MR. ROACHE:  Your Honor, I don't have any

12   personal.

13        THE COURT:  Then the objection is sustained.  Go

14   on.  The objection is sustained.  Next question.

15        MR. ROACHE:  Thank you.

16   Q.  Now, you had an attorney appointed for you, correct?

17   A.  Correct.

18   Q.  Okay.  And on each of the occasions that you appeared

19   in court, you had a court-appointed attorney?

20   A.  Most likely, yes.

21   Q.  In 1988, 1989?

22   A.  Most likely, yes.

23   Q.  Now, you testified earlier that you gave false names

24   because you didn't want to go to jail; is that correct?

25   A.  Correct.

1     Q.  And, as a matter of fact, you did spend some time in

2     jail back in the '90s, correct?

3     A.  Correct.

4     Q.  You spent about three months in jail?

5     A.  Uh-hum.

6     Q.  And that was for receiving a stolen motor vehicle?

7     A.  Correct, yes.

8     Q.  So you knew that if you're convicted of a crime, you

9     could spend some time in jail?

10           MS. SCAPICCHIO:  Objection, your Honor.

11           THE COURT:  Overruled.

12    A.  Correct.

13    Q.  Okay.  And that's one of the reasons why you gave false

14    names to the police, to the Court, to the Judge in '88 or

15    '89 so you would not have to spend any time in jail?

16    A.  Back in the '90s, I had went to Dorchester Court to

17    clear one up that I had.  That's how I ended up getting

18    locked up.

19    Q.  You didn't want to get locked up?

20    A.  I said that's why I went to Dorchester Court, to clear

21    a warrant up.

22    Q.  Yet you can come in here to tell this jury that in 1989

23    in October when you testified at the trial of Commonwealth

24    vs. Shawn Drumgold that you risked life in prison,

25    punishment by life in imprisonment for committing

1    perjury?

2              MS. SCAPICCHIO:  Objection.

3              THE COURT:  Overruled.

4    Q.  Is that what you're telling this jury?

5    A.  Back then, back then, I would have done anything.  I

6    wasn't in my right mind.  I'm living on the streets.  I'm

7    doing what I can.  I'm trying to make a living the way I

8    could, so you have somebody that you look up to, and I did

9    what they wanted me to do, and I did it.

10   Q.  Sir, you did not want to go to jail for three months or

11   six months for giving false names; isn't that correct?

12   A.  Correct.

13   Q.  But you were willing or at least according to your

14   testimony today is that were you willing to face the

15   possibility of spending life imprisonment for committing

16   perjury in a capital offense?

17   A.  That was over 21 years ago.  I would have done

18   anything.

19   Q.  You would have done anything?

20   A.  Yes.

21   Q.  So you would have done anything to avoid jail for three

22   or six months, but you were willing to commit perjury and

23   facing a life imprisonment?

24   A.  I was getting whatever I wanted.

25   Q.  I see, sir.  Now, to put this matter in a little bit of

1    perspective, if I may, do you recall when Tiffany Moore was

2    shot?

3    A.   Yes.

4    Q.   And when was that?

5    A.   Back in '88, '89.

6    Q.   Well, was it in 1988 or 1989?

7    A.   9.

8    Q.   I'm sorry?

9    A.   9.

10   Q.   1989?

11   A.   Uh-hum.

12   Q.   When were you shot, sir?

13   A.   I don't remember the date that it actually happened.

14   Q.   You can't recall the date on which your cousin was shot

15   and you were almost killed yourself?

16   A.   I tried to forget about all that.  I tried to put all

17   that in the past.  I tried not to think about it.

18   Q.   Was it in 1988 or 1989?

19   A.   It was '88, I think.

20   Q.   Okay.  So, according to your testimony, Tiffany Moore

21   was shot and killed after you were shot?

22   A.   I don't remember.

23   Q.   You don't remember?

24   A.   No, I do not.

25   Q.   Well, sir, if I would suggest to you that Ms. Moore was

1     shot in August of 1988?

2     A.  Okay.

3     Q.  Would that refresh your memory?

4     A.  No.

5     Q.  Doesn't refresh your memory?

6     A.  No, it does not.

7     Q.  Okay.  By the way, is your memory today better than it

8     was back in 1989 when you testified in court in the case of

9     Commonwealth vs. Shawn Drumgold?

10    A.  My memory is that I remember the things that happened

11    with me and my cousin because it's a fact, it actually

12    happened, you know, but the things about the Tiffany Moore

13    murder, about Tiffany Moore was fed to me, what I put in

14    myself, I don't remember all that because everything back

15    then was fed to me or I lied about it.  It was like

16    combining both.  I don't remember it.

17    Q.  We'll get to you, everything was fed to you?

18    A.  I didn't say everything was fed to me.

19    Q.  Well, sir, Tiffany Moore was shot in August of 1988,

20    and let's back up a little bit.  Before 1988, you were a

21    street person, correct?

22    A.  Correct.

23    Q.  And before August of 1988, you were a street person?

24    A.  I was around.

25    Q.  You were around?

1    A.  Yes.

2    Q.  And you were how old in 1988?

3    A.  18, 19.

4    Q.  Okay.  18 or 19 years of age, and you had lived in

5    Grove Hall area?

6    A.  Grove Hall area.

7    Q.  That was depicted on the map, you had lived there since

8    you were five years old, isn't that so, sir?

9    A.  I didn't live at 118, I lived at 63 for a number of

10   years.

11   Q.  You lived there in the Grove Hall area from age 5 to

12   age 19 when Tiffany Moore was shot?

13   A.  There was quite a few years I lived in the area, yes.

14   Q.  I'm sorry, I didn't hear you.

15   A.  It was quite a few years I lived in the area, yes.

16   Q.  And you considered yourself to be a street kid?

17   A.  Back then, yes.

18   Q.  And you lived at several different addresses,

19   correct?

20   A.  I stayed where I could lay my head.

21   Q.  Okay.  For the jury's edification and for my

22   edification, would you please explain to us or tell us what

23   addresses you lived from age 5 to age 19.

24   A.  Age 5 to 19, 63.

25   Q.  63 what, sir?

1    A.  Elm Hill.

2    Q.  Elm Hill Ave.?

3    A.  Yes, 118.  This is not -- I lived at 63.

4    Q.  What ages did you live at 63 Elm Hill Ave.?

5    A.  I don't remember.  I don't remember the time I left

6    63.

7    Q.  Well, when you moved to Boston, you moved to Boston at

8    age 5 from Mississippi; is that correct?

9    A.  When I moved to Boston I was young.

10   Q.  Age 5?

11   A.  I was young.

12   Q.  Okay.  That was from Mississippi?

13   A.  Yes.

14   Q.  Okay.  I assumed at age 5 you were going to school

15   somewhere?

16   A.  Yes.

17   Q.  Where were you living at age 5?

18   A.  If I was in Boston, had to be Elm Hill.

19   Q.  Okay.  What number?

20   A.  63.

21   Q.  63 Elm Hill Ave.  And with whom were you living at 63

22   Elm Hill Ave.?

23   A.  My stepmother.

24   Q.  Your stepmother?

25   A.  Uh-hum.

1     Q.  Her name is what, sir?

2     A.  Juanita Griham.

3     Q.  Juanita Griham.  Were you living with anybody else?

4     A.  My brothers, stepbrothers, stepsisters.

5     Q.  And you had 13 siblings, correct?

6     A.  Yes.

7     Q.  And they all live at 63 Elm Hill Ave.?

8     A.  No.

9     Q.  Did they all live in the Grove Hall area?

10    A.  No.

11    Q.  No?

12    A.  No.

13    Q.  Okay.  From 63 Elm Hill Ave., sir, what was your next

14    address?

15    A.  Stayed at 63.  I mean, moved around a little bit in the

16    area.

17    Q.  What do you mean by that, sir?

18    A.  I'm a street person.  After --

19    Q.  No, from age 5, age 5, for how many years did you live

20    at 63 Elm Hill Ave.?

21    A.  I lived at 63, I went back to Mississippi, came back to

22    Boston, stayed back at 63.

23    Q.  Where did you move back to Boston, sir, from

24    Mississippi?

25    A.  I don't remember.

1    Q.  How old were you?

2    A.  I was 10, if that.

3    Q.  Age 10?

4    A.  Yes.

5    Q.  Did you ever say that before in any forum at all that

6    you had returned to Mississippi?

7    A.  It never came up.  The question never came up.

8    Q.  It never came up?

9    A.  No.

10   Q.  Do you recall testifying at another hearing that you

11   lived in the Grove Hall area from age 5 to age 19 before

12   Tiffany Moore got killed?

13   A.  I lived in the Grove Hall area for a while.  I mean, I

14   lived in the Grove Hall area for a while.

15   Q.  That's not my question, sir, do you recall testifying

16   at another hearing that you had lived in the Grove Hall

17   area from age 5 to age 19?

18   A.  I don't recall that, no.

19   Q.  You never testified before, sir, that you had returned

20   to Mississippi for a period of time, had you?

21   A.  I went to Mississippi and came back, go to visit and

22   come back, whenever I went to Mississippi and I came back,

23   I went back to Elm Hill with my stepbrother.

24   Q.  When you went to Mississippi, was it a visit or did you

25   stay there for a length of time?

1          MS. SCAPICCHIO:  Objection, Judge.  How is this

2     relevant?  He was 5.

3          MR. ROACHE:  He was not 5, your Honor.

4          THE COURT:  Good point.  I'll give you a few more

5     questions, but I'm mystified.

6          MR. ROACHE:  Okay.

7     Q.  What was the next address you lived, sir, after 63 Elm

8     Hill Ave.?

9     A.  After we got evicted from 63, that's when I started to

10    move around the neighborhood.

11    Q.  What year were you evicted from 63?

12    A.  I don't remember.  I don't remember the year.  As a

13    matter of fact, it was my stepmother, it wasn't me.  I was

14    living with her.

15    Q.  Okay.  And what other addresses did you live at?

16    A.  I don't remember every address I used to live at.  I

17    used to give -- I used to just live around, I mean,

18    wherever, but if I needed an address, I used an address.

19    Q.  Okay.  At what age were you, sir, when you were evicted

20    from 63 Elm Hill Ave.?

21    A.  I don't know.  My stepmother was living there.  I was

22    living with her.

23    Q.  You don't know what age that was?

24    A.  I don't.

25    Q.  Were you a teenager?

1    A.  Had to be.

2    Q.  Okay.  And from 63 Elm Hill Ave., your mother went to

3    live with your brother?

4    A.  Stepmother went to live with my brother, yes.

5    Q.  I'm sorry, your stepmother?

6    A.  Yes.

7    Q.  She went to live with your brother; is that correct?

8    A.  Uh-hum.

9    Q.  And your brother is Roy?

10   A.  Yes.

11   Q.  And where was he living?

12   A.  Trull Street.

13   Q.  I'm sorry?

14   A.  Trull Street.

15   Q.  Trull Street?

16   A.  Yes.

17   Q.  Roy never lived on Charles Street, did he?

18   A.  Trull.  My aunt lived on Charles Street.

19   Q.  You never lived on Charles Street, did you?

20   A.  My aunt lived on Charles Street.

21   Q.  I'm sorry.

22   A.  My aunt lived on Charles Street.  I would use it as an

23   address.

24   Q.  Your aunt lived on Charles Street, but you didn't live

25   there?

1    A.  Exactly.

2    Q.  You lied about that, too?

3    A.  No, you can't say I lived because if I used an address,

4    I had mail coming somewhere, I couldn't give in the Grove

5    Hall area where I was at, so I would do an address.  As

6    long as the person was a relative to me, I'd use an

7    address.

8    Q.  So you'd use any relatives' address regardless or not

9    whether you were living there?

10   A.  I would tell them that I'm going to use an address.

11   "Yeah, you can go ahead and use it," so I used it.

12   Q.  Okay.  So I understand correctly, Charles Street you

13   never lived at, but you used that as an address when you

14   felt it necessary, isn't that correct, sir?

15   A.  When it was necessary, yes.

16   Q.  But you had never lived there, your aunt lived there,

17   your aunt?

18   A.  Yes.

19   Q.  And your brother lived at 3 Trull Street?

20   A.  Actually it was 6 Charles Street that my aunt lived at.

21   My brother lived at Trull Street, not 3 Charles Street.

22   Q.  Just so the court reporter can understand, Trull Street

23   is T-r-u-l-l, correct?

24   A.  Yes.

25            MS. SCAPICCHIO:  Judge, I'm going to object.  I

1    still can't find the relevance.  We don't know what year

2    this is.

3                THE COURT:  Two more questions, Mr. Roache, then

4    that's it for this line of questioning.

5                MR. ROACHE:  Your Honor, it's very relevant as to

6    where he was picked up with the police.

7                THE COURT:  Where he was when he was 5 is

8    relevant to when he was picked up by the police?

9                MR. ROACHE:  No, your Honor, I'm going to get the

10   address.

11               THE COURT:  Two more questions.  Go on.

12   Q.  Now, at some point, sir, you lived at Chaney Street?

13   A.  Yes.  I didn't live there.  It was a girl that I used

14   to date that lived there so I stayed with her a few

15   nights.

16   Q.  And that was 40 Chaney Street?

17   A.  I guess it was.

18   Q.  And when did you live at 40 Chaney Street?

19   A.  I don't have no idea.  I don't remember the exact time

20   I lived at a place.

21   Q.  Do you remember testifying that Detective Callahan

22   visited you at 40 Chaney Street?

23   A.  I don't recall.

24   Q.  You don't recall that?

25   A.  No.

1    Q.  Now, I believe you testified earlier in this trial that

2    you had many girlfriends, correct?

3    A.  I had enough.

4    Q.  I'm sorry?

5    A.  I had enough.

6    Q.  You had -- I can't hear you.

7    A.  I had enough.

8    Q.  You had enough?

9    A.  Uh-hum.

10   Q.  Did you stay with the other girlfriends?

11   A.  No, not all of them.

12   Q.  I can't hear you, sir.

13   A.  Not all of them.  Not all of them.

14   Q.  Not all of them.  Okay.  Do you recall the addresses

15   that you stayed at?

16   A.  No.

17            MS. SCAPICCHIO:  Objection, your Honor.

18            THE COURT:  Well, the answer is no.  Go on, next

19   question.

20            MR. ROACHE:  Thank you.

21   Q.  Now, 3 Trull Street is where your brother was living,

22   and that's where Detective Callahan and three other

23   detectives came to bring you to the Howard Johnson's,

24   correct?

25   A.  Two other detectives.

1    Q.  Two other detectives?

2    A.  Yes.

3    Q.  Do you recall testifying at an earlier hearing that

4    there were a total of four detectives?

5    A.  I don't remember.

6    Q.  You don't remember?

7    A.  No.

8    Q.  Okay.  Do you recall one was stationed at the corner of

9    Hancock Street and Bowdoin Street?

10   A.  Excuse me.

11   Q.  Do you recall that there was a detective stationed at

12   the corner of Hancock Street and Bowdoin Street?

13   A.  Bowdoin is not near there, Hancock Street and

14   Charles.

15   Q.  Hancock runs into Bowdoin Street, sir, doesn't it?

16   A.  It was by Upham's Corner, it wasn't by --

17   Q.  Did you testify at an earlier hearing that you saw a

18   detective at the corner of Hancock and Bowdoin?

19   A.  Hancock Street and Trull Street.

20   Q.  Hancock and Trull Street?

21   A.  Hancock and Trull Street.

22   Q.  I see.  Now, you have testified in this case on several

23   different occasions, correct?

24   A.  Correct.

25   Q.  In fact, you have given statements involving this case,

1    and on your case on many occasions -- when I say your case,

2    I mean respectfully the murder of your cousin Roy who was

3    also known as Willie, correct?

4    A.  Correct.

5    Q.  And your shooting?

6    A.  Correct.

7    Q.  Okay.  Now, you gave a statement to the police

8    regarding the shooting of your brother or the murder of

9    your cousin, I should say, and your shooting in January of

10   '89, correct?

11   A.  I don't recall.

12   Q.  You don't recall?

13   A.  No.

14   Q.  Okay.  And you testified at a grand jury involving the

15   killing of your cousin and your shooting in May of '89;

16   isn't that correct, sir?

17   A.  I don't recall when I had that meeting.

18   Q.  Well, you were shown the grand jury testimony by

19   Ms. Harris, were you not, earlier today?

20   A.  Yes.

21   Q.  And that doesn't refresh your memory as to your

22   testifying in May of '89?

23          MS. SCAPICCHIO:  Just this is asked and

24   answered.

25          THE COURT:  Sustained.

1    Q.  And in June of 1989, you went to the district

2    attorney's office and gave a statement to Assistant D.A.

3    Phil Beauchesne who was prosecuting the case against

4    Shawn Drumgold, correct?

5         MS. SCAPICCHIO:  Objection, asked and answered.

6    A.  Not that I recall.

7         MR. ROACHE:  Your Honor, I'm putting this all in

8    context.

9         THE COURT:  All right.

10   Q.  Is that correct?

11   A.  Not that I recall.  I don't recall.

12   Q.  You don't recall that?

13   A.  No.

14   Q.  Okay.  In August, on or about August 6th of '89, you

15   gave a taped statement to Detective Callahan that was shown

16   before this jury; is that correct?

17   A.  Correct.

18   Q.  Okay.  On October 4th, 1989 -- are some four months

19   later than June -- you testified at the trial of

20   Commonwealth vs. Shawn Drumgold; do you recall that?

21   A.  I don't remember the time.

22   Q.  But you do remember giving testimony?

23   A.  Actually it's kind of blurred.

24   Q.  It's kind of blurred?

25   A.  Yes.

1    Q.  And then, sir, there was a motion for new trial some

2    time in 2003 in which you gave testimony?

3    A.  Correct.

4    Q.  Okay.  And in June of 2006 and in July of 2006, you

5    gave sworn testimony at depositions, correct?

6    A.  Correct.

7    Q.  And in March, '08, March 5th, 6th and 7th of '08 at

8    another hearing, you also gave sworn testimony?

9    A.  Correct.

10   Q.  And then you gave testimony last Thursday and then

11   again today?

12   A.  Correct.

13   Q.  Okay.  And each time that you testified in court, you

14   testified -- strike that.  When you testified in August of

15   1989 at the trial of Commonwealth vs. Shawn Drumgold, you

16   testified under oath; is that correct?

17   A.  Correct.

18   Q.  And you testified before a jury of 12, correct?

19   A.  Correct.

20   Q.  And there was a Judge in the courtroom at that time?

21   A.  Correct.

22   Q.  Do you recall that?

23   A.  I don't recall it, but, yes, I guess so.

24   Q.  Okay.  When you testified at the prior court hearing, a

25   prior hearing, you testified in this courtroom?

1    A.   The last time, yes.

2    Q.   Okay.  Before her Honor?

3    A.   Yes.

4    Q.   And before another panel of juries?

5         MS. SCAPICCHIO:  Objection, your Honor.

6         THE COURT:  Sustained.

7         MS. SCAPICCHIO:  Move to strike.

8         THE COURT:  That will be struck.

9         MR. ROACHE:  Okay.

10        MS. SCAPICCHIO:  Your Honor, can we be seen at

11   sidebar?

12        MS. SCAPICCHIO:  Yes.

13        ( THE FOLLOWING OCCURRED AT SIDEBAR:)

14        MS. SCAPICCHIO:  Judge, I specifically asked how

15   the Court wanted us to refer to that prior trial, and I

16   remember this Court saying it would be referred to as a

17   prior hearing and that this jury would never find out there

18   was a prior trial.  He specifically brought it up.

19        THE COURT:  Are you moving for a mistrial?

20        MS. SCAPICCHIO:  No, your Honor, I'm not.

21        MR. ROACHE:  Your Honor, I referred to it.

22        THE COURT:  You said another panel of juries.

23   This jury doesn't know the difference between a hearing and

24   a trial.

25        THE COURT:  I don't want to deal with whether

1    this jury knows a difference.  This is not the way it was

2    supposed to be done.  Unless you want a curative

3    instruction which would highlight it, we'll talk about it

4    as a prior hearing, that's all.

5              MS. SCAPICCHIO:  Thank you.

6              THE COURT:  You don't want a curative

7    instruction?

8              MS. SCAPICCHIO:  Not at this time.

9              (SIDEBAR CONFERENCE WAS CONCLUDED)

10   Q.  Now, Mr. Evans, when you were shot in December of 1988,

11   you were taken to the hospital, correct?

12   A.  Correct.

13   Q.  And you stayed in the hospital for one or two days?

14   A.  One day.

15   Q.  Correct?

16   A.  One day.  Overnight.

17   Q.  You stayed overnight?

18   A.  Yes.

19   Q.  But while you were in a hospital you were visited by

20   the police, were you not?

21   A.  I think I was, yes.

22   Q.  And do you recall the names of the officers who visited

23   you at the hospital?

24   A.  No, I don't recall the names.  No, I do not.

25   Q.  And did the officers who visited you at the hospital

1     ask you any questions?

2     A.  I think they asked me on who shot me.

3     Q.  I'm sorry.

4     A.  I think they asked me who shot me and who shot Roy.

5     Q.  Who shot Roy?

6     A.  Yes.

7     Q.  And were you able to tell them?

8     A.  Yes.

9     Q.  And you were able to tell them because you knew the

10    name of the person who shot you?

11    A.  I didn't know him.  I seen him on the street.

12    Q.  I'm sorry.

13    A.  I didn't know him, I seen him on the street.

14    Q.  You had seen him on the street, in fact, you had seen

15    not only the person who had shot you but you had seen the

16    other two individuals before that night?

17    A.  I don't remember seeing the other two.  I don't recall

18    seeing the other two.  I could have seen them.  I could

19    have seen them, but I don't remember.

20    Q.  Well, Mr. Evans, on the night that you were shot, you

21    knew the name of the person who was the shooter, did you

22    not?

23    A.  I knew his street name.

24    Q.  You knew his street name?

25    A.  Yes.

1    Q.   And you knew his street name as Chilly?

2    A.   Yes.

3    Q.   And is that what you told the police?

4    A.   I could have, yes.

5    Q.   That you knew his name was Chilly?

6    A.   I think I did, yes.

7    Q.   Okay.  Now, do you recall on December 18th, Sunday,

8    that you gave a tape recorded statement to the police

9    regarding the incident that occurred on December 16th?

10   A.   No, I do not.

11   Q.   Do you recall being visited at 40 Chaney Street by two

12   detectives by the name of Ahearn and Timlin?

13   A.   I think I was visited, but I don't recall the names of

14   them.

15   Q.   You think what?

16   A.   I don't recall the names, but I think I was visited by

17   them, yes.

18   Q.   And do you recall giving a taped statement?

19   A.   No, I don't.

20           MR. ROACHE:  May I approach the witness, your

21   Honor?

22           THE COURT:  Yes, you may.

23   Q.   I show you this document, sir.  Is there a date on that

24   document?

25   A.   December 18, 1988.

1    Q.   Okay.  Is there a location?

2    A.   40 Chaney Street, Apartment 6.

3    Q.   And is there a title to the document?

4    A.   The document's interviewer is Detective Robert Ahearn

5    and Detective Robert Timlin, Boston Police Department,

6    Homicide.

7    Q.   What is the nature of the --

8    A.   Statement of Ricky Evans.

9    Q.   Statement of Ricky Evans?

10   A.   Yes.

11   Q.   Do you recall looking at this document, sir, as to

12   whether or not that statement was tape recorded?

13   A.   It could have been.  It could have been, but I don't

14   remember.

15   Q.   Okay.  Does this appear to be in a question and answer

16   format?

17   A.   Can I see it?

18        MS. SCAPICCHIO:  Judge, I'm going to object.  I

19   can't understand the relevance of the statement he gave him

20   in the Treas Carter case.

21        THE COURT:  Again, a few more questions.  Wait,

22   Mr. Evans, you can't answer until I've ruled.  A few more

23   questions, then we'll figure this out.

24   Q.   Do you recall giving a statement?

25   A.   I don't recall it.

1   Q.  Does this appear to be in a question and answer

2   format?

3   A.  It has my name on it, yes.

4   Q.  Does it appear to be in a question and answer format?

5   A.  Yes.

6   Q.  Okay.  When you gave the officers the information on

7   December 18th, you were cooperating with the Boston Police

8   regarding the killing of your cousin and the shooting of

9   you, correct?

10          MS. SCAPICCHIO:  Your Honor, it's been asked and

11   answered.

12   A.  Correct.

13          THE COURT:  Overruled.  We'll give this a few

14   more minutes.

15   Q.  And this was at 40 Chaney Street, correct?

16   A.  I don't remember giving the statement, but, yes,

17   40 Chaney Street.

18   Q.  Okay.  And do you recall that on January 9th, 1989,

19   Detective Callahan along with Detective Ahearn went to

20   40 Chaney Street and conducted a second interview of you

21   concerning the Willie Evans murder and your shooting?

22   A.  No.

23   Q.  You testified earlier that you recall Detective

24   Callahan showing you some photographs, correct?

25   A.  Correct.

1    Q.  Were you at 40 Chaney Street, sir, when he showed you

2    those photographs?

3    A.  I think I was.

4    Q.  Okay.  And do you recall about what month or year it

5    was that you were shown the photographs?

6    A.  No.

7    Q.  Do you recall that was January 9th, 1989?

8    A.  I don't recall the date.

9    Q.  And do you recall seeing 13 photographs?

10   A.  I think it was 6.  I don't think it was 13.

11   Q.  You think it was 6?

12   A.  I think it was.  I'm not sure.

13   Q.  Were you asked to pick out one or more of the

14   assailants that killed your cousin and wounded you?

15   A.  I think so.

16   Q.  Okay.  And you picked out someone, didn't you?

17   A.  Yes.

18   Q.  And that person was Treas Carter?

19   A.  Chilly.

20   Q.  Chilly?

21   A.  Yes.

22   Q.  And you were able to identify him to the

23   Boston Police?

24   A.  Correct.

25   Q.  Okay.  And as a result of your identification of

1    Treas Carter, did the police inform you that they would

2    seek a warrant for his arrest?

3    A.  I don't remember what the conversation was about.

4    Q.  Okay.  But at that point everything that you were

5    telling the police concerning your shooting and the killing

6    of your brother was accurate?

7    A.  Yes, correct.

8    Q.  And when you testified before the grand jury in May of

9    1989, you testified truthfully and accurately concerning

10   the shooting of yourself and the killing of your brother?

11   A.  Cousin.

12   Q.  Of your cousin, I'm sorry?

13   A.  Yes.

14   Q.  So, at that point in time, everything that you had told

15   the police, everything that you had told the district

16   attorney's office and everything that you told the members

17   of the grand jury was truthful?

18   A.  About me and Roy's killing, yes.

19   Q.  So there was no reason at that point in time as of May

20   of 1989 for Detective Callahan or for any other member of

21   the Suffolk County District Attorney's Office or the

22   Boston Police to doubt your credibility?

23           MS. SCAPICCHIO:  Objection.  As to what?

24           THE COURT:  Sustained.  Sustained.

25   Q.  Now, prior to your testimony before the grand jury in

```
1    May of 1989, you and Detective Callahan had not discussed
2    Tiffany Moore at all, had you?
3    A.  I don't recall.
4    Q.  As a matter of fact, the first time that you were asked
5    about Tiffany Moore by Detective Callahan was in June of
6    1989 after you had testified at the grand jury involving
7    your shooting and the killing of your cousin?
8    A.  I don't recall when we had spoke about it.
9    Q.  Okay.  And he knew that you were a street kid?
10             MS. SCAPICCHIO:  Objection.  As to what --
11             THE COURT:  Sustained.
12   Q.  You were a street kid living in Grove Hall; is that
13   correct?
14   A.  I was living in the area when I could.
15   Q.  Okay.  And you hear a lot of things about what goes on
16   in the Grove Hall area, correct?
17   A.  I hear my share, yes.
18   Q.  Okay.  And you knew that -- well, did Detective
19   Callahan tell you that he was investigating the shooting
20   and killing of Tiffany Moore?
21   A.  I don't recall that.
22   Q.  You don't recall that?
23   A.  No.
24   Q.  And do you recall Timothy Callahan asking you if you
25   heard anything or knew anything about the killing of
```

1    Tiffany Moore?

2    A.  I don't recall.

3    Q.  You don't recall?

4    A.  No.

5    Q.  As a matter of fact, your biological brother Roy, he

6    also lived in the area, correct?

7    A.  He lived on Trull Street off of Hancock Street.

8    Q.  I'm sorry.

9    A.  He lived on Trull Street.

10    Q.  Did you have a brother, sir, that was a member of the

11    Humboldt gang?

12    A.  No.

13          MS. SCAPICCHIO:  Objection, your Honor.

14          THE COURT:  Sustained.

15          MR. ROACHE:  Your Honor, may I be heard?

16          THE COURT:  No.

17    Q.  Did you testify earlier at another hearing that you had

18    a brother who was a member of the Humboldt gang?

19    A.  I don't recall.

20          MS. SCAPICCHIO:  Objection, your Honor.

21          THE COURT:  Sustained.  Go on.

22    Q.  Now, you had heard in the area about the shooting of

23    Tiffany Moore, correct?

24    A.  Correct.

25    Q.  And it's your testimony before this jury that you had

1    told Detective Callahan that it wasn't Shawn Drumgold, the

2    rumor in the neighborhood was that it wasn't Shawn Drumgold

3    but it was Lug Taylor, Terrance Taylor?

4    A.  No, I didn't testify to that.

5    Q.  You didn't testify to that?

6    A.  No.

7    Q.  Well, you testified, sir, you said you heard in the

8    neighborhood the rumors in the neighborhood was that it was

9    Lug Taylor who committed the shooting?

10   A.  I didn't say it was Lug Taylor, I said Theron Davis.

11   Q.  I'm sorry, Theron Davis.

12   A.  Yes.

13   Q.  And that was rumored in the neighborhood?

14   A.  Yes.

15   Q.  Okay.  And then it was your testimony that after that

16   statement, you were whisked away to the Howard Johnson's?

17   A.  I don't recall when I was whisked away.

18   Q.  Well, sir, you don't remember when you went to the

19   Howard Johnson's, do you?

20   A.  Excuse me?

21   Q.  You don't remember when you went to the

22   Howard Johnson's?

23   A.  Yes.  Yes, I do.  I just don't recall the date I was

24   taken there.

25   Q.  You don't recall the date you were taken there?

1    A.  No.

2    Q.  Okay.  But you remember going there?

3    A.  Yes.

4    Q.  Okay.  Do you know what information -- or strike that.

5    Did Detective Callahan ever tell you any information about

6    any other witnesses who may have maybe called to testify in

7    the case against Shawn Drumgold?

8    A.  Not that I recall.

9    Q.  Never mentioned the word that the name

10   Vantrell McPherson?

11           MS. SCAPICCHIO:  Objection, your Honor.

12           THE COURT:  Overruled.

13   A.  No.

14   Q.  Never mentioned the word the name Tracie Peaks?

15   A.  He could have.  I don't remember all those names.

16   Q.  Never mentioned Mary Alexander?

17   A.  Could have, but I didn't know everybody, I didn't know

18   anybody by the name in the area.

19   Q.  Never mentioned the name Kevin Johnson?

20   A.  Kevin Johnson, could have, but I don't remember.

21   Q.  Okay.  Now, Ms. Harris asked you, and I believe she

22   showed you your prior testimony that you did not go to the

23   Howard Johnson's or you were not staying at the

24   Howard Johnson's on the day of your birthday, August 13th,

25   correct?

1    A.  I told her I don't remember.

2    Q.  But you testified that you were at the Howard Johnson's

3    for at least eight months?

4    A.  At least eight months.

5    Q.  At least eight months?

6    A.  Yes.

7    Q.  So, if you were not there on your birthday in August,

8    that means eight months would have brought you into 1989,

9    some time in April of 1989 you stayed at the

10   Howard Johnson's?

11   A.  I said I don't remember going there.  I don't remember

12   what date it was.

13   Q.  I see.  When you went to the Howard Johnson's, sir, do

14   you remember testifying at an earlier hearing that the

15   police came to 3 Trull Street and took you to the

16   Howard Johnson's?

17   A.  Yes.

18          MS. SCAPICCHIO:  Objection, asked and answered.

19          THE COURT:  Yes, sustained.  Go on.

20   Q.  Well, sir, did the police come to 3 Trull Street on

21   September 12th, 1989?

22   A.  I don't know what day it was, I just remember them

23   coming to get me.

24   Q.  Now, September 12th, 1989 is approximately three weeks

25   before October 4th, 1989; would you agree with me?

1    A.  Would you repeat that, please.

2    Q.  September 12th, 1989 is approximately three weeks

3    before October 4th, 1989?

4    A.  You could say.

5    Q.  Would you agree with that statement?

6    A.  Yes.

7    Q.  Okay.  And that's the day on which you testified at the

8    murder trial of Commonwealth vs. Shawn Drumgold; isn't that

9    a fact?

10    A.  It could be.  I'm not sure of the date.

11    Q.  Okay.  So if the police had taken you to the

12    Howard Johnson's on September 12th, 1989 and you testified

13    on October 4th, 1989, that time frame was approximately

14    three weeks, correct?

15          MS. SCAPICCHIO:  Objection, your Honor.

16    A.  Correct.

17          THE COURT:  Overruled.

18    A.  Correct.

19    Q.  Okay.  And you testified earlier that after you had

20    finished testifying in the murder trial of Shawn Drumgold,

21    the police didn't come around anymore?

22    A.  They didn't.

23    Q.  They didn't?

24    A.  No.

25    Q.  You never heard from them again?

1    A.  No.  I was --

2           THE COURT:  Wait.  You don't have a question.  Go

3    on.

4    Q.  So if you were taken to the Howard Johnson's on

5    September 12th and you testified on October 4th, the police

6    didn't come and visit you at the Howard Johnson's weekly

7    for more than two or three times?

8           MS. SCAPICCHIO:  Objection, your Honor.  It

9    assumes facts not in evidence.  He never said it was the

10   12th.

11          THE COURT:  The objection is overruled.  You can

12   clarify what you need to clarify on redirect.  Go on,

13   counsel.

14   Q.  The police never came more than two or three times to

15   the Howard Johnson's, did they?

16   A.  Yes, they did.

17   Q.  Well, you testified earlier that they came weekly or

18   biweekly?

19   A.  They came whenever I would call or whenever they would

20   come downstairs and call for me.

21   Q.  Okay.  But if you were there three weeks, sir?

22   A.  I said I wasn't sure around the time.

23   Q.  If you were there three weeks, the police didn't come

24   more than three times before you testified at the case of

25   Commonwealth vs. Shawn Drumgold?

1    A.  I testified that I did not know what day they had came

2    and picked me up from my brother's house.

3    Q.  You don't know what day?

4    A.  I don't remember the date.

5    Q.  Do you know what time of year it was?

6    A.  No, I don't remember the time of year.

7    Q.  You don't even know what time of year it was?

8    A.  No.

9    Q.  Okay.  And you don't know if it was as a result of

10   being questioned by a private investigator?

11   A.  I don't remember the private investigator.

12   Q.  You don't remember that either?

13   A.  No.

14   Q.  Now, you testified that while you were at the

15   Howard Johnson's, you were working?

16   A.  Yes.

17   Q.  Okay.  So you had money?

18   A.  Yes.

19   Q.  So you didn't need any money because you had money, you

20   were living there for free?

21   A.  Still I needed more money.

22   Q.  You needed more money?

23   A.  Uh-hum.

24   Q.  So you called up Detective Callahan and said I need

25   money?

1    A.  If I needed it, yes, if my paycheck wouldn't last,

2    yes.

3    Q.  I see.  You were getting all your meals for free and

4    you were living for free, correct?

5    A.  Correct.

6    Q.  Okay.  And you would call Tim Callahan and say, hey,

7    come on over here, I need money?

8    A.  No, I would call and ask him, I wouldn't demand

9    anything.

10   Q.  Did you know Tim Callahan's work schedule?

11   A.  No.

12   Q.  How did you know to call him?

13   A.  I had his card.

14   Q.  You had his card?

15   A.  Yes.

16   Q.  Did you know his work schedule?

17   A.  No, I did not.

18   Q.  So you'd call, what, his business line, I assume?

19   A.  I don't recall.

20   Q.  You don't recall?

21   A.  No.  I just had his card.

22   Q.  Okay.  And he would come over at your call?

23   A.  Yes, if I needed it.

24   Q.  I see.  Now, you testified that while at the

25   Howard Johnson's, you had conversations or you were present

1    during conversations that Detective Callahan was having

2    with Paul McDonough, Detective McDonough?

3    A.   In the cafeteria, yes.

4    Q.   You were present?

5    A.   Yes.

6    Q.   And you heard things like guns and a car?

7    A.   Guns, car, it was quite a few things I overhear.

8    Q.   Okay.  But you heard no conversation about the clothing

9    that the assailants of Tiffany Moore were wearing?

10   A.   I don't recall.

11   Q.   Well, did you think that that would be an important

12   point that Detective Callahan, if he were feeding you

13   information, that he would want you to know?

14           MS. SCAPICCHIO:  Objection.

15           THE COURT:  Sustained.

16   Q.   Well, sir, isn't it important when you identify an

17   assailant that you're able to identify the assailant and

18   what that assailant was wearing at the time that a crime

19   was committed?

20           MS. SCAPICCHIO:  Objection.

21           THE COURT:  Sustained.

22   Q.   Did Detective Callahan ever give you or did you ever

23   overhear any conversation about any clothing that either

24   Shawn Drumgold or Terrance Taylor was wearing that night?

25   A.   Like I testified, like I testified earlier, you know, I

144

1    was fed and I added some myself.  I don't recall all

2    that.

3    Q.  Okay.  And when you gave the statement that this jury

4    saw on August the 6th that was tape recorded by Detective

5    Callahan, did Detective Callahan feed you all that

6    information on that statement?

7    A.  Not all of it.

8    Q.  Not all of it?

9    A.  Not all of it.

10   Q.  In effect, he fed you none of it, did he, sir?

11   A.  Yes, he did.

12   Q.  He did?

13   A.  Yes.

14   Q.  Did he feed you saying that you were at 118 Elm Hill

15   Ave.?

16   A.  I don't recall.

17   Q.  Did he feed you the information that he saw or you saw

18   Lug Taylor and Shawn Drumgold before the killing of

19   Tiffany Moore?

20   A.  I don't recall all that.

21   Q.  Did he tell you to say or did he feed you information

22   that Lug Taylor came up to Shawn Drumgold and said I know

23   where Mervin and Chaney are at?

24   A.  Not that I recall.

25   Q.  Did he feed you information, sir, that 45 minutes after

1   Lug Taylor and Shawn Drumgold left Elm Hill Ave. where you

2   and Willie were at that you saw them coming back 45 minutes

3   later in a white car?

4   A.  I didn't know anything about the white car, I just put

5   the rest of it in myself.

6   Q.  You made the rest up yourself?

7   A.  I made the rest of it saying it was in a car.  I didn't

8   know what kind of car it was.

9   Q.  If you heard --

10  A.  Can I answer this?  If you hear on the tape that I

11  didn't know, I explained to them I didn't know what kind of

12  car it was.  It wasn't Taurus, Taurus didn't come out of my

13  mouth.

14  Q.  You were questioned by Ms. Harris earlier where she had

15  indicated that you testified earlier that you had heard

16  from the neighborhood that a white car was the getaway car?

17  A.  It was something I added in there.

18  Q.  Oh, something that you added in there.  So, your prior

19  testimony about what you had heard from the neighborhood

20  was false?

21  A.  About who did the killing was true.

22  Q.  Sir, just answer my question.  The prior testimony that

23  you had given that Ms. Harris read to you that you had

24  heard about the white car being the getaway car from the

25  rumors in the neighborhood was false?

1          MS. SCAPICCHIO:  Objection.  I don't

2    understand.

3          THE COURT:  I don't understand the question

4    either.  Objection is sustained.

5    Q.  Let me rephrase it.  Do you recall Ms. Harris asking

6    you a question about the white car?

7    A.  Yes.

8    Q.  And do you recall her showing you prior testimony that

9    you had given earlier in this case that you had testified

10   that you had heard that the getaway car that the killers of

11   Tiffany Moore or the Tiffany Moore killing, the getaway car

12   was a white car?

13   A.  No.  No.

14   Q.  You don't recall Ms. Harris asking you those

15   questions?

16   A.  No.

17   Q.  Just 45 minutes to an hour ago?

18   A.  She could have.

19   Q.  She could have?

20   A.  Yes.

21   Q.  But you don't recall it now?

22   A.  No, I don't.

23   Q.  Okay.  When we're going through that taped statement in

24   August of 1989, you had already spoken to an assistant

25   district attorney who was prosecuting the case against

1    Shawn Drumgold, hadn't you?

2    A.  I don't recall.

3    Q.  Well, sir, you recall testifying at the criminal trial

4    that you visited with the district attorney in June of

5    '89?

6    A.  June of '89, no.

7    Q.  Is your answer you didn't testify to that or you did

8    not visit the district attorney?

9    A.  I don't remember it.  I'm not saying I didn't, I'm not

10   saying I don't, I don't remember it.

11   Q.  You don't remember even though the testimony was shown,

12   your trial testimony, that you visited with the district

13   attorney in June of '89?

14   A.  Like I said to her, evidently I must have said it, but

15   I don't remember it.

16   Q.  I see.  Okay.  So, getting back to the taped statement

17   of August of '89, did Detective Callahan tell you to say

18   that Shawn Drumgold and Terrance Taylor came back and that

19   you asked them about the guns and they told you or Lug

20   Taylor told you that they were hot?

21   A.  They wouldn't say directly anything to me, they would

22   talk amongst themselves, and as they spoke, I picked up.

23   Q.  Did Detective Callahan say anything in your presence

24   that Lug Taylor and Shawn Drumgold came back to 118 Elm

25   Hill Ave. after the shooting of Tiffany Moore?

1    A.  I don't recall.

2    Q.  And said that they said the guns were hot?

3    A.  I don't recall that.

4    Q.  Did Detective Callahan in your presence say anything

5    about Taylor, Lug Taylor and Shawn Drumgold hiding the guns

6    up at the Franklin Hill projects?

7    A.  This is over 20 something years ago.  It's hard to

8    remember all this.

9    Q.  Okay.  And did Detective Callahan in your presence say

10    anything about you, Willie, Shawn and Lug drinking beer at

11    118 Elm Hill Ave.?

12    A.  No.

13    Q.  Did Detective Callahan say anything about your saying

14    that Willie Evans went to a package store to buy a case of

15    beer?

16    A.  No, I said that myself.

17    Q.  Did Detective Callahan ever tell you to say that at 118

18    Elm Hill Ave. that Lug Taylor and Shawn Drumgold after the

19    shooting of Tiffany Moore appeared to be nervous?

20    A.  He wouldn't say it directly to me, he never said

21    anything directly to me, he would come to the hotel and

22    they would talk amongst themselves, and what they said, you

23    know, I would pick up, and I combined both of them

24    together.  You know, I wasn't about to lose what I had

25    either.  I trusted the man, you know.

```
1     Q.  I see.  And did Detective Callahan ever tell
2   you -- strike that.  Detective Callahan did not tell you to
3   testify at the case of Commonwealth vs. Shawn Drumgold, did
4   he?
5     A.  I don't remember.
6     Q.  He never said to you, now, listen, Ricky, I'm going to
7   give you some information and I want you to tell a jury in
8   a capital case to lie?
9     A.  I was staying at the hotel.  I was getting what I
10   wanted.
11    Q.  Sure.  Would you please answer the question.  Did he
12   ever tell you --
13    A.  I don't recall.
14    Q.  You don't recall?
15    A.  I don't believe so.
16    Q.  You don't believe he did?
17    A.  No, I don't believe so.
18    Q.  He never told you to take the stand and to tell a
19   lie?
20    A.  He would talk, they would discuss amongst me --
21    Q.  Did he tell you to take the stand --
22    A.  I don't recall.
23    Q.   -- in a homicide case and lie?
24    A.  I don't recall.
25    Q.  Now, you testified that after you were shown six
```

1    photographs, there were six photographs that you were shown

2    by Detective Callahan involving the crime of the murder of

3    Tiffany Moore, correct?

4    A.  Correct.  It could have been six, correct.

5    Q.  Right.  Not the three that Ms. Scapicchio was talking

6    about?

7    A.  It was about six.

8    Q.  There were six photos?

9    A.  About six.  There was about six.

10   Q.  And do you recall testifying at an earlier hearing that

11   you picked out Shawn Drumgold and Terrance Taylor?

12   A.  Yes.  Can I rephrase that?  I didn't pick out

13   Shawn Drumgold and Terrance Taylor, I said to Mr. Callahan,

14   this is the person here that everybody is saying that did

15   the shooting, which is Apple, a/k/a Theron Davis, and

16   Mr. Callahan, he kept pointing at Shawn's picture.

17   Q.  So, Mr. Evans, you want this jury to believe that even

18   though you had no information, in fact, you were

19   contradicting Detective Callahan about your knowledge as to

20   who shot Tiffany Moore, you want this jury to believe that

21   Detective Callahan decided to take you to the

22   Howard Johnson's and to feed you information about a case

23   you knew nothing about?

24   A.  Yes.

25   Q.  You want this jury to believe that?

1    A.  Yes.

2    Q.  And you are willing to go along with that?

3    A.  That's the truth.

4    Q.  Is that correct, sir?

5    A.  Yes.

6    Q.  So, out of the blue, without having any information

7    about the killing of Tiffany Moore, you were taken to the

8    Howard Johnson's hotel?

9    A.  I don't recall that.  I don't recall it.

10   Q.  You don't recall it?

11   A.  No.

12   Q.  Now, you lived in the Grove Hall area for many years,

13   correct?

14   A.  Correct.

15   Q.  And you knew that there were quite a few shootings

16   going on at that time, correct?

17   A.  Correct.

18   Q.  And there were quite a few murders that were occurring

19   at that time?

20   A.  Correct.

21   Q.  Did Detective Callahan ask you about your knowledge

22   about any other murders?

23   A.  No.

24   Q.  And that's because, sir, you told him that you knew

25   something about the Tiffany Moore murder; isn't that

1      correct?

2              MS. SCAPICCHIO:  Objection.

3              THE COURT:  Overruled.

4      A.  How am I going to say something about the murder, I

5      ain't know nothing about it.

6      Q.  Well, Detective Callahan didn't ask you about any other

7      murders that were being committed in the Grove Hall area

8      apart from Willie Evans and Tiffany Moore?

9      A.  I didn't know Detective Callahan.

10     Q.  You knew him to become friendly with him?

11     A.  That's what I thought.

12     Q.  And he didn't ask you about any other murders?

13     A.  No.

14     Q.  About your knowledge about any other murders?

15     A.  No.

16     Q.  And you knew at that time, sir, that Detective Callahan

17     was a sergeant in charge of a homicide team?

18     A.  I didn't know his rank.  All I knew, he was a cop; he

19     was a cop and I was a street person.

20     Q.  You were a what?

21             THE COURT:  Street person.

22     Q.  He was a cop, oh, a street person?

23     A.  Yes.  You couldn't get that back then.

24             THE COURT:  Mr. Roache, how much more do you

25     have?

1          MR. ROACHE:  Another 20 minutes or so.

2          THE COURT:  We'll stop at this point.  We'll see

3    you all at 9:00 tomorrow morning.  All rise for the jury.

4    Leave your notebooks on your chair.  Don't read anything

5    about the case.  Don't do any research.  I'll say this

6    every time until I'm boring.  I think I'm already boring,

7    so we'll see you tomorrow morning.

8          (Jurors exited the courtroom.)

9          MS. SCAPICCHIO:  Your Honor, may we be heard very

10   briefly?

11         THE COURT:  Yes, you can all be excused.  Is

12   there any reason why this can't be on the record?

13         MS. SCAPICCHIO:  Not at all.  I have a concern

14   with respect to Attorney Bob George's testimony.  I don't

15   know how much longer the defendants are going to be with

16   Mr. Evans.  Mr. George informed me or at least his office

17   did that he's starting a homicide case before Judge Giles

18   scheduled to impanel on Thursday, and the office tells me

19   they're doing motions in limine on Wednesday.  The only day

20   that Mr. George would be able to testify is tomorrow.  Is

21   there a possibility that we could take him out of order so

22   that if we don't finish by tomorrow we don't lose him for

23   the three weeks he's going to be on trial?

24         THE COURT:  How long will his testimony will be?

25         MS. SCAPICCHIO:  My direct is no more than 25

1      minutes.

2              THE COURT:  Is there an objection to taking him

3      out of order?

4              MS. HARRIS:  We have no objection.

5              MR. CURRAN:  Absolutely not, your Honor.  I just

6      can't gauge how long I'm going to be.  I've had phone calls

7      into him.  He hasn't returned my call.  I can't give the

8      Court a gauge.  I've asked counsel.  I don't know what

9      you're going to ask.

10             THE COURT:  Why don't you start him at.

11     9:00.  Can he be here at 9:00?

12             MS. SCAPICCHIO:  He can be here.

13             THE COURT:  Your situation, as I understand it,

14     we've now arranged with the Court of Appeals for you to

15     argue at the end of the morning.  That is likely to be

16     12:30.  There is a possibility that if every other case

17     folds and they get to you earlier, we'll get an emergency

18     call, and I promised them that I would allow you to go up

19     and do the argument.  Okay.

20             MS. SCAPICCHIO:  Thank you, your Honor.

21             THE COURT:  It's either thank me or not thank me,

22     and I have another naturalization.  I'm the emergency

23     Judge.  This one is in Lawrence, and I will have to leave

24     at 12:30 tomorrow.

25             THE CLERK:  Yes.

1          THE COURT:  We'll make it 12:30.  The marshals

2     will drive fast.  We'll see if we can push it off so I can

3     stay until one.  What I wanted to do is dovetail your

4     leaving with my leaving.

5          MS. SCAPICCHIO:  Yes, your Honor.  I anticipate,

6     I will have Bob George here tomorrow morning.  I will also

7     have Attorney Rappaport on call.  He also has a matter that

8     is starting either Thursday or Friday up in Lowell, and

9     he's trying to gauge how long this matter is going to take.

10    Last time he was on the stand for three days.  I don't know

11    that he'll be that long this time around.  He would be the

12    witness that would follow Mr. George.

13          THE COURT:  Okay.

14          MS. HARRIS:  Actually this is my issue now

15    dovetails into that.  I was going over the transcript, and

16    the opening argument of Ms. Scapicchio said that she

17    expects, "The defense attorneys to say their whole theory

18    of the case would have switched to a case of mistaken

19    identity to police misconduct.  How do you trust the

20    investigation when an officer is feeding a witness details

21    of the crime?  I expected that the defense attorneys will

22    tell you how their strategy would have changed if they had

23    known it's not as simple as taking Ricky Evans out of the

24    picture."

25          I can file something with the Court, but my

1    concern is that if both Mr. George and Mr. Rappaport

2    testified to that effect, it would start raising questions

3    about the quality of the information that they were

4    receiving or the integrity of the investigation that they

5    would have done strategically different things with

6    witnesses above and beyond Ricky Evans, that it puts into

7    play the information that was collected and was distributed

8    by Sergeant Callahan.

9              THE COURT:  In other words, this is your point,

10   if it gets into, that you wanted to then show all the

11   exculpatory information and that in fact was turned over?

12             MS. HARRIS:  Yes, your Honor.

13             THE COURT:  This would open that up?

14             MS. HARRIS:  That's my intention.

15             MS. SCAPICCHIO:  I don't have any intention with

16   getting into the investigation.  What I would be getting

17   into with both Mr. George and Mr. Rappaport, how they would

18   have cross-examined differently at trial had they been

19   given the information regarding Detective Callahan's

20   interaction with Ricky Evans.

21             THE COURT:  The only witness they would be

22   talking about is Evans.  Why would their cross-examination

23   of Peaks or Alexander be any different if they had the

24   information on Evans you claim they should have had?

25             MS. SCAPICCHIO:  Because I believe they would

1       have asked either Alexander or Tracie Peaks what their

2       contact with Detective Callahan was and no more than

3       that.

4                   THE COURT:  Why would they go into that?

5                   MS. SCAPICCHIO:  Because if the theory of -- if

6       they found out prior to trying Commonwealth vs.

7       Shawn Drumgold that Detective Callahan fed information to a

8       witness, to allow him to testify falsely at trial, I would

9       assume that if they were cross-examining other witnesses

10      who had given damaging evidence regarding Shawn Drumgold

11      that they would ask about their contact with Detective

12      Callahan.

13                  THE COURT:  So you're going to open up

14      Tracie Peaks and Mary Alexander?

15                  MS. SCAPICCHIO:  I don't think that opens it, but

16      I'm not asking what was given over, what wasn't given over,

17      I'm asking whether or not they would have learned that

18      information, would they have asked questions regarding how

19      much contact they had with Detective Callahan.  I thought

20      your pretrial ruling was that we could get into Detective

21      Callahan's contact with other witnesses.  That's what I

22      thought you had ruled.  To the extent that these witnesses

23      had contact with Callahan, that's what I would expect both

24      Mr. George and Mr. Rappaport to testify to.

25                  THE COURT:  Once again, it's your case to try,

1    but if the issue here was this evidence material,

2    information promised, rewards, inducements given to a major

3    witness in a murder trial, was this evidence material, it

4    is not clear to me that the witness, that these witnesses

5    have to say, oh, it would have fundamentally changed my

6    strategy in the following nine thousand ways.  There's no

7    question that it was material and should have been turned

8    over if it were true.

9         There's no question that it's material, so the

10   question is by asking, by asking questions about how it

11   would have affected their -- they would have at least, I

12   mean is what you're saying they would have at least

13   investigated contacts that Callahan had with other

14   witnesses?

15        MS. SCAPICCHIO:  They would have asked about

16   contacts Callahan had with other witnesses.

17        THE COURT:  You understand that unless the jury

18   believes that those questions would have borne fruit, in

19   other words, those questions would have revealed

20   information with other witnesses, first of all, I don't see

21   how it helps you, and, second of all, I don't see how it

22   then doesn't open up what they're saying it would open up.

23   In other words --

24        MS. SCAPICCHIO:  Because I expect that they're

25   going to argue with at least these witnesses, with Steve

1     Rappaport, that he was the proximate cause of Shawn's

2     conviction.

3              THE COURT:  Right.

4              MS. SCAPICCHIO:  It had nothing at all to do with

5     Mr. Evans, that's what they argued last time that it was

6     actually Steve Rappaport's fault.

7              THE COURT:  You remember last time I changed my

8     instruction with respect to causation because it certainly

9     doesn't have to be the case that the issues with respect to

10    Ricky Evans were the sole cause.

11             MS. SCAPICCHIO:  Right.

12             THE COURT:  Or even the sole cause of

13    Mr. Drumgold's conviction, even if he would have been

14    convicted based on the other evidence, if this contributed

15    to it, it was sufficient based on my original instruction

16    as a contributing cause, so the question is whether you

17    have to go that far.

18             MS. SCAPICCHIO:  I understand, your Honor.

19             THE COURT:  And, I mean, so that if they say we

20    would have investigated other witnesses, that's very

21    interesting, only it doesn't get you very far unless that

22    investigation would have borne fruit, i.e., Detective

23    Callahan manipulated other witnesses.

24             MS. SCAPICCHIO:  I understand that, your Honor.

25             THE COURT:  But that --

1            MS. SCAPICCHIO:  Opens the door?

2            THE COURT:  That's exactly what the jury rejected

3       the last time.

4            MS. SCAPICCHIO:  I understand.

5            THE COURT:  So the question you have to decide is

6       whether or not you need to go that far.  How also will you

7       address -- we're still under the rules from the first trial

8       about letting the jury know that this was a conviction that

9       had been set aside, the fact that it had been set aside,

10      the date that it had been set aside but not the rulings.

11           MS. SCAPICCHIO:  There's a stipulation, I

12      believe.

13           MR. REILLY:  We have a stipulation that we should

14      have had this morning.  We'll have it first thing tomorrow

15      morning.  I didn't get done together.  It's very similar to

16      the stipulation in the last trial.

17           THE COURT:  I think the answer is it depends

18      where it goes, but I think you have to think this through

19      about what you want to open up.  Okay.  We'll see you

20      tomorrow morning.

21           THE CLERK:  All rise.

22           (Whereupon, the hearing was suspended at

23      1:12 p.m.)

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS     )

5    CITY OF BOSTON                )

6

7           I, Valerie A. O'Hara, Registered Professional

8    Reporter, do hereby certify that the foregoing transcript

9    was recorded by me stenographically at the time and place

10   aforesaid in No. 04-11193-NG, in re:  Shawn Drumgold vs.

11   Timothy Callahan and thereafter by me reduced to

12   typewriting and is a true and accurate record of the

13   proceedings.

14                         /S/ VALERIE A. O'HARA

15                         _____

16                         VALERIE A. O'HARA

17                         REGISTERED PROFESSIONAL REPORTER

18

19                         DATED SEPTEMBER 14, 2009

20

21

22

23

24

25