IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


SHAWN DRUMGOLD,            )   C.A. No. 04-11193-NG

          PLAINTIFF      )   Courtroom No. 2

VS.

TIMOTHY CALLAHAN, ET AL.,)   1 Courthouse Way

          DEFENDANTS     )   Boston, MA  02210


JURY TRIAL DAY 5

SEPTEMBER 15, 2009

9:14 a.m.


BEFORE THE HONORABLE NANCY GERTNER

UNITED STATES DISTRICT COURT JUDGE


VALERIE A. O'HARA

OFFICIAL COURT REPORTER

1    A P P E A R A N C E S:

2         ROSEMARY CURRAN SCAPICCHIO, ATTORNEY, Four Longfellow
     Place, Boston, Massachusetts  02114, for the Plaintiffs;

3

4         Tommasino & Tommasino, by MICHAEL W. REILLY, ESQ.,
     Two Center Plaza, Boston, Massachusetts  02108, for the
     Plaintiff;

5

6         Roache & Malone, LLP, by JOHN P. ROACHE, ESQ., 66 Long
     Wharf, Boston, Massachusetts  02110, for the Defendants.

7         Bletzer and Bletzer, P.C., by HUGH R. CURRAN, ESQ., 300
     Market Street, Brighton, Massachusetts  02135, for the

8    Defendants.

9         Morgan, Brown & Joy, LLP, by MARY JO HARRIS, ESQ., 200
     State Street, Boston, Massachusetts  02109-2605, for the

10   Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                              INDEX

2   **EXAMINATION**

3   **Witness Name                 Direct Cross Re-Direct Re-Cross**

4   ROBERT A. GEORGE

5       By Ms. Scapicchio          4              78

6       By Mr. Curran                    22                   95

7       By Mr. Roache                    78                   98

8                          EXHIBITS

9                      (None marked)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          PROCEEDINGS

2              THE CLERK:  All rise.  United States District

3    Court is now in session.  All rise for the jury.

4              THE COURT:  You can all be seated.  Ladies and

5    gentlemen, because of scheduling issues, Mr. Evans will not

6    be on the stand.  Call the next witness.

7              MS. SCAPICCHIO:  Thank you, your Honor.

8    Plaintiffs call Attorney Robert George.

9              ROBERT A. GEORGE, having been duly sworn by the

10   Clerk, testified as follows:

11                      DIRECT EXAMINATION

12   BY MS. SCAPICCHIO:

13   Q.  In a loud clear, voice, Mr. George, can you please state

14   your name for the record spelling your last name for the

15   record court reporter.

16   A.  Robert A. George, G-e-o-r-g-e.

17   Q.  And what do you for a living, Mr. George?

18   A.  I'm a trial lawyer.

19   Q.  And what type of law do you practice primarily?

20   A.  Criminal law.

21   Q.  And how long have you been -- well, are you a criminal

22   defense attorney?

23   A.  Yes, I am.

24   Q.  How long have you been a criminal defense attorney?

25   A.  Going on 30 years.

1    Q.   And in your course as A criminal defense attorney, have

2    you had occasion to represent defendants in murder cases?

3    A.   Yes, I have.

4    Q.   Okay.  And I'm going to direct your attention to August

5    of 1988.  Were you involved in the defense of Commonwealth

6    vs. Shawn Drumgold and Terrance Taylor?

7    A.   Yes, I was.

8    Q.   How were you involved in that case, Attorney George?

9    A.   I was Terrance Taylor's defense lawyer.

10   Q.   And Terrance Taylor was whom?

11   A.   He was the co-defendant to Shawn Drumgold charged with

12   the same crimes.

13   Q.   Can you explain what a co-defendant is for the jury,

14   please?

15   A.   A co-defendant is when you're charged with the same

16   crimes as someone else and you're being tried at the same

17   time.

18   Q.   During the course of your representation of Mr. Taylor,

19   do you remember who was prosecuting the case?

20   A.   Phil Beauchesne.

21   Q.   Okay.

22   A.   Do you want me to spell that for you?

23   Q.   Yes.

24   A.   B-e-a -- like a spelling test -- c-h-e-s-n-e.

25   Q.   There's a u in there.  It's close.  In any event,

1    Attorney Beauchesne was the attorney that represented the

2    Commonwealth; is that right?

3    A.   He was the prosecutor on the cases.

4    Q.   Okay.  And during the course of your representation of

5    Mr. Taylor, did you have conversations with Mr. Beauchesne

6    regarding discovery?

7    A.   Yes.

8    Q.   Okay.  And did you request in your capacity of

9    representing Mr. Taylor exculpatory evidence?

10   A.   Yes.

11   Q.   Did you learn in the course of your representing

12   Mr. Taylor, did you learn of any evidence regarding

13   Ricky Evans?

14   A.   Yes.

15   Q.   Okay.  Could you first let me back up a minute.  Could

16   you first explain to the jury what exculpatory evidence is

17   and how it's important in a criminal defense?

18   A.   When you're representing someone in a criminal case,

19   you're looking to get all the evidence you can get prior to

20   trial that tends to exculpate them or tends towards their

21   innocence, which could be almost anything that's admissible

22   in the courtroom.  It could amount to almost anything, but

23   it's evidence you should have in order to defend somebody

24   against what they're charged with.

25   Q.   That's in general.  Specifically in this case I'm going

1   to direct your attention to a witness by the name of

2   Ricky Evans.  Do you remember being notified about a witness

3   by the name of Ricky Evans in the case of Commonwealth vs.

4   Terrance Taylor and Shawn Drumgold?

5   A.  I remember Ricky Evans.  I do remember Ricky Evans,

6   yes.

7   Q.  Okay.  Do you remember during the course of your

8   representation of Mr. Taylor whether or not you ever

9   received any information about Mr. Evans being put up in the

10  Howard Johnson's?

11  A.  No.

12  Q.  Did you ever receive any information about Ricky Evans

13  charging meals in the Howard Johnson's?

14  A.  No.

15  Q.  Did you ever receive any information regarding Mr. Evans

16  or promises to Mr. Evans on his pending criminal cases?

17  A.  There was some -- there was some evidence that his

18  default warrants were going to be cleared up for him, but

19  that was it.

20  Q.  Okay.  But other than his default warrants being cleared

21  up, did you receive any evidence prior to the trial of

22  Shawn Drumgold and Terrance Taylor regarding whether or not

23  Detective Callahan made any promises to Mr. Evans regarding

24  assistance on his pending open matters?

25  A.  No.

1    Q.   During the course of your representation of Mr. Taylor,

2    specifically with respect to Mr. Evans, did you ever learn

3    that Detective Callahan showed Mr. Evans photographs of

4    Shawn Drumgold, Terrance Taylor and Theron Davis?

5    A.   Absolutely not.

6    Q.   Did you ever learn during the course of your

7    representation of Terrance Taylor that Mr. Evans pointed to

8    a photograph of Mr. Davis indicating that was the person

9    from the neighborhood everyone had indicated had done the

10   shooting?

11   A.   No, I would have remembered that.

12   Q.   Now, during the course of this trial, do you remember

13   whether or not Detective Callahan was second seating

14   Phil Beauchesne?

15   A.   Yes.

16   Q.   Could you explain to the jury what second seating

17   means?

18   A.   Well, Mr. Curran and his associate are over there, it's

19   a nonlawyer sitting at a table helping you with the case

20   with the permission of the Court because you're not supposed

21   to be sitting inside the bar unless you're a lawyer.

22           THE COURT:  That's Mary Jo Harris, Mr. Curran's

23   associate.

24           THE WITNESS:  I'm sorry, Mary Jo.

25           THE COURT:  It's important to make that clear.

1    A.   Second chair in the way we're talking about would be a

2    nonlawyer sitting with someone to help.

3    Q.   If you had a police officer or law student helping you

4    at counsel table, that's what you refer to as second

5    seating?

6    A.   Yes.

7    Q.   Now, during the course of the trial in this case, do you

8    remember, first of all, have you had an opportunity to

9    review Mr. Evans' trial testimony?

10   A.   Yes, I did.

11   Q.   Where did you get that trial testimony?

12   A.   From you.

13   Q.   Okay.  And having reviewed Mr. Evans' trial testimony,

14   do you have a present memory as to whether or not you

15   questioned Mr. Evans regarding any promises related to his

16   pending cases?

17   A.   I asked him some questions about his default warrants

18   that were pending, and that was it.

19   Q.   Okay.  And do you remember at some point there being a

20   break in the proceedings and both you and Attorney Steve

21   Rappaport -- let me back up, did Steven Rappaport represent

22   Shawn Drumgold?

23   A.   Yes, he did.

24   Q.   He was the attorney that represented Shawn Drumgold at

25   trial; is that right?

1   A.  Yes.

2   Q.  Now, at some point do you remember there being a break

3   in the proceedings where there was a voir dire of Mr. Evans

4   regarding his pending cases?

5   A.  Yes.

6   Q.  Okay.  And can you tell the jury what you recall about

7   that proceeding?

8   A.  Well, after I read it, of course, it was a long time

9   ago.  It was in '88, '89.  Evans acknowledged some of the

10  charges were his, and he said that others were not.  There

11  was some back and forth what was his and what was being made

12  up or what wasn't his.  Other than that, he said nothing

13  else, no promises had been made to him in regard to any of

14  his cases.

15  Q.  And do you remember whether or not Detective Callahan

16  was in the courtroom during that proceeding?

17  A.  My memory is that Detective Callahan was seated at the

18  table in front of the clerk with Mr. Beauchesne throughout

19  the trial, that's my memory.

20  Q.  Now, Attorney George, with respect to do you have a

21  clear memory of any representations made by Assistant

22  District Attorney Phil Beauchesne relative to any promises

23  made to Ricky Evans regarding his pending cases at that voir

24  dire on October 4th of 1989?

25  A.  After reading the transcript, my memory is Phil

1    Beauchesne represented to the Court that there were no other

2    promises made to him on his pending cases.

3    Q.  And do you remember whether or not Mr. Beauchesne also

4    made representations that to the best of his knowledge

5    nobody from the police department had made any promises?

6              MR. CURRAN:  Objection.

7              THE COURT:  Overruled.

8    A.  After reading the transcript, that's exactly what he

9    said.

10   Q.  Do you have a specific memory of Mr. Beauchesne's exact

11   words?

12   A.  I believe Beauchesne reported to the Court,

13   Judge Alberti, that no promises had been made by either him

14   or by anyone in the police department or anyone to his

15   knowledge to Ricky Evans as regards to any of his cases.

16   Q.  And as a result of that representation that Assistant

17   D.A. Phil Beauchesne made to the Trial Judge.  Who was the

18   Trial Judge back then?

19   A.  Charles Alberti.

20   Q.  And as a result of those representations that

21   Assistant D.A. Phil Beauchesne made to the trial Judge back

22   then, do you remember there being actually a voir dire where

23   Mr. Evans took the stand?

24   A.  Yes.

25   Q.  Okay.  And during that time period that Mr. Evans took

1   the stand, do you remember whether or not Detective Callahan

2   was in the courtroom?

3   A.   My memory was that Callahan was in the courtroom.

4   Q.   And do you remember specifically what it was that

5   Mr. Beauchesne asked Mr. Evans?  Do you have a specific

6   memory of that?

7   A.   No.

8           MS. SCAPICCHIO:  May I approach the witness, your

9   Honor?

10          THE COURT:  Yes, you may.

11  Q.   This is page 202, October 4th, 1989, line 12.  Can you

12  read lines 12 through 24 to yourself, please.  You read

13  quicker than I expected.  Sorry.

14          MS. SCAPICCHIO:  May I approach the witness, your

15  Honor?

16          THE COURT:  Yes, you may.

17  Q.   Attorney George, having read --

18          THE COURT:  Wait, wait, Mr. Reilly's waving at

19  you.

20          MS. SCAPICCHIO:  Your Honor, may I have document

21  camera 1, please.

22          THE COURT:  Okay, it's okay.

23  Q.   We can start at line 12.  Is that Mr. Beauchesne

24  speaking?  "All right.  Notwithstanding the fact that half

25  of these on the list you don't believe are yours?"

1          MR. ROACHE:  Your Honor, I object to the form of

2     the question.  Mr. George was asked, "Does he have a

3     memory?"  And I think the document was produced to see if

4     the document refreshes Mr. George's memory.

5          MS. SCAPICCHIO:  It's a stipulated exhibit.

6          THE COURT:  It's a stipulated exhibit, what went

7     on at the trial is part of the operative facts in the

8     case.

9          MR. ROACHE:  Thank you, your Honor.

10          MS. SCAPICCHIO:  Thank you.

11     Q.  Attorney George, if I can again direct your attention to

12     line 12, this is Mr. Beauchesne speaking with the witness,

13     Ricky Evans on the stand:  "All right.  Notwithstanding the

14     fact that half of these on the list you don't believe are

15     yours, have you had any conversations with me concerning my

16     office doing anything for you on any of these cases?  What

17     do you recall Mr. Evans' answer being?

18     A.  No.

19     Q.  Okay.  Do you remember the next question Mr. Beauchesne

20     asks, Assistant District Attorney Beauchesne, "Have you

21     talked with any police officer concerning anyone doing

22     anything for you?"  What was Mr. Evans' answer at that voir

23     dire?

24     A.  "No."

25     Q.  "Do you think as you sit here right now that because you

1    testify you're going to get any special break on any of

2    these cases?"  What do you recall Mr. Evans answer being

3    back then?

4    A.  "No."

5    Q.  And do you remember -- if you could switch to page 204.

6    Do you remember in that same voir dire, Attorney George,

7    Assistant D.A. Phil Beauchesne asking Mr. Evans, "Now with

8    regard to those cases that you say you've been charged with,

9    have you been convicted of any of them?"  What was his

10   answer?

11   A.  "No."

12   Q.  "And as you sit here today, do you think you're going to

13   get a break because you testified?"  What was his answer?

14   A.  "No."

15   Q.  "Are you testifying --" this is Assistant D.A. Phil

16   Beauchesne, "Are you testifying because you think you're

17   going to get a break?"  The answer?

18   A.  "No."

19   Q.  That testimony that I just refreshed your memory with,

20   does that refresh your memory as to whether or not -- well,

21   let me ask you this.  The testimony that we just heard, does

22   that coincide with your memory that you didn't receive any

23   information from anyone regarding promises made to

24   Ricky Evans about pending cases?

25   A.  Well, that confirms it.  I didn't get it.

1   Q.   Okay.  And with respect to this voir dire, do you then

2   remember that Mr. Evans took the stand?

3   A.   Yes.

4   Q.   And this is page 220.  Do you see that on your screen

5   right in front of you, Attorney George?

6   A.   Yes.

7   Q.   And if I represent to you this was your

8   cross-examination of Mr. Evans at trial, do you remember as

9   you sit there, do you see at line 7, "Now, did you ever have

10  any discussions with anyone, any police officers regarding

11  these open cases against you?"  What was Mr. Evans' answer

12  at trial?

13  A.   "No."

14  Q.   Was Detective Callahan there during that testimony?

15  A.   My memory is Detective Callahan sat at the table

16  throughout the trial with Phil Beauchesne.

17  Q.   Okay.  And do you see the next question, "Well, are you

18  sure about that, Rick, Mr. Evans?"  And what do you recall

19  Mr. Evans' testimony being?

20  A.   He said, you know, he was playing on me with what I was

21  talking about.  He wanted to know which cases I was talking

22  about.  He was splitting hairs.

23  Q.   Okay.  And if you go down to line 15, the question you

24  asked him, "Now, have you had any discussions about your

25  pending cases?"  What's Mr. Evans' answer then at line 17?

1    A.  Well, he said, "My pending cases?"  He was acting like

2    he didn't know what I was talking about.

3    Q.  And you were questioning him with anybody, in line 20,

4    "With anybody before you took the stand."  What was

5    Mr. Evans' answer back in 1989?  Can you read that?

6    A.  "I must have discussed it one time with Sergeant

7    Callahan about."

8    Q.  And you asked Sergeant Timothy Callahan?

9    A.  I can't see the top of it, but I'm guessing that's what

10   it says.  There you go.  Your hand is over it.  Now I see

11   it.

12   Q.  Okay.  Then if you turn the page to 221, if you look at

13   the top of the page, your next question is, "Sitting right

14   there next to the prosecutor?"  What did you mean by that,

15   Attorney George?

16   A.  Well, not that my memory is that good, the witness stand

17   was almost where I am now, it was to the right or the left

18   of the bench.  The table would have been right where the

19   clerk is sitting here or just in front of it.  I was

20   pointing at the table.  I was probably standing in front of

21   the bench pointing at the table, Detective Callahan sitting

22   right here.  My finger was probably five feet from Detective

23   Callahan at that point.

24   Q.  Does that help confirm your memory that Detective

25   Callahan was in the courtroom during Mr. Evans' testimony?

1    A.  Yes.

2    Q.  And with respect to the next question, do you remember

3    asking Ricky Evans what he talked to Detective Callahan

4    about?

5    A.  Yes.

6    Q.  And what was Mr. Evans' response back in 1989?

7    A.  Evans said, "I just asked him if he'd help me with my

8    warrants."

9    Q.  And back in 1989 before you tried the case, you knew or

10   did you know that Ricky Evans had received some help with

11   his warrants prior to taking the witness stand?

12   A.  Yes.

13   Q.  And in your experience as a criminal defense attorney,

14   was that common practice that a witness who had outstanding

15   warrants would be cleared up before they came in to

16   testify?

17   A.  Yes.

18   Q.  Okay.  But with respect to any promises about pending

19   matters, do you remember that Mr. Evans had six or seven or

20   eight pending matters at the time he testified in 1989?

21           MR. CURRAN:  Objection.

22           THE COURT:  Overruled.

23   A.  I just remember Evans had a substantial criminal

24   record.

25   Q.  Okay.  And --

1    A.   Substantial means a long criminal record.

2    Q.   And based on the voir dire that you participated in and

3    the testimony at trial of Mr. Evans, did you have any reason

4    to believe that Detective Callahan had made promises to

5    Mr. Evans regarding assistance on his pending cases?

6    A.   It didn't surprise me that warrants had been cleared up,

7    so I knew that, but, you know, as to anything else beyond

8    that, I didn't know anything else.

9    Q.   And had you known that Detective Callahan had made

10   promises to Mr. Evans about some assistance on his pending

11   cases, would you have asked Mr. Evans about it?

12   A.   You know, it depends on what kind of promises they were.

13   I mean, if they were, you know, propositions to get cases

14   dismissed or to drop cases where someone was looking at big

15   jail time, of course it's something you'd ask Ricky Evans

16   about.

17   Q.   If it was promises to speak to the district attorney on

18   your behalf and speak to the Court on your behalf some time

19   after Mr. Evans testified in the case of Commonwealth vs.

20   Shawn Drumgold and Terrance Taylor, would you have asked

21   Mr. Evans about that at trial?

22   A.   Yes.

23   Q.   And if you had known about Mr. Evans staying at the

24   Howard Johnson's, would you have asked him about that at

25   trial?

1    A.  Yes.

2    Q.  If you had known about Mr. Evans charging meals to his

3    hotel room, would you have asked him about that at trial?

4    A.  Yes.

5    Q.  If you had known that Mr. Evans was inviting friends to

6    the hotel room to treat them to dinners, would you have

7    asked him about that at trial?

8             MR. CURRAN:  Objection.

9             THE COURT:  Overruled.

10   A.  Yes.

11   Q.  If you had known that Mr. Evans was inviting family

12   members to treat them to meals at the Howard Johnson's,

13   would you have asked him about that at trial?

14   A.  Yes, I would have.

15   Q.  Now, prior to the time that you tried the case of

16   Commonwealth vs. Shawn Drumgold and Terrance Taylor, did you

17   learn that Detective Callahan had paid Ricky Evans any money

18   at all?

19   A.  No.

20   Q.  And if you had learned that Detective Callahan had paid

21   Ricky Evans money, would you have asked him questions about

22   that at trial?

23   A.  Yes.

24             MS. SCAPICCHIO:  Can I just have a minute, your

25   Honor.

1    Q.  After Mr. Evans made those representations and after

2    Phil Beauchesne, Assistant D.A. Phil Beauchesne, made

3    representations that there were no promises made to his

4    office or to the best of his knowledge any police officer,

5    did Detective Callahan ever come up to you and say anything

6    to you about promises he made to Mr. Evans?

7             MS. HARRIS:  Objection.

8             THE COURT:  Overruled.

9    A.  No.

10   Q.  Did Detective Callahan ever come up to you and make any

11   statements to you over promises he made to Ricky Evans?

12   A.  No.

13   Q.  Did you ever find out from Detective Callahan that he

14   had told, promised Ricky Evans that he would speak to the

15   prosecutor and the Court on his behalf on his pending

16   cases?

17            MS. HARRIS:  Objection.

18            THE COURT:  Overruled.

19   A.  No.

20   Q.  Did you ever find out Detective Callahan gave as far as

21   he admits $20 to Ricky Evans?

22   A.  No.

23   Q.  Did you ever find out that Detective Callahan brought

24   Ricky Evans to the Howard Johnson's and allowed him to stay

25   there for a period of time?

1    A.  No.

2    Q.  And Detective Callahan never came and told you any of

3    those things after that testimony in court; is that right?

4         MS. HARRIS:  Objection.

5    A.  No, he did not.

6         THE COURT:  Overruled.  Go on.

7         MS. SCAPICCHIO:  I have nothing further.  Hold on

8    one second.

9    Q.  One more, sorry.  Did you learn during the course of

10   your representation of Terrance Taylor that

11   Detective Callahan was feeding the details of the crime to

12   Mr. Evans so that he could testify at trial?

13   A.  No.

14   Q.  If you had learned that, would you have asked him about

15   that at trial?

16   A.  Yes.

17   Q.  And how important would that information have been to

18   your cross-examination of Mr. Evans at trial?

19   A.  Well, if a person's tailoring their story with evidence

20   being fed to them by the police about the version of events

21   the police wanted them to, you know, to give to the jury,

22   it's something you'd beat them over the head with.

23   Q.  When you say beat them over the head with it, Attorney

24   George, what do you mean?

25   A.  You would use it to try to demonstrate to the jury that

1   Evans was lying about what he knew or about what he said he

2   knew.

3           MS. SCAPICCHIO:  I don't have anything further.

4   Sorry.

5           MR. CURRAN:  May I, your Honor?

6           THE COURT:  Yes, of course.  Your assistant can

7   help you at any time.

8           MR. CURRAN:  Thank you, your Honor.

9           THE COURT:  Mr. George, you're not going to hear

10  the end of that one, but go on.

11          MS. SCAPICCHIO:  From me either.

12          MR. CURRAN:  For the record, I'm her assistant,

13  your Honor, any day of the week.

14                      CROSS-EXAMINATION

15  BY MR. CURRAN:

16  Q.  Good morning, Mr. George.

17  A.  Good morning.

18  Q.  How many years have you been a practicing attorney?

19  A.  About 30 years.

20  Q.  And --

21  A.  Actually 28 years.

22  Q.  And you look pretty good for 28 years.

23  A.  Flattery will get you everywhere.

24  Q.  Mr. George, prior to being a criminal defense attorney

25  in Massachusetts, you practiced law before that, correct?

1   A.  Yes.

2   Q.  Okay.  And you practiced law as an assistant district

3   attorney in Norfolk County?

4   A.  Yes, I did.

5   Q.  And you prosecuted homicide cases?

6   A.  Yes.

7   Q.  Okay.  And you worked in Norfolk County from 1980 to

8   1982?

9   A.  Yes, I did.

10  Q.  And you then went on for the past 28 years handling

11  criminal cases in state and federal courts, correct?

12  A.  Yes.

13  Q.  And you prosecuted numerous homicide cases?

14  A.  I've defended numerous homicide cases.

15  Q.  Okay.  You've also prosecuted your fair share of

16  homicide cases?

17  A.  Yes, way more defense.

18  Q.  All right.  When you defended Terrance Taylor, you got

19  appointed to represent Terrance Taylor in August of 1988,

20  correct?

21  A.  Yes, sir.

22  Q.  And the trial took place in October of 1989; is that

23  right?

24  A.  Yes.

25  Q.  And during the course of that period of time, you

1    enlisted associates to work with to help you on this case?

2    A.  Yes, I did.

3    Q.  And you enlisted investigators to help you on this

4    case?

5    A.  Yes.

6    Q.  All right.  Is it fair to say when you got discovery,

7    you took notes?

8    A.  I don't want to say I don't recall but, you know, did I

9    take notes, no.  No, I don't recall taking notes, I should

10   say.

11   Q.  Well, is it fair to say that if you had a conversation

12   with Phil Beauchesne, the trial prosecutor, and he provided

13   you information that was not contained in a report, you

14   would have taken notes of that conversation?

15   A.  Yes.

16   Q.  Okay.  And, in addition, if you had an opportunity to

17   speak with any of the police officers that responded to the

18   scene of the crime, any detectives or homicide detectives,

19   if you had a conversation with them about their role in the

20   investigation, the murder of Tiffany Moore, you would have

21   taken notes?

22   A.  You know, I would take notes if it was important for me

23   to write something down that I thought I'd forget.  I take a

24   lot more notes now than I used to.

25   Q.  Now, is it also fair to say that if you're in this case

1    that the joint witness list between the Commonwealth and the

2    defendants in the case was in excess of 100 witnesses?

3    A.   There were a lot of witnesses on the joint witness list

4    in this case.

5    Q.   Okay.   In regards to the discovery that was provided,

6    you had in excess of 60 reports or transcribed statements,

7    correct, provided by the police department?

8    A.   You know, Mr. Curran, I don't remember.   I remember in

9    this case it was a very, you know, it was a high profile

10   case at the time.   I don't recall how much discovery there

11   was.   There was a substantial amount of discovery, I just

12   don't remember how many statements were provided or not.

13   Q.   Okay.  And is it fair to say that in the discovery you

14   would isolate potential witnesses that had either

15   exculpatory evidence or inculpatory evidence in regards to

16   Terrance Taylor?

17   A.   I don't want to knit-pick with you, but your definition

18   of isolate might be different than mine.   Did I take them

19   and put them in a separate folder, did I take them and put a

20   little star on top?

21   Q.   That's not my definition.   You read the discovery to

22   identify witnesses that could either hurt or harm your

23   client?

24   A.   Yes.

25   Q.   Okay.   As a result, you wanted your investigators out

1    there interviewing those witnesses?

2    A.   I would want my investigators out interviewing witnesses

3    that helped me quicker than I would want them out there to

4    talk to witnesses I thought were hostile.

5    Q.   Okay.  But, in any event, you would want your

6    investigators to go out there and interview witnesses and

7    report back to you what they were saying?

8    A.   Yes.

9    Q.   All right.  And your investigators would write

10   reports?

11   A.   Well, I don't know about that.

12   Q.   Okay.  Did you use your investigator, Joe Guiditti, in

13   this case?

14   A.   Yes.

15   Q.   And did you use Daniel Fitzgerald?

16   A.   Yes.

17   Q.   And did you use Lawrence Fallon?

18   A.   Yes.  Fallon worked in conjunction with Danny

19   Fitzgerald.

20   Q.   Both of them were in law school at the time?

21   A.   Yes, they were.

22   Q.   Very eager to assist you?

23   A.   Yes.

24   Q.   And they wrote reports and they gave them to you,

25   correct?

1    A.   I can't say that they wrote reports and gave them to

2    me.

3    Q.   Do you have any memory of any report being written by

4    your investigator?

5    A.   I have no memory today of any reports being written and

6    given to me.

7    Q.   Did they not write reports?

8    A.   Well, you know, I don't want to make this into Criminal

9    Law 101, you don't always ask for reports, you know,

10   immediately when people are out, you know, investigating

11   your cases.  If you want a report, you demand a report or

12   request one, you usually get one.  I can't recall whether I

13   was asking for reports to be brought back to me in written

14   form every time they talked to somebody.

15   Q.   Do you recall the first group of discovery provided you

16   by Phil Beauchesne?

17   A.   No.

18   Q.   Okay.  Well, let's move back, Mr. George.  Could you

19   describe to the jury after a police officer applies for a

20   warrant for the arrest of someone on a capital case, a

21   murder case, and they've been arrested, could you describe

22   for the jury what the process is, what the criminal process

23   is, where they're arraigned and what takes place?

24   A.   After someone is arrested on a case, they're brought --

25   they haven't been indicted yet, which is the grand jury.

1    They're brought into the local district court where they're

2    charged, and they're arraigned before a District Court

3    Judge, which in the state court system is the lower court,

4    it's the community court.

5    Q.   Okay.

6    A.   Then they're arraigned and they plead not guilty, and if

7    it's a serious charge, like homicide, you argue bail, and

8    most times on that type of charge someone is held without

9    bail.

10   Q.   Okay.  Now, Mr. George, not to interrupt you, to

11   streamline a little, at some point the Commonwealth presents

12   witnesses to the grand jury for citizens of Suffolk County

13   to determine if there's probable cause to indict someone and

14   charge them with murder, correct?

15              MS. SCAPICCHIO:  Objection.

16              THE COURT:  Overruled.

17   A.   At some point the grand jury's convened to hear whatever

18   evidence the Commonwealth puts to it.

19   Q.   Okay.  And they return either a no bill or a true bill,

20   correct?

21   A.   Which in lay talk, they either indict you or they

22   don't.

23   Q.   And if you are indicted, you are then arraigned in

24   Superior Court again, correct?

25   A.   Yes, they're rearraigned in Supreme Court.  You go

1    through the bail process all over again.

2    Q.  And after the arraignment, is the case continued for a

3    pretrial conference date?

4    A.  Yes.

5    Q.  Can you explain what the purposes of the pretrial

6    conference date is.

7    A.  Pretrial conference is when you come back to court and

8    you sit down, if you haven't already with the prosecutor,

9    and you try to work out the details, you try to open the

10   avenues of communication in terms of evidence going back and

11   forth, what motions are going to be filed, what documents

12   they're going to give you without a fight.

13           When you say without a fight, without going to the

14   Court and asking the Court to order them to give it to you,

15   and you set a series of dates what's going to happen next

16   time you're in court.

17   Q.  And, in fact, the pretrial conference date, some initial

18   discovery is provided?

19   A.  Today it is.  Back in those days, you would go to court

20   and you would just fill out -- you'd fill out a form, but

21   you didn't necessarily get anything at a pretrial conference

22   date.  Today you do, but back then you didn't.

23   Q.  Could you describe what the discovery process was like

24   back in 1988 and 1989.

25   A.  Today the rules are much stricter in terms of

1    prosecutors, discovery as well as defense discovery.  Now

2    dates are set and, you know, there are time standards within

3    which things have to be provided.  The federal court is a

4    lot stricter than the state court, but back then you'd make

5    agreements, you'd shake hands and things were provided back

6    and forth, but everything was documented.

7    Q.  Okay.

8    A.  And the reason you had to document it because if you

9    didn't get something, you would let the Court know you

10   didn't get something.  No one took your word for it.

11   Q.  Okay.  Do you recall being deposed in this case?

12   A.  Yes.

13   Q.  Okay.  Do you recall describing the discovery process in

14   1988 and 1989 as extremely sloppy?

15   A.  Yes, it was sloppy.

16   Q.  Why don't you describe what you meant by sloppy.

17   A.  Similar to what I just said, much less formal than it is

18   today.

19   Q.  Okay.

20   A.  You know, you'd do things on an agreement, you'd talk in

21   a hallway.  I don't want it to seem like it was the frontier

22   or anything, it was today things are documented, computers

23   are used, docketing systems are on computer screens.  Back

24   then we weren't even using -- we were barely using computers

25   back then.  People typed you the letter, they would actually

1    type you the letter, and you would make an agreement to do

2    something and, you know, it would either happen or not

3    happen.  It's different than it is now.

4    Q.  Do you recall using the language cover letters were

5    never, as I recall, would never detail out everything that

6    was included in the envelope?

7    A.  Yes, I do remember that.

8    Q.  And, in fact, when you would get the envelopes in 1988

9    or 1989, they're in disarray, documents were out of order,

10   correct?

11   A.  Yes.

12   Q.  Missing pages?

13   A.  Sometimes.

14   Q.  Okay.

15   A.  The tech. was a lot different back then.  When a person

16   like Phil Beauchesne would send you a letter, his secretary

17   would be sitting there typing the entire letter out instead

18   of cutting and pasting it on a computer screen and make it

19   happen much faster, so it was very rare to see everything

20   listed out number by number.  You could come on up.

21            THE WITNESS:  I'm sorry.

22            MR. CURRAN:  May I approach, your Honor?

23            THE COURT:  Yes, you may.

24   Q.  It's the October 18th, 1988 letter.  Mr. George, I have

25   to get permission from her Honor to walk up, but thank you

1    anyway.

2         THE COURT:  You do.

3    Q.  Mr. George, I'm going to show you these two letters.  I

4    submit to you that they're identical.

5    A.  Okay.

6    Q.  One is addressed to you, one is addressed to

7    Mr. Rappaport?

8    A.  All right.

9    Q.  I'd ask you to take a quick look at those.

10   A.  I've looked at it.

11   Q.  Do you recall this correspondence sent by

12   Phil Beauchesne to you on October 19th, 1988?

13   A.  I mean, do I specifically recall it, no, but, I mean, I

14   recognize it as something that was sent to me back then.

15   Q.  Okay.  Prior to you coming today, have you had a chance

16   to review any of these documents that were provided to you

17   during the course of discovery by the Commonwealth?

18   A.  No.

19   Q.  Okay.  You weren't able to review the grand jury

20   minutes?

21   A.  No.

22   Q.  You weren't able to review the crime lab report?

23   A.  I wasn't able to review anything that's listed on this

24   sheet.

25   Q.  Okay.  25 items of discovery, separate items relative to

1    what was given to you in October of 1988, correct?

2    A.   That's what the letter says, yes.

3    Q.   Okay.  There's 1, 2, 3, 4, 5, five transcribed recorded

4    statements.  Did you have a chance to review them?

5    A.   I haven't reviewed anything that's in this letter to

6    testify today.  I don't have the file.

7    Q.   Where's the file?

8    A.   The file was turned over to Terrance Taylor's attorney

9    on other matters years ago.

10   Q.   Did you keep a copy?

11   A.   No, not that I recall, but, I mean, anything I had --

12   anything I had -- I don't have a copy in my possession now.

13   I don't recall if I ever turned a copy over to you or anyone

14   else in regard to this litigation.

15   Q.   You think you turned a copy over to me?

16   A.   No, Mr. Curran, I don't, no, no, I don't know that.

17   Q.   Do you recall testifying at the deposition that you had

18   some problems in your storage facility and the file may have

19   been destroyed or you had a memory of turning it over to

20   Terrance Taylor's family many years ago?

21   A.   That sounds familiar, yes.

22   Q.   And you have not had the opportunity to review any of

23   these documents that were provided, correct?

24   A.   No, sir.

25   Q.   Have you reviewed the completed trial transcript?

1    A.   No, you did provide me with the complete trial

2    transcript, and I did not review it.  It was about a year

3    and a half ago.

4    Q.   And you haven't had time to review the complete trial

5    transcript since then?

6    A.   No, sir.

7    Q.   Now, Mr. George, where do the discovery obligations in

8    Massachusetts begin with and end with in regards to the

9    Commonwealth, the prosecutor?

10   A.   You mean where does the duty arise from?  Where does it

11   come from?

12   Q.   Whose duty is it?

13   A.   The prosecution -- it's the prosecution's duty to

14   provide you discovery based on the rules of criminal

15   procedure.

16   Q.   Correct.  The police department and any investigators in

17   the D.A.'s Office that may investigate a crime would provide

18   reports of discovery, correct?

19   A.   Yes.

20   Q.   And it's ultimately the filter, so to speak, for

21   discovery obligations as the prosecutor, correct?

22   A.   The person that would answer for it all is the

23   prosecutor.

24   Q.   Okay.  It's the prosecutor's obligation to make a

25   determination if something is exculpatory evidence or not?

1    A.  Yes.

2    Q.  And it's their decision whether to turn over certain

3    information, correct?

4    A.  Yes.

5              MR. CURRAN:  May I just have a moment, your Honor?

6              THE COURT:  Yes.

7              MR. CURRAN:  May I approach, your Honor?

8              THE COURT:  Yes.

9    Q.  Mr. George, I'm just going to ask you for the record

10   this is a letter dated October 23d, 1989 addressed to you

11   signed by Phil Beauchesne.

12   A.  Okay.

13   Q.  All right.  Have you had a chance to review that

14   information?

15   A.  Yes.  Yes.  Yes.

16   Q.  Now, for the record, there's 14 items of discovery that

17   were provided on that day by Mr. Beauchesne to you,

18   correct?

19   A.  Yes.

20   Q.  All right.  Is Ricky Evans' name in any of those

21   discovery letters?

22   A.  No.  No.

23   Q.  Okay.  In fact, Mr. Beauchesne, do you recall

24   Mr. Beauchesne providing you with a transcribed statement

25   and a copy of Ricky Evans' interview?

1   A.  I'm not saying he didn't.  I don't recall.

2   Q.  You don't recall whether or not you were provided

3   that?

4   A.  Yes, sir.

5   Q.  Okay.

6   A.  Yes, sir, I don't recall.

7   Q.  All right.  Do you recall whether or not you had the

8   opportunity to listen to the tape, Ricky Evans' tape prior

9   to the trial?

10  A.  Not that you're looking for answers that you're not -- I

11  mean, if I had gotten such a tape, I would have listened to

12  it, but I don't have a memory today of listening to the

13  tape.

14  Q.  Okay.  Do you recall receiving a report of an interview

15  of Ricky Evans when he was brought to the D.A.'s Office on

16  June 21st, 1989?

17  A.  I don't recall today whether or not I saw such a thing,

18  but if you put it here in front of me, I'll look at it.  I

19  just don't remember --

20  Q.  Okay.

21  A.  -- seeing that document.

22  Q.  Okay.  Now --

23  A.  And I'm not saying I didn't see it, I'm just saying I

24  don't remember today whether I saw it.

25  Q.  Now, were there times in Suffolk County in the D.A.'s

1    Office when you wouldn't get a cover sheet that detailed the

2    discovery and provided you with reports back in 1988 and

3    1989?

4    A.   On homicide cases, you would usually get a cover sheet

5    with your discovery, it's just, you know, some were better

6    than others, that's all.  Some cover sheets were better than

7    others.

8    Q.  Do you recall getting any information from

9    Phil Beauchesne that was not contained in a cover letter,

10   correspondence regarding discovery obligations?

11   A.   I cannot say whether Phil Beauchesne, you know, wrote a

12   cover letter every time he gave me discovery, but I agree

13   those two letters you've just shown me are letters that came

14   from Phil Beauchesne to me listing out 39 different pieces

15   of discovery.  I can tell you this, there was way more than

16   39 separate pieces of discovery in this case.

17   Q.   Correct, okay.  Thank you, Mr. George.  Now, do you

18   recall any of the transcribed statements in the August 23d,

19   1989 disclosures that you just reviewed?

20   A.   No.

21   Q.   Let me help you.  Do you recall transcribed statements

22   of Cherry Walker?

23   A.   No, I don't, sir.

24   Q.   Do you recall the transcribed statement of

25   Lisa Graham?

1    A.  No, I don't, sir.

2    Q.  Do you recall a transcribed statement of

3    Vantrell McPherson?

4            MS. SCAPICCHIO:  Objection.

5            THE COURT:  Overruled.

6    A.  The names are familiar, but I don't recall the

7    transcribed statements or the contents.

8    Q.  Do you recall the transcribed statement of Michelle

9    Royston?

10   A.  No.

11   Q.  Tanoi Curry?

12   A.  No.

13   Q.  Shamia Clemons?

14   A.  No.

15   Q.  Michelle Blalock?

16   A.  No.

17   Q.  Mr. George, what was your relationship with

18   Phil Beauchesne?

19   A.  We had a very -- you know, we were friendly.  I mean,

20   did we have beers together, no, but I respected

21   Phil Beauchesne and I liked him.

22   Q.  Okay.

23   A.  By the way, I like Phil Beauchesne and I respect him.  I

24   don't want you to think he's not with us.

25   Q.  That's not what we're trying to do, Mr. George.

1    A.   Yes.

2    Q.   In regards to Paul Connolly, do you know the name

3    Paul Connolly?

4    A.   Yes.

5    Q.   Okay.  How do you know Paul Connolly?

6    A.   I know who Paul Connolly was, and I had dealt with him

7    in the past but it wasn't as close a relationship or as

8    respectful a relationship as with Phil Beauchesne.

9    Q.   Did you deal with Paul Connolly when he was a criminal

10   defense lawyer?

11   A.   I barely remember that, but I remember dealing -- I

12   remember Paul Connolly was a criminal defense attorney.

13   Q.   Did you have any cases with him when he was a

14   prosecutor?

15   A.   Yes, I did.

16   Q.   You had a professional and good relationship with

17   Paul Connolly?

18   A.   Yes, I didn't have a bad relationship with

19   Paul Connolly.

20   Q.   Okay.  Now, have you had the opportunity to review the

21   Treas Carter file?

22   A.   No.

23   Q.   Okay.  Do you know what the Treas Carter file is?

24   A.   No.

25   Q.   Okay.  Do you know that Treas Carter was indicted for

40

1   the execution, murder of Willie Evans and for shooting

2   Ricky Evans on December 16th, 1988?

3   A.  No.

4   Q.  Do you recall that you actually cross-examined

5   Ricky Evans, either you or Mr. Rappaport, that Mr. Evans was

6   arrested at 118 Elm Hill Ave. two days before he was shot?

7   A.  I don't have any specific memory of that right now,

8   no.

9   Q.  Okay.  Now, do you recall being provided in discovery

10  information regarding the murder of Willie Evans and the

11  shooting of Ricky Evans?

12  A.  I have no memory today of being provided that, no.

13  Q.  Okay.  And do you recall whether or not you

14  cross-examined Ricky Evans relative to the shooting of his

15  cousin and himself in that he was a witness for the

16  Suffolk County D.A.'s Office in that murder case?

17  A.  Was Treas his cousin?

18  Q.  Yes.

19  A.  I don't have a memory.

20  Q.  Do you recall, let me maybe refresh the name Chilly?

21  A.  Chilly?

22  Q.  Yes.  Do you recognize the name Chilly?

23  A.  They're memorable names, but I don't remember Chilly.

24  Q.  Now, who's in charge of all homicide investigations by

25  law in the City of Boston?

1    A.   Well, they all come through the district attorney's

2    office.

3    Q.   Do you know that there's a law in the statute that puts

4    the Suffolk County D.A.'s Office in charge of all homicide

5    investigations in Suffolk County, the City of Boston,

6    Winthrop?

7    A.   That would not surprise me, and I agree with that.

8    Q.   Okay.  Now,  --

9         MR. CURRAN:  Your Honor, this is an agreed upon

10   exhibit.  Could you bring up the photograph, Exhibit No. 6,

11   Mr. Bailey.  Thank you, your Honor.

12        MS. HARRIS:  I'll help you.

13   Q.   Mr. George, when you were assigned this case, at some

14   point in time you went out and conducted a crime scene

15   investigation, correct?

16   A.   Yes.

17   Q.   All right.  And you were aware that the Boston Police

18   Department responded to the shooting of Tiffany Moore at

19   approximately 9:20 on the evening of August 19, 1988,

20   correct?

21   A.   I don't disagree with that.

22   Q.   And, in fact, were you familiar with the Suffolk County

23   D.A.'s Office having a homicide response team?

24   A.   Yes.

25   Q.   Okay.  Could you tell the jury what the homicide

1   response team was.

2   A.  Well, an assistant district attorney would carry a

3   beeper, and when a homicide would occur or when -- I

4   shouldn't say a homicide -- a sudden death would occur, a

5   call would be made into that beeper and the assistant

6   district attorney would respond to the scene of the homicide

7   with an assigned Boston Police officer or detective.

8   Q.  And in this particular case, are you familiar with an

9   assistant district attorney by the name of Matthew King?

10  A.  Yes.

11  Q.  And did in fact Matthew King respond to the scene of the

12  Tiffany Moore homicide on August 19, 1988?

13  A.  My memory is that Matt King was involved in the case,

14  and that doesn't -- that's something that refreshes my

15  memory.

16  Q.  Okay.  If I told you that Matt King also participated in

17  interviews with witnesses with Detective Richard Walsh into

18  the late evening of August 19th and into the early morning

19  of August 20th, does that refresh your memory?

20  A.  I remember Matt King was involved in interviews.

21  Q.  Now, at some point in time you had the opportunity to go

22  out to the scene, correct?

23  A.  Yes.

24  Q.  And you went out to the scene with your investigators?

25  A.  I remember being with Danny Fitzgerald.  I don't know if

1   I was with anyone else.

2           MR. CURRAN:  Mr. Bailey, if you could first bring

3   up, and I apologize, bring up the map of the Humboldt and

4   Homestead area.

5   Q.  Okay.  Mr. George, if you could just acquaint yourself

6   with this particular area.  You're familiar with that area

7   of Grove Hall, correct, in the City of Boston?

8   A.  Yes.

9   Q.  And you're familiar with the fact that on the corner of

10  Homestead and Humboldt Avenue that purple building is the

11  Boston Edison plant?

12  A.  I remember that now.

13  Q.  And, in fact, the little dot here is where the mailboxes

14  were, correct?

15  A.  Yes.

16  Q.  And the Boston Edison plant was encased by a fence,

17  correct?

18  A.  Yes.

19  Q.  And at the time of the shooting of Tiffany Moore,

20  Tiffany Moore was sitting on one of the mailboxes; is that

21  correct?

22  A.  Yes.

23  Q.  And she was surrounded by other young girls and some

24  older boys?

25  A.  Yes.

1    Q.  And one of those older boys included

2    Christopher Chaney?

3    A.  You're refreshing my memory now.

4              MS. SCAPICCHIO:  Is there a question?

5              THE COURT:  I'm waiting for a question.  Go on.

6    Q.  Do you recall Christopher Chaney was one of the boys

7    that was standing next to Tiffany Moore at the mailbox?

8    A.  Now that you mentioned it, yes.

9    Q.  Do you acknowledge that the Commonwealth's theory of the

10   case was that Chris Chaney and Mervin Reese were the

11   intended targets that evening?

12   A.  Yes.

13   Q.  Okay.  And that Mervin Reese had been at the mailbox

14   within a half hour of the shooting of Tiffany Moore?  Do you

15   acknowledge that?

16   A.  Yes.

17   Q.  All right.  And is it fair to say that the allegations

18   of the witnesses were that there were two or three masked

19   gunmen wearing black clothing and/or black Adidas

20   sweatsuits, climbed over the fence at the back of the

21   Edison, crept up along the building and fired shots at the

22   intended targets striking Tiffany Moore?

23   A.  That's my memory.

24   Q.  Okay.  And that after the shots were fired, depending on

25   which witness how many shots there were, they ran back along

1    the building climbing over the fence and going up Homestead

2    Street, correct?

3    A.   I remember that, yes.

4    Q.   And, in fact, there were two witnesses in this case,

5    Tracie Peaks and Mary Alexander, that lived at 72 Homestead

6    Street, the blue building, correct?

7    A.   Yes.

8    Q.   And do you recall during the trial that Tracie Peaks and

9    Mary Alexander said after they heard shots fired, they went

10   to the porch and they saw black males coming over the back

11   of the fence and coming by their house, and one of them

12   putting a gun in his waistband, correct?

13   A.   I remember that, yes.

14   Q.   All right.  And let me move to the picture now, please.

15   Sir, could you tell the jury what this picture is?

16   A.   Those are the mailboxes you're talking about, and that's

17   the front of the Edison plant, and that's the fence encasing

18   the front of the Edison plant.  We're on Humboldt, and

19   Homestead is over to the left.

20   Q.   All right.  Can we move to the next exhibit, 7, please.

21   And is this -- sir, could you explain what this photo is?

22   A.   It's obvious, it's not obvious, that's the back -- I

23   don't know what that is.

24   Q.   Good answer.  If I was going to give you an area, to the

25   left of the photograph is Homestead Street, and we're

1    looking from the view of this picture is from Humboldt down

2    Homestead?

3    A.  Right, that's what -- yes.

4    Q.  And the allegations were that the shooters ran down the

5    side of this fence over the fence and down Homestead,

6    correct?

7    A.  Yes.

8            MR. CURRAN:  Thank you, Mr. Bailey.

9    Q.  Mr. George, when you went out that evening, when did you

10   go out to the crime scene, how many times?

11   A.  I was out there two or three times.

12   Q.  And was that to get acclimated as a trial lawyer so you

13   know the witnesses coming up, where they were when they made

14   observations?

15   A.  Yes.

16   Q.  Okay.  Did you go to the porch at 72 Homestead Street?

17   A.  72 Homestead Street where Mary Alexander and

18   Tracie Peaks lived?

19   Q.  Yes.

20   A.  Yes.

21   Q.  Did you go across the street to where Willie Simms on

22   the third floor lived?

23   A.  Yes.

24   Q.  Okay.  And he was another witness that was

25   called -- well, strike that.  Did you canvass the

1    neighborhood?

2    A.  Not really.

3    Q.  Okay.  Did you have your investigators go knock on

4    door?

5    A.  They did, yes.

6    Q.  Okay.  Could you describe what the level of cooperation

7    was with witnesses in this case when you were trying it?

8    A.  There was no cooperation.

9    Q.  Okay.  Could you describe what the level of violence was

10   in that area of the City of Boston back in 1988 and 1989?

11   A.  Well, let's put it this way, you asked me if I went out

12   there at night.  I'd have to be crazy to go out there at

13   night.  It was the kind of place in the daytime it looked

14   just fine, but at night it became a different place.

15   Q.  Do you acknowledge in 1988 and 1989 there were record

16   number of homicides and record number of shootings in the

17   City of Boston?

18   A.  Yes.  It was a bad summer.

19   Q.  Now, you testified on direct examination that your

20   memory is that Tim Callahan second sat Phil Beauchesne

21   throughout the course of the whole trial?

22   A.  That's my memory.

23   Q.  Okay.  And your memory is that he was in the courtroom

24   the whole time?

25   A.  My memory is he was there throughout the course of the

1    time that I recall being in the courtroom, yeah, but, I

2    mean, if you're asking me if he ever left the courtroom at

3    any time, I wasn't watching him constantly, but he was there

4    for almost all of the time I can recall.

5    Q.  Do you remember Tim Callahan being away from the trial

6    because he was a witness in another murder case and he was

7    on the stand testifying in the same courthouse?

8    A.  I don't recall that.

9    Q.  Do you dispute that?

10   A.  I don't dispute it, but I don't recall it.

11   Q.  Okay.

12   A.  I don't mean to interject, Mr. Curran, but I wasn't -- I

13   wasn't there in the trial from the beginning to the end

14   because at some point we were out of the trial.  I don't

15   know what happened after that.

16   Q.  I understand that.

17          MR. CURRAN:  Your Honor, may I approach?

18          THE COURT:  Yes.

19          MR. CURRAN:  This is unagreed upon, your Honor.

20   I'm just going to show the witness and have him review it by

21   refreshing his memory.

22   Q.  This is a trial transcript of October 5th, 1989, and I'd

23   ask you to take a look at that page.

24   A.  Okay.

25   Q.  Okay.  Does that refresh your memory that Detective

1    Timothy Callahan during the course of this trial went out to

2    pick out defense witnesses to bring them into court to

3    testify?

4    A.  That's what that transcript says, yeah.

5    Q.  Do you remember that?

6    A.  I don't remember it, no.

7    Q.  Was there a reason why you wouldn't send your own

8    investigator out to pick up these witnesses?

9    A.  There's a variety of different reasons.  I could be busy

10   with something else, an investigator could be doing other

11   things for the defense at the same time, but if you're

12   asking me if I have a specific memory as to why that

13   happened as to what you just showed me, I have no specific

14   memory of that.

15   Q.  Is it common practice?

16   A.  For the police to bring in --

17   Q.  -- a defense witness?

18   A.  Well, it is not common practice to bring in a defense

19   witness, but it is common practice for the prosecution to

20   bring in witnesses that are listed on their witness list or

21   are joint witnesses that they don't call.  That happens all

22   the time.

23   Q.  And that was referred to as defense witnesses?

24   A.  The person was referred to as a defense witness.

25   Q.  Thank you, Mr. George.  Now, Mr. George, you practiced

1   in Suffolk County for 30 years, correct?

2   A.  Yes.

3   Q.  You've had all kinds of types of criminal cases in state

4   and federal courts?

5   A.  Yes.

6   Q.  And you're familiar with Roxbury District Court?

7   A.  Yes.

8   Q.  Do you acknowledge that Roxbury District Court is one of

9   the busiest municipality courts in New England?

10          MS. SCAPICCHIO:  Objection.

11          THE COURT:  Overruled.

12  A.  They're a very busy court.

13  Q.  Do you acknowledge in 1988 and 1989 that it was so busy

14  that some trial dates were six months in the future?

15  A.  That wouldn't surprise me.

16  Q.  All right.  Would you acknowledge that there was a -- do

17  you acknowledge that certain types of cases that are

18  arraigned or within a few appearances before the court that

19  the court would try to dispose of those types of cases, less

20  serious ones?

21  A.  Yes, I mean, that occurs even today.

22  Q.  Do you acknowledge that in Roxbury District Court in

23  1988 a case like trespassing where you were living with a

24  family member and you weren't on the loose that that type of

25  case would be dismissed either outright or court costs?

1   A.   I don't recall that, but that wouldn't surprise me.

2   Q.   Okay.  Disorderly person?

3   A.   Same.

4   Q.   Same, dismissed on court costs or community service,

5   correct?

6   A.   Same type of disposition.

7   Q.   All right.

8   A.   It wouldn't surprise me.

9   Q.   How about straight possession of drugs?

10  A.   Depends on the person's record.

11  Q.   All right.

12  A.   It would have depended on a person's record.

13  Q.   And if you didn't have a record of convictions?

14  A.   Even today it would be resolved quickly.

15  Q.   Either dismissed on court costs or continued without a

16  finding, correct?

17  A.   Could you tell me what type of drugs?

18  Q.   Possession of Class B?

19  A.   Class B, okay, possibly, probably.

20  Q.   Okay.  And when you say -- could you explain what a

21  continued without a finding is?

22  A.   Continued without a finding is a matter is continued,

23  you admit that you've committed the crime but the Court

24  doesn't find you guilty, puts it off for a period of time,

25  and if you have no trouble within that period of time, the

1    case is dismissed.  It's like a pretrial probation.

2    Q.  CWAF on a docket sheet?

3    A.  CWOF.

4    Q.  O-F, okay.  And were you aware that when you

5    cross-examined Ricky Evans -- strike that.  The Commonwealth

6    provided you information that the Boston Police Department

7    brought Ricky Evans to the Roxbury District Court to have

8    his pending cases default removed, correct?

9    A.  Yes.

10   Q.  That was a common practice by all the prosecutors in

11   Suffolk Superior Court?

12   A.  Well, resolving or removing defaults prior to the

13   testimony would not be something out of the ordinary in

14   Suffolk or in any county even today.

15   Q.  Correct.  You were provided that information which

16   allowed you to cross-examine Ricky Evans on that, correct?

17   A.  Yes.

18   Q.  All right.  The trial transcript, Detective McDonough

19   brought Ricky Evans to have his default removed, correct?

20   A.  Yes.

21   Q.  In fact, there was a returnable warrant that was signed

22   by Detective McDonough, correct?

23   A.  Yes.

24   Q.  And you used that returnable warrant to cross-examine

25   Ricky Evans, right?

1    A.   That's my memory, yes.

2    Q.   Now, did you know what the relationship was like between

3    Phil Beauchesne and Paul Connolly?

4    A.   I know they weren't enemies, but I don't know whether

5    they were hanging out together.

6    Q.   They were colleagues?

7    A.   They were professional colleagues.

8    Q.   They had a professional relationship?

9    A.   They had a professional relationship for certain, yes.

10   Q.   You're aware that Phil Beauchesne and Paul Connolly were

11   team leaders for different felony teams in Suffolk Superior

12   Court at the time in 1988 and 1989?

13   A.   I know that Phil Beauchesne was a team leader or a

14   supervisor, but I don't recall if Paul Connolly was, but it

15   wouldn't surprise me if he was.

16   Q.   Do you remember that Phil Beauchesne and Paul Connolly

17   had offices right next to each other on the fifth floor at

18   55 Court Street?

19   A.   I didn't know that.

20   Q.   Did you go over to 55 Court Street to meet the

21   prosecutors back then in 1988 and 1989?

22   A.   Yes, I did.

23   Q.   And they were on the fifth floor of the superior court

24   prosecutors, correct?

25   A.   I don't know remember where I got off the elevator, but

54

1   it was above the ground, you know, it was above the street

2   level.  I don't mean to be knit-picking, I just don't want

3   to agree to the fifth floor if I don't remember.

4   Q.  All the Superior Court prosecutors were on one floor?

5   A.  Right, that's true, yes.

6   Q.  And the district court prosecutors for the BMC and the

7   other district court units were on the third floor?

8   A.  They were on another floor.

9   Q.  You don't want to commit to the third floor?

10  A.  Well, I mean, you know, I'm just under oath.

11  Q.  Okay.  Now, Mr. George, as a seasoned criminal defense

12  attorney when you were provided information that Ricky Evans

13  was a common witness between Paul Connolly and

14  Phil Beauchesne, you would take steps to investigate that,

15  correct?

16  A.  It depends what you mean by common witness.  I mean, a

17  witness for -- it depends what you mean in terms of how much

18  I would investigate it.

19  Q.  Okay.  Well, do you acknowledge that

20  Ricky Evans -- strike the question.  Do you acknowledge that

21  the initial investigation that took place, you had 15

22  reports, transcribed statements, return of search warrant, a

23  whole litany of information, correct?

24  A.  Yes, sir.

25  Q.  And you had no knowledge of Ricky Evans at that time?

1    A.   No.

2    Q.   Okay.   In fact, some time in the summer of 1988,

3    Ricky Evans was disclosed by Phil Beauchesne to you about

4    being a witness in a case?

5    A.   At some point prior to the trial he was disclosed, yes.

6    The trial was in October of '89.   That wouldn't surprise me

7    that that's the date.

8    Q.   Did Phil Beauchesne indicate to you that he had met with

9    Ricky Evans and interviewed him?

10   A.   I don't recall whether Phil Beauchesne said he had

11   actually met with him, but, you know, he let us know about

12   it, so I'm not going to assume anything.   I don't recall

13   Phil telling me he had met with him.

14   Q.   Well, you had several cases with Phil Beauchesne,

15   correct?

16   A.   Yes.

17   Q.   You considered him to be a very good prosecutor?

18   A.   Yes.

19   Q.   And you had a good relationship with him?

20   A.   Yes, sir.

21   Q.   Do you think that Phil Beauchesne would ever put a

22   witness on the stand without interviewing him and preparing

23   him to testify?

24            MS. SCAPICCHIO:   Objection.

25            THE COURT:   Objection sustained.

56

```
1   Q.  Have you ever heard of any prosecutor in a homicide case
2   putting a cooperating witness on the stand without ever
3   interviewing him?
4           MS. SCAPICCHIO:  Objection.
5           THE COURT:  Sustained.
6           MR. CURRAN:  Could I just have a moment, your
7   Honor?
8           THE COURT:  Yes.
9           MR. CURRAN:  We have an agreed upon exhibit, your
10  Honor, trial transcript, Day 6, October 4th, 1989, TR 00501.
11          THE COURT:  On the document camera or on the
12  screen?
13          MR. CURRAN:  On the screen, please, your Honor, if
14  I don't show my inadequacies on the document camera.
15  Q.  I hit this too high.  I just refer you to the question
16  beginning where the arrow is.
17  A.  Yes, sir.
18  Q.  And the answer of Ricky Evans?
19  A.  You've got it.
20  Q.  "I have to go back the 8th of this month," correct?
21  A.  Yes, sir.
22  Q.  And he was referring to the 8th of October, 1989,
23  correct?
24  A.  Yes.
25  Q.  And at that time you had done your due diligence and you
```

1    had gotten all of Mr. Evans' pending cases, correct?

2    A.  Well, is this me asking the questions?

3    Q.  What's that?

4    A.  Did I ask these questions?

5    Q.  Correct.

6    A.  I mean, I was asking him generally about his defaults,

7    but I don't know if I knew he had to go on the 8th of that

8    month.  I was taking his word for it.

9    Q.  You cross-examined him on dealing drugs during the

10   course of the trial?

11   A.  I think so.

12   Q.  Okay.  You cross-examined him on him being a gang

13   member?

14   A.  I don't recall.

15   Q.  Did you cross-examine him on his brother being a member

16   of the Humboldt gang?

17   A.  I don't recall.

18   Q.  Okay.  Now, as a seasoned criminal defense attorney, if

19   you're going to cross-examine someone on pending cases or on

20   prior convictions, you get a copy of the complaint and the

21   docket sheet, correct?

22   A.  Yes.

23   Q.  So, when you were cross-examining him, you knew that

24   Ricky Evans had to go back to court to answer on charges in

25   Roxbury District Court?

1   A.   It would not surprise me if I had such evidence.

2   Q.   So on that day when he testified, those cases in Roxbury

3   District Court weren't wiped away, correct?

4   A.   No, no.

5   Q.   All right.  And they didn't just disappear prior to that

6   day?

7   A.   No, the warrants, you know, his defaults had been

8   cleared.

9   Q.   Okay.  Now, can an individual remove a default without

10  going before a Judge, a clerk and being given a bail

11  warning?

12  A.   For a speeding ticket?

13  Q.   No, I'm talking about for a criminal charge, you said

14  possession of Class B, disorderly, trespassing?

15  A.   The more the charge, the more difficult it is certainly

16  without a Judge.

17  Q.   Right.  You're not going to be able to walk into the

18  courthouse, talk to your probation officer and go on your

19  way if you have defaults on a criminal case, correct?

20  A.   I misunderstood.  No, you can't, you can't.

21  Q.   So you got to go before a Judge and a clerk calls the

22  warrant and there's a bail argument or the Court releases

23  you on your recognizance and says you are recognized to be

24  here on October 8th, 1989 to answer on these charges?

25  A.   The Court has to approve the removal of a default, I

1    don't just get it done.  It's not just something that

2    happens when you walk in the front door of a courthouse.

3    Q.  Did you work with Steven Rappaport closely on this

4    case?

5    A.  I worked with Mr. Rappaport, Attorney Rappaport on this

6    case, yes.

7    Q.  There was no joint defense agreement, correct?

8    A.  No, sir.

9    Q.  And, in fact, you worked with Attorney -- you worked

10   with the attorneys that worked with you and your

11   investigators on behalf of Terrance Taylor, correct?

12   A.  Yes.

13   Q.  You didn't say divide the duties?

14   A.  No, sir.

15   Q.  If a witness was going to be called, you prepared for

16   that witness, correct?

17   A.  We worked for Taylor, and we prepared our case for

18   Taylor.

19   Q.  All right.  You acknowledge that there was a big

20   discrepancy in the evidence against Taylor vs. Drumgold?

21   A.  As I said in the deposition, the case against

22   Mr. Drumgold was different than the case against

23   Mr. Taylor.

24   Q.  The case against Drumgold was much stronger, wasn't

25   it?

1    A.   It was stronger than against Taylor.

2    Q.   And, in fact, against Taylor there was no one that

3    identified Terrance Taylor at the scene of the shooting or

4    coming from the scene of the shooting, correct?

5    A.   Not that I recall.

6    Q.   All right.  Do you recall Chris Cousins?

7    A.   No.  I mean, I recall his name, but I don't recall the

8    content of his testimony.

9    Q.   Okay.  Do you recall that Chris Cousins was one of the

10   key witnesses that you had to discredit on behalf of

11   Terrance Taylor?

12   A.   I had to discredit several witnesses to get to where we

13   got to in the case, yes.

14   Q.   And do you acknowledge that not one witness that was

15   called at trial identified Terrance Taylor at the scene of

16   the shooting coming over the fence or running down Homestead

17   Street when he had a gun in his pocket?

18   A.   My memory is that no one identified Taylor in that

19   fashion, although there were people that identified him as

20   having a weapon --

21   Q.   Okay.

22   A.   -- prior to.

23   Q.   You acknowledge that there was two witnesses against

24   Terrance Taylor, one, Chris Cousins that was at a hospital

25   room where Romero Holliday who had been suffering from a

1    gunshot wound, and there was a talk of retribution and

2    Chris Cousins identified Shawn Drumgold and Terrance Taylor

3    as the individuals in that room talking about retribution?

4              MS. SCAPICCHIO:   Objection.   There were more than

5    two witnesses.

6    A.   I recall --

7              THE COURT:   Sustained.

8    Q.   Do you recall that testimony at trial?

9              THE COURT:   Can you rephrase your question now in

10   light of the objection?

11   Q.   Do you recall that Chris Cousins testified at trial that

12   he was in a hospital room visiting Romero Holliday when

13   Shawn Drumgold and Terrance Taylor were present and that

14   Shawn Drumgold and Terrance Taylor discussed with Romero

15   Holliday retribution?

16   A.   I recall that now.

17   Q.   Okay.   And that was one of the witnesses that you had to

18   deal with on behalf of Terrance Taylor, correct?

19   A.   Yes, sir.

20   Q.   And the other witness was Ricky Evans who testified that

21   he saw Shawn Drumgold and Terrance Taylor before the

22   shooting and saw him after the shooting?   Is that correct?

23   A.   Yes, sir.

24   Q.   Do you recall sending investigators out looking for

25   Ricky Evans?

1    A.  I don't recall it, but that doesn't surprise me.  I

2    don't recall that.

3    Q.  Okay.  He was one of the key witnesses against Terrance

4    Taylor, correct?

5    A.  Yes.

6    Q.  Would it surprise yourself that as a seasoned criminal

7    defense attorney that you would not have sent investigators

8    out?

9            MS. SCAPICCHIO:  Objection.

10            THE COURT:  Sustained.

11    Q.  Do you recall Lawrence Fallon who worked as an

12    investigator for you?

13    A.  Yes.

14    Q.  Okay.  And do you recall that --

15            MR. CURRAN:  May I approach, your Honor?

16            THE COURT:  Yes.

17    Q.  Do you recall that Mr. Fallon was assigned the task of

18    finding Ricky Evans?

19    A.  Yes.

20    Q.  I just ask that you review the September 12th, 1989

21    report prepared by Detective Callahan.  Okay.  Does that

22    refresh your memory?

23    A.  It refreshes my memory that Larry Fallon, Lawrence

24    Fallon, met with or went out looking for Ricky Evans.

25    Q.  Does it refresh your memory that Ricky Evans claimed

1    that Lawrence Fallon asked him these series of questions?

2              MS. SCAPICCHIO:  Objection.

3    Q.  Did the police force you --

4              THE COURT:  Wait, the objection to -- are you

5    reading from the trial transcript?

6              MS. SCAPICCHIO:  No.

7              MR. CURRAN:  This was discussed at the trial, your

8    Honor, this is the September 12th -- may I approach?

9              THE COURT:  I don't want you to approach, just

10   show it to me.

11             MS. SCAPICCHIO:  It's not part of the trial

12   transcript, your Honor.

13             THE COURT:  Is this something that the witness

14   indicated he had received?

15             MR. CURRAN:  I can prove that he received it,

16   Judge.  There's discussions.

17             THE COURT:  Why don't you ask him whether or not

18   he received it.  You can have it.

19   Q.  Do you recognize that document?

20   A.  I recognize it as a Boston police report.

21   Q.  Do you recognize that you at some point during the

22   course of the discovery phase of this case received that

23   document?

24   A.  I can't say I received it, but if it's part of the

25   discovery packages that were going back and forth.  I don't

1    deny receiving it, I just don't have any specific memory of

2    receiving any particular document.

3    Q.  Do you recall various voir dires that were conducted

4    regarding Ricky Evans and the disclosure of reports

5    regarding Ricky Evans?

6    A.  Yes.

7         THE COURT:  This is during the trial?

8         MR. CURRAN:  During the trial, your Honor.

9         MS. SCAPICCHIO:  Pretrial hearings.

10         THE COURT:  Pretrial hearings, okay.

11    Q.  Do you recall this issue was brought up in a pretrial

12    hearing relative to Ricky Evans and his testimony?

13    A.  Yes.

14    Q.  And it was discussed with you and Mr. Beauchesne and the

15    Court about your investigator, Lawrence Fallon, finding

16    Ricky Evans at his family home in Dorchester?

17         MS. SCAPICCHIO:  Objection.

18    Q.  His brother's home in Dorchester?

19    A.  My memory there was a court proceeding about that

20    issue.

21    Q.  Okay.  And, in effect, you spoke with Mr. Beauchesne

22    about Ricky Evans' allegations about statements made by your

23    investigator to him in regards to what he perceived,

24    Ricky Evans perceived?

25         MS. SCAPICCHIO:  Objection.

65

1          THE COURT:  Can you rephrase that question?

2          MR. CURRAN:  Sure.

3          THE COURT:  It was a complicated question.

4    Q.  You've had a chance to review the questions that were

5    contained in this report that Ricky Evans alleges that your

6    investigator asked him?

7    A.  I wanted to make sure you said alleges, yes, I saw the

8    report.

9    Q.  And this is what Ricky Evans claimed Mr. Fallon said to

10   him?

11          MS. SCAPICCHIO:  Objection.  It's what

12   Mr. Callahan claims Mr. Evans said.  It's not what Mr. Evans

13   said.  There's no evidence as to what Mr. Evans said.

14          THE COURT:  Wait, has the witness identified the

15   document as having been in his file?

16          MS. SCAPICCHIO:  No.

17   Q.  Do you recognize that document that I've just showed

18   you?

19   A.  I don't have a specific memory of any particular

20   document that was in my file.

21   Q.  Do you have any memory as you sit here today of any

22   documents you had in your file?

23   A.  No.

24          THE COURT:  So if the document wasn't in his file,

25   then the contents of the document you've just examined --

66

```
1          MR. CURRAN:  He didn't say it wasn't in his
2     file.
3          THE COURT:  I understand.  If you can't establish
4     that it was in his file, and if the content -- you've just
5     examined about the contents and you had his testimony.  Go
6     on.
7          MR. CURRAN:  Can I just have a moment?
8     Q.  In any event, Mr. Beauchesne approached you, correct,
9     about it?
10    A.  I remember taking up the subject of what you're asking
11    me about with Mr. Beauchesne.
12    Q.  Mr. Beauchesne came up to you and said we have a problem
13    or to that effect there's some allegations that your
14    investigator steered a witness?
15    A.  I have a memory of Phil Beauchesne talking to me about
16    Larry Fallon talking to a witness.
17    Q.  And that was just a couple weeks before the trial?
18    A.  I don't remember the timing of it.  I'm remembering that
19    it happened.
20    Q.  Okay.  The date of this report is September 12th, 1989.
21    Do you recall at the pretrial that took place, that the
22    original trial date for Shawn Drumgold and Terrance Taylor
23    was September 12th?
24    A.  No, I didn't.  I don't recall that.
25    Q.  Now, you indicated that you did not receive information
```

1    from Phil Beauchesne that Ricky Evans was in a hotel?

2    A.  That's right, I didn't receive it.

3    Q.  Okay.  Did you receive it from Paul Connolly?

4    A.  No.

5    Q.  Well, do you acknowledge that Ricky Evans was a witness

6    in the Treas Carter prosecution and also a witness in the

7    Drumgold case?

8    A.  I acknowledge that he was a witness in the Drumgold

9    case, and I agree with you that he was a witness in another

10   case, if you say so.

11   Q.  Okay.  Well, you cross-examined him on it, Mr. George.

12   A.  Then we don't have to disagree with you, I agree with

13   you.

14   Q.  If you cross-examined Ricky Evans about it, is it fair

15   to say that you would have taken steps as a criminal defense

16   lawyer to speak to the prosecutor, Paul Connolly, in regards

17   to what he had in the other murder case?

18              MS. SCAPICCHIO:  Objection.

19              THE COURT:  Overruled.

20   A.  I can't say.

21   Q.  Do you acknowledge that you would have asked the

22   Commonwealth to provide discovery, incident reports, witness

23   reports, transcribed statements in regards to the murder of

24   Willie Evans and the prosecution of Treas Carter to see if

25   there was any information that could help your client?

1    A.  Yes.

2    Q.  Okay.  And do you have a memory of the Commonwealth

3    providing you that information?

4    A.  I don't have a memory of the Commonwealth providing

5    that.

6    Q.  All right.

7    A.  But I'm not saying they didn't.

8    Q.  All right.  But as your practice would dictate that you

9    would have sought out that information?

10   A.  Yes.

11   Q.  Okay.  So you don't dispute that you had?

12       MS. SCAPICCHIO:  Objection.  That's not what he

13   said.

14       THE COURT:  Sustained.  Sustained.

15   Q.  As a seasoned criminal defense attorney, you would have

16   also found out who was representing Treas Carter?

17   A.  Yes.

18   Q.  And you would have taken steps to speak to her to see

19   what information she had in regards to a common witness, how

20   we could help, get information on this witness so we can do

21   our job?

22       MS. SCAPICCHIO:  Objection.

23       THE COURT:  Overruled.

24   A.  That's something I should have, would have done.

25   Q.  Okay.  Do you recall Joan Stanley?

1    A.   I know Joan Stanley.

2    Q.   And you have a good relationship with Joan Stanley?

3    A.   Yes.

4    Q.   Joan Stanley represented Treas Carter, Chilly, who was

5    being prosecuted for the murder of Willie Evans and the

6    shooting of Ricky Evans.  Do you have a memory of speaking

7    to her?

8    A.   I don't have a memory of speaking to Joan Stanley.

9    Q.   And you had a good relationship with her back in 1988

10   and 1989?

11   A.   Yes.

12        MR. CURRAN:  Can I just have a moment, your Honor.

13   I don't have much more.

14   Q.   Now, there was some questions asked about Theron Davis.

15   A.   Yes.

16   Q.   Okay.  You acknowledge that one of the theories of the

17   defense in this case was that Theron Davis was the

18   shooter?

19   A.   Yes.

20   Q.   Okay.  Do you acknowledge that the Commonwealth did not

21   dispute that?

22        MS. SCAPICCHIO:  Objection.  I don't even know

23   what that means.

24        THE COURT:  I don't know what that means either,

25   sustained.

1  Q.  Do you acknowledge that Phil Beauchesne had provided you

2  information that allowed you and your co-defense counsel,

3  Mr. Rappaport, to develop your theory that Theron Davis was

4  the shooter?

5         MS. SCAPICCHIO:  Objection.

6         THE COURT:  The question is about providing

7  information.  You can have it.  Go on.  Did you get such

8  information?

9         THE WITNESS:  My memory today is that it's not a

10  mystery that Apple Davis or Theron Davis was the alleged

11  shooter.

12  Q.  Okay.  You acknowledge that the witnesses said there

13  were two to three shooters, correct?

14  A.  My memory is that there were shooters in a vehicle on a

15  drive-by shooting out of a vehicle.

16  Q.  And that's what came out at trial?

17  A.  I don't believe it came out at trial.  I don't know.

18  Q.  So, you're at trial, the trial witnesses that --

19  A.  I just don't recall.

20  Q.  The trial witnesses that were before 14 jurors in

21  Suffolk County testified that there were two to three masked

22  gunmen that climbed over the fence at the Edison plant,

23  correct?

24         MS. SCAPICCHIO:  Objection, your Honor.  Can we be

25  heard?

1           THE COURT:  No.  If the testimony is what was

2   going on at trial, there will be transcripts to that extent.

3   If the testimony is what was turned over, you can have it.

4   The question is, was there anything turned over to this

5   effect?

6           MS. SCAPICCHIO:  Judge, the question that

7   Mr. Curran is asking about witnesses who were called after

8   Mr. George left the case.

9           THE COURT:  Well, in that case the objection is

10  sustained.

11          MR. CURRAN:  That's not accurate.  The trial

12  transcript will show that, so that's fine.

13  Q.  Mr. George, were you provided information that Theron

14  Davis and London Williams were interviewed within a few days

15  of the murder of Tiffany Moore?

16  A.  That's not a surprise to me right now, but I don't have

17  a specific memory of it.

18  Q.  Okay.  In fact, there was a report provided to you in

19  discovery about the interview with Theron Davis, correct?

20  A.  There likely was.

21  Q.  And interview with London Williams?

22  A.  The names are not unfamiliar to me.

23  Q.  Do you acknowledge that Theron Davis' photograph was put

24  in the array that was shown the identifying witnesses?

25          MS. SCAPICCHIO:  Objection.

1          THE COURT:  The issue is not whether it happened,

2     the issue is whether he was told about it, whether or not

3     that was something you were told about or received

4     information in writing or orally.

5     A.  I don't have a specific memory of individual pieces of

6     evidence that were handed to me during discovery.

7     Q.  You were provided the photo array, correct?

8     A.  If there was a photo array, it would have been

9     provided.

10    Q.  Okay.  And --

11    A.  Or it should have been provided.

12    Q.  All right.  As a criminal defense lawyer, you'd want to

13    know who was in the photo array, correct?

14    A.  Yes.

15    Q.  And you in 1988 knew what London Theron looked like?

16    A.  I came to know what he looked like.

17    Q.  So you had a chance to review a photo array with your

18    knowledge with what Theron Davis looked like?

19    A.  Yes.

20    Q.  And do you recall that it was disclosed to you that

21    Theron Davis was in the photo array that was shown the

22    identifying witnesses?

23          MS. SCAPICCHIO:  Objection.  He just said he

24    didn't recall what the photo array was.

25          THE COURT:  Sustained.  Sustained.

1   Q.  Mr. George, based on the Treas Carter murder, you knew

2   that there was three assailants that were involved in the

3   murder of Willie Evans and the shooting of Ricky Evans?

4           MS. SCAPICCHIO:  Objection, your Honor.  He's

5   already testified he doesn't remember the Treas Carter

6   matter.

7           THE COURT:  Sustained.

8   Q.  Do you recall being provided information in the Treas

9   Carter case that three gunmen took Ricky Evans and Willie

10  Evans' cousin off the street and up into an apartment?

11          MS. SCAPICCHIO:  Objection, your Honor.

12          THE COURT:  Sustained.

13  Q.  Do it this way, Mr. George, if the safety of a witness

14  was an issue, would you cross-examine a witness if his

15  safety and life were involved because of his cooperation and

16  testimony in a criminal case?

17          MS. SCAPICCHIO:  Objection, your Honor.  That's

18  not the evidence.

19          THE COURT:  Sustained.

20          MR. CURRAN:  May I be heard, your Honor?

21          THE COURT:  No, go on.

22          MR. CURRAN:  One minute, your Honor.

23  Q.  You didn't find Ricky Evans a credible witness at trial,

24  did you?

25          MS. SCAPICCHIO:  Objection.

```
 1              THE COURT:  Sustained.
 2   Q.  Did you find Ricky Evans credible?
 3              MS. SCAPICCHIO:  Objection.
 4              THE COURT:  Sustained.
 5              MR. CURRAN:  May I approach the witness, your
 6   Honor?
 7              THE COURT:  Yes, you may.
 8   Q.  Deposition testimony, page 173.
 9              MS. SCAPICCHIO:  Judge, I'm going to object.  This
10   is the exact same question he just asked.
11              THE COURT:  I don't have it in front of me what
12   he's showing the witness.
13              MR. CURRAN:  It's not the exact same question.  If
14   you'd like, I'll read the question out loud.
15              THE COURT:  No, show it to me first.
16              MR. CURRAN:  May I approach?
17              THE COURT:  Yes.  This is 173?
18              MR. CURRAN:  Yes, your Honor.
19              THE COURT:  You're showing this?
20              MR. CURRAN:  Yes, your Honor.
21              THE COURT:  Yes, you can have it.
22              MR. CURRAN:  Thank you, your Honor.
23   Q.  Prior sworn testimony, your Honor, I'd like him -- I'll
24   read the question, you read the answer out loud, sir.
25              THE COURT:  Are you representing that is
```

1  inconsistent with his testimony today?

2          MR. CURRAN:  Yes, it is, your Honor.

3          MS. SCAPICCHIO:  Judge, may we be heard?

4          THE COURT:  You know what he's showing?

5          MS. SCAPICCHIO:  I believe I do.  It is the exact

6  same question he asked.

7          THE COURT:  No, it is not.  Look at it now.

8          MS. SCAPICCHIO:  Judge, I guess I don't know what

9  it's inconsistent with.  I thought he said he didn't know.

10          THE COURT:  Go on.

11  Q.  Question:  "In regards to Ricky Evans, do you have any

12  memory of it being disclosed to you that he was put up in a

13  hotel for any period of time?"  Answer?

14  A.  "No."

15  Q.  Do you have a memory that it was not disclosed to you or

16  you just don't know?

17  A.  I have no memory.

18  Q.  Did you have someone second seating you?

19  A.  I think so.

20  Q.  Okay.  Who was that?

21  A.  I think it was Joe Balliro, Jr.

22  Q.  Do you recall another attorney second seating

23  Phil Beauchesne?

24  A.  I don't remember.

25  Q.  Do you know Jane Sullivan?

1   A.  Yes, I do actually.

2   Q.  Do you remember that Jane Sullivan second sat

3   Phil Beauchesne?

4          MS. SCAPICCHIO:  Objection, your Honor.  It's not

5   true.

6          MR. CURRAN:  It is true.

7          THE COURT:  That's not an objection.  If the

8   witnessed can adopt it, and that's the question, then it

9   becomes truth for this case, so the objection is overruled.

10  Go on.

11  A.  I don't recall whether Jane Sullivan sat in the

12  courtroom, well, second chair in the case or third chair in

13  the case.

14  Q.  Do you recall Phyllis Broker assisting

15  Phil Beauchesne?

16  A.  No, I don't have any specific recollection of Phyllis

17  Broker assisting Phil Beauchesne.

18  Q.  Do you recall any other witnesses?  Do you recall Travis

19  Johnson testifying at trial?

20  A.  I don't recall.  The name sounds familiar, but I don't

21  recall him testifying at trial.

22  Q.  Okay.  Do you recall cross-examining Travis Johnson as a

23  witness in the trial?

24          MS. SCAPICCHIO:  Objection, your Honor.

25          THE COURT:  Overruled.

1    A.  No.

2    Q.  Okay.

3         MR. CURRAN:  Your Honor, could I bring up the

4    agreed upon trial transcript, Trial Day 5, October 3rd,

5    1989?

6         THE COURT:  Attorney 2, go on.

7         MR. CURRAN:  It's transcript page 268 starting on

8    line 20.

9    Q.  Mr. George, I'm going to ask the question, if you could

10   provide the answer.  This is your cross-examination.  I get

11   the pleasure of being you.  If you could provide the answer.

12   "Who did you talk to yesterday?"  Starting on line 20.

13   A.  "I talked to Detective Walsh, Detective McDonough and

14   Sergeant Callahan."

15   Q.  Did you tell them yesterday that the one person was a

16   couple inches taller than the other, or did you tell them

17   five or six inches?  Mr. Beauchesne objects.  The Court

18   sustained in that form.  The question:  "Did you change your

19   statement at that time from what you had said on

20   October 20th, 1988?"  The objection was sustained.  "How

21   long did you talk to them, Travis?"

22   A.  "Maybe about ten or fifteen minutes."

23   Q.  "Where did you speak with them?"

24   A.  "In my hotel room."

25   Q.  "You had a hotel room?"

1  A.  "Yes."

2  Q.  "Where is your hotel room?"  The Court instructs you

3  don't have to answer that.  "Who paid for your hotel room?"

4  Mr. Beauchesne:  "The Commonwealth, your Honor, would offer

5  to agree that we paid his transportation costs to and from

6  his home and put him up in a motel while he's here to

7  testify."  The Court responds:  "Standard operating

8  procedure."  Mr. Beauchesne:  "Standard operating

9  procedure."  Do you recall that, Mr. George?

10  A.  As I read it, I recall it.

11  Q.  The Commonwealth never disclosed to you that they

12  brought this witness from out of state and put him up in a

13  hotel, did they?

14  A.  No.

15          MR. CURRAN:  I don't have anything further.  Thank

16  you, Mr. George.

17                    REDIRECT EXAMINATION

18  BY MS. SCAPICCHIO:

19  Q.  Mr. George, is there --

20          MR. ROACHE:  Your Honor, may I?

21          THE COURT:  Yes, go on.

22          MS. SCAPICCHIO:  I forgot about him.

23          THE COURT:  Go on.

24                    CROSS-EXAMINATION

25  BY MR. ROACHE:

1    Q.   Good morning, Mr. George.

2    A.   Good morning, sir.

3    Q.   Now, Mr. George, you were testifying that it's the

4    obligation of the prosecution to disclose to defense counsel

5    exculpatory evidence; is that correct, sir?

6    A.   Yes, sir.

7    Q.   It is the procedure for defense counsel in Massachusetts

8    to obtain discovery from the assistant district attorney

9    that is prosecuting the case and not directly from a police

10   officer; isn't that so?

11   A.   Yes.

12   Q.   Okay.  So, if a police officer wrote a report or had

13   information, it would not be standard procedure for the

14   police officer to report that information or give a copy of

15   the report directly to defense counsel, correct?

16   A.   Correct.

17   Q.   It would be the standard procedure, it would be for the

18   police officer to report or to give a report or to give

19   whatever information he or she may have obtained to the

20   district attorney's office, and it would be up to the

21   district attorney's office to determine whether or not that

22   information should be turned over to a defense counsel?

23   A.   Yes, sir.

24   Q.   Okay.  So, it is the obligation of a district attorney's

25   office and not the police department to turn over any

1    information, whether inculpatory or exculpatory to a defense

2    counsel?

3    A.  Yes.

4    Q.  Now, this jury has heard a lot of talk about voir dires,

5    and without being too technical, could you explain to the

6    jury what a voir dire is?

7    A.  A voir dire is if a witness came in here that was about

8    to testify to things that the Judge had to determine the

9    jury should hear, the jury would be taken out of the

10   courtroom, and we'd have a hearing without you here.  We'd

11   actually run through that testimony without you here, the

12   Judge would hear it and make a determination as to what you

13   could hear, and you'd be brought back in and you'd hear it,

14   so the voir dire is what happens when you're not here.

15   Q.  All right.  So in the case of the prosecution of

16   Terrance Taylor and Shawn Drumgold with respect to

17   Ricky Evans, there were a few voir dires?

18   A.  Yes.

19   Q.  Is that correct?

20   A.  Yes.

21   Q.  And getting back to exculpatory evidence for a moment,

22   it is the obligation of the prosecution to determine whether

23   or not information that it receives from whatever source is

24   exculpatory, correct?

25   A.  Yes.

Q.   Okay.  And if the prosecution determines that that
information is not exculpatory, then it has no obligation to
turn it over to defense counsel?

A.   At their own peril.

Q.   Correct.  But initially it is the district attorney who
makes the initial determination as to whether or not the
information he or she may have received tends to be
inculpatory or exculpatory?

A.   Just like an umpire, he would determine what he wants to
give you based on what he defines as exculpatory or not.

Q.   And the rule is or the law is that the district
attorney's obligation to turn over exculpatory information
is when that district attorney determines that the
information he or she may have received is substantial and
material to aid in a defense of a case?

        MS. SCAPICCHIO:  Objection.

        THE COURT:  To the extent that your question
involves an issue of law, it is not for this witness to be
intoning on that issue of law.  Can you rephrase that
question?

        MR. ROACHE:  Well, your Honor, he's an experienced
criminal defense lawyer.  I think he knows the law.

        THE COURT:  It is for me to instruct on the law.
The content of the exculpatory evidence obligation would be
something we'll instruct the jury about.  Do you want to

1    rephrase your question?

2              MR. ROACHE:  Okay.

3    Q.  Well, it would be up to the prosecution to determine

4    whether or not the information the prosecution receives is

5    sufficiently exculpatory in order for it to be obligated to

6    turn it over to defense counsel?

7              MS. SCAPICCHIO:  Objection.

8              THE COURT:  As a matter of practice, not

9    necessarily as a matter of law.  Yes, you can have that

10   question.

11   A.  It's the prosecutor's call what they want to give you in

12   terms of exculpatory evidence, but, like I said, it's at

13   their own peril because someone might disagree.

14   Q.  And there are times when defense counsel and prosecutors

15   disagree as to whether or not information should have or

16   should have not been turned over?

17   A.  It happens all the time.

18   Q.  It happens all the time.  Now, you would agree with me

19   that you cross-examined Mr. Evans during the course of the

20   case when you were representing Terrance Taylor, you

21   cross-examined him extensively about his prior criminal

22   record, correct?

23             MS. SCAPICCHIO:  Objection.

24             THE COURT:  Overruled.  Go on.

25   A.  Yes.

1  Q.  And you went through all of the cases that he had either

2  pending or had been convicted of in the past?

3  A.  My memory is I cross-examined him on those subjects.

4  Q.  And, as a matter of fact, you even cross-examined him

5  without objection over pending cases that had not yet been

6  resolved?

7  A.  I'm not disputing that.

8  Q.  Okay.  And you even cross-examined him about the death

9  of his cousin, Willie Evans?

10  A.  Yes.

11  Q.  So you already, you knew about Mr. Evans' involvement in

12  the case where his cousin, Willie, was killed and Mr. Evans

13  was shot?

14  A.  Well, if I asked him questions about it, I would have

15  had to know.

16  Q.  Well, you asked on page 217 of the trial transcript, you

17  say, "December 14th, 1988, right about the time Willie

18  died?"  And the answer was, "Yes, somewhere in there."  Then

19  you asked, "Two days before Willie died?"  The answer from

20  Mr. Evans was, "Yeah."  And then you say, "How do you

21  remember?"  And he answered -- strike that, the question

22  was, "Now do you remember?"  "Yeah, I remember that."  "It's

23  two days before you were shot?"  And Mr. Evans' answer was,

24  "Uh-hum."  Do you remember that testimony, sir?

25  A.  I remember it as you're reading it to me.

1    Q.  So you do remember it.  So you had information that was

2    provided to you by the prosecution that Ricky Evans was a

3    witness in a pending homicide case involving another murder,

4    the murder of his cousin, Willie Evans?

5    A.  Yes.

6    Q.  And you asked Mr. Evans about who took him to get his

7    warrants cleared up, didn't you?

8    A.  Yes.

9    Q.  And he answered Sergeant McDonough, didn't he?

10   A.  Yes, he did.

11   Q.  And he said, "I didn't go there, I went by myself"?

12   A.  Yes.

13   Q.  "He just drove me there"?

14   A.  I remember that.

15   Q.  And then you asked him, "He drove you there in a police

16   car?"  And his response was, "No," this is at page 219?

17   A.  I remember that.

18   Q.  Okay.  "When did he take you?"  His answer was, "About

19   three months ago."

20   A.  I recall that.

21   Q.  Okay.  Then you asked, "You had some warrants pending

22   for you there?"  His response was, "Uh-huh."  Do you

23   remember that?

24   A.  Yes.

25   Q.  "And what Court was that?"  And he responded, "Roxbury."

1    Do you recall that?

2    A.  Yes, I do.

3    Q.  And then you asked him, "And did you appear before a

4    Judge then?"  His answer was, "Yes."

5    A.  I remember that.

6    Q.  Do you recall that?

7    A.  Yes, I do.

8    Q.  Okay.  "And were the warrants removed?"  And his answer

9    was "Yes"?

10   A.  I recall that.

11   Q.  Okay.

12   A.  Because I just read it.

13   Q.  "And were those warrants for not coming to court?"  And

14   his answer was, "Yes."

15          THE COURT:  Are you asking this witness to ratify

16   what's in the transcript that the jury is going to have?

17          MR. ROACHE:  Just this portion, your Honor.

18          THE COURT:  All right, go on.

19   Q.  And his answer was or your question was, "Were those

20   questions for not coming to court?"  His answer was,

21   "Yes"?

22   A.  I remember that.

23   Q.  Okay.  So, back in October of 1989, Mr. Evans testified

24   that he went to court, that he was driven to court by

25   Detective McDonough, who he described as Sergeant McDonough,

1    who drove him to court, that Mr. McDonough did not go into

2    the court and that Mr. Evans appeared in court before a

3    Judge and had his defaults removed?

4           MS. SCAPICCHIO:  Is there a question?

5    Q.  Isn't that what your memory is of what Mr. Evans'

6    testimony is?

7           THE COURT:  The objection is sustained.  The

8    testimony is the testimony.  If there's anything you want

9    him to add to it, you ask him about that.  The objection is

10   sustained.

11   Q.  Now, Mr. George, you have a memory of Mr. Fallon, your

12   investigator, locating Mr. Evans at 3 Trull Street in

13   Dorchester on September 12th, 1988 -- strike that,

14   September 12th, 1989?

15   A.  After the questioning today, I do.

16   Q.  Okay.  There isn't any question that Mr. Fallon located

17   Mr. Evans at 3 Trull Street in Dorchester?

18   A.  I don't dispute that he located him.

19   Q.  Okay.  And you recall that there was a voir dire prior

20   to trial or a pretrial hearing concerning that issue?

21   A.  Yes, sir.

22   Q.  Did Mr. Fallon write a report about his locating

23   Mr. Evans at 3 Trull Street in Dorchester and give you a

24   copy of that report?

25           MS. SCAPICCHIO:  Objection.  He didn't say he

1    located him at 3 Trull Street, he said he located him.

2         THE COURT:  Sustained.

3    Q.  Did Mr. Fallon write a report to you that he located

4    Mr. Evans at 3 Trull Street in Dorchester?

5         MS. SCAPICCHIO:  Objection.

6         THE COURT:  Insofar as this is about the report,

7    not the truth of the matter but whether he wrote a report,

8    you can have it.

9    A.  Not that I recall.

10   Q.  Okay.  Now, you had indicated before that you no longer

11   have your defense file concerning your representation of

12   Terrance Taylor; is that correct?

13   A.  That's correct.

14   Q.  So you have no independent memory as you sit here today

15   as to the contents of your defense file?

16        MS. SCAPICCHIO:  Objection.

17        THE COURT:  Overruled.

18   A.  Bits and pieces, but, no.

19   Q.  Okay.  And you don't know why it is that you don't have

20   your defense file; isn't that true?

21        MS. SCAPICCHIO:  Objection.

22        THE COURT:  Overruled.

23   A.  I believe that I've said in the past that I turned the

24   file over to Terrance Taylor's family at some point when he

25   moved onto other things.

1  Q.  And did you also testify in the past that it may have

2  been lost?

3  A.  Well, I didn't say lost, I said it must have been

4  destroyed in the storage process, but because Taylor's case,

5  he was acquitted so there was no reason to keep the file.

6  There was no appeal.

7  Q.  Well, in any event, it may have been destroyed?

8  A.  Yeah, but not by me.  I don't want it to seem like I've

9  lost a file or I've destroyed a file, that's not what

10 happened.  It might have been -- my memory is I don't have

11 it.  My memory, the fact is I don't have it now and I

12 haven't had it for many years.

13 Q.  Do you recall testifying at your deposition that back in

14 1988 a lot of the information that was stored you stored in

15 a computer?

16 A.  Yes.

17 Q.  And that you had difficulty when you obtained a new

18 computer system of removing files from one computer and

19 putting them into another computer?

20 A.  I remember the computer systems I was using then

21 belonged to someone else, they belonged to the office I was

22 in.  I left there and started my own law office with my own

23 computers, so it's not as easy as it is now, but back then

24 you would have had to download everything onto discs and

25 floppies to bring with you, and it wasn't my lawfirm.

1   That's what I meant when I said that, yes.

2   Q.  Okay.  But it would have been your practice as a defense

3   lawyer if you were moving from one firm to another to take

4   your files with you?

5   A.  Yes.

6   Q.  Okay.  And you don't have any memory as you sit here

7   today as to whether or not you were able to take your file

8   because you were able to extract that information from the

9   computer and remove it to a new file, a new computer in the

10  office that you set up?

11  A.  I have no memory of being able to do that.

12  Q.  All right.

13          MR. ROACHE:  That's all I have, your Honor.  Thank

14  you.  Thank you, Mr. George.

15          THE WITNESS:  Thanks.

16          THE COURT:  Ladies and gentlemen, we're going to

17  go through, if this is all right with everyone, past the

18  break time.  We won't take a break until about 11:45.  Is

19  that all right with you?  All right.  You know, let's take a

20  five-minute break, a quick break for those of you who need

21  it and then we'll come back.  All rise for the jury.

22          MS. SCAPICCHIO:  One of the jurors left her

23  notebook or his notebook open right there.  I just wanted to

24  clear that up before we left.

25          THE COURT:  Is that it?  Five minutes.

1          MS. SCAPICCHIO:  Thank you.

2          (A recess was taken.)

3          THE CLERK:  All rise for the jury.

4          THE COURT:  You can all be seated.  Sorry for the

5     shorter snack period, ladies and gentlemen, but we have to

6     end earlier today because one of the lawyers has an argument

7     in the Court of Appeals, and I have to swear in new citizens

8     again, so we wanted to squeeze as much as we could.  Go on,

9     Ms. Scapicchio.

10          MS. SCAPICCHIO:  Thank you.

11                    REDIRECT EXAMINATION

12     BY MS. SCAPICCHIO:

13     Q.  Attorney George, on cross-examination, Mr. Curran asked

14     you about whether or not you had any knowledge that another

15     witness by the name of Johnson was put up at the

16     Howard Johnson's, I'm sorry, was put up in a hotel, not at

17     the Howard Johnson's, at the request of the district

18     attorney's office.  Do you remember your answer being that

19     you didn't recall that?

20     A.  Yes.

21     Q.  Mr. Curran didn't show you the next page of that

22     transcript, 144, CR 00264.  Can you read lines 1 through 16

23     to yourself, please.

24     A.  Okay.

25          MS. SCAPICCHIO:  It is TR 264.  This is 1JE.

1    Q.   Attorney George, having read that portion of the trial

2    testimony, does that refresh your memory as to whether or

3    not there was a stipulation about this particular witness,

4    Mr. Johnson, at a hotel room?

5    A.   Yes.

6    Q.   And explain to the jury what a stipulation is.

7    A.   A stipulation is an agreement between the attorneys.   In

8    other words, you're not fighting about it, you're not

9    arguing about that point, you agree on it.

10   Q.   So, having read that page of the transcript, 144, does

11   that refresh your memory as to whether or not you knew

12   Mr. Johnson as an out of state witness was placed in a hotel

13   room?

14   A.   Yes.

15   Q.   And is there a difference in your mind in terms of

16   cross-examining witnesses between a witness who was brought

17   in from out of state and has nowhere to stay and stays in a

18   hotel and a witness who was put up while he lives here in

19   Massachusetts in a hotel for the convenience of the police

20   department?

21   A.   There's a big difference.

22   Q.   What's the difference?

23   A.   Someone who is coming from out of state has no place to

24   stay because they're not home.  If someone is home, they

25   don't need to stay in a hotel room.

1    Q.  And then on cross-examination Mr. Curran asked you

2    questions and Mr. Roache asked you questions about the duty

3    of the prosecutor to turn over exculpatory evidence.  Is

4    your experience as a criminal defense attorney that the

5    prosecutors are the ones out in the field talking to the

6    witnesses on a daily basis?

7    A.  Not a lot of prosecutors do that.

8    Q.  Okay.  Is it fair to say that it's actually the

9    detectives, the homicide detectives that are out talking to

10   witnesses?

11   A.  Almost all of the time it's the detectives that are

12   investigators talking to the witnesses.

13   Q.  So if the detectives don't give the information to the

14   prosecutors the prosecutors can't give it to you; is that

15   right?

16   A.  Right.

17   Q.  So whether it's the prosecutor's duty or not the

18   prosecutor's duty, he has to get the information from the

19   detectives; is that right?

20   A.  They can't give you something they don't have.

21   Q.  Now, you were also asked by Mr. Curran on

22   cross-examination to read a portion of your deposition where

23   Mr. Curran directed you to a statement about do you have a

24   memory, and this is regarding the hotel, that it was not

25   disclosed to you or do you just don't know, and he read up

1    to the line that said, "I have no memory."  This is page 173

2    of your deposition.  Could you read line 20, the very next

3    line that Mr. Curran didn't read to you when he refreshed

4    your memory.

5    A.  You want me to read it to myself?

6    Q.  No, please read it out loud.  What's the very next

7    question after you said, "I have no memory"?

8    A.  "I have no memory of it being disclosed to me.  I note

9    that as I reviewed my cross-examination, I didn't ask about

10   it, which leads me to believe that it was not disclosed

11   because I would not have forgotten."

12   Q.  So, at your deposition when you were deposed in this

13   case, you didn't leave the impression in Mr. Curran's mind

14   or anyone's mind that you knew about it and you forgot, you

15   told them right then that you didn't know about it, you

16   never knew about it, had you known about it, you would have

17   asked about it on cross-examination, right?

18   A.  Yes.

19   Q.  Now, you were also asked questions on cross-examination

20   by Mr. Curran about whether or not Mr. Callahan was in the

21   courtroom on Day 7 of the testimony in this case and he

22   asked you to read an excerpt about whether or not

23   Mr. Callahan went to get a defense witness or something of

24   that nature.  Do you remember that Mr. Evans in this case

25   testified on Day 6?

A.  I don't remember what day, but, I mean --

      MS. SCAPICCHIO:  May I approach the witness, your

Honor?

      THE COURT:  Yes.

A.  We don't have to disagree about it.  Okay, yes.

Q.  And when you asked the question in the courtroom of

Mr. Evans about his communications with Mr. Callahan, you

actually pointed to Detective Callahan in the courtroom,

right?

A.  Yes.

Q.  And you wouldn't have done that if Detective Callahan

wasn't there, right?

A.  Unless I like pointing to an empty chair.  Yes, it was

him.

Q.  And he was there?

A.  Yes.

Q.  And there's no doubt in your mind that he was there?

A.  No.

Q.  He was there during the process Mr. Evans was on the

stand; is it fair to say?

A.  Yes, that's fair to say.

Q.  Now, is there any chance in your mind that you knew that

Callahan was feeding information to Ricky Evans and you

didn't ask about it at trial?

A.  I don't think there's much chance of that, no.

1   Q.  All right.  Is it fair to say it didn't happen?

2   A.  I'm telling you that if I had known about it, I would

3   have likely asked about it.

4   Q.  And if you had known about the free hotel, you would

5   have asked about it?

6   A.  Yes.

7   Q.  If you had known about the free meals, you would have

8   asked about it?

9   A.  Yes.

10  Q.  And if you had known about the money, would you have

11  asked about it?

12  A.  Yes.

13  Q.  And if you had known about the pending cases, would you

14  have asked about it?

15  A.  Yes.

16  Q.  And there's no doubt in your mind, Attorney George, as

17  you sit here today, you didn't know about it because you

18  didn't ask about it, right?

19  A.  I didn't know about it.

20        MS. SCAPICCHIO:  I have nothing further.

21                  RECROSS-EXAMINATION

22  BY MR. CURRAN:

23  Q.  Mr. George, your testimony and memory today is based on

24  your limited review of Mr. Evans' cross-examination,

25  correct?

1    A.  Yes.

2    Q.  You haven't had the opportunity to review the whole

3    trial transcript?

4    A.  No.

5    Q.  You have not had the opportunity to review all the

6    reports that were completed in this case?

7    A.  No.

8    Q.  And you haven't had the opportunity to discuss with any

9    of your investigators or the attorneys that work with you

10   what knowledge you had as a defense team?

11   A.  No.

12   Q.  It's based on your limited review of Ricky Evans'

13   testimony that was provided to you?

14   A.  And my review of my deposition.

15   Q.  Well, let's get to your deposition on page 179, okay,

16   starting on line 15.  "Do you have any memory as you sit

17   here today whether or not Phil Beauchesne did or did not

18   share information with you that Ricky Evans was put up in a

19   hotel?"  And your answer was?

20   A.  Do you want me to say it?

21   Q.  Please.

22   A.  "I do not remember Phil Beauchesne telling me that.  I

23   don't remember."

24   Q.  Okay.  And just so the question -- just so the record is

25   clear, is it your memory that it did occur or it didn't

1    occur or that you're not sure one way or the other, just so

2    the record is clear?  What was it said?

3    A.  Does it go down here?

4    Q.  Yes.

5    A.  "If I was being pressed on it, I'd say it did not occur

6    because you had me review my cross-examination, but the best

7    I can do is that I don't remember, but I am telling you that

8    if I do not ask about it on cross, I don't believe that it

9    was strategically left out or omitted by me because I don't

10   even touch on it, I don't even go near it, so I'm thinking I

11   didn't know.  I can't remember any document that I read that

12   told me so."

13   Q.  Okay.  So, again, your memory is based on your limited

14   review of Ricky Evans' testimony on cross-examination?

15   A.  And the deposition.

16   Q.  And you don't know as you sit here today the facts of

17   the Treas Carter murder?

18   A.  No.

19          MS. SCAPICCHIO:  Objection.  Beyond the scope.

20          THE COURT:  Sustained.

21   Q.  So, you don't have the ability to weigh the facts as you

22   knew it in 1988 or 1989 that you made a strategic decision

23   not to cross-examine Ricky Evans on the hotel because of

24   safety issues?

25          MS. SCAPICCHIO:  Objection.

1          THE COURT:  Sustained.

2          MR. CURRAN:  I don't have any further questions.

3          THE COURT:  Mr. Roache.

4          MR. ROACHE:  Very quickly.

5                    RECROSS-EXAMINATION

6   BY MR. ROACHE:

7   Q.  Mr. George, you were asked by Ms. Scapicchio that had

8   you known if Mr. Evans was paid any money by Detective

9   Callahan, you would have inquired about that; is that

10  correct?

11  A.  Yes.

12  Q.  And that's assuming that Mr. Evans was in fact paid

13  money by Mr. Callahan, correct?

14  A.  Yes.

15  Q.  So if Mr. Callahan did not pay any money to Mr. Evans,

16  there would be no reason for you to cross-examine him on

17  that; isn't that so?

18  A.  Right.

19  Q.  Okay.  Similarly, sir, if Detective Callahan did not

20  promise, make any promises to Ricky Evans about the

21  disposition of his pending cases, you would have no reason

22  to cross-examine Ricky Evans?

23          MS. SCAPICCHIO:  Objection.

24          THE COURT:  Sustained.

25  Q.  Ms. Scapicchio asked you on redirect examination if

1   Detective Callahan made any promises, rewards or inducements

2   to Ricky Evans, you would have asked Mr. Evans about those

3   promises, rewards and inducements, correct?

4   A.  Yes.

5   Q.  And that's assuming that Detective Callahan did make

6   promises, rewards or inducements to Mr. Evans?

7        MS. SCAPICCHIO:  Objection.

8        THE COURT:  This is argument.  Sustained.

9   Q.  In any event, you did not question Mr. Evans about any

10  promises, rewards or inducements except for the fact that

11  defaults were removed, correct?

12  A.  That's right.

13       MR. ROACHE:  That's all I have.  Thank you,

14  Mr. George.

15       THE COURT:  I think at this point, ladies and

16  gentlemen, we have to suspend for the day.  It's the

17  situation when the Court of Appeals calls, someone has to

18  argue before the Court of Appeals, we can't say no, so we

19  had to say yes, and so that's why we had to end early.

20  We'll have a full day tomorrow.  We'll see you then.  Don't

21  talk about the case.  Leave your notes here.  Don't Twitter

22  about it, don't go online, don't do any of the things that

23  anybody might think about doing.  I'm sure there's a more

24  cogent way of describing it.  We'll see you in the morning.

25  All rise for the jury.

1          (Whereupon, the hearing was suspended at

2     11:35 a.m.)

3

4

5                    C E R T I F I C A T E

6

7     UNITED STATES DISTRICT COURT )

8     DISTRICT OF MASSACHUSETTS     )

9     CITY OF BOSTON                )

10

11          I, Valerie A. O'Hara, Registered Professional

12    Reporter, do hereby certify that the foregoing transcript

13    was recorded by me stenographically at the time and place

14    aforesaid in No. 04-11193-NG, in re:  Shawn Drumgold vs.

15    Timothy Callahan and thereafter by me reduced to typewriting

16    and is a true and accurate record of the proceedings.

17                         /S/ VALERIE A. O'HARA

18                         _____

19                         VALERIE A. O'HARA

20                         REGISTERED PROFESSIONAL REPORTER

21                         DATED SEPTEMBER 15, 2009

22

23

24

25