1                IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF MASSACHUSETTS

3

4

5      SHAWN DRUMGOLD,              )   C.A. No. 04-11193-NG

6                 PLAINTIFF        )   Courtroom No. 2

7      VS.

8      TIMOTHY CALLAHAN, ET AL.,)   1 Courthouse Way

9                 DEFENDANTS       )   Boston, MA  02210

10

11                     JURY TRIAL DAY 6

12                  SEPTEMBER 16, 2009

13                      9:13 a.m.

14

15

16

17

18

19              BEFORE THE HONORABLE NANCY GERTNER

20              UNITED STATES DISTRICT COURT JUDGE

21

22

23

24                  VALERIE A. O'HARA

25                OFFICIAL COURT REPORTER

1    A P P E A R A N C E S:

2        ROSEMARY CURRAN SCAPICCHIO, ATTORNEY, Four Longfellow
     Place, Boston, Massachusetts  02114, for the Plaintiffs;

3

4        Tommasino & Tommasino, by MICHAEL W. REILLY, ESQ.,
     Two Center Plaza, Boston, Massachusetts  02108, for the
     Plaintiff;

5

6        Roache & Malone, LLP, by JOHN P. ROACHE, ESQ., 66 Long
     Wharf, Boston, Massachusetts  02110, for the Defendants.

7        Bletzer and Bletzer, P.C., by HUGH R. CURRAN, ESQ., 300
     Market Street, Brighton, Massachusetts  02135, for the

8    Defendants.

9        Morgan, Brown & Joy, LLP, by MARY JO HARRIS, ESQ., 200
     State Street, Boston, Massachusetts  02109-2605, for the

10   Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

INDEX

**EXAMINATION**

| Witness Name | Direct | Cross | Re-Direct | Re-Cross |
|---|---|---|---|---|
| RICKY LEE EVANS | | | | |
| By Mr. Roache | | 4 | | |
| | | | | |
| STEVEN RAPPAPORT | | | | |
| By Ms. Scapicchio | 31 | | 90 | |
| By Ms. Harris | | 48 | | 96 |
| By Mr. Roache | | 88 | | 97 |
| | | | | |
| TIMOTHY CALLAHAN | | | | |
| By Ms. Scapicchio | 105 | | | |

**EXHIBITS**

| Exhibit | Description | Identification | Evidence |
|---|---|---|---|
| No. 11 | Discovery Motion | | 37 |
| Nos. 12, 13, 14 and 15 | Four discovery letters | | 54 |
| Nos. 16 and 17 | Discovery letters produced by the Suffolk County District Attorney's Office | | 61 |
| No. 18 | Portion of the pretrial hearing of September 25th, 1989 | | 66 |

<u>PROCEEDINGS</u>

1    
2   THE CLERK:  All rise for the jury.
3   THE COURT:  You can all be seated.  We understand
4   that Ms. Slade wound up having an accident yesterday so she
5   can't be here for two days, and in order not to delay the
6   trial, we'll proceed without her, but we're sorry that there
7   was that excitement in doing something as simply leaving the
8   courthouse, so we'll proceed.  Mr. Evans will take the
9   stand?
10  MS. SCAPICCHIO:  Yes, your Honor.
11  THE COURT:  Mr. Evans, come on up here.
12  MS. SCAPICCHIO:  I believe where we left off, it
13  was Mr. Roache who was cross-examining Mr. Evans.
14  THE COURT:  Mr. Roache is finished?
15  MR. ROACHE:  No, your Honor, thank you.
16  RICKY LEE EVANS, RESUMED
17  CROSS-EXAMINATION, CONTINUED
18  BY MR. ROACHE:
19  Q.  Good morning, Mr. Evans.
20  A.  Good morning.
21  MR. ROACHE:  Good morning, ladies and gentlemen.
22  Q.  Mr. Evans, when you living in the Grove Hall area back
23  in 1988 and 1989, I believe you testified that you were
24  living basically on the streets?
25  A.  Yes.

1   Q.  Is that correct?  And in 1988 or 1989, you had 13 or 15

2   siblings?

3   A.  Yes.

4   Q.  You did?

5   A.  Yes.

6   Q.  Okay.  And several of those siblings lived in the Boston

7   area; is that correct?

8   A.  Correct.

9   Q.  And they didn't allow you to stay with them, did they?

10        MS. SCAPICCHIO:  Objection.  How is that relative?

11        THE COURT:  Sustained.

12   Q.  Well, you didn't stay with your siblings apart from your

13   brother Roy, correct?

14   A.  Correct.

15   Q.  That's because of the life you were living, isn't that

16   so?

17        MS. SCAPICCHIO:  Objection.

18        THE COURT:  Sustained.

19   Q.  Now, do you recall being deposed in this case back in

20   the year 2006; is that correct?

21   A.  Yes.

22   Q.  Okay.  And you received a subpoena to appear at a

23   deposition at Attorney Curran's office; isn't that

24   correct?

25   A.  Correct.

1   Q.  And when you received that subpoena, you called Attorney

2   Curran's office, didn't you?

3   A.  Yes.

4   Q.  And you were looking for some help or for some

5   information regarding what it is that you were supposed to

6   do; isn't that so?

7   A.  I think so.

8   Q.  Okay.  And Mr. Curran's office informed you they

9   couldn't be of any assistance to you; is that correct?

10  A.  Correct.

11  Q.  And so you then spoke to another attorney who

12  recommended that you call Ms. Scapicchio; isn't that

13  correct?

14  A.  Correct.

15  Q.  Okay.  And Ms. Scapicchio indicated to you that she

16  couldn't be of any assistance to you; isn't that correct?

17  A.  Correct.

18  Q.  But Ms. Scapicchio recommended a lawyer for you; isn't

19  that correct?

20  A.  Correct.

21  Q.  And that lawyer was Attorney James McCall?

22  A.  Correct.

23  Q.  And you learned subsequently that Attorney McCall and

24  Ms. Scapicchio were former partners?

25          MS. SCAPICCHIO:  Objection, your Honor.

```
 1              THE COURT:  Sustained.
 2   Q.  Well, you learned that Ms. Scapicchio and Mr. McCall
 3   worked in the same office?
 4              MS. SCAPICCHIO:  Objection.
 5              THE COURT:  Sustained.
 6              MR. ROACHE:  Your Honor, this was brought out
 7   before.
 8              THE COURT:  I understand.  I'm sustaining the
 9   objection.  Go on.
10   Q.  And do you recall, sir, that when you were deposed in
11   2006, you had indicated that in 1989 when you were first
12   contacted by Detective Callahan relative to the killing of
13   your cousin and the shooting of yourself that you had been
14   living with your brother Roy at 3 Trull Street for
15   approximately three to six months?
16   A.  I don't recall that.
17   Q.  You don't recall that, sir?
18   A.  No.
19   Q.  Do you recall, sir --
20              MR. ROACHE:  Well, may I approach the witness?
21              THE COURT:  Yes, you may.
22              MS. SCAPICCHIO:  What page?
23              MR. ROACHE:  Page 289, 290.  July 10th, Day 2.
24   Q.  I'm going to show you, sir, your deposition transcript
25   of July 10th, 2006 taken at Mr. Curran's office.  You
```

1    remember being there?

2    A.  Yes.

3    Q.  And you were represented by counsel at that time?

4    A.  Yes.

5    Q.  And that was Mr. McCall?

6    A.  Yes.

7    Q.  Looking on page 289, beginning with page 289 --

8              MS. SCAPICCHIO:  What line?

9              MR. ROACHE:  I'll give it to you.

10   Q.  Line 12, question:  "Do you recall where you were when

11   you first had the conversation with Detective Callahan?"

12             MS. SCAPICCHIO:  Judge, that wasn't the question

13   he asked before he's attempting to refresh his memory.

14             THE COURT:  Are you refreshing his memory or are

15   you trying to impeach the witness?

16             MR. ROACHE:  I'm doing both.

17             THE COURT:  Okay, go on.

18   Q.  "Do you recall," question line 12, "when you first had

19   the conversation with Detective Callahan?"  What was your

20   answer?

21   A.  "I think it was on the phone discussing Tiffany's

22   murder, somehow my cousin's murder came up."

23   Q.  When you testified in July, you testified under oath

24   that when you had the conversation with Detective Callahan

25   concerning the murder of Tiffany Moore it was over the

1    phone?

2    A.  Could have been, yes.

3    Q.  That's what you testified to?

4    A.  Yes.

5    Q.  And you were telling the truth then, weren't you?

6    A.  Yes.

7    Q.  Okay.  Next question, "How long did the conversation

8    take place?"

9            MS. SCAPICCHIO:  That's not the question.  There's

10   a question in between.

11           THE COURT:  For context read the question in

12   between.

13   Q.  "You recall it was a phone conversation?"

14   A.  "I guess so, yes."

15   Q.  And your answer was what?

16   A.  Yes.

17   Q.  Line 17, sir.

18   A.  "Must have been a phone call, yes."

19   Q.  "Must have been a phone call, yes"?

20   A.  Yes.

21   Q.  Okay.  Next question, "How long did the conversation

22   take place?"  What was your answer?

23   A.  I don't recall how long it was.

24   Q.  Okay.  Next question, "How long had you talked about

25   your cousin's murder over the phone with Detective Callahan

1  before you started talking about Tiffany Moore?"  What was

2  your answer?

3  A.  "I don't remember how long the conversation was."

4  Q.  Okay.  But you didn't dispute at that point in time that

5  you began talking about Tiffany Moore, did you?

6          MS. SCAPICCHIO:  Objection.

7          THE COURT:  Overruled.

8  A.  Not that I remember, no.

9  Q.  Next question, "Do you recall where you were living at

10  that time?"  What was your answer on page 290?

11  A.  "Most likely it was Trull Street," 3 Trull Street.

12  Q.  "Most likely it was 3 Trull Street"?

13  A.  Yes.

14  Q.  Next question, "How long had you been living at 3 Trull

15  Street as of that time frame?"  What was your answer?

16  A.  "No more than a year, six months to a year, something

17  like that."

18  Q.  So, your testimony in 2006 was that you had a phone

19  conversation while living with Detective Callahan while

20  living at Trull Street and you lived at Trull Street from

21  anywhere between six months to a year?

22  A.  I wasn't sure how long I was living at Trull Street at

23  the time.

24  Q.  That was your testimony under oath in 2006 though?

25  A.  Yes.

1    Q.  Now, the other day I was asking you about your life in

2    the Grove Hall area, and you had indicated that you were a

3    street person, correct?

4    A.  Correct.

5    Q.  And that you were familiar with people who associated

6    with the so-called Humboldt gang?

7           MS. SCAPICCHIO:  Objection.

8           THE COURT:  Overruled.

9    A.  I didn't say I was familiar with anybody in the Humboldt

10   gang.

11   Q.  Well, you knew that your brother was a member of the

12   Humboldt gang?

13   A.  I didn't testify to that.

14   Q.  You did not testify to that?

15   A.  I could have, but I don't remember testifying to that.

16   Q.  Did you testify to that at the criminal trial in 1989

17   that your brother was a member of the Humboldt gang?

18   A.  I could have, but I don't remember.

19          MR. ROACHE:  Okay.  Trial transcript 0543.  This

20   is an agreed upon exhibit, your Honor.

21          THE COURT:  Okay.

22   Q.  Beginning with line 17, sir, you were being

23   cross-examined at this time by Mr. George, the same attorney

24   who testified yesterday in this case.  On line 17, he asked

25   you "Now, you were aware of a group of kids known as the

1    Humboldt boys?"  What was your answer?

2    A.  Excuse me.

3    Q.  "Were you aware of a group of kids known as the Humboldt

4    boys or the Humboldt gang?"

5    A.  "Yes."

6    Q.  "And did they hang in a particular area on

7    Humboldt Ave.?"  Next page.

8    A.  "I don't know."

9    Q.  "How were you aware of these guys?"

10   A.  "My brother was one."

11   Q.  "Your brother was one, one of them, and did you learn

12   from your brother where these people would hang out?"  What

13   was your answer?

14   A.  "I don't deal with gangs."

15   Q.  Okay.  So when you testified in 1989 at the criminal

16   trial, you testified that your brother was a member of the

17   Humboldt boys or Humboldt gang?

18   A.  Well, I had, yes, I see.

19   Q.  Do you recall it?

20   A.  I don't recall it, but it's on here, yes.

21   Q.  So you knew about who hung out at Humboldt Street?

22   A.  I didn't know anybody about who hung out on Humboldt

23   Street.

24   Q.  Did you talk with your brother?

25   A.  Excuse me?

13

1   Q.  Were you friendly with your brother?

2   A.  Yes.

3   Q.  Okay.  And which brother was it that hung out on

4   Humboldt Street?

5   A.  Tyronne.

6   Q.  Tyronne.  Did you have conversation with Tyronne?

7   A.  I didn't know if he was a gang member, so I didn't have

8   a conversation about no gang with him.

9   Q.  Did you have a conversation with Tyronne about any

10  information he had --

11  A.  No, I did not.

12  Q.  -- concerning the Tiffany Moore murder?

13  A.  No, I did not.

14  Q.  Now, you were asked by Mr. George in the criminal trial

15  in 1989 on cross-examination whether or not your testimony

16  was true.  Do you recall that?

17  A.  No, I don't.

18  Q.  All right.

19        MR. ROACHE:  May I have trial transcript 0523,

20  please.

21  Q.  Now, you being again cross-examined by Mr. George, and

22  he was asking you about your knowledge of the weapons that

23  you testified that Shawn Drumgold and Terrance Taylor, that

24  you saw Shawn Drumgold and Terrance Taylor have that night.

25  Do you remember testifying at the criminal trial that you

1    saw weapons, guns on Shawn Drumgold and Terrance Taylor when

2    you met with them prior to the killing of Tiffany Moore?

3    A.   I never did see any guns.

4    Q.   I'm sorry, do you remember testifying at the criminal

5    trial that you saw both Shawn Drumgold and Terrance Taylor

6    carrying guns?

7    A.   I don't remember testifying, but I could have testified

8    about it.

9    Q.   You don't remember testifying to that?

10   A.   No, but I could have testified about it, yes.

11   Q.   Okay.  Well, looking at the top of the page, sir,

12   question:  "You saw the handle of a gun."  What was your

13   answer?

14   A.   "An ordinary person would know a gun from a blackjack.

15   A blackjack is a knife."

16   Q.   Okay.  Question:  "Would an ordinary person know a gun

17   from an ordinary wooden handle of a knife?"

18   A.   "Yes."

19   Q.   "An ordinary person?"

20   A.   "Anybody would know a gun from a knife."

21   Q.   "Are you sure, Ricky?"

22   A.   "Positive."

23   Q.   "Positive?  You're positive that you're telling the

24   truth here today?"

25   A.   "Yes."

1   Q.  And your answer was yes, correct?

2   A.  Yes.

3   Q.  And now you want this jury to believe that you were

4   lying in 1989 when answering that question?

5           MS. SCAPICCHIO:  Objection, your Honor.

6           THE COURT:  Overruled.

7   A.  Repeat that, please.

8   Q.  You want this jury to believe that you were lying in

9   1989 when you said that you were positive that you were

10  telling the truth?

11  A.  Yes.

12          MR. ROACHE:  Your Honor, I'm a little bit confused

13  that some of the jurors did not see the transcript.

14          THE COURT:  Well, if they didn't see it on this

15  screen, they could have seen it on that, so let's proceed.

16  Go on.

17          MR. ROACHE:  May I have a moment, your Honor?

18          THE COURT:  Yes.

19  Q.  Mr. Evans, isn't it a fact that the first time that you

20  told Detective Callahan that you had any information about

21  the murder of Tiffany Moore occurred in June of 1989 over

22  the telephone when you were discussing your case involving

23  your shooting, your being shot and your cousin being

24  killed?

25  A.  I don't recall.

1    Q.  You don't recall?

2    A.  No.

3    Q.  Do you recall after that phone conversation that you

4    went to the Suffolk County District Attorney's Office and

5    met with an assistant district attorney by the name of

6    Paul Connolly?

7    A.  I don't remember.

8    Q.  You don't recall that?

9    A.  I don't remember.

10   Q.  And that occurred on June 21st, 1989?

11   A.  I don't remember.

12   Q.  You don't remember that.  And do you remember, sir, when

13   we had showed it on the screen that you were tape recorded

14   on August 6th, 1989?

15   A.  Yes.

16   Q.  Do you remember that?

17   A.  I remember, yes.  I don't remember when I was tape

18   recorded.

19   Q.  Okay.  When you were tape recorded on August 6th, 1989,

20   you were still living at 3 Trull Street with your brother

21   Roy, weren't you?

22          MS. SCAPICCHIO:  Objection.

23          THE COURT:  Overruled.

24   A.  I don't recall where I was living.

25   Q.  Well, you testified earlier that you had been living

1   with your brother Roy for at least six months to a year at a

2   deposition, correct?

3   A.   I wasn't sure where I was living at the time.  I don't

4   know how long I was there.

5   Q.   You don't know how long you were there?

6   A.   No.   It could have been, I don't know, it was 22 years

7   ago.  I don't remember how long ago I stayed there.

8   Q.   Do you recall on September 12th, 1989, you were visited

9   by a private investigator who asked you questions concerning

10  your knowledge of the killing of Tiffany Moore?

11  A.   I don't remember the interview by a private

12  investigator.

13  Q.   Okay.  Do you remember, sir, that on September 12th,

14  1989, you made a phone call to Detective Callahan to report

15  to him that you had been contacted by an investigator on

16  behalf of Terrance Taylor?

17  A.   I don't recall that conversation.

18  Q.   But you do recall, sir, that Detective Callahan along

19  with a few other detectives came to 3 Trull Street, knocked

20  on your door and either your brother or your stepmother

21  answered the door.  Do you recall that?

22  A.   I recall there was three detectives, yes.

23  Q.   Yes.  And they asked you to come with them, didn't

24  they?

25  A.   Correct.

1    Q.  And at that point Detective Callahan brought you to the

2    Howard Johnson's.  Do you recall being taken from 3 Trull

3    Street to the Howard Johnson's?

4    A.  Yes.

5    Q.  Okay.  But you don't know when that was?

6    A.  I don't remember the date, no.

7    Q.  Okay.  But you do remember testifying at the trial of

8    Commonwealth vs. Terrance Taylor and Shawn Drumgold?

9    A.  I don't remember when I testified, no.

10   Q.  Okay.  Well, if I represented to you, sir, it was

11   October 4th, 1989, would that in any way refresh your

12   memory?

13   A.  No.

14   Q.  It would not, okay.  And do you recall, sir, that around

15   the same time the case against Shawn Drumgold and Terrance

16   Taylor was scheduled to begin on September 12th, 1989?

17          MS. SCAPICCHIO:  Objection.  He said he didn't

18   remember.

19          THE COURT:  Overruled.

20   A.  No, I don't.

21   Q.  And, do you recall, sir, that the case against

22   Treas Carter, Chilly Carter involving the killing of your

23   cousin Willie and the shooting of yourself was to begin

24   right after the Tiffany Moore murder case?

25   A.  No.

1   Q.  You don't recall that?

2   A.  No.

3   Q.  And do you recall, sir, that Treas Carter, Chilly, pled

4   guilty to second degree murder in December of 1989?

5   A.  No.

6   Q.  You don't recall that?

7   A.  I don't recall him pleading guilty.

8   Q.  Okay.  Well, you never testified in the case of

9   Commonwealth vs. Treas Carter concerning your shooting and

10  the killing of your brother, correct?

11  A.  My cousin.  I don't remember testifying to that.

12  Q.  I'm sorry, your cousin, you never testified in court

13  before a jury?

14  A.  I never said I did.

15  Q.  Did you testify?

16  A.  I never said I testified.  I don't remember

17  testifying.

18  Q.  You don't remember testifying?

19  A.  No, I don't.

20  Q.  Okay.  And you testified earlier that you were at the

21  Howard Johnson's, and I want to clear up something because I

22  made a mistake in my arithmetic, I guess.  You testified

23  earlier that you spent about eight months at the

24  Howard Johnson's?

25  A.  Correct.

1   Q.  Now, sir, if you went to the Howard Johnson's on

2   September 12th, 1989, if my math is correct, that would have

3   meant if you did indeed spend eight months at the

4   Howard Johnson's, you would have spent up until May of 1990

5   in the Howard Johnson's?

6           MS. SCAPICCHIO:  Objection, your Honor.

7           THE COURT:  Overruled.

8   A.  Could you repeat that, please?

9   Q.  You testified -- do you recall testifying that you spent

10  approximately eight months in the Howard Johnson's?

11  A.  About eight months, yes.

12  Q.  Okay.  And if you were brought to the Howard Johnson's

13  on September 12th of 1989, going forward eight months, that

14  would bring you to about May of 1990?

15          MS. SCAPICCHIO:  Objection, Judge.  He never said

16  he was brought on October 12th.  It assumes facts not in

17  evidence.  He's asking him to calculate from October 12th or

18  September 12th.  He never said that.

19          MR. ROACHE:  Your Honor, the question was if he

20  were brought.

21          THE COURT:  If it's a hypothetical.

22          MR. ROACHE:  Yes, it is.

23          THE COURT:  Based on his testimony?

24          MR. ROACHE:  Well, your Honor, there's going to be

25  other testimony in this case about when he was brought to

1    the Howard Johnson's.

2           THE COURT:  So if you're asking to calculate just

3    a matter of math, the jury can do that.  Next question.

4    Objection sustained.

5    Q.  You testified earlier in this trial that in October

6    after you testified in the case of Commonwealth vs.

7    Shawn Drumgold and Terrance Taylor that the police did not

8    come around any longer to visit you?

9    A.  I testified -- could you repeat that, please?

10   Q.  You testified earlier in this case that when you

11   returned to the Howard Johnson's after your testimony in the

12   Tiffany Moore killing, about the Tiffany Moore killing that

13   the police did not come around any longer?

14   A.  No, I testified, I remember testifying about the

15   Tiffany Moore killing.

16   Q.  And do you recall you testified before this jury that

17   after you testified, you went back to the Howard Johnson's

18   and Tim Callahan nor any other police officer came up to

19   visit you?

20   A.  I've testified after a while that everything had died

21   down and I didn't see anybody so I left the Howard Johnson's

22   myself on my own.

23   Q.  Everything died down, nobody came to visit you?

24   A.  Nobody came to visit anymore.

25          MR. ROACHE:  That's all I have.  Thank you,

1    Mr. Evans.

2            MS. SCAPICCHIO:  I have no questions, your

3    Honor.

4            THE COURT:  Okay.  Thank you very much, Mr. Evans.

5    Next witness.

6            MS. SCAPICCHIO:  Your Honor, can we be seen at

7    sidebar?

8            THE COURT:  Okay.

9            (THE FOLLOWING OCCURRED AT SIDEBAR:)

10           MS. SCAPICCHIO:  Judge, I apologize, my next

11   witness is Steven Rappaport.  He left a message on my

12   machine this morning that he was running late and he

13   couldn't get here until 10:00 or 10:15, which I didn't think

14   it would be a problem.  I thought it would go longer with

15   Mr. Evans.  I thought Ms. Harris was going.

16           THE COURT:  What's the issue?

17           MS. HARRIS:  When we were here, Ms. Scapicchio had

18   raised the issue about Mr. Rappaport would be able to

19   refrain from expressing something about Mr. Drumgold's

20   innocence, and if you remember you instructed about that.

21   When we were talking about the scope of the retrial in

22   chambers before we started this trial, I believe

23   Ms. Scapicchio indicated that if we asked him about

24   Mrs. Alexander, he may go into it.

25           I'm flagging it only, I want to make sure that if

1    I'm asking Mr. Rappaport, I assume he's going to testify, I

2    assume he's going to testify about the importance of him as

3    a witness.  He previously testified that he felt witness

4    I.D.s, the Tracie Peaks and Mary Alexander were the

5    significant.

6              THE COURT:  Let me cut you short.  The more I

7    think about this case, the more it's clear to me if it were

8    the case that information about money, Howard Johnson's, the

9    whole scope things, that the claim with regard to

10   Ricky Evans, that there's no question that the information

11   was material, and I would find this as a matter of law that

12   there's no question that it meets the substantial factor

13   test in terms of causation, so he doesn't have to testify as

14   to its centrality in the case.

15             The only problem that would come up here is that,

16   as it did in the last trial, if the jury says no to

17   everything but yes to $20, right, because that clearly is

18   neither material nor causation at all, so I don't need an

19   expert telling me how central this was or telling the jury

20   how central any of it was to the case.

21             I'm saying as a matter of law it's clear this

22   stuff wasn't disclosed, it was both material and it would

23   have been material with regard to a major witness in a case,

24   so there's no question that it would have met the causation

25   issue.

1              MS. HARRIS:  I think respectfully there's two

2     issues.  One is the centrality, and the second is whether

3     that suppression, assuming the jury finds it happens,

4     undermines confidence in the verdict as a whole.  Now, first

5     I believe your Honor was looking at it if Tracie Peaks, Mary

6     Alexander and Ricky Evans issues were all suppressed that

7     anything Rappaport did or didn't do could be foreseeably

8     flowing from that alleged misconduct.

9              The first jury found a misconduct with Peaks or

10    Alexander so those witness I.D.s are completely unrelated.

11             THE COURT:  As testimony they're unrelated, I just

12    wanted to let you know that even regardless what he did or

13    didn't do, concerning the Mary Alexander.

14             MS. HARRIS:  Right.

15             THE COURT:  Regardless of Peaks, regardless of

16    Alexander, if this jury were to find that all of the

17    allegations with respect to Evans are true, there is no

18    question as a matter of law but proximate cause or

19    materiality, if they find something less than that, that's a

20    different issue.  That was the problem the last time.  He

21    doesn't need to go into any of this.

22             MS. SCAPICCHIO:  My plan with Mr. Rappaport is to

23    ask him whether or not he received the information with

24    respect to Ricky Evans and whether or not he ever received

25    it from the prosecutor and then direct his attention the

1    times he asked for it and that's it.  I've asked him not to
2    go into the Mary Alexander stuff.
3            THE COURT:  Right.
4            MS. SCAPICCHIO:  I've told him the Tracie Peaks
5    isn't relevant.  It may not be a bad idea that the Court
6    remind him that it's not relevant if that's your concern.
7    I've done what I can to tell this is the focus.
8            MS. HARRIS:  I wanted to flag.  I didn't want to
9    in front of the jury.  Two things, first, with respect to I
10   disagree with your sense on proximate cause, and just to
11   highlight it, if there were three eyewitnesses who said I
12   saw suspect shoot victim in the heart and there was evidence
13   that was withheld but you still had that eyewitness
14   identification, then I don't see how withholding of material
15   evidence that doesn't undermine credibility.
16           THE COURT:  I disagree completely.
17           MS. HARRIS:  Well, I'm going to offer a case from
18   the Third Circuit.
19           THE COURT:  I disagree, I thought about it more,
20   it seems to me clear with respect to a major witness like
21   Evans' impeachment, again, it depends on the scope of the
22   impeachment.  With respect to a major witness like
23   Ricky Evans undermines the verdict, whether the verdict
24   would have been the same without it is a different question
25   but then I don't believe is the standard at all.

1           We're talking about the fairness of the proceeding

2    and there's no question he was a central witness.

3           MS. HARRIS:  I'll reserve on that.  The second

4    issue we were speaking again about the evidence that

5    Mr. Rappaport, it's my memory again from the status

6    conference, pretrial conference that your Honor had

7    suggested that Rappaport could speak about the investigation

8    when he received it in order for Ms. Scapicchio to

9    develop.

10          MS. SCAPICCHIO:  I'm not going there.  I'm going

11   to get were you his lawyer on such and such a date, did

12   Mr. Callahan take over on such and such a date, and did you

13   get this information, if I can limit it to 20 minutes,

14   that's my goal.

15          THE COURT:  Okay.  All right.

16          MR. REILLY:  Also that stipulation needs to be

17   read to the jury on the procedures.

18          THE COURT:  Let's do that right now.

19          MS. SCAPICCHIO:  That's my assistant's job.

20          (SIDEBAR CONFERENCE WAS CONCLUDED)

21          THE COURT:  I understand there's a stipulation to

22   be read at this point.

23          MR. REILLY:  Yes, your Honor.

24          THE COURT:  All right.  Proceed.

25          MR. REILLY:  A stipulation of the parties on

1    August 19th --

2            THE COURT:  Would you like to read it and put it

3    on the screen at the same time?

4            MR. REILLY:  That's a good idea, your Honor.

5            THE COURT:  Maryellen, I think we need help on the

6    screen.

7            THE COURT:  There's an on-off switch that seems to

8    be daunting.

9            MR. REILLY:  "On August 19th, 1988, a 12 year-old

10   Darlene Tiffany Moore was shot and killed while sitting on a

11   mailbox while surrounded by a group of teenagers on the

12   corner of Humboldt and Homestead Street in Roxbury

13   Massachusetts.  She was struck by three bullets."

14           "Detective Richard Walsh, a Boston Police Homicide

15   Detective, was assigned to the investigation of the Moore

16   homicide on August 19, 1988."

17           "On August 29th, 1988, 23 year-old Shawn Drumgold

18   was arrested by Walsh and his partner Paul Murphy and

19   charged with the murder of Tiffany Moore."

20           "On September 8, 1988, Drumgold and Terrance

21   Taylor were indicted by the Suffolk County Grand Jury and

22   charged with the murder of Tiffany Moore."

23           "Defendant Timothy Callahan, a Boston Police

24   Homicide Detective, was assigned to the Moore murder

25   investigation in late, May/early June, 1989."

1          "On October 2d, 1989, Drumgold and Taylor went to

2     trial on the charge of murder."

3          "On October 13th, 1989, the Suffolk County jury

4     convicted Drumgold of first-degree murder."

5          "After Drumgold was incarcerated, he filed a

6     motion seeking a new trial.  On November 6, 2003, the motion

7     was allowed by Judge Rouse of the Superior Court.

8          The Suffolk County District Attorney decided they

9     would not retry Mr. Drumgold.  He was released from

10    incarceration on November 6, 2003."

11         "The Defendant Timothy Callahan was acting under

12    color of state law while he was involved in the

13    investigation of the murder of Tiffany Moore and the

14    prosecution of Shawn Drumgold."

15         THE COURT:  I understand that we're now waiting

16    for a witness who is delayed, and we're told he'll be here

17    no later than 10 or 15 minutes so whereas yesterday we took

18    a late break, today we're taking a really early break.  We

19    hope they'll be snacks in the jury room.  We'll do the best

20    we can so there's nothing we can do without the witness, so

21    all rise for the jury.

22         (Jurors exited the courtroom.)

23         THE COURT:  You can all be seated.  I'd like to

24    see the Third Circuit case that you identified, but it does

25    seem to me there are a laundry list of issues with respect

1    to Mr. Evans, factual issues.

2            MS. HARRIS:  I agree.

3            THE COURT:  Profound factual issues as to which

4    there is a substantial contest.  I want to come up with a

5    verdict slip that breaks those down better than we did the

6    last time so the jury can say if this happened, this

7    happened, this happened, if that entire laundry list was

8    found by the jury to have happened, I have no doubt as a

9    matter of law that those disclosures would have been

10   material and therefore ought to have been disclosed.

11           I also have no doubt under my understanding now of

12   causation that Evans was a major witness in the case, that

13   impeachment issues of this kind, material, exculpatory

14   impeachment issues not turned over would have undermined the

15   fairness of the trial, so it seems to me clear that the only

16   thing that we're really asking the jury to decide is the

17   question of what happened here, but if the entire laundry

18   list happened, then I think it's both material and undermine

19   the trial.

20           If as occurred in the last trial, what the jury is

21   really doing is saying Officer Callahan gave $20, then I

22   would make the opposite finding, if that's what happened, if

23   that's what they find, then I'd make the opposite finding,

24   I'd find it not material and it's not causation, but I'd

25   like to see the Third Circuit case you are talking about.

1          MS. HARRIS:  The case is Smith vs. Holtz, and I

2    don't have the cite with me, but I can get it for you.  It's

3    the only case, your Honor, that I had found where there's an

4    alleged wrongful conviction, reversal of a case based on --

5    I believe the reversal was based on evidentiary issues, but

6    there was also a finding that evidence had been withheld.

7    There was then a 1983 action, and the 1983 action charged

8    the jury with making the Brady decision.

9          The Third Circuit found that the evidence of

10   culpability was such in the underlying trial that the

11   suppression of the evidence, although it was Brady

12   suppression, was not such that it undermined the confidence

13   and the criminal trial's ultimate result.

14         THE COURT:  I'll take a look at it.  I'll take a

15   look at it.  So that essentially it would mean that for this

16   phase of the trial, if I'm going to follow along what we've

17   said, the first thing we'll ask the jury is what happened,

18   then we go back, depending upon their answers to that, and

19   ask the materiality and the causation question, but as I

20   said, if it's at either end of the spectrum, if it is

21   everything, I don't have any doubt -- and I'll read this

22   case, but I don't have any doubt that I would direct then on

23   the other legal issues.

24         If it is on the other end of the spectrum, as

25   occurred the last time, at least my interpretation of what

1    the jury was really trying to tell us, which was that it was

2    probably the $20 testimony, then I have no doubt that I

3    would direct in the other direction.  If it is anywhere in

4    the middle, some combination, then I would give that to the

5    jury.

6              Can you find out where he is?

7              MS. SCAPICCHIO:  I will call him right now, your

8    Honor.

9              THE COURT:  Thank you.

10             THE CLERK:  All rise.

11             (A recess was taken.)

12             THE CLERK:  All rise for the jury.

13             THE COURT:  You can all be seated.  Call your next

14   witness.

15             MS. SCAPICCHIO:  Attorney Steven Rappaport.

16             STEVEN RAPPAPORT, having been duly sworn by the

17   Clerk, testified as follows:

18                      DIRECT EXAMINATION

19   BY MS. SCAPICCHIO:

20   Q.  Good morning, Mr. Rappaport.  In a loud, clear voice

21   could you please state your name spelling your last name for

22   the court reporter?

23   A.  It's Steven with a V, Rappaport, R-a-p-p-a-p-o-r-t.

24   Q.  Mr. Rappaport, what do you do for a living?

25   A.  I'm an attorney.

1   Q.   What type of law do you practice?

2   A.   Criminal defense.

3   Q.   And how long have you practiced criminal defense law?

4   A.   Thirty-two and a half years.

5   Q.   Thirty-two and a half years.  Do you work with someone

6   or do you have your own firm?

7   A.   I'm a member of a small firm, partner in a small firm.

8   Q.   And when you say you are a criminal defense attorney,

9   would you explain to the jury what that means?

10  A.   Well, I defend people who are accused of crimes.

11  Q.   And I'm going to direct your attention to August of

12  1988, specifically on August 29 of 1988.  Did you

13  receive -- well, let me ask you this.  Do you accept

14  court-appointed cases?

15  A.   Yes, I do, in certain situations.

16  Q.   Could you explain to the jury what court-appointed cases

17  are?

18  A.   Well, what happens very often if more than one person is

19  charged with a particular felony offense, the Committee For

20  Public Counsel Services, that's our public defender's

21  office, will represent one of those people, but because of

22  the potential conflict of interest that may exist, there's a

23  private bar, a number of attorneys that are willing to

24  accept assignments in cases where there may be a conflict of

25  interest, particularly in murder cases, and that's how I

1    accepted the assignment in '88 on behalf of Mr. Drumgold.

2    Q.  Let me direct your attention to August 29th of 1988 or

3    thereabouts, did you receive a call regarding the case of

4    Commonwealth vs. Shawn Drumgold?

5    A.  Yes, I did.

6    Q.  And did you agree to represent Shawn Drumgold pursuant

7    to a request from the Committee For Public Counsel

8    Services?

9    A.  Yes, I did.

10   Q.  And did you file an appearance at some point for

11   Mr. Drumgold?

12   A.  I believe that day.

13   Q.  Okay.  Now, I'm going to direct your attention to late

14   May or early June of 1989.  Can you first tell the jury, do

15   you recall what time period it was that Detective Callahan

16   took over the investigation of the case of Commonwealth vs.

17   Shawn Drumgold and Terrance Taylor?

18   A.  Well, there were motions that had been filed in the

19   matter.

20   Q.  Let me direct your attention, not the motions that were

21   filed in the matter, if I can direct your attention to just

22   around the time that you remember Detective Callahan getting

23   involved in the case, do you remember when that was?

24   A.  Well, I remember based upon an event that occurred.  It

25   sounds that it was some time at the beginning of the summer,

1    late spring that Mr. Callahan became involved.  He was not

2    one of the key investigating officers early on in the

3    case.

4    Q.  Okay.  Up to the time Mr. Callahan got involved, do you

5    remember the names of the two other officers that were

6    involved in investigating?

7    A.  Walsh and Murphy.

8    Q.  I'm sorry?

9    A.  I think it was Walsh and Murphy.

10   Q.  Walsh and Murphy, okay.  So, at some point did you

11   receive some indication that Detective Callahan had taken

12   over the case?

13   A.  At some point I was informed that he had become the case

14   officer.

15   Q.  Okay.  And I'm going to direct your attention to June

16   and/or May or June of 1989.  At that point in time, was

17   there a trial date that you recall set in the case of

18   Commonwealth vs. Shawn Drumgold?

19   A.  I believe the initial trial date was for September of

20   '89, and for some reason it didn't begin until October.

21   Q.  Okay.  So initially it was scheduled in September, and

22   the trial didn't actually start until October?

23   A.  That's my best memory.

24   Q.  And during the course of your representation of

25   Mr. Drumgold in this case, did you file a motion for

1    exculpatory evidence?

2    A.  Yes, I did.

3    Q.  Okay.  And can you explain to the jury what exculpatory

4    evidence is, not in this case, just in general, what

5    exculpatory evidence is?

6    A.  Exculpatory evidence is material potential evidence that

7    might affect whether or not a person committed the crime

8    he's accused of.  It might affect whether or not the

9    person's going to receive a large sentence or a small

10   sentence for a particular crime.  It's basically any

11   information that would be helpful to the defense either in

12   the defense of the case or in certain types of cases, not a

13   murder case, but in certain types of cases at sentencing.

14   Q.  Okay.  Do you remember within your motion for discovery

15   whether or not you asked for promises, rewards or

16   inducements?

17   A.  That's something that I would have asked for in every

18   single case.

19   Q.  Okay.  Do you remember as to whether or not you asked

20   for it in this case?

21   A.  I believe I did, yes.

22          MS. SCAPICCHIO:  Judge, is this an agreed upon

23   exhibit?

24          MR. ROACHE:  No.

25          MS. SCAPICCHIO:  May I approach the witness, your

1    Honor?

2              THE COURT:  Yes, you may.

3              MS. SCAPICCHIO:  This is Plaintiff's R.

4    Q.  Can you review that document, Attorney Rappaport?

5    A.  This appears to be the discovery motion that I filed in

6    that matter.

7    Q.  In fact, if I could direct your attention to the first

8    page, do you see any reference where you specifically

9    requested promises, rewards and inducements?

10   A.  Yes, in two places.  First of all, I was looking for any

11   types of agreements, formal agreements with witnesses that

12   would indicate what the witness would expect to receive in

13   exchange for his testimony, and if there wasn't any formal

14   written agreement, I also wanted a summary of any promises

15   that had been made to any perspective witness by any member

16   of the prosecution team, whether it was the D.A. or any of

17   the police officers that were involved.

18             THE COURT:  Are you offering that into evidence?

19             MS. SCAPICCHIO:  I am, your Honor.  I would offer

20   it.

21             THE COURT:  Is there an objection?

22             MS. HARRIS:  Your Honor, yes, we do object.

23             THE COURT:  Can I see it?

24             THE WITNESS:  Yes.

25             MS. SCAPICCHIO:  Sorry, your Honor.

1          THE COURT:  Can you briefly object based on

2     authentication or issues like that or based on substance?

3          MS. HARRIS:  Based on the substance, partial

4     substance of it, yes, your Honor.

5          THE COURT:  I'm going to overrule the objection.

6          MS. HARRIS:  May we request that it be sanitized,

7     your Honor?

8          THE COURT:  You can do it afterwards.  At this

9     point you can testify just generally about it.  It's

10    admitted now subsequent to subsequent redaction if there's

11    an issue.

12         THE CLERK:  No. 11.

13         ( Discovery Motion was marked and admitted into

14    evidence as Exhibit No. 11.)

15    Q.  Now, Attorney Rappaport, if I could direct your

16    attention to page 3 of Exhibit 11, paragraph 12, could you

17    read that yourself first, Attorney Rappaport.

18    A.  I've read it.

19    Q.  And could you tell the jury in Exhibit 11 what it is

20    that you requested at that time when you filed the discovery

21    motion?

22    A.  Well, I was looking for any exculpatory evidence, that's

23    evidence that would tend to indicate information that could

24    be used to impeach or discredit any prosecution witness or

25    any evidence or information that tends to show that the

1  defendant is not guilty of the crime charged.

2  Q.  And you filed that in the Superior Court proceeding, is

3  that right, Mr. Rappaport?

4  A.  That is correct.

5  Q.  And as a result of that, did you receive any information

6  from -- first of all, do you remember who the prosecutor was

7  who was prosecuting Commonwealth vs. Shawn Drumgold and

8  Terrance Taylor?

9  A.  Yes, Phil Beauchesne.

10  Q.  And did you know Assistant D.A. Phil Beauchesne before

11  you represented Shawn Drumgold in this case?

12  A.  I had known Mr. Beauchesne, yes.

13  Q.  Did you have any type relationship with him or

14  professional relationship with him prior to your

15  representation of Shawn Drumgold?

16  A.  I believe that we were on opposite sides of another case

17  on a motion for new trial that had been filed.

18  Q.  Okay.  And had you ever had any difficulty getting

19  information from Assistant D.A. Phil Beauchesne upon your

20  request?

21  A.  Never, no, I didn't.  In fact, as I recall, this was

22  supposed to be an open file case.

23  Q.  What do you mean by open file case, Mr. Rappaport?

24  A.  Basically Mr. Beauchesne would invite me into his office

25  and show me what he had.

1    Q.  When you say show me what he had, what do you mean by

2    that?

3    A.  If he had witness statements, he would show me the

4    witness statements, facts both of an exculpatory evidence

5    and of an inculpatory nature, that is, anything that might

6    tend to show that Mr. Drumgold was the perpetrator,

7    Mr. Beauchesne shared his file with me, at least I was led

8    to believe he shared his file with me.

9    Q.  And in this instance some time after you filed that

10   motion for exculpatory evidence, did Assistant D.A. Phil

11   Beauchesne ever inform you that a witness by the name of

12   Ricky Evans was put up in the Howard Johnson's?

13   A.  I have no memory of receiving that information.  I just

14   have no memory.  I don't believe I was told that, but I have

15   no memory of receiving any information from Mr. Beauchesne

16   with regard to anything that had been provided to Mr. Evans,

17   I just don't remember it.

18   Q.  Okay.  Let me back up a little.  Do you remember

19   Ricky Evans becoming part of the prosecution's case at some

20   point after Detective Callahan took over the

21   investigation?

22   A.  That is my memory.

23   Q.  Okay.  Now, at some point -- well, you didn't receive

24   anything regarding the Howard Johnson's?

25   A.  Not that I remember.  I just don't have a specific

1   memory of it, but I don't remember receiving anything.

2   Q.  Had you received information that Mr. Evans was put up

3   at the Howard Johnson's, would you have asked him up about

4   that on cross-examination?

5        MR. CURRAN:  Objection.

6        THE COURT:  Overruled.

7   A.  I certainly would have.

8   Q.  After you filed the motion for exculpatory evidence, did

9   you ever receive any information from Assistant D.A. Phil

10  Beauchesne that Ricky Evans was paid money by Detective

11  Callahan?

12  A.  I didn't know that at all.  I don't believe I was ever

13  given that information.

14  Q.  Okay.  If you had received information from Assistant

15  D.A. Phil Beauchesne or any prosecutor that Ricky Evans was

16  paid money by Detective Callahan, would you have asked him

17  about it in your cross-examination of Mr. Evans in the trial

18  of Commonwealth vs. Shawn Drumgold?

19  A.  Absolutely.

20  Q.  Now, during the course of your representation of

21  Mr. Drumgold in the criminal matter and after you filed your

22  motion for exculpatory evidence, did you ever receive any

23  information from Assistant D.A. Phil Beauchesne regarding

24  Mr. Evans being able to charge his meals to the

25  Howard Johnson's at the restaurant at the bottom of the

1    hotel?

2    A.   I don't believe I had that information.

3    Q.   You don't believe you did or you didn't?

4    A.   I didn't.

5    Q.   If you had information that Mr. Evans was able to charge

6    his meals to the restaurant at the Howard Johnson's, would

7    you have asked him about that on cross-examination at

8    trial?

9    A.   Certainly.

10   Q.   And did you ever receive any information after having

11   filed that motion for exculpatory evidence that

12   Detective Callahan had promised to assist Mr. Evans with his

13   pending cases?

14   A.   I have some memory of Mr. Callahan having helped

15   Mr. Evans clear up some outstanding default warrants or

16   straight warrants that he had at the time.

17   Q.   Okay.  Let me stop you there.  It's not unusual for a

18   prosecution witness to be taken to clear up their warrants

19   before they testify, is it?

20   A.   If the Commonwealth knows about it, it's something they

21   would do to foreclose the defense from getting into that

22   area as a possible motivation for testimony favorable to the

23   Commonwealth.

24   Q.   And that's a pretty common occurrence?

25   A.   I would say it's pretty common for the Commonwealth to

1    assist an individual in cleaning up their outstanding

2    warrants, yes.

3    Q.  And, in fact, you asked Mr. Evans about his warrants

4    being cleared up when you cross-examined him at trial,

5    right?

6    A.  I'm sure I did.

7    Q.  You knew about that prior to trial?

8    A.  If I asked him about it, then I knew about it.

9    Q.  I'm not talking about clearing up the warrants, I'm

10   talking about Timothy Callahan promising Mr. Evans that he

11   would speak to the district attorney or speak in a court of

12   law on behalf of Mr. Evans relative to his pending cases

13   that were pending at the time that he testified in the

14   matter of Commonwealth vs. Shawn Drumgold.  Did you ever

15   receive any information from Assistant D.A. Phil Beauchesne

16   or any district attorney about Detective Callahan's promises

17   to Ricky Evans on his pending matters?

18   A.  No.

19   Q.  Had you received that information, Attorney Rappaport,

20   would you have asked Mr. Evans about it at trial?

21   A.  Without a doubt.

22   Q.  Okay.  Now, some time after you filed your motion for

23   exculpatory evidence, did you ever learn from Assistant D.A.

24   Phil Beauchesne or any prosecutor that Detective Callahan

25   was having meetings with Ricky Evans where he was discussing

1    the details of the homicide of Tiffany Moore in front of

2    Mr. Evans?

3    A.   I didn't know that.

4    Q.   And if you had known that, Attorney Rappaport, would you

5    have asked about that during your cross-examination of

6    Mr. Evans in the case of Commonwealth vs. Shawn Drumgold?

7    A.   Absolutely.

8    Q.   And during the course of your representation of

9    Shawn Drumgold and after you filed your motion for

10   exculpatory evidence in this case, did you ever learn that

11   Detective Callahan made statements in front of Ricky Evans,

12   "Remember Shawn had the silver gun and Lug had the black

13   gun"?

14            MR. CURRAN:  Objection.

15            THE COURT:  Overruled.

16   A.   I did not know anything of that nature at that time.

17   Q.   And if you had that information, Attorney Rappaport,

18   prior to your cross-examination of Ricky Evans, would you

19   have asked him about it at the trial of Commonwealth vs.

20   Shawn Drumgold?

21   A.   Absolutely.

22   Q.   And if you had had -- well, let me ask you this, some

23   time after you filed your motion for exculpatory evidence,

24   did you ever learn from Assistant D.A. Phil Beauchesne or

25   any prosecutor that Detective Callahan was feeding the

1   details of the crime to Ricky Evans during meetings that

2   they were having prior to Mr. Evans' testimony?

3   A.  I had no knowledge of that prior, at any time.

4   Q.  And if you had that information, Mr. Rappaport, would

5   you have questioned Mr. Evans about it in the trial of

6   Commonwealth vs. Shawn Drumgold?

7   A.  I would have without a doubt.

8   Q.  Now, in the course of your motion that's marked

9   Exhibit 11, can you review that to see whether or not you

10  specifically requested any information regarding

11  photographic identification of Mr. Drumgold?  I think it's

12  on page 3.

13  A.  Oh, yes, certainly, I was looking for any details of any

14  out of court identification of the defendant while he wasn't

15  represented by counsel.  Basically --

16  Q.  That's it, let's stop right there.

17  A.  Sure.

18  Q.  Some time after you filed that motion looking for out of

19  court identification of Mr. Drumgold, did you ever learn

20  from Assistant D.A. Phil Beauchesne or any prosecutor that

21  Detective Callahan showed three photos to

22  Ricky Evans -- well, first of all, did you ever learn

23  that?

24  A.  No.

25  Q.  Did you ever learn from any prosecutor, Assistant D.A.

1   Phil Beauchesne or any prosecutor, that when the three

2   photos were shown to Ricky Evans that Ricky Evans made a

3   statement that one person by the name of Theron Davis is the

4   person in the neighborhood that he had heard had committed

5   the crime?  Did you ever learn that from Assistant D.A. Phil

6   Beauchesne or any prosecutor?

7   A.  No, I did not.

8   Q.  And did you ever in the course of your representation of

9   Mr. Drumgold get from Assistant D.A. Phil Beauchesne or any

10  prosecutor any photo array that Detective Callahan showed to

11  Mr. Evans?

12  A.  No, I did not.

13  Q.  Do you remember the actual trial of Commonwealth vs.

14  Shawn Drumgold?

15  A.  I remember parts of it.

16  Q.  Do you remember Detective Callahan being present -- was

17  Detective Callahan present during the trial of Commonwealth

18  vs. Shawn Drumgold?

19  A.  He was present at court, I believe, every day.  He was

20  in court for a good part of the trial itself.  I can't say

21  that he was in court every minute of the trial, and I'm sure

22  he wasn't, but it's my memory that he actually second seated

23  the district attorney in this case.

24  Q.  Okay.  Let me direct you to the testimony of

25  Ricky Evans.  Have you had an opportunity to review the

1    trial testimony of Ricky Evans before you came in here to

2    testify today?

3    A.   I have looked it over.

4    Q.   Okay.  And in reviewing the trial testimony of

5    Mr. Evans, do you remember whether or not Mr. George asked a

6    question of Mr. Evans where he pointed to Detective Callahan

7    as having been in the courtroom during the trial testimony

8    of Ricky Evans?

9    A.   I've reviewed testimony, the transcript of the trial,

10   and, yes, I recall that.

11   Q.   Any time after you filed your motion for exculpatory

12   evidence and before you tried the case of Commonwealth vs.

13   Shawn Drumgold, did you ever learn from Assistant D.A. Phil

14   Beauchesne or any prosecutor that Mr. Evans was allowed to

15   bring family members to the Howard Johnson's and treat them

16   to meals downstairs in the restaurant?

17   A.   I was not aware of that.

18   Q.   And if you had been aware that Detective Callahan

19   brought Mr. Evans to the Howard Johnson's and Mr. Evans was

20   able to bring his family members over and treat them to

21   meals, would you have asked Mr. Evans about it at the

22   criminal trial of Commonwealth vs. Shawn Drumgold?

23   A.   Certainly.

24   Q.   And did you ever learn during the course of your

25   representation of Mr. Drumgold in the criminal trial some

1    time after you filed the motion for exculpatory evidence

2    that Mr. Evans was allowed to bring friends, invite friends

3    from the neighborhood over to the Howard Johnson's and treat

4    them to meals at the restaurant downstairs?

5    A.  I never knew that.

6    Q.  And if you had learned that prior to the trial of

7    Commonwealth vs. Shawn Drumgold, would you have asked

8    Mr. Evans about that at trial?

9    A.  Of course.

10   Q.  Did you ever learn during the course of your

11   representation of Shawn Drumgold in the criminal trial and

12   after you filed your motion for exculpatory evidence from

13   Assistant D.A. Phil Beauchesne or any prosecutor that

14   Detective Callahan told Ricky Evans that the car in this

15   case was white, "remember the car was white?"  Did you ever

16   learn that information prior to the trial of Commonwealth

17   vs. Shawn Drumgold from Assistant D.A. Phil Beauchesne or

18   any prosecutor?

19   A.  I did not.

20   Q.  And if you had that information, Attorney Rappaport, at

21   the trial of Commonwealth vs. Shawn Drumgold, would you have

22   asked Mr. Evans about it at trial?

23   A.  Of course.

24            MS. SCAPICCHIO:  If I could just have a minute,

25   your Honor.  I have no further questions.  Thank you.

1                    CROSS-EXAMINATION

2     BY MS. HARRIS:

3     Q.  Mr. Rappaport, good morning.  Just give me a moment to

4     orient myself.  Good morning, sir.

5     A.  Good morning.

6     Q.  Mr. Rappaport, when's the last time you saw the file

7     that you had when you were defending Shawn Drumgold?

8     A.  Early '90s, whenever Ms. Scapicchio replaced me as

9     counsel.

10    Q.  If I suggest to you that that would be something in

11    1990, does that sound right to you?

12    A.  It could be, '90, '91, I'm not sure.  I know there were

13    some post trial matters I stayed involved to a certain

14    point.

15    Q.  Have you reviewed for your preparation of today, have

16    you reviewed the correspondence file from that case?

17    A.  No, I haven't.

18    Q.  After you reviewed the trial transcript other than the

19    testimony that was provided to you of Mr. Evans?

20    A.  I've reviewed testimony by Mr. Evans, I've reviewed

21    testimony by a Christopher Cousins, that's what I've

22    reviewed.

23    Q.  Now, I believe that you just were asked whether you had

24    been told by anybody that Mr. Evans was shown a photo array,

25    and your memory, you were never told that; is that

1 correct?

2 A.  I have no memory of a photo array being an issue in the

3 case as to Mr. Evans.

4       MS. HARRIS:  Okay.  Can I please have trial

5 transcript 1224 and 1225.

6       MS. SCAPICCHIO:  Judge, for clarification, the

7 question was before the trial, did he learn that information

8 before the trial.

9       MS. HARRIS:  I understand.  Your Honor, can I ask

10 for a moratorium on speaking objections?

11       THE COURT:  No, go on.

12       MS. HARRIS:  Can I have 1225 at the bottom.  This

13 is the voir dire of Ricky Evans.  It's JF.

14       MR. REILLY:  Thank you.

15       MS. HARRIS:  I believe this is a stipulated

16 exhibit.  I'm sorry, your Honor, could we switch to the

17 document camera.

18       THE COURT:  It is on the document camera.  To

19 Attorney 2, okay.

20 Q.  Can you see that?

21 A.  If I move close, I can.

22 Q.  I'll represent to you this is the voir dire of

23 Ricky Evans, and he's being questioned by Mr. Beauchesne and

24 at the bottom of the page, there's some discussion about the

25 identification of Terrance Taylor, co-defendant, and at the

1    bottom of the page at line 19, Mr. Beauchesne says, "So the

2    name that you knew of the individual that you've identified

3    here in court today, was his name Lug?"  And Mr. Evans

4    answered:  "Yes."  Mr. Beauchesne asked:  "And when you

5    attempted to add to it, when's the first time that you heard

6    his so-called Christian name?"  Mr. Evans replied:  "When I

7    picked him out of the photo."

8            We can go off the transcript for just a moment.

9    Having reviewed that testimony, Mr. Rappaport, do you have

10   any question in your mind that Mr. Beauchesne knew that a

11   photo array had been shown to Mr. Evans?

12   A.  With regard to Mr. Drumgold or Mr. Taylor?

13   Q.  With regard to Mr. Taylor.

14   A.  Well, apparently, yes.

15   Q.  Okay.  Had you ever been informed that Mr. Evans had

16   been shown a photo array of any kind?

17   A.  I don't have any memory of being informed of that.

18   Q.  You don't remember one way or the other?

19   A.  I don't have a memory.

20   Q.  And I won't ask you to review the entire testimony of

21   Mr. Evans, but I'll represent to you --

22   A.  Are we talking about Mr. Taylor now?

23   Q.  We're talking about Mr. Evans now.

24   A.  Whether or not he was shown a photo array of

25   Mr. Drumgold or Mr. Taylor?

1    Q.  Whether he was shown a photo array of anyone.

2    A.  Well, I had no memory.  As I look now, it's obvious that

3    he says he was shown Taylor's picture at some point.

4    Q.  And when looking -- and I'll represent to you that in

5    the testimony of Mr. Evans, there was no reflection that

6    there's any inquiry or any objection made by yourself or by

7    Mr. George to the questioning of Mr. Evans about having

8    viewed a photo array.  Would you accept that representation

9    if I made it to you?

10   A.  Sure.

11   Q.  If you had not been shown a photo array by

12   Mr. Beauchesne, would you have made any objection or made

13   any inquiry of him about what evidence that he had that he

14   hadn't been provided to you?

15   A.  If I had picked up on it, perhaps.

16   Q.  Would you have becoming aware that Mr. Evans had been

17   shown a photo array of some sort where he picked out

18   Mr. Taylor, would you have asked whether he had been shown a

19   photo array of your client?

20   A.  I don't know if he picked out Mr. Taylor from a photo

21   array or whether he was shown a photo array of Mr. Taylor, I

22   just don't know.

23   Q.  Would you have asked?

24   A.  With regard to Mr. Taylor, I would have left that to

25   Mr. George.

1    Q.  And it wouldn't have crossed your mind to ask if he had

2    been shown a photo array of your client?

3    A.  Well, without knowing the answer to the question, I

4    probably would not have asked.

5    Q.  Would you have asked Mr. Beauchesne?

6    A.  I don't know.

7    Q.  You described having had an open file policy or that

8    Mr. Beauchesne had an open file policy and that you were

9    invited to review the evidence that he had in his file; is

10   that fair to say?

11   A.  Well, certainly, that's what had been represented to me,

12   and I had no reason not to trust Mr. Beauchesne.

13   Q.  And with all of the evidence that was exchanged between

14   the district attorney's and yourself, is it your contention

15   that every piece of evidence that was shown to you or

16   delivered to you was documented in some regard?

17   A.  I don't know that I can say everything was documented.

18   Sometimes lawyers have discussions in hallways, sometimes

19   lawyers -- I can't say everything was documented.  I believe

20   that Mr. Beauchesne would have for his own purposes

21   documented providing me with materials.

22   Q.  Can you just lean a little bit more forward to the

23   microphone.  I'm having trouble hearing you.

24   A.  I suspect -- I shouldn't say suspect, based on

25   experience, it would be Mr. Beauchesne who would want to

1    document everything that he was providing to me in case

2    there was some later challenge.

3    Q.  And you've not reviewed your correspondence file,

4    correct?

5    A.  No, I have not.

6    Q.  So, as you sit here today you don't know what remains in

7    the file to document what was given to him by you or by him

8    to you; is that fair to say?

9    A.  I do not have a memory of that.

10   Q.  I actually have a couple of documents that were proposed

11   by the plaintiff, if you give me one moment.  Mr. Rappaport,

12   I'll represent to you in the file as has been produced by

13   the Suffolk County District Attorney's Office and by

14   plaintiffs as inheritors, if you will, of your file, we have

15   four discovery letters which are marked S, T, U and V for

16   identification, and I'll represent to you, sir, that these

17   are the only documents that we have located that indicate,

18   that document, if you will, any kind of discovery that was

19   exchanged, and with the Court's permission, I'm going to put

20   these in front of Mr. Rappaport and ask him a couple

21   questions?

22           THE COURT:  Is there an objection to these

23   exhibits?

24           MS. SCAPICCHIO:  No, your Honor.

25           THE COURT:  All right.  Then if you wish to offer

1   them?

2           MS. HARRIS:  I'll move them in, that actually

3   makes more sense.

4           THE CLERK:  12 and 13.

5           MS. SCAPICCHIO:  Your Honor, if we could be seen

6   in terms of proposed Exhibit S for redaction.

7           THE COURT:  Again, the witness can be examined

8   about it, we'll deal with redactions outside the presence of

9   the jury.

10          MS. SCAPICCHIO:  Okay.

11          THE CLERK:  It will be 12, 13, 14 and 15.

12          ( Four discovery letters produced by the Suffolk

13  County District Attorney's Office were marked and admitted

14  into evidence as Exhibit Nos. 12, 13, 14 and 15.)

15  Q.  And I misspoke, I may have one more.  Let's just start

16  with these.  First off, Mr. Rappaport, as you look at these

17  documents, have you seen them recently before today?

18  A.  No, I have not.

19  Q.  And as you look at them, notwithstanding the fact you

20  may not have seen them recently, can you identify them?

21  A.  Well, they're documents, first document V seems to be a

22  letter sent from Mr. Beauchesne to me.

23  Q.  Dated October 19th 1988?

24  A.  October 19th, 1988, then there's a letter from me to

25  Mr. Beauchesne, I think asking for certain information.

1   Q.  And that one, just so that we keep this straight?

2   A.  November 18th of 1988, then we have another discovery

3   reply dated June 30th of 1989 in which I get date of births

4   of perspective witnesses, police officers at the scene.

5   Q.  That's the Commonwealth's response to the consolidated

6   request for discovery?

7   A.  Yes, correct.

8   Q.  And then Exhibit 15 dated August 23d, 1989?

9   A.  Then T for identification here is a letter to Mr. George

10  from Mr. Beauchesne similar to -- uh-hum, I have a letter

11  from Mr. Beauchesne to Mr. George, but it seems to have some

12  information different than what I was provided.

13  Q.  And the date on that letter is?

14  A.  Is August 23d, 1989, which would have been about a week

15  before the trial was originally scheduled to start.

16  Q.  Okay.  Let's start, if we could, with the October 19th

17  of 1988 --

18  A.  Sure.

19  Q.  -- that document lists 25 items including a number of

20  statements, police reports and witness reports; would you

21  agree?

22  A.  I would agree.

23  Q.  Okay.  And then turning to the next exhibit, which I

24  believe is No. 13, the letter from you to Mr. Beauchesne

25  dated November 18th of 1988, you list where you thank him

1    for this discovery provided on October 19th of 1988 and then

2    you ask in your first item for pages 8 and 9 of the Chaney

3    statement.  Do you see where I'm referring there?

4    A.  Yes.

5    Q.  Can you tell me or would you agree with me that on

6    October 19th, Mr. Beauchesne although he lists 25 items, he

7    doesn't list a statement of Mr. Chaney; is that correct?

8    A.  I do not see a statement of Mr. Chaney listed on the

9    October 19th.

10   Q.  Okay.  Then referring to your November 18th letter where

11   you thank him for the discovery provided on October 19th and

12   ask for pages 8 and 9 of the Chaney statement, do you have

13   an independent memory or can you assume from looking at this

14   letter that you had been given that statement, albeit in an

15   incomplete form?

16   A.  I obviously had it.

17   Q.  Okay.  Can you tell us as you sit here where you got it?

18   A.  From Mr. Beauchesne, I would imagine.

19   Q.  Do you have --

20   A.  I'm trying to think if there was any other prosecutor

21   involved in the case that would have provided me with any

22   discovery, and the only thing I can think of perhaps in the

23   Roxbury court I received some initial material, but I would

24   doubt I received the Chaney statement at that point.

25   Q.  Okay.  If you're asking Mr. Beauchesne to give you a

1    complete copy of the Chaney statement, does that help you

2    recollect that it would have been from Mr. Beauchesne that

3    you would have received the statement to begin with?

4    A.  Like I said, I don't have any memory of where I received

5    it from, but I think my letter speaks for itself.

6    Q.  Okay.  Are you aware of any other correspondence between

7    October 19th and your reply letter on November 18th that you

8    received from Mr. Beauchesne?

9    A.  I have no memory of the correspondence between

10    Mr. Beauchesne and myself.

11    Q.  Now, I ask you to look at the June 30th, 1989 reply to

12    the defendant's consolidated request for discovery, and

13    within this document the Commonwealth lists date of births

14    for some 44 witnesses, the first page of which 1 through 14

15    lists what appear to be civilian witnesses, and as you look

16    at the first page of Commonwealth's reply to the defendant's

17    request for discovery, can you tell me whether -- strike

18    that question.  That's an awkward question.  By my count

19    there are some 8 to 10 witnesses listed in that list of 14

20    who don't appear in either the October 19th letter from

21    Mr. Beauchesne or in the November 18th letter from you to

22    Mr. Beauchesne?

23    A.  Fair to say.

24    Q.  Can you tell us if you would have -- or strike that.

25    Can you tell us if you had received any information

1    regarding those witnesses other than in the two pieces of

2    correspondence in October and November?

3    A.   I know what the documents say.  I don't have any

4    independent memory of when I received most of the discovery

5    or whether it came in bits and pieces.  I know that I would

6    accept anything Mr. Beauchesne offered me at any time.

7    Q.   Do you have any memory of Mr. Beauchesne having given

8    you discovery in hallway conversations or when you came to

9    his office to look through his file?

10   A.   I don't have a distinct memory, but it's possible it

11   happened.  I just don't have a distinct memory.

12   Q.   If Mr. Beauchesne had listed these 14 civilian witnesses

13   with their date of births in response to your request for

14   discovery, and this document is undated, but I believe that

15   the request for discovery, which was previously marked, I

16   believe, is dated in the spring of 1989, and I can be

17   corrected if that's wrong, but had you received the names of

18   these witnesses and not have received reports or statements

19   that indicated what their relation to the case was, would

20   you have made further requests of Mr. Beauchesne?

21   A.   I believe so.  In effect, it looks like I had some

22   questions about at least two of the witnesses.

23   Q.   And what makes you say that?

24   A.   Well, I see a question mark next to Kevin Louis, and I

25   see a question mark next to Eric Johnson.

1   Q.  I'll represent to you that the document, I believe, is

2   Bates numbered SCDA 2095, and this is produced from the

3   Suffolk County District Attorney's, not from your files.

4   A.  Someone is saying they don't know who Johnson and Kevin

5   Louis are.

6   Q.  When you received this list of witnesses -- strike that

7   question.  Then I'm going to ask you to look at the

8   August 23d, 1989 letter from Mr. Beauchesne which is dated

9   Exhibit No. 15, and can you read the first item that's

10  listed on that correspondence?

11  A.  Boston Police Department homicide report from

12  Detective McDonough and Sergeant Callahan, four pages.

13  Q.  I'm sorry.

14  A.  Four pages.

15  Q.  Do you have any idea what that refers to?

16  A.  I do not.

17  Q.  Okay.  This document also lists statements of some seven

18  female witnesses, correct?

19  A.  Yes.

20  Q.  And there are also six reports referenced which reflect

21  neither a subject matter, a witness who was interviewed or a

22  date; is that correct?

23  A.  I'm sorry, I don't understand the question.

24  Q.  Okay.  Well, the item No. 1, Boston Police report,

25  homicide report from McDonough and Sergeant Callahan, four

1    pages, there's not a witness name listed nor is there a date

2    given to indicate what that report refers to?

3    A.   That's fair to say.

4    Q.   And going down, there's item 10, Boston Police

5    Department report from McDonough and Sergeant Callahan, one

6    page, again, no witness, no date, correct?

7    A.   Correct.

8    Q.   And the last two items, another report from

9    Sergeant Callahan at item 13, one page, no date, no subject,

10   and No. 14, a report from Walsh and Callahan, two pages with

11   no date?

12   A.   That's what it says.

13   Q.   Having looked -- strike that.  I'm going to show you a

14   document which was a proposed exhibit which I would propose

15   to offer further in the series of correspondence and direct

16   you, sir, to the document that's dated September 13th of

17   1989.  This is a letter from you to Mr. Beauchesne,

18   correct?

19   A.   It certainly appears to be, yes.

20   Q.   And you list a number of witnesses for whom you are

21   seeking taped copies of statements if they exist, correct?

22   A.   Yes.

23   Q.   And then on the second page of this document, you list

24   an additional set of witnesses and state, "If any of the

25   following persons have their statements taped, please

1    provide me copies of theirs as well," and in that sequence

2    of names, the fourth name down is Ricky Evans.  Do you see

3    where I'm pointing?

4    A.  I do.  I see it.

5    Q.  Looking at Exhibit No.  --

6             MS. HARRIS:  I'm sorry, Maryellen.

7             THE CLERK:  You're moving 16 and 17.

8             ( Discovery letters produced by the Suffolk

9    County District Attorney's Office were marked and admitted

10   into evidence as Exhibit Nos. 16 and 17.)

11   Q.  If this is No. 16 and 17, would you agree with me that

12   this letter reflects that you were aware and had possession

13   of a statement by Ricky Evans as of this date?

14   A.  Yes, I wouldn't have made the request.

15   Q.  And in the previous correspondence that we've looked at,

16   would you also agree there's no reference of Ricky Evans?

17   A.  Oh, there does not appear to be.  I don't see any

18   reference to Ricky Evans.

19   Q.  And then in the next piece of correspondence dated

20   September 22d, Exhibit 17, again your first line you thank

21   Mr. Beauchesne for his most recent discovery package, and

22   I'll represent to you that we don't have another piece of

23   correspondence from Mr. Beauchesne to you following the

24   August 23d letter.  Do you have a recollection of having

25   received anything further from him or what that most recent

1    discovery package could have contained?

2    A.  No.

3    Q.  And then I'll direct you to the second full paragraph

4    which starts, "With regard to the cassette recording of

5    statements, I have received the following," and I'll direct

6    you to item No. 5 which lists a cassette recorded statement

7    of Lisa Graham.

8    A.  Okay.

9    Q.  And I'm going to ask you, Mr. Rappaport, you testified

10   in 2003 at the motion for new trial in this case; is that

11   correct?

12   A.  I did.

13   Q.  And do you have a recollection that you signed an

14   affidavit in that action claiming that you had never

15   received a statement of a Lisa Graham from the prosecutor or

16   from anyone else?

17   A.  I believe I signed such an affidavit.

18   Q.  And do you recall that your affidavit stated that had

19   you received the statement of Lisa Graham that your trial

20   strategy would have been different?

21   A.  I believe I said that.

22   Q.  And you later corrected that to say having reviewed the

23   correspondence that you realize you had in fact received

24   that statement?

25   A.  That's correct.

1    Q.   Is it fair to say that your memory what you received in

2    discovery in this case is at best a spotty memory?

3    A.   I would say it is spotty.  I mean, it is 20 years, and

4    I've had a lot of cases between then and now.

5    Q.   And in signing the affidavit in 2003, you were swearing

6    to the Court under oath that you had been denied evidence

7    that was germaine and relevant to the defense of your

8    client, correct?

9    A.   To the best of my memory when I signed it was correct.

10   Q.   And the information you allege was also exculpatory

11   evidence, correct?

12   A.   Correct.

13   Q.   And even though that had in fact been given to you by

14   the district attorney's office?

15   A.   That didn't mean it was not exculpatory.

16   Q.   That it was given to you?

17   A.   Yes.

18   Q.   Do you have a recollection in 1989 that you were given a

19   report by Mr. Beauchesne about Ricky Evans that was dated

20   June 21st of 1989?

21   A.   I don't remember the discovery with regard to

22   Mr. Evans.

23   Q.   Okay.  Do you recall having had in your possession two

24   statements by -- strike that.  Do you recall having had in

25   your possession at the time of trial two statements

1  regarding Mr. Evans, one that was a narrative, the other

2  which was a tape recorded transcript of his statement?

3  A.  I know I asked for a tape recording.  I don't remember

4  the physical items.

5  Q.  Okay.  Do you recollect that there was an investigator

6  working for Mr. George who actually located Mr. Evans prior

7  to trial?

8  A.  Having reviewed transcripts, I know recall that that was

9  mentioned in one of the transcripts.  I don't have an

10  independent memory.

11  Q.  Do you recall bringing a motion for discovery in the

12  pretrial hearings prior to the start of this trial?  By this

13  trial, of course I'm referring to the 1989 trial.

14  A.  I don't have an independent memory of any motions filed,

15  however, it's not unusual on the eve of trial for there to

16  be a flurry of activity back and forth.

17  Q.  Do you have a recollection that Ricky Evans was a

18  witness in two parallel homicide cases, the Tiffany Moore

19  case and another case being prosecuted by Connolly involving

20  the shooting of his cousin and the wounding of him?

21  A.  His cousin or uncle.  I read the transcript recently,

22  his cousin or uncle had passed.

23  Q.  Do you recall a Paul Connolly from the Suffolk County

24  District Attorney's Office was prosecuting that case?

25  A.  I do not have a recollection who the prosecutor was.

1          MS. HARRIS:  Your Honor, this is a disputed

2     exhibit, but I would like to offer it through Mr. Rappaport.

3     This is a portion of the pretrial hearing of September 25th,

4     1989 at pages 65 and 66.

5          THE COURT:  It continues to be objected to?

6          MS. SCAPICCHIO:  If I could just take a look at

7     it, your Honor.

8          THE COURT:  Sure.

9          MS. SCAPICCHIO:  Just one second.

10         MS. HARRIS:  Actually, 64, 64, 65 and 66.

11         MS. SCAPICCHIO:  I don't believe I have an

12    objection.

13         THE COURT:  You have no objection?

14         MS. SCAPICCHIO:  No, your Honor.

15         THE COURT:  It may be admitted.

16         THE CLERK:  18.

17         MS. HARRIS:  If I could start at page 62 --

18         MS. SCAPICCHIO:  If you could give me a minute.

19         THE COURT:  Are you seeking to introduce selected

20    pages?

21         MS. HARRIS:  I'm trying to introduce selected

22    pages so as trying not to overwhelm.

23         THE COURT:  Is there an objection?

24         MS. SCAPICCHIO:  If I could read 62 to 63 and 64

25    to 66.

1           THE COURT:  Go right ahead.

2           MS. SCAPICCHIO:  I don't have an objection, your

3    Honor.

4           ( Portion of the pretrial hearing of

5    September 25th, 1989 was marked and admitted into evidence

6    as Exhibit No. 18.)

7           THE COURT:  Proceed.

8    Q.   Okay.  So, Mr. Rappaport, this is a conversation with

9    yourself, Judge Alberti and Mr. George, Mr. Beauchesne

10   regarding Ricky Evans?

11          THE COURT:  This took place before the Drumgold

12   trial?

13          MS. HARRIS:  Exactly.  This took place prior to

14   the commencement of trial on September 25th.

15   Q.   I'll direct your attention, if I could, to line 8 of

16   this transcript, and with the Court's permission, may I read

17   through it?

18          THE COURT:  Yes.

19   Q.   Mr. George states, "Your Honor, in the month of July or

20   August, Mr. Beauchesne provided us with a statement or a

21   police report offered by Sergeant Callahan on the date of

22   June 21st as to the type of statement he's describing to you

23   from a Ricky Evans."

24          "As a result of that investigation, I assigned two

25   investigators actually and an attorney to find Ricky Evans

Case 1:04-cv-11193-PBS   Document 351   Filed 09/17/09   Page 67 of 144

1    and verify the fact that he existed.  At some point two

2    weeks ago, the investigator was able to locate Mr. Evans in

3    the Town of Dorchester, the City of Dorchester, and he spoke

4    with him, and at that time Mr. Evans spoke with my

5    investigator and told him the first time he had spoken to

6    the police about this matter and given a statement, the type

7    of statement that is being offered to us now was some time

8    in the month of March or April."

9         "Now, upon further investigation by the

10   investigator, the investigator asked Mr. Evans if those

11   statements were transcribed, if notes were taken, if he was

12   being tape recorded, and he said he believed at the time

13   that he was being interviewed that the notes were taken and

14   he believed that there were existing statements."

15        "When the question was put to him at that point as

16   to whether those statements could possibly be inconsistent

17   with the statement he gave supposedly on June 21st, he said,

18   "I'll do my talking in the courtroom."  That was his last

19   response.  He said, "That's for you to find out."  Then

20   Mr. George goes on to say, "And I suggest that I can

21   tomorrow call an attorney who was present during that

22   interview and the investigator to testify as to the fact

23   that Mr. Evans possibly gave a prior inconsistent statement

24   or similar statement as early as March of this year and that

25   we were provided with some time in the month of July or

1   August of this year is far more egregious than it appears to

2   be on its face.""

3          "Then Mr. Rappaport yourself go on to say, "This

4   is a concern that you have in this case because it's a

5   recently transcribed statement that I received from

6   Mr. Beauchesne which I believe was recently done with

7   Mr. Evans.""

8          "And I believe at the beginning of that statement,

9   when Detective Callahan is talking to him, he says, or

10  whoever is talking to him, says something we met you

11  originally during the Willie Evans murder investigation, and

12  that naturally calls to mind, and perhaps Mr. Beauchesne can

13  provide a shortcut to some extent, but we don't have a

14  person in Mr. Evans who came to the police on day one, it's

15  somebody who apparently came to the police as a result of a

16  different investigation, and as the Court can well

17  understand, immediately my mind starts to work that perhaps

18  this Mr. Evans was a suspect in a different homicide, or

19  what have you, and suddenly as a result of that

20  investigation, this Willie Evans' murder investigation, and

21  I don't know why that sticks in my mind, perhaps that's how

22  he comes to the police."

23         "Certainly for the purposes of cross-examining

24  Mr. Evans, I would like to know as much as I can about the

25  background about how he came to the police, was it a result

1    of the murder investigation, was he a suspect in another

2    murder case, whether any formal deals that had been made, is

3    there some sort of inducement for him to offer his

4    testimony."

5            "Then Mr. Beauchesne responds indicating in this

6    first paragraph his continuing duty to disclose and he will

7    attempt to comply with that and goes on to say, "I'd also

8    like to put on the record that the first statement that I

9    have in my possession," which I turned over to him, "says on

10   June 21st, 1989, Callahan, McDonough and Evans came to the

11   D.A.'s Office to meet with Assistant District Attorney Paul

12   Connolly, who was the prosecutor in the other case, and, in

13   any event, there was a meeting at that particular time on

14   the 21st of June, and that was turned over, I presume some

15   time in August, after I got a chance to review the

16   transcript after I returned from vacation."

17           "The second statement is another report which is

18   dated September 12th that indicates that they met with Evans

19   again and that he's had a complaint concerning the conduct

20   of a private investigator named Fallon, and he goes on to

21   say that Evans said the investigator stated, "Did the police

22   force you to testify?  It's not too late to testify.  It's

23   best if you don't testify," and things of that nature, and

24   he later called the police and told them that and

25   later -- strike that."

1          "There's also a report here indicating, and this

2     is a taped transcript, that on August 6th, 1989 at 4:05, and

3     this is a taped statement of four or five, six pages which

4     was obviously done a month after the due date."

5          And off the transcript.  I'll represent the due

6     dated that's in question was whether this was discovery that

7     was turned over in a seasonal way.  So, having reviewed the

8     discussions between counsel and the Court on September 25th

9     of 1989, it's clear, would you agree, that Assistant

10    District Attorney Connolly was identified as someone who was

11    working with Ricky Evans in another case and that was known

12    to you, correct?

13    A.  I would -- sure.

14    Q.  And that the investigator according to Mr. George found

15    Mr. Evans in the City of Dorchester earlier that month,

16    obviously earlier than this took place?

17          MS. SCAPICCHIO:  Objection, your Honor.

18          THE COURT:  Sustained.

19    Q.  Do you have a recollection of being informed by

20    Mr. George that his investigator had located Mr. Evans?

21    A.  I just don't remember.

22    Q.  Okay.  And reading the discussion that you had with the

23    Court does nothing to refresh your memory as to whether or

24    not you had an investigator locate him or where the

25    investigator located him?

1    A.   I wouldn't know.   Mr. Fallon wasn't reporting to me.

2    Q.   When you were trying the case of Commonwealth vs.

3    Drumgold and Taylor, were you and Mr. George working

4    cooperatively with one another?

5    A.   For a period of time.

6    Q.   Is it fair to say that many of the witnesses who

7    testified in the trial were testifying both against

8    Mr. Drumgold and against Mr. Taylor?

9    A.   All I can say is that the witnesses that were called by

10   the Commonwealth were testifying to some aspect of the

11   Commonwealth's presentation.

12   Q.   Okay.   But as far as you and Mr. George were preparing

13   to defend the case, is it fair to say that you were -- there

14   were witnesses who would be offering testimony against both

15   of your clients, correct?

16   A.   Certainly.

17   Q.   And you didn't withhold information from one another as

18   you prepared the defense of the case, didn't you?

19   A.   I certainly didn't withhold information from him.

20   Q.   Do you have a belief that Mr. George was withholding

21   information from you?

22   A.   I don't know of any specific information he withheld

23   from me.   I can't read Mr. George's mind.

24   Q.   And having reviewed the testimony of Ricky Evans prior

25   to coming in here today, was there anything in the testimony

1   of Ricky Evans that made you suspicious or wonder if you had

2   been -- if Mr. George had withheld information that his

3   investigator developed with regard to Ricky Evans?

4   A.  I don't think that Mr. George had withheld any

5   information from me concerning Ricky Evans.

6   Q.  You had been asked on your direct examination by

7   Ms. Scapicchio whether you would have inquired of Mr. Evans

8   about various allegations that are in play here, and I'll

9   start, if I may, have you inquired if promises had been made

10  to get rid of his existing cases?  Do you recall that

11  testimony?

12  A.  Absolutely.

13  Q.  And do you have a recollection as you sit here today

14  that you had described in the 1989 trial that witnesses may

15  testify because they have a subjective belief that they've

16  been offered something even if they hadn't been?

17  A.  Correct.

18  Q.  And I believe that you had testified that it's human

19  nature for a witness to come in and offer testimony that he

20  thinks is what people want to hear even if nobody has

21  offered him anything in response to that testimony?

22  A.  Well, it depends upon the witness.  If the witness is

23  merely a person who was in a certain place at a certain

24  time, observed something, what have you, I'm less suspect of

25  that witness' motivations.

1              When a witness appears to be testifying in

2      exchange for rewards, then I have a different view of the

3      witness.  In a case such as this, certainly I would have

4      known that Mr. Evans' warrants were cleared up.  Most people

5      who testify in exchange for something, I would say that

6      they're more concerned about what's going to happen in the

7      future than what happened in the past.  They're looking to

8      please the person that can help them in the future.

9      Q.  Do you mean to suggest that Mr. Evans having had his

10     warrants cleaned up could have understood that to be some

11     sort of inducement for him to testify?

12     A.  Well, it would certainly have been an inducement, viewed

13     as an inducement by him to testify, certainly viewed even by

14     the Commonwealth as an inducement to testify.  If they

15     provided that information to me, they felt dutybound to

16     provide that information to me because it's potentially

17     exculpatory.  The point what you were just asking me about

18     is that a person's expectations are going to be much more of

19     a motivating factor in their testimony than what's been done

20     for them in the past.

21     Q.  As you sit here today, do you have a recollection that

22     Mr. Beauchesne told you that Mr. Evans' warrants had been

23     cleaned up?

24     A.  I don't have a specific memory, but based upon both what

25     I've read, questions I've been asked over the past four

1    years or so and just my experience as a criminal defense

2    attorney, it would be natural for a prosecutor to make sure

3    that outstanding warrants were cleared up before the witness

4    actually walked into the court to testify.

5    Q.  And is it fair to say that the witness may take that to

6    be a promise or a reward, but it's something that as you had

7    the opportunity to cross-examine Mr. Evans about his

8    criminal record, that having had that information, it didn't

9    hamper your ability to explore his motivations, correct?

10                 MS. SCAPICCHIO:  Objection.

11                 THE COURT:  Overruled.

12   A.  Well, in general --

13   Q.  No, let's just focus on Mr. Evans.

14   A.  I am.  In general, there would be a certain track I

15   would take in cross-examining Mr. Evans whether or not I had

16   been provided with information specifically as to promises

17   or rewards, various inducements that he received, but being

18   provided with the actual promise or inducement goes a long

19   way to not having to overcome the witness' reluctance to

20   admit that they're testifying in exchange for something.

21   Q.  Now, I think Ms. Scapicchio had asked you that if you

22   had been told that Mr. Callahan, Detective Callahan, had

23   promised Ricky Evans that he was going to get rid of his

24   pending cases following the trial of Mr. Drumgold, that

25   would have been something you would have asked Mr. Evans?

75

1    A.  I would have explored it, yes.

2    Q.  And if Detective Callahan had not made any such promise

3    to Ricky Evans, it's fair to say that you wouldn't have

4    asked Mr. Evans questions about whether he had received such

5    promises, right?

6    A.  Well, I would have asked whether he received it.  If he

7    said no, I would be somewhat limited as to the

8    Commonwealth's hand in the testimony.

9    Q.  Okay.  And that is in fact what happened, you asked him

10   if he was given any inducements, and he said no?

11   A.  Correct.

12   Q.  And you knew because you had a copy of his criminal

13   docket that he was due to return to court later that month

14   in October, correct?

15   A.  Well, I would have had it.  I don't have a current

16   memory of having that in front of me, but I'm sure I would

17   have had it in front of me.

18   Q.  So you had an awareness -- I'm trying to avoid going

19   through the testimony, having looked at the testimony of

20   Ricky Evans, he acknowledged that his defaults had been

21   removed and he had dates back in Roxbury court later that

22   month in October?

23   A.  That makes sense, yes.

24   Q.  Now, you had also been asked by Ms. Scapicchio whether

25   if you had been informed that Mr. Evans was being put up in

1  a hotel, whether that was some information that you would

2  have explored, and you've stated that your question was yes,

3  correct?

4  A.  Yes.

5  Q.  Do you recall a witness by the name of Travis Johnson?

6  A.  I recall the name.  I don't recall the witness.

7  Q.  Okay.  Do you recall that during the testimony of Travis

8  Johnson he stated that he had met with police detectives to

9  prepare him for testimony prior to trial in a hotel room?

10 A.  I don't recall.

11 Q.  Okay.

12        MS. HARRIS:  May I refer to the transcript, your

13 Honor?

14        THE COURT:  Yes.

15 Q.  Directing, please, to page -- this is the stipulated

16 transcript, transcript at 269, please.  This is Mr. George

17 examining Mr. Johnson.  At line 10, Mr. George asks, "Where

18 did you speak with him, Travis?  He answers:  "In my hotel

19 room."  The question is:  "You had a hotel room?"  The

20 answer is:  "Yes."  The question is:  "Where is your hotel

21 room?"  The Court interjects and states:  "You don't have to

22 answer that."  Question:  "Who paid for your hotel room?"

23 Mr. Beauchesne states:  "The Commonwealth, your Honor, would

24 offer to agree that we paid his transportation costs to and

25 from his home and put him up in a motel while he's here to

1  testify."  The Court:  "It's standard operating procedure."

2  Mr. Beauchesne repeats:  "It's standard operating

3  procedure."

4           Going off the transcript, I'll represent to you we

5  had not seen a document that reflects the Commonwealth

6  informing yourself or Mr. George that Travis George was

7  being placed in a hotel or transported to the Commonwealth

8  to give testimony.  Is that consistent with your memory?

9  A.  It's consistent with my reading of the transcript.

10  Q.  Okay.  I will also represent that there's no further

11  questioning of Mr. Johnson or discussion with Mr. Beauchesne

12  in the record regarding the disclosure that Mr. Johnson was

13  in a hotel room.  Would you accept that representation?

14  A.  I would accept the representation to the extent that

15  Mr. Beauchesne and the Judge seem to be in accord for the

16  purposes of giving his testimony during the course of the

17  trial he was being put up in a hotel room.  I got the

18  impression from that that it was a very -- it wasn't a very

19  long period of time that he was being put up.

20  Q.  So, if somebody is put up in a hotel and it's not for a

21  very long period of time, is it your testimony that it's a

22  different type of obligation to disclose?

23  A.  It should have been disclosed.

24  Q.  Did you object to the fact that it had hadn't been

25  disclosed?

1   A.  I did not.  I don't know.

2   Q.  I'll let you hear the whole --

3   A.  If you represent that I didn't, then I didn't.

4          MS. SCAPICCHIO:  Objection.  Can we be seen?

5   She's representing something that isn't in the transcript.

6          THE COURT:  Is not one way or the other?

7          MS. SCAPICCHIO:  It's five pages later there's a

8   stipulation, five pages before this conversation, there's a

9   stipulation.  She's representing he never knew about it, do

10  you agree that you never knew about it?

11         THE COURT:  You'll have an opportunity to

12  cross-examine.

13         MS. HARRIS:  I'm happy to address the issue.

14  Q.  Did you know about Travis Johnson being placed in a

15  hotel prior to Travis Johnson telling you from the stand?

16  A.  Not that I recall.

17  Q.  Do you have any recollection of Mr. Beauchesne offering

18  you any documentation to say I am bringing Travis Johnson,

19  would you stipulate that this is the type of housing it

20  doesn't need to be explored at trial?

21  A.  I don't recall a stipulation.

22         MS. HARRIS:  Do you have the page?

23         MS. SCAPICCHIO:  Page 144 of JE.

24         MS. HARRIS:  I see it.

25  Page 143, please, Mr. Bailey.

1    Q.  I believe this is still the examination by yourself,

2    Mr. Rappaport.  At the bottom of page 263, question:  "One

3    more question, sir.  You no longer live in Boston, do you?"

4    The answer:  "No, I don't."

5    A.  It's not on my screen.

6          MS. HARRIS:  I'm sorry, page 263, Chris.

7    Q.  Line 21, question by Mr. Rappaport:  "One more question,

8    sir.  You no longer live in Boston, do you?"  Answer:  "No,

9    I don't."  Question:  "Where do you live now?"  The

10   following page Mr. Beauchesne makes an objection and then

11   goes on to state:  "I think we can stipulate that it's out

12   of state.  I'm offering to agree that it's out of state."

13   Then you say:  "The stipulation is that Mr. Johnson came in

14   from out of state to testify in this case.  Mr. Beauchesne

15   says:  "Yes, your Honor."  The Court says:  "Fine, you don't

16   have to say where you live."

17          So the stipulation that was entered into was with

18   regard to where Mr. Johnson lived, correct?

19   A.  It appears to be, yes.

20   Q.  The stipulation wasn't that he was staying at a hotel

21   and this information had been provided to you previous to

22   trial, correct?

23   A.  Fair to say.

24   Q.  Is it fair to say that there are some reasons that

25   people are placed in hotels that would not lead you to

1    question where they would be housed by the Commonwealth?

2    A.  There might be reasons, yes.

3    Q.  Can you think of any of those reasons as you sit here

4    today?

5    A.  The person being brought in from other of states doesn't

6    have any relatives or people to stay with, the person is a

7    perceived threat to a person, so he's housed.  I've

8    always -- well, you don't want my suspicions with regard to

9    the Commonwealth and why they might house people.

10          THE COURT:  No, go on.

11   Q.  No, that's fine, thanks.  When people are being housed

12   when they're being brought in from out of state, the fact

13   they are given a place to live, presumably fed, transported

14   to and from the court, that's not the kind of inducement

15   that leads you to -- strike that.  It's not the sort of

16   benefit that would necessarily lead you to cross-examine

17   them about that, correct?

18   A.  It depends upon the individual.  If you tell me that an

19   individual who's living in a home in a community somewhere

20   out of state is brought in here, he's put up in a hotel

21   without any extravagances, anything of that nature, no,

22   that's not totally unusual.

23          If you tell me somebody is homeless, they don't

24   have a penny in their pocket and suddenly they're placed in

25   a hotel room and they have an expense account, that's a

1    different situation.  I think you have to look at each

2    situation separately.

3    Q.  Okay.  You would also mention if there was a threat to

4    the person's safety that that might not be something you

5    would elicit during the examination of the witness; is that

6    fair to say?

7    A.  I would tend to think I would avoid that if I thought

8    that's why the person was being put up as a security

9    measure, I probably would not want to explore it, that

10   particular aspect.

11   Q.  And is the reason for that because you wouldn't want to

12   put in front of the jury the fact that this is an individual

13   who's safety is being compromised?

14   A.  I wouldn't want that innuendo to go to the jury.

15   Q.  Do you have a recollection that in this case that the

16   witnesses who testified were sequestered from one another?

17   A.  I believe they were.

18   Q.  And just for the jury, could you just briefly explain

19   what a sequestration order means and how it would be

20   affected?

21   A.  Well, no witnesses are permitted in the courtroom while

22   other witnesses are testifying, nor may anybody who's

23   involved in the trial tell any witness about what a prior

24   witness has testified to.

25   Q.  And that sequestration order applied to all of the lay

1    witnesses in the case, correct?  By that I mean --

2    A.   The only witness it would not have applied to would have

3    been Mr. Callahan, potential witness.

4    Q.   I'm sorry?

5    A.   The only potential witness that it would not have

6    applied to would be Mr. Callahan because he obviously was

7    going to be in the courtroom for most of the witnesses'

8    testimony.

9    Q.   I believe you had stated on direct you remember him

10   being there, but you can't say he was there every moment of

11   the proceedings?

12   A.   He was not the total focus of my attention during the

13   trial.

14            MS. HARRIS:  One moment, your Honor.

15            THE COURT:  Yes.

16   Q.   Now, when we talked about the photo array a few moments

17   ago, you had been asked whether you had been told Mr. Evans

18   had been shown photographs and had been shown photographs of

19   Mr. Drumgold, Mr. Taylor and Theron Davis, and directing

20   your attention back to that, you were aware, were you not,

21   that Ricky Evans knew who Shawn Drumgold was and vice versa,

22   correct?

23   A.   I was aware that Ricky Evans stated he knew

24   Shawn Drumgold.

25   Q.   Well, you were representing Shawn Drumgold?

1  A.  I say Ricky Evans said he knew Shawn Drumgold.

2  Q.  And you knew that Shawn Drumgold knew who Ricky Evans

3  was as well, correct?

4  A.  You know, I don't have a memory of whether or not

5  Mr. Drumgold knew Mr. Evans or not.

6  Q.  Okay.

7  A.  I know Mr. Evans said he knew Mr. Drumgold.  I don't

8  remember Mr. Drumgold saying he knew Mr. Evans.

9  Q.  And you knew that the alleged assailants in this case

10  all wore masks, correct?

11  A.  That's what was reported.

12  Q.  Okay.  So Mr. Evans being shown a photo array, if he

13  knew who Mr. Drumgold was, would that be something you would

14  likely inquire of him?

15  A.  I don't understand the question, I'm sorry.

16  Q.  Okay.  It's probably not a very clear question.  It's

17  one thing, is it not, if a witness doesn't know a

18  perpetrator or a suspect in a crime and is shown a photo

19  array of some 10 to 15 people and is asked can you pick out

20  who you saw that night vs. a witness who knows who someone

21  is, who sees a photograph and then says yes, that's the guy

22  I know?

23  A.  That's the guy I know or that's the guy that did it?

24  Q.  That's the guy I know?

25  A.  Okay.  That's two different things.

84

1    Q.  That's two different things, okay.

2         MS. HARRIS:  If I could just have a moment, your

3    Honor.

4         THE COURT:  Sure.

5    Q.  Mr. Rappaport, did you review any of the trial testimony

6    other than the testimony of Ricky Evans and Chris Cousins

7    before coming in today?

8    A.  I read part of the Ricky Evans testimony and I read a

9    voir dire of Christopher Cousins.

10   Q.  Okay.  Do you recollect that Ricky Evans' testimony was

11   that he had seen Mr. Taylor and Mr. Drumgold earlier in the

12   day prior to the shooting?

13   A.  Correct.

14   Q.  And do you recall having testified previously that the

15   fact that Mr. Evans saw Mr. Drumgold and Mr. Taylor earlier

16   in the day and testified that he saw them with guns, that

17   might mean that they were up to something, but it didn't

18   link them to this crime; do you recall having testified to

19   that effect?

20   A.  I think I recall raising that issue at trial.

21   Q.  The time gap between when Mr. Evans saw them and when

22   this crime occurred meant that there was a significant gap

23   in time?

24   A.  I don't remember so much the significant gap in time.  I

25   remember -- well, it's hard to say what I remember and what

1    I've reviewed, but having reviewed the transcript of

2    Ricky Evans and Christopher Cousins recently, it appears

3    that the Court, the Judge had some question as to the

4    relevancy of Ricky Evans' testimony without the

5    Chris Cousins testimony.

6    Q.  And do you recall that there was an issue at trial about

7    a white car being the getaway car?

8    A.  I don't specifically remember.  I do believe there was a

9    white car, a Jeep Suzuki Sumarai.  I thought that was part

10   of the defense, we were trying to show Theron Davis was the

11   actual culprit in the case, and that was the vehicle that he

12   and London Williams -- the names, Theron Davis' name I

13   remember, but it was my memory that the major part of the

14   defense was trying to show it was somebody other than

15   Shawn Drumgold who had committed the crime.

16   Q.  And this is what you referred to as the third-party

17   culprit defense, correct?

18   A.  Correct.

19   Q.  And would you agree with me that the witnesses that

20   testified about the white getaway car said that they saw a

21   white Jeep Suzuki?

22   A.  Correct, and as I recall, there had been shortly some

23   time earlier that evening a white Jeep Suzuki with Mr. Davis

24   and Mr. Williams driving had past by and there had been some

25   perhaps threats intimated between Chaney and people in that

1   vehicle.

2   Q.   And this is all information you were able to elicit at

3   trial, correct?

4   A.   I hope so.

5   Q.   I would also ask would you agree with me that there were

6   witnesses that said that they had seen two people fleeing

7   the scene and there were witnesses that said they saw three

8   people fleeing the scene?

9   A.   Yes.

10   Q.   And that there were a number of witnesses in the case

11   who were young girls between the ages of say 13 and 14 who

12   were with Tiffany Moore on the corner?

13   A.   There seemed to be a lot of young girls, early teenagers

14   maybe from 11 through 15, I don't know.

15   Q.   And would you agree with me that one of the witnesses

16   was a Vantrell McPherson?

17   A.   I remember the name.

18   Q.   And do you recall that Vantrell McPherson was 14 years

19   old at the time and testified that she had seen Mr. Drumgold

20   and Mr. Taylor prior to the murder and testified that she

21   heard Mr. Taylor say to Mr. Drumgold, "Come on, Shawn, you

22   know we have to do this"?

23   A.   I don't remember that.

24        MS. HARRIS:  May I refer to the transcript, your

25   Honor?

```
1              THE COURT:  No.  Go on.
2   Q.  You don't recollect that?
3   A.  I don't.
4   Q.  You had testified, I believe, a few moments ago that
5   your understanding was that Mr. Chaney was the presumed
6   target of the perpetrators of the crime, correct?
7   A.  That's my memory, yes.
8   Q.  Do you have a recollection that Mr. Cousins testified
9   that Mr. Drumgold and Mr. Taylor had been seen at a hotel
10  room with Mr. Holliday where retaliation was discussed?
11  A.  No.
12             MS. SCAPICCHIO:  Objection, your Honor.  The
13  transcript is in.
14             THE COURT:  The objection is sustained.  Go on.
15  Q.  Do you have a recollection that there were witnesses
16  other than Mr. Evans who testified about Chaney and Reese
17  being the targets of the alleged retaliation?
18             MS. SCAPICCHIO:  Objection.
19             THE COURT:  I don't understand where this is
20  going.  Objection is sustained.
21             MS. HARRIS:  So I can understand, your Honor, am I
22  not permitted to explore the trial testimony with this
23  witness?
24             THE COURT:  Unless it bears on something he can
25  add to it, but if the trial transcript is in, you can argue
```

1    from it to the jury.  In other words, the trial transcript

2    has to be the basis of the question, but you have to be

3    asking the witness more than do you remember what's in the

4    trial transcript.

5          MS. HARRIS:  Thank you, your Honor, I have nothing

6    further.

7          THE COURT:  Mr. Roache.

8          Let me just amend what I said, unless, as you did

9    earlier, the trial transcript is a way of reflecting what

10   the witness knew or didn't know.  That's a different issue

11   so far as it bears on what he received.  Go on.

12                      CROSS-EXAMINATION

13   BY MR. ROACHE:

14   Q.  Good morning, Mr. Rappaport.

15   A.  Good morning, Mr. Roache.

16   Q.  Mr. Rappaport, in a criminal case such as the case of

17   Commonwealth vs. Shawn Drumgold, the burden of proof that

18   Mr. Drumgold committed the murder of Tiffany Moore lies with

19   the Commonwealth, does it not?

20   A.  Yes, it does.

21   Q.  And the burden of proof is that the Commonwealth must

22   prove beyond a reasonable doubt that Mr. Drumgold committed

23   the murder of Tiffany Moore?

24          MS. SCAPICCHIO:  Objection.

25   Q.  Isn't that so?

1       THE COURT:  I'll let this go on a little bit.  Go

2  on.

3  A.  That's the burden of proof.

4  Q.  Okay.  And beyond a reasonable doubt means to a moral

5  certainty, isn't that so?

6       MS. SCAPICCHIO:  Objection.

7       THE COURT:  Sustained.

8  Q.  And in order to obtain a conviction for a crime such as

9  a homicide before a jury, the jury verdict must be

10  unanimous; isn't that so?

11  A.  Yes.

12  Q.  And in the case of Commonwealth vs. Shawn Drumgold,

13  Mr. Drumgold was in fact convicted by a jury of 12 persons;

14  isn't that so?

15       MS. SCAPICCHIO:  Objection.  There's a stipulation

16  to that.

17       THE COURT:  Sustained.

18  Q.  Now, would you agree with me, sir, that there were

19  several witnesses who testified on behalf of the

20  Commonwealth that they saw Shawn Drumgold either at the

21  scene of the crime or fleeing the scene of the crime?

22       MS. SCAPICCHIO:  Objection, your Honor.  The

23  transcript is in.

24       THE COURT:  Sustained.

25       MR. ROACHE:  Your Honor, you're not allowing me to

1    cross-examine Mr. Rappaport about the quality of the

2    evidence?

3              THE COURT:  That's right, I'm not.

4              MR. ROACHE:  Please note my objection.

5              THE COURT:  Yes.

6              MR. ROACHE:  I have no other questions then.

7              THE COURT:  Anything further?

8              MS. SCAPICCHIO:  Just a few, your Honor.

9                        REDIRECT EXAMINATION

10   BY MS. SCAPICCHIO:

11   Q.  Attorney Rappaport, you were asked on cross-examination

12   about whether or not you remembered a stipulation regarding

13   the fact that Mr. Johnson came from out of state to testify

14   in this case, do you remember that testimony?

15   A.  I remember the question a while ago, sure.

16   Q.  And do you remember indicating to the Court back on

17   October 3rd of 1989 that you were willing to stipulate that

18   Mr. Johnson came in from out of state to testify in this

19   case; do you remember that?

20   A.  Okay.

21   Q.  So, had you to have known that Mr. Johnson was in a

22   hotel or you wouldn't have stipulated to it, right?

23              MS. HARRIS:  Objection.

24   A.  That's fair to say.

25              THE COURT:  Overruled.  You more than anyone

1    should know you got to wait.

2             THE WITNESS:  I'm sorry, I apologize.

3             THE COURT:  Go on.

4    Q.  You wouldn't have stipulated that he came from out of

5    state unless you knew he came out from out of state?

6    A.  That's fair to say.

7    Q.  Is there a difference, Attorney Rappaport, from a

8    witness who no longer lives in the Commonwealth and is

9    brought into the district attorney's office to testify and

10   then leave and a witness who is homeless and put up at the

11   Howard Johnson's and given money and fed information?  Is

12   there a difference between that?

13   A.  I would submit there's an obvious difference.

14   Q.  Now, you were asked on cross-examination about whether

15   or not Mr. Beauchesne may have documented everything that he

16   gave you or didn't document everything he gave you; do you

17   remember those questions?

18   A.  Yes, I do.

19   Q.  Is there any doubt in your mind as you sit here today

20   that Assistant D.A. Phil Beauchesne and/or any prosecutor in

21   the Suffolk County District Attorney's Office ever informed

22   you prior to the Drumgold trial that Mr. Evans was put up in

23   the Howard Johnson's?  Any doubt in your mind?

24   A.  No doubt.

25   Q.  Is there any doubt in your mind, no matter what those

1   documents said, that you didn't know that Mr. Callahan,

2   Detective Callahan, was giving money to Ricky Evans prior to

3   his testimony?  Any doubt in your mind?

4   A.  I absolutely did not know that.

5   Q.  Is there any doubt in your mind, no matter what those

6   documents say, that you didn't know that Detective Callahan

7   had made promises to take care of Ricky Evans' pending

8   cases, to speak to a prosecutor on his behalf and to address

9   the Court on his behalf before you cross-examined Mr. Evans

10   at trial?

11   A.  I didn't know.  I truly didn't know that had been

12   offered to him.

13   Q.  In fact, you had mentioned on your cross-examination

14   that you recall a voir dire in this case regarding pending

15   cases and Mr. Evans.  Do you remember that testimony?

16   A.  I remember questioning whether or not -- I remember the

17   whole concept of what Mr. Evans' expectations were as

18   opposed to what specific promises may have been.

19         MS. SCAPICCHIO:  Judge, may I approach the

20   witness?

21         THE COURT:  Yes, you may.

22         MS. SCAPICCHIO:  This is the voir dire of

23   Ricky Evans which I think is an unagreed --

24         MS. HARRIS:  What page?

25         MS. SCAPICCHIO:  Page 202.  An unagreed exhibit

1   that I would be looking to introduce at this time.

2   Q.  Could you just read this to yourself, Attorney

3   Rappaport.

4        MR. CURRAN:  Page number, please.

5        MS. SCAPICCHIO:  202.

6   A.  I've read 202.

7   Q.  Mr. Rappaport, having read that, is it fair to say -- I

8   want to set this up -- that is a voir dire of Mr. Evans

9   during the course of his trial testimony where there is some

10  question by you as to whether or not he was promised

11  anything on his pending cases?  Is that fair to say?

12  A.  It's fair to say.

13  Q.  All right.  And could you read the representations of

14  Assistant D.A. Phil Beauchesne to Judge Alberti in front of

15  you, in front of Attorney George, in front of

16  Shawn Drumgold, in front of Terrance Taylor, and in front of

17  Detective Callahan?  Can you read what Assistant D.A. Phil

18  Beauchesne said to the Court at that point regarding pending

19  cases?

20  A.  I'm sorry, I'm missing, what Mr. Beauchesne said?

21  Q.  Yes.

22  A.  Or the questions that he asked and the answers that were

23  given?

24  Q.  The questions that he asked and the answers that were

25  given.

1   A.  Mr. Beauchesne says:  "All right.  Notwithstanding the

2   fact that half of these on the list you don't believe are

3   yours, have you had any conversation with me concerning my

4   office doing anything for you on any of these cases?"  The

5   response is:  "No."

6           "Have you talked with any police officer

7   concerning anyone doing anything for you?"  "No."  Do you

8   think as you sit here right now that because you testify

9   you're going to get any special break on any of these

10  cases?"  "No."  "You don't."

11  Q.  That conversation that took place, the questioning of

12  Ricky Evans, that was when Detective Callahan was in the

13  courtroom, right?

14  A.  I believe Mr. Callahan was in the courtroom, yes.

15          MS. SCAPICCHIO:  Judge, I would move to introduce

16  those two pages.

17          THE COURT:  Isn't that part of the transcript?

18          MS. HARRIS:  It's not disputed.

19          THE COURT:  Isn't that part of the transcript?

20          MS. HARRIS:  Yes, there's no objection.  It's part

21  of the stipulated transcript.

22          THE COURT:  Absolutely.  Then there's no need to.

23  Q.  Now, Attorney Rappaport, you were also asked questions

24  on cross-examination regarding whether or not Mr. Beauchesne

25  reduced everything to writing regarding all of the discovery

1    in this case.  Is there any doubt in your mind as you sit

2    here today that Mr. Beauchesne never told you nor did any

3    prosecutor tell you that Detective Callahan was giving money

4    to Ricky Evans?

5    A.  I didn't know that he was receiving money.

6    Q.  Despite what those documents say in terms of discovery

7    back and forth, is there any dispute in your mind that you

8    didn't have the information, that Detective Callahan was

9    discussing the details of the Tiffany Moore murder in front

10   of Ricky Evans?

11   A.  I don't know that.

12   Q.  Despite what those documents say in terms of what you

13   received and what you didn't receive, is there any doubt in

14   your mind that you didn't know prior to the trial of

15   Commonwealth vs. Tiffany Moore that Detective Callahan in

16   this case had brought Mr. Evans to the Howard Johnson's and

17   allowed his family members to come and visit him?

18   A.  I didn't know that.

19   Q.  And is there any doubt in your mind despite what's

20   contained in the record as it stands in terms of

21   correspondence between you and Assistant D.A. Phil

22   Beauchesne, is there any doubt in your mind that you didn't

23   know that Mr. Evans could bring his friends to the

24   Howard Johnson's to treat them to meals at the restaurant

25   downstairs?

1   A.   I didn't know that.

2   Q.   And if you had known that information, would you have

3   cross-examined Ricky Evans at trial?

4   A.   I would have cross-examined him specifically with regard

5   to the things you're asking me about now that I didn't know

6   about then.

7        MS. SCAPICCHIO:   I have no further questions.

8        MS. HARRIS:   I have a few, your Honor.

9                    RECROSS-EXAMINATION

10  BY MS. HARRIS:

11  Q.   Mr. Rappaport, is it your testimony on redirect that

12  you're absolutely certain that you knew nothing about

13  Ricky Evans' housing prior to the trial in 1989?

14  A.   My best memory is I knew absolutely nothing about his

15  housing.

16  Q.   Okay.  Are you absolutely certain or is it your best

17  memory?

18  A.   I just told you it's my best memory that there are

19  certain things that were brought to my attention, and I can

20  say I absolutely was unaware of.

21  Q.   And when you signed an affidavit in 2002 stating, "The

22  Commonwealth never provided me with any statement by

23  Lisa Graham, in fact, I was unaware that she was interviewed

24  until I received her affidavit"?

25       MS. SCAPICCHIO:   Objection, beyond the scope.

1        THE COURT:  Overruled.

2   A.  I made a mistake.

3   Q.  Okay.  And when you went on to say, "Had the

4   Commonwealth informed me prior to trial that Lisa Graham

5   could corroborate Shawn Drumgold's alibi, I would have

6   called her as a witness for the defense," and you were

7   absolutely certain that you had not gotten her statement?

8   A.  The question is?

9   Q.  The question is when you signed the affidavit alleging

10  that you were absolutely certain that the Commonwealth had

11  not given you her statement?

12  A.  That was my belief at the time, yes.

13  Q.  And then when you went on to say, "Had the Commowealth

14  informed me about Lisa Graham, I would have brought this

15  information to the attention of the court and filed a motion

16  to dismiss"?

17  A.  If I said it in the affidavit, it was true to the best

18  of my knowledge and belief at the time.

19  Q.  And you were wrong, right?

20  A.  Not the first time, not the last time.

21        MS. HARRIS:  Thank you, nothing further.

22               RECROSS-EXAMINATION

23  BY MR. ROACHE:

24  Q.  Mr. Rappaport, you were asked by Ms. Scapicchio

25  if you had received information concerning Ricky Evans that

1    you would have cross-examined Ricky Evans about that

2    information, correct?

3    A.   Of course, if it worked to the benefit of the defense, I

4    would have gotten into it, and I've subsequently learned or

5    if there was the showing of photo arrays that I was

6    unaware --

7    Q.   I think you've already answered my question.  Now,

8    Ms. Scapicchio asked you, sir, that if you knew that

9    Mr. Evans was receiving money from Detective Callahan, you

10   would have inquired about that; is that correct, sir?

11   A.   Sure.

12   Q.   Now, that's assuming the truth of the underlying premise

13   that Mr. Evans was in fact receiving money from

14   Mr. Callahan?

15   A.   I think that's obvious, sir.

16          MS. SCAPICCHIO:  Objection.

17          THE COURT:  Overruled.

18   A.   You're saying -- I thought that the question was if you

19   had known that, therefore, assuming that this is what

20   happened, would you have done this, and I say yes.

21   Q.   If Detective Callahan did not give Ricky Evans money,

22   then there would be no reason for you to know, 1, receive

23   any information concerning that or cross-examine Mr. Evans

24   about receiving money?

25   A.   If there had been no receipt, of course, there would

1   have been no reason to question about it.

2   Q.  If the testimony were, sir, that Detective Callahan gave

3   Ricky Evans $20 at the time that he took him to the

4   Howard Johnson's, you would not cross-examine Mr. Evans

5   concerning that, would you?

6           MS. SCAPICCHIO:  Objection, your Honor.

7           THE COURT:  Overruled.  You can have it.

8   A.  I think it's fair to say that $20 probably would not

9   have been an area that I would have gone into.

10  Q.  Because if the testimony were that when Mr. Evans went

11  to the Howard Johnson's he didn't have any money and

12  Mr. Callahan gave Mr. Evans $20, that is a rather

13  insignificant event, is it not?

14  A.  In most circumstances it would be insignificant.

15  Q.  And would not be worthy of cross-examining Mr. Evans

16  during the course of a criminal trial?

17  A.  Well, it depends.  Let's say Mr. Evans said or denied

18  that he had been given any money whatsoever and I knew he

19  had, well, then I would try to show that Mr. Evans was lying

20  about something insignificant.  If he lies about something

21  insignificant, why would you believe him about something

22  significant?

23  Q.  And if Mr. Evans -- strike that.  I believe

24  Ms. Scapicchio asked you if you had received information

25  that Mr. Evans was promised to have his cases fixed, that is

1    something that -- his pending cases fixed, that is something

2    that you would have inquired of Mr. Evans; isn't that

3    correct?

4    A.  Absolutely.

5    Q.  And, sir, that's assuming, again, the truth of the

6    underlying premise, that if in fact Mr. Evans was promised

7    to have his pending cases fixed, if that premise were not

8    true, then you would not have any reason to cross-examine

9    Mr. Evans; isn't that so?

10             MS. SCAPICCHIO:  Objection.

11             THE COURT:  Overruled.

12   A.  Well, you say I can't say I wouldn't have any reason to

13   cross-examine Mr. Evans, but if you're telling me that it's

14   been represented to me by the prosecutor that there's no

15   promise with regard to his pending cases, I wouldn't discuss

16   it with the witness with regard to whether or not there was

17   any formal arrangement, payment in exchange for the

18   testimony, but I would still think it's significant as to

19   the witness' expectations.

20   Q.  Well, sir, if there were no promises made to Mr. Evans

21   concerning fixing his pending cases, you would not inquire

22   of Mr. Evans about his cases being -- any promises of having

23   his cases fixed, would you?

24   A.  Once again, the question of promises vs. a question of

25   expectations --

1   Q.  Well, sir --

2            THE COURT:  Let him finish his answer, please.

3   A.  -- if there were no promises made and it had been

4   represented to me that there were no promises made, I

5   wouldn't question him about promises, however, if it had

6   been represented to me that there were promises made, that

7   there were no promises made and I learned independently that

8   there were promises made, of course I would cross-examine

9   once again trying to show that the witness had lied, and if

10  the witness lies about X, why would the jury accept the

11  witness' testimony about Y?

12  Q.  And, sir, if you had learned -- I believe Ms. Scapicchio

13  had asked you that if you had learned that Detective

14  Callahan was feeding information to Mr. Evans to testify at

15  the criminal trial, that is something that you would want to

16  know and cross-examine Mr. Evans about, correct?

17  A.  I would have wanted to expose that, yes.

18  Q.  And that's again assuming the truth of the underlying

19  premise that in fact Mr. Callahan was feeding information to

20  Mr. Evans?

21  A.  Well, the trial's supposed to be a search for the truth,

22  so, yes.

23  Q.  So, if Mr. Callahan was not feeding information to

24  Mr. Evans concerning the facts of the case, then there would

25  be no reason for you to cross-examine Mr. Evans concerning

1   that fact, would there?

2   A.  That's fair to say.

3   Q.  So, if Mr. Evans says that he was being fed information

4   by Detective Callahan, then the issue becomes whether or not

5   that testimony is credible?

6          MS. SCAPICCHIO:  Objection.

7   Q.  Isn't that so?

8          THE COURT:  Overruled.  I'm sorry, no, no, I'm

9   going to sustain the objection.  The issue is whether that

10  testimony is credible before this jury, yes, the issue is

11  whether the testimony is credible, that's just what they're

12  to decide.  It's not for him to decide.  Next question.

13         MR. ROACHE:  Thank you, your Honor.

14  Q.  And if the Commonwealth -- strike that.  Ms. Scapicchio

15  asked you had you become of aware meetings where

16  Mr. Callahan was meeting with Mr. Evans and discussing the

17  details of the case, that is something that you would want

18  to know about; is that correct?

19  A.  Absolutely.

20  Q.  Okay.  Well, any time a police officer meets with a

21  witness, do you expect that you're going to be provided that

22  information?

23  A.  I'd like to know that information.

24  Q.  Well, it's not exculpatory information, is it?

25  A.  Yes, it is.

1    Q.  The fact --

2    A.  Can I finish my answer, please?

3    Q.  Sure.

4    A.  You said to me it's not exculpatory.  Whether it's

5    exculpatory or inculpatory, the counsel should know whether

6    it's exculpatory or inculpatory, and I believe that's the

7    definition in Massachusetts of exculpatory evidence.

8    Q.  Any time a police officer meets with a witness, that

9    fact, unless there's some significance to that meeting, need

10   not be disclosed to defense counsel; isn't that correct?

11   A.  I would say -- well, I don't know what the rules are for

12   prosecutors.  When they're aware of their police officers

13   meeting with witnesses, if there's any change whatsoever in

14   any testimony, if there's any representations made of any

15   kind, I submit that the prosecutor has an obligation to turn

16   that information over to the defense.

17   Q.  That's your submission, that no matter what is

18   discussed --

19   A.  No, no, did you listen to my answer?  I said that if

20   there's any change in any statement, even a subtle change in

21   any statement, if there's any new information provided,

22   anything of that nature, yes, I would want to know about it,

23   and, in fact, I would like to know whether or not over the

24   course of time how many times a particular officer, case

25   officer or detective on a case met with an individual.  Yes,

1   that's information I'd want to know.

2   Q.  Okay.  During the course of the criminal trial, did you

3   inquire of Ricky Evans as to whether or not he had met with

4   Officer Callahan?

5   A.  I don't recall.

6   Q.  You don't recall?

7   A.  I don't recall that specific question.

8   Q.  Okay.  If I suggest to you that there was no such

9   questions of Ricky Evans, would you accept that

10  representation?

11  A.  Sure.

12  Q.  And if during the course of the criminal trial -- did

13  you cross-examine Officer Callahan about meeting with

14  Ricky Evans?

15  A.  I don't remember.

16  Q.  Now, you were the trial lawyer for Shawn Drumgold back

17  in 1988 and 1989, correct?

18  A.  Yes.

19  Q.  So you were his advocate in the court?

20  A.  Yes.

21          MS. SCAPICCHIO:  Objection, your Honor.  Beyond

22  the scope.

23          THE COURT:  I'm waiting.  Go on.

24  Q.  And you still are an advocate for Shawn Drumgold, are

25  you not?

1          MS. SCAPICCHIO:  Objection.

2          THE COURT:  Overruled.

3   A.  No, I'm not an advocate for Shawn Drumgold.  I'm part of

4   the system.  I'm very upset when the system doesn't work.

5   Q.  Okay.  And you're upset, sir, that Shawn Drumgold was

6   convicted while you were representing him?

7   A.  I'm very upset, still to this day that Shawn Drumgold

8   spent 15 years in prison for --

9   Q.  You were representing him at trial, were you not, sir?

10  A.  You know I did.

11  Q.  Okay.  And you're upset because Shawn Drumgold was

12  convicted while you were representing him?  Can you answer

13  that yes or no?

14          THE COURT:  I believe he's answered it.  Next

15  question.

16          MR. ROACHE:  That's all I have, thank you.

17          THE COURT:  Thank you very much, Mr. Rappaport.

18  Next witness.

19          MS. SCAPICCHIO:  Timothy Callahan.

20          TIMOTHY CALLAHAN, having been duly sworn by the

21  Clerk, testified as follows:

22                    DIRECT EXAMINATION

23  BY MS. SCAPICCHIO:

24  Q.  In a loud clear voice, Mr. Callahan, could you please

25  state your name spelling your last name for the record.

1   A.   Timothy Callahan, C-a-l-l-a-h-a-n.

2   Q.   And, Mr. Callahan, were you employed by the Boston

3   Police Department?

4   A.   Yes.

5   Q.   And directing your attention to May of 1989, were you

6   employed as a detective with the Boston Police Department at

7   that point in time?

8   A.   Yes.

9   Q.   Were you working in the homicide unit at that point?

10  A.   Yes.

11  Q.   And at some point in May or June of 1989, Detective

12  Callahan, did you take over the investigation of

13  Commonwealth vs. Shawn Drumgold and Terrance Taylor?

14  A.   Yes.

15  Q.   And was that at the request of a supervisor of yours?

16  A.   Yes.

17  Q.   And as a result of taking over the investigation in May

18  or June of 1989, fair to say the case was a mess, right?

19          MS. HARRIS:  Objection.

20          THE COURT:  Overruled.

21  Q.   Is it fair to say the case was a mess, right?

22  A.   I don't have that recollection of the case being a mess

23  at the time.

24  Q.   Well, you didn't have any statements of the defendants,

25  right?

```
1              MS. HARRIS:  Objection, your Honor.

2              THE COURT:  Overruled.

3    A.  I --

4    Q.  You didn't have any statements of the defendant when you

5    took over the case, right?

6    A.  Yes, I did.

7    Q.  That you could use?

8              MS. HARRIS:  Objection, your Honor.  Can we be

9    seen, please.

10             THE COURT:  Sidebar.

11             (THE FOLLOWING OCCURRED AT SIDEBAR:)

12             MS. SCAPICCHIO:  She's opened the door.

13             MS. HARRIS:  How?

14             MS. SCAPICCHIO:  You said a statement was

15   suppressed, that's when the statement, when he got there.

16             MS. HARRIS:  That wasn't the question.  The

17   question, did he have statements of the defendants?  He had

18   the statements of the defendants.

19             THE COURT:  All right.  You need to ask the

20   question again, the statements that he could use in court.

21   Restrict the focus of his answer.  If he answers he had

22   statements that could be used, then the door is open.  It

23   could be statements used in court.

24             MS. HARRIS:  I'd like to the direction, he had

25   statements of the defendant, he had statements of the
```

1    alleged alibi witnesses who put guns in his hands.  I think

2    it opens exactly what he had and what he could use.

3           THE COURT:  Well, I'm not going to get into the

4    issue of what was out there for him to use, in other words,

5    it's not going to be factual innocence or guilt against, see

6    how far he goes on this.  What you're trying to suggest --

7           MS. SCAPICCHIO:  What the case looked like at the

8    time he took it over.

9           THE COURT:  To some degree it doesn't open the

10   door to what else they had at the time because you're

11   characterizing it as a mess; he may characterize it

12   otherwise.  If they had witnesses 1 through 10 at the time,

13   you know, at the time he took over, so you do open that

14   door.

15          MS. HARRIS:  And I think I would open to press

16   that door if we're talking about what evidence did he have

17   that he could use, he could use a statement of

18   Antonio Anthony tracing the guns that went to New York and

19   he said he left and went to New York with Antonio Anthony

20   had a gunshop.

21          THE COURT:  I agree.  I agree.  I mean, you want

22   to provide an incentive for this officer to do the things he

23   did with respect to Ricky Evans, so you can inquire into

24   that, but you have to understand you open up the other door

25   as well.

1          MS. SCAPICCHIO:  I understand, your Honor.

2          THE COURT:  Okay.

3          (SIDEBAR CONFERENCE WAS CONCLUDED)

4    Q.  Detective Callahan, how many meetings did you have with

5    Ricky Evans from June 21st of 1989 through the day he

6    testified at trial on October 4th of 1989?

7    A.  I can think of at least three.

8    Q.  Three.  What was the first one?

9    A.  It was a telephone conversation I had with Ricky Evans

10   on June 21st, 1989.

11   Q.  And that was a telephone call that you brought up

12   Tiffany Moore, right?

13   A.  That is correct, I did.

14   Q.  It wasn't a situation where Mr. Evans brought up

15   Tiffany Moore, you brought up the case, right?

16   A.  That's correct, I did.

17   Q.  And when you brought up Tiffany Moore, you had no reason

18   to believe that Mr. Evans had any information, did you?

19   A.  No, however, I knew he lived one or two blocks from

20   where the murder occurred, and I asked him if he had any

21   knowledge or information on the murder.

22   Q.  Okay.  So that's the telephone call on June 21st; is

23   that right?

24   A.  I believe it was June 21st, yes.

25   Q.  And all you learned at that time is that he said he had

1    some information, right?

2    A.  No, that is not correct.

3    Q.  Well, was there a substantive discussion about the

4    information on the phone at the time?

5    A.  No, because someone yelled in the background, "Don't

6    give the cops anything, you'll end up dead."

7    Q.  Well, wait a minute.  At that point --

8    A.  Then he said --

9    Q.  At that point when you say somebody yelled, "Don't give

10   the cops any information," hadn't Ricky Evans already

11   identified Treas Carter as shooter of his cousin, the murder

12   of his cousin, hadn't he done that?

13   A.  I thought we were talking about the Tiffany Moore

14   murder.

15   Q.  Right.  You say you had a conversation on June 21st,

16   1989, in the middle of the conversation he said something to

17   you about Tiffany Moore, you heard someone in the background

18   say, "Don't say anything or you'll get killed," right?

19   A.  No.  What I heard was, "Don't tell the cops anything,

20   you'll end up dead."

21   Q.  But at that point in time --

22   A.  Then -- can I answer the question, please?

23   Q.  At that point in time --

24        THE COURT:  Let the witness finish the answer.

25   Anything further with respect to what you overheard on the

1    phone?

2              THE WITNESS:  Then, excuse me, then Mr. Evans told

3    me that he couldn't talk right now, he hung up and called me

4    back a few minutes later.

5              THE COURT:  Okay.  Now your question.

6              MS. SCAPICCHIO:  Thank you.

7    Q.  The statement is that you say you heard in the

8    background, "Don't tell the cops anything or you'll end up

9    dead."  That was on June 21st of 1989, right?

10   A.  I know it was June.  I'm not sure I'm correct on the

11   21st.

12   Q.  By June 21st of 1989, Ricky Evans had been shot,

13   right?

14   A.  That's correct.

15   Q.  And his cousin had been murdered, right?

16   A.  That's correct.

17   Q.  And he had talked to the police about Treas Carter,

18   right?

19   A.  That is correct.

20   Q.  And he had picked out a photograph of Treas Carter,

21   right?

22   A.  That is correct.

23   Q.  He was cooperating with the Boston Police Department,

24   right?

25   A.  That is correct.

1    Q.  Okay.  Now, and then he had actually testified in front
2    of the grand jury at that point, right, on the Treas Carter
3    case?
4    A.  I believe that is true.
5    Q.  So he had told you about Treas Carter, he had picked out
6    a photo array and he had testified to the grand jury
7    regarding Treas Carter, right?
8    A.  Correct.
9    Q.  Okay.  But you heard someone say on the phone, "Don't
10   say anything to the cops or you'll end up dead," right?
11   A.  That is correct.
12   Q.  Now, what prompted -- what did Ricky Evans say to you?
13   You asked him, "Do you know anything about Tiffany Moore?"
14   What did he say?
15   A.  He said, "I had some information, I meant to tell you
16   the last time I saw you, but I didn't."  Then I asked him,
17   "Why didn't you tell us?"  That's when I heard the voice
18   come over in the background, and that is when he said, "I
19   got to hang up," and he hung up.  I don't recall if he said
20   he'd call me right back, but he did.
21   Q.  So you asked him if he knew anything about
22   Tiffany Moore, and he said, "I meant to tell you and I
23   forgot," then you heard the voice?
24   A.  Would you repeat the question?
25   Q.  Sure.  You're talking to Ricky Evans on the phone, you

113

1  asked him if he knew anything about the Tiffany Moore

2  murder, he told you, according to you, "I meant to tell you

3  before," and that's when the voice comes, right?

4  A.  That's my recollection, correct.

5  Q.  So how did the person that makes that statement know you

6  had asked about Tiffany Moore?

7          MS. HARRIS:  Objection.

8          THE COURT:  Overruled.

9  A.  I have no idea.  All I can tell you is what I heard over

10  the phone.

11  Q.  So, you don't mention Tiffany Moore, according to your

12  testimony, or Ricky Evans doesn't even mention the name

13  Tiffany Moore, doesn't mention the name Shawn Drumgold,

14  doesn't mention the name Terrance Taylor, and somehow while

15  he's talking to you, who he had been talking to for six

16  months, somebody in the background says, "Don't say anything

17  to the cops or you'll be killed?"  Is that your testimony?

18  A.  That's my exact testimony, yes.

19  Q.  Okay.  So that's time No. 1, June 21st, 1989.  That's

20  the whole conversation you had with him right then, right?

21  A.  No.  He called me back a few minutes later.

22  Q.  And said?

23  A.  And gave me some information.  I typed the report, and I

24  gave it to the district attorney.

25  Q.  What information did he give you the second time?

1    A.  The second time?

2    Q.  You talked to him first?

3    A.  Okay.

4    Q.  He had to hang up because somebody was warning him not

5    to talk to you about the Tiffany Moore case, even though you

6    didn't mention that?

7    A.  Correct.

8    Q.  Now, the second time when he called you back, what did

9    he tell you?

10   A.  He told me that he had some information about

11   Shawn Drumgold and Terrance Taylor, that he was outside

12   118 Elm Hill Ave. with them earlier in the evening.  He

13   stated that they left, they come back later and they bought

14   a case of beer and were drinking.

15   Q.  Is that the substance of the conversation you had with

16   him the second time you spoke to him?

17   A.  That's all I can think of at the moment.  I don't recall

18   if there was more.

19   Q.  Well, if there were additional details, would you have

20   documented them in some way?

21   A.  Yes, I did document them, and I submitted it to the

22   district attorney.

23   Q.  Okay.  As you sit here today, that's the substance of

24   the second conversation that you had with Ricky Evans

25   regarding Tiffany Moore; is that right?

1          MS. HARRIS:  Objection.  That's not what he

2     said.

3          THE COURT:  Rephrase the question.

4          MS. SCAPICCHIO:  Sure.

5     Q.  Was that the substance of the second conversation that

6     you had with Tiffany Moore, about Tiffany Moore with

7     Ricky Evans?

8     A.  That's all I can remember at this time.

9     Q.  Okay.  Now, when's the third time you spoke to

10    Ricky Evans?

11    A.  I believe it was August 6th, 1989.

12    Q.  And is that when you took him to take the tape recorded

13    statement?

14    A.  That's correct.

15    Q.  And did you have conversation with him before you went

16    on tape?

17    A.  Yes, I believe I did.

18    Q.  Did he say anything different than what you said when he

19    was on tape?

20    A.  I'm not sure I understand the question.

21    Q.  Sure.  You took a tape recorded statement of Ricky Evans

22    on August 6th of 1989; is that right?

23    A.  Yes.

24    Q.  And you said in the tape recorded statement that you

25    guys had talked before, right?  Isn't that what you said in

1    the tape recorded statement, you had spoken to Mr. Evans

2    before the tape went on?

3    A.   That's probably true.

4    Q.   Okay.  Did he tell you anything different than what he

5    said on tape when you spoke to him before the tape recorder

6    went on?

7    A.   He told me about some guns and the budge of

8    Shawn Drumgold and Terrance Taylor.

9    Q.   That's what he said on tape, Detective Callahan.  I'm

10   asking you did he say anything different from what he said

11   on tape when you spoke to him before the tape recorder went

12   on?

13              MS. HARRIS:  Objection.

14              THE COURT:  Overruled.

15   A.   My memory is I interviewed him, then I put him on tape.

16   I assume what he told us on tape was the same info that he

17   had told us prior before we went on tape.

18   Q.   If he had said something different, Detective Callahan,

19   you would have had to report that, that would have been an

20   inconsistency, right?

21   A.   I don't have a great recollection of it, however

22   everything he said prior is on the tape that I asked him.

23   Q.   Okay.  So he didn't say anything different prior to

24   going on tape than he said when he was on tape; is that

25   right?

1   A.   I assume what's on the tape is what I asked him just

2   prior to putting him on tape.

3   Q.   And you assume that because if he said anything

4   different, you'd have to tell someone, right, it would be a

5   prior inconsistent statement, right?

6   A.   I don't recall anything different.

7   Q.   So, my question again is, whatever he said on tape that

8   day is all you knew about Ricky Evans that day, right?

9   A.   Whatever he said on tape, yes.

10  Q.   Okay.  Now, the conversation you had with him before the

11  tape recorder went on was not any different from the

12  conversation you had with him when the tape recorder was

13  running; is that right?

14  A.   I believe so, yes.

15  Q.   Okay.  So those are three separate conversations.  Were

16  there any other conversations that you had with Mr. Evans?

17          MS. HARRIS:  Objection.  Could we just ask about

18  what these conversations are?

19          THE COURT:  Sustained.

20  Q.   When is the next time you spoke to Mr. Evans?

21  A.   After August 6th, 1989?

22  Q.   That's correct.

23  A.   I don't have a memory of that.

24  Q.   Did you speak to him again at all before the trial?

25  A.   I'm sure I did, but I don't have a memory of that.

1  Q.  Where did you speak to him?

2  A.  It wasn't at the hotel, I know that, until

3  September 12th of 1989.  I may have spoken to him between

4  then.  I just don't recall.

5  Q.  Well, sir, where did you find him?

6  A.  That was a tough --

7          MS. HARRIS:  Objection.

8          THE COURT:  Overruled.

9  Q.  Where did you find him?

10  A.  I had some difficulty finding Ricky.

11  Q.  So, how many times do you believe you spoke to him

12  between August 6th of 1989 and the day that he testified at

13  the Shawn Drumgold trial on October 4th of 1989?  How many

14  times, Detective Callahan?

15  A.  Well, I know I got him to the D.A.'s Office to be

16  briefed by the district attorney.  I believe I took him to

17  the courthouse on two occasions.  I'd have to say at least

18  three.

19  Q.  Three times between August 6th of 1989 and October 4th

20  of 1989?

21  A.  That's my best memory at the moment, yes.

22  Q.  Did you write any reports?

23  A.  No.

24  Q.  The first time that you spoke to him after August 6th of

25  1989, what did you talk about?

1    A.   On August 6th?

2    Q.   After August 6th, the first time you spoke to him, you

3    said you spoke to him three times after August 6th, 1989?

4    A.   One was I got him to the district attorney's to speak to

5    assistant district attorneys handling the case, the other

6    two that I have a memory of is I really didn't speak to him,

7    I got him to the court to testify on that trial.

8    Q.   Okay.  And you wouldn't speak to him on the way into the

9    courthouse about the details of the investigation, would

10   you?

11   A.   No, I would not.

12   Q.   And you wouldn't discuss anything with him on the way

13   into the courthouse, on the way out of the courthouse,

14   right, about the details of the Tiffany Moore homicide?

15   A.   No, I would not.

16   Q.   Did he volunteer any information to you during those

17   rides?

18   A.   Not that I'm aware of.

19   Q.   Well, had he volunteered the information, sir, would you

20   have reduced it to a report?

21   A.   Yes, or I would have brought it to the attention of the

22   district attorney, yes.

23   Q.   Okay.  So, we have the June 21st first telephone call,

24   we have the June 21st second conversation that you had with

25   him, we have the August 6th statement, then we have three

1    additional times that you spoke to him, one that you took

2    him to the district attorney's office, right, and two

3    additional times; is that right?

4    A.   No.  I also spoke to him on September 12th, 1989.

5    Q.   And what did you speak to him about on September 12th,

6    1989, sir?

7    A.   I got a phone call from him that a private investigator

8    had come to his house and that he was quite upset and felt

9    threatened, so I went to the house and spoke with Ricky.

10   Q.   You spoke with Ricky at that time?

11   A.   Yes.

12   Q.   Did you put him in the Howard Johnson's?

13   A.   Yes, I did.

14   Q.   Did you talk to the prosecutor before you put him in the

15   Howard Johnson's?

16   A.   No, not at that time.

17   Q.   Now, sir, those conversations that you had with

18   Mr. Evans, the June 21st, the August 6th, the conversation

19   that you say you had with him when you brought him into the

20   district attorney's office, during those conversations, did

21   Mr. Evans mention anything other than what's contained in

22   this August 6th statement and your September 12th report?

23          MS. HARRIS:  Objection.  Other than about the

24   Tiffany Moore case?

25          MS. SCAPICCHIO:  Tiffany Moore case, yes.

1   A.   I don't have a present memory of that.

2   Q.   Any other meetings that you had with Mr. Evans from the

3   time that you first spoke to him about the Tiffany Moore

4   case on June 21st of 1989 through his trial testimony on

5   October 4th of 1989?

6   A.   Whatever I had, I reported.

7   Q.   Well, sir, but you didn't make reports about the times

8   you spoke to Ricky Evans because you just told us that,

9   right?

10  A.   When I took him to the court to see the district

11  attorney other than August 6th, that's correct, I didn't.

12  Q.   Did you do anything else of significance that you didn't

13  report?

14          MS. HARRIS:  Objection.

15          THE COURT:  Overruled.

16  A.   There was nothing to report.

17  Q.   Okay.  Well, let's talk about the photo array then.  Is

18  a photo array identifying a suspect in a homicide, is that a

19  significant event as a homicide detective?

20  A.   I would say that is reportable, yes.

21  Q.   Okay.  Now, in this case, Mr. Evans, did you forget that

22  you had talked to, I'm sorry, Mr. Callahan, you had talked

23  to Mr. Evans about a photo array, right?

24  A.   No, I did not talk to Mr. Evans about a photo array.

25  Q.   Did you show him three photos?

1   A.   No, I showed him two photos.

2   Q.   Showed him two photos?

3   A.   That is correct.

4   Q.   Which two photos did you show him, sir?

5   A.   Shawn Drumgold and Terrance Taylor.

6   Q.   When did you show him those photos, sir?

7   A.   On August 6th, 1989.

8   Q.   Where is the report?

9   A.   I taped him and I didn't put it on the tape.

10  Q.   Where is the report, sir, of him picking out a photo of

11  Shawn Drumgold or Terrance Taylor on August 6th of 1989?

12  Where is it, sir?

13  A.   I don't have it.

14  Q.   Did you ever create a report of the conversation you say

15  you had with Mr. Evans when he picked out a photo of

16  Shawn Drumgold?

17  A.   No, I don't believe I did a report.

18  Q.   Now, sir, at that point in 1989, you had been a

19  detective for how long?

20  A.   Many years.

21  Q.   Okay.  Many years.  How many?

22  A.   Nineteen, twenty.

23  Q.   Twenty years.  And you understood the procedures that

24  you needed to go through on a photo array, didn't you,

25  sir?

1    A.  I didn't show a photo array.

2    Q.  Sir, I'm asking you whether or not with 20 years as a

3    homicide detective you understood the procedures involving

4    photographic identification.  Did you understand that,

5    sir?

6    A.  Yes, I did.

7    Q.  Okay.  And is it fair to say, sir, that the procedure is

8    you conduct an array, you put together a series of

9    photographs, at least six photographs where you would ask a

10   witness whether or not they can recognize anyone?  That's

11   standard operating procedure, right?

12   A.  No.

13   Q.  No, okay.  Well, how many other occasions, Detective

14   Callahan, did you show a single photo to a witness in a

15   homicide case?  How many other times?

16          MR. ROACHE:  Objection, your Honor.

17          THE COURT:  Overruled.

18   A.  It is my understanding --

19   Q.  Sir, how many other times?

20          MR. CURRAN:  Can he answer the question?

21   Q.  How many other times?

22   A.  I have no idea.

23   Q.  More than a hundred?

24   A.  I can't think of another case.

25   Q.  You can't think of a single other case where you showed

1    a single photo of a defendant to a witness?

2    A.  I know I've done it, I just can't think of a case.

3    Q.  Did you tell the prosecutor about it?

4    A.  I'm sure I did.

5    Q.  You're sure you did, but you don't have a report; is

6    that right?

7    A.  That is correct.

8    Q.  Okay.  Now, you remember when you testified back in 2003

9    you said you didn't tell the prosecutor about the photo

10   array, that that was a blunder by you; do you remember that

11   testimony?

12   A.  And I admit that today.  That is an error.  There isn't

13   any question about it, I did not put it on the tape.

14   Q.  Not that you didn't put it on the tape, that you didn't

15   tell the prosecutor about it, that's what you said in 2003,

16   right?

17   A.  I have no idea.  I don't have a memory of that.

18   Q.  You don't have a memory of telling the prosecutor about

19   the photo array?

20   A.  I don't have --

21        MS. HARRIS:  Objection.

22   A.  I don't have a memory of the question in 2003.

23        THE COURT:  Are you asking about the 2003

24   question, or are you asking about what had happened in 1989?

25        MS. SCAPICCHIO:  I was asking about what happened

1    in 1989 as to whether or not he told the prosecutor in 1989

2    that he had shown two photos of Mr. Drumgold and Mr. Taylor,

3    according to your testimony, to Mr. Evans.

4            MS. HARRIS:  I'll object.

5            THE COURT:  Overruled.

6    Q.  Did you tell the prosecutor, Detective Callahan?

7    A.  I assume I did.

8    Q.  You assume you did?

9    A.  Yes.

10   Q.  And in 2003 when I asked you the exact same question,

11   Detective Callahan, is it fair to say that you told me back

12   in 2003 that you never told the prosecutor?

13           MS. HARRIS:  Page and reference.

14   Q.  Do you remember being asked questions at the motion for

15   new trial hearing back in 2003?  Do you remember being asked

16   questions about whether or not you showed photographs to

17   Mr. Evans at the time?  This is page 7.  I'm sorry.  It's

18   page --

19           MS. SCAPICCHIO:  Let me just have one minute.  I

20   know I have it.

21   Q.  Now, so, Mr. Evans, that photo array you say took place

22   on August 6th of -- I'm sorry, August 6th of 1989, you never

23   documented it in any way; is that right?

24   A.  I never showed a photo array.  I showed singular

25   photographs of Shawn Drumgold and Terrance Taylor.

1  Q.  Sir, is it standard operating procedure in the Boston

2  Police Department to show single photo arrays to a witness

3  who hasn't previously identified the suspect?

4          MS. HARRIS:  Objection.

5  Q.  Is it standard operating procedure, sir?  Yes or no.

6  A.  It is if the individual --

7          THE COURT:  The objection is overruled.  Go on.

8  A.  It is if the individual is known by the person on a

9  continuous basis on a period of time, it is my understanding

10  of the law that's permissible, and that's what I did.

11  Q.  So, sir, the conversation that you had with Mr. Evans on

12  October -- I'm sorry, on June 21st, 1989, he never mentioned

13  Shawn Drumgold, did he?

14          MS. HARRIS:  Objection.

15          THE COURT:  Overruled.

16  A.  Would you repeat the question, please.

17  Q.  On October 21st, 1989, the first phone call you had with

18  Mr. Evans, there's no mention of Shawn Drumgold, do you

19  believe?

20          MS. HARRIS:  Objection.

21          THE COURT:  Do you mean October '88 or '89?

22          MS. SCAPICCHIO:  '89.

23          MS. HARRIS:  You mean June.

24  Q.  June of '89, June 21st of 1989, your first conversation

25  with Mr. Evans, there's no mention of the word

1   Shawn Drumgold, right, the very first conversation where you

2   get interrupted by that person who can apparently hear you

3   on the phone?

4   A.  I believe, if my memory serves me correct, I think that

5   is correct.

6   Q.  Then you have a second conversation where he tells you

7   Shawn Drumgold did it, right?

8           MS. HARRIS:  Objection.

9           THE COURT:  Overruled.

10  A.  He mentioned --

11  Q.  Then he put it on tape?

12          THE COURT:  Wait, let the witness answer.

13          MS. SCAPICCHIO:  Sure.

14  A.  He mentioned Shawn Drumgold and Terrance Taylor.

15  Q.  Okay.  And then you put him on tape, right, on

16  August 6th?

17  A.  On August 6th, yes.

18  Q.  So, where is it, sir, on the tape statement of Mr. Evans

19  that he tells you he knew Shawn Drumgold?  Can you find

20  that, sir, in his tape recorded statement where he tells you

21  he knew Shawn Drumgold?

22  A.  I forgot my glasses.

23          THE COURT:  Well, you need glasses.

24          THE WITNESS:  Sorry, your Honor.

25          THE COURT:  That's okay.  Although any of us can

128

1   give you ours.

2          MS. SCAPICCHIO:  Can I put it on the document

3   camera, would that help?

4          THE WITNESS:  I'm squeaking through this.

5          THE COURT:  This is important.  I literally will

6   give you mine, but then I can't see anything.

7   A.  He states that, "Yes, me and Shawn and Willie were

8   standing on the corner of Sonoma and Elm Hill."

9   Q.  He doesn't tell you that he knew Shawn Drumgold from the

10  neighborhood, does he, sir?

11  A.  No, but that's his statement.

12  Q.  Sir, you said before he went on tape you showed him the

13  two photos, right?

14  A.  I don't think I said before we went on tape.

15  Q.  Oh, okay.  So you go on tape --

16  A.  I don't believe I ever stated it was before we went on

17  tape.

18  Q.  -- then you showed him the photos; is that right?

19  A.  Yes, that is correct, I believe, if my memory was

20  correct, it was after I took the statement.

21  Q.  Okay.  So after he tells you that it's Shawn Drumgold,

22  you show him a single photograph of Shawn Drumgold?

23  A.  I asked him, "Who's this?"  He says, "That's Shawn."

24  Q.  Sir, you know as in your experience, 20 years as a

25  detective in the Boston homicide unit that you don't show a

1  single photo of a suspect in a homicide to a witness, do

2  you?

3  A.  I did, and I believe it was legal, and that's why I did

4  it.

5  Q.  Well, but, sir, you didn't have a single conversation

6  with him that you can point to that he said he knew who

7  Shawn Drumgold was.  How do you know it wasn't somebody

8  else?

9         MS. HARRIS:  Objection.

10        THE COURT:  Overruled.  Go on.

11 Q.  How do you know he wasn't mistaken, sir?  How do you

12 know that?

13 A.  That's why I asked him, "Who's this?"

14 Q.  Sir, how did you know he wasn't mistaken?  When you

15 showed him that single photo, how did you know he wasn't

16 mistaken?  How did you know he didn't mean Shawn Rowell or

17 somebody else in the neighborhood from the conversation?

18 How did you know that, sir?

19        MS. HARRIS:  Your Honor, can we have one question?

20        THE COURT:  Objection is overruled.  Go on.

21 A.  Because it was a photo of Shawn Drumgold.

22 Q.  But that assumes that Mr. Evans is telling the truth,

23 right?  You have no way of knowing that when you talk to him

24 on August 6th of 1989, do you, sir --

25 A.  No, I assume.

1    Q.   -- unless you were feeding him the information?

2    A.   That never happened.

3            MR. CURRAN:  May he finish the question, your

4    Honor?

5            THE COURT:  He can finish the answer, yes.

6            MR. CURRAN:  The answer.

7    A.   I assume he was acting in good faith.

8    Q.   Well, sir, you make those assumptions about a witness

9    who you had talked to for six months who didn't say a

10   single, solitary thing about the Tiffany Moore homicide, you

11   made that assumption then?

12   A.   When I spoke to him on that evening on June 21st, he had

13   told me that when we had showed the photo array given to us

14   by New York City PD that he had meant to tell us then.  I

15   don't know if I had any contact in between after the photo

16   array.

17   Q.   You're talking about Treas Carter, that's not what we're

18   talking about here, we're talking about you, a 20-year

19   detective in the homicide unit, showing a single photo to a

20   witness who had never even said he knew who Shawn Drumgold

21   was, right?

22           MS. HARRIS:  Objection.

23           THE COURT:  Overruled.

24   A.   My understanding is he knew who Shawn Drumgold was.

25   Q.   From what, Detective Callahan, because you had three

1    conversations with him, he didn't tell you on the 21st, when

2    you spoke to him in June, right, he didn't tell you I know

3    Shawn because you said you didn't have any information, he

4    didn't tell you when you sat down with the district

5    attorney's office, and he didn't tell you before the

6    statement, so how did you know, Detective, how were you sure

7    that it was okay, it was legal for you to show him a single

8    photo unless you gave him the information?

9              MS. HARRIS:  Objection.

10             THE COURT:  Overruled.

11   A.  First of all, that never happened.  Second of all, on

12   the second telephone call on June 21st, 1989, he told me

13   that he was with Shawn Drumgold and Terrance Taylor.

14   Q.  But you don't know if he's talking about the

15   Shawn Drumgold that you know as Shawn Drumgold or somebody

16   else using Shawn Drumgold's name, do you?

17   A.  To my knowledge, there was only one Shawn Drumgold and

18   one Terrance Taylor in the neighborhood.

19   Q.  You don't know who he's talking about, do you, sir?

20   Isn't the way to find out who a witness is talking about,

21   put them in a photo array and say which guy are you talking

22   about?  Isn't that what you do?

23   A.  Sometimes, yes, that is what I do.

24   Q.  But you didn't do that in this case, did you?

25   A.  No, I didn't because he knew him.

1   Q.   Instead, you showed him a single photograph?

2          THE COURT:  Okay, we're going over the same

3   territory now several thousand times.  The witness can

4   answer.

5          MS. SCAPICCHIO:  I'll move on.

6          THE COURT:  Why don't you move on.

7   Q.  Now, sir, other than the June 21st, the August 6th and

8   now we have the photo identification, any other information

9   you get from Ricky Evans regarding Shawn Drumgold?

10  A.   Not that I recall.

11  Q.   Did you ever have any conversations with Mr. Evans

12  regarding any other witnesses in the case?  Specifically did

13  you ever have any conversations with Mr. Evans regarding

14  Eric Johnson?

15  A.   Not to my knowledge, no.

16  Q.   Would you have discussed other witnesses with Mr. Evans

17  and not reduced it to writing, sir?

18  A.   I don't believe that happened.

19  Q.   Sir, that's not my question.  My question is would you

20  have discussed other witnesses with Mr. Evans and not

21  reduced it to writing?  Would you have done that, sir?

22  A.   I don't believe I did.

23  Q.   You would not have?

24  A.   No.

25  Q.   Did you discuss with Ricky Evans at any point the name

1    Tyronne Brewer?

2    A.  I believe he brought up the name Tyronne.

3    Q.  I'm sorry.

4    A.  I believe he brought up on the taped interview I think

5    Tyronne come up.

6    Q.  On the taped interview?  Sir, can you find the name

7    Tyronne Brewer in the taped interview anywhere?

8    A.  Excuse me, it was Keith Butler.

9    Q.  So, let's focus on Tyronne Brewer.  Did you ever have a

10   conversation with Mr. Evans that you didn't reduce to

11   writing regarding Tyronne Brewer?  Yes or no, sir.

12   A.  No, I don't believe I did.

13   Q.  I'm going to direct your attention to the voir dire of

14   September 26th of 1989.  This is page 61.

15           MS. SCAPICCHIO:  May I approach the witness, your

16   Honor?

17           THE COURT:  Yes.

18   Q.  You're under oath at this time, Detective Callahan.  Can

19   you read that, see if it refreshes your memory regarding

20   what you told the Judge back in 1989?

21           THE COURT:  Page 61.

22           MS. SCAPICCHIO:  61.

23   A.  Yes, I've read this.

24   Q.  And, sir --

25           MS. SCAPICCHIO:  May I approach the witness?

134

1          THE COURT:  Yes.

2     Q.  Does that refresh your memory as to whether or not in

3     1989 when you were asked about your conversations with

4     Ricky Evans you told the Judge back then that Ricky Evans

5     during the summer months told you about Tyronne Brewer?

6     A.  Yes, apparently.

7     Q.  And did you reduce that conversation to writing, sir,

8     the conversation that you say you had with Ricky Evans

9     regarding Tyronne Brewer?  Did you reduce that to writing,

10    sir?

11    A.  No, I did not.

12    Q.  Now, sir, did you ever have any other conversations with

13    Ricky Evans other than the report that we don't have about

14    the photos, the report that we don't have about Tyronne

15    Brewer, were there other conversations that you had with

16    Mr. Evans?

17    A.  I don't recall.  My last interview of Ricky Evans was on

18    September 12, 1989.  Other than that, all I did was pick him

19    up, bring him to the district attorney's office or bring him

20    to the court.

21    Q.  But you told the Court back in 1989 you had a

22    conversation with him about Tyronne Brewer, didn't you?

23    Isn't that what you said, sir?

24    A.  Tyronne Brewer is familiar to me.

25    Q.  Sir, did you tell the Court back in 1989 you had a

1    conversation with Ricky Evans regarding Tyronne Brewer?

2    A.  Yes.

3    Q.  Now, sir, other than Tyronne Brewer that we don't have a

4    report about, about the photo array that we don't have a

5    report about, other than the Howard Johnson's we don't have

6    a report about, did you talk to Mr. Evans about

7    Michelle Payne?

8    A.  That name is familiar to me.

9    Q.  Did you talk to Mr. Evans about Michelle Payne?

10   A.  I don't have a present memory.

11   Q.  Well, sir, did you ever write a report about talking to

12   Mr. Evans about Michelle Payne?

13            MS. HARRIS:  Objection.

14            THE COURT:  Overruled.

15   A.  I don't recall.

16   Q.  Sir, it's fair to say with respect to Mr. Evans, there's

17   a June 21st, a September 12th report, and an October 6th

18   statement, and that's it, right?

19   A.  That name is very familiar to me.

20   Q.  Sir, that's not the question.  With respect to

21   Mr. Evans, there's an October 21st report, there's an

22   August 6th statement and a September 12th report; is that

23   right?

24   A.  That is correct.

25   Q.  Okay.  And it's fair to say none of those mention

1    Tyronne Brewer; is that right?

2    A.  That is correct.

3    Q.  So you must have had another conversation with

4    Ricky Evans regarding Tyronne Brewer or you wouldn't have

5    told the Court that?

6    A.  Or with someone else.

7    Q.  You didn't tell the Court, Ricky Evans told you about

8    Tyronne Brewer; isn't that what you said in '89?

9    A.  That is correct.

10   Q.  So you had to have another conversation with Mr. Evans

11   that you didn't reduce to writing, right?

12   A.  Either that or I got Keith Butler mixed up with Tyronne

13   Brewer.

14   Q.  You think you might have got Keith Butler mixed up with

15   Tyronne Brewer.  Let's start with page 66.  This was a

16   pretrial hearing where you were specifically asked how you

17   got to Tyronne Brewer, and your explanation back then in

18   1989 was through Ricky Evans.  That's what you told the

19   Court back in '89, right?

20   A.  That's correct.

21   Q.  Was that a lie, Detective Callahan?

22   A.  No.  It was the truth at the time.

23   Q.  Did the truth change somehow between then and now?

24   A.  I believe I used a matrix in answering those questions.

25   Unless there was a typo on the matrix, I must have done

137

1   it.

2   Q.  You told the Court at the time and you were under oath

3   at the time?

4   A.  That's correct.

5   Q.  And back in '89 your memory was fresher than today,

6   right?

7   A.  I would hope so.

8   Q.  You told the Court back in '89 you did have a

9   conversation with Ricky Evans regarding Tyronne Brewer?

10  A.  I did.

11  Q.  My next question, did you have a conversation that you

12  didn't reduce to writing with Ricky Evans regarding

13  Michelle Payne?

14  A.  I know the name Michelle Payne.  I don't have a memory

15  of talking to Ricky.  I may have.

16  Q.  When would that have been, sir?

17  A.  I don't recall.

18  Q.  You told us you only talked to him on the 21st, when you

19  brought him in to see the D.A., you didn't talk to him at

20  all, you took a tape recorded statement, and then you met

21  with him on September 12th.  When would it have been you

22  talked to him regarding Michelle Payne?

23  A.  I don't recall.

24  Q.  Did you reduce that one to writing, sir?

25  A.  No, I did not.

138

```
1    Q.  So we have the photo array, we have the conversation

2    with Tyronne Brewer, we have the conversation regarding

3    Michelle Payne; is that right?

4    A.  That's correct.

5    Q.  And those are three times that you spoke to Ricky Evans

6    that you didn't generate a report, correct?

7            MS. HARRIS:  Objection.  Can I have an offer of

8    proof, please?

9            MS. SCAPICCHIO:  Sure.  May I approach the

10   witness, your Honor?

11           THE COURT:  Yes.

12   Q.  This is page 66 of the same pretrial hearing.  Did you

13   tell the Judge, Judge Alberti, at page 66 at the bottom --

14           MS. SCAPICCHIO:  And I would offer this, Judge, at

15   this present time as a prior statement of the defendant.

16           THE COURT:  Is this in the trial transcript?

17           MS. SCAPICCHIO:  This is in the pretrial

18   hearing.

19           THE COURT:  So that's not already offered?

20           MS. SCAPICCHIO:  It's not.

21           THE COURT:  All right.

22           MS. HARRIS:  I'm asking for an offer of proof for

23   Charlene.

24           MS. SCAPICCHIO:  Michelle, Michelle Payne.

25           MS. HARRIS:  You're asking has he ever reported
```

1    it?

2           MS. SCAPICCHIO:  No, I'm not, I'm asking whether

3    he ever had a conversation with Michelle Payne.

4           MS. HARRIS:  It's in the report.

5           MR. CURRAN:  It's in the interview.

6           THE COURT:  Wait, wait, wait, first you have a

7    document which purports to be a prior inconsistent statement

8    of a defendant?

9           MS. SCAPICCHIO:  That's correct.

10          THE COURT:  That's what you're seeking to admit?

11          MR. CURRAN:  Judge, could we be seen at sidebar?

12    In the prior inconsistent statement we have to show you

13    something because it's not a prior inconsistent statement.

14          THE COURT:  Okay, counsel.

15          MS. SCAPICCHIO:  Judge, let me ask another

16    question to clear it up.

17    Q.  Do you ever remember having a conversation with

18    Ricky Evans where Ricky Evans said to you Lug gives coke to

19    a girl name Michelle and Tyronne Brewer's sister Cheryl; do

20    you ever remember saying that, sir?

21    A.  I remember that, yes.

22    Q.  So you had another conversation with Mr. Evans regarding

23    Lug giving coke to a girl name Michelle and Tyronne Brewer?

24    A.  That would have either been in the June 21st report or

25    the August 6th tape.

1    Q.  And, sir, you testified about that in 1989; is that

2    right?

3              MR. CURRAN:  Judge, could we be seen, please?

4              THE COURT:  Okay, sidebar.

5              (THE FOLLOWING OCCURRED AT SIDEBAR:)

6              MR. CURRAN:  Judge, the objection is it's a

7    misstatement, it is untrue.  The name Michelle Payne is in

8    the August 6th statement.  She's making suggestions to this

9    jury.

10             THE COURT:  Keep your voice down.

11             MR. CURRAN:  It never occurred to this jury when

12   she has the statement and she's making misrepresentations.

13             THE COURT:  The point is orally testified about

14   but never in a written report?

15             MS. SCAPICCHIO:  That's correct.

16             THE COURT:  Is there a written report?

17             MS. SCAPICCHIO:  There's now a written report to

18   Lug giving coke to Michelle Payne, that's the conversation,

19   another conversation that he had with Ricky Evans that

20   wasn't reduced to writing.

21             MR. CURRAN:  The question, Judge --

22             MS. SCAPICCHIO:  That's why I asked the

23   question.

24             MR. CURRAN:  Did you ever have a conversation with

25   Ricky Evans about Michelle Payne?

1           THE COURT:  I see.

2           MR. CURRAN:  It's a misstatement of fact before

3  this jury.

4           THE COURT:  You can rephrase your question again

5  and take it from the top.

6           MS. SCAPICCHIO:  Sure.

7           MR. CURRAN:  Thank you, your Honor.

8           (SIDEBAR CONFERENCE WAS CONCLUDED)

9  Q.  Sir, did you have a conversation with Ricky Evans that

10  you reduced to writing regarding him telling you that Lug

11  gives coke to a girl named Michelle and Tyronne Brewer's

12  sister Cheryl, did you reduce that conversation that you had

13  with Mr. Evans to writing anywhere, sir?

14  A.  I believe that and Michelle Payne were on the June 21st

15  report, 1989.  That I have a memory of.

16  Q.  Well, isn't it true, sir, that the report in 1989, that

17  August 6th statement, you ask him the question, "Do you know

18  Michelle Payne," right?  Is that the question that you ask

19  in 1989 on tape, sir?

20  A.  I don't recall.  I may have.  I don't recall.

21  Q.  Page 5 of Mr. Evans' statement.

22           MS. SCAPICCHIO:  Can I have document camera 1.

23           THE COURT:  This is from where, the trial

24  transcript?

25           MS. SCAPICCHIO:  This is Mr. Evans' statement of

1    August 6th, 1989.

2            MS. HARRIS:  This is not an exhibit, but I would

3    be happy to move it in.  We have no objection to recorded

4    statement, transcribed testimony.

5            MS. SCAPICCHIO:  I thought it was a stipulated

6    exhibit, Judge.

7            MR. REILLY:  The transcript was played.

8            THE COURT:  The transcript was played and shown,

9    so is there any inconsistency between your version of the

10   transcript and the transcript that was played and shown?

11           MS. SCAPICCHIO:  Not to my knowledge, no.

12           THE COURT:  Whatever it was.  Do you need this as

13   a separate exhibit or is this already part of the tape

14   recording that has been submitted?

15           MS. SCAPICCHIO:  It's part of the tape recording

16   that has been admitted.

17           THE COURT:  You can use it in this form, but it

18   doesn't have to be separately marked.

19   Q.  Sir, I'm going to direct your attention to the question:

20   "All right.  Do you know Michelle Payne?"

21   A.  Yes.

22   Q.  And anywhere in there is there any information that

23   Ricky Evans told you that Lug gives coke to a girl named

24   Michelle?

25   A.  No, but this is the taped interview, and I'm pretty sure

1    I have a recollection that on the June 21st report that it

2    was on that.

3    Q.  You're pretty sure it was on the June 21st report --

4    A.  Yes.

5    Q.  -- that Ricky Evans told you that Lug gives coke to a

6    girl named Michelle Payne because it doesn't appear in the

7    statement; is that fair to say?

8    A.  It does not appear on this statement.

9    Q.  So you must have had conversation with Mr. Evans about

10   it, right, at some point, right?

11   A.  Yes, that's correct.

12   Q.  And that's another -- did you write a report about that

13   conversation that you had with Mr. Evans regarding Lug

14   giving coke to a girl named Michelle Payne?

15   A.  If I got that information from Shawn, it would have been

16   on that June 21st telephone call and also relative to

17   Michelle.  I reduced that to writing.  If it's not on that,

18   it would be on the August 6th statement.

19              THE COURT:  I'm sorry, are you finished?

20              THE WITNESS:  Yes, your Honor.

21              THE COURT:  Let's stop at this point.  It's one

22   o'clock.  Officer Callahan, would you bring your glasses

23   tomorrow, otherwise we'll provide you with some.

24              THE WITNESS:  Yes, your Honor, I will.

25              THE COURT:  We'll see you tomorrow morning at nine

```
1    o'clock.  All rise for the jury.

2              (Jurors exited the courtroom.)

3              THE COURT:  We'll see you tomorrow.

4              MS. SCAPICCHIO:  Thank you.

5              (Whereupon, the hearing was suspended at

6    1:06 p.m.)

7

8                    C E R T I F I C A T E

9

10   UNITED STATES DISTRICT COURT )

11   DISTRICT OF MASSACHUSETTS    )

12   CITY OF BOSTON               )

13             I, Valerie A. O'Hara, Registered Professional

14   Reporter, do hereby certify that the foregoing transcript

15   was recorded by me stenographically at the time and place

16   aforesaid in No. 04-11193-NG, in re:  Shawn Drumgold vs.

17   Timothy Callahan and thereafter by me reduced to typewriting

18   and is a true and accurate record of the proceedings.

19                         /S/ VALERIE A. O'HARA

20                         _____

21                         VALERIE A. O'HARA

22                         REGISTERED PROFESSIONAL REPORTER

23                         DATED SEPTEMBER 16, 2009

24

25
```