1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3

4

5   SHAWN DRUMGOLD,           )   C.A. No. 04-11193-NG

6            PLAINTIFF      )   Courtroom No. 2

7   VS.

8   TIMOTHY CALLAHAN, ET AL.,)  1 Courthouse Way

9            DEFENDANTS     )  Boston, MA  02210

10

11              JURY TRIAL DAY 7

12             SEPTEMBER 17, 2009

13                9:13 a.m.

14

15

16

17

18

19          BEFORE THE HONORABLE NANCY GERTNER

20          UNITED STATES DISTRICT COURT JUDGE

21

22

23

24             VALERIE A. O'HARA

25           OFFICIAL COURT REPORTER

1    A P P E A R A N C E S:

2        ROSEMARY CURRAN SCAPICCHIO, ATTORNEY, Four Longfellow
     Place, Boston, Massachusetts  02114, for the Plaintiffs;
3
         Tommasino & Tommasino, by MICHAEL W. REILLY, ESQ.,
4    Two Center Plaza, Boston, Massachusetts  02108, for the
     Plaintiff;
5
         Roache & Malone, LLP, by JOHN P. ROACHE, ESQ., 66 Long
6    Wharf, Boston, Massachusetts  02110, for the Defendants.

7        Bletzer and Bletzer, P.C., by HUGH R. CURRAN, ESQ., 300
     Market Street, Brighton, Massachusetts  02135, for the
8    Defendants.

9        Morgan, Brown & Joy, LLP, by MARY JO HARRIS, ESQ., 200
     State Street, Boston, Massachusetts  02109-2605, for the
10   Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                              INDEX

2   EXAMINATION
    Witness Name                   Direct Cross Re-Direct Re-Cross
3
    TIMOTHY CALLAHAN
4       By Ms. Scapicchio          4
        By Ms. Harris                     120
5
    EXHIBITS
6   Exhibit      Description              Identification Evidence

7   M            Two-page document        132

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

PROCEEDINGS

1    THE CLERK:  All rise for the jury.  United States

2    District Court is now in session.

3    THE COURT:  Good morning, everyone.  You can be

4    seated.  Proceed, Ms. Scapicchio.  Mr. Callahan has told me

5    he has his glasses.  He has his glasses.

6    MS. SCAPICCHIO:  Thank you, your Honor.

7                TIMOTHY CALLAHAN, RESUMED

8              DIRECT EXAMINATION, CONTINUED

9    BY MS. SCAPICCHIO:

10   Q.  Detective Callahan, is it fair to say with respect to

11   Ricky Evans and your involvement in this case you generated

12   exactly two police reports?

13   A.  That is my memory, yes.  Excuse me, no, three.

14   Q.  Not counting the statement, there were two reports and a

15   statement, right?

16   A.  Yes.

17   Q.  And so you generated a report on the 21st of June; is

18   that right?

19   A.  Yes.

20   Q.  And you generated a report on September 12th; is that

21   right?

22   A.  Yes.

23   Q.  And then you took a statement from him on August 6th of

24   1989; is that right?

1    A.  Yes.

2    Q.  And other than those three written pieces of paper

3    regarding your involvement with Mr. Evans, did you generate

4    any other reports about Mr. Evans?

5    A.  Yes.

6    Q.  You did.  What's the date of the next report, sir?

7    A.  I generated reports on the other murder.

8    Q.  No, no, no, we're not talking about the Treas Carter

9    case, we're talking about Tiffany Moore, just with respect

10   to Tiffany Moore and the homicide investigation of

11   Tiffany Moore, with respect to Mr. Evans you generated a

12   report you say on June 21st of 1989; is that right?

13   A.  Yes.

14   Q.  A tape recorder statement on August 6th of 1989; is that

15   right?

16   A.  Yes.

17   Q.  And you generated a report on September 12th of 1989; is

18   that right?

19   A.  Yes.

20   Q.  And are there any other reports out there that you

21   generated with respect to your conversations with

22   Mr. Evans?

23   A.  I don't have a memory of it.

24   Q.  Well, did you review your file --

25   A.  Yes.

1  Q.  -- before you came in here today?  Yes, sir, did you?

2  A.  Yes.

3  Q.  And in the file are there any other reports other than

4  the report of June 21st, the statement of August 6th and

5  your report of September 12th of 1989?

6  A.  Not to my knowledge.

7  Q.  And who would have been responsible for writing those

8  reports, sir?

9  A.  Which ones?

10 Q.  If you had conversations with Mr. Evans outside of those

11 three times, who would have been responsible for writing

12 those reports, sir?

13 A.  I would have.

14 Q.  Okay.  Now, can you tell the jury why you wrote the

15 report on June 21st of 1989?

16 A.  I wrote the report as a result of a conversation with

17 Ricky Evans on the murder of Willie Evans.  During the

18 course of the discussion, I asked him if he had any

19 information relative to the Tiffany Moore murder.

20 Q.  Sir, not what's contained in the report, tell the jury

21 why you wrote a report on June 21st of 1989.  Why did you

22 write that report?

23 A.  To give the information to the district attorney.

24 Q.  Okay.  And on September 12th of 1989, when you wrote

25 that report, why did you write that report?

1    A.   To give the information to the district attorney.

2    Q.   Okay.  And was that part of your job to give the

3    information to the district attorney?

4    A.   Yes.

5    Q.   And that's why you wrote reports, to make sure the

6    district attorney got to that information, right?

7    A.   Yes.

8    Q.   Okay.  Now, sir, when you showed Ricky Evans those two

9    photographs, did you generate a report about that?

10   A.   No.

11   Q.   When you showed -- when you had a conversation with

12   Mr. Evans and you put him in the Howard Johnson's, did you

13   generate a report about that?

14   A.   No.

15   Q.   When you allowed Ricky Evans to charge meals to the

16   restaurant, did you generate a report about that?

17            MR. CURRAN:  Objection.

18            THE COURT:  Overruled.

19   A.   No.

20   Q.   Sir, did you generate a report about that?

21   A.   No.

22   Q.   And, sir, when you allowed friends and family members to

23   come visit Mr. Evans at the Howard Johnson's, did you

24   generate a report about that?

25            MR. ROACHE:  Objection.

```
1            THE COURT:  Overruled.
2   A.  I never allowed Mr. Evans to have any visitors at the
3   Howard Johnson's hotel.  Mr. Evans told me during an
4   occasion that he had two friends over.  I reprimanded and I
5   chastised him.  To my knowledge, those are the only two
6   people that ever went to the hotel.
7   Q.  So you never had a conversation with Mr. Evans, did you,
8   when you chastised him?
9   A.  Yes.
10  Q.  Because yesterday you told us you only had three
11  conversations with him, right?
12  A.  No.
13            MS. HARRIS:  Objection.
14            THE COURT:  Overruled.
15  Q.  So, sir, there's another conversation that you had with
16  Mr. Evans when you chastised him about bringing people to
17  the hotel?
18  A.  I wrote three reports.
19  Q.  Not your reports, sir, did you have another conversation
20  with Mr. Evans while he was staying at the Howard Johnson's
21  about bringing people over to the Howard Johnson's?  Yes or
22  no, sir.
23            MS. HARRIS:  May he answer the question, your
24  Honor?
25            THE COURT:  Overruled.  Go on.
```

1   Q.  Yes or no, sir.

2   A.  Could you repeat the question, please?

3   Q.  Sure.  Did you have another conversation with

4   Ricky Evans while he was staying in the Howard Johnson's

5   where you chastised him about bringing people to the

6   Howard Johnson's?

7   A.  I did not write a report on that.

8   Q.  Not a report, sir, did you have a conversation with him?

9   A.  Yes, relative to that.

10  Q.  At the Howard Johnson's?

11  A.  I don't recall where it was.

12  Q.  And did you generate a report about that conversation,

13  sir?

14  A.  No.

15  Q.  Okay.  Now, other than June 21st, August 6th, September

16  12th and the conversations that you told us about yesterday

17  that you had with Mr. Evans and now the one today about

18  chastising him, how many times did you meet with Mr. Evans

19  after you put him in the hotel?

20  A.  After I put him in the hotel, I brought him to the

21  district attorney's office or to the court, that's the only

22  time I had any conversation with him.

23  Q.  Well, sir, you told us yesterday when you were driving

24  him to court, you didn't have any conversation about the

25  case at all, right?

1   A.  I don't recall if I did or I didn't.

2   Q.  You don't recall.  So when did you have the conversation

3   where you chastised him, sir?

4   A.  After he went into the hotel.  I don't know when I had

5   the conversation.  It was some time after September 12th

6   though.

7   Q.  Okay.  So there was a conversation between

8   September 12th and October 4th, when he testified, right?

9   A.  That is correct.

10  Q.  How many times did you visit him at the Howard Johnson's

11  when he stayed there?

12  A.  I only remember -- I only remember going to the

13  Howard Johnson's to pick him up and take him to the court or

14  to take him to Phil Beauchesne's office.

15  Q.  And that was on two occasions?

16  A.  I don't recall how many occasions.

17  Q.  Well, did you make notes when you picked him up and

18  brought him to the D.A.'s office?

19  A.  No.

20  Q.  You didn't?

21  A.  No.

22  Q.  Okay.  Now, sir, you remember being subpoenaed to

23  testify in 2003 at the motion for new trial, right?

24  A.  I have a memory of that, yes.

25  Q.  Okay.  And in 2003, you were still a member of the

1    Boston Police Department; is that right?

2    A.  That's correct.

3    Q.  You had not retired at that point; is that fair to

4    say?

5    A.  Yes.

6    Q.  Okay.  And when you were subpoenaed to testify in the

7    motion for new trial in 2003, did you speak to assistant

8    district attorney -- first of all, who do you remember was

9    representing the Commonwealth in 2003?

10   A.  Mr. Meier.

11   Q.  David Meier?

12   A.  Yes.

13   Q.  Did you have any conversations with David Meier prior to

14   your testimony in 2003?

15   A.  Yes.

16   Q.  Okay.  And do you remember what the substance -- well,

17   how many conversations did you have?

18   A.  Two.

19   Q.  What did you tell him in the first conversation?

20           MR. ROACHE:  Objection.

21           THE COURT:  Overruled.

22   A.  I told him I was very upset on what I was reading in the

23   newspapers, I wanted to know what was going on, and I got an

24   attorney to represent my rights relative to this case.

25   Q.  You brought an attorney?

1    A.   That is correct.

2    Q.   The motion for new trial?

3    A.   That is correct.

4    Q.   Was your attorney sitting in the courtroom at the motion

5    for new trial?

6    A.   No.

7    Q.   Who was it?  Who was your attorney?

8    A.   It was the union lawyer.

9    Q.   So you called David Meier, and you told him you were

10   upset because you had been reading things in the newspaper

11   about this case; is that right?

12   A.   I don't recall calling David Meier.  All I recall is

13   that I got a phone call and a request to see him.  I'm

14   pretty sure I brought a union lawyer with me because I was

15   outraged in what I was reading in the paper.

16   Q.   And was that with respect to Mr. Evans' testimony?

17   A.   Yes.

18   Q.   Okay.  So when you met with Mr. Meier the first time

19   with your union lawyer, did you discuss Ricky Evans?

20   A.   Relative to the newspaper reports, yes.

21   Q.   Okay.  What did you tell him?

22   A.   It's what he told me.  He told me that it was --

23            THE COURT:  Wait a second.  Is what David Meier

24   told him, is that what you're trying to get out, what

25   Mr. Meier told him or what he said?

1          MS. SCAPICCHIO:  I'm trying to get out what he

2     said to Mr. Meier.

3          THE COURT:  I only want to know what this witness

4     said.  Go on.

5     Q.  What did you say to Mr. Meier?

6     A.  I told him I was outraged with the newspaper articles

7     and that I would like to know where all these allegations

8     are coming.  Mr. Meier said to me --

9          MS. HARRIS:  Objection.

10          THE COURT:  Sustained.

11    Q.  Mr. Meier responded to your outrage, did he?

12    A.  He stated --

13    Q.  No, no, no, not what he stated, did he respond to your

14    outrage?

15          MS. HARRIS:  Objection.

16    A.  I don't recall.

17          MS. HARRIS:  Objection.

18          THE COURT:  Overruled.

19          THE COURT:  He did answer, that's all I need, next

20    question.

21    Q.  Did he answer you?

22    A.  I don't recall.

23    Q.  At that point in time, that first meeting that you had

24    with David Meier and your union lawyer, did you tell him

25    what your interaction with Ricky Evans was?

1    A.   I don't have a memory of that.  No, I do not have a
2    memory of him discussing Ricky Evans.
3    Q.   Isn't that why you went to his office because you were
4    outraged about what you read in the newspaper about
5    Ricky Evans?
6           MS. HARRIS:  Objection.
7           THE COURT:  Overruled.
8    A.   I went, after that meeting, I had another meeting with
9    Mr. Meier.
10   Q.   Let's just stick with the first meeting.  The first
11   meeting you had a conversation with him because you were
12   outraged about what you were reading in the newspaper about
13   Ricky Evans' testimony, right?
14   A.   Correct.
15   Q.   Okay.  And during that conversation, you don't know if
16   you talked about Ricky Evans?
17          MS. HARRIS:  Objection.
18          THE COURT:  Overruled.
19   A.   Yes, we did.  He stated --
20   Q.   What did he tell him about Ricky Evans and your
21   involvement with Ricky Evans that first conversation that
22   you had with Assistant District Attorney David Meier?
23   A.   My memory is he stated --
24          MS. HARRIS:  Objection.
25   Q.   Not he, what did you tell him, sir?  Not what he told

1    you, what did you tell him about Ricky Evans --

2              MS. HARRIS:  I'll object.  Asked and answered.

3    Q.  -- in that first meeting?

4              THE COURT:  Overruled.

5    A.  I don't recall telling him anything.

6    Q.  Okay.  Now, you said there was a second meeting that you

7    had with Assistant District Attorney David Meier?

8    A.  Yes.

9    Q.  Was your union attorney present for the second

10   meeting?

11   A.  No.

12   Q.  Who is your union attorney?

13   A.  I don't recall.

14   Q.  Your second meeting that you had with David Meier, where

15   did that take place?

16   A.  At David Meier's office.

17   Q.  Okay.  Was that before you testified at the motion for

18   new trial?

19   A.  Yes.

20   Q.  And at that point did you discuss your involvement with

21   Ricky Evans with Assistant District Attorney David Meier?

22   A.  I don't have any memory of David Meier discussing the

23   case other than informing me --

24              MS. HARRIS:  Objection.

25              THE COURT:  Sustained.

1   Q.   Not what David Meier told you, I'm asking you on the

2   second occasion that you met with Assistant District

3   Attorney David Meier before you testified in 2003 at the

4   motion for new trial, did you tell David Meier what you knew

5   about your involvement with Ricky Evans?

6   A.   No, I have no memory discussing it with him.

7   Q.   And how long did you meet with David Meier on the second

8   occasion without your lawyer?

9   A.   It was a very short discussion.

10  Q.   Okay.  And after -- let me ask you this, do you know

11  when the first meeting took place?

12  A.   No.

13  Q.   Do you know when the second meeting took place with

14  Mr. Meier?

15  A.   No.

16  Q.   And the first time, was it in a phone conversation or

17  was it an actual meeting?

18  A.   On the first occasion?

19  Q.   Yes.

20  A.   It was an actual meeting at his office.

21  Q.   Okay.  Did you ever remember talking to David Meier on

22  the phone regarding this case prior to your testimony in

23  2003?

24  A.   No.

25  Q.   Okay.  Now, after you spoke to David Meier, whatever you

1   spoke about, did you go back to the Boston Police Department

2   and pull the homicide file of Tiffany Moore?

3   A.  No.

4   Q.  Did you review the homicide file?

5   A.  No.

6   Q.  But you were outraged about what Mr. Evans was saying,

7   right?

8   A.  That's correct.

9   Q.  Now, in 2003, when you testified at the motion for a new

10  trial, you answered questions that Mr. Meier asked you

11  regarding your involvement with, specifically with

12  Mr. Evans.  Do you remember being asked questions about

13  Mr. Evans?

14  A.  Yes.

15  Q.  Okay.  And do you remember -- this is at page 227 on

16  August 5th of 2003.  Do you remember being asked by

17  Assistant District Attorney David Meier, "What's your best

18  memory, Lieutenant, as to when you personally became

19  involved in the investigation of that case, referencing the

20  Tiffany Moore homicide?"  Do you remember Mr. Meier asking

21  you that?

22  A.  Yes.

23  Q.  And do you remember your response being approximately

24  May or June of 1989?

25  A.  Yes.

1    Q.   Okay.  And at page 228.

2              MS. SCAPICCHIO:  May I approach the witness?

3              THE COURT:  Yes, you may.

4    Q.  This is August 5th, 2003, Mr. Callahan's testimony

5    starting at page 224.

6              MR. ROACHE:  Your Honor, I'd like to know the

7    reason why she's showing the witness the testimony.

8              MS. SCAPICCHIO:  They're statements --

9              MR. ROACHE:  I don't believe he said.

10             THE COURT:  It doesn't have to be inconsistent, it

11   doesn't have to be refreshing your recollection, this is a

12   statement of the defendant.  It's an admission.

13             MR. ROACHE:  I understand, your Honor.  If he

14   doesn't remember what his testimony was, that's one thing,

15   but if he remembers what his testimony is, there's no reason

16   to show him the documents.

17             THE COURT:  I understand that it's a courtesy to

18   see if he remembers it, that's all.  There's no reason not

19   to.  Go on.

20   Q.  Sir, if you could flip to page 228 of your testimony in

21   2003.  Do you remember Assistant District Attorney David

22   Meier asking you a question at line 21, "During the second

23   incident Ricky Evans was injured."  You're talking about the

24   shooting death of Willie Evans and the shooting of

25   Ricky Evans.  Do you remember being asked about that in

1    2003?

2    A.  Yes.

3    Q.  Okay.  And do you remember being asked questions at

4    page 29, line 16, "Do you have a memory today, sir, of who

5    that individual was and what his name was?"  This was

6    relative to Ricky Evans identifying an individual who had

7    shot Willie Evans and had shot at him.  Do you remember what

8    your answer was?  Can you read that for the jury, sir?

9    A.  "His name was Troy Carter."

10    Q.  Mr. Meier asked you, "Did that individual have a

11    nickname, at least back then?"  What was your answer?

12    A.  "His nickname was Chilly."

13    Q.  Okay.  And if you switch to page 230, line 6, Assistant

14    District Attorney Meier was trying to ask you questions

15    regarding when your first interaction with Mr. Evans was,

16    and he asked you, "And what's your recollection, as best you

17    can recall, of how it was that you first met up with

18    Ricky Evans and how it was that you first spoke to him?"

19    Could you read your answer to the jury?

20         MS. HARRIS:  Your Honor, I object.  This is not

21    inconsistent or admissible as I can see for any other

22    reason.

23         THE COURT:  It's a statement of a defendant.  It's

24    admissible under the rules, you can have it.  Go on.

25    Q.  Can you read your answer, Detective?

1    A.   "It was in regards to the murder of his cousin,

2    Willie Evans, plus two wounds he received in that shooting.

3    We took statements from Ricky Evans and other witnesses

4    attempting to ascertain who the perpetrator was."

5    Q.   Okay.  And Mr. Meier asked you next, "And do you know or

6    do you have a recollection, either independently or having

7    reviewed that file before you testified this afternoon,

8    before Judge Rouse as to the approximate date when you

9    interviewed Ricky Evans?"  Can you read the jury what your

10   answer was back in 2003?

11   A.   "If the murder was on December 18th, 1988, I don't

12   recall the date, but it was immediately after the incident."

13   Q.   And Mr. Meier then asked you, "When you say immediately

14   after the incident, you mean within days or a week?"  Next

15   page, sir, at the top, what was your answer?

16   A.   "Yes."

17   Q.   And Mr. Meier asked you about, "So, let me ask you this,

18   did you review the Treas Carter file before you testified in

19   2003 at the motion for new trial for Shawn Drumgold?"

20   A.   "No."

21   Q.   Okay.  Now, the next question, Mr. Meier asks you, "Do

22   you have a recollection of that case, sir," talking about

23   the Treas Carter case, "as a result of the police

24   investigation Mr. Carter, whose street name or nickname was

25   Chilly, being identified as a suspect and then a warrant

1    being issued from the Roxbury District Court for

2    Mr. Carter?"  What was your answer, sir?

3    A.  "Yes, sir."

4    Q.  The next question, "Do you have a recollection, sir, as

5    a result of your work in that case in December of '88 into

6    early '89 of Ricky Evans at some point in 1989 testifying

7    before the grand jury?"  What was your answer, sir?

8    A.  "I believe he did."

9    Q.  Then Mr. Meier asked you, "Do you have a recollection

10   today in 2003 of when it was that Mr. Evans appeared before

11   the grand jury in this case?"  That is Ricky Evans.  What

12   was your answer?

13   A.  "I don't recall."

14   Q.  And at that point Mr. Meier showed you Mr. Evans'

15   testimony before the grand jury in the Chilly Carter case;

16   is that right?

17   A.  Yes.

18   Q.  Okay.  And does that refresh your memory if you look at

19   line 7 as to when Mr. Evans testified in the grand jury on

20   the Treas Carter case, and what was your answer to

21   Judge Rouse back in 2003 of when that occurred?

22   A.  "May 24th, 1989."

23   Q.  Okay.  And then Mr. Meier asked you about how long, and

24   this is line 17 on page 232, "About how long after May 24th

25   of 1989 when Ricky Evans testified before the grand jury

1   would you estimate as best you can you became involved

2   officially in the Tiffany Moore investigation?"  As best you

3   can, what was your answer, sir?

4   A.   "My best recollection is late May or June."

5   Q.   Okay.  And then the next page, if you switch to page

6   234, sir, at line 11, do you see where David Meier asks you,

7   "At some point during that process, sir, did you meet with

8   the same individual, Ricky Evans?"  Do you remember -- will

9   you read to the jury what your answer was at line 13?

10  A.   Would you repeat the question, sir?

11  Q.   Okay.  At line 14, Mr. Meier asks you, "At some point

12  during that process that you just described, did you meet

13  with the same individual who had testified at the grand jury

14  on December of 1989 case in which you were the investigating

15  officer, that is Mr. Ricky Evans?"  Could you read the jury

16  what your answer was back in 2003?

17  A.   "My best recollection is I contacted him by telephone,

18  and it was in regards to the Treas Carter case or the

19  Willie Evans case, and while we were talking, I asked him

20  information about this Tiffany Moore girl that was killed,

21  and I remember him, he started to talk to me about it,

22  something to the effect, "I meant to tell you something when

23  you showed me the photographs," and then there was someone

24  in the background that made the statement, "You know, don't

25  talk to the cops, you'll end up dead or something."

1    Q.  Okay.  And back then in May of 1989, when he testified

2    before the grand jury on the Treas Carter case, you weren't

3    assigned to the Tiffany Moore case, were you?

4          MS. HARRIS:  Objection.

5          THE COURT:  Overruled.

6    A.  Would you repeat the question, please?

7    Q.  Sure.  Back in May of 1989, May 24th I believe it is,

8    when Mr. Evans testified before the grand jury, you weren't

9    assigned to the Tiffany Moore case then, were you?

10         MS. HARRIS:  Objection.

11         THE COURT:  Overruled.

12   A.  My memory is that I was assigned in May or June of 1989

13   to the Tiffany Moore case.

14   Q.  Okay.  But --

15   A.  The date I don't know.

16   Q.  But the photo array in the Treas Carter case took place

17   well before May or June of 1989, sir, didn't it?

18         MS. HARRIS:  Objection.  This is misstating the

19   report.

20         THE COURT:  The objection is overruled.

21   A.  Repeat the question, please.

22   Q.  Sure.  The photo array in the Treas Carter case, when

23   you actually put together the array --

24   A.  Yes.

25   Q.  -- and you had him sign it and he looked at a bunch of

1    pictures in the Treas Carter case, that took place before

2    May of 1989, didn't it, sir?

3    A.  Yes.

4         MS. HARRIS:  Objection.  May we be seen, your

5    Honor?

6         THE COURT:  No.

7    A.  Yes, it did.

8    Q.  Now, at some point the Court interrupts and says, "I'm

9    sorry," and says, "I didn't hear you."  You repeat the

10   answer to the Court about Ricky Evans.  Can you tell the

11   jury now what you said back in 2003?

12   A.  What line are you talking about?

13   Q.  Line 9, sir, your answer continued.

14   A.  "Don't talk to the cops, you'll end up dead," and Ricky

15   said he had to get off the phone, so he got off the phone

16   and a short time later he called back to homicide, and when

17   he called back to homicide, he informed me that he did have

18   information, and I don't know if he told me at the time what

19   he told us when we met him and took a taped statement, but

20   he may have."

21        "As a result of that, we met him.  We took the

22   taped statement from him, and then we contacted the

23   assistant district attorney who was handling the

24   Tiffany Moore matter and advised him relative to

25   Ricky Evans' statement."

1    Q.   Okay.  So back in 2003, your testimony was that you

2    didn't contact the district attorney until after his

3    statement on August 6th of 2003; is that right?

4              MS. HARRIS:  Objection.  Your Honor --

5              THE COURT:  The objection is overruled.  You'll

6    have an opportunity to cross-examine and correct the record.

7    This is not the way to do it -- go on -- if the record needs

8    correcting.  Go on.

9    A.   Repeat the question, please.

10   Q.   Sure.  Back in 2003, when you were answering Judge

11   Rouse's question under oath, did you tell Judge Rouse that

12   you took a taped statement and then contacted the assistant

13   district attorney who was handling the Tiffany Moore case?

14   Is that what you just said?

15   A.   Yes.

16   Q.   And, sir, if you could flip to page 237 of your

17   testimony at the motion for new trial, and I'm going to

18   direct your attention to question line 12, Assistant

19   District Attorney Meier asks you, "And with respect to the

20   time frame during which you had previously telephoned

21   Mr. Evans, what's your best recollection of how much before

22   that date you called on him, you called him on the

23   telephone?"

24   A.   "It could have been the very next day."

25   Q.   "Okay.  Meaning how much before the taped recorded

1    interview was it that you first called him?"  What was your

2    memory back in 2003, sir?

3    A.   "I don't recall, sir, all I know is I either did it that

4    same night or the following day, and I can't recall if I was

5    on days or nights then."

6    Q.   Now, sir, if you could flip to page 239 of your

7    testimony in 2003 under oath at line 3.  Assistant District

8    Attorney Meier asks you, "What's your best recollection of

9    where Mr. Evans was staying or living during the year or

10   during that trial period --" and this was in -- let me back

11   up because I have to put it in context, I'm sorry.

12         The question before on page 238, Mr. Meier asks

13   you, "What was going on as best you recall with the other

14   case in which Mr. Evans was a victim and a witness, that is

15   the case in which the gentleman Treas Carter was charged?"

16   And will you read to the jury what your answer was back in

17   2003?

18   A.   "It was my opinion that was -- that case was scheduled

19   for October for trial."

20   Q.   Okay.  And Mr. Meier then asks, "What's your best

21   recollection of where Mr. Evans was staying or living during

22   that year or during that trial period?"  What was your

23   answer?

24   A.   "My recollection is 40 Chaney Street."

25   Q.   Okay.  And the next question Mr. Meier asks you at line

1   7, "At some point was Mr. Evans staying or living someplace

2   else?"  What was your answer?

3   A.  "Yes, sir."

4   Q.  "Okay.  And where was that?"  What was your answer?

5   A.  "Howard Johnson's Hotel."

6   Q.  Okay.  Then Mr. Meier asks you at line 12, "And let me

7   ask you, first of all, to tell the Court what's your best

8   recollection in the sequence of events the murder

9   of -- strike that -- the shooting death of Willie Evans and

10  the shooting of Ricky Evans in December of 1989 -- strike

11  that -- december of 1988, the grand jury testimony of

12  Ricky Evans in that case on May 24th of 1989, the tape

13  recorded statement by Ricky Evans on August 6th of 1989

14  about the Tiffany Moore case and the trial involving

15  Tiffany Moore case at which Mr. Evans testified in October

16  of 1989, using those sorts of general reference points,

17  what's your best memory as to when Mr. Evans was relocated

18  or began staying at that motel?"  Would you read to the jury

19  what you said back in 2003?

20  A.  "My best recollection was three or four weeks until I

21  read that it was typed on September 12th that Ricky Evans

22  had contacted me and told me that someone had been at his

23  house, and he thought it was a private investigator, and

24  then he was concerned, so I think it was some time after

25  September 12th, which would have been two weeks to the

1   trial, not the three to four that I originally thought."

2   Q.  And Mr. Meier asks, "So just so I understand this right,

3   it's your recollection that Mr. Evans was relocated or began

4   staying at a hotel some time in September of 1989?"

5   A.  "That's correct."

6   Q.  Okay.  Mr. Meier then asks you, "What's your best

7   recollection today of when Mr. Evans stopped staying at the

8   hotel?"  What did you say under oath in 2003?

9   A.  "This particular case had been heard by the

10  Commonwealth, and it's my recollection that the Willie Evans

11  case was supposed to start within a week or two weeks of the

12  trial, and I had requested or I had asked if we could keep

13  him in there until this trial.  The other trial was over,

14  and my recollection is that that was continued and I got him

15  out of the hotel."

16  Q.  You got him out of the hotel?

17  A.  Yes.

18  Q.  That's what you told the Judge under oath in 2003?

19  A.  Yes.

20  Q.  And that was because the Treas Carter case was continued

21  so you got Ricky Evans out of the hotel; is that what you

22  told the Judge back in 2003?

23  A.  Yes.

24  Q.  Okay.  And the Court asks you, "Excuse me, detective,

25  why was he relocated in the first instance?"  What was your

1   answer back in 2003, sir?

2   A.  "I think he was there a couple of weeks prior -- "

3   Q.  No, no, no, line 6, page 241.

4   A.  "My understanding of it, he told me, your Honor, that he

5   had been thrown out of the house and he had no place to

6   live, and I was concerned that I wouldn't be able to find

7   him for the trial, so I put him into a hotel room."

8   Q.  And the Court asks you, "And how long do you say, sir,

9   he was there?"  What was your answer at line 13?

10  A.  "I think he was there a couple of weeks prior to the

11  trial."

12  Q.  And the Court asks you, "Prior to which trial?"  And

13  what was your response at line 17?

14  A.  "Oh, no, excuse me, prior to this Tiffany Moore trial."

15  Q.  Okay.  And the Court at line 20 asks you, "And he stayed

16  there?"  And what was your answer at line 21?

17  A.  "I believe a week or possibly two weeks after the

18  trial."

19  Q.  And the Court asks you, "At that point, and was that

20  after the Willie Evans murder trial?"  And at line 1 on page

21  242 under oath to Judge Rouse, what was your answer, sir?

22  A.  "No, I got him out because they continued the

23  Willie Evans trial."

24  Q.  Okay.  Now, Mr. Meier next asks you at line 23, "And

25  with respect to what Justice Rouse asked you then just so

1    it's clear, what if any role --" I have to read the

2    conversation, I'm sorry, I thought I could skip it.  Let's

3    go in order.  Starting at line 5, sir, Mr. Meier asks you,

4    "With respect to the Judge's question about why he was

5    relocated -- strike that -- why it was that you saw or read

6    -- no, what was it that you saw or read recently or whatever

7    it was you read about a private investigator visiting

8    Mr. Evans, tell us that or tell the Judge about that?"  What

9    was your answer?

10   A.  If you could tell me where we are, counsel.

11   Q.  Sure, line 11 where your answer starts with Ricky Evans

12   on page 242, sir.

13   A.  "Ricky Evans had contacted us relative to a prior

14   investigator coming to his house and that this investigator

15   had told him that he shouldn't testify at the trial and so

16   or he didn't have to testify or there were three or four

17   things relative to his testifying at this trial that the

18   investigator had stated, and he was concerned because it was

19   his opinion that the investigator was attempting to stop his

20   testimony at trial."

21   Q.  And Mr. Meier asked, Assistant District Attorney Meier

22   asked you, "And do you remember roughly when that occurred?"

23   What was your response back in 2003?

24   A.  "I wrote the report on September 12th, 1989."

25   Q.  "Okay.  And the next question Assistant District

1  Attorney Meier asks you, "And with respect to what

2  Justice Rouse just asked you then, sir, just so it's clear,

3  what, if any, role did that conversation you had which

4  caused you to write a report on September 12th of 1989,

5  what, if any, role did that conversation have in the time

6  frame in which you recollect Mr. Evans being put into the

7  hotel?"  What was your answer under oath to Judge Rouse back

8  in 2003?

9  A.  "Well, if he was still living at 40 Chaney when I wrote

10 that report, I had to put him in the hotel after the

11 report."

12 Q.  Okay.  So back in 2003, you weren't even sure if he was

13 still living at 40 Chaney when he wrote that report; is that

14 right?

15 A.  I had not reviewed the file, and I did the best I could

16 in answering those questions.

17 Q.  So, sir, is that a yes, in 2003, you told the Court that

18 you weren't even sure if he was still living at 40 Chaney

19 Street when you wrote that September 12th, 1989 report?

20       MS. HARRIS:  Objection.  That's not what he

21 said.

22       THE COURT:  Overruled.

23 A.  I stated, well, if he was still living at 40 Chaney,

24 then when I wrote the report, I had to put him in the hotel

25 after the report.

1   Q.  Right.  So you weren't sure he was still living at 40

2   Chaney Street back on September 12th when you testified in

3   2003, were you, sir?

4           MS. HARRIS:  Objection.

5           THE COURT:  Overruled.

6   A.  That was the only street address I could remember at the

7   time.

8   Q.  So you weren't sure, sir, is that your testimony?

9           MS. HARRIS:  Is she asking if he's sure in 2003 or

10   1989?

11           MS. SCAPICCHIO:  I'm only asking him about 2003.

12           MS. HARRIS:  So you're asking if he was sure in

13   2003, right?

14           THE COURT:  That's right.

15           MS. SCAPICCHIO:  Yes, that's based on his

16   testimony in 2003.

17   A.  No, I was not sure.

18   Q.  Okay.  The next question that Assistant District

19   Attorney Meier asks you as the Judge just asked you, "What

20   were your reasons which caused you to, as you say, put him

21   in the hotel?"  Can you read for the jurors what you said

22   under oath to Judge Rouse in 2003.

23   A.  "I don't know whether he contacted us or we had

24   contacted him, but he told us that he had been thrown out of

25   the house, and he told us that he had no place to go, and I

1   was concerned that I would be unable to find him for a trial

2   that was to begin in a couple of weeks, and that was the

3   catalyst because of the other demands of the other cases

4   that it was my opinion the best way to handle it was to put

5   him in a hotel so we wouldn't have difficulty finding him

6   for the trial."

7   Q.  So back in 2003, when you were asked under oath why you

8   put him in the hotel, you said it was to find him for trial;

9   is that right?

10  A.  Yes.

11  Q.  Okay.  And the Court asks you at line 23, "And that

12  trial, by that trial, you mean which trial, sir?"  What was

13  your answer on page 244?

14  A.  "The Tiffany Moore trial."

15  Q.  Okay.  And Mr. Meier then begins questioning you again

16  at line 4 and asks, "What arrangements, if any, Lieutenant,

17  as best you recall were made to pay for Mr. Evans' meals and

18  rooms to provide him with any spending money?"  What did you

19  say to the Court under oath in 2003 about whether or not you

20  gave Mr. Evans any money?  What did you say in 2003, sir, at

21  line 8?

22  A.  "I'm not aware of him being provided any money for

23  spending.  I am aware that his meals and his lodging were

24  paid for."

25  Q.  So, back in 2003, under oath when you were specifically

1   asked about spending money that might have been given to

2   Mr. Evans under oath, you said you weren't aware of any

3   money provided for spending; is that what you said in 2003,

4   sir?

5   A.  That's correct.

6   Q.  Okay.  Now, sir, you were asked at line 11, "And could

7   you tell the Court what, if any, arrangements you recall now

8   in August of 2003 about those arrangements?  What was your

9   answer, the arrangements about putting Mr. Evans in the

10  hotel, what was your answer under oath back in 2003?

11  A.  That it was just lodging and food costs.

12  Q.  So in 2003, you didn't mention anything about pending

13  cases or promises on pending cases in response to those

14  arrangements, right?

15          MR. CURRAN:  Objection.

16          THE COURT:  Sustained.

17  A.  Right.

18  Q.  The next question you were asked is by Mr. Meier at line

19  15, "Well, I guess what I'm saying is who made that

20  decision, and who did you talk to about that?"  That

21  decision, referring to putting Mr. Evans in the

22  Howard Johnson's.  What was your testimony under oath back

23  in 2003?

24  A.  "I spoke to my boss in homicide, Lieutenant McNully."

25  Q.  And the next question Assistant District Attorney Meier

1   asks you, "And was there anybody in the district attorney's

2   office involved in that decision-making process?"  What was

3   your answer?

4   A.  "At the particular time it was made, I don't know.  I

5   know later when it came to paying the bill that there was a

6   meeting as to the payment."

7   Q.  Okay.  Now, the next question that you're asked at line

8   6 on page 245, as to Mr. Evans, this is Mr. Meier asking you

9   this question as to Mr. Evans' living situation as you

10  recall it in September and October of 1989, "Did you

11  personally, do you have a recollection of personally making

12  anyone from the district attorney's office, specifically

13  Mr. Phil Beauchesne, or anyone else aware of that

14  situation?"  Could you read the jurors what your answer was

15  under oath in 2003 at line 13 on page 245, sir?

16  A.  "I don't have a recollection.  I assumed he knew, but I

17  don't have a recollection of specifically telling the

18  District Attorney Beauchesne I brought Ricky Evans to a

19  hotel and were lodging him there, I just don't recall."

20  Q.  Now, you were asked next by Assistant District Attorney

21  David Meier with respect to the statement, the tape recorded

22  statement which followed a telephone call to Mr. Evans that

23  you took in August of 1989, "Do you have a memory, what's

24  your best recollection if you have one, as to where that

25  statement was taken, that is, where Mr. Evans and yourself,

1   where were Mr. Evans and yourself and Detective McDonough

2   when that tape recorded statement was made?"

3           What did you tell the Court, Judge Rouse, 2003,

4   under oath about where you took that tape recorded

5   statement, line 3, sir?

6   A.  "I don't recall, but I believe it was either in the

7   homicide unit or in the -- blank blank."

8   Q.  Mr. Meier interrupts you, "And in addition -- strike

9   that.  With respect to Ricky Evans, is it fair to say that

10  as of late May, early June of 1989, you were involved in a

11  homicide case, two cases in which Mr. Evans --" he strikes

12  that.  "Is it fair to say that as of August 6th, 1989 or

13  perhaps a day or two before when you spoke to him over the

14  telephone that you were involved as of that time with

15  Mr. Evans in two different homicides?"  What was your

16  answer?

17  A.  "Yes.  Yes, sir."

18  Q.  "And Mr. Meier asks you then at some point whether

19  before, that is before the tape recorded statement in early

20  August of 1989 or after that, did you have any conversations

21  with Mr. Evans about any criminal charges that were pending

22  against him?"  What was your answer under oath, sir, in 2003

23  to Judge Rouse, line 21, 241 of your testimony?

24  A.  "Yes, I did.  I recall speaking with Ricky Evans, and I

25  don't know whether it was during the taped statement or at

1    some other time, but I was aware that he had pending cases

2    in the Roxbury District Court."

3    Q.  And Mr. Meier then asked you, "And, sir, what's your

4    best recollection today, if you have one, of the nature of

5    those cases that were pending in the district court?"  What

6    was your answer?  It's line 9, sir.

7    A.  "I think one was dropped.  I'm not sure of the rest."

8    Q.  Okay.  Then Mr. Meier showed you a bunch of documents

9    regarding Ricky Evans' pending cases, and after reviewing

10   those documents asks you on page 248 at line 1, "About how

11   many cases did he have, speaking of pending cases of

12   Mr. Evans at the time of trial, of trial, I mean the

13   Commonwealth vs. Tiffany Moore in 1989?"

14           THE COURT:  Commonwealth vs. Drumgold.

15           MS. SCAPICCHIO:  Commonwealth vs. Drumgold, your

16   Honor, I apologize.

17   A.  "Approximately 8 to 10."

18   Q.  The next question that Mr. Meier asks you, "What, if

19   any, conversation did you have or were you present for if

20   other officers had it with Mr. Evans regarding those pending

21   cases?"  What was your answer under oath regarding pending

22   cases in 2003, sir?

23   A.  "I don't know if Detective McDonough was with me or not,

24   but I recall knowing that Ricky had pending cases in court,

25   and I told him I know you have some outstanding cases.  I

1    can't promise you anything, but I will promise you that I

2    will bring your cooperation to the attention of the

3    assistant district attorney, and if you so desire, I will

4    testify in a court of law relative to your cooperation in

5    this case.  That was the extent of my conversation with him

6    in this regard."

7    Q.  Now, sir, you're asked next by Assistant District

8    Attorney Meier, "And when you say, Lieutenant, that you

9    would bring his cooperation to the attention of the

10   assistant district attorney, did you mean the assistant

11   district attorney on the Tiffany Moore case, or did you mean

12   the assistant district attorneys involved in Mr. Evans' own

13   case?"  What was your answer under oath back in 2003 at

14   line 23, sir?

15   A.  "I remember going back.  I assume it was assistant

16   district attorney, I brought the information back to

17   District Attorney Beauchesne and told him exactly what I had

18   just stated to you, and he was the only one I mentioned it

19   to, so I can't recall if I meant Beauchesne or the D.A.

20   prosecuting these complaints.  I don't remember, all I

21   remember is I brought it to the attention of Assistant

22   District Attorney Beauchesne."

23   Q.  So when you were asked back in 2003, your testimony was

24   that you couldn't remember whether or not you meant you

25   brought it to the attention of the D.A.s prosecuting

1    Ricky Evans or whether or not it was you meant bring it to

2    Mr. Beauchesne's attention; is that right?

3              MS. HARRIS:  Objection.

4              THE COURT:  Overruled.

5    A.  That's what it says.

6    Q.  Now, sir, can I have the next day, the August 6th, 2003.

7              MS. SCAPICCHIO:  May I approach the witness, your

8    Honor?

9              THE COURT:  Yes, you may.

10   Q.  That's the next day.  Now, sir, it's fair to say with

11   respect to this case you testified a second day at the

12   motion for new trial, and that would have been on August 6th

13   of -- I'm sorry, August 6th of 2003, do you remember coming

14   back a second day and testifying in 2003 relative to your

15   involvement with Mr. Evans and the motion for new trial?

16   A.  Yes.

17   Q.  Okay.  At page 26, sir, forget it.  Yes, at page 26,

18   sir, line 19, Assistant District Attorney Meier asks you,

19   "Lastly, Lieutenant Callahan, you told the Court yesterday

20   that you had some conversation with Mr. Evans, that is

21   Ricky Evans, about his pending charges."  Do you remember

22   that testimony?  What was your answer at line 23?

23   A.  Yes, sir.

24   Q.  And Mr. Meier asked you and you told the Court yesterday

25   that you recollect some events occurring that you were

1  discussing the same relocation of the same Ricky Evans to a

2  hotel or payment of some of the monies by the Boston Police

3  Department, Suffolk County District Attorney's Office or a

4  combination of the two, combination of the two to Mr. Evans

5  while he was at the hotel.  Do you recall that testimony?

6  What was your answer?

7  A.  I don't recall that Ricky Evans was paid anything.

8  Q.  That's the second time in 2003 you said Mr. Evans wasn't

9  paid anything, right?

10  A.  Yes.

11  Q.  Okay.  And Mr. Meier asks you at line 10, "Let me

12  rephrase that question, I apologize.  What I mean is that

13  there was some testimony yesterday about Mr. Evans'

14  expenses, that is, hotel bill, for lodging and his meals

15  being paid for?"  And do you remember what your answer was

16  then?

17  A.  "Yes, sir."

18  Q.  And Mr. Meier, Assistant District Attorney Meier, asked

19  you, "Other than that, those two concerns or matters, that

20  is, your conversation with Mr. Evans regarding his pending

21  cases and Mr. Evans' expenses"?

22  A.  Yes.

23  Q.  I'm going to strike that, I'm sorry, I don't want to go

24  there.  Now, at some point in time you were asked questions

25  by Mr. Drumgold's attorney back in 2003; is that right?

1    A.  Yes.

2    Q.  Okay.  And if you can turn to page 47.  Do you have

3    that, sir?

4    A.  Yes.

5    Q.  Okay.  You were asked a question at line 20 referring to

6    the times that you met with Mr. Evans on the Treas Carter

7    case, you were asked specifically, "In the several times

8    that you met with him, do you remember learning that he was

9    homeless at that time?"  What was your answer?

10   A.  "At the time?"

11   Q.  "Yes."

12   A.  "No, I don't recall that."

13   Q.  Okay.  So back in 2003, you had said you didn't know

14   that Ricky Evans was homeless?

15            MS. HARRIS:  Objection.

16            THE COURT:  Overruled.

17   A.  Yes.

18            MS. HARRIS:  Can we have the context, your Honor,

19   this is in the context of the Treas Carter case?

20            THE COURT:  All right.  I think that was the

21   question, you were asked --

22            MS. SCAPICCHIO:  About Treas Carter.

23            THE COURT:  -- about Treas Carter.  If there's

24   anything further you want to bring out, you can bring it

25   out.  Go on.

42

1    Q.  Okay.  You were asked, do you remember where he -- this

2    is Ricky Evans, at page 48 -- was living at that time, and

3    what was your answer back in 2003?

4    A.  "It was my understanding, I believe, 40 Chaney Street."

5    Q.  And you were asked, "Was that the brother's apartment?"

6    What was your answer?

7    A.  "I don't recall."

8    Q.  Okay.  And you were asked at line 7, "So do you have any

9    information that he had his own apartment back then?"  What

10   was your answer?

11   A.  "No, I don't."

12   Q.  You were asked, "Do you have any information he was

13   living with his parents back then?"  What was your answer?

14   A.  "No, ma'am."

15   Q.  And you were asked at line 17, "In the course of getting

16   to know him, it never came up that he didn't have a place to

17   stay?"  What was your answer under oath, sir, at line 20

18   back in 2003?

19   A.  "I don't recall it coming up, ma'am."

20   Q.  And you were asked, "Okay.  Never told you he was

21   sleeping on his brother's couch?"  What was your answer at

22   line 23?

23   A.  "I don't recall that."

24   Q.  And you were asked on the four or five or several

25   occasions that you went to see him, "Did you always visit

1    him in the same place at 40 Chaney Street?"  What did you

2    tell the Court under oath back then?

3    A.  "The only location I was aware is 40 Chaney Street."

4    Q.  And you were asked, "Okay.  So every time you spoke to

5    him, he was at 40 Chaney Street; is that fair to say?"

6    A.  "I would assume so, yes."

7    Q.  Okay.  And at page 50, line 4, you were asked, "And at

8    some point in time if the district attorney's office had six

9    or seven addresses for Ricky Evans, do you remember them

10   providing those addresses to you?"  What was your answer at

11   line 8?

12   A.  "They could have."

13   Q.  And the next question, "But you don't remember ever

14   visiting at any of those six or seven places because every

15   time you visited him, he was at 40 Chaney Street; is that

16   right?"

17   A.  "I just don't have a recollection.  All I remember is 40

18   Chaney Street."

19   Q.  Okay.  If you could switch to page 52.  Do you remember

20   being asked under oath in 2003, "And on several occasions

21   that you met with him --" talking about Mr. Evans -- "did he

22   ever tell you he didn't have any money?"  What was your

23   answer at line 5, sir, under oath in 2003 before

24   Judge Rouse?

25   A.  "I don't recall that coming up."

1    Q.  And then you were asked a follow-up question, "So money

2    was never discussed between you and Mr. Evans; is that

3    right?"  What was your answer?

4    A.  "I don't recall discussing money with Mr. Evans at all."

5    Q.  So that would be the third time that you denied that you

6    ever had any conversations with Mr. Evans regarding money;

7    is that fair to say, sir?

8    A.  Yes.

9    Q.  Three times under oath you said you never talked to

10   Mr. Evans about money; is that right, sir?

11   A.  Yes.

12   Q.  And then in 2008 did you say for the first time you gave

13   Ricky Evans $20?

14   A.  Please repeat that.

15   Q.  In 2008, did you say for the first time you gave

16   Ricky Evans $20?

17   A.  Yes.

18   Q.  And that's certainly different, sir, what you

19   represented three different times under oath in 2003; is

20   that right, sir?

21   A.  The $20 in my opinion was so insignificant --

22   Q.  Sir, is it different from what you represented three

23   times under oath in 2003?

24          MR. ROACHE:  Objection.  May he answer the

25   question?

1          THE COURT:  He may answer the question.  Is it

2     true that your answer was different?  That's a yes or no

3     answer.  Objection is overruled.

4     Q.  Sir, is it true that your answer was different in 2008

5     than it was in 2003?

6     A.  That is correct.

7     Q.  Okay.

8     A.  However -- can I answer the question?

9          THE COURT:  You'll have an opportunity on

10    cross-examination.  Go on.

11         MS. SCAPICCHIO:  Thank you.

12    Q.  Now, sir, if you could look down to line 19 at page 52,

13    you were asked, "Well, you knew at some point that he --

14    this is Ricky Evans -- "had open cases; is that right?"

15    What's your answer in 2003?

16    A.  Yes, ma'am.

17    Q.  And you were asked, "When did you run his record to

18    determine that he had open cases?"  What was your answer

19    back in 2003?

20    A.  "It was probably during the Willie Evans murder."

21    Q.  And you were asked at line 7, page 53, "And do you

22    remember whether it was you or Detective McDonough that took

23    him down to Roxbury police station to clear up some

24    outstanding warrants?"  What was your answer back in 2003?

25    A.  "I know it wasn't me."

1   Q.  And then you were asked at line 18, "Do you recall

2   requesting anyone to take him down to the Roxbury police

3   station to clear up the warrants?"  What was your answer?

4   A.  "No, ma'am."

5   Q.  You were asked at page 54, sir, at line 16, "Well, did

6   you have a policy back then in the Boston Police Department

7   when you were interviewing a witness to run a record before

8   you took a statement from him?"  What was your answer back

9   then?

10  A.  "I normally did that, yes."

11  Q.  Page 55, line 1, "And as you sit here today, do you have

12  a memory as to whether or not you assisted him in clearing

13  up warrants with respect to the Treas Carter matter?"  What

14  was your answer in 2003?

15  A.  "Not that I recall, ma'am, no."

16  Q.  So, when the warrants cleared up, it was in relationship

17  to the Tiffany Moore case, not the Treas Carter case; is

18  that right?  That's what you said in 2003?

19          MS. HARRIS:  Objection.

20  A.  I believe I said I don't recall.

21  Q.  Okay.  Now, you were asked a question at line 23, "And

22  if he had any open cases, you certainly would have told him

23  that you knew he had open cases; isn't that right?"  What

24  was your answer?

25  A.  "Correct."

1  Q.  And you were asked, "And the conversation about the fact

2  that you knew he had open cases, does that appear anywhere

3  on the tape of Mr. Evans' statement?"  What was your

4  answer?

5  A.  "Not to my knowledge."

6  Q.  And line 21, sir, you were asked, "And if somebody asked

7  you for assistance with respect to those outstanding

8  warrants, what would you tell them?"  What was your answer

9  back in 2003?

10  A.  "All I could tell them was that I'd bring their

11  cooperation to the attention of the D.A. and I would testify

12  in a court of law if required relative to the cooperation.

13  There's nothing else I can do."

14  Q.  And you were asked right after that, "All right.  At

15  that point in time you agreed to help him, if you could."

16  What was your answer under oath in 2003, sir?

17  A.  "I agreed to testify before a court relative to his

18  cooperation in the Tiffany Moore and the Willie Evans

19  murder."

20  Q.  And you were asked, "Okay.  So you agreed, you told him

21  at some point that you would help him; is that fair to say?"

22  What was your answer?

23  A.  "No, I didn't say I would help him.  What I said to him,

24  if you want, I will in the future testify in a court of law

25  relative to your cooperation."

1   Q.   Isn't that an offer of help, sir?

2   A.   I didn't consider it that.

3   Q.   You didn't?

4   A.   No.

5   Q.   What did you consider it?

6   A.   A subpoena to a court to testify under oath.

7   Q.   He can't subpoena you, he's a defendant?

8           MS. HARRIS:   Objection.

9           MR. CURRAN:   Objection.

10          THE COURT:   Sustained.

11  Q.   Sir, you thought when you said that you meant if you got

12  subpoenaed to court by his defense attorney you would

13  testify on his behalf?

14  A.   I didn't know who I was going to be subpoenaed by.  It

15  could have been the assistant district attorney.  All I know

16  is that if I'm subpoenaed to court, I'm going to testify for

17  the truth, and the only one that can help him with the case

18  is the district attorney or the Judge sitting.

19  Q.   Okay.

20  A.   There was never an offer --

21  Q.   What did you tell Mr. Evans about how you were going to

22  help him, not what you believe, what did you say to

23  Mr. Evans about how you were going to help him?

24  A.   I just stated how I was going to help him.

25  Q.   That you would testify for him on his pending cases and

49

1    you would bring his cooperation to the attention of the

2    assistant district attorney prosecuting him; is that

3    right?

4    A.   No, that's absolutely wrong.

5    Q.   Okay.  And the next question that you were asked is, "At

6    that point in time you agreed to help him, if you could?"

7    What was your answer?

8    A.   What line are we on?

9    Q.   This is line 7.

10   A.   "I agreed to testify before a court relative to his

11   cooperation in the Tiffany Moore and the Willie Evans

12   murder."

13   Q.   And were you asked, "So you agreed, you told him at some

14   point that you would help him; is that fair to say?"  What

15   did you say?

16   A.   "No, I didn't say I would help him, what I said to him,

17   if you want, I will in the future testify in a court of law

18   relative to your cooperation."

19   Q.   And that's not help, sir?

20           MS. HARRIS:  Objection.

21           THE COURT:  Overruled.

22           MR. ROACHE:  Objection.

23           THE COURT:  Overruled.

24   Q.   Sir, that's not help?

25   A.   I couldn't help him, only the district attorney or the

1    Judge could.

2    Q.  It doesn't matter what you could done for him, what did

3    you tell him, sir?  Did you tell him you would testify for

4    him?

5    A.  Yes.

6    Q.  Did you tell him you would bring his cooperation to the

7    attention of the assistant district attorney?

8    A.  I did.

9    Q.  Not what you did, did you tell Mr. Evans you would?

10   A.  Yes, I did.

11   Q.  Okay.  Now, you're asked back in 2003, "When you say

12   testify in a court of law, you would tell the Court and the

13   district attorney and anyone else who asked that he was

14   helpful to you; is that right?"

15   A.  "Well, his defense lawyers, I assume."

16   Q.  And you were Asked, "But you would say that he was

17   helpful to you, is that right?  What was your answer?

18   A.  "Yes."

19   Q.  And you would say that those things in an effort to try

20   to help him out with whatever recommendation or sentence

21   that the prosecutor would give him in those cases; isn't

22   that right?"  What was your answer in 2003?

23   A.  "Yes."

24   Q.  And so you were asked, sir, "So whether you said the

25   word "help" or didn't say the word "help," that was

1   certainly what you meant when you told him you would testify

2   for him; isn't that right?"  What was your answer,

3   Detective Callahan?

4   A.  "That's correct."

5   Q.  Now, sir, at page 59, you were asked a question, "But

6   the conversation that you had with Mr. Evans before he gave

7   a tape recorded statement in which he implicated

8   Mr. Drumgold, you had a conversation with him, and what you

9   told him was that you would talk to the assistant district

10  attorney on his case and that you would testify in a court

11  if he needed you to?"

12  A.  "Yes."

13  Q.  So before Mr. Evans even made his first statement, you

14  told him you would help him on his pending cases?

15          MS. HARRIS:  Objection.

16          THE COURT:  Overruled.

17  Q.  Is that what you testified to in 2003, sir?

18  A.  Would you repeat the question, please?

19  Q.  Sure.  Before he even made that tape recorded statement

20  of August 6th, 2003, you promised to help him with his

21  pending cases --

22          MR. ROACHE:  Objection, that's not --

23  Q.  That's what you testified to in 2003, right?

24          MR. ROACHE:  Objection, that's not --

25          THE COURT:  You read the witness something at

1    page 59.  Was that a verbatim statement?

2           MS. SCAPICCHIO:  It was.

3           THE COURT:  Can you read it again slowly.

4           MS. SCAPICCHIO:  Sure.

5    Q.  At line 3, "But the conversations that you had with

6    Mr. Evans before he gave the tape recorded statement in

7    which he implicated Mr. Drumgold, you had a conversation

8    with him, and what you told him was that you would talk to

9    the assistant district attorney on his case and that you

10   would testify in a court if he needed you to?"  What was

11   your response, sir?

12   A.  "Yes."

13   Q.  And so you did tell him before the statement that you

14   would assist him, right?

15          MS. HARRIS:  Objection.

16          THE COURT:  Overruled.

17   A.  I don't recall when the statement was.

18   Q.  August 6th of 1989, sir.  You said under oath in 2003

19   that you made these promises to him before he made the

20   initial statement on August 6th of 2003; isn't that what you

21   said, sir?

22          MR. ROACHE:  Your Honor, I object.

23          THE COURT:  The objection is overruled.  All you

24   asked him, you first asked him whether or not he said it was

25   on page 59 at that particular line.

53

1           MS. SCAPICCHIO:  Yes.

2           THE COURT:  Now you're restating that and

3    characterizing, but go on, you can have it.

4           MR. ROACHE:  Your Honor, she asked before the

5    initial conversation.  We know that that initial

6    conversation took place in June.

7           THE COURT:  You will have an opportunity to

8    cross-examine.  If there are factual errors in the

9    presentation, you'll have an opportunity to correct them

10   when you get up.  I'm not going to sort this out question by

11   question.  Go on, Ms. Scapicchio, and likewise you will

12   restate his statement accurately so there won't be any

13   factual issues.

14          MS. SCAPICCHIO:  I believe I did, your Honor.

15          THE COURT:  Go on.

16   Q.  Now, at line 11, "You were asked all of this in an

17   effort to bring his cooperation to their attention?  And

18   what was your answer back in 2003?

19   A.  "Yes."

20   Q.  And you were asked, "And what did you hope would happen

21   as a result of bringing his cooperation to their attention?"

22   What was your answer back in 2003?

23   A.  "Nothing.  The bottom line here was the fact that Ricky

24   had stated to me, "I don't want any help," or something to

25   that effect, "I don't need any help," so I never went to

1   court and helped him or testified."

2   Q.  When did you have that conversation with Mr. Evans that

3   he didn't want your help on 8 to 10 pending cases and he

4   didn't need your help on 8 to 10 pending cases?  Was that

5   when he was in the Howard Johnson's?

6   A.  I have no idea when it was.

7   Q.  But you obviously had a conversation because you

8   wouldn't have testified about a conversation that you didn't

9   have, right?

10  A.  That's correct.

11  Q.  And you were asked, "So he told you, you knew he had

12  8 to 10 pending cases, but he said he didn't want your help;

13  is that your testimony?"  What's your answer at line 24?

14  A.  "My testimony is, if I recall correctly, I thought there

15  was only a drug case, counselor, and I agreed if he wanted

16  that I would show up in court and testify on his behalf

17  relative to his cooperation.  Ricky said the statement that

18  he wasn't looking for any help.  That's what I recall."

19  Q.  Now, that statement made by Mr. Evans after you offered

20  to help him, did you reduce that to a report somewhere?

21  A.  No, but I reported it to the district attorney.

22  Q.  Well, wait a minute.  Didn't you tell us the whole

23  reason to write the report is so that the district attorney

24  knows?  Didn't you tell us that earlier today?

25  A.  To write what report?

1   Q.  You said you wrote the report of June 21st to inform the

2   district attorney, you said you wrote a report of

3   September 12th to inform the district attorney?

4   A.  Yes.

5   Q.  Why didn't you write a report about this, sir, a witness

6   who you offered promises to who told you, no, I don't want

7   any help on my 8 to 10 open cases, I'm okay, I'm homeless, I

8   have nowhere to go and I might go to jail but I don't need

9   your help?  You didn't write a report about that, sir?

10              MR. ROACHE:  Objection.

11              THE COURT:  Overruled.

12  Q.  You didn't write a report about that, sir?

13  A.  No.

14  Q.  And you were asked next, "Wasn't looking for any help?"

15  What was your answer?

16  A.  "Yeah."

17  Q.  And the next question, "Does that mean you weren't going

18  to give it to him?"  And what's your answer?

19  A.  "That meant whatever it meant.  I mean, I always

20  expected to hear from his defense attorneys, and I never

21  did."

22  Q.  So you thought you were going to have to help him at

23  some point, right?

24  A.  I didn't know.  No, I did not know I was going to help

25  him at some point.

1   Q.  Back in 2003, you said you always expected to hear from

2   his defense attorneys, and you never did, right?

3   A.  Yes, or the district attorney.

4   Q.  So, why would you expect to hear from his defense

5   attorneys, sir, if he told you he didn't want your help?

6   A.  I know for a fact he didn't want my help.

7   Q.  Sir, why would you expect to hear from his defense

8   attorney if he didn't want your help?

9   A.  It would have been a defense attorney or the assistant

10  district attorney.

11  Q.  That's not what you said in 2003.  2003 you said you

12  always expected to hear from his defense attorney, but you

13  just told us that he told you he didn't want any help, so

14  why would you have expected to hear from his defense

15  attorney?

16  A.  I never heard from his defense attorney.

17  Q.  Not that you didn't, you said you expected, you always

18  expected to hear from his defense attorney.  Why would you

19  expect to hear from his defense attorney if Mr. Evans had

20  already told you he didn't want any help on his 8 to 10

21  pending cases?

22  A.  That's exactly what he said, "I don't need your help."

23  Q.  But why would you expect to hear from his defense

24  attorney if you already knew that he told you he didn't want

25  any help?  Why would you say that, sir, under oath that you

1    expected to hear from his defense attorney?

2    A.  Or the district attorney.

3    Q.  That's not what you said, sir.

4    A.  I understand it.

5    Q.  Why would you say it if he had already told you he

6    didn't want your help?

7    A.  I don't have an answer for this.  All I can tell you is

8    that I told him that I would bring his cooperation to the

9    attention of the district attorney and also testify in a

10   court of law if required.  That's what I said to him.  I

11   promised him nothing.  I had nothing I could do for him, it

12   can only be done by the district attorney or the Judge.

13   Q.  Sir, the next question you were asked under oath in 2003

14   at line 14, "Well, in your expectation to hear from the

15   defense attorney, were you aware that your partner,

16   Detective McDonough, on June 27th of 1989, took Ricky Evans

17   to the Roxbury District Court to clear up all his

18   outstanding warrants?  Were you aware of that in the course

19   of your investigation?  What was your answer back in 2003?

20   A.  "No, ma'am, I was not."

21   Q.  You were asked at line 24, "How many conversations did

22   you have with Detective McDonough regarding this homicide?"

23   What was your answer back in 2003?

24   A.  "Every day."

25   Q.  And at line 10, "But you didn't tell him to take him

1   there --" meaning tell him to take Ricky Evans to the

2   Roxbury District Court --" to remove his warrants?  And what

3   was your answer?

4   A.  "I would assume the district attorney told him to take

5   him over there.  I don't know.  You'll have to ask Paul

6   McDonough."

7   Q.  You were asked, "As you sit here today, you have no idea

8   why Officer McDonough would have taken Mr. Evans over to

9   Roxbury District Court to clear up his warrants?"  What was

10  your answer in 2003?

11  A.  I would assume he drove him over there to clear the

12  warrants up, but, No. 1, I didn't direct him to do that, and

13  No. 2, I don't know who did.  I had no idea that

14  Paul McDonough until recently took him over to the Roxbury

15  court."

16  Q.  Now, Paul McDonough was your subordinate; is that

17  right?

18  A.  Yes.

19  Q.  You brought him into the homicide unit; is that right?

20  A.  Yes.

21  Q.  He wasn't a homicide detective back in 1989, was he,

22  sir?

23  A.  No.

24  Q.  You specifically requested that he come and work this

25  case with you; is that right?

1    A.   That's correct.

2    Q.   And that's because he's a friend of yours, right, sir?

3    A.   No, because he was a talented detective with years of

4    experience who had been in the drug unit who had done

5    thousands of investigations and who was a dependable

6    detective that I could depend upon to investigate this

7    case.

8    Q.   And could you depend on him to tell you, keep you

9    updated on what he was doing on the case, sir?

10   A.   In 2003 I had no recollection.

11   Q.   Sir, could you depend on him to keep you updated on what

12   he had done in the case?

13   A.   Yes.

14   Q.   But he never told you he took Ricky Evans to the Roxbury

15   District Court to clear up the warrants --

16             MR. ROACHE:  Objection.

17   Q.   -- even though you spoke to him every day, right?

18             MR. ROACHE:  Objection.

19             THE COURT:  Overruled.

20   A.   I had no memory in 2003 that he had done that.

21   Q.   Now, sir, at page 64, you were asked a question at line

22   16, "And Ricky Evans was your witness, for lack of a better

23   word?"  What was your answer?

24   A.   Where are we?

25   Q.   Page 64, line 16.

1   A.  "Yes."

2   Q.  "Back in June of '89?"  What's your answer at line 20?

3   A.  "Yes, ma'am."

4   Q.  "And you had that conversation with him in which you

5   told him you would help him out on his cases; is that fair

6   to say?"

7   A.  "Yes, ma'am."

8   Q.  "What did you say?"

9   A.  "Yes, ma'am."

10   Q.  And you were asked at page 66, line 9, "Now, with

11   respect to putting Mr. Johnson," I misspoke," Mr. Evans in

12   the Howard Johnson's, your best estimate as to how long he

13   stayed there is what?"  What's your answer under oath at

14   line 13?

15   A.  "I believe it would have to be after September 12th,

16   1989."

17   Q.  And you were asked, "And you based that on your

18   interview with an investigator for the defense; is that

19   right?"  What's your answer?

20   A.  "Yes."

21   Q.  And the next question, "You reviewed a report of an

22   investigator for the defense that says he interviewed

23   Mr. Evans in a hallway; is that right?"  What's your

24   answer?

25   A.  "Yes."

1  Q.  "And you concluded that that hallway must have been at
2  his brother's house; is that right?"
3  A.  "Yes."
4  Q.  And you were asked at page 67, line 1, "And that's
5  because you don't have any other address at which Mr. Evans
6  would have lived back then?"  What's your answer?
7  A.  "I don't recall.  I just don't remember."
8  Q.  And you were asked, "And your best estimate is that you
9  made this determination to put Mr. Evans in the
10  Howard Johnson's; is that right?"  What's your answer?
11  A.  "Yes, ma'am."
12  Q.  And the next question, sir, you were asked specifically,
13  "That wasn't for any security reasons, is that right?"  And
14  under oath in 2003, before Judge Rouse, read to this jury
15  what you said.
16  A.  "My best recollection, the main reason I did it was I
17  didn't want to have to go looking for him in a couple of
18  weeks for the trial."
19  Q.  And then you were asked, "So you knew he was homeless
20  then?"  What's your answer?
21  A.  "Yes."
22  Q.  And you're asked again, "And he didn't talk to you about
23  money then when he was homeless?"  What did you say under
24  oath for the fourth time regarding money?
25  A.  "I don't recall him.  I don't remember Mr. Evans ever

1    talking about it.  I don't ever recall Mr. Evans ever

2    talking about money."

3    Q.  So, on four separate occasions under oath in 2003, you

4    were asked about Mr. Evans and money, and four separate

5    occasions your answer was either you didn't give him money

6    or you don't recall him ever asking about money; is that

7    fair to say, sir?

8    A.  I believe my testimony was I don't recall him ever

9    asking about money.

10   Q.  Sir, you were asked specifically did you give him any

11   money, and you said no, right?

12   A.  I had given him $20.

13   Q.  But you said under oath no, right?

14   A.  I felt it was so insignificant that because I had given

15   him $20 for food that in regards to money, this was not a

16   reward for his testimony, it was just to get him food to get

17   him through the night at the hotel.  He had no money that

18   day.  I had asked him if he had eaten, he stated no, and I

19   gave him $20 to get some food.

20   Q.  Are you done?

21   A.  Yes.

22   Q.  So, sir, four times during the motion for new trial you

23   were asked about money, and you knew at that point because

24   you already told us you read the reports about Mr. Evans

25   saying you gave him a ton of money, right, you read those

1    police reports, those newspaper reports, you told us about

2    that, right?

3              MS. HARRIS:  Objection.

4              THE COURT:  Can you rephrase that question?

5              MS. SCAPICCHIO:  Sure.

6    Q.  Before you went to see Mr. Meier, one of the first

7    things you told us today is you reviewed reports in the

8    newspaper about Mr. Evans' testimony in 2003; is that

9    right?

10   A.  I reviewed newspaper articles being written on this

11   case.

12   Q.  And you were outraged, right?

13   A.  That is correct.

14   Q.  And you were outraged because Mr. Evans was saying you

15   paid him money, right?

16             MS. HARRIS:  Objection.

17             THE COURT:  Overruled.

18   A.  I didn't pay him money.

19   Q.  Not what you did or didn't, you were outraged because

20   Mr. Evans was saying you paid him money, right?

21             MS. HARRIS:  Objection.

22             THE COURT:  Overruled.

23   A.  I never paid him money.

24   Q.  I'm not asking you that.

25   A.  I gave him 20 --

1          THE COURT:  The question was whether you were

2     outraged what was in the newspaper in which Evans was saying

3     you paid him money, outraged about the newspaper accounts.

4          MR. CURRAN:  Judge, can we go to sidebar?

5          THE COURT:  No.

6     Q.  Sir, you were outraged because you knew when you read

7     the newspaper articles that Mr. Evans was saying you paid

8     him money, right?

9          MS. HARRIS:  Objection.

10    A.  I think the article was mentioned more than money, it

11    was almost like he was on a payroll and I had given him $20

12    for food, that's all I did, yes, I was outraged.

13    Q.  Stop right there.  So when you met with Mr. Meier back

14    in 2003 before you testified, when you knew Mr. Evans was

15    claiming you gave him money, did you tell Assistant District

16    Attorney Meier that you gave him $20?

17    A.  I don't recall discussing the case with Mr. Meier, all I

18    recall --

19    Q.  The second time you met with Mr. Meier when you were

20    talking about Ricky Evans, did you tell him then that you

21    gave him $20?

22    A.  No, I don't think I did.

23    Q.  And four separate occasions when you were asked in 2003

24    about money, you never told Judge Rouse that you gave

25    Ricky Evans $20, did you, sir?

1  A.  No, I did not because I felt it was so insignificant it

2  would not impact I had to report it.  I just felt it was

3  insignificant.

4  Q.  Sir, how do you know $20 is insignificant to a homeless

5  kid?

6          MR. ROACHE:  Objection.

7          THE COURT:  Overruled.

8  Q.  How do you know that, sir?  He doesn't have a dollar in

9  his pocket, he can't do anything, you hand him $20, how do

10  you know that was insignificant?

11  A.  Ricky Evans was not homeless, he was always living

12  somewhere during the course I'm aware of until

13  September 12th, 1989.

14  Q.  Sir, that doesn't answer my question.  How do you know

15  $20 isn't significant to Mr. Evans?  How do you know that,

16  sir?

17  A.  I was attempting to buy him dinner.  I had specifically

18  asked him if he had eaten during that day.  He said no.  I

19  wasn't sure when I could get back to the hotel, so I gave

20  him $20 to get something to eat, and then I went back to

21  homicide and reported what I was doing.

22  Q.  Right.  Did you write a report about the $20?

23  A.  No.

24  Q.  So who did you report that you gave him $20?

25  A.  I didn't report that to anyone.  I just felt it was so

1   insignificant it didn't require a report.

2   Q.  Now, sir, if I can direct your attention to page 224 of

3   your August 5th, 2003 testimony, you just told us that you

4   never, ever said that he wasn't provided spending money.

5   Can you read, sir,  --

6   A.  124?

7   Q.  It's 224, the other day, the previous day.

8         MS. HARRIS:  Sorry, what page?

9         MS. SCAPICCHIO:  224, August 5th, 2003.

10        MS. HARRIS:  That's when he's sworn in.

11        MS. SCAPICCHIO:  244, August 5th of 2003.

12   Q.  Sir, Mr. Meier asks you, "What arrangements, if any,

13   Lieutenant, as best you recall were made to pay for

14   Mr. Evans' room or meals or to provide him with any spending

15   money?  What was your answer under oath in 2003, sir, at

16   line 8?

17   A.  What page?

18   Q.  244.

19   A.  "I'm not aware of him being provided any money for

20   spending.  I am aware that his meals and his lodging were

21   paid for."

22   Q.  You weren't aware back in 2003 that you gave him $20?

23   A.  For food.

24   Q.  It says any money, any money.  Isn't that what you were

25   asked?

1   A.   Any spending money.

2   Q.   Oh, so now there's a difference between spending money

3   and food money; is that right?

4   A.   I gave him $20 to get dinner.

5   Q.   How do you know he spent it on dinner?  How do you know

6   he didn't go out and get two bags of heroin with your $20?

7   How do you know that, sir?

8           MS. HARRIS:  Your Honor, objection.

9           THE COURT:  Sustained.  Enough.

10  Q.   Now, sir, you were asked at page 66 of your testimony in

11  2003, and this is regarding why your memory is that he was

12  in the hotel after September 12th of 1989.  You're asked at

13  line 22, "And you can concluded that that hallway must have

14  been at his brother's house; is that right?"  What was your

15  answer, sir, at line 24 on page 66 of your August 6th, 2003

16  testimony?

17  A.   Yes.

18  Q.   And on page 67, when you were asked at line 16, "Okay.

19  He didn't talk to you about money then when he was

20  homeless?"  What was your answer, sir, at line 18?

21  A.   "I don't recall him.  I don't recall.  I don't remember

22  Mr. Evans ever talking about, I don't ever recall Mr. Evans

23  ever talking about money.

24  Q.   You were asked, "So at some time you just went to his

25  brother's house and took him to the Howard Johnson's."  What

1  was your answer back in 2003, sir, at line 24?

2  A.  "I don't know where we picked him up from, but I took

3  him to the Howard Johnson's."

4  Q.  So you don't even know he was at his brother's house,

5  right?  That was your testimony in 2003?  You don't know

6  where you picked him up from, right?

7  A.  I had no memory at that time, yes.

8  Q.  Well, did you write a report about putting him in the

9  Howard Johnson's?

10  A.  No, however I did write a report relative to the PI who

11  had gone to that home on September 12th, 1989, and I

12  reported to the district attorney that he was brought to the

13  hotel.

14  Q.  But, sir, if it was no big deal, why not write a report?

15  A.  I was writing an awful lot of reports.

16  Q.  Mr. Evans, we have two reports, sir, we have one on

17  June 21st, then we have one on September 12th, 1989, exactly

18  two reports about Mr. Evans, right?

19  A.  Three.

20  Q.  The statement, I'm talking about your reports that you

21  generated, two reports, right?

22  A.  Yes.

23  Q.  So you never wrote a report about putting him in the

24  Howard Johnson's, right?

25  A.  Yes.

1   Q.  You never wrote a report about paying him $20, right?

2   A.  Yes.

3   Q.  And if it's so insignificant, why not put it in a

4   report?  Why not document it?  This is what I did, big deal?

5   A.  Mr. Evans was one witness of potentially 45 witnesses

6   that I had met with in and got reports --

7   Q.  We're not talking about the 45 witnesses?

8          MR. ROACHE:  May he answer the question, your

9   Honor?

10         THE COURT:  Let him answer the question.

11  A.  In this particular case, there were numerous witnesses,

12  and I wrote reports on all the interviews that I did with

13  these witnesses.  I did not put the $20 in the report.  I

14  felt it was just a kind gesture of insignificance to feed a

15  kid who hadn't eaten all day.  I didn't consider that

16  payment, and I didn't write a report on that.

17  Q.  Sir, getting back to your testimony in 2003, you were

18  asked at line 2 regarding when you took him to the

19  Howard Johnson's.  You were asked, "Is that a result of you

20  calling him or him calling you?"  What was your answer in

21  2003?

22  A.  "I don't remember."

23  Q.  You were asked, "When you took him to the

24  Howard Johnson's, at that point in time did the Boston

25  Police Department have any type of arrangements with the

1   Howard Johnson's as to housing witnesses?"  What was your

2   answer?

3   A.  "No, not that I'm aware of."

4   Q.  Okay.  "So, when you signed him in at the Howard

5   Johnson's, did you sign him in as the Suffolk County

6   District Attorney's Office or under Ricky Evans?"  What was

7   your answer?

8   A.  "I believe -- I don't recall, but I believe it was

9   Ricky Evans."

10  Q.  Okay.  Do you typically, when you are trying to place a

11  witness in a hotel for security reasons, sign them in under

12  their own name?

13  A.  In my time on the job, this was the first experience I

14  ever had with an individual who was thrown out of his house

15  a week before a murder trial.  I had never experienced this

16  in all my investigations.  I was very concerned that because

17  there were two shooters still loose on the Treas Carter

18  murder there were --

19  Q.  So you put him under his own name, sir?

20  A.  Could I finish the question?

21  Q.  Oh, sure.

22        THE COURT:  Let him finish, please.

23  A.  There were other individuals, possibly three others, in

24  the Tiffany Moore murder, and I was concerned about the

25  private investigator who had gone to his apartment on

1    September 12th, and I do recall it was Ricky Evans that

2    contacted me.  Based upon our response to the apartment, I

3    became very concerned because Ricky had just been spooked,

4    and I wasn't sure that I could find him for the trial.  I

5    was preparing for three murder trials at the time, not

6    including the other murders that I was responding to.

7            I thought at that point that it was time to think

8    of getting him to a secure place where we could guarantee

9    not only his safety but his attendance before the Court.

10   Q.  Are you done?

11   A.  Yes.

12   Q.  Okay.  So, the way that you secure a witness who you

13   think might have some security issues is you sign him into a

14   hotel under his very own name, Ricky Evans, right?  Is that

15   right, sir?

16   A.  This particular hotel was down the street from homicide,

17   it was outside the area of where the gang and violent

18   problems were happening, and I felt comfortable that we

19   could assure his security based upon that location.

20   Q.  So you signed him in under the name Ricky Evans instead

21   of John Smith because you were so concerned about his

22   security that you wanted to make sure he was secure so you

23   signed him under the name Ricky Evans, right?

24   A.  This particular hotel was in an area outside that

25   particular community, and I was not concerned that we had to

1   hide his name or perform anything more at that point in time

2   to guarantee his attendance and security.

3   Q.  Sir, aren't we talking about the hotel right in

4   Dorchester off the expressway, the Howard Johnson's right

5   there?

6   A.  That is correct.

7   Q.  So, a hotel in Dorchester is so far out of the area that

8   you felt secure signing him in with all these security

9   problems under the name Ricky Evans; is that right?

10  A.  I was confident we could assure his security at that

11  location.

12  Q.  Okay.  Did you post someone outside his room?

13  A.  No.

14  Q.  Did you check on him frequently to make sure that he

15  didn't have any security issues?

16  A.  I know I spoke to him.  I have no idea, my memory has

17  faded over the years, but I was confident that we could

18  guarantee his security.

19  Q.  You put him in the hotel, you think, on September --

20  right after September 12th.  How often did you talk to him?

21  Did you contact him to make sure he was safe?

22  A.  Well, it was up to him to contact us --

23  Q.  Not up to him.  How often did you contact him, sir, to

24  make sure he was safe because you were worried, you were

25  worried about his safety, how many times, sir?

1   A.   I don't recall.

2   Q.   More than 20?

3   A.   No.

4   Q.   More than 10?

5   A.   If this was when I believe it was, a week before the

6   trial, no, maybe a couple of times, or he called me, but it

7   was a good location, it was down the street from homicide.

8   I'm not sure if that is in South Boston or Dorchester, but I

9   was confident because they had their own security at

10  Howard Johnson's, and if there had been any problems there,

11  we could have gotten there right away.

12  Q.   Oh, so you had a conversation with the security

13  department at Howard Johnson's?

14  A.   No, I never had.

15  Q.   About keeping Ricky Evans safe?

16  A.   No, I never had a conversation with the security at

17  Howard Johnson's, but I knew they had it.

18  Q.   Well, the security was the person behind the desk,

19  right?

20  A.   No.

21  Q.   You're saying there was a paid detail?

22  A.   No, I believe it was private security.

23  Q.   Okay.  But you never talked, you were so concerned about

24  Mr. Evans' security, and you never talked to any of the

25  security officers to ask them, to watch out for Mr. Evans,

1   right?

2   A.   That is correct.

3   Q.   Okay.  Now, sir, back to your testimony in 2003, you

4   were asked on page 68 at line 16, "Okay.  When you signed

5   him in, your best memory is that he only stayed there for

6   two weeks?"  What was your answer back then?

7   A.   "I don't know if it was two weeks.  It could have been

8   longer than two weeks."

9   Q.   And you were asked, "But it wasn't seven to eight

10   months; is that what you're saying?"

11   A.   "Absolutely.  In my opinion, it was never seven to eight

12   months."

13   Q.   And you were asked, "When you say your opinion, what

14   makes you believe it wasn't seven to eight months?"  What's

15   your answer back in 2003 under oath?

16   A.   "The main reason is the fact that I have a distinct

17   recollection that I thought it was three or four weeks prior

18   to the trial, and then I read that report on September 12th,

19   and if it was 40 Chaney Street, then it had to be

20   September 13th, and the trial was the end of September, so

21   it could not have been eight or seven months."

22   Q.   Then you were asked, "Let me ask you this.  Were there

23   any restrictions placed on Mr. Evans while he was staying at

24   the Howard Johnson's?"  What was your answer?

25   A.   "Just food."

1    Q.  And you were asked, "I'm not saying what you paid for,

2    in other words, while he was at the Howard Johnson's, was he

3    given any instructions not to leave the hotel?"  What was

4    your answer under oath, sir?

5    A.  "No."

6    Q.  "Was he given any instructions not to return back to his

7    brother's house?"  What was your answer, sir?

8    A.  "No."

9    Q.  "Was he given any instructions not to visit his mother

10   or not to go back to the neighborhood for any reason?"  What

11   was your answer, sir?

12   A.  "No."

13   Q.  Now, sir, you had security issues with him you told us,

14   right?  Right?

15   A.  Yes.

16   Q.  But you didn't tell him not to go back to the

17   neighborhood, right?

18   A.  Yes.

19   Q.  You didn't tell him not to talk to his family, right?

20   A.  Yes.

21   Q.  And you didn't tell him he could go right back to

22   40 Chaney Street if that's what he wanted to do, right?

23   A.  Yes.

24   Q.  Now, sir, you were asked in 2003, "Okay."  This is at

25   page 70.  "Okay.  So that if he was at his brother's house

1   some time while he was staying at the hotel, it wouldn't

2   have been unusual because there was no reason for him not to

3   be there; is that right?"  What was your answer?

4   A.   What line are we on?

5   Q.   This is page 70, I just read you lines 1 through 4.  I'm

6   asking you to read to us your answer under oath at line 5.

7   A.   "I don't recall.  I thought he was living -- it was my

8   recollection that he was living at a girlfriend's house and

9   she threw him out.  I mean, that was my recollection of it."

10  Q.   And you were asked is that some time after he lived at

11  his brother's?

12  A.   I just can't recall.

13  Q.   So you were asked, "There was at least two addresses

14  that you knew were associated with Mr. Evans prior to

15  putting him in the Howard Johnson's."  What was your

16  answer?

17  A.   "If there were two addresses, I only remember 40 Chaney

18  Street."

19  Q.   And the next question, "And when you say the reason

20  you're estimating that it was two weeks is because this

21  investigator had found Mr. Evans at 40 Chaney Street on

22  September 12th; is that right?"

23  A.   "Yes."

24  Q.   "But if you have no information as to whether or not

25  Mr. Evans was living at 40 Chaney Street on September 12th,

1   is that right?"

2   A.  "That's correct."

3   Q.  And the next page.  "He could have been visiting his

4   brother while this investigator come by; is that right?"

5   A.  "I just don't recall."

6   Q.  "So if he was visiting his brother, would that change

7   your opinion as to how long he stayed at the

8   Howard Johnson's?"  What was your answer?

9   A.  "It would change my opinion by maybe two weeks.  My best

10  recollection, three or four weeks prior to the trial he

11  stayed.  He stated he had no place to live, that's my

12  recollection."

13  Q.  And at line 13, "And when he stated he had no place to

14  live, he didn't mention the fact that he didn't have any

15  money?"  What was your answer?

16  A.  "I don't recall him ever mentioning money."

17  Q.  That's the fifth time money's brought up during your

18  testimony in 2003 and the fifth time you don't say anything

19  about $20, right?

20  A.  That's correct.  I did not because I felt it was so

21  insignificant it had no impact on this particular case or

22  the other one.

23  Q.  And at line 17, "And in terms of deciding to place him

24  in the Howard Johnson's, who did you speak to before that,

25  before you actually drove him to the Howard Johnson's and

1  signed him in under the name Ricky Evans?"  What was your

2  answer, sir?

3  A.  "All I know is I brought him to the Howard Johnson's,

4  and I told my boss that we had put him up there."

5  Q.  And you are asked at the next page, 72, "And when you

6  say your boss, who did you tell?"  What was your answer,

7  sir?

8  A.  "Lieutenant McNully."

9  Q.  And you were asked, "Did he authorize you to bring this

10  witness to the Howard Johnson's so it would make it easier

11  for the Boston Police to find him two, three, four weeks

12  later for trial?"  What was your answer?

13  A.  "I think I took him to the hotel and I reported to

14  homicide and told them what I had done, and they kept him

15  in."

16  Q.  And you were asked, "And when you say reported to

17  homicide, you reported to your supervisor?"

18  A.  "Yes."

19  Q.  And you were asked at line 13, sir, under oath in front

20  of Judge Rouse, "Did you ever tell the district attorney

21  that Mr. Evans was being housed at the Howard Johnson's

22  hotel on your instructions?"  What did you say under oath to

23  Judge Rouse in 2003 about that, sir?

24  A.  "I assumed the district attorney's office knew.  Do I

25  have a specific recollection, no."

1   Q.  And you were asked, "So you don't remember having any

2   conversations with A.D.A. O'Meara or Assistant District

3   Attorney Phil Beauchesne relative to where Mr. Evans was

4   staying?"  What was your answer under oath in 2003?

5   A.  "I just assumed they knew."

6   Q.  And you were asked, "Is that a no?  You don't have any

7   memory of having conversations with them?"  What was your

8   answer on page 73?

9   A.  "I have no specific memory of a conversation with them."

10  Q.  And you were asked -- I'm sorry, I lost my place.  One

11  second.  Oh, line 6, "What made you assume that they knew?"

12  A.  "Because we kept going back from the hotel to the D.A.'s

13  office to pick him up."

14  Q.  Well, didn't you say you only did that twice?  Wasn't

15  that your testimony earlier today, sir?

16  A.  Twice, I don't recall exactly, but, yes, we took him

17  from the hotel to the D.A.'s Office.  The number of times, I

18  don't recall.

19  Q.  At page 74, line 5, "And did you have a conversation

20  with Mr. Beauchesne as to how Mr. Evans would get to the

21  district attorney's office?"  What was your answer under

22  oath in 2003, sir, at line 8?

23  A.  "I don't know if I did or I didn't."

24  Q.  And at line 13, "You're aware of what's called promises,

25  rewards and inducement for witnesses."  Are you aware what

1    that means?

2    A.  "Yes."

3    Q.  What did you say in 2003 about that?

4    A.  "Yes."

5    Q.  And you were asked at line 17, "Are you aware that you

6    have an obligation to turn over to the district attorney's

7    office anything that you may have promised a witness in

8    exchange for their testimony or their statement?"  What was

9    your answer?

10   A.  "Yes."

11   Q.  And you were asked, "And do you have a memory of in

12   carrying out that duty, Lieutenant, telling the assistant

13   district attorney in this case that you made some promises

14   to Ricky Evans regarding these pending matters?"  What was

15   your answer?

16   A.  "I spoke to Phil Beauchesne and told him exactly what I

17   had said to Ricky Evans, that I told him I'll bring it to

18   the assistant district attorney's attention and testify in a

19   court of law, if required."

20   Q.  Then you were asked, "And with respect to the

21   Howard Johnson's situation, the fact that you had put

22   Mr. Evans up for nonsecurity reasons for two, three or four

23   weeks prior to trial, do you have a memory of bringing that

24   to the attention of anyone from the Suffolk County District

25   Attorney's Office?"  What was your response under oath in

1    2003, sir?

2    A.  "I know I told my boss.  I don't have a specific

3    recollection of telling Assistant District Attorney

4    Beauchesne, hey, we put this guy up.  I assume I did, I just

5    have no recollection of it."

6    Q.  Okay.  "And relative to money, if Mr. Evans says he was

7    paid at that time in August or June, July, August of 1989,

8    all the way up to October of 1989, was there a fund that the

9    Boston Police Department from which you could pay

10   informants?"

11   A.  "There is a fund, yes."

12   Q.  And, sir, normally, when you deal with informants, are

13   they registered in some way?

14          MS. HARRIS:  Objection.

15          THE COURT:  Overruled.

16   Q.  Just in general, when you deal with informants, are they

17   registered in some way?

18   A.  Yes.

19   Q.  And did Mr. Evans get registered at all in this case?

20          MS. HARRIS:  Objection.

21          MR. ROACHE:  Objection.

22          THE COURT:  Overruled.

23          MR. ROACHE:  Your Honor, may I have a sidebar on

24   this?

25          THE COURT:  No.  Overruled.  Go on.

1   A.  No.

2   Q.  You were asked at page 77, line 11, "If it's an

3   informant, the person would have to be --" I'm sorry, you

4   were asked, let me back up, "What type of

5   restrictions --" never mind, I'll skip that.  You were asked

6   about the petty cash fund in the homicide unit, and you were

7   asked specifically at line 14, "And if it's petty cash, what

8   happens?"  What was your answer?

9   A.  "I think you can get that from, I'm not 100 percent sure

10   about, I think that comes out of the cashier's office, which

11   is a different fund."

12   Q.  And you were asked, "And if you needed $35, $40 or $50

13   to give a witness, you would have to go to the Boston Police

14   cashier's office in order to get it?"  What was your

15   answer?

16   A.  "Well, I believe the commander of the homicide unit had

17   petty cash."

18   Q.  "And you'd have to get the petty cash from the commander

19   of the homicide unit?"

20   A.  "You'd have to put a request in and sign for it."

21   Q.  "And when you sign for it, was there a book or a ledger

22   or someplace in which these cash payments were kept back in

23   1988 and '89?"

24   A.  "I can't remember."

25   Q.  "But you yourself don't have any memory of ever paying

1   any witness out of this petty cash fund; is that correct?"

2   A.  "Correct."

3   Q.  "Okay.  Now, with respect to the promises, rewards and

4   inducements that we're talking about with Mr. Evans, were

5   you aware in this case that the district attorney's office

6   had indicated that there were no promises, rewards or

7   inducements made to Mr. Evans in exchange for his

8   testimony?"  What was your answer?

9   A.  "I don't know."

10  Q.  And you were asked, "Well, you were present in the

11  courtroom when Mr. Evans testified; is that right?"

12  A.  "Yes."

13  Q.  What was your answer?

14  A.  "Yes."

15  Q.  And you were asked, "Okay.  So you heard him testify on

16  the stand; isn't that right?"  What was your answer?

17  A.  "Yes."

18  Q.  And in the course of your testimony, you heard

19  Attorney George stand up and asked him was he promised

20  anything in exchange for his testimony.  There's a sidebar

21  conference.  If you could skip to page 83.

22          MS. HARRIS:  The question was withdrawn.

23          MS. SCAPICCHIO:  There was a sidebar conversation,

24  unless you want me to get into the sidebar conversation, I'm

25  happy to do it.

1       MS. HARRIS:  No, but the question was withdrawn.

2  You posed a new question on page 83.

3       MS. SCAPICCHIO:  Right.

4  Q.  Detective Callahan, you were asked at page 83 of your

5  testimony in 2003, "Lieutenant, do you have a memory as you

6  sit here today of Mr. Evans testifying in two separate voir

7  dires before he testified in front of the jury in this case.

8  Do you remember that"?

9  A.  "I know he testified, yes."

10  Q.  "Okay.  And do you remember one of those voir dires

11  being specifically directed at what he was promised in

12  exchange for his testimony?  Do you remember that?"

13  A.  "No."

14  Q.  "Do you remember whether or not you were present in the

15  courtroom when he testified?"

16  A.  "I don't."

17  Q.  "And that was at the voir dire, right?"

18  A.  "Apparently so, yes."

19  Q.  But you know he was there for his trial testimony,

20  right, you were there?

21  A.  Yes.

22  Q.  Okay.  And you were asked directing your attention, it's

23  day 10, page 177, and do you remember being asked questions

24  line 11 through 25 relative to whether or not you were

25  present when Mr. Evans was in court, what was your answer?

1    A.   What page?

2    Q.   This is the bottom of 83, the top of 84.

3    A.   "Yes."

4    Q.   Now, sir, you were asked at line 23 on page 85, "And at

5    some point in time do you have a memory of bringing to his

6    attention -- talking about Mr. Beauchesne -- hold on.

7              THE COURT:  Before you back up, let's take a

8    break.  All rise for the jury.

9              (A recess was taken.)

10             THE CLERK:  All rise for the jury.

11             THE COURT:  You can be seated.

12             MS. SCAPICCHIO:  May I, your Honor?

13             THE COURT:  Yes.

14   Q.   Detective Callahan, you were asked at page 85, line 6,

15   about your conversations with the district attorney's

16   office, and you were asked specifically, "And during those

17   several conversations did the assistant district attorney

18   ever ask you what witnesses were promised in exchange for

19   their testimony?"  What was your answer?

20   A.   "It's my recollection that I had told the Assistant

21   District Attorney Beauchesne exactly what I told this

22   court.

23   Q.   "And when you say exactly what you told this court, you

24   told them about the willingness to help Mr. Evans out on his

25   pending cases; is that right?"

1   A.  "I don't -- willing to help, I just stated I would bring

2   his cooperation to the attention of the district attorney

3   and I would testify to the cooperation, if he required."

4   Q.  And you were asked, "And you have a memory of bringing

5   that to Mr. Beauchesne or Mr. O'Meara's attention?"  What

6   was your answer?

7   A.  "Mr. Beauchesne."

8   Q.  Now, sir, do you remember being deposed in this case?

9   A.  Yes.

10  Q.  This is the September 8th, 2006 deposition at page 132.

11  Do you have a memory when you were asked that very same

12  question about the promises of bringing it to the attention

13  of Mr. Beauchesne, do you remember what you said under oath

14  at your deposition?

15  A.  I don't have a current memory.

16          MS. SCAPICCHIO:  May I approach the witness, your

17  Honor?

18          THE COURT:  Yes, you may.

19          MS. SCAPICCHIO:  This is page 132 and 133 of the

20  deposition on September 8th, 2006.

21  Q.  Starting at line 10 and straight through to the next

22  page, is that too small for you to read?

23  A.  I can see, thank you.

24  Q.  Can you read that to yourself, sir.

25  A.  Read it to myself?

1    Q.  Yes.

2    A.  Yes.  I read it.

3            MS. SCAPICCHIO:  May I approach the witness, your

4    Honor?

5            THE COURT:  Yes.

6    Q.  Sir, does that refresh your memory at all when in -- are

7    you done reading, I'm sorry -- when in 2006 at a deposition

8    you were asked specifically about conversations that you had

9    with Mr. Beauchesne, you were asked, "And what was the

10   conversation that you and Mr. Beauchesne had?"  Fair to say

11   your answer was, "I said Phil, I want to bring your

12   attention, to your attention this guy has cases, and I told

13   him I couldn't do anything for him and that he would have to

14   go through the district attorney's office in regard to any

15   cases that he had."  Do you remember that being your answer

16   in 2006 about what you told Assistant D.A. Phil Beauchesne

17   about the pending cases?

18   A.  Yes.

19   Q.  And do you remember asking, "What did Phil Beauchesne

20   say?"  And your answer being, "I don't recall him saying

21   anything"?

22   A.  Yes.

23   Q.  And then do you remember being asked, "So for the first

24   conversation you had was with Phil Beauchesne, the second

25   conversation was when you first talked to Ricky Evans about

1   the Tiffany Moore case; is that correct?  What was your

2   answer?  Do you remember your answer being, "I think that

3   would be fair"?

4   A.  Yes.

5   Q.  And in that conversation, just in regards to you were

6   asked, "And what was that conversation?"  And you were

7   asked, "Just in regards to his cases there was nothing I

8   could do to help?"  Do you remember that being your answer

9   under oath in 2006?

10  A.  Yes.

11  Q.  So the conversation you had with Assistant D.A. Phil

12  Beauchesne, according to your testimony under oath, is that

13  you told Mr. Evans there was nothing you could do to help,

14  right?

15  A.  That's correct.

16  Q.  Now, sir, you were asked at line 13 on page 85 --

17          MR. ROACHE:  Where are we now?

18          MS. SCAPICCHIO:  Page 85, motion for new trial,

19  line 13.

20  Q.  "When you say exactly what you told this Court, you told

21  him about the willingness to help Mr. Evans out on pending

22  cases, is that right?"  What did you say back in 2003?

23  A.  What line, please?

24  Q.  Line 16.

25  A.  "I don't -- willingness to state, I just stated I would

1    bring his cooperation to the attention of the district

2    attorney and that I would testify to his cooperation, if

3    required."

4    Q.  And then you were asked at line 23, "And then at some

5    point do you have a memory of bringing to his --" this is

6    Assistant D.A. Phil Beauchesne -- "or Mr. O'Meara's

7    attention with respect to the assistance you gave him at the

8    Howard Johnson's?  Did you bring that to anyone's

9    attention?"  What was your answer back in 2003 under oath?

10    A.  "I know I got it to my boss' attention.  I assume that

11    the D.A.'s office was aware of it, but I don't have a

12    recollection of specifically telling them."

13    Q.  And you were asked, "You don't have a recollection of

14    specifically telling them?"  What was your answer?

15    A.  "No."

16    Q.  Then you were asked some questions on page 87 about

17    steps you took after you interviewed Ricky Evans and took

18    that tape recorded statement.

19          MS. SCAPICCHIO:  Your Honor, could we be seen for

20    a minute?

21          THE COURT:  Okay.

22          (THE FOLLOWING OCCURRED AT SIDEBAR:)

23          MS. SCAPICCHIO:  Judge, would it be the position

24    of the Court if I asked this witness what he did after to

25    corroborate Mr. Evans' statements that he interviewed the

1    individual by the name of Keith Butler, would that be

2    opening up all the other reports he did?

3             THE COURT:  This is to corroborate the things

4    that --

5             MS. SCAPICCHIO:  Ricky Evans said.

6             THE COURT:  So he went and he talked to other

7    witnesses to corroborate what Ricky Evans said?

8             MS. SCAPICCHIO:  He talked with one other witness

9    to corroborate what Ricky Evans said, if I ask him the

10   question, does it open the door what other evidence he did?

11            THE COURT:  To corroborate --

12            MS. SCAPICCHIO:  In general.

13            THE COURT:  I don't think so.

14            MS. HARRIS:  I would just put our position would

15   be to the extent we're asking him, we did during the summer

16   months, it would be our position to be the fact on the other

17   interviews.  I understand there is some limitation on the

18   content of the interviews, but to the extent we're talking

19   about dates during the summer months and what he did and

20   what he reported to the district attorney's office, I think

21   that's all in play.

22            THE COURT:  I don't see how it's all in play.  I

23   know that there was a confusion on dates.  It seems to me

24   those are confusions not what he did but certainly marking

25   what he did, in other words, to frame the issue.  I mean,

1    your point in getting to --

2             MS. SCAPICCHIO:  He was asked questions at the

3    motion for new trial about what he did to corroborate

4    Ricky Evans' testimony.

5             THE COURT:  And your point is he didn't do much?

6             MS. SCAPICCHIO:  He didn't do much, yes.

7             THE COURT:  He just talked to one person?

8             MS. SCAPICCHIO:  Yes.

9             THE COURT:  That's actually a different issue.

10   That's your point, he didn't have to do much because it was

11   corroborated?

12            MS. SCAPICCHIO:  That's why.

13            THE COURT:  I agree it does open the door.

14            MS. SCAPICCHIO:  But as to what he testified to in

15   2003, did he go and interview people at 118, did he go and

16   corroborate at any point, I can't get into any of that?

17            MS. SCAPICCHIO:  Well, if the defendants want to

18   say, well, it didn't have to corroborate because he was

19   already corroborating Peaks and Alexander, then, yes, I

20   think --

21            MS. HARRIS:  You can't pull them all apart?

22            THE COURT:  I agree.

23            MS. SCAPICCHIO:  One other question, if Mr. Evans

24   in his statement tells him where the gun is and he doesn't

25   look for the gun as a public safety matter, can I ask him

1    about that?

2            MS. HARRIS:  I think if we're getting into that,

3    I'm going to get into the search warrant.

4            THE COURT:  There's a search warrant, Evans?

5            MS. HARRIS:  For Terrance Taylor, there was

6    testimony by Antonio Anthony that the guns were taken to

7    New York and that they were deposited someplace else.  His

8    statement from Evans is a year later, and I would submit if

9    we start talking about Evans to find the guns, then all of

10   that comes in.

11           MS. SCAPICCHIO:  My only point is that

12   Ricky Evans' statement, Ricky Evans tells him according to

13   his tape recorded statement that the gun is on a path in

14   Franklin Field, and he never goes to Franklin Field to

15   look.

16           THE COURT:  If the answer is because a year before

17   Terrance Taylor --

18           MS. SCAPICCHIO:  Right.

19           THE COURT:  You do open it, whatever the truth of

20   the matter, you certainly open it.

21           MS. HARRIS:  Just when we begin examination of

22   Mr. Callahan, Ms. Scapicchio opened her examination saying

23   that when you inherited the investigation it was a mess, and

24   my position, there will be limitations, it's fairly put in

25   front of the jury to wonder what it was Callahan started

1    with and the mechanisms he went through in order to pick up

2    his investigation and that he took --

3              MS. SCAPICCHIO:  He said no.

4              THE COURT:  I don't think it opened any.

5              MR. CURRAN:  Judge, the other thing, she's asked

6    numerous questions, did he write a report on that, he didn't

7    write a report on that, what did you write a report on?

8    We're not going into the substance, but he reported in

9    excess of 45 interviews.  It goes to does he have to report

10   everything.

11             THE COURT:  This case is about the reports about

12   Ricky Evans.

13             MR. CURRAN:  I understand.  It still goes to the

14   issue they're making the impressions to this jury is he had

15   a few witnesses, he didn't do anything, he didn't write the

16   stuff.

17             THE COURT:  You certainly could talk about numbers

18   of reports if you want to get into that, but the only

19   reports that mattered are reports with respect to Brady

20   issues having to do with Evans.  That's it.

21             MR. CURRAN:  The other issue is the time frame,

22   time frame in regards from June he gets involved and he has

23   contact with Evans and the delay that's been inferred from

24   June 21st to August 6.  We have every right, on this day,

25   did you interview someone, did you write a report and go

1    through it.  It wasn't like Ricky Evans was the only

2    witness.  On numerous occasions, based on her feeding him

3    information, that's what the evidence Ricky Evans said.

4            THE COURT:  I'm not sure, as a matter of law,

5    writing 5,000 reports would have excused not doing a report

6    about cooperation.

7            MS. HARRIS:  That's not what we're arguing,

8    Judge.

9            MS. HARRIS:  What we're arguing is that there were

10   communications on a constant basis.  It demonstrates the

11   level of communication between this witness and the district

12   attorney's office, the level of activity.  We don't need to

13   go through what every one has said, but we can these dates

14   you had five.

15           THE COURT:  You don't have the talk about the

16   content, you can certainly talk about the frequency,

17   correct.

18           MS. SCAPICCHIO:  Thank you.

19           (SIDEBAR CONFERENCE WAS CONCLUDED)

20   Q.  Page 91 of your motion for a new trial testimony, you

21   were asked to read a portion of Mr. Evans' trial testimony,

22   and you were asked, I'm going to ask you to read page 20 of

23   Mr. Evans testimony to yourself.  After having read that,

24   were you asked a question, "Does that refresh your

25   recollection as to whether or not Mr. Evans took the witness

1    stand in a murder trial and answered that no police officer

2    had promised anything in exchange for his testimony?"  What

3    was your answer?

4    A.  "Yes."

5    Q.  "And you were sitting in the courtroom during that

6    testimony?"

7    A.  "Yes."

8    Q.  "And you didn't do anything?"

9    A.  "I think I was."

10   Q.  "Did you do anything to bring to the Court's attention

11   the fact that you had promised Mr. Evans something in

12   exchange for his testimony?"

13   A.  "No, ma'am."

14   Q.  "You didn't?"

15   A.  "No."

16   Q.  "Did you do anything to bring that to the attention of

17   the assistant district attorney trying the case?"  And that

18   refers to the promises made to Mr. Evans.  What was your

19   answer back in 2003, line 21?

20   A.  "No, ma'am."

21   Q.  And the next question, You knew at the time that he said

22   he wasn't promised anything, that you, at least, had put him

23   up at the Howard Johnson's; is that right?"

24   A.  "Yes, ma'am."

25   Q.  "And you knew that you had promised to assist him in

1  some way with his pending matters, although you can't

2  guarantee the outcome; is that right?"

3  A.  "I agreed to testify before court if he requested me to

4  do so."

5  Q.  You were asked, "And you didn't do anything when you

6  heard him tell the jury that he wasn't promised anything in

7  exchange for his testimony?"  What was your answer?

8  A.  "No."

9  Q.  And you were asked, "Is there a reason that you didn't

10  do anything?"  What was your answer?

11  A.  "I had no responsibility for it."

12  Q.  And you were asked, "And you sat in the courtroom and

13  you listened to him?"  And what was your answer?

14  A.  "Yes."

15  Q.  And you listened to him say something that wasn't true,

16  is that right?  And you were asked, "Did you sit in the

17  courtroom and listen to him tell the jury something that

18  wasn't true?"  What was your answer in 2003, sir?

19  A.  "I don't believe that Mr. Evans testified falsely in

20  his -- blank blank."

21  Q.  And you were asked, "But you knew it to be untrue; is

22  that a fair statement?"

23  A.  "No, he didn't know it to be untrue.  I don't think what

24  I testified to is what I testified to, but what promise was

25  made, he was never made a promise that you're going to get

1    off on this or anything else.  I think that's what they were

2    asking."

3    Q.  "You were a police officer for 33 years; is that

4    correct, Lieutenant?"

5    A.  "Yes."

6    Q.  "And in your 33 years, have you ever on any occasion

7    when you promise witnesses that you would see what you could

8    do about their pending cases, have you ever brought that to

9    the attention of the assistant district attorney trying the

10   case?"  What was your answer?

11   A.  "I never suggested that I would see what I could do, all

12   I suggested was I would bring it to their attention.  I

13   never stated I would do anything, and I brought it to the

14   Assistant District Attorney Beauchesne's attention, and I

15   told him I would testify in a court as to his cooperation if

16   he so required me to.  That's what I testified to."

17   Q.  And you were asked at page 95, "So, is it your testimony

18   here today --" this is 2003 -- "under oath that when you

19   heard Mr. Evans say that he wasn't promised anything in

20   exchange for his testimony that you believe that to be a

21   truthful statement?"

22   A.  "Well, I believe the promise -- blank blank."

23   Q.  You're asked, "Yes or no.  Did you believe that to be a

24   truthful statement?"  What was your answer at line 12?

25   A.  "It was my opinion that a promise or reward was that he

1   was going to get something he wanted.  He hasn't gotten

2   anything.  We put him up in a hotel, yes."

3   Q.  And you were asked, "Is that not a promise or reward for

4   his testimony?"  What did you say at line 19?

5   A.  "I didn't look at it as a reward for his testimony."

6   Q.  And you were asked, "What did you look at it as?"

7   A.  "I looked at it as making sure this person would be in

8   court on the day he was required to be there."

9   Q.  You were asked, "Well, did you do that for any other

10  witness, make sure that they were going to be in court and

11  put them up at the Howard Johnson's two, three, or four

12  weeks before trial?"  What was your answer?

13  A.  "No."

14  Q.  "Do you know if anyone else in this case did?"  What was

15  your answer?

16  A.  "I'm not aware of it."

17  Q.  And you were asked, "So he would be the only witness who

18  you put up at the Howard Johnson's two or three or four

19  weeks prior to trial without any security concerns; is that

20  fair to say?"

21  A.  "Yes."

22  Q.  So back in 2003, Detective Callahan, that's the third

23  time you said that he wasn't there for security reasons; is

24  that right?

25          MR. ROACHE:  Objection.

1          THE COURT:  Overruled.

2    Q.  Sir, is that the third time you said he wasn't there for

3    security reasons?

4    A.  That was a two-part question.  I believe I answered the

5    first part.

6    Q.  Sir, that's not my question.  Is that the third time?

7          MR. CURRAN:  Could he answer the question, Judge?

8          THE COURT:  Yes.

9          MR. CURRAN:  Please, Mr. Callahan, thank you.

10   A.  I believe I was referring to he was the only witness I

11   ever put up in a hotel in my career.

12   Q.  So, sir, that didn't answer my question.  My question

13   was is that the third time that you said he wasn't there for

14   security reasons back in 2003?  The question was nonsecurity

15   reasons, and you answered yes.  That was the third time in

16   2003 you said he wasn't there for security reasons, is that

17   right, sir?

18         MR. ROACHE:  Your Honor, I'd ask that the question

19   be restated or reread.

20         THE COURT:  Why don't you reread it.

21   Q.  Line 8.  "Okay.  So he would be the only witness who you

22   put at the Howard Johnson's two or three or four weeks prior

23   to trial without any security concerns; is that fair to

24   say?"  What was your answer, sir?

25   A.  Yes.

1   Q.  And that's the third time that you testified in 2003

2   that you said Mr. Evans wasn't at the hotel for security

3   reasons, is that right, sir?

4           MR. ROACHE:  Objection.

5           THE COURT:  Overruled.

6   A.  In this context, yes.

7   Q.  And you were asked, "Okay.  In your mind did you

8   consider that a promise or a reward in exchange for a

9   statement or testimony?"  What was your answer?

10  A.  "Well, it's not a reward to me.  I didn't think it was a

11  reward to Mr. Evans.  I just thought we were doing what was

12  right to make sure his attendance in court would be there,

13  and as far as the security concern, I did have thoughts that

14  with all the shootings going on, that if he was living in a

15  hallway, he may have a problem."

16  Q.  And the very next question, sir.

17  A.  "But I mean -- blank blank."

18  Q.  "That's not the reason you put him in the

19  Howard Johnson's?"  And what's your answer under oath back

20  in 2003 when you said maybe there were some security

21  concerns, you were asked about that in 2003, and you were

22  asked, "That's not the reason you put him in the

23  Howard Johnson's?"  What was your answer in 2003?

24  A.  "I put him in the Howard Johnson's for his appearance in

25  court."

1   Q.  And you were asked, "Because it would have made it

2   easier for you to find him when you needed him in court,

3   right?"

4   A.  "Yes."

5   Q.  "And he had nowhere to live?"

6   A.  "Correct."

7   Q.  "He certainly benefited from the fact he was living at

8   the Howard Johnson's because he had a place to live?"

9   A.  "Correct."

10  Q.  So you knew it was a promise, a reward or inducement,

11  right?

12          MS. HARRIS:  Objection.

13          THE COURT:  Overruled.

14  A.  No, I never thought this was a promise, reward or

15  inducement, I felt --

16  Q.  So you said when he benefited from it back in 2003, sir,

17  what did you mean?

18  A.  I believe the Commonwealth benefited from it.

19  Q.  That's not what you said in 2003, you said he benefited

20  from it?

21          MR. ROACHE:  Your Honor, the question was he.  He

22  did not answer the question that Mr. Evans benefited, he

23  answered the question that was posed.

24          THE COURT:  I understand, I understand, but she

25  has a right to inquire as to what he said in 2003 and what

1  this witness now believes is the interpretation of that.

2  She certainly has a right to inquire, and you don't have a

3  right to rebut in your question.  Go on, counselor.

4  Q.  So, sir, what did you mean when you said it was a

5  benefit to him in back in 2003?

6  A.  It was my -- I don't have an actual memory, but it was

7  my belief that the Commonwealth was benefiting from it to

8  guarantee his appearance and his safety for testifying at

9  the court.

10 Q.  That's not what you said in 2003.  In 2003 you said he

11 benefited, right?

12 A.  Yes.

13 Q.  So you admit in 2003 that it was a benefit to him; is

14 that correct, sir?

15 A.  In 2003, that's what I testified to, yes.

16 Q.  Okay.  And you were asked at line 12, "He was provided

17 with all his meals?"  What was your answer?

18 A.  "Right."

19 Q.  "And he could visit his family or have them for meals?"

20 What was your answer?

21 A.  "I'm not aware of that."

22 Q.  And the next question, "Did you ever or did anyone

23 review how many meals he was charging on a regular basis?"

24 And what was your answer?

25 A.  "I don't know."

1   Q.  And you were asked, "As you sit here today, what was

2   your answer?"

3   A.  "I did not."

4   Q.  "Do you know if anyone else did?"

5   A.  "No."

6   Q.  So, back in 2003, you said you didn't even know he was

7   having family over for meals, right?

8   A.  That's correct, I did.

9   Q.  But you told us today that you chastised him about that,

10  right?

11  A.  He told me he had two friends at the hotel.  He never

12  told me about the meals that I can recall.

13  Q.  So he said he just had people over but he didn't bring

14  them downstairs?

15  A.  He told me he had two people over at the hotel, and I

16  chastised and reprimanded him for it.

17  Q.  Did you write a report?

18  A.  No.

19  Q.  Line 24, "Did anyone ever question you as to whether or

20  not he charged two, three, four, five, six meals a day to

21  his room?"

22  A.  "I don't know."

23  Q.  "He charged meals to his room.  Would that have been a

24  promise that you'd bring to the attention of the assistant

25  district attorney or the Court?"

1   A.  "Yes."

2   Q.  What's your answer?  Okay.  Then you were asked at line

3   8, "Did you in fact bring that to the attention of the

4   assistant district attorney or the Court in this case?"

5   What was your answer under oath, sir, in 2003?

6   A.  "I brought it to the attention of my boss.  I assumed

7   the district attorney's office was aware."

8   Q.  Then you were asked, "Now, after Mr. Evans testified in

9   this case, did you have any conversation with the Assistant

10  D.A. Phil Beauchesne or Frannie O'Meara about what he had

11  said on the stand regarding promises, rewards or

12  inducements?"  What was your answer in 2003?

13  A.  "No, I did not."

14  Q.  So, you sat in a courtroom, and you listened to a

15  witness commit perjury that you knew wasn't true, and you

16  didn't have a single conversation with the prosecutor about

17  that?

18          MR. ROACHE:  Objection.

19          THE COURT:  Overruled.

20  A.  No.

21  Q.  Did you go back to your office and write a report to

22  cover your rear end to say, wait a minute, this witness just

23  committed perjury, I better make sure everybody knows what's

24  going on so they don't blame me?

25          MS. HARRIS:  Objection.

1        THE COURT:  Overruled.

2   A.  He never committed perjury in my opinion.

3   Q.  Well, sir, when you said he wasn't promised anything,

4   was the hotel a promise, a benefit to him?

5   A.  I felt it was a benefit to the Commonwealth.

6   Q.  Was the money a benefit to him?

7   A.  The $20 for food, yes, I believe that was.

8   Q.  Was the promises regarding assistance on pending cases,

9   was that a benefit to him, sir?

10  A.  I did not agree to assist him on pending cases,

11  counselor.

12  Q.  Didn't you tell him I'll talk to the district attorney

13  and I'll speak to the Court on your behalf?

14  A.  But that was up to the district attorney's office, not

15  me.

16  Q.  Sir, did you say that to Mr. Evans before he made that

17  tape recorded statement?

18  A.  I have no idea at the time this was -- no, no, I don't

19  believe I did, but I don't recall.  I don't have a handle on

20  the timeline.

21  Q.  So when you just testified earlier today that you did

22  tell him before he made this tape recorded statement, was

23  that a lie under oath, sir?

24  A.  No, it wasn't.

25  Q.  Okay.  Now, sir, you were asked, "You never discussed it

1    with anyone?"  This is reference to Mr. Evans saying he

2    received nothing in exchange for his testimony.  What was

3    your answer?

4    A.  "I can't recall."

5    Q.  Now, sir, if you'll skip to page 114, line 11, you were

6    asked, sir, at line 11, "And do you have a memory now, sir,

7    as to Mr. Evans continuing to insist he wasn't promised

8    anything in exchange for his testimony?"  And I'll represent

9    to you that's after you had a chance to review Mr. Evans'

10   trial testimony.  What did you answer under oath in 2003?

11   A.  "Yes."

12   Q.  And you were asked, "And, sir, at that point in time,

13   sir, did you do anything to bring to the attention to the

14   Court that in fact you had promised to speak to the

15   District Attorney on his behalf?"  What was your answer

16   under oath?

17   A.  "No, ma'am."

18   Q.  Sir, if you'll skip to page 116, line 3, you were asked,

19   "And in your 33 years of experience as a police officer,

20   would you consider the fact that a police officer went and

21   assisted a witness in clearing up warrants under the realm

22   of promises, rewards and inducements?"  What was your

23   answer?

24   A.  "Yes."

25   Q.  And you were asked at line 13, "In addition to clearing

1    up those warrants, would you consider putting a witness up

2    at the hotel room and paying for his room and board under

3    the realm of a promise, reward or inducement?"  Sir, would

4    you tell this jury what you told Judge Rouse under oath in

5    2003 about that?

6    A.  "Yes."

7    Q.  So, in 2003, when you were under oath, you said it was a

8    promise, right?

9    A.  Yes.

10   Q.  But today your story is it's not; is that right?

11   A.  That's my belief.

12   Q.  Okay.  And then you were asked about putting this

13   witness in the hotel especially if that witness is homeless,

14   that's a promise, right, what did you say?

15   A.  "Yes."

16   Q.  And then you were asked, "And in terms of promises,

17   rewards and inducements, if the witness was paid any monies,

18   whether it's out of petty cash or informant cash funds, that

19   would certainly be, that would be a promise that should be

20   reported to the prosecutor; is that right?"  What was your

21   answer?

22   A.  "Yes."

23   Q.  And the next question, "And do you have a memory as you

24   sit here today reporting any of that information to the

25   prosecutor?"

1   A.  "I'm sure I told the assistant district attorney

2   relative to what I promised Ricky Evans.  I know I told him

3   that.  In regards to financial rewards, I'm not aware of

4   any, and in regards to the hotel, I don't have a specific

5   memory of telling the assistant district attorney."

6   Q.  And you were asked on page 118, "Even if in fact he

7   stayed there for two or three or four weeks, that is a

8   promise in exchange for his testimony; is that fair to say?"

9   A.  "Yes."

10  Q.  What did you say back in 2003?

11  A.  "Yes."

12  Q.  Now, sir, if you could skip to --

13          MS. SCAPICCHIO:  Could I just have a moment, your

14  Honor?

15          THE COURT:  Yes.

16  Q.  So, sir, it's fair to say to say in 2003 you admitted

17  under oath that the hotel was a promise; is that right?

18  A.  Yes.

19  Q.  And the pending cases were promises; is that right?

20  A.  I admitted that the hotel, yes.

21  Q.  And money certainly would have been a promise, but you

22  didn't admit to giving him any back in 2003; is that

23  correct?

24  A.  That's correct, because I felt it was insignificant.

25  Q.  Sir, if it's so insignificant, why didn't you just say

1   it, why didn't you say, hey, I gave him all this money, all

2   I gave him was 20 bucks to get a meal, that's all I ever

3   did, why wouldn't you have said that in 2003?

4          MS. HARRIS:  Objection.

5          THE COURT:  Overruled.

6   A.  Because in my opinion the $20 was so insignificant it

7   never -- I never even thought it as a reward, promise or

8   inducement.

9   Q.  How many other witnesses did you give cash money to

10  before you turned the tape recorder on and they made

11  incriminating statements against a defendant, how many other

12  times, sir?

13         MS. HARRIS:  Objection.

14         THE COURT:  Overruled.

15  A.  The sequence of events --

16  Q.  Sir, answer my question, how many other times did you

17  give cash money to a witness before you took their tape

18  recorded statement, how many times, sir?

19         MS. HARRIS:  Objection.

20         THE COURT:  Overruled.

21  A.  My understanding --

22  Q.  Sir, how many times?

23  A.  Never.  I never had anyone that went without food for a

24  day that I had to give a couple of bucks to.

25  Q.  And did you document that, sir?

1   A.  No, I did not.

2   Q.  And that's because it was so insignificant?

3   A.  In my opinion.

4        MR. ROACHE:  Your Honor, we've been over this for

5   two hours.

6        THE COURT:  Sustained.

7   Q.  Now, sir, since Mr. Drumgold's release in this case,

8   since you testified in 2003, your position on whether or not

9   you told the district attorney has changed, right?

10        THE COURT:  The district attorney about what?

11        MS. SCAPICCHIO:  I'm sorry.

12  Q.  Since your testimony in 2003, when you said you had no

13  memory of telling the district attorney about the Howard

14  Johnson's and you had no memory certainly of telling them

15  anything about the money because you hadn't told anyone at

16  that point, is your position now that you did tell him?

17  A.  Yes, that's correct.

18  Q.  Okay.  And did you previously say the reason that you

19  you're now sure you told him because you reviewed something

20  in your file?

21  A.  That was part of it, yes.

22  Q.  Well, sir, there's not a single document in the

23  Boston Police file about Mr. Evans being in a hotel, is

24  there?

25  A.  No, there is not.

1    Q.  There's not a single request for payment about that, is

2    there?

3    A.  No.

4    Q.  There's not a single document in your file about the

5    $20; is that right?

6    A.  That is correct.

7    Q.  And there's not a single document in your file about the

8    promises, rewards or inducements regarding pending cases; is

9    that right?

10   A.  That is correct.  The hotel on prior -- on municipal

11   court, the Boston Police paid the charges for lodging.  If

12   it's post indictment --

13   Q.  I'm not asking what the procedure is, sir, I'm asking

14   you about the file because you said you reviewed the file?

15   A.  -- the district attorney's office pays for --

16          MR. CURRAN:  Could he answer the question, please,

17   Judge out of common courtesy.

18          MS. SCAPICCHIO:  He's not answering.  He hasn't

19   replied.

20          MR. CURRAN:  You're screaming over him.  Let him

21   answer the question.

22          THE COURT:  Wait, wait, wait.

23          MS. SCAPICCHIO:  Your Honor, is he cross-examining

24   or is Ms. Harris because they both shouldn't be objecting?

25          THE COURT:  Ask your question again and wait for

1    the answer.  Go on.

2    Q.  Detective Callahan, is there a single document in your

3    file that you reviewed from your testimony in 2003 until

4    2006 and 7 and 8 when you were deposed in a prior hearing

5    that indicates Mr. Evans was put up at the Howard Johnson's?

6    Is there a single document in that file, sir?

7    A.  No.

8    Q.  Is there a single document in that file about the $20

9    that you paid to Mr. Evans?

10   A.  No.

11   Q.  Is there a single document in that file regarding

12   promises to help Ricky Evans on his pending cases?

13   A.  No.

14   Q.  So, sir, when you reviewed that file to refresh your

15   memory about your conversations with Mr. Beauchesne, it's

16   fair to say there was nothing in the file about those three

17   things, right?

18   A.  That's correct, however --

19   Q.  Sir, there's no question before you.

20          MR. ROACHE:  Let him finish the question.

21          THE COURT:  There is no question before him.  You

22   can ask what you like.  Go on.

23   Q.  Now, sir, at a prior hearing on March 26th of 1988 when

24   you were asked about whether or not you told Assistant

25   District Attorney Phil Beauchesne, do you remember being

113

1     asked the question that --

2               MR. ROACHE:  Page.

3               MS. SCAPICCHIO:  I think it's page 2 -- page 21,

4     if I'm reading it right.

5     Q.  Do you remember being asked the question about your

6     conversations with the assistant district attorney and you

7     indicating you absolutely remember speaking to Beauchesne

8     about the pending cases, do you remember that, sir?

9     A.  Yes.

10    Q.  Okay.  And --

11              MS. HARRIS:  I'm sorry, can you tell me where you

12    are now?

13              MS. SCAPICCHIO:  Right now, 3-27-08, prior

14    hearing.

15              MS. HARRIS:  I'm sorry, page 21?

16              MS. SCAPICCHIO:  That was page 21.  We're moving

17    on now I believe to page 28.

18    Q.  And at the prior hearing when you were asked about why

19    Mr. Evans was put at the Howard Johnson's, in 1988 after you

20    were personally sued in this case, do you remember

21    testifying, "I believe I also testified that we had security

22    concerns?"

23    A.  Yes.

24    Q.  Now, sir, we just read your 2003 testimony, you didn't

25    say in 2003 there were security concerns, right?

1   A.   I believe I did.

2   Q.   You did?

3   A.   I believe I did mention security.

4   Q.   Where, sir, where did you say there were security

5   concerns that caused you to put Mr. Evans in the hotel?

6   A.   I don't know where it is, but I believe I mentioned

7   security concerns here.

8   Q.   And the very next question, sir, was, "That's not the

9   reason you put him in the hotel?"  And you agreed, "Yeah,

10   that's not the reason I put him in the hotel," right?

11   A.   Yes, but I believe security concerns is mentioned in

12   this testimony.

13   Q.   But, sir, in 1988, after you were sued, there were

14   security concerns, right?

15   A.   No.

16   Q.   In 1988, when you were asked at a deposition why you put

17   him in the hotel, you said it was the Treas Carter case, the

18   Tiffany Moore case and that there were security concerns,

19   right?

20   A.   Yes.

21   Q.   That's not what you said in 2003, sir, at the motion for

22   new trial; is that right?

23   A.   That's correct.

24   Q.   And in fact in 2003 when you were asked that same exact

25   question, you said you got him out of the hotel when the

1    Treas Carter case got continued, right?

2    A.  Correct.

3    Q.  And you said he wasn't in the hotel as a result of the

4    Treas Carter case, right?

5    A.  It was a culmination that led to him going to

6    Howard Johnson's.  The two shooters in the Treas Carter case

7    I was concerned about, there was a potential for three other

8    shooters in the Tiffany Moore murder, the violent area and

9    the increase in violence I was concerned he could get hurt

10   accidentally in another shootout if he was there, and, yes,

11   I had great concerns that if I couldn't find him, then I

12   would not have a witness for two murder trials.

13   Q.  Sir, that's not what you said in 2003, is it?

14   A.  In 2003, I did not have the benefit of reviewing the

15   files.

16   Q.  But you just told us the file had nothing about the

17   Howard Johnson's, the promises or the money, right?

18   A.  Correct.

19   Q.  So you reviewed a file that contradicted your memory,

20   and that's how your memory was refreshed?

21   A.  No.  My memory after 2003 after reviewing the reports

22   and after remembering the protocol requirements of the

23   district attorney's office, I had to have told them,

24   otherwise I wouldn't be employed there.

25   Q.  So the reason that your testimony changed in 2006 and

1    2007 and 2008 is because you reviewed protocols that said

2    you had to tell the district attorney?

3    A.  That was the protocol in homicide, you tell the district

4    attorney everything.

5    Q.  Wait a minute.  When you started your testimony here

6    today, you said you wrote reports to make sure the D.A.

7    knew, right?

8    A.  That's correct.

9    Q.  And you wrote no reports about Howard Johnson's pending

10   cases or money, right?

11   A.  I wrote reports, and I orally reported to the district

12   attorney.  I did not write reports on those issues.

13   Q.  But you reviewed a file with no reports, and that

14   refreshed your memory about telling the district attorney;

15   is that what you're saying?

16   A.  No.  I distinctly remember reading some testimony of the

17   assistant district attorney himself that he stated he had a

18   vague memory of Mr. Evans living at the hotel.  I also read,

19   understand that the Assistant District Attorney Paul

20   Connolly has a document in his --

21           MS. SCAPICCHIO:  This is nonresponsive, Judge, to

22   my question.  I move to strike.

23           THE COURT:  Sustained.

24           MS. HARRIS:  Why doesn't she ask him if he saw the

25   file.

1          THE COURT:  If these are things that he saw in the

2     file.

3          MS. HARRIS:  She's asking what he saw that

4     refreshed his memory.

5          THE COURT:  No, no, no, you can have this on

6     cross-examination.  Your question was what did he review.

7     Go on.

8     Q.  Sir, in 2006, when your testimony changed, that was some

9     time after you were sued in this case, right, when you

10    became a defendant in a civil case, right?

11    A.  I'm not sure when actually the suit went in.

12    Q.  Well, sir, after you testified in 2003, did you go

13    anywhere and say, "I can't believe they're putting this on

14    me?"  Did you do that, sir?  Did you go to the D.A.'s office

15    and say what are you doing?

16         MS. HARRIS:  Objection.

17         THE COURT:  Overruled.

18    A.  I went to Mr. Meier's office and expressed my concern

19    about articles in the newspaper.  I also was concerned

20    because I had never been contacted for preparation, for the

21    hearing for the new trial.  I also was upset that I didn't

22    have access to my records on the motion for the new trial,

23    and I brought that to the attention of Mr. Meier.

24    Q.  But, sir, didn't you just tell us that this case was so

25    unusual, you had never had a case before where you put

1     somebody at the Howard Johnson's, never had a case before

2     where you gave a witness money, wouldn't this case have

3     stood out in your mind, sir?

4     A.  I brought Ricky Evans to the Howard Johnson's --

5     Q.  That's not the question, sir.  Wouldn't this case have

6     stood out in your mind because you just told us it was the

7     first time in 33 years that this had ever happened, wouldn't

8     that have stood out in your mind if that's the truth?

9     A.  There was so many murders I was investigating, they were

10    all major concerns of mine.  I had the responsibility for

11    the investigation.  I don't treat one different than

12    another.  They were all concerns and they were all

13    important.

14    Q.  Sir, you didn't get sued on all of them for feeding

15    information to a witness and for hiding exculpatory

16    evidence, did you?

17              MS. HARRIS:  Objection.

18              THE COURT:  Sustained.

19    Q.  Sir, so your testimony is you didn't remember this case

20    in 2003 because it didn't stick out in your mind, right?

21              MS. HARRIS:  Objection.

22              THE COURT:  Overruled.

23    A.  This particular case was years old.  I didn't have the

24    memory I had in 1989 or '88, and I was not prepared for this

25    particular hearing with the case preparation with the

1    district attorney.

2    Q.  But you worked at the Boston Police Department at the

3    time, right, why didn't you go get your file?

4    A.  I believe the file was at the district attorney's

5    office.

6    Q.  Did you try?

7           MS. HARRIS:  Objection.

8           THE COURT:  Overruled.

9    A.  I had expected to get that when I had the meeting with

10   Mr. Meier.

11   Q.  That's not my question, did you try to go get the

12   file?

13          MS. HARRIS:  Objection.

14          THE COURT:  Overruled.

15   A.  In my experience --

16   Q.  Sir, did you try to go get the file?  Yes or no.

17   A.  The district attorney's office always provided the file.

18   Q.  Sir, did you try to go get the file?  Yes or no.

19          MS. HARRIS:  Objection.

20          THE COURT:  Overruled.

21   A.  I was never furnished with my file by the district

22   attorney.

23   Q.  Did you, sir, try to go get the file from the Boston

24   Police Department?

25   A.  I don't know.  I don't recall if I did or I didn't, but

1   I didn't get it, no.

2          MS. SCAPICCHIO:  Could I just have a minute, your

3   Honor.

4   Q.  Sir, when you were deposed on 8-8-06 at page 162, do you

5   remember being asked the question how many times you

6   contacted Mr. Evans between the date of his statement on

7   August 6th and September 12th?  Do you remember being asked

8   that question?

9   A.  No.

10  Q.  Do you remember answering that you didn't recall

11  contacting Evans between August 6th and September 12th?

12  A.  I'll accept that.

13  Q.  And, sir, before you took over this case, this homicide,

14  you had had some training in how to conduct a homicide

15  investigation, right?

16  A.  I don't know if I did or I didn't at the time.  I was

17  trained.  I just don't recall when.

18          MS. SCAPICCHIO:  I have nothing further, your

19  Honor.

20                  CROSS-EXAMINATION

21  BY MS. HARRIS:

22  Q.  Lieutenant Callahan, you were just asked by

23  Ms. Scapicchio whether you had been sued in any other

24  circumstance before; do you recall that testimony?  Do you

25  recall just being asked by Ms. Scapicchio if you had ever

1    been sued in the performance of your duties?

2    A.  No.

3    Q.  And your answer was no, you've never been sued,

4    correct?

5    A.  No.

6    Q.  You've never even been complained about during the

7    course of the 34 years that you worked for the Boston Police

8    Department, correct?

9    A.  Correct.

10   Q.  And you were also asked what you did to prepare yourself

11   for the 2003 testimony, and your testimony was that you

12   weren't given access to your file, correct?

13   A.  Correct.

14   Q.  Because that file was not in the homicide division at

15   the BPD, it was with the district attorney's office,

16   correct?

17   A.  Correct.

18   Q.  Now, Mr. Callahan, I show you the transcripts in this

19   case.  I show you a series of reports in this case.  Did you

20   review any of that before you testified in 2003?

21   A.  No.

22   Q.  Did anybody give you access to any of that before you

23   testified in 2003?

24   A.  No.

25   Q.  After you had access to this file and to the

1   Treas Carter file, did you go through that file?

2   A.  Yes.

3   Q.  Did you recall seeing a report authored by Assistant

4   District Attorney Paul Connolly who prosecuted the

5   Treas Carter file that said we in effect relocated

6   Ricky Evans to a hotel?

7   A.  Yes.

8   Q.  Do you recall seeing that memo?

9   A.  Yes.

10  Q.  Did that confirm what you testified to in 2003 where you

11  said that you had a memory of having told the assistant

12  district attorney's office that Ricky Evans had been

13  relocated to a hotel but you didn't have a specific

14  recollection of it?

15  A.  Correct.

16          MS. HARRIS:  And I'm going to ask that the

17  document be marked, your Honor.

18          MS. SCAPICCHIO:  Judge, may we be seen?

19          THE COURT:  Can I see the document?  Is this an

20  agreed upon exhibit?

21          MS. SCAPICCHIO:  No.

22          MS. HARRIS:  No.

23          THE COURT:  Counsel at sidebar.

24          (THE FOLLOWING OCCURRED AT SIDEBAR:)

25          THE COURT:  Any objection?

1          MS. SCAPICCHIO:  Judge, this is a report that was

2     in the victim witness file, not in the prosecutor's file in

3     this case, and this is relative to him allegedly telling

4     A.D.A. Connolly, he never testified, he told A.D.A.

5     Connolly, so how can he refresh his memory?

6          THE COURT:  There was no objection to the source

7     of it, it was in the victim witness file.

8          MS. HARRIS:  It was produced by the --

9          MS. SCAPICCHIO:  As to the Treas Carter case not

10    the Shawn Drumgold.

11         THE COURT:  I understand.  It's up to the jury to

12    make the decision whether that's sufficient, putting it in

13    the Connolly file with respect to the victim witness list is

14    sufficient under the circumstances.  If you have no

15    challenge to the authenticity of the document, to its

16    production, then it comes in, you make whatever arguments

17    you can make.

18         MS. SCAPICCHIO:  It's going to come in through

19    Laura Scherz.  It's her document.

20         THE COURT:  You opened up the door to what he

21    reviewed.  What you can do is mark it for identification,

22    but if it's going to come in through a witness, you don't

23    have a meaningful contest to authentication or anything like

24    that, it's clearly relevant to the case, and if you want to

25    press your objection, you can.

1          MS. HARRIS:  I would like to go through the

2     document with him.

3          MS. SCAPICCHIO:  It's not his document.

4          MS. HARRIS:  It doesn't matter, it was produced by

5     the assistant district attorney's office.

6          THE COURT:  You made a great deal of what he

7     reviewed or didn't review.  If this was a document --

8          MS. SCAPICCHIO:  In his homicide file.

9          THE COURT:  If this was a document that he claims

10    to have seen before now, you've opened up that door, so it

11    seems to me this certainly can come in for identification.

12    It can come in finally when Scherz takes the stand if you're

13    objecting to that.

14          MS. HARRIS:  I would like to know if she's

15    objecting to the authenticity because we have someone from

16    the Attorney General's Office who is here who can respond to

17    the Keeper of the Records, and I'm am happy to break and put

18    her on, that this is the authenticated document.  It's

19    produced.  It's got a SCDA number on it.

20          MR. CURRAN:  Judge, this is the document in the

21    last hearing that Paul Connolly, that he wrote it and he

22    knew he wrote it.

23          MS. SCAPICCHIO:  Doesn't it come in through

24    Paul Connolly?

25          THE COURT:  If it's going to come in, it's going

1    to come in.  You're certainly entitled to that, it doesn't

2    matter in a case we want to be expeditious as possible.  If

3    you're going to stand on it, she can have for it

4    identification now subject to being produced, subject to

5    being authenticated.

6            MS. SCAPICCHIO:  This is anything this witness

7    did.  This document verifies what a witness advocate did.

8            THE COURT:  You challenged the change in his

9    testimony from 2003 to 2008, and you are claiming that he

10   contrived his testimony.  If this is something he saw to

11   have refreshed his recollection, then it comes in as

12   something he saw.  It doesn't come in for the truth of the

13   matter under these circumstances, but it comes in as

14   something he saw.  If you want another witness to bring in

15   the fact it was in the file, and that can come in.  It

16   doesn't matter whether it's true or not, whether the fact

17   it's true.

18           MS. SCAPICCHIO:  Is the Court saying that it

19   didn't come in substantively that this is actually true,

20   it's just what he reviewed?

21           THE COURT:  Well, for these purposes, it's what he

22   reviewed, but if there's a witness out there saying it's in

23   the file and it comes in for the purposes of having been

24   part of the file, it will come in.  It will come in through

25   Connolly or Scherz.

126

1          MS. SCAPICCHIO:  But not for the truth of what's

2     contained in my memo.  That's my issue.

3          THE COURT:  That's not the issue, your issue is

4     not whether it was true he was put in the hotel, your issue

5     is that it was in the D.A.'s Office, and they're

6     authenticating that it was in the D.A.'s file entitles to

7     argue that the D.A.'s Office had it.  That's the only issue

8     in this case.  You're entitled to say the D.A.'s Office

9     didn't have it, but they're entitled it seems to me, if it's

10    in their file, they're entitled to argue and can you argue

11    otherwise.

12         MS. SCAPICCHIO:  Ms. Harris is entitled to go

13    through the entire content with this witness, it doesn't

14    come in as the truth?

15         THE COURT:  It's coming in as something he

16    reviewed.

17         MS. SCAPICCHIO:  Is Ms. Harris going through the

18    content?

19         MS. HARRIS:  I want to go through the content to

20    say that Connolly was prosecuting Ricky Evans at the same

21    time that Ricky Evans was a witness in the Tiffany Moore

22    case, that Connolly is documenting concerns that they had

23    about his safety or to the extent he's saying friends were

24    looking for him, that he was put up in a hotel.

25         MR. REILLY:  That's all for the truth.

1          MS. HARRIS:  That's all what was in their file.

2          THE COURT:  You can have it for now, only for the

3     purposes of something he reviewed prior to his testimony,

4     and if it refreshes his recollection as to what he knew at

5     the time, you can have it but not as something that was said

6     in here, in other words, it refreshes his recollection, and

7     if he wants to resurrect the claim that Evans was put in the

8     Howard Johnson's for security purposes under the name,

9     you're welcome to that.

10          MS. HARRIS:  So I can use this?

11          THE COURT:  Are you --

12          MS. SCAPICCHIO:  I'm objecting to her reading that

13     saying it's something did you review this, did you review

14     that, did you review that.

15          THE COURT:  I think you can look at it for the

16     purposes of did you review this before your testimony and

17     does that refresh your recollection as to what you, you

18     know, does that refresh your recollection, and he can say it

19     does or it doesn't.  He can testify to his recollection as

20     refreshed.  Whether the document establishes the D.A.'s

21     Office had it, if this is going to be a witness that was

22     going to say it was in the file.

23          MS. HARRIS:  And there's no good faith objection

24     to that, your Honor?  It was produced by them.

25          MS. SCAPICCHIO:  Judge, for this witness to be

1   able to go through this document suggesting that the

2   contents of this document are true, then that's what caused

3   him to change his mind.

4           THE COURT:  It's going to come in for the purposes

5   of showing something he reviewed which was the basis of

6   changing his mind, it doesn't come in for the truth of the

7   facts inside.

8           MR. REILLY:  If she goes through paragraph by

9   paragraph, it does come in for the truth.

10          THE COURT:  I'll give a limiting instruction to

11  that effect.

12          MS. HARRIS:  I'm going to offer it, and I can

13  offer it?

14          THE COURT:  You still want them to bring the

15  Keeper of the Records in?

16          MS. SCAPICCHIO:  The keeper of the records is

17  coming in for the D.A.'s file.  He's already a witness.

18          THE COURT:  You're going to mark it for

19  identification purposes and show it to him.

20          MS. HARRIS:  Okay.

21          (SIDEBAR CONFERENCE WAS CONCLUDED)

22          MS. HARRIS:  May I continue, your Honor?

23          THE COURT:  Yes, you can.

24          MS. HARRIS:  May I approach, please?

25  Q.  Lieutenant Callahan, I'm going to show you a two-page

1  document which we're going to mark for identification as

2  Defense Exhibit M, and I'm going to ask you to take a look

3  at it and tell me, sir, have you seen that document

4  before?

5  A.  Yes.

6  Q.  And that's one of the documents of the thousand of

7  documents you reviewed in this matter?

8  A.  Yes.

9  Q.  And can you just looking at the first page, can you tell

10  us this is a document from Paul Connolly, Assistant District

11  Attorney, to Laura Scherz, victim witness advocate?

12  A.  Yes.

13  Q.  And it's dated January 30th, 1990?

14  A.  Yes.

15  Q.  Okay.  Lieutenant Callahan, in reviewing that document,

16  did that document refresh your recollection as to the

17  reasons why Ricky Evans was put in a hotel and/or that he

18  was -- strike that -- that it was information that you had

19  communicated to the assistant district attorney?

20  A.  Yes.

21  Q.  And can you tell us what it is in that document that

22  refreshed your recollection?

23  A.  On the second page, the fourth paragraph, since we had

24  in effect relocated him to a hotel, his family had gotten

25  repeated inquiries from his friends wondering where he

1    was.

2    Q.  And the he in that document, is that referring to

3    Ricky Evans?

4    A.  Yes.

5    Q.  And did Assistant District Attorney Connolly bracket the

6    term "friends" in quotation marks?

7    A.  Yes.

8         MS. SCAPICCHIO:  Objection.  It's not assistant

9    district attorney's memo.

10         MS. HARRIS:  Yes, it is.

11         THE COURT:  The jury will ultimately have this, we

12   believe.  The document is being shown to the witness, not

13   yet admitted, for the purpose of refreshing his recollection

14   about what it was that he reviewed before his testimony now.

15   So the document comes in solely not for the truth of the

16   matter, not that the things said are accurate but the things

17   said in it he used to refresh his current memory.  Okay.  Go

18   on.

19   Q.  Can you tell the jury, Lieutenant, who Assistant

20   District Attorney Paul Connolly was or is, I should say?

21   A.  He was the assistant district attorney in charge of the

22   Treas Carter murder.

23   Q.  And the Treas Carter murder was the investigation that

24   you were assigned to in December of 1988, correct?

25   A.  Correct.  And I'd like to recant, it was the Willie

1    Evans' murder.  Treas Carter was the suspect.

2    Q.  The defendant.  And the Treas Carter case, as we've

3    discussed it in this trial, is the crime where Ricky Evans

4    was shot and his cousin, Willie Evans was shot and killed,

5    correct?

6    A.  Yes.

7    Q.  And Paul Connolly was prosecuting that case?

8    A.  Yes.

9    Q.  And you had been working with Paul Connolly in the

10   prosecution of that case since December of 1988; is that

11   right?

12   A.  Yes.

13   Q.  And you were also asked previously about your

14   relationship with Ricky Evans, and you identified

15   Ricky Evans as being the victim in that case, and I believe

16   you had accompanied him to the grand jury in May of 1989; is

17   that correct?

18   A.  Yes.

19   Q.  And was the indictment of Chilly Carter some time after

20   or Treas Carter some time after the grand jury in May of

21   1989?

22   A.  Yes.

23        MS. HARRIS:  Okay.  Subject to authentication, we

24   will offer the document.

25        MS. SCAPICCHIO:  Same objection, your Honor.

1          THE COURT:  It stays for identification now.

2          ( Two-page document was Exhibit M for

3     identification.)

4     Q.  Lieutenant Callahan, you began working on the

5     Tiffany Moore investigation in late May, early June of 1989;

6     is that correct?

7     A.  Yes.

8     Q.  And can you tell the jury when you took over that

9     investigation, did you have the homicide file to review?

10    A.  Yes.

11    Q.  And as a consequence of leaving the homicide file, can

12    you tell us in general terms the type of information that

13    was available to you when you took over the investigation?

14    A.  I had --

15          MS. SCAPICCHIO:  Objection, your Honor.

16    A.  -- interviews that were conducted by prior detectives.

17    I had read all of them and prepared a list of individuals we

18    had to seek out to interview to see if we could get further

19    information relative to this particular murder.

20    Q.  And do you have a recollection of, Lieutenant, after you

21    reviewed the documents that were available to you at the end

22    of May or the beginning of June of 1989 that you prepared a

23    game plan for how you were going to proceed with

24    reinvestigating this case?

25    A.  Yes.

1  Q.  And do you have a recollection, sir, that at some point

2  prior to the trial of Tiffany Moore on Tuesday,

3  September 26th of 1989 that there was a pretrial hearing

4  that was held in order to go over the ways in which you

5  identified witnesses?

6  A.  Yes.

7       MS. HARRIS:  With the Court's permission, I'd like

8  to give him a copy of that testimony.  This is an unagreed

9  document, I believe.

10       THE COURT:  Can I see it?

11       MS. HARRIS:  Yes.  I have several copies of that.

12  Your Honor, this is the transcript from the entire day, but

13  Mr. Callahan, his testimony I believe begins on page 51, 52,

14  excuse me.

15       THE COURT:  Just a second.

16       MS. SCAPICCHIO:  Judge, may we be seen on this?

17       THE COURT:  Yes.

18       (THE FOLLOWING OCCURRED AT SIDEBAR:)

19       THE COURT:  What's the basis for this coming in?

20       MS. HARRIS:  Your Honor, in the testimony of voir

21  dire of Timothy Callahan, he's asked about whether he had as

22  a consequence of interviewing witnesses, including Ricky

23  Evans, he had identified other witnesses.  He was

24  cross-examined yesterday about whether or not he had ever

25  reported that he was given the names Michelle Payne, I

1    believe Cheryl, Tyronne Brewer and Keith Butler.

2         MS. SCAPICCHIO:  I didn't ask him about

3    Keith Butler.

4         THE COURT:  Go on.

5         MS. HARRIS:  There's a report dated June 21st,

6    1989 which everybody agreed is in the D.A.'s file.  That

7    report is referenced here.  Callahan talks about the

8    contents of that report including names of people.

9         THE COURT:  This is essentially prior inconsistent

10   statements.  Okay.

11        MS. SCAPICCHIO:  The concern I have, this was a

12   hearing because the defense had filed a motion saying that

13   many of the witnesses that were now coming forward were as a

14   result of the statements that had been suppressed by both

15   Drumgold and Taylor.  Mr. Callahan took the stand to suggest

16   that he had an independent basis for having located these

17   witnesses.  My concern is there's talk about

18   Antonio Anthony, there's talk about Tyronne Brewer.

19        THE COURT:  She's only saying with respect to the

20   June 21st, 1989.  In other words, she's simply dealing as a

21   prior consistent statement.

22        MS. SCAPICCHIO:  That's all it is.

23        MS. HARRIS:  I understand the objection, and I

24   have no intention of offering the entire pathway of

25   information he received.  I want to focus him on the

1    June 21st and what he told the Court at that time that he

2    did and what he learned.

3            THE COURT:  Okay.

4            MS. HARRIS:  I'm also going to offer a document

5    which was produced along with this pretrial transcript by

6    the district attorney's office which is the matrix that this

7    witness created so he could keep all the characters straight

8    here.

9            MS. SCAPICCHIO:  I don't know how that's

10   relevant.

11           THE COURT:  I don't know how this is relevant

12   either.

13           MS. HARRIS:  This is what he testified during his

14   testimony in 1989 trial.

15           THE COURT:  What is this relevant to?

16           MS. HARRIS:  It's relevant first to his memory and

17   the difficulty keeping all these different players straight

18   the overall confusion he had with this investigation and to

19   the kinds of documents that he created at the time to assist

20   his memory.

21           (SIDEBAR CONFERENCE WAS CONCLUDED)

22           MS. HARRIS:  May I approach, your Honor?

23           THE COURT:  Yes.

24   Q.  Lieutenant, at some point yesterday counsel asked you

25   whether you had documented that Ricky Evans had given you

1   pieces of information including information about other

2   witnesses.  Do you recall that testimony or that

3   examination?

4   A.  Yes.

5   Q.  And do you recall, sir, that we've testified -- or

6   strike that.  You've testified about a June 21st, 1989

7   report that you generated after your first conversation with

8   Ricky Evans when he gave you information about the

9   Tiffany Moore case?

10   A.  Yes.

11   Q.  And you have not had an opportunity to review the

12   June 21st report, correct?

13   A.  Correct.

14   Q.  And you have never seen it in any of the documents that

15   have been exchanged in this case, correct?

16   A.  Correct.

17   Q.  Do you have a recollection, sir, of a pretrial hearing

18   where you were asked to describe the links between witnesses

19   that you had interviewed?

20   A.  Yes.

21   Q.  I'm going to show you just a couple of pages from that,

22   that hearing, 61, 62, 63 and 66, and I'm going to be

23   going -- I want you to listen to the questions.  We're not

24   going to read the entire thing, but I want you to have it in

25   front of you, okay?

1    A.   Thank you.

2    Q.   Did I give you 61, Lieutenant?

3    A.   Yes.

4    Q.   On page 61 at line 8, and I'll represent to you, sir,

5    that this is a pretrial conference where Mr. Beauchesne is

6    asking you questions, and it's in the presentence of the

7    Judge, Judge Alberti, Defense Attorney Rappaport and Defense

8    Attorney George, and the question at line 8 is, "Can you

9    tell us the names of the individuals that supplied you with

10   the name of Tyronne Brewer?"  Can you read your response

11   lines 10 through line 13?

12   A.   "Yes.  One moment, please.  Tyronne Brewer came to my

13   attention through Ricky Evans as well as at least one of the

14   two young females that were on Homestead Street on that

15   evening."

16   Q.   Okay.  And then going down to line 18, the question put

17   to you is, "Can you tell us when Ricky Evans mentioned that

18   name Tyronne Brewer?"

19   A.   "It was in June or July of 1989."

20   Q.   And then the question, "How did you come to interview

21   Ricky Evans?"  And your answer?

22   A.   "Ricky Evans, during the summer months of 1988 on Elm

23   Hill Avenue there was a shooting.  Ricky Evans' cousin was

24   shot in the head and killed as a result of gunshot wounds.

25   Ricky Evans was shot in the head, but the bullet was --"

1   excuse me, "Ricky Evans was shot in the hand and incurred

2   gunshot injuries in the same incident.  I had contacted

3   Ricky Evans relative to the murder of Willie Evans, and I

4   don't know the reason, but I asked him, "Would you happen to

5   know anything relative to the Tiffany Moore tragedy?"  And

6   he stated to me, When you were at the house at

7   40 Chaney Street when he made the identification of Chilly,

8   who was the person that murdered Willie Evans, I meant to

9   tell you but I didn't.  I stated to him blank blank, then I

10  heard in the background someone yelling and screaming don't

11  talk to the cops, don't talk to the cops, you'll end up

12  dead."

13          "As a result of that, we terminated the phone call

14  and the girl in the apartment went to the store and Ricky

15  Evans called back to the homicide unit and spoke with me and

16  told me what he was aware of."

17  Q.   Okay.  Thank you, Lieutenant.  Now, I'm going to ask you

18  to flip over to page of 6 and I'm going to direct you to the

19  top of the page, question at line 4.  "Before the break I

20  think we had discussed one Tyronne Brewer, and at that point

21  we had passed on that.  Since the break, can you tell me now

22  with regard to Tyronne Brewer the manner in which his name

23  came to the investigation?"  And I'll ask you to read your

24  answer at line 9 to line 13.

25  A.   "His name came up in a statement taken by Troy Jenkins.

He was an individual present during the shooting.  Troy

Jenkins stated that Tyronne Brewer was one of the

individuals present during the shooting incident."

Q.  And now I'll ask you to go to the rest of your answer

beginning at line 20 through 24.

MS. SCAPICCHIO:  Objection, your Honor.

MS. HARRIS:  Just line 20 to line 24.

A.  "During the course of my conversation with Mr. Evans,

Ricky Evans, when I asked him about Lug or Terrance Taylor,

he stated to me that Lug gives coke to a girl named Michelle

and Tyronne Brewer's sister Cheryl.  Those are the ways that

he came up."

Q.  And I'll stop you there, Lieutenant.  When you were

testifying on September 26th of 1989, did you have the

benefit of the June 21st 1989 report?  Did you have that

report available to you, your initial communication with

Ricky Evans?

A.  In 1989, yes.

Q.  And the testimony that you just read where you reference

Michelle and Cheryl, are those references to your memory

were contained in your report of June 21st, which has since

been lost?

A.  Yes.

Q.  So when you were asked yesterday whether you had

documented in any report, does this testimony indicate that

1  you had in fact documented that information in your

2  June 21st, 1989 report?

3  A.  Yes.

4  Q.  And the testimony that you offered in September of 1989

5  was offered in the presence of Judge Alberti, the District

6  Attorney Phil Beauchesne and both defense counsel,

7  correct?

8  A.  Yes.

9  Q.  And to your knowledge, both defense counsel as well as

10 the assistant district attorney had a copy of the June 21st,

11 1989 report, correct?

12 A.  Yes.

13 Q.  And by that time you had also had the opportunity to

14 tape Mr. Evans and put his statement on a tape recording

15 that was transcribed, correct?

16 A.  Yes.

17 Q.  Now, can you tell the jury when you put a witness on

18 tape in a homicide investigation, what is the process for

19 that tape being transcribed and delivered to the assistant

20 district attorney's office?

21 A.  The homicide unit had the secretary that did all the

22 transcriptions on the tape.  After taking the statement, we

23 would deliver it to her, and she would transcribe it, type

24 it up and bring it or get it to the D.A.'s Office.

25 Q.  And how long would that usually take, if you know?

1    A.   Those were eventful times.  I don't recall.

2    Q.   But it's fair to say when you were called to testify at

3    the motion for new trial in 2003, you didn't have a copy of

4    the June 21st report, correct?

5    A.   Correct.

6    Q.   And you didn't have a copy of any of the statements you

7    had made in the pretrial hearing, correct?

8    A.   Correct.

9    Q.   And you didn't have a copy of any of the transcriptions

10   of the trial from the Shawn Drumgold trial, correct?

11   A.   Correct.

12   Q.   And when you were asked what your recollection was about

13   your initial contact with Ricky Evans when you testified in

14   2003, you were testifying to the best of your memory without

15   having had the luxury of reviewing any of your reports,

16   correct?

17   A.   With the exception of one report given to me, one-page

18   report given to me by A.D.A. Meier.

19   Q.   And do you remember what that report was?

20   A.   No.

21   Q.   Okay.  Now, Lieutenant Callahan, in 1988, '89 -- strike

22   that.  When did you go into the homicide unit?

23   A.   1988.

24   Q.   And in 1988 how long had you been a detective?

25   A.   Fourteen years.

1   Q.  And when you were assigned to the homicide unit, can you

2   tell us generally what kind of a caseload you were carrying

3   when you were first assigned?

4   A.  Anywhere from 30 to 40 murders per year not including

5   sudden deaths or serious injury wounds suffered, and then

6   later on, we responded also to motor vehicle fatalities.

7   Q.  Now, just in very general terms, can you tell the jury

8   how the jury the homicide unit worked when you entered it in

9   1989?  Were you assigned to a squad?  How were people

10  deployed?

11  A.  The homicide unit was deployed in three man teams.

12  There were three three man teams on days and three three man

13  teams on nights, and we'd work a 4 and 2 schedule.  The

14  first two nights you took all homicides coming in.  The

15  second two nights you went out and investigated your

16  homicide investigations.

17  Q.  And when it came to the point of typing reports, who

18  typed the reports?

19  A.  We did.

20  Q.  So you typed your own reports?

21  A.  As best we could.

22  Q.  Now, let's just step back for a moment.  Can you tell

23  the jury generally -- what's your background, did you grow

24  up in Boston?

25  A.  Yes.

1    Q.  And where did you grow up?

2    A.  In Charlestown.

3    Q.  So you've been a resident of Boston or the Boston area

4    your entire life?

5    A.  Yes.

6    Q.  And did you go to high school here in the city?

7    A.  Yes.

8    Q.  Where did you go?

9    A.  Cathedral.

10   Q.  Did you go to college?

11   A.  Yes.

12   Q.  And where did you go?

13   A.  Northeastern.

14   Q.  When did you go to Northeastern?

15   A.  All I remember is I graduated around '71.

16   Q.  And at some point did you join the MBTA?

17   A.  Yes.

18   Q.  When did you join the MBTA?

19   A.  1968.

20   Q.  And what was your job when you joined them?

21   A.  Police officer.

22   Q.  How long did you work with them?

23   A.  Well, I went on Boston in 1970.

24   Q.  Okay.  So when you entered the Boston Police Department,

25   explain to the jury what your career path was.  You started

1   as a police officer, I assume.  Where were you assigned?

2   A.  Roxbury.

3   Q.  And how long were you assigned to Roxbury?

4   A.  A few years.  Two or three, four years, I don't

5   recall.

6   Q.  Okay.  What was your next assignment after you were

7   assigned to the Roxbury area?

8   A.  I think I went to planning and research.

9   Q.  And what is planning and research?  Just not everybody

10  worked there, so tell us what was planning and research,

11  give us a little detail.

12  A.  It was a think tank for the Boston Police Department to

13  attempt to find better ways to operate the department

14  operationally and try to develop plans relative to any

15  situation the Commissioner would give you or any boss would

16  give you actually, and that was it.

17  Q.  How long did you work in planning and development?

18  A.  A couple of years.

19  Q.  What was your next assignment?

20  A.  I went on an undercover assignment.

21  Q.  When you went to an undercover assignment, what kind of

22  assignment was that?

23  A.  It was I reported to the Suffolk County District

24  Attorney's Office and was briefed relative to what the

25  assignment was, and then I believe I spent the next

1    approximately a year doing it.
2    Q.   Okay.  Was there a focus of this assignment?  Was there
3    a certain problem in the city that you were focusing on in
4    particular?
5    A.   Yes.
6    Q.   And what was it?
7    A.   The combat area, combat zone area of downtown Boston.
8    Q.   Okay.  Were you focusing on drugs, on violence?
9    A.   We were focusing on illegal activities going on in the
10   establishments in the combat zone area.
11   Q.   Okay.  Gaming kind of things, that sort of thing?
12   A.   Yes.
13   Q.   And when you say you were working with the Suffolk
14   County District Attorney's Office, can you tell us -- well,
15   do you recall who it was that you were working with from the
16   Suffolk County D.A.'s Office?
17   A.   My boss was Assistant District Attorney Thomas Dwyer.
18   Q.   And were there other members of the police department
19   who were working with this assignment along with you?
20   A.   Yes.
21   Q.   Were you working in developing cases with the aim of
22   bringing them forward for prosecution?
23   A.   Yes.
24   Q.   And in doing so, how frequently would you interact with
25   the assistant district attorney at that time?

1    A.  We wrote our reports up there, so we were probably there

2    just about every day.

3    Q.  Were you actually located in the Suffolk County D.A.'s

4    Office at that time?

5    A.  No, I was just temporarily attached to them there, and

6    that's where I did -- I was specifically told to do our

7    reports at the district attorney's office.

8    Q.  And did you discuss your cases with the assistant

9    district attorney at that time?

10   A.  Him and the detective in charge at the district

11   attorney's office.

12   Q.  Okay.  So you would go over your cases with him?

13   A.  Yes.

14   Q.  Okay.  Now, I believe that you testified, and correct me

15   if I have the dates wrong, but I believe you testified you

16   worked in that capacity for approximately a year; is that

17   right?

18   A.  That sounds right.

19   Q.  And when you finished with that assignment, was your

20   rank still police officer?

21   A.  I believe it was.

22   Q.  Okay.  Do you recall where you went after you left the

23   organized crime assignment?

24   A.  I went to the vice control section.

25   Q.  And the vice control section, would that oversee things

1    like prostitution, drugs, things of that nature?

2    A.  Yes, not drugs but prostitution and licensed

3    establishments in the city.

4    Q.  And by licensed establishments, you mean places that had

5    alcohol licenses?

6    A.  Yes.

7    Q.  Okay.  When you were assigned to the vice unit, were you

8    assigned in an investigatory capacity?

9    A.  Yes.

10   Q.  And for how long did you work in the vice unit?

11   A.  My best guess would be about three years.

12   Q.  I am going to ask you when you got married, so you

13   better start thinking about these dates.  So when you left

14   the vice unit, where did you go next?

15   A.  I think I went to the intelligence unit.

16   Q.  And what were your job responsibilities in the

17   intelligence unit?

18   A.  Mainly surveillance.

19   Q.  Was there a specific type of case that you worked on?

20   A.  A lot of it had to do with the increased drug activity

21   and specific cases given to us by our bosses.

22   Q.  You said that the organized crime assignment that you

23   had focused on the combat zone, right?

24   A.  Yes.

25   Q.  And the vice assignment, was that focused on a specific

1    section of the city or was that city-wide?

2    A.  The vice was city-wide.

3    Q.  And the intelligence unit assignment that you had,

4    again, was that located in a specific section of the city or

5    was it a city-wide assignment?

6    A.  City-wide.

7    Q.  Now, after you finished the assignment in the

8    intelligence unit, do you recall whether or not you were

9    rated as a detective?

10   A.  Yes, I was.

11   Q.  And how many years had you been working in an

12   investigatory capacity by the time you were formally rated

13   as a detective, roughly?

14   A.  A year to two years.

15   Q.  Okay.  Well, there's a year or two years in vice, a

16   couple years more in intelligence, correct?

17   A.  Yes.

18   Q.  Now, at some point, Lieutenant, did you become aware

19   that there were promotional opportunities available within

20   the police department?

21   A.  Yes.

22   Q.  And the promotional opportunities in the police

23   department are ruled by a civil service system; is that

24   right?

25   A.  Yes.

1    Q.  And that's actually a test, is that correct?

2    A.  Yes.

3    Q.  Okay.  Now, at some point did you sit for the civil

4    service exam for sergeant?

5    A.  Yes.

6    Q.  And do you recall when it was that you took that exam?

7    A.  Some time in the '80s.

8    Q.  Okay.  As a consequence of sitting for the civil service

9    sergeant's exam, were you promoted into the position of

10   sergeant?

11   A.  Yes.

12   Q.  And in 1988, 1989, when you were working in the homicide

13   unit, you held the rank of a sergeant, Sergeant Detective,

14   correct?

15   A.  Yes.

16   Q.  Now, at some point were you also made aware that there

17   was an opportunity to sit for the lieutenant's promotional

18   exam?

19   A.  Yes.

20   Q.  And did you sit for the lieutenant's exam?

21   A.  Yes.

22   Q.  And do you recall roughly when that was?

23   A.  1994.

24   Q.  And were you promoted after taking that exam?

25   A.  Yes.

150

1   Q.  Okay.  Now, during the time period that you were

2   employed by the Boston Police Department, you told us that

3   you believe you graduated from Northeastern around 1970,

4   right?

5   A.  Yes.

6   Q.  Did you take any other formal education or did you

7   pursue formal education after you graduated from college?

8   A.  Yes.

9   Q.  And can you tell the jury what was the next educational

10  opportunity that you pursued?

11  A.  I got a masters's at Boston State College.

12  Q.  A master's in what?

13  A.  I was taking urban planning, but I think it come under

14  the public affairs major.  I can't remember.

15  Q.  You have to sit a little bit closer.  You're fading out

16  on me here.

17  A.  It was actually in public affairs.

18  Q.  Okay.

19  A.  But I had an urban planning concentration.

20  Q.  An urban planning concentration?

21  A.  Yes.

22  Q.  Okay.  Do you recall when you received that master's

23  degree?

24  A.  '83 is a guess.

25  Q.  Okay.  And was that it or did you continue to pursue

1   education?

2   A.  Later on I went to law school.

3   Q.  And where did you go to law school?

4   A.  Massachusetts School of Law.

5   Q.  Do you recall when it was that you began going to law

6   school?

7   A.  1988.

8   Q.  Okay.  So in 1988 you're working full time, correct?

9   A.  Yes.

10  Q.  And you began going to law school.  Did you go to law

11  school nights?

12  A.  Yes.

13  Q.  Okay.  And how long did it take you to finish law school

14  going to school at night?

15  A.  Four years.

16  Q.  When you began law school in 1988, can you tell were you

17  married?  I won't ask you about the date.

18  A.  Thank you.  Yes.

19  Q.  And in 1988, did you have any children?

20  A.  Yes.

21  Q.  How many children?

22  A.  Three.

23  Q.  At that time.  Do you remember how old they were in

24  1988?

25  A.  Babies.

1   Q.  When did you retire from the Boston Police Department?

2   A.  2005.

3   Q.  2005.  Prior to your retirement, had you done any

4   service in the armed services?

5   A.  Yes.

6   Q.  Can you tell the jury when it was that you first entered

7   the armed services?

8   A.  1969.

9   Q.  Okay.  Just give us some information, in what capacity

10  did you join the service?

11  A.  I went into the United States Army Reserve.

12  Q.  Okay.  And after when you joined the reserves in '69,

13  did you remain a member of the reserves continuously?

14  A.  Yes.

15  Q.  And were you ever deployed?

16  A.  Yes.

17  Q.  And when?  When is the first time you were deployed?

18  A.  It's several years ago.  I went to Korea, Europe.

19  Q.  Okay.  How many times were you deployed as a member of

20  the reserves?

21  A.  Two short term and one long term.

22  Q.  Okay.  So you said that you were deployed to Korea, was

23  that a short-time deployment?

24  A.  Yes.

25  Q.  And you were deployed to Europe, and that was a short

1   deployment?

2   A.  Yes.

3   Q.  What was the long term deployment?

4   A.  The Mideast.

5   Q.  And do you know when it was that you were deployed to

6   the Mideast?

7   A.  2003, 2004.

8   Q.  So you were there for a two-year stint?

9   A.  One year.

10  Q.  Have you since retired from the reserves?

11  A.  Yes.

12  Q.  Lieutenant Callahan, as we sit here today, are you

13  employed?

14  A.  Yes.

15  Q.  And it's my understanding you're employed as a director

16  of security for a Boston area college; is that right?

17  A.  Yes.

18  Q.  When you retired from the Boston Police Department in

19  2005, is that when you began working in the private law

20  enforcement world?

21  A.  Yes.

22  Q.  And have you been employed continuously since 2005?

23  A.  No, I took a year off.

24  Q.  And as we sit here today, how many children do you

25  currently have?

1   A.  Five.

2   Q.  And can you just tell us what their ages are?

3   A.  I have a daughter 16, a son 20, a son 21 going on 22,

4   one 23 and 24.

5   Q.  And you're still married, I assume?

6   A.  Yes.

7            MS. HARRIS:  Your Honor, with your permission, I'd

8   like to stop here and resume back into the heart of the case

9   when we reconvene; is that all right?

10           THE COURT:  Yes, that's fine.  So, ladies and

11  gentlemen, for a combination of reasons, we're going to take

12  a break next week, and we're not going to begin again until

13  Tuesday, September 29th because of the Jewish holidays on

14  Monday.

15           Now, it is essential, particularly essential, that

16  you don't try to read anything about the case, that you

17  don't talk to anyone about the case, that you don't do any

18  research about the case and really just go on about your

19  lives and resume on the date that I indicated.  Counsel has

20  assured me we're on track, and if we were not on track, then

21  as I mentioned, I would change the schedule to try to open

22  up afternoons.

23           I do other work in the afternoon, they prepare,

24  that's the reason why we stop at one, but we would give you

25  notice of that if there was any reason to change the

1    schedule because, as I have mentioned to you, I want you to

2    know exactly what is happening as things are happening so

3    we'll suspend next week and we'll continue on the 29th.

4            We'd like you to remain, to come back on the 29th

5    just as you are now which is without any additional

6    information about the case, without talking to anyone about

7    the case, without, you know, even trying to crystallize

8    things in your mind because you haven't heard everything.

9    So with that, all rise for the jury.

10           (Juror exited the courtroom.)

11           (Whereupon, the hearing was suspended at

12   12:56 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS    )

5    CITY OF BOSTON               )

6

7            I, Valerie A. O'Hara, Registered Professional

8    Reporter, do hereby certify that the foregoing transcript

9    was recorded by me stenographically at the time and place

10   aforesaid in No. 04-11193-NG, in re:  Shawn Drumgold vs.

11   Timothy Callahan and thereafter by me reduced to typewriting

12   and is a true and accurate record of the proceedings.

13                            /S/ VALERIE A. O'HARA

14                           _____

15                            VALERIE A. O'HARA

16                            REGISTERED PROFESSIONAL REPORTER

17                            DATED SEPTEMBER 16, 2009

18

19

20

21

22

23

24

25