IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


SHAWN DRUMGOLD,            )  C.A. No. 04-11193-NG

             PLAINTIFF     )  Courtroom No. 2

VS.

TIMOTHY CALLAHAN, ET AL.,)  1 Courthouse Way

             DEFENDANTS   )  Boston, MA  02210


JURY TRIAL DAY 1 OF PHASE II

OCTOBER 19, 2009

9:15 a.m.


BEFORE THE HONORABLE NANCY GERTNER

UNITED STATES DISTRICT COURT JUDGE


VALERIE A. O'HARA

OFFICIAL COURT REPORTER

1    A P P E A R A N C E S:

2         ROSEMARY CURRAN SCAPICCHIO, ATTORNEY, Four Longfellow
      Place, Boston, Massachusetts  02114, for the Plaintiffs;
3
4         Tommasino & Tommasino, by MICHAEL W. REILLY, ESQ.,
      Two Center Plaza, Boston, Massachusetts  02108, for the
      Plaintiff;
5
6         Roache & Malone, LLP, by JOHN P. ROACHE, ESQ., 66 Long
      Wharf, Boston, Massachusetts  02110, for the Defendants.

7         Bletzer and Bletzer, P.C., by HUGH R. CURRAN, ESQ., 300
      Market Street, Brighton, Massachusetts  02135, for the
8     Defendants.

9         Morgan, Brown & Joy, LLP, by MARY JO HARRIS, ESQ., 200
      State Street, Boston, Massachusetts  02109-2605, for the
10    Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

INDEX

**EXAMINATION**

| **Witness Name** | **Direct** | **Cross** | **Re-Direct** | **Re-Cross** | **Voir Dire** |
|---|---|---|---|---|---|

SHAWN DRUMGOLD
  By Ms. Scapicchio  16

FRANCIS O'MEARA
  By Mr. Curran    66              105
  By Ms. Scapicchio      91                  110

**CLOSING ARGUMENTS**
  By Mr. Curran                  133
  By Ms. Scapicchio              144

**JURY CHARGE**                  **151**

**EXHIBITS**

| **Exhibit** | **Description** | **Identification** | **Evidence** |
|---|---|---|---|
| A | Two newspaper articles | 4 | |
| No. 1 | Shawn Drumgold's G.E.D. certificate | 38 | |
| Nos. 2, 3 | Photographs | 42 | |
| No. 4 | Photograph | 44 | |
| No. 5 | Photograph | 45 | |
| No. 6 | Photograph | 46 | |
| No. 7 | Photograph | 46 | |
| No. 8 | Photograph | 47 | |
| No. 9 | Photograph | 47 | |
| No. 10 | Photograph | 48 | |
| No. 11 | Photograph | 49 | |
| Nos. 12, 13 and 14 | Photographs | 50 | |
| No. 15 | Page 218, line 12 to line 18 of The Motion for New Trial | 99 | |
| No. 16 | Page 217, line 23 to page 218, line 11 of The Motion for New Trial | 109 | |
| No. 17 | Francis O'Meara's 2006 deposition at pages 35, line 16 through 20 | 113 | |

**JURY TRIAL DAY 1 OF PHASE II**

<u>PROCEEDINGS</u>

1
2       ( THE FOLLOWING IN JUDGE'S CHAMBERS:)

3       THE COURT:  You've gotten the jury instructions?

4   I don't know why you didn't.

5       MR. ROACHE:  I was not.

6       THE COURT:  Did we give you a copy?

7       MR. ROACHE:  Yes.

8       THE COURT:  What I'll do, we'll mark the universe

9   of articles, the article from The Herald on.

10      MS. HARRIS:  Yes.

11      THE COURT:  Yesterday and the article from the

12  Globe was also yesterday?

13      MS. HARRIS:  Yes.

14      ( Two newspaper articles were marked Exhibit A

15  for identification.)

16      THE COURT:  Is there another article that I should

17  ask them about?

18      MS. HARRIS:  I am not aware of anything today.

19      MR. CURRAN:  Just there was an article last week

20  about the jury verdict.

21      THE COURT:  That's included.  I'm sorry, there's a

22  Globe 10-15 and a Herald article 10-18, and that's the

23  universe, so we'll ask them about that.  I think you saw in

24  my rulings that I'm not going to, unless something comes out

25  of this questioning, I'm not going to disqualify the

1    foreman, the foreperson of the jury.

2            MR. CURRAN:  Judge, before you make that

3    decision --

4            THE COURT:  I made that.

5            MR. CURRAN:  -- I ask that you inquire a little

6    further.  To the extent that his statement was that he read

7    a first couple paragraphs because the money award aspect was

8    at the end.

9            THE COURT:  I saw that.

10            MR. CURRAN:  And there's some cases I understand

11    that the jurors get put in that situation are afraid to say

12    something even though their answer may be honest and

13    legitimate that it didn't impact their deliberations, that's

14    all I'm saying, it's not in the first two paragraphs.

15            THE COURT:  I've already made findings.  I'm not

16    going to inquire more than the foreman, I won't inquire

17    anything further of him either.  The impact of what I did

18    last night was that superseding cause in the case but only

19    if the evidence presented warrants it.

20            MS. SCAPICCHIO:  Judge, I'd ask for an offer of

21    proof.

22            THE COURT:  May I finish?

23            MS. SCAPICCHIO:  I'm sorry.

24            THE COURT:  Only if the evidence warrants it, so

25    the question is I'm not going allow openings with respect to

1    damages.  It seems to me it's a very short case, and I'd

2    like to hear from you as to what you plan to present.  Now,

3    there was a memo the motion that you filed asking to limit

4    the amount of damages which sort of --

5              MS. HARRIS:  Yes.

6              THE COURT:  Tell me, is that the nature of your

7    case this morning -- what's the nature of your case?

8              MS. HARRIS:  The nature of our case this morning

9    is we're going to be calling Frannie O'Meara who was the

10   supervisor of the homicide unit at the time, 1988 and 1989,

11   and it's my understanding and expectation he's going to

12   testify he was informed of Ricky Evans being housed in the

13   hotel in a discussion with the head of homicide for the

14   Boston Police Department and there was discussion about

15   payment.

16             THE COURT:  When?

17             MS. HARRIS:  I don't know that he can tie it.

18             MR. CURRAN:  I might be able to help.  The timing

19   is this, he got a call, he can't remember, he knows it was

20   definitely after the Drumgold verdict.  He's not sure if it

21   was in between the Drumgold verdict and the Treas Carter

22   plea.  It could have been after but it was definitely at the

23   end of December of '89, beginning of January.

24             THE COURT:  What did he do with the information?

25             MR. CURRAN:  He said his standard course of

1    conduct when he would meet with Dunford if it was not an

2    expense that he was aware of that he knew already knew

3    about, he would do two things, he would contact the trial

4    prosecutor to confirm, then he'd call the first assistant

5    because the first assistant was the person who wrote the

6    checks.

7                THE COURT:  Who was the trial prosecutor that he

8    said would confirm?

9                MR. CURRAN:  He's going to testify that he

10   contacted Phil Beauchesne.

11               THE COURT:  Is that right?

12               MR. CURRAN:  Yes.

13               MR. REILLY:  It is at best, I assume I can't

14   remember any conversation with Beauchesne, and I can't

15   remember anything he said or I said.

16               THE COURT:  He will also say he was adequately

17   prepared at the motion for new trial.

18               MR. REILLY:  I think at his deposition.

19               THE COURT:  Other than O'Meara, who's next, your

20   guy is going to go first, other than O'Meara?

21               MS. HARRIS:  That was the only person.  I would

22   push back of the knowledge of the trial prosecutor based on

23   the Supreme Court jurisprudence that the district attorney's

24   aware of this.

25               THE COURT:  I think with respect to causation,

we're in a different issue, but the question is whether it was foreseeable to the person who received this information that it had not been disclosed in the Drumgold case and the only person who would have known whether it had been disclosed in the Drumgold case is Beauchesne, so we're dealing with this issue in a very different posture than we had at the beginning. Information that Connolly had it seemed to me doesn't necessarily mean that Connolly had a clue whether it had been disclosed in the Drumgold case. Likewise, with O'Meara, it's not at all clear that he would understand the implications of what he had.

MS. HARRIS: As the supervisor of the homicide unit.

THE COURT: The question, he would have known what would have been going on with Beauchesne, so it seems to me, it seems to me the question it's foreseeable that the person who had received it had not disclosed it, what steps he took, if he took steps, it would have been a different issue, it seems to me the steps would have been focused on the prosecutor.

The other thing, logically speaking, you're now talking about the jury finds that as of the moment of conviction this information had not been disclosed, so now you have to say that information that came up in connection with paying bills after the Drumgold trial, after the

1    Treas Carter plea, anyone having that information would have

2    understood its significance.

3         Connolly with regard to the Treas Carter plea was

4    dealing with a mopping up operation and not an appeal, so

5    the question is whether Connolly would have at that moment,

6    "Oh, my God, has this information been disclosed?"  Did it

7    have implications for Drumgold, 1; and 2, had it been

8    disclosed, if that's the direction the evidence came, goes

9    in, I'm not sure I'm going to allow you this instruction,

10   but we'll have to see.

11        MR. CURRAN:  Regardless of that issue though you

12   can't take the evidence in a vacuum and saying what is

13   O'Meara, the evidence is cumulative evidence.  The jury

14   could have found that Beauchesne knew but didn't know at the

15   date of conviction and found out afterwards based on his

16   testimony.

17        THE COURT:  Absolutely.

18        MR. CURRAN:  So it's a factual distinction, not a

19   legal one.

20        THE COURT:  I completely agree with you, which is

21   why I gave you the superseding.  You have the burden of

22   proof.  It's the burden of proof under Rule 50.  If the

23   testimony leads to the inference that Connolly knew about

24   it, that it was expenses in the Treas Carter case, I'm not

25   sure that at that point there's enough to suggest that

1    anyone would have believed it had implications for Drumgold

2    which then a live case, so we'll have to see.  I'm

3    giving you an opportunity to present your testimony.  I

4    imagine that Drumgold will go first.

5            MS. SCAPICCHIO:  Yes.

6            THE COURT:  Okay.  You understand that what they

7    can cross-examine on depends completely on what you ask.

8            MS. SCAPICCHIO:  I do.

9            THE COURT:  And if you begin to go far afield into

10   innocence or guilt, the doors are then wide open.

11           MS. SCAPICCHIO:  I understand.

12           MS. HARRIS:  We had spoken about this when we

13   began but there had been a proposal of jury instructions by

14   the plaintiff talking about loss of reputation,

15   humiliation.

16           THE COURT:  I have concluded in that my

17   instructions but I don't really know what he's going to say.

18   Loss of reputation will also open doors.

19           MS. SCAPICCHIO:  I understand.  It's the 15 years

20   that he spent in jail from the day he was convicted to the

21   day he was released.

22           THE COURT:  All right.

23           MS. HARRIS:  Will we have a separate charge

24   conference because I did file supplemental jury instructions

25   after having received yours?

1          THE COURT:  Superseding.

2          MS. HARRIS:  Superseding and cumulative damages,

3    and I would also in order, assuming you're going to allow

4    the jury to consider superseding cause, I would want to have

5    some instruction to them about what the duties are of a

6    prosecutor's office, and I presented cases to you that talk

7    about on the foreseeability issue which I didn't put in my

8    instructions but are in the memo that I filed that it would

9    not be foreseeable for normal error to occur in the normal

10   conduct of one's official duties and that the cases that

11   Wagenmann and Burke talking about misleading or active

12   effort to deceive not being sufficient to break the causal

13   chain.

14          THE COURT:  I saw that.

15          MS. HARRIS:  And I've also referred you to an

16   Eleventh Circuit case that says if the prosecutor's office

17   has from any source whether from the officer or anyone else

18   that the decision by the prosecutor's not to act on it, even

19   if it's inadvertent, he breaks the causal change.

20          THE COURT:  I looked at it very quickly.  I'll

21   certainly look at it again, but the question is whether or

22   not the pre-conviction time is different than a post

23   conviction time and not only a post conviction time but a

24   time with two cases where information is coming up with a

25   case that was a plea when the mopping up operation could

1     have led all the prosecutors involved to believe that this

2     was just a question of a payment of a bill and had no other

3     implications.

4              So the issues are going to be whether that's going

5     to be what is shown or whether or not the alternative that

6     they understood or someone, it was foreseeable for someone

7     to understand the implications for Drumgold which had at

8     that point been ended for over like four months.  We'll see

9     what the testimony is and I'll ask the jury about this

10    question.  We'll start -- we'll figure that the evidence

11    will be finished --

12             MS. SCAPICCHIO:  I'm hoping by 11:30.

13             MR. ROACHE:  Judge, I'd ask that we address The

14    Herald article yesterday?

15             THE COURT:  Absolutely.  I'm going to give them

16    pointed --

17             MR. ROACHE:  Even more so, your Honor, according

18    to the articles as I read it Peter Gelzinis says that the

19    diary contains hundreds of pages.  I don't know how he

20    received that information.

21             THE COURT:  Let's do it here.  Let's do it right

22    now.  Did either side, and I'll leave this neutral, did

23    either side disclose any of the information, the Daley diary

24    that was under seal?

25             MS. SCAPICCHIO:  Not only did I note violate this

1    Court's protective order, when the reporter called me for a

2    comment, I not only did not comment, I asked him not to run

3    the story explaining to him I had worked for 20 years to get

4    a jury verdict in this case and that I was concerned that

5    the defendants would move for a mistrial if this story ran

6    and asked him to speak to his boss about not running the

7    story.

8              THE COURT:  Nobody on this side released it?

9              MS. HARRIS:  Did not release it.

10             MR. ROACHE:  Your Honor, I find inconceivable that

11   the Boston Herald has not been following this story from Day

12   One and yet on the eve of the most important part of this

13   case, the damages portion, that there are two articles that

14   are run by the Boston Herald where Ms. Scapicchio is quoted

15   and there is indicated --

16             MS. SCAPICCHIO:  Quoted where?  I am not quoted at

17   all.  Do not say I was quoted.

18             THE COURT:  All right.  I'm going to accept her

19   representations as an officer of the court, period, and

20   that's the end of it.  So let's go back in.

21             ( LOBBY CONFERENCE WAS CONCLUDED.)

22             THE CLERK:  All rise for the jury.

23             (Jurors entered the courtroom.)

24             THE COURT:  Good morning, you can all be seated.

25   You seem to be walking a little more slowly.  First I want

1    to apologize, when the weather seems to turn, our heating

2    overcompensates, so we called if that can be fixed.

3    Needless to say we are dressed for yesterday's weather so we

4    are all going to be uncomfortable together.  I have a couple

5    of questions to ask of you before we begin, and I'll tell

6    you what beginning means.

7          First there was an article in the paper, as is not

8    unusual after your findings, your verdict of last week, it's

9    not unusual that there would be articles reporting that.

10   Has anyone read any of the articles which reported on what

11   you had done last week, the verdict in this case?  Any

12   affirmative responses?  Okay.

13         Then in addition there were articles over the

14   weekend, just one second, there was one on October 15th,

15   then there were articles over the weekend there was an

16   article in The Herald which was about this case.

17         Did anyone read that article or talk to anyone

18   about that article?  Okay.  There may have been articles

19   over the weekend and last week that talked not just about

20   this case, the case involving Shawn Drumgold, but cases

21   involving other civil rights cases against the

22   Boston Police.  Has anyone read, seen or heard anything

23   about that apart from the inquiry we made of the jury last

24   week, has anyone seen, heard or anything about that?  What

25   I'm talking about, not just articles that purport to talk

1    about the Drumgold case, the Tiffany Moore murder or Officer

2    Callahan, but also articles that talk more broadly about the

3    Boston Police and civil rights cases apart from what we

4    discussed last week, no one has read, seen or heard anything

5    along those lines?  Okay.

6          Now, what we will be doing today, and it's my

7    understanding that the evidence will be only today and that

8    you'll have this stage of the case for your verdict and then

9    your responsibilities will be over.  I wanted to say that at

10    the beginning looking at your faces.  This stage of the

11    proceeding involves determining the damages that flow from

12    your verdict of last week.

13          Before I turn, before I instruct you on the

14    standard for determining damages, which I will do at the end

15    of this morning's proceedings, I just wanted to put this in

16    context for you.  You have already decided the question of

17    Officer Callahan's liability in two respects, withholding

18    exculpatory evidence about hotel and food and the payment of

19    $20.

20          Another jury, ladies and gentlemen, will determine

21    whether the other defendants in this case, namely the City

22    of Boston and Police Commissioner Francis Roache, are liable

23    for any constitutional violations.  Because of the timing

24    here, we will not ask you to determine those questions,

25    another jury will answer those questions.

1          In this proceeding, you'll decide the amount of

2    damages to be awarded to Mr. Drumgold, but bear in mind that

3    there will only be a single award for Mr. Drumgold.  The

4    remaining defendants, who will be the subject of another

5    jury, may also be responsible for the compensatory damages

6    that you have awarded but only if they are found liable.

7          So today you will be asked to determine damages,

8    and I'll instruct you what that consists of.  The

9    responsibility of these two other defendants for that same

10   amount of damages will be determined by another jury.  You

11   will focus only on damages here.  We want to say this to

12   people so they don't think there are multiple awards, it's

13   one amount of damages which you will determine if you find

14   it is appropriate.

15         So with that we will begin.

16         MS. SCAPICCHIO:  Thank you, your Honor.  The

17   plaintiff calls Shawn Drumgold.

18         SHAWN DRUMGOLD, having been duly sworn by the

19   Clerk, testified as follows:

20                      DIRECT EXAMINATION

21   BY MS. SCAPICCHIO:

22         THE COURT:  Proceed.

23   Q.  Good morning.  In a loud clear, voice, Shawn, could you

24   please state your name for the record.

25   A.  Shawn Drumgold.

1    Q.  Could you move that microphone closer to you, Shawn.

2    Thank you.  And, Shawn, where are you living now?

3    A.  181 Stratton Street.

4    Q.  Who did you live there with?

5    A.  With my mother and my niece.

6    Q.  And are you married?

7    A.  Yes.

8    Q.  Who are you married to?

9    A.  Rochelle Drumgold.

10   Q.  And do you have any children?

11   A.  Yes.

12   Q.  How many children do you have, Shawn?

13   A.  Four.

14   Q.  And can you tell the jury the names and the ages of your

15   children?

16   A.  Rowshana, she's 26; Shawn, Jr., he's 24; Karen Kyara,

17   she's 24; and Kiamoni, he's 4.

18   Q.  What's the last one?

19   A.  Kiamoni.

20   Q.  He's four?

21   A.  Yes.

22   Q.  Shawn, I'm going to direct your attention to, first of

23   all, do you know the date you were convicted?

24   A.  Yes.

25   Q.  What was the date of your conviction?

1    A.  October 13th, 1989, Friday.

2         MS. SCAPICCHIO:  And if I may, your Honor, I'd

3    like to read the sentence into the record.

4         THE COURT:  Yes, you may.

5    Q.  This is October 13th, 1989.  "The Commonwealth moves for

6    sentencing by Mr. Beauchesne."  The clerk:  "Shawn Drumgold,

7    please rise.  Shawn Drumgold, the jury having returned a

8    verdict of guilty, the Court in consideration of your

9    offense as set forth on the Indictment No. 071882 sentences

10   you to be committed to the Massachusetts Correctional

11   Institute at Cedar Junction for and during the term of your

12   natural life.  The Court will have deemed you have served

13   whatever time spent in custody awaiting disposition of this

14   matter.  You have a right of appeal pursuant to Mass. Rules

15   of Criminal Procedure 28.  You stand committed, sir."

16        Shawn, do you remember the day you were

17   convicted?

18   A.  Yes.

19   Q.  Can you tell the jury what happened after that sentence

20   was imposed?

21   A.  After that sentence was imposed, I was taken to the back

22   of the courthouse, I was shackled, they put chains around my

23   waist, once in handcuffs, they put shackles around my legs

24   and escorted me to Walpole.

25   Q.  When you say Walpole, what is Walpole?

1    A.   Maximum state prison.

2    Q.   How did you get to Walpole?

3    A.   They drove me in a car.

4    Q.   Do you remember driving up to Walpole state prison

5    October 13th of 1989?

6    A.   Yes.

7    Q.   Can you tell the jurors what you remember about driving

8    up to Walpole state prison October 13th of 1989?

9    A.   When we first got to Walpole what I had recognized was a

10   big white wall, it was 30 feet tall, and when I saw the

11   wall, I knew basically what it was, it was Walpole, and when

12   we got to Walpole, we went inside a door, and when we

13   entered into the door, the door closed, and there was a guy

14   in the trap.  When I looked up, it was about as high as this

15   ceiling, and he was pointing down with a shotgun.

16   Q.   And how did that make you feel, Shawn?

17   A.   Scared.  I was terrified.

18   Q.   And where did you go from that trap?

19   A.   From that trap, they bring me into Walpole, and they

20   brought me to the hospital unit.

21   Q.   Okay.  And where is the hospital unit in relation to the

22   other units at Walpole state prison?

23   A.   The hospital unit is outside the visiting room.

24   Everyone that comes into Walpole state prison, you have to

25   go to the hospital unit first to be checked in before you

1    enter into the institution.

2    Q.  Were you physically brought to the hospital unit by some

3    corrections officer?

4    A.  Yes.

5    Q.  Tell us where physically they placed you within the

6    hospital unit.

7    A.  They placed me in a cell in the hospital unit.

8    Q.  Could you describe that cell for the jurors, please.

9    A.  The cell was a three feet by six cell, it had a bed in

10   it and a toilet with a sink on the top.

11   Q.  Could you describe the bed for the jurors.

12   A.  The bed was a metal bed, a metal slab.  It was stuck on

13   the wall, and it had a green mattress.

14   Q.  Okay.  And at some point in time did the corrections

15   officer who escorted you to that cell leave?

16   A.  Yes.

17   Q.  What did you do when they left?

18   A.  I put my head down and I cried.

19   Q.  You what?

20   A.  I cried.

21   Q.  And how long did you cry that day?

22   A.  I cried all that day.  I was in the cell for about an

23   hour, hour and a half, and then my family came up to

24   visit.

25   Q.  Okay.  Did someone notify you that you were going

1    somewhere else?

2    A.  Yes, an officer came and told me that I had a visit.

3    Q.  And were you escorted to the visiting room?

4    A.  Yes.

5    Q.  What happened before you went into the visiting room?

6    A.  When I went into the visiting room, they strip searched

7    me, they made me take off all my clothes, they checked my

8    mouth, my ears, they made me spread my butt cheeks, lift up

9    my testicles, my feet, then they told me I could get dressed

10   and go into the visiting room.

11   Q.  When you got to the visiting room, who was there?

12   A.  My wife, my mother, my brother, my daughter.

13   Q.  And what did you see -- well, what happened in that

14   visiting room?  Did you visit?

15   A.  Yes.  When I was in the visiting room --

16   Q.  For how long?

17   A.  I think it was like close to, I think it was like six or

18   seven hours.

19   Q.  That you visited that day?

20   A.  Yes.

21   Q.  And what happened at the end of the visit?

22   A.  At the end of the visit, my daughter, she didn't want to

23   leave.  It was kind of difficult for her.  No one wanted to

24   leave.  They didn't want to leave me behind.

25   Q.  And were you crying during that visit?

22

1    A.  Yes.

2    Q.  Were they crying during that visit?

3    A.  Yes.

4    Q.  And at some point did that visit end?

5    A.  Yes.

6    Q.  And where did you go when that visit ended?

7    A.  I went back into the institution and they strip searched

8    me and took me through the procedure all over again and

9    bring me back to the hospital unit.

10   Q.  And how long did you stay in the hospital unit, Shawn?

11   A.  I got there on a Friday so I stayed there through the

12   weekend.  Monday morning I was brought into an orientation

13   unit.

14   Q.  And could you explain to the jurors what an orientation

15   unit is?

16   A.  Orientation unit is the first unit for new men when you

17   first get into Walpole.

18   Q.  When you say the first unit for new men, what does that

19   mean?

20   A.  As soon as you come into the institution, it's a unit --

21   Q.  Before you get classified?

22   A.  -- before you get classified.

23   Q.  Now, Shawn when you were brought to the orientation unit

24   shortly after October 13th, 1989, did something happen?

25   A.  Yes.

1   Q.   Can you tell the jurors what happened?

2   A.   When I was brought into the unit, there was a lot of

3   guys and stuff in the unit.  It's 45 men in a cell, in the

4   unit.  Each cell has 45.  There's 45 cells so guys was

5   calling me a chow killer, that's the guy that got convicted,

6   he killed two little girls, he's a piece of shit and stuff

7   like that.

8   Q.   And, Shawn, can you describe your first visit?  Well,

9   first of all, where did you eat your meals in prison?

10  A.   In the chow hall.

11  Q.   And can you describe for the jury your first experience

12  in the chow hall at MCI-Cedar Junction?

13  A.   My first experience in the chow hall, when I entered

14  into the chow hall, we end up going double in the double

15  line, then when you get into the chow line, you get into a

16  single line and you grab a tray.  The chow hall, it's very

17  big, and I don't know how many seats it housed, but it's a

18  large place.

19        When you get your trays, everyone is like falling

20  in line to get their food and then you head into a seat.

21  When you get into the chow hall and you go try to sit down

22  at a table, guys are always saying this seat is taken, and

23  they're moving you from one place to another, and if you sit

24  down in someone's seat, you can get stabbed, you can get

25  hurt really bad in there.

1    Q.  The first day that you described when you got to the

2    chow hall after you were convicted on October 13th, 1989,

3    were you able to find a seat?

4    A.  No.

5    Q.  How did you eat your meals?

6    A.  I eat standing up, and then the staff, that you're

7    supposed to sit down and eat, so they move you.  If you

8    can't find a seat, you got to keep moving, so I ate as fast

9    as I could on my way to the trash can, and I dumped it, and

10   I kept going back to the unit.

11   Q.  And, Shawn, at some point were you moved to a regular

12   block?

13   A.  Yes.

14   Q.  And can you describe for the jury what the regular

15   blocks at MCI-Cedar Junction looked like?

16   A.  A regular block is a similar cell.  It's a 3 by 6 cell,

17   but it has a desk in it so when you're sitting in the cell,

18   you have like maybe a foot and a half to the desk and it has

19   a toilet in it and a bed stuck to the wall, a green plastic

20   mattress.

21   Q.  And, Shawn, could you stand up for the jury and pace out

22   how many steps you could take in that cell?

23   A.  Like if you're going this way, it would be three steps,

24   one, two, three.

25   Q.  And what would happen at that, you hit the wall?

1    A.   You hit the wall.

2    Q.   What type of wall was that, Shawn?

3    A.   Cement wall.

4    Q.   How about coming forward?

5    A.   Then when you come forward, you take 1, 2, 3, 4, 5, 6,

6    then you stop here and you hit bars.

7    Q.   Could you resume the stand, please.  Shawn, from

8    October 13th of 1989 until you were released in November of

9    2003, how many days did you spend in jail?

10   A.   5,182 days.

11   Q.   5,182?

12   A.   Yes.

13   Q.   And, Shawn, if you could, could you take the jurors

14   through a day at MCI-Cedar Junction.  What happens?  What

15   time, first of all, how do you wake up in the morning?

16   A.   In the morning, the lights come on.  There are blocks,

17   some bright lights, and they make -- it's a horn that goes

18   off to let everyone know that it's getting ready to be count

19   time.

20   Q.   Stop right there.  What is count time?

21   A.   Count time is where an officer comes by and counts

22   everybody and each block in the whole institution does the

23   same thing.

24   Q.   How many counts do you have a day while you're in

25   prison?

1   A.   About four.

2   Q.   Four counts a day?

3   A.   Yes.

4   Q.   So the first count is first thing in the morning?

5   A.   Yes.

6   Q.   How much time do you have between when that loud sound

7   happens and count happens?

8   A.   We have five minutes.

9   Q.   What do you have to do during that five-minute period?

10  A.   You throw your clothes on and you brush your teeth and

11  you stand by the bars and the officer counts you.

12  Q.   And the officer counts you?

13  A.   Yes.

14  Q.   And what happened after you've been counted and the

15  count clears?

16  A.   After the count clears --

17  Q.   Wait a minute, why don't you tell the jury what it means

18  for the count to clear.

19  A.   The count to clear, once all the inmates in the whole

20  entire institution is counted, then the count is cleared for

21  movement, and once the count is cleared, they open the cell

22  up, and the first thing that you do is go to chow.

23  Q.   And how do you get to chow?

24  A.   You walk.

25  Q.   And physically how do you get from your cell block to

1    the chow?

2    A.  Each block is called for chow so you come out your cell

3    and you exit out the unit, and the whole block goes together

4    into the chow hall.

5    Q.  So you march down to the chow hall?

6    A.  Yes.

7    Q.  And how long do you get to eat in the chow hall?

8    A.  Maybe two or three minutes.

9    Q.  From the time the chow is called until you're back to

10   your cell, how much time has usually passed?

11   A.  Probably about 20 minutes.

12   Q.  From the time they call chow to your unit until you have

13   to get back to your unit is 20 minutes?

14   A.  Yes.

15   Q.  And that includes the time you have to march down there,

16   eat your food and march back?

17   A.  Yes.

18   Q.  What happens after you're marched back after chow?

19   A.  When you're coming back, there's correctional officers

20   posted all the way to each unit.

21   Q.  When you get back to your unit, are you locked in your

22   cell again?

23   A.  Yes, you get locked back in your cell.

24   Q.  Then you had mentioned something about movement.  Can

25   you tell the jury what movement is within a prison system?

1   A.  Movement in a prison system is 9:00 movement, it's like

2   it opens, whatever part of the institution is opened that

3   you can go to those areas, it's like school, the library,

4   gym, whatever.

5   Q.  Okay.  And are different portions of the institution

6   open for movement at different times of the day?

7   A.  Yes.

8   Q.  Okay.  And during that movement period, is that the time

9   period that you shower and you make phone calls as well?

10  A.  Yes.

11  Q.  Can you tell me how many showers are typically on a tier

12  in the Walpole system?

13  A.  For 45 inmates, there's three showers.

14  Q.  And when we talk about phone calls, how did you make

15  phone calls in prison?

16  A.  You had to stand in line.  Each block holds 45 inmates,

17  and there's two phones in a block so as the blocks are open

18  up for movement, if you make movement or you stay in a

19  block.  If you stay in a block, everyone has to stay in line

20  to get on the phone.

21  Q.  How do you place calls, they're collect?

22  A.  Yes, they're collect calls.  It's a long wait to get on

23  the phone because it's so many inmates.

24  Q.  Other than the movements period that you have during the

25  day where you shower, you make phone calls, how many hours a

1    day are you typically locked in your cell?

2    A.  About 16 hours a day.

3    Q.  Sixteen hours a day?

4    A.  Yeah.

5    Q.  Now, Shawn, I'm going to ask you in your first days at

6    Walpole state prison after your conviction on October 13th

7    of 1989, did you witness any violence?

8    A.  Yes.

9    Q.  Can you tell the jury the first instance that you

10   witnessed at MCI-Cedar Junction.

11   A.  The first incident, it was one shared block is being

12   called for movement, you have to go to your officer and get

13   a pass to the designated area you're going to, so I was

14   going to the yard, so I got a pass to go to the yard.

15   Q.  And let's stop right there.  Let's explain to the jury

16   what the yard is.

17   A.  The yard is one of the most dangerous parts of the

18   prison.

19   Q.  Why is that, Shawn?

20   A.  Because that's where most of the stuff happens out in

21   the open, you're like caged in, a fenced area, and it's like

22   where people congregate, all different nationalities.

23   Q.  And is that the only place you get fresh air?

24   A.  Yes.

25   Q.  And you got a pass to the yard this day?

1    A.  Yes.

2    Q.  And what happened?

3    A.  On the way going to the yard, my block was being called

4    so we was going in.  There was a guy that was coming in.

5    Q.  When you say your block was called, were you in a

6    line?

7    A.  Yes.

8    Q.  Same type of line you were in when you went to chow?

9    A.  Yes.

10   Q.  Marching towards the yard?

11   A.  Yes.

12   Q.  And then what happened?

13   A.  A guy was coming against our movement.

14   Q.  When you say against your movement, tell the jury what

15   you mean.

16   A.  We were walking straight on the right-hand side and he

17   was coming on the left-hand side.

18   Q.  What happened when you saw him come on the left-hand

19   side?

20   A.  It seemed, it looked like what he appeared he was

21   punching the guy, then the guy fell down so we all kept

22   going.

23   Q.  He punched a guy?

24   A.  It was like he was punched.

25   Q.  Did you later find out what happened?

1   A.  He was stabbed.

2   Q.  Did you stop to help him?

3   A.  No.

4   Q.  Why not?

5   A.  It's one of the things you don't do in prison.

6   Q.  Now, Shawn were you ever assaulted while you were in

7   MCI-Cedar Junction?

8   A.  Yes.

9   Q.  Can you tell the jury about the first assault.

10  A.  The first assault, I was in my cell, the first incident

11  happened, it was like three or four inmates came in to the

12  cell, and they was saying, "He's the piece of shit, he

13  killed a little girl," there was talk about hurting me and

14  there was punching and kicking, and I sustained a lot of

15  bruises and stuff like that.

16  Q.  So they came into your cell.  Did you try to defend

17  yourself?

18  A.  No.

19  Q.  Why not?

20  A.  Because I was scared.

21  Q.  And what bruises did you suffer as a result of that

22  beating?  First of all, how long did the beating last?

23  A.  Probably about 10, 15 minutes.

24  Q.  Okay.  And what were you doing, physically doing?  Three

25  or four inmates were beating you at MCI-Cedar Junction?

1    A.   I was protecting my head.

2    Q.   How were you doing that?  Tell the jury.

3    A.   I was curled in a fetus position, and I was trying to

4    block my head.

5    Q.   Did you say anything back to them?

6    A.   No.

7    Q.   At some point did the beating stop?

8    A.   Yes.

9    Q.   What did you do when the beating stopped?

10   A.   I got up and tried to clean myself and act like nothing

11   happened.

12   Q.   Did you report the beating?

13   A.   No.

14   Q.   Why did you try to act like nothing happened?

15   A.   Because I didn't want to get anyone in trouble, they

16   call me a snitch.  In prison, if you're called names like

17   that, a snitch, if you're telling on somebody, you can get

18   hurt really bad from that.

19   Q.   You thought you'd get hurt worse if you told?

20   A.   Yes.

21   Q.   Were you assaulted at any other time while you were at

22   MCI-Cedar Junction?

23   A.   Yes.

24   Q.   Where were you the second time you were assaulted at

25   MCI-Cedar Junction?

1    A.  The second time I was in the library, I was down the

2    library asking for copies and stuff in the machine and some

3    guys came and jumped on me, and they were kicking and

4    stomping me.

5    Q.  When you say kicking and stomping, where were they

6    kicking and stomping?

7    A.  All over my body.

8    Q.  What were you doing?

9    A.  I was trying to defend myself, I was trying to block the

10   hits.

11   Q.  And at some point during that beating did you lose

12   consciousness?

13   A.  Yes.

14          MR. ROACHE:  Your Honor, I object to leading

15   questions.

16          THE COURT:  Sustained.

17   Q.  Tell us what happened during that beating.

18   A.  During -- what I remember is someone hit me in the back

19   of the head, I was trying to block the hits from hitting me,

20   I fell down, and that's all I remember from that.  When I

21   woke up, there was some correctional officers and staff

22   nurse over me.

23   Q.  Were you bleeding?

24   A.  Yes.

25   Q.  Where were you bleeding from at that point?

1    A.  My mouth, my nose.

2    Q.  All right.  And was that the last time you were

3    assaulted at MCI-Cedar Junction or was there another

4    assault?

5    A.  That was the last.

6    Q.  Okay.  At some point were you transferred to

7    MCI-Norfolk?

8    A.  Yes.

9    Q.  And was the cell at MCI-Norfolk -- let me ask you this,

10   were the restrictions that were placed on you at MCI-Cedar

11   Junction, it was the same 16 hours you spent at Norfolk and

12   all the other state prisons?

13   A.  Yes.

14   Q.  And every day was the same, movement for chow and the

15   various movements during the day?

16   A.  Yes.

17   Q.  And other than that you were locked in your cell?

18   A.  Yeah.

19   Q.  Now, at MCI-Norfolk, can you describe for the jury

20   whether or not you were ever assaulted while you were at

21   MCI-Norfolk?

22   A.  Yes.

23   Q.  And can you tell the jury what happened during that

24   assault?

25   A.  When I was in Norfolk, MCI-Norfolk, when you first get

1   to Norfolk, it's like Norfolk's orientation, it's a dorm

2   type area when you first come in.  I was jumped in the dorm

3   area.

4   Q.  When you say jumped, Shawn, what happened to you?

5   A.  A bunch of guys jumped and were stomping on me, calling

6   me a piece of shit saying I killed a little girl.

7   Q.  How long did that beating last?

8   A.  I don't know.

9   Q.  Did something happen after that beating, the next day?

10  Let me ask you this, after that beating, did you do anything

11  to clean up?

12  A.  Yes.

13  Q.  What did you do?

14  A.  What I did, I put a longjohn shirt on.

15  Q.  Why did you put a longjohn shirt on?

16  A.  Because what happened is once I cleaned up, I didn't

17  want no one to see the bruises and stuff so I covered the

18  bruises with my shirt.

19  Q.  Okay.  And the next day did you get a visit?

20  A.  Yes.

21  Q.  Who did you get a visit from?

22  A.  I got a visit from you.

23  Q.  And during that visit, do you remember lifting up your

24  shirt?

25  A.  Yes.

36

1    Q.   Do you remember lifting up the thermal on your arm?

2    A.   Yes.

3    Q.   Can you tell the jury how long that visit lasted that

4    day?

5    A.   That visit lasted almost about seven hours.

6    Q.   It was unusual for your lawyer to stay there for seven

7    years?

8    A.   Yes.

9    Q.   Why so long, Shawn?

10   A.   Because I was scared and I really didn't want to go back

11   into the institution, and I didn't know what to do.

12   Q.   Now, Shawn, from Norfolk, were you transferred to Old

13   Colony Correctional Center?

14   A.   Yes.

15   Q.   Is that another state prison within Massachusetts?

16   A.   Yes.

17   Q.   And the prison routine, did that apply in Old Colony

18   Correctional Center as well?

19   A.   Yes.

20   Q.   Three meals a day, 20 minutes a day to eat your meals;

21   is that right?

22   A.   Yes.

23   Q.   And locked in your cell 16 hours a day?

24   A.   Yes.

25   Q.   And at Old Colony, were you ever assaulted?

1    A.   Yes.

2    Q.   And can you tell the jury about that assault.

3    A.   Old Colony was the same, when I was in the new man unit,

4    when I came in, there was like three or four guys jump me in

5    the cell, and I had a bunch of bruises on my back and my

6    stomach area.

7    Q.   And did you report that beating?

8    A.   No.

9    Q.   And did you clean up from that beating?

10   A.   Yes.

11   Q.   And, Shawn, while you were in prison, did you get your

12   G.E.D.?

13   A.   Yes, in 1995.

14          MS. SCAPICCHIO:  May I approach the witness, your

15   Honor?

16          THE COURT:  Yes, you may.

17   Q.   Do you recognize that certificate, Shawn?

18   A.   Yes.

19   Q.   What do you recognize that to be?

20   A.   This is my G.E.D. certificate.

21   Q.   Okay.  And how long did you work to get your G.E.D.

22   while you were in prison, Shawn?

23   A.   Five years.

24   Q.   Five years?

25   A.   Yeah.

1          MS. SCAPICCHIO:  Your Honor, I move to introduce

2    this.

3          THE COURT:  Any objection?

4          MR. CURRAN:  No objection, your Honor.

5          THE COURT:  It may be admitted.

6          ( Shawn Drumgold's G.E.D. certificate was marked

7    and admitted into evidence as Exhibit No. 1.)

8    Q.  Now, Shawn we talked a little bit about the first visit

9    you had right after your conviction.  Can you tell the

10   jurors what the procedure was for your family to come and

11   visit you at any of the various institutions you were locked

12   up in?

13   A.  The same routine like I am, when my family came to visit

14   me, they had to sign a paper for visitor's form to come in,

15   and then when they came in, they were subject to the same

16   searches, pat searches and stuff like that that we were.

17   Q.  They weren't cavity searches, they were just pat

18   searches?

19   A.  Pat searches, but there was also times that they can

20   make the women pull their bras out.

21          MR. CURRAN:  Objection, your Honor.

22          THE COURT:  Overruled.  Go on.

23   A.  They have mirrors where they can check for cavity

24   searches and stuff like that so that they make sure no one

25   brings no contraband, anything into the institution.

1   Q.  And when your family came to visit you, those 5,182 days

2   that you were incarcerated, did they have to go through the

3   same routine to get into the institution each time?

4   A.  Yes.

5   Q.  And at some point -- well, how often did your wife visit

6   you while you were incarcerated?

7   A.   In the beginning, it was like, you know, two or three

8   times a week, but then as time went on, my daughter when I

9   first went in, when I first got locked up, she was five and

10  a half months, so when I got sentenced, she was like almost

11  two, so as time went on she was getting older and school and

12  stuff like that so the visits changed, it went from two or

13  three times a week to once a week to every other week to

14  once a month, and as the years went on, it changed.  My

15  daughter got older, she was developing, and she was started

16  to go through the process as adults do in prison with the

17  searches.

18  Q.  So she was beginning to get pat searched?

19  A.  Yes.

20  Q.  And what happened when she started to get pat

21  searched?

22  A.  She was feeling reluctant to come.

23  Q.  She didn't want to visit?

24  A.  No.

25  Q.  Because she didn't want to go through the pat search?

1 A. Yes.

2 Q. Now, when you were convicted in October, the 13th of

3 1989, were you married at that time, Shawn?

4 A. When I first got convicted, no.

5 Q. Did you get married at some point?

6 A. Yes.

7 Q. When did you get married?

8 A. I got married February 11th, 1990.

9 Q. And were you in jail at the time?

10 A. Yes, MCI-Walpole.

11 Q. Where were you married?

12 A. In Walpole, MCI-Walpole, City Junction.

13 Q. And how long was your wedding ceremony in jail?

14 A. It was like seven or eight minutes, they called us in

15 before the visits.

16 Q. And you were married in a civil ceremony?

17 A. Yes.

18 Q. And what happened right after you were married to your

19 wife Rochelle?

20 A. After I was married, I had to exit back out the visiting

21 room, go through the strip search procedure and wait for the

22 visits to be called out to come out to the visiting room

23 again.

24 Q. Do you have any pictures of your wedding?

25 A. No.

1    Q.  Shawn, do you remember or could you tell the jury

2    whether or not when you were on visits with your family if

3    you got the opportunity to take any photographs?

4    A.  Yes.

5    Q.  All right.  Can you tell the jury what you had to do in

6    order to take photographs while you were in prison?

7    A.  In prison, you could work in there, you get a dollar a

8    day, so I used to have to save up my money to help get some

9    of the pictures in the early parts of my sentence, I didn't

10   have the money, and what little bit you have canteen where

11   you can get cosmetics and food and stuff like that, but I

12   used to have to save up for the pictures so I could take

13   them of my family.

14   Q.  When you say pictures, where is the picture actually

15   taken at the various institutions?

16   A.  In the visiting room.

17          MS. SCAPICCHIO:  Can I use the document camera,

18   your Honor?

19          THE COURT:  Yes.

20   Q.  Can you see that on the screen in front of you, Shawn?

21   A.  Yes.

22   Q.  And can you tell the jury what that's a photograph of?

23   A.  That's a photograph of me, my wife and my daughter

24   Kyara.

25   Q.  And was that shortly after you were convicted on

1    October 13th, 1989?

2    A.  Yes.

3    Q.  And how old is Kyara in that picture?

4    A.  She's like 18 months.

5    Q.  Shawn, do you remember where that picture was taken?

6    A.  Yes.

7    Q.  Where is that?

8    A.  That picture is at MCI-Norfolk.

9    Q.  And how old is your daughter Kyara in that picture?

10   A.  In that picture she was like three or four.

11        MS. SCAPICCHIO:  Your Honor, I'd move to introduce

12   the first picture and this picture.

13        THE COURT:  It may be admitted.

14        ( Photographs were marked and admitted into

15   evidence as Exhibit Nos. 2 and 3.)

16   Q.  Shawn, could you tell the jury who's in that picture?

17   A.  That's my mother, me, my wife and my daughter.

18   Q.  And do you remember where that picture was taken?

19   A.  That picture was taken at Old Colony Correctional

20   Center.

21   Q.  And how old is Kyara in that picture?

22   A.  She was like five years old in that picture.

23   Q.  Shawn, do you remember how you spent holidays while you

24   were in jail?

25   A.  Yes.

1    Q.   Did you spend them with your family?

2    A.   No.

3    Q.   How did you spend them?

4    A.   If a holiday fell on a weekday like Thanksgiving mostly

5    is the third Thursday of the month, we would celebrate it on

6    a weekend in the visiting room.

7    Q.   Let's talk about the actual holiday, the holiday itself,

8    how did you spend that?

9    A.   I spent it on the phone by myself.

10   Q.   And was the prison staff reduced staff on holidays?

11   A.   Yes.

12   Q.   So if you didn't have a visit, what happened?

13   A.   If you didn't have a visit, you basically stayed in your

14   cell.

15   Q.   You were locked in your cell all day?

16   A.   Most of the day.

17   Q.   And that was because there was a reduced staff on

18   holidays?

19   A.   Yes.

20   Q.   Shawn, you talked about spending Christmas with your

21   family.  Is this picture representative of how you spent

22   Christmas with your family?

23   A.   Yes.

24   Q.   Can you explain to the jury what is depicted in this

25   picture?

1   A.   In the visiting room this was another picture at Old

2   Colony Correctional Center.   Christmas would happen it

3   didn't fall on the same day, so what happened, that Saturday

4   my wife and my daughter came up to visit me, and we spent

5   that -- we celebrated Christmas on a Saturday so we bought

6   like sandwiches.

7   Q.   They were just from the vending machine?

8   A.   Yes, from the vending machine.   My wife, she wouldn't

9   let Kyara eat candy, so I used to sneak her candy, and we

10  bought like chips and stuff like that, sodas and that.   This

11  was the memorable time that I could remember so I would save

12  my money up to take pictures with them so that we can have

13  some memories.

14          MS. SCAPICCHIO:   Your Honor, I'd move to introduce

15  this photograph as well.

16          THE COURT:   It may be admitted.

17          ( Photograph was marked and admitted into

18  evidence as Exhibit No. 4.)

19  Q.   Do you remember where that photograph was taken,

20  Shawn?

21  A.   Yes.

22  Q.   Where is that?

23  A.   That's at Bay State Correctional Center.

24  Q.   And how old is Kyara in that picture?   First of all,

25  who's in that picture?

1   A.   That's my wife, Rochelle, and Kyara.

2   Q.   And how old is Kyara in that picture?

3   A.   Kyara is like eight years old in that picture.

4          MS. SCAPICCHIO:  I move to introduce that, your

5   Honor.

6          THE COURT:  It may be admitted.

7          ( Photograph was marked and admitted into

8   evidence as Exhibit No. 5.)

9   Q.   Do you ever remember an occasion, Shawn, where in the

10  5,182 days that you were incarcerated that you actually got

11  to share a meal with your family?

12  A.   Yes, like Thanksgiving and stuff like that we would have

13  some --

14  Q.   And do you remember -- let me show you this.  Who's in

15  that picture?

16  A.   That's my daughter, my nephews, my two nephews came up

17  to see me, that was my first time seeing them, and my

18  brother Darryl and my big brother Steve.

19  Q.   And was that an occasion that you remember that you

20  actually got to share a meal with your family in the 5,182

21  days you spent in jail?

22  A.   Yes.

23  Q.   And did you keep that picture throughout the years?

24  A.   Yeah.

25          MS. SCAPICCHIO:  I'd move to introduce this

1    picture, your Honor.

2           THE COURT:  It may be admitted.  Go on.

3           ( Photograph was marked and admitted into

4    evidence as Exhibit No. 6.)

5    Q.  Now, in addition to the photographs you took while you

6    were at the institution, did you actually receive

7    photographs from your wife during your incarceration?

8    A.  Yes.  That's my daughter, her name is Karen Kyara, we

9    call her Kiki.  That was her first time on the phone with me

10   that she was like -- that I got the first picture I got with

11   the phone on me, she was talking to me on the phone.

12   Q.  So when she talked to you at jail, your wife took a

13   picture for you?

14   A.  Yes.

15   Q.  And sent it to you?

16   A.  Yes.

17           MS. SCAPICCHIO:  I'd move to introduce that photo,

18   your Honor.

19           THE COURT:  It may be admitted.

20           ( Photograph was marked and admitted into

21   evidence as Exhibit No. 7.)

22   Q.  Shawn, do you know what this picture is?

23   A.  Yes, this is another picture of me talking to her on the

24   phone.  She always asks all the time when I was talking to

25   her on the phone is, "When you coming home, daddy?"

1    Q.  What's that?

2    A.  She's always asking, "When you coming home, daddy?"

3    That's one of the pictures that she was having a hard time

4    with me not being there.

5              MS. SCAPICCHIO:  I'd move to introduce that.

6              THE COURT:  It may be admitted.

7              ( Photograph was marked and admitted into

8    evidence as Exhibit No. 8.)

9    Q.  Do you know what that's a photograph of, Shawn?

10   A.  Yes.

11   Q.  What's that a photograph of?

12   A.  That's a birthday card.  My daughter took a picture of

13   it.

14   Q.  A card that she was sending to you?

15   A.  Yes.

16   Q.  And then your wife took a picture of her sending that

17   card to you?

18   A.  Yes.  You can see, if you can see, there's some writing

19   on there, she used to write little things for me on the

20   card.

21             MS. SCAPICCHIO:  I'd move to introduce that photo,

22   your Honor.

23             THE COURT:  It may be admitted.

24             ( Photograph was marked and admitted into

25   evidence as Exhibit No. 9.)

1    Q.  Do you know what that's a photo of, Shawn?

2    A.  Yes.

3    Q.  What's that a photo of?

4    A.  That's Kyara's kindergarten graduation, and that's her

5    great grandfather, Grandpa Billy, he passed away, God bless

6    him.

7    Q.  Were you able to attend her kindergarten school

8    graduation?

9    A.  No.

10   Q.  Is that the only memory you have of her kindergarten

11   school graduation?

12   A.  Yes, and that's the only picture I have of

13   Grandpa Billy.

14          MS. SCAPICCHIO:  I move to introduce that, your

15   Honor.

16          THE COURT:  It may be admitted.

17          ( Photograph was marked and admitted into

18   evidence as Exhibit No. 10.)

19   Q.  Shawn, can you tell us what's depicted in the next

20   photograph?

21   A.  Yes, that's a picture of Kyara brushing her teeth.  Her

22   mother didn't want her eating candy, so we used to always

23   kid her about brushing her teeth and stuff like that, and

24   she was showing me that she was brushing her teeth.

25   Q.  And is that how you kept apprised of your daughter's

49

1   daily activities, you would get these photographs in the

2   mail every once in awhile?

3   A.  Yes.

4           MS. SCAPICCHIO:  I'd move to introduce that, your

5   Honor.

6           THE COURT:  It may be admitted.

7           ( Photograph was marked and admitted into

8   evidence as Exhibit No. 11.)

9   Q.  Shawn, can you tell us what's depicted in the next

10  photo?

11  A.  This is Kyara in bed.

12  Q.  And why did you get a picture of Kyara in bed?

13  A.  Because she wanted me to read to her.  She always used

14  to say I can't wait until you get a chance to read me a book

15  to bed at night, so she sent me a picture.

16  Q.  Did you have a chance during those 5,182 days that you

17  spent in jail to tuck your daughter in?

18  A.  No.

19  Q.  Did you have a chance to give her a kiss goodnight

20  during those times?

21  A.  No.

22  Q.  Is this one of the only pictures you have of her in

23  bed?

24  A.  Yes.

25  Q.  And did you keep that through all these years?

1    A.  Yes.

2    Q.  Can you tell the jury --

3            MS. SCAPICCHIO:  I'd move to introduce the next

4    photo, your Honor, the last photo, I should say.

5            THE COURT:  It may be admitted.

6            ( Photographs were marked and admitted into

7    evidence as Exhibit Nos. 12, 13 and 14.)

8    Q.  Shawn, can you tell us what's depicted in this photo?

9    A.  This is Kyara going to school.  This is the first

10   time -- I didn't know what a backpack was.  She was trying

11   to explain what a backpack was.  We had like little duffle

12   bags that had the little straps, we used to carry them when

13   I was growing up.  She kept telling me that she had a

14   backpack and she put her books and lunch and stuff in there

15   to go to school, so this is her showing me.

16   Q.  So you had conversations with your daughter about how

17   she carried her books to school?

18   A.  Yes.

19   Q.  Were you able to walk your daughter to school on any

20   occasion --

21   A.  No.

22   Q.  -- during her grammar school?

23   A.  No.

24   Q.  And is this the first time you understood what she was

25   talking about when she was talking to you about backpacks?

1    A.  Yes.

2    Q.  Did you keep this picture throughout the years?

3    A.  Yes.

4    Q.  Now, Shawn, was there occasions when you remember

5    talking to your daughter with respect to her first day of

6    first grade?

7    A.  Oh, God.  She was scared to death first grade.  When she

8    went from kindergarten, the picture that you all saw, she

9    was excited, she knew all the kinds in the school because

10   she was there for a couple years, but going to the first

11   grade, she was nervous so she wanted me to come to school

12   with her for the first grade.  I couldn't promise her.  She

13   kept asking me to promise her that I'd be able to take her

14   to school for that first grade, so all that summer long I

15   was trying to prepare how to come up with a way to help her

16   understand that I couldn't go with her for the first day of

17   school.

18   Q.  Do you remember speaking to her the day before the first

19   day of school?

20   A.  Yes.

21   Q.  And can you tell the jury about that conversation?

22   A.  She wanted me to go to school with her.  She was asking

23   me when I was coming home.

24   Q.  And did you explain to her that you couldn't walk her to

25   school?

1   A.  Yes.

2   Q.  And how did you share in her experience of the first day

3   of first grade?  Did you get a phone call?

4   A.  Yes.  I called, and she explained to me what she went

5   through in her day, and she talked about her friends, her

6   new friends she met.

7   Q.  All right.  And when you hung up from that phone call,

8   what did you do, Shawn?

9   A.  I cried.

10  Q.  Why did you cry?

11  A.  Because I couldn't be there.

12  Q.  Now, Shawn, you had mentioned the first day of school.

13  Were you able to be there for Kyara's graduation from

14  grammar school?

15  A.  No.

16  Q.  Were you able to be there for Kyara's first day of

17  Brownies?

18  A.  No.

19  Q.  Were you able to be there for any of the school

20  presentations that Kyara had from the first grade to the

21  eleventh grade?

22  A.  No, I wasn't able to.

23  Q.  And were you able to spend any birthdays with Kyara from

24  the time that you were convicted on October 13th of 1989

25  until you were released in November of 2003?

1   A.  No.

2   Q.  Were you able to spend any wedding anniversaries with

3   your wife from the date that you were convicted on

4   October 13th of 1989 through November of 2003?

5   A.  No.

6   Q.  How did you find out that Kyara had -- well, did you

7   talk to Kyara about her first date?

8   A.  Yes.

9   Q.  Were you able to be there when she went on her first

10  date?

11  A.  No.

12  Q.  Did you have a conversation with her about that?

13  A.  Yes.

14  Q.  And what did you do after that conversation?

15  A.  I was trying to coach her into, you know, to make the

16  right choices and stuff like that and be open because with

17  females either they run after the boys and they stay away

18  from home or you keep them home so I was trying to explain

19  to her to bring him home if you have a boyfriend and you

20  meet him and you like him, bring him home so your mother can

21  meet him.

22  Q.  Were you able to during the 5,182 days that you spent in

23  jail in this case, were you able to attend any

24  teacher-parent conferences?

25  A.  No.

1   Q.  Were you able to talk to any of Kyara's teachers during
2   that time period?
3   A.  No.
4   Q.  Now, Shawn, at some point, well, at any point in time
5   from the period of October 13th of 1989 till you were
6   released in November of 2003, were you allowed to go home at
7   all?
8   A.  No.
9   Q.  There were no furloughs?
10  A.  No, no furloughs.
11  Q.  Were you able to have any conjugal visits with your
12  wife?
13  A.  No.
14  Q.  Now, Shawn, at some point you were aware that there were
15  motions, post conviction motions filed on your behalf,
16  right?
17  A.  Yes.
18  Q.  And what was your mind set during the time period that
19  those motions were pending?
20  A.  I was hopeful.  I believed in the system.
21  Q.  And did you learn at some point that a motion for new
22  trial had been denied?
23  A.  Yes.
24  Q.  And who did you learn that from?
25  A.  From you.

1  Q.  How did you learn that, explain that to the jury, not

2  the conversation, just explain how you learned it.

3  A.  Okay.  That the post conviction, when --

4  Q.  The motion for new trial.

5  A.  You came up on a visit.

6  Q.  Okay.  And did you learn during that visit that the

7  motion had been denied?

8  A.  Yes.

9  Q.  Okay.  And what was your state of mind at that point?

10  A.  My state of mind was I was let down, I was sad.

11  Q.  And then at some point did you learn that a direct

12  appeal had been filed on your behalf?

13  A.  Yes.

14  Q.  What was your state of mind when the direct appeal was

15  filed?

16  A.  When it was filed, I was excited, I was more hopeful, I

17  said this is the highest court of Mass., they have to hear

18  me, you know, and I was really hopeful in this court that

19  they was going to be able to exercise justice in this

20  case.

21  Q.  And at some point in time did you learn that your direct

22  appeal had been denied?

23  A.  Yes.

24  Q.  And do you remember how you learned that?

25  A.  I learned that from you, too.

1    Q.  How did you learn it specifically?

2    A.  It was over the phone.

3    Q.  And do you remember a visit shortly thereafter?

4    A.  Yes.

5    Q.  All right.  And do you remember at that visit any

6    discussion about how you would tell your family?

7    A.  I asked you because I couldn't do it.

8    Q.  Say that again, I'm sorry.

9    A.  I asked you to do it because I couldn't do it.

10   Q.  To tell your family that your appeal had been denied?

11   A.  Yes.

12   Q.  Did something happen to you after your direct appeal was

13   denied?

14   A.  Yes.

15   Q.  What happened?

16   A.  I started losing hope.

17   Q.  You started what, Shawn?

18   A.  I started losing hope in the system.

19   Q.  Okay.  And what happened specifically?

20   A.  I was trying to let my wife know to live her life.

21   Q.  You were trying to let your wife know to live her

22   life?

23   A.  Uh-hum.

24   Q.  What does that mean?

25   A.  Because I was tired of hurting her.

1    Q.   So what did you do, Shawn?

2    A.   I tried to seeing other people to try to get her to stop

3    coming to see me.

4    Q.   Did you actually file for divorce?

5    A.   Yes.

6    Q.   Why?

7    A.   Because I was tired of hurting her.

8    Q.   And at some point in time did you withdraw the divorce

9    petition?

10   A.   Yes.

11   Q.   And is that after having conversations with Rochelle?

12   A.   Yes.

13   Q.   She wasn't going to leave you?

14   A.   She said she wasn't going to leave me.  She says she

15   wasn't going nowhere.

16   Q.   Now, Shawn, at some point you're aware that there was a

17   third motion for a new trial filed?

18   A.   Yes.

19   Q.   Okay.  You were present for that hearing?

20   A.   Yes.

21   Q.   And at some point in time did you find out that there

22   was a decision on that motion for new trial?

23   A.   Yes.

24   Q.   Can you tell the jury how you found that out.

25   A.   I found out through you.

1    Q.  Tell the jury exactly what happened.

2    A.  I was in my cell --

3    Q.  Wait, first when is this?

4    A.  This is -- this was like on a Monday night or something

5    like that in the evening like 9:30 at night.

6    Q.  In November?

7    A.  In November.

8    Q.  Of 2003?

9    A.  Yes.

10   Q.  After you had served how many years, Shawn?

11   A.  I served 15 years and some months.

12   Q.  Okay.  And what happened in this conversation?

13   A.  A case worker had came and told me that I had a phone

14   call.

15   Q.  What time of night was it, Shawn?

16   A.  It was like 9:30 at night.

17   Q.  And was that unusual for you to have a phone call at

18   9:30 at night?

19   A.  Yes.

20   Q.  Had it ever happened in the 5,182 days that you had been

21   incarcerated?

22   A.  No.

23   Q.  When you got to the case worker's office, what

24   happened?

25   A.  I didn't know what it was.  In my mind I thought

1    something happened to someone in my family, so I was rushing

2    to the phone, and when I got to the phone, it was you on the

3    phone.

4    Q.   And what did you learn as a result of having that

5    conversation with you?

6    A.   That you told me that you were outside the prison and

7    you had good news and bad news.

8    Q.   And what was your response?

9    A.   And I wanted to know the bad news.

10   Q.   All right.  And why outside the prison and not inside

11   the prison?

12   A.   Because the visiting room was closed.  There were no

13   visits.

14   Q.   Okay.  And you wanted to know the bad news?

15   A.   Yes.

16   Q.   And what was the bad news, Shawn?

17              MR. ROACHE:  Objection, your Honor.

18              THE COURT:  Just for the fact of having known and

19   its impact on him.  Go on.

20   Q.   What was the bad news, Shawn?

21   A.   The bad news was that it wasn't going to be today.

22   Q.   And what was the good news?

23   A.   The good news that I was coming home.

24   Q.   And how did you feel, Shawn, after 5,182 days when you

25   finally got the news at 9:30 at night on the telephone alone

1   at MCI-Gardner, how did you feel?

2   A.  I was breathless, my legs were gone, I was excited.

3   Q.  All right.  And what did you do at that point?

4   A.  At that point I asked you to let me -- this time I knew

5   I could tell them, that I said don't tell nobody and I'll

6   call them tomorrow.

7   Q.  You wanted to tell your family yourself?

8   A.  Yes.

9   Q.  Were you able to sleep that night?

10  A.  No.

11  Q.  And what's the first thing you did the next morning?

12  A.  I called my family.

13  Q.  Okay.  Can you explain what happened during those calls?

14  Who did you speak to first?

15  A.  I spoke to my wife.

16  Q.  Did you wait in that line, that line of 45 people to

17  call?

18  A.  Yes.

19  Q.  How long did you wait in that line before you could

20  call?

21  A.  I waited 30 minutes.

22  Q.  And you spoke to your wife first?

23  A.  Yes.

24  Q.  And what did you tell her?

25  A.  I told her that I'm coming home.

1    Q.   And what was her reaction?

2    A.   She dropped the phone.

3    Q.   And then at some point did you speak to your daughter

4    Kyara?

5    A.   Yes.

6    Q.   And what did you tell Kyara?

7    A.   I told her her dream came true.

8    Q.   What did you mean her dream came true?

9    A.   Because she always said it was her dream that I come

10   home.

11   Q.   And you told her her dream came true?

12   A.   Yes.

13   Q.   And from that date that you spoke to your family on the

14   phone in November of 2003, how long was it, Shawn, before

15   you were brought to court?

16   A.   A few days.  I got a call from you later on that

17   afternoon that I wasn't going in the next day, you told me

18   Thursday.

19   Q.   Okay.  So you waited from Monday to Thursday?

20   A.   Yes.

21   Q.   And what happened physically when you got to the

22   courthouse on Thursday?

23   A.   We went down, and when I first got there, I was excited,

24   I didn't know what to do, my mind was everywhere, I had to

25   go to bathroom, everything, my whole body was changing, I

1  was so excited.

2  Q.  So after we got to the courtroom, did you learn that you

3  were going home that day?

4  A.  Yes.

5  Q.  And did you learn that the Commonwealth was not going to

6  retry you again?

7  A.  Yes.

8  Q.  Tell the jury what happened.

9  A.  When that happened, we sat in front of the Judge, and

10  they read out the reasons why that this motion was going to

11  be --

12  Q.  Not what the Judge said, just what you were feeling at

13  that time, Shawn.

14  A.  What I was feeling is overwhelmed, I was excited.  I

15  just couldn't wait.  It was like time wasn't moving quick

16  enough for me to get to my family, and I was like in

17  shortness of breath, and I was trying not to breathe too

18  fast and think too fast because I didn't want to have a

19  heart attack, I was too excited.

20  Q.  And at some point were you brought upstairs?

21  A.  Yes.

22  Q.  And were the handcuffs removed from you?

23  A.  Yes.

24  Q.  And were the shackles removed from you?

25  A.  Yes.

1    Q.  And did that cell door open?

2    A.  Yes, it did.

3    Q.  And who was standing there when the cell door opened?

4    A.  You was.

5    Q.  Where did we go from there?

6    A.  We went down to the third floor.

7    Q.  Who was waiting for you on the third floor?

8    A.  My family, my daughter, my wife, everybody.

9    Q.  What happened when you got off the elevator?

10   A.  There was a bunch of lights and everything, just,

11   everybody, family, friends.  It was just amazing.  I lost my

12   legs.  I just grabbed my daughter, and I just said take me.

13   I didn't know where to go.  She says, "Where are you going?"

14   "Wherever you take me."  "She was like my dream came true."

15   Q.  Were you able to walk out of the courthouse that day a

16   free man?

17   A.  Yes.

18            MS. SCAPICCHIO:  I have nothing further.

19            MR. CURRAN:  Can I have a few minutes, your Honor?

20            MS. HARRIS:  May we be seen, your Honor?

21            THE COURT:  All right.

22            (THE FOLLOWING OCCURRED AT SIDEBAR:)

23            MS. HARRIS:  Just in an abundance of caution, I'm

24   putting on the objection not being able to inquire into the

25   innocence, your point about the precedent, every legislative

1   law for compensation that has been enacted with which I'm

2   aware requires a finding of exoneration or a finding of

3   actual innocence in order to qualify for compensatory

4   damages so I put that on the record and refer to

5   Mr. Curran.

6           MR. CURRAN:  Judge, the other issue is just the

7   way this has been brought out in regards to his failure not

8   to do anything.  He had other pending cases, he had other

9   things that were on his record that he was faced with then

10  went away, so it creates this issue now that he came from a

11  squeaky past and was prevented from doing all these things.

12  I mean --

13          THE COURT:  You can cross-examine him if you wish,

14  if you choose to, you could cross-examine him on his

15  convictions.  You can cross-examine him on pending cases if

16  you want to.

17          MS. HARRIS:  Can we cross-examine on his

18  assertions he made post media that he thought he was being

19  arrested for another individual that he had shot?

20          MS. SCAPICCHIO:  Judge, I have been very careful

21  to keep the damages from any of his convictions through the

22  date of his release, that's where we ended, the day of his

23  release.  Those are post conviction statements.

24          THE COURT:  They're post conviction statements

25  that refer to pretrial.  You started the story at the date

1    of his conviction to the date of his release, so I'll

2    exclude those statements.  Is there anything else?  Your

3    Honor, to the extent that he says he was terrified when he

4    went to prison, I think it would bring new evidence that he

5    had served prison time prior to that.

6              THE COURT:  Yes, you can.

7              MR. ROACHE:  To the extent he went home we should

8    be able to say that in fact he didn't go home, he stayed

9    with someone else for a period of time.

10             THE COURT:  After he was released?

11             MR. ROACHE:  That's correct.

12             THE COURT:  Yes, you can have that.

13             THE COURT:  Okay.

14             MR. CURRAN:  Judge, can we have five minutes to

15   confer?

16             THE COURT:  Let's do that.

17             ( THE SIDEBAR CONFERENCE WAS CONCLUDED.)

18             THE COURT:  Ladies and gentlemen, we'll take a

19   brief break, but I'm telling you that we anticipate that the

20   evidence in this phase, and this will be the concluding

21   phase for this jury, will be over by we anticipate no later

22   than lunch so we'll take a break right now.  All rise for

23   the jury.

24             (Jurors exited the courtroom.)

25             THE COURT:  Fifteen minutes, counsel.

66

1           MS. SCAPICCHIO:  Thank you.

2           (A recess was taken.)

3           THE CLERK:  All rise for the jury.

4           THE COURT:  You can all be seated.  Proceed.

5    Mr. Curran.

6           MR. CURRAN:  Subject to the Court's rulings and

7    our objections that were previously noted, we have no

8    further questions of this witness and thank the Court for

9    the time.

10           THE COURT:  Mr. Roache.

11           MR. ROACHE:  Nothing, your Honor.

12           THE COURT:  Thank you, Mr. Drumgold.  Anything

13    further?

14           MS. SCAPICCHIO:  Not from plaintiffs, your

15    Honor.

16           THE COURT:  Counsel?

17           MR. CURRAN:  Yes, your Honor, we call

18    Francis O'Meara.

19           FRANCIS O'MEARA, having been duly sworn by the

20    Clerk, testified as follows:

21                     DIRECT EXAMINATION

22           THE WITNESS:  Good morning, your Honor.

23           THE COURT:  Good morning.

24    BY MR. CURRAN:

25    Q.  Good morning, sir.  Could you please state your name and

1    introduce yourself to Judge Gertner and the ladies and

2    gentlemen of the jury.

3    A.  My name is Francis O'Meara, and that's spelled,

4    F-r-a-n-c-i-s O-'-M-e-a-r-a.

5    Q.  Mr. O'Meara, could you tell the Court and the jury what

6    your educational background is?

7    A.  Degree, M.B.A. degree from Boston University and juris

8    degree from Suffolk University.

9    Q.  Where did you go undergraduate?

10   A.  University of Massachusetts.

11   Q.  What year did you graduate from University of

12   Massachusetts?

13   A.  1973.

14   Q.  And did you continue your education at that time?

15   A.  I did.

16   Q.  Where did you go to school?

17   A.  A two-year M.B.A. program at Boston University followed

18   by three years of law school.

19   Q.  And what years did you go to law school?

20   A.  '75 to '78.

21   Q.  And did you work while you were going to law school?

22   A.  I did.

23   Q.  Where did you work?

24   A.  I worked two jobs actually, I continued to drive cab in

25   the city, and I also got a job in the Suffolk County

1    District Attorney's Office in June of '75.

2    Q.  Okay.  What year did you graduate from law school?

3    A.  May-June of '78.

4    Q.  And did you work during that three-year period of time

5    while you were in law school at the D.A.'s Office in

6    Suffolk County?

7    A.  I did.

8    Q.  And when you graduated from law school, where did you

9    start your legal career?

10   A.  I graduated in June of '78, became a lawyer in December

11   of '78 and started as an assistant district attorney on

12   January 3rd of 1979.

13   Q.  Could you describe what your experience was in the

14   district attorney's office starting when you became

15   appointed as assistant D.A.?

16   A.  Having gone through the prior three years of the

17   appellate division in the district court, also the district

18   courts, during that three-year period in January of '79, I

19   was appointed to superior court as an assistant district

20   attorney, and I was assigned to we had at that time five

21   major felony teams.  Each one had a team leader and three or

22   four lawyers, assistant D.A.s that worked on the team, and

23   in January of 1979, I was assigned to Major Felony Team 5

24   and remained there for four and a half years.

25   Q.  Could you tell the jury what Major Felony Team 5 was and

1   what did it do?

2   A.   The five major felony teams prosecuted in superior court

3   after cases would be indicted by a grand jury, it was their

4   responsibility approximately 25 lawyers to prosecute all

5   violent crimes.  We categorized them into rapes, robberies,

6   stabbings and shootings, anything of that serious nature we

7   prosecuted, and everything less, the victim died, and if the

8   victim died, it would be a homicide case, and the case would

9   not be prosecuted by the major felony teams, it would go

10  directly to the homicide division.

11  Q.   You indicated you were on Team 5.  What part of

12  Suffolk County did Team 5 cover?

13  A.   Well, there was a time when Team 5 covered the Roxbury

14  District Court.

15  Q.   Okay.  And for how long were you an assistant D.A.

16  handling major felonies for Team 5 in Superior Court?

17  A.   A little over four and a half years from January of '79

18  to September, '83.

19  Q.   And what types of cases did you handle as assistant D.A.

20  during that time period?

21  A.   We tried, I tried many armed robberies, shootings,

22  stabbings and many, many rapes.

23  Q.   And at some point in time were you moved from Team 5 to

24  another unit in the D.A.'s Office?

25  A.   Yes, in September of 1983 I was assigned by D.A.

1    Flanagan to move from the felony teams to the homicide

2    team.

3    Q.   Okay.  In what capacity?

4    A.   As we call it, homicide prosecutor.  From that point

5    forward, I would be one of five lawyers in the homicide team

6    which comprised of a team leader and four other assistant

7    D.A.s, and we would investigate all sudden deaths, suicides,

8    shootings, hangings, everything that happened that was of a

9    violent nature, and if the victim died, we would work with

10   the police to locate, identify people responsible for

11   killing the person and then prosecuting them.

12   Q.   Okay.  At some point in time were you promoted?

13   A.   I was.

14   Q.   And what year?

15   A.   In February of 1988, I became the team leader of the

16   homicide team.

17   Q.   Okay.  Just going back a little, you indicated you spent

18   some time in the appellate division?

19   A.   Yes.

20   Q.   What were your duties and responsibilities when you were

21   assigned to the appellate division?

22   A.   As a law student, you'd be given transcripts of trials

23   that had previously occurred where there had been

24   convictions and where the case was on appeal, the conviction

25   was being appealed, and you would read the transcript and

1    research all of the legal arguments being put forward by the

2    defendants' attorneys and respond to them by writing what's

3    called a brief, disagreeing with their positions that the

4    trial was not a fair trial and try to support the conviction

5    before the appellate courts.

6    Q.  Did you receive training during the course of your time

7    in the district attorney's office up until you became the

8    head of homicide?

9    A.  Yes.

10   Q.  What types of training did you receive?

11   A.  Well, for the four and a half years that I was on

12   Team 5, my team leader was Philip Beauchesne, and he was

13   very active, a good boss, and he was always available night

14   and day, and he would sit with us, the other lawyers on the

15   team and counsel us on cases coming up and problems and

16   evidentiary issues and whatnot.

17   Q.  Would you go to seminars?

18   A.  Yes.

19   Q.  What type of seminars would you go to?

20   A.  It would be teachings about at that time major felonies,

21   about the identification process, how the police worked,

22   what evidence is necessary to secure search warrants, how to

23   draft search warrants in crimes involving allegations of

24   rape, I deal with those and particularly evidentiary issues

25   that are in those trials that are not in run-of-the-mill

1    rape, robbery, shooting case.  So there was training every

2    day throughout to learn how to beside prosecute these

3    cases.

4    Q.  Okay.  Would you receive training in regards to

5    exculpatory evidence during the course of your career?

6    A.  Yes.

7    Q.  What type of training did you receive?

8    A.  Well, we'd be instructed that if there was evidence

9    produced that you felt would be favorable to a defendant,

10   you had an ethical obligation to turn that information over

11   to his or her attorney.

12   Q.  Okay.  And you indicated in 1988 you became the head of

13   homicide?

14   A.  Yes, sir.

15   Q.  And what were your duties and responsibilities at that

16   time?

17   A.  Well, under Massachusetts General Law, Chapter 28,

18   Section 6 was passed by the legislature years ago, and it

19   gives the district attorneys of each of the counties, you're

20   overseeing all homicide investigations.  At that time I was

21   under Assistant District Attorney Flanagan was then in

22   charge of investigating all the homicides that occurred in

23   Suffolk County which includes, Boston, Revere, Chelsea and

24   Winthrop.  He then in turn delegated his authority to the

25   chief of homicide who then was me to perform all the duties

1    that were given to him.  He still remained in a supervisory

2    capacity, but basically I was to run the day-to-day

3    investigation and prosecution of all homicides.

4    Q.  And could you explain to the jury the process when there

5    was a shooting or stabbing or motor vehicle accident what

6    would take place in regards to the homicide division?

7              MS. SCAPICCHIO:  Objection, your Honor.  This is

8    damages.

9              THE COURT:  I understand.

10             MR. CURRAN:  Judge, we're getting there.

11             THE COURT:  Okay.  On the strength of, "we're

12   getting there," I'll let you have it.

13   Q.  You can answer, Mr. O'Meara.

14   A.  We had district attorneys assigned on the 10-day,

15   10-week rotational basis 10 people, assistant district

16   attorneys who would be assigned to go out and assist the

17   police in any way on all investigations, and as I said,

18   suicides, sudden deaths, anything that was unexplained,

19   violent deaths, deaths that weren't attended by a doctor,

20   and at least one assistant district attorney would go out on

21   each of these events and file a report and send it back to

22   me and call me from the scene to explain me what do you

23   have, what's there, what's it look like and address any

24   legal issues that the police might have as to how to

25   proceed.

1   Q.  When a case was designated as a homicide, what would you

2   do in your capacity as the head of homicide in

3   Suffolk County in 1988 and 1989?

4   A.  Well, when a case was a homicide and continued to be

5   investigated by the police, they, at some point, the

6   homicide unit of the Boston Police Department, when they

7   thought they had sufficient evidence to seek an arrest

8   warrant, they would contact me, that was the protocol that

9   was set up by the district attorney, and they would speak

10  with me whenever it was, 24 hours a day, 7 days a week and

11  review with me the amount of evidence they collected and

12  request that they could seek in the appropriate district

13  court a warrant for the individual's arrest or

14  individuals.

15          They would do that, they had to do that on every

16  case, and I would spend time reviewing the evidence that

17  they had collected and then make a decision whether or not I

18  felt that they had sufficient evidence to go before a clerk

19  at one of the district courts and seek an arrest warrant,

20  and then if I made a decision that there was enough

21  evidence, I'd instruct them --

22          MS. SCAPICCHIO:  Objection.

23          THE COURT:  Sustained.

24          MS. SCAPICCHIO:  Motion to strike.

25          THE COURT:  Sustained, it may be struck.

1  Q.  Mr. O'Meara, at some point in time as the head of

2  homicide, would you assign homicides that came into the

3  Suffolk County District Attorney's Office?

4  A.  During that period of time I assigned all homicides that

5  came in.

6  Q.  Okay.  So every homicide that came into Suffolk County

7  you were responsible for reviewing and then assigning to an

8  assistant?

9  A.  Once an arrest was made, yes.

10  Q.  Okay.  And do you know Phil Beauchesne?

11  A.  Yes.

12  Q.  And how long had you worked with Phil Beauchesne?

13  A.  I worked for him almost five years, a little over four

14  and a half years.

15  Q.  How long did you work with him in the overall course of

16  your career?

17  A.  Almost 17 years.

18  Q.  Okay.  In 1989, what was the level of Phil Beauchesne's

19  experience?

20  A.  He was one of the most experienced homicide prosecutors,

21  if not the most that was authorized to try homicide cases.

22  Q.  Did you have a good relationship with him?

23  A.  Very good.

24  Q.  Were you able to communicate well with him?

25  A.  Yes.

1    Q.   Do you know Paul Connolly?

2    A.   Yes, I do.

3    Q.   How do you know Paul Connolly?

4    A.   He was an assistant D.A. in superior court with me, he

5    went to homicide, then I went to homicide, and we spent time

6    together on the homicide team, then he was promoted to a

7    team leader position.

8    Q.   In 1988 and 1989, what was the level of experience of

9    Paul Connolly?

10   A.   It was close to Phil's.  He had been a prosecutor for

11   almost as long as Phil had been, make a couple, three years

12   less.

13   Q.   Based on your working with Phil Beauchesne and

14   Paul Connolly during those 17 years, did they understand the

15   obligations in regards to discovery --

16            MS. SCAPICCHIO:  Objection.

17   Q.   -- as it pertained --

18            THE COURT:  Sustained.  No, no, the objection is

19   sustained.  Go on.

20   Q.   Did you have a time in August of 1988 to assign

21   Phil Beauchesne to an investigation into the murder of

22   Tiffany Moore?

23   A.   Yes.

24   Q.   When did that occur?

25   A.   Either on August 29th, when Mr. Drumgold was arraigned,

1    or possibly as late as the next day, August 30th.

2    Q.   Okay.  And did you partake in the review that you just

3    spoke to the jury about in regards the police's evidence --

4              MS. SCAPICCHIO:  Objection.

5              THE COURT:  Sustained.

6    Q.   -- to assign it for probable cause?

7              THE COURT:  Objection is sustained.

8              MS. SCAPICCHIO:  Move to strike.

9    Q.   Now, Mr. O'Meara, after you assigned the case of

10   Commonwealth vs. Shawn Drumgold and Terrance Taylor to

11   Phil Beauchesne, did you play any further role up until the

12   conviction?

13   A.   No.

14   Q.   Okay.  Why not?

15   A.   The five team leaders of the felony teams were all

16   located in a building not where I was located, I was in the

17   courthouse, my team, my four and myself, when these

18   homicides were assigned, if I assigned them to the team,

19   that was fine, if I assigned it to one of the team leaders

20   across, down the street, each of those five people were

21   senior to me in experience, so the case would go to them,

22   and they being senior trial lawyers, would try the case.

23             The only time I would get involved is at the end

24   of the case when the case was settled, they would return the

25   case to the division as a settled case, and I would

1   immediately assign them another one.

2   Q.  Okay.  And do you recall assigning the case of

3   Commonwealth vs. Treas Carter to Paul Connolly?

4   A.  Yes, I do and I did.

5   Q.  Okay.  Did you have any role up until the plea relative

6   to the prosecution of Treas Carter for the murder of

7   Willie Evans?

8   A.  No, I did not.

9   Q.  In Suffolk County, in the Suffolk County District

10  Attorney's Office, could you explain what the role of the

11  assistant district attorneys are relative to the discovery

12  process?

13          MS. SCAPICCHIO:  Objection.

14          THE COURT:  Sustained.  You can ask what

15  procedures, if any, were in place after the conviction of

16  Shawn Drumgold in, what was it, September of 1989?

17          MR. REILLY:  October.

18          THE COURT:  October of 1989.

19  Q.  What procedures were in place in the Suffolk County

20  District Attorney's Office relative to their ongoing

21  discovery obligations post October 13th, 1989?

22  A.  I apologize, are you referring specifically to this case

23  or all cases in general?

24  Q.  All cases in general.

25  A.  Each assistant being assigned to a case would continue

1    to review the evidence as it came in and some could come in

2    while the case is pending, and as I said previously, if

3    something came forward that caused you to think that this is

4    called exculpatory, to take your attention away from --

5            MS. SCAPICCHIO:  Objection.

6            THE COURT:  Your objection is?  Are these

7    policies?  What's your objection?

8            MS. SCAPICCHIO:  It's not responsive to the

9    question, and he's asked about policies, and now he's

10   explaining something that isn't policy.

11           MR. CURRAN:  It is responsive to the question,

12   Judge, and it is policy what he just said.

13           THE COURT:  I'm going to allow it.

14           MS. SCAPICCHIO:  Not that they revealed to me

15   before today.  If there's a policy in existence, I'd like to

16   see it.

17           THE COURT:  Well, you'll be able to examine

18   whether it is written, oral or just mentioned today for the

19   first time.  Go on, sir.

20           THE WITNESS:  May I continue?

21           THE COURT:  Yes.

22           THE WITNESS:  Thank you.

23   A.  Each assistant D.A. would examine the case, as I said,

24   the evidence that they had, and if there was any evidence

25   that tended to be exculpatory, which is exculp from the

1   Latin, lame, away from lame, it tended to be something that

2   would help the defendant or negate maybe his other evidence

3   against him, and you were obligated ethically to turn this

4   evidence over to the defense, and that was done on a regular

5   basis.

6   Q.  Was there a policy that permitted police officers to

7   turn that evidence directly over to the defense without

8   going to the D.A.'s Office?

9         MS. SCAPICCHIO:  Objection, Judge.  This is

10   damages.

11         MR. CURRAN:  Judge, it goes to the question --

12         THE COURT:  No, the only question, ladies and

13   gentlemen, this is the damages phase of the case, and there

14   is a defense which the defendants will seek to raise in this

15   testimony as to whether there was what is known as a

16   superseding cause, in other words, whether the damages in

17   this case flowed not from the actions of Officer Callahan

18   but from something that the district attorney's office did

19   or didn't do after the conviction of Mr. Drumgold, and I'll

20   instruct you more specifically about that.

21         This testimony is solely going to that, so it

22   seems to me the questions should focus on the post

23   conviction period, and if there's a question of policies,

24   you'll have an opportunity to cross-examine as to whether

25   these are written, oral or ever mentioned before.

1          MS. SCAPICCHIO:  Thank you, your Honor.

2          THE COURT:  Go on.

3    Q.  Post October 13th, 1989, was there a policy in the

4    Suffolk County District Attorney's Office which permitted a

5    police officer to bypass the D.A.'s Office and go directly

6    to defense attorneys to disclose what may be considered

7    exculpatory evidence?

8          MS. SCAPICCHIO:  Objection.

9          THE COURT:  You can have it.

10   A.  No.  The police had to go through us, everything came to

11   us for our evaluation, us, meaning the assistant D.A., and

12   then we distributed all the discovery, the inculpatory

13   evidence and if there is any exculpatory evidence.

14   Q.  And it was the assistant D.A.'s responsibility to make

15   that evaluation and decision?

16   A.  That's correct.

17         MS. SCAPICCHIO:  Objection.

18         THE COURT:  Wait.  You're objecting?

19         MS. SCAPICCHIO:  He's leading his witness.

20         THE COURT:  Sustained.

21   Q.  Okay.  Whose decision was it, whose responsibility was

22   it post October 13th, 1989 to evaluate and assess any

23   information or evidence to whether it was exculpatory?

24         MS. SCAPICCHIO:  Objection.

25         THE COURT:  Overruled.

1    A.   The assistant district attorney assigned to the case.

2    Q.   In your role as the head of homicide, did you ever have

3    the opportunity to discuss expenses related to homicide

4    prosecutions, expenses between the D.A.'s Office and the

5    Boston Police Department?

6            THE COURT:  During the period of late, 1989, early

7    1990?

8            MR. CURRAN:  Yes.

9    A.   Yes.

10   Q.   Okay.  Post October 13th, 1989, or at that time, at

11   October 13th, 1989, was there a policy in the D.A.'s Office

12   in regards to when the D.A.s were responsible for costs

13   associated with expenses at a murder prosecution?

14           MS. SCAPICCHIO:  Objection.

15           THE COURT:  The question was there a policy.  Go

16   on.

17   A.   Yes, there was.

18   Q.   What was the policy?

19   A.   The policy, which was set by me, there's a date called

20   the indictment date, and that's the date, it's not the date

21   of the arrest, it's the date later in the case when the

22   grand jury returns an indictment for a homicide in general.

23   That became the magic date, so to speak, between the Boston

24   Police Department and the Suffolk County D.A.'s Office.

25   Expenses that were incurred pre-indictment date were the

1    Boston Police Department's responsibility, and expenses that

2    occurred post indictment date were the Suffolk County

3    District Attorney's responsibility.

4    Q.  Did you ever have the responsibility to speak -- strike

5    that.  Did you ever hear about a witness named Ricky Evans

6    that was a witness in the Commonwealth vs. Shawn Drumgold

7    case?

8    A.  I did.

9    Q.  Okay.  Do you have a memory today when you first heard

10   about Ricky Evans?

11   A.  Yes.

12   Q.  When did you first hear about Ricky Evans?

13   A.  It was post verdict in the Drumgold case and possibly

14   post the plea I think it was on December 20th in the

15   Treas Carter case.  It was after Drumgold's verdict, which

16   would have been then December, or it could have been as late

17   as January after the other case that was pled by

18   Paul Connolly.

19   Q.  Okay.  How did you come to find out about this witness,

20   Ricky Evans?

21   A.  I received a telephone call which occurred from time to

22   time from Deputy Joseph Dunford in the Boston Police

23   Department, and he and I would review expenses.  Basically

24   the first question he'd ask me is what's the indictment date

25   on this case, Frannie, and I'd give it to him, and from that

1    he'd determine which bills he was supposed to pay and which

2    bills he was supposed to forward to the organizer of the

3    D.A.'s Office and the indictment was the cutoff date,

4    pre-indictment Joe Dunford had to write a check from the

5    Boston Police Department, post indictment came to us.

6    Q.  Did you have these meetings periodically with

7    Deputy Dunford --

8    A.  I did.

9    Q.  -- relative to expenses related to homicide cases?

10   A.  He would call me on a fairly regular basis reviewing

11   specifically the indictment dates and whatnot to try to

12   determine whose expense it was.

13   Q.  Were there times that you were advised of an expense

14   that you were unaware of as the head of homicide?

15             MS. SCAPICCHIO:  Objection.

16   A.  Yes.

17   Q.  What would you do in your custom practice and procedure

18   when you were asked about an expense that you were unaware

19   of as the head of homicide?

20             MS. SCAPICCHIO:  Objection.

21             THE COURT:  The question is whether this is one

22   that he had been unaware of.

23             MR. CURRAN:  I'm setting the foundation, Judge,

24   just in general what his practice was and then we're going

25   to get to this expense.

1          THE COURT:  What his practice was in?

2          MR. CURRAN:  In October of 1989.

3          THE COURT:  First, did he have a practice with

4    respect to expenses, what it was, then the time.  Go on.

5    Q.  Did you have a practice relative to expenses after

6    having conversations with Deputy Dunford?

7    A.  I did.

8    Q.  What was your practice?

9    A.  If the expense was his, it was his; if the expense was

10   ours, I would notify the first assistant D.A. that there's

11   an expense coming in that we have to pay, I'd confirm for

12   him that it was an appropriate expense and it had to be

13   paid.

14   Q.  When you say first you'd confirm whether it was an

15   appropriate expense and it had to be paid, how did you

16   confirm it?

17   A.  Well, if it was one of the members of my team, I

18   probably would have reviewed it with him or made him know

19   about it.

20          MS. SCAPICCHIO:  Objection, your Honor, probably

21   would have.

22          THE COURT:  Sustained.

23          MS. SCAPICCHIO:  Move to strike.

24          THE COURT:  Sustained.

25   Q.  If it was your team that you had direct supervision

1  over, what would you have done?

2  A.  I would have already known about the expense and made

3  certain it was approved.

4  Q.  And if it was one of the cases that was assigned to one

5  of the team leaders that you did not have direct supervision

6  over, what would you do?

7  A.  If it was an expense that I was unaware of at that time,

8  I would confirm with the particular team leaders whose

9  homicide case it was that this was an expense, it happened

10  in the case and it was a legitimate expense that we owed,

11  and I would transfer that information to the first

12  assistant.

13  Q.  Why would you transfer it to the first assistant?

14  A.  Because he was the person who approved expenses and sent

15  them to the organizers of the office who then wrote checks,

16  paid for expenses.

17  Q.  Okay.  Would you call the first assistant first before

18  the trial prosecutor?

19  A.  No.

20  Q.  Why?

21  A.  Because the first question he would ask me is did you

22  check with the assistant and find out if this is an

23  appropriate expense, so I would check with the first

24  assistant first to see that it was an appropriate expense,

25  then I would call and say I've spoken with the first

1    assistant on the case, Mr. Beauchesne or Mr. Connolly,

2    whoever it might be, and this is an expense that we

3    incurred, I wasn't aware of it, but I'm aware of it now, and

4    it's post indictment date, and you'll be getting a call from

5    Joe Dunford about this and giving a heads-up that it's

6    coming in and this is what it's about, it's an expense that

7    although I didn't know about it when it was happening, I now

8    know about it and it's coming, and you should be aware it's

9    coming and the background of it.

10   Q.   In regards to the case of Commonwealth vs.

11   Shawn Drumgold, did you have a conversation with

12   Deputy Dunford regarding expenses related to a Ricky Evans

13   being relocated to the Howard Johnson's hotel?

14   A.   I did.

15   Q.   Okay.  And could you tell me when that occurred the best

16   of your memory.

17   A.   It definitely occurred post verdict in the Drumgold

18   case, and it may have gone as long as post plea in the

19   Carter case, some time December or January.  I can't tie it

20   down any more than that, it was after one of those events

21   and possibly after both of those events Joe Dunford called

22   me, and we've got an expense here for the Howard Johnson's

23   hotel for a witness, I think this is post indictment, what's

24   the indictment date, and it certainly was.

25   Q.   And at that time you were aware that it was related to

1   the Commonwealth vs. Shawn Drumgold case?

2           MS. SCAPICCHIO:  Objection.

3   A.  Yes.

4           THE COURT:  Wait, wait, wait, there's an objection

5   that he's leading.  That's sustained.  Next.

6   Q.  Okay.  Did you investigate what case Ricky Evans was

7   involved with in his relocation to the hotel?

8   A.  Yes.

9   Q.  Okay.  And what information did you find out?

10  A.  It was the Shawn Drumgold case.

11  Q.  Okay.  Were you also aware at that time whether or not

12  he was a witness in any other cases?

13  A.  I'm not sure whether I knew that then or later.  I don't

14  remember.

15  Q.  All right.  At some point in time were you made aware he

16  was a witness in the Treas Carter case which was a plea in

17  December of 1989?

18  A.  I knew that Treas Carter had pled on December 20th of

19  1989.  I don't know exactly when I learned that Mr. Evans

20  was a witness in that case, too.

21  Q.  Okay.  As a result of that conversation with

22  Deputy Dunford, what did you do?

23  A.  I confirmed with the assistant assigned to the case that

24  it was a legitimate expense that we owed, and I called the

25  first assistant and gave him that information.

1    Q.  Okay.  Who was the assistant that you confirmed that

2    with?

3    A.  Beauchesne.

4    Q.  Okay.  Was it a long conversation?  Was it a brief

5    conversation?

6    A.  It was just very short.  I've got this bill here from

7    Joe Dunford in Drumgold, "Is this something we owe?"  And he

8    confirmed that, yes, we owe that, and that was it.

9    Q.  Okay.  Were you aware in regards to the length of the

10   stay at the Howard Johnson's?

11   A.  I'm not sure.  I'm not sure if I knew the length, I

12   think I tried to compute it by the time when I knew he was

13   homeless up in the Elm Hill section and Sergeant Callahan

14   took him for his own safety and brought him over.  I knew

15   that occurred after September 12th.

16            MS. SCAPICCHIO:  Objection, your Honor.

17            THE COURT:  Sustained.

18            MS. SCAPICCHIO:  Move to strike.

19            THE COURT:  Sustained.  There's a question and an

20   answer and nothing beyond the question.

21            MR. CURRAN:  Can the defendants have a moment,

22   your Honor?

23            THE COURT:  Yes.

24            MR. CURRAN:  May I approach the witness, your

25   Honor?

1           THE COURT:  With what?

2           MR. CURRAN:  Motion for new trial testimony, page

3     197 for the purposes of refreshing his recollection, your

4     Honor.

5           THE COURT:  Wait a second.  Please take that away.

6     You haven't asked a question which suggested that his

7     recollection was exhausted.  Can you ask that question?

8           MR. CURRAN:  Sure.

9     Q.  You indicated September 12th, 1989, was a particular

10    date.  What were you referring to?

11          MS. SCAPICCHIO:  He did not.

12          THE COURT:  I don't recall that testimony either.

13    Can you roll it back a little bit?

14          MR. CURRAN:  Sure.

15    Q.  Do you recall the length of stay of Ricky Evans at the

16    Howard Johnson's hotel?

17    A.  I believe it to be in the vicinity of two weeks.

18    Q.  Okay.  What did you base that on?

19    A.  I learned that on November 12th he was still living at

20    his home because that was the date that -- well, he was

21    spoken to by somebody.  That was in a report that I

22    reviewed, and I knew that the trial was coming up the end of

23    the month, so it just it looked like two weeks, maybe a

24    little bit longer.

25    Q.  Did you speak to anyone in regards to the length that

1    you remember?

2    A.  When Joe Dunford called me with the bill and the

3    question about indictment date, he had to have told me how

4    many days it was, I just don't remember now.

5    Q.  Okay.  At some point in time, were you advised whether

6    or not the D.A.'s Office paid for the bill?

7    A.  As far as I know, it was paid for by the D.A.'s

8    Office.

9            MR. CURRAN:  I have no further questions.  Thank

10   you, Mr. O'Meara.

11                     CROSS-EXAMINATION

12   BY MS. SCAPICCHIO:

13   Q.  Mr. O'Meara, do you remember testifying in 2003?

14   A.  Where?  In reference to what, ma'am?

15   Q.  In Suffolk Superior Court in reference to Mr. Drumgold's

16   motion for a new trial?

17   A.  2003, the motion for new trial?

18   Q.  Yes.

19   A.  I do remember that.

20   Q.  You remember testifying in that case, right?

21   A.  Yes, I do.

22   Q.  That's when Mr. Drumgold's liberty was at stake; do you

23   remember that?  He was serving life without the possibility

24   of parole; do you remember that?

25   A.  That's correct.

1  Q.  And you were testifying in that case?  Do you remember

2  that?

3  A.  I was called as a witness.

4  Q.  Did you tell Judge Rouse back in 2003 that you asked

5  Phil Beauchesne about this bill from the Howard Johnson's?

6  Did you say that in 2003, sir?

7  A.  I believe I did.

8  Q.  You did.  Sir, isn't it fair to say in 2003 when you

9  were specifically asked questions about whether or not you

10 had a conversation with Phil Beauchesne, you told that court

11 in 2003 that you didn't?  Do you remember that, sir?

12 A.  No, I don't.

13 Q.  Sir, do you remember being asked questions in 2003 when

14 you were called before the Court to testify at the motion

15 for a new trial, do you remember being asked questions

16 specifically about your role as head of the homicide to try

17 to determine whether or not anyone from the Suffolk County

18 District Attorney's Office knew about these payments?  Do

19 you remember those questions, sir?

20 A.  No, I don't.

21 Q.  Sir, do you remember telling the Court back in 2003 that

22 Howard Johnson's wasn't a place that you used in the

23 district attorney's office?  Do you remember that, sir?

24 A.  That's correct, it wasn't.

25 Q.  Do you remember telling that to the Court?

1    A.  I did.

2    Q.  Okay.  And do you remember being asked after you told

3    the Court that Howard Johnson's wasn't a place that you

4    used, do you remember being asked specifically whether or

5    not the district attorney's office got the bill?  Do you

6    remember being asked that?

7    A.  I don't remember being asked that.

8            MS. SCAPICCHIO:  This is page 216 of his 2003

9    testimony.

10   Q.  Can you read lines 11 through 15 to yourself, sir.

11           MS. SCAPICCHIO:  May I approach the witness, your

12   Honor?

13           THE COURT:  Yes, you may.

14   Q.  Does that refresh your memory, sir, as to whether or not

15   in 2003 when you were asked whether or not you ever received

16   a bill, you told the Court -- were you under oath in 2003?

17   A.  Yes, ma'am.

18   Q.  You took the same oath you took today?

19   A.  That's correct.

20   Q.  You understand the oath to tell the truth, the whole

21   truth and nothing but the truth?

22   A.  I do.

23   Q.  And the truth doesn't change, does it, sir?

24   A.  Memories fade, but the truth doesn't change, no.

25   Q.  Well, back in 2003, your memory would be a lot better

1    than it is today in 2009; is that fair to say, sir?

2    A.  It would be better.

3    Q.  Okay.  In 2003, when you were asked about the bill,

4    didn't you say we never received the bill?

5    A.  We didn't receive the bill.

6    Q.  Okay.  And that's what you told the Court back in

7    2003?

8    A.  That's correct.

9    Q.  And you said the only reason you were involved in this

10   case was because you got a bill, right?

11   A.  Because Joe Dunford called me about a bill that the

12   Boston Police received.  The D.A.'s office was never billed

13   directly for this, that's why I was saying the Boston Police

14   was billed for it.  He had to call me and notify me of it.

15   We didn't have it.  It didn't come to us.

16   Q.  Now, sir, you just told us on direct examination that

17   you had a memory of speaking to Phil Beauchesne after you

18   had this conversation with Deputy Dunford, right?

19   A.  I have a memory that I confirmed that the expense was

20   legitimate, so to speak, or accurate.

21   Q.  Page 218, do you remember telling Judge Rouse you had no

22   such conversation, sir, that you don't remember speaking to

23   anyone in the district attorney's office regarding this

24   bill?  Isn't that what you said under oath in 2003, sir?

25   A.  Give me a chance to read it, I'll be happy to answer

1    your question.  I said here that I confirmed it possibly

2    with the trial assistant.

3    Q.  No, no, no, sir, that's not what you said.  When you

4    were asked specifically whether or not you confirmed it, you

5    told us today --

6             MR. CURRAN:  Objection, your Honor.

7    Q.  -- that you spoke to the trial prosecutor; isn't that

8    what you said?

9    A.  That's correct.

10   Q.  In 2003, sir, when you were asked that specific

11   question, do you have a memory of who you would have

12   confirmed this with back then, do you know if you talked to

13   Phil Beauchesne?  Tell us what your answer was at line 15.

14            THE COURT:   Wait, wait.

15            MR. CURRAN:  She pulled the document.  He was

16   reading his answer which says what he was testifying to.

17   She doesn't like the answer.

18            THE COURT:  No, Mr. Curran, what I would like you

19   to do is to read the question and read the answer and under

20   801(d)(1) you can in fact put that on the screen and

21   introduce it as an exhibit.  That way the question and the

22   answer will be known to the jury.

23   Q.  Sir, you were under oath in 2003; is that fair to say?

24   A.  That's correct.

25   Q.  And you were testifying, you took the same oath that you

1   took here today; is that fair to say?

2   A.  That's correct.

3   Q.  At line 12, sir, is the question, "Do you have a memory

4   of who you would have confirmed it with back then?  Do you

5   know if you talked to Phil Beauchesne?"  What was your

6   answer at line 15?

7   A.  The answer there is, "I don't."

8   Q.  Okay.  So you were under oath in 2003, you were asked a

9   specific question as to whether or not you would have talked

10  to Phil Beauchesne, and your answer was you had no memory of

11  it, right?

12  A.  I answered the prior question is that I either spoke to

13  Phil Beauchesne or Tim Callahan, and that's what I said back

14  then, and that's my position today.

15  Q.  That's not what you said today, today you said you spoke

16  to Phil Beauchesne, not you might have spoke to him, not you

17  think you spoke to him, you actually remember speaking to

18  him, right?

19  A.  I do.

20  Q.  Okay.  And in 2003, when you were asked that specific

21  question, in 2003, when you were asked that specific

22  question, sir, do you know if you talked to Phil Beauchesne,

23  your answer was, "I don't," right?

24  A.  I said I spoke to either Phil Beauchesne or Tim

25  Callahan.

1  Q.  But now it's Phil Beauchesne, right?

2  A.  That's correct.

3  Q.  After Tim Callahan was found responsible for

4  Shawn Drumgold's conviction, now it's Phil Beauchesne,

5  right?

6          MR. CURRAN:  Objection.

7          THE COURT:  Overruled.

8  Q.  Right, sir?

9  A.  Now it's Phil Beauchesne, yes.

10  Q.  But it wasn't Phil Beauchesne in 2003, right?

11  A.  In 2003, it was either Phil Beauchesne or

12  Tim Callahan.

13  Q.  No, no, sir, because you go on to say, "It's more

14  likely," if you look at line 17, you go on to say, "It's

15  more likely, it's more likely Lieutenant Callahan than

16  Phil Beauchesne."  Do you remember that saying under oath,

17  sir?

18  A.  I don't remember saying it, but I believe it's there.

19  Q.  Well, you wouldn't have lied, would you have, sir?

20  A.  No, I don't lie under oath, ma'am.

21  Q.  Okay.  So when you said back in 2003 that it was more

22  likely you spoke to Lieutenant Callahan, that's not what you

23  told us here today, right?

24  A.  That's correct.  Today --

25  Q.  Today you say it's Phil Beauchesne?

1    A.   Today I believe it was Phil Beauchesne, yes.

2    Q.   Sir, what changed other than the fact that

3    Lieutenant Callahan was found responsible for

4    Shawn Drumgold's unfair trial, what else changed, sir?

5    A.   At a prior proceeding in this building, I spoke to

6    Tim Callahan.  This is after the motion for new trial.

7    Q.   So you spoke to Tim Callahan and your testimony changed;

8    is that what happened, sir?

9    A.   I spoke to him, and he informed me that if it was him or

10   Phil Beauchesne, he doesn't remember me calling him on it,

11   so then it must have been Phil Beauchesne.

12   Q.   So it was your conversation with Tim Callahan?

13   A.   Right.

14   Q.   Who told you you didn't talk to me some time after you

15   testified here?

16   A.   Correct.

17   Q.   That's what changed your testimony?

18   A.   Now I believe it was Phil Beauchesne.

19   Q.   Well, sir, weren't you deposed in this case, too?

20   A.   I was.

21   Q.   When you were deposed, didn't you say you had no memory

22   of ever telling Phil Beauchesne?

23   A.   I didn't say I had no memory of ever telling him.  I

24   would have confirmed this expense before I called the first

25   assistant.

1    Q.  You didn't, you said you didn't in 2003, sir, you said

2    you didn't at your deposition, sir, and now you come in here

3    after you spoke to Lieutenant Callahan, and you say you did;

4    is that right?

5            MR. ROACHE:  Objection.  She's putting facts in

6    the question that are not in evidence.

7            THE COURT:  The objection is overruled.  Go on.

8    Q.  Sir, is that right, the thing that changed --

9            THE COURT:  You have a compound question.  The

10   question was whether there was a prior statement in 2003;

11   the question was whether or not there was a prior statement

12   in a deposition.  If you have a prior statement in the

13   deposition, you can inquire about that, and then you can

14   have the summary question at a high rate of voice.

15           MS. SCAPICCHIO:  Your Honor, I move at this time

16   to introduce this page of his 2003.

17           THE COURT:  Yes, you can introduce that, you can

18   excise the part, it will go to the jury with only the

19   relevant parts.  Go on.

20           ( Page 218, line 12 to line 18 of The Motion for

21   New Trial was marked and admitted into evidence as Exhibit

22   No. 15.)

23   Q.  Now, sir, you remember being cross-examined by me in

24   2003?

25   A.  I know it happened.  I don't remember it.

1   Q.  I'm sorry.

2   A.  I know it happened, but I don't remember it.

3   Q.  Okay.  Do you remember answering questions again under

4   oath in 2003?

5   A.  Yes, I remember that.

6   Q.  Do you remember specifically being asked questions about

7   whether or not you ever got involved with discussing

8   witnesses with team leaders?

9   A.  That's correct.

10  Q.  And do you remember, sir, your answer back in 2003 when

11  you were under oath is that, "If it was a team leader, to

12  the extent they were doing something with a witness, that's

13  something they would take upon themselves.  I wouldn't be

14  aware of it, nor would I need to be aware of it."  Is that

15  what you said in 2003 under oath, sir?

16  A.  If I did, I did.  That's still my testimony.

17  Q.  Now, sir, do you also remember testifying in 2003 that

18  if it was an expense at the district attorney's office that

19  you actually paid, it would be authorized in advance; do you

20  remember that, sir?

21  A.  That's also true.

22  Q.  And this wasn't an expense that was authorized in

23  advance, sir, was it?

24  A.  No, it was not.  Not by me.

25  Q.  Sir, do you remember being asked questions in 2003 --

1    A.  Yes.

2    Q.  -- regarding Mr. Evans and the district attorney

3    office's conversations regarding payment of money?  Do you

4    remember those questions, sir?

5    A.  No.

6    Q.  Do you remember being cross-examined in 2003 and being

7    asked specifically, sir, whether or not -- if I can just

8    have a minute, your Honor.  Sir, when you were asked in 2003

9    under oath if there were any discussions about Ricky Evans'

10   housing situation prior to the Drumgold trial, it was your

11   position that there were no discussions prior to the

12   Drumgold trial; is that right?

13   A.  Not with me.

14   Q.  Okay.  And that you had no role in prosecuting the case

15   against Shawn Drumgold; is that right?

16   A.  Other than the arrest, after the arrest, I assigned it

17   to Phil Beauchesne, and I had no involvement in the case

18   from that point forward.

19   Q.  Now, sir, when you talked about the bill under oath in

20   2003 and you were asked whether or not you spoke at all to

21   Phil Beauchesne, is it your testimony, sir, that when you

22   told the Court back in 2003 that you didn't have a memory of

23   speaking to Phil Beauchesne that that was a lie?

24   A.  No, I had a memory of either speaking to Phil Beauchesne

25   or Tim Callahan, that's what I said back in 2003.  I would

1    have spoken to one, seen one or the other of them or talked

2    to one or the other of them to confirm the expense, and I

3    did.

4    Q.  Not what you would have done, sir, what you testified to

5    under oath.  Under oath in 2003, you said that you had no

6    memory of speaking to Phil Beauchesne, right?

7    A.  In the text above that, it says I either spoke to him or

8    Tim Callahan, but I had no memory of speaking to him on that

9    day, but I had to get it confirmed, I had to speak to one of

10   them to find out it was a legitimate expense, and I did.

11   Q.  Well, sir, didn't you tell the Judge in 2003 you spoke

12   to Sergeant Callahan?

13   A.  I said it was more likely Timmy Callahan than

14   Phil Beauchesne, but I always left open the possibility that

15   it was Phil Beauchesne.  I never spoke to Phil Beauchesne

16   about it or Timmy Callahan at that time.  I knew I had

17   somebody I had to confirm it with.

18   Q.  Did you ever tell David Meier, who was prosecuting the

19   case for the Commonwealth back in 2003, that you think you

20   talked to Bill Beauchesne about paying this bill; did you

21   ever say that to David Meier?

22   A.  I would have told him that I spoke to either

23   Tim Callahan, who's the sergeant on the homicide team, or

24   Phil Beauchesne, who's the assistant D.A., whoever I saw

25   first.  If I saw Timmy first or if I called Phil and caught

1   up with him first, I would have confirmed the expense.

2   Q.  Sir, we're not talking about would have, could haves or

3   should have --

4   A.  That's what I did.

5   Q.  -- we're talking about what you testified to under oath

6   in 2003, in 2003 when you were asked whether or not you

7   talked to Phil Beauchesne, you said no, right?

8   A.  No, I didn't say no.

9   Q.  You said, "Did you confirm it with Phil Beauchesne?  Did

10  you talk to Phil Beauchesne?"  Do you remember that

11  testimony, sir?  What was your answer?

12  A.  Do I have a memory of doing it, and I said at that time,

13  I don't, I don't have a memory of doing that, but right

14  above that, I said I spoke to either Lieutenant or the trial

15  assistant.

16  Q.  And then when you --

17  A.  Four lines above the ones that you keep referencing.

18  Q.  Read the ones right below, sir, when you were asked to

19  explain your answer that you didn't speak to

20  Phil Beauchesne.  Read your answer.

21          MR. ROACHE:  Your Honor, this is the third time

22  we're going through this.

23          THE COURT:  I understand.  This is the last time.

24  A.  It would be likely --

25          THE WITNESS:  I'm sorry, are you finished, your

1    Honor?

2            THE COURT:  Go on.

3    A.  It would be more likely that I spoke to

4    Lieutenant Callahan than Phil Beauchesne, but I spoke to one

5    of them.

6    Q.  Sir, the only thing that changed from your testimony

7    under oath in 2003 is that you spoke to Detective Callahan,

8    right?

9    A.  I don't understand that question, ma'am.

10   Q.  Sure.  When you testified under oath and you said you

11   didn't know if you talked to Phil Beauchesne, the only thing

12   that changed from 2003 to now is you spoke to Tim Callahan,

13   right?

14   A.  That's correct.

15   Q.  And you're friends with Hugh Curran, aren't you?

16   A.  We worked together, yes.

17   Q.  You worked together in the district attorney's office?

18   A.  Yes, we did.

19   Q.  And you're friends with his former boss, his partner,

20   right?

21           MR. CURRAN:  Objection, Judge, can we be seen?

22           THE COURT:  Come at sidebar.

23           (THE FOLLOWING OCCURRED AT SIDEBAR:)

24           MR. CURRAN:  Judge, that's a hit below the belt.

25   We know it.  We could have gotten to the fact that

1    Mr. Reilly's former partner Bill Walsh is also a friend of

2    his.  We got to the fact that Paul Connolly switched his

3    testimony from the first trial to the second trial after he

4    had contact.

5              THE COURT:  Keep your voice down.

6              MR. CURRAN:  These are --

7              THE COURT:  Where are you going?

8              MS. SCAPICCHIO:  I'm almost done.

9              MR. REILLY:  We already have testimony about

10   Jim McCall, a lawyer and he shares space with

11   Ms. Scapicchio.

12             MR. CURRAN:  He represented a witness in the

13   case.

14             THE COURT:  We're going to have one or two more

15   questions, and then it's over.

16             MS. SCAPICCHIO:  Thank you.

17             (SIDEBAR CONFERENCE WAS CONCLUDED)

18             MS. SCAPICCHIO:  I have no further questions, your

19   Honor.

20             THE COURT:  Mr. Curran.

21                    REDIRECT EXAMINATION

22   BY MR. CURRAN:

23   Q.  How many people have you worked with in the

24   Suffolk County D.A.'s Office over the course of your 20 plus

25   years?

1    A.  It's got to be more than 1,000.  There's an average of

2    110, 125 assistant D.A.'s, there was a support staff of

3    about 200 people, there was great turnover within the staff,

4    and, therefore, it's got to be over 1,000.

5    Q.  Do you think you should be excused from being a witness

6    in a case because you may have worked at some point in time

7    with someone in the D.A.'s Office that's an attorney

8    representing someone?

9              MS. SCAPICCHIO:  Objection.

10             THE COURT:  Sustained.

11   Q.  Would you ever lie on behalf of some of the people you

12   worked with in the D.A.'s Office?

13   A.  I don't lie.

14   Q.  Okay.  Ms. Scapicchio sat down and didn't want to ask

15   you the next question, do you know Mr. Reilly's partner?

16   A.  I do.

17   Q.  Bill Walsh?

18   A.  Yeah, very well.

19   Q.  Do you have a very close relationship with him?

20   A.  Yes.

21   Q.  And you socialize with him as well?

22   A.  Yes.

23   Q.  You indicated that the hotel was not a hotel that the

24   D.A.'s Office normally used when you spoke with

25   Deputy Dunford, correct?

1    A.  That's correct.

2    Q.  That creates some concern for you?

3            MS. SCAPICCHIO:  Objection.

4            THE COURT:  Sustained.

5    Q.  Did that puzzle you?

6    A.  Yes.

7            MS. SCAPICCHIO:  Objection.

8            THE COURT:  Sustained.

9            THE WITNESS:  Sorry.

10   Q.  Okay.  Well, when it wasn't a hotel that was used by the

11   D.A.'s Office, did you take steps to confirm with the trial

12   assistant because of that?

13   A.  Yes.

14   Q.  Okay.  And you wanted to make sure that the trial

15   assistant knew about --

16           MS. SCAPICCHIO:  Objection.

17   Q.   -- Ricky Evans being in the hotel, especially since it

18   wasn't one that you were used to seeing?

19           THE COURT:  Overruled.

20   A.  Yes, when Deputy Dunford said it was a Howard Johnson's

21   off the expressway in Dorchester, we had three or four

22   places we put witnesses, and that was not one of them, the

23   reasons we didn't put people there, and that surprised me

24   that it was there, and that's what caused me to think I've

25   got to check this out to make sure it's an appropriate

1    expense because if it was one of our own hotels, it would

2    have gone through our billing process already, this one

3    didn't go through our billing process, it went directly to

4    the Boston Police Department, and between going directly to

5    the Boston Police Department post indictment and at a hotel

6    that we didn't use, it caused me, I've got to look into this

7    and make sure that it's appropriate because the first

8    assistant is going to ask me that, and I've got to have the

9    information for him when I call him.

10   Q.  If it was something that the D.A.'s Office wasn't aware

11   of, would they have paid the bill?

12   A.  No.

13          MS. SCAPICCHIO:  Objection.

14          THE COURT:  Sustained.  The objection is

15   sustained.  That's a speculative question.

16   Q.  Do you have any questions in your mind as you sit here

17   today that because of the nature of the disclosure from

18   Deputy Dunford that you spoke with Phil Beauchesne?

19   A.  I did.

20   Q.  Okay.  And there was a document that was shown, the

21   question that was asked previously, and you were asked about

22   what did you do to confirm, and you -- the question before

23   that starting on page 217, "And once you got that bill

24   before you agreed whether or not Suffolk County would pay it

25   or bring it to your superiors to ask them to pay it, did you

1    do anything with the trial prosecutor to determine or verify

2    whether or not this witness was put up and what the reason

3    was that he was put up?"  What was your answer?

4    A.  "I would have confirmed either with the police, the

5    homicide police, possibly Lieutenant Callahan and maybe

6    lieutenant in charge of homicide, possibly the trial

7    assistant, I would have confirmed that yes, it was a witness

8    in the case and it was our expense."

9         MR. CURRAN:  Judge, I move into evidence that

10   question and answer.

11        THE COURT:  You may have that.

12        ( Page 217, line 23 to page 218, line 11 of The

13   Motion for New Trial was marked and admitted into evidence

14   as Exhibit No. 16.)

15   Q.  The Tiffany Moore murder case was a pretty high profile

16   case, correct?

17   A.  It was.

18        MS. SCAPICCHIO:  Objection.

19   Q.  And it was being covered in the media on a daily

20   basis?

21   A.  It was.

22   Q.  Okay.  Do you have any reason to believe that you didn't

23   follow your common practice and procedure of confirming with

24   the trial assistant as you sit here today?

25        MS. SCAPICCHIO:  Objection.

1    A.  I moved --

2              THE COURT:  Overruled.

3              MR. CURRAN:  I have no further questions.

4                      RECROSS-EXAMINATION

5    BY MS. SCAPICCHIO:

6    Q.  Sir, do you remember being deposed back in December of

7    2006, three years after you testified under oath that you

8    didn't tell Phil Beauchesne; do you remember that, sir?

9    A.  I didn't testify under oath that I didn't tell

10   Phil Beauchesne in 2003.

11   Q.  You didn't?

12   A.  I said I spoke to either him or Callahan.

13   Q.  When you were asked specifically about Phil Beauchesne,

14   didn't you say you didn't know?

15   A.  I said I had no memory of it.  That was the question

16   that I was asked.  That's the answer that I gave at that

17   time.  I now have a memory of it having done something to

18   confirm it.

19   Q.  Having talked to Detective Callahan?

20   A.  That's correct.

21   Q.  Now, page 35, you were asked specifically whether or not

22   you had a conversation -- this is under oath, too, at your

23   deposition, right, in 2006?

24   A.  Yes.

25   Q.  Where you swore to tell the truth, the whole truth and

1    nothing but the truth?

2    A.  Yes, I did.

3    Q.  In 2006, on page 35, you were asked whether or not you

4    had a conversation with Beauchesne about disclosing a

5    witness at the Howard Johnson's; do you remember that, sir?

6    A.  Yes.

7              MS. SCAPICCHIO:  May I approach the witness, your

8    Honor?

9              THE COURT:  Yes, you may.

10   Q.  Sir, when you were under oath in 2006, three years after

11   you said you didn't have any memory of telling

12   Phil Beauchesne in 2003, when you were under oath in 2006

13   and you were asked the question at line 16, "Do you ever

14   remember having any conversation with Phil Beauchesne on the

15   Drumgold case about whether or not there should be

16   disclosure of a witness being put up at the hotel?"  What

17   was your answer under oath in 2006, sir?

18   A.  Same one I gave today, "I have no memory of that."

19   Q.  And then were you asked whether or not you talked to

20   Detective Callahan, Walsh, McDonough or Murphy about

21   witnesses being put up in connection with the Drumgold case?

22   A.  Yes.

23   Q.  And do you remember at page 36 saying that you didn't

24   even remember speaking to Callahan in 2006?

25   A.  At that time I did not have a memory whether I spoke to

1    Callahan or Beauchesne.

2          MS. SCAPICCHIO:  Judge, I move to introduce

3    this.

4          THE COURT:  Do you want to just put this on the

5    screen again and make it line by line so that only those

6    portions that are relevant to the examination come in.

7          MS. SCAPICCHIO:  There is a portion that isn't

8    relevant, your Honor, that's why I took it off the screen.

9          MR. CURRAN:  Judge, I'd ask for the prior page go

10   in, page 34.

11         THE COURT:  Can you give me the deposition?

12         MR. CURRAN:  Page 34, line 9, I'm sorry, line 12,

13   9 through 12.

14         THE COURT:  What are the lines that you seek to

15   introduce or do I have your only copy?

16         MS. SCAPICCHIO:  You do have my only copy, your

17   Honor, so I apologize.

18         MR. REILLY:  Page 35, line 16 through 20.

19         THE COURT:  I'm going to allow in question at line

20   16 and the answer at line 20, and I do not believe that the

21   comment on 34 should be admissible.  I do not believe that

22   it in fact contradicts page 35, so those lines will come

23   in.

24         MR. CURRAN:  May I offer it for a prior consistent

25   statement, Judge?  Clearly what it says --

1    MR. REILLY:  Objection, your Honor.

2    THE COURT:  No, no, I'm going to overrule, I'm

3    going to sustain the objection to yours.  I'm sorry, I'm now

4    thoroughly confused.  The objection is overruled, just the

5    portion that Ms. Scapicchio has offered comes in.

6    ( Francis O'Meara's 2006 deposition at pages 35,

7    line 16 through 20 was marked and admitted into evidence as

8    Exhibit No. 17.)

9    MS. SCAPICCHIO:  Thank you, your Honor.

10    Q.  Now, sir, you told us on redirect examination that you

11    had no question in your mind that you had this conversation

12    with Phil Beauchesne; do you remember that testimony?

13    A.  Today, you're talking about today?

14    Q.  Well, the truth doesn't change, sir, so, I guess, yeah,

15    today.

16    A.  The truth doesn't change, ma'am, that's correct.

17    MR. ROACHE:  Objection, your Honor.

18    THE COURT:  The objection is overruled.

19    Q.  The truth should be the same, right?

20    THE COURT:  The objection is overruled.  Go on.

21    Q.  Now, sir, do you remember testifying at a deposition

22    that you never heard back from Leary or Dunford and you

23    weren't sure if the bill got paid?  Do you remember that,

24    sir?

25    A.  That's correct, that would be my testimony today.

1   Q.  Well, didn't you tell us 10 minutes ago that you know
2   the bill was paid?
3   A.  No, I believe it was paid.  I don't know it was paid.
4   Q.  When you were asked under oath, sir, at page 37, when
5   you were asked under oath whether or not the bill was paid,
6   did you tell everyone under oath that you didn't hear back
7   from Dunford, you didn't hear back from anyone, you weren't
8   even sure if the bill got paid; is that what you said in
9   2006, sir?
10  A.  At that time I said I was not sure if the bill was paid,
11  and I'm still not sure.
12  Q.  Oh, I'm sorry, I thought you said you knew the bill was
13  paid?
14  A.  No, I said now I believe the bill was paid.
15  Q.  What makes you believe it was paid when in 2006 you
16  weren't sure if it was paid, sir?
17  A.  Because it --
18  Q.  Did you have a conversation with Detective Callahan?
19          THE COURT:  Give him an opportunity to answer.
20  A.  Because it never came back to me.  First assistant
21  never, not that he needed to, contacted me back to get more
22  information, so the presumption I reach is the bill was
23  paid.
24  Q.  So that's a presumption, you don't even know if it was
25  paid?

1    A.  No, I don't.

2    Q.  You have no knowledge it was paid?

3    A.  I believe it was paid.

4    Q.  Do you have anything that suggests that the

5    Suffolk County D.A.'s Office paid the bill?

6    A.  Yes, they never got back to me and asked me more about

7    it.

8    Q.  So that's why you think it got paid?

9    A.  That's right.

10   Q.  You don't have any memory in 2006 when you were asked

11   this exact same question as to whether or not the bill got

12   paid, your memory then was you didn't know, right, you

13   didn't say then I believe it did, I think it did, I hope it

14   did, you just said it didn't get paid, right?

15   A.  I said at that time I didn't know.

16   Q.  Okay.  And your memory got better from 2006 to today in

17   2009, right?

18   A.  No, I wouldn't say that.

19           MS. SCAPICCHIO:  I have nothing further.

20           THE COURT:  Thank you very much.  Any further

21   witnesses?

22           MR. CURRAN:  No, your Honor.

23           THE COURT:  Ladies and gentlemen, the witness is

24   excused.  The end is in sight, ladies and gentlemen, I want

25   to make this clear.  The evidence is concluded at this

1    portion of the trial.  There will not be another portion of

2    this case that you will have to address.  I'd like to take a

3    few moments with the lawyers to deal with the instructions,

4    and we'll find out whether your lunch has come, then the way

5    this will work is that once we resolve what the instructions

6    should be and any other legal issues that they'll be closing

7    arguments on damages and then instructions on damages, and

8    then you'll have an opportunity to deliberate.

9            So we'll just take a break now and the break may

10   bleed into your lunch, if your lunch is there.  Heaven

11   forbid that we should not let you eat.  All rise for the

12   jury.

13           (Jurors exited the courtroom.)

14           THE COURT:  Okay.  You can be seated.  I want to

15   deal with the jury instructions.  Both sides have the jury

16   instructions.  Before we get to the superseding intervening

17   cause issue, Mr. Reilly, do you have a motion with respect

18   to this?

19           MR. REILLY:  Yes, your Honor.  Under Rule 58, your

20   Honor, the evidence is not sufficient as a matter of law.

21   Your Honor, the first test is that the superseding test be

22   different in kind and that the damage cause be different in

23   kind.  This is the exact same.  This is, if you buy

24   everything they want to give you by every kind of inference,

25   the harm here is that an individual is kept in jail because

1    of the withholding of exculpatory evidence.  It is exactly

2    the same kind of harm, it's not different in kind, and,

3    therefore, as a matter of law, this cannot be a superseding

4    cause.

5           Secondly, your Honor, the evidence in this case,

6    when Mr. O'Meara testified, his testimony was I suggest to

7    you that he told Beauchesne, crediting his testimony, if you

8    do that, if he told Beauchesne that there was a witness in

9    Ho-Jo's, the evidence in this case is that there was a

10   witness, Eric Johnson, who was put up.  There's no evidence

11   here that he told Beauchesne that it was Ricky Evans or that

12   he told Beauchesne anything more than that there was a

13   witness there, and so I'd suggest on that ground --

14          THE COURT:  There is evidence in the record about

15   this other witness whose name is what?

16          MR. REILLY:  Yes, Eric Johnson, your Honor.  If

17   you remember during the trial, Mr. Beauchesne announced to

18   the defendants, and they argued this in their case,

19   announced to the defendants when Eric Johnson was asked

20   where are you staying, he said, Beauchesne said I will

21   stipulate that he's being put up at a hotel at the expense

22   of the Commonwealth.

23          THE COURT:  So you're saying that O'Meara's

24   testimony doesn't make clear whether the witness he was

25   talking about was Eric Johnson or Ricky Evans?

1        MR. REILLY:  When he talks to Beauchesne, yes,

2   your Honor, and that's following your Honor's rulings this

3   morning.  They need to show that Beauchesne was on notice as

4   to this, and this evidence doesn't do it, so I'd suggest on

5   that grounds, and I'd suggest, thirdly, your Honor, just as

6   a matter of foreseeability, this is a case where the jury

7   has found that this officer withheld exculpatory evidence,

8   and as a matter of law, it is foreseeable that if he

9   withholds it, it's not going to get and be disclosed to the

10  defendants absent him doing something.  He can't assume that

11  the district attorney's office will clean this up for me.

12        THE COURT:  Who can't assume this?

13        MR. REILLY:  Callahan.  Callahan can't go on the

14  assumption I can withhold this exculpatory evidence, but

15  it's foreseeable to me that the D.A.'s Office will find out

16  sooner or later and they'll disclose, and, therefore, it's

17  not fair to hold me responsible.  That's not like something

18  that is totally unexpected, you know, it's not the bolt of

19  lightning, to use the example the Court gave.  This is a

20  process that Mr. Callahan set in play, and the evidence in

21  this case is not that this was some different in kind,

22  unexpected, different in type cause.

23        This is the exact same cause, your Honor, and as a

24  matter of law, this cannot be a superseding cause.

25        MS. HARRIS:  Your Honor.

1          THE COURT:  Yes.

2          MS. HARRIS:  I think first to frame this argument,

3   we have to look about what this evidence is.  This is

4   impeachment evidence, this is not evidence of falsified

5   statements or any of the other litany of bad acts that the

6   plaintiffs have tried to prove in this case, and I would

7   suggest that the Supreme Court jurisprudence is abundantly

8   clear that the decision-making about what is evidence that

9   has to be disclosed and under what circumstances is left to

10  the prosecutor's discretion.

11         They're the ones that make the fine decisions

12  about what has to be disclosed and what doesn't.  It is

13  absolutely clear, there is no question that in 1990

14  Paul Connolly wrote in a memo we put Ricky Evans in a

15  hotel.

16         That information is undisputably in the possession

17  of the district attorney's office.  That can't be subject to

18  any cavil at this stage of the proceedings, it's simply, you

19  know, it's part of the record of what the district

20  attorney's office has in its possession.

21         The issue about whether or not this is

22  Eric Johnson or Ricky Evans I submit is a false distinction

23  because Ricky Evans was in the hotel, and as Mr. O'Meara

24  testified here, the Howard Johnson's was not a hotel that

25  was used by the district attorney's office so it would make

1    no sense for him to assume that it was Eric Johnson vs.

2    Ricky Evans when the district attorney's office, as he just

3    testified, had a number of places where they located

4    witnesses.  This is not a hotel that was one of them.

5         In any event, it's a cloud on the issue since

6    Paul Connolly knew in 1990 that this witness who was a

7    witness in both cases, and he knew that, was being housed

8    anywhere, was being housed in a hotel.

9         The question of whether or not it's foreseeable

10   that this would be disclosed or not disclosed I think goes

11   back to what started with our motion for qualified immunity.

12   Essentially we're asking Lieutenant Callahan to make fine

13   distinctions about what should be disclosed or not disclosed

14   and excusing the district attorney's office, who are the

15   persons who are supposed to be making those decisions

16   entirely.

17        I would submit to you that the evidence suggests

18   very strongly that the district attorney's office didn't

19   consider housing this witness to be the sort of information

20   that needed to be disclosed.

21        We learned from the first trial, and I believe it

22   was reiterated here, that Connolly himself never disclosed

23   the information about housing Ricky Evans.  I think it turns

24   the requirements of Brady completely backward to say that

25   the district attorney's office when it has this information

1    in its actual possession has absolutely no responsibility

2    and can't be expected to fulfill their obligations which

3    have been their obligations since Giglio was decided in 1962

4    but somehow the lieutenant should have gone to them and

5    said, excuse me, this is really you should do something

6    about, you should disclose this.

7         It's a factual dispute, I understand, but I think,

8    your Honor, that it really can't be disputed that this

9    information was in their possession as of 1990.  The cases

10   that talk about what is foreseeable or not foreseeable, even

11   those cases such as Burke, even the cases such as Wagenmann

12   would not have found the Magistrate's decision on setting

13   bail or on granting the indictment to have been a

14   foreseeable continuation but for the misleading behavior on

15   the part of the officers in those cases, so to suggest that

16   it is foreseeable that officers will not comply with or will

17   exercise their discretion in a different way than somebody

18   with the hindsight of 20 years would have them exercise that

19   discretion I think makes the test simply, you know, it's

20   like that butterfly flaps their wings in Colorado and

21   there's a tsunami in Srilanka.

22        There is a break to causation when it is

23   reasonable that somebody exercising independent judgment

24   makes independent decisions and here, you know, at the risk

25   of repeating myself, the D.A.'s Office made independent

1    decisions about whether or not Ricky Evans' housing ought to

2    have been disclosed, and I will defer to my colleagues if

3    there are points that they would like to make here, but I

4    simply think we have to bear in mind that we're talking

5    about the knowledge and the responsibilities of an officer

6    in 1989, and I submit there is just no basis to find that

7    the independent decisions here by the D.A.'s Office --

8              THE COURT:  Mr. Curran.

9              MS. HARRIS:  -- somewhere fall to the side.

10             THE COURT:  Mr. Curran, Mr. Roache, does anyone

11   have anything to add?

12             MR. ROACHE:  Your Honor, I think the evidence was

13   quite clear from Mr. O'Meara that he inquired of

14   Mr. Beauchesne as to Ricky Evans and not to Eric Johnson, as

15   my Brother seems to suggest.

16             The question was put right onto Mr. O'Meara, did

17   you in fact inquire about the housing of Ricky Evans, and he

18   said yes, I did, and that was as a result of a phone call

19   from Superintendent Dunford.  It was not about Eric Johnson,

20   it was about Ricky Evans, and I think to suggest otherwise

21   is misleading, your Honor, at best.

22             THE COURT:  Let me say I think this is a close

23   case whether or not to direct a verdict in favor of the

24   plaintiff on this issue.  I think it is a close case because

25   clearly the jury found that as of the time of the Drumgold

1    verdict no constitutionally required information had been

2    turned over to the prosecutor.  That's what the jury's

3    verdict meant, information about the hotel and meals, et

4    cetera.

5         So the question is did something happen between

6    the time of the Drumgold verdict and probably January of

7    1990 that got this information in the hand of the prosecutor

8    independent of anything Officer Callahan did or didn't do.

9         He got it in the hand of the prosecutor in a way

10   that the prosecutor could then have exercised independent

11   judgment about whether to turn this over.  It seems to me

12   the evidence is clear that Detective Callahan set in motion

13   a series of events that led to this information reaching the

14   district attorney's office as an expense after the

15   Treas Carter plea when there was no reason to evaluate

16   whether or not it had been turned over, the Treas Carter

17   case was over, and months after the Drumgold case when it's

18   coming in as tidying up, cleanup expense and not did it have

19   significance for the case.

20        So there's an argument that Mr. Reilly's argument

21   which is that Officer Callahan is putting in motion a series

22   of events that if this makes it to the district attorney's

23   office at all, it's going to make it a trivial

24   administrative detail and not the significance that a Judge

25   of the Superior Court then found it to have.

1          I am troubled by the -- having said all of that,

2    having said that there's a series of consequences here that

3    Sergeant Callahan put in motion that makes this, if it

4    surfaces at all surfaces as a detail, as an expense,

5    surfaces as an expense arguably in the Treas Carter case and

6    not necessarily in the Drumgold case, surfaces as an expense

7    which it's not clear is an Eric Johnson expense or an Evans

8    expense and surfaces in a way that it's not likely that a

9    district attorney, should he see it, would understand its

10   significance to the original case, to the Drumgold case.

11         But having said all of that, the problem is that

12   Mr. O'Meara today apparently says that he talked to

13   Phil Beauchesne about this expense, and I have to check to

14   see if he says he spoke about it in connection with

15   Ricky Evans.  I'm looking for the transcript to see if

16   that's so, and today he says for the first time apparently

17   that he spoke to Phil Beauchesne about it in connection with

18   the Ricky Evans case, in connection with Ricky Evans, and,

19   strictly speaking, under Rule 50, I can't say, well, I don't

20   believe him, that's what I'm not allowed to say.

21         I'm supposed to give this to the jury, I'm not

22   supposed to make credibility determinations as to the

23   significance of that, and so under the circumstances I'm

24   going to let this go to the jury, but I'll re-examine this

25   depending upon the verdict afterwards.

1          In other words, the general idea here is not

2     strictly speaking, as Mr. Reilly says, that it has to be

3     different in kind, it has to be not foreseeable, that it

4     seems to me that there's a reasonable argument here that it

5     was not foreseeable, that something that's going to come in

6     as an expense along with all other expenses of the case that

7     was going to come in as an expense arguably in the

8     Treas Carter case that was going to come in as an expense

9     that was ambiguous as to who the witness was would not have

10    been the kind of thing that any prosecutor would have said,

11    oh, this is of significance, I have to turn this over.

12         But the witness having said I talked to

13    Phil Beauchesne about it, it seems to me I can't second

14    guess as a matter of his credibility, so the superseding

15    cause instruction will be in the case.  Does anyone have any

16    comments about the instructions?  I'm giving a punitive

17    damages instruction, as you see.  There's an interest

18    instruction.  Anything, Mr. Reilly?

19         MR. REILLY:  Yes, your Honor, in terms of the

20    superseding cause, I'd ask that you instruct the jury on the

21    factors from the restatement as set out in the Russo case in

22    the First Circuit, and that is No. 1, that the intervention

23    would bring about a harm different in kind from that which

24    otherwise would have resulted from the actor's negligence.

25    The restatement sets out the five step.

126

1          THE COURT:  Has that been accepted by

2     Massachusetts?

3          MR. REILLY:  Yes.  It's accepted by the First

4     Circuit, your Honor, that's the First Circuit rule, I would

5     suggest.

6          THE COURT:  Is this in your memo?

7          MR. REILLY:  It's in my memo, your Honor.

8          THE COURT:  I'll take a look at that.  Okay.

9     Go on.

10         MR. REILLY:  So I'd ask, your Honor, that the

11    instruction on superseding basically track the restatement

12    and require them to make the findings of the elements of the

13    restatement say are an element.

14         THE COURT:  I'll take a look at that.  I don't

15    have it immediately in front of me.

16         MR. REILLY:  Secondly, your Honor, in terms of the

17    punitive damages at this point, the plaintiffs are not

18    seeking punitive damages.

19         THE COURT:  You're not seeking punitive damages.

20         MR. REILLY:  That's correct.

21         THE COURT:  We'll take that.  Next.

22         MS. HARRIS:  Your Honor, on the superseding cause

23    issue, I would refer to the First Circuit's decision in

24    Burke vs. McDonald.  It's my understanding that although

25    they refer to the restatement as guidance, they've not

1    adopted it as a step-by-step rule, and instead they focus

2    particularly in these kind of cases, which I think is the

3    appropriate place to look, they look at whether the

4    independent exercise of judgment breaks the chain of

5    causation.

6            They don't look at the multi-factor test under the

7    general tort law for superseding cause, and I would suggest

8    that the controlling language would track that that I've

9    submitted to the Court in my request No. 1 in superseding

10   cause and in request No. 2, which speaks to the

11   foreseeability issue, and I've cited for you two Second

12   Circuit cases, I'm not aware of any First Circuit case that

13   discusses whether or not an actor who is not misled may

14   otherwise err.

15           THE COURT:  In other words, you're saying that in

16   order for this to be a superseding, for this to be not a

17   superseding, no, in order for this to be a superseding

18   cause, there has to be the absence of active misleading?

19           MS. HARRIS:  I'm suggesting, your Honor, that the

20   cases that have found there not to be, that the actions of a

21   third party do not break the chain of causation on issues

22   having to do with prosecution or holding of criminal

23   suspects have focused on those areas where those third

24   parties, whether they be magistrates or courts or

25   prosecutors have been actively misled, and, therefore, they

1    cannot have used independent judgment.

2         THE COURT:  I know there are cases that say that.

3    I don't believe that those are the only circumstances.

4         MS. SCAPICCHIO:  Judge, isn't that exactly what we

5    have here, a jury verdict that says Beauchesne didn't know?

6         THE COURT:  What she's saying is that from the

7    time of the verdict in the Drumgold case that somehow

8    Officer Callahan is not responsible what happened because he

9    didn't actively mislead, and I don't think that that's the

10   law.

11        MS. HARRIS:  I would also submit, your Honor, that

12   this is contained in instructions, but I'm happy to rework

13   it, but in my motion in limine to limit the damage period, I

14   think this jury should be instructed what exactly the

15   responsibility of the district attorney is, and I think it's

16   clear that their obligation to assess and disclose continues

17   post trial, certainly continues during the immediate appeal

18   period.

19        THE COURT:  I think that's a fair comment.  I

20   think that's a fair comment.

21        MS. HARRIS:  I would also submit that, as we had

22   discussed earlier, that the burden or the duty that we've

23   talked about is the duty of disclosure to the district

24   attorney's office, and I submit that to change that now to

25   being that the duty post trial is to put it directly into

1   the hands of the trial prosecutor is unprecedented, and I

2   again would refer to the cases that are in my brief

3   including the Porter vs. White case from the

4   Eleventh Circuit which says basically if the information

5   comes to the district attorney's office from anywhere, from

6   any source that there is an independent duty on the part of

7   the district attorney to assess it.

8          THE COURT:  That is a criminal case, isn't it, a

9   criminal appeal?

10          MS. HARRIS:  No, it's a civil rights action, your

11   Honor.

12          THE COURT:  They were dealing with the violation

13   in the first instance, right, not what we're dealing with?

14          MS. HARRIS:  They were dealing with the obligation

15   of the police investigator to provide information,

16   exculpatory information to the district attorney's office,

17   and the question was whether or not the district attorney's

18   office, having had that information, whether the causal

19   chain between the police officer and the ultimate 1983

20   violation was broken, and they found that it did.

21          MR. REILLY:  Your Honor, the evidence in this case

22   from every D.A. witness is that the practice in

23   Suffolk County was to turn over exculpatory evidence, so Mr.

24   Connolly and O'Meara learned of this information,

25   Mr. Callahan reasonably and foreseeably knew they were going

1    to assume it was turned over, and there's no evidence that

2    either Connolly or O'Meara knew that it hadn't been turned

3    over, so there's no argument they had some independent duty

4    at that time.  They assumed things went where they should

5    have, and the reason they didn't the jury found --

6              THE COURT:  Which is why I thought this issue

7    hinged so completely on whether Beauchesne had the

8    information because only Beauchesne knew what he had turned

9    over and what he hadn't.

10             MS. HARRIS:  And the trial record is clear of 1989

11   that he didn't think he had to turn information over Eric

12   Johnson being housed in a hotel and that that understanding,

13   which he said was standard operating procedure, was then

14   echoed by the trial court.  I think we have to bear in mind

15   that we're talking about these decisions 20 years ago, your

16   Honor.

17             THE COURT:  No, I understand, but it seems to me

18   that there's a factual issue, and the factual issue is what

19   goes to the jury.  I will examine it again because I want to

20   look carefully at Mr. O'Meara's testimony, but for now I'm

21   going to let the jury have this.  I'll look again at an

22   instruction that would say that there's a continuing duty to

23   disclose because that is absent from our instructions here.

24   I'll look again at the restatement and see if I agree that

25   that has to be in here.  Is there anything else on the

1   damages instruction?

2          MS. HARRIS:  To the extent that we need to renew

3   our 50(a) motions, I would ask that you consider it to be

4   renewed.

5          THE COURT:  Thank you.  They're denied.  Yes.

6   Go on.

7          MS. SCAPICCHIO:  Judge, we would just note the

8   objection to the superseding cause.  I know we have to do it

9   at the end of the jury instructions, but just so the record

10  is clear.

11         THE COURT:  Can we find out if they're eating?

12  They are?

13         THE CLERK:  No, I'll find out.

14         THE COURT:  We'll take a few minutes.

15         MS. HARRIS:  I'm sorry, your Honor, are there any

16  instructions on damages other than the punitives?  I did not

17  receive instructions other than punitive damages.

18         THE COURT:  Yes, there were compensatory damages,

19  page 2.

20         MS. HARRIS:  I'm sorry, I apologize.

21         THE COURT:  Do you have that?

22         MS. HARRIS:  I'm sorry, yes, I do have it.

23         THE COURT:  Do you want to spend a minute?

24         MS. HARRIS:  We still would raise our obligation

25  to 2(c), humiliation, embarrassment, loss of self respect

1    with regard to our argument as to actual guilt or

2    innocence.

3            THE COURT:  Okay, thank you.

4            (A recess was taken.)

5            THE CLERK:  All rise.  United States District

6    Court is now session.

7            (Jurors entered the courtroom.)

8            ( THE FOLLOWING OCCURRED AT SIDEBAR:)

9            THE COURT:  I just wanted to sort out who goes

10   first, you would be able to go last on damages and you last

11   on cross, so who goes last?  I think that it would be better

12   for you to go first and then for the plaintiff to go last.

13           MS. SCAPICCHIO:  Okay.

14           MS. HARRIS:  Your Honor, we have one other

15   question, your Honor, for the jury instructions.

16           THE COURT:  Yes.

17           MR. ROACHE:  With respect to compensatory damages,

18   part C, you've instructed about any humiliation

19   embarrassment, loss of self-respect, et cetera, up to the

20   present time.  Your Honor, there's been no evidence

21   introduced at trial as to any humiliation or embarrassment

22   of Shawn Drumgold up to the present time.  Ms. Scapicchio

23   said she'd limit it only to the time he was incarcerated,

24   and I think to allow this jury --

25           THE COURT:  Okay, I'll change that.  I'll take out

1     present time.

2          MS. SCAPICCHIO:  Again you won.

3          (SIDEBAR CONFERENCE WAS CONCLUDED)

4          THE COURT:  The way this will work would be first

5     you'll hear from Mr. Curran and then Ms. Scapicchio.  Go on,

6     Mr. Curran.

7                        CLOSING ARGUMENT

8          MR. CURRAN:  Thank you, your Honor.  Ladies and

9     gentlemen, during the past month, you've listened carefully

10    to all the evidence presented by both parties.  On behalf of

11    Tim Callahan and his counsel, we want to thank you for your

12    diligence and all the patience you've given all of us.

13          As you enter this phase of your obligations as

14    jurors, I want to remind you what we said from the

15    beginning, and that is that your life experience and common

16    sense is extremely important and when you go into the

17    deliberation room.  Bring with you your life experience and

18    your common sense in evaluating the facts that have been

19    presented in this courtroom, not anything outside, but

20    solely the facts that you have heard by the witnesses on the

21    stand, then apply the facts to the law that Judge Gertner is

22    going to instruct you on the law.

23          At this time you're going to be asked to evaluate

24    two issues, the damages for Shawn Drumgold and the issue of,

25    as the Judge alluded before, any superseding or intervening

1    cause of his damages.  In assessing his damages, the Judge

2    will instruct you on compensatory damages.  I would suggest

3    that in assessing his damages, you are to bring with you

4    your ability to be objective as jurors and evaluate the

5    facts in evidence.  You are to remove any sympathy or

6    presumption of innocence that you may have for or against

7    any of the parties in this case, Mr. Callahan or

8    Mr. Drumgold.

9           In assessing damages in this case, you're going to

10   be limited to Shawn Drumgold's conviction on October 13th,

11   1989 and his incarceration until 2003 when he was released

12   from prison and any of the damages that are associated with

13   that incarceration, not to take into consideration his

14   family's loss, they're not parties here, the only damages

15   are damages attributable to Shawn Drumgold in regards to

16   what he suffered.

17          You don't know anything after his release from

18   prison, you don't know much prior to his conviction.  He

19   testified about going off that day in shackles to the state

20   prison.  I just ask that you go back in the trial record and

21   take into consideration the cross-examination of

22   Shawn Drumgold where he admitted that he had been convicted

23   of various offenses for possession with intent to distribute

24   drugs, possession of a firearm and that he had served

25   sentences and had been incarcerated in the House of

1   Correction and weigh that.

2         In regards to the issue in assessing the issue of

3   superseding cause and intervening cause, the Judge is going

4   to tell you that you have to take the facts on that claim

5   and apply them to the law as she will give you.

6         Now, I want to start by, and I don't mean to

7   rehash anything but just highlight a few things, and the

8   issue is in regards to the obligation of disclosure in

9   criminal cases.  I suggest, and the Judge will instruct you

10  on the law, and follow the law the way she tells you, not

11  from what I say, I suggest that the law is very clear, that

12  the allegation of disclosure of material exculpatory

13  evidence falls squarely on the shoulders of the prosecutor,

14  the D.A.'s Office, the Suffolk County D.A.'s Office.

15        The officer's only obligation is to disclose the

16  information and report to the D.A.'s Office, and the D.A.'s

17  Office carries with it the responsibility and obligation to

18  assess the information, and what that information is and

19  determine if it's materially exculpatory evidence --

20        MS. SCAPICCHIO:  Objection, your Honor.

21        THE COURT:  Overruled.  I'll instruct.  Go on.

22        MR. CURRAN:  -- and whether or not to turn that

23  information over.  That is solely their obligation.

24        Now, in evaluating that issue, I ask to bring with

25  you your common sense.  What I'm going to highlight for you

1    is this testimony, and I'd like you to give some

2    consideration to it.  Now remember every witness that came

3    before you on this stand had to try to recount something

4    that occurred 20 years ago, 15 years ago, 15 years or 14

5    years at the time of the motion for new trial.

6           When you take that into consideration, take into

7    consideration the prosecutors who came in here and testified

8    in regards to the number of cases that they've handled, the

9    murder cases over the years and many years of their service

10   in the D.A.'s Office.

11          When you look at that evidence, you don't take one

12   witness and isolate it and evaluate it and either accept it

13   or disregard it and then move onto the next witness and the

14   next one.  What you do is you take all the evidence

15   together.  It's like a puzzle, you start putting the puzzle

16   together, and you don't get the full picture until you get

17   to the end of the puzzle.  So you don't guess the beginning

18   or halfway through, you wait to the end.

19          I want you to take into consideration five

20   witnesses that you heard on this stand under oath.  The

21   first you did not hear from, Phil Beauchesne.

22   Paul Connolly, Laura Scherz, David Meier and Francis

23   O'Meara.  Take their testimony and look at it as a whole and

24   cumulatively.

25          Now, you know that Mr. Beauchesne, and, again, I'm

1    not going to be long on each witness, I just want to

2    highlight a few things.  You know Mr. Beauchesne was not

3    available to come to testify before you under oath, so you

4    can judge his credibility for your own by looking at him as

5    a witness.

6              You have his motion for new trial testimony.  That

7    was read in by Mr. Drumgold's counsel.  I just want to -- I

8    apologize for the glasses, but when you get this age, your

9    eyes start to go, but there were questions that were asked

10   at the motion for new trial of Mr. Beauchesne.  Do you have

11   any recollection of whether or not at the time that he

12   testified Mr. Evans was staying at the Howard Johnson's in

13   South Boston?  Well, from anything I've heard, I believe he

14   was.

15             MS. SCAPICCHIO:  Objection, your Honor.

16             MR. CURRAN:  I don't really have a memory that he

17   was staying there.

18             THE COURT:  Mr. Curran, you're dealing with

19   damages, not --

20             MR. CURRAN:  I understand that.  I understand

21   that.

22             THE COURT:  Okay, go on.

23             MR. CURRAN:  I'll just say for the record it

24   appears that that's where he was staying, yes, but I don't

25   know that I recall it.

1          MS. SCAPICCHIO:  Objection, your Honor.  It's

2     damages.

3          MR. CURRAN:  Judge, it goes to the superseding

4     cause issue.

5          THE COURT:  I understand, that but those things

6     that occurred before the conviction do not.

7          MR. CURRAN:  But it goes to the issue in regards

8     to what Beauchesne, it's this jury's determination what the

9     D.A.'s Office knew when they knew it, and this is part of

10    the puzzle, Judge.

11         THE COURT:  Well, I'll let you go on, but the date

12    is after the conviction.

13         MR. CURRAN:  He's asked another question, "If you

14    could do your best just for the purposes of this hearing

15    tell Judge Rouse anything about your knowledge, the effect

16    that Mr. Evans was staying at a hotel at the time of the

17    trial."

18         MS. SCAPICCHIO:  Objection, your Honor.

19         THE COURT:  I'll let him go on.  Go on.

20         MR. CURRAN:  "I would have to say before I came in

21    for this hearing, I have absolutely no memory of it, I now

22    have a little bit of memory, and I tried to compress it.

23    The reason he was taken there was the safe house, I think

24    the safe house wasn't available, and that's why they had to

25    put him up there.  Ordinarily he would have been a lot safer

1      at our safe house."

2           "Do you have any recollection of doing anything of

3      that sort with respect to Mr. Evans in this case?"  The

4      question before was in regards to the expenses and putting

5      him in the hotel.  "I don't have a recollection.  I know I

6      must have done it.  I believe I did it, but do I remember on

7      a particular day I spoke to a particular person?  I do not."

8           MS. SCAPICCHIO:  Objection, your Honor.  This is

9      damages.  I move to strike this argument.

10          THE COURT:  No, I will instruct you at the

11     appropriate time.  This is to deal with the defense of

12     superseding cause, but even so, the only question is what

13     information, what was done, what acts were taken after the

14     date of the conviction since this jury has already resolved

15     issues with respect to before the date, so focus on that, if

16     you will.

17          MR. CURRAN:  I will, your Honor.  When you go back

18     to the jury room, take each of the evidence and evaluate it

19     and determine what the D.A.'s Office knew after

20     October 13th, 1989, who knew it and what they did with it.

21          Now, you have the memo that's been a topic of

22     direct examination and cross-examination of Paul Connolly to

23     Laura Scherz, who was the victim witness advocate on

24     January 30th, 1990.  Take a look at the memo.

25          I want to highlight a few things in the memo.

1    First, he talks about the plea taking place on

2    December 20th, 1989 when he's detailing his memory of what

3    occurred back at the plea and what he knew back at the time

4    of the plea, and he writes to Laura, "Perhaps you remember

5    that our witness, Ricky Evans, was in need of housing."  Why

6    is that important?  That's important because you know that

7    Laura Scherz' note, which was July 7th, 1989, she wrote

8    about Ricky Evans, Willie Roy Evans victim, witness cousin

9    gave info on Tiffany Moore.

10          MS. SCAPICCHIO:  Objection, your Honor, this is

11   July of 1989 before the conviction.

12          MR. CURRAN:  Judge.

13          THE COURT:  I'm going to give you just a little

14   bit more room, Mr. Curran, but then I'm going to stop it.

15   Go on.

16          MR. CURRAN:  Why is that important?  Because it

17   talks about him living with a married brother, violating a

18   lease and that he's referred to the Roxbury multi-service

19   for housing advocacy and counseling.  Why is that important?

20   Because it shows that the communication within the D.A.'s

21   Office was working, was working.  You have from

22   Paul Connolly in his memo that he wrote his own words,

23   "Since we had in effect relocated him to a hotel, his family

24   had gotten repeated inquiry from his friends wondering where

25   he was.  I believe some of them reporting Ricky's unknown

1    whereabouts back to Carter, Carter's defense lawyer in

2    candor wanted assurances from me if this were a trial Ricky

3    would in fact be available to testify."

4          Why is that important?  "Since we relocated him."

5    It shows that the D.A.'s Office had knowledge of Ricky Evans

6    being relocated to a hotel at the time of the plea in

7    December, 1989, at the latest, January 30th of 1990.

8          Now, you have also Laura Scherz.  Why is Laura

9    Scherz important?  Because Laura Scherz in that note that I

10   just referred to indicated that she was going to consult

11   with Phil Beauchesne in regards to the issues of

12   Ricky Evans.

13         She testified on the stand --

14         MS. SCAPICCHIO:  Objection, your Honor.

15         THE COURT:  Overruled.

16         MR. CURRAN:  She testified on the stand, she

17   stated that she did her job and she did consult with

18   Phil Beauchesne.  Now, you have to take into consideration

19   the fact that Phil Beauchesne and Paul Connolly, seasoned

20   trial lawyers, seasoned prosecutors, had an office right

21   next to each other separated by a computer room on the same

22   floor.  They saw themselves on a daily basis.  They knew

23   that they shared a common witness, Ricky Evans.

24         Does it make sense that two seasoned prosecutors

25   in Suffolk County never spoke to each other about the common

1    witness Ricky Evans, never kept each other up to date

2    regarding what was going on with Ricky Evans?

3           Now, you have David Meier who years later gets the

4    task of handling the motion for new trial, and what do we

5    know from David Meier?  David Meier said he investigated the

6    issue of Ricky Evans being placed in a hotel, and he tried

7    to get to the bottom of it but he confirmed that the D.A.'s

8    Office paid for Ricky Evans' hotel bill either in its

9    entirety or a portion of it, and he confirmed that, and he

10   told you that the records relative to the expenditures from

11   the D.A.'s Office were sent to the state archives and they

12   were destroyed after six years so there's no physical record

13   of a check being written.

14          Then you have Francis O'Meara who came in and

15   testified today, 20 years later, high profile case, gets

16   contacted by the Boston Police Department about a bill for

17   the hotel, and Francis O'Meara says it's not a hotel that we

18   would ordinarily place our witnesses in.

19          As a result, he took steps to confirm it.  As he

20   said, his policy and procedure on those cases if he wasn't

21   aware of the expense, he needed to confirm with the trial

22   prosecutor, and that's what his memory is today because the

23   trial prosecutor controls that information.

24          Now, when you go to the jury room, I ask that you

25   bring your common sense and your life experience and ask

1    yourself the questions, does it make sense that two seasoned

2    prosecutors in excess of 40 years of experience between them

3    handling high profile murder cases wouldn't talk about a

4    common witness, Ricky Evans?

5            Does it make sense that Paul Connolly would write

6    a memo to Laura Scherz detailing the fact that since we, the

7    D.A.'s Office, relocated Ricky Evans to a hotel, but he

8    wouldn't discuss that with the prosecutor whose office is

9    next door to him separated by a computer room who he saw

10   every day?

11           Does it make sense that the D.A.'s Office would

12   pay for a hotel stay for a witness when they didn't know

13   about it and didn't approve it?  Put the pieces of the

14   puzzle together, and you add things up in a cumulative

15   effect that it has.  You have Laura Scherz consulting

16   Phil Beauchesne and Paul Connolly about a common witness.

17   You have Paul Connolly who told you he knew, we relocated

18   him to the hotel.  "We."  You look at Phil Beauchesne who

19   testified in 2003, I just read the testimony to you.  His

20   memory was vague, but he knew.  He knew.

21           Then you put the pieces of the puzzle together in

22   regards to the timing of everything, then you recall the

23   questions that were asked Phil Beauchesne at the motion for

24   new trial in regards to promises, rewards and inducements

25   about being placed in a hotel, and his answer was I did not

1    consider that a promise, reward or inducement as I have been

2    under guard myself.  Then the questions were asked again,

3    putting aside safety, and he kept on saying there was

4    safety, then he said it was for the convenience of the

5    Commonwealth.

6          You put all those pieces of the puzzle together,

7    the D.A.'s Office had the information, they had the

8    knowledge, it's their obligation to determine and assess its

9    impact, its exculpatory nature and whether to disclose it.

10   Their duty is ongoing post conviction, and the Judge will

11   instruct you.

12         I want to thank you for all your patience.  I want

13   to thank you for all the time but also the consideration

14   that I know you're going to continue to give all the parties

15   in this case when you listen to the instructions of the

16   Judge and you go back and deliberate.  Thank you.

17         THE COURT:  Mr. Roache, are you addressing the

18   jury?

19         MR. ROACHE:  No, your Honor, thank you.

20         THE COURT:  Okay, go on.

21                   CLOSING ARGUMENT

22         MS. SCAPICCHIO:  Ladies and gentlemen, Mr. Curran

23   didn't say one word, not one word about the 15 years that

24   Shawn spent in jail because of Detective Callahan, not one

25   word, and do you know why?  Because he wants you to focus on

1   something else, because he knows the damage award for

2   15 years of your life, a damage award for 15 years of your

3   life is so huge that he doesn't want you to focus on it.

4          He wants you to focus over here, look over here,

5   blame someone else.  Now you saw in this courtroom this

6   morning for the first time in 21 years they put a witness on

7   the stand who says he told Phil Beauchesne, 21 years he kept

8   that a secret.  Do you believe that?  He testified under

9   oath in 2003 and said he never told Phil Beauchesne, he

10  testified under oath in 2006 and said he never told

11  Phil Beauchesne, and the only thing that changed is that you

12  found Detective Callahan liable and he had a conversation

13  with Detective Callahan saying it wasn't me?

14         Detective Callahan orchestrated that whole thing.

15  He's what caused O'Meara to change his mind.  O'Meara

16  doesn't have an independent memory of saying anything.  He

17  sat on that stand and said he didn't have an independent

18  memory.  He's basing his entire testimony on speaking to

19  Detective Callahan.

20         What do you think Callahan told him, gees, you

21  know, I tried that whole 2003 thing, it didn't work out

22  really well for me, they're not going to buy it, better come

23  up with something else.  That's exactly what happened here.

24  If you think this really happened, this conversation with

25  Detective Callahan in telling Phil Beauchesne about this

1    whole meet, why on earth wouldn't he have said it in 2003?

2            This was such a high profile case, and he got such

3    a huge bill, what, he just didn't remember it in 2003?  When

4    Shawn's fighting for his freedom, he can't remember?  But

5    after you found Detective Callahan liable for that 15 years

6    he spent in jail, now he can?  To help out his buddy,

7    absolutely.  They want to distract you with this

8    information.  They want you to say look over here.  They

9    want you to say the D.A.'s Office knew.

10           I want you to focus on what happened to

11   Shawn Drumgold in those 15 years that he spent in jail,

12   those 15 years away from his daughter, away from his wife,

13   away from his family.

14           Mr. Curran said don't focus on his family, you

15   don't want to focus on his family.  He didn't get to see his

16   family for 15 years.  His every movement was controlled by

17   corrections officers for 15 years, 5,182 days of being told

18   when to eat, of being told when to sleep, of being told when

19   you can use the phone, of being told when you can use the

20   shower, of being told when you can go out and get fresh air,

21   15 years, and they want you to say don't even think about

22   it, don't even mention it in passing because how do you

23   compensate someone for 15 years of their lives?

24           You don't get those birthdays back.  You don't get

25   that first day of school back.  You don't get any of those

1    life experiences back, but you can compensate Shawn Drumgold

2    for them, you can pay him money for those 15 years that he

3    spent in jail because of Detective Callahan.

4         Now, ladies and gentlemen, they want you to

5    believe Phil Beauchesne knew.  They still want you to

6    believe Phil Beauchesne knew, and according to O'Meara this

7    morning he remembers after talking to Detective Callahan

8    that he actually had a conversation with him some time after

9    this January memo, that's what he wants you to believe.

10        I'd ask you to look at Phil Beauchesne's testimony

11   at page 171 when he's asked, "At some point do you ever

12   remember being present at a conference between the Boston

13   Police Department and any member of the Suffolk County

14   D.A.'s Office discussing how the bill for Ricky Evans' stay

15   at the Howard Johnson's would be split?"  His answer, "No."

16   "Do you know who might have attended the meeting?"  "No."

17   "Do you have any information that the meeting in fact took

18   place?"  "No."

19        It's not what O'Meara told us this morning.

20   O'Meara told us that he had this conversation and then he

21   immediately called Phil Beauchesne.  Why would Phil testify

22   in 2003, not only did he have no memory but he never had a

23   conversation with anyone about it?  Phil Beauchesne who was

24   the trial prosecutor with the open file policy, the guy who

25   had his whole file copied for defense attorneys, he's the

1    guy who's hiding the evidence now?  He's the guy you can't

2    trust?  Are you kidding me?  That's what they're selling

3    today, and it's a story they're selling for the first time

4    in 21 years.  If you really think that story was true,

5    wouldn't they have told it before now?

6         Wouldn't they have come in when they were trying

7    to keep Shawn in jail and told it then if it was actually

8    the truth?  We know it's not the truth, ladies and

9    gentlemen.  We know Detective Callahan spoke to O'Meara, and

10   that's what changed O'Meara's mind, not because he had any

11   independent memory at all but because Detective Callahan

12   talked to him.

13        You have a very difficult job of trying to

14   compensate Shawn Drumgold for those 15 years, and I'd ask

15   you to look at those photographs that are quite stunning of

16   his relationship that he had with his family in that 15

17   years.  He had six or seven pictures of his daughter growing

18   up, and you can see her growing up in the prison, six or

19   seven pictures.  He never got to tuck his daughter in.  He

20   never got to kiss her goodnight in 15 years.  He didn't get

21   to walk her to school, he wasn't there on her first date, he

22   didn't get to participate in any aspect of her life.

23        The only way, the only way that he got to spend

24   time with his daughter is when she went through that

25   visiting room trap up to the various jails to see him.  The

1    only way that he got to have any influence on his daughter's

2    life is through those phone calls and those visits.

3          Detective Callahan took him away from his daughter

4    and his wife for 15 years.  I'm asking you to compensate

5    Shawn Drumgold for those 15 years.  Don't buy what O'Meara

6    was selling this morning.  Don't buy the superseding cause.

7    Don't buy this whole idea that Beauchesne knew because then

8    in order to buy that, you have to believe Beauchesne lied,

9    Beauchesne, the guy who had all the integrity in the world,

10   according to them, he lied when he testified in 2003.

11         Mr. Curran stands up and wants you to still

12   believe that Ricky Evans was in the hotel for security

13   reasons, and you've already decided that's not true and he's

14   still trying to sell that to you.  Fifteen years and never

15   once getting to take your wife out to dinner, fifteen years

16   of never once getting to send flowers to your wife on her

17   anniversary, fifteen years of not ever being able to spend a

18   birthday or a Christmas or an Easter or a Thanksgiving with

19   your family.

20         He told you how he spent those holidays.  It was a

21   skeleton crew, if he didn't have a visit, he was locked in

22   his cell all day.  That's how he spent those 15 years, every

23   holiday, every birthday, every Christmas alone locked in a 6

24   by 3 cell, three steps one way, 6 steps the other for 16

25   hours a day for 5,182 days.

1        I'm asking you to hold Detective Callahan

2   responsible for those 5,182 days, and I'm asking you to

3   compensate Shawn Drumgold for those 15 years that he spent

4   away from his family and away from his daughter and away

5   from his life.  Thank you.

6           MR. ROACHE:  Your Honor may I be seen at sidebar?

7           THE COURT:  Yes.

8           (THE FOLLOWING OCCURRED AT SIDEBAR:)

9           MR. ROACHE:  Your Honor, I object to the closing

10  argument Ms. Scapicchio where she continually suggested that

11  Mr. Drumgold spent 15 years in prison.  On the facts that

12  belie that, he spent 14 years in prison.  I would ask that

13  this Judge, that you instruct the jury that it was a 14-year

14  incarceration and not a 15-year incarceration.

15          MR. REILLY:  If you count from the date of his

16  arrest.

17          MR. ROACHE:  Well, you can't count that, your

18  Honor.

19          MS. SCAPICCHIO:  To the date of his arrest was 15

20  years.

21          MR. ROACHE:  It's the date of conviction.

22          MS. SCAPICCHIO:  What are you saying, it's

23  14 years, 9 months?

24          MR. ROACHE:  It's 14 years almost to the day.

25          THE COURT:  The date of the conviction was what?

1          MS. SCAPICCHIO:  October 13th of 1989.

2          THE COURT:  Anything else?

3          MR. ROACHE:  The date of release was November of

4     2003.

5          THE COURT:  It was November?

6          MR. ROACHE:  2003.

7          THE COURT:  Okay.  Anything else?

8          MS. SCAPICCHIO:  No, your Honor.

9          THE COURT:  Thank you.

10         (SIDEBAR CONFERENCE WAS CONCLUDED)

11                      JURY CHARGE

12         THE COURT:  So this stage of the proceeding

13    involves determining the damages that flowed from the

14    finding that you made last week, that is to say, that

15    Officer Callahan failed to disclose certain exculpatory

16    evidence, that that evidence was material and that it was

17    the legal cause of Drumgold's conviction on October 13th,

18    1989, and I would say to you Mr. Drumgold was released from

19    jail on November 6th, 2003.

20         But before I turn to the standards for determining

21    damages, as I said at the beginning of today, I just want to

22    put this in context.  As I said, you've already decided the

23    question of Officer Callahan's liability.  Another jury will

24    determine whether the other defendants in this case, namely

25    the City of Boston and Police Commissioner Francis Roache

1    are also liable for any constitutional violation.

2         You will decide the amount of damages to be aware

3    to Mr. Drumgold.  Bear in mind that there will only be a

4    single damage award.  The remaining defendants may also be

5    responsible for the damages that you have awarded, if you

6    do, but only if they are also found liable.

7         So now let me proceed to the question of damages.

8    Again, you have already found that Mr. Drumgold's rights

9    have been violated, that evidence, certain evidence was not

10   turned over by Officer Callahan at the time of

11   Mr. Drumgold's conviction.  You found that to be material

12   and you found that the failure to turn it over was a legal

13   cause of his conviction.

14        That issue is not to be relitigated at this time.

15   That finding entitles Mr. Drumgold to compensation for the

16   actual damages he suffered.  You must fix the amount of

17   money damages which will reasonably and fairly compensate

18   him for the harm suffered as a result of his conviction.

19        The elements of injury and harm which you should

20   consider in calculating these damages which we call

21   compensatory damages include any fear, anxiety, emotional or

22   other emotional distress or harm which the defendant

23   suffered during or after the conviction, any emotional

24   distress, anxiety or other mental harm which the plaintiff

25   suffered as a result of his imprisonment, any humiliation,

1    embarrassment, loss of self-respect or esteem or any fear,

2    anxiety, emotional or other mental distress that the

3    plaintiff has suffered as a result of the violations of his

4    civil rights that you have found.

5         Damages from mental distress should not result in

6    a windfall to the plaintiff, the plaintiff is only entitled

7    to the damages that he can prove to you by a fair

8    preponderance of the evidence.

9         Now, although this stage is about damages

10   attributable to the conduct of Officer Callahan that you

11   have found, an issue has arisen with respect to causation

12   that also relates to damages.  A defendant may be held

13   liable for the consequences of his actions including actions

14   attributable to intervening events like the acts or

15   omissions of third parties when those intervening events are

16   reasonably foreseeable to him.  Sometimes we speak of a

17   chain of causation.  A defendant is responsible for all the

18   consequences in that chain unless the chain is somehow

19   broken by a significant intervening event that is

20   unforeseeable to the defendant.

21        Bear in mind that on this issue whether there was

22   a significant intervening cause that broke the chain of

23   causation, Officer Callahan has the burden of proof by a

24   preponderance of the evidence.  So what is a significant

25   intervening unforeseeable event in the context of this case?

154

1   A prosecutor has a continuing duty to disclose exculpatory

2   evidence that comes to his attention even after a

3   conviction, and if the prosecutor decided not to turn it

4   over, that decision may break the chain but only if that

5   decision is independent of the defendant's original actions

6   in withholding the information.

7           Specifically you must find, A, that the prosecutor

8   in the Drumgold case actually received the information which

9   the officer failed to disclose prior to the conviction.  B,

10  that the prosecutor received it in a fashion that would have

11  enabled him to exercise an independent decision about

12  whether it should have been turned over.  And, C, that the

13  prosecutors' failure to turn over that information was not

14  foreseeable to Officer Callahan.

15          Bear in mind, however, that if you find the

16  prosecutor did make an unforeseeable decision not to

17  disclose information at some point after Shawn Drumgold's

18  trial, Officer Callahan is still liable for any harm

19  suffered before that decision.

20          Now, Jen, can you put up the verdict slip?  So

21  there are two questions on the verdict slip, and, again, the

22  answer to question 1, in answering question 1, you do have

23  to resolve this question of intervening cause that I've

24  already instructed you on, but you're asked what amount of

25  compensatory damages do you award to the plaintiff?  Then do

1    you award interest on the compensatory damages?  We simply

2    ask you to say yes or no.

3            If you determine that compensatory damages should

4    be awarded to the plaintiff, you must also decide whether to

5    award interest.  This lawsuit began approximately five years

6    ago.  You may award interest on the sum which you have

7    decided is an appropriate compensatory award from that time

8    to the present.

9            Whether you do award interest should depend upon

10   whether you conclude that interest is necessary to

11   compensate the plaintiff fully for any injury suffered

12   bearing in mind that the plaintiff has not had the use of

13   the damages you award during the time this litigation has

14   been pending.  If you do award interest, the actual sum will

15   be computed by the clerk at the rate provided by law.  So

16   we're simply asking a yes or no answer to that question.

17   We'll take a moment again at sidebar to talk to counsel and

18   then you'll have the case for your decision.

19            (THE FOLLOWING OCCURRED AT SIDEBAR:)

20            MR. REILLY:  Your Honor, has the jury been

21   instructed the superseding cause needs to bring a kind

22   different in harm?

23            MS. HARRIS:  I object to that because the

24   statement is dealing with negligence, it's not dealing with

25   a civil rights.

1          THE COURT:  Put your objections on the record.

2          MR. REILLY:  Otherwise they result from acts of

3    negligence.  Secondly, the superseding cause needs to be

4    extraordinary rather than ordinary in view of the

5    circumstances at the time of its operations.

6          THE COURT:  Okay.

7          MS. SCAPICCHIO:  Judge we would just object to the

8    whole instruction on superseding to save that objection.

9          MS. HARRIS:  Your Honor, we would object to your

10   examples in breaking the chain of causation, your subparts

11   A, B and C of your instructions to the extent that it

12   require the jury to find Beauchesne as opposed to anybody

13   else, as opposed to anybody else in the office actually

14   received this information.

15          I raise an objection to as much the interest

16   instruction that suggests he did not have the use of damages

17   only for the reason we're not talking about any kind of lost

18   wage, and I would suggest that any compensatory damage the

19   jury is awarding is stemming only from emotional distress,

20   as I understand it, and I would suggest that interest on

21   that award will be subsumed in the overall award that they

22   fashion so I would raise a separate objection to the

23   interest.

24          THE COURT:  We have the opportunity to deal with

25   that because we've separated out the questions.

1          MS. HARRIS:  I would also ask if there's going to

2     be a question on the jury form for superseding cause.

3          THE COURT:  No, I told them to consider it as part

4     of the damages.

5          MS. HARRIS:  I object to it as well.  Your Honor,

6     I did object to the verdict slip, I think interest whether

7     or not there was a superseding, intervening cause, and if so

8     what amount of damages do they award against Callahan and

9     not against anyone else?

10          THE COURT:  The verdict slip is identical to the

11     verdict slip in the first case.  It's absolutely identical

12     in all respects, so you had an opportunity to see it.  Just

13     one second.

14          THE COURT:  Have either of you, have the

15     defendants provided me with verdict slips?

16          MS. HARRIS:  We have not, your Honor.

17          THE COURT:  Thank you.

18          MR. CURRAN:  Judge, one last issue, I don't know

19     if it was raised if they do find it was a superseding

20     cause.

21          THE COURT:  I did.

22          (SIDEBAR CONFERENCE WAS CONCLUDED)

23          THE COURT:  You have the exhibits from Phase I

24     that are still in the jury room.  We don't clean them up.

25     We'll ask you to go to the jury room again and the rules

1    that I said with respect to deliberations apply again, it's

2    a group process.  We asked all of you to participate.  If

3    you wish to communicate with us, you need to communicate in

4    writing.  You let us know, your verdict has to be unanimous.

5    You let us know how long you wish to stay, how long you wish

6    to stay today or whenever and during the course of your

7    deliberations, you're only to talk to each other and nobody

8    else and not certainly to read anything else other than the

9    evidence that has been presented to you at Phase I as well

10   as Phase II.  With that ladies and gentlemen, all rise for

11   the jury.

12          (A recess was taken.)

13          (THE FOLLOWING OCCURRED IN JUDGE'S LOBBY:)

14          THE COURT:  I was just concerned about the

15   intervening cause issue.  Ordinarily one doesn't have to ask

16   special questions of the jury, but this is a situation where

17   that could either be -- this is not a yes or no answer.  If

18   they found intervening cause, you could still get a damage

19   award, it would just be a damage award from October to

20   January.

21          So, the issue is if there were post trial motions

22   whether or not the defendant met his burden of proof, we

23   would have to guess from the size of the verdict what they

24   did, and that's a problem, and I didn't realize that was a

25   problem.  Here's the two alternatives, one alternative is

1     that we wait to see what the verdict is and then we ask them

2     the next question would be did you find superseding cause?

3     That has the advantage of not messing around with their

4     deliberations right now.  The other would be, and there's no

5     reason why we can't do that, say did you find superseding

6     cause, yes or no, or we could amend the verdict slip now, I

7     have to bring them back into the courtroom.

8              MS. SCAPICCHIO:  I prefer to wait.

9              MR. REILLY:  I would rather wait.

10             MR. ROACHE:  I prefer to amend the verdict slip.

11             MS. SCAPICCHIO:  How is that not surprising?

12             THE COURT:  Right.  Because it really just

13    occurred to me it's not a situation if they found X, there

14    would be no damages, it would be different damages, and,

15    therefore, if I would have to have post trial issues, we'd

16    have no way of knowing, we'd have to guess.

17             MR. REILLY:  I think there would be verdicts they

18    had or they hadn't at the extremes, and so if they came back

19    with an extremely high verdict, I think it would be beyond

20    dispute they hadn't found it.

21             THE COURT:  Do you want at this late in the day to

22    be guessing at anything?

23             MR. REILLY:  We could send them back.  There's no

24    reason why we can't send them back.

25             MR. ROACHE:  Well, there is, it depends when they

1    do come back and the availability of the Court to address

2    that issue with them.

3            THE COURT:  I will have Judge Woodlock, he loves

4    baby-sitting for my juries, nobody has to do anything

5    usually.  With all due respect, I think the question needs

6    to be answered by you or the instructions should be given by

7    you, and that's why I think.

8            MR. REILLY:  That's not a long deliberation.

9    We've already made a decision, it's a decision they've

10   already made at that point.

11           MR. ROACHE:  That's why, your Honor, I wish we had

12   seen the verdict slip before.

13           THE COURT:  I wish I had gotten one from you.

14           MR. ROACHE:  Well --

15           THE COURT:  Gee, we're even it seems to me because

16   we were doing this all on our own.

17           MR. CURRAN:  He's not in the case anymore.

18           THE COURT:  I wish I had gotten one from the two

19   of you.  If the redacted, if they don't have everything as

20   yet, perhaps the best thing to do is if we can redo this

21   verdict slip now and give it to them without explanation,

22   don't have to pull them in again because the explanation was

23   already in the instructions that would be the compromise, I

24   just don't want to bring them down again and bring them up.

25           MS. SCAPICCHIO:  I think, Judge, you put the

1  verdict slip up and went over it with them.  They're not

2  dumb, they're going to say it now has three.

3          THE COURT:  We'll say amended verdict slip, do you

4  find intervening cause.  We'll put it in terms of the burden

5  of proof.  Do you find that Officer Callahan has met his

6  burden of proof?

7          MS. SCAPICCHIO:  By a preponderance of the

8  evidence.

9          THE COURT:  By a preponderance of the evidence in

10  the conclusion that there was an intervening cause, period,

11  and then do you find that the plaintiff has proven damages

12  by a preponderance of the evidence, we'll make it equal and

13  then have a number and then have the interest question and

14  just give it to them with explanation, we can give it to

15  them and indicate that if they have a question, they can ask

16  about it.

17          MR. ROACHE:  You'll give them a copy of the

18  written instructions.

19          THE COURT:  Yes.

20          MS. SCAPICCHIO:  Here's my problem with that,

21  you've already told them that once they've found that

22  Detective Callahan withheld exculpatory evidence and not

23  turned it over to the prosecutor that Drumgold was entitled

24  to damages, now you're going to tell them that we have to

25  prove damages by a preponderance of the evidence.

1          THE COURT:  No, I've already said that you have to

2     prove damages by a preponderance of the evidence.

3          MS. SCAPICCHIO:  Right.  But the verdict slip says

4     what's the compensatory damages.

5          THE COURT:  You're only talking about the order,

6     then perhaps the question is compensatory damages because

7     that would be the case with or without intervening cause.

8          MS. SCAPICCHIO:  Right.

9          THE COURT:  Second would be intervening cause.

10          MS. SCAPICCHIO:  If any.

11          THE COURT:  If any.  We can try to do this, we'll

12     wait for now, see what they do.  There's really no bar to

13     asking them the question afterwards.

14          MS. SCAPICCHIO:  I just think it's cleaner to ask

15     something afterwards.

16          MR. ROACHE:  I think we had that problem in the

17     first trial, your Honor.

18          THE COURT:  I know.

19          MS. HARRIS:  I was just going to say.

20          THE COURT:  Nobody wanted me to go back where here

21     it seems to me, well, the difficulty is we won't know is the

22     problem.  There will be a number, and it could be a high

23     number, even four months, one doesn't know, and the question

24     is whether we then would speculate, and, gees, at some point

25     I don't want to speculate about anything, let me draft

1    something, show it to you, if you wait just a second.

2          My preference would be to draft it, to call it an

3    amended verdict slip and send it up there with a note that

4    if there are any questions they should let us know.  If you

5    prefer to have everyone come out again we can do that, but

6    it will delay.

7          MR. ROACHE:  I don't think it will be necessary if

8    they come out, if they have written instructions, just the

9    amended verdict slip.

10          THE COURT:  Do you have to go to Judge O'Toole?

11    Is that okay?

12          MS. HARRIS:  He's winding down and he's been very

13    accommodating.

14          THE COURT:  Stay out there, and we'll get you a

15    copy.  We already have a question?

16          THE CLERK:  It's a note.

17          THE COURT:  They want to leave at 3:45.  "For

18    Thursday and Friday, the 22d and 23d, we're not available to

19    deliberate."  Because I'm not going to be here tomorrow so I

20    really want to give them that amended verdict slip.

21          MS. SCAPICCHIO:  What does it say?

22          THE COURT:  For, Monday, 10-19, "We would like to

23    leave at 3:45.  For Thursday and Friday we're not available

24    to deliberate."

25          MR. ROACHE:  Did you say for Tuesday?  For

1    Thursday and Friday.  Monday and Tuesday they want to leave

2    at 3:45?

3              THE COURT:  No, just today is 3:45.  I'll say

4    goodbye to them at 3:45.  At that point I will give them an

5    amended verdict slip after I show it to you.

6              MR. CURRAN:  Judge, I saw TV reporters.

7              THE COURT:  I saw.

8              MR. CURRAN:  The other issue which I was going to

9    bring to the Court's attention, the Internet, it's always

10   about newspapers, reading The Herald or Globe and the

11   Internet, even though The Herald paper, the article was

12   buried, you go on the Internet bang, it's the first thing.

13   I ask that that instruction be incorporated.

14             THE COURT:  Having spoken out loud and figured out

15   what I'm doing while we're speaking, since I'm going to say

16   goodbye to them at 3:45, by that point we'll have the

17   amended verdict slip and then we'll give them a robust don't

18   turn on anything.

19             MR. CURRAN:  Would your Honor entertain a proposed

20   verdict slip during the interim now at 3:45?

21             THE COURT:  You can.  You will, too.  Thank you.

22             (LOBBY CONFERENCE WAS CONCLUDED.)

23             THE CLERK:  Exhibits 1 through 17 are all agreed

24   upon?

25             MS. SCAPICCHIO:  They are from the plaintiffs.

1          THE CLERK:  Defendants?

2          MR. CURRAN:  Yes, satisfied.

3          (A recess was taken; jury deliberating)

4          THE CLERK:  All rise.

5          THE COURT:  You can be seated.  Ladies and

6     gentlemen, there was a change in the verdict slip which

7     we'll give you tomorrow morning.  There's an amended verdict

8     slip.  There was a question that was left out so I'll give

9     that to you in the morning.  In the morning you'll have the

10    jury instructions, the written version of what I gave you

11    orally.

12          Please don't read about this case.  Don't read

13    about this case.  Don't read about any case involving the

14    Boston Police or constitutional accusations, don't do any

15    internet research, don't Google anything, don't Twitter

16    anything, you know, just don't even probe or pry about what

17    could possibly be going on in the outside world about this

18    case.

19          Your focus should be on the information you've

20    heard in this courtroom and nowhere else.  I'll greet you in

21    the morning when you -- well, you actually can begin

22    deliberating.  I will be around.  You can begin deliberating

23    when all of you are in the jury room.  I will be here until

24    about 10:30 and another Judge will be supervising your

25    deliberations.  I will be in close touch.

1          .

2          THE COURT:  Mr. Roache, I had a much simpler

3    verdict slip.  I take it the plaintiffs disagree because the

4    plaintiffs and defendants disagree about everything?

5          MS. SCAPICCHIO:  Absolutely.

6          THE COURT:  Right, you disagree?

7          MS. SCAPICCHIO:  Yes, I do, especially in the

8    light of superseding comes even before a determination of

9    compensatory damages.

10         THE COURT:  You like mine better?  You don't like

11   mine either, but you like mine better than his?

12         MS. SCAPICCHIO:  I do, I still object to the

13   superseding issue, question, being included, but I like

14   yours better than Mr. Roache's, yes.

15         THE COURT:  Might as well end this case the way we

16   began it with no one agreeing to anything.

17         MS. HARRIS:  I agree with Mr. Roache's.

18         THE COURT:  Mr. Curran, you agree with Mr. Roache.

19         MR. ROACHE:  Your Honor, my fear is based on the

20   admitted verdict slip, it's still rather vague as to what

21   the jury is actually finding when you ask, you know, did you

22   find that there was an intervening cause, but there should

23   be a follow-up to that and to make it more defined as to

24   what the jury is actually finding as far as damages are

25   concerned.

1          THE COURT:  I understand that, but they could

2    find, you know, $10 million from October, 1989 to January,

3    1990.  In other words, there's an award of damages here

4    whether there is superseding cause or not.

5          MR. ROACHE:  I agree.

6          THE COURT:  The only question becomes remittitur

7    which is if they found it in four months, I would have to

8    make an adjustment or arguably make an adjustment, that's

9    the only question.  That's why I submitted the proposed,

10   your Honor.  The Court put it all into context so it would

11   give your Honor some idea of what is an appropriate damage

12   award.

13         THE COURT:  Okay.  Let me take a look at it and

14   I'll see you in the morning.  We'll let them begin

15   deliberating, but I'll come out and talk to you about the

16   verdict slip, and we'll give it to them at that time.

17         MR. CURRAN:  Judge, in regards to that aspect I

18   think sooner as opposed to later than in the morning because

19   I do expect that they'll be some coverage in the papers

20   before they have a substantive group of discussions that we

21   go through that colloquy on the Internet and newspaper.

22         THE COURT:  And Twitter.

23         MR. CURRAN:  I still don't know what Twitter is.

24   I'm still behind.

25         THE COURT:  We'll have a seminar.

1          THE CLERK:  All rise.

2          (Whereupon, the hearing was suspended at

3     3:54 p.m.)

4                    C E R T I F I C A T E

5

6     UNITED STATES DISTRICT COURT )

7     DISTRICT OF MASSACHUSETTS     )

8     CITY OF BOSTON                )

9

10         I, Valerie A. O'Hara, Registered Professional

11    Reporter, do hereby certify that the foregoing transcript

12    was recorded by me stenographically at the time and place

13    aforesaid in No. 04-11193-NG, in re:  Shawn Drumgold vs.

14    Timothy Callahan and thereafter by me reduced to typewriting

15    and is a true and accurate record of the proceedings.

16                         /S/ VALERIE A. O'HARA

17                         _____

18                         VALERIE A. O'HARA

19                         REGISTERED PROFESSIONAL REPORTER

20                         DATED OCTOBER 9, 2009

21

22

23

24

25