1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

3

4

5

6   SHAWN DRUMGOLD,          )  C.A. No. 04-11193-NG

7           PLAINTIFF       )  Courtroom No. 2

8   VS.

9   TIMOTHY CALLAHAN, ET AL.,)  1 Courthouse Way

10          DEFENDANTS      )  Boston, MA  02210

11

12              JURY TRIAL DAY 1

13              JURY IMPANELMENT

14              MARCH 3, 2008

15               9:40 a.m.

16

17

18

19

20

21       BEFORE THE HONORABLE NANCY GERTNER

22       UNITED STATES DISTRICT COURT JUDGE

23

24          VALERIE A. O'HARA

25        OFFICIAL COURT REPORTER

1    A P P E A R A N C E S:

2        ROSEMARY CURRAN SCAPICCHIO, ATTORNEY, Four Longfellow
     Place, Boston, Massachusetts  02114, for the Plaintiffs;

3

4        Tommasino & Tommasino, by MICHAEL W. REILLY, ESQ.,
     Two Center Plaza, Boston, Massachusetts  02108, for the
     Plaintiff;

5

6        Roache & Malone, LLP, by JOHN P. ROACHE, ESQ., 66 Long
     Wharf, Boston, Massachusetts  02110, for the Defendants.

7        Bletzer and Bletzer, P.C., by HUGH R. CURRAN, ESQ., 300
     Market Street, Brighton, Massachusetts  02135, for the

8    Defendants;

9        Law Offices of William M. White, Jr. and Associates,
     WILLIAM M. WHITE, JR., ESQ., 218 Lewis Wharf, Boston,

10   Massachusetts  02110;

11       Morgan, Brown & Joy, LLP, by MARY JO HARRIS, ESQ., 200
     State Street, Boston, Massachusetts  02109-2605, for the

12   Defendants.

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1        THE CLERK:  All rise.  United States District

Court is now in session.

         THE COURT:  You can be all seated.  I wanted to

chat with you a little bit to tell you what's happening.

Right now certain number of jurors are getting the

questionnaires.  I just went and talked, went to the jury

room, I spoke to the jurors, just told them to be careful in

filling out of the questionnaires and all of that.

         I would imagine in about an hour we'll get the

questionnaires back.  We will separate them so everyone has

their own copies.  They'll be three copies, one for the

court, one for the plaintiff, one for the defendants.

         There are questions at the beginning of the

questionnaire about disability and about whether the jurors

can serve for six weeks.  As Maryellen may have communicated

to you, my goal here would be to immediately disqualify

anyone that has any problem so that we're struggling with

people that can serve and move on.

         So I would urge your cooperation to identify

anyone who's clearly disabled, can't participate or clearly

has a problem in serving for this period of time, then we

bring everyone in here who is left, I'll ask the disability

and the can you serve question again because there's

invariably somebody who didn't quite get it.  I'll ask

1    whether people are familiar with the witnesses, I'll read

2    that list very slowly.

3           If you can come up with a three-page,

4    three-sentence description of the case, fine, if you can't,

5    I will do it and show it to you in about a half an hour.

6    It's something you really need to do, really three sentences

7    is all, the kind of description of the case that would

8    enable anyone who has heard about the publicity to

9    immediately know what the case is about because be the

10   purpose of this would be to get that questionnaire.

11          I will ask each of you to introduce yourself and

12   your clients to the jury and see if anyone knows you, then

13   we will go upstairs into the jury room and question jurors

14   individually.  I don't know if the press is interested in

15   listening to the jury questioning, if the press is

16   interested, then we would have to move this to an open

17   courtroom, which is what I've done in another jury

18   selection.

19          Ordinarily they are not interested in this, and

20   this is going to take some, time but the optimal situation

21   would be to do this in the jury room.  Clients can be there

22   around the table, we'll just have to figure out the seating

23   arrangement, Maryellen, and we'll go juror by juror.

24   They'll be five minutes of questioning per side so that the

25   defendants will have to take turns who questions.

1          My advice to you is I won't allow questions about

2     legal matters.  In other words, in a criminal case, I don't

3     allow the lawyers to say what do you really think about the

4     presumption of innocence or what do you think about burden

5     of proof because I'm confident that I can instruct people on

6     the law.

7          You certainly can follow up on some of the issues,

8     for example, that were in your questionnaire, attitudes to

9     the police, attitudes to civil rights actions, those things

10    that have to do with attitudes towards the issues in this

11    case but not anything that has to do with legal matters, the

12    kinds of things that I would instruct about, and if you get

13    into that, I'll stop you.  I'll also monitor the five

14    minutes.  When you go through each jury, you have to take

15    fabulous notes.

16         One of these days we'll be able to take pictures,

17    but you have to take fabulous notes because we won't be

18    finished, likely not be finished with clearing everyone for

19    cause, and it may spill over until tomorrow, and then you'll

20    exercise your peremptory challenges not in the usual case

21    with 12 or 14 people in the box because some will be cleared

22    today and some will be cleared tomorrow, you'll have to do

23    it from your memory.

24         The peremptory challenges, as I said, will be five

25    on each side.  Again, the defendants have to exercise that

1    together.  We figured that we would clear how many people

2    for cause, Maryellen?  24.  Clearing people for cause means

3    if at the end of today we had 24 people who we had

4    questioned, had the questionnaire questioned in open court,

5    questioned individually and there were no cause changes,

6    then we stop and you exercise those challenges as to that

7    group.

8         If you exhaust all your challenges, both sides,

9    then the first 14 is the jury.  If you don't exhaust all

10   your challenges, then the first 14 is still the jury,

11   although there may be people unchallenged in the rest of the

12   pool, so it sounds way more complicated than it is.  We give

13   the jurors as we question them a number to call, hopefully

14   at the end of the day tomorrow to find out if they're on the

15   final jury.  If we have selected a jury by the end of

16   tomorrow, then openings will be Wednesday, okay.  So I think

17   you can go and get another cup of coffee, I don't think

18   we'll see the jury until 11.

19         MS. SCAPICCHIO:  Could I ask a quick question,

20   your Honor?

21         THE COURT:  Yes.

22         MS. SCAPICCHIO:  I know there were some schedule

23   changes, and I'm just trying to figure out.

24         THE COURT:  Wednesday, we're going to sit on

25   Wednesday.

1          MS. SCAPICCHIO:  Wednesday we'll do openings and

2     call our first witness.

3          THE COURT:  Yes, if the jury is selected by the

4     end of the day tomorrow, if not, then we have another day.

5          MS. SCAPICCHIO:  Is there a limit for openings, in

6     other words, am I trying to figure out how many witnesses I

7     need for Wednesday.

8          THE COURT:  There are limits for openings.  You

9     tell me how much time you think you'll need, and then I'll

10    decide.  Let me say this, I was just telling my clerks about

11    this, I do not run a trial, some of you have tried cases in

12    front of me, with, you know, artificial deadlines, you know,

13    you have 10 minutes to cross-examine.

14          I'm too much the old trial lawyer to want to do it

15    that way because I remember how much I chastised that.  By

16    the same token, I'll monitor the case in terms of the

17    merits.  If you're repetitive, I'll intervene, if it's going

18    nowhere, I'll intervene, so it will be substantive

19    intervention and not time limits, so this is a long trial.

20    Lengthy openings will fall on deaf ears to a jury that

21    doesn't know any of the details, so you tell me what you

22    think you need.

23          MS. SCAPICCHIO:  I think 20 minutes.

24          THE COURT:  That's what I was going to recommend,

25    okay.  Is each of the defendants going to open?  Are each of

1    the defendants going to open?

2              MR. CURRAN:  We have not made that decision,

3    Judge.  I know one of us will be opening.  Twenty minutes is

4    fine, that's if I have my voice by Wednesday.

5              THE COURT:  I hope you're not the one opening.

6              MS. HARRIS:  Could I ask a question following up

7    your voir dire, would it be contrary to what you just said

8    if we were to ask questions about whether a specific juror

9    would have difficulty deciding the law as you instructed it

10   when it gets to their personal views.

11             THE COURT:  That's okay.

12             MS. HARRIS:  Thank you.

13             THE COURT:  That's okay.  That's sufficiently

14   general.  What I'm saying is, you know, I've seen defense

15   lawyers, mostly in criminal cases, doing things like saying

16   do you think that if someone's indicted they're likely

17   guilty.  The answer is 90 percent of the public is going to

18   say yes.  That doesn't necessarily mean that when sitting in

19   this box they won't be guided by the instructions, and, as I

20   said, having done this for a number of years myself, I

21   actually believe that they are guided by the instructions,

22   so those kinds of direct questions I won't let you ask.

23   Okay.  So get another cup of coffee, and you need a cup of

24   tea.

25             MR. CURRAN:  Just one question, we did comply with

1    your orders in regards to the IT issues.

2              THE COURT:  Yes.

3              MR. CURRAN:  We do have our IT gentleman here,

4    Mr. Natanagara, and my question is this now that you're

5    going to be sitting on Wednesday, instead of having sitting

6    here, we prefer to try to get him organized to get all his

7    equipment in so could I excuse him?

8              THE COURT:  Absolutely.  No witnesses until

9    Wednesday at the earliest, and with respect to what you've

10   turned over, I would want the plaintiffs' counsel to look at

11   that and tell me, I mean to look at it and decide, A,

12   whether or not you have a problem and want a voir dire, and

13   if you don't, then you can proceed.  If you do, then we'll

14   have a voir dire.

15             MR. CURRAN:  We do not intend to use it in our

16   openings.

17             THE COURT:  You do not, okay.

18             MS. SCAPICCHIO:  The only issue I have is I don't

19   how to manipulate their stuff.  If they're going to use it,

20   then I may need to learn how to manipulate it.

21             THE COURT:  They'll help you learn.

22             MR. CURRAN:  There's another issue, Judge.  We'll

23   provide a second affidavit.  The software is a proprietary

24   of WIN Interactive, not us.  There's an issue there.  I have

25   a problem with us doing preparations, spending the

1    significant amount of money for them to use our

2    interactive.

3            THE COURT:  Well, I think if WIN Interactive is

4    doing what they did before, I think that we're not talking

5    about -- it's not a big deal.  In other words, if it's a

6    question, as I understand it, these are reconstructions of

7    the scene.

8            MR. CURRAN:  Illustrations.

9            THE COURT:  Illustrations of the scene.  If

10   there's a witness on the stand and Ms. Scapicchio wants to

11   highlight something at the scene, she can ask one of you do

12   it or you can teach her how to circle something.  I don't

13   think you're talking about rocket science.  I don't mean to

14   mean demean the expert.  What went into the picture may well

15   be rocket science.  Since you're asking lawyers, I assume

16   that the operation of it doesn't take rocket science.  I

17   know that all of you are completely --

18           MR. CURRAN:  Judge, the issue is this.  We spend

19   the money so our preparation of our evidence has an impact

20   on the jury.  They went to Brian Carney a year ago and

21   asked -- he said he already was.  They've had every

22   opportunity to do the same thing.  Now they want to benefit

23   from our work.

24           THE COURT:  But if you had a model, the

25   pre-electronic stuff, you had a model and you set it up the

1    way you wanted to set it up, opposing counsel could take

2    that model and say, okay, this is what they presented, take

3    a look at this, take a look at that, take a look at this.

4    There's nothing wrong with that, so I don't know exactly,

5    and, likewise in the Limone case, for example, WIN

6    Interactive did a wonderful timeline.  The timeline was just

7    a timeline, it was just factual.

8         The government, even though this is something they

9    did something for the plaintiffs, the government could

10   easily do that as well.  I understand what you're saying,

11   but it seems to me, we'd have to take a look at it, but to

12   have her be able to note things in your presentation seems

13   to me par for the course.

14        MR. CURRAN:  They've had the same things, they've

15   had access to still photography, they can blow it up.  If

16   they want to share the cost, I mean, if you're going to

17   order us, they should share the burden and the cost of the

18   development, Judge.

19        THE COURT:  They have to be able to cross-examine,

20   and their ability to cross-examine includes the ability to

21   access what it is.  There are two levels of

22   cross-examination, one is the underlying documents, the

23   other is the presentation.  They need to be able to access

24   the presentation to cross-examine.  I'm not sure what that

25   means concretely, but if we need a voir dire on this, I

1   think you should try to cooperate on this issue.  Anything

2   else?

3          MR. CURRAN:  Judge, WIN Interactive has asked me

4   to submit an affidavit of Brian Carney for the purposes of a

5   protective order.

6          THE COURT:  Absolutely.  Give me a protective

7   order, and I'll sign it.

8          (A recess was taken.)

9          THE CLERK:  All rise.  United States District

10  Court is now in session.

11         THE COURT:  Good afternoon, everyone, you can be

12  seated.  I saw you before in the jury room.  My name is

13  Nancy Gertner, and I'm the Judge in this case.  As I

14  mentioned, we'll ask questions of you as a group.  It's been

15  my experience that those are the general questions and that

16  it's much better to talk to people individually because

17  you'll be more comfortable if we talk to you individually.

18         It lengthens the process, but I think it's the

19  fairest way, so the first thing that's going to happen is

20  that Ms. Molloy will swear you as jurors, as potential

21  jurors so that your questions are under oath.  Please

22  stand.

23         (Prospective jurors were sworn)

24         THE COURT:  You can be seated.  I'm going to do

25  this in a little bit of odd order.  First I want to tell you

what the case is about very generally and ask if any of you

have read, seen or heard anything about the case, then I'm

going to ask you, I'm going to tell you how long the case is

going to last bearing in mind we go 9 to 1 so if any of you

have responsibilities in the afternoon, you'll be out of

here at 1:00.

There are a few days in which neither court or

counsel can be here, and we'll let you know what those days

are, but then I'll ask so that my second question will

pertain to whether any of you have problems, serious

problems with the length of this trial, and then I'm going

to read a list of witnesses, and the list of witnesses is

everybody that anybody could imagine would testify in this

case.

Don't be daunted by the list of witnesses.  We try

to forecast any problems that might happen in the case, and

the parties will also introduce themselves to you, and then

we'll go into the lobby for individual voir dire.  Actually

let me do it this way.  Let me first tell you what the case

is, and then I'll see if any of you have problems serving

during the period of time.

This is a civil rights action in which the

plaintiff Shawn Drumgold alleges that he was convicted of

the murder of Tiffany Moore because of the unconstitutional

actions of the defendant police officers and the defendant

1    City of Boston.  Specifically he claims deliberate

2    misconduct on the part of the defendants Richard Walsh,

3    Timothy Callahan, former police Commissioner Mickey Francis

4    Roache and the City of Boston.

5         The defendants deny all allegations of misconduct.

6    So that is the case that we are hearing now.  We'll ask you

7    whether you have heard about that case when we talk to you

8    individually.  The trial will last until April 18th.  We

9    will, as I said, we'll be sitting 9 until 1, and when I say

10   the trial lasts until April 18th, I mean that.

11        It could be less than that, but it will not be

12   more than that.  It will not be more than that.  April 18th

13   is the last day of the evidence, and whether or not the case

14   lasts longer will then depend upon the deliberations of the

15   jury.  In other words, I can control part of the case, but

16   once the case goes to a jury for deliberation, I can't

17   control that part of the case obviously.  That's up to the

18   jury completely and totally.

19        So, I'm going to ask those of you who have a plane

20   ticket, a medical procedure, impossible demands that make it

21   impossible for you to serve, I'll ask you to stand up, but

22   first let me tell you how important it is that we have as

23   diverse a jury as we could possibly get, that jury service

24   is not easy for anyone, but if it's enough to avoid the

25   responsibility of jury service to say I'm sorry, it's

1    inconvenient, we wouldn't have a very diverse jury at all.

2    Everyone has important responsibilities, so having said all

3    of that, is there anyone among you that absolutely cannot

4    serve during this period of time until April 18th?  Please

5    stand.

6            I'm going to, as I read your name, I'm going to

7    ask you to sit.  Oh, my, Ms. Grokulsky, if I mangle your

8    name, please let me know, juror No. 1; Mr. Williams, jury

9    No. 4; Ms. Lynn Biddle, juror No. 30; Ms. Carilli, juror

10   No. 26; Mr. Lucia and Mr. Shaban, jury No. 22 and jury

11   No. 24 in the next row; Mr. Simard, jury No. 43;

12   Mr. McDougall.

13           THE JUROR:  McDonagh.

14           THE COURT:  I'm sorry, McDonagh, juror No. 59;

15   Mr. Hoffman, juror No. 61; Ms. Miller, juror No. 56;

16   Ms. Paek, juror No. 49; I forgot two over here, Mr. Apple,

17   did I have that right?  I'm sorry, Mr. McGrath.

18           THE JUROR:  Yes.

19           THE COURT:  Juror No. 15, and Mr. Ryan --

20           THE JUROR:  Haberlin.

21           THE COURT:  Haberlin, juror No. 12.  Then in the

22   last row, Mr. McCue and Mr. NievNieva, juror 65 and 67

23   and --

24           THE JUROR:  Dupaul.

25           THE COURT:  Mr. Dupaul, this requires knowing my

1  right from my left, which is a little bit of a difficulty.

2  I think we should see these individuals first.  Counsel at

3  sidebar.

4          THE COURT:  If we could have juror No. 1,

5  Ms. Grokulsky, Mr. Williams, Mr. Haberlin, Mr. McGrath

6  first.

7          (THE FOLLOWING OCCURRED AT SIDEBAR:)

8          THE COURT:  What's the problem?

9          THE JUROR:  We're in a margin systems

10  implementation, I work at Northeastern University, and I'm

11  actually away at a conference the second week in April.

12          THE COURT:  Okay, I'll excuse you.  Thank you.

13  Juror No. 4, Mr. Williams.  Hi.

14          THE JUROR:  I have a medical condition where

15  unexpectedly I have to leave to go to the bathroom.  I had

16  an attack five or ten minutes ago.

17          THE COURT:  Okay, I'll excuse you, sir.

18  Mr. Williams, thank you very much.  Juror No. 4 is excused,

19  Mr. Haberlin.  Hi.

20          THE JUROR:  I'm self-employed.  If I'm out of work

21  for two months, I could lose my work.

22          THE COURT:  What kind of work do you do?

23          THE JUROR:

24          THE COURT:  Let the record note that the Judge

25  made a face.  You can't go 9 to 1.

```
 1              THE JUROR:  I can't.

 2              THE COURT:  Okay, I'll excuse you.  Juror No. 12.

 3    Mr. McGrath, juror No. 15.  Mr. McGrath.  Hi.

 4              THE JUROR:  Yes, Judge, I have nonrefundable plane

 5    tickets going out Thursday and coming back Sunday.

 6              THE COURT:  That will do it, you're excused.

 7    Next, Juror No. 26, Ms. Carilli, Mr. Biddle, Mr. Lucia and

 8    Mr. Shaban.  Ms. Biddle.  No. 26, Ms. Carilli.

 9                   .

10              THE JUROR:  I have a vacation April 10th, we're

11    going down to Pennsylvania.

12              THE COURT:  Thank you.  Juror 26 is excused.  The

13    next juror?  Hi.

14              THE JUROR:  Lynn Biddle.

15              THE COURT:  This is juror No. 30.

16              THE JUROR:  And my reason is that every once in a

17    while I get migraines about once a week, and I can't do

18    anything when I have a migraine.

19              THE COURT:  Literally every week?

20              THE JUROR:  Just about.  Since the 23d, I've had

21    two.

22              THE COURT:  And you're totality disabled when this

23    happens?

24              THE JUROR:  For a day, yes, at least.

25              THE COURT:  Okay, I'll excuse you, thank you.
```

1          THE JUROR:  I'd love to be on a jury.

2          THE COURT:  Well, maybe if you go back to the jury

3    room, you could be on a shorter case, okay.  No. 30,

4    Ms. Biddle.  Michael Lucia.  Mr. Lucia, yes, sir.

5          THE JUROR:  Hi, I'm running on a project at work

6    that is going through May.  I'm already halfway through

7    it.

8          THE COURT:  What kind of project.

9          THE JUROR:  I'm working on a county club in

10   Gloucester.  I'm an electrician.  It's a burden for me to go

11   out for that length of time.

12         THE COURT:  Thank you.  Mr. Shaban, hi.

13         THE JUROR:  Ma'am, I am the network guy, I'm the

14   IT person for my company.  There's nobody else who can do my

15   job.

16         THE COURT:  So they will go nuts.

17         THE JUROR:  I can be out one day, cross your

18   finger nothing is going to happen, anything go wrong, no one

19   can take care of it.

20         THE COURT:  What kind of company.

21         THE JUROR:  It's a fabricating company that makes

22   tanks for fire departments.

23         THE COURT:  Okay, I'll excuse you, Mr. Shaban.

24   You will have to go back.  There may be a shorter case.

25         THE COURT:  Juror No. 43, Mr. Simard; juror

1    No. 59, Mr. McDonagh; juror No. 61, Mr. Hoffman; juror

2    No. 56, Ms. Miller.

3            MR. WHITE:  Also 49.

4            THE COURT:  That will be the next one, not in

5    order.  Mr. Simard.

6            THE JUROR:  Hi, I have a vacation all booked up

7    for the 9th.

8            THE COURT:  The 9th of April?  You're excused.

9    Have a wonderful time.

10           THE JUROR:  Thank you.  The next one is

11   Mr. McDonagh.  Hi.

12           THE JUROR:  Hi, John McDonagh, I got a trip

13   planned to the island on April 12th.

14           THE COURT:  You're excused.  Have a wonderful

15   time.  Juror No. 61, Mr. Roblee Hoffman.  Hi.

16           THE JUROR:  I'm scheduled to be in Austin, Texas

17   on March 11th for interviews and relocation and looking for

18   work.

19           THE COURT:  Okay, I'll excuse you, sir.  Thank

20   you.

21           THE JUROR:  Thank you.

22           THE COURT:  Juror No. 61, Mr. Hoffman.  Juror

23   No. 56, Ms. Miller.  Hi.

24           THE JUROR:  Hi.

25           THE COURT:  Juror 61.

1          THE JUROR:  I'm scheduled to be out of town on

2     March 21st.  I have a husband who travels extensively and a

3     child at home.

4          THE COURT:  How old is your child?

5          THE JUROR:  She's 15.

6          THE COURT:  You know, I understand.  I understand

7     you need to be home exactly in those days.  I have had

8     teenage boys.

9          THE JUROR:  Yeah.

10         THE COURT:  That's exactly when you need to be

11    home.  I understand.  So he travels?

12         THE JUROR:  He travels extensively, he's in

13    Mexico.

14         THE COURT:  You have no backup.

15         THE JUROR:  I have no family here, MCAS are coming

16    up, so the schedule is erratic.

17         THE COURT:  You couldn't get home at one and catch

18    her.

19         THE JUROR:  I also to get her at ten during the

20    MCAS and things like that.  I would be very torn.

21         THE COURT:  Okay.  I'll excuse you, thank you.

22    Juror No. 49, Ms. Rosko; juror No. 65, Mr. McCue; juror

23    No. 67, Mr. Nieva; and juror No. 73, Mr. Dupaul.

24         MS. SCAPICCHIO:  Excuse me, Judge, who did you

25    have for 49?

1          MR. WHITE:  49.

2          THE COURT:  Ms. Paek, I'm sorry, I did not mean to

3    call Ms. Rosko, Ms. Paek, hi.

4          THE COURT:  Paek.  So...

5          THE JUROR:  I actually have three separate travel

6    commitments that require me to be out of the area and

7    also --

8          THE COURT:  For your work.

9          THE JUROR:  It's actually board commitments, I'm

10   vice-president of the alumni association at Smith College.

11         THE COURT:  And so you have to go?

12         THE JUROR:  I have to go.  There's no one there to

13   replace me.

14         THE COURT:  That's too bad.  You're excused.

15   Thank you.  65, Mr. McCue.  Hi.

16         THE JUROR:  I have plans to attend the masters,

17   65th birthday, once in a lifetime opportunity.

18         THE COURT:  We understand.  You're excused.  67,

19   Mr. Nieva.  Hi.

20         THE JUROR:  Hi.  I got a trip planned for the

21   27th.

22         THE COURT:  Of March?

23         THE JUROR:  Yes, March.

24         THE COURT:  Going where?

25         THE JUROR:  Going on a cruise to the Caribbean.

1          THE COURT:  Thank you.  Juror No. 73, Mr. Dupaul.

2     Hi.

3          THE JUROR:  Hello.  I have a vacation that I leave

4     for next weekend to Colorado with my wife, and then I have a

5     wedding that I'm in the first week of April.

6          THE COURT:  I'll excuse you.  Juror No. 73.  We'll

7     go back.

8          (SIDEBAR CONFERENCE WAS CONCLUDED.)

9          THE COURT:  I had originally planned to ask if any

10    of you had read, seen or heard about this case.  I think

11    I'll reserve that question for individual questioning.  Let

12    me do this.  Counsel please introduce themselves and their

13    clients starting with the plaintiffs.

14         MS. SCAPICCHIO:  Thank you.  Good afternoon,

15    ladies and gentlemen, my name is Rosemary Scapicchio.  I

16    have a law office here in Boston and together with

17    Michael Reilly --

18         MR. REILLY:  Good afternoon, ladies and

19    gentlemen.

20         MS. SCAPICCHIO:  -- we represent Shawn Drumgold.

21    He's the plaintiff in this case.

22         MS. HARRIS:  I'm Mary Jo Harris, and I represent

23    Timothy Callahan.

24         MR. CALLAHAN:  Good afternoon, everyone.

25         MR. WHITE:  My name is William White.  My office

1   is also here in Boston.

2          MR. CURRAN:  Good afternoon, please excuse my

3   voice.  I'm an attorney in Brighton, Massachusetts.  I

4   represent Richard Walsh.

5          THE COURT:  Counsel.

6          MR. ROACHE:  Good afternoon, my name is John

7   Roache.  I represent two defendants in this case, Francis

8   M. Roache, no relation to me, he is the former police

9   commissioner of the City of Boston Police Department and now

10  currently serves as the Registry of Deeds, and I also

11  represent the City of Boston.  I also have an office in

12  Boston.

13         THE COURT:  Have any of you had any dealings with

14  these lawyers or are related to these lawyers or had

15  dealings with their clients or related to their clients?

16  Okay.  There are no affirmative responses.  Now, I'm going

17  to read a list of trial witnesses, and I would ask the

18  parties tell me anyone who could possibly be called as a

19  witness because we don't want to have in the middle of a

20  trial your long lost cousin suddenly take the stand, so the

21  list is longer than the number of witnesses in this case,

22  but it is really a just in case list.

23         Okay.  So I'm going to go slowly, at the end I'm

24  going to ask you know any of these individuals or are

25  related to any of these individuals.

1          So you'll have to remember who I said.

2     Lola Alexander of Boston; True See Allah, unknown address;

3     Antonio Anthony, Brookline; Josh Banville, Somerville;

4     Maurice Banville, Somerville; Phillip Beauchesne, Boston;

5     Stanley Bogdan, Boston; Tyrone Brewer, formerly of Boston;

6     Phyllis Broker, Boston; Gregory Brown, Boston;

7     Timothy Callahan, Boston; John Canavan, Plymouth; David

8     Carter, Boston; Treas Carter; William Celester, Boston;

9     Christopher Chaney; Shamia Clemons; David Conley;

10    Paul Connolly, Christopher Cousins; Tanoi Curry,

11    Richard Dahill, Boston; John Daley, Boston; Theron Davis;

12    Wayne Davis; Kareem Delahunt; Mark DeLuca of Duxbury;

13    Vincent DeFazio, Boston; Robert Downes, Boston; Juanda

14    Drumgold, Boston; Karen Drumgold, Boston; Rochelle Drumgold,

15    Boston; Shawn Drumgold obviously; Joseph Dunford of Boston;

16    Paul Durand; Larry Ellison; Ricky Evans, Cambridge; Lawrence

17    Fallon; William Fogerty, Boston; Jose' Garcia, Boston;

18    Andrew Garvey, Boston; Thomas Gaughan, G-a-u-g-h-a-n,

19    Boston; Robert George of Boston; Diane Gill, Boston;

20    Thomas Gomperts, G-o-m-p-e-r-t-s; Travis Goss; Olisa Graham,

21    Boston; Jay Groob, Boston; Paul Hadley, Waterville,

22    New York; Diane Paul, Dorchester; Madalyne Hamilton,

23    New York, New York; Leslie Harris, Boston; Robert Hayden,

24    Boston; Romero Holliday, Dorchester; Lisa Holmes, Boston;

25    Charles Horseley, Boston; Gemini Hullum, H-u-l-l-u-m,

1    Boston; Troy Jenkins; Donnell Johnson; Eric Johnson; Wendell

2    Josey, J-o-s-e-y, Boston; Paul Joyce, Boston; Scott Keller,

3    Methuen; Dr. Stanton Kessler, Boston; Matthew King, West

4    Roxbury; Daniel Linsky, Boston; Kevin Lucas; Dr. Michael

5    Lyman, Columbia, Missouri; Gordan Martin, Newton; Ralph

6    Martin, Boston; Paul McDonough, Boston; Robert McGarry,

7    Boston; Rosemary McLaughlin; Edward McNelley, Boston;

8    Vantrell McPherson; David Meier, Belmont; Shawn Mells;

9    Robert Merner, Boston; Neal Miller, Boston; Alice Moore of

10   Roxbury; Paul Murphy of Boston; Phyllis and Timothy

11   O'Callaghan, Dorchester; Francis O'Meara, Norwell; Gerard

12   O'Rourke, Weymouth; Marlon Passley of Boston; Adrina Payne,

13   Roslindale; Tracie Peaks, Boston; Betty Peaks, Boston;

14   Steven Rappaport, Lowell; Mervin Reese; Francis Roache,

15   Boston; David Roberto; Rana Rolston, Boston;

16   Rodney Sadberry, Joseph Saia of Boston; Laura Scherz of

17   Arizona; William Simms; Tony Smith; Joan Stanley;

18   Terrence Taylor; Joan Stanley of Boston; Terrence Taylor,

19   Thomas Miller of Boston, Ellis Thornton of Boston; Angel

20   Toro of Boston; John Towle, T-o-w-l-e, of Suffolk; Fred

21   Waggett of Boston; Cheryl Walker; Leslie Walker of Boston;

22   Richard Walsh of Boston; Gatewood West, Cambridge; Donald

23   Wilson, Boston; Edward Callahan, Boston; Francis Callan,

24   Boston; William Celester of Dorchester; we've already said

25   his name, James Claiborne, Boston; Captain Dan Coleman of

1    Boston, Patrick Cullity, Boston; Commissioner Edward Davis,

2    Boston; Robin DeMarco of Boston; Ann Marie Doherty, Boston;

3    Robert Dunford, Boston; William Dunn, Boston; Gary Eblan,

4    Boston; Paul Evans, South Boston; Newman Flanagan, Pocasset,

5    Massachusetts; George Foley, Boston; Kenneth Fong, Boston;

6    Robert Francis, Boston; Lorraine Henshaw, Boston; Trent

7    Hullum, Boston; Steve Hrones of Boston; William Hussey,

8    H-u-s-s-e-y, Boston; James Jordan, Boston; Daniel Keeler,

9    Boston; Paul Leary, Judge Paul Leary; Jennifer Maconochie,

10   Boston; William McCarthy, Boston; Thomas Miller, Canton;

11   Timothy Murray, Boston; Peter O'Malley, Charlestown;

12   Terrence O'Neil, Boston; Commissioner Kathleen O'Toole,

13   South Boston; Lalita Pulaverti, Boston; Pervis Ryan, Boston;

14   Herbert Spellman of Kingston; Michael Stratton, Boston;

15   Justina Ward, Boston; Melbert Ahearn.

16          Let me stop here so that you people don't have to

17   remember.  So far anyone have a relationship with, related

18   to, not just heard of, related or have any dealings with any

19   of the individuals I mentioned?  Why don't you stand and

20   we'll get your juror number.  Mr. Feely, juror No. 7;

21   Mr. Green, juror No. 25; Mr. Everitt; 38.  I see,

22   Mr. Everitt, okay.  Back there, Mr. --

23          THE JUROR:  Marchand.

24          THE COURT:  Mr. Marchando, juror No. 68; in the

25   second row, Mr. Butler?

1           THE JUROR:  Bowden.

2           THE COURT:  I'm sorry, Mr. Bowden, juror No. 42;

3    in the back --

4           THE JUROR:  Mr. McKenna.

5           THE COURT:  -- Mr. McKenna, juror No. 74.  If you

6    can remember the name of the person you know, we can move

7    on.  Why don't we do that.  I have your names here for the

8    first list.  Okay, you can be seated.  If there are any

9    other names, you'll have to stand again, okay.

10          Kevin Averill, Boston; Joseph Carter, Boston;

11   Michael Conley, Boston; Robert Cunningham, Boston;

12   Donald Devine of Boston; Daniel Dovidio, Boston; Thomas Dowd

13   of Boston; Paul Farrahar, F-a-r-r-a-h-a-r, Boston; Robert

14   Foilb, F-o-i-l-b, Boston; Gregory Gallagher of Boston;

15   Michael Galvin, Boston; Darrin Greeley, Boston;

16   James Hasson, H-a-s-s-o-n; James Hussey, H-u-s-s-e-y, of

17   Norwell; Bobbie Johnson of Boston; John Kelly, Boston, John

18   Kervin, Boston; Thomas Lee, Boston; Donald Levine, Boston;

19   John McCarthy, Boston; Robert Orr, Boston; Bridgett

20   Robinson, Boston; Roger Spring, Boston; Albert Terestre,

21   T-e-r-e-s-t-r-e, Boston; James Wood, Boston; Joseph Zinck,

22   Boston; R.J. Cinquegrana, Boston.  Anyone familiar with any

23   of those names?  Again, not familiar with, you've heard of

24   them but related to, have any relationship with?  We'll call

25   the jurors at sidebar.

1              (THE FOLLOWING OCCURRED AT SIDEBAR:)

2              THE COURT:  Mr. Healey first.  Hi.

3              THE JUROR:  Joseph Healey.

4              THE COURT:  Who do you know?

5              THE JUROR:  Joe Saia, my aunt bought his parents'

6    house for him.

7              THE COURT:  Can you step over there for a second.

8    How significant is Joseph Saia to this case?

9              MR. CURRAN:  He was called by the defense in the

10   criminal trial.  He was maybe three pages of testimony.

11             MS. HARRIS:  He testified in relation --

12             MR. REILLY:  He's the witness who put in the gang

13   intelligence.

14             THE COURT:  THE COURT:  You're going to call him.

15   Is there any issue?

16             MS. SCAPICCHIO:  His name will be suggested which

17   will be submitted.

18             THE COURT:  His credibility won't be at issue in

19   that.

20             THE COURT:  Okay.  Mr. Feely, you can stay, thank

21   you.  Okay.  Juror 25, Mr. Green followed by Mr. Everitt,

22   Mr. Marchando, Mr. Bowden and Mr. McKenna, so first

23   Mr. Green.  Mr. Green, hi.  Who do you know?

24             THE JUROR:  And I'm familiar with the case, and

25   it's too close for me to my home with the Romero Holliday

1    and the people he hanged out with.

2          THE COURT:  You know too much about the case?

3          THE JUROR:  Yes.

4          THE COURT:  I'll excuse you.  Thank you for coming

5    forward, juror No. 25.  Juror No. 38, Mr. Everitt.  Hi.

6          THE JUROR:  Good afternoon.

7          THE COURT:  Who do you know?

8          THE JUROR:  Robert Francis.

9          THE COURT:  Okay.  You have to step aside, I got

10   to find out.  How do you know him?

11         THE JUROR:  I used to work for him.  Police.

12         THE COURT:  Were you once a police officer?

13         MR. ROACHE:  Different Robert Francis.

14         THE COURT:  Not the one involved in this case?

15         MR. ROACHE:  Not the one involved in this case.

16         THE COURT:  You can go back to your seat.  Juror

17   38 will stay.  Juror 68, Mr. Marchando.

18         THE JUROR:  It's Marchand.

19         THE COURT:  I'm making you Italian.

20         THE JUROR:  Yeah, I noticed.  Newman Flanagan I'm

21   associated with.

22         THE COURT:  Know him well?

23         THE JUROR:  I'm a past officer in the Knights of

24   Columbus, I met him about a dozen times.  I never really had

25   personal association, just met him through the Knights of

1    Columbus and conferences.

2            THE COURT:  Can you step aside for a second.  I

3    have to find out how significant that is.

4            MR. ROACHE:  I don't anticipate calling him.  His

5    name may come up.

6            THE COURT:  Mr. Marchand, you can stay, thank you.

7    Mr. Bowden.

8            THE JUROR:  Vincent DiFazio.  I think I worked

9    with him at Tri-City Sales in Lynn.

10           MS. HARRIS:  He's a police officer.

11           THE JUROR:  It might not be the same one then.

12           THE COURT:  Thank you.  Juror No. 74, Mr. McKenna.

13   He's in.

14                   .

15           THE JUROR:  I doubt he's the same guy, but I know

16   a David Carter of Boston.  I worked with him fairly closely.

17   He's an attorney at Fidelity.  Is that the same

18   David Carter?

19           MR. CURRAN:  No.

20           THE COURT:  Thank you.  You can go back to your

21   seat.  This concludes the questioning of the group.  We'll

22   reassemble then in the jury room.  Okay.  Maryellen, will

23   you tell them that people have to eat lunch.  Ladies and

24   gentlemen, I would barrel right on through.  Ms. Molloy

25   tells me I have to go let you go eat lunch.  She runs things

1    having to do with stomaches, so here's what we'd like.  You

2    need to come back.  There's a cafeteria in the building.

3    You need to come back at two o'clock.  We'll resume exactly

4    at two o'clock.

5            Now we're doing individual questioning.  If it

6    turns out that the questioning is getting -- we'll let you

7    know what the estimates of how long this will take, but I

8    think you can count on spending the afternoon here unless

9    you're at the beginning of the list.  So lunch from 1 to 2.

10   Thank you very much.

11           Ms. Molloy again is telling me what to do.  Don't

12   talk to anyone about this case.  The only information you

13   will ever learn about this case should come from the four

14   corners of this room, so don't speculate what it may be

15   about, don't talk to anyone, don't talk amongst yourselves

16   about it.  You've come this far.  Let's make sure you can go

17   the rest of the way.  All rise, please.

18           (A recess was taken.)

19           (THE FOLLOWING OCCURRED IN JUDGE'S LOBBY.)

20           THE JUROR:  Hello, everyone.

21           THE COURT:  Hi.

22           THE JUROR:  Your Honor.

23           THE COURT:  You are?

24           THE JUROR:  Mr. Curran.

25           THE COURT:  Mr. Curran, okay.  Here's what we're

1   going to do, Ms. Scappichio, you begin with the questioning

2   for five minutes and then one of the defendant counsel will

3   follow up later.

4           MS. SCAPPICHIO:  I'm Rosemary Scappichio.  I

5   represent Shawn Drumgold.  He's the plaintiff in this case.

6   Do you have any personal opinions or beliefs that may affect

7   your ability to follow the Judge's instructions as to how

8   you should determine damages in this case?

9           THE JUROR:  No.

10          MS. SCAPICCHIO:  Do you have any personal opinions

11  or beliefs as to that would prevent you from concluding

12  -- wait a minute, can I strike that?  Do you have any

13  personal opinions or beliefs that would prevent you from

14  finding in favor of the plaintiff if you knew he had a

15  criminal past?

16          THE JUROR:  No.

17          MS. SCAPICCHIO:  Okay.  Would the fact that

18  Mr. Drumgold may have been convicted of any crime concern

19  you in terms of your awarding damages in terms of somebody

20  who had been convicted of a crime?

21          THE JUROR:

22          MS. SCAPICCHIO:  If the evidence established that

23  a multi-million dollar verdict was appropriate given the

24  evidence, do you have any views as to your ability to fairly

25  award those damages?

1          THE JUROR:  It would be based on the facts from

2    the evidence, correct?

3          MS. SCAPICCHIO:  Yes.

4          THE JUROR:  Okay, so, no.

5          MS. SCAPICCHIO:  Do you know anything about the

6    details of this case, the Shawn Drumgold case?

7          THE JUROR:  No.

8          MS. SCAPICCHIO:  Have you read anything or seen

9    anything in the newspaper regarding it?

10          THE JUROR:  I've only heard of Mickey Roache, but,

11    just in the paper and TV, nothing with respect to this

12    case.

13          MS. SCAPICCHIO:  With respect to wrongful

14    convictions in general, do you have any opinions one way or

15    the other in terms of police misconduct that you think you

16    should bring to our attention?

17          THE JUROR:  No, I mean, I think police are just

18    like any other people.  They're majority are good cops and

19    then there might be some that aren't good, but it's

20    dependent upon the individuals, not any generalized

21    belief.

22          MS. SCAPICCHIO:  I don't think I have any further

23    questions, your Honor.

24          THE COURT:  Okay.  Who's questioning?

25          MR. WHITE:  If I may have a moment, your Honor.

1          THE COURT:  You have five moments --

2          MR. WHITE:  I have five of them, all five of them.

3      Do you have any general opinions of police officers that you

4      could share with us?

5          THE JUROR:  I think I share the majority opinion

6      that police are -- they're here to protect us, and I

7      believe that, so, no, I have positive opinions of police.

8          MR. WHITE:  Have you ever had a personal encounter

9      with a police officer?

10         THE JUROR:  No, I've never been arrested or

11     anything like that.

12         MR. WHITE:  Whether you were stopped for a traffic

13     violation or anything like that, that sort of thing?

14         THE JUROR:  I think they represent the general

15     population.  There's some good guys and some bad guys, and,

16     you know, we all get pulled over once in awhile and we're

17     not happy about it, but most of the time they're pretty fair

18     if you didn't do anything bad.

19         MR. WHITE:  Do you have any opinions about an

20     individual who's accused of or a police officer who's

21     accused of misconduct?

22         THE JUROR:  I don't subscribe to the media bias,

23     that, you know, I don't listen to the news and say all of a

24     sudden because one thing happened that they say this cop did

25     this or this cop did that means all cops do that, so, no, I

1   don't have any biases like that.

2          MR. WHITE:  You think you'd be able to keep an

3   open mind in hearing all the evidence and hearing both sides

4   of it?

5          THE JUROR:  Very open minded unfortunately.

6          MR. WHITE:  This case, the Court mentioned earlier

7   involves the shooting death of a 12 year-old little girl by

8   the name of Darlene Tiffany Moore back in 1988.  Have you

9   ever heard anything about that case?

10          THE JUROR:  I was 14.  No, I don't remember

11   anything about it.

12          MR. WHITE:  With respect to Mr. Drumgold, have you

13   ever heard his name in the media anywhere before?

14          THE JUROR:  No.

15          MR. WHITE:  Whether on the news or magazine show

16   or anything like that?

17          THE JUROR:  No.  I saw recently released wrongly

18   incarcerated on the Colbert Report, but that was about it.

19          MR. WHITE:  His name, was his name associated with

20   that?

21          THE JUROR:  No.

22          MR. WHITE:  And with respect to the fact that an

23   individual is granted a new trial and circumstance where

24   they were not exonerated, do you understand the difference

25   that that does not mean that they were wrongfully convicted?

1          THE JUROR:  Uh-hum.

2          MR. WHITE:  Do you believe that if the law as the

3   Judge gives it to you in this case if it goes against your

4   personal views of what the decision should be, can you tell

5   me what your -- excuse me, let me strike that.  I'll try to

6   start that again.  Do you believe that if the law as the

7   Judge gives it to you in this case, if it goes against your

8   personal views of what the decision should be that you would

9   base your verdict on your personal views?

10          THE JUROR:  No, I would listen to the Judge.

11          THE COURT:  Because he's sitting close to me.

12          THE JUROR:  This is the most positive jury

13   experience I have had seeing you this morning, so I trust

14   her, I would listen to her.

15          THE COURT:  Okay.  You mentioned just as a

16   curiosity, you mentioned in your questionnaire that you like

17   legal thrillers.

18          THE JUROR:  Yes.

19          MR. WHITE:  You like political novels and spy

20   novels.  Who are some of your favorite authors.

21          THE JUROR:  Well, I like John Grisham, I used to

22   like the legal shows by David Kelley, not serious,

23   obviously.

24          MS. HARRIS:  So, it's just like that.

25          THE JUROR:  Yeah, sure.  You know, I think the law

1   is interesting.  I think this whole process is interesting

2   to me, even being here today, so I think that's why I like

3   those shows.

4           MR. WHITE:  You mentioned that one of the

5   newspapers that you read or one of the newspapers you read

6   mentioned The Globe sports section.  Do you read the rest of

7   the Globe as well.

8           THE JUROR:  I might through.  I go right to the

9   sports section.  That's embarrassing to admit actually.

10          MR. WHITE:  You can tell us, you can tell us

11  everything.  Do you believe that you can decide this case

12  based on the law and the facts and not be swayed by sympathy

13  or bias or prejudice in any way?

14          THE JUROR:  I do.

15          THE COURT:  That's it.  Okay.  I'm going to ask

16  you to call a number.  Call this tomorrow after 6:00.

17          THE JUROR:  Okay.

18          THE COURT:  You need your juror number when you

19  call, and they'll let you know whether you're going to be on

20  the final jury.  Thank you very much.

21          THE JUROR:  Good luck, all.

22          MR. ROACHE:  Your Honor, before we bring in the

23  next juror.

24          THE COURT:  I think I can telescope what you're

25  going to say.  On the one hand, do not be feeding

1   multi-million verdicts to this jury, okay, so that's not a

2   question you ask.  By the same token, the question that says

3   what do you feel about damages if someone was granted a new

4   trial but not exonerated.

5          MR. WHITE:  Well, I think I had to combat, I think

6   I had to combat what she asked.

7          THE COURT:  We're going to keep away from that

8   question.  We talked about the innocence-guilt question is

9   out of this case unless someone opens the door, so no

10  multi-million verdicts and not exonerated.

11         MR. WHITE:  Now, is the plaintiff allowed to pose

12  the question if somebody's wrongfully convicted?

13         THE COURT:  Right.  But wrongly convicted means

14  violation of constitutional rights.  You want to change your

15  language to say convicted because of violation of their

16  constitutional rights.  That would be a better way of

17  saying, that's fine.  That's what this is.

18         MR. ROACHE:  It's an alleged violation, it's not a

19  violation.

20         THE COURT:  No, I appreciate that.  She knows how

21  to say it.  For these purposes you can say allege, but the

22  jury understands what side each of you is on.  Certainly

23  don't feed numbers, I understand you want to educate the

24  jury, but don't.  Okay.

25         MR. ROACHE:  Thank you, your Honor.

1          THE COURT:  Bring in the next person.  The next

2    person is Joseph Baio.  How do you pronounce your name?

3          THE JUROR:  Bailor.

4          THE COURT:  Starting with one of the defendants.

5          MR. WHITE:  If I could have just a moment, your

6    Honor.

7          THE COURT:  Sure.

8          MR. WHITE:  I'd be happy to.  Sir, this case stems

9    from a 1988 shooting incident in which a 12 year-old girl by

10   the name of Darlene Tiffany Moore was killed, and as a

11   result of the investigation that followed, Shawn Drumgold

12   was arrested, he was prosecuted, and he was convicted of

13   that crime.

14          Have you ever heard anything about the shooting of

15   Darlene Tiffany Moore or the case involving Shawn Drumgold?

16          THE JUROR:  No.

17          MR. WHITE:  Have you ever had a personal encounter

18   with a police officer?

19          THE JUROR:  Personal encounter, like define that,

20   like an interaction, of course, yes, but I've never had an

21   incident or an altercation or any kind of relevance.

22          MR. WHITE:  When you say an interaction with a

23   police officer, what do you mean?

24          THE JUROR:  I mean like seeing a police officer,

25   ever talked to one, physically, yes.  I've had conversations

1    with police officers, not like -- I don't know any of them

2    personally like that I would say like, for instance, my

3    friend lost her purse, you know what I mean, she called the

4    police, I had to speak with the police when they came down

5    there.

6            MR. WHITE:  Was this a close friend that lost her

7    purse?

8            THE JUROR:  Yes.

9            MR. WHITE:  Did you accompany her to the police

10   station?

11           THE JUROR:  No, the police came down to the

12   mall.

13           MR. WHITE:  When that happened to your friend,

14   were you there when the police came and talked to her?

15           THE JUROR:  Uh-hum.

16           MR. WHITE:  Did the police do something about it?

17           THE JUROR:  No, they just made a report.  I mean,

18   it hardly seems relevant, but they made a report based on

19   what she told them about the purse being lost, but there's

20   nothing that stands out about it.

21           MR. WHITE:  Based on that, did you have any

22   opinions about the way the police handled that?

23           THE JUROR:  No, they handled it very

24   professionally, came down, took her statement.  You know, I

25   suppose it was very normal.

1          MR. WHITE:  And other than that, have you had any

2     other interaction with the police?

3          THE JUROR:  I mean, none really that I can

4     remember that sticks out.

5          MR. WHITE:  Do you have any particular opinions

6     regarding police officers?

7          THE JUROR:  Well, they serve a vital function in

8     society, but other than that, no.  I'm sure there's some

9     good, some bad, but that's life.  It's everywhere.

10          MR. WHITE:  You mentioned that you like a wide

11     variety of books, particularly I guess fiction.  Are there

12     any types of books you like to read?

13          THE JUROR:  Well, I have a book with me right now.

14     It's Tom Clancy based on like war, you know, things like

15     that, but I suppose if I had a --

16          MR. WHITE:  Excuse me, which book?

17          THE JUROR:  It's right here, this one.  It's the

18     newest one, And War.

19          THE COURT:  We're going to turn into a book club

20     at the end of this.

21          THE JUROR:  I don't know, I suppose, I mean, I'm

22     just reading this today, you know, to pass time.

23          MS. HARRIS:  Good idea.

24          THE JUROR:  The books I really like are older

25     fiction like Hugo.

1          MR. WHITE:  You mentioned also in your

2     questionnaire that you get your news information from

3     newspapers, the radio, the Internet and television.  With

4     regards to the radio, do you listen to talk radio stations?

5          THE JUROR:  Well, my grandfather does, and I'm in

6     the car with him a lot, so I tend to hear, you know,

7     obviously what they say on the radio, but I don't listen to

8     that myself like if I was just by myself in the car.

9          MR. WHITE:  You mentioned that you get your

10    newspaper information from The Globe and The Herald.  Is

11    that primarily where you get your information?

12         THE JUROR:  Well, anything that's in front of me,

13    The Globe, The Herald, The Now, Metro.  I have no favorite

14    newspaper.

15         MR. WHITE:  With regards to the newspaper articles

16    you read, are you -- do you critique the stories as they're

17    written?  In other words, I'm asking do you accept the

18    stories as they're written, or do you think about the

19    stories and whether they're accurate or not?

20         THE JUROR:  Well, I mean, I don't know how to

21    really answer that.  I suppose like --

22         MR. WHITE:  It might be a bad question.  It might

23    be a bad question, so don't feel bad.

24         THE JUROR:  I don't know what you mean by that, I

25    suppose most of the facts are in the newspaper or they

1   wouldn't be printed, but I'm sure like Howie Carr, for

2   instance, might have his tilt on the stories and other

3   people, too, but as far as like facts, there's very little

4   dispute for most of what they write anyway.

5          THE COURT:  You're running out of time.  Just one

6   question.

7          MR. CURRAN:  I see in your questionnaire that your

8   father was charged with larceny and you have a relative that

9   was robbed.  Is there anything about those incidents in

10  regards to the investigation that bring any prejudice or

11  bias to anybody in the case?

12         THE JUROR:  No, with my father, for example, he

13  did commit a crime, and they followed through what they had

14  to follow through.  The law is the law.  I have no grudge

15  towards anybody for that.

16         MR. CURRAN:  Did you think law enforcement treated

17  the process fairly?

18         THE JUROR:  Yes, for the most part, yes.

19         MR. CURRAN:  In regards to the factual

20  circumstances of the relative that was robbed at gun

21  point.

22         THE JUROR:  It was my two cousins and their

23  friend, and they were right outside their house on Otis

24  Street in Brockton, robbed them, made everybody take out

25  what was in their pockets.

1           MR. CURRAN:  Did the police respond appropriately

2      in your family's mind?

3           THE JUROR:  Yes, they called the police, it was

4      what it was, they filed a report, and they never found the

5      guy, but, you know.

6           MR. CURRAN:  Do you wish they could have done

7      more?

8           THE JUROR:  There was nothing more they could have

9      done in retro, looking back on it.

10          THE COURT:  Ms. Scappichio, five minutes for

11     her.

12          MS. SCAPICCHIO:  Thank you.  Hi, I'm Rose

13     Scapicchio.  I represent Shawn Drumgold in this case.  I

14     want to ask you a few questions about your views of people

15     who have been wrongfully convicted.  Do you have any views

16     in general about people who have been convicted of a crime

17     that would prevent you from awarding them any damages?

18          THE JUROR:  Can you say that question again?

19          MS. SCAPICCHIO:  Sure.  Do you have any views of

20     people who have been convicted of crimes that would prevent

21     you from awarding them any damages?

22          THE JUROR:  No.  Like if you were convicted of a

23     crime like what are you saying like do you think that should

24     affect like something separate?

25          MS. SCAPICCHIO:  Yes.  In other words, if you had

1    found out that somebody had a criminal past, would that

2    prevent you in any way from awarding damages?

3         THE JUROR:  No, not at all because, I mean, a

4    criminal past is a criminal past, but people who get

5    convicted of a crime and then serve their time or whatever

6    the case may be afterwards, that's like, that in and of

7    itself is its own issue, an issue that comes after that

8    whether it involves monetary compensation, what have it, it

9    is completely separate, the issues are separate.

10        MS. SCAPICCHIO:  Okay.  Thank you.  Now, with

11   respect to somebody who had a drug history, in other words,

12   somebody who had a history of drugs and ended up going to

13   jail for a history with drugs, would that affect your

14   ability to award damages, the fact that the person may have

15   had a drug history?

16        THE JUROR:  Not at all.  As long as like the facts

17   of the case were laid out in a way that would show that

18   drugs had nothing to do, I mean, I don't even know how to

19   answer that, no, I don't have any bias against people who

20   have taken drugs or have a drug past.  If it doesn't relate

21   to the situation at hand, there's no reason people should

22   really bring it up, but, you know, common sense.

23        MS. SCAPICCHIO:  Would you believe the testimony

24   of a police officer than that of a lay witness simply

25   because of his or her role as a police officer?

1      THE JUROR:  That's tricky.  See, I suppose, like,

2  yeah, for the most part if it was because I know a lot of

3  people personally say they got speeding or something like

4  that, they say no, I didn't speed, so I guess, yeah, you

5  would have to in a way especially because most cruisers have

6  the camera on their cruiser.

7      MS. SCAPICCHIO:  But if it wasn't speeding, if it

8  was a police officer giving his rendition of what happened

9  and a civilian witness giving their rendition of what

10 happened, would you give more credit to what the police

11 officer said because of his position as a police officer?

12     THE JUROR:  Yes, because he would be trained to

13 pay more attention to deal.  If the civilian in question

14 though had nothing to do with it and just happened to be

15 like a passerby and saw the situation, I suppose, you know,

16 his credibility would be obviously high, but, you know, a

17 police officer, if they seen something and they wrote it

18 down, that's their job, you know, obviously they should be

19 good at it.

20     MS. SCAPICCHIO:  So if there was a report from a

21 police officer that something had occurred, you'd be more

22 likely to believe that police officer's testimony that it

23 actually occurred because that's what they're trained to do?

24     THE JUROR:  Well, yeah, and that's what they do on

25 a daily basis, so the details that they'd write down would

1    probably be more accurate than say without the training for

2    paying attention to such detail.

3            THE COURT:  Let's say this is simple, light is

4    red, light is green, kind of thing.  The police officer said

5    the light was red, the civilian said the light was green.

6    You don't know anything else about the case, would you

7    believe the police officer just because he's an officer and

8    for no other reason?

9            THE JUROR:  I suppose I wouldn't because how could

10   you just based on title alone, like one person says one

11   thing, one person says the other, like what I'm saying

12   basically if the civilian has nothing to do with the

13   situation, you know what I mean.

14           THE COURT:  No reason why the civilian was paying

15   attention.

16           THE JUROR:  No reason why, I mean, it's pretty

17   much logic, you know.

18           THE COURT:  I don't want to put words in your

19   mouth.  What you're saying is it depends on the

20   circumstances?

21           THE JUROR:  Well, of course, doesn't it always?

22           THE COURT:  Yes, that's right.  These are stupid

23   questions.

24           MS. SCAPICCHIO:  Thank you, Judge, I appreciate

25   it.

1          THE COURT:  Go on.  No, go on.  She has one

2     minute.  I've taken her time.

3          MS. SCAPICCHIO:  Another stupid question.  Now,

4     with respect to this particular case, if there were

5     witnesses who had indicated that the police had done

6     something wrong and the police got on the stand and denied

7     that they had done something wrong, would you tend to

8     believe those police officers more than the witnesses?

9          THE JUROR:  I suppose I would have to look at the

10    circumstances.  Based on that alone, it's very hard to come

11    to a conclusion as to who I would believe.

12         MS. SCAPICCHIO:  Perfect, thank you.

13         THE COURT:  Okay.  We're going to ask you to call

14    this number tomorrow evening at six, call the 1-800 number.

15    You need your juror number with you, they'll let you know if

16    you're going to be on the final jury, and if you are, we'll

17    see you Wednesday.  Thank you.

18         Next one is Mr. Feely.  Hi, Mr. Feely.

19         THE JUROR:  Hello.

20         THE COURT:  Ms. Scappichio, you start.

21         MS. SCAPICCHIO:  Hi, how are you?

22         THE JUROR:  Good.

23         MS. SCAPICCHIO:  I'm Rose Scapicchio, and I

24    represent Shawn Drumgold.

25         THE JUROR:  Could I have one second?

1          THE COURT:  Yes, go right ahead.

2          THE JUROR:  When we were asking for exemptions

3    down below and I didn't really -- the dates didn't click on

4    me, you talked about a six-week, and I'm saying that will

5    bring me right up until the first week of April.

6          THE COURT:  April 18th is when we said.  When you

7    first came in downstairs, you said up to six weeks, and I

8    was figuring out, well, I'm currently studying for my

9    Massachusetts Termite License, and I believe the last day

10   they give it is April 11th.

11         THE COURT:  Then you're excused.  I don't want to

12   jeopardize that.

13         THE JUROR:  I didn't want to seem like a whimp

14   because we were talking about economic.

15         THE COURT:  If you have a test that you're

16   studying, don't be silly.  This is not meant to be pain.

17   Thank you.

18         THE JUROR:  I'm sorry.

19         THE COURT:  Thank you.  Ms. Gallant.

20         MS. SCAPICCHIO:  Judge, this juror says in

21   question 4 it would be very difficult for the juror to serve

22   because of the small company.

23         THE COURT:  Okay, I'll try that.  Let me start

24   there.

25         MS. SCAPICCHIO:  I think they write it and you

1    just expect them to tell you.

2              THE COURT:  Hi.  How do you pronounce your name?

3              THE JUROR:  Gallant.

4              THE COURT:  I was turning French.

5              THE JUROR:  It is French.

6              THE COURT:  You said that a six-week trial would

7    pose a problem for you.  Are we talking about somewhat of a

8    problem or a gigantic problem?

9              THE JUROR:  It would be very really difficult.  I

10   work for a nonprofit.  I'm a director of a small department.

11   We have a group that provides our contracts, so I have two

12   members in the building at all times.

13             THE COURT:  What kind of work?

14             THE JUROR:  We work with disabilities, provide

15   placement and training, and I have to go on interviews, so

16   there's not a big staffing issue, so we can't get funding,

17   and I have another staff member who has federal jury duty.

18   That would be two of us out of the building.  That would be

19   very difficult.

20             THE COURT:  Well, if you think that it could

21   jeopardize your livelihood, we won't put you through it.

22   We'll excuse you.  Thank you.

23             THE JUROR:  Thank you.

24             THE COURT:  Mr. Gedutis is next.  Thanks for

25   bringing that to my attention.

1          MS. SCAPICCHIO:  Judge, there's one question that

2     this juror didn't answer, it's No. 27.

3          THE COURT:  Why don't you ask that question.

4          Hi.

5          THE JUROR:  Hello, Judge.

6          THE COURT:  Mr. Gedutis.

7          THE JUROR:  That's correct.

8          THE COURT:  All right, Ms. Scappichio goes first.

9          MS. SCAPICCHIO:  Hi, I'm Rose Scapicchio.  I

10    represent Shawn Drumgold.

11         THE JUROR:  Pleasure to meet you.

12         MS. SCAPICCHIO:  Pleasure to meet you.  I have a

13    question on your questionnaire, question 27 was people who

14    have been wrongfully convicted sometimes brings lawsuits

15    against the police department.  Do you favor or oppose or do

16    you have no opinion whatsoever?

17         THE JUROR:  No opinion.

18         MS. SCAPICCHIO:  With respect to this case, we

19    expect that they'll be police officers testifying.  Would

20    you believe the testimony of a police officer over that of a

21    civilian witness merely because his or her position as a

22    police officer?

23         THE JUROR:  No.

24         MS. SCAPICCHIO:  Do you have any opinions about

25    police officers in general that would interfere with your

1    ability to be fair and impartial?

2            THE JUROR:  No.

3            MS. SCAPICCHIO:  Do you know any police officers?

4            THE JUROR:  My son-in-law is a police officer.

5            MS. SCAPICCHIO:  And do you speak to your

6    son-in-law on a regular basis?

7            THE JUROR:  Not really, no.

8            MS. SCAPICCHIO:  No.

9            THE JUROR:  Certainly not about his business.

10           MS. SCAPICCHIO:  Okay.  So what he does at work

11   stays at work?

12           THE JUROR:  That's correct.

13           MS. SCAPICCHIO:  And have you ever had discussion

14   with your son-in-law regarding police misconduct?

15           THE JUROR:  No.

16           MS. SCAPICCHIO:  Have you ever had discussions

17   with your son-in-law regarding police procedure?

18           THE JUROR:  No.

19           MS. SCAPICCHIO:  Have you ever discussed the

20   details of any of his cases with him?

21           THE JUROR:  No.

22           MS. SCAPICCHIO:  What unit does he work in in the

23   Sherburn Police Department, do you know?  Does he work in

24   the drug unit, the homicide unit?

25           THE JUROR:  No, I think he's just a patrol

1    officer.

2           MS. SCAPICCHIO:  How long has he been a police

3    officer?

4           THE JUROR:  He's actually starting training today.

5    He's been there about a year, I believe.

6           MS. SCAPICCHIO:  Did he go through the academy?

7           THE JUROR:  He's starting the academy today.

8           MS. SCAPICCHIO:  He was married to your daughter

9    before he went to the academy?

10          THE JUROR:  Yes.

11          MS. SCAPICCHIO:  And you had indicated on

12   your -- well, let me ask you another question.  Some people

13   feel that the job that police officers do is so crucial to

14   our well-being that they think it's inappropriate to

15   actually sue them for something that happened during the

16   course of their duties.  Do you have any opinions about

17   that?

18          THE JUROR:  I think it's a very important job.  It

19   is the first line of defense, I believe, but they have to be

20   held to a high standard as well just like we do.

21          MS. SCAPICCHIO:  Okay.  Now, would you have any

22   trouble awarding damages to a plaintiff if that plaintiff

23   had a criminal past?

24          THE JUROR:  No, I don't believe so.

25          MS. SCAPICCHIO:  What if that Plaintiff had some

1    history of drug use?  Would you have trouble awarding

2    damages on someone who you thought was a former drug user?

3          THE JUROR:  It would have to depend on the

4    circumstances and what was presented as evidence.

5          MS. SCAPICCHIO:  What would prevent you from

6    awarding damages that a plaintiff had a drug history?

7          THE JUROR:  I can't think of anything off the top

8    of my head right now.

9          MS. SCAPICCHIO:  With respect to I know you said

10   it would depend on the circumstances.  You can't think of

11   any circumstances in which you would say just can't do

12   because of the drug history?

13         THE JUROR:  No, I can't.

14         MS. SCAPICCHIO:  Now, in this case you had

15   indicated on your questionnaire that you watch Law & Order?

16         THE JUROR:  That's correct.

17         MS. SCAPICCHIO:  Which one?

18         THE JUROR:  When I get a chance.

19         MS. SCAPICCHIO:  The real one or the CSI one or

20   whatever it is?

21         THE JUROR:  No, the Law & Order, the one that's

22   been running for about 10 or 12 years.

23         MS. SCAPICCHIO:  The original one?

24         THE JUROR:  Yes.

25         MS. SCAPICCHIO:  You also indicated that you

1    served in the U.S. Army?

2              THE JUROR:  Yes, I did.

3              MS. SCAPICCHIO:  Where were you stationed?

4              THE JUROR:  I was in West Germany.

5              MS. SCAPICCHIO:  So you got out of the Army in

6    1971?

7              THE JUROR:  That's correct.

8              MS. SCAPICCHIO:  Judge, I don't have any further

9    questions.

10             THE COURT:  Okay, counsel.

11             MR. WHITE:  My name is William White, and I

12   represent Tim Callahan with Mary Jo Harris, and Hugh Curran

13   represents Richard Walsh, and John Roache represents the

14   City of Boston and Francis Mickey Roache.  This case, I

15   notice that you've been a resident of Massachusetts for your

16   entire life?

17             THE JUROR:  Other than the two years I was in the

18   military, yes.

19             MR. WHITE:  And so in 1988, there was a shooting

20   incident involving a little girl who was sitting on a

21   mailbox in Boston, and she was shot and killed.  Do you

22   recall anything?

23             THE JUROR:  No, sir, I do not.

24             MR. WHITE:  Do you have any recollection at all

25   about a little girl by the name of Darlene Tiffany Moore?

1           THE JUROR:  No, sir, I don't.

2           MR. WHITE:  Do you have any recollection of

3     hearing any stories about Darlene Tiffany Moore during the

4     time you've lived in Massachusetts?

5           THE JUROR:  No, sir.

6           MR. WHITE:  Have you ever heard of the plaintiff,

7     Shawn Drumgold?

8           THE JUROR:  No, sir.

9           MR. WHITE:  Could you tell me, have you ever had

10    any personal encounters with police officers?

11          THE JUROR:  Just in my youth for speeding

12    tickets.

13          MR. WHITE:  Youthful indiscretion?

14          THE JUROR:  Yes.

15          MR. WHITE:  And you mentioned also that later on

16    that you had served in the military when you were in

17    Germany?

18          THE JUROR:  That's correct.

19          MR. WHITE:  Do you have any opinions with respect

20    to police officers?

21          THE JUROR:  Again, you know, I think they're the

22    first line of defense, and I think they're very necessary.

23          MR. WHITE:  You've mentioned in your questionnaire

24    the types of books that you like are history?

25          THE JUROR:  Uh-hum.

1          MR. WHITE:  Is there any particular series that

2   you like?

3          THE JUROR:  I'm reading one right now on the

4   Second World War and the invasion of the Tara War.

5          MR. WHITE:  I don't know about the invasion of the

6   Tara War.

7          THE JUROR:  It's the second marine division

8   landing in 1942 I believe it was on the South Sea Island.

9   It was really the first big invasion leading up to the

10  invasion of Japan.

11         MR. WHITE:  That's more than I knew about it, and

12  it might inspire me.

13         THE COURT:  Do you recommend the book?  Obviously

14  that's the next question.

15         THE JUROR:  Well, I'm about a third of the way

16  through it, your Honor.

17         MR. WHITE:  You mentioned also that your primary

18  source of news is the Middlesex News?

19         THE JUROR:  That's correct.

20         MR. WHITE:  Do you ever read The Globe or

21  The Herald.

22         THE JUROR:  No, sir.

23         MR. WHITE:  Have there been any periods in your

24  life where you've read The Globe or Herald?

25         THE JUROR:  No, sir.

1           MR. WHITE:  When you read articles in the

2    newspaper, what kind of weight do you give to the stories

3    you read?

4           THE JUROR:  Well, first of all, that's a locally

5    published newspaper, so my job entails that I be aware of

6    certain building construction that's going on in the area,

7    and that's principally why I read the newspaper for

8    information related to that, but there's also stories in

9    there about, you know, political happenings in the

10   surrounding towns where I live and work.

11          MR. WHITE:  And what kind of weight do you give to

12   those stories that you read about the news stories?

13          THE JUROR:  Well, I think pretty much I just take

14   them on face value.

15          MR. WHITE:  Do you ever wonder if the author of

16   the story had more information that didn't make it into the

17   story that you read?

18          THE JUROR:  Yes.

19          MR. WHITE:  Do you ever wonder what happened

20   about, you know, certain information that's left out of a

21   story?

22          THE JUROR:  On occasion, yes.

23          MR. WHITE:  But you said just a moment ago that

24   when you read the story you pretty much accept it on face

25   value?

1              THE JUROR:  That's correct, for the information
2    that is provided.
3              MR. WHITE:  For the information that's provided.
4    I don't have anything else.
5              MS. HARRIS:  I'm Mary Jo Harris for Tim Callahan.
6    Do you have any personal opinion about the civil justice
7    system, whether it works well or imperfectly?
8              THE JUROR:  I don't really have any opinion.
9              MS. HARRIS:  Have you ever had any experience
10   either observing trials or reading about trials, learning
11   about cases that have been prosecuted or defended and
12   drawing opinions about how things progressed?
13             THE JUROR:  Not really.  I had occasion early last
14   year to sit for jury duty.  It was over in Cambridge, but
15   the case was settled before we even got into court.
16             MS. HARRIS:  You actually sat on that jury?
17             THE JUROR:  No, I was not.
18             MR. ROACHE:  I have one question.
19             THE COURT:  One more minute.
20             MR. ROACHE:  Where were you living in 1989?
21             THE JUROR:  1989, I was living in Hopkinton, Mass.
22             MR. ROACHE:  Have you ever lived in the City of
23   Boston?
24             THE JUROR:  No.
25             MR. CURRAN:  Judge, he skipped over me.  I see in

1   your questionnaire that your uncle was convicted of assault,

2   and you're also a victim of B & E.  Was there anything in

3   regards to those two incidents that would cause you to have

4   any bias towards any of the parties or the police in how

5   they handled it?

6          THE JUROR:  No, sir.  My uncle deserved it.  He

7   was wrong in assaulting, and the breaking and entering was

8   so many years ago, I just forgot about it.

9          MS. HARRIS:  Thank you, sir.

10         THE COURT:  Tomorrow at 6:00 we ask you to call

11  this number.  You need your 1-800 juror number, and the

12  announcement will let you know if you're on the final jury,

13  and then you have to report on Wednesday morning.

14         Catherine Smith.

15         MS. SCAPICCHIO:  Judge, do you ever think we'll

16  get to the point where we can take pictures and put the

17  pictures with the name?  Mr. Reilly is best to draw me

18  people, but I'm not sure stick figures will do me any good

19  at the end of the day.

20         THE COURT:  It's actually an interesting point,

21  but there's all this stuff about the privacy of jurors, and

22  I'm not sure how.

23         MS. SCAPICCHIO:  We have their whole life story

24  there.  This voir dire is public up with their names?

25         THE COURT:  It is.

1           Hi.

2           THE JUROR:  Hello.

3           THE COURT:  You are Ms. Smith-Ventura?

4           THE JUROR:  Yes.

5           THE COURT:  I think the questioning is somewhere

6      here.

7           MR. WHITE:  Hello, I'm William White.  I represent

8      Mr. Tim Callahan, along with Mary Jo Harris.  I have a few

9      questions, if I could.  This case stems from a 1988 shooting

10     in which a 12 year-old girl who was sitting on a mailbox by

11     the name of Darlene Tiffany Moore was killed.

12           THE JUROR:  Okay.

13           MR. WHITE:  The result of that investigation led

14     to the arrest, prosecution and conviction of the plaintiff

15     in this case, Shawn Drumgold, for that murder.  At some

16     point later on -- well, let me just let me end that part of

17     the story here.

18           THE JUROR:  Okay.

19           MR. WHITE:  And ask if you've heard anything about

20     the shooting death of Darlene Tiffany Moore or the

21     prosecution of Shawn Drumgold?

22           THE JUROR:  It does not sound familiar.

23           MR. WHITE:  Do you know if you've read any

24     articles in the newspaper or heard anything on television?

25           THE JUROR:  I might have, but it didn't stick, so

1  I don't recall it.

2          MR. WHITE:  All right.  With respect to this

3  particular case, it involves the testimony of some police

4  officers, and could you tell me what your opinion of police

5  officers?

6          THE JUROR:  I would think they would uphold the

7  law, and they've been screened.  I mean, things are corrupt,

8  but you hope that's past it, so I would respect the police

9  officers.

10         MR. WHITE:  When you say things are corrupt, what

11  do you mean by that?

12         THE JUROR:  Well, not everything is perfect.

13         MR. WHITE:  There are things that you hear, the

14  rumor mill, that sort of thing?

15         THE JUROR:  Every industry has something going on

16  in it, but you hope when it gets to the police that they've

17  picked them well.

18         MR. WHITE:  Have you ever had a personal encounter

19  with the police officer?

20         THE JUROR:  No.

21         MR. WHITE:  Have you ever had a loved one or a

22  close friend who's had an encounter with a police officer?

23         THE JUROR:  Not that I can recall, no.

24         MR. WHITE:  Do you know anyone who's had to go get

25  help from a police officer?

1           THE JUROR:  Not really, no.  I think I was pulled

2   over once but didn't get a ticket, so that's it.

3           MR. WHITE:  With respect to being pulled over that

4   time, on that one occasion, how did you feel after the

5   encounter ended?

6           THE JUROR:  Fine.  I guess I didn't notice the

7   pedestrian in the crossing.

8           MR. WHITE:  Did you have any opinion as to the

9   performance of the police officer who stopped you?

10          THE JUROR:  No.  He pulled over about eight of

11  us.

12          MR. WHITE:  At the same time?

13          THE JUROR:  At the same time, yes.

14          MR. WHITE:  I notice that you mentioned on your

15  questionnaire that you had a cousin who was killed by a

16  drunk driver?

17          THE JUROR:  Yes, in Ohio.

18          MR. WHITE:  Did you have -- were you in Ohio at

19  the time?

20          THE JUROR:  No.

21          MR. WHITE:  Did you have any contact with the

22  police officers who investigated that matter?

23          THE JUROR:  No, I heard about it through family.

24          MR. WHITE:  Was this a close cousin of yours?

25          THE JUROR:  Pretty close.

1          MR. WHITE:  How old was your cousin.

2          THE JUROR:  He was just married, so he was in his

3    early 20's.

4          MR. WHITE:  I'll let you.

5          MS. HARRIS:  In one of the questions that was

6    given to you in the questionnaire, question 27 asked people

7    who have been wrongfully convicted sometimes bring lawsuits

8    against the police department.  Do you favor or oppose this

9    type of lawsuit, and you indicated you opposed, and I'm

10   wondering if you could tell us a little bit.

11         THE JUROR:  Yes, that was a gut answer.  I mean,

12   it does depend on the circumstances and such, but there are

13   so many lawsuits brought against -- I mean drop of the hat

14   there's a lawsuit, so especially against the police, you

15   would hope there wouldn't be that many.

16         MS. HARRIS:  Have you read or learned generally

17   just through the general media or news shows, anything like

18   that, have you heard about claims of wrongful conviction?

19         THE JUROR:  Just in the everyday news.

20         MS. HARRIS:  What is your sense of what that

21   means, a wrongful conviction?

22         THE JUROR:  Just someone who believes they were

23   convicted wrongly, I mean, they disagreed and they think

24   they have a reason to disagree.

25         MS. HARRIS:  Okay.  I think that's all.  Thank you

1    very much.

2          THE COURT:  Ms. Scappichio.  I'm sorry, you're out

3    of time.  I'm tough.

4          MS. SCAPICCHIO:  It's a five minute limit, we have

5    to hurry.  My name is Rose Scapicchio.  I represent

6    Shawn Drumgold in this case, and I want to ask you a couple

7    questions regarding police officers.  Would you tend to

8    believe the testimony of a police officer over that of a

9    civilian witness simply because of his or her position as a

10   police officer?

11         THE JUROR:  Probably.

12         MS. SCAPICCHIO:  Can you tell me why you think

13   that?

14         THE JUROR:  Just because they're sworn to uphold

15   the law not that people aren't, but police officers should

16   take it even more seriously.

17         MS. SCAPICCHIO:  So if there was a choice

18   between -- if two people saw the same thing, one was a

19   police officer, one was a civilian witness, you would

20   believe the testimony of a police officer because you would

21   have more faith and credit than what that police officer is

22   doing because it would be part of his job?

23         THE JUROR:  I think what he does for a living

24   would give him a little more credit where you don't know the

25   civilian.

1        MS. SCAPICCHIO:  You also indicated in your

2   questionnaire, I want to get back to question 27 that you

3   would oppose lawsuits brought by people who were wrongfully

4   convicted?

5        THE JUROR:  That's not concrete.  Again, it would

6   depend on the circumstance in the situation.

7        MS. SCAPICCHIO:  When you said it was your gut

8   reaction, what made you check that?

9        THE JUROR:  Just because lawsuits seem to run

10  rampant.  That's always in the news.

11        MS. SCAPICCHIO:  Is it civil lawsuits?

12        THE JUROR:  No, lawsuits in general.

13        MS. SCAPICCHIO:  Is it the wrongful conviction

14  portion of it or just the lawsuits?

15        THE JUROR:  Just the lawsuits.

16        MS. SCAPICCHIO:  Does it have anything to do with

17  the lawsuits against the police officer?

18        THE JUROR:  No, not really.

19        MS. SCAPICCHIO:  Now, in this case the some people

20  feel that the job the people perform they shouldn't be sued

21  for anything that happens while they're on duty.  How do you

22  feel about that?

23        THE JUROR:  It would depend on the circumstance

24  and situation.  I wouldn't say concrete yes or no, but, I

25  mean, it would depend on the situation.

1          MS. SCAPICCHIO:  And do you have any feelings

2     about somebody who has a criminal past being able to award

3     them damages?

4          THE JUROR:  I'm not sure on that.  I would have to

5     find out what it was all about.

6          MS. SCAPICCHIO:  What would prevent you from

7     awarding them damages?  If you found out that they had a

8     drug history, would that concern you?

9          THE JUROR:  No, it's just if they have a criminal

10    record, you figure they've done something wrong in the past,

11    so it would maybe need a little more convincing to say it

12    was warranted.

13          THE COURT:  Let me ask you two questions.

14          THE JUROR:  Sure.

15          THE COURT:  This case is going to involve

16    situations in which civilian will say one version of an

17    interview and a police officer will describe a totally

18    different version, and so it's important the question that

19    Ms. Scappichio is asking, the question is whether or not you

20    are more likely to believe a police officer knowing nothing

21    more than his status in a situation like that.  Do you think

22    you would?

23          THE JUROR:  It's a possibility just because of

24    what they do for a living that you figure they would tell

25    the truth, but two people can see the same situation and

1   have different versions.  I mean, that is possible.

2        THE COURT:  What we're looking for in this

3   questioning is a tilt and a tilt the people would start with

4   and it would be difficult to shake them from.  If you were

5   thinking you're tilting in that direction I would excuse

6   you, so you have to tell me what your tilt is.

7        THE JUROR:  Oh, gosh, I've never be in that

8   situation to believe one over the other.  I mean, if it was

9   myself against what the police officer was saying --

10       THE COURT:  You'd believe you?

11       THE JUROR:  -- I would believe me.

12       THE COURT:  Sure.

13       THE JUROR:  But do you figure because of what they

14   do for a living, they're supposed to tell the truth?

15       THE COURT:  Right.

16       THE JUROR:  So I think maybe they -- I couldn't

17   say.

18       THE COURT:  The question is whether you would

19   believe or whether your answer is it depends on the

20   circumstance?

21       THE JUROR:  It does depend on the circumstances.

22       THE COURT:  And it depends on their testimony and

23   all of the circumstances?

24       THE JUROR:  I think most people believe police

25   officers are supposed to be honest, but it does depend on

1    the circumstance.

2            THE COURT:  The second question, this is a lawsuit

3    brought by someone who -- I don't know all the facts of

4    this -- may have a criminal record.  The claim is that he

5    was allegedly wrongfully convicted and if you can conclude

6    that whatever his record was shouldn't be a bar to damages.

7    Do you agree with the plaintiff, the fact that he has a

8    record shouldn't be a bar to damages?  Do you think the fact

9    that he had a criminal record would stop you?

10           THE JUROR:  It would make me think twice

11   definitely.

12           THE COURT:  I'll excuse you.  Thank you for your

13   honest answers.  Thank you so much.

14           MS. HARRIS:  Thank you.

15           THE JUROR:  Thank you.

16           THE COURT:  Next one is Mr. Doug Riley.

17           MR. WHITE:  "A long trial is problematic due to

18   the nature of my occupation."

19           THE COURT:  Hi.

20           THE JUROR:  Hello.

21           THE COURT:  Mr. Reilly, before letting anyone

22   question, let me ask you a question.  You answered that a

23   long trial is potentially problematic due to the nature of

24   your occupation.  Why is that?

25           THE JUROR:  I'm the lead portfolio manager for two

1    products, represent 10 percent of the firm's revenue, and

2    while we do have other people there that see it, I'm the

3    primary person that handles the money, so I didn't know if

4    there would be full day trials.

5         THE COURT:  It's 9 to 1.  It's 9 to 1.  We'll go

6    full this week, this whole week but next week I think there

7    will be two days we won't be sitting.

8         THE JUROR:  Then you run into quarter end, it's a

9    very important period of time.

10        THE COURT:  When does the quarter end?

11        THE JUROR:  March is quarter end.

12        THE COURT:  You can decide, I can put lots of sort

13   of political pressure on that everybody has to serve, but if

14   this is going to be a hardship for you and your company then

15   we don't ask that you do that.

16        THE JUROR:  I think realistically it's going to

17   cause some problems.

18        THE COURT:  Okay, I'll excuse you, Mr. Riley,

19   thank you very much.

20        THE COURT:  Hi, Mr. Ryan.

21        THE JUROR:  Hi.

22        THE COURT:  Ms. Scappichio will question you five

23   minutes and not a minute more.

24        MS. SCAPICCHIO:  Hi.  My name is Rose Scapicchio,

25   and I represent Shawn Drumgold.  He's the plaintiff in this

1    case.  I have a few questions for police officers.  Would

2    you tend to believe the testimony of a police officer over

3    that of a civilian witness because of his or her position as

4    a police officer?

5              THE JUROR:  No, I don't think so.

6              MS. SCAPICCHIO:  Okay.  If two people saw the same

7    thing, one being a police officer and the other one being a

8    civilian witness, do you think the police officer's training

9    and experience would cause you to believe that person more

10   than the civilian witness?

11             THE JUROR:  Yeah, it might.

12             MS. SCAPICCHIO:  Okay.  And when you say yeah, it

13   might, you think it's because he or she has gone through the

14   police academy and then trained and observed things that

15   they may have a better sense?

16             THE JUROR:  Yes.

17             MS. SCAPICCHIO:  In this case if there were

18   interviews that were conducted by the police that the police

19   will say happened in one way and civilian witnesses who were

20   interviewed will say they happened in another way, would you

21   tend to believe the testimony of the police officers that

22   they were conducted according to what their reports would

23   indicate?

24             THE JUROR:  I'm not sure.

25             MS. SCAPICCHIO:  Do you have some hesitation that

1     you would believe the testimony of a police officer?

2               THE JUROR:  I might, yes.

3               MS. SCAPICCHIO:  And in this case some people

4     think that because the job that police officers do is so

5     important to be able to function as a society that they

6     disfavor any suits against police officers when they're in

7     their official capacity.  Do you have any feelings about

8     that?

9               THE JUROR:  Not really, no.

10              MS. SCAPICCHIO:  Okay.  Would you have any trouble

11    awarding damages to a plaintiff who had a criminal past, in

12    other words, had been convicted of a crime?

13              THE JUROR:  Not if he deserves it, no.

14              MS. SCAPICCHIO:  Would you have any trouble

15    awarding damages to a plaintiff who may have had some drug

16    abuse in the past?

17              THE JUROR:  No, a lot of people are drug abused,

18    no.

19              MS. SCAPICCHIO:  Now, with respect to this case,

20    this involves a case that happened in 1988 where a little

21    girl by the name of Tiffany Moore was shot and killed as she

22    sat on a mailbox in Roxbury.  Shawn Drumgold, my client, was

23    arrested and convicted and sent to jail for life.  Some time

24    after 15 years he was let go in this case and he is now

25    suing the police claiming that they violated his

1    constitutional rights and it led to his wrongful conviction

2    in this case.  Do you have any opinions about somebody who

3    spent a great deal of time in jail turning around and suing

4    the police?

5              THE JUROR:  No, I don't think so.

6              MS. SCAPICCHIO:  Okay.  Do you have any concerns

7    that come to your mind in terms of somebody who has spent

8    that amount of time in jail once he got out to turn around

9    and sue the police?

10             THE JUROR:  Would you repeat that, please?

11             MS. SCAPICCHIO:  Sure.  Do you have any concerns

12   amount a person that spent that much time in jail when he

13   got out and turned around and sued the police?

14             THE JUROR:  What do you mean by concerns?

15             MS. SCAPICCHIO:  In other words, does it concern

16   you at all?  In your mind does it not fit?  Do you think

17   there's something wrong with it?  Do you think it's okay?

18             THE JUROR:  No, I think it's okay.  I mean, he was

19   obviously, I mean, if the evidence freed him, then he was

20   wrongly accused, arrested, so I think it's okay.

21             MS. SCAPICCHIO:  Okay.  And in this particular

22   case, there will be witnesses who will say that certain

23   things happened that won't be able to document those at all,

24   it will basically be their testimony about what happened vs.

25   police officers who will say they have written reports about

1    things that will contradict the witness.  Do you have any

2    ability to be able to decipher who you think you would

3    believe, or do you think it would depend on the evidence?

4            THE JUROR:  I think it would depend on the

5    evidence.

6            MS. SCAPICCHIO:  I don't have anything further,

7    your Honor.

8            THE COURT:  Counsel.

9            MR. WHITE:  My name is William White.  Good

10    afternoon.

11            THE JUROR:  Good afternoon.

12            MR. WHITE:  I represent Tim Callahan along with

13    Mary Jo Harris.  I wanted to ask you first have you ever had

14    a personal encounter with a police officer?

15            THE JUROR:  No.

16            MR. WHITE:  Do you have any general opinions of

17    police officers?

18            THE JUROR:  Not particularly, no.

19            MR. WHITE:  As you heard, this case involves the

20    shooting of a 12 year-old girl and by the name of Darlene

21    Tiffany Moore, the police investigation that followed, the

22    prosecution of Shawn Drumgold and his conviction.  You heard

23    that 15 years later he was granted a new trial.  Does the

24    fact that he's granted a new trial suggest to you in any way

25    that there's any police wrongdoing?

1          THE JUROR:  No, it just means that new evidence

2     came up.

3          MR. WHITE:  If you were to hear in this case, for

4     example, that witnesses who testified one way at the

5     original trial testified differently 15 years later, would

6     that affect you in any way?

7          THE JUROR:  I'm not sure.  I guess I'd have to

8     know why they decided to change their mind.

9          MR. WHITE:  Would you be curious about that?

10          THE JUROR:  Yes, very curious.

11          MR. WHITE:  You, sir, have lived in Massachusetts

12     or you've lived at your current residence for 34 years?

13          THE JUROR:  Yes.

14          MR. WHITE:  In 1988 do you remember where you were

15     living?

16          THE JUROR:  Yes.

17          MR. WHITE:  The same place?

18          THE JUROR:  Yes.

19          MR. WHITE:  And that's in Raynham?

20          THE JUROR:  Yes.

21          MR. WHITE:  Sir, with respect to 1988, do you

22     remember hearing anything at all about the shooting of

23     Darlene Tiffany Moore?

24          THE JUROR:  I want to say I do, but I'm not sure.

25     I vaguely remember something, but I don't think I could tell

1    you what happened or why it happened or anything else.

2         MR. WHITE:  Do you remember hearing anything about

3    Shawn Drumgold from that period of time?

4         THE JUROR:  No.  I might have heard about the

5    shooting on the news, but I didn't follow the case at all.

6         MR. WHITE:  You mentioned that in your

7    questionnaire that your primary source for news is

8    television and radio?

9         THE JUROR:  Yes.

10        MR. WHITE:  With respect to the radio stations

11   that you listened to, what type of stations are they?

12        THE JUROR:  News stations.  I mean, I listen to

13   WBZ and I listen to music, country.

14        MR. WHITE:  With respect to this particular

15   incident involving Darlene Tiffany Moore and Shawn Drumgold,

16   do you remember hearing anything about the case in the last

17   few years?

18        THE JUROR:  No.

19        MR. WHITE:  I think I'm going to let Ms. Harris

20   and Mr. Curran question.

21        MR. ROACHE:  Mr. Ryan back in 1988 or '89, were

22   you familiar with, did you read or hear anything about gang

23   violence in the City of Boston?

24        THE JUROR:  Well, you always hear about gang

25   violence but I don't pay too much attention to it.

1          MR. ROACHE:  Did you form any opinions back then
2     or now as to whether or not there was gang violence?
3          THE JUROR:  No.
4          MR. ROACHE:  You say that in your interview that
5     you watch TV, that you watch CSI and Cold Case, those TV
6     programs?
7          THE JUROR:  Yes.
8          MR. ROACHE:  Do you believe that those things can
9     occur, ultraviolet lights?
10         THE COURT:  There will be no ultraviolet light in
11    this case.
12         THE JUROR:  I do not, no.
13         MR. ROACHE:  You don't believe a crime is solved
14    within an hour of it being committed?
15         THE JUROR:  No.
16         THE COURT:  I just wanted to follow up on one
17    question.  Going back to the police officer, assuming there
18    was a traffic violation and a police officer testified that
19    the light was red and a civilian testified that the light
20    was green, would you believe the police officer just because
21    he's a police officer and for no other reason or would it
22    depend on the circumstance?
23         THE JUROR:  It would depend on the circumstance.
24         THE COURT:  Okay.  I'm going to ask you to call
25    this number, sir.  It's a 1-800 number.  You need to call it

```
1    at 6 and have your jury number.  If you're on the final

2    jury, you'll join us on Wednesday morning.

3              MS. HARRIS:  Thank you.

4              MR. WHITE:  Thank you, sir.

5              MS. SCAPICCHIO:  Thank you.

6              MR. CURRAN:  Judge, could I be heard in regards to

7    an objection?

8              THE COURT:  You're talking the others?

9              MR. CURRAN:  I object to the line of questions

10   because there's evidence that we objected to that the Court

11   hasn't indicated a ruling.

12             THE COURT:  About what?

13             MR. CURRAN:  In regards to the sentence of life in

14   prison, the length of confinement.

15             THE COURT:  No, that comes in, that he was in 15

16   years, the basis of his damages.

17             MR. CURRAN:  The fact that he was sentenced to

18   life in prison, Judge, I have a problem in.

19             THE COURT:  I'm going to allow the evidence in.

20   The question we have been struggling, how much of the basis

21   for the reversal of the conviction comes in and that I was

22   saying, there's a stipulation.

23             MS. SCAPICCHIO:  Did I get into that?  I didn't

24   mean to get into it.  What did I say?

25             THE COURT:  This is a bad sign, Rosemary.  You
```

1   mentioned he had been sentenced to life and been in 15

2   years.

3           MS. SCAPICCHIO:  I thought it was all okay.  I

4   didn't get into why the new trial was granted.

5           THE COURT:  The next juror is Larry Apple.

6           THE JUROR:  Hello.

7           THE COURT:  I think we begin on this side of the

8   aisle.

9           MR. WHITE:  Good afternoon, sir.  My name is

10  William White and with Mary Jo Harris, we represent

11  Timothy Callahan in this case.  I have a few questions to

12  ask you, and first let me start off by telling you just a

13  little bit more that this case stems from the 1988 shooting

14  of a 12 year-old girl by the name of Darlene Tiffany Moore

15  who was sitting on a mailbox at the time that she was shot.

16          There was a police investigation that followed.

17  As a result of the police investigation, Mr. Drumgold was

18  arrested, he was convicted, and he was sent to prison.  This

19  case is going to involve the testimony of police officers,

20  and it's going to involve the testimony of some civilian

21  witnesses.

22          Does the fact that a police officer will testify

23  and a civilian witness will testify about the same incident

24  affect you in any way as to which individuals you are more

25  likely to believe?

1          THE JUROR:  No.

2          MR. WHITE:  Have you ever had a personal encounter

3   with a police officer?

4          THE JUROR:  I have one that's a friend.  Yes.  Not

5   adversarial conditions.

6          MR. WHITE:  In other words, have you ever needed

7   the protection of a police officer, needed the help of a

8   police officer, had a loved one or a close friend who's

9   needed the help of the police in some fashion that you knew

10  more about what was going on with that police officer in

11  that particular investigation?

12         THE JUROR:  I would have to say as I interpret

13  your question, I don't believe so.  Again, I have a neighbor

14  who's a State Police lieutenant and certainly one could be

15  called on to help in some minor --

16         MR. WHITE:  You have a social relationship?

17         THE JUROR:  Should you say traffic adviser,

18  something like that.  Consultative.

19         MR. WHITE:  As a neighbor?

20         THE JUROR:  As a neighbor and a friend.  Everyone

21  like that one?

22         MS. SCAPICCHIO:  Yes, that was a good one.

23         THE COURT:  That was good.

24         MR. WHITE:  With respect to your relationship with

25  your neighbor, do you ever discuss police business or police

1   events that are in the news?

2          THE JUROR:  No.

3          MR. WHITE:  Have you ever read anything about the

4   case involving Darlene Tiffany Moore?

5          THE JUROR:  I'm not familiar with this at all.

6          MR. WHITE:  Not at all?

7          THE JUROR:  Not at all.  I was not here in '88.

8          MR. WHITE:  I see you got some roots to Tennessee?

9          THE JUROR:  Yes.

10         MR. WHITE:  Were you living in Tennessee?

11         THE JUROR:  No, Corpus Christi.  I moved around

12  some.

13         MR. WHITE:  You have been around the country?

14         THE JUROR:  Left Tennessee in '84 and never

15  returned.

16         MR. WHITE:  I'm going to allow Mr. Curran to ask

17  you.

18         MR. CURRAN:  Could you tell me about your

19  experience, you say 14 years in the National Guard?

20         THE JUROR:  I did, all of it in Tennessee.

21         MR. CURRAN:  So it was before you went to the

22  corporate world?

23         THE JUROR:  No, it was concurrent, mostly in the

24  executive seat and what we call field sales, regional

25  offices.

1          MR. CURRAN:  What?

2          THE JUROR:  Ping pong between the north and south,

3     and Kentucky and Tennessee.

4          MR. CURRAN:  Have you lived in metropolitan areas?

5          THE JUROR:  Always suburbs close to the city.

6          MS. HARRIS:  I'm sorry, I'm going to jump in out

7     of order.  Excuse me, sir.  You indicated on question 30,

8     you were asked is there any particular reason you would like

9     to be a juror in this case or would like not to be a juror

10    in this case, and you said you were ambivalent.  Could you

11    tell me a little bit what that means.

12         THE JUROR:  I have no incentive to do this.  I'm a

13    retired man, and every minute is my own, and I think I'm

14    quite accustomed to that.  In some small sense, and don't

15    take this too literally, this is an imposition on my day, my

16    day of fun.

17         MS. HARRIS:  No question about it.

18         THE JUROR:  And I worked a long time to achieve

19    those 365 days of fun per year, but then again I'm not one

20    to shirk duty as well.

21         MS. HARRIS:  So it's nothing about the case,

22    either about the case --

23         THE JUROR:  It's nothing about the court, nothing

24    about the case, yes.

25         MR. CURRAN:  Just one last question.  There was an

1      indication that one of your neighbor's son was murdered?

2              THE JUROR:  Yes.

3              MR. CURRAN:  You indicated it wasn't close?

4              THE JUROR:  A neighborhood being what it is, there

5      are people you know in the neighborhood but perhaps don't

6      see them socially or things like that, but a neighborhood

7      over time becomes close in sort of a casual way.  This was a

8      very brutal kidnapping, torture and murder.  It was the

9      Sampson case, if anyone remembers that, and that was one of

10     our neighbors.

11             MR. CURRAN:  Is there anything about that case and

12     your knowledge of it that impact your ability to be able to

13     be fair to the police officers and Mr. Drumgold?

14             THE JUROR:  I would say that's a very difficult

15     question to answer.  This was a case where the defendant

16     confessed, he was captured, he confessed, preponderance of

17     the evidence against him, he was tried and convicted, and I

18     think at least for the neighborhood those are very close to

19     the family, the most concerning issue was the death penalty,

20     for crying out loud, and did we get emotional, yes, I did.

21     That was in some measure one of our sons who was brutally

22     murdered, tortured.  I have never served in a criminal trial

23     at all, I've never observed a criminal trial so I don't know

24     how I would feel.

25             THE COURT:  This is not a criminal trial.

1          THE JUROR:  No, it's a civil trial, but you asked

2     me about, you know, would that in any way affect my view.  I

3     can't tell you.  I have no experience in this.

4          MR. CURRAN:  In regards to your knowledge of the

5     investigation, anything impact your ability to be fair to

6     Richard Walsh and Timothy Callahan?

7          THE JUROR:  I would hope I'm fair.  I'm kind of a

8     boy scout when you get right down to it.

9          MR. CURRAN:  Thank you, sir.

10          THE COURT:  Ms. Scappichio.

11          MS. SCAPICCHIO:  Good afternoon.  My name is Rose

12     Scapicchio.  I represent Shawn Drumgold.  He's the plaintiff

13     in this case.  I'm going to ask you a few questions in terms

14     of people who have been wrongly convicted.  Would you tend

15     to believe the testimony of a police officer over that of a

16     civilian witness simply because of his or her position as a

17     police officer?

18          THE JUROR:  Honestly, no.

19          MS. SCAPICCHIO:  Okay.  So if a police officer

20     took a statement from a witness and wrote a report regarding

21     that statement and said the witness said X and the witness

22     came in and said that's not true, I said Y, would you weigh

23     the testimony of both witnesses, or would you give a little

24     bit of an edge to the police officer because they wrote it

25     down?

1          THE JUROR:  I probably watch way too much CSI

2    episodes, but there has to be some evidence of something

3    that yes, I can have an opinion, but I tend to be a logical

4    person, so a lot would go into my decision.  I think I would

5    weigh both sides equally, I think.

6          MS. SCAPICCHIO:  So you wouldn't sway either

7    towards the civilian or to the police officer?

8          THE JUROR:  That would be a correct statement.

9          MS. SCAPICCHIO:  In this case if you were to find

10   out that the plaintiff had a criminal past, would that

11   prevent you in any way from awarding damages if you found

12   that the defendants violated his civil rights?

13         THE JUROR:  I think it might.

14         MS. SCAPICCHIO:  Could you tell me why you think

15   that?

16         THE JUROR:  I think there is perhaps some issue

17   that the plaintiff, as you call it, might not deserve some

18   compensation.

19         MS. SCAPICCHIO:  Because of criminal history?

20         THE JUROR:  Depending on what that was, petty

21   crimes or whatever.

22         MS. SCAPICCHIO:  If you found out that the

23   defendant had a history with drugs, would that concern you

24   in terms of awarding his damages?

25         THE JUROR:  Yes, it would.

1          MS. SCAPICCHIO:  Would you be able to award him

2   damages or you would have to think twice about it?

3          THE JUROR:  I would say I'd have to think twice

4   about it.

5          MS. SCAPICCHIO:  I have no further questions.

6          THE COURT:  The question about deserving damages,

7   if you find that there's a constitutional violation but only

8   if you find there's a constitutional violation and that that

9   violation was the cause of his conviction, then I would be

10  instructing you on damages which also have to be focused on

11  the evidence in the case.  You can't award damages based I

12  like the guy or don't like the guy, it has to be grounded in

13  real damages in the case.  You have to take a number of

14  circumstances in account.  The fact that someone has a prior

15  record is not a disqualification, is not a bar.

16         THE JUROR:  I understand that.

17         THE COURT:  The question in answer to

18  Ms. Scappichio's question you would find that because the

19  plaintiff had a prior record that that would somehow in your

20  judgment disqualify him from getting damages or whether

21  you'd listen to my instructions.

22         THE JUROR:  Well, I'm just being candid about the

23  human nature piece of me here.  My view is that in a perfect

24  world people should be only rewarded only when they deserve

25  it.  Now, in the particular circumstances of the case as it

1     may develop, I don't know if there's a deserving nature to

2     that or not.  I would have to listen.

3              THE COURT:  To the circumstances?

4              THE JUROR:  To the circumstances of the case, but

5     I'm not -- I'm probably not on the side of the common man as

6     we view it in the movies.

7              THE COURT:  Right.  The issue is, you know, we're

8     really talking about people are going to start with a level

9     playing field, and wrongful conviction cases are brought

10    oftentimes on behalf of people who may have criminal records

11    and may have problems, then the damages are to be focused on

12    those that derive from the wrongful conviction.

13             THE JUROR:  I would agree with that.

14             THE COURT:  Okay.  I'm going to ask you to call

15    this number after 6:00 tomorrow.  You need your jury room

16    number when you call up, and we'll let you know whether

17    you're on the final jury, and you have the rest of the day

18    off.

19             THE JUROR:  I will be playing enthusiastically.

20             THE COURT:  Oh, good.  Thank you.

21             MS. HARRIS:  Thank you.

22             MS. SCAPICCHIO:  Your Honor, may we have a moment

23    before the next juror?  I'd challenge that jury for cause.

24    I think he said unequivocally that he wouldn't be able to

25    award damages because of a criminal past.

1          THE COURT:  I think that the question was

2   ambiguous, and I think that he was characterizing the

3   question as who deserves it as if it were a moral issue and

4   not a factual issue.  As I said, the question that you

5   really want to ask is wrongful conviction is about what

6   happened to the plaintiff, the accusations about the

7   plaintiff.  He's entitled to damages for having been

8   wrongfully convicted.  Would the fact that he has a record

9   be a bar, and I think he said no to that, so I'll reject

10  your challenge.

11          THE COURT:  Bring in the next juror.

12          MS. SCAPICCHIO:  Judge, this juror on question 4

13  indicated they might have a problem sitting.

14          MR. WHITE:  Then No. 30.  I want to do it so I

15  won't have to do it again.

16          THE COURT:  Hi.  Your name is Soraya Assar?

17          THE JUROR:  Soraya Assar.

18          THE COURT:  You said you're a consultant, and you

19  think it would interfere with jury duty?

20          THE JUROR:  Well, after you explained it a bit, it

21  might not be too bad.  The way consulting works, you got to

22  utilize and bill so many hours, and we haven't signed a lot

23  of business, but there is work I can do at home so you're

24  anticipating a 9 to 1 schedule.  It's possible I have a

25  client on the west coast, which is three hours behind, so I

1    could get in some work.

2           THE COURT:  That would be great.  Go on,

3    Ms. Scappichio.

4           MS. SCAPICCHIO:  Good afternoon.  My name is Rose

5    Scapicchio.  I represent Shawn Drumgold.  He's the plaintiff

6    in this case, and I'm going to ask you a few questions about

7    your feelings in general regarding wrongful convictions and

8    police officers.  First I wanted to tell you this case is

9    about a murder that took place in 1988, a little girl by the

10   name of Tiffany Moore was murdered as she sat os an mailbox.

11   The police arrested Shawn Drumgold, he was tried, he was

12   convicted, he was sentenced to life, he served 15 years in

13   jail, and then he was granted a new trial.  He's now brought

14   suit against the defendants in this case, Detective Callahan

15   and Detective Walsh.

16          My question is with respect to this particular

17   case, have you heard anything about the Drumgold case or

18   Tiffany Moore or anything of that nature?

19          THE JUROR:  No, I actually have been here in

20   Boston four years May the 1st.  I travel every week Monday

21   through Thursday, and I don't get time to watch the local

22   news, and the only reason I get the Sunday paper is for the

23   sale items.  I usually read the New York Times, so, I'm

24   sorry, I really am not familiar with the case or actually

25   with Boston very much at all.

1          MS. SCAPICCHIO:  Okay.  Do you have any ideas

2     about police officers, in other words, would you believe the

3     testimony of a police officer over that of a civilian

4     witness because of his or her training and experience as a

5     police officer?

6          THE JUROR:  No.  I mean, I think I would look at

7     each person.

8          MS. SCAPICCHIO:  It would depend on the

9     circumstances?

10          THE JUROR:  Yes.

11          MS. SCAPICCHIO:  With respect to this particular

12     case, if you were to find that the defendant's violated

13     Mr. Drumgold's civil rights and then you were to find that

14     Mr. Drumgold had a criminal past, would that prevent you in

15     any way from awarding damages on this violation?

16          THE JUROR:  I don't think so.  I don't know

17     anything about the case.  I'd have to see, I mean, I can't

18     make a decision on something that I don't have enough

19     information on.

20          MS. SCAPICCHIO:  Okay.  That's fair enough.

21     Similarly in this case if you were to find that the

22     defendants violated Mr. Drumgold's civil rights and you

23     found out that Mr. Drumgold had some problems with drugs in

24     the past, would that prevent you from being able to award

25     him damages?

1          THE JUROR:  No.

2          MS. SCAPICCHIO:  Okay.  Some people think that the

3     job that police officers do is so important that they

4     shouldn't be sued at all for anything that happens while

5     they're on duty.  Do you agree with that?

6          THE JUROR:  No.

7          MS. SCAPICCHIO:  Okay.  In this particular case do

8     you have any feelings about people who have committed other

9     crimes that you'd like to share with us, any people with

10    criminal histories, do you have any opinions about them in

11    general?

12         THE JUROR:  Are you asking me if I would judge

13    somebody differently because I knew they committed other

14    crimes?  It's a much better question.  Yes.

15         THE JUROR:  Well, Dr. Phil says the best predictor

16    of future behavior is past behavior, and they say that

17    leopards don't change their spots but people do change,

18    so...

19         MS. SCAPICCHIO:  So you don't believe Dr. Phil?

20         THE JUROR:  I know my friends ask me if I believe

21    Dr. Phil and Oprah are the gold standard for everything, I

22    don't.  Things that happen in the past can affect somebody's

23    future behavior, but it can go either way, so I can't say

24    that just because somebody's done something in the past is

25    going to necessarily mean that they've done something now or

1    that they're guilty or not guilty because of what they've

2    done.  People can change as well as not change.

3              MS. SCAPICCHIO:  Okay.  And in this case we expect

4    that they'll be evidence that witnesses will take the stand

5    and they testified one way at the criminal trial and we

6    expect that they will testify differently here, in other

7    words, recant their testimony that they had at the criminal

8    trial and provide an explanation for that recantation.

9    Would you have some concerns about witnesses who had

10   testified one way in one trial and then come in here and

11   testify differently?

12             THE JUROR:  Some, I guess especially if it was a

13   child or a younger person, then a lot of years had passed.

14             MS. SCAPICCHIO:  Why would that make a difference

15   to you?

16             THE JUROR:  People may see things differently as a

17   child than they do as an adult, and they understand things

18   differently, so there may be a very good reason for them to

19   change their testimony.  I guess I'd have to listen to why

20   they're changing the testimony.

21             MS. SCAPICCHIO:  Okay.

22             THE JUROR:  Yeah, it might concern me, but

23   explanations could, you know, make all the difference in the

24   world.

25             MS. SCAPICCHIO:  Thank you.  I appreciate it.

1          MS. HARRIS:  Thank you.

2          THE COURT:  Who goes?

3          MS. HARRIS:  I'm going this time.  Hi, I represent

4   retired Detective Timothy Callahan as well as the other

5   defendants.  This case is related to the 1988 murder of a

6   little girl named Tiffany Moore, Darlene Tiffany Moore.  She

7   was shot as she sat on a mailbox on a street corner.  Do you

8   know anything about that case?

9          THE JUROR:  No.

10          MS. HARRIS:  And, likewise, do you know anything,

11   have you read in any of the media about either the murder of

12   Tiffany Moore or the suit that brings us here today brought

13   by Mr. Drumgold?

14          THE JUROR:  No.

15          MS. HARRIS:  I notice that you read Patricia

16   Cornwell?

17          THE JUROR:  Yeah, that's the only fiction writer

18   that I read.

19          MS. HARRIS:  She's pretty sophisticated.  Does

20   reading her novels have anything -- does it affect your --

21          THE JUROR:  I skip over that stuff.

22          MS. HARRIS:  So do I.

23          THE JUROR:  When I skip over, I just really wanted

24   to see what's happening to Lucy, Pete Marino.

25          MS. HARRIS:  And the reason I ask is just because

1    with popular culture, there's a certain level of

2    sophistication in these crime shows that may not always

3    match up in real life.  Do you have an opinion about that

4    one way or the other?

5                    THE JUROR:  I skip over that stuff.

6                    MS. HARRIS:  Likewise when you read the newspaper

7    or listen to the news, do you have an opinion about the

8    objectivity or the lack thereof that may be involved in any

9    of the news coverage that you experience?

10                    THE JUROR:  Years ago -- my training is as a

11    librarian, and one of my first jobs was in a newspaper

12    library, and so I do know that, believe it or not,

13    journalists are humans, too, and the ones that I've had the

14    pleasure to know are just as human as anyone, and they do

15    strive for objectivity, so I believe it is.

16                    MS. HARRIS:  Would you be more likely to believe

17    something you read in the newspaper than base it on any

18    other evidence that came to you?

19                    THE JUROR:  No.

20                    MS. HARRIS:  Okay.  I think that's all I have.

21                    MR. CURRAN:  I just have a question in regards to

22    younger person vs. older, as they mature that they see

23    things differently as a child.  Could you further explain on

24    that?

25                    THE JUROR:  Well, depending on, for example, like

1    traumatic events that happen in a young child's life that

2    can certainly have an impact on them and maybe after going

3    through therapy and some of those things, they may

4    understand it differently than they did when it originally

5    happened.  So, it's not to say what they saw when they were

6    younger wasn't valid, and the way that they're understanding

7    it now isn't valid but they just may understand it

8    differently.

9         THE COURT:  Thank you.  I'm going to ask you to

10   call this number after 6:00 on Tuesday.  You need your jury

11   number, they'll be a recorded announcement that will let you

12   know if you're a juror in this case.  If you are, we'll see

13   you Wednesday morning.

14        MS. HARRIS:  Thank you.

15        MS. SCAPICCHIO:  Thank you.

16        THE COURT:  Six jurors.  Hi.  Mr. Corrivea, is it

17   French?

18        THE JUROR:  Yes.

19        THE COURT:  I think.

20        THE JUROR:  One thing, I got to tell you something

21   that I think I was a little ill before lunch, so I took one

22   of my glucose things.  I thought it might be my sugar.  I'm

23   not sure if it's my sugar or I have a touch of something.

24        THE COURT:  You let me know.  You're feeling okay

25   now?

1          THE JUROR:  I'm feeling better.

2          THE COURT:  Counsel, this side.

3          MR. WHITE:  I'm William White, and I represent

4    Timothy Callahan along with Ms. Harris and Mr. Curran

5    represents Richard Walsh, and John Roache represents the

6    City of Boston and Francis Mickey Roache.  I just wanted to

7    start by asking you whether you understand that this case

8    involves a 1988 incident that occurred?

9          THE JUROR:  I do now.  I didn't know at this

10   time.

11         MR. WHITE:  This incident happened in 1988.  It

12   involved the shooting of a 12 year-old girl by the name of

13   Darlene Tiffany Moore as she sat on a mailbox on a street

14   corner and --

15         THE JUROR:  I remember something about that, but I

16   wasn't sure of all the details, but I remember sitting on a

17   street corner, a girl.

18         MR. WHITE:  Do you remember how you heard about

19   the incident?

20         THE JUROR:  Just the news.

21         MR. WHITE:  Do you remember from 1988 or something

22   more recent you came across?

23         THE JUROR:  I couldn't tell you before, but once

24   you said the little girl on the stoop type thing, I could

25   relate to that.  It may have been a previous shooting and it

1    came back.

2          MR. WHITE:  As a result of this particular

3    shooting, the police conducted an investigation which led to

4    the arrest of Shawn Drumgold.  Did you know that before?

5          THE JUROR:  I knew someone was arrested, but I

6    didn't really know who.

7          MR. WHITE:  It also as a result of the arrest and

8    the prosecution of the case, Mr. Drumgold was convicted.

9    Did you know that?

10          THE JUROR:  I didn't follow the case, no.  I

11    didn't really follow it.  I knew someone was arrested and

12    then after that I assume they were convicted.  Probably

13    heard excerpts of it in the news, things like that.

14          MR. WHITE:  In 1988, I noticed on your

15    questionnaire you indicated that you've lived at your

16    present address in Salem for 35 years?

17          THE JUROR:  Correct.

18          MR. WHITE:  In 1988, where were you living?

19          THE JUROR:  That would be there.

20          MR. WHITE:  There at that same address?

21          THE JUROR:  Yes.

22          MR. WHITE:  Okay.  With respect to the information

23    that you learned about this case, do you know if you learned

24    about it through the newspapers, through the news?

25          THE JUROR:  I would think in the news.  It was a

1    while back, but I would say probably the news.

2           MR. WHITE:  Have you ever discussed this matter

3    with anyone else?

4           THE JUROR:  (Witness shaking head.)

5           MR. WHITE:  That you recall?

6           THE JUROR:  Maybe something over coffee, we might

7    discuss not any details, maybe an offhand remark or

8    something like that.

9           MR. WHITE:  Do you recall ever hearing anything

10   about the police investigation concerning this particular

11   shooting?

12          THE JUROR:  No.  I knew there were police

13   investigations, but that may have been others.  There was a

14   lot of ongoing turmoil I remember and there were a lot of

15   different things like that.

16          MR. WHITE:  Did you hear there were problems with

17   gangs in the City of Boston in 1988 around that time?

18          THE JUROR:  Well, I heard about it.  I don't

19   remember the date.

20          MR. WHITE:  Do you remember gangs being involved

21   in the shooting of Darlene Tiffany Moore?

22          THE JUROR:  I heard about gangs, I don't know if

23   it was that particular case.

24          MR. WHITE:  In this case there are going to be a

25   number of witnesses who will testify.  Some of them will be

1    civilians and some of them will be police officers.  Does

2    the fact that a police officer testifies differently or

3    contrary to what a civilian testifies affect your opinion as

4    to whom you would believe?

5                THE JUROR:  I wouldn't think so.

6                MR. WHITE:  In other words, you would consider the

7    testimony of a police officer and a civilian equally?

8                THE JUROR:  I would try, I guess, yeah.

9                MR. WHITE:  Have you ever had a personal encounter

10   with a police officer?

11               THE JUROR:  Yes.

12               MR. WHITE:  And could you tell us a little bit

13   about that?

14               THE JUROR:  I was -- it happened to be like a

15   speeding ticket, and it was like he said, I was speeding and

16   he didn't have a radar gun, and he said I was going this

17   fast and I said I wasn't.  It was pretty much I ended up

18   paying the ticket.

19               MR. WHITE:  You said that he didn't have a radar

20   gun?

21               THE JUROR:  He did, they didn't have radar on this

22   vehicle.

23               MR. WHITE:  How long ago was that?

24               THE JUROR:  Maybe five, six year ago.

25               MR. WHITE:  When he said that you were speeding

1  and didn't have a radar, did you challenge the ticket at

2  all?

3          THE JUROR:  Yes.

4          MR. WHITE:  Did you go to a clerk's hearing?

5          THE JUROR:  Yes.

6          MR. WHITE:  And did the police officer show up?

7          THE JUROR:  No.

8          MR. WHITE:  When you got to the clerk's hearing,

9  how was it that you decided to resolve the case?

10          THE JUROR:  The feeling he got once I stepped in

11  the room that they were not thrilled that I was going to be

12  fighting this, and I got the feeling I was going to go

13  nowhere, do you want to go to trial.  I said this is not

14  worth it so I paid the ticket.

15          MR. WHITE:  When you paid the ticket and you left

16  the court that day, how did you feel about how you were

17  treated?

18          THE JUROR:  Well, I was upset.

19          MR. WHITE:  When you say you were upset, what was

20  it specifically about that process that made you feel upset?

21          THE JUROR:  I guess I was thinking that they were

22  more siding with the officer I would guess because I was

23  saying, look it, he doesn't have a radar gun, he was saying

24  I was going this fast, I was saying I really wasn't, look

25  it, we can resolve this by going to court.  I said it's

1    really not worth it, I'll pay the fine, and that would be

2    it.

3              MR. WHITE:  Did you feel like your case was

4    handled fairly?

5              THE JUROR:  Not at that instance, no, but that was

6    five, six years ago, so...

7              MR. WHITE:  On your questionnaire, you mentioned

8    that you spent some time in the National Guard?

9              THE JUROR:  Yes.

10             MR. WHITE:  And when you left the National Guard,

11   what was your rank?

12             THE JUROR:  I was a Specialist 4.

13             MR. WHITE:  Were you ever in any type of active

14   service?

15             THE JUROR:  No.

16             MR. WHITE:  I don't have any other questions.

17             MR. CURRAN:  I just have one question, sir.  The

18   fact that you pulled over for a speeding ticket and went

19   through that process, you'd still be able to judge the facts

20   in regards and to evaluate the credibility of Mr. Callahan

21   and Mr. Walsh?

22             THE JUROR:  Yes, I think so.

23             THE COURT:  Ms. Scapicchio.

24             MS. SCAPICCHIO:  Hi, I represent the plaintiff

25   Shawn Drumgold in this case.  I have a few questions about

1    wrongful convictions.  I think you heard Mr. White tell you

2    that Shawn was arrested and convicted.  He was sentenced to

3    life in prison for the murder of Tiffany Moore, and after 15

4    years, a motion for a new trial was allowed and he was set

5    free.  Do you remember reading anything about that in the

6    papers at all?

7            THE JUROR:  No.

8            MS. SCAPICCHIO:  And in terms of if you had

9    listened to the evidence in this case and came to the

10   conclusion that the defendants, Detective Walsh and

11   Detective Murphy, violated Shawn Drumgold's rights and that

12   violation led to his wrongful conviction, would you have any

13   trouble awarding damages if you knew that Mr. Drumgold had a

14   criminal past?

15           THE JUROR:  Well, I would think if he was

16   wrongfully convicted and I mean the evidence proved that,

17   then I would have to glean that he should get some

18   restitution for it.

19           MS. SCAPICCHIO:  But would you take into

20   consideration his criminal past at all when you were trying

21   to figure out what the appropriate award of damages would

22   be?

23           THE JUROR:  I'm not sure about that.

24           MS. SCAPICCHIO:  Okay.  Let me try to ask a better

25   question because I don't think that was a good question.

1    Would you hold it against Shawn Drumgold, in other words,

2    would you think he's entitled to less money because of his

3    criminal past even if the defendant's violated his rights

4    and that violation led to his wrongful conviction?

5          THE JUROR:  No, I don't think so.

6          MS. SCAPICCHIO:  In this case if you found out, if

7    you believed that the evidence supported the fact that the

8    defendants violated Shawn Drumgold's civil rights and that

9    violation led to his wrongful conviction, would you have any

10   concerns awarding damages if you found out Shawn Drumgold

11   had some drug problems in the past?

12         THE JUROR:  I don't think that would relate to

13   what was going on.

14         MS. SCAPICCHIO:  Okay.  Now, some people think

15   that the job that police officers do is so important in

16   society that they shouldn't be sued for anything that

17   happens while they're on duty.  Do you agree with that?

18         THE JUROR:  I know they have a difficult job, but

19   I guess probably be the evidence in the situation trying to

20   evaluate the best I could.

21         MS. SCAPICCHIO:  You'd look at each situation and

22   evaluate it to the best of your ability?

23         THE JUROR:  To the best I could.

24         MS. SCAPICCHIO:  There may be evidence in this

25   case that police took statements from witnesses to the

1    actual homicide and those witnesses actually testified at

2    the criminal trial in this case, and I would expect that

3    some of those witnesses will come in and recant their

4    testimony, say their testimony at the criminal trial wasn't

5    true for a variety of reasons.  Would you have any trouble

6    judging that testimony if you found out that these witnesses

7    at the criminal trial had testified one way and then in this

8    trial were testifying another?

9                THE JUROR:  I guess I would have some concern.

10               MS. SCAPICCHIO:  What would concern you about

11   that, sir?

12               THE JUROR:  They're stating -- I'm assuming

13   they're all under oath?

14               MS. SCAPICCHIO:  They're all under oath.

15               THE JUROR:  I guess it would be confusing to me.

16   That could be confusing.

17               MS. SCAPICCHIO:  Would you tend to look at their

18   testimony with a little less credibility than the testimony

19   of another witness who didn't have that situation or issue?

20               THE JUROR:  I guess that's possible.

21               MS. SCAPICCHIO:  Okay.  In this case if those

22   witnesses came in and said one thing at the criminal trial

23   and then came in and said something different at this trial

24   and police officers supported what they said at the criminal

25   trial, would you believe the testimony of a police officer

1    in that situation over the witness who testified one way and

2    then recanted?  It's a tough question, I know.

3              THE COURT:  The answer could be it would depend.

4              THE JUROR:  Yeah, I think because it's a difficult

5    situation.

6              THE COURT:  What we're trying to get at to deal

7    with jurors who might say I don't care what the evidence is.

8    If an answer, well, it depends on the evidence, then that's

9    the appropriate answer.  Okay.  Go on.

10             MS. SCAPICCHIO:  It depends on evidence?

11             THE JUROR:  I would have to say so, I guess,

12   yes.

13             MS. SCAPICCHIO:  In this particular case there may

14   also be witnesses who were very young when they originally

15   testified at the criminal trial and who are now in their

16   30's, and these would be the same witnesses who have

17   recanted their testimony.  Do you think that age would play

18   a factor in what happened with these witnesses?

19             THE JUROR:  I couldn't say.

20             MS. SCAPICCHIO:  And in this particular case with

21   respect to damages, if you found that the defendants,

22   Detective Walsh and Detective Murphy, violated

23   Shawn Drumgold's civil rights and that violation led to him

24   spending 15 years in jail, and was wrongfully convicted --

25   are you okay?  Do you need a break?

1          THE JUROR:  I'm good.

2          MS. SCAPICCHIO:  Are you sure?

3          THE JUROR:  Yeah.

4          MS. SCAPICCHIO:  Now I forget where I was.

5          THE COURT:  You're out of time, in any event.

6          MS. SCAPICCHIO:  Then I have no more.

7          THE COURT:  Here's a number to call.  If you're

8     not feeling well, let us know immediately.

9          (A recess was taken.)

10         THE COURT:  Hi.  You are Ms. Kristie Froman?

11         THE JUROR:  Yes.

12         THE COURT:  I don't have any idea.  Hi.

13         MS. SCAPICCHIO:  Hi, I'm Rose Scapicchio.  I

14    represent the plaintiff in this case, Shawn Drumgold, and I

15    wanted to ask you about police officers and wrongful

16    convictions.  This case stems from a 1988 shooting of a

17    little girl by the name of Tiffany Moore.  She was shot and

18    killed as she sat on a mailbox in Roxbury.  The police did

19    an investigation and arrested my client, Shawn Drumgold.  He

20    was later tried and convicted.  He was sentenced to life

21    imprisonment.  After 15 years, he filed a motion for a new

22    trial, and that motion was granted and he was released.

23         Do you have any memory of this case at all?  Are

24    you familiar with the names Tiffany Moore, Shawn Drumgold,

25    anything like that?

1           THE JUROR:  No, ma'am.

2           MS. SCAPICCHIO:  Did you live in Boston back in

3    1988 and '89?

4           THE JUROR:  No, ma'am.

5           MS. SCAPICCHIO:  Okay.  And in this case would you

6    tend to believe the testimony of a police officer over that

7    of a civilian witness because of his training and experience

8    as a police officer?

9           THE JUROR:  Not necessarily.

10          MS. SCAPICCHIO:  What would cause you to -- when

11   you say not necessarily, what would cause you to maybe lean

12   towards the police officer or towards the civilian witness?

13          THE JUROR:  If it's dark, if it's confusing, if

14   there are a lot of people milling about.

15          MS. SCAPICCHIO:  You would tend to lean towards

16   who in those circumstances?

17          THE JUROR:  Who did you call?

18          MS. SCAPICCHIO:  The police officers or the

19   civilian?

20          THE JUROR:  The civilian perhaps.

21          MS. SCAPICCHIO:  In this case if you were to find

22   that the defendants in this case, Defective Callahan and

23   Defective Walsh, violated Shawn Drumgold's civil rights and

24   that violation led to his wrongful conviction, would you

25   have any trouble awarding damages if you knew that

1    Shawn Drumgold had some drug problems in the past?

2              THE JUROR:  No.

3              MS. SCAPICCHIO:  In that same situation, if the

4    evidence supported the fact that Detective Walsh and

5    Detective Callahan violated Shawn Drumgold's civil rights

6    and that violation of his civil rights led to his wrongful

7    conviction, if you knew that Mr. Drumgold had a criminal

8    past, would that enter into your decision in terms of

9    damages?

10              THE JUROR:  In terms of damages?

11              MS. SCAPICCHIO:  Yes.  In other words, if you

12   believed the defendants had violated Shawn Drumgold's civil

13   rights and that violation led to his wrongful conviction and

14   then you were presented with evidence that he wasn't perfect

15   that before he went to jail on this crime he had committed

16   other crimes that he had admitted to, would that enter into

17   your sort of realm of calculations when you were determining

18   damages?

19              THE JUROR:  No.

20              MS. SCAPICCHIO:  The same with my question and

21   drugs, I'm not sure if I was that clear, if you found out,

22   if you believed that the defendants had violated

23   Shawn Drumgold's civil rights and that violation led to his

24   wrongful conviction and then you found out that Mr. Drumgold

25   had some drug problems, would that enter into your ability,

1    or would that preclude you from awarding damages?

2              THE JUROR:  No.

3              MS. SCAPICCHIO:  In this case we expect that there

4    will be testimony from witnesses who were interviewed by the

5    police and the defendants, specifically Detective Walsh and

6    Detective Callahan, and those witnesses testified one way at

7    the trial while they were under oath, we expect now they

8    will come in at the civil trial and they will have recanted

9    their testimony and said that their testimony at the

10   criminal trial wasn't true for a variety of reasons.  Would

11   you have some concerns in believing those witnesses over the

12   police officers who say that their trial testimony was the

13   correct testimony and not the testimony now?

14             THE JUROR:  So they had testified one way?

15             MS. SCAPICCHIO:  At trial, the light is blue at

16   trial, they're going to coming in and say the light was not

17   blue, it's red, I was under oath at trial and basically I

18   lied?

19             THE JUROR:  That's not good.  So, all right, what

20   was the question?

21             MS. SCAPICCHIO:  The question is if the police

22   officers were to come in and say in essence their trial

23   testimony was the correct version and they're lying now,

24   would you be able to credit?

25             THE JUROR:  They were lying then and they're

1    saying --

2              MS. SCAPICCHIO:  No, the police officers were

3    saying they were telling the truth at the criminal trial.

4              THE JUROR:  Oh, the witnesses aren't telling the

5    truth now?

6              MS. SCAPICCHIO:  Right.

7              THE JUROR:  Would I have a problem believing the

8    witnesses?

9              MS. SCAPICCHIO:  Yes, over the police officers

10   because of their prior testimony?

11             MR. ROACHE:  Your Honor, I'm confused here.

12             THE COURT:  Let me rephrase that.  There will be

13   testimony about witnesses whose statements may be

14   inconsistent one way to the other, and I will instruct about

15   how to deal with inconsistent statements.  I think the

16   relevant question is what Ms. Scappichio asked you before

17   just because police officers say one thing and a civilian

18   says another, you won't believe a police officer just

19   because he's an officer and for no other reason, you'd look

20   at the circumstances?

21             THE JUROR:  Right, right.

22             MS. SCAPICCHIO:  Actually, your Honor, I think

23   it's little bit more than that in this case.  I expect we'll

24   have witnesses who testified at the trial and they would

25   have been under oath and said --

```
1              THE COURT:  It is far too complicated for this

2    voir dire because how one deals with inconsistent statements

3    is a question of law that I would instruct the jury.

4              MS. SCAPICCHIO:  That's fine, your Honor.

5              THE COURT:  So weren't don't we go on.

6              MS. SCAPICCHIO:  Some people think that the job

7    that police officers do is so important in society that they

8    should never be sued for anything that happens in their

9    official capacity while they're on duty.  Do you agree with

10   that?

11             THE JUROR:  No, I don't.

12             MS. SCAPICCHIO:  I don't have any further

13   questions, your Honor.  Thank you.

14             THE COURT:  You're not finished, almost, five more

15   minutes.

16             MS. HARRIS:  I'm going.  Hi, I'm Ms. Harris, and

17   I'm one of the defense attorneys representing the homicide

18   detectives in this case.  I see from your questionnaire you

19   have an uncle who worked as a special agent for Homeland

20   Security.  Were you close with him?

21             THE JUROR:  Yes, ma'am.

22             MS. SCAPICCHIO:  Did you discuss his job with him?

23             THE JUROR:  No, he can't really.

24             MS. HARRIS:  It was secret kind of stuff?

25             THE JUROR:  Yes.
```

1          MS. HARRIS:  I see also that you've never served

2     on a jury before?

3          THE JUROR:  No, ma'am.

4          MS. HARRIS:  Do you have a sense from popular

5     culture, do you have a sense what is entailed in sitting on

6     a jury?

7          THE JUROR:  I don't believe so.

8          MS. HARRIS:  Do you understand there's a dispute

9     there but it's going to be left to the jury to make various

10    decisions as the evidence comes in?

11         THE JUROR:  Yes, ma'am.

12         MS. HARRIS:  Are you one that follows the media at

13    all, you know, do you?  Would you describe yourself as

14    somebody who reads papers or listens to news radio on a

15    regular basis?

16         THE JUROR:  Not particularly.  When I get to work

17    in the mornings, Yahoo will pop up and I'll look at the

18    headlines, I listen to my coworkers, but I don't take the

19    paper every day, usually on Sundays.

20         MS. HARRIS:  And just sort of in the scope of your

21    life living day-to-day, has the term "wrongful conviction"

22    come to your attention before?

23         THE JUROR:  Yes.

24         MS. HARRIS:  You had the pleasure here.  Can you

25    tell us just how generally it came to your attention, what

1    you know about the concept or the term, the phrase?

2          THE JUROR:  It seems to be cropping up more and

3    more these days, DNA testing and things like that seem to

4    bring it up and more trials seem to be happening because of

5    newer technology, but that's pretty much.

6          MS. HARRIS:  Have you formed any opinion about why

7    these things are cropping up more and more lately?

8          THE JUROR:  Newer technology or different

9    perceptions of society or how things worked in the past,

10   more liberal attitudes and just a more global perception of

11   life, I think.

12         MS. HARRIS:  In saying that, do you have a sense

13   that things have changed such that the society is more fair

14   now than it was in the past?

15         THE JUROR:  Perhaps.

16         MS. HARRIS:  Okay.  And I appreciate that these

17   are hard concepts to talk of sort of in the abstract like

18   we're doing, but, you know, if essentially you are called to

19   be a juror here and you're called to make credibility

20   determinations, would you be able do you think to focus on

21   the people who testify before you and judge them based on

22   their testimony and leave aside any sort of overall

23   assumptions that you have about how the world has changed?

24         THE JUROR:  Yes, ma'am.

25         MS. HARRIS:  If that's a fair question.

1          MR. ROACHE:  May I have one question.  Do you

2     believe because of the development of technology that if a

3     person was found to be in fact innocent when they were found

4     guilty in the past, would you hold that against the police

5     in any way?

6          MS. SCAPICCHIO:  Your Honor, we're going to object

7     to that question.

8          THE COURT:  No, go on.

9          THE JUROR:  Answer it?

10          THE COURT:  Yes, you can answer it.

11          THE JUROR:  If there were new evidence, is that

12     what you're --

13          MR. ROACHE:  New like you said, development of DNA

14     test evidence that didn't exist when the police investigated

15     the case and it was found that that person was in fact

16     innocent now, would that affect -- would you hold the police

17     accountable because of that?

18          THE JUROR:  It depends on what it was.  It depends

19     on what the evidence was, if there was no plausible way that

20     they could have had that evidence back then, if the

21     technology, yes, had indeed changed, but if it was

22     oversight, things like, you know, willfully putting things

23     aside, then I might hold them accountable for it, yes.

24          MR. ROACHE:  Thank you.

25          THE COURT:  I'm going to ask you to call this

1    number tomorrow at six.  You need your juror number with you

2    when you call, and you'll hear a recorded announcement which

3    will let you know whether you're on the final jury.  Thank

4    you very much.

5                MS. HARRIS:  Thank you very much.

6                THE JUROR:  Thank you.

7                MR. WHITE:  Thank you.

8                THE COURT:  They can easily take into account that

9    there was a prior inconsistent sworn statement in

10   determining the credibility of the witnesses.

11               MS. SCAPICCHIO:  That wasn't -- the question was

12   guilt and innocence.

13               THE COURT:  I understand that, but I mean when you

14   start talking about the dual statements, there's an issue of

15   law about who they're going to believe that is completely

16   fair and which version they're going to believe, which is

17   completely fair, so I mean -- and to ask someone now are you

18   going to believe the trial version under oath or this

19   version, I mean I think that's not a comprehensible question

20   under the circumstances because the answer is going to

21   depend.  Okay.  Next.

22               THE CLERK:  Lisa Laing.

23               THE COURT:  Ms. Laing, juror No. 28.  Hi.  You are

24   Ms. Laing?

25               THE JUROR:  Laing, yes.

```
 1            THE COURT:  Start here, you have five minutes.

 2            MR. WHITE:  Hello, I'm William White, and I

 3   represent Timothy Callahan with Mary Joe Harris, continuing

 4   the same thing all afternoon.  This case concerns a 1988

 5   shooting of a little girl by the name of Darlene

 6   Tiffany Moore who was 12 years old at the time as she sat on

 7   a mailbox in the Roxbury section of Boston.  Do you have any

 8   recollection of those events?

 9            THE JUROR:  I do, I remember.

10            MR. WHITE:  Could you tell me what it is you

11   recall about the incident?

12            THE JUROR:  I remember when it happened, I

13   remember that she was shot.  I don't remember much about the

14   trial.  I do remember reading recently about Shawn Drumgold

15   and that he was suing the city.

16            MR. WHITE:  Excuse me, I don't mean to step on

17   you.

18            THE JUROR:  That he was in jail and he had been

19   released I don't know when.  I don't remember when.

20            MR. WHITE:  Okay.  In 1988, did you hear anything

21   about the incident?

22            THE JUROR:  Yes.

23            MR. WHITE:  Do you recall where you were living at

24   the time?

25            THE JUROR:  In '88, probably Brighton.
```

1          MR. WHITE:  Did you follow the events as they led

2     up to the trial?

3          THE JUROR:  I remember reading about it in

4     The Globe.

5          MR. WHITE:  And since 1988, did you follow any of

6     the stories that might have been printed in newspapers or

7     published on television?

8          THE JUROR:  Well, I read The Globe every day so I

9     do remember reading about him getting out of prison and

10    probably a few stories since then.  I heard it on NPR this

11    morning.  I wasn't paying attention to it, but I do remember

12    I heard his name this morning.

13         MR. WHITE:  With regards to the information you've

14    heard or I guess read in The Globe, have you formed any

15    opinions as to the circumstances of his release?

16         THE JUROR:  I don't feel like I know enough of the

17    details, no.

18         MR. WHITE:  Have you heard anything about the way

19    that the police handled the investigation of the case?

20         THE JUROR:  Other than this morning when the

21    charges were explained or that this was a civil rights case,

22    no.

23         MR. WHITE:  And when you say this morning when the

24    charges were explained, do you mean here in the courthouse

25    or on NPR?

1          THE JUROR:  In the courthouse.

2          MR. WHITE:  Have you talked with anyone about the

3    facts concerning the Tiffany Moore case at any point that

4    you recall?

5          THE JUROR:  At any point?

6          MR. WHITE:  Yes.

7          THE JUROR:  I don't know whether I did 20 years

8    ago, but I don't remember.

9          MR. WHITE:  What I mean is that you have any

10   recollection, anybody who provided you with any information

11   concerning the case or told you their opinions about the

12   case?

13         THE JUROR:  No.

14         MR. WHITE:  Can I ask you have you ever had a

15   personal encounter with a police officer?

16         THE JUROR:  Speeding ticket.

17         MR. WHITE:  That's what I mean, by your own

18   encounter with a police officer.  How long ago did you get a

19   speeding ticket?

20         THE JUROR:  About five or six years ago.

21         MR. WHITE:  After you got the ticket, do you

22   recall if you appealed it or if you --

23         THE JUROR:  No, I paid it.  I was speeding.

24         MR. WHITE:  What did you think about how the

25   police officer handled the encounter when you were stopped?

1          THE JUROR:  I was speeding, so he was polite,

2    there was no -- it was nothing unusual.

3          MR. WHITE:  Have you or any close family members

4    or close friends had any encounter with the police officers

5    that you can share with us?

6          THE JUROR:  Other than traffic, no, I don't think

7    so.

8          MR. WHITE:  Can you tell us what opinions you hold

9    of police officers?

10          THE JUROR:  In general, I don't have any opinion

11   one way or another of police officers.

12          MR. WHITE:  When you say you don't have any

13   opinion one way or the other?

14          THE JUROR:  I mean, they're people, so unless I

15   know someone, I don't really form an opinion.

16          MR. WHITE:  You don't have any friends who are

17   police officers?

18          THE JUROR:  Acquaintances.

19          MR. WHITE:  This case is expected to involve a

20   number of witnesses who are going to testify.  Some of them

21   will be police officers, some of them will be civilian

22   witnesses.  Does the fact that a police officer testifies

23   contrary to what a civilian witness testifies affect you in

24   any way insofar as the opinion that you would have of one or

25   the other?

1           THE JUROR:  Do you mean does the police officer

2    have more weight?  Does his opinion have more weight?

3           MR. WHITE:  Well, let's ask it that way.

4           THE JUROR:  No.

5           MR. WHITE:  With respect to <u>The Globe</u> stories that

6    you told us about, do you have an overall opinion as to the

7    accuracy of the stories you read?

8           THE JUROR:  No.  I don't have an overall opinion.

9    I didn't read them all, and I probably skimmed a lot of

10   them, so I know that the general facts of the story but I

11   don't know any details.

12          MR. WHITE:  When you read the stories in the

13   newspaper, do you tend to accept the story as it's written

14   or do you question what the author has written?

15          THE JUROR:  No, I don't tend to question a

16   newspaper article.

17          MR. WHITE:  You accept what's there in the article

18   for what it is?

19          THE JUROR:  Uh-hum.

20          MR. WHITE:  Do you sometimes question the

21   information that may have been left out of the story or

22   information that you think should have been included in the

23   story?

24          THE JUROR:  In that particular story or just --

25          MR. WHITE:  In general.

1          THE JUROR:  Well, if I don't really know about

2     what has happened, no, I probably don't think about what

3     wasn't in the story.

4          THE COURT:  I think the question is whether you

5     think that there's anything -- what's in the newspaper is

6     not necessarily what you're going to hear at trial.  What

7     you're going to have to understand as a juror will be what

8     goes on in the courtroom.  The question is whether you're

9     likely to say, well, the newspaper said X and now they're

10    saying Y and you believe The Globe over any witness?

11         THE JUROR:  No, I understand that you don't think

12    about other things that you've heard about.

13         THE COURT:  Focus on what's in front of you?

14         THE JUROR:  You're focused what you're told in

15    court.

16         THE COURT:  Go on.

17         MS. HARRIS:  Could I ask one question?

18         THE COURT:  Sure, go on.

19         MS. HARRIS:  Do you have a recollection generally

20    what the stories were about?

21         THE JUROR:  I remember reading when the girl was

22    shot.

23         MS. HARRIS:  Yes.

24         THE JUROR:  I remember there was a trial, I don't

25    think I remember reading much about it then.  I do remember

1    hearing later that the person who had been jailed because of

2    that trial was released because there was some kind of

3    evidence that someone else had done the crime.  I don't know

4    anything else, any details about who the other person was,

5    how the evidence came to light or anything about if there

6    was a second trial.

7              MS. HARRIS:  Okay.

8              THE COURT:  I think you're out of time.

9    Ms. Scappichio.

10             MS. SCAPICCHIO:  Hi, I'm Rose Scapicchio, and I

11   represent Shawn Drumgold, he's the plaintiff in this case,

12   and I wanted to ask you a few questions about wrongful

13   convictions and police officers.  I think you said when

14   Mr. White was questioning you that you would listen to the

15   evidence and hear what people have to say before you make up

16   your mind in terms of who you believed.  Is that right?

17             THE JUROR:  Uh-hum.

18             MS. SCAPICCHIO:  And in this case I think

19   Mr. White told you a little bit about the Tiffany Moore

20   murder and the fact that Mr. Drumgold was sentenced to life

21   in prison and released after 15 years.  You had indicated

22   that you read some Globe stories or you remember reading a

23   Globe story about that release; is that right?

24             THE JUROR:  Yes.

25             MS. SCAPICCHIO:  But nothing specific sticks in

1    your mind?

2           THE JUROR:  No.

3           MS. SCAPICCHIO:  Now, in this case if you were to

4    listen to the evidence in this case and come to the

5    conclusion that the defendants in this case, Detective Walsh

6    and Detective Murphy, had violated Shawn Drumgold's civil

7    rights and that violation led to his wrongful conviction,

8    would you have any concerns about awarding damages if you

9    knew that Mr. Drumgold had a criminal past?

10          THE JUROR:  No.

11          MS. SCAPICCHIO:  And the same question all over

12   again in terms of if you had believed that the evidence

13   supported the fact that the defendant's Detective Walsh and

14   Detective Murphy violated Shawn Drumgold's civil rights and

15   that violation led to his wrongful conviction, would you be

16   concerned about awarding damages if you found out that

17   Shawn Drumgold had some trouble with drugs in the past?

18          THE JUROR:  No.

19          MS. SCAPICCHIO:  Okay.  Some people believe that

20   the job that police officers do is so important that they

21   shouldn't be sued for anything that they do in their

22   official capacity.  Do you agree with that?

23          THE JUROR:  No.

24          MS. SCAPICCHIO:  Okay.  In this particular case we

25   expect that some of the witnesses who testified at trial

1    will come in and testify in this case and we expect that the

2    police officers in this case will indicate that they had

3    interviewed these witnesses at trial and wrote reports.

4    Would the fact that the police officers wrote reports or

5    tape recorded interviews lead you to believe what the police

6    officers say more than the civilian witnesses because of

7    their training and experience as police officers?

8         THE JUROR:  Because of their training or because

9    of a tape recorded conversation?

10        MS. SCAPICCHIO:  Let's start with their training.

11   Would their training and experience cause you to believe

12   what they have to say over the civilian witness?

13        THE JUROR:  I don't know whether I could say that

14   in a general way.

15        MS. SCAPICCHIO:  That's fine.  With respect to a

16   tape recorded interview, if the interview, not necessarily

17   what's on the interview is in dispute, but if that same

18   person came in and said I said it but it wasn't true, would

19   the fact that it had a tape recording attached to it, in

20   other words, it was a taped statement, would that cause you

21   any concern in terms of the believability or credibility of

22   that witness?

23        THE JUROR:  It would cause me a little concern.

24        MS. SCAPICCHIO:  What would cause you concern?

25        THE JUROR:  I think I would want to know if

1    somebody said something and changed their story later.

2            MS. SCAPICCHIO:  I have no further questions, your

3    Honor.

4            THE COURT:  I'm going to give you a number to

5    call.  You have to call this number after 6:00 using your

6    juror number, and you'll find out if you're on the final

7    jury.  Thank you very much.

8            MS. HARRIS:  Thank you.

9            THE JUROR:  I'm not coming back tomorrow?

10           THE COURT:  You're not coming back tomorrow.  You

11   have a day off.

12           THE COURT:  Mr. Bridges.

13           THE JUROR:  Yes.

14           THE COURT:  Starting with Ms. Scappichio.

15           MS. SCAPICCHIO:  Thank you.  Hi, I'm Rosemary

16   Scapicchio.  I represent Shawn Drumgold, he's the plaintiff

17   in this case, and this case actually involves a murder that

18   took place in 1988.  It was a shooting of a little girl by

19   the name of Tiffany Moore who was sitting on a mailbox in

20   Roxbury.  The police arrested my client, Shawn Drumgold, he

21   was later tried and convicted.  He was sentenced to life in

22   prison, and after 15 years, he was granted a new trial and

23   he was released.  Do you remember any of this case back in

24   1988?

25           THE JUROR:  I don't.  I remember the name of the

1    girl, but I don't know any of the details.

2          MS. SCAPICCHIO:  Did you ever remember reading

3    about it in the newspaper at all?

4          THE JUROR:  I don't.

5          MS. SCAPICCHIO:  In this case if you found that

6    the defendants case, Detective Walsh and Detective Murphy,

7    I'm sorry, Detective Walsh and Detective Callahan, had

8    violated Shawn Drumgold's civil rights, and that violation

9    led to his wrongful conviction, would you have any -- if you

10   found out that Mr. Drumgold had a drug history, had some

11   problems with drugs in the past, would that preclude you

12   from awarding him damages?

13         THE JUROR:  Not if it didn't have anything to do

14   with the crime, no.

15         MS. SCAPICCHIO:  And the same question again if

16   the evidence supported the fact that Detective Walsh and

17   Detective Callahan violated Shawn Drumgold's civil rights

18   and that violation led to his wrongful conviction and you

19   found out that Shawn Drumgold had some criminal past, in

20   other words, had been convicted of other crimes, would that

21   preclude you from awarding damages?

22         THE JUROR:  No.  When you say wrongful meaning he

23   didn't commit the crime, is that what you mean when you say

24   wrongful?

25         THE COURT:  Wrongful in this case is going to mean

1    whether or not he was convicted as a result of

2    constitutional violations, in other words, there was

3    allegedly misconduct during the trial and that led to his

4    conviction.  Go on.

5           MS. SCAPICCHIO:  Thank you.  Now, some people

6    believe that police officers play such an important role in

7    society that they should not be sued for anything that they

8    do in their official capacity.  Do you agree with that?

9           THE JUROR:  I don't agree with that.

10          MS. SCAPICCHIO:  And in this particular case, if I

11   may just have a minute, your Honor.

12          THE COURT:  Yes.

13          MS. SCAPICCHIO:  In this particular case, we

14   expect that they'll be witnesses who will testify in one way

15   and police officers who will testify contrary to what those

16   witnesses say.  Would you be able to evaluate the

17   credibility of each witness based on the evidence you hear

18   at trial and draw conclusions based on that evidence?

19          THE JUROR:  I believe so.

20          MS. SCAPICCHIO:  Before we even start, would you

21   be leaning one way or the other or would you be able to keep

22   an open mind?

23          THE JUROR:  Open mind.

24          MS. SCAPICCHIO:  I have no further questions, your

25   Honor.

1          MS. HARRIS:  Good afternoon, my name is Mary Jo

2     Harris, and I'm representing homicide Detectives Walsh and

3     Detective Callahan in this case.  I believe that you stated

4     that you recall the name Tiffany Moore but you don't recall

5     any of the details; is that correct?

6          THE JUROR:  That is correct, yeah.

7          MS. HARRIS:  Do you have a sense in your memory

8     whether your recollection comes from 1988 when this crime

9     occurred or some time later?

10          THE JUROR:  It would have been in '88.

11          MS. HARRIS:  In '88?

12          THE JUROR:  Yeah.

13          MS. HARRIS:  Where were you living?

14          THE JUROR:  I was going to school in Boston,

15     Northeastern.

16          MS. HARRIS:  You were going to Northeastern.  Did

17     you live in town at that time?

18          THE JUROR:  I did, yeah.

19          MS. HARRIS:  Do you have a recollection of the

20     relevance in the prosecution case?

21          THE JUROR:  I don't.

22          MS. HARRIS:  And does the name Shawn Drumgold ring

23     a bell for you?

24          THE JUROR:  No, I've never heard that name.

25          MS. HARRIS:  I think I'm going to pass on to my

1    colleagues.

2            MR. ROACHE:  Sir, do you read The Boston Globe?

3            THE JUROR:  I do on Sundays.

4            MR. ROACHE:  Do you know a Globe reporter by the

5    name of -- ever read anything from a Globe reporter by the

6    name of Richard Lehr or Dick Lehr?

7            THE JUROR:  I don't recognize that name.

8            MR. ROACHE:  Do you recall reading anything about

9    Mr. Drumgold or his being released from custody in 2003?

10           THE JUROR:  No.

11           MR. ROACHE:  When you lived at Northeastern,

12   that's while you were a student?

13           THE JUROR:  Yes.

14           MR. ROACHE:  Did you have any interactions with

15   the Boston Police Department when you were living in Boston?

16           THE JUROR:  No, never.

17           MR. ROACHE:  Did you form any opinions as to the

18   manner in which Boston police officers conducted themselves

19   while you were in Boston?

20           THE JUROR:  No.

21           MR. ROACHE:  Have you formed an opinion since?

22           THE JUROR:  No.

23           MR. ROACHE:  That's all I have.

24           THE COURT:  Okay.  Mr. Richardson, I'm going to

25   ask you to call this number at 6:00 tomorrow, and you need

1    your jury number, and if you are on the jury, we'll see you

2    Wednesday morning.  Okay, goodbye.

3             Mr. Girish.

4             THE JUROR:  Thank you.

5             THE COURT:  I think you go first.

6             MS. HARRIS:  Good afternoon, sir.  How are you?

7             THE JUROR:  Very good, thanks.

8             MS. HARRIS:  So thank you for joining us today.

9             THE JUROR:  Certainly.

10            MS. HARRIS:  The reason that the attorneys, that

11   we are here is to try to talk to you to see if you have any

12   information about this case that you may have learned before

13   coming into the court today, so with that preface, this is a

14   case that's related to the 1988 murder of a little girl in

15   Boston named Tiffany Moore who was killed as she sat on a

16   street corner on a mailbox in the Roxbury section of Boston.

17   Do you know anything about -- have you ever heard about

18   Tiffany Moore, about this crime?

19            THE JUROR:  No, not that I know of.

20            MS. HARRIS:  Were you living in Boston in 1988?

21            THE JUROR:  No, I wasn't in this country I believe

22   in '88.

23            MS. HARRIS:  Are you familiar with the name of the

24   plaintiff in this case, Shawn Drumgold?

25            THE JUROR:  No, I'm not.

1          MS. HARRIS:  Can you tell me do you have an

2    understanding in general terms of the term "wrongful

3    conviction"?

4          THE JUROR:  I'm not sure if I can.  In general

5    terms, all right, so someone committed a crime, there wasn't

6    enough evidence and they convicted the person and sent them

7    to jail, I think that's wrongful conviction.

8          MS. HARRIS:  Okay.  Do you have an opinion about

9    whether such suits should be brought in general?

10          THE JUROR:  If it is believed to be a wrongful

11    conviction, then, yes, sir, they should get a fair

12    hearing.

13          MS. HARRIS:  Do you have an opinion as to whether

14    or not -- or strike that question.  Can you tell me do you

15    have an opinion, positive, negative at all about police

16    officers in general?

17          THE JUROR:  Like in every occupation there are

18    good ones, there are bad ones.

19          MS. HARRIS:  Is it your sense before you would

20    judge someone you would want to know the circumstances of

21    what --

22          THE JUROR:  That's right.

23          MS. HARRIS:  What the accusations are and also

24    what the facts are?

25          THE JUROR:  That's right.

1        MS. HARRIS:  So if there were a challenge, a

2    credibility challenge between what a police officer said

3    versus someone who's not a police officer says about the

4    same incident, would you give more or less credit to the

5    police officer because they're a police officer?

6        THE JUROR:  I don't know how to answer that

7    question.  I would have to look at the Judge and kind of

8    rely on their direction.

9        MS. HARRIS:  Okay.  I guess what I'm trying to get

10   at is does the fact of somebody holding that job either make

11   you think that they are more believable or less believable

12   or no opinion one way or the other?

13       THE JUROR:  No opinion one way or the other.  I

14   look at facts to come to that judgment.

15       MS. HARRIS:  Okay.

16       MR. ROACHE:  Sir, are you from India?

17       THE JUROR:  Yes, I am.

18       MR. ROACHE:  Do you have any opinion as to law

19   enforcement in India, whether it's good, bad or indifferent?

20       THE JUROR:  Like I said, every occupation, there's

21   good, there's bad.  What we get to see on the street is more

22   bad than good.

23       THE COURT:  In India?

24       THE JUROR:  Yes, in India.

25       MR. ROACHE:  Have you had any interactions with

1    any police officers while in the United States?

2           THE JUROR:  Just the one when I came very oddly

3    that gave me a traffic ticket, but I was wrong in this

4    case.

5           MR. ROACHE:  Did you feel that that police officer

6    mistreated you in any way, violated any rights of yours?

7           THE JUROR:  No, no, not at all.

8           MR. ROACHE:  Did you pay the ticket?

9           THE JUROR:  Yes, I did.

10          MR. ROACHE:  Or did you challenge the ticket in

11   court?

12          THE JUROR:  I did challenge it, And the Judge said

13   that, "You know you were speeding, weren't you?"  And I

14   said, "Yes, I was a little bit over," and I paid the fine.

15   He said, "Guilty or not?"  I said, "Guilty."

16          MR. ROACHE:  Did you feel that the process that

17   you underwent was a fair process?

18          THE JUROR:  Yes, it was a fair process.

19          MR. ROACHE:  Okay.  That's all I have.

20          THE COURT:  Ms. Scappichio.

21          MS. SCAPICCHIO:  Hi.  I'm Rosemary Scapicchio.  I

22   represent Shawn Drumgold.  He's the plaintiff in this case.

23   I have a few questions that I need to ask you.  If you

24   thought that the evidence supported the fact that the

25   defendants in this case, Detective Walsh and Detective

1   Callahan, violated Shawn Drumgold's civil rights and that

2   violation led to his wrongful conviction and then you found

3   out Shawn Drumgold had committed a different crime in the

4   past, would that preclude you from awarding him damages in

5   this case if you found out he had a criminal record?

6          THE JUROR:  I guess I would look to the Judge for

7   that, and you need to separate the cases, right, you're

8   trying this particular case and not any other case?

9          THE COURT:  That's right.  Go on, Ms. Scappichio,

10  that's exactly right.

11         MS. SCAPICCHIO:  Thank you.  In the same fashion,

12  if you thought the evidence supported the fact that

13  Detective Walsh and Detective Callahan violated

14  Shawn Drumgold's civil rights and that violation led to his

15  wrongful conviction and then evidence was introduced that

16  Shawn had some problems with drugs in the past, would that

17  prohibit you from awarding damages, the fact that he had

18  some drug issues?

19         THE JUROR:  That's a very complicated question.

20  Can you state it again, please?

21         MS. SCAPICCHIO:  Sure.  If you believe that the

22  evidence supported the fact that Detective Walsh and

23  Detective Callahan violated Shawn Drumgold's civil rights

24  and that violation led to his wrongful conviction and there

25  was additional evidence that Shawn Drumgold had some

1   problems with drugs in the past, would that preclude you

2   from awarding him damages in this case?

3           THE JUROR:  I'm sorry, what does preclude me?

4           MS. SCAPICCHIO:  Prevented you from awarding

5   damages in this case?

6           THE JUROR:  Again, I would say that I'm just

7   looking at the facts of this case, put the blinders, look at

8   the facts for this case and not anything else.

9           MS. SCAPICCHIO:  I don't have anything further,

10  your Honor.

11          THE COURT:  Okay.  We're going to ask you to call

12  this number, call this number after 6:00 tomorrow and then

13  you need your jury number, and if you are on the final fury,

14  you'll find out.

15          THE JUROR:  Tomorrow?

16          THE COURT:  6:00, you don't have to come back to

17  the court tomorrow, but if your name is mentioned or your

18  jury number, you have to be.

19          THE JUROR:  Call tomorrow evening?

20          THE COURT:  Yes.  Thank you very much.

21          MS. SCAPICCHIO:  Thank you.  Could we have a

22  minute?

23          THE COURT:  The next juror is Ellen Perry.  Hi.

24  Everyone decided to go to the bathroom the minute you walked

25  in.  This is Ms. Perry.  Ms. Scappichio I think you go

1    next.

2             MS. SCAPICCHIO:  My name is Rosemary Scapicchio,

3    and I represent the plaintiff, in this case Shawn Drumgold,

4    and I wanted to give you a little bit of background about

5    the case just to see if you have any outside knowledge of

6    this case before we started.

7             THE JUROR:  Okay.

8             MS. SCAPICCHIO:  This case involves a little girl

9    by the name of Tiffany Moore who was shot and killed back in

10   1988 as she sat on a mailbox in Roxbury.  The police

11   arrested my client, Shawn Drumgold.  He was tried and

12   convicted of having killed Tiffany Moore.  He was sentenced

13   to life in prison.  He served 15 years of that sentence, and

14   then a motion for a new trial was allowed and he was set

15   free.  Do you remember reading or seeing or hearing anything

16   about this case?

17            THE JUROR:  No, I don't.

18            MS. SCAPICCHIO:  Not when it happened in 1988 or

19   when he was set free in 2003?

20            THE JUROR:  No.

21            MS. SCAPICCHIO:  Some people believe that police

22   officers hold such an important role in society that they

23   should not be sued for anything that happens while they're

24   on duty.  Do you agree with that?

25            THE JUROR:  I guess it just depends on what

1    happened.

2         MS. SCAPICCHIO:  So it would depend on the

3    evidence as it developed?

4         THE JUROR:  Right, right.

5         MS. SCAPICCHIO:  Okay.  And in this case if the

6    evidence supported the facts that Detective Walsh and

7    Detective Callahan violated Shawn Drumgold's rights and that

8    violation led to his wrongful conviction, and you found out

9    additionally that Shawn Drumgold had some problems with

10   drugs in the past, would that bar you from awarding him

11   damages the fact that he had some drug issues?

12        THE JUROR:  I don't know.  I think I would have to

13   hear a little more before I could say yes or no.

14        MS. SCAPICCHIO:  Would the fact that drugs were

15   involved in Shawn's life at all concern you when thinking

16   about damages?

17        THE JUROR:  No.

18        MS. SCAPICCHIO:  Okay.  Similarly if the evidence

19   supported the fact that Detective Callahan and Detective

20   Walsh violated Shawn Drumgold's civil rights and that

21   violation led to his wrongful conviction and you found out

22   that Shawn had been convicted of other crimes, had a

23   criminal record, would that concern you at all in terms of

24   awarding damages?

25        THE JUROR:  I think I would like to know more

1    information about that also.

2          MS. SCAPICCHIO:  Okay.  When you say you'd like to

3    know more information, what types of information would you

4    be interested in knowing before you could make your mind up?

5          THE JUROR:  I guess I'd like to hear -- I guess it

6    would be the witnesses, other witnesses saying that these

7    things happened.

8          MS. SCAPICCHIO:  Okay.  And in this case if there

9    was no dispute about the fact that Shawn had a criminal

10   record in the past before he was convicted and released on

11   this crime, would the fact that he had a criminal record

12   sway you one way or another when you were making a decision

13   in this case?

14         THE JUROR:  No.

15         MS. SCAPICCHIO:  And in this particular case, we

16   expect that some witnesses will come in and testify one way

17   and police officers will testify contrary to what those

18   witnesses are saying.  Would you tend to believe the

19   testimony of a police officer over that of a civilian

20   witness because of his training and experience as a police

21   officer?

22         THE JUROR:  No, I think I'd have to hear all the

23   evidence first.

24         MS. SCAPICCHIO:  Thank you.

25         THE COURT:  Okay.  Counsel.

1           MR. WHITE:  Hi.  I'm William White, and I

2    represent Tim Callahan along with Mary Jo Harris and Hugh

3    Curran represents Richard Walsh.  Let me just follow up on

4    the last question that you were asked about believing police

5    officers or civilian witnesses, and you said that you were

6    the type of person that you'd need to hear all of the

7    testimony before you could make up your mind; is that right?

8           THE JUROR:  Yes.

9           MR. WHITE:  And I guess what you're saying to us

10   is that you would keep an open mind as you heard the

11   evidence come in in the case before you made any decision

12   about who you believed?

13          THE JUROR:  That's right.

14          MS. SCAPICCHIO:  And if I'm understanding you

15   clearly, you're saying that you would pay careful attention

16   to all of the evidence as it came in in this case and you

17   would not make any determinations until you had heard both

18   sides?

19          THE JUROR:  Correct, that's correct.

20          MR. WHITE:  In this case there's going to be some

21   witnesses who may testify relevant to their use of drugs.

22   Does the fact that a witness who testifies in court may have

23   used drugs at some point in the past affect how you will

24   assess their testimony?

25          THE JUROR:  No, no.

1          MR. WHITE:  In this case you're going to hear

2    testimony about a police investigation and what officers did

3    in the course of their investigation.  Would you listen

4    carefully to that evidence?

5          THE JUROR:  Yes.

6          MR. WHITE:  And would you give it fair

7    consideration?

8          THE JUROR:  Yes.

9          MR. WHITE:  And if that evidence tells you that a

10   thorough investigation had been conducted, would you give it

11   the weight that it deserves?

12         THE JUROR:  Yes.

13         MR. WHITE:  In this case, in other words, again,

14   you're telling us that you'll keep an open mind until you've

15   heard everything?

16         THE JUROR:  Correct.

17         MR. WHITE:  I don't have anything else.

18         MR. ROACHE:  I just have a logistics question.  I

19   notice you live in Hyannis.  Will you be traveling each day

20   from Hyannis to Boston?  Do you drive?

21         THE JUROR:  I'll be taking a bus.

22         MR. ROACHE:  That does create any hardship for

23   you?

24         THE JUROR:  It is a little hardship, yes.  I'm a

25   nurse part time, and I have a patient so I would have to

1    make arrangements for her also to have help coming in to be

2    with her.

3              MR. ROACHE:  What time in the morning would you

4    have to leave to get here by 9:00?

5              THE JUROR:  I'd probably have to leave probably

6    6:30 bus, 6:00 bus because it takes almost two hours to get

7    here.

8              MR. ROACHE:  Okay.

9              THE JUROR:  Assuming the weather is good.  Like

10   today I took the ten of six bus, and I got here about 7:30.

11   There's one quarter past six, and that gets here about 8:30,

12   and that if there's no problems traveling and so forth, bus

13   is on time.

14             MR. ROACHE:  What time would you expect to arrive

15   home if we go each day to 1:00?

16             THE JUROR:  Depending, I don't know what the bus

17   schedule is, but I would take the next bus that I could

18   after here to get home.

19             MR. ROACHE:  Would you be able to arrange the

20   schedule so it would not affect your patient?

21             THE JUROR:  Yes, if I know in advance that I am

22   going to be out, yes, I'd have to make arrangements.

23             THE COURT:  You're willing to do this?

24             THE JUROR:  I would, yes.

25             THE COURT:  Okay.  Thank you.  I'm going to ask

1    you to call this number after 6:00.  Thank you so very much.

2    You'll need your jury number when you call up, and if you're

3    with us, if you're listed on the recorded announcement, we

4    will see you first thing on Wednesday morning.  Fine.

5          MS. HARRIS:  Thank you very much.

6          MR. WHITE:  Thank you.

7          THE COURT:  Next person is Brian Hawes, juror

8    No. 36.  Mr. Hawes?

9          THE JUROR:  Yes.

10          THE COURT:  This side goes first, five minutes, no

11    more.

12          MR. WHITE:  Good afternoon, Mr. Hawes.

13          THE JUROR:  Hi, how are you doing?

14          MR. WHITE:  Fine.  I'm William White, and I

15    represent Tim Callahan along with Mary Jo Harris and Hugh

16    Curran represents Richard Walsh.  I want to first tell you

17    that this case involves a shooting that occurred back in

18    1988 of a 12 year-old girl by the name of Darlene

19    Tiffany Moore as she sat on a mailbox on a street corner in

20    the Roxbury section of Boston.  Have you ever heard anything

21    about that particular incident?

22          THE JUROR:  No, I haven't.

23          MS. SCAPICCHIO:  When Darlene Tiffany Moore was

24    shot and killed, there was a police investigation that

25    followed that resulted in the arrest of Shawn Drumgold.

1    Does that ring a bell with you?

2         THE JUROR:  No.

3         MS. SCAPICCHIO:  And subsequent to the arrest of

4    Mr. Drumgold, there was a prosecution of Mr. Drumgold, and

5    he was convicted in that case.

6         THE JUROR:  No.

7         MR. WHITE:  Mr. Drumgold was convicted, he was

8    sentenced to life in prison, and in 2003, he was granted a

9    new trial.  Does that ring any bell with you?

10        THE JUROR:  No, not at all.

11        MR. WHITE:  Let me tell you that this case is

12   going to involve the testimony of various witnesses

13   including police officers, and with respect to police

14   officers who testify and civilians who testify, you may have

15   to make some determinations as to who you believe.  Does the

16   fact that a police officer testifies hold any weight with

17   you just by virtue of that individual being a police

18   officer?

19        THE JUROR:  No.

20        MR. WHITE:  So you, in other words, you would keep

21   an open mind and you would weigh the testimony of police

22   officers and civilians equally?

23        THE JUROR:  Yes, I would.

24        MR. WHITE:  And would you keep an open mind

25   understanding that you may not hear from the defendants

1     until after you hear from the plaintiffs?

2               THE JUROR:  Yes.

3               MR. WHITE:  And you would give an opportunity for

4     the defendants to present their side of the case and what

5     they had to say with respect to each of the witnesses in the

6     case?

7               THE JUROR:  Yes.

8               MR. WHITE:  In this case, this case is going to

9     involve some witnesses who testified in 1988 one way and in

10    2003, they testified differently.  In other words, they

11    reversed their testimony, reversed the positions they had on

12    their testimony from 1988.  Does the fact that a witness

13    does that give you any particular feeling?

14              THE JUROR:  Should I elaborate or does it matter?

15              THE COURT:  Please elaborate.

16              THE JUROR:  Yeah, it would raise questions.  I

17    don't really know how to describe it, yeah, it would raise

18    questions with myself if they were telling the truth or not,

19    yes.

20              MR. WHITE:  With respect to those witnesses, would

21    you listen to their testimony?

22              THE JUROR:  Of course.

23              MR. WHITE:  With respect to this case, you're

24    going to hear about a police investigation that was

25    conducted in the case.  Would you consider all of the

1    testimony that you hear about the police investigation?

2               THE JUROR:  Yes.

3               MR. WHITE:  With respect to this case, you may

4    also hear something about gangs.  Does that give you any

5    particular feeling?

6               THE JUROR:  No, not at all.

7               MR. WHITE:  You would keep an open mind as to

8    whether any individual who testified who might be associated

9    with a gang or not associated with a gang?

10              THE JUROR:  Of course, yeah.

11              MR. WHITE:  There may also be some testimony in

12   this case regarding individuals who have histories of drug

13   use.  Does that give you any concern?

14              THE JUROR:  No.

15              MR. WHITE:  And you would consider the testimony

16   of all of the individuals who testified whether they used

17   drugs or not?

18              THE JUROR:  Yes.

19              MR. WHITE:  And let me ask you -- actually let me

20   stop and see if anyone has questions.

21              MS. HARRIS:  Very quickly.  I see you served how

22   long ago was that?

23              THE JUROR:  Last summer.

24              MS. HARRIS:  Can you tell me not about the

25   deliberations, what kind of case it was?

1           THE JUROR:  It was drug dealing on school

2     property.

3           MS. HARRIS:  Okay.  What court were you in?

4           THE JUROR:  Brockton.

5           MS. HARRIS:  Did you enjoy the experience?

6           THE JUROR:  Yes.

7           MS. HARRIS:  What did you like about being on the

8     jury?

9           THE JUROR:  I thought it was very interesting, I

10    always wanted to see what a trial was like, so it was very

11    interesting.

12          MS. HARRIS:  And you still want to do it again

13    after that experience?

14          MS. HARRIS:  I would like to be on a jury.  I'm

15    very curious it's all it's cracked up to be.

16          MS. HARRIS:  Do you guys --

17          THE COURT:  Ms. Scappichio.

18          MS. SCAPICCHIO:  Hi, my name is Rosemary

19    Scapicchio.  I represent the plaintiff in this case,

20    Shawn Drumgold.  In looking at your questionnaire, you

21    answered question 27, you indicated that people who have

22    been wrongfully convicted sometimes bring lawsuits against

23    the police department to favor or oppose this type of

24    lawsuit, and you say you oppose it.  Could you explain a

25    little bit what you mean by that?

1          THE JUROR:  I feel that they're trying to do their

2     job.  Sometimes, you know, they might make the wrong choice,

3     but I do believe in what the officers do.  I feel it is

4     wrong to bring something against them like that.

5          MS. SCAPICCHIO:  It's wrong to bring a suit

6     against a police officer who's in his capacity as a police

7     officer?

8          THE JUROR:  Yes.

9          MS. SCAPICCHIO:  Is that because you think that

10    police officers have a tough job and --

11         THE JUROR:  Yes.

12         MS. SCAPICCHIO:  And they shouldn't be sued for

13    something that happens while they're on duty?

14         THE JUROR:  Yes.

15         MS. SCAPICCHIO:  I don't have any further

16    questions.

17         THE COURT:  That's what this lawsuit is about, so

18    if you're opposed to someone suing a police officer under

19    these circumstances, if you think that that would be make it

20    hard for you to serve as a juror, then I would have to

21    excuse you.  Do you understand that?

22         THE JUROR:  Yes.

23         THE COURT:  I'll excuse you.  I'm sorry it took so

24    long.  Ms. Olson.

25         THE JUROR:  Hi, good afternoon.

```
 1              THE COURT:  I think it's Ms. Scappichio.

 2              MS. SCAPICCHIO:  Hi, my name is Rosemary

 3   Scapicchio, and I represent Shawn Drumgold.  He's the

 4   plaintiff in this case, and this case involves a 1988 murder

 5   of a little girl by the name of Tiffany Moore.  She was

 6   sitting on a mailbox in August of '88 when she was shot and

 7   killed.  The police subsequently arrested my client,

 8   Shawn Drumgold.  He was tried and convicted, sentenced to

 9   life in prison, and in 2003, about 15 years later, a motion

10   for a new trial was allowed and he was released.

11              Do you have any memory having those facts now in

12   your mind of any of the details of this case?

13              THE JUROR:  Very vaguely, if it was that that far

14   away behind.

15              MS. SCAPICCHIO:  Do you remember hearing about it

16   in 1988?

17              THE JUROR:  No.

18              MS. SCAPICCHIO:  Do you remember hearing about it?

19              THE JUROR:  No, not personally, just glimpse over

20   it in the newspaper.

21              MS. SCAPICCHIO:  Some people think that the job

22   that police officers do is such an important job, it's such

23   an important role in society that they shouldn't be sued

24   when they're doing anything in their official capacity.  Do

25   you believe that?
```

```
 1            THE JUROR:  No.

 2            MS. SCAPICCHIO:  No, okay.  In this case if the

 3   evidence suggested that Detective Walsh and Detective

 4   Callahan violated Shawn Drumgold's civil rights and that

 5   violation led to his wrongful conviction, and you learned

 6   that Mr. Drumgold also had some problems with drugs in the

 7   past, would that bar you from awarding him damages in this

 8   case?

 9            THE JUROR:  No.

10            MS. SCAPICCHIO:  And if the evidence suggested in

11   this case that Detective Walsh and Detective Murphy violated

12   Shawn Drumgold's civil rights and that violation led to his

13   wrongful conviction and you learned that Mr. Drumgold had a

14   criminal past, had committed some crimes in the past, would

15   that bar you from awarding him damages in this case?

16            THE JUROR:  No.

17            MS. SCAPICCHIO:  Can I have just a minute, your

18   Honor?

19            THE COURT:  Yes.

20            MS. SCAPICCHIO:  I don't have anything further,

21   your Honor.

22            THE COURT:  Counsel.

23            MS. HARRIS:  Good afternoon.  My name is

24   Mary Jo Harris, and I along with these gentlemen represent

25   the defendant officers in this case.  Have you had any
```

1    experience serving as a juror in the past?

2            THE JUROR:  No.

3            MS. HARRIS:  This is a civil suit, and there are

4    going to be allegations made and evidence presented by the

5    plaintiff and then the defendants also have an opportunity

6    to explain their side of the story.  Would you have any

7    problem keeping an open mind and hearing the whole thing

8    before you began making decisions about who was telling the

9    truth and whose version of the events were more correct?

10           THE JUROR:  No.

11           MS. HARRIS:  I see that you have a disabled son at

12   home.  Would serving on a jury in this case be any personal

13   hardship given your home situation?

14           THE JUROR:  When I mentioned disabled on that

15   first question, I realized later that mentioned in

16   household.  That person is not in my household, I

17   apologize.

18           MS. SCAPICCHIO:  That's quite all right.  So

19   you're not a caretaker at home?

20           THE JUROR:  No, I'm not.

21           MS. HARRIS:  I also noticed your son had a charge

22   of larceny in the past?

23           THE JUROR:  Correct.

24           MS. HARRIS:  Can you tell us a little bit about

25   that.

1          THE JUROR:  That was a breaking and entering with

2     some destructive damage, and he also does have a drug,

3     excuse me, alcohol abuse problem and is presently being

4     treated for it.

5          MS. HARRIS:  Would that experience affect your

6     ability do you think to judge this case impartially?

7          THE JUROR:  No.

8          MS. HARRIS:  And fairly?  That's all for me.

9     Thank you.

10          MR. CURRAN:  I have no questions.

11          MR. ROACHE:  Nothing.

12          THE COURT:  Okay.  You need to call this number at

13     6:00 tomorrow, and you need your juror number.  When you

14     call up, have your juror number, and they'll let you know

15     whether or not you'll be on the final jury, and if so, we'll

16     see you at Wednesday morning at 9:00.

17          THE COURT:  We'll begin, Maryellen, everyone is

18     brought downstairs.

19          THE CLERK:  They'll be in the jury assembly.

20          THE COURT:  We'll begin at 9:00.  You should know

21     that right now it looks like it won't be anymore.

22          THE CLERK:  Who's to say we wouldn't excuse seven

23     or five or ten tomorrow.

24          THE COURT:  We have 12, so we're halfway there.

25     It's a good thing we're stopping now.  I hope you feel

1  better, Mr. Curran.

2       MR. CURRAN:  Thank you.

3       (Whereupon, the hearing was suspended at

4  4:48 p.m.)

5

6            C E R T I F I C A T E

7

8  UNITED STATES DISTRICT COURT )

9  DISTRICT OF MASSACHUSETTS    )

10 CITY OF BOSTON               )

11

12      I, Valerie A. O'Hara, Registered Professional

13 Reporter, do hereby certify that the foregoing transcript

14 was recorded by me stenographically at the time and place

15 aforesaid in No. 04-11193-NG, in re:  Shawn Drumgold vs.

16 Timothy Callahan and thereafter by me reduced to typewriting

17 and is a true and accurate record of the proceedings.

18                   /S/ VALERIE A. O'HARA

19      _____

20                   VALERIE A. O'HARA

21                   REGISTERED PROFESSIONAL REPORTER

22                   DATED APRIL 28, 2011

23

24

25