IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


SHAWN DRUMGOLD,           )  C.A. No. 04-11193-NG

      PLAINTIFF      )  Courtroom No. 2

VS.

TIMOTHY CALLAHAN, ET AL.,)  1 Courthouse Way

      DEFENDANTS    )  Boston, MA  02210


JURY TRIAL DAY 2

JURY IMPANELMENT

MARCH 4, 2008

9:18 a.m.


BEFORE THE HONORABLE NANCY GERTNER

UNITED STATES DISTRICT COURT JUDGE


VALERIE A. O'HARA

OFFICIAL COURT REPORTER

1    A P P E A R A N C E S:

2        ROSEMARY CURRAN SCAPICCHIO, ATTORNEY, Four Longfellow
     Place, Boston, Massachusetts  02114, for the Plaintiffs;

3
         Tommasino & Tommasino, by MICHAEL W. REILLY, ESQ.,
4    Two Center Plaza, Boston, Massachusetts  02108, for the
     Plaintiff;

5
         Roache & Malone, LLP, by JOHN P. ROACHE, ESQ., 66 Long
6    Wharf, Boston, Massachusetts  02110, for the Defendants.

7        Bletzer and Bletzer, P.C., by HUGH R. CURRAN, ESQ., 300
     Market Street, Brighton, Massachusetts  02135, for the
8    Defendants;

9        Law Offices of William M. White, Jr. and Associates,
     WILLIAM M. WHITE, JR., ESQ., 218 Lewis Wharf, Boston,
10   Massachusetts  02110;

11       Morgan, Brown & Joy, LLP, by MARY JO HARRIS, ESQ., 200
     State Street, Boston, Massachusetts  02109-2605, for the
12   Defendants.

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1
2          THE COURT:  Mr. Boyden is ill.  We have not

3     reached him.

4          MR. CURRAN:  The gentleman we had yesterday with

5     the diabetes?

6          THE COURT:  I think we'll ask the jury clerk to

7     find out.

8          MR. CURRAN:  That was juror No. 19.

9          THE COURT:  You're sounding better.

10          MS. SCAPICCHIO:  I don't know if this needs to be

11     on the record.  There was an issue that you handed down two

12     jury questions in the criminal trial.  There were two

13     questions in the jury trial we wanted to get copies of.

14          THE COURT:  Right.

15          MS. SCAPICCHIO:  You issued an order.  I'm not

16     sure you're going to be happy about this, but the Superior

17     Court says they can't honor your order and that I have to go

18     to Judge Hinkle with another order because they don't

19     recognize Federal Court orders.

20          THE COURT:  Say that again and slowly.

21          MS. SCAPICCHIO:  This was not Judge Hinkle, it was

22     the clerk who called me back.  I saved the message, and she

23     said had spoken directly to Maura Hennigan who is the clerk

24     in Suffolk Superior Court, criminal side.  She was told them

25     in order for us to get those there had to be a Superior

1    Court order, I had to go to Judge Hinkle, file an order, get

2    it approved by Judge Hinkle and then she could release the

3    questions.  They told Mike yesterday --

4           MR. REILLY:  I talked to the clerk.

5           THE COURT:  In what respect are questions that a

6    jury asks not a public record to begin with?

7           MS. SCAPICCHIO:  I think it was marked for

8    identification, not an exhibit.

9           THE COURT:  How can it not be a public record?

10          MR. REILLY:  I sent my clerk over to get a copy of

11   it.  They said we can't give it to you.  She said why.

12          THE COURT:  Rather than starting a war --

13          MS. SCAPICCHIO:  That's what I didn't want to

14   start.

15          THE COURT:  If you want, I can try to call

16   Judge Hinkle directly.

17          MS. SCAPICCHIO:  That would be great.

18          THE COURT:  She might not even know, that's my

19   concern.  Judge Hinkle might not know what has happened in

20   the clerk's office.

21          THE COURT:  Off the record.

22          (A discussion was held off the record.)

23          THE COURT:  Mr. Boyden is sick and so he's out.

24          THE CLERK:  Corriveau, he's actually 19.  He was

25   our juror No. 7.  He was the gentleman, if I remember --

1           THE COURT:  That was ill.

2           THE CLERK:  -- had diabetes, and he's on the call

3   back number, and I made a call to Jim, I don't know how you

4   handle it all.  He's saying he's not feeling well today, so

5   I don't know how you want to handle that.

6           THE COURT:  Which one is he, Maryellen?

7           THE CLERK:  He was the one who sat. --

8           THE COURT:  John Corriveau.  I think that the best

9   thing to do would be to excuse him so as not to run the

10  risk.  With everyone's approval, we'll excuse him.

11          MS. SCAPICCHIO:  That's fine, your Honor.

12          THE COURT:  19 and 42 both so we are back at 11.

13          MR. REILLY:  I think we've got one more than you

14  do.

15          THE COURT:  Let's go through this.  Curran, Baio,

16  Gedutis, Ryan, Apple, Soraya Assar.

17          THE CLERK:  Is what, 6?

18          THE COURT:  Sara is 6, Kristie Froman is 7, Lisa

19  Laing is 8, Bruce Bridges is 9, Girish Rao is 10, Ellen

20  Perry, you're right, Donna Olson is 12.

21          MR. REILLY:  With John Curran we've got 12 now.

22          THE COURT:  Let's go.  Hi.

23          THE JUROR:  Good morning.

24          THE COURT:  Mr. Everitt, hi.  I'm not sure whose

25  turn it is, but let's start with the plaintiff.

1          MS. SCAPICCHIO:  Hi, my name is Rose Scapicchio.

2     This is Michael Reilly.  We represent the plaintiff,

3     Shawn Drumgold.  We wanted to ask you a couple questions

4     about this case.

5          THE JUROR:  Okay.

6          MS. SCAPICCHIO:  This case is a civil lawsuit that

7     stems from the 1988 shooting death of a little girl by the

8     name of Darlene Tiffany Moore.  She was shot as she sat on a

9     mailbox back in August of 1988, and the police arrested

10    Shawn Drumgold.  He was tried and convicted and sentenced to

11    life in prison.  After 15 years, he filed a motion for a new

12    trial, and he was released from prison.  Do the facts of

13    these case ring a bell at all to you?

14         THE JUROR:  Slightly.  I remember the fact that

15    the girl got shot, she was shot in the head.  I didn't

16    really get into it, but I remember that part, where the girl

17    was on the mailbox.  That's all I remember.

18         MS. SCAPICCHIO:  Did you follow the case at all?

19         THE JUROR:  Not really, no.  I remember the fact

20    that it was a little girl that got shot.

21         MS. SCAPICCHIO:  What about in 2003, when

22    Shawn Drumgold was released from prison, did you remember

23    reading anything about that?

24         THE JUROR:  No recollection at all, nothing.

25         MS. SCAPICCHIO:  Okay.  You indicated on your

1    questionnaire that you are an employee of the City of

2    Boston?

3            THE JUROR:  Correct.

4            MS. SCAPICCHIO:  You understand that the City of

5    Boston is a defendant in this case?

6            THE JUROR:  Okay.

7            MS. SCAPICCHIO:  Do you think that would interfere

8    with your ability to serve?

9            THE JUROR:  Immaterial, no.

10           MS. SCAPICCHIO:  I'm sorry.

11           THE JUROR:  Nothing.

12           MS. SCAPICCHIO:  You also indicated that you are a

13   patrol officer with the Boston?

14           THE JUROR:  No, I was.

15           MS. SCAPICCHIO:  Because there is no more Boston

16   Municipal Police?

17           THE JUROR:  Right.

18           MS. SCAPICCHIO:  How long did you work for the

19   Boston Municipal Police?

20           THE JUROR:  Eight years.

21           MS. SCAPICCHIO:  Where did you work out of?

22           THE WITNESS:  Frontage Road.

23           MS. SCAPICCHIO:  Did you work in conjunction with

24   the Boston Police?

25           THE JUROR:  No, I actually started out in Cedar

1    back like the '70s I think it was.  I was a dispatcher like

2    six and a half years, then I went on patrol.

3         MS. SCAPICCHIO:  What kind of work did you do on

4    patrol?

5         THE JUROR:  Basically the school buildings, we had

6    like intrusion alarms, and if there was any problem, we

7    actually called the police ourselves.

8         MS. SCAPICCHIO:  Now, some people think that the

9    job that police officers do is such an important job in

10   society that they should never be sued for anything that

11   they do in their official capacity.  Do you agree with that?

12        THE JUROR:  All depends on the situation I would

13   think.

14        MS. SCAPICCHIO:  Okay.

15        THE JUROR:  I go by individual basis actually.

16        MS. SCAPICCHIO:  Perfect.  And in this case if the

17   evidence supported the fact that the defendants in this

18   case, Detective Walsh and Detective Callahan, violated

19   Shawn Drumgold's civil rights and that violation led to his

20   wrongful conviction, would you have any concerns awarding

21   damages if you knew that Shawn Drumgold had a criminal

22   history, a criminal past?

23        THE JUROR:  It wouldn't make any difference in the

24   case.  If the person's found guilty, then the evidence would

25   show the fact that they are guilty, if they are not, they

1   would find not guilty and I'd go on the evidence.

2           MS. SCAPICCHIO:  Okay.  And with respect to the

3   same question again, if the evidence supported the fact that

4   Detective Walsh and Detective Callahan violated

5   Shawn Drumgold's civil rights and that violation led to his

6   wrongful conviction, would you have any concerns in terms of

7   awarding damages if you knew that Shawn Drumgold had some

8   drug problems in the past?

9           THE JUROR:  That would make no difference at all.

10  If the facts show that he was a violator of his civil

11  rights, then I would go on that prejudice that he was

12  innocent, and I would award damages if there's any damages

13  to be awarded.

14          MS. SCAPICCHIO:  Thank you.  I have no further

15  questions.

16          THE COURT:  Mr. White.

17          MR. WHITE:  Sir, my name is William White.  With

18  Mary Jo Harris, Hugh Curran and John Roache, we represent

19  the defendants in this case, Timothy Callahan and

20  Richard Walsh, who were Boston police officers at the time

21  that these events occurred.  In 1988, as we just discussed,

22  there was a 12 year-old girl who was shot while she was on a

23  mailbox, and I believe you mentioned that I think it was

24  mentioned that her name was Darlene Moore, she was also

25  known as Tiffany Moore.  Does that ring a bell any further?

1          THE JUROR:  No, not really, no.

2          MR. WHITE:  You had mentioned in your

3    questionnaire that you read The Globe and The Herald?

4          THE JUROR:  Yes.

5          MR. WHITE:  Do you recall reading any stories

6    recently about Shawn Drumgold in The Globe or Herald?

7          THE JUROR:  Nothing recently, no.

8          MR. WHITE:  Is that primarily the source of your

9    information?

10         THE JUROR:  Usually I go to the papers first thing

11   in the morning during my early morning break, I skim real

12   quick, and if something catches my eye, then I'll read it.

13   I didn't recall any of this case in it at all.

14         MR. WHITE:  In this case, there were a number of

15   witnesses who were expected to testify.  Some of the

16   witnesses are expected to recant testimony that they offered

17   at the original trial in 1988.  Do you understand what

18   "recant" means, first of all?

19         THE JUROR:  That means you remember something or

20   something that wasn't true before or they thought was true,

21   they revised their testimony.

22         MR. WHITE:  They're going to change their

23   testimony.  They may come in and say they lied.

24         THE JUROR:  Okay.

25         MR. WHITE:  Does that affect your ability to

1    assess the witnesses who come in and tell you they lied or

2    wanted to recant their testimony?

3            THE JUROR:  Well, I figure sometimes when you lie,

4    you're incriminating yourself and you want to protect

5    yourself, too.  Sometimes once you tell a lie, there's

6    another lie afterwards, a lie about your first lie sometimes

7    to cover yourself, so, yes, I would think twice about

8    thinking about their testimony if they're caught lying.

9            MR. WHITE:  And you understand that in the manner

10   that this case proceeds, the plaintiff goes first and then

11   the defendants have an opportunity to present their

12   evidence?

13           THE JUROR:  Okay.

14           MR. WHITE:  And with that, would you keep an open

15   mind until you've heard all of the evidence in this case?

16           THE JUROR:  Yes, I would, yes.

17           MR. WHITE:  In other words, you'd hear both sides?

18           THE JUROR:  I'd hear both sides first, yes.

19           MR. WHITE:  Some of the witnesses in this case

20   will talk about their drug use.  How does that make you feel

21   when you hear that a witness is going to tell you about

22   their drug use in general?

23           THE JUROR:  Well, some people can't help

24   themselves when they're on drugs because -- and all they

25   want is more drugs so they want to do something about

1   getting more drugs, and if it concerns money, then they'll

2   go with it, but most times you can tell people how they tell

3   their stories, too.

4          MR. WHITE:  Does the fact that somebody sells

5   drugs impact you differently than somebody who uses drugs?

6          THE JUROR:  Yes.  I don't think a person who sells

7   drugs they're well maintained in society.  They could find

8   better things to do even though it's quick money for them,

9   but I don't really dislike them, I don't want to associate

10  with them.

11         MR. WHITE:  Thank you, sir.

12         MS. HARRIS:  Can I follow up very quickly?  I'm

13  Mary Jo Harris, as Mr. White said.  When the municipal

14  police were merged into the Boston Police, were you still

15  working?

16         THE JUROR:  Oh, no, I left them in '86.

17         MS. HARRIS:  Okay.  What were the circumstances of

18  your deciding to leave them?

19         THE JUROR:  I was having problems with the

20  management so I says okay, that's enough, see you later.

21         MS. HARRIS:  Did you leave voluntarily?

22         THE JUROR:  No.

23         MS. HARRIS:  Can you tell us anything more about

24  it?

25         THE JUROR:  We were working out of Frontage Road,

1    and it was on a Christmas Day, and I was there fixing my

2    car, and they thought I was doing something improper.  I

3    says no, but they tried to give me the suspension.  I says,

4    fine, I'm out of here, I'm just done with this.  They were

5    just actually finding fault with everything I was doing at

6    the particular time, so I just said the heck with it, I'm

7    out of here.

8              MS. HARRIS:  Do you have any ill will toward the

9    Boston Police, the City of Boston?

10             THE JUROR:  No, I do not.

11             MS. HARRIS:  And you mentioned in your

12   questionnaire in question 34 that you had a family member,

13   close friend or associate who was the victim of a crime, and

14   you state yes, domestic, girlfriend, injured face?

15             THE JUROR:  Yes, that was my girlfriend.  She had

16   a drinking problem, okay, and she came over to my house one

17   day in a fit of rage, I forget what it was all about, and

18   she went to smack me, she had a set of keys in her hand, and

19   she scratched my face, so I called the police on her, and

20   that was it, and I had her arrested.

21             MS. HARRIS:  In answer to that question you're

22   saying that the girlfriend injured your face?

23             THE JUROR:  Yes, that's what the domestic.

24             MR. CURRAN:  I don't have any questions, thank

25   you, sir.

1           THE COURT:  I'm going to ask you to call this

2    number at 6:00 today.  You call that list of all the people

3    who will be on the jury, on the final jury, and if you're on

4    the final jury, we'll see you on Wednesday, 9:00.

5           THE JUROR:  When do I call this?

6           THE COURT:  After six today.  You have to have

7    that jury number, wherever that is.

8           THE JUROR:  Who gives you that?

9           THE CLERK:  It should have been on your summons.

10          THE COURT:  Thank you.

11          MS. SCAPICCHIO:  Your Honor, could we be heard

12   before the next juror?

13          THE COURT:  What's the problem?

14          MS. SCAPICCHIO:  I have some concerns about this

15   jury being an employee of the City of Boston in that the

16   City of Boston is a named defendant in the suit.  I know he

17   indicated on the record that it wouldn't affect him.

18          THE COURT:  Not only it wouldn't affect him but he

19   left the City of Boston.

20          MS. HARRIS:  He's still employed.

21          MS. SCAPICCHIO:  He's still employed?

22          MR. WHITE:  He is a custodian.

23          MS. SCAPICCHIO:  He works for the city.  The city

24   is a defendant.

25          MR. CURRAN:  The old break, your Honor, he was

1    part of the police, if you look, he's custodian of the

2    school department.  He basically stayed with the same

3    department, he shifted.  He has nothing to do with the

4    defendants in this case, in this phase, otherwise we're

5    going to eliminate how many hundreds of thousands of people?

6              THE COURT:  Is there anyone else in the pool who's

7    a City of Boston employee?

8              MS. SCAPICCHIO:  I didn't see anyone.

9              THE COURT:  I'm going to excuse him then.

10             MR. WHITE:  Judge, not for nothing, in a case

11   where if this was a criminal case and there was a federal

12   employee in the venire who was summoned to sit on the case,

13   is that person excluded because they are a federal employee,

14   they can't sit on a jury?

15             THE COURT:  No, the federal government is a little

16   bigger than the City of Boston.  It seems to me out of an

17   abundance of caution, we'll excuse him.

18             THE COURT:  Ms. Francisco Parra.

19             MR. WHITE:  Judge, this individual, he would

20   prefer not to sit.  Actually the two have indicated some

21   difficulty.

22             THE COURT:  Thank you for pointing that out.  What

23   are you looking at, what number?

24             MS. SCAPICCHIO:  Question 30.

25             THE JUROR:  Good morning, your Honor.

```
1              THE COURT:  Good morning, Mr. Parra.  You said, I
2    was trying to figure out, is there any particular reason
3    that you would like to be a juror or would not like to be a
4    juror, and you said you prefer not given the anticipated
5    length of the trial.  If anyone in this courtroom was asked
6    if they would prefer to be someplace else, I think it is
7    fair to say they would prefer to be someplace else.  The
8    question, is this a real hardship for you?
9              THE JUROR:  I'd rather be elsewhere.
10             THE COURT:  You'd rather be elsewhere.  In this
11   case, we're all in the same boat.  Go on, Mr. White.
12             MR. WHITE:  Sir, this case stems from the 1988
13   shooting of a 12 year-old girl by the name of Darlene
14   Tiffany Moore as she sat on a mailbox in the Roxbury section
15   of Boston.  Do you recall anything about that particular
16   incident?
17             THE JUROR:  No.
18             MR. WHITE:  Were you living in the Boston area
19   back in 1988?
20             THE JUROR:  I was.
21             MR. WHITE:  Do you recall whereabouts you were
22   living?
23             THE JUROR:  In 1988, I was living in Lexington, I
24   think.
25             MR. WHITE:  Do you recall -- first let me tell you
```

1    a little bit more.  After the shooting and killing of

2    Tiffany Moore, the police conducted an investigation which

3    led them to arrest an individual by the name of

4    Shawn Drumgold who's the plaintiff in this case.  Does that

5    ring any bell with you?

6           THE JUROR:  It doesn't ring a bell with me from

7    back then.  I did hear a story on NPR yesterday morning

8    about the case as I was driving in.

9           MR. WHITE:  What did you hear about the case as

10    you came in yesterday?

11           THE JUROR:  What I heard was what you just said,

12    that a young girl was shot, as I took it from the story, a

13    shoot-out incident and that, let's see what else, the Boston

14    Police Department was under some pressure to resolve the

15    case, that the plaintiff had been convicted of the crime and

16    spent some time in jail, I believe they said 15 years and

17    that subsequently two witnesses, I believe they had said had

18    recanted their testimony as a result of which the plaintiff

19    was released.

20           MR. WHITE:  Anything else you remember about the

21    story?  Is that it?  That seems like quite a mouthful.

22           THE JUROR:  I think that's it.

23           MR. WHITE:  With respect to this particular case

24    as you indicated, there's going to be some witnesses who may

25    testify in this case who in 1988 testified one way and later

1    on changed their testimony to say something different.  How

2    would you feel about that?

3           THE JUROR:  I don't know how to answer that

4    question.  I would have to see the witnesses and how they

5    were on the stand.

6           MR. WHITE:  And you understand, I know that you're

7    an attorney, and you understand that there's two sides to

8    the story, and the plaintiff goes first obviously and the

9    defendant goes second.  You would keep an open mind?

10          THE JUROR:  I would try to, yes.

11          MR. WHITE:  If you were selected as a juror in

12   this case, you would keep an open mind until you heard both

13   sides of the case and then the Judge's instructions before

14   you made your decision?

15          THE JUROR:  Yes.

16          MR. WHITE:  Thank you.

17          MS. HARRIS:  In listening to the story on NPR, did

18   it cause you to come to any conclusions about what happened

19   in this case?

20          THE JUROR:  No.

21          MS. HARRIS:  If you were presented with evidence

22   that suggested that the recantations were not credible, is

23   that something that you think you would be able to hear?

24          THE JUROR:  Yes.

25          MS. HARRIS:  I think one of the answers to your

1    questions you indicated that you're involved in pending

2    litigation on a malpractice claim?

3              THE JUROR:  That's correct.

4              MS. HARRIS:  Can you tell us a little bit about

5    that?

6              THE JUROR:  I'm a defendant in the case.  It was a

7    case involving an appeal from the denial of a Conservation

8    Commission wetlands permit.  It is alleged that I missed the

9    deadline.

10             MS. HARRIS:  What kind of work do you do?

11             THE JUROR:  It's primarily land use and planning

12   law.

13             MS. HARRIS:  Have you had any experience in front

14   of jurors?

15             THE JUROR:  I've had one jury trial.

16             MS. HARRIS:  Is that also a land use?

17             THE JUROR:  It was.

18             MS. HARRIS:  Have you ever done any civil rights

19   work or personal jury work?

20             THE JUROR:  No.  I take that back.  I represented

21   a shopping mall developer in the Town of Acton who brought a

22   claim of a violation of civil rights.  The case was

23   settled.

24             MS. HARRIS:  Okay.  Who did you represent in that

25   litigation?

1          THE JUROR:  It's a while ago.

2          MS. HARRIS:  Plaintiff or defendant?  I don't know

3    the details.

4          THE JUROR:  Plaintiff.

5          MS. HARRIS:  Do you subscribe to or follow

6    Lawyer's Weekly at all?

7          THE JUROR:  Yes, I subscribe to and read Lawyer's

8    Weekly.

9          MS. HARRIS:  Have you read anything in Lawyer's

10   Weekly about this case?

11         THE JUROR:  No.

12         THE COURT:  You're out of time.  Go on.

13         MS. SCAPICCHIO:  Hi, my name is Rose Scapicchio.

14   This is Michael Reilly.  We represent the plaintiff,

15   Shawn Drumgold.  I have a few questions for you, just

16   follow-ups from what the defense attorneys asked you.  Do

17   you have any opinion, some people think that the police do

18   such an important job in society that they should never be

19   sued for anything that happens while they're on the job.  Do

20   you agree with that?

21         THE JUROR:  No.

22         MS. SCAPICCHIO:  Would you tend to believe the

23   testimony of a police officer over that of a civilian

24   witness merely because of his or her position as a police

25   officer?

1              THE JUROR:  No.

2              MS. SCAPICCHIO:  In this case if the evidence

3     supported the fact that Detective Callahan and Detective

4     Walsh violated Shawn Drumgold's civil rights and that

5     violation led to his wrongful conviction, would you have any

6     concerns about awarding damages if you knew that

7     Shawn Drumgold had a criminal past?

8              THE JUROR:  No.

9              MS. SCAPICCHIO:  And, again, if the evidence

10    supported the fact that Detective Callahan and Detective

11    Walsh violated Shawn Drumgold's civil rights and that

12    violation led to his wrongful conviction, would you have any

13    concerns awarding damages if you knew that Shawn Drumgold

14    had a drug problem?

15             THE JUROR:  No.

16             MS. SCAPICCHIO:  I don't have anything else, your

17    Honor.  Thank you.

18             THE COURT:  Okay.  Mr. Parra, 6:00 please call

19    this number.  You need your juror number, which is on your

20    summons, and then you'll know whether you're on the final

21    jury.  Thank you very much.

22             MR. REILLY:  Your Honor, could we have just a

23    moment?  My client needs to use the bathroom.

24             THE COURT:  Yes.  I just want to make a comment.

25    I understand what both sides are doing with respect to the

1    questions.  The questions are difficult, however, the

2    question about if you have a witness who changed their

3    testimony, would that affect you, well, of course, the

4    answer it does and should, and so I wonder.  I'm just noting

5    that you're going to get ambiguous responses to that because

6    prior inconsistent statements matter.

7           If your point is, which seems to be very well

8    taken, this is going to be a long trial and you have to make

9    sure you hold any judgments until you hear our side of it,

10   that's a different point, but any careful thinker would say

11   of course it's going to matter.  Likewise your comment about

12   would it matter that he had a criminal record or the drug

13   issue in terms of damages, well, that's going to depend

14   entirely on how you try this case.

15          If the case is going to be I was imprisoned for 15

16   years and I want damages deriving from that and not

17   reputation damage or anything else.

18          MS. SCAPICCHIO:  The problem with that -- I didn't

19   mean to interrupt you.

20          THE COURT:  Yes, go on.

21          MS. SCAPICCHIO:  The problem with that in the

22   trial testimony Mr. Drumgold at trial admits to a gun, drug

23   convictions and defacing the serial number of a gun, that's

24   all coming in as part of the trial.  Whether or not we try

25   to impeach strictly as you want us to, which we hope you do,

1   but that's all going to be before the jury.  My goal is to

2   just get the jurors who say if he's got a problem, I

3   wouldn't award him money, if he's had a criminal past, I

4   wouldn't award him money.

5          THE COURT:  Because it's an ambiguous question on

6   the facts of this case, but as I said, there's nothing

7   improper, it's just the answer to the question may not

8   necessarily be an answer that disqualifies a juror.  It may

9   actually be a reasonable answer.

10          MS. SCAPICCHIO:  The goal isn't disqualify them to

11   talk about whether or not it's really an issue and we really

12   find out their views at all.

13          THE COURT:  If someone says it's really an issue

14   linked to damages may not be a disqualifying answer.

15          MS. SCAPICCHIO:  I understand, your Honor.

16          THE COURT:  There may be another way of asking

17   this question.  This is all advice, not rulings.

18          MS. SCAPICCHIO:  Your Honor, the next juror is

19   opposed to lawsuits of the police department.

20          MS. SCAPICCHIO:  What's question No. 24?

21          THE COURT:  Why don't we bring him and we'll ask

22   that question right away.  He favors --

23          MS. HARRIS:  No. 44, 42 is the guy who called in

24   sick, I believe, Paul Butler.

25          THE COURT:  Butler, I'm sorry.  The question is

1   27?

2           MS. SCAPICCHIO:  27, your Honor.

3           THE COURT:  Hi, Mr. Butler.

4           THE JUROR:  Hello.

5           MS. SCAPICCHIO:  Good morning.

6           THE COURT:  I'm just going to start the questions

7   and then we'll turn to the lawyers, five minutes a side.

8   Nobody can go past five minutes, otherwise I have the hook,

9   okay.  On answer to question No. 27, you were asked people

10  who have been wrongfully convicted sometimes bring lawsuits

11  against the police department, do you favor or oppose this

12  type of lawsuit, and you said oppose.  Now, this case is

13  about an allegation of wrongful conviction and a lawsuit

14  about that.

15          Would your opposition make it hard for you to sit

16  on a case like this?

17          THE JUROR:  Not really.  I wrote down opposed

18  because I think there's a lot more to it than blaming it on

19  the police or lawyers, the prosecutors and everything.

20          THE COURT:  Okay.  If your answer is it depends on

21  the facts, then that's one thing, if your answer is I think

22  it's terrible all the time.

23          THE JUROR:  No, no.

24          THE COURT:  All right.  Why don't we proceed.

25  Counsel.

1          MS. SCAPICCHIO:  It's me.  Hi, my name is

2    Rose Scapicchio.  This is Michael Reilly.  We represent the

3    plaintiff, Shawn Drumgold in this case.  I want to ask you

4    to see if you have outside knowledge of this case.  This

5    case is actually a civil lawsuit brought as a result of a

6    murder that took place in 1988, a little girl by the name of

7    Darlene Tiffany Moore was murdered.  The police arrested my

8    client, Shawn Drumgold.  He was tried and convicted and

9    sentenced to life in prison.  After 15 years, he filed a

10   motion for a new trial, and it was allowed and he was

11   released.

12          Do the facts of this case at all, the names

13   Shawn Drumgold or Darlene Tiffany Moore or any of the

14   underlying facts of the case ring a bell to you?

15          THE JUROR:  Yes.

16          MS. SCAPICCHIO:  What do you know about the case?

17          THE JUROR:  Just an outline basically what you

18   said, somebody went to jail and done -- I couldn't remember

19   how many years later got out, and that's basically what I

20   heard on the news.

21          MS. SCAPICCHIO:  Did you follow this case on the

22   news at all?

23          THE JUROR:  No.

24          MS. SCAPICCHIO:  Did you follow the case in 1988

25   when Darlene Tiffany Moore was murdered?

1            THE JUROR:  No.

2            MS. SCAPICCHIO:  Did you follow it in 2003 when

3    Shawn Drumgold was released?

4            THE JUROR:  No.

5            MS. SCAPICCHIO:  Okay.  When you said you heard it

6    on the news, would that be the TV news or newspaper?

7            THE JUROR:  TV news.

8            MS. SCAPICCHIO:  Do you remember what you heard on

9    the news at all?

10           THE JUROR:  The TV is like background noise but

11   picked it up just somebody went to jail, a number of years

12   later got out.

13           MS. SCAPICCHIO:  Okay.  And you had indicated to

14   Judge Gertner when she was asking you questioning about how

15   you answered No. 27, you answered you opposed these type of

16   lawsuits because you didn't think it was a simple as just

17   blaming the police, it could be the lawyers or the

18   prosecutors?

19           THE JUROR:  Yeah.

20           MS. SCAPICCHIO:  What makes you say that?

21           THE JUROR:  Because after the police arrest

22   somebody, they go to trial, there's prosecutors, there's

23   defense, there's a jury.  To blame everything on the police

24   you're skipping the part that actually got him convicted.

25           MS. SCAPICCHIO:  So you think that the police

1    didn't play a role?

2            THE JUROR:  Oh, I don't know.

3            MS. SCAPICCHIO:  But when you say the part that

4    actually got him convicted, what do you mean?

5            THE JUROR:  Well, the jury and the prosecutors,

6    the defense, you know, it was all evidence presented and

7    all.  Actually I should have written undecided, but I think

8    it's a lot more complex than saying the police.

9            MS. SCAPICCHIO:  Okay.  So you think there could

10   be other factors that contributed to a wrongful conviction

11   other than the police?

12           THE JUROR:  Yeah.

13           MS. SCAPICCHIO:  Now, you had indicated that you

14   had some relatives that worked for the Boston Police

15   Department; is that right?

16           THE JUROR:  Yes, a grand uncle.

17           MS. SCAPICCHIO:  An uncle?

18           THE JUROR:  A grand uncle.

19           MS. SCAPICCHIO:  What position?

20           THE JUROR:  He's passed away, long retired, passed

21   away.

22           MS. SCAPICCHIO:  Where did he work?

23           THE JUROR:  Staff inspection.

24           MS. SCAPICCHIO:  And you also have a brother that

25   was a guard at the Department of Corrections?

1          THE JUROR:  Yes.

2          MS. SCAPICCHIO:  What facility did he work at?

3          THE JUROR:  I think he's at Bridgewater now.

4          MS. SCAPICCHIO:  How long has he worked for the

5  DOC?

6          THE JUROR:  It's got to be over 20 years.

7          MS. SCAPICCHIO:  And in terms of this case, if the

8  evidence supported the fact that the defendants

9  Detective Walsh and Detective Callahan violated

10 Shawn Drumgold's civil rights and that violation led to his

11 wrongful conviction, would you have any concerns in terms of

12 awarding damages if you knew that Shawn Drumgold had a

13 criminal past?

14         THE JUROR:  No, because this is about one thing,

15 not the other stuff.

16         MS. SCAPICCHIO:  And in the same vain, if the

17 evidence supported the fact that Detective Walsh and

18 Detective Callahan violated Shawn Drumgold's civil rights

19 and that violation led to his wrongful conviction, would you

20 have any concerns awarding damages if you knew that

21 Shawn Drumgold had a drug history?

22         THE JUROR:  No.  It doesn't have anything to do

23 with it.

24         MS. SCAPICCHIO:  Excuse me one second.  Would you

25 tend to believe the testimony of a police officer over that

1    of a civilian witness?

2            THE JUROR:  I don't know.  I never had to.  Now

3    you're going to reputation, comparing reputation to

4    somebody.

5            MS. SCAPICCHIO:  Would the fact that police

6    officers had training and experience cause you to lean in

7    their direction if you had to make a choice between a

8    civilian and a police officer?

9            THE JUROR:  I'd have to go by who I believe.

10           MS. SCAPICCHIO:  Thank you.

11           THE COURT:  You have to go by what?

12           THE JUROR:  Who I believe.

13           MS. HARRIS:  Good morning, sir.  I'm Mary Jo

14   Harris and myself and these other attorneys represent the

15   defendant officers in this case.  Following up on the point

16   you just touched upon, if you sat on this jury and you had a

17   police officer give you a version of events and that version

18   of events was contradicted by a civilian witness, is it your

19   testimony that you would have to assess both of them and

20   then determine who to believe?

21           THE JUROR:  Yeah.

22           MS. HARRIS:  In other words, the fact that the

23   police officer -- the job of the police officer would not

24   automatically cause you to credit him over somebody else?

25           THE JUROR:  No.

1           MS. HARRIS:  No, it wouldn't cause you to credit

2    him?

3           THE JUROR:  No, because there has to be more to

4    it.

5           MS. HARRIS:  You also indicated in your

6    questionnaire that unfortunately your parents had

7    experienced crime, your parents' house was robbed and your

8    mother had her purse snatched.  Would those events cause you

9    to bring any bias or prejudice to this case?

10          THE JUROR:  No.

11          MS. HARRIS:  The facts that they had been victims

12   of crime?

13          THE JUROR:  No.

14          MS. HARRIS:  You mentioned your great uncle was in

15   staff inspection.  Who was your great uncle?

16          THE JUROR:  Paul Weare.

17          MS. HARRIS:  How long ago did he leave?

18          THE JUROR:  A long time ago.

19          MS. HARRIS:  Were you a child?

20          THE JUROR:  My 20's.

21          MS. HARRIS:  Did you have any substantive

22   conversations with him about his work or anything else like

23   that?

24          THE JUROR:  Sure, when I was kid, always wanted to

25   know what he did.

1          MS. HARRIS:  Do you have any recollection of

2     anything that he may have told you about work?

3          THE JUROR:  Not really.  It's just he wouldn't go

4     into specifics or anything.

5          MR. CURRAN:  Sir, you understand that there's two

6     sides to every story and the plaintiff gets to put his case

7     on first and then the defendants have a chance to respond

8     and put on their case?

9          THE JUROR:  Yes.

10          MR. CURRAN:  You understand that you're prepared

11     to wait and listen to all the evidence and weigh all the

12     evidence, the credibility of each witness before you make

13     any decision?

14          THE JUROR:  Yes.

15          MR. CURRAN:  Thank you, sir.

16          THE COURT:  Okay.  I'm going to ask you to call

17     this number after 6:00 tonight, and you need your juror

18     number, it's the number that was on your summons, and

19     they'll let you know whether you're on the final jury.

20     Thank you very much, Mr. Butler.  Mr. Higgins.  The lawyers

21     will question you five minutes.

22          MR. WHITE:  Good morning, sir.  My name is

23     William White, along with Mary Jo Harris, Hugh Curran, and

24     John Roache, we represent the two detectives,

25     Timothy Callahan and Richard Walsh in this particular

1     lawsuit.  Just to tell you a little more than perhaps you

2     have heard, this case stems from a 1988 shooting of a

3     12 year-old girl by the name of Darlene Tiffany Moore.  She

4     sat on a mailbox in the Roxbury section of Boston.  Having

5     told you that, does that spur any recall from you?

6                 THE JUROR:  I think I remember a little bit about

7     the case.

8                 MR. WHITE:  Do you remember something from the

9     case from back in 1988 or something more recent that you

10    heard?

11                THE JUROR:  I think the last thing I remembered

12    was the defendant was released from jail because he was

13    wrongly accused.

14                MR. WHITE:  So something more recent, that's what

15    triggered your memory?

16                THE JUROR:  Yes, when I saw the sheet I was given,

17    I recollected the name on there.

18                MR. WHITE:  In 1988 after the murder of

19    Tiffany Moore, there was a police investigation, and that

20    investigation led to the arrest and ultimately the

21    prosecution and conviction of Shawn Drumgold.  In this case

22    you're going to be hearing from a number of witnesses

23    including police officers and civilian witnesses.

24                Let me first ask you, have you ever had any

25    individual contact with a police officer?

1          THE JUROR:  With a police officer, I have a friend

2    who's a state police officer, and I have my uncle was a

3    detective.

4          MR. WHITE:  Your uncle who's a detective, in what

5    police department?

6          THE JUROR:  Milton.

7          MR. WHITE:  Your close friend?

8          THE JUROR:  He's actually my brother's close

9    friend.  He grew up in the neighborhood so I know him.

10          MR. WHITE:  Having your uncle and your brother's

11   friend, do you have discussions at all with either of those

12   individuals about police business?

13          THE JUROR:  Not really, no.

14          MR. WHITE:  Would the fact that an individual who

15   was a nonpolice officer testified in a case in which a

16   police officer testified cause you to believe either the

17   police officer or the nonpolice officer more than the other?

18          THE JUROR:  I don't think so.

19          MS. HARRIS:  Jumping in, good morning, I'm

20   Mary Jo Harris.  I also represent some of the defendant

21   officers.  I think you said a moment ago that you were

22   familiar with the names Tiffany Moore, Shawn Drumgold, and

23   you had a recollection that Mr. Drumgold was released

24   because he had been wrongfully accused.  Can you tell us a

25   little bit more about what you remember?

1          THE JUROR:  I just think what I recall was he was

2     released after spending a lot of time in prison, but I don't

3     recall the details of why that occurred, just that he had

4     been released.

5          MS. HARRIS:  And is it your sense that his release

6     was the result of a finding that he had been wronged in some

7     way?

8          THE JUROR:  I don't recall the details of why he

9     was released, I just recalled the fact that he had spent

10    some time in prison and was released.

11         MR. CURRAN:  The fact that he was released, does

12    that impact your ability to be fair and impartial and listen

13    to all the evidence in this case?

14         THE JUROR:  I don't think so.  I don't have enough

15    recollection of the details to, you know, think one way or

16    the other.

17         MR. CURRAN:  So you're prepared to hear the facts

18    that there's two sides to every story?

19         THE JUROR:  I think so.

20         MR. CURRAN:  The plaintiffs put on their case and

21    the defendants have a chance to respond, you're willing to

22    listen to the evidence and make decisions that these are

23    mere allegations and not any facts until you decide the

24    facts?  Do you understand that?

25         THE JUROR:  Yeah, I think so, yeah.

1          MR. CURRAN:  Is there anything about that that

2     gives you any hesitation, anything you read in the papers or

3     heard on the news in regards to your ability to evaluate all

4     the evidence in this case?

5          THE JUROR:  I don't believe so.

6          MR. CURRAN:  Okay.  Thank you, sir.

7          THE JUROR:  You're welcome.

8          THE COURT:  Ms. Scapicchio.

9          MS. SCAPICCHIO:  Thank you, your Honor.  Hi, I'm

10    Rose Scapicchio.  This is Michael Reilly, and we represent

11    Shawn Drumgold.  I have a few more questions if you don't

12    mind.

13         THE JUROR:  Sure.

14         MS. SCAPICCHIO:  Some people think that the role

15    that police officers play in society is so important that

16    they should not be sued for anything that happens while

17    they're on duty.  Do you agree with that?

18         THE JUROR:  No, I don't think they're above the

19    law if they do something wrong.

20         MS. SCAPICCHIO:  Okay.  In this case, if the

21    evidence supported the fact that Detective Walsh and

22    Detective Callahan violated Shawn Drumgold's civil rights

23    and that violation led to his wrongful conviction, would you

24    have any concerns awarding damages if you knew that

25    Shawn Drumgold had a drug history?

1          THE JUROR:  Probably not if it wasn't related to

2     the issue at hand.

3          MR. WHITE:  Okay.  In the same vain, if the

4     evidence supported the fact that Detective Walsh and

5     Detective Callahan violated Shawn Drumgold's rights and that

6     violation led to his wrongful conviction, would you have any

7     concerns awarding damages if you knew that Shawn had been

8     arrested and convicted in the past?

9          THE JUROR:  I don't think so.  I would hope not.

10          MS. SCAPICCHIO:  Do you have any concerns at all

11     about that?  Is there some reason you're hesitating?

12          THE JUROR:  No.  I think I'd be able to separate

13     the two issues.

14          MS. SCAPICCHIO:  Great.  Thank you very much.  I

15     don't have anything further, your Honor.

16          THE COURT:  Okay.  I'm going to give you a number

17     to call today at 6:00.  You need your juror number, which is

18     on the summons, and that will let you know if you're going

19     to be a final juror in which case we'll see you tomorrow

20     morning.  Thank you very much.

21          MS. SCAPICCHIO:  Thank you.

22          MS. HARRIS:  Thank you.

23          MR. WHITE:  I'll tell your Honor that the next

24     juror on question 5 indicated that she had depression and

25     that she had --

1          MS. HARRIS:  She's got a brand new baby and

2     questions about being --

3          THE COURT:  How old is her baby?

4          MS. HARRIS:  18 months.  She was asked about her

5     ability, and she said her daughter eats and sleeps.

6          MS. SCAPICCHIO:  Eating, sleeping, et cetera.

7     That's No. 15, her answer to No. 15.  Her child's occupation

8     is eating and sleeping.  I think she adds some flavor to the

9     jury, what do you think?

10          THE COURT:  She said if she got depression would

11     be a problem but it could make things difficult because it

12     comes and go.

13          Hi, how are you?

14          THE JUROR:  Good.  How are you?

15          THE COURT:  Okay.  This is Wendy Rosko.

16          MS. SCAPICCHIO:  Good morning.

17          THE COURT:  In reading your questionnaire, you

18     have an 18 year-old.  I love your comment.  What does she

19     do, eats and sleeps.  I understand that.

20          THE JUROR:  That's her occupation.

21          THE COURT:  That's good.  I just want to make sure

22     that everything is okay with you serving.  You indicated you

23     had some problem with depression, you're on medication?

24          THE JUROR:  Yeah.

25          THE COURT:  Do you think that would be okay?

1          THE JUROR:  I think I haven't had any problem, I

2    get anxiety doing new things like stress.

3          THE COURT:  This shouldn't be stressful.

4          THE JUROR:  Oh, okay.

5          THE COURT:  It's stressful for them, it shouldn't

6    be stressful for you.  You're the best judge of whether you

7    think you can handle this.  Do you think you're fine at

8    handling it?

9          THE JUROR:  Yes.

10          THE COURT:  And you said there was something in

11    here about not wanting to be away from your child.  We're

12    going to go 9 to 1, so you'd be back in the afternoon.

13    Would there be any problem?

14          THE JUROR:  No, I usually come back from Cambridge

15    on the 5:00 train anyway.

16          THE COURT:  Beside, you know, you'll get a break,

17    right?  This is not a bad thing.

18          THE JUROR:  The only thing, I don't know if your

19    job is to pay you.

20          THE COURT:  Your job is supposed to pay you.  If

21    there's a problem, you need to let us know.  We left off

22    here, Ms. Scapicchio, five minutes.

23          MS. SCAPICCHIO:  Hi, I'm Rose Scapicchio.  This is

24    Mike Reilly.  We represent Shawn Drumgold in this case, and

25    we wanted to ask you a few questions to find out if you had

1    any outside knowledge of this case before we start

2    presenting the facts, and let me tell you a little bit about

3    the case.  This case is a case that started back in 1988,

4    August of 1988 when a little girl by the name of Darlene

5    Moore, Tiffany Moore, was shot and killed as she sat on a

6    mailbox.  The police arrested my client, Shawn Drumgold.  He

7    was tried and convicted.  He was sentenced to life in

8    prison.  He spent 15 years in jail and then filed a motion

9    for a new trial and was freed.  Do the facts of this case

10   ring any bells to you?  Do you know the name Shawn Drumgold

11   or Tiffany Moore or anything about the case?

12         THE JUROR:  The Tiffany Moore, today and when they

13   just discussed it briefly to us, it rang a bell, but I

14   couldn't put it all together.  It was a long time ago.  I

15   think I remember that, but I don't really know much about it

16   beside it rang a bell.

17         MS. SCAPICCHIO:  Were you living in Boston back in

18   1988?

19         THE JUROR:  No, I moved to Somerville in 1990, but

20   I live in Maynard, I keep saying Hudson, but I live in

21   Maynard now.

22         MS. SCAPICCHIO:  And would you tend to believe the

23   testimony of a police officer over that of a civilian

24   witness because of his or her position as a police officer?

25         THE JUROR:  Well, it would depend on a lot of

1    things.

2         MS. SCAPICCHIO:  What types of things would it

3    depend on?

4         THE JUROR:  He said, she said.

5         MS. SCAPICCHIO:  You'd listen to the evidence?

6         THE JUROR:  Not because they're a police

7    officer.

8         MS. SCAPICCHIO:  So you'd listen to the evidence

9    and then you'd weigh each side and make a decision?

10        THE JUROR:  Yes.

11        MS. SCAPICCHIO:  Some people think that the role

12   police play in our society is so important that they should

13   never be sued in their official capacity while they're on

14   duty.  Do you agree with that?

15        THE JUROR:  No.

16        MS. SCAPICCHIO:  And in this case if the evidence

17   supported the fact that Detective Walsh and Detective

18   Callahan violated Shawn Drumgold's civil rights and that

19   violation led to his wrongful conviction, would you have any

20   concerns of awarding damages if you knew Shawn Drumgold had

21   criminal convictions in the past?

22        THE JUROR:  That could make a difference depending

23   on what they were.

24        MS. SCAPICCHIO:  Okay.  What would cause you some

25   concern in terms of awarding damages?  What types of crimes

1    would cause you concern in terms of awarding damages?

2          THE JUROR:  Just murder.

3          MS. SCAPICCHIO:  Okay.  Drug offenses, would they

4    concern you?

5          THE JUROR:  No.

6          MS. SCAPICCHIO:  Offenses involving firearms,

7    would they concern you?

8          THE JUROR:  Maybe, yeah.

9          MS. SCAPICCHIO:  Okay.  What would concern you

10    about that?

11          THE JUROR:  Well, I mean, you're using a firearm

12    that's pretty dangerous.

13          MS. SCAPICCHIO:  Okay.  That would come into your

14    consciousness in terms of whether or not you would award

15    damages in this case?

16          THE JUROR:  Well, it doesn't have anything to do

17    with the case, but it's like it's hard to answer these

18    questions without everything put in front of me because you

19    need more to think of than just the basic if you did this.

20          MS. SCAPICCHIO:  So you would listen to the

21    evidence?

22          THE JUROR:  Yes.

23          MS. SCAPICCHIO:  And try to make a determination

24    based on what you heard?

25          THE JUROR:  Yes.

```
 1              MS. SCAPICCHIO:  Okay.  And would it make any
 2    difference to you if you knew that Shawn Drumgold had some
 3    drug history?
 4              THE JUROR:  No.
 5              MS. SCAPICCHIO:  I don't have anything further
 6    questions, your Honor, thank you.  Thank you.
 7              THE JUROR:  Thank you.
 8              MS. HARRIS:  Good morning, I'm Mary Jo Harris, and
 9    along with these gentlemen, we represent the detectives in
10    this case, Detective Walsh and Detective Callahan.  I
11    noticed from your questionnaire that you've served on a jury
12    before?
13              THE JUROR:  Yes.
14              MS. HARRIS:  Can you tell us a little bit about
15    that experience?
16              THE JUROR:  It was in Cambridge probably at least
17    five years ago.
18              MS. HARRIS:  And it was a civil case, I
19    understand?
20              THE JUROR:  Yes.
21              MS. HARRIS:  What kind of case was it?
22              THE JUROR:  It was a drunk driving case.
23              MS. HARRIS:  Were there injuries in that case?
24              THE JUROR:  No.
25              MS. HARRIS:  And it went to a verdict, I
```

1    understand from your questionnaire?

2             THE JUROR:  Yes.

3             MS. HARRIS:  How did you experience being on the

4    jury?  Did you like it?  Did you dislike it?  Was it what

5    you expected?

6             THE JUROR:  It was different from what I expected.

7    I liked it.  I learned something.

8             MS. HARRIS:  In what way was it different?

9             THE JUROR:  Well, I didn't know it would be so

10   quick.  It was just a two-day case, and I expected, you

11   know.

12            MS. HARRIS:  Surprise, this is not that case.

13            THE JUROR:  No, not at all, but I was really

14   surprised something could be resolved and not everybody on

15   the jury agreed.  I thought it would take longer for people

16   to agree.

17            MS. HARRIS:  And was your experience of that a

18   fair process?

19            THE JUROR:  Yes.

20            MS. HARRIS:  The case as we have explained is

21   related to the murder of a child, and does that, do those

22   facts cause you any concern about being able to sit on this

23   jury to know that a child was killed?

24            THE JUROR:  It's very disturbing.

25            MS. HARRIS:  Would it be something that would

1    impede your ability to sit as a juror on the case do you

2    think?

3              THE JUROR:  I don't think so.

4              MS. HARRIS:  Some of my colleagues might have more

5    questions.

6              MR. CURRAN:  My name is Hugh Curran.  I represent

7    Richard Walsh.  Excuse my voice, I'm trying to get over the

8    flu before we start.  You indicated your husband has had

9    some contact with law enforcement.  That aspect, knowing

10   that, will that impede your ability to give a fair

11   assessment of the evidence to Richard Walsh and

12   Timothy Callahan who are retired police officers?

13             THE JUROR:  No, because that happened before we

14   even started dating, and he deserved what he got.

15             THE COURT:  We'll seal that part of the record.

16             MR. CURRAN:  We won't tell him that part of it.

17   The other aspect you indicated that new experiences

18   sometimes cause you stress?

19             THE JUROR:  Yes.

20             MR. CURRAN:  Obviously you've had some jury

21   experience, but this is going to be a lot different than

22   sitting on a drunk driving case.

23             THE JUROR:  Right.

24             MR. CURRAN:  As a result, there are going to be a

25   lot of facts about any violence and gang violence in the

1    City of Boston back in 1988 and the murder of a young girl.

2    Is that going to impede your ability to cause or any stress

3    because of the factual nature of this case vs. the other

4    case you sat on?  I understand you're comfortable with the

5    process.

6            THE JUROR:  Yeah, I'm comfortable with the

7    process, but when a child is involved and murdered, me just

8    becoming a mother a year and a half ago kind of it's very

9    disturbing, but, you know, I would never say that it's not

10   disturbing and stressful to think about those things.

11           MR. CURRAN:  Well, for your health it's not going

12   to cause a problem you don't think?

13           THE JUROR:  No.

14           MR. CURRAN:  Fair, thank you very much.

15           MR. WHITE:  Could I ask --

16           THE COURT:  Just ask one question.  You have two

17   minutes, one second rather.

18           MR. WHITE:  You understand that the plaintiff goes

19   first and the defendant goes second.  You will keep an open

20   mind until you've heard all of the evidence in the process?

21           THE JUROR:  Yes.

22           MR. WHITE:  Thank you very much.

23           THE COURT:  Fabulous question.  If you can call

24   this number at 6:00.

25           THE JUROR:  Okay.

```
 1              THE COURT:  After 6:00 today, you have your juror
 2    number with you, and we'll let you know whether you're on
 3    the final jury.
 4              THE JUROR:  Okay.  What is my juror number?
 5              THE COURT:  On the summons.  Right.  No problem.
 6    Okay.
 7              MS. HARRIS:  He also said he has been convicted of
 8    homicide.
 9              MR. WHITE:  Negligent homicide.
10              MS. HARRIS:  Not having the wealth of the
11    experience of all other colleagues here.
12              THE COURT:  Hi.
13              THE JUROR:  Hi.
14              THE COURT:  You're --
15              THE JUROR:  James Vizakis, this is juror No. 52.
16              MR. WHITE:  If I directed your Honor's attention
17    to question 30 or answer 30.
18              THE COURT:  Is there any reason you'd like to be a
19    juror or not like to be a juror, and you said you don't want
20    to be a juror.  Aside from the general sense that this is
21    not the most fun thing to do in the world, is there any
22    problems you serving?
23              THE JUROR:  Yeah, my job, even though I've been at
24    my job for 12 years, I moved to a different -- doing
25    something different.
```

```
1              THE COURT:  Right.

2              THE JUROR:  I've even got a few days I've been

3    out, they call before I come here and just asking questions

4    about where I left not as much as where I'm going.

5              THE COURT:  Would your job be in jeopardy if you

6    were on this?

7              THE JUROR:  No, but, you know.

8              THE COURT:  It's a pain?

9              THE JUROR:  Yes.

10             THE COURT:  I understand.  We have to go above

11   that in order to disqualify, but if there's any problem with

12   your job in terms of continuing to pay you or any issues

13   with your employer, let us know because they're not supposed

14   to do it.

15             THE JUROR:  I can do it but 5:30 or 6:00 we're

16   still on here, this, and that.

17             THE COURT:  Okay.

18             MS. SCAPICCHIO:  Your Honor, could you also ask

19   about question 27?

20             THE COURT:  27, just one second here.  You

21   indicated that you oppose a lawsuit by people who have been

22   wrongfully convicted.  You understand that that's what this

23   is about, this is an allegation of a wrongful conviction and

24   a lawsuit against the individuals who were allegedly

25   responsible for that, so you indicated you oppose those kind
```

1    of lawsuits.  Would that make it hard for you to serve as a

2    juror on this case?

3              THE JUROR:  Possibly, yeah.

4              THE COURT:  You think that the plaintiff didn't

5    have a right to bring the case?  In other words, is it the

6    kind of thing where you're going to say I don't think the

7    plaintiff had a right to bring this case or whether you're

8    going to say let me look at the facts?

9              THE JUROR:  Oh, you have to look at the facts.

10   Maybe I misunderstood the question.

11             THE COURT:  Okay.  So generally you'd oppose it

12   because there would be facts that you might believe that

13   would be justified?

14             THE JUROR:  Yeah.

15             THE COURT:  Go on.

16             MS. SCAPICCHIO:  I just want to follow up on what

17   Judge Gertner asked you regarding your answer to question

18   No. 27.  When you checked the box that said you opposed

19   these type of lawsuits when wrongly convicted individuals

20   bring lawsuits against the police department, can you tell

21   us a little bit about what went through your mind when you

22   checked that?  Why check oppose as opposed to favor?

23             THE JUROR:  Well, then again, I don't remember the

24   question, to be honest with you.

25             MS. SCAPICCHIO:  Sure.  The question is people who

1    have been wrongly convicted sometimes bring lawsuits against

2    the police department.  Do you favor or oppose this type of

3    lawsuit?  You checked opposed?

4              THE JUROR:  Yeah, I do oppose, yeah.

5              MS. SCAPICCHIO:  Would it make it difficult for

6    you to serve on a trial like this?

7              THE JUROR:  Yeah.

8              THE COURT:  Okay.  I'm going to disqualify you, so

9    tell your company you're back.

10             THE JUROR:  Okay.

11             THE COURT:  Thank you very much.

12             MR. WHITE:  Thank you.

13             Is Mr. Scholz out of the --

14             THE COURT:  Somewhere Scholz did not show up.  I'm

15   not sure what the issue is, but it was flagged for me, his

16   questionnaire was flagged for me because of the felony

17   conviction.  The felony conviction is more than seven years

18   old, it doesn't matter, he's in this pool.

19             MS. SCAPICCHIO:  What happens to federal jurors

20   that don't show up, anything?

21             MR. CURRAN:  He's a disabled vet.

22             THE COURT:  Technically we're supposed to subpoena

23   him for the next pool, so that's technically, and

24   technically if they don't show up, they're subject to

25   prosecution.  The next juror, Ms. Crowley.

1          THE JUROR:  Good morning.

2          THE COURT:  Hi.  This is Ms. Crowley, and I've

3     forgotten whose turn it is.  I think it's your turn to

4     start.

5          MS. SCAPICCHIO:  I just finished.

6          THE COURT:  So you start.

7          MS. SCAPICCHIO:  Do you want to start?

8          MS. HARRIS:  I don't care.

9          MS. SCAPICCHIO:  Hi, I'm Rose Scapicchio.  This is

10    Michael Reilly, and we represent Shawn Drumgold.  I'm going

11    to ask you a few questions just to see if you have any

12    outside knowledge of this case.  This case was actually

13    started in 1988, in August of 1988 when a little girl by the

14    name of Darlene Tiffany Moore was shot and killed as she sat

15    on a mailbox.  My client, Shawn Drumgold, was arrested,

16    tried and convicted of the murder of Tiffany Moore.  He was

17    sentenced to life in prison, and 15 years later he filed a

18    motion for a new trial and he was released.  Do the facts of

19    this case ring a bell at all to you?

20         THE JUROR:  I can't say they do, no, that's an

21    awfully long time ago.

22         MS. SCAPICCHIO:  Does the name Shawn Drumgold or

23    Tiffany Moore ring a bell to you?

24         THE JUROR:  No.

25         MS. SCAPICCHIO:  Do you remember reading anything

1   or hearing anything about Shawn Drumgold or Tiffany Moore?

2            THE JUROR:  No.

3            MS. SCAPICCHIO:  Some people think that the role

4   that police officers play in society is so important that

5   they should never be sued in their official capacity.  Do

6   you agree with that?

7            THE JUROR:  No, I do not.

8            MS. SCAPICCHIO:  In this particular case would you

9   tend to believe the testimony of a police officer over that

10  of a civilian witness merely because of his or her position

11  as a police officer?

12           THE JUROR:  No, I would not.

13           MS. SCAPICCHIO:  In this case if the evidence

14  supported the fact that the defendants, Detective Walsh and

15  Detective Callahan, violated Shawn Drumgold's civil rights

16  and that violation led to his wrongful conviction, would you

17  have any concerns awarding damages if you knew that Shawn

18  had a drug history?

19           THE JUROR:  No, I would not.

20           MS. SCAPICCHIO:  And in this case again if the

21  evidence supported the fact that Detective Walsh and

22  Detective Callahan violated Shawn Drumgold's civil rights

23  and that violation led to his wrongful conviction, would you

24  have any concerns awarding damages if you knew that Shawn

25  had a criminal past?

1          THE JUROR:  No, I would not.

2          MS. SCAPICCHIO:  I don't have any further

3     questions, thank you.

4          THE COURT:  One more round.

5          MS. HARRIS:  Hi, I'm Mary Jo Harris, and with

6     these other gentlemen, we represent Detectives Callahan and

7     Walsh who are with us here today.  The points of having a

8     trial, of course, is that there's two sides to every story,

9     and you understand that, I assume?

10          THE JUROR:  I do.

11          MS. HARRIS:  And following up a little bit on

12     Ms. Scapicchio's questions, would you tend to disbelieve a

13     police officer if the civilian contradicted the police

14     officer.

15          THE JUROR:  No, I would not.

16          MS. HARRIS:  So I'm understanding that you would

17     say you would listen to the evidence and make your

18     determinations based on how these people testified and your

19     judgments about the credibility?

20          THE JUROR:  Absolutely.

21          MS. HARRIS:  Is that fair to say?

22          THE JUROR:  Absolutely.

23          MS. HARRIS:  I understand that you're in school

24     seeking a nursing degree; is that right?

25          THE JUROR:  I'm a nurse, but I'm seeking a higher

1    level of education.

2            MS. HARRIS:  I'm sorry, what is it you're going

3    for?

4            THE JUROR:  My baccalaureate in nursing, I have a

5    an associates degree.

6            MS. HARRIS:  Would the case interfere with your

7    schooling in any way?

8            THE JUROR:  No.  I'm doing school online.  I have

9    access.

10            MR. CURRAN:  I don't have any questions.

11            MR. ROACHE:  No.

12            THE COURT:  Okay.  I'm going to ask you to call

13    this number after six today.

14            THE COURT:  Okay.  You need your juror number,

15    which is on the summons, and you'll use that, they'll let

16    you know who's going to be on the final jury.  If you're on

17    the final jury, then I need to see you tomorrow at 6:00.

18    Don't Google this case, don't try to find out anything about

19    this case until we see you tomorrow morning.  Thank you.

20            MR. WHITE:  Thank you.

21            MS. SCAPICCHIO:  Thank you.  Enthusiastic juror, I

22    would find it interesting to serve on a case.

23            THE COURT:  Good.

24            MR. McALEAR:  Your Honor, I just got a phone call

25    from juror No. 50, Mr. Scholz.  He has no better excuse

1    other than he forgot, so I said okay, Mr. Scholz, let me go

2    up and tell the Court and I will give you further

3    instruction.

4            THE COURT:  Well, it does seem to me he should be

5    here.  I'm not sure that we need him.  We may very well make

6    it from this pool without going any further.  You know what,

7    actually let's not have him come in this week.  Have him

8    come in next week because, Jim, his conviction was in 1980,

9    he's not disqualified.  Okay.  Take that back.  He may not

10   be selected, but he's certainly not disqualified.  The next

11   person is Murphy.  Hi.

12           THE JUROR:  Hello.

13           MR. WHITE:  Good morning, Ms. Murphy.

14           THE JUROR:  Good morning.

15           MR. WHITE:  My name is William White, and along

16   with Mary Jo Harris, Hugh Curran and John Roache, we

17   represent the individuals back here, Timothy Callahan and

18   Richard Walsh in this particular lawsuit.  This case

19   concerns the 1988 shooting of a 12 year-old little girl by

20   the name of Darlene Tiffany Moore as she sat on a mailbox in

21   the Roxbury section of Boston.  Does that ring any bells

22   with you?

23           THE JUROR:  Vaguely I remember.  I might have

24   heard something in the news about it.

25           MR. WHITE:  Do you remember if your recall is from

1    back in 1988 or if you heard something more recent about it?

2              THE JUROR:  I don't know.

3              MR. WHITE:  After the murder of Darlene

4    Tiffany Moore, there was a police investigation that led to

5    the arrest of Shawn Drumgold.  He was arrested and

6    prosecuted for the murder of Darlene Tiffany Moore.  Does

7    that ring any bells?

8              THE JUROR:  Yes.

9              MR. WHITE:  Does it sound familiar from something

10   recent or does it sound something from long ago?

11             THE JUROR:  I think it sounds something more

12   recent.

13             MR. WHITE:  You mentioned in your questionnaire

14   that you read, you get your sources of news from the TV and

15   newspapers.  Do you regularly read The Boston Globe or

16   The Boston Herald?

17             THE JUROR:  No.

18             MR. WHITE:  In 1988, were you living in the Boston

19   area?

20             THE JUROR:  I was living in Malden.

21             MR. WHITE:  You were living in Malden.  When you

22   lived in the Malden area, did you regularly read the

23   newspapers?

24             THE JUROR:  I don't think so, no, because I was

25   working a distance from there.

1              MR. WHITE:  When you say you were working a

2     distance, were you working further north?

3              THE JUROR:  The western suburbs in Natick.

4              MR. WHITE:  When this case goes to trial, you

5     know, which we're a part of right now, you're going to hear

6     from witnesses who are police officers and civilians.  Does

7     the fact that a police officer testify give you any cause to

8     evaluate that testimony above the testimony of a civilian

9     witness?

10             THE JUROR:  When I look at things -- I'm on a

11    school committee, and when I look at things, I try to look

12    and not be judgmental, I try to see all sides of anything

13    that I look at.  It's just something I do.

14             MR. WHITE:  So if I understand you, you're saying

15    that where police officers and civilian witnesses testify,

16    you're going to keep an open mind?

17             THE JUROR:  Uh-hum.

18             MR. WHITE:  Is that right?

19             THE JUROR:  Uh-hum.

20             MR. WHITE:  In this case, the plaintiff goes first

21    and then the defendants have an opportunity to present their

22    side.  Would you keep an open mind until you heard both

23    sides?

24             THE JUROR:  Uh-hum.

25             MR. WHITE:  I think that's what you're telling me,

1    that's your experience in the school system?

2                    THE JUROR:  Right.

3                    MR. WHITE:  Are you member of the school committee

4    or a you a member of -- let me ask you that.

5                    THE JUROR:  I'm a member of the school

6    committee.

7                    MR. WHITE:  If I could have just a moment.  I

8    don't think I have anything.

9                    MS. HARRIS:  Could I go if I have time left?

10                   THE COURT:  Yes.

11                   MS. HARRIS:  When you say the name Shawn Drumgold

12   is familiar to you, can you tell me what you associate with

13   that name?

14                   THE JUROR:  Just in hearing it on the news, that's

15   all.

16                   MS. HARRIS:  Do you have a recollection what it is

17   you heard, what the story is or --

18                   THE JUROR:  Not details of it, no.

19                   MS. HARRIS:  Anything at all other than knowing

20   that the name is familiar?

21                   THE JUROR:  Right.  Probably hearing it in the

22   media over and over.

23                   MS. HARRIS:  In your questionnaire, you indicated

24   that you thought this might be an interesting case to sit

25   on, and I'm wondering --

1          THE JUROR:  Just in general I think it would be

2     interesting.

3          MS. HARRIS:  Okay.

4          MR. CURRAN:  The fact that you've heard

5     Shawn Drumgold's name, does that force you or cause you to

6     reach any conclusions before you heard any of the evidence

7     in this case?

8          THE JUROR:  No.

9          MR. CURRAN:  And the school committee position, is

10    that an elected position?

11         THE JUROR:  It's an elected position.

12         MS. HARRIS:  How many terms have you served?

13         THE JUROR:  I'm still on my first term, finishing

14    the second of a three-year term.

15         MR. CURRAN:  Is that in Rowley?

16         THE JUROR:  It's for the Triton District which I

17    represent the Town of Rowley.

18         MR. CURRAN:  Thank you.

19         THE COURT:  I'll ask you to call this number.

20         MS. SCAPICCHIO:  Could I ask you a few?  Hi, I'm

21    Rose Scapicchio, this is Michael Reilly.  We represent

22    Shawn Drumgold.  He's the plaintiff in this case.  I had a

23    few follow-up questions what the defense attorneys asked

24    you.  You indicated you were a member of the school

25    committee.  Have you ever been named as a defendant, as a

1    member of the school committee?

2              THE JUROR:  No.

3              MS. SCAPICCHIO:  I also notice from your

4    questionnaire that your spouse is a fire chief?

5              THE JUROR:  Uh-hum.

6              MS. SCAPICCHIO:  Where is that?

7              THE JUROR:  In Malden.

8              MS. SCAPICCHIO:  Has he ever been sued as a fire

9    chief?  Has he been named as a defendant in any suit?

10             THE JUROR:  No, not that I know of.

11             MS. SCAPICCHIO:  Would his position as a fire

12   chief, does he interact with the police often?

13             THE JUROR:  I would imagine so, yes.

14             MS. SCAPICCHIO:  Would that interaction, do you

15   discuss what happens with him on the job, things of that

16   nature?

17             THE JUROR:  Just little things but nothing that

18   involves, you know, to that extent of, you know, just little

19   personnel quirks or something, that's really all.

20             MS. SCAPICCHIO:  Would that interaction with the

21   police, would that tend to make you believe police officers

22   more than civilian witnesses because of your husband's

23   position and interaction?

24             THE JUROR:  I don't think so, no.

25             MS. SCAPICCHIO:  Now, in this case some people

1    believe that the job that police officers do is important,

2    that they should never be sued for anything that happens in

3    their official capacity.  Do you agree with that?

4              THE JUROR:  I haven't really thought of that.  I

5    suppose mistakes, everybody is human, and mistakes can be

6    made, so I think you could, I think everybody has rights,

7    and they should be able to sue if they need to.

8              MS. SCAPICCHIO:  Thank you.  In this case if the

9    evidence suggested that Detective Walsh and Detective

10   Callahan violated Shawn Drumgold's civil rights and that

11   violation led to his wrongful conviction, would you have any

12   concerns awarding damages if you knew that Shawn had a drug

13   problem?

14             THE JUROR:  I might have concerns.

15             MS. SCAPICCHIO:  And what would concern you about

16   that?

17             THE JUROR:  Drugs I think just don't put you in

18   the right frame of mind.

19             MS. SCAPICCHIO:  So you'd have some concerns that

20   would prevent you from awarding damages if you knew that

21   Shawn had a drug problem?

22             THE JUROR:  I might, yes.

23             MS. SCAPICCHIO:  It would.

24             THE COURT:  I would instruct you his having a drug

25   problem would have nothing to do with the award of damages

1    in this case.  Could you follow those instructions?

2              THE JUROR:  Yes.

3              THE COURT:  In other words, the issue of damages

4    in this case would be unrelated to drug problems, prior

5    convictions if you found damages to be appropriate.  Do you

6    think you could do that notwithstanding your feelings about

7    drugs?

8              THE JUROR:  Yes, I think I could take instructions

9    that way.

10             THE COURT:  Go on.

11             MS. SCAPICCHIO:  If the evidence supported the

12   fact that Detective Walsh and Detective Callahan violated

13   Shawn Drumgold's civil rights and that violation led to his

14   wrongful conviction, would you have any concerns about

15   awarding damages if you knew that Shawn had a criminal

16   history, in other words, he had been convicted of other

17   crimes?

18             THE JUROR:  No.

19             MS. SCAPICCHIO:  Excuse me one second.  I have

20   nothing further.  Thank you.

21             THE COURT:  Okay.  Now, this is a number for you

22   to call.  Use your juror number, and you'll know from that

23   call whether or not you're on the final jury in this case

24   which we'll see you in the morning.  Don't research this

25   case, don't find out anything about it, okay.  Thank you

1    very much.

2              MR. WHITE:  Thank you.

3              THE COURT:  Mr. Richards.

4              THE JUROR:  Yes.

5              THE COURT:  Hi.

6              MS. SCAPICCHIO:  Good morning, Mr. Richards.  My

7    name is Rose Scapicchio.  This is Michael Reilly.  We

8    represent Shawn Drumgold.  He's the plaintiff in this case.

9    I want to give you a little bit of information about the

10   case to find out if you have any knowledge outside of what

11   you might learn as a juror.  This case actually stems from

12   an incident that took place in 1988 when a little girl by

13   the name of Darlene Tiffany Moore was shot and killed as she

14   sat on a mailbox in Roxbury.  The police arrested my client,

15   Shawn Drumgold.  He was tried and convicted, he was found

16   guilty of the murder of Tiffany Moore and sentenced to life

17   in prison.  After 15 years, he filed a motion for a new

18   trial and was released.  Do you remember reading, seeing,

19   hearing, anything about this case?

20             THE JUROR:  I read the newspaper a lot, but I'm

21   trying to think if I've read anything about this one or seen

22   it on the news or anything, this particular one.  I mean,

23   I've heard quite a few cases in Boston recently because of

24   DNA evidence or new evidence or whatever, but I don't know

25   if I've heard of this one.

1          MS. SCAPICCHIO:  You've heard of other wrongful

2    convictions but not necessarily the name Shawn Drumgold

3    doesn't ring a bell?

4          THE JUROR:  Not necessarily this one.

5          MS. SCAPICCHIO:  And the name Tiffany Moore

6    doesn't ring a bell to you?

7          THE JUROR:  No.

8          MS. SCAPICCHIO:  Would you tend to believe the

9    testimony of a police officer over that of a civilian

10   witness merely because of his or her position as a police

11   officer?

12         THE JUROR:  No.

13         MS. SCAPICCHIO:  Some people think that police

14   hold such an important role in society that they should

15   never be sued for anything that happens while they're on

16   duty.  Do you agree with that?

17         THE JUROR:  No.

18         MS. SCAPICCHIO:  In this case if the evidence

19   supported the fact that Detective Walsh and Detective

20   Callahan violated Shawn Drumgold's civil rights and that

21   violation led to his wrongful conviction, would you have any

22   concerns about awarding damages if you knew that Shawn had

23   criminal convictions in the past?

24         THE JUROR:  No.

25         MS. SCAPICCHIO:  Did you have some hesitation

1   about that?

2        THE JUROR:  I was thinking about it.  I'm thinking

3   what convictions, maybe, maybe.

4        MS. SCAPICCHIO:  Are there some convictions that

5   would concern you?

6        THE JUROR:  Yeah.

7        MS. SCAPICCHIO:  Like what?

8        THE JUROR:  Like if he -- like if he was convicted

9   of earlier crimes that were really harsh and he got out or

10  maybe something, but it all depends on what it is.

11       MS. SCAPICCHIO:  When you say really harsh, what

12  do you mean?

13       THE JUROR:  Like if he severely hurt somebody,

14  almost killed somebody perhaps or, you know, certain

15  situations.

16       MS. SCAPICCHIO:  Okay.  And if you knew that Shawn

17  had a drug history, would that affect your ability to award

18  damages if you believed that the evidence supported the

19  facts that Detective Walsh and Detective Callahan violated

20  Shawn Drumgold's civil rights?

21       THE JUROR:  No, that wouldn't bother me.

22       MS. SCAPICCHIO:  Okay.  Could I just have a

23  moment, your Honor.  I have nothing further, thank you.

24       THE COURT:  Counsel.

25       MR. WHITE:  I am William White, and along with

1    Mary Jo Harris, Hugh Curran and John Roache, we represent

2    Timothy Callahan and Richard Walsh.  In your mind does it

3    make a difference whether somebody uses drugs or sells or

4    the individual sells drugs?

5              THE JUROR:  Yes.

6              MR. WHITE:  Let me just ask you a couple of

7    questions.  You know that this case involves the murder of a

8    12 year-old girl, and you said that you get your sources of

9    information reading lots of newspapers?

10             THE JUROR:  Yes.

11             MR. WHITE:  You get it from television as well?

12             THE JUROR:  Yes.

13             MR. WHITE:  Radio?

14             THE JUROR:  Yes.

15             MR. WHITE:  Can you tell me do you have any

16   general opinions of police officers?

17             THE JUROR:  I don't, but I have heard many bad

18   things about the Boston Police.  I've heard that they're

19   either corrupt or negligent because a lot of cases are being

20   overturned.

21             MR. WHITE:  What kind of things do you hear about

22   it?

23             THE JUROR:  Like I heard about one case I think it

24   was about 12 and a half years he was convicted and they

25   found him guilty, and it was overturned.  I've heard a few,

1    I can't remember what they were about.  I read the press and

2    Internet and online, newspapers, I see articles.

3           THE COURT:  This case is about different officers,

4    and they're entitled to have a jury that doesn't start off

5    with strikes against them.  Do you think that the stuff

6    you've read and that you know would make it hard for you to

7    serve as a juror here?

8           THE JUROR:  It probably would because I've read a

9    lot.

10          THE COURT:  Okay.  I'm going to excuse you, thank

11   you very much, Mr. Richards.  Thank you very much.

12          Mr. Webb, hi, how are you?  I've lost track.  Now

13   you go first.  They take turns, five minutes each side, I

14   keep the clock, and I have the hook.

15          MR. WHITE:  Good morning.  My name is

16   William White, and along with Mary Jo Harris, Hugh Curran

17   and John Roache, we represent Timothy Callahan and

18   Richard Walsh in this particular lawsuit, and we have an

19   opportunity to talk to you a little bit more about the facts

20   of the case and some of the issues that may be confronted by

21   the jury during the course of the trial.

22          This case involves a 1988 shooting of a

23   12 year-old girl as she sat on a mailbox in the Roxbury

24   section of Boston.  Her name was Darlene Tiffany Moore, and

25   as a result of a police investigation following her murder,

1       an individual by the name of Shawn Drumgold was arrested.

2       He was prosecuted, he was convicted of that crime for

3       murdering Darlene Tiffany Moore.

4               Having said that to you, do you have any

5       recollection about that particular incident?

6               THE JUROR:  Very vague, but I do remember reading

7       it.

8               MR. WHITE:  In 1988, do you remember where you

9       were living?

10              THE JUROR:  Same place, 1399 Phillips Road,

11      New Bedford, Massachusetts.

12              MR. WHITE:  What do you remember about the

13      Tiffany Moore case or Shawn Drumgold?

14              THE JUROR:  No specifics, just reading that it had

15      happened and it was in Boston.

16              MR. WHITE:  In 1988, did you have any relatives or

17      friends who lived in the Boston area?

18              THE JUROR:  I'm sure I did.  I worked in Boston in

19      '88 for Polaroid in Cambridge, so I did have friends in the

20      Boston area, yes.

21              MR. WHITE:  You traveled regularly?

22              THE JUROR:  Daily.

23              MR. WHITE:  At that time?

24              THE JUROR:  Between Cambridge and Waltham.

25              MR. WHITE:  How long did you work for Polaroid?

1          THE JUROR:  Thirty-six years.

2          MR. WHITE:  In that entire time you commuted from

3     New?  Bedford.

4          THE JUROR:  No, between 1986 and 1993, my main

5     plant was in New Bedford, Mass., but we didn't have a union,

6     and all of our meetings and core headquarters were here in

7     Cambridge at the time, 750 Main Street.

8          MR. WHITE:  Within the past few years, do you

9     recall if you've heard any stories or read any stories

10    concerning Shawn Drumgold or Tiffany Moore?

11         THE JUROR:  No.

12         MR. WHITE:  In this case we expect to have

13    witnesses testify including police officers and civilian

14    witnesses.  Would you believe either one of those witnesses

15    more than the other?

16         THE JUROR:  It's a very difficult question, why is

17    it difficult?  I just did a case, a state case in November

18    involving issues with police officers, so what I took from

19    that case is that the police officers are not always right,

20    be it wrong or be it right, that's basically how that came

21    out, and I would have to hear it.  I weigh what I hear and

22    then I make my own judgment.

23         THE COURT:  Fair enough.  Go on.

24         MR. WHITE:  Could you tell me a little bit about

25    that case from back in November?

1          THE JUROR:  Yes.  It was a driving to impaired

2     case where a gentleman pulled up to a fastfood restaurant,

3     got into a verbal altercation with the teller or the person

4     serving the food.  He ended up throwing his change at her

5     because she gave him the wrong order a couple of times, and

6     just coincidentally there happened to be a police officer

7     parked across the street, and they summoned him, the manager

8     summoned him, he came over, asked the gentleman to move his

9     car forward, and then he asked him to park it maybe 50 to 60

10    feet away between two lines, and he said he smelled alcohol

11    on the individual, so he got him out of the car, made him do

12    the sobriety test, the gentleman passed all the motor skills

13    but he flunked him on the fact of the procedural skills.

14          What does that mean?  He asked him to count

15    backwards from 100, instead of starting at 100, the

16    gentleman started at 99.  He asked him to do the touch your

17    nose test, like that.  The gentleman went like this, but he

18    performed it correctly, he just didn't do the 90 degree.

19          So the charge was driving to impaired, and the

20    officer let him drive his car from point A to point B, let

21    him drive his car to a designated parking spot and then got

22    him out of the car.  Consequently the guy came out

23    innocent.

24          MR. WHITE:  Were you on a jury for that case?

25          THE JUROR:  Yes, I was.

1          MR. WHITE:  When you started that case, did you

2    have any idea as to whom you thought you might believe going

3    into the case when the charges were read to you?

4          THE JUROR:  Not when the charges were read, no.

5          MR. WHITE:  Did you go into that thinking that you

6    could keep an open mind?

7          THE JUROR:  Yes.

8          MR. WHITE:  Through the process you listened to

9    both sides and you didn't make up your mind until after you

10   had the instructions from the court?

11         THE JUROR:  No.  My mind was made up after hearing

12   both testimonies.

13         MR. WHITE:  After you heard both testimonies, in

14   other words, you heard both sides of the case, is that what

15   you're telling us?

16         THE JUROR:  Right.  Actually what made up my mind

17   was the police officer's testimony.

18         MR. WHITE:  Was there something about the police

19   officer's testimony?

20         THE JUROR:  Yes, it was his attitude and it was

21   the way he tested the individual and the way he came to the

22   conclusion that the gentleman was impaired when indeed he

23   passed all the motor skills and he was able to count

24   successfully from 100 backwards, just the points of

25   contention between the starting point and the procedural

1    that he didn't touch his nose.

2         MR. WHITE:  As a result of that experience, that

3    jury service, did you form any other opinions about police

4    officers?

5         THE JUROR:  Not going in but if I saw the same

6    kind of attitude, sure.  I mean, the gentleman, the police

7    officer, and I have respect for the law, I grew up in law,

8    my friends are law enforcement people, but I can tell kind

9    of, I feel like I have a sixth sense about what's going

10   on.

11        MR. WHITE:  In this case where police officers are

12   accused, would you start into this case with any

13   preconceived notions against them?

14        THE JUROR:  No, not until I heard all the

15   testimony, but I would start with the premise that, you

16   know, people think that the police officers are always

17   right, and I know that's not the case.  That I know, but

18   would I have a preconceived notion before hearing, no, I

19   wouldn't.

20        MR. CURRAN:  On your questionnaire you wrote that

21   your son had some run-ins with law enforcement?

22        THE JUROR:  Yes.

23        MR. CURRAN:  Could you further elaborate on that

24   issue?

25        THE JUROR:  He was not living with me at the time.

1    He was with his mother, and he was I'm not going to use set

2    up because he screwed up, he was definitely dealing with

3    drugs, not using them but he was distributing drugs and he

4    got caught and he paid the price.

5            MR. CURRAN:  Then did that cause you some hard

6    feelings?

7            THE JUROR:  No, the part that caused me the

8    hardship about that, I think the case was about -- I think

9    the decision was fair, but I think the prosecution tried to

10   embellish more than that was there for sure, that I know for

11   a fact.

12           MR. CURRAN:  That was through the witnesses that

13   they put on?

14           THE JUROR:  It was to the witnesses.

15           MR. CURRAN:  It was through the witnesses they put

16   on?

17           THE JUROR:  No.

18           MR. CURRAN:  What do you mean the prosecution

19   tried to embellish?

20           THE JUROR:  They tried to say there were weapons

21   involved, which there were not, they found no weapons, they

22   had tried to introduce hearsay evidence that he owned a

23   weapon, he never owned a weapon, even as a kid, he owned toy

24   guns.  Unfortunately those charges never came to fruition.

25   It was basically with the intent to distribute, it was

1    distribution, it was possession with intent.

2           THE COURT:  I think you're out of time.  Let me

3    ask you one question before we get to you.  It says you had

4    a kidney transplant, you're on numerous meds twice a day,

5    that's fine, right?

6           THE JUROR:  Yes, as long as I take them on time.

7           THE COURT:  We'll make sure you do that.

8    Ms. Scapicchio.

9           MS. SCAPICCHIO:  Hi, my name is Rose Scapicchio.

10   This is Michael Reilly.  We represent Shawn Drumgold.  He's

11   the plaintiff in this case.  I have a few more questions to

12   ask you with respect to what the defense attorneys have

13   asked you, and let me start with I think I heard you say

14   that with respect to police officers, you would view them as

15   any other witness, they wouldn't have any more credibility

16   or less credibility, you would view them like everybody

17   else?

18          THE JUROR:  That's correct.

19          MS. SCAPICCHIO:  You would wait to hear the

20   evidence and determine what was said by each witness whether

21   they were police officers or civilian witnesses before you

22   made up your mind?

23          THE JUROR:  That's correct.

24          MS. SCAPICCHIO:  In this case I think Mr. White

25   told you that my client had been convicted of the murder of

1   Tiffany Moore 15 years later, he filed a motion for a new

2   trial and he was released.  Do you remember hearing anything

3   about anything that happened in 2003?

4          THE JUROR:  No.

5          MS. SCAPICCHIO:  I don't have any further

6   questions, your Honor.

7          THE COURT:  Okay.

8          MR. CURRAN:  Judge, can we be heard?

9          THE COURT:  Yes.  Actually why don't you wait

10  outside for just a second.

11         MR. CURRAN:  Judge, I move to challenge this

12  gentleman for cause.  It's pretty clear to me that the

13  language he used is that he had a sixth sense, that he based

14  it not on the credibility of any of the witnesses.  He also

15  indicated in regards to his son's aspect of the case, that

16  the prosecution embellished, and clearly in a drug case and

17  the investigation, it all falls on police officers.  This is

18  too important a case to risk the fairness of a trial based

19  on someone who clearly has a bias based on personal

20  dealings.

21         THE COURT:  The question is whether I take what he

22  said or I take your impression of what he said because what

23  he said was a witness individually, and I'm not going to

24  start with a premise in one direction.  Do I take it for

25  what it's worth or do I take, you know, your interpretation

1    of it?

2           MR. CURRAN:  Well, Judge, the interpretation, he's

3    clearly said the prosecution embellished.  It wasn't true,

4    he said that, this is wrong.  This isn't a drunk driving

5    case.

6           THE COURT:  I understand.

7           MR. CURRAN:  There's one thing, the drunk driving

8    issue, which I can understand the Court's consideration

9    saying he's going to weigh the evidence, but here he clearly

10   said, Judge, that the prosecution, which unfortunately you

11   know is bunched together with the police in a drug case,

12   it's only police officers.

13          THE COURT:  Mr. Curran, I know what you said, but

14   the rule I have been following is that if a juror says I can

15   be fair, unless it's expressly contradicted by what else he

16   said, and we had with Mr. Bennett, Mr. Richards, the one

17   with the T-shirt, you know, who said I can be fair

18   notwithstanding knowing about this other, he said I can't be

19   fair.  If he said I can be fair, that would be the problem.

20   I'm not willing to second guess.  You have extra peremptory

21   challenges, so if you can tell Mr. --

22          MR. CURRAN:  I ask you that you inquire further,

23   Judge, because five minutes for an important issue like

24   that.

25          THE COURT:  Okay.

1          MS. HARRIS:  Before he comes in, if I could just

2     raise one question as well.  I'm also troubled by "I have a

3     sixth sense and can tell," and the sense that he would be

4     judging on attitude instead of on evidence, if you would.

5          THE COURT:  I think that's fair.  Do you want to

6     bring Mr. Webb back in again.  Mr. Webb, let me ask you some

7     questions.  The question is whether or not when these police

8     officers appear in front of you as defendants in this case

9     whether they're going to be on an equal playing field or

10    whether you're going to start thinking that because the

11    police were less than candid in the case you just heard or

12    your problems with your son's case, you're going to

13    basically start being skeptical of the information that they

14    have.  Do you think you're going to be that way?

15         THE JUROR:  I don't think I'm going to start out

16    that way.  I can't tell you where I'm going to end up, it

17    depends on what I hear.

18         THE COURT:  That's what I want to know.  It's one

19    thing to say I'm not going to give them the benefit of every

20    doubt, as many people would say, I want to make sure that

21    they're not starting off in a lower position than any other

22    witness, and you can say with confidence that they wouldn't

23    be?

24         THE JUROR:  Equal but not lower.

25         THE COURT:  Equal.  Then you said you had a sixth

1    sense about these things.  If you become a juror in this

2    case, I will instruct you that jurors are supposed to decide

3    credibility, supposed to size up a witness, but they have to

4    size up a witness based on the way the witness testifies and

5    the information in the case, not prejudices and biases.  Do

6    you think you could do that?

7         THE JUROR:  I've done it in the past.  I think I

8    probably can.

9         THE COURT:  Okay.

10        THE JUROR:  I shouldn't use the word "probably,"

11   you want a definite, as I said, they'll start out equal.

12        THE COURT:  And the problem with your son could

13   lead someone to walk away saying I, you know, I hate the

14   police, I hate the prosecutors and start off a case with a

15   tilt.  Do you think you'd have that in this case?

16        THE JUROR:  I doubt it.  I mean, every day is a

17   new day.

18        THE COURT:  Right.

19        THE JUROR:  Every case is different.  Every

20   situation is different.

21        THE COURT:  Right, okay.

22        THE JUROR:  And New Bedford is a very small town,

23   a lot of people know everybody, so it's easy to sit there

24   and say, you know, I knew that person growing up, I knew

25   what's going on in the police department, I knew what's

1   going on.

2           THE COURT:  Now you don't know any of the people

3   in Boston here?

4           THE JUROR:  No.

5           THE COURT:  You don't know any of the defendants

6   in this case?

7           THE JUROR:  No, I didn't.

8           THE COURT:  You didn't recognize any of the names

9   that I read to you?

10          THE JUROR:  No, I did not.

11          THE COURT:  I'm going to ask you to call this

12  number, see, and you need this juror number when you call

13  up, you know the juror number that was on the summons, if

14  you call it after six, they'll tell you whether you're on

15  the final jury.  Thank you very much.

16          MR. CURRAN:  Your Honor, it's 11:00.  Judge, for

17  the record, I wanted to renew my challenge for cause based

18  on your colloquy to protect the record.

19          THE COURT:  I know.  The rule that I follow is

20  unless it's explicitly contradicted by something or the

21  relationship is too close.

22          MR. CURRAN:  Judge --

23          THE COURT:  I don't want to hear anymore,

24  Mr. Curran.  I do want to say one thing though.  I wanted to

25  put on the record totally unrelated to this.  My husband has

1    Kerry Walsh working for him as an assistant, and Kerry Walsh

2    is the niece of one of the defendants.

3              THE DEFENDANT:  Kerry is my niece, ma'am.

4              THE COURT:  She was going to come and watch the

5    trial, and in the course of that she found out whether she's

6    your niece, I wanted to put that on the record.  I don't

7    think it has any relevance to anything.  We'll be back in 15

8    minutes.

9              (A recess was taken.)

10             THE COURT:  Let's put this on the record before we

11   do the jurors.  We need to select five, and we have six from

12   the initial group.  There's another group of jurors

13   downstairs.  With your permission, I'd like to now excuse

14   those you haven't seen their questionnaires, my

15   representation, my clerk's representation that there are

16   jurors from 76, juror 76, 78, 85, 84, 86, 91 and 101 have

17   tickets.  I'd like to excuse them now because at most we

18   will be selecting two from a group of 11, and so I think we

19   can afford to let these people go.  Anyone have any

20   objections?

21             MS. SCAPICCHIO:  None, your Honor.  Before the

22   next one, just so you know, this person answered question 27

23   that they opposed people who were wrongfully convicted.

24             THE COURT:  This is Catania, Regina Catania.

25             MR. CURRAN:  I think we need to bring to the

1    Court's attention because it's going to cause some

2    complications the CORI issue.

3            THE COURT:  What do you mean?

4            MR. CURRAN:  We did not receive it in the mail,

5    and as of just a few minutes ago, they still have not

6    disclosed CORI to the witnesses, and I know that because

7    there's certified copies.  We're looking at four or five

8    different courts, Judge.

9            THE COURT:  You'll open --

10           MS. SCAPICCHIO:  Ricky Evans.

11           THE COURT:  Will he be finished by the morning?

12   Let me ask you a question.  Is there a meaningful contest so

13   at least with respect to Evans we can get going without

14   certified copies, she can stipulate to a conviction?

15           MR. CURRAN:  We understand, Judge.  If there's

16   anything new, and those cases are all over the place since

17   2006, when he was deposed, that's the problem.

18           MS. SCAPICCHIO:  If it is, it is.  I don't have a

19   problem stipulating.

20           THE COURT:  Get the CORI.  Now, is there someone I

21   can call?

22           MR. CURRAN:  We can try to find that out at the

23   break.

24           THE COURT:  Let me find that out.  I'll call, I'll

25   scream.  If you can stipulate to these convictions, once you

1    get the CORI, we're set to go.

2         MR. ROACHE:  The issue, I think, your Honor, with

3    respect to Mr. Evans is not just the convictions, it's what

4    is on his record because the information is vital to the

5    case as to whether or not he's going to claim the police did

6    some promises, rewards or inducements with respect to

7    pending cases back in 1989.

8         THE COURT:  Right.

9         MR. ROACHE:  And we need to see those actual

10   cases, the dockets to see what happened with those cases.

11        THE COURT:  Have you had some depositions?

12        MR. CURRAN:  We've had some.

13        THE COURT:  As of his deposition a year ago,

14   didn't you have whatever issues were outstanding?

15        MR. CURRAN:  As of that date.

16        THE COURT:  But your concern --

17        MS. HARRIS:  But the question is some of them

18   remained open.

19        THE COURT:  Some of those remained open over the

20   past year, so you're just updating this information?

21        MR. CURRAN:  Correct.

22        THE COURT:  It seems to me you have enough to

23   start and we'll see where you go, and if you need to update

24   it, you can make inquiries, you know what I mean, you can go

25   by the CORI record rather than having to go and get

1    certified copies of documents, okay.  You're talking about

2    the CORI record won't show which issues are still open, is

3    that what you're concerned about?

4            MR. ROACHE:  Right.

5            THE COURT:  You can make a call this afternoon

6    what issues are still open, you could get dockets this

7    afternoon, or you could have done that before we started.

8    You didn't need CORI for that.

9            MR. ROACHE:  Well, we do need the CORI for the

10   updated.

11           THE COURT:  Right, but that you'll get.

12           MR. ROACHE:  I'm not so sure we're going to get

13   that.

14           THE COURT:  You'll get it if I call, frankly,

15   okay.  I may not be able to push around the clerk of the

16   Suffolk Superior Court, but I can do better on the criminal

17   record.

18           MS. SCAPICCHIO:  I did try to call, your Honor,

19   during the break, and Paula Sordillo was in session so I

20   left her another message.

21           THE COURT:  Hi.

22           THE JUROR:  Good morning, everyone.

23           THE COURT:  Good morning.  You are Regina Catania?

24           THE JUROR:  I am.

25           THE COURT:  What's the number of the question?

1          MS. SCAPICCHIO:  27, your Honor.

2          THE COURT:  You said when asked people that are

3     wrongly convicted sometimes bring lawsuits against the

4     police department.  Do you favor or oppose this type of

5     lawsuit?  You said oppose.  There's no right or wrong

6     answers here, but this case is about the allegation of a

7     wrongful conviction, and the claim is that it was brought

8     about through the actions of the police officers in this

9     case, the police officers and the city in this case.  Do you

10    think that you would be able to listen to the evidence?

11         THE JUROR:  What I based that judgment on, I

12    figured it was a court case, they went to court, it was

13    resolved, and that's how the court system is supposed to

14    work.

15         THE COURT:  Well --

16         THE JUROR:  Did I misunderstand the question?

17         THE COURT:  Oh, I see, you thought this is part of

18    the original case.

19         THE JUROR:  No, no, not this case, that question

20    was someone's gone to court, they've been found guilty and

21    that's how --

22         THE COURT:  This case is a civil rights action

23    brought against the City of Boston and a number of

24    individual police officers for the wrongful conviction of

25    Mr. Drumgold.  Do you have any feelings against such a case?

1        THE JUROR:  No.

2        THE COURT:  Okay.  Ms. Scapicchio.

3        MS. SCAPICCHIO:  Thank you, your Honor.  Hi, I'm

4    Rose Scapicchio.  This is Michael Reilly.  We represent

5    Shawn Drumgold.  I'm going to ask you just a few questions

6    about the case to see if you have any outside knowledge that

7    might affect your ability to be a fair and impartial

8    juror.

9        THE JUROR:  Okay.

10       MS. SCAPICCHIO:  This case actually stems from a

11   murder that took place in the City of Boston in 1988, a

12   little girl by the name of Darlene Tiffany Moore was shot

13   and killed in Roxbury as she sat on a mailbox.  My client,

14   Shawn Drumgold was arrested, tried and convicted and

15   sentenced to life without the possibility of parole.

16   Fifteen years later he filed a motion for new trial that was

17   granted, and he was released from prison.  Does the name

18   Shawn Drumgold or Tiffany Moore or any of the facts of this

19   case ring a bell to you?

20       THE JUROR:  Nothing.

21       MS. SCAPICCHIO:  And when you indicated on your

22   questionnaire that you would oppose lawsuits brought by

23   wrongfully convicted people, do I understand you to mean if

24   you were convicted and if you remained in jail, you

25   shouldn't be able to sue?

1          THE JUROR:  No, I thought if they -- I guess I

2     misinterpreted the question.  I wasn't reading it clearly.

3     I thought if you went through a trial and it was decided it

4     was a done deal, the judicial system the way it's supposed

5     to work...

6          MS. SCAPICCHIO:  So once there was a conviction,

7     that was the end of it?

8          THE JUROR:  That's how.

9          MS. SCAPICCHIO:  And that should be the end of it?

10         THE JUROR:  That's how I understand it.

11         MS. SCAPICCHIO:  If someone was then released from

12    jail and filed a civil lawsuit against the police officers

13    who investigated the case, would you have any concerns about

14    that type of case?

15         THE JUROR:  No, because I just listen and listen

16    to the evidence that was brought forward.

17         MS. SCAPICCHIO:  Sometimes people think that the

18    job that police officers do is so important to society that

19    they shouldn't be sued for anything that happens while

20    they're on duty.  Do you agree with that?

21         THE JUROR:  No, nobody's that important.

22         MS. SCAPICCHIO:  Would you believe the testimony

23    of a police officer over that of a civilian witness because

24    of his or her position as a police officer?

25         THE JUROR:  No.

1          MS. SCAPICCHIO:  And in this case if the evidence

2     demonstrated that the defendants, Detective Walsh and

3     Detective Callahan, violated Shawn Drumgold's civil rights

4     and that violation led to his wrongful conviction, would you

5     have any concerns awarding damages if you knew that Shawn

6     had a criminal past?

7          THE JUROR:  No.

8          MS. SCAPICCHIO:  Okay.  And the same question a

9     little differently, if the evidence supported the fact that

10    Detective Callahan and Detective Walsh violated

11    Shawn Drumgold's civil rights and that violation led to his

12    wrongful conviction, would you have any concerns awarding

13    damages if you knew that Shawn had a drug problem?

14         THE JUROR:  No.

15         MS. SCAPICCHIO:  I don't have anything other

16    questions, thank you very much.

17         THE COURT:  Counsel.

18         MS. HARRIS:  Good morning, I think it's still

19    morning.  I'm Mary Jo Harris.  Myself and the other

20    gentlemen here, we represent Detectives Walsh and Callahan

21    that are in this suit.  Following up a little bit on the

22    questions you were just asked, premising this case is about

23    the conviction of Mr. Drumgold.  If you received evidence or

24    heard evidence at trial that suggested that neither of the

25    police officers did anything to compromise Mr. Drumgold's

1    rights, would you be able to return a verdict in their favor

2    notwithstanding the fact that he was released?

3            THE JUROR:  If they were found innocent, is that

4    when you're saying?

5            MS. HARRIS:  Well, you're going to be hearing the

6    facts and drawing conclusions here.

7            THE JUROR:  Right.

8            MS. HARRIS:  Just as Mr. Drumgold's going to

9    present a side of the story, we're also going to present the

10   detectives' side of the story, and if you heard evidence

11   that demonstrated that there hadn't been any misconduct on

12   the part of these officers, would you be able to return a

13   verdict for them notwithstanding the fact that Mr. Drumgold

14   has been released from prison?

15           THE JUROR:  Yeah.

16           MS. HARRIS:  So you're going to be able to listen

17   to all of the evidence?

18           THE JUROR:  They're just people to me, they're not

19   jobs.  There's no difference in who they are.  I don't know

20   the case, I don't know the people.  They're strangers to

21   mean, and --

22           MS. HARRIS:  So you'll be keeping an open mind and

23   learning everything about this case at trial?

24           THE JUROR:  Yes, I think to the best of my

25   knowledge.

1          THE COURT:  That's fine.  That's all that we're

2     asking.

3          MS. HARRIS:  Anything else?

4          MR. CURRAN:  No, I'm fine.  Thank you.

5          MS. HARRIS:  Thank you.

6          THE COURT:  I'm going to ask you to call this

7     number, you have your juror number which is on the summons,

8     you have to call after six o'clock.

9          THE JUROR:  This one here that they told us wasn't

10    the juror number?

11         THE COURT:  I guess so.  You better check.  They

12    told us you didn't have a juror number.

13         THE JUROR:  There's a juror number, the number

14    that the order that you're coming in here and then there's a

15    number on the summons.

16         THE COURT:  It's the number on the summons.

17         THE JUROR:  Okay.

18         THE COURT:  Call after six and we'll let you know

19    whether you're on the final jury here.

20         THE JUROR:  Have a great day everybody.

21         MR. WHITE:  You, too.

22         MS. HARRIS:  Ruth Albert, 64.

23         MR. ROACHE:  Your Honor, this particular witness I

24    believe had taught at some point at the Jeremiah Burke High

25    School, which is located in the general area.  I'd ask the

1   Court to inquire about what was going on in 1988.

2           THE JUROR:  This is supposed to be intimidating.

3           THE COURT:  No, come on in, not when you get to

4   know them.

5           THE JUROR:  As long as it is not a job

6   interview.

7           THE COURT:  It is a job interview actually.

8   According to your questionnaire, you had worked at the

9   Jeremiah Burke School?

10          THE JUROR:  Yes.

11          THE COURT:  Some of the --

12          THE JUROR:  Not worked, went to, graduated.

13          THE COURT:  I don't think that's a problem.  Go

14  on.  When did you graduate?

15          THE JUROR:  Do I have to tell you, 1961.  Before

16  anyone's born in this room probably.

17          MR. ROACHE:  1961, okay.

18          THE COURT:  Not a problem.  Counsel.

19          MR. WHITE:  Thank you.  Ms. Albert, my name is

20  William White and along with Mary Jo Harris, Hugh Curran and

21  John Roache, we represent the detectives in this matter,

22  Detective Callahan and Detective Callahan.  This case stems

23  from an incident that occurred back in 1988 when a 12

24  year-old girl by the name of Darlene Tiffany Moore was shot

25  and killed.

1           THE JUROR:  I seem to that remember that, yeah.

2           MR. WHITE:  It happened in the Roxbury section of

3   Boston.

4           THE JUROR:  Uh-hum.

5           MR. WHITE:  How was it that you remember the

6   incident?

7           THE JUROR:  The name more than anything else.  I

8   can't remember that many details truthfully.

9           MR. WHITE:  Do you recall if you followed the

10  incident?

11          THE JUROR:  She was just the wrong place the wrong

12  time, and I don't remember the kids said -- I don't remember

13  the details truthfully.

14          MR. WHITE:  Have you read or heard any recent

15  stories about the case?

16          THE JUROR:  No.

17          MR. WHITE:  As a result of Tiffany Moore being

18  shot and killed while she was on the mailbox, the police

19  conducted an investigation that led them to arrest

20  Shawn Drumgold.

21          THE JUROR:  Okay.  The names are coming back to

22  me.

23          MR. WHITE:  Okay.  What do you remember about the

24  name Shawn Drumgold?

25          THE JUROR:  I don't want to introduce terms

1   because I really don't know the details, but I'm thinking

2   they arrested him, but he wasn't supposed to have done it.

3   I hate to say that, I don't remember that many details.

4           MR. WHITE:  When you were getting your information

5   back in 1988, was that from newspapers?

6           THE JUROR:  Newspaper, maybe television also.

7           MR. WHITE:  Are you a person who reads the

8   newspapers every day?

9           THE JUROR:  Not anymore, no.

10          MR. WHITE:  Were you back then?

11          THE JUROR:  I would skim the headlines more than

12  anything else.

13          MR. WHITE:  Did you watch the news every night?

14          THE JUROR:  Probably did watch the news every

15  night passively, it was on while I was eating dinner.

16          MR. WHITE:  That sort of thing, you heard it in

17  the background?

18          THE JUROR:  Or heard it in the morning when I woke

19  up, that type of thing.

20          MR. WHITE:  Do you recall if you tried to follow

21  what happened in that case?

22          THE JUROR:  Not actively.  I was hit in the face

23  with it once in a while, you keep hearing it over and over

24  again.  I don't think I tried to look out for the details.

25          MR. WHITE:  You mentioned that you heard something

1    about he wasn't supposed to have done it?

2         THE JUROR:  I think they said -- I think I

3    remember that he was found guilty, then he wasn't, he wasn't

4    there.  There was something that wasn't straightforward.

5    I'm thinking what I thought originally that didn't really

6    happen maybe.

7         MR. WHITE:  When you thought that didn't really

8    happen maybe, did that give you any impression of the police

9    or the prosecution of that case?

10        THE JUROR:  I don't think I paid attention to that

11   many details, it was just like a pleading thought in my

12   head.

13        MR. WHITE:  Did you ever have any conversations or

14   conversations with anybody in particular that case?

15        THE JUROR:  No.

16        MR. WHITE:  In this case, the plaintiff gets to go

17   first and present evidence and then the defendants get the

18   chance to present evidence.  Would you keep an open mind

19   until you heard both sides?

20        THE JUROR:  I would hope so.  I would try to.

21        MR. WHITE:  Is there anything that you can think

22   of that would prevent you from keeping an open mind to hear

23   both sides?

24        THE JUROR:  I don't think so.

25        MR. WHITE:  If you were to hear in this case

1    evidence concerning the police investigation that led you to

2    conclude that there was no misconduct as the plaintiff

3    allegation, would you be able to return a verdict in favor

4    of the detectives?

5              THE JUROR:  Yeah, I tend to think that I would be

6    pro-police than detectives, to be honest, because I tend to

7    think sometimes they have a hard job.

8              MR. WHITE:  With regards to, you know, your

9    statement that you might tend to be pro-police --

10             THE JUROR:  In this situation, I would try to be

11   very neutral and keep an open mind.

12             MR. WHITE:  Was there anything that would prevent

13   you from keeping an open mind about the evidence you heard

14   in this case understanding that you know nothing?

15             THE JUROR:  Not that I'm aware of, put it that

16   way.

17             MR. WHITE:  Not that you're aware of.  In the

18   event we expect witnesses to testify, some were or are

19   police officers, some are non-police officers, would the

20   fact that somebody was a police officer or had been a police

21   officer cause you to believe their testimony more than a

22   non-police officer?

23             THE JUROR:  That seems like a tough question for

24   me because I think my bias would be for the police, but I

25   would try to think that people are telling the truth and be

1    open to both sides.

2         MR. WHITE:  Would you -- so you're telling us that

3    you would try to keep an open mind?

4         THE JUROR:  Yeah, right, and I think I would be

5    able to.  Sometimes things sneak in that you don't realize,

6    you think you're keeping an open mind and there's something

7    that is subtle.

8         MR. WHITE:  Are there any experiences that you can

9    think of to cause you to want to believe a police officer

10   more than anyone else?

11        THE JUROR:  Nothing personal, it's just knowing

12   that who they are and the job they perform.

13        MR. WHITE:  You understand that they perform a

14   difficult job in our society?

15        THE JUROR:  Yes, exactly, right.  A lot of times

16   society doesn't give them the right respect, I think.

17        MR. CURRAN:  The fact that Shawn Drumgold was

18   released, does that factor alone force you to drew any

19   conclusions that would impact your ability to evaluate the

20   evidence?

21        THE JUROR:  I know the details of the case

22   obviously, saying he was released.  I don't know why he

23   would be released.  If he was released because the law says

24   he should be, fine; if he's released because he was

25   innocent, fine.  I don't think that would affect me in any

1    way.

2              MR. CURRAN:  You still would be able to evaluate

3    the police officers based on the conduct of the witnesses?

4              THE JUROR:  Yes.

5              MR. ROACHE:  May I have one question?

6              THE COURT:  Yes.

7              MR. ROACHE:  What section of the City of Boston

8    did you grow up?

9              THE JUROR:  Many cases up to being 12 years old

10   was Charlestown, then I grew up in Dorchester, then in

11   college, Mattapan.

12             MR. ROACHE:  Are you familiar with Grove Hall

13   area?

14             THE JUROR:  Yes.

15             MR. ROACHE:  Are you familiar with Humboldt Avenue

16   and Homestead Street.

17             THE JUROR:  I was a teenager at the time.  That

18   was a long time, that was in the 50's.  I'm vaguely

19   familiar.

20             MR. ROACHE:  How about Sonoma Street?

21             THE JUROR:  It doesn't sound familiar.

22             MS. SCAPICCHIO:  I'm Rose Scapicchio.  This is

23   Michael Reilly.  We represent Shawn Drumgold.  I had a

24   couple follow-up questions based on your answer from the

25   questions of the defense attorneys.  In this case you said

1    you think you might be pro-police?

2              THE JUROR:  Yes.

3              MS. SCAPICCHIO:  What does that mean?  Can you

4    explain that for us a little bit?

5              THE JUROR:  Yes, maybe I can.  I would think that

6    they have no reason to lie, I just would think they're

7    telling the truth.

8              MS. SCAPICCHIO:  So you tend to believe their

9    testimony a little bit more because of their training and

10   experience as a police officer?

11             THE JUROR:  Also to put the other side to it,

12   presuming everyone is under oath and everyone is telling the

13   truth.

14             MS. SCAPICCHIO:  If you had one witness who was a

15   police officer and one witness who was not and they were

16   saying two totally opposite things, would you tend to lean

17   towards the police officer?

18             THE JUROR:  I would tend to lean towards the

19   police officer, I would think.  I would try not to.  I think

20   it's a gut thing in my system that I would.

21             MS. SCAPICCHIO:  Thank you for being so honest.

22             THE COURT:  So let me ask the other question then.

23   What we're looking for is jurors that will not tilt in one

24   direction.

25             THE JUROR:  Right, of course.

1          THE COURT:  Since there will be instances in which

2     the police will say one thing and someone will say the

3     opposite, so the question is whatever your general feelings

4     about that, do you think in this case you could be fair?

5          THE JUROR:  I know what you're saying.  I'm trying

6     to answer honestly, and I don't know my honest.  I don't

7     know.  It depends on other things.  I suspect I'd be

8     influenced by other things besides them being police

9     officers and not police officers that would be the beginning

10    part of my judgment, but then I think what they say is more

11    convincing is also have something more.

12         MS. SCAPICCHIO:  When you say the beginning part

13    of your judgment --

14         THE JUROR:  My initial.

15         MS. SCAPICCHIO:  That would be lean towards the

16    police in the beginning before anyone said anything?

17         THE JUROR:  Yes.

18         MS. SCAPICCHIO:  Then you'd listen to the

19    evidence, but in the beginning you'd lean toward the police?

20         THE JUROR:  I think so.

21         THE COURT:  I'm going to have to disqualify you

22    then, Ms. Albert.  Thank you very much for your candor.

23         THE JUROR:  I had to be honest.

24         THE COURT:  No, that's fine.  Thank you.

25    Raymond Marchand.

1        MS. SCAPICCHIO:  He thought he knew Roache from

2   the Knights of Columbus.

3        MS. HARRIS:  That was somebody else, I think.

4   This is somebody who knew Flanagan socially.

5        MS. SCAPICCHIO:  "I would like to participate and

6   be a part of democracy and action and serve."  I like that.

7        THE COURT:  Hi.

8        THE JUROR:  Good morning.

9        THE COURT:  This is Mr. Marchand who I turned into

10  an Italian, I called you Mr. Marchando.

11        THE JUROR:  Yes.

12        THE COURT:  So I think we begin with

13  Ms. Scapicchio.

14        MS. SCAPICCHIO:  Hi, my name is Rose Scapicchio,

15  and this is Michael Reilly, and we represent Shawn Drumgold.

16  He's the plaintiff in this case.  I want to give you a

17  little background of the case to see if it jogs any memories

18  what you may have read or seen outside of what you will hear

19  in the courtroom.  This case started in 1988 when a little

20  girl by the name of Darlene Tiffany Moore was shot and

21  killed as she sat on a mailbox in Roxbury.  My client was

22  arrested by the police, he was tried and convicted of her

23  murder.  He was sentenced to life in prison and 15 years

24  later filed a motion for a new trial and was released from

25  prison.

1              Do the facts of this case jog your memory as

2    having seen or heard or read anything about the case?

3              THE JUROR:  The name Tiffany Moore strikes a bell,

4    but other than that.

5              MS. SCAPICCHIO:  Anything specific of

6    Tiffany Moore other than the name?

7              THE JUROR:  Just the name.

8              MS. SCAPICCHIO:  What about the name

9    Shawn Drumgold, does that ring a bell at all?

10             THE JUROR:  No.

11             MS. SCAPICCHIO:  Do you remember reading anything

12   about the Tiffany Moore or Shawn Drumgold case in 2003 when

13   Shawn was released from prison?

14             THE JUROR:  No.

15             MS. SCAPICCHIO:  Some people believe that police

16   officers have such an important role in society that they

17   shouldn't be sued for anything that happens while they're on

18   duty.  Do you agree with that?

19             THE JUROR:  It all depends on the circumstances

20   involved in the situations and how they were presented and

21   how their job was done.

22             MS. SCAPICCHIO:  In this case if the evidence

23   suggested that Detective Walsh and Detective Callahan

24   violated Shawn Drumgold's civil rights and that violation

25   led to his wrongful conviction, would you have any concerns

1     about awarding damages if you knew that Shawn Drumgold had a

2     criminal past?

3           THE JUROR:  I would be presumptuous to make a

4     statement now on that without hearing the evidence and the

5     facts behind the case.

6           MS. SCAPICCHIO:  Okay.  And the same sort of

7     question again if the evidence suggested that

8     Detective Walsh and Detective Callahan violated

9     Shawn Drumgold's rights and that violation led to his

10    wrongful conviction, would you have any concerns about

11    awarding damages if you knew Shawn had a drug problem?

12          THE JUROR:  Well, like I said, it all depends on

13    the suppositions of the case, and I don't think prior

14    records are involved or past history, I think it would have

15    to do with the present situation.

16          MS. SCAPICCHIO:  Okay.  Would you tend the believe

17    the testimony of a police officer over that of a civilian

18    witness merely because his or her position as a police

19    officer?

20          THE JUROR:  Absolutely not.

21          MS. SCAPICCHIO:  I don't have any further

22    questions.  Thank you very much.

23          THE COURT:  Thank you.  You may go.

24          MR. WHITE:  Sir, I think if I understand what you

25    said to Ms. Scapicchio, you're saying that you would keep an

1    open mind in this case?

2              THE JUROR:  Absolutely.

3              MR. WHITE:  You understand that in this case the

4    plaintiff goes first and then the defendants have an

5    opportunity to put on their evidence or questions in the

6    case?

7              THE JUROR:  That's correct.

8              MR. WHITE:  And so until they get an opportunity,

9    your mind will be open; is that right?

10             THE JUROR:  That is correct.

11             MR. WHITE:  Sir, just following up on the question

12   about drugs, do you have any opinions regarding drug

13   dealers?

14             THE JUROR:  Drug dealers?

15             MR. WHITE:  Drug dealers.

16             THE JUROR:  I think they're in the wrong business,

17   and I don't think drugs should be involved in any particular

18   type of society, especially where around schools and things

19   like this because it's the degradation of any well-balanced

20   society.

21             MR. WHITE:  Sir, in this case there are going to

22   be witnesses who testify, and you're going to hear from

23   police officers, you're going to hear from our witnesses.

24   Some of the witnesses testified in 1988 one way and then

25   they changed or recanted their testimony or lied.  We're

1    going to say they lied about their testimony at some point.

2    How do you feel about that?

3            THE JUROR:  Well, the fact of the matter is it's

4    like once a person changes his testimony and things of this

5    nature, then his credibility comes into effect.

6            MR. WHITE:  So you're weighing that in the

7    credibility of what those witnesses have to say or offer?

8            THE JUROR:  That should be, you know, to the best

9    of my ability, you know, which would carry more weight.

10           MR. WHITE:  Sir, in 1988, do you remember where

11   you were living?

12           THE JUROR:  1988, yes, I was still living where I

13   am living at, 39 Beaver Street, Salem, Mass.

14           MR. WHITE:  At any point within the last few

15   years, have you heard any stories at all that you remember

16   concerning Tiffany Moore or Shawn Drumgold?

17           THE JUROR:  As this lady asked me, the only thing

18   that came into mind was that Tiffany Moore was shot during,

19   you know, I understand if my recollection during a drive-by

20   or something like that.

21           MR. WHITE:  Something involving gangs or something

22   like that?

23           THE JUROR:  No, that she was just hurt, anything

24   else was just vague.  The name seemed to pop up.

25           MR. CURRAN:  I don't have any questions.  Thank

1   you, sir.

2          THE COURT:  Thank you, sir.  I just have to give

3   you this.  You have to call after 6:00 with your juror

4   number, and they'll tell you if you're selected on the final

5   jury, and if you are, you have to come in in the morning.

6   Don't read anything about the case.  Don't do any research,

7   okay.

8          THE JUROR:  Okay.  That juror number would be on

9   my --

10          THE COURT:  On your summons.

11          THE JUROR:  On my summons, right.

12          THE COURT:  Thank you.  21, three more.

13          MS. HARRIS:  This is another that opposes,

14   Patricia Sexton and question No. 27.

15          MS. SCAPICCHIO:  There goes my theory that women

16   are more sympathetic.

17          THE COURT:  This is Patricia Sexton and I just

18   want to begin.

19          THE JUROR:  Hi.

20          THE COURT:  Good morning.  There was a question on

21   the questionnaire that said people who have been wrongly

22   convicted sometimes bring lawsuits against the police

23   department.  Do you oppose that lawsuit?  This case is about

24   someone who claimed to have been wrongly convicted and who

25   now years later brings a case against the police officers

1  who he claims were responsible for that.  Do you have any

2  problems serving as a juror in this case?

3          THE JUROR:  No.

4          THE COURT:  So this was just a general opposition?

5          THE JUROR:  Sure.  It's supposition on my own part

6  if, you know, I mean, you don't generally see people suing

7  police officers.  I guess that's just my theory that it's a

8  generalization, but I wouldn't have a problem with serving,

9  I'm not judgmental.

10          THE COURT:  Okay.  So the question is whether in

11  this case with the instructions I give you you'd be able to

12  say, well, you may not like it in general, but if the

13  evidence pointed in one direction or another, you'd have no

14  problem going there?

15          THE JUROR:  None.

16          THE COURT:  All right, who goes?

17          MS. HARRIS:  I think it's me.  My name is Mary Jo

18  Harris, and I and these gentlemen represent Detectives

19  Richard Walsh and Timothy Callahan.  Just to give you a

20  little bit of background of this case, this case is related

21  to or stems from the 1988 murder of Tiffany Moore who was a

22  12 year-old girl who was shot as she sat on a mailbox on a

23  street corner in Boston.  Does that ring a bell?

24          THE JUROR:  It doesn't.

25          MS. HARRIS:  And the plaintiff here, Mr. Drumgold,

1    was arrested and ultimately convicted of that murder and was

2    released from prison some few years ago.  Does his name ring

3    a bell to you?

4            THE JUROR:  None at all, no.

5            MS. HARRIS:  I see that you went to Boston City

6    Hospital for your nursing diploma.

7            THE JUROR:  I did.

8            MS. HARRIS:  When was that?

9            THE JUROR:  I graduated in 1972.

10           MS. HARRIS:  Did you ever work at Boston City

11   Hospital?

12           THE JUROR:  I did.  I worked till 1974, when my

13   first child was born, '73, I'm sorry, so it was just a year

14   out for my nursing career, then I moved to the North Shore,

15   and that's where I worked.

16           MS. HARRIS:  When you were working at Boston City

17   Hospital, did you have any experience with victims of urban

18   crime, of gunshot wounds, things like that?

19           THE JUROR:  I believe I did take care of a couple

20   of patients that were shot, but it wasn't like police shot,

21   it was crime amongst themselves, drug dealers.

22           MS. HARRIS:  I note that I think it's your

23   son-in-law is a police officer in Lynn and Cambridge?

24           THE JUROR:  He was a Lynn police officer and just

25   transferred to Cambridge two weeks ago.

1          MS. HARRIS:  How long has he been with the Lynn

2     Police?

3          THE JUROR:  I believe he started in 2001.

4          MS. HARRIS:  Did you ever have occasion to speak

5     to him about the nature of his job or the kind of work he

6     does, the kind of experiences he has?

7          THE JUROR:  He has small children so he tends not

8     to discuss a lot so just that the kids aren't within hearing

9     view of whatever he does, and he lived in the same community

10    that he worked, so he really didn't like discussing what

11    went on, so very rarely would he bring something up.

12         MS. HARRIS:  Okay.  And I'm assuming you

13    understand at this point this is a dispute, if you will,

14    between police officers and the plaintiff?

15         THE JUROR:  Uh-hum.

16         MS. HARRIS:  And much of the evidence that's going

17    to be put forward at this trial is going to be contested.

18    Would you have any problem keeping an open mind as you hear

19    the evidence and deciding issues of credibility and deciding

20    which evidence to accept?

21         THE JUROR:  I don't think so, no.

22         MS. HARRIS:  Would you favor, for example, the

23    testimony of a police officer over a civilian?

24         THE JUROR:  No.

25         MR. CURRAN:  I see your husband is retired.

1          THE JUROR:  Yes.

2          MR. CURRAN:  What did he do?

3          THE JUROR:  He worked for Verizon for 36 years.

4          MR. CURRAN:  The fact that Shawn Drumgold was

5     released, would that cause you to draw any conclusions

6     before hearing the evidence in any way?

7          THE JUROR:  No.  I guess I probably just don't

8     know enough about that legal aspect that, no.

9          MR. CURRAN:  Thank you very much.

10         THE COURT:  Ms. Scapicchio.

11         MS. SCAPICCHIO:  Hi, I'm Rose Scapicchio.  This is

12    Michael Reilly.  We represent the plaintiff Shawn Drumgold

13    in this case.  I had a few follow-up questions from what the

14    defense attorneys asked you.

15         THE JUROR:  Sure.

16         MS. SCAPICCHIO:  One of the questions I have is

17    because your son-in-law is a police officer, would you tend

18    to believe the testimony of a police officer over that of a

19    civilian witness?

20         THE JUROR:  No.

21         MS. SCAPICCHIO:  Some people think that the job

22    police officers do in society is so important that they

23    should never be sued for anything that happens in their

24    official capacity.  Do you agree with that?

25         THE JUROR:  I don't 100 percent agree with that,

1      no.

2             MS. SCAPICCHIO:  When you say 100 percent, what do

3      you mean?

4             THE JUROR:  I'm not somebody who would sue myself,

5      I don't believe.

6             MS. SCAPICCHIO:  When you say you don't believe,

7      what do you mean?

8             THE JUROR:  I really don't, I never thought about

9      whether or not someone would sue the police or sue an

10     individual, or it's just not something that I've really

11     given much thought to.  I guess everybody has their own

12     legal rights to do whatever they feel is necessary for

13     themselves.

14            MS. SCAPICCHIO:  Would you have any bias against

15     someone who did sue the police?

16            THE JUROR:  No, I would not.

17            MS. SCAPICCHIO:  And when Judge Gertner asked you

18     the question No. 27 that you had checked you oppose lawsuits

19     filed by wrongly convicted people against the police

20     department, can you tell me a little bit why you checked

21     that?

22            THE JUROR:  You know, I checked that, you know, it

23     was funny yesterday after the fact after I was sitting there

24     thinking, I don't know how I really should have answered

25     that question.  It was one question that stuck in my head

1  because I thought -- I don't know whether or not I find

2  enough thought about it.  I'm just not really clear.

3  　　　　　If somebody were to sue, then they sue.  It's

4  their legal right to do so, and they're justified.  I don't

5  know why I answered it that way, I really don't.

6  　　　　　MS. SCAPICCHIO:  Would you hold it against them

7  because of your belief that you would oppose those types of

8  suits?

9  　　　　　THE JUROR:  No, I would not, no, no.

10  　　　　　MS. SCAPICCHIO:  Now, in this case if the evidence

11  suggested that Detective Walsh and Detective Callahan

12  violated Shawn Drumgold's civil rights and that violation

13  led to his wrongful conviction, would you have any concerns

14  about awarding damages if you knew that Shawn had a criminal

15  past?

16  　　　　　THE JUROR:  No.

17  　　　　　MS. SCAPICCHIO:  And in the same vain, if the

18  evidence supported the fact that Detective Walsh and

19  Detective Callahan violated Shawn Drumgold's civil rights

20  and that violation led to his wrongful conviction, would you

21  have any concerns awarding damages if you knew that Shawn

22  had a drug problem?

23  　　　　　THE JUROR:  No.

24  　　　　　MS. SCAPICCHIO:  Can I just have a moment, your

25  Honor?

```
 1            THE COURT:  Yes.

 2            MS. SCAPICCHIO:  I don't think I have anything

 3    further, your Honor.

 4            THE COURT:  You need to call this number after

 5    6:00 today and have your juror number which was on the

 6    summons and then with that you'll know whether you are on

 7    the final jury.  If you are, you're to come tomorrow

 8    morning.  Don't research the case, don't think about it.

 9    Okay.

10            Hi, Mr. McKenna.

11            THE JUROR:  Hello, your Honor, how are you?

12            THE COURT:  Okay.  Let me just start in answer to

13    this question, people who have been wrongly convicted

14    sometimes bring lawsuits against the police department.  Do

15    you favor or oppose this type of lawsuit?  You said oppose?

16            THE JUROR:  Yes.

17            THE COURT:  And that's kind of important since

18    this case is about a lawsuit against the police for their

19    role in the alleged wrongful conviction of Shawn Drumgold.

20    The question is whether you feel like because of your

21    feelings about these lawsuits that you couldn't be a fair

22    juror?

23            THE JUROR:  I think that could be an issue, and

24    actually I don't know if I should start off with -- I think

25    I might have heard of this case prior to yesterday.
```

1           THE COURT:  Okay.

2           THE JUROR:  And it just didn't ring a bell to me.

3    Well, I didn't put two and two together yesterday when you

4    were asking, but I knew that the name Drumgold kind of rang

5    a bell for me.

6           THE COURT:  Let's separate one thing.  So if

7    somebody who says I don't like these kind of cases, I'm

8    opposed to these kind of cases, you're a juror and there's a

9    lawsuit, and the law says these cases are appropriate to be

10   brought, do you think the feelings of these kind of cases

11   would make it hard for you to sit as a juror?

12          THE JUROR:  Probably.  I would have a tough time.

13   It would have to be proven without a shadow of a doubt that

14   the police officers or the police department were willfully

15   negligent in their duties.

16          THE COURT:  Okay.  That's not the law, but it

17   sounds like you'd be starting there anyhow.  I'm going to

18   excuse you, thank you, Mr. McKenna, thank you very much.

19          The next to last person is Alexis Watts.  In the

20   next pool, there's another group of how many jurors, 14.  In

21   other words, we can excuse anyone who has any kind of

22   problem, we have 14 left, and we will surely pick a juror

23   from that.  So with your permission, I'd like to excuse

24   anyone who had any kind of problem leaving just 14.  Is that

25   okay?

1          MS. SCAPICCHIO:  Not a problem from the

2     plaintiff's side, your Honor.

3          THE COURT:  Fine, you can excuse them.  By all

4     means, excuse anybody who has any problem.  We will be

5     needing two or possibly just one after we talk to this

6     juror, so we'll be able to do it from the pool of 14.

7     Thanks.  Bring in the next juror who is Ms. Watts.  Hi.

8     It's been a long morning.

9          THE JUROR:  Yes.

10         THE COURT:  I think we'll start with

11    Ms. Scapicchio.

12         MS. SCAPICCHIO:  Hi.  I'm Rose Scapicchio.  This

13    is Michael Reilly, and we represent the plaintiff who is

14    Shawn Drumgold.  I just want to give you a little background

15    about the case to see if it jogs your memory at all and see

16    if you know anything at all about the case.  This case

17    started in 1988 when a little girl by the name of Darlene

18    Tiffany Moore was shot and killed.  The police arrested my

19    client, Shawn Drumgold.  He was tried and convicted of

20    first-degree murder.  He was sentenced to life in prison,

21    and 15 years later he filed a motion for a new trial and was

22    released.

23         Does the name Drumgold or Tiffany Moore, do any of

24    those ring a bell to you?

25         THE JUROR:  No.

1          MS. SCAPICCHIO:  Do you ever remember reading or

2    hearing either about the Tiffany Moore murder or the

3    Shawn Drumgold case?

4          THE JUROR:  No.  I was four when it first

5    happened.

6          MS. SCAPICCHIO:  Well, let me ask you this, some

7    people think that the role that police officers play in

8    society are so important that they should never be sued for

9    anything that happens while they're on duty.  Do you agree

10   with that?

11         THE JUROR:  No.

12         MS. SCAPICCHIO:  Would you tend to believe the

13   testimony of a police officer over that of a civilian

14   witness simply because of his or her position as a police

15   officer?

16         THE JUROR:  Not necessarily.

17         MS. SCAPICCHIO:  Okay.  And in this case, if the

18   evidence suggested that Detective Walsh and Detective

19   Callahan violated Shawn Drumgold's civil rights and that

20   violation led to his wrongful conviction, would you have any

21   concerns about awarding damages if you knew that Shawn had a

22   criminal past?

23         THE JUROR:  No.

24         MS. SCAPICCHIO:  In the same vain, if the evidence

25   suggested that Detective Walsh and Detective Callahan

1   violated Shawn Drumgold's civil rights and that violation

2   led to his wrongful conviction, would you have concerns

3   awarding damages if you knew that Shawn had a problem with

4   drugs?

5           THE JUROR:  No.

6           MS. SCAPICCHIO:  I don't have anything further.

7   Thank you.

8           THE COURT:  Counsel.

9           MS. HARRIS:  Good morning.  My name is Mary Jo

10  Harris, and I along with my colleagues represent Detective

11  Callahan and Detective Walsh.  I noted from your

12  questionnaire you worked as an intern in the district

13  attorney's office; is that right?

14          THE JUROR:  Right.

15          MS. HARRIS:  Which district?

16          THE JUROR:  North Hampton.

17          MS. HARRIS:  When did you perform that work?

18          THE JUROR:  It was right before I graduated, so

19  '06.

20          MS. HARRIS:  What kind of work were you doing

21  then?

22          THE JUROR:  I was mostly filing dockets and

23  sitting in the courtroom.

24          MS. HARRIS:  Did you have the opportunity to

25  observe any criminal trials?

1          THE JUROR:  Yeah.

2          MS. HARRIS:  And civil trials?

3          THE JUROR:  Yeah.

4          MS. HARRIS:  Did you have any role working either

5     as a victim witness advocate or in any other support

6     capacity directly with any of the prosecutors?

7          THE JUROR:  No.

8          MS. HARRIS:  Okay.  Now, as I'm sure you

9     understand, this is a civil rights suit where the plaintiff

10    is alleging one set of circumstances and the defense is

11    countering with their own set of circumstances.  Would you

12    have any difficulty keeping an open mind about the facts of

13    this case as the evidence was presented?

14          THE JUROR:  No.

15          MS. HARRIS:  Gentlemen.

16          MR. CURRAN:  I have no questions, thank you.

17          THE COURT:  Okay.  I'm going to give you a number

18    to call after six o'clock today.

19          THE JUROR:  Okay.

20          THE COURT:  You need your juror number, they'll

21    let you know if you're on the final jury, if you are, you

22    need to report.  Don't read anything about this case, don't

23    go online, and if you're selected, we'll see you in the

24    morning.  Thank you very much.

25          Now, unfortunately this is not just calling the

**JURY TRIAL DAY 2**

1    next group, we need to examine them.  The fastest thing is

2    to go out then with the 14 and examine them, introduce you

3    and read the list of witnesses.  One way we could do this --

4    they haven't been sworn.

5              MS. SCAPICCHIO:  Have they completed the

6    questionnaires?

7              THE COURT:  They have completed the

8    questionnaires.  We could select a jury of 13 and you can

9    still have five challenges on each side.  Essentially

10   because it's a civil jury, we have some wiggle room with

11   respect to the size of the jury.  If you want to do that, we

12   could do that.  If you want to take a moment, then you pick

13   a juror and we're all set.  You pick 13, you have 5 on each

14   side.

15             THE CLERK:  Or you can 14 with 4 and 4.

16             THE COURT:  We have 23.  You have 23 now so if you

17   picked a jury of 13, 13, 5 and 5.

18             THE CLERK:  Or 14, 4 and 4.

19             THE COURT:  Does anyone have an objection if we

20   pick a jury of 13?

21             MR. CURRAN:  No.

22             THE COURT:  Then why don't we stop now then and

23   what I'd like to do is give you about till 1:00.  At 1:00,

24   come in and exercise your peremptory challenges and the

25   remaining 13 will be the jury.

1          MS. HARRIS:  Do we go one for one?

2          THE COURT:  Yes, one for one.

3          MR. CURRAN:  Judge, I just have a thing to throw

4   out to the court, I was hoping since I had medication last

5   night and this morning that I'd start to feel better.  I

6   don't feel up to speed.

7          THE COURT:  You don't have to stay.

8          MR. CURRAN:  No, I understand that, I'll stay.  I

9   have no problem staying.

10          THE COURT:  Anything else?

11          MR. CURRAN:  If I start tomorrow, it may be an

12   issue?

13          THE COURT:  No, it won't be an issue.

14          MR. CURRAN:  My client's entitled.

15          THE COURT:  No, I understand that.  I think you

16   can take the rest of the afternoon off.  I mean, obviously

17   if you feel pretty grim, but I'm worried about this time of

18   year and people getting sick, and I'm worried about getting

19   started and getting the chunk of the case.  I want to also

20   let you know that my secretary called, is in the process of

21   calling the Criminal Offender Records Board.

22          MR. CURRAN:  That has nothing to do with me

23   putting it out there.

24          THE COURT:  I want to let you know and find out

25   whether there really is this Idiotic rule that with a court

1    order that you can't get things in hand.  She's talking to

2    the head of it.

3              MR. WHITE:  Those are two different voices, the

4    probation department and the criminal systems board.

5              THE COURT:  Who have you been dealing with?

6              MR. CURRAN:  Criminal history over at the

7    Ashburton Place.  That's the Commissioner of Probation.

8              MR. WHITE:  The Criminal History Board is over in

9    Chelsea.

10             MR. CURRAN:  He's been dealing with Jack O'Brien's

11   office, Commissioner of Probation.

12             THE COURT:  Because CORI approves it and gives

13   their records to them.

14             MR. CURRAN:  No, it gives right to them and they

15   issue the records to us.  He's the Commissioner.

16             THE COURT:  All right.  So we'll see you at one

17   o'clock.

18             MS. SCAPICCHIO:  Thank you.

19             (A recess was taken.)

20             THE CLERK:  All rise.

21             THE COURT:  You can be seated.  First, Mr. Curran,

22   you got the faxes?

23             MR. CURRAN:  My investigator called, and he got it

24   at the same time.  Thank you very much for your assistance.

25   We have provided -- I know they have a laptop, provided DVDs

1    of the presentation, our presentation and the images.  We'll

2    have the form, and I'll talk with Mr. Carney, I know he's on

3    trial down in Rhode Island about a protective order that

4    you'll be happy with, but I think the Court can make an

5    order now verbally for all counsel that WIN Interactive is

6    provided in this courtroom, not outside this courtroom, and

7    not disseminated.

8              THE COURT:  No question, I will enter such an

9    order.  WIN Interactive is a bit of the problem because the

10   actual document comes in as a chalk.  In other words, the

11   Limone case, for example, there was an exhibit that was

12   their interactive timeline.

13             MR. CURRAN:  We don't intend to introduce it as an

14   exhibit.

15             THE COURT:  Using it as a chalk.

16             MR. CURRAN:  As an illustration and chalk only,

17   your Honor.  If you would like to mark it for identification

18   purposes.

19             THE COURT:  I think it's safer.  Also, by the way,

20   I was on the phone with Judge Hinkle the questions that the

21   jurors asked are clearly public record.  She'll find out

22   what she can do.

23             MS. SCAPICCHIO:  I actually spoke to her clerk

24   over the break, your Honor, and an attorney from

25   Mr. Reilly's office is hand delivering another copy of your

1    order and the original motion to Judge Hinkle.

2           THE COURT:  The difficulty is that the state

3    clerk's office doesn't understand that an ECF order is an

4    order.

5           MS. SCAPICCHIO:  Apparently there was no

6    signature, as they understood it, on the order, and that was

7    the holdup.  They didn't see a written signature, they

8    didn't understand that the e-filing here is gold because it

9    doesn't apply in state court.

10          THE COURT:  Okay.  All right.  We'll start with

11   the plaintiff, we'll alternate one from the plaintiff, one

12   from the defendant side, 5 each, and we'll select 13, so

13   starting with Ms. Scapicchio.

14          MS. SCAPICCHIO:  Thank you, your Honor.  We'd move

15   to challenge juror No. 16, Larry Apple.

16          THE COURT:  Jury 16, Larry Apple.  Okay.

17          MS. HARRIS:  The defense would move No. 60.

18          THE COURT:  Juror 60, Ronald Webb.  Okay.

19          MS. SCAPICCHIO:  Your Honor, was Mr. Webb the only

20   minority that we cleared today?  My memory is that he was

21   the only minority that we cleared today.  I'm concerned that

22   Mr. Drumgold is African-American, that the only chance that

23   he has of any minority sitting on the jury would be that

24   particular juror.

25          MS. HARRIS:  I can't remember what Mr. Webb looks

1    like.  I remember that he had issues with his child's

2    arrest.

3            THE COURT:  I agree that he had issues to the

4    extent that applies to a civil case.

5            MR. CURRAN:  Judge, for the record, Judge, I don't

6    know if he was Portuguese.

7            THE COURT:  I think he was Portuguese.

8            MR. CURRAN:  So, again --

9            THE COURT:  It's not an issue.  Okay, next,

10   plaintiff.

11           MS. SCAPICCHIO:  Juror No. 44, Paul Butler.

12           THE COURT:  Paul Butler, juror No. 44.

13   Defendant.

14           MS. HARRIS:  Yes, juror No. 28, Lisa Laing.

15           THE COURT:  28, Lisa Laing.  Plaintiff.

16           MS. SCAPICCHIO:  Juror No. 32, I don't know how to

17   say his name, Rao Girish.

18           THE COURT:  Rao Girish, 32.  Of course a minority

19   as well, okay.

20           MS. HARRIS:  Juror No. 17, Soraya Assar.

21           THE COURT:  Soraya Assar, juror No. 17.

22           MS. SCAPICCHIO:  Juror No. 55, Mary T. Murphy.

23           THE COURT:  Juror 55, Mary Murphy.

24           MS. HARRIS:  Juror 41, Francisco Parra.

25           THE COURT:  41, Francisco Parra.

1          MS. SCAPICCHIO:  And juror No. 70, Patricia

2  Sexton.

3          THE COURT:  70, Patricia Sexton.  That's your

4  last.  This is your last, defendant.

5          MS. HARRIS:  I'm sorry, may I have just a moment?

6          THE COURT:  Of course.

7          MS. HARRIS:  Juror 21, Kristie Froman.

8          THE COURT:  Okay.  The jury is juror No. 1,

9  Christopher Curran; juror No. 2, Joseph Baio;

10  3, Paul Gedutis; 4, Joseph Ryan; 5, Bruce Bridges; Ellen

11  Perry; 7, Donna Olson; 8, Peter Higgins; 9, Wendy Rosko;

12  10, Robin Crowley; 11, Regina Catania; 12, Raymond Marchand;

13  13, Alexis Watts.  Maryellen, you have that?

14          THE CLERK:  Yes.

15          THE COURT:  The jury will report at nine.  It's

16  the only way to get parking around here, but we in fact will

17  start at ten to give everybody an opportunity to set up.  If

18  you would like to use the courtroom -- is there a problem

19  with that, Maryellen?

20          THE CLERK:  No.

21          MS. SCAPICCHIO:  I had one additional question,

22  your Honor.  I'm not sure if it's appropriate in a civil

23  case or not.  My understanding from the court reporter is

24  that the defendants have ordered daily copy of the

25  transcript.  Mr. Drumgold has filled out a financial

1    affidavit indicating that he's indigent.  I don't know if

2    there is available in a civil case --

3              THE COURT:  I'm not sure that there is.  We have

4    to find that out.

5              MS. SCAPICCHIO:  Okay.

6              THE COURT:  There are two issues here, which is

7    that because he's asking for damages, any money he gets from

8    the public would have to be returned.

9              MS. SCAPICCHIO:  Absolutely.

10             THE COURT:  I'm not sure there's even funds for a

11   non-habeas civil case, and we need to find that out.  Okay,

12   but otherwise I'll let you know in the morning.

13             MS. SCAPICCHIO:  Thank you, your Honor.

14             THE CLERK:  All rise.

15             (Whereupon, the hearing was suspended at

16   1:09 p.m.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2    UNITED STATES DISTRICT COURT )

3    DISTRICT OF MASSACHUSETTS     )

4    CITY OF BOSTON                )

5            I, Valerie A. O'Hara, Registered Professional

6    Reporter, do hereby certify that the foregoing transcript

7    was recorded by me stenographically at the time and place

8    aforesaid in No. 04-11193-NG, in re:  Shawn Drumgold vs.

9    Timothy Callahan and thereafter by me reduced to typewriting

10   and is a true and accurate record of the proceedings.

11                           /S/ VALERIE A. O'HARA

12                           _____

13                           VALERIE A. O'HARA

14                           REGISTERED PROFESSIONAL REPORTER

15                           DATED APRIL 28, 2011

16

17

18

19

20

21

22

23

24

25