IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


SHAWN DRUMGOLD,              )  C.A. No. 04-11193-NG

             PLAINTIFF       )  Courtroom No. 2

VS.

TIMOTHY CALLAHAN, ET AL.,)  1 Courthouse Way

             DEFENDANTS     )  Boston, MA  02210


JURY TRIAL DAY 1

JURY IMPANELMENT

SEPTEMBER 8, 2009

9:27 a.m.




BEFORE THE HONORABLE NANCY GERTNER

UNITED STATES DISTRICT COURT JUDGE










VALERIE A. O'HARA

OFFICIAL COURT REPORTER

1    A P P E A R A N C E S:

2         ROSEMARY CURRAN SCAPICCHIO, ATTORNEY, Four Longfellow
     Place, Boston, Massachusetts  02114, for the Plaintiffs;

3
         Tommasino & Tommasino, by MICHAEL W. REILLY, ESQ.,
4    Two Center Plaza, Boston, Massachusetts  02108, for the
     Plaintiff;

5
         Roache & Malone, LLP, by JOHN P. ROACHE, ESQ., 66 Long
6    Wharf, Boston, Massachusetts  02110, for the Defendants.

7         Bletzer and Bletzer, P.C., by HUGH R. CURRAN, ESQ., 300
     Market Street, Brighton, Massachusetts  02135, for the
8    Defendants;

9         Law Offices of William M. White, Jr. and Associates,
     WILLIAM M. WHITE, JR., ESQ., 218 Lewis Wharf, Boston,
10   Massachusetts  02110;

11        Morgan, Brown & Joy, LLP, by MARY JO HARRIS, ESQ., 200
     State Street, Boston, Massachusetts  02109-2605, for the
12   Defendants.

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1          THE CLERK:  All rise.  United States District

2     Court is now in session.

3          THE COURT:  Good morning, everyone, you can be

4     seated.  My name is Nancy Gertner, and I'm the Judge of this

5     session.  What we're going to do is spend a little bit of

6     time in selecting a jury for this case, the case of Drumgold

7     vs. Callahan.  We're going to spend a little bit of time.  I

8     wish it could be faster, but the goal here is to try to

9     select a jury that would be the kind of jury that you'd want

10    to have if you were sitting in the shoes of either side in

11    this case.

12         So the way it's going to work is that I'll ask

13    questions of you as a group, just a few questions, you've

14    already answered a questionnaire, then we'll ask questions

15    of you as a group, but because I fundamentally don't believe

16    that people feel comfortable in talking in a group, we're

17    going to question people individually.  The questioning will

18    be very short, it's really in the event you want to share

19    individually what you wouldn't otherwise be comfortable

20    sharing as a member of a group.

21         My hope is we'll go as quickly as possible.  I

22    want you to know however exhausting this is for you, it's

23    equally exhausting for us, but it's a way that I believe, at

24    least, it's a way of getting the fairest jury we know how to

1    pick.  Right now you have to stand again because you have to

2    be sworn in.  All rise, please.

3                ( Prospective jurors were sworn)

4                THE COURT:  Okay.  You can be seated.  Let me just

5    get back to my page here.  Just a second.  Let me first

6    describe to you the case, then I'll ask again the question

7    about whether you can serve, so this case is brought under

8    the Federal Civil Rights Act in which the plaintiff,

9    Shawn Drumgold, claims that the defendant, Officer Timothy

10   Callahan, a Boston homicide detective, violated his right to

11   a fair trial by withholding exculpatory evidence relating to

12   a witness who testified in a criminal prosecution of

13   Mr. Drumgold in 1989.

14                Mr. Drumgold claims that Mr. Callahan's violation

15   of his rights was a substantial factor in causing his

16   conviction in 1989.  The burden of proof on this case is

17   upon the plaintiff to prove the elements of the claim by a

18   preponderance of the evidence.  You'll get more detailed

19   instructions at the end of the case.  My goal here is just

20   to tell you generally about the case to see if any of you

21   have heard of it.

22                The case arises out of an August, 1988 murder of a

23   young girl, Tiffany Moore, who was shot while she was

24   sitting on a mailbox surrounded by a group of teenagers near

25   the corner of Humboldt Avenue and Homestead Street in

1    Roxbury.  The plaintiff, Drumgold, and another man,

2    Terrance Taylor, were ultimately arrested and charged with

3    the crime.

4         Mr. Drumgold claims that exculpatory evidence,

5    which I'll describe to you, pertaining to a witness called

6    at trial, a witness by the name of Ricky Evans was withheld

7    from the prosecution.  Detective Callahan denies that.  I'm

8    sorry, withheld from the prosecution, which Detective

9    Callahan denies.  Mr. Drumgold further claims that the

10   knowing suppression of potentnially exculpatory evidence by

11   Detective Callahan violated his rights and resulted in a

12   conviction that was improper.

13        Again, Detective Callahan denies that any of his

14   actions denied Mr. Drumgold a fair trial.  Have any of you

15   read, seen or heard anything about this case?  Okay.  If you

16   could stand, and I'll put your numbers down, your jury

17   numbers down.  I'll talk to you at sidebar about it in a

18   moment.  Mr. Gertzog.

19        THE JUROR:  Yes.

20        THE COURT:  Ms. Leighton, Mr. McLaughlin, juror

21   No. 5; Ms. Brooke Robinson, juror No. 6; Mr. White, juror

22   No. 16; Ms. Santapaula, juror No. 14; in the next row,

23   Mr. Potts, juror No. 24; Mr. Scott, juror 20; Mr. Quigley,

24   is that right, juror No. 34.  I'm going to go through all of

25   my general questions so I don't have to have you come back

1    and forth.

2            This trial could last until October 15th.  We put

3    this in the questionnaire.  It's possible it could be

4    shorter than that, but we wanted to put this on the outside

5    limit so that you'd know that.  We sit from 9 to 1.  You

6    have your afternoons off.  You understand, I say that

7    delicately since most people go to work at 1:00 when they

8    finish here, so nobody has the afternoon off, we go from

9    9 to 1, then the week of the 21st, I will not be able to

10   sit, and we also take Fridays off.  So that's the way the

11   schedule would go.

12           I know on the questionnaire all of you have

13   indicated you could do this.  Is there anyone who absolutely

14   cannot serve?  Before you stand up, I want to say something

15   else.  This is not easy for anybody to be a juror in a case,

16   we understand that.  We also understand that the only way we

17   have a fair jury is if everyone is part of the pool here,

18   however difficult it is.  So would you stand if you

19   absolutely cannot serve even on the questionnaire you said

20   you could.

21           Okay.  Ms. Santapaula, you're juror No. 14.  I'll

22   question you again.  Okay.  First I'm going to ask the

23   lawyers to introduce themselves and their clients starting

24   with the plaintiff.  Counsel.

25           MS. SCAPICCHIO:  Thank you, your Honor.  Good

1    morning, ladies and gentlemen, my name is Attorney Rosemary

2    Scapicchio.  I have a law office here in Boston, and I

3    represent the plaintiff.  This is Shawn Drumgold.

4              THE COURT:  Okay.  Defendants.  I'm sorry,

5    Mr. Reilly, sorry.

6              MR. REILLY:  Good morning, ladies and gentlemen,

7    my name is Michael Reilly.  I also represent Mr. Drumgold,

8    and I also have a law office here in Boston, and with us is

9    Amy Coggan, who is a law student.

10             THE COURT:  Keep your voice up.

11             MR. REILLY:  Yes, your Honor.

12             THE COURT:  Her name is?

13             MS. SCAPICCHIO:  Amy Coggan.  Your Honor, she's a

14   third year law student at Suffolk University Law School in

15   Boston.  She was assisting us in this case and we were

16   looking for permission for her to second seat the trial.

17             THE COURT:  That's fine.

18             MS. SCAPICCHIO:  Thank you, your Honor.

19             MS. HARRIS:  Good morning, my name is Mary Jo

20   Harris.  I'm also an attorney in Boston.  I represent

21   Detective Callahan, who's a defendant in this action.

22             MR. CURRAN:  Good morning, ladies and gentlemen.

23   My name is Hugh Curran.  I'm also an attorney in the City of

24   Boston at a law firm called Bletzer & Bletzer in Brighton.

25   I'm also representing Mr. Callahan with Mary Jo Harris.

1    Thank you.

2         MR. ROACHE:  Good morning, ladies and gentlemen,

3    my name is John Roache.  I also have a law practice in the

4    City of Boston.  I will be representing former Police

5    Commissioner Francis Roache and the City of Boston.

6         THE COURT:  Anyone familiar with either the

7    attorneys or the individuals they represent?  Familiar with,

8    related to, know?  Okay.  There are no affirmative

9    responses.  Now, I've asked the parties to give me a list of

10   every witness who could conceivably be in this case.  It's a

11   long list, but I can assure you that all these individuals

12   will not be witnesses in this case.  We've asked them to

13   give me a list just in case.  We don't want to be in the

14   middle of trial and have someone get on the stand who is one

15   of your long lost uncles, so I ask them to overdo the list,

16   and they have complied by overdoing this list.

17        So I will give you a list of names, and if any of

18   these names are familiar to you, just note it, and then

19   after I'm finished, we'll ask you if you know any of these

20   people, so the following individuals from Boston:  Eric

21   Johnson, Corinne Delahunt, Stanley Kessler, Mary Alexander,

22   Ricky Evans -- all from Boston -- Wayne Davis, Ronald Downs,

23   David Cart, Vincent DiFazio, Theron Davis, Andrew Garvey,

24   Romero Holliday, Robert Hayden, Mervin Reese, Rana Roisten,

25   Alice Moore, Cherry Walker, Vantrell McPherson,

1    Tracie Peaks, Chris Cousins, Kevin Lucas, Thomas Gaughan,

2    Lisa Holmes, Larry Ellison, Willie Simms, Donald Wilson,

3    Troy Jenkins, Gerald O'Rourke, Terrance Taylor, Paul Murphy,

4    Tanoi Curry, Shamia Clemons, Travis Goss, Eric Johnson,

5    Diane Gill, Jose' Garcia, Daniel Linsky, Tyrone Brewer,

6    Rodney Sadberry, William Celester, Paul Durand -- again, all

7    from Boston -- Paul Linn, Rosemary McLaughlin, Marlon

8    Passley, Lewis Santos, Robert George, Tony Smith,

9    Francis Roache, Angel Toro, Charles Horseley, David Meier,

10   Edward McNelly, Neil Miller, Darnell Johnson, Ralph Martin,

11   Honorable Tracy Lyons, Sheryl Cormier, Miller Thomas, Joseph

12   Dunford, Joseph Saia -- I'm just reading Boston names --

13   Marie Donohue, Robert Dunford, Sergeant Gary Eblan,

14   Mark Hayes, Kenneth Fong, Robert Francis, William Hussey,

15   James Jordan, Paul Leary, Jennifer Maconochie, William

16   McCarthy, Timothy Murray, Peter O'Malley of Charlestown,

17   Terrence O'Neil, Kathleen O'Toole, Lalita Pulavarti,

18   Pervis Ryan, Michael Stratton, Justina Ward, Robert Ahearn,

19   Lorraine Henshaw, Robin DeMarco, Kevin Averill, Joseph

20   Carter, Michael Connolly, Robert Cunningham, Donald Devine,

21   Daniel Dovidio, Thomas Dowd, Paul Farrahar, Robert Foilb,

22   Gregory Gallagher, Michael Galvin, Darrin Greeley, James

23   Hasson, Bobbie Johnson, John Kelly, John Kervin, Thomas Lee,

24   Donald Levine, John McCarthy, Robert Orr, Bridgett Robinson,

25   Roger Spring, Albert Terestre, James Wood, Joseph Zinck,

1    Paul Joyce, Ralph Cinquegrana, Melvin Tucker.

2          Let's stop there for a second.  Anyone know those

3    individuals?  There are no affirmative responses.  These are

4    individuals from cities and towns outside of Boston:

5    Stanley Bogdon of Belmont; Mark DeLuca of Marshfield;

6    Joseph Saia, I said Boston, it's actually Norwood;

7    Richard Walsh of Weymouth; Paul McDonough, Quincy;

8    Philip O'Shane of Marlborough.

9          MS. SCAPICCHIO:  Marblehead.

10          THE COURT:  Marblehead.  Laura Scherz, is that

11    Arizona?

12          MR. REILLY:  Yes, your Honor.

13          THE COURT:  John Stanley; Dr. Michael Lyman,

14    St. Louis, Missouri; Paul Connolly, Winthrop; Scott Keller,

15    North Andover; Steve Rappaport, Lowell; John Daley,

16    Marshfield; John Canavan of Plymouth; Ann Marie Doherty,

17    Chatham, Massachusetts; Thomas Miller of Canton,

18    Massachusetts; Herbert Spellman of Kingston; James Hussey of

19    Norwell.  Have I said his name?  That's it.  Anyone familiar

20    with those individuals?  Okay.  Mr. Scott, okay.  We'll talk

21    to you in a moment.

22          THE JUROR:  Your Honor, is it know who they are or

23    have a relationship with them?

24          THE COURT:  Either.  We'll explore that.  You're

25    Mr. McLaughlin?

```
1              THE JUROR:  Yes.

2              THE COURT:  Okay.  Go to sidebar, counsel.  You,

3    too, Mr. Brennan.  Anybody else before I move?

4              (THE FOLLOWING OCCURRED AT SIDEBAR:)

5              THE COURT:  Because of the numbers that have heard

6    about the case, let's do a preliminary screening and then go

7    further when we do individual voir dire, in other words,

8    have you heard about the case?  We'll do a preliminary

9    screening and then otherwise we'll be here all day.

10             MS. SCAPICCHIO:  That's fine, your Honor.

11             THE COURT:  Maryellen, start with juror No. 3

12   which is Mr. Gertzog.  Mr. Gertzog, come forward.  Hi, sir.

13             THE JUROR:  Hi.

14             THE COURT:  I'm sorry for all the people.

15             THE JUROR:  I understand.

16             THE COURT:  You heard about the case?

17             THE JUROR:  I read about it in the newspaper.  I

18   believe Mr. Drumgold was in prison then freed on something

19   to do with propriety in the case, and I don't have any other

20   detail.

21             THE COURT:  Stating now, we can talk about you

22   again afterwards.  Do you think it would make it hard for

23   you to be fair and have an open mind in this case?

24             THE JUROR:  I don't believe so based on my

25   confusion what the facts were.  I don't remember the
```

1    details.

2           THE COURT:  We'll talk to you again about that.

3    You can go back to your seat.

4           THE COURT:  Juror No. 4, Brenda Leighton.  Hi.

5           THE JUROR:  Hi.

6           THE COURT:  You heard about the case?

7           THE JUROR:  Yes, only because I work with someone

8    that is from that area.

9           THE COURT:  Okay.

10          THE JUROR:  But I don't know any specifics.

11          THE COURT:  Okay.  We were thinking that we'd

12   question you more specifically inside my office, but do you

13   think standing here now it would make it hard for you to be

14   fair in this case because of what you heard about the case?

15          THE JUROR:  Truthfully?

16          THE COURT:  Truthfully is all we're looking at.

17          THE JUROR:  Yeah, I would say yes.

18          THE COURT:  You work with someone in the area?

19          THE JUROR:  Yes.

20          THE COURT:  Who do you work with?

21          THE JUROR:  Her name is Jackie.

22          THE COURT:  She lives in the area?

23          THE JUROR:  Yeah, she was actually the one that

24   brought it to my attention because she lives in that town.

25          THE COURT:  Roxbury?

1          THE JUROR:  Yeah, Roxbury.

2          THE COURT:  So you've had extended conversations

3   with her about the case?

4          THE JUROR:  I wouldn't say extended, but, you

5   know, she did bring it to my attention, otherwise I don't

6   think I would have heard about it because I don't live in

7   the Boston area.

8          THE COURT:  Do you think it would make it hard for

9   you to sit as a juror?

10          THE JUROR:  Knowing what happened to the girl?

11          THE COURT:  Yes, this case is not about what

12   happened to the girl.

13          THE JUROR:  It's more about --

14          THE COURT:  The prosecution afterwards.

15          THE JUROR:  Well --

16          THE COURT:  Why don't you stay with us and we'll

17   talk about it.  Think a little bit about it.

18          THE JUROR:  Yeah.

19          THE COURT:  Okay.  Juror No. 5, Mr. McLaughlin,

20   you've heard about the case and you know one of the

21   witnesses?

22          THE JUROR:  Me?

23          THE COURT:  You heard about the case and you heard

24   one of the witnesses' names?

25          THE JUROR:  Yes, I vaguely recall hearing about

1    the case but no real details about it.

2              THE COURT:  Okay.  Who's the person you know?

3              THE JUROR:  Mark DeLuca.  I believe he's the Chief

4    of Police in Duxbury.

5              THE COURT:  Mr. DeLuca?

6              THE JUROR:  Yes, but I believe he's chief of

7    police.

8              THE COURT:  You just heard of him, you're not

9    related to him?

10             THE JUROR:  No.

11             THE COURT:  Do you think his name mentioned in the

12   case would make it hard for you to be a juror?

13             THE JUROR:  No.

14             THE COURT:  You could go back.  Ms. Robinson.

15   Hi.

16             THE JUROR:  Hi.

17             THE COURT:  You've heard about the case?

18             THE JUROR:  No, I have not.

19             THE COURT:  I think you raised your hand and said

20   that you had heard about the case?

21             THE JUROR:  No, no, I haven't.

22             THE COURT:  Did you raise your hand?

23             THE JUROR:  No, I didn't.

24             THE COURT:  Well then go back to your seat.  Juror

25   No. 14, is that next in order?  Are they in order?  Juror

1    No. 14 is Ms. Santapaula.  Hi.

2               THE JUROR:  Hi.

3               THE COURT:  First you said you didn't think you

4    could serve?

5               THE JUROR:  I have a trip to Sweden planned coming

6    back on the 12th, September 27 to October 12th.

7               THE COURT:  I'll excuse you.  Thank you.

8               THE JUROR:  I can leave then?

9               THE COURT:  You can go down to the second floor.

10   That's on your way to leaving.

11              THE COURT:  Juror 16, Mr. White.

12              THE JUROR:  Good morning, your Honor.

13              THE COURT:  Hi.  You've heard about the case?

14              THE JUROR:  Pardon me?

15              THE COURT:  You've heard about the case?

16              THE JUROR:  I wasn't sure when you asked about the

17   case meaning the murder or this particular case, but as far

18   as the incident from 1988, I'm familiar with that.

19              THE COURT:  What about the prosecution and what

20   happened to it?

21              THE JUROR:  I have no specific knowledge of

22   that.

23              THE COURT:  Okay.

24              THE JUROR:  Just being an attorney and hearing

25   things and reading things.

1              THE COURT:  Okay.

2              THE JUROR:  Growing up in the area.

3              THE COURT:  Well, this is a subjective question.

4     Do you think that anything that you have learned growing up

5     in the area as an attorney would make it hard for you to sit

6     as a juror in this case?

7              THE JUROR:  Not for those reasons.

8              THE COURT:  Okay.  Is there another reason I'm

9     missing?

10             THE JUROR:  My office and I have represented the

11    Town of Framingham and the police department for 30 years,

12    we've represented the police.

13             THE COURT:  In 1983 cases?

14             THE JUROR:  No federal civil rights cases.

15             THE COURT:  Right.

16             THE JUROR:  Yes.  I haven't personally, my

17    partner, Aaron Bikofsky.

18             THE COURT:  You think that would make it hard for

19    you to sit as a juror?

20             THE JUROR:  It would make it difficult.

21             THE COURT:  I'm going to excuse you.  Thank you.

22    Juror No. 16 is excused.  Juror 24, who is Mr. Potts.

23    Mr. Potts.

24             THE JUROR:  Hi, your Honor.

25             THE COURT:  You've heard about this case?

1           THE JUROR:  Yes.

2           THE COURT:  You heard?

3           THE JUROR:  I'm a talk radio junkie, so I hear a

4    lot.  I believe there was a case where there was a driveby

5    shooting near the ballfield and Tiffany was sitting on a

6    mailbox, and it's been be bandied about recently also, I

7    believe.

8           THE COURT:  This case is more about the

9    prosecution of Mr. Drumgold.  Do you know anything about

10   that?

11          THE JUROR:  I do not.

12          THE COURT:  Do you think anything you've heard on

13   the radio and elsewhere would make it hard for you to sit as

14   a juror?

15          THE JUROR:  As much as I like to fulfill my civic

16   duty.

17          THE COURT:  Because of the talk radio stuff?

18          THE JUROR:  Yes.

19          THE COURT:  Okay.  I'll excuse you.  Thank you,

20   sir.  Mr. Scott?

21          THE JUROR:  Good morning, your Honor.

22          THE COURT:  Good morning.

23          MR. ROACHE:  Mr. Scott is --

24          THE COURT:  20.  You also knows a witness in the

25   case, as I understand it?

1          THE JUROR:  Yes, John Daley, it was a neighbor,

2    someone that we socialized with probably back in the

3    1970s.

4          THE COURT:  But not recently?

5          THE JUROR:  Not recently.

6          THE COURT:  If his name came up or testimony from

7    him, would that make it hard for you to serve?

8          THE JUROR:  No, I don't think it would be.

9          THE COURT:  Okay.  You also indicated --

10         THE JUROR:  I also knew a gentleman by the name of

11   Matt DeLuca from Marshfield.  I think his name was read.

12         MS. HARRIS:  It's Mark.

13         THE JUROR:  Then I don't.

14         THE COURT:  You also indicated I thought that you

15   had heard about the case?

16         THE JUROR:  Yes, I've read about it in the

17   newspaper.

18         THE COURT:  Do you think that anything you've read

19   or heard would make it hard for you to serve as a juror?

20         THE JUROR:  No.

21         THE COURT:  Thank you.  You can go back.  Juror

22   No. 34, Mr. Quigley.  Hi.

23         THE JUROR:  Hi.

24         THE COURT:  You had heard about the case?

25         THE JUROR:  Just on the news and stuff like that,

1    but I do have an issue with the timeline.  The 28th of the

2    September I'm unavailable.

3              THE COURT:  28th, is that Yon Kipper?

4              THE JUROR:  Actually my son's being inducted into

5    the Navy.

6              THE COURT:  I wouldn't worry about the 28th of

7    September because I can't be here either, so we're even.

8              THE JUROR:  That's fine.

9              THE COURT:  Also juror No. 19 knew, Mr. Brennan.

10             THE JUROR:  Good morning.

11             THE COURT:  Hi.

12             THE JUROR:  I just recollect the case from the

13   newspapers, and I just don't know if things might start

14   clicking readback.

15             THE COURT:  Do you think right now, is there any

16   reason --

17             THE JUROR:  No.

18             THE COURT:  We'll go back and talk to you about it

19   and see if you can flesh out any more of your memories.

20             THE JUROR:  It's quite a while ago.

21             THE COURT:  I can't remember what I ate for

22   breakfast.  Do you think that anything that you remember now

23   as you're standing there would make it hard for you to serve

24   as a juror?

25             THE JUROR:  Probably not, no.

1          (SIDEBAR CONFERENCE WAS CONCLUDED.)

2          THE COURT:  We'll talk again about this.  So,

3    ladies and gentlemen, we'll interview you individually.

4    Those of you who remembered something about this case, try

5    to see what you can remember, but we'll talk to you

6    individually about it, and we'll ask that when you finish

7    talking to me and the lawyers and you come back in this

8    room, you don't share with the other jurors what you have

9    been asked about.  This is not a civics lesson.  There's no

10   right or wrong.  We want your best reaction, we want your

11   most honest reaction, just come back and wait and relax and

12   we'll try to get this done as quickly as possible.

13          THE CLERK:  All rise.

14          (A recess was taken.)

15          (THE FOLLWING OCCURRED IN JUDGE'S LOBBY:)

16          THE COURT:  I want to put one thing on the record.

17   I've forgotten the name of the case.  It's a criminal case

18   which I wrote which talked about voir dire in a criminal

19   case that was public and that to some degree having the

20   questioning in here undermines the public's access to this,

21   so everyone around the table, the parties have to waive

22   public access to the voir dire so we can have the

23   questioning here.

24          MS. SCAPICCHIO:  It's waived on behalf of the

25   plaintiff, your Honor.

1           MS. HARRIS:  It's waived for us, your Honor.

2           MR. ROACHE:  Waived, your Honor.

3           THE COURT:  Your Honor, can I ask a question, how

4    many jurors are we sitting?

5           THE COURT:  Good point.  Well --

6           MS. SCAPICCHIO:  Last time we did 14.

7           THE COURT:  So we can do 14 again.  That's 8, I'm

8    sorry, that's 14.  Three challenges each side so we're

9    clearing 20.

10          THE CLERK:  I have them calling tomorrow

11   tonight.

12          THE COURT:  14.  This will be considerably

13   shorter.  Okay.  I resist time limits, and I may be

14   challenged in this case.  Won't you sit down.  This is

15   Mr. Coseglia.

16          THE JUROR:  Coseglia.

17          THE COURT:  Very short questioning each side.  Who

18   begins, Ms. Scapicchio?

19          MS. SCAPICCHIO:  Yes, your Honor.  I'm

20   Rose Scapicchio.  I represent Shawn Drumgold in this matter.

21   In looking at your questionnaire, you indicated on question

22   24 that you had some relatives working for either the

23   District Attorney's Offices in Middlesex, Essex County and

24   U.S. Attorney's Office.  Would that affect your ability do

25   you think to be fair and impartial in this case?

1          THE JUROR:  No, the three people I mentioned are

2     not relatives, they're former colleagues or currently

3     colleagues and friends.  No, it would not.

4          MS. SCAPICCHIO:  If you were asked to listen to

5     the testimony of a police officer vs. a civilian witness,

6     would you give either side any more or less weight because

7     of the police officer position vs. the civilian witness

8     position?

9          THE DEFENDANT:  No.

10          MS. SCAPICCHIO:  Okay.  If a police officer

11     violates someone's constitutional right and causes them to

12     be wrongly convicted, how would you feel about awarding

13     money damages?

14          THE JUROR:  I feel favorable to awarding money

15     damages.

16          MS. SCAPICCHIO:  I don't have any further

17     questions, your Honor.

18          MS. HARRIS:  Thank you.  Good morning.  My name is

19     Mary Jo Harris, and we're the defense team, if you will, for

20     Mr. Callahan and Mr. Roache for the City of Boston.  I

21     understand that you are a practicing lawyer?

22          THE JUROR:  I am.

23          MS. SCAPICCHIO:  What kind of law do you practice?

24          THE JUROR:  I do general commercial litigation.

25     Most of my practice is in pharmaceutical industry-related

1    products liability and consumer fraud cases.

2          THE COURT:  Did you ever do any work as a criminal

3    defense attorney in law school or any clinics, anything like

4    that?

5          THE JUROR:  No, definitely not.

6          MS. HARRIS:  Any interest in it at all?

7          THE COURT:  You're offering him a job?

8          THE JUROR:  In doing it, no.

9          MS. HARRIS:  Okay.  This case, as you know, it's

10   an allegation of a wrongful conviction, and obviously the

11   defense is that there was no misconduct on the part of the

12   officer, and you indicated that you'd be able to keep an

13   open mind as you hear the evidence; is that fair to say?

14         THE JUROR:  Absolutely.

15         MS. HARRIS:  And as you probably know, the

16   plaintiff goes first in a civil case, so you would have to

17   listen to the plaintiff's case before the defendants

18   actually have a chance to put their case before you.  Do you

19   think you'd be able to keep an open mind waiting for that to

20   happen?

21         THE JUROR:  Absolutely.

22         MS. HARRIS:  If you had a sense that maybe a

23   conviction went wrong but it wasn't necessarily the fault of

24   the person who is being charged with misconduct under the

25   civil rights act, would you be able to separate those two

```
1    things out in your mind?
2           MS. HARRIS:  Yes.
3           MR. ROACHE:  Just one question, sir.  In your
4    practice do you generally represent plaintiffs or
5    defendants?
6           THE JUROR:  I would say that I generally represent
7    defendants.  Most of my work is defending large
8    pharmaceutical companies, but I do some bit of work on the
9    civil side representing plaintiffs as well.
10          MR. ROACHE:  Thank you, that's all I have.
11          THE COURT:  I want to ask you because we're not
12   going to be finished doing jury selection today, we'll ask
13   you to call this 1-800 number after 6:00 tomorrow, and that
14   will let you know whether you're on the final jury, and if
15   you are, we'll start on Thursday.
16          MR. CURRAN:  Just a quick question in regards to
17   the scheduling with regards if you're in litigation, do you
18   have any trials coming up that you're scheduled to
19   participate in in the next six weeks?
20          THE JUROR:  I don't have any trials scheduled, I
21   do not have a trial scheduled.
22          THE COURT:  Thank you very much.
23          MS. SCAPICCHIO:  Thank you.
24          MR. CURRAN:  Thank you.
25          THE COURT:  Next juror is Teelucksingh.  Hi, we
```

1    meet again.  If we could bring this person in.

2          THE CLERK:  Judge, I skipped over 2 and brought 3

3    in instead.

4          THE COURT:  That's fine.

5          MS. HARRIS:  Good morning, as we've introduced us,

6    I'm Mary Jo Harris, and I represent Timothy Callahan.

7    Mr. Teelucksingh, I noticed you indicated you just started a

8    new job?

9          THE JUROR:  Yes.

10         MS. HARRIS:  Will that be a problem for you

11   sitting here?

12         THE JUROR:  Well, my concern, I was hired for an

13   eight-week temporary basis to be then considered for

14   full-time work, gone after eight weeks, so I'm just two and

15   a half weeks into that.  I'm willing to serve, but I'm

16   really concerned that this really might jeopardize my

17   chances.

18         THE COURT:  No one can judge that better than you,

19   if you think it would jeopardize your job, this economy, I'm

20   not going to push anybody.

21         THE JUROR:  Well, it clearly jeopardizes the job

22   since it's an eight-week term, and I've been working around

23   the clock.

24         THE COURT:  You know what, I'll excuse you,

25   Mr. Gertzog, your civic duty is important, but your

1    livelihood is important also.

2             THE JUROR:  It is.

3             THE COURT:  We'll excuse you.

4             THE JUROR:  Do I wait with the jurors?

5             THE COURT:  No, you go back down to the second

6    floor.  Ms. Molloy will take care of you.

7             THE COURT:  I think there's a higher rate of I

8    can't do it and I'm not about to push.

9             THE CLERK:  Judge, this is juror No. 2.

10             THE COURT:  Tell me how to pronounce your name.

11             THE JUROR:  Teelucksingh.

12             MS. HARRIS:  Good morning.  My name is Mary Jo

13    Harris, and I represent Timothy Callahan in this case.  I

14    notice from your questionnaire that you reported that you

15    had an OUI in your past?

16             THE JUROR:  Yes.

17             MS. HARRIS:  Can you tell me how long ago that

18    was?

19             THE JUROR:  1987, 1988.

20             MS. HARRIS:  Was that in Boston?

21             THE JUROR:  No, actually it's right next to my

22    house, one house.  I had a flat tire and the officer pulled

23    up, and I was changing it and he said OUI.  I had suspended

24    license for a year.

25             MS. HARRIS:  Is there anything about that

1    experience that would cause you to view the police officers

2    in this case with suspicion or dislike or any kind of a bias

3    do you think?

4               THE JUROR:  Actually I didn't take the

5    breathalyzer, and what happened is he just assumed I was

6    under the influence of operating, so and then the case at

7    the courthouse, whoever is the prosecutor said the police

8    ten years' experience on the job and so I just accepted the

9    sentence.

10              MS. HARRIS:  Even though you didn't believe it was

11   fair that the police officer had told the truth?

12              THE JUROR:  Yes.

13              MS. HARRIS:  Is that something that you think

14   would color your perception here because in this case the

15   allegations are that the police didn't tell the truth about

16   the investigation that they conducted, so do you think that

17   your personal experience would affect the way you judge

18   because essentially you would be judging these witnesses?

19              THE JUROR:  I would say yes, it would.

20              THE COURT:  Okay.  I'll excuse you

21   Mr. Teelucksingh, there will be cases that won't involve

22   officers.  Thank you so much.  Juror No. 4, Brenda Leighton.

23              THE CLERK:  Judge, it's juror No. 4.

24              THE COURT:  Hi.  We meet again.  Why don't we

25   start with you, Ms. Scapicchio.

1        MS. SCAPICCHIO:  Hi, my name is Rose Scapicchio.

2    I represent Shawn Drumgold.  He's the plaintiff in this

3    case.  I have a couple of questions for you.  This is a case

4    where Shawn Drumgold alleges that Detective Callahan

5    withheld some information from a prosecutor that he could

6    have used, he pleas at his trial and that that resulted in

7    an unfair trial.  We're asking that you evaluate the

8    testimony of all the witnesses in this case, some of whom

9    are going to be police officers and some of who are going to

10   be civilian witnesses.  Would you give any more credit to a

11   witness who was a police officer merely because of his or

12   her position as a police officer?

13        THE JUROR:  No.

14        MS. HARRIS:  Okay.  Would you listen to the

15   evidence and decide who was telling the truth?

16        THE JUROR:  Yes.

17        MS. SCAPICCHIO:  Also in this case we believe that

18   you're going to hear evidence.  That evidence was withheld

19   from the prosecutor prosecuting Mr. Drumgold on the criminal

20   case, and you will hear from a witness, specifically a kid

21   by the name of Ricky Evans.  This witness has in the past

22   testified at a criminal trial where he'll come in and say he

23   committed perjury at the criminal trial at the request of

24   Detective Callahan.  Would that give you any pause to

25   believe his testimony here?

1           THE JUROR:  It might slightly if he lied once.

2           MS. SCAPICCHIO:  Okay.  Can you elaborate, can you

3    tell me would you listen to the testimony or would you

4    think --

5           THE JUROR:  Yeah, I would, I would listen to it.

6           MS. SCAPICCHIO:  Would you prejudge that, in other

7    words, would you hold it against him if he got on the stand

8    and told you that at the request of Detective Callahan he

9    lied at the criminal trial of Shawn Drumgold?  Would that

10   make you disbelieve what he's saying now?

11          THE JUROR:  I can't really say for sure, but I

12   mean that would be in the back of my mind that he lied once

13   before.

14          MS. SCAPICCHIO:  Okay.  How would that affect your

15   ability to be fair and impartial do you think?

16          THE JUROR:  I would have to hear from other

17   witnesses as well to really, you know, make a decision.  I

18   mean, I wouldn't rely on him alone since you're saying he

19   lied once before.

20          MS. SCAPICCHIO:  Okay.

21          THE JUROR:  Do you know what I'm saying?

22          MS. SCAPICCHIO:  If you found after listening to

23   all the evidence Detective Callahan violated Shawn

24   Drumgold's right to a fair trial by withholding the

25   exculpatory evidence, would you be able to award money

1    damages to Shawn Drumgold?

2        THE JUROR:  Well, if that, yeah, if it were

3    proven, you know, without a doubt.

4        MS. SCAPICCHIO:  Well, the standard, the Judge

5    will instruct you on what the standard is in a civil case.

6        THE JUROR:  Okay.

7        MS. SCAPICCHIO:  It's not really beyond a

8    reasonable doubt, it's not the standard you hear on TV and

9    the crimes, but that's not my job, that's the Judge's job.

10   If you listen to the evidence and you came to the conclusion

11   at the end of the evidence that Shawn Drumgold had proven

12   his case that what Detective Callahan did in withholding the

13   exculpatory evidence did have an affect on his trial, would

14   you be able to award Shawn money damages?

15       THE JUROR:  I believe so, yeah, yes.

16       MS. SCAPICCHIO:  Thank you.

17       MS. HARRIS:  Good morning.  I'm Mary Jo Harris.  I

18   represent Detective Callahan.  I think you mentioned outside

19   that you had a friend at work, your friend Jackie told you

20   about a bit about the case?

21       THE JUROR:  Yes.

22       MS. HARRIS:  What did she tell you?

23       THE JUROR:  It wasn't anything specific, just that

24   the young girl had been killed on her stoop.

25       MS. HARRIS:  Did you have any discussion about the

1  investigation?

2          THE JUROR:  No.

3          MS. HARRIS:  Or the impact?

4          THE JUROR:  It didn't go that far.

5          MS. HARRIS:  Did Jackie live in the neighborhood

6  when the murder occurred?

7          THE JUROR:  Yes.

8          MS. HARRIS:  So when you spoke about it, you were

9  talking about the murder, not about the prosecution or

10  anything that happened thereafter?

11          THE JUROR:  Right, only because there had been

12  other incidents in that area.

13          MS. HARRIS:  Okay.  And in this case, you know,

14  like in every case, you know, there's two sides to every

15  story, and you've indicated that if you were chosen to sit

16  on this jury that you would be able to listen to the

17  evidence that's presented by all of the witnesses?

18          THE JUROR:  I feel I could.

19          MS. HARRIS:  You feel you could preserve judgment?

20          THE JUROR:  Yes, and, again, the Judge does

21  instruct on, but the ground rules are you're supposed to

22  reserve judgment until you've heard the whole story, both

23  sides, and collectively with the other jurors come to some

24  conclusions.  You think you'd be able to do that?

25          THE JUROR:  Yes.

1          MS. HARRIS:  I think in the questionnaire you have

2     indicated you have some friends who are in the police

3     department, the Mass. State Police?

4          THE JUROR:  Right.

5          MS. HARRIS:  What kind of relationships are those?

6          THE JUROR:  We're just friends, I've just known

7     them for a long time, you know, we live in the same town

8     and --

9          MS. HARRIS:  Have you had any discussions with

10    them that would make you question --

11          THE JUROR:  No.

12          MS. HARRIS:  -- or have doubts?  Let me just

13    finish.  This lady is trying to take down every word.  Have

14    you had any conversations with her that would cause you to

15    question the ethics or the propriety of police action?

16          THE JUROR:  No.  We don't discuss like legal, you

17    know.

18          MS. HARRIS:  Work stuff?

19          THE JUROR:  Exactly.  It's more personal, you

20    know, getting to...

21          MS. HARRIS:  Thanks.

22          THE COURT:  Mr. Roache.

23          MR. ROACHE:  Very quickly.  Did your friend Jackie

24    speak to you at all about the arrests that occurred in the

25    killing of Tiffany Moore?

1          THE JUROR:  No.

2          MS. HARRIS:  Did she discuss anything in the

3    neighborhood as to whether there was any rumors in the

4    neighborhood about who may have committed the murder of

5    Tiffany Moore?

6          THE JUROR:  No, we just discussed it one time at

7    the time it happened.

8          MR. ROACHE:  Did she ever discuss with you that

9    the persons that were arrested were not the ones that really

10   committed the murder of Tiffany Moore?

11         THE JUROR:  I don't recall ever saying, no.

12         MR. ROACHE:  Do you have any information one way

13   or the other as to any allegations about the way in which

14   the investigation took place?

15         THE JUROR:  No.

16         MR. ROACHE:  Okay.  That's all I have, thank

17   you.

18         THE COURT:  Okay.  I'm going to give you a number

19   to call tomorrow at 6:00.  It's a 1-800 number.  You need

20   your juror number, which was on the card, then you'll know

21   whether you're on the final jury.  Thank you very much.

22         MS. SCAPICCHIO:  Thank you.

23         MS. HARRIS:  Could I ask one thing before the next

24   juror comes in?

25         THE COURT:  Yes.

1           MS. HARRIS:  I recognize that we've competing

2     motions about the duty to tell the prosecutor on the case.

3           THE COURT:  Yes.

4           MS. HARRIS:  I would, I guess, raise an objection

5     to phrasing questions that imply to the jurors that that is

6     the duty.

7           THE COURT:  I think that's fair.

8           THE CLERK:  Juror 5.

9           THE COURT:  Mr. McLaughlin that we had before.

10           THE JUROR:  Yes.

11           THE COURT:  The question begins.

12           MS. HARRIS:  Good morning, Mr. McLaughlin, I'm

13     Mary Jo Harris.  I represent Timothy Callahan along with my

14     colleague here, Hugh Curran.  I understand that you have

15     friends who are affiliated with the BPD?

16           THE JUROR:  Yes.

17           MS. SCAPICCHIO:  Would that cause you to have a

18     pro or con feeling about any of the witnesses who may be

19     testifying in this case?

20           THE JUROR:  No, I don't think it affects me at

21     all.

22           MS. HARRIS:  Basically the subject matter of this

23     case is a wrongful conviction, and as the defendants, we're

24     going to be following the evidence that is presented by the

25     plaintiff.  Would you be able to listen to all of the

1    evidence and reserve your judgment one way or the other

2    until you've heard the entire story from both sides?

3         THE JUROR:  Yes.

4         MS. HARRIS:  There are some allegations that

5    witnesses testified one way at the criminal trial and now

6    this witness is going to be claiming that he testified

7    falsely in 1989 at the behest of the police witnesses, so

8    he'll essentially be recanting.  Would you be able to listen

9    to that kind of testimony and keep an open mind to both his

10   explanations for his behavior 20 years ago and his

11   explanation for his behavior now?

12        THE JUROR:  Yes.

13        MR. ROACHE:  I don't have any questions.

14        MS. SCAPICCHIO:  Hi, I'm Rose Scapicchio.  I

15   represent Shawn Drumgold in this matter.  I noticed that you

16   were a hockey coach.  Would the six weeks here interfere

17   with the obligations as the hockey coach?

18        THE JUROR:  I thought it would because we have

19   some afternoon practices, but you think it ends at 1:00, so

20   it wouldn't be a significant conflict.

21        MS. SCAPICCHIO:  Okay.  Now, in this case Shawn

22   Drumgold alleges that Detective Callahan, who's the

23   defendant in this case, withheld some evidence from the

24   prosecutors in this case, and that evidence he says resulted

25   in an unfair trial to him.  If you listened to all of that

1    evidence and in the end had to make a judgment call as to

2    who you would believe between a police officer and a

3    civilian witness in that you have friends who are in the

4    State Police and the Boston Police and the probation

5    department, would you give an edge to a witness who was a

6    police officer and believe that he has more of a duty to

7    tell the truth than a civilian witness?

8              THE JUROR:  No.

9              MS. SCAPICCHIO:  Why?

10             THE JUROR:  Because I think there's two sides to

11   every story, so I would look at the facts and make a

12   judgement on that and not be bias because I have friends

13   that are in that profession.

14             MS. SCAPICCHIO:  Now, if you had listened to all

15   the evidence and you concluded at the end of the trial that

16   Shawn Drumgold met his burden and determined that resulted

17   in an unfair trial to him, would you be able to award money

18   damages to Shawn Drumgold?

19             THE JUROR:  If it was appropriate.  I don't know

20   what the guidelines are, but if that's part of the

21   process.

22             MS. SCAPICCHIO:  Some people think that although

23   the police make mistakes and people are wrongfully

24   convicted, that's pretty much the price we pay to have a

25   police force.  Do you have any feelings one way or other

1    about that statement?

2            THE JUROR:  Say it again.

3            MS. SCAPICCHIO:  Sure.  Some people think that

4    police do the best job they do out there and people still

5    get wrongfully convicted, but that's the price we pay to

6    have a police force.  Do you have any feelings about that

7    statement?  Do you agree with it?  Do you disagree with it?

8            THE JUROR:  I would say I tend to agree with it.

9            MS. SCAPICCHIO:  Why?

10           THE JUROR:  Because I think in that profession

11   people are doing the best job they can and they're not

12   perfect and mistakes can happen.

13           MS. SCAPICCHIO:  Okay.  So when you say mistakes

14   can happen, are you more willing to overlook mistakes the

15   police make because police are hired to protect us?

16           THE JUROR:  No.

17           MS. SCAPICCHIO:  Can you explain?

18           THE JUROR:  Just as being human beings can

19   happen.

20           MS. SCAPICCHIO:  You think that's the price we pay

21   for police service we get?

22           THE JUROR:  I don't think it's a price we pay, I

23   think it's an outcome of people not being perfect and things

24   happening.

25           MS. SCAPICCHIO:  And given that you feel that way,

1    would you find it difficult at all if you believed at the

2    end of this case that Detective Callahan did withhold

3    evidence from a prosecutor awarding Shawn Drumgold money

4    damages?

5              THE JUROR:  No, I wouldn't find it difficult.

6              MS. SCAPICCHIO:  Okay.  Thank you very much.

7              THE COURT:  Okay.  Mr. McLaughlin, I'm going to

8    give you a telephone number to call after 6:00 on

9    Wednesday.

10             THE JUROR:  Okay.

11             THE COURT:  You need your juror number, which was

12   on the card, and at that point you'll find out if you're on

13   the final jury in this case.  Thank you so much.  Juror

14   No. 6.  Hi, Ms. Robinson.  I don't remember who goes.

15             MS. SCAPICCHIO:  I'll go.  Hi, I'm Rose

16   Scapicchio.  I represent Shawn Drumgold in these matters.

17   You're going to hear evidence in this case from a police

18   detective, Detective Callahan, as well as forensic evidence,

19   some civilian witnesses, and the allegations are that

20   Shawn Drumgold claims that Detective Callahan failed to turn

21   over some exculpatory evidence to the prosecutors in this

22   case, and as a result of that he was wrongfully convicted.

23             If you heard that evidence and you had to decide

24   whether a police officer was telling the truth or a civilian

25   witness was telling the truth, would you give any more

1    weight to a police officer merely because of his or her

2    position as a police officer?

3              THE JUROR:  No, not necessarily.

4              MS. SCAPICCHIO:  Okay.  And some people think that

5    even though police make mistakes and people are wrongfully

6    convicted, that's the price we pay for having a police

7    force.  Do you agree with that statement?

8              THE JUROR:  No.

9              MS. SCAPICCHIO:  Okay.  Can you elaborate?

10             THE JUROR:  Can you actually repeat it?

11             MS. SCAPICCHIO:  Sure.  Some people think even

12   though people make mistakes and people may be wrongfully

13   convicted, that's the price we pay.

14             THE JUROR:  No.  I believe that everyone, you

15   know, I agree that, you know, police are human and they'll

16   make mistakes, but I still feel like they should be

17   corrected.

18             MS. SCAPICCHIO:  Okay.  In this case if you were

19   to listen to all of the evidence and at the end of the trial

20   conclude that Shawn Drumgold had met his burden of proving

21   that Detective Callahan withheld evidence from the

22   prosecutors and it did affect his right to a fair trial,

23   would you be able to award Shawn Drumgold money damages?

24             THE JUROR:  Yeah, I guess so, yeah, sure.

25             MS. SCAPICCHIO:  Okay.  I'm done, your Honor,

1    thank you, thank you very much.

2          MS. HARRIS:  Thanks.  My name Mary Jo Harris, and

3    I represent Mr. Callahan.  Did you have an area of specialty

4    or focus?

5          THE JUROR:  End of life, palliative care.

6          MS. HARRIS:  The issues that are in this case

7    obviously arise out of a wrongful conviction.  You just

8    mentioned that you would understand that mistakes could

9    happen.  Would you have any difficulty if you heard the

10   evidence in this case and if you disagreed with the finding

11   of the original jury that convicted Mr. Drumgold but

12   nevertheless felt there was nothing about that trial that

13   could be attributed to any misconduct or any intentional

14   misbehavior on the part of police, would you have a

15   difficult time finding in favor of Detective Callahan if you

16   thought something went wrong?

17         THE JUROR:  No, not necessarily.  It would depend

18   on the evidence, I suppose.

19         MS. HARRIS:  I think you had also said that you

20   served as a juror on a prior occasion?

21         THE JUROR:  Yes.

22         MS. HARRIS:  Just generally what kind of case was

23   that?

24         THE JUROR:  It was a murder trial.

25         MS. HARRIS:  It was?

1          THE JUROR:  Yeah.

2          MS. HARRIS:  Where did you serve?

3          THE JUROR:  Barnstable District Court on the

4     Cape.

5          MS. HARRIS:  Did anything about that experience

6     color the way you understand the criminal justice system?

7          THE JUROR:  Yes, very much so actually.

8          MS. HARRIS:  Could you tell us about that?

9          THE JUROR:  It's just the way -- I don't know.

10    It's hard to explain.  I guess the jurors I felt like

11    weren't very qualified to make a decision, and the way the

12    decision was made was very, very quickly, and I actually was

13    the only one that wanted to discuss it, and I didn't -- it

14    made me uncomfortable, and I was young, I was only 18 at the

15    time.

16          THE COURT:  Would you have --

17          THE JUROR:  So I felt not very qualified to be

18    deciding this person's life.  That was what I was kind of

19    left with.

20          MS. HARRIS:  Have you had any other experiences,

21    you know, talking about or learning about the criminal

22    justice system since that time?

23          THE JUROR:  Not really, no.

24          MS. HARRIS:  And, you know, forgive me if this is

25    redundant or repetitive.  Having had that experience as a

1    juror in a criminal case, part of what will be the evidence

2    in this case is going to be evidence about the 1989 criminal

3    trial, and would you be able to sort of accept, how can I

4    say, you know, understanding that there's one piece of that

5    trial that's at issue here, would you be able to listen to

6    all of that I guess with an open mind is what I'm trying to

7    ask you?

8            THE JUROR:  Yes, definitely.

9            MS. HARRIS:  John.

10           MR. ROACHE:  Hi, I represent former police

11   Commissioner Francis Roache and the City of Boston.  The

12   fact that the City of Boston may be a defendant in this

13   case, would that affect your ability to find for either or

14   against the city?

15           THE JUROR:  No, I don't think so.

16           MR. ROACHE:  Would it affect your ability to award

17   damages either for or against Mr. Drumgold?

18           THE JUROR:  No, it shouldn't.

19           MR. ROACHE:  It shouldn't?

20           THE JUROR:  No.

21           MR. ROACHE:  The fact that if the city is found

22   liable that the city would have to pay, may have to pay

23   money damages, would that have any impact on you at all?

24           THE JUROR:  No.

25           MR. ROACHE:  That's all I have.

1          MR. CURRAN:  Judge, just a few questions, I don't

2     mean to interrupt.

3          THE COURT:  You do mean to interrupt, but that's

4     all okay.  Do you recall who the prosecutor was on the case

5     you handled?

6          THE JUROR:  I believe, I'm going to say for sure,

7     but I believe his last name was Robinson because I remember

8     that because that's the same last name.

9          MR. CURRAN:  Do you recall the prosecutor?

10          THE JUROR:  No.

11          MR. CURRAN:  The fact that there's going to be

12     former prosecutors, current prosecutors and criminal defense

13     lawyers that handle murder cases called as witnesses in this

14     case, is your experience as a juror in how they conducted

15     themselves in that case going to shape any decisions that

16     you make in evaluating their credibility?

17          THE JUROR:  No, no, it shouldn't.

18          MR. CURRAN:  Okay.  Thank you very much.

19          THE COURT:  Anything further?

20          MS. SCAPICCHIO:  No, your Honor.

21          THE COURT:  Ms. Robinson, I'm going to give you a

22     number to call after 6:00 on Wednesday.  You're not on the

23     final jury yet, you'll know whether you're on the final

24     jury.  You'll need to have your juror number at the time.

25     If you are, we'll start on Thursday.

1           THE JUROR:  My juror number was on my summons?

2           THE COURT:  That's right.  Thank you.

3     Mr. DeSouza.  Hi, Mr. DeSouza, we'll start with

4     Ms. Scapicchio.

5           MS. SCAPICCHIO:  Sure.  Hi, Mr. DeSouza, my name

6     is Rose Scapicchio.  I represent Shawn Drumgold in this

7     case.  He's the plaintiff.  In this case you're going to

8     hear evidence from police officers and evidence from

9     civilian witnesses, and the allegation is that Shawn

10    Drumgold says that Detective Callahan withheld some

11    exculpatory evidence from the prosecutors prosecuting his

12    criminal matter, and as a result of that he did not get a

13    fair trial.  In evaluating the testimony in this case of

14    police officers and of civilian witnesses, would you give

15    any more weight to a police officer's testimony because you

16    think he has more of a duty to tell the truth?

17          THE JUROR:  I'd be factored, both.

18          MS. SCAPICCHIO:  So you wouldn't hold one a little

19    bit higher than the other because he was a police officer?

20          THE JUROR:  No.

21          MS. SCAPICCHIO:  In this case, the allegations are

22    that Shawn Drumgold -- well, Detective Callahan withheld

23    some evidence that resulted in Shawn Drumgold's wrongful

24    conviction.  If at the end of the trial, you came to the

25    conclusion that Shawn Drumgold had proven his case, would

1    you be able to award him money damages?

2         THE JUROR:  No.

3         MS. SCAPICCHIO:  Okay.  Why not?

4         THE JUROR:  If the defendant would prove the case

5    and if the evidence shows the damages would be reported.

6         MS. SCAPICCHIO:  So you would be able to award

7    money damages?

8         THE JUROR:  Yes.

9         MS. SCAPICCHIO:  I may have misunderstood you.

10        THE JUROR:  Yes.

11        MS. SCAPICCHIO:  Now, some people think that

12   police officers make mistakes and wrongful convictions

13   happen, but that's the price we pay for a police force.  Do

14   you agree with that statement?

15        THE JUROR:  Yes, sometimes the police officers do

16   make mistakes, and yes --

17        MS. SCAPICCHIO:  When you say yes, do you think

18   that under those circumstances police officers should not be

19   held responsible because they're just doing their job?

20        THE JUROR:  No, they should be held responsible.

21        MS. SCAPICCHIO:  They should be.  Thank you.

22        MS. HARRIS:  Good morning, sir.  My name is

23   Mary Jo Harris, and along with Mr. Curran we represent

24   Detective Callahan.  It appears you're a single father of a

25   12 year-old daughter?

1          THE JUROR:  Sixteen.

2          MS. HARRIS:  This case involves allegations coming

3     out of the murder of a young girl.  Would the fact of that

4     murder and the fact you've got a young daughter of your own,

5     would that cause you any difficulty to hearing the evidence

6     in this case to you?

7          THE JUROR:  No.

8          MS. HARRIS:  I believe you indicated you had

9     served on a jury once before?

10          THE JUROR:  Yes.

11          MS. HARRIS:  Can you tell us what kind of case it

12     was?

13          THE JUROR:  Well, it's about two young kids.  At

14     the time they were 16, and at the time of the trial they

15     were 18, and it came after two years and the Judge said the

16     state didn't have the proper evidence to show, they should

17     have never come to the trial, so after listening to the

18     state, he threw out the case after like about two hours.

19          MS. HARRIS:  Okay.

20          THE JUROR:  It was lack of evidence.

21          MS. HARRIS:  Was it a criminal case then?

22          THE JUROR:  Yeah, he was charged with assault and

23     battery and robbing the other kid.

24          MS. HARRIS:  I see.  Was there anything about that

25     experience that caused you to have feelings either pro or

1    con with regard to the criminal justice system?

2              THE JUROR:  No, I'll be fair to the justice.

3              MS. HARRIS:  Okay.  Anything else?

4              MR. ROACHE:  I don't have anything.

5              THE COURT:  Okay.  Mr. DeSouza, we're going to

6    give you a number to call tomorrow.  You're not on the final

7    jury, you'll know when you call this number and you give

8    them the jury summons, if your name is mentioned when you

9    call, you report Thursday, Thursday at 9:00.

10             MS. SCAPICCHIO:  Thank you very much.

11             MS. HARRIS:  I question, do you think he

12   understands English well enough?  He answered you twice

13   incorrectly.

14             THE COURT:  I think he did.  I think it was hard,

15   but I think he did, so I'd like him to keep him in the pool.

16             MS. SCAPICCHIO:  Okay.

17             THE COURT:  Collins is next.

18             MS. SCAPICCHIO:  She opposes these types of

19   lawsuits.

20             THE COURT:  Hi, Ms. Collins.

21             THE JUROR:  Hello.

22             THE COURT:  Let's see.  I think we start with

23   you.

24             MS. HARRIS:  Good morning -- afternoon.  I'm

25   Mary Jo Harris, and I along with these gentlemen represent

```
1    Detective Tim Callahan.  One of the questions that we

2    actually had for you in the jury questionnaire, one of the

3    questions is whether or not you oppose wrongful conviction

4    cases or lawsuits, and I'm wondering, you indicated that you

5    did oppose, and I'm just wondering if you could tell us a

6    little bit about your feelings.

7              THE JUROR:  What do you mean oppose?

8              MS. HARRIS:  Let me just --

9              THE JUROR:  Do I think it's right?

10             MS. HARRIS:  There's a question that says people

11   who are wrongfully convicted sometimes bring lawsuits

12   against the police department.  Do you favor or oppose this

13   type of lawsuit, and you checked oppose.  We're just

14   wondering what your thoughts are because this is that kind

15   of case obviously.

16             THE JUROR:  I think if somebody did wrong, then

17   they should have to pay for it, either monetarily or another

18   way.

19             MS. HARRIS:  Okay.  So do I understand you to mean

20   if somebody was convicted of a crime and the evidence comes

21   in that suggests that they --

22             THE JUROR:  Well, guilty of suppressing it?

23             MS. HARRIS:  Then you would be in favor?

24             THE JUROR:  They were wrong.

25             MS. HARRIS:  Am I right in understanding that you
```

1    would -- that you're answering the question saying if it was

2    shown that police officers did something wrong that you

3    would have no problem hearing that case and making that

4    decision if that was the evidence then?

5          THE JUROR:  Correct.

6          MS. HARRIS:  Now, conversely, if you are presented

7    evidence where somebody was convicted of a crime and you

8    didn't believe he should have been but there's not proof

9    that the detective, here the defendant did anything wrong,

10   would you have a hard time finding for the detective even if

11   you believe that the case below should have come out

12   differently?

13         THE JUROR:  No, because I would have based it on

14   the evidence that was presented to me.

15         MS. HARRIS:  Okay.  In this case, the plaintiff

16   goes first and the defense puts on their case following

17   that.  So before you could make a judgment, what we would

18   hope is that before you made a judgment that you would

19   listen to both sides?

20         THE JUROR:  Right.

21         MS. HARRIS:  Have you been on a jury before?

22         THE JUROR:  No, I went to school for paralegal.

23         MS. HARRIS:  You did.  Did you ever work for a law

24   firm or something like that?

25         THE JUROR:  No, I haven't.

```
1              MS. HARRIS:  Gentlemen, do you have anything else?

2              MR. ROACHE:  Good afternoon, Ms. Collins, my name

3    is John Roache, and I represent former Commissioner Roache,

4    no relation to me, and I also represent the City of Boston.

5    I notice on your questionnaire you live in the City of

6    Boston?

7              THE JUROR:  South end.

8              MR. ROACHE:  How long have you lived there?

9              THE JUROR:  Nine and a half years.

10             MR. ROACHE:  Have you ever had the bad experience

11   with the city or any employees of the City of Boston?

12             THE JUROR:  Maybe a bus driver or two.

13             MS. HARRIS:  That's not -- that's somebody else.

14             THE JUROR:  No.

15             MR. ROACHE:  Would that experience in any way

16   impact your decision as to whether or not the city is or not

17   liable in this particular case?

18             THE JUROR:  No, no.

19             MR. ROACHE:  Have you had any dealings with the

20   police department while you have lived in the City of

21   Boston?

22             THE JUROR:  Yes.

23             MR. ROACHE:  Okay.  Have those dealings been

24   positive or negative?

25             THE JUROR:  Positive.
```

1          MR. ROACHE:  Okay.  Have you ever dealt with

2    former Police Commissioner Francis Roache?

3          THE JUROR:  No.

4          MR. ROACHE:  Do you know anything about him?

5          THE JUROR:  No.

6          MR. ROACHE:  That's all I have, thank you.

7          MS. SCAPICCHIO:  Hi, I'm Rose Scapicchio.  I

8    represent Shawn Drumgold.  He's the plaintiff in this case.

9    If you were to listen to all of the evidence, I think I

10   heard you say already, so I don't want to spend too much

11   time, if at the end of the evidence, if you were to conclude

12   Shawn Drumgold had proven his case and proved that Detective

13   Callahan had withheld evidence from the prosecutors

14   prosecuting his case and that resulted in an unfair trial to

15   Shawn Drumgold, you could award him money damages for that?

16          THE JUROR:  Yes.

17          MS. SCAPICCHIO:  I have no further questions.

18   Thank you, your Honor.

19          THE COURT:  Okay.  Ms. Collins, we're going to ask

20   you to call this number, and you need your glasses it looks

21   like.  Call the number, you can have your jury number.  When

22   you call this number, you have to have your jury number.  If

23   you're part of the final jury, we'll see you Thursday

24   morning.  Juror number was on the summons you got.

25          Ms. Gibson.  You start.

1          MS. SCAPICCHIO:  Hi, Ms. Gibson, I'm Rose

2   Scapicchio.  I represent the plaintiff in this case,

3   Shawn Drumgold.  I had a couple of questions on your

4   questionnaire.  You noted on question 4 you had a doctor's

5   appointment on 9-17.  Is that an all day appointment that's

6   going to prevent you from sitting on that day?

7          THE JUROR:  No, it's not an all day appointment.

8   I know I can probably reschedule the appointment, but, you

9   know, whatever.

10          THE COURT:  You can reschedule in the afternoon,

11   that's all you need.

12          THE JUROR:  I think it's scheduled right now at

13   two, but that's nowhere I can get from here to there.  I

14   live a distance away.

15          THE COURT:  Okay.  Go on.

16          MS. SCAPICCHIO:  I also noticed in your

17   questionnaire question 27 when you were asked whether or not

18   people who have been wrongfully convicted sometimes bring

19   lawsuits against the police department.  Do you favor or

20   oppose these type of lawsuits, and your answer was not sure

21   how to answer this question?

22          THE JUROR:  Yes.

23          MS. SCAPICCHIO:  Obviously police do their best

24   but are not above the law.  What do you mean by that?

25          THE JUROR:  I mean, obviously you have seen and

1   heard sometimes things in the news that have happened that

2   have involved police that were wrong in doing what they were

3   doing and obviously have been convicted at a future date.

4           MS. SCAPICCHIO:  So you were talking about police

5   actually being charged with something?

6           THE JUROR:  Yes.

7           MS. SCAPICCHIO:  Okay.  All right.  Some people

8   think that police make mistakes and people might be

9   wrongfully convicted, but that's the price we pay for a

10  police force.

11          THE JUROR:  Exactly.

12          MS. SCAPICCHIO:  You agree with that?

13          THE JUROR:  Yes.

14          MS. SCAPICCHIO:  Can you tell me why you agree

15  with that?

16          THE JUROR:  Say that one more time.  I'm a little

17  anxious here, bear with me.

18          MS. SCAPICCHIO:  Deep breaths.  Some people

19  believe that police make mistakes and sometimes people are

20  wrongfully convicted, but that's the price we pay for a

21  police force.  Do you agree with that?

22          THE JUROR:  Well, no one is above error or what

23  not, but, I mean, a police force is just that, a police

24  force that is supposed to be enforcing the law.

25          MS. SCAPICCHIO:  So if you listen to the evidence

1   and at the end of the trial came to the conclusion that

2   Detective Callahan withheld some exculpatory evidence from

3   the prosecutors in this case and that that resulted in Shawn

4   Drumgold getting an unfair criminal trial, would you be able

5   to award money damages to Shawn Drumgold or do you think

6   it's just the price we pay?

7            THE JUROR:  I think I need to know more

8   information than what, in fact, what you call it, the

9   exculpatory evidence.

10           THE COURT:  Exculpatory evidence.

11           THE JUROR:  I'm not even sure I understand even

12  what that means even when it was presented in the courtroom

13  when we were sitting.

14           MS. SCAPICCHIO:  Okay.  If there was evidence at

15  trial that one of the important witnesses at trial had been

16  promised certain things, had been given money by

17  Detective Callahan, had been put up in a hotel room and

18  promised things about pending cases and that information was

19  not turned over to the prosecutors and Shawn Drumgold says

20  that resulted in his wrongful conviction, under those

21  circumstances, if you heard all that evidence, would you be

22  able in those circumstances to award money damages, or do

23  you think police make mistakes but we need to move on?

24           THE JUROR:  Well, that's wrong, so obviously then

25  I think we could award damages if they shouldn't have done

1    it, then obviously something needs to be done to correct

2    that.

3            MS. SCAPICCHIO:  Okay.  If you had to listen to

4    evidence of police officers vs. evidence of civilian

5    witnesses, would you give the police witnesses any more

6    weight because of their position as police officers and

7    their obligation to tell the truth?

8            THE JUROR:  I think everyone needs to tell the

9    truth so they should be equally balanced.

10            MS. SCAPICCHIO:  Great.  Thank you so much.

11            THE COURT:  Wait, you're not done yet.

12            MS. SCAPICCHIO:  Just me, sorry.

13            THE JUROR:  Just you.

14            MS. HARRIS:  I'm Mary Jo Harris, and along with

15    these gentlemen I represent Detective Callahan.  As I'm

16    listening to you, people who make normal human error and

17    intentional human misconduct, would that be a distinction in

18    your mind?

19            THE JUROR:  Say that again.

20            MS. HARRIS:  When you were asked by Ms. Scapicchio

21    whether you felt that mistakes happen and that's the price

22    we pay, do you distinguish in your mind between mistakes

23    happening and --

24            THE JUROR:  Somebody that did something

25    intentional.

1          MS. HARRIS:  Somebody did something intentionally

2     and seeing the distinction between those things?

3          THE JUROR:  Yes.

4          MS. HARRIS:  So you could understand how a mistake

5     could happen, but you would hold somebody accountable for

6     doing something -- that was done intentionally?

7          THE JUROR:  Something that was done intentionally,

8     yes.

9          MS. HARRIS:  You indicated on your questionairre

10    that would like not to serve as a juror?

11         THE JUROR:  Yes, it just makes me nervous,

12    anxious, the whole thing, and then when you throw in, sorry,

13    folks, but, you know, the police, just that whole idea that

14    you're dealing with the police, and, you know, they might be

15    wrongdoing in doing something, it just makes me even more

16    anxious.  I'm anxious anyway, but that made me even more

17    anxious.

18         MS. HARRIS:  And it makes you anxious that the

19    police are parties to the case or that it's about a criminal

20    case?

21         THE JUROR:  Well, a criminal, both, both.

22         MS. HARRIS:  All of these things cause you stress?

23         THE JUROR:  Yes, a little, yeah.  I mean, I know

24    you're here in court, it's a case, and it's not just going

25    to be fa-la-la-la.

1          MS. HARRIS:  Do you think that the level of

2  anxiousness that you feel about this would interfere with

3  your ability to serve as a juror?

4          THE JUROR:  Honestly, I don't know.  I've never

5  served.

6          MS. HARRIS:  Do you have friends who are law

7  enforcement or in policing?  I think you mentioned you knew

8  somebody in the CIA?

9          THE JUROR:  A close friend that we have, his son.

10  I was thinking afterwards, I didn't write it down, but I

11  have a neighbor who I believe is still working for the State

12  Police.

13          MS. HARRIS:  And is there anything that you've

14  learned in the course of those relationships that causes you

15  to be fearful of the police?

16          THE JUROR:  No, they happen to be high pressure.

17  I can't say I'm fearful, no.

18          MS. HARRIS:  Gentlemen?

19          MR. ROACHE:  I don't have anything, thank you.

20          THE COURT:  We will calm you down.  We will calm

21  you down.  I'm going to give you a number to call tomorrow.

22  You may not be on the final jury, so don't get anxious until

23  you get the call.  When you call this number, you need your

24  juror number.

25          THE JUROR:  The one I originally had because on

1    the receipt, on the form --

2            THE COURT:  No, the original, whatever the number

3    is, and if you're a member of the final jury, we'll see you

4    on Thursday.

5            THE JUROR:  Thursday?

6            THE COURT:  Thursday, and I assure you it will be

7    the best experience you have ever had.

8            THE JUROR:  We shall see what happens.  If I am

9    not selected, do I have to continue to call on Friday to see

10   if I would be because it says for three weeks?  I wasn't

11   quite sure.

12           THE CLERK:  Ask Jim when you go downstairs.

13           THE COURT:  I know everything except that.  Thank

14   you.

15           MS. HARRIS:  Thank you very much.

16           MR. ROACHE:  Your Honor, may I ask a question?

17           THE COURT:  Sure.

18           MR. ROACHE:  I know the last time we were in

19   court, you said you had a one o'clock meeting with the

20   Judges?

21           THE COURT:  1:30.  I'm going to push it to 1:30.

22           MR. ROACHE:  I wanted to make sure you weren't

23   late.

24           THE CLERK:  Juror No. 12.

25           THE COURT:  Ms. O'Leary.

1          MS. HARRIS:  Hi, good afternoon.  I'm Mary Jo

2     Harris.  Along with my colleagues, we represent

3     Detective Callahan in this case.  I noticed going through

4     your questionnaire that you have a boyfriend who works for

5     the sheriff's department; do I have that right?

6          THE JUROR:  Yes.

7          MS. HARRIS:  What does he do with the sheriff's

8     department?

9          THE JUROR:  He's a teacher, so during the summer

10     he works there as a youth counselor.  They bring in youths

11     from around the state and teach them about public safety.

12          MS. HARRIS:  Is he interested in public safety as

13     a career?

14          THE JUROR:  No.

15          MS. HARRIS:  Just as part of his teaching, more

16     connected to teaching than it is to law enforcement sort of

17     thing?

18          THE JUROR:  Right.

19          MS. HARRIS:  This is a case about a claim of a

20     wrongful conviction.  Is there anything about the nature of

21     this case that could cause you to question whether you would

22     be fair and impartial as a juror here?

23          THE JUROR:  Not that I can think of.

24          MS. HARRIS:  Do you have any -- have you had any

25     prior experiences with law enforcement, positive or

1   negative?

2          THE JUROR:  Aside from the occasional ticket, no.

3          MS. HARRIS:  What's Caverns'?

4          THE JUROR:  It's a finance planning magazine.

5          MS. HARRIS:  No wonder I don't know anything about

6   it.  Any questions, gentlemen?

7          MR. ROACHE:  I do.  Ms. O'Leary, I notice in your

8   questionnaire you lived on Beacon Street in Boston for about

9   a year?

10          THE JUROR:  Yes.

11          MR. ROACHE:  How long have you lived --

12          THE JUROR:  Prior to that I was in Cambridge for

13   two years, and prior to that I was in the North End for

14   two.

15          MR. ROACHE:  During the period of time you've

16   lived around the City of Boston, have you had positive or

17   negative experiences with the city or any of its employees?

18          THE JUROR:  Just my landlord.

19          THE COURT:  Any employees of the city itself?

20          THE JUROR:  No, I don't think so.

21          MR. ROACHE:  That's all I have.

22          THE COURT:  Ms. Scapicchio.

23          MS. SCAPICCHIO:  Hi, my name is Rose Scapicchio.

24   I represent the Defendant Shawn Drumgold together with

25   Mike Reilly.  You're going to be asked in this case to

1    evaluate the testimony of a police officer vs. that of a

2    civilian witness, and the allegations in this case are that

3    Shawn Drumgold claims that Detective Callahan withheld some

4    important information about a witness at his criminal trial

5    and as a result of that he had an unfair trial.  When you

6    evaluate the testimony of a police officer and a civilian

7    witness, would you give the police officer's testimony any

8    more weight just because he was a police officer?

9            THE JUROR:  Probably not.

10           MS. SCAPICCHIO:  Okay.  And in this case if you at

11   the end of the trial came to the conclusion that

12   Shawn Drumgold had proven his case that in fact

13   Detective Callahan had withheld important evidence from the

14   criminal prosecutors, would you be able to award money

15   damages to Shawn Drumgold?

16           THE JUROR:  If it was rightful, I don't see why

17   not.

18           MS. SCAPICCHIO:  Thank you.

19           THE COURT:  Okay.  Ms. O'Leary, we're going to ask

20   you to call this number tomorrow.  You're not on the final

21   jury yet.  Call this number after six.  It's a 1-800 number,

22   and you have your jury number, punch it in, and if you're on

23   the final jury, we'll see you Thursday morning.  Thank you

24   very much.

25           Mark Troia is next.  Hi.

1          THE JUROR:  Hello.

2          THE COURT:  Mr. Troia, start with

3    Ms. Scapicchio.

4          MS. SCAPICCHIO:  Thank you, my name is

5    Rose Scapicchio.  I represent Shawn Drumgold together with

6    Mike Reilly.

7          THE JUROR:  Right.

8          MS. SCAPICCHIO:  In answer to your questionnaire

9    at question 27 when you were asked people who have been

10   wrongfully convicted sometimes bring lawsuits against the

11   police department, do you favor or oppose these types of

12   lawsuits, and you wrote, "Depends."  Depends on what?

13         THE JUROR:  It depends on the situation and the

14   facts of the case.

15         MS. SCAPICCHIO:  Okay.  So you'd evaluate the

16   evidence as it comes in and make a determination after you

17   heard all the evidence?

18         THE JUROR:  Yes.

19         MS. SCAPICCHIO:  But you're not in general just

20   opposed to plaintiff bringing a suit against a police

21   officer?

22         THE JUROR:  No, not at all.

23         MS. SCAPICCHIO:  Not at all, okay.  Now, in this

24   case Shawn Drumgold alleges that Detective Callahan withheld

25   some important information about an important witness at his

1    criminal trial and as a result of that he says he did not

2    get a fair trial.  You're going to be asked to evaluate the

3    evidence of police officer witnesses vs. civilian witnesses.

4    Would you give police officers any more weight because

5    they're required to tell the truth or hold them higher, to a

6    higher standard because they're required to tell the truth?

7              THE JUROR:  No, not necessarily.

8              MS. SCAPICCHIO:  You'd listen to the evidence and

9    decide when you heard the evidence which way?

10             THE JUROR:  Yes, exactly.

11             MS. SCAPICCHIO:  And in this case if at the end of

12   the trial you came to the conclusion that Shawn Drumgold had

13   proven his case and had proven that Detective Callahan

14   withheld some important evidence from an important witness

15   and it resulted in Shawn having an unfair criminal trial,

16   would you be able to award money damages to Shawn Drumgold?

17             THE JUROR:  Of course.

18             MS. SCAPICCHIO:  I don't have any further

19   questions.

20             THE COURT:  Attorney Harris.

21             MS. HARRIS:  Hi, I'm Mary Joe Harris, and I

22   represent Detective Callahan here.  I saw from your

23   questionnaire that in 2004 that you were mugged?

24             THE JUROR:  Yes.

25             MS. HARRIS:  Which is unfortunate.  Was that in

1    the City of Boston?

2              THE JUROR:  No, it was in Cambridge.

3              MS. HARRIS:  Did you have an encounter with the

4    Cambridge Police Department as a result of that?

5              THE JUROR:  Yes, it was very positive.  They

6    responded in less than two minutes.  It was very good.

7              MS. HARRIS:  Was the person who assaulted you, was

8    that person apprehended?

9              THE JUROR:  No, they never were caught.

10             MS. HARRIS:  And I also noticed that you have

11   family who work for the U.S. Attorney's Office in Virginia;

12   is that right?

13             THE JUROR:  It's the Attorney General's office.

14             MS. HARRIS:  Oh, okay.  In what capacity?

15             THE JUROR:  My brother-in-law was an Assistant

16   Attorney General, so was my sister.

17             MS. HARRIS:  Did you ever share experiences with

18   them, you know, talk with them?

19             THE JUROR:  I lived with them for ten years.  I

20   know their friends, they're all lawyers.  I was bombarded

21   with stuff.

22             MS. HARRIS:  Poor you.

23             THE JUROR:  It was interesting.

24             MS. HARRIS:  Was there anything about the stories

25   you told them or any of their experiences that they shared

1    with you that caused you to have either favorable or

2    unfavorable perceptions?

3            THE JUROR:  No.  The one thing that came out

4    consistently, you can never anticipate what was going to

5    come up in each different story, there's some weird twist or

6    unusual circumstance, people are people are people, they

7    have their faults.

8            MS. HARRIS:  So there was no sort of thing that

9    you took away from it that the police were all rogues or

10    they'll all angels?

11            THE JUROR:  No, none of that.

12            MS. HARRIS:  And forgive me, I don't mean to be

13    invasive, but you have indicated that you have to take

14    medication every four hours, and that was something we

15    should be aware of?

16            THE JUROR:  Yes, indeed.

17            MS. HARRIS:  Would that be a problem if you were

18    knowing that we sit from 9 to 1 and we have breaks during

19    the course of the day?

20            THE JUROR:  My main concern is the length of the

21    case.  I volunteered for a Parkinson's study at Brigham and

22    Women's, and they kind of wanted me to start some time in

23    September, but...

24            MS. HARRIS:  Could you participate in that study

25    in the afternoons do you know because we're sitting only

1  9 to 1 and not on Fridays?

2          THE JUROR:  Actually I could.  The schedule is

3  very flexible.

4          THE COURT:  Great, okay.

5          MS. HARRIS:  Terrific.

6          THE COURT:  That would be great.  We'll take

7  whatever breaks you need.  We've had all different kinds of

8  people on juries, I've had a pregnant woman on a jury that

9  every time she needed a break, she'd go like this, and we'd

10  break, so whatever you need, we can accommodate.

11          THE JUROR:  Right now my meds are wearing off.

12  This is as bad as they get, so I'm pretty good, so if I'm

13  twisting or wiggling, it's no big deal.

14          MS. HARRIS:  Mr. Roache.

15          MR. ROACHE:  Good afternoon, Mr. Troia.  I

16  represent as a client the City of Boston, and I notice that

17  you live in Jamaica Plain and you have for the past six

18  months?

19          THE JUROR:  I lived there literally about three

20  weeks ago.  I lived in Cambridge for 14 years, and I sold my

21  house, and I'm living with a friend temporarily.

22          MR. ROACHE:  During the time you lived in

23  Cambridge or in Boston, have you had any positive or

24  negative responses with anyone employed by the City of

25  Boston?

1          THE JUROR:  I imagine so, but I can't remember any

2     off the top of my head.

3          MR. ROACHE:  Do you know what type of negative

4     experience you may have had?

5          THE JUROR:  Actually I'd say postal worker, but

6     they didn't work for the City of Boston.

7          THE COURT:  Those are the Feds, thank you very

8     much.

9          MR. ROACHE:  We'll blame the Feds on that one.

10    The fact that the City of Boston is a potential defendant in

11    this case, would that affect your ability to or would you if

12    you decided that there was a wrongful conviction, would you

13    consider the fact that the city a potential defendant award

14    more money or less money to Mr. Drumgold?

15         THE JUROR:  No, that wouldn't persuade me one way

16    or the other.

17         MR. ROACHE:  It doesn't one way or the other?

18         THE JUROR:  No.

19         THE COURT:  Mr. Troia, we ask you to call this

20    number after 6:00 tomorrow.  You're not necessarily on the

21    final jury, but if you call that number with your jury

22    number, you'll know whether you're on the final jury, and if

23    you are, we'll see you Thursday morning.  Thank you.

24         THE CLERK:  Juror No. 17.

25         THE COURT:  Hello, Ms. Foley.

1          MS. HARRIS:  Good afternoon, I'm Mary Jo Harris,

2    and along with my colleagues here, I represent

3    Detective Callahan.  I understand that you are at Phillips

4    Andover, is that right?

5          THE JUROR:  Yes.

6          MS. HARRIS:  Have you lived in the city or are you

7    from the area?

8          THE JUROR:  I'm from Los Angeles.

9          MS. HARRIS:  When did you move to Massachusetts?

10          THE JUROR:  About three years ago.

11          MS. HARRIS:  Can you tell me the case that we have

12    here that we're representing is a case involving a claim of

13    a wrongful conviction, and my client denies that he

14    committed any kind of misconduct that would have impacted

15    the underlying criminal case.  Is there anything about this

16    type of case that causes you to have any concern or that

17    makes you question whether you would be able to sit as an

18    impartial juror?

19          THE JUROR:  No, not based on what you just told

20    me.

21          MS. HARRIS:  Since the time that you've been in

22    Massachusetts, have you had any experiences with law

23    enforcement, positive or negative?

24          THE JUROR:  No.

25          MS. HARRIS:  Okay.  At Phillips Andover, you're

1    dealing with kids, I assume.  Is there anything, and I

2    should tell you briefly the underlying case here stems from

3    the killing of a young girl, and many of the witnesses who

4    testified in the 1989 trial were children themselves.

5              THE JUROR:  Okay.

6              MS. HARRIS:  Is there anything about your

7    experience working with children that would cause you to

8    question their ability to testify as witnesses?

9              THE JUROR:  No.

10             MS. HARRIS:  I realize that's a very general

11   question.

12             THE JUROR:  I work with high school students, so I

13   don't know the age of these students or these children.  I

14   can't think of anything.

15             MS. HARRIS:  You didn't indicate that you have any

16   experience or affiliation, friendship, family, with any law

17   enforcement members?  A world outside of your world, I

18   assume?

19             THE JUROR:  I'm distant but nothing immediate.

20             MS. HARRIS:  Okay.

21             MR. CURRAN:  Did you live in Los Angeles for a

22   period of time?

23             THE JUROR:  I lived, was born in Los Angeles

24   County, so it's outside of the city.

25             MR. CURRAN:  I see you went to Stanford

1    undergrad.?

2          THE JUROR:  Yes.

3          MR. CURRAN:  Then stayed in California, then went

4    to Michigan.  What did you get a graduate degree?

5          THE JUROR:  Educational technology, and it's

6    interdepartmental, interdisciplinary is what I was trying to

7    say, so it's counseling and psychology and technology.

8          MR. CURRAN:  Right.  While you were living in

9    California, there has been some high profile criminal cases

10   but also some notoriety relative to the Los Angeles Police

11   Department, some of it favorable, some of it not so

12   favorable.  Were you aware of any of that going on in

13   California in Los Angeles?

14         THE JUROR:  There have been lots of cases, some

15   wrongful suits, some, yeah, I've seen a lot of things on

16   TV.

17         MR. CURRAN:  Right.

18         THE JUROR:  I wasn't involved in any of it.

19         MR. CURRAN:  By watching it and living in

20   California, did you form an opinion one way or the other in

21   regard to law enforcement itself or the criminal justice

22   system that would in any way impact your ability to be fair

23   and impartial to Mr. Evans?

24         THE JUROR:  No, that was a long time ago.

25         MR. CURRAN:  Thank you very much.  I appreciate

1    your time.

2                THE COURT:  Ms. Scapicchio.

3                MS. SCAPICCHIO:  Hi.  My name is Rose Scapicchio.

4    I together with Mike Reilly, we represent Shawn Drumgold in

5    this case.  I have a couple of questions for you.  In this

6    case Shawn Drumgold alleges that Detective Callahan withheld

7    some important evidence about an important witness in his

8    criminal trial, and as a result he didn't get a fair trial.

9    You're going to be asked to evaluate the testimony of police

10   officer witnesses vs. civilian witnesses.  Would you give

11   the police officer's testimony any more credit just because

12   they were a police officer?

13               THE JUROR:  Not if I was instructed not to, I

14   would try to be as partial for all the rules.

15               MS. SCAPICCHIO:  So they wouldn't get sort of a

16   head start just because they were police?

17               THE JUROR:  I'd listen.

18               MS. SCAPICCHIO:  You'd listen to the evidence and

19   evaluate the testimony as the witnesses testified?

20               THE JUROR:  Yes.

21               MS. SCAPICCHIO:  And in this case if at the end of

22   the trial you concluded that Shawn Drumgold did prove his

23   case that Detective Callahan did withhold important evidence

24   regarding an important witness that resulted in an unfair

25   trial, would you be able to award monetary damages to

1    Shawn Drumgold?

2           THE JUROR:  You're saying once I reviewed

3    everything?

4           MS. SCAPICCHIO:  Yes, if you came to the

5    conclusion that he had proven his case, could you award him

6    monetary damages?

7           THE JUROR:  I think I could, if I think the word

8    is the preponderance of the evidence.

9           MS. SCAPICCHIO:  Thank you.

10          THE COURT:  Okay.  Ms. Foley, we're going to ask

11   you to call this number tomorrow after six.  You're not on

12   the final jury yet, this is a preliminary screening, and you

13   have to dial in your juror code, which was on the summons,

14   okay, and if you're on the final jury, we'll see you

15   Thursday morning at 9:00.

16          THE JUROR:  If I'm not sure what my employer does

17   with the salary, pay, could I follow up if it could be a

18   financial hardship if they don't pay?

19          THE COURT:  You need to find that out and call

20   Ms. Molloy.  The Court pays a little bit.

21          THE JUROR:  Right.

22          THE CLERK:  I can bring her down to talk to Jim,

23   the jury administrator will know.

24          THE COURT:  Or you can call your employer right

25   now.  So she'll take you down, and if there's an issue, let

1    us know.  Thank you very much.

2            MS. SCAPICCHIO:  Thank you.

3            THE COURT:  The law is on the state side they have

4    to pay, on the federal side they don't.

5            MS. HARRIS:  More than three day on the state.

6            THE COURT:  You're Ms. Millard?

7            THE JUROR:  Yes.

8            THE COURT:  Ms. Scapicchio, you start.

9            MS. SCAPICCHIO:  Hi, I'm Rose Scapicchio.

10   Together with Mike Reilly, we represent Shawn Drumgold.

11   He's the plaintiff in this case.  The allegations are that

12   Shawn Drumgold says that Detective Callahan withheld some

13   important evidence about an important witness in his

14   criminal trial, and as a result he didn't get a fair trial.

15   You're going to be asked to evaluate the testimony of police

16   officer witnesses vs. testimony of civilian witnesses.

17   Would you give any more credit to the police officer

18   witnesses because they're police officers and they're

19   expected to tell the truth?

20           THE JUROR:  No.

21           MS. SCAPICCHIO:  So you'd evaluate the evidence

22   after you heard it based on whatever the witness said?

23           THE JUROR:  Correct.

24           MS. SCAPICCHIO:  And some people think that police

25   officers make mistakes and people are wrongfully convicted,

1    but that's the price we pay to have a police force.  Do you

2    agree with that?

3              THE JUROR:  Yes.

4              MS. SCAPICCHIO:  Okay.  Why do you say you would

5    agree with that, can you explain that a little bit to me.

6              THE JUROR:  I would say sometimes circumstantial

7    evidence relates to that.  I don't think all cops are

8    honest.

9              MS. SCAPICCHIO:  What do you mean?

10             THE JUROR:  I mean, sometimes circumstances can

11   change the testimony or the evidence or things like that.  I

12   think, you know history shows not all policemen are honest,

13   not all people are honest.

14             MS. SCAPICCHIO:  So you'd evaluate the testimony

15   based on whatever you heard from the witness stand?

16             THE JUROR:  Correct.

17             MS. SCAPICCHIO:  And when you evaluated the

18   testimony of a police officer vs. a civilian witness, nobody

19   gets a head start, everybody starts on the same footing, is

20   that what you're saying?

21             THE JUROR:  Yes.

22             MS. SCAPICCHIO:  In this case if you listened to

23   all the evidence and at the end of the trial decided that

24   Shawn Drumgold had proven his case that Detective Callahan

25   had withheld evidence that resulted in an unfair trial to

1   Shawn Drumgold, could you award money damages?

2          THE JUROR:  If that was part of what I needed to

3   do, I'm not sure, I've never sat on a jury before so I'm not

4   sure how that would work.

5          MS. SCAPICCHIO:  Okay.  Thank you very much.

6          THE COURT:  One more question.

7          MS. HARRIS:  Good afternoon, Mary Jo Harris, and I

8   represent Detective Callahan along with my colleagues.  I

9   think I saw that your son had a DUI?

10          THE JUROR:  Yes.

11          MS. HARRIS:  Did his experience going through the

12   system as he did, did that color your experience or your

13   perception of law enforcement?

14          THE JUROR:  No.  I'm glad they caught him.  He was

15   definitely out of control driving drunk, and I'm glad he

16   didn't hurt himself or anybody else with him or somebody

17   innocent, no, so, it didn't color it.

18          MS. HARRIS:  Did you feel he was treated fairly by

19   the police?

20          THE JUROR:  Yes.

21          MS. HARRIS:  Do you have any other experience,

22   positive or negative, with law enforcement?  You had

23   mentioned that you think that not all police are honest?

24          THE JUROR:  I think all people are not honest, so

25   I mean, is it all police, no, because I've worked with

1    police officers doing DARE in the school systems and things

2    like that, so, yes, where I come from, I know several of the

3    police officers in my town.

4            MS. HARRIS:  Okay.  So you're not speaking from

5    negative personal experience?

6            THE JUROR:  No, I'm just thinking that all people

7    can hide things.

8            MS. HARRIS:  Anything else for you gentlemen?

9            MR. ROACHE:  I'm fine.  Thank you.

10           THE COURT:  Ms. Millard, don't run away yet.  This

11   is a number you have to call tomorrow after 6:00.  After you

12   call this number, you'll have to dial your juror code, which

13   came with your summons, if you're on the final jury, we'll

14   see you Thursday morning.  We have 11.

15           Hi, Mr. Brennan?

16           THE JUROR:  Yes.

17           THE COURT:  We meet again.

18           THE JUROR:  We meet again.

19           THE COURT:  I think you start.

20           MS. HARRIS:  Hello, Mr. Brennan, I'm Mary Jo

21   Harris and with Mr. Curran I represent Detective Callahan.

22           MR. CURRAN:  Good afternoon.

23           THE JUROR:  Good afternoon.

24           MS. HARRIS:  I believe that you had indicated you

25   may have family members who are Boston Police officers.  Do

1    I have that right?

2           THE JUROR:  I do have a brother who's a Boston

3    cop.

4           MS. HARRIS:  You do?

5           THE JUROR:  Yes.

6           MS. HARRIS:  Who is he?

7           THE JUROR:  My brother.

8           MS. HARRIS:  How long has he been a Boston police

9    officer?

10           THE JUROR:  Sixteen years.

11           MS. HARRIS:  And is there anything -- obviously

12    Detective Callahan is retired now, but for a very long time

13    he was a Boston police officer and retired, what, three

14    years ago?

15           DETECTIVE CALLAHAN:  Yes.

16           MS. HARRIS:  But would the fact that Mr. Callahan

17    would that bias you in any way toward or against

18    Mr. Callahan in this case?

19           THE JUROR:  I would say no.

20           MS. HARRIS:  Do you have any -- we've explained to

21    you this is a wrongful conviction case where the plaintiff

22    is alleging that he received an unfair trial because of

23    actions on the part of Mr. Callahan that Mr. Callahan

24    denies, would you have any problem listening to the entire

25    case and taking in the evidence from all of the witnesses

1    before coming to any conclusions one way or the other?

2            THE JUROR:  No.

3            MS. HARRIS:  Have you served on a jury before?

4            THE JUROR:  I have.

5            MS. HARRIS:  That's what I thought.  In a federal

6    case, is that right?

7            THE JUROR:  Yes, I have.

8            MS. HARRIS:  Can you tell me just briefly what

9    kind of case that was?

10           THE JUROR:  It was a drug smuggling case.

11           MS. HARRIS:  So it was a criminal case?

12           THE JUROR:  Criminal case, correct.

13           MS. HARRIS:  Was it here in this courthouse?

14           THE JUROR:  It was.

15           MS. HARRIS:  Do you remember who the prosecutor or

16   defense attorneys were?

17           THE JUROR:  No.

18           MS. HARRIS:  Do you remember who the Judge was?

19           THE JUROR:  No.

20           MS. HARRIS:  Was there anything about that?

21           THE JUROR:  I'm not good with names, that's why I

22   said he was my brother.

23           MS. HARRIS:  Was there anything about the

24   experience that you had serving on that jury that caused you

25   to question any aspect of the criminal justice system?

1          THE JUROR:  No.

2          MS. HARRIS:  Were there police officers or federal

3     officers who testified in that case?

4          THE JUROR:  Yes, there was.

5          MS. HARRIS:  And did anything about the manner the

6     way in which they testified cause you to question the ethics

7     or the integrity of those law enforcement officers without

8     getting into the case?

9          THE JUROR:  No, I don't think so, no.

10          MS. HARRIS:  Anything else, gentlemen?

11          MR. ROACHE:  Mr. Brennan, I noticed you graduated

12     from Brighton High School?

13          THE JUROR:  Yes.

14          MR. ROACHE:  Are you from the City of Boston?

15          THE JUROR:  Yes, I am.

16          MR. ROACHE:  Do you still live in the City of

17     Boston?

18          THE JUROR:  Yes, I do.

19          MR. ROACHE:  How long have you lived in the City?

20          THE JUROR:  My whole life.

21          MR. ROACHE:  That's --

22          THE JUROR:  Forty-four years.

23          MR. ROACHE:  Forty-four years.

24          THE JUROR:  Same address.

25          MR. ROACHE:  During that period of time, 44 years,

```
 1    have you had any sort of positive or negative experience
 2    with the City of Boston itself?
 3              THE JUROR:  Positive or negative, no, good
 4    experiences, no positive, no negative, everything's -- I
 5    agree.
 6              MR. ROACHE:  Have you had any difficulty dealing
 7    with any employees of the City of Boston?
 8              THE JUROR:  No.
 9              MR. ROACHE:  How about with any police officers
10    employed by the City of Boston?  Have you ever dealt with
11    them in a negative fashion?
12              THE JUROR:  There was one time I had a situation
13    with a Boston police officer, and he's been since let go.
14    He was kind of a nut.
15              MS. HARRIS:  I can't imagine.
16              MR. ROACHE:  Could you describe what kind of
17    situation that was?
18              THE JUROR:  He was a -- I could be specific, but
19    he was a pedophile, and he was messing around with the young
20    kids in the neighborhood, and I called him on it and he got
21    chased off.
22              MS. HARRIS:  What neighborhood was this?
23              THE JUROR:  West Roxbury.
24              MR. ROACHE:  West Roxbury?
25              THE JUROR:  Yes.
```

1          MR. ROACHE:  And did that experience in any way

2    have an impact on your feelings about the Boston Police

3    Department?

4          THE JUROR:  No, just him.

5          MR. ROACHE:  Just that one particular officer?

6          THE JUROR:  Just that one.

7          MR. ROACHE:  Did that experience have any negative

8    impact on your feelings about the City of Boston?

9          THE JUROR:  No.

10         MR. ROACHE:  That's all I have.

11         THE COURT:  Ms. Scapicchio.

12         MS. SCAPICCHIO:  I represent Shawn Drumgold

13    together with Mike Reilly.  Your brother being a Boston

14    police officer, in this case Shawn Drumgold alleges that

15    Detective Callahan withheld some important evidence about an

16    important witness at his criminal trial that resulted in him

17    having an unfair criminal trial.  You're going to be asked

18    to evaluate the testimony of police officers vs. the

19    testimony of civilian witnesses.  Given that your brother is

20    a police officer and it looks like your brother-in-law is in

21    law enforcement and another brother is a military police

22    officer.

23         THE JUROR:  Retired military police.

24         MS. SCAPICCHIO:  Retired, okay.  Would it be

25    difficult for you or would you give any more credit to the

1   police department and their witnesses as opposed to civilian

2   witnesses?

3               THE JUROR:  No.

4               MS. SCAPICCHIO:  Okay.  Why not?

5               THE JUROR:  I think I would look at both sides of

6   the coin and see what we got.

7               MS. SCAPICCHIO:  So your brother doesn't get any

8   edge at all?

9               THE JUROR:  No.

10              MS. SCAPICCHIO:  Let me ask you this, if you

11  listened to all of the evidence in this case and you decided

12  at the end of the trial that Shawn did prove his case and

13  that Detective Callahan did withhold important evidence

14  about an important witness from prosecutors that resulted in

15  an unfair trial, could you award money damages to

16  Shawn Drumgold?

17              THE JUROR:  Is that up to the jurors or is that up

18  to the Judge?

19              MS. SCAPICCHIO:  If it were up to you to award

20  money damages, could you award money damages?

21              THE JUROR:  If it was proven that he was, yeah,

22  probably.

23              MS. SCAPICCHIO:  And would the fact that you live

24  in the City of Boston enter into your mind in terms of

25  awarding damages?

1          THE JUROR:  With what's going on, a lot of things,

2    you know, the DNA and all this stuff, a lot of guys are

3    coming out of prison that didn't do things, I don't know.

4          MS. SCAPICCHIO:  So let me ask but in terms of

5    money damages, because you live in the City of Boston, would

6    that have an effect that you could award money damages

7    against the City of Boston?

8          THE JUROR:  It's hard to say.  I don't know.  I

9    never really put any thought into it.  I mean, what's right

10   is right, and what's wrong is wrong, I would imagine.

11         MS. SCAPICCHIO:  Because the money damages would

12   come out of the budget out of the City of Boston wouldn't

13   have an effect on your ability to award damages?

14         MS. HARRIS:  Objection.

15         THE COURT:  The objection is sustained.

16         MS. SCAPICCHIO:  Okay, I'll ask another question.

17   Some people think that police make mistakes and people are

18   wrongfully convicted and that's the price we pay to have a

19   police force.  Do you agree with that?

20         THE JUROR:  Do I agree with that?

21         MS. SCAPICCHIO:  Yes.

22         THE JUROR:  No.

23         MS. SCAPICCHIO:  Why not?

24         THE JUROR:  I don't -- state that again, please.

25         MS. SCAPICCHIO:  Sure.  Some people think that

1   police make mistakes and people are wrongfully convicted but

2   that's the price we pay to have a police force?

3           THE JUROR:  I have no opinion on that.  I don't

4   agree with that, no.

5           MS. SCAPICCHIO:  Why not?

6           THE JUROR:  I just don't.  I just don't agree with

7   it.  People make mistakes, I don't know, criminals make

8   mistakes, police make mistakes.

9           MS. SCAPICCHIO:  Okay.  So in a case where the

10  evidence suggested that the police officer intentionally

11  withheld evidence, would you be able to award damages in a

12  case like that?

13          THE JUROR:  It would have to be proven, I guess,

14  right?

15          MS. SCAPICCHIO:  Assuming it was, would you be

16  able to award damages in a case like that?

17          THE JUROR:  I would imagine.  I mean --

18          MS. SCAPICCHIO:  Would you have some difficulty?

19          THE JUROR:  Yeah, you know, I'd have to -- I don't

20  know.

21          MS. SCAPICCHIO:  Okay.  Can you explain why you

22  think you might have some difficulty?

23          THE JUROR:  I never really thought of it.  I never

24  thought about it.

25          MS. SCAPICCHIO:  I know they're hard questions,

1    nobody really thinks in the abstract like this.

2            THE JUROR:  I would imagine the person deserves

3    compensation for being incarcerated if he wasn't guilty.

4            MS. SCAPICCHIO:  Okay.  If the issue wasn't guilt

5    or innocence and the issue was whether or not evidence was

6    withheld from prosecutors in this case, would you be able

7    under those circumstances to award money damages?

8            THE JUROR:  Once again, it would have to be

9    proven, yeah, I would imagine.

10           THE COURT:  I think that's enough.  Thank you very

11   much.  We're going to ask you to call this number tomorrow

12   after 6:00.

13           MR. CURRAN:  Do you get along with your brother?

14           THE JUROR:  He's my brother.

15           THE COURT:  6:00, call this number.

16           THE JUROR:  6:00?

17           THE COURT:  Tomorrow, Wednesday.

18           THE JUROR:  Okay.

19           THE COURT:  You use your juror number and you'll

20   know from that call whether you're on the final jury and if

21   you are we'll see you Thursday morning.  Okay.  Thank you

22   very much.

23           MS. HARRIS:  Thank you.

24           MS. SCAPICCHIO:  Thank you.

25           THE COURT:  This is the last person we're going to

1    interview is Mr. Scott.  You're moving right into legal

2    questions, it's complicated.  Hi, Mr. Scott.

3              THE JUROR:  Good afternoon, your Honor.

4              THE COURT:  I think we start with

5    Ms. Scapicchio.

6              MS. SCAPICCHIO:  Hi, Mr. Scott, my name is

7    Rose Scapicchio.  Together with Mike Reilly we represent the

8    plaintiff in this case, Shawn Drumgold.

9              THE COURT:  So down a bit, you talk very fast.

10             MS. SCAPICCHIO:  I have a couple questions based

11   on your questionnaire.  My niece's wedding in North Carolina

12   on the evening, you wouldn't be in court on Monday, the

13   21st.  We're not sitting that whole week, so that would not

14   be a problem for you?

15             THE JUROR:  That would not be a problem.

16             MS. SCAPICCHIO:  You wouldn't have to leave until

17   when?

18             THE JUROR:  The Friday preceding.

19             THE COURT:  That's fine.

20             MS. SCAPICCHIO:  That would work out because we're

21   not sitting on Fridays.  This case involves Shawn Drumgold's

22   allegation that Detective Callahan withheld some important

23   evidence about an important witness from the prosecutors in

24   this case.  You're going to be asked to evaluate the

25   evidence from police officer testimony vs. civilian witness

1    testimony.  Would you give the police any more weight

2    because they're police officers?

3              THE JUROR:  I don't think that I would, no.

4              MS. SCAPICCHIO:  When you saw you don't think you

5    would, is there any hesitation about whether or not you

6    would?

7              THE JUROR:  Well, I've never been in that

8    situation before so I'm kind of supposing, but I don't think

9    I would.

10             MS. SCAPICCHIO:  So they don't get a head start at

11   all just because they're police officers?

12             THE JUROR:  No.

13             MS. SCAPICCHIO:  Some people think that police

14   officers make mistakes and people are wrongfully convicted,

15   but that's the price we pay for having a police force.  Do

16   you agree with that statement?

17             THE JUROR:  Well, I know people are wrongly

18   convicted.  I believe in that, but the price we pay for a

19   police force, no, I don't think I would buy that.

20             MS. SCAPICCHIO:  Okay.  And in this case if at the

21   end of the trial you came to the conclusion that

22   Shawn Drumgold had proven his case and that Detective

23   Callahan did in fact withhold important evidence from an

24   important witness that resulted in an unfair trial to

25   Shawn Drumgold, would you able to award him money damages?

1          THE JUROR:  I certainly would, yes, if that were

2     my duty to do that, yes.

3          MS. SCAPICCHIO:  And John Daley, the neighbor --

4          THE JUROR:  Yes.

5          MS. SCAPICCHIO:  -- that we talked about at

6     sidebar, how well did you know him?

7          THE JUROR:  He was a social acquaintance, went to

8     parties, and he was a neighbor that was a few houses away,

9     and we interacted socially but, you know, not terribly well,

10    certainly wasn't a best friend or any one of that category,

11    plus I really have not socialized with him probably in 25 or

12    30 years.

13         MS. SCAPICCHIO:  Okay.  But if you were asked to

14    decide whether or not he was telling the truth or not

15    telling the truth, would the fact that you socialized him

16    before come into your decision when you're trying to

17    determine whether he was telling the truth or not?

18         THE JUROR:  I don't believe that it would.

19         MS. SCAPICCHIO:  Thank you.

20         THE COURT:  Ms. Harris.

21         MS. HARRIS:  Good afternoon.  I'm Mary Jo Harris,

22    and I represent Detective Callahan along with Hugh Curran.

23    I just want to make sure that the John Daley that we're

24    talking about, this is somebody who was employed by the

25    Boston Police Department?

1          THE JUROR:  Yes, who lived on Flames Road in

2     Marshfield at the time.

3          MS. HARRIS:  Okay.  Was there anything in your

4     social encounters with him that was negative in any way?

5          THE JUROR:  No.

6          MS. HARRIS:  Just sort of a neutral guy from the

7     neighborhood?

8          THE JUROR:  Yes, seemed like a very nice fellow.

9          MS. HARRIS:  I noticed that in your juror

10    questionnaire, you mentioned that you have a number of

11    family members or extended family members who were involved

12    in law enforcement?

13         THE JUROR:  Yes.

14         MS. HARRIS:  Is there anything about their

15    experiences in law enforcement, any experiences that they

16    may have shared with you that causes you to have an opinion

17    one way or the other about the ethics or the integrity of

18    law enforcement?

19         THE JUROR:  No.

20         MS. HARRIS:  I saw, I think it's your stepbrother

21    who was --

22         THE JUROR:  Yeah, step, I have two stepbrothers,

23    one's in the State Police, one's in the Justice

24    Department.

25         MS. HARRIS:  Okay.  And there's been nothing that

1    they've shared with you that has caused you to question

2    policing or the criminal justice system one way or the

3    other?

4            THE JUROR:  No, not at all.

5            MS. HARRIS:  You had mentioned that you knew that

6    wrongful convictions occur.  Have you ever given thought to

7    the reasons why wrongful convictions occur?  I don't know if

8    this is something that's something that's new to you.

9            THE JUROR:  No, I've never really thought about it

10   a great deal, I just know that they do occur from, you know,

11   reading the newspaper, and, you know, particularly being

12   interested in science, DNA and hearing about those

13   situations and reading books in general.

14           MS. HARRIS:  Okay.  Do you see a distinction in

15   your mind between a wrongful conviction that may have

16   occurred for otherwise innocent reasons, and by that I mean

17   for reasons other than deliberate behavior or misconduct?

18           THE JUROR:  Certainly.  I certainly could discern

19   that and understand that there are different reasons for

20   wrongful convictions, yes.

21           MS. HARRIS:  Would you have any difficulty if you

22   came to the conclusion that the conviction in this case was

23   an improper one but wasn't attributable to the misconduct of

24   Detective Callahan, would you have any problem in not

25   awarding money damages or not finding Mr. Callahan liable?

1            THE JUROR:  No, I would have no problem with

2    that.

3            MS. HARRIS:  Gentlemen.

4            MR. ROACHE:  Just briefly, Mr. Scott, you said you

5    read books about wrongful convictions?

6            THE JUROR:  Yes.

7            MR. ROACHE:  From your reading, you learned about

8    wrongful convictions?

9            THE JUROR:  Just reading newspapers, right.

10            MR. ROACHE:  Have you read anything in particular

11    that you can recall about any particular case?

12            THE JUROR:  No, no specific cases, no.

13            MR. ROACHE:  Have you ever heard anything about

14    this case, the Shawn Drumgold case?

15            THE JUROR:  Certainly at the time when it took

16    place 20 plus years ago, it was in the newspapers and I

17    remember reading about that.

18            MR. ROACHE:  Okay.  Have you read anything

19    recently about Shawn Drumgold?

20            THE JUROR:  No.

21            MR. ROACHE:  Have you heard anything on the news

22    or on the radio about Shawn Drumgold?

23            THE JUROR:  No, I have not.

24            MR. ROACHE:  Do you know a person by the name of

25    Richard Lehr who was a reporter from the Boston Globe?

1              THE JUROR:  No, I do not.

2              MR. ROACHE:  Have you ever read anything by

3    Richard Lehr concerning Mr. Drumgold?

4              THE JUROR:  Not that I'm aware of.

5              MR. ROACHE:  That's all I have.

6              THE COURT:  Mr. Scott, we're going to ask you to

7    call this number at 6:00 tomorrow.  We need your jury number

8    at the time, and when you call the number, you'll find out

9    if you're on the final jury, and if you are on the final

10   jury, we'll see you Thursday morning at 9:00.  Thank you.

11             MR. CURRAN:  Judge.

12             THE COURT:  Yes.

13             MR. CURRAN:  A major portion of their case has to

14   do with the diary notes of John Daley, some of which are

15   highly pretentious.

16             THE COURT:  Not much of that came in the last

17   time.

18             MS. HARRIS:  It was the second phase of the trial.

19             MR. ROACHE:  Which will be objectionable at the

20   time if we try to enter it, your Honor, as far as relevance

21   is concerned.

22             THE COURT:  We'll go through that again.  I mean,

23   he said he didn't think that would affect him.  It's a

24   25-year-old relationship.

25             MS. HARRIS:  I believe that Daley was the head of

1    homicide for at least a portion of the time, so he's more of

2    a prominent player than some of the other.

3          MR. CURRAN:  Daily was the head of the homicide

4    until August, September.  McNelly got appointed in

5    September, the trial started at the end of, September and

6    McNelly said I got appointed in August, was on vacation,

7    first day I reported to the job was September.

8          THE COURT:  Let me think about it.  We now have

9    12, we need 14, so let me think about it overnight.

10         MR. CURRAN:  I like him for the initial phase, but

11   the issue we then have is if there's ever a second phase.

12         THE COURT:  Let me think about that.  13, sorry,

13   13.  So if you want to look at my list so that we all share

14   the same list, we know who's in and who's out, and I'll see

15   you tomorrow morning at 9:00.

16         MS. SCAPICCHIO:  Judge, I just have one question.

17   Is 20 going to get us their 3 challenges?  I'm just

18   wondering is the city getting separate challenges?

19         THE COURT:  Actually, no, the 3 is for the

20   defendants as a group actually.  What did I do the last

21   time, do you recall?

22         MR. ROACHE:  I don't recall specifically what we

23   did the last time, but since this is a bifurcated case, I

24   think the city and Francis Roache should have their own set

25   of peremptories.

```
1          THE COURT:  But then that would mean it would be 6

2   per side.

3          MS. SCAPICCHIO:  Yes, that was my question.

4          THE COURT:  I don't remember.  Let me check what I

5   did the last time, but, as I said, we have time, we have

6   enough people, so let me reserve the issue of Mr. Scott and

7   let me think about that.  I mean, I think technically under

8   the rules if it's a joint defense essentially, in other

9   words, the defendants are not really operating at cross

10  purposes, I could give you three challenges as a group.  On

11  the criminal side, I ordinarily can affect that.  Let me

12  think a little bit about that, okay.

13         MR. CURRAN:  If we're starting Thursday, do we

14  just have a line-up and if there's any issues with regards

15  to CORI records from civilian witnesses?

16         THE COURT:  Say that again.

17         MR. CURRAN:  CORI issues for civilians, are we

18  going to need a new order?  Has that already been done?

19         THE COURT:  I'll sign any CORI record, any order

20  you want, let me know.  That shouldn't be a problem.  You

21  know the lineup of the first day?

22         MS. HARRIS:  We know the first witness.

23         MS. SCAPICCHIO:  Ricky Evans.

24         MR. REILLY:  He's going to keep us busy.

25         THE COURT:  I don't think it will be a problem.
```

1          MS. HARRIS:  We also have a couple of pending

2    motions, and would we be able to address those?

3          THE COURT:  You can.  Now we have to worry about

4    Judge Wolf and my being late.

5          MS. HARRIS:  Okay, that's fine, I just want to

6    make sure we don't lose that.

7          THE CLERK:  Judge, I will meet with counsel after

8    lunch.

9          MS. SCAPICCHIO:  That's fine.  Nobody from the

10   press gets it.

11          (Whereupon, the hearing was suspended at

12   1:42 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS    )

5    CITY OF BOSTON               )

6

7         I, Valerie A. O'Hara, Registered Professional

8    Reporter, do hereby certify that the foregoing transcript

9    was recorded by me stenographically at the time and place

10   aforesaid in No. 04-11193-NG, in re:  Shawn Drumgold vs.

11   Timothy Callahan and thereafter by me reduced to typewriting

12   and is a true and accurate record of the proceedings.

13                        /S/ VALERIE A. O'HARA

14                        _____

15                        VALERIE A. O'HARA

16                        REGISTERED PROFESSIONAL REPORTER

17                        DATED APRIL 28, 2011

18

19

20

21

22

23

24

25