IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


SHAWN DRUMGOLD,          )  C.A. No. 04-11193-NG

          PLAINTIFF      )  Courtroom No. 2

VS.

TIMOTHY CALLAHAN, ET AL.,)  1 Courthouse Way

          DEFENDANTS     )  Boston, MA  02210


JURY TRIAL DAY 2

JURY IMPANELMENT

SEPTEMBER 9, 2009

9:21 a.m.


BEFORE THE HONORABLE NANCY GERTNER

UNITED STATES DISTRICT COURT JUDGE


VALERIE A. O'HARA

OFFICIAL COURT REPORTER

1    A P P E A R A N C E S:

2         ROSEMARY CURRAN SCAPICCHIO, ATTORNEY, Four Longfellow
     Place, Boston, Massachusetts  02114, for the Plaintiffs;
3
4         Tommasino & Tommasino, by MICHAEL W. REILLY, ESQ.,
     Two Center Plaza, Boston, Massachusetts  02108, for the
     Plaintiff;
5
6         Roache & Malone, LLP, by JOHN P. ROACHE, ESQ., 66 Long
     Wharf, Boston, Massachusetts  02110, for the Defendants.

7         Bletzer and Bletzer, P.C., by HUGH R. CURRAN, ESQ., 300
     Market Street, Brighton, Massachusetts  02135, for the
8    Defendants;

9         Law Offices of William M. White, Jr. and Associates,
     WILLIAM M. WHITE, JR., ESQ., 218 Lewis Wharf, Boston,
10   Massachusetts  02110;

11        Morgan, Brown & Joy, LLP, by MARY JO HARRIS, ESQ., 200
     State Street, Boston, Massachusetts  02109-2605, for the
12   Defendants.

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1  (THE FOLLOWING OCCURRED IN THE JUDGE'S LOBBY:)

2  MR. ROACHE:  Your Honor, to make things simpler,

3  I'm going to waive request for the additional three

4  peremptories.

5  THE COURT:  Fabulous.

6  MR. ROACHE:  It will go quicker today.

7  THE COURT:  Is there anything else you want to

8  waive?  I want to take advantage of this mood.  Okay.

9  That's fine.

10  MR. ROACHE:  I also, your Honor, I have an

11  investigator waiting for the CORI.

12  THE COURT:  I signed them.

13  MR. ROACHE:  Gave it to him?

14  THE CLERK:  Yes, certified, done, everything.

15  MR. ROACHE:  Thank you.

16  MR. REILLY:  Your Honor, I had 13.

17  THE COURT:  Yes, 13.  There are 11 remaining for

18  the group that we had screened.  We picked 14, three on each

19  side.  We need to get to 20.  Hi.

20  THE JUROR:  Good morning.

21  THE COURT:  You are Ms. Longo?

22  THE JUROR:  Yes.

23  THE COURT:  Why don't we start with you,

24  Ms. Scapicchio.

1          MS. SCAPICCHIO:  Hi, my name is

2     Rosemary Scapicchio.  Together with Mike Reilly, we

3     represent the Shawn Drumgold.  He's the plaintiff in this

4     case.  We're going to ask you a couple of questions

5     regarding your questionnaire.  To clarify, you indicated

6     regarding No. 22 you had a lawsuit pending regarding a

7     breach of a fiduciary duty.  Would the experience that you

8     have with that lawsuit, does it affect you at all in terms

9     of deciding this case?

10          THE JUROR:  I wouldn't think that it would.

11          MS. SCAPICCHIO:  Okay.  And you also indicated on

12     your questionnaire at No. 27 when you were asked people who

13     have been wrongfully convicted sometimes bring lawsuits

14     against the police department.  Do you favor or oppose those

15     type of lawsuits?  You say you favor this option because it

16     exists even though it may not always been warranted.  Can

17     you tell me what you mean by that?

18          THE JUROR:  I don't always think a law enforcement

19     officer would do the wrong thing, but there's a possibility

20     that that would happen, so we all need to have a right to

21     pursue that, to protect ourselves.

22          MS. SCAPICCHIO:  When you say you don't always

23     think that a law enforcement officer person would do the

24     wrong thing, in this case, you're going to hear testimony if

25     you're selected as a juror from police officer witnesses and

1   civilian witnesses, and the allegation in this case is

2   Detective Callahan, who's the defendant, withheld some very

3   important information from the prosecutors in the case, and

4   it resulted in Shawn Drumgold getting an unfair trial.

5           If you were asked -- given your statement, if you

6   were asked to decide between the testimony of a police

7   officer and the testimony of a civilian witness, would you

8   give the police officer's testimony any more weight?

9           THE JUROR:  No.

10          MS. SCAPICCHIO:  Okay.

11          THE JUROR:  I really feel like I could be

12  impartial, and I feel -- I don't know this will make any

13  sense, when I had to prepare to be certified for preschool

14  teacher, I had to take a class on observing children, and I

15  had to block everything else out and focus on what I was

16  seeing and only Judge on that, and I did very well, so I

17  think it would be the same process here for me.

18          MS. SCAPICCHIO:  Okay.  If you listened to all the

19  evidence in this case and you decided that Shawn Drumgold

20  had met its burden and had proved that Detective Callahan

21  withheld this information and it affected his right to a

22  fair trial, would you be able to award money damages to

23  Shawn Drumgold?

24          THE JUROR:  Yes, I think I would if I felt that

25  what you just said took place.

1          MS. SCAPICCHIO:  Thank you so much.

2          THE JUROR:  You're welcome.

3          MS. HARRIS:  Good morning.  My name is

4  Mary Jo Harris, and I along with Hugh Curran represent

5  Detective Callahan.  Could you tell me one of the lawsuits

6  that you referenced in your questionnaire, are you one of

7  the plaintiffs in this case?

8          THE JUROR:  I'm the plaintiff.

9          MS. HARRIS:  How long has it been pending?

10          THE JUROR:  It began in January of 2008.

11          MS. HARRIS:  You said you're in discovery right

12  now?

13          THE JUROR:  I think we're going toward the end of

14  discovery.  My sister ignored for almost a whole year all

15  the legal papers she was being served, so it sort of like

16  dragged this whole thing out.

17          MS. HARRIS:  Okay.  Have you actually been deposed

18  in that case?

19          THE JUROR:  No.  What do you mean by deposed?  We

20  haven't been to trial or anything like that.

21          MS. HARRIS:  Right.  A deposition is somewhat sort

22  of similar to this in that there's a court reporter, there's

23  a question and answering of witnesses giving evidence in a

24  case.

25          THE JUROR:  No, no.

1          MS. HARRIS:  Have you ever testified in any

2     capacity?

3          THE JUROR:  No.

4          MS. HARRIS:  One of the ways that this case will

5     proceed, because it's a civil case, is that Ms. Scapicchio

6     will have the opportunity to put on her evidence, and

7     obviously the reason we're here is because, you know, we

8     believe that there's a very different version of events and

9     we would be expecting anybody that sat on the jury to be

10    able to sort of suspend their judgment until all of the

11    evidence has been heard and then make a judgment based on

12    that the evidence that's presented in the court and then the

13    instructions you're given by the Judge.  Do you think that's

14    something you'd be able to do in this case?

15         THE JUROR:  Yes, I do.

16         MS. HARRIS:  Gentleman, do you have anything?

17         MR. ROACHE:  Just one question, what court is in

18    your pending lawsuit?

19         THE JUROR:  In Brockton so that's Plymouth.

20         MR. ROACHE:  Is it probate court or superior?

21         THE JUROR:  I think it's superior.

22         MR. ROACHE:  Who represents you?

23         THE JUROR:  Morisi & Oatway, M-o-r-i-s-i, &

24    Oatway.

25         MR. ROACHE:  Do you know who represents your

1    sister?

2             THE JUROR:  Eileen Belinsky in Brockton,

3    B-e-l-i-n-s-k-y.  My attorney's name is Andrew Oatway.

4             MR. ROACHE:  Thank you.  That's all I have, thank

5    you.

6             MS. SCAPICCHIO:  Thank you very much.

7             THE COURT:  I'm going to ask you to call this

8    number this afternoon after 6:00.  You're not on the final

9    jury yet, and whether you're on the final jury, you'll find

10   out at that point.  You have your juror number, and you plug

11   in the juror number, and we'll see you 9:00 Thursday morning

12   if you're on the final jury.

13            THE JUROR:  Thank you so much.

14            MS. SCAPICCHIO:  Thank you.

15            MS. HARRIS:  Can we ask something, in the

16   questions the characterization of withholding important

17   evidence I'm a little bit afraid, fearful of putting forward

18   facts that aren't exactly consistent with the law as it's

19   being argued, so I would just ask for your guidance.

20            THE COURT:  What's your objection to saying

21   withholding important evidence?

22            MS. HARRIS:  Very important evidence I think is

23   the way I think it's being phrased, and I think that's an

24   issue.

25            MR. CURRAN:  The standard is exculpatory evidence,

1    important evidence one way or the other is not meeting that

2    legal definition.

3           THE COURT:  But she's found that exculpatory

4    evidence is not necessarily a word that people understand.

5           MS. SCAPICCHIO:  Exculpatory evidence doesn't mean

6    anything to these jurors.

7           MR. CURRAN:  Otherwise we're going to start asking

8    questions and putting forth our facts, and, you know, in our

9    view of what the law is in front of these jurors.

10          MS. HARRIS:  I'm trying to avoid the knowing and

11   deliberate.

12          THE COURT:  What would you suggest?

13          MS. HARRIS:  I'd suggest if you found that he

14   withheld evidence.

15          THE COURT:  I think that's fine.

16          MS. SCAPICCHIO:  Just withheld evidence.

17          MS. HARRIS:  To be neutral.

18          MR. ROACHE:  I would ask, Judge, that once the

19   jury is selected that there's some sort of limiting

20   instruction that any questions that were asked within the

21   voir dire not be -- they have to understand that that's not

22   evidence.

23          THE COURT:  By all means, I'll do that.  Okay.

24          MS. HARRIS:  Thank you.

25          THE CLERK:  Next one is 25.

1          THE COURT:  Mr. Meza, Salomon Meza.  Mr. Meza, why

2     don't you sit down.  It will be short question for a short

3     time.

4          MS. HARRIS:  Good morning.

5          THE JUROR:  Good morning, everybody.

6          MS. HARRIS:  My name is Mary Jo Harris, and I

7     represent Detective Tim Callahan along with Hugh Curran, and

8     we're the defendants in this case.  I noticed in your

9     questionnaire you reported having been charged with an

10    assault and battery at some point?

11         THE JUROR:  Yes.

12         MS. HARRIS:  Can you tell me when that happened?

13         THE JUROR:  It happened in 1996.

14         MS. HARRIS:  Okay.  Did that occur here in Boston?

15         THE JUROR:  It occurred in Waltham, the city.

16         MS. HARRIS:  Waltham.  Going through that

17    experience, did that cause you to question the fairness or

18    the impartiality of the criminal justice system or of the

19    police that you encountered?

20         THE JUROR:  Actually I want to go back how it

21    happened just quickly.  I came from Peru, I was born in Peru

22    with my wife and my two stepsons, so as you must know, we

23    used to be educating in different way than the American

24    culture, so when they were in the high school, they changed

25    their behavior and so they disrespect us, me, so my first

1    impulse was slapping a couple times, and then I think it was

2    advisable, you know, classmate that they should charge me so

3    that's why I was called to the courthouse in Waltham so the

4    Judge decided I should go someplace like violence, control

5    violence, stuff like that, so it was in one jail, probation.

6    After that, I don't happen, I didn't have any case else.  It

7    was the first and the last time.  I learned.

8         MS. HARRIS:  So you felt from what you're saying I

9    take from that that you felt you were treated fairly by the

10   law enforcement agency?

11        THE JUROR:  Yes, according to the American law, I

12   did, so I recognize that I shouldn't do that so I wasn't

13   guilty, that's it.

14        MS. HARRIS:  And then there was another question

15   that we had in this questionnaire that asks, you know,

16   people who have been wrongfully convicted sometimes bring

17   lawsuits against the police, and you were asked if you favor

18   or oppose this kind of a lawsuit, and you said that you

19   opposed, so I'm wondering if you could tell us a little bit

20   about your feelings.

21        THE JUROR:  Excuse me, could you repeat again?

22        MS. HARRIS:  Yes.  People who have been wrongfully

23   convicted sometimes bring lawsuits against the police

24   department.  Do you favor or do you oppose this type of a

25   lawsuit?

1           THE JUROR:  Okay.  What the thing is, when there

2    is not enough evidence sometimes, some lawyer, I don't want

3    to say bad lawyer, but lawyers, you know, according to the

4    economic situation with the person go to the courthouse

5    without looking, they can't afford a lawyer, so I was being

6    advised by my lawyer, I mean, the Court put a lawyer for me

7    be guilty, say guilty, but I didn't have the chance that I

8    speak by myself in the courthouse to the charge, say I'm

9    sorry, I didn't realize that I shouldn't hit my stepson

10   because it was my culture, yes, it came from my origin in my

11   country, so I think New England, they should send to one

12   special place, like a school, teach how to act, how to live

13   with the kids in the United States before making any

14   mistakes.

15           MS. HARRIS:  So, if I understand what you're

16   saying, would you say with this question sometimes you think

17   that a wrongful conviction can occur for reasons other than

18   the law enforcement?

19           THE JUROR:  Exactly.  I think the person must be

20   convicted of evidence really, really did that in the United

21   States.

22           MS. HARRIS:  I'm sorry, I didn't understand

23   that.

24           THE JUROR:  What I'm trying to say is the person

25   must be convicted of the crime that he did, that's what I'm

1    trying to say.

2            MS. HARRIS:  Gentlemen, do you have anything else?

3            MR. ROACHE:  I have nothing.

4            MS. SCAPICCHIO:  Good morning.  My name is

5    Rosemary Scapicchio.  I think I'm a little unclear with your

6    answer regarding the lawsuits.  Are you saying that unless

7    somebody can prove that they're actually innocent you

8    wouldn't favor these type of lawsuits?

9            THE JUROR:  What I think is when someone is

10   demanding, for example, like a committee or whatever, if

11   this guy really, really there is strong evidence that he may

12   have that he committed the crime, no question about it, I

13   believe in that.

14           MS. SCAPICCHIO:  Okay.  So are you saying then

15   that if you believe that the evidence showed that the person

16   committed the crime, whether his civil rights were violated

17   or not, you wouldn't find in his favor?

18           THE JUROR:  Exactly.

19           THE COURT:  If we told you that the law was that

20   every citizen is entitled to a fair trial.

21           THE JUROR:  Right.

22           THE COURT:  And that they are entitled to sue

23   officials if those officials are responsible for their not

24   having a fair trial and their innocence or guilt doesn't

25   matter, they can still say because of what you did my trial

1  was unfair and collect damages for that, would you be able

2  to follow those instructions?

3          THE JUROR:  I don't really understand.

4          THE COURT:  Let me try it again.  Let's assume I'm

5  accused of a crime, okay, and I did it but the trial wasn't

6  a fair trial, evidence was withheld, it's not shown to me

7  that I should have seen and other things made it unfair, I

8  can go into court and I can sue officials that made my trial

9  unfair even though I'm guilty because I have a right to a

10  fair trial.  That's what the allegations here are about.

11  Would you be able to sit as a juror and follow the law in

12  this kind of situation?  In other words, it doesn't matter

13  whether I'm innocent or guilty, I'm entitled a fair trial?

14          THE JUROR:  If I was in this person's position, if

15  I'm honest?

16          THE COURT:  No, we're talking about you as a

17  juror, if you're a juror here, could you sit on a case in

18  which an officer is accused of doing something that made the

19  trial of Mr. Drumgold unfair?  That's what the nature of the

20  accusation is, it doesn't matter if he did the crime or not,

21  it only matters that the claim was that the trial was

22  unfair, could you be a juror in that kind of a case?

23          THE JUROR:  Honestly, I don't know what to

24  answer.

25          THE COURT:  Well, if you're not sure, then we'll

1    excuse you, but thank you very, very much for coming in.

2    Thank you, sir.

3              MS. SCAPICCHIO:  Thank you.

4              MS. HARRIS:  Thank you.

5              THE COURT:  Hi, Mr. Schwartz, come sit down.  I

6    think you start, Ms. Scapicchio.

7              MS. SCAPICCHIO:  Good morning, Mr. Schwartz.  My

8    name is Rosemary Scapicchio.  Together with Mike Reilly, we

9    represent Shawn Drumgold.  He's the plaintiff in this case.

10   We expect that you will hear evidence in this case that

11   during Shawn Drumgold's criminal trial back in 1989

12   Detective Callahan withheld evidence that resulted in

13   Shawn Drumgold not having a fair trial.  If you were asked

14   to evaluate the testimony of a police officer vs. that of a

15   civilian witness, would you give the police officer any more

16   weight?

17             THE JUROR:  I probably would.

18             THE COURT:  Okay.  So the question is, we're

19   looking for jurors for whom the playing field would be

20   equal, both sides.  It means that an officer is testifying,

21   he doesn't start, if an officer starts one way and a

22   civilian starts one way, doesn't start with a leg up.  You

23   think it would be hard for to do?

24             THE JUROR:  I think I could, but I'm just saying I

25   tend to believe a police officer more than a civilian.

1           THE COURT:  That's what this case is about, a

2    civilian will say X and the police officer will say Y, and

3    if there's any concern that you have that you wouldn't be

4    able to evaluate the testimony equally, then we'd have to

5    excuse you.  What do you think?

6           THE JUROR:  I would do my very best, and I think I

7    could.

8           THE COURT:  Okay.  Go on.

9           THE JUROR:  That's my honest opinion.

10          MS. SCAPICCHIO:  When you were talking about your

11   honest opinion, you would credit the police officers's

12   testimony.  Can you tell us why?

13          THE JUROR:  I think when I'm told something by a

14   police officer, I would tend to believe it's the truth.

15          MS. SCAPICCHIO:  If you had to listen to a police

16   officer tell one version and listen to a civilian witness

17   tell another version, would you give the edge to the police

18   officer because they're supposed to believe the police

19   officer?

20          THE JUROR:  I do my best not to, but I think it's

21   a possibility.

22          THE COURT:  I'll excuse you.  They'll be other

23   cases where there won't be this kind of collision.  Thank

24   you so much.  Thank you.

25          MS. SCAPICCHIO:  Judge, this next juror says that

1    he has business trips throughout October.

2              THE JUROR:  Good morning.

3              THE COURT:  Good morning.  This is Mr. Bacon.

4    Okay.  Start.

5              MS. HARRIS:  Hi, Mr. Bacon, my name is

6    Mary Jo Harris, and I along with Hugh Curran represent

7    Detective Callahan who's the defendant in this case, and

8    we're all wondering, you indicated you had business trips

9    throughout October.  As a first matter, what kind of

10   schedule are you looking at?

11             THE JUROR:  Well, I was scheduled to be in the

12   office only two or three days during October.  I visit all

13   of our plants for our company every October, so, I mean, I

14   can show you the schedule.

15             THE COURT:  No, no, tell us now.  The trial as we

16   said will go to October 15th.  You have business trips

17   scheduled between now and October 15th?

18             THE JUROR:  Actually longer than that.

19             THE COURT:  But the trial is going to be over the

20   15th, so the question, you'll be out of town?

21             THE JUROR:  I'll be out of town October 1st, 2d,

22   6th, 7th 13th and 15th.

23             THE COURT:  I'll excuse you.  Thank you very much.

24             MS. HARRIS:  Thank you very much for coming in.

25             MS. SCAPICCHIO:  Thank you.

```
1              THE COURT:  Hi.

2              THE JUROR:  Hi.

3              THE COURT:  You are Ms. Barile?

4              THE JUROR:  Barile.

5              MS. HARRIS:  Good morning, my name is

6    Mary Jo Harris.

7              THE JUROR:  Good morning.

8              MS. HARRIS:  Along with Hugh Curran, we represent

9    Detective Callahan in this suit, and as we explained

10   yesterday, this is a case arising out of a wrongful

11   conviction and police misconduct claim.  One of the

12   questions that was in our questionnaire asked if you favored

13   or opposed suits like this, and we noticed that you didn't

14   answer.  I'm curious to know what your thoughts are on this

15   kind of case?

16             THE JUROR:  Well, I think I answered the question

17   before I knew what the case was.

18             MS. HARRIS:  Okay.

19             THE JUROR:  So, and the reason I didn't answer the

20   question was for me it would determine like what the case

21   is.

22             MS. HARRIS:  Okay.

23             THE JUROR:  And after like hearing like both sides

24   like what my decision would be.

25             MS. HARRIS:  Okay.  So if I understand you
```

1    correctly, you can only decide if it was a wrongful

2    conviction after you heard the evidence from both sides?

3              THE JUROR:  Pretty much.

4              MS. HARRIS:  Have you served as a juror before, I

5    think you said no?

6              THE JUROR:  No, I've been called for jury duty but

7    I've never been chosen.

8              MS. HARRIS:  Then I'm not trying to pry into your

9    personal business, but you had mentioned that friends and

10   colleagues of yours have been charged on different drug

11   offenses or offenses?

12             THE JUROR:  Yes, November of this year will be six

13   years that I've been in recovery, and so in the past six

14   years that I've been clean, I've met a lot of people in

15   recovery, and unfortunately they did some bad things in the

16   past before they got clean, so that's why I have many

17   friends that have been locked up.

18             MS. HARRIS:  Oh, sure.  Has there been anything

19   about your relationships or anything that they've told you

20   that's caused you to question the ethics or the integrity of

21   the civil justice system or of the police in general, any

22   experiences that they shared with you?

23             THE JUROR:  Not really.  I mean, they pretty much

24   knew what they did was wrong, you know, and they got caught

25   and they had to do the time, you know.

1        MS. HARRIS:  You know, the case here involves, you

2   know, a stark difference of opinion about what actually

3   happened, but there are going to be civilian witnesses, some

4   who may have had criminal backgrounds and police officers

5   testifying, and there may even be some lawyers testifying.

6   Would the nature of their backgrounds or their occupations

7   weigh in any way in the credibility that you ascribe to each

8   of these witnesses, in other words, would you take the word

9   of a lawyer or a police officer over the word of a civilian

10  who maybe had a record?

11       THE JUROR:  Well, for me because the people that I

12  know now such as like the people that were criminals after

13  being clean, they're not the same people anymore, and they

14  live good, honest lives, and they change, so would I take

15  someone's opinion that may have been a criminal before,

16  possibly, if they're being honest now, you know what I mean,

17  does that make sense?

18       MS. HARRIS:  I think so.  I think I understand

19  what you're saying.

20       MS. HARRIS:  Do you guys have anything further?

21       MR. ROACHE:  Follow up with that, if you knew that

22  certain witnesses that are going to testify in this case did

23  have a criminal background and they may not have a

24  background in the last couple of years and may have been

25  trying to set their lives straight, would you tend to

1    believe their testimony more than that of a police officer

2    or less than that of a police officer?

3              THE JUROR:  I guess I'd have to determine on how

4    good they sounded, like how like if I believed their

5    testimony or not.  I don't know.

6              MS. HARRIS:  Okay.  If you heard evidence that a

7    witness was a drug dealer years ago but claims not to be a

8    drug dealer any longer, would that impact you as to

9    assessing that person's credibility today?

10             THE JUROR:  Yeah.

11             MS. HARRIS:  How would that impact you?

12             THE JUROR:  I don't know how to answer that.  I

13   guess I would just -- by like being able to like hear all

14   parts of case and like that, you know, knowing that about

15   that individual like then I guess that's how I would like

16   decide like how I would go.  I don't know what to say

17   really.

18             THE COURT:  I think that's enough.

19             MR. ROACHE:  Have you had personally any bad

20   experience with law enforcement?

21             THE JUROR:  No.  I haven't had a bad experience

22   with law enforcement.  As police officers?

23             MR. ROACHE:  Yes.

24             THE JUROR:  I have not, but I have had family

25   members who have been police officers, and they haven't said

1   such nice things about other officers that they worked

2   with.

3        MR. ROACHE:  Would that impact you as assessing

4   the credibility of a police officer who may be testifying in

5   this case?

6        THE JUROR:  Well, nothing against you, but it

7   would.  It would because I know like what -- you can't not

8   know what you've already heard, you know what I mean?  Does

9   that make sense?  Like I can't take like what a family

10  member has said to me and say, okay, I'm just going to

11  dismiss that and take that out of my mind.  It's in my mind,

12  you know, so, of course, like it would impact my thoughts on

13  like the case.

14       THE COURT:  Well, so you're someone who's known

15  civilians who have gotten in trouble, and you're also

16  someone who has heard of police officers who haven't done

17  good things.

18       THE JUROR:  Right.

19       THE COURT:  So the question is whether in this

20  case you'd be able to listen to a witness, civilian or a

21  police, and be able to hear that and make a decision as to

22  that person's credibility, not on what else you've heard, on

23  that credibility, you'd have to listen?

24       THE JUROR:  I'd be able to listen, but I would

25  tell you that would be in the back of my mind.

1          THE COURT:  So that would make you lean against

2     the officers?  In other words, what's in the back of your

3     mind, is that going to make everybody in the same soup,

4     everybody looks bad to you, or does that make everybody

5     even, or is that going to mean you're going to tilt on one

6     side or the other?

7          THE JUROR:  I guess I would make a decision after

8     I heard everything about the case.  You know what I mean, I

9     couldn't tell you that right now because I don't know the

10    whole case right now.

11         THE COURT:  That's fair.  Go on.

12         MR. CURRAN:  Judge, one question.

13         THE COURT:  Mr. Curran.

14         MR. CURRAN:  You had the information in the back

15    of your mind that members of law enforcement have shared

16    with you that there aren't good things about other police

17    officers.  As you sit here today, are you able to say that

18    that won't play a role in you evaluating the testimony of

19    police officers that are going to testify in this courtroom

20    under oath on the stand?  Are you able to totally remove

21    that?  Could you say with 100 percent certainty and

22    confidence that that will not play a role in you deciding?

23         MS. SCAPICCHIO:  Judge, I would object.  I don't

24    think that's the standard.

25         THE COURT:  I think that's right.  You don't have

1    to answer that question.  Go on, Ms. Scapicchio.

2            MS. SCAPICCHIO:  If I hear what you told

3    Judge Gertner is that you've had experiences or you've heard

4    experiences with police officers, you've had experiences

5    with people with criminal records, but in this case you

6    would listen to the evidence, and you would make a

7    determination after you heard the person testify?

8            THE JUROR:  Uh-hum.

9            MS. SCAPICCHIO:  Nobody would start with any edge

10   one way or the other, you would just listen to the evidence?

11           THE JUROR:  Right.

12           MS. SCAPICCHIO:  I have no further questions.

13           THE JUROR:  Can I say something real quick?

14           THE COURT:  Yes, go right ahead.

15           THE JUROR:  Yesterday when you said is there any

16   person that can't stand on the trial, I can, I'm going away

17   a couple days though.

18           THE COURT:  When?

19           THE JUROR:  September, this Monday, the 14th and

20   15th and the 18th, but the 18th is a Friday, and I know that

21   you said it's Monday through Thursday, so that one really

22   don't count.

23           THE COURT:  The 14th and 15th you're going to go

24   away, prearranged vacation?

25           THE JUROR:  Yes.

1          THE COURT:  That would be a problem.  Okay.  I'm

2     sorry, you should have told us that at the beginning.

3          THE JUROR:  I was nervous.  I didn't want to stand

4     up.  I didn't want to be the only person to stand up.

5     Sorry.

6          THE COURT:  This is a prearranged vacation going

7     where?

8          THE JUROR:  I have tickets to go to New York.

9          THE COURT:  For the 14th and the 15th?

10         THE JUROR:  Yes.

11         THE COURT:  Okay.  I'll excuse you.  This has been

12    wonderful.  Thank you.

13         MS. SCAPICCHIO:  Thank you very much.

14         THE JUROR:  Am I in trouble?

15         THE COURT:  You're in big trouble.  I'm only

16    kidding.

17         Mr. Quigley.

18         THE JUROR:  Yes.

19         THE COURT:  Ms. Scapicchio, you go first.

20         MS. SCAPICCHIO:  Hi, my name is Rose Scapicchio.

21    Together with Mike Reilly, we represent the plaintiff in

22    this case, Shawn Drumgold.

23         THE JUROR:  Okay.

24         MS. SCAPICCHIO:  I noticed in your questionnaire

25    you indicated at question 24 that you had some relationships

1     with people on the Cambridge Police Department and the

2     Holyoke Police Department?

3              THE JUROR:  Uh-hum.

4              MS. SCAPICCHIO:  In this case we expect that

5     you'll hear evidence from police officers and evidence from

6     civilian witnesses, and the allegation that Shawn Drumgold

7     is making is that Detective Callahan withheld some

8     information from the prosecutors in this case that resulted

9     in him getting an unfair trial.

10             THE JUROR:  Okay.

11             MS. SCAPICCHIO:  If you had to listen to evidence

12    with police officers, given your friendship with police

13    officers and evidence from civilian officers, would the

14    police officers get an edge at all?

15             THE JUROR:  I don't think so.

16             MS. SCAPICCHIO:  Why not?

17             THE JUROR:  I mean, why not, that's a good

18    question.  I mean, because they're all the same.  I don't

19    think that there's any more -- I mean, maybe you feel better

20    that the police officer is telling you, but it doesn't

21    necessarily mean that they couldn't be telling the story as

22    well as somebody else.

23             MS. SCAPICCHIO:  Just to follow up, when you say

24    you feel better that the police officer is telling you, can

25    you tell me what you mean by that?

1           THE JUROR:  Well, I mean, just because growing up,

2     you know, as a kid, you always respected the police officers

3     and stuff like that, so maybe they hold a little more weight

4     when they make a statement than somebody else, I don't know.

5     I don't think I'd make it, but personally I don't think it

6     makes a difference.

7           MS. SCAPICCHIO:  Okay.  So when you say police

8     officers would hold a little more weight, if you had to

9     evaluate a police officer's testimony that was in conflict

10    with a civilian witness' testimony, would that idea that

11    police officers carry a little more weight come into your

12    decision-making in this case?

13          THE JUROR:  I'm sure it might be possible.  I

14    mean, I don't personally think right now, but it might.

15    It's like growing up, you always, you know, were told, you

16    know, to respect the police officer and stuff like that, so

17    whether that would -- I wouldn't -- I'm trying to think how

18    to put this.  I don't think I would consciously make that

19    statement, but I don't know.

20          MS. SCAPICCHIO:  All right.  So you'd give the

21    police officers a little more weight because of the way you

22    grew up?

23          THE JUROR:  Yes, I think so.

24          MS. SCAPICCHIO:  That took a long time to get out.

25    Let's see if we can try this again.  The police officer

1    testifies that the light is green, the civilian testifies

2    that the light is red, are you going to believe the police

3    officer just because he's a police officer and for no other

4    reason?

5            THE JUROR:  No, I don't think so.  I think the

6    thing there they'd have to be more information.  That's not

7    enough information to make a judgment either way.

8            THE COURT:  So you'd struggle, you'd treat him

9    like you would any other witness?

10           THE JUROR:  Yeah, I think so.

11           THE COURT:  When you said everyone grew up

12   respecting police, you said that that may be in the back of

13   your mind, but you would struggle against that, you'd try to

14   evaluate the testimony?

15           THE JUROR:  Yes.  Part the problem there is my

16   father was a fireman, so all those -- I mean, I had a lot of

17   dealings with policemen when I was younger because that's

18   who he knew, those people and stuff like that, so I think

19   that's where I would base that, my feelings on that from

20   growing up like that.

21           THE COURT:  But the question, go back to that,

22   this is a terribly important question.

23           THE JUROR:  No, I understand.

24           THE COURT:  There may be issues in this case in

25   which there's one version that comes from an officer and one

1    version that comes from a civilian.  We want jurors who will

2    evaluate what they're listening to and hear it and not

3    jurors who would say police officer never lies?

4             THE JUROR:  No, I wouldn't go that far.

5             THE COURT:  Okay.

6             MS. HARRIS:  Thank you.  Good morning, sir.  My

7    name is Mary Jo Harris, and I represent Detective Callahan

8    along with Hugh Curran here.  This is a case where the

9    plaintiff is alleging a wrongful conviction, and that's

10   actually in the questionnaire, and you indicated that when

11   the question was posed did you favor or oppose those kinds

12   of suits, you said you favor them.  Can you tell us just a

13   little bit more about that?

14            THE JUROR:  Well, I mean, my feeling is that if

15   somebody even of authority makes a mistake or something like

16   that and it affects them, it should be rectified, that's how

17   I feel about that.

18            MS. HARRIS:  You understand here as we come in

19   that there are two sides to every story and that there's

20   going to be a lot of evidence that you're going to have to

21   assess and weigh in order to make a decision, but you feel

22   you can do that fairly?

23            THE JUROR:  Yes.

24            MS. HARRIS:  I noticed also that you had indicated

25   that your son had had a car accident and there had been some

1    litigation perhaps --

2              THE JUROR:  Yeah.

3              MS. HARRIS:  -- that followed.  Can you tell us a

4    little bit what that was about?

5              THE JUROR:  Actually I wasn't involved in the

6    litigation, I was named in the lawsuit.

7              MS. HARRIS:  Because it's your car?

8              THE JUROR:  Because it's my car.

9              MS. HARRIS:  Of course.

10             THE JUROR:  Because he got in the car, somebody in

11   the other car got injured and they sued my name because it

12   was my car.

13             MS. HARRIS:  You were not personally involved in

14   going to trial?

15             THE JUROR:  It never went to trial, the insurance

16   company settled, but I know there was a lawsuit filed

17   because I have copies of it at home where my name was on

18   it.

19             MS. HARRIS:  Anything else?

20             MR. ROACHE:  I have nothing.

21             MR. CURRAN:  Thank you, sir.

22             MS. SCAPICCHIO:  Thank you.

23             THE COURT:  Mr. Quigley, I'm going to ask you to

24   call this number tonight after 6:00 with your juror number,

25   and if you're selected for the final jury, we'll see you

1    tomorrow morning at nine.  Thank you.

2              THE JUROR:  Thank you.

3              MR. ROACHE:  Thank you, sir.

4              MS. HARRIS:  Thank you.

5              MS. SCAPICCHIO:  Thank you.

6              THE COURT:  Hi.

7              THE JUROR:  Hi.

8              THE COURT:  This is Mr. Gilbert?

9              THE JUROR:  Right.

10             THE COURT:  Ms. Harris.

11             MS. HARRIS:  Good morning, sir, my name is

12   Mary Jo Harris.  I and Hugh Curran represent Detective

13   Callahan.  We're going to follow up with a few follow-up

14   questions.  I understand you're a truck driver?

15             THE JUROR:  Yes, I drive the mail around at night

16   from post office to post office.

17             MS. HARRIS:  Okay.  I think you had indicated in a

18   prior lifetime you had worked in a detention center in

19   Tampa, Florida?

20             THE JUROR:  In Tampa, Florida, yes, ma'am.

21             MS. HARRIS:  How long were you working there?

22             THE JUROR:  About three years total.

23             MS. HARRIS:  What was your job when you were down

24   there?

25             THE JUROR:  I was a childcare worker.

1          MS. HARRIS:  Okay.  So, detention center, it

2     wasn't -- I guess I'm assuming from that that you're working

3     in the criminal justice system.  Is my assumption incorrect?

4          THE JUROR:  Well, it was just in a detention

5     center there in the boys dorm, you know, as a worker.

6          MS. HARRIS:  I see, I see.  Okay.

7          THE JUROR:  Sometimes I would drive them to the

8     courthouse.

9          MS. HARRIS:  Okay.  Was there anything in that

10    experience that caused you to form an opinion, either

11    positive or negative, toward the criminal justice system or

12    law enforcement generally?

13         THE JUROR:  No.  No, there wasn't.

14         MS. HARRIS:  Anything else?

15         MR. ROACHE:  Just a brief question, Mr. Gilbert.

16    My name is John Roache, and I represent some of the

17    defendants in this case.  You say you drive a truck at night

18    for the post office?

19         THE JUROR:  Yes, sir.

20         MR. ROACHE:  What hours do you drive?

21         THE JUROR:  I drive from three in the morning to

22    ten in the morning.

23         MR. ROACHE:  Okay.  Three in the morning to ten in

24    the morning.  Would your sitting on this jury have an impact

25    on your employment?

1          THE JUROR:  Would it have an impact, I would not

2     be able to work that shift if I had to be here at nine.

3          MS. HARRIS:  Would you be able to work?

4          THE JUROR:  I would work different hours, work in

5     the afternoon.

6          MR. ROACHE:  Okay.  This case involves a suit

7     brought by a person who claims to be wrongfully convicted of

8     a homicide that occurred many years ago, and he's claiming

9     that certain evidence was withheld from his lawyer, he was

10    denied the right to a fair trial.  Now, have you ever been

11    involved or ever heard of any type of similar lawsuits?

12         THE JUROR:  No, sir, I only moved here to Boston

13    three years ago.

14         MR. ROACHE:  Okay.  Nothing while you were working

15    in Florida, any lawsuits brought against law enforcement for

16    alleged wrongdoings or inmates or detainees?

17         THE JUROR:  No, not firsthand, no.

18         MR. ROACHE:  Okay.  That's all I have, thank

19    you.

20         THE COURT:  Ms. Scapicchio.

21         MS. SCAPICCHIO:  Good morning, my name is

22    Rosemary Scapicchio.  Together with Mike Reilly, we

23    represent the plaintiff in this case, Shawn Drumgold.  We

24    expect that the evidence is going to show -- is going to

25    demonstrate in this case that, well, the allegation is that

1    Detective Callahan withheld some information from the

2    prosecutors in this case that resulted in Shawn Drumgold

3    getting an unfair trial.  We expect that you're going to

4    hear evidence from police witnesses as well as evidence from

5    civilian witnesses.  Would you be able to evaluate the

6    evidence of both police witnesses and civilian witnesses the

7    same, or would the police get an edge at all?

8            THE JUROR:  I believe it would be the same.  I

9    could look at both sides.

10           MS. SCAPICCHIO:  Okay.  After you heard all the

11   evidence if you determined that Shawn Drumgold had proven

12   his case that evidence was withheld that resulted in him

13   getting an unfair trial, could you award money damages to

14   Shawn Drumgold?

15           THE JUROR:  I believe so, yes.

16           MS. SCAPICCHIO:  I don't have anything further.

17   Thank you very much.

18           THE COURT:  Mr. Gilbert, here's a number for you

19   to call after 6:00.

20           THE JUROR:  Today?

21           THE COURT:  Today.  This will tell you whether

22   you're on the final jury.  There's one more round.  You'll

23   use your juror information, the string of numbers that you

24   plug into when you call up, okay, and if you are selected,

25   we'll see you tomorrow morning at 9:00.

1           MS. HARRIS:  Should we ask one question.  I'm

2     assuming you'll be able to change your shift, if we sit from

3     9 to 1, are you sure that that won't interfere with your

4     work?

5           THE JUROR:  No, it won't, I can work another shift

6     from three in the afternoon into the night and I get paid

7     for the rest for jury duty.

8           THE COURT:  Federal Government, right?

9           THE JUROR:  No, there's a contractor for the post

10    office.

11          THE COURT:  Okay.  Thank you, sir.  Hi,

12    Mr. Pittenger.

13          THE JUROR:  Hello.

14          MS. SCAPICCHIO:  Good morning, my name is

15    Rosemary Scapicchio.  Together with Mike Reilly, we

16    represent the plaintiff in this case, Shawn Drumgold.  We

17    expect in this case that the evidence would suggest that

18    Detective Callahan in this case withheld some evidence from

19    the prosecutors that resulted in Shawn Drumgold not getting

20    a fair trial.  We expect that you're going to hear evidence

21    from police witnesses as well as from civilian witnesses.

22    Would you be able to evaluate the evidence from the police

23    witnesses the same as the evidence from the civilian

24    witnesses or would the police witnesses get an edge at all?

25          THE JUROR:  I think I'd be able to evaluate both

1   equally.

2          MS. SCAPICCHIO:  Okay.  Do you have any hesitation

3   about that?

4          THE JUROR:  Well, I mean, a little bit, it's just

5   kind of being taught from an early age to kind of trust

6   police.  Obviously I've kind of -- that's kind of evolved

7   over the years.  It's gone a little bit beyond that where

8   I'm inclined to believe the civilian witnesses in a lot of

9   cases after hearing so much about in the news about the

10  police maybe not always giving people a fair shake.  I think

11  I'd be more open to the civilian point of view than I have

12  had in the past.

13         MS. SCAPICCHIO:  When you say more edge, would the

14  police officer get an edge or would a civilian get an edge?

15         THE JUROR:  I think at this point no one would get

16  an edge.

17         MS. SCAPICCHIO:  No one would get an edge?

18         THE JUROR:  Correct.

19         MS. SCAPICCHIO:  I also noticed on your

20  questionnaire that you indicated you had a family friend

21  that was a warden in a county jail?

22         THE JUROR:  Yes.

23         MS. SCAPICCHIO:  Which county jail would that have

24  been?

25         THE JUROR:  He was at Cedar Junction.

1          MS. SCAPICCHIO:  Would the fact that you had a

2     friend at Cedar Junction enter into your considerations

3     here?

4          THE JUROR:  No.

5          MS. SCAPICCHIO:  I don't have any further

6     questions.

7          MS. HARRIS:  My name is Mary Jo Harris.  I

8     represent Detective Callahan.  I think I noticed from your

9     questionnaire you've just started a job?

10          THE JUROR:  Yes.

11          MS. HARRIS:  Would sitting on this jury interfere

12     with your employment in any way?

13          THE JUROR:  I don't think it would interfere, but

14     the one thing I would be a little concerned, I mean, I

15     realize it's, you know, it's jury duty, I can't help it, but

16     I kind of think that it would be important for me to show my

17     face around the office more, but I don't think it would

18     actually affect my job.

19          MS. HARRIS:  And when did you start working?

20          THE JUROR:  I started working last Thursday.

21          MS. HARRIS:  I'll defer to your Honor on that.

22          THE COURT:  It's up to Mr. Pittenger, if you think

23     you can manage this, we won't sitting on Fridays, and

24     they'll be a chunk of time in a week that we won't be

25     sitting, the week of the 21st, so if you think that that's

1    enough to keep you from your job.

2         THE JUROR:  No, I don't think it's a matter like

3    risking losing the job, by any means, I just, I think that I

4    would ideally in a perfect world, I'd prefer to be able to

5    show my face eight, nine hours a day, but, I mean, it's

6    federal jury duty, I think the excuses don't get much more

7    legitimate than that.

8         THE COURT:  I agree.  Go on.

9         MS. HARRIS:  I also noticed that you indicated you

10   had an alcohol charge?

11        THE JUROR:  Yes.

12        MS. HARRIS:  And you felt that the police had

13   singled you out.  Can you tell us a little bit more, about

14   your feelings, about the feelings about singled out?

15        THE JUROR:  Well, it was at a beach, appeared on

16   the 4th of July weekend when I was 19, and it just seemed

17   like there was a sea of kids my age drinking, and I was the

18   only one that was arrested out of my immediate group.  Well,

19   the kids had open containers all around me, and I could not

20   understand why I had been specifically singled out.

21   Fortunately I was put in a first-time offenders type program

22   where I attended counseling and so forth, so it ended up

23   really not ending up as a conviction, per se.

24        MS. HARRIS:  Did it leave you questioning the

25   fairness of the police you dealt with?  It sounds having

1   felt that you were singled out, how did that impact the way

2   that you were looking at the officers that you dealt with?

3          THE JUROR:  Well, that incident specifically

4   certainly kind of made me realize how human they are, kind

5   of open to bias, open to judgment calls that might not

6   always go your way, but the fact that they're kind of not

7   machines, you know, that they have biases just like anyone

8   else.

9          MS. HARRIS:  The case that we're going to be

10  presenting here has a pretty stark dispute of factors, if

11  you will, there are civilians who say one thing happened,

12  and there's obviously a defense that says something else

13  entirely went on, and you're going to be evaluating the

14  testimony of police officers and civilians.  Some of the

15  testimony is going to be based on things that happened over

16  20 years ago.  Are you going to be able to listen to that

17  evidence and give fair credibility to everybody who's

18  testifying in front of you?

19          THE JUROR:  Yes, I think so.

20          MS. HARRIS:  Guys.

21          MR. ROACHE:  A couple questions, Mr. Pittenger.

22  In what municipality were you arrested for drinking the open

23  container?

24          THE JUROR:  That was in Scituate.

25          MR. ROACHE:  Scituate?

1          THE JUROR:  Humarock.

2          MR. ROACHE:  Have you ever had any interactions

3    with the Boston Police?

4          THE JUROR:  Nothing beyond like, you know, get out

5    of the street, things like that, things of that nature,

6    nothing beyond that though.

7          MR. ROACHE:  Have you read or heard anything about

8    any cases involving the Boston Police in which the police

9    were put in a negative light?

10         THE JUROR:  None really come to mind offhand.

11         MR. ROACHE:  Okay.  Now, in this particular case,

12   you're going to hear testimony that the police singled out

13   an individual, Mr. Drumgold, as a perpetrator of a homicide

14   despite evidence to the contrary, and they focused on him

15   and him alone along with another individual.  Would your

16   prior experience having been singled out for drinking

17   whereas there were many other people drinking at the same

18   time, would that have an impact on your ability to assess

19   the credibility of the witnesses and the weight of the

20   evidence?

21         MS. SCAPICCHIO:  I think I would object to that

22   question, your Honor.

23         THE COURT:  I don't think so.  Go on.  You can

24   have the question.

25         THE JUROR:  I feel that I would kind of have those

1    feelings regardless of whether or not I had been arrested

2    being able to empathize with someone who had been singled

3    out in a situation like that, I kind of felt like that

4    incident specifically wouldn't affect my judgment.

5         MR. ROACHE:  Your incident of being singled out

6    for drinking?

7         THE JUROR:  Right.

8         MR. ROACHE:  But you think if you heard evidence

9    that the police were singling out an individual for a

10   homicide that that would have an impact on your decision?

11        THE JUROR:  I'm sorry, could you repeat that?

12        MR. ROACHE:  Would the fact that you're going to

13   hear evidence that the police were singling out an

14   individual who proclaimed his innocence as the person who

15   committed a homicide and despite other evidence to the

16   contrary about perhaps other perpetrators that could have

17   committed the homicide, would that affect your decision to

18   be able to fairly evaluate the evidence and come to a

19   decision based on the evidence alone, or would you have some

20   bias either for or against the person who was singled out or

21   for or against the police officers that were alleged to have

22   singled this person out?

23        THE JUROR:  I guess it might affect somewhat

24   honestly.  I know this is sort of going back on what I just

25   said, but when it's phrased like that, I guess I could see

1    that my experience affecting that kind of being, you know,

2    being more inclined to believe someone who said they had

3    been singled out because I realize that it can happen in

4    cases minor as mine or in serious cases as a homicide.

5             MS. SCAPICCHIO:  Can I follow up, your Honor?

6             THE COURT:  Yes, you can.

7             MS. SCAPICCHIO:  So, in this case, if guilt or

8    innocence wasn't an issue and the only issue was whether or

9    not Shawn Drumgold got a fair trial and whether or not a

10   police officer withheld evidence that may have resulted in

11   an unfair trial, whether he was singled out or not singled

12   out, the evidence in this case is about evidence that

13   withheld and whether or not it resulted in an unfair

14   trial.

15            THE JUROR:  Okay.

16            MS. SCAPICCHIO:  Under those circumstances, could

17   you evaluate the evidence of a police officer and the

18   evidence of a civilian witness the same way you would

19   everyone else, listen to the evidence and make the

20   conclusions after you heard the person testify?

21            THE JUROR:  Yes, I feel so.

22            THE COURT:  Any further questions?

23            MS. SCAPICCHIO:  No, your Honor.

24            THE COURT:  I'm going to give you a number to call

25   after 6:00 today.  Okay.  It will tell you whether you're on

1    the final jury, sir, and you need your juror number when you

2    call in after 6:00.

3           THE JUROR:  Also, I just witness stand to mention

4    somebody, one of the gentleman the name of his firm,

5    Bletzer & Bletzer, Conrad Bletzer is a family friend.

6           MR. CURRAN:  Medfield.

7           THE JUROR:  He lives up a block.  I don't think --

8           THE COURT:  He's on the witness list?

9           MR. CURRAN:  No, Judge, he's my law partner.

10          THE COURT:  I see.

11          MR. CURRAN:  How long have you known the Bletzer

12   family?

13          THE JUROR:  As long as I can remember.

14          THE COURT:  So then the question is do you think

15   that if you were a juror in this case and you voted against

16   Mr. Curran, the position Mr. Curran was taking, would it be

17   hard for you to go home and run into your friend down the

18   block?

19          THE JUROR:  I don't think so.

20          THE COURT:  Can you step out for just a second, I

21   want to talk to the lawyers about this.  Your feelings,

22   Mr. Curran?

23          MR. CURRAN:  Both Bletzers, they're both pretty

24   active in Medfield.  I look at the age.  I know that

25   Conrad's son just graduated from Bentley, and he played

1   hockey, so he spent an extra year before he went to college,

2   and they're about the same age.

3          THE COURT:  So?

4          MR. CURRAN:  To me, before Mr. Roache asked some

5   questions, I liked him as a juror, but I understand the

6   Court, you know, the concern.  I know that both Bletzers,

7   Conrad and Kurt live in Medfield.  If he's in that

8   neighborhood, they're both pretty close to him.

9          THE COURT:  Ms. Scapicchio.

10         MS. SCAPICCHIO:  Judge, I'm concerned he felt like

11  he needed to bring it to our attention.  I liked him as a

12  juror, but I would be concerned.  I'm having the same

13  concerns Mr. Curran has.

14         THE COURT:  Okay, we'll excuse him.  Tell him he's

15  excused.  Hi.  Mr. Lombardo, Ms. Scapicchio you start.

16         MS. SCAPICCHIO:  Hi, Mr. Lombardo, my name is

17  Rosemary Scapicchio.  We're going to ask you a few more

18  questions regarding the questionnaire you've already filled

19  out.  I noticed on your questionnaire that you were asked a

20  question, people who have been wrongfully convicted

21  sometimes bring lawsuits against the police department, do

22  you favor or oppose these type of lawsuits, you indicated

23  you opposed them.  Could you tell me why?

24         THE JUROR:  Just because if it's not the officer's

25  fault to begin with that the person was wrongfully accused.

1   It doesn't make it -- I think it shouldn't go against that

2   officer.

3          MS. SCAPICCHIO:  Okay.  What would make you say if

4   it's not, why would you have the position if it's not the

5   officer's fault?

6          THE JUROR:  The circumstances just on the basis

7   that it was that wrongfully accused in the first place or

8   things of that nature.

9          MS. SCAPICCHIO:  Okay.  And so is there any

10  circumstance where you think a plaintiff is entitled to sue

11  a police officer if he didn't have a fair trial, or are

12  there no circumstances where you think that's appropriate?

13         THE JUROR:  No, there probably is some.

14         MS. SCAPICCHIO:  But you don't think that you

15  don't favor those types of lawsuits and you don't believe

16  they should be brought?

17         THE JUROR:  Not necessarily, no.  Certain

18  circumstances that, you know, it would have to all be

19  explained.

20         MS. SCAPICCHIO:  What would be those circumstances

21  that you think it would be okay, a lawsuit for a wrongful

22  conviction?

23         THE JUROR:  I'm not really certain at this

24  point.

25         MS. SCAPICCHIO:  You can't think of any occasions

1    on which it would be okay to bring a wrongful conviction

2    suit?

3              THE JUROR:  No, not offhand, no.

4              THE COURT:  Is it that you just can't think of

5    one?

6              THE JUROR:  Correct.

7              THE COURT:  You don't think there is a situation

8    out there?

9              THE JUROR:  Oh, no, I imagine there definitely is.

10   I just can't think of one right off the top of my head.

11             THE COURT:  Go on, Ms. Scapicchio.

12             MS. SCAPICCHIO:  In this case, Detective Callahan

13   withheld some evidence from the prosecutors that resulted in

14   Shawn Drumgold not getting a fair trial.  You're going to be

15   asked to evaluate the testimony of police officers vs. the

16   testimony of civilian witnesses.  Would the police officers

17   get an edge at all?

18             THE JUROR:  I don't think so.

19             MS. SCAPICCHIO:  Why not?

20             THE JUROR:  In today's day and age, things that

21   have happened in the past, just there's always that doubt.

22             MS. SCAPICCHIO:  What things are you talking about

23   that happened in the past?

24             THE JUROR:  Just different stuff you see in the

25   local news, and, you know, things that have gotten by other

1  people because they were officers and --

2          MS. SCAPICCHIO:  Like what, can you give me an

3  example?

4          THE JUROR:  Just basic stuff.  You see people

5  getting pulled over for a DUI, which is on there, and

6  different people with a badge have gotten let off with

7  lesser penalties than somebody like myself would have.

8          MS. SCAPICCHIO:  Okay.  So, is it your position

9  that the police officers would get the same treatment as the

10 civilian witnesses, you would listen to the testimony and

11 come to a conclusion after you heard the evidence?

12         THE JUROR:  Correct, all based on evidence, not

13 who they are or what they do.

14         MS. SCAPICCHIO:  Thank you.

15         MS. HARRIS:  Good morning, sir.  My name is

16 Mary Jo Harris, and I and Hugh Curran represent

17 Detective Callahan.  Just to follow up on a couple of

18 questions, Ms. Scapicchio, like here there are two very

19 different stories about what happened.

20         THE JUROR:  Correct.

21         MS. HARRIS:  Is it your testimony that you would

22 listen to both sides and you would be able to find against a

23 police officer if you felt it was proven that he had done

24 something wrong?

25         THE JUROR:  Correct.

1          MS. HARRIS:  You are also open to the possibility

2     that there could be a wrongful conviction?

3          THE JUROR:  That's right, need to hear all that

4     evidence.

5          MS. HARRIS:  You had referenced your own

6     experience being charged with a DUI.  Does that impact your

7     ability, you know, credit or to listen to a police officer

8     and give him the same kind of credibility, or that's a bad

9     question to --

10          THE JUROR:  I know what you're saying.

11          THE COURT:  Good, because I don't.

12          THE JUROR:  No, because that was my own doing,

13     that was my choice to get behind the wheel.  I got caught.

14          MS. HARRIS:  Did you feel that you were treated

15     unfairly in that circumstance?

16          THE JUROR:  No.  There was actually three.

17          MS. HARRIS:  I'm sorry.

18          THE JUROR:  Three different ones.

19          MS. HARRIS:  I'm not trying to pry into your

20     personal business.

21          THE JUROR:  No, it's not.

22          MS. HARRIS:  Do you guys want to follow up

23     anything?

24          MR. ROACHE:  You said that there were three prior

25     OUIs, without getting into the details?

1             THE JUROR:  Correct.

2             MR. ROACHE:  Do any of them involve the Boston

3     Police?

4             THE JUROR:  None.

5             MR. ROACHE:  Nope.  In any of the three times that

6     you were stopped for OUI, did you feel you were being

7     treated unfairly by the police?

8             THE JUROR:  No, I did not.

9             MR. ROACHE:  Did you feel that because you were a

10    civilian and not a police that you were treated unfairly?

11            THE JUROR:  No.

12            MR. ROACHE:  Do you think if you were a police

13    officer you would have received better treatment from a

14    fellow police officer?

15            THE JUROR:  It's hard to say not being a police

16    officer.

17            MR. ROACHE:  Now, you said you thought, if I

18    understood you correctly, you thought that police officers

19    sometimes get off more easily than civilians when they do

20    something wrong?

21            THE JUROR:  Correct.  That's just the stuff in the

22    newspaper or you hear on the news, those are the only ones

23    that I know of, things that of that nature.

24            MR. ROACHE:  Would that -- your having heard that

25    or read that, would that affect your ability to assess the

1    credibility of a police officer or a law enforcement officer

2    that will testify in this case as opposed to a civilian who

3    will testify in this case?

4            THE JUROR:  None whatsoever.  It's all based on

5    what is heard in the courtroom as far as I'm concerned.

6            MR. ROACHE:  Okay.  That's all I have, thank you,

7    sir.

8            THE COURT:  I'm giving you a number to call after

9    6:00, call this number with your juror number and then you

10   find out with calling this 1-800 number, and if you are,

11   we'll see you tomorrow at nine.  Thanks a lot, sir.

12           MS. SCAPICCHIO:  Thank you.

13           THE JUROR:  Hello.

14           THE COURT:  Hi.  This is Ms. Rijo.

15           THE JUROR:  Ms. Rijo, you got it right.

16           MS. HARRIS:  It's me, good morning.  How are you?

17           THE JUROR:  Good.

18           MS. HARRIS:  I'm Mary Jo Harris, and Hugh Curran

19   and I represent Detective Tim Callahan in this case, and as

20   you probably remember, this is a case where the plaintiff

21   alleges he was wrongfully convicted.  We represent the

22   defendant who denies that he did anything that led to a

23   wrongful conviction.  That's basically the dispute.  I

24   noticed in going through your questionnaire you indicated

25   that at some point in the past you felt that your father was

1    mistreated by the police?

2            THE JUROR:  Uh-hum.

3            MS. HARRIS:  Could you tell us just a little bit

4    about that?

5            THE JUROR:  Well, I was not there, but, of course,

6    my father, and he was never convicted or had any criminal

7    records, and he was collecting the rent.  It was already two

8    months.  I was getting married, couldn't help with the

9    mortgage that was behind.  I said, dad, you know, you might

10   want to go and talk to the tenant and say, you know, you

11   need to pay it at one point.

12           He went, he was talking to the mother, pointing

13   out things saying we fixed this, we fixed that, and so the

14   tenant called the police, and then the police came and my

15   father was talking to this lady, he was talking with his

16   hands.  They didn't say anything to him.  He got pushed, he

17   didn't know what was going on and was being arrested.

18           My family came and my nephew saw that.  My sister

19   is also a social worker.  She was telling the State Police

20   who obviously spoke Spanish said you need to talk to my

21   father in Spanish, he doesn't understand what's going on,

22   please, you know, indicate what's going on, she didn't, and

23   he was arrested, and we bailed him out.  It was not a

24   pleasant moment.  He did what he was supposed to do, and it

25   just, you know, it's all in the past.

1        MS. HARRIS:  How long ago did this happen?

2        THE JUROR:  This was in '07.

3        MS. HARRIS:  Where did it happen?

4        THE JUROR:  In my house.

5        MS. HARRIS:  I mean which town?

6        THE JUROR:  Lawrence.

7        MS. HARRIS:  And the police officer was a female

8   police officer?

9        THE JUROR:  There was a male officer and a female

10  officer.  The female officer spoke Spanish.

11        MS. HARRIS:  Having had that experience, has that

12  impacted the way you view police officers?

13        THE JUROR:  No, because I work with police

14  officers, I work with the court.  The only thing is that,

15  you know, it is unfortunate that, you know, it was presented

16  the way it was presented and handled the way it was handled,

17  so of course it was my father, it didn't hurt me, but it

18  just happened that he was one of the unfortunate ones.

19        MS. HARRIS:  When you say that you work with the

20  court, what court do you work with?

21        THE JUROR:  I work with the Lawrence court or any

22  court that we happen to have a case on, could be Boston, but

23  mainly Lawrence court, juvenile court.

24        MS. HARRIS:  You work with a social worker?

25        THE JUROR:  With the Department of Children and

1    Families.

2         MS. HARRIS:  Have you had any experiences with the

3    Boston Police Department either professionally or in your

4    personal life?

5         THE JUROR:  No.

6         MS. HARRIS:  In this case there are going to be

7    different versions of events testified to, and there's going

8    to be civilian witnesses as well as police officer

9    witnesses, and there may be lawyer witnesses as well.  Would

10   any of those types of witnesses be entitled to more credence

11   or less credence by you based on their profession?

12        THE JUROR:  With what, I'm sorry?

13        MS. HARRIS:  Would you be more likely to credit

14   the testimony of a police officer or a lawyer over a

15   civilian witness?

16        THE JUROR:  I think, you know, whatever evidence

17   they have, you know, we go by, I will go by that.  I don't

18   think that I will, you know, favor a police officer or a

19   lawyer, it's what's presented, and you know what seems

20   logical and fair.

21        MS. HARRIS:  What kind of work or what kind of

22   cases are you involved with?  Do you actually go to court

23   with any of your clients?

24        THE JUROR:  Yes.  Most of my cases are COP cases

25   where the department has custody, and these kids are in

1    placement, but a lot of them we have CHINS custody for, you

2    know, kids who are in need of services and juveniles, and,

3    you know, we're often in court because they're in violation

4    of their probation and constantly building a plan to make

5    sure that they're stable and we can meet their needs.

6            MS. HARRIS:  Has anything in your work led you to

7    question the ability or the competence of any of the law

8    enforcement officers that you've dealt with in the course of

9    your work?

10           THE JUROR:  No, I think from the work that we do,

11   I do and the relationship that my department has with the

12   Lawrence District Court, I think we actually have two judges

13   that we work with, and they're really good and on point.  We

14   have a good relationship, and, of course, I have the support

15   of my coworkers and never really had a problem.

16           MS. HARRIS:  Okay.

17           MR. ROACHE:  Hi, Ms. Rijo, my name is John Roache,

18   and I represent a couple of the defendants in this case.

19   First of all, I noticed on your questionnaire question

20   No. 30 that you are concerned with your job if you were to

21   serve as a juror.  What concerns do you have with your job?

22           THE JUROR:  Well, I didn't want to say anything

23   yesterday because I felt like, you know --

24           THE COURT:  I guilt tripped you is what you're

25   saying.

1          THE JUROR:  I think you did, but honestly I think

2     this is a wonderful experience and I feel honored to be

3     here, but, you know, as you probably guys know social

4     workers, I have 17 cases, 17 families to work with, and it's

5     not your typical family, it's families that usually have

6     issues and problems that we need to address and kids that we

7     work with, and I usually have weekly supervised visits with

8     a family of four children under the age of four which I had

9     to cancel today.  We're five unit members, and my team

10    couldn't do the visits, so, you know, that's going to hurt

11    me, and we actually lost a client yesterday, and I cannot be

12    there to support my coworkers.

13          THE COURT:  Lost a client how?

14          THE JUROR:  Well, the child died, so we came back

15    from the -- so, these are typical things that happen.  I

16    have to be constantly on the phone doing referrals,

17    planning.  I have two court cases coming up next week.

18          THE COURT:  At what time, in the morning?

19          THE JUROR:  Yeah, mornings.

20          THE COURT:  There's obviously no way you could do

21    that and be a juror in this case.  If you think that your

22    responsibilities on the job will make it impossible.

23          THE JUROR:  Well, I also wrote a statement, and I

24    called and I was on call for three weeks, and I wrote the

25    statement and I called the lady and I said, you know, being

1    on call for three weeks is also crazy because you don't

2    know, it's unpredictable.  She said, well, it's not an

3    excuse, so I'll give you a one day and yesterday was my day

4    and I got to be chosen.

5            THE COURT:  What do you mean, when you talked to

6    your employer?

7            THE JUROR:  No, when I called.

8            THE COURT:  When you called here?

9            THE JUROR:  When I called to register, the lady

10   said we received the excuse, however that's not enough, so

11   instead of three week on call, they gave me one day which

12   was yesterday.

13           THE COURT:  I see.  You know what I'm going to

14   excuse you.  I'm sorry that we had to put you through this.

15   It does seem to me that you have obligations that would be

16   undermined by this.  Thank you very much.

17           THE JUROR:  Thank you, good luck.

18           THE COURT:  Business owners, CEO.

19           MR. ROACHE:  Why don't we ask that first.

20           THE COURT:  Yes, please, I'll do that.  Hi.

21           THE JUROR:  Hi.

22           THE COURT:  You are Ms. Shea?

23           THE JUROR:  Uh-hum.

24           THE COURT:  Let me start you have conferences and

25   presentations scheduled for the start of October?

57

```
 1              THE JUROR:  Yes.

 2              THE COURT:  You understand that there is a chance,

 3    there's a chance that it would end earlier but there's a

 4    chance that you would be on until October 15th, 9 to 1.

 5    What's the impact of that on your job?

 6              THE JUROR:  So I own my own business.

 7              THE COURT:  Yes.

 8              THE JUROR:  I've put in nonrefundable deposits for

 9    these conferences to exhibit.

10              THE COURT:  Where are they?

11              THE JUROR:  They're all over in Massachusetts, one

12    in Worcester, one in Springfield, one in. --

13              THE COURT:  So these are nonrefundable?

14              THE JUROR:  Yes, so it would be about $1,000,

15    $1500, somewhere in there.

16              THE COURT:  I'll excuse you.  Thank you.  Debra

17    Slade is next.  We have to go back into the courtroom.

18    Let's take a brief break.  15 minutes.  We'll start again at

19    11.

20              (A recess was taken.)

21              THE CLERK:  All rise.  United States District

22    Court is now in session.

23              THE COURT:  Good morning, everyone.  You can be

24    seated.  My name is Judge Gertner, and I'm the Judge of this

25    session.  What we're doing this is picking a jury in the
```

1    case of Shawn Drumgold vs. Callahan, City of Boston,

2    Callahan and the City of Boston.  The goal of the jury

3    selection, just so that you know, is to pick a jury that

4    would be the kind of jury that you'd want to have if you

5    were sitting in the shoes of either side.

6            That's when you think about it, who do you want to

7    sit on a case that you would have in a comparable situation

8    to the people in this case?  So, we take a little bit of

9    time, and that means I address you all as a group and ask

10   some questions of you as a group, and then we question

11   people individually.  We've done a lot of questioning

12   yesterday, so this won't take very long.  I anticipate we'll

13   be finished by early afternoon and people won't have to hang

14   around much more than that.  You understand it takes more

15   than a quick questioning to find the fairest jurors we know

16   how to find.

17           I'm going to ask a couple questions.  I'm going to

18   give you some idea what the case is and ask whether or not

19   whether you've read, seen or heard anything about the case.

20   When I give you the description of the case, I want you to

21   listen carefully, then I'm going to read a long list of

22   witnesses to you.  The lawyers were told to give us the name

23   of anyone that they might conceivably call, so their

24   imaginations were very fertile, so we have a very, very long

25   list, but I assure this will not be the list of actually

1    people who will be called.

2         We want to make sure that no one goes on the stand

3    that you're related to, so we ask them to clear a bunch of

4    names, then we'll introduce you to the parties.  Would you

5    stand, please, and you can be sworn in as potential jurors.

6         (Potential jurors were sworn)

7    THE COURT:  You can be seated.  So let me first

8    give you a description of the case.  It's a little long.

9    This is a case that's brought under the federal civil rights

10   statute in which the plaintiff, Shawn Drumgold, claims that

11   the defendant, Timothy Callahan, City of Boston and Officer

12   Superintendent Roache violated his right to a fair trial by

13   knowingly withholding exculpatory evidence relating to a

14   witness who testified in his criminal prosecution.  The

15   criminal prosecution was in 1989.

16        Mr. Daley claims that he was convicted as a result

17   of Mr. Callahan's violation of his civil rights, that the

18   violation of his civil rights was a substantial factor

19   rather in causing his conviction.  The burden of proof is on

20   the plaintiff, Mr. Drumgold, to prove elements of his claim

21   to you by a preponderance of the evidence.

22        You'll get more detailed instructions from me at

23   the end of the case, I just want to give you an overview to

24   see if any of you have heard of the case.  The case arises

25   out of the August, 1988 murder of a young girl named

1    Tiffany Moore.  She was shot while she was sitting on a

2    mailbox surrounded by a group of teenagers near the corner

3    of Humboldt Avenue and Homestead Street in Roxbury.

4            Shawn Drumgold and Terrance Taylor were ultimately

5    arrested and charged with the crime, but Mr. Drumgold claims

6    that exculpatory evidence pertaining to a witness that was

7    called at trial, a witness named Ricky Evans, was knowingly

8    withheld from the prosecution.  Detective Callahan denies

9    this.  Mr. Drumgold further claims that the knowing

10   suppression of that penal exculpatory evidence by Detective

11   Callahan violated his rights to due process and resulted in

12   a conviction that led to an unfair and untrustworthy guilty

13   verdict.  Detective Callahan denies that any of his actions

14   deprived Mr. Callahan of a fair trial.

15           Have any of you read, seen or heard anything about

16   this case?  Let me write down, you have to stand, I'm just

17   going to get your numbers, and then we'll talk to you again.

18   Can you tell me who you are, Ms. Bresnahan?

19           THE JUROR:  Bresnahan, yes.

20           THE COURT:  Juror No. 45.  It's a little hard for

21   me to figure this out.  I'm sorry, can you tell me your

22   name?

23           THE JUROR:  Patricia Antosca.

24           THE COURT:  Mr. Keck?

25           THE JUROR:  Yes.

1          THE COURT:  Juror No. 54, and Mr. Spoerl, juror

2    No. 56, and you are Ms. --

3          THE JUROR:  -- Desmery.

4          THE COURT:  Just one second.

5          THE CLERK:  Last name.

6          THE JUROR:  Desmery.

7          THE CLERK:  She's 66.

8          THE COURT:  Ms. Desmery, okay.  You are?

9          THE JUROR:  Mr. Pitman.

10          THE CLERK:  68.

11          THE COURT:  I don't have those numbers, Maryellen.

12          THE CLERK:  Second page.

13          THE COURT:  I don't have a second page.

14    Mr. Pitman did you say?

15          THE JUROR:  Yes.

16          THE COURT:  You can sit down when I call your

17    name.  Anyone in the remaining rows.  All right.  We'll

18    question you again at the sidebar in a moment.  I'm going to

19    read a list.  First let me have the lawyers and the parties

20    introduce themselves to you.

21          MS. SCAPICCHIO:  Thank you, your Honor.  Good

22    morning, ladies and gentlemen, my name is

23    Rosemary Scapicchio.  I have a law office here in Boston,

24    and I together with Attorney Mike Reilly and Amy Coggan,

25    who's a third law student at Suffolk University, are

1    representing Shawn Drumgold, this is the plaintiff.

2              THE COURT:  Okay.

3              MS. HARRIS:  Good morning, ladies and gentlemen.

4    My name is Mary Jo Harris, and I also practice in town.  I

5    represent retired Detective Timothy Callahan along with my

6    colleagues who will introduce themselves.  Thank you.

7              MR. CURRAN:  Good morning, ladies and gentlemen,

8    my name is Hugh Curran.  I'm an attorney in Boston at the

9    law firm of Bletzer & Bletzer.  I also represent

10   Timothy Callahan.

11             MR. ROACHE:  Good morning, ladies and gentlemen,

12   my name is John Roache, and I like the other lawyers have a

13   law firm in Boston.  I represent the City of Boston and

14   former Police Commissioner Francis M. Roache who may or may

15   not be defendants in this case.

16             THE COURT:  Are any of you familiar with the

17   lawyers or the parties in this case?  Personal relationship,

18   family relationship?  Okay.  There are no affirmative

19   responses.  This trial, it's possible that this trial will

20   last until October 15th.  That was put in the questionnaire,

21   but we sit from 9 to 1, so you typically have your

22   afternoons off except at a time when the jury begins

23   deliberating, then you deliberate for as long as it takes.

24             In addition the week of the 21st, which is the

25   week after next, because of my schedule, we can't have

1    trial.  We typically don't sit on Fridays, so the

2    obligations in this case will be essentially four days a

3    week, obligations for all the days except for that week, and

4    also the Monday, the 28th, which is a Jewish Holiday.  It is

5    conceivable that the case could go to October 15th.  It

6    could conceivably end earlier than that, but we want to make

7    sure we've cleared all that amount of time.  All of you have

8    said on your questionnaire that you can serve through that

9    period of time.

10          If there is any one among you, let me preface

11   that, we need everyone to sit as jurors, you know that.

12   It's not fun for everyone to take time off in busy lives,

13   but the system works only when as many people from all parts

14   of our area sit, so with that really fabulous guilt trip, is

15   there anyone who absolutely can't serve during this period

16   of time?  Again, Mr. Pitman, okay.  Is there anyone else who

17   can't serve?  Tell me your name.

18          THE JUROR:  Kathleen Sullivan.

19          THE COURT:  Okay.  And tell me your name, Mr. --

20          THE JUROR:  Caballera.

21          THE COURT:  Mr. Caballera is juror 50, and

22   Mr. Lomba is 51.  Okay.  I'm going to read -- I'm just

23   taking all this down, I'll question you again.  I'm going to

24   read a list of witnesses to you, again, witnesses that may

25   conceivably be involved in the case.  It's a long list, so

1    listen carefully, and if there's anyone on that list you

2    know, related to, you know, good buddies with, raise your

3    hand afterwards.

4              First I'm going to read the names of people from

5    Boston, and they are Eric Johnson, Corinne Delahunt,

6    Stanley Kessler, Mary Alexander, Ricky Evans, Wayne Davis,

7    Ronald Downs, David Carte, Vincent DiFazio, Theron Davis,

8    Andrew Garvey, Romero Holliday, Robert Hayden, Mervin Reese,

9    Rana Roisten, Alice Moore, Cherry Walker,

10   Vantrell McPherson, Tracie Peaks, Chris Cousins, Kevin

11   Lucas, Thomas Gaughan, Lisa Holmes, that's Gaughan,

12   G-a-u-g-h-a-n, Lisa Holmes, Larry Ellison, Willie Simms,

13   Donald Wilson, Troy Jenkins, Geraldo O'Rourke, Terrance

14   Taylor, Paul Murphy, Tanoi Curry, Shamia Clemons, Travis

15   Goss, Eric Johnson, Stanley Bogdon, Diane Gill, Jose'

16   Garcia, Daniel Linsky, Tyronne Brewer, Rodney Sadberry,

17   Joseph Saia, William Celester, Paul Durand, Richard Walsh,

18   Paul Linn, Rosemary McLaughlin, Marlon Passley, Lewis

19   Santos, Robert George, Tony Smith, Francis Roache, Angel

20   Toro, Charles Horseley, David Meier, Edward McNelly, Neil

21   Miller, Darnell Johnson, Ralph Martin, Tracy Lyons, Cheryl

22   Cormier, Miller Thomas, Joseph Dunford, Joseph Saia, Marie

23   Donohue, Robert Dunford, Gary Eblan, Mark Hayes,

24   Kenneth Fong, Robert Francis, William Hussy, James Jordan,

25   Paul Leary, Jennifer Maconochie, William McCarthy.  These

1    names might be repetitive, Timothy Murray, Peter O'Malley,

2    Terrence O'Neil, Kathleen O'Toole, Lalita Pulavarti,

3    Pervis Ryan, Michael Stratton, Justina Ward Justina Ward,

4    Robert Ahearn, Lorraine Henshaw, Robin DeMarco, Kevin

5    Averill, Joseph Carter, Michael Connolly, Robert Cunningham,

6    Donald Devine, Daniel Dovidio, Thomas Dowd, Paul Farrahar,

7    Robert Foilb, Gregory Gallagher, Michael Galvin, Darrin

8    Greeley, James Hasson, Bobbie Johnson, John Kelly, John

9    Kervin, Thomas Lee, Donald Levine, John McCarthy, Robert

10   Orr, Bridgett Robinson, Roger Spring, Albert Terestre, James

11   Wood, Joseph Zinck, Paul Joyce, Ralph Cinquegrana, Melvin

12   Tucker.

13           Now, from other towns, Stanley Bodgon from

14   Belmont; Mark DeLuca from Marshfield, I believe I already

15   mentioned Joseph Saia, who's Norwood; Paul McDonough,

16   Quincy; Philip O'Shane, Marblehead; Laura Scherz from

17   Arizona; Paul Connolly from Winthrop; Scott Keller, North

18   Andover; John Stanley, Milton; Steven Rappaport, Lowell;

19   John Daley, Marshfield; John Canavan from Plymouth, Thomas

20   Miller from Canton; Peter O'Malley from Charlestown;

21   Herbert Spellman, Kingston; James Hussy from Norwell.

22   Again, these are repetitious.  Okay.  Anyone familiar with

23   any of the names on that list?  Please stand.  Tell me your

24   name again, I'm sorry.

25           THE JUROR:  Patricia Antosca.

1          THE COURT:  Your number is.

2          THE CLERK:  52.

3          THE COURT:  Okay.  Counsel at sidebar.

4          (Sidebar conference was held as follows:)

5          THE COURT:  Juror No. 45, of course, which is

6    Ms. Bresnahan.  Ms. Bresnahan, Ms. Antosco, Mr. Keck and

7    Mr. Spoerl, please come forward.

8          THE COURT:  Hi, Ms. Bresnahan.

9          THE COURT:  Yes.  If the others can please wait so

10   this conversation is confidential.  You absolutely

11   positively can't serve?

12         THE JUROR:  Oh, no, I didn't --

13         THE COURT:  You heard about the case?

14         THE JUROR:  Yes.

15         THE COURT:  You heard about the case?

16         THE JUROR:  I just remember the name Ricky Evans,

17   the name, and I remember some details but not a lot.  I read

18   the paper constantly.

19         THE COURT:  Anything that comes to mind?

20         THE JUROR:  I sort of when you said the

21   Tiffany Moore, I remembered that.  I used to work for

22   programs in the City of Boston and I just sort of remember,

23   not a lot though.  It rang a bell.

24         THE COURT:  We'll question you again on this in

25   the lobby, so try to remember what you remember, but

1    standing there now is there anything, any reason why you

2    don't think you could serve because of your memory of these

3    cases?

4                THE JUROR:  No.

5                THE COURT:  Okay.  Thank you.

6                THE JUROR:  I can go sit back?

7                THE COURT:  You can go sit back.  Ms. Antosca,

8    Patricia Antosca.

9                MS. SCAPICCHIO:  What number is Ms. Antosca?

10               THE COURT:  52.  Hi.

11               THE JUROR:  Good morning.

12               THE COURT:  You remember something about this

13   case?

14               THE JUROR:  Only what I read in newspapers.

15               THE COURT:  Right.  What do you remember?

16               THE JUROR:  Just, you know, reading different

17   articles in the newspaper at different times, nothing

18   specific.

19               THE COURT:  There's nothing that comes to mind

20   right now?

21               THE JUROR:  Only the effects of the case, I

22   remember the incident where a little girl was shot and the

23   mailbox, that whole thing.

24               THE COURT:  This case is not about that.

25               THE JUROR:  Okay.

```
1              THE COURT: That was the reason for the conviction.

2    This case is a challenge to a claim that there was

3    essentially allegation of the conviction.  Did you read

4    anything about those?

5              THE JUROR:  Not specifically.

6              THE COURT:  We'll ask you about this again, but is

7    there anything sitting now, you know, standing there now

8    that makes you think you couldn't be a fair juror?

9              THE JUROR:  Well, a couple of names I

10   recognized.

11             THE COURT:  What were the names you recognized?

12             THE JUROR:  Joseph Zinck is a police officer, I'm

13   very good friends with him.

14             THE COURT:  Will he be a witness?

15             MR. ROACHE:  No, your Honor.

16             MS. HARRIS:  We think not.

17             THE JUROR:  And I have Robert George, is that the

18   attorney Robert George?  I worked at District Court.

19             THE COURT:  Which District Court?

20             THE JUROR:  Dedham.

21             THE COURT:  In Dedham.

22             THE JUROR:  And Tracy Lyons, was she a former D.A.

23   in Norfolk?

24             THE COURT:  Who is this?

25             THE JUROR:  Tracy Lyons, I know Bobby Lyons.
```

1          THE COURT:  You know Officer Zinck well?

2          THE JUROR:  Oh, very well.  40 years.

3          THE COURT:  Why don't you go back to your seat.

4    Thank you very much.

5          THE COURT:  How is Officer Zinck in the case?

6          MR. ROACHE:  None.  He may be mentioned, but he's

7    not going to be called.

8          THE COURT:  Juror 54, Mr. Keck.  Hi, sir.  You

9    heard about the case?

10          THE JUROR:  I remember reading the articles when

11   it initially happened, but I also remember some things in

12   the paper later.

13          THE COURT:  Like what?

14          THE JUROR:  That there was a question about one of

15   the suspects, but I don't remember the name that had been

16   convicted and that there was some question as to whether or

17   not he had gotten out as a result of something unusual.

18   That's really all I remember.

19          THE COURT:  Is there anything about your memory of

20   the case that would make it hard for you to serve?  We'll

21   question you more about this in the lobby.

22          THE JUROR:  I don't know, did I arrive at an

23   opinion?

24          THE COURT:  Right.

25          THE JUROR:  No, I didn't arrive at an opinion, it

1    was just more informational news at the time.

2            THE COURT:  We'll question you again about that,

3    but I wanted to make sure who the press was disqualifying in

4    some way.

5            THE JUROR:  Not that I have any recollection.

6            THE COURT:  Okay.  Thank you.  Ms. Spoerl.  Hi,

7    sir.

8            THE JUROR:  Hi.

9            THE COURT:  Do you remember anything about the

10   case?

11           THE JUROR:  Really nothing.  I mean, I was

12   scanning on the Internet looking for something at various

13   cases that I knew something, incidentally came into this

14   one.

15           THE COURT:  When was this one?

16           THE JUROR:  Last night, but I was half asleep, and

17   I don't remember much what I read.

18           THE COURT:  How did you know, you knew from the

19   title of the case that you were involved with?

20           THE JUROR:  No, I didn't even realize.

21           THE COURT:  It was this case?

22           THE JUROR:  Yes.

23           THE COURT:  Okay.  Is there anything that you read

24   that would make it hard for you to be a juror in this case?

25           THE JUROR:  Not from that, no.

1          THE COURT:  Anything else?

2          THE JUROR:  Yeah, but we'll talk later, I guess.

3          THE COURT:  You can tell me now.

4          THE JUROR:  It just has to do with one of the

5     questions on the questionnaire.

6          THE COURT:  Which question?

7          THE JUROR:  The one about lawsuits being brought

8     by someone who was either -- was previously convicted and

9     whether or not I thought those were legitimate.

10          THE COURT:  And do you?

11          THE JUROR:  Well, I wrote down I didn't know

12     because I had never thought too much about it before.

13          THE COURT:  Do you have an opinion now?

14          THE JUROR:  Yes.

15          THE COURT:  What's your opinion?

16          THE JUROR:  I think they're not legitimate.

17          THE COURT:  Okay.  You know what, I'll excuse you.

18     Thank you, sir.

19          THE COURT:  Maryellen, Jim should make sure that

20     he says that no one is to do any research or investigate

21     anything about this case, okay.  I'll warn the people here,

22     but last night's group I want to make sure there's a warning

23     on the 1-800 number to that effect, and I'll write it out

24     and everyone will agree.  Okay.  Juror No. 66, Ms. Desmery,

25     Diane Desmery.  Hi.

```
 1            THE JUROR:  Hi.

 2            THE COURT:  You knew something about this case?

 3            THE JUROR:  It just sounds familiar.  I don't

 4   remember details, it's just something that sounded

 5   familiar.

 6            THE COURT:  Nothing?

 7            THE JUROR:  Nothing, I don't remember details.

 8            THE COURT:  Is there anything about what you

 9   remember that tilts you in one direction or another?

10            THE JUROR:  No.  I also wanted to bring up

11   Mark DeLuca in Marshfield, is he the Duxbury head of police?

12            THE JUROR:  Yes.  I live in Duxbury.  I don't know

13   him.  I wanted to let you know I know his name.

14            THE COURT:  We'll talk to you about that again.

15            THE JUROR:  Great.

16            THE COURT:  Thank you.  No. 68, Mr. Pitman.  Hi,

17   Mr. Pitman.

18            THE JUROR:  How are you?

19            THE COURT:  You've heard about the case?

20            THE JUROR:  Yeah, well, I had read about it in the

21   papers, probably saw it on television.

22            THE COURT:  Is there anything about what you --

23            THE JUROR:  I'm having trouble hearing.

24            THE COURT:  I have to keep my voice down.  Is

25   there anything about what you remember that would make it
```

1    hard for you to serve as a juror, make it hard for you to

2    serve?

3              THE JUROR:  I don't think I kept up with after the

4    fact, you know, I read about the occurrence and thought it

5    was a tragedy and so forth, but I don't recall the

6    conviction aspect or the trial or anything like that.

7              THE COURT:  You indicated you knew someone on the

8    list.  Who did you know?

9              THE JUROR:  No, no.

10             MR. ROACHE:  Time commitment.

11             THE COURT:  You can't serve because of time?

12             THE JUROR:  I have a medical, some medical tests

13   on the 29th and the 28th.

14             THE COURT:  Long scheduled medical tests?

15             THE JUROR:  It's been postponed a couple of

16   times.

17             THE COURT:  You don't want to postpone it again?

18             THE JUROR:  No, but I also have, I'm also

19   scheduled to go to California for the 6th and 7th and 8th.

20   Tickets are all bought.

21             THE COURT:  I'll excuse you, thank you,

22   Mr. Pitman.  Thank you very much.

23             THE JUROR:  Thank you.

24             THE COURT:  Juror No. 41, Mr. Lombardo.

25             MR. REILLY:  Just 47.

74

1            THE CLERK:  47 is the next one.

2            THE COURT:  Ms. Sullivan, okay.  Ms. Sullivan.

3    Hi.

4            THE JUROR:  Hi.

5            THE COURT:  You indicated that you would have a

6    hard time serving?

7            THE JUROR:  I have a procedure scheduled on

8    September 23d.

9            THE COURT:  We're actually not sitting that week.

10    Is this surgery?

11            THE JUROR:  I'm going to need a couple weeks to

12    recuperate.

13            THE COURT:  I'll excuse you.  Good luck.  Juror

14    47, Ms. Sullivan.  No. 50, Mr. Caballera.  Hello.

15            THE JUROR:  I'm in City Year.

16            THE COURT:  So you can't serve?

17            THE JUROR:  Yeah.  I was going to explain that.

18    My team yesterday got almost into the schools to get to know

19    the teachers and they're going to be in this month.

20            THE COURT:  If you're out of this --

21            THE JUROR:  I'm the leader, I'm the team leader

22    for the Augusti School.

23            THE COURT:  I'll excuse you, but you have to

24    promise me that the next time you get a jury service note

25    you do it.

1           THE JUROR:  Of course, yes.

2           THE COURT:  You're excused.  Mr. Caballera is

3   excused.  Mr. Lomba.  Hi.

4           THE JUROR:  Hi.  I've been unemployed for about a

5   year.  I got a job interview to go to work as a CNA.

6           THE COURT:  Okay.

7           THE JUROR:  I want to have a job.

8           THE COURT:  You've been unemployed for a year?

9           THE JUROR:  Yes.  Great shift, by the way.

10           THE JUROR:  Thank you.

11           THE COURT:  I'll excuse you.  Thanks.

12           THE JUROR:  Thank you.

13           THE COURT:  That's it.  We go in the back.

14           (SIDEBAR CONFERENCE WAS CONCLUDED.)

15           THE COURT:  Ladies and gentlemen, we're going to

16   interview you one by one.  It will not take a long time

17   because we have already interviewed a number of jurors and

18   we don't need that many more.  You are not to come back into

19   this room and tell people what the questions were because

20   this is not a civics lesson, you know, where you have to

21   recite it.

22           We really want your honest answers, and we want

23   your honest answers to questions that you'll be hearing for

24   the first time, so it won't take very long.  I do anticipate

25   in fact the selection will be completed by one o'clock, so

1    with that, Maryellen, Maryellen, we're ready to go back.

2    All rise.

3              (A recess was taken.)

4              THE COURT:  44, Debra Slade.  Hi.

5              THE JUROR:  Hi.

6              THE COURT:  I don't know whose turn it is.  Why

7    don't we start with you, Ms. Scapicchio.

8              MS. SCAPICCHIO:  Thank you, your Honor.  Hi, my

9    name is Rosemary Scapicchio.  Together with Mike Reilly, we

10   represent the plaintiff in this case, Shawn Drumgold.  We

11   just want to ask you a couple more questions regarding the

12   long questionnaire that you filled out.  On question 27,

13   there was a question, "People who have been wrongfully

14   convicted sometimes bring lawsuits against the police

15   department.  Do you favor or oppose these type of lawsuits?"

16   You said you oppose them.  Could you tell me why?

17             THE JUROR:  The way I was reading it, if the

18   police arrest somebody, it's either usually they seen

19   somebody or the Court system has told them that that person

20   is wanted, so I don't see why somebody should go and sue the

21   police department for doing their job.

22             MS. SCAPICCHIO:  So there's never an occasion

23   where you think it would be appropriate for somebody to

24   bring a lawsuit against a police officer?

25             THE JUROR:  Yeah, if the police were acting out of

1    their realm of work and habits, you know, but other than

2    that, they're doing their job like anybody else.

3            MS. SCAPICCHIO:  So when you say you oppose these

4    lawsuits, you'd never be able to find in favor of anybody

5    who brought a lawsuit like this because you don't think that

6    they could be brought?

7            THE JUROR:  Anybody could sue anybody, but I'd

8    have to see both sides if the police were really at fault.

9            MS. SCAPICCHIO:  In this case we expect they'll be

10   evidence from police witnesses as well as civilian

11   witnesses, and the allegation is that Detective Callahan

12   withheld some important -- some evidence from the

13   prosecutors in this case that resulted in Shawn Drumgold

14   having an unfair trial.  When you were asked to evaluate the

15   evidence of police officers vs. civilian witnesses, would

16   you give an edge to the police officer?

17           THE JUROR:  No, I'd be fair at how they would go

18   for it.

19           MS. SCAPICCHIO:  Okay.  When you say oppose these

20   types of lawsuits, can you give me an example of a situation

21   where you think they would be okay to file a lawsuit?  In

22   other words, if the police officer was acting in the course

23   of his duties, is there never an occasion where you should

24   be able to file a lawsuit?

25           THE JUROR:  Well, if the police showed brutality

1    or something like that, then that person, but if the police

2    is actually working within their law system, but, you know,

3    doing what they were told if this person is wanted, you

4    know, whether he's innocent or guilty, then that person has

5    been arrested, it's not the police officer's fault that they

6    arrested him, they're just doing their job, and I don't feel

7    that the person should arrest, should sue.

8            MS. SCAPICCHIO:  Okay.  So would you hold it

9    against Mr. Drumgold because he did sue in this case?

10           THE JUROR:  No.  I don't really know about this

11   case, never heard of it before.

12           MS. SCAPICCHIO:  But you just said that you don't

13   think that a person should sue just because they were

14   arrested wrongfully, you don't think they should sue because

15   the police officer was just doing their job.  What did you

16   mean by that?

17           THE JUROR:  Saying more brutality as far as the

18   police.

19           MS. SCAPICCHIO:  So the only occasion when you

20   think it's appropriate is when there's brutality, is that

21   right?

22           THE COURT:  No, let me see if I can help you out

23   here.  This is a case about the trial and the claim that the

24   trial was unfair.

25           THE JUROR:  Right.

1          THE COURT:  The information wasn't turned over

2    that the defendant should have had, that his lawyer should

3    have had, and the failure to turn that over, that was

4    information that would have aided in the defense, and the

5    failure to turn it over made the trial unfair.  The law

6    allows someone to sue under those circumstances.  The

7    question, do you feel those suits are wrong or would you be

8    able to listen to the evidence in this case?

9          THE JUROR:  No, they're not wrong, evidence was

10   withheld, then I understand.

11         THE COURT:  Go on, Ms. Scapicchio.

12         MS. SCAPICCHIO:  So if after you listen to the

13   evidence that you came to the conclusion that Shawn Drumgold

14   had proven his case and that Detective Callahan had violated

15   his civil rights and he got an unfair trial as a result of

16   that, would you be able to award money damages to Shawn

17   Drumgold?

18         THE JUROR:  Yeah, if I find that it was wrong, you

19   know, withholding evidence is one thing and then lying and

20   money, I'd have to hear all the cases as far as, you know,

21   money amounts and all that to go.

22         MS. SCAPICCHIO:  When you say withholding evidence

23   is one thing, is that something in your mind that is

24   different?

25         THE JUROR:  No.

1          MS. SCAPICCHIO:  Okay.  Thank you.

2          THE COURT:  Go on.

3          MS. HARRIS:  Thank you.

4          THE JUROR:  I'm all confused.

5          THE COURT:  That's okay, you don't know anything

6     about the case, that's fine.  Go on.

7          MS. HARRIS:  My name is Mary Jo Harris, and I

8     along with my colleagues with Hugh Curran represent

9     Detective Timothy Callahan, and I saw from your

10    questionnaire that you watch Law And Order and CIS and those

11    shows.  This case, it comes out of an investigation, so it's

12    not the sort of thing where the police are going to say I

13    saw something happen, but they interviewed witnesses, and,

14    you know, and so on and prepared reports, it's that kind of

15    a case, so you're going to be hearing from police officers

16    who did bits and pieces of an investigation and from

17    civilian witnesses, and from all of that, you know, the

18    question that's ultimately going to be asked is whether you

19    believe that Timothy Callahan deliberately withheld evidence

20    that should have been turned over, and I think what we're

21    trying to find out is whether you can listen to all of the

22    different kinds of witnesses who are coming forward to give

23    their evidence and treat them all fairly when you listen to

24    them testify.

25          THE JUROR:  Yes, I can do that.

1          MS. HARRIS:  And I noticed also that your

2     son-in-law is a state trooper?

3          THE JUROR:  New York, yes.

4          MS. HARRIS:  In New York.  Have you had any

5     conversations or discussions with your son-in-law about the

6     work that he does?

7          THE JUROR:  No.

8          MS. HARRIS:  Gives you any insight or feelings

9     about law enforcement?

10          THE JUROR:  No.  My daughter, grandchildren,

11     that's basically it.  They live so far up in New York.

12          MS. HARRIS:  And then I think you also noted that

13     your son had been convicted of a B and E?

14          THE JUROR:  Yes.

15          MS. HARRIS:  Breaking and entering.

16          THE JUROR:  My son's had 17 years of being in the

17     wrong place at the wrong time from a kid up.  I've spent a

18     lot of time on the other side.

19          MS. HARRIS:  Has that experience made you question

20     whether or not he was treated fairly by law enforcement?

21          THE JUROR:  No, no, because he's always got the

22     appropriate care for the lawyers, so they all help him.

23          MS. HARRIS:  When you say he's had 17 years in the

24     wrong place at the wrong time.

25          THE JUROR:  Juvy, always drunk, drinking,

1    partying, hanging out with the wrong crowd which put him

2    into B and E.

3              MS. HARRIS:  I see.  Do you feel like the police

4    picked on him or singled him out for unfair treatment?

5              THE JUROR:  No, because he just happened to be

6    there with the rest of them.

7              MS. HARRIS:  When you say he's had lawyers and so

8    on?

9              THE JUROR:  Court-appointed, yes.

10             MS. HARRIS:  Have you developed an opinion about

11   the quality of the representation that he got along the way?

12             THE JUROR:  No, because I tried to stay out of it

13   because he's the one that got in trouble.  I ended up having

14   to pay enough as it is, visitation.

15             MS. HARRIS:  Where was he held, was he in

16   Massachusetts when this happened?

17             THE JUROR:  Yes, Wrentham most times, Dedham, Ash

18   Street, North Dartmouth.  He spent some time.

19             MS. HARRIS:  All right.  Thank you.  I'll just see

20   if my colleagues have any questions.

21             MR. ROACHE:  I just have a couple questions.

22             THE COURT:  You can always count on him.  Go on.

23             MR. ROACHE:  I've been very good, your Honor.  My

24   name is John Roache.  I notice that you indicate that you

25   watch LA Law.  Is that the reruns of LA Law or are you

1    talking about from years ago?

2         THE JUROR:  Just basically years, I just recently

3    got cable, so watching some of the old stuff.

4         MR. ROACHE:  And you also watch NCIS, a program I

5    have never watch.

6         THE JUROR:  Yeah, maybe.

7         MR. ROACHE:  From your experience, do you

8    understand that sometimes criminal investigations take

9    longer than what may be portrayed on TV shows?

10        THE JUROR:  Oh, yeah.

11        MR. ROACHE:  That TV shows have to put everything

12   into a certain period of time, an hour time slot usually?

13        THE JUROR:  Right.

14        MR. ROACHE:  And usually there's an end result,

15   but that doesn't really happen in real life?

16        THE JUROR:  Yes.

17        MR. ROACHE:  You understand that?

18        THE JUROR:  Oh, yes.

19        MR. ROACHE:  That's all I have.

20        THE JUROR:  It's just fun watching.

21        THE COURT:  All right.  Ms. Slade, I'm going to

22   ask you to call this number after 6:00 today with your juror

23   number, and you'll find out from this call whether or not

24   you're on the final jury, okay.  Don't read anything about

25   the case, don't consider anything about the case, and if

1    you're on the final jury, we'll see you tomorrow morning.

2              THE JUROR:  9:00?

3              THE COURT:  It's actually going to be 10:00.  Call

4    after six.

5              THE JUROR:  I'm free to leave?

6              THE COURT:  Yes, you are.  I have to swear in some

7    citizens in the morning, so we're going to be a little late.

8    The next juror is Karen Bresnahan, juror No. 45.  Hi,

9    Ms. Bresnahan.  We meet again.

10             THE JUROR:  Yes.

11             THE COURT:  Let's start with you, Ms. Harris.

12             MS. HARRIS:  Good afternoon.  My name is Mary Jo

13   Harris.  Myself and Hugh Curran represent retired Detective

14   Callahan.  Just to follow up what we started talking to you

15   about outside, you had mentioned you had some familiarity

16   with some of the facts or some of the names in the case?

17             THE JUROR:  Yes.

18             MS. HARRIS:  And you worked for the city?

19             THE JUROR:  I did, I worked for the city years

20   ago, I now work for the state.

21             MS. HARRIS:  Can you elaborate what it is you

22   recall or what you know about?

23             THE JUROR:  Not a whole lot.  I recognize the

24   names and some of the details of the case but not a whole

25   lot.  I remember when the little girl was shot, and I also

1    remember recently when Mr. Drumgold was released, I remember

2    that in the news.

3         MS. HARRIS:  Okay.  Do you have any specific

4    recollection of what you learned from reading the news about

5    the release or about the murder, anything, any details that

6    you may have picked up in reading about it?

7         THE JUROR:  Five years ago maybe.  Nothing

8    specific, just sort of fuzzy around the edges when the Judge

9    was mentioning some of the names and the facts of the case,

10   it was like I kind of remember that.

11        MS. HARRIS:  Do you have any memory of what you

12   may have read about the circumstances of Mr. Drumgold's

13   release, about what led to it?

14        THE JUROR:  I think I remember, I hope I'm not

15   misspeaking, but that he was released after the conviction

16   was overturned.

17        MS. HARRIS:  Do you remember anything about what

18   led to that?  I know, believe me.

19        THE JUROR:  I honestly don't.  I just remember, I

20   mean, that's sort of what stuck in your head was that it had

21   been overturned.

22        MS. HARRIS:  The case that we're trying here now

23   is Mr. Drumgold's claim that his trial, that his criminal

24   trial was -- there was something improper about it because

25   of the actions of our client which, of course, you know, we

1    deny, so that's really the issue that's going to be put

2    before the jury here, so what I'm trying to find out from

3    you is whether there's anything that you may have read or

4    been exposed to that causes you to have an opinion one way

5    or the other about the handling of the criminal trial or

6    about the investigation itself?

7              THE JUROR:  I don't remember the criminal trial.

8    I just sort of remember, as I said, the names in the

9    newspaper.  I read the paper a lot.  I read it on the

10   internet, and I deal with in my job now some issues with

11   violence in Boston, so I'm sort of aware of the issues.

12             THE COURT:  Your job entails what kind of

13   responsibilities?

14             THE JUROR:  I work for the Department of Housing

15   and Community Development.  I'm the policy manager, and one

16   of the things that I've recently worked on is a Street Safe

17   Boston Initiative.

18             THE COURT:  Okay.

19             THE JUROR:  So I'm sort of -- it's just an issue

20   that I deal with at work, one of the many.

21             MS. HARRIS:  Yeah, I'm sure.  In that capacity do

22   you work with the Boston Police Department or members of it?

23             THE JUROR:  No, we fund the Boston Foundation.

24   I'm a funder for the Boston Foundation Initiative.

25             MS. HARRIS:  Okay.  So you're involved in the

1    policy piece but not the actual putting the teams together

2    and so forth?

3           THE JUROR:  No, I was one of the people, we

4    reviewed a proposal and we gave them some funding for the

5    past couple of years for this Street Safe Boston

6    Initiative.

7           MS. HARRIS:  That's a program that's funded by the

8    Boston Foundation?

9           THE JUROR:  Boston Foundation and coordination

10   with the city, and there's a whole bunch of public and

11   private fundings, so I've gone to some meetings on some

12   violence issues in Boston.  It's a summer safety more than

13   anything kind of program.

14          MS. HARRIS:  Is one of the focuses of that program

15   any kind of gang interjectory, that kind of work?

16          THE JUROR:  Yes, it is.  There are what they call

17   street workers who are working in the hardest hit

18   neighborhoods.

19          THE COURT:  How long have you been on this job?

20          THE JUROR:  I've been in this job, I've been at

21   this agency for 17 years.  I've been in this current job for

22   about 6.

23          THE COURT:  For 6, okay.  And prior, at any point

24   in the course of your job have you dealt with issues, before

25   you got this new job, have you gotten to deal with issues

1    having to do with gangs and violence in Boston?

2          THE JUROR:  Not directly, sort of indirectly.  I

3    worked for the city, which was sort of the City of Boston,

4    the mayor's office, the jobs in community services, and we

5    used to fund a bunch of youth programs and different City of

6    Boston programs.

7          THE COURT:  Did you work with the police in

8    connection with those?

9          THE JUROR:  Never directly, no.

10         MS. HARRIS:  I think that's all I have unless you

11    guys have anything else.

12         MR. ROACHE:  What were the circumstances under

13    which you left the city for working for the city?

14         THE JUROR:  For another job, I went to the state.

15    It was a better job, nothing.

16         MR. ROACHE:  That's all I have.

17         THE COURT:  Ms. Scapicchio.

18         MS. SCAPICCHIO:  Thank you.  Hi, my name is

19    Rosemary Scapicchio.  Together with Mike Reilly, we

20    represent the plaintiff, Shawn Drumgold.  Your work with the

21    City of Boston, you may have noticed from the questionnaire

22    that the City of Boston is a named defendant in this case.

23    Do you think your prior employment for the City of Boston

24    would come into your thinking if we were asking for a damage

25    award from the City of Boston?

1          THE JUROR:  I don't think so.  I've sort of worked

2     with a quasi public agency that I worked for.  It wasn't

3     directly -- it was at one point the mayor's office of jobs

4     and community services, then it merged with the Economic

5     Development Industrial Corporation, so it wasn't directly

6     the City of Boston that I worked for.  We worked very

7     closely with the city, but I don't believe so, no.  It was a

8     long time ago.

9          MS. SCAPICCHIO:  In this case, you were -- let me

10     ask you this.  With respect to your job and the funding that

11     you do, would your experience regarding funding with respect

12     to the City of Boston enter into your deliberations when you

13     were determining damages, in other words, your awareness of

14     how much the city would pay or anything like that?

15          THE JUROR:  No, I wouldn't know that, no.  I

16     didn't fund directly the city, it was more the Boston

17     Foundation, which is a private philanthropic organization.

18          MS. SCAPICCHIO:  In this case, we expect that you

19     will hear some evidence that Detective Callahan withheld

20     some evidence from the prosecutors that resulted in

21     Shawn Drumgold not getting a fair trial.  You'll be asked to

22     evaluate the evidence of police officers and the testimony

23     from civilian witnesses.  Would you give either side an

24     edge, so to speak, in other words, would you credit the

25     police more than you would credit a civilian witness?

1          THE JUROR:  That's sort of hard to answer.  I

2     would hope not, but I don't know.  Just I grew up, my dad

3     was a firefighter for 32 years, a lot of our family friends

4     were police officers, my father's best friend was chief of

5     police for years.  It's been part of my life growing up.

6          MS. SCAPICCHIO:  Right.  There's nothing wrong

7     with it.

8          THE JUROR:  I'd like to think that I'm fair and

9     impartial, but I don't think it would enter into it.

10          MS. SCAPICCHIO:  Okay.  So you think you could put

11     aside the relationships that you have with your father and

12     the relationships growing up with police officers and listen

13     to the testimony in this case to determine whether or not

14     you credit the witness's testimony?

15          THE JUROR:  I think so.

16          MS. SCAPICCHIO:  Do you think there was any

17     occasion in which you would give a police officer's

18     testimony more credit?

19          THE JUROR:  I can't think of an occasion right

20     now, not unless it was somebody I knew which that wouldn't

21     be the case.

22          MS. SCAPICCHIO:  You had indicated on your

23     questionnaire that you have a cousin that's a federal agent?

24          THE JUROR:  Yes.

25          MS. SCAPICCHIO:  Family friends that are police

1  officers, a nephew that's a probation officer?

2          THE JUROR:  Yes.

3          MS. SCAPICCHIO:  Would any of those relationships

4  affect your ability to evaluate the evidence if the evidence

5  was going to conflict pretty drastically between what a

6  police officer says and what a civilian witness says?

7          THE JUROR:  I don't think so.  It's very hard, I'm

8  sorry, I don't mean to be so wishy washy, it's a very hard

9  thing to think about.  I would hope not.

10          MS. SCAPICCHIO:  Okay.  Then on question 27, you

11  were asked, "People that have been wrongfully convicted

12  sometimes bring lawsuits against the police department.  Do

13  you favor or oppose those types of lawsuits?"  And you

14  wrote, "Unsure, would depend on the circumstances."

15          THE JUROR:  It's something I have never thought

16  about before, that's all, and, you know, I'm the type of

17  person I sort of think about things before I make a

18  decision, so I think that's probably circumstances where

19  yes, I would support it.

20          MS. SCAPICCHIO:  But it's not the relationships

21  that you had with your father and family friends that would

22  prevent you from deciding a case that involved a wrongful

23  conviction?

24          THE JUROR:  No, I don't think so.

25          MS. SCAPICCHIO:  Is there anything specific about

1    the idea of wrongful convictions that doesn't sit well with

2    you?

3            THE JUROR:  Aside from the fact that it was wrong?

4            MS. SCAPICCHIO:  Right.

5            THE JUROR:  I mean, no, I think it's unfortunate,

6    that's all.

7            MS. SCAPICCHIO:  Okay.  But if the evidence --

8            THE JUROR:  It seems like a light word, I don't

9    mean it as light as that.

10           MS. SCAPICCHIO:  I understand.  If the evidence

11   suggested that Shawn Drumgold were to prove his case, could

12   you award him damages in this case if he were to prove that

13   Detective Callahan withheld evidence that resulted in an

14   unfair trial?  Could you award him damages?

15           THE JUROR:  If that's what we're supposed to do, I

16   suppose so, yes.

17           MS. SCAPICCHIO:  Thank you.

18           THE JUROR:  I'm sorry.

19           THE COURT:  No, that's a good answer.  Okay.  I'm

20   going to ask you to call this number.  Don't do any research

21   about the case ever.  Don't talk to anyone about what this

22   discussion was, but please call this number after 6:00 to

23   see if you're a member of the final jury.  You need your

24   juror number when you call, and if you're a member of the

25   final jury, we'll see you tomorrow morning at ten.

```
1              THE JUROR:  Thank you.

2              MS. SCAPICCHIO:  Thank you very much.

3              MR. ROACHE:  Thank you.

4              THE COURT:  One more.  Ms. Schiappa.

5              THE JUROR:  Yes.

6              THE COURT:  Ms. Scapicchio, you go first.

7              MS. SCAPICCHIO:  Thank you, your Honor.  Hi,

8     Ms. Schiappa.  My name is Rosemary Scapicchio.  Together

9     with Mike Reilly, we represent Shawn Drumgold.  We expect in

10    this case you'll hear evidence that is from plaintiff

11    witnesses and civilian witnesses, and the allegations are

12    that Detective Callahan withheld some evidence from the

13    prosecutors that we say resulted in Shawn Drumgold getting

14    an unfair trial.  If you were asked to evaluate the

15    testimony of police officers that would conflict with the

16    testimony of civilian witnesses, would you give the police

17    officers any more weight because they're police officers?

18             THE JUROR:  Absolutely not.

19             MS. SCAPICCHIO:  And in this case if Shawn

20    Drumgold were to prove his case that Detective Callahan did

21    withhold evidence that resulted in an unfair trial to

22    Mr. Drumgold, would you be able to award money damages to

23    Shawn Drumgold?

24             THE JUROR:  I would have to have more information,

25    I think.
```

1          MS. SCAPICCHIO:  Okay.  And you indicated, I

2     think, on your questionnaire that you're a self-employed

3     office assistant?

4          THE JUROR:  Yes.

5          MS. SCAPICCHIO:  Is the fact you're self-employed

6     going to affect your ability to sit on this trial through

7     the 15th of October, if necessary?

8          THE JUROR:  No, no.  I work with my husband, he's

9     a CPA, it's our own business.

10          MS. SCAPICCHIO:  Great, thank you so much.

11          THE COURT:  Not yet.

12          MS. HARRIS:  Not so fast.  Nice try.  Good

13     afternoon, ma'am.

14          THE JUROR:  There's two sides, okay, I'm sorry.

15          MS. HARRIS:  Right.  We'll speed through it, I

16     promise.  Together with Mr. Curran here, we represent

17     Detective Callahan, and as you said, there's two sides, so

18     what we're looking to explore is whether if you're chosen to

19     sit on the jury of this case that you'll be able to listen

20     to the plaintiff's presentation because they go first and

21     put on their best case, and then the defendant has the

22     opportunity to give his side of the story, and as you can

23     imagine, there are very sharp differences between our view

24     of the facts, so, you know, knowing that, would you be able

25     to sit as a juror in this case and be able to sort of hold

1    your judgment in abeyance until the end when you have all

2    the information in front of you?

3              THE JUROR:  Sure.

4              MS. HARRIS:  Do you have any experience, positive

5    or negative, with the law enforcement or the criminal

6    justice system?

7              THE JUROR:  No, not at all.

8              MS. HARRIS:  So there's nothing that you're

9    bringing here that would cause you to weigh more heavily

10   than the other?

11             THE JUROR:  No, no.

12             MS. HARRIS:  Anything you want to ask?

13             MR. ROACHE:  Just very briefly.  My name is

14   John Roache, and one of my clients is the City of Boston.

15   Ms. Schiappa, have you ever lived in the city?

16             THE JUROR:  No, I haven't.

17             MR. ROACHE:  Have you had any dealings with any of

18   the employees of the city including whether they be police

19   or fire or office workers or parking ticket meter maids?

20             THE JUROR:  No.

21             MS. HARRIS:  You've had a blessed life.

22             MR. ROACHE:  That's all I have.

23             THE COURT:  Okay.  There's a number to call at

24   6:00 today with your juror number, and you'll find out.  We

25   don't want you to do any research, and if you're on the

1    final jury, you come tomorrow at 10:00.  Thank you.

2          THE CLERK:  Judge, Jim came up and said the woman,

3    she was from L.A., she went to Stanford, she might have

4    problems.

5          MS. HARRIS:  Lanita Foley.

6          THE JUROR:  Yes.  She called and said work is very

7    stressful for her right now.  She called a little while ago,

8    and I had to tell you this because she's in the pool and

9    that she didn't feel comfortable sitting on the jury because

10   she'd like to be deferred because she's having problems at

11   work meaning that it's very, very busy, it's not a good

12   time.

13         THE COURT:  We'll select one more.  Thank you for

14   telling us now.  No. 17 is excluded.  We'd select one more.

15   The next one is Robert Oldham.

16         THE COURT:  Hi, Mr. Oldman.  I think we start, I

17   have no idea.

18         MS. HARRIS:  I think it's my turn.

19         THE COURT:  Sorry.

20         MS. HARRIS:  That's okay.  Good afternoon, sir,

21   how are you?

22         THE JUROR:  Good.  Yourself?

23         MS. HARRIS:  Good, thanks.  My name is Mary Jo

24   Harris, and with Hugh Curran we represent retired Detective

25   Callahan.  He's a defendant in this action.  I'm going to

1    ask before we go further, I see you have a job in the

2    financial field.  Would sitting on this jury cause a problem

3    if we were to go as long as we hope not to go, which is to

4    the middle of October?

5            THE JUROR:  It startS getting into sort of a busy

6    time for me at that point in time.

7            MS. HARRIS:  That's like the furthest, the longest

8    that we anticipate, and we don't expect that it will take us

9    that long.

10           THE JUROR:  Probably the second week of October

11   that I start getting rather busy at that point in time.

12           MS. HARRIS:  If we concluded before then, you'd be

13   okay?

14           THE JUROR:  Yes.

15           MS. HARRIS:  This case, just to talk very briefly,

16   is going to involve witnesses who are civilian witnesses,

17   police officers, maybe lawyers all testifying about events

18   that occurred some time ago.

19           THE JUROR:  Yes.

20           MS. HARRIS:  And knowing that, would you have any

21   inclination to credit one type of witness over another

22   because of their profession or background?

23           THE JUROR:  No, no, I don't think I would.

24           MS. HARRIS:  Have you had any positive or negative

25   experiences with law enforcement or the civil justice system

1    in general?

2              THE JUROR:  No.

3              MS. HARRIS:  I'm going to probably defer to my

4    colleagues, see if these gentlemen have anything to ask.

5              MR. ROACHE:  Good afternoon, sir.  My name is John

6    Roache, and one of my clients is the City of Boston.  I

7    notice that you do work within the city?

8              THE JUROR:  Yes, I do.

9              MR. ROACHE:  Have you had any positive or negative

10   experiences with the city itself or any of its employees

11   while you've been working in the city?

12             THE JUROR:  Not with city employees, no.

13             MR. ROACHE:  Have you lived in the City of Boston?

14             THE JUROR:  Yes, I did.

15             MR. ROACHE:  When was that, sir?

16             THE JUROR:  Back in I want to say, when did I

17   graduate, '87, I lived in the city from '88 to '93.

18             MR. ROACHE:  Okay.  And what part of the city did

19   you live?

20             THE JUROR:  I did live in Roxbury.

21             MR. ROACHE:  In Roxbury?

22             THE JUROR:  Yes.

23             MR. ROACHE:  Were you aware of or did you hear

24   about the killing of Tiffany Moore during that period of

25   time?

1          THE JUROR:  You know, I lived in Roxbury, he lived

2     right behind Pat Connors' Pub right off of Blue Hill Ave.,

3     so at that point in time there was a lot of I think city

4     violence at that point in time and a lot of murders in that

5     area at that time, so I don't remember that case

6     particularly.

7          MR. ROACHE:  You don't remember the Tiffany Moore

8     case in particular?

9          THE JUROR:  No.

10         MR. ROACHE:  Do you remember anything positive or

11    negative in the press at that time being said about the

12    Boston Police Department or any of its officers?

13         THE JUROR:  Not negatively about the police

14    officers or the City of Boston, no.

15         MR. ROACHE:  Okay.  Were you a student or were you

16    out of school at that time?

17         THE JUROR:  I was out of school at that point.

18         MR. ROACHE:  That's all I have, thank you.

19         THE COURT:  Ms. Scapicchio.

20         MS. SCAPICCHIO:  Hi, my name is Rosemary

21    Scapicchio.  Together with Mike Reilly we represent the

22    plaintiff, Shawn Drumgold in this case.

23         THE JUROR:  Yes.

24         MS. SCAPICCHIO:  We expect in this case that

25    you'll hear evidence from police officer witnesses as well

1    as evidence from civilian witnesses.

2              THE JUROR:  Yes.

3              MS. SCAPICCHIO:  And you're going to be asked to

4    evaluate their testimony, and in a situation where we expect

5    that some evidence will suggest that Detective Callahan did

6    not turn over information to the prosecutors that resulted

7    in Shawn Drumgold's wrongful conviction and an unfair trial,

8    if that were the evidence and you were asked to evaluate

9    testimony from a police officer witness vs. testimony from a

10   civilian witness, would you give the police officer any more

11   credit because he's a police officer and he's held to a

12   higher standard or anything like that?

13             THE JUROR:  No, not to my knowledge.  I'd have to

14   listen to the evidence.  I wouldn't want to make a judgment

15   on that right now until I heard the evidence and you saw the

16   evidence.

17             MS. SCAPICCHIO:  You'd wait until you heard all

18   the evidence, then you'd make a determination?

19             THE JUROR:  Yes.

20             MS. SCAPICCHIO:  When you lived behind Packy's,

21   did you say?

22             THE JUROR:  Yes.

23             MS. SCAPICCHIO:  Right in the Roxbury-Dorchester

24   area.  You don't remember hearing anything about the murder

25   of a little girl on a mailbox back in 1988?

1          THE JUROR:  I remember there was a few different

2     killings of a number of people.  I remember back then we'd

3     pick up the Sunday Boston Globe, and they used to outline

4     all the murders in the area at that point in time, and we

5     were counting the ones that were on our street actually.

6          MS. SCAPICCHIO:  Is this one of the ones you

7     counted?

8          THE JUROR:  You know, honestly, I don't.

9          MS. SCAPICCHIO:  When you say you were counting

10    the ones that were on the street, did you have some feeling

11    about the number of murders that were in the neighborhood,

12    did you have some feeling about the way that the police were

13    investigating these cases, did you think they were

14    overwhelmed, anything like that?

15         THE JUROR:  No, we were living there at a time I

16    think that was not a very good time, you know, there was a

17    lot of violence in the area, you know, nothing that, you

18    know, I guess we were more alarmed than anything else.

19         MS. SCAPICCHIO:  Did you form any opinions about

20    the kids that were hanging on the corners in those

21    neighborhoods?

22         THE JUROR:  Honestly, we would come home, I worked

23    in the city at that point, we'd come home from the city,

24    work on the house, then go to work the next day, and on

25    weekends we would, you know, work on the house, then go out

1    with my friends.  I honestly didn't spend any -- honestly,

2    the time I spent in the area was from the time I left my

3    door to get in my car, that's it.

4            MS. SCAPICCHIO:  Just to follow up something

5    Ms. Harris said, you were saying that it would be getting

6    rather busy at the second week of October in your current

7    position?

8            THE JUROR:  Yeah.

9            MS. SCAPICCHIO:  Does that mean that you don't

10   think you'd be able -- if you were deliberating at that

11   time, we may have to sit full days.  Does that mean you

12   couldn't sit full days?

13           THE JUROR:  That would be difficult at that point

14   in time for me because we do -- I work for Met Life.  We're

15   a public company, we do file --

16           MS. SCAPICCHIO:  Public offerings?

17           THE JUROR:  -- not public offerings but 10Qs at

18   that point in time for multiple clients.

19           MS. SCAPICCHIO:  So you'd need to be available for

20   your work that last week of October?

21           THE JUROR:  Yes, after sort of the probably to me

22   business day 10 on.

23           THE COURT:  It is not likely the case but it's

24   possible, and if it did, what you would have during that

25   week would be the deliberations, and during the

1   deliberations, that's when we ask the jury to stay all day.

2           THE JUROR:  Yes.

3           THE COURT:  So probably, it's possible it would be

4   the second week in October.  Would that preclude your

5   participating, or do you think you could stretch things to

6   that point, if necessary?

7           THE JUROR:  I stretch on the normal day.  My

8   normal day is, you know, probably similar to a lot of you

9   folks around the table, it's seven in the morning to seven

10  or eight at night.

11          THE COURT:  Do you think you could do that?

12          THE JUROR:  That's what I do typically.

13          THE COURT:  Right.  I'm saying if the

14  deliberations were the second week in October, would you be

15  able to spend all day with us?

16          THE JUROR:  Probably I would say no.  That would

17  be difficult for me.

18          THE COURT:  I'm going to excuse you because I

19  don't want to run the risk that after sitting on this case

20  you couldn't stay with us at the end.  Thank you.

21          THE JUROR:  Thank you.

22          MS. HARRIS:  Just for your information, No. 54

23  says that he has litigation involving your prior firm.

24          THE COURT:  Oh, is that right?  Which prior firm?

25  I had a number of prior firms.

1          MS. HARRIS:  He doesn't say, but he mentioned you

2     by name.

3          MS. SCAPICCHIO:  Keck.  It's question 22, your

4     Honor.

5          MR. CURRAN:  His mother was also a victim of a

6     violent crime.

7          MS. HARRIS:  She's deaf in one ear as well.

8          MS. SCAPICCHIO:  She's also concerned about the

9     length of the trial.

10          THE COURT:  In order to save time, would everyone

11     generally agree that Antosca is not appropriate because of

12     her answers in open court so we don't have to deal with

13     this?

14          MS. SCAPICCHIO:  That's fine with me.

15          MR. ROACHE:  Your Honor, I think we should inquire

16     of her.  She's retired from the Dedham District Court.  I

17     don't know how long she's worked there.  She said she knew

18     Robert George.

19          THE COURT:  Hi, won't you sit down.

20          THE JUROR:  Your Honor.

21          THE COURT:  Start with Ms. Scapicchio.  No,

22     Ms. Harris, I think.

23          MS. HARRIS:  That's fine.

24          THE COURT:  I have no idea.

25          MS. HARRIS:  Good afternoon, my name is Mary Jo

1    Harris.  I along with Hugh Curran represent Detective

2    Callahan.  We're going to follow up a little bit on the

3    responses you had given us earlier.  Would there be anything

4    about the anticipated length of this trial that would be a

5    problem?

6              THE JUROR:  Not that it would keep me away, but I

7    came back here to come to this from my summer house in

8    Maine, and we would be going back if I'm not called.  I

9    didn't want to use it as an excuse, but that's the truth.

10             MS. HARRIS:  You're good.  How long had you

11   planned to be up there?

12             THE JUROR:  We usually stay through October.

13             MS. HARRIS:  We also noticed that you know a

14   couple of the attorneys, I think Robert George and

15   Tracy Lyons?

16             THE JUROR:  Yes, I know them from my job at the

17   Dedham District Court.  They both work there also.

18             MS. HARRIS:  If they were to appear as witnesses,

19   which we anticipate that one or both of them may, would you

20   have any difficulty treating them like normal witnesses,

21   that is, giving their testimony the same weight as you would

22   give anyone else who you didn't know?

23             THE JUROR:  I wouldn't have a problem with that I

24   don't believe, no.

25             MS. HARRIS:  This is a case which alleges that

1    there was a wrongful conviction, and obviously you know

2    this, there's two sides to every story here, and

3    Mr. Drumgold is going to present evidence that he believes

4    supports his claim, and Detective Callahan through us is

5    also going to be presenting evidence we think rebutting

6    that.  There's going to be testimony given by civilians,

7    police officers, lawyers, and with that we anticipate that

8    it's going to take about six weeks, and really what we're

9    just looking for anything that you can identify within that

10    would give you pause about sitting in a case like this?

11          THE JUROR:  Not with the witnesses, even though I

12    do know one of the police officers very well.

13          MS. HARRIS:  Right.  We don't anticipate that

14    Joe Zinck would be called.

15          THE JUROR:  But the only other thing I would tell

16    you is that I do have a hearing problem.  I put it on my

17    questionnaire.

18          MS. HARRIS:  Yes.

19          THE JUROR:  As long as I look at you directly and

20    watch your lips, I can understand, you know, hear pretty

21    much what's going on, but as this morning when the

22    introductions were being made by the attorneys, I would miss

23    some of it as they turned away or looked to the back or

24    whatever.  I could understand the Judge quite well because

25    with the microphone, and I could really focus on watching

1    her speak, but other than that, sometimes I do miss things

2    that are off to the side.

3              MS. HARRIS:  You had mentioned having a long

4    friendship with Joe Zinck?

5              THE JUROR:  Yes.

6              MS. HARRIS:  Would your relationship with him

7    cause you to give more credit to a police officer witness

8    particularly because the Boston, you know, Tim is a former

9    Boston police officer and former homicide detective.  Would

10   that --

11             THE JUROR:  I would hope not, but I have to say,

12   and this goes back to also working at the courthouse, I do

13   have probably a little more of a bias to the law enforcement

14   side of the case.  That's just the truth.

15             MS. HARRIS:  That's all we're asking.

16             THE JUROR:  That comes from my job, too.

17             THE COURT:  You know what, both because I feel

18   awful about your vacation and because of the hearing issue

19   and because of where you work, we'll excuse you.  Go back to

20   Maine.

21             THE JUROR:  Thank you very much.

22             MS. HARRIS:  Thank you so much.

23             THE COURT:  Thank you for offering.

24             MS. SCAPICCHIO:  Thanks very much.

25             THE COURT:  Now is Mr. Keck.

1          MS. SCAPICCHIO:  If you look at No. 30, I think

2     he's got some issues.  No. 30, he has reservations for a

3     flight to see his 75-year old mother on the 15th of

4     September.

5          THE COURT:  Hi, Mr. Keck.  We won't go any

6     further.  You have a flight to see your mother on September

7     15th.  Where is she?

8          THE JUROR:  Michigan.

9          THE COURT:  That's her birthday?

10          THE JUROR:  75th.

11          THE COURT:  I'll excuse you.  Ms. Malaver is the

12     next.  We're still searching for one.  Hi.  This is you're

13     Stephanie Malaver?

14          THE JUROR:  Malaver.

15          THE COURT:  I think Ms. Scapicchio.

16          MS. SCAPICCHIO:  Thank you, your Honor.  Hi,

17     Ms. Malaver.  My name is Rosemary Scapicchio.  Together with

18     Mike Reilly, we represent the plaintiff, Shawn Drumgold.

19     The allegations in this case are that Detective Callahan

20     withheld some information from the prosecutors that

21     prosecuted Shawn Drumgold, and as a result he didn't get a

22     fair trial.  You're going to be asked to evaluate the

23     testimony of police officer witnesses which we expect is

24     going to vary quite significantly from civilian witnesses

25     who might come in and testify.  Would you give the police

1    witnesses any more credit because they're police officers?

2        THE JUROR:  No.

3        MS. SCAPICCHIO:  Okay.  And in this case if you

4    were at the conclusion of the case to come to the conclusion

5    that Shawn Drumgold proved his case that Detective Callahan

6    did withhold information that resulted in an unfair trial to

7    Shawn Drumgold, would you be able to award him money damages

8    if the Court instructed you that that's what you could do?

9        THE JUROR:  Yes.

10       MS. SCAPICCHIO:  And I noticed from your

11   questionnaire that you're an engineer?

12       THE JUROR:  Yeah.

13       MS. SCAPICCHIO:  And as part of your job, is there

14   any problem with you being out of your work until

15   potentially October 15th, although we hope it doesn't go?

16       THE JUROR:  I'm unaware of a problem.

17       MS. SCAPICCHIO:  Great, thank you so much.

18       THE COURT:  Hold on.

19       MS. HARRIS:  Almost.  Hi, I'm Mary Jo Harris and I

20   and Hugh Curran represent Detective Timothy Callahan, and I

21   notice from the questionnaire you live in South Boston?

22       THE JUROR:  Yes.

23       MS. SCAPICCHIO:  For about five years?

24       THE JUROR:  Yes.

25       MS. SCAPICCHIO:  Is that when you moved to Boston

1    about five years ago?

2            THE JUROR:  No, I've been here for 11 years.

3            THE COURT:  Have you lived in the city the entire

4    time?

5            THE JUROR:  I was in Brookline, so close.

6            MS. HARRIS:  Close enough.  Obviously this case

7    involves allegations made about the activities of Boston

8    police officers.  Have you had any experience, either

9    positive or negative, with any members of the Boston Police

10   Department since you've lived here?

11           THE JUROR:  No.

12           MS. HARRIS:  I just lost my train of thought,

13   excuse me.  I'll pass over.

14           MR. ROACHE:  Just very briefly, Ms. Malaver, where

15   you live in South Boston at 45 West Broadway, that's about a

16   block or so from the old G Street projects.  Are you aware

17   of those?

18           THE JUROR:  Vaguely, yeah.

19           MR. ROACHE:  Do you know anybody who lives there?

20           THE JUROR:  No.

21           MR. ROACHE:  Do you live in the old church?

22           THE JUROR:  Yes.

23           MR. ROACHE:  That's all I have, thank you.

24           MS. HARRIS:  Thanks.

25           THE COURT:  I will show you a number to call after

1   6:00, and you need your juror number when you call up, and

2   the voice on the phone will let you know whether you're

3   going to be part of the jury tomorrow, and if you are, we'll

4   welcome you tomorrow morning.

5           THE JUROR:  My juror number is the nine digit

6   number?

7           THE COURT:  That's right.  Don't research the

8   case.  The first thing you will hear with the case will be

9   tomorrow morning.  Okay?

10          THE JUROR:  Okay.

11          THE COURT:  Thank you.

12          At this point if you want, we'll do challenges in

13  open court.  If the defendants want to stay, and you can go

14  into court.  The jurors, the remaining jurors can be

15  excused, and you'll do the challenges based on your notes of

16  the various jurors.

17          MS. SCAPICCHIO:  Can we have some time?

18          THE COURT:  Take 15 minutes.  We'll resemble again

19  at 12:45, okay.

20          (A recess was taken.)

21          MS. SCAPICCHIO:  I think the issue regarding the

22  motion in limine regarding the responsibility of Detective

23  Callahan was to tell Assistant D.A. Phil Beauchesne or to

24  tell a prosecutor in the office because I would open

25  differently depending on.

1           THE COURT:  I have gone back and forth on that,

2     and I now believe that the defendants are right in this

3     respect.  The obligation is to turn over to the prosecutor

4     in a meaningful way, in a way that we'll make sure it winds

5     up in the prosecutor's, in the relative prosecutor's hands.

6     If the issue was if a police officer, for example, slid a

7     piece of paper under the door in the middle of the night or

8     gave it to a secretary who had no responsibility, then there

9     would be an argument that that would be an intentional

10    withholding.  In this situation, and you have to correct me

11    if I'm wrong, the facts are that the Prosecutor Connolly had

12    the information and Beauchesne did not?

13          MR. CURRAN:  We read Beauchesne differently,

14    Judge, we read the allegation that Beauchesne says that he

15    did, but they say in their view of his testimony at the

16    motion for new trial that it says he didn't.

17          THE COURT:  So the question is under these

18    circumstances, is there any body of law that says that for

19    the prosecutor that is essentially down the hall from

20    Beauchesne, right, I mean?

21          MR. ROACHE:  Next door.

22          THE COURT:  That giving it to one was not

23    reasonably going to lead to giving it to the other, then I

24    don't understand how, again, one can imagine a set of facts

25    where giving the information to one person in the D.A.'s

1    Office is so perfunctory, that it's not likely to get to its

2    intended target.  Those are not the facts here, so to some

3    degree saying that it has to physically be in the hands of

4    Beauchesne when it is physically in the hands of the

5    prosecutor next door, I don't think the case law goes that

6    far, and if it did, I think there would be a very

7    substantial qualified immunity argument.

8          What I would be prepared to do is to say that the

9    information has to be turned over in a way, and we can play

10   with the language, in which it is reasonably foreseeable

11   that it will get in the hands of the intended prosecutor,

12   so, in other words, you can argue that this was a

13   contrivance giving it to one rather than the other, but I'm

14   not going to direct the jury that unless they find it's

15   physically in the hands of Beauchesne that it is not,

16   doesn't fulfill their obligation.

17         So, in other words, what I'm saying is that I

18   would say you turn it over to the prosecutor's office in a

19   way that will mean that it's reasonably foreseeable that it

20   will get to the intended target, which would be Beauchesne,

21   and you can argue that this wasn't, and they can argue that

22   it was.  But there's no case, you couldn't provide me with a

23   case, I couldn't find a case.  Broadly speaking, it's true

24   that there's a difference between the conviction, reversal

25   of the conviction theory under Brady and 1983, but 1983 is

1  individual liability.

2       MS. SCAPICCHIO:  Exactly.

3       THE COURT:  And where if the evidence was as I

4  recall that the police officer gives it to the prosecutor

5  that he's most familiar with who's next door to Beauchesne,

6  it seems to me to say that that's not good enough as a

7  matter of law it seems to me would be wrong, and to say that

8  it would be not good enough as a matter of law would really

9  open the door to qualified immunity because there's not a

10  single case that says that that has to be done.

11       MS. SCAPICCHIO:  Judge, I think that the standard

12  between the Brady standard knowledge of one is knowledge of

13  all is different from the 1983 standard where it has to be

14  reasonably foreseeable to Detective Callahan assuming the

15  jury believes he turned something over to A.D.A. Connolly.

16       THE COURT:  Right, but what I'm saying that is a

17  fact, I will give broad language about the nature of the

18  Brady obligation and include in it language that it has to

19  be turned over in a way that it's reasonably foreseeable

20  that it would get to the appropriate prosecutor, but I will

21  not say that the failure of Callahan to put it in the hands

22  of Beauchesne is the violation.

23       You can argue either you disbelieve Connolly,

24  disbelieve Beauchesne, you can argue that this was giving it

25  to one in a way that it's not reasonably foreseeable to give

1   it to the other, but why shouldn't they be entitled to an

2   inference that giving it to Connolly is giving it to

3   Beauchesne?

4           MS. SCAPICCHIO:  Because under that scenario then

5   Detective Callahan could give it to Connolly, if you believe

6   that testimony, knowing it would never get to Beauchesne.

7           THE COURT:  If you can prove that.

8           MS. SCAPICCHIO:  Right.

9           THE COURT:  But it seems to me it's your burden to

10  prove that.

11          MS. SCAPICCHIO:  But there's a scenario under your

12  logic that Detective Callahan in giving it to Connolly could

13  understand and know at that point in time it will never get

14  to Beauchesne and ultimately never get to Drumgold.

15          THE COURT:  What I'm saying, Ms. Scapicchio, is

16  that I can envision a scenario where an officer slips

17  something under the secretary's desk or puts it in an inbox

18  in a large metropolitan urban office where who knows where

19  it's going to go, but the facts in this case suggest that it

20  arguably went to one D.A. who's next door to the other D.A.

21  in a relatively small office.

22          It seems to me the defendants are entitled to the

23  inference that it got to its intended target, and you're

24  entitled to argue that it did not.  What I won't do is to

25  say unless Callahan put it in the hands of Beauchesne.  You

1    can argue what you wish to argue because it seems to me that

2    there's an argument that this has to be reasonably

3    foreseeable, but I won't direct that to fulfill the 1983

4    obligation Callahan has to put it in the hands of Beauchesne

5    because were I to do that, there is a qualified immunity

6    argument.  There is simply no law that says that the

7    obligation has to be fulfilled directly like that.

8         Beauchesne is on vacation, I give it to Connolly,

9    you know, because Connolly is going to likely give it to

10   Beauchesne, because I tell Connolly to give it to

11   Beauchesne.  I can't imagine 1983 obligation would turn on

12   that kind of formality, and certainly no case says so.

13        You can argue that this was a contrivance, that

14   this was intended to keep it from Beauchesne and nominally

15   conform to the obligations of law.  They can argue the

16   opposite, but I won't fashion an instruction that says

17   unless you give A to B it's a 1983 violation.  It might.  It

18   might not be, and the question is whether these are the

19   circumstances in which it would be, but I can't forecast

20   that in advance.  I went back over the transcript.  It seems

21   to me I can't weigh in one way or the other.

22        Now, that means that my instructions would be

23   somewhat different than the instructions I gave in the first

24   case, and if the jury came back with the same kind of

25   question, what I would say is it's up for them to decide

1    whether it was reasonably foreseeable to Callahan that the

2    information would not get to Beauchesne under the

3    circumstances that he turned it over, but I will not say as

4    a matter of law unless police officer A puts it in the hands

5    of prosecutor B, it's a violation.

6             You're entitled to argue that, and I think this is

7    the safer way to proceed.  This then becomes an articulation

8    of an existing exculpatory Brady obligation rather than

9    fashioning a new rule because I think the defendants are

10   quite right, maybe it should be the rule, but it certainly

11   would be a new rule, so that's what I'm going to do.  I'll

12   give you 15 minutes now.

13            MR. CURRAN:  The other issue is the David Meier

14   motion in limine that was filed.

15            THE COURT:  Actually I can rule on that as well.

16   David Meier is accessible to both sides.  If a witness in

17   three depositions never says anything of relevance to this,

18   but if let's say in a subsequent interview, Ms. Scapicchio,

19   he said something which was of relevance, she's entitled to

20   call him.  It's not like an expert where he's bound by the

21   reports that he submitted.  Do you have any information from

22   David Meier that suggests that he will testify to Callahan

23   admissions?

24            MS. SCAPICCHIO:  Yes.

25            THE COURT:  Okay.  Well then I think she's

1    entitled to put him on.

2          MS. HARRIS:  Then we'll ask for a voir dire

3    because I've spoken to him, and I don't believe that to be

4    the case.  I'm trying to figure how far into the motion for

5    new trial we're going to litigate that in this case, and,

6    frankly, I'm trying to limit testimony from the D.A.'s

7    Office from the mid to late '90s about what they found in a

8    file that has been torn apart, as both sides have agreed, on

9    various pieces of evidence that things are missing.

10         I believe that the purpose of Meier and Paul Linn

11   being called as witnesses is to say these people have

12   obligations, and in 1994, when they took over the case, or

13   '98, or whenever it is, they didn't find anything,

14   therefore, it never existed, therefore you can infer such

15   and such.

16         If I'm wrong, then I apologize in advance, but

17   I've lived with David Meier for many years from before and

18   during and after the motion for new trial and discovery.

19         THE COURT:  Let me block off.

20         MS. HARRIS:  Yes.

21         THE COURT:  If the purpose, as I said, was a

22   keeper of the records issue, which is in '94, when I looked

23   in the file, it had these contents.

24         MS. HARRIS:  Right.

25         THE COURT:  Then you have a relevance argument or

1    at least we could have a voir dire on that --

2          MS. HARRIS:  Right.

3          THE COURT:  -- which is does the state of the

4    record in '94 reasonably reflect what it had been in '89?

5    Is it '88?

6          MS. HARRIS:  '88.

7          THE COURT:  So that's one question, and we can

8    have a voir dire on that.  I don't know enough about what

9    happened to the file between '88 and '94, so if the issue is

10   in preparing for the motion for new trial the defendant in

11   this case made admissions to Meier, then that would be a

12   relevant question about what he did or didn't do.

13         If those admissions are not in his deposition,

14   that doesn't bother me, if he's making it now, that only

15   suggests he'll testify on the stand and you'll rip him apart

16   with his prior statements.

17         MR. CURRAN:  The issue or the concern I have is

18   that if she asks the questions in the form of during the

19   motion for new trial you advised me that Callahan told

20   you --

21         MS. SCAPICCHIO:  I know I can't do that.

22         MR. CURRAN:  You did it in  the motion for new

23   trial, throughout the motion for new trial, and you were

24   chastised by Judge Rouse.

25         THE COURT:  She won't do that here.

1          MS. SCAPICCHIO:  That's a criminal proceeding, not

2     a civil proceeding.  We tried this whole case, and that

3     never came up, not even once.

4          THE COURT:  If David Meier has admissions of

5     Callahan, then you can have that.  The keeper of records

6     issue is a little bit more complicated.

7          MS. SCAPICCHIO:  I think the keeper of the records

8     issue, Judge, becomes more of an issue based on your ruling

9     of whether or not Beauchesne got the information or didn't

10    get the information and whether or not it was reasonably

11    foreseeable.

12         That now I think will play into the plaintiff's

13    case as to the state of the file.  I think that becomes more

14    of an issue if the instruction is that Callahan didn't have

15    to put it in the hands of Beauchesne, but we can argue that

16    it was reasonably foreseeable by giving it to D.A. A than it

17    would ever get to D.A. B.  The state of those files do

18    become important.

19         THE COURT:  Okay.  But then the only question

20    about the state of the files that I need some guidance about

21    is there's an '88 conviction.

22         MS. SCAPICCHIO:  Yes.

23         THE COURT:  Was the file -- will Meier or anyone

24    else in the D.A.'s office testify that the file was

25    untouched between '88 and '94?

1           MS. SCAPICCHIO:  I don't know the answer to that

2      question.  My understanding is that Paul Linn took it over

3      on appeal.  He had it on appeal for a period of time.  There

4      were no disclosures made while he had it on appeal.  When

5      the third motion for a new trial was filed, David Meier took

6      it over.

7           THE COURT:  Okay.  So if you have a consistent

8      story, consistent witnesses from here's the person who was

9      in charge of it at trial, here's the person who was in

10     charge of it on appeal, here's the person who took over on

11     the motion for new trial, and then there can be

12     cross-examination that it was really their recordkeeping was

13     awful, and, therefore, this was a function of bad recording

14     keeping rather than it wasn't in the file.  I don't know.  I

15     need to hear that testimony to know.

16          It seems to me as a matter of logic, if you can

17     tell a consistent story as to what happened to the file, you

18     can have Meier talking about the file when he came to it,

19     then the cross-examination would be that doesn't mean it

20     wasn't there in '88.

21          MS. SCAPICCHIO:  Exactly.  Exactly.  I think

22     that's fair.

23          THE COURT:  That's very limited testimony.  It was

24     what's the state of the file, what did Callahan tell you,

25     and that's it.

1          MS. SCAPICCHIO:  Yes.

2          MR. ROACHE:  One final thing.

3          THE COURT:  And Meier is obviously not a witness

4     that is to be led because he's not the defendant.

5          MS. SCAPICCHIO:  Absolutely.

6          MR. ROACHE:  Your Honor, I'm hearing a lot about

7     arguments, and I just want to make it clear that the purpose

8     of the opening statement is not to present argument.

9          THE COURT:  She knows.

10         MR. ROACHE:  Well, your Honor, I want to make it

11    so that I don't have to get up and object during

12    Ms. Scapicchio's opening statement when she starts arguing

13    about --

14         MS. SCAPICCHIO:  You already did that.

15         THE COURT:  No, we've been here before.  This is a

16    much more narrow case.  I've already said to Ms. Scapicchio

17    in sort of out of my role in a way that not only is this a

18    much more narrow case because there is a verdict on other

19    issues, but there were certain parts of her case which were

20    in fact weak as can be, and she shouldn't be going over that

21    again because they were a waste of time.  Now, you can

22    listen to me or not.

23         MS. SCAPICCHIO:  Judge, how do you want us to

24    refer to the first trial when we're cross-examining

25    witnesses?

1          THE COURT:  Another hearing.

2          MS. SCAPICCHIO:  Another hearing.  I wasn't sure

3    what we were going to do with that.  In fact, my binder said

4    Drumgold retrial, and we just purged it of all references to

5    that so no one would see it.  Okay, You still have 15

6    minutes.

7          MS. HARRIS:  Can I ask one final question?

8          THE COURT:  Yes.

9          MS. HARRIS:  I'm assuming that because of the

10   prior verdict that we can treat Mary Alexander and Tracie

11   Peaks like we treated all of the other witnesses?

12         THE COURT:  Yes.

13         MS. HARRIS:  In other words, Mary Alexander's

14   brain tumor is not going to be referenced to anybody?

15         THE COURT:  Yes.

16         MS. SCAPICCHIO:  Not unless you bring it up with

17   Rappaport.

18         THE COURT:  The only issue that I said is that as

19   I understand, I understand Ms. Scapicchio's case is that at

20   the time Officer Callahan came into the case, the case was a

21   mess, and so the only thing is there was no statement of the

22   defendant.  Why is another issue.  She doesn't get into the

23   why.  There were no witnesses who did any identification,

24   and there was a city that was inflamed over this case.  She

25   can start the story from there because it sets up the motive

1    and the pressure on the police, but that's it.

2              MR. CURRAN:  It creates an issue to the extent

3    that the inferences that we would go back to what exactly

4    did exist.

5              MS. HARRIS:  What there was, which was the

6    Tracie Peaks' statement, among other things.

7              MR. CURRAN:  Which is the Tracie Peaks'

8    identification.

9              THE COURT:  Tracie Peaks' identification was in

10   play by the time Officer Callahan?

11             MR. ROACHE:  Oh, yes.

12             MR. CURRAN:  Mary Alexander picked up the photo

13   three times, and her trial testimony is --

14             MR. ROACHE:  Vantrell McPherson.

15             MR. REILLY:  That's all in the trial transcript.

16   The trial transcript is in, and that evidence is there, and

17   that's what it is.

18             THE COURT:  Nothing is in now.

19             MR. REILLY:  Right, I'm sorry.

20             THE COURT:  And I have to go back over this, but

21   you can certainly start the story from the moment Officer

22   Callahan took over, and, you know, portray what he was faced

23   with in the light of that, but you're not going through, you

24   know, Mary Alexander's --

25             MS. SCAPICCHIO:  I have no desire to.

1           THE COURT:  Really because that was really awful.
2    Now, I'm going to leave.  Goodbye.
3           MS. SCAPICCHIO:  15 minutes?
4           THE COURT:  15 minutes.
5           (A recess was taken.)
6           (THE FOLLOWING OCCURRED IN THE COURTROOM:)
7           THE CLERK:  All rise.  United States District
8    Court is now in session.
9           THE COURT:  Okay.  You can be seated.  We'll do
10   this plaintiffs first, then defendants.  You have three on
11   each side Ms. Scapicchio.
12          MS. SCAPICCHIO:  Thank you, your Honor.  Our first
13   strike would be to juror No. 11, Laurin Gibson.
14          THE COURT:  Laurin Gibson, No. 11.  Ms. Harris.
15          MS. HARRIS:  No. 6, Brooke Robinson.
16          THE COURT:  No. 6, Brooke Robinson.
17   Ms. Scapicchio.
18          MS. SCAPICCHIO:  Our second strike, your Honor,
19   would be juror No. 19, Patrick Brennan.
20          THE COURT:  Patrick Brennan, 19.
21          MS. HARRIS:  And for the defendants, your Honor,
22   No. 9, Tracy Collins.
23          THE COURT:  No. 9, Tracy Collins.
24          MS. SCAPICCHIO:  Your Honor, with respect to
25   No. 9, she's one of two African-American women on the jury,

1    and I'd ask that you ask the defendants to provide a race

2    control reason for challenging her.

3              THE COURT:  Who is the other African-American

4    woman?

5              MS. SCAPICCHIO:  The other African-American woman

6    is No. 4, Brenda Leighton.

7              THE COURT:  Okay.  Your next challenge, well, your

8    next challenge.  Let's go on and see what else they do.

9              MS. SCAPICCHIO:  You want my challenge?

10             THE COURT:  Yes.

11             MS. SCAPICCHIO:  My next challenge would be juror

12   No. 5, Stephen McLaughlin.

13             THE COURT:  And yours?

14             MS. HARRIS:  No. 1, your Honor, Zachary

15   Coseglia.

16             THE COURT:  I'm not going to say that challenging

17   one of two African-Americans in the pool triggers a Batson

18   analysis.  Your last challenge?

19             MS. SCAPICCHIO:  That was it.

20             THE COURT:  You did 5, and your last challenge was

21   1, okay.  All right.  The jury is Brenda Leighton, No. 1;

22   Clifford Dsousa, juror No. 8; I'm sorry, Brenda Leighton is

23   1; Dsousa is 2; Erin O'Leary is 3; Mark Troia is 4;

24   Cheryl Millard is 5; William Scott is 6; Patricia Longo is

25   7; Michael Quigley is 8; Donat Gilbert is 9; Scott Lombardo

1    is 10; Debra Slade is 11; Karen Bresnahan is 12;

2    Mary Schiappa is 13; and Stephanie Malaver is 14.  That's

3    the jury.

4          We have to decide, there could be 8 with a jury of

5    4 alternates.  In a civil case with 14, 2 need to be

6    alternates in a civil case because the jury shouldn't be any

7    bigger than 12, could be as little as 8 but shouldn't be any

8    bigger than 12.

9          MR. ROACHE:  Your Honor, we had all 14 deliberate.

10    We lost one during the course of the trial.

11          THE COURT:  That's really up to you if you want to

12    have a jury of 14, that's fine.  All right.  That's the

13    jury.  I'm going to include in my instructions to the jury

14    at 6:00, I'm going to write this out, and I'll make it as an

15    order.  I want to make sure that because I didn't have a

16    chance to address the jury because they left for the day

17    yesterday or today, I want to make sure that they know not

18    to read about the case, not to watch anything, not to

19    Twitter, I got a whole long list, not to go online, not to

20    do any Internet research, et cetera, so I will put that in

21    an order which Mr. McAlear will read, okay, otherwise we'll

22    see you at 10:00.  I have to swear in some citizens.

23          THE CLERK:  All rise.

24          (A recess was taken.)

25          THE CLERK:  All rise.  United States District

1    Court is now in session.

2            THE COURT:  You can be seated.  So, first of all,

3    we have to commend my courtroom deputy.  Apparently she ran

4    down the street in her heels trying to find you.

5            MS. SCAPICCHIO:  Thank you, Maryellen.

6            THE COURT:  It occurred to me from reading my own

7    book, The Law of Juries, there is no such thing as a civil

8    jury in federal court with alternates.  Rule 48, the way it

9    works is that a jury must have at least 6 and no more than

10   12 members, so because the minimum is 6 and the maximum is

11   12, that builds in alternates.  The last time we had 13, we

12   selected 13, one person was excused for illness, so we wound

13   up with a jury of 12.

14           MR. ROACHE:  No, it was 14, your Honor.

15           MS. SCAPICCHIO:  We ended up with 13.

16           THE COURT:  No, that's not what the records say,

17   so we didn't have to confront this.  In any event, it's

18   crazy to have a jury of 14.  It seems to me it needlessly

19   complicates this.  What I would like to do then is since

20   we've selected 14, and because in my judgment selecting a

21   jury is a relative determination, not an absolute

22   determination, if you all wish to exercise your peremptory

23   challenges again, bearing in mind now that you're only going

24   to go to 12, I'll let you do that.  Alternatively we can lob

25   off, not a good way of putting it, but jury 13 and 14.

1           MS. HARRIS:  I'd go for the latter option, your

2      Honor.

3           THE COURT:  Because you're tired and you want to

4      get back to your office?

5           MS. HARRIS:  Yes.

6           MS. SCAPICCHIO:  Could I suggest a third option?

7           THE COURT:  Yes.

8           MS. SCAPICCHIO:  Could we each exercise another

9      peremptory challenge?

10          MS. HARRIS:  That I think was the first option,

11     but if you would entertain it, we would object because we

12     never would have gotten to the last two had we followed the

13     rules, so I think in fairness, the last two ought to have

14     been excused.

15          THE COURT:  Yes.  It's conceivable you would have

16     made different judgments as to the whole pool, so I have to

17     go by agreement now.  I mean, in other words, the right

18     thing to do is now to wipe this out and have everybody

19     exercise challenges again which sounds like you don't want

20     to do or your proposal, last two by agreement or

21     Ms. Scapicchio's proposal, additional peremptory challenges

22     by agreement.

23          It seems to me, in other words, the only way that

24     I can make up for the mistake that I made is by starting all

25     over again with the peremptory challenges, otherwise we have

1    to do either proposal by agreement.

2         I should say one other thing, too, that on

3    reflection, and I hate to needlessly complicate things, I do

4    believe that the strike of Tracy Collins, the defendants

5    ought to justify that strike, and I want to give you an

6    opportunity, and the reason for that is this has been a

7    jurisdiction with issues with respect to African-American

8    representation.

9         There are only seven percent of minorities in the

10   pool that we draw from.  We typically wind up with a jury of

11   three or four percent, so going from two African-Americans

12   on the jury to one, it seems to me is not an insignificant

13   step.

14        MS. HARRIS:  I'm happy to address it.  I can do it

15   now or I can do it later.

16        THE COURT:  Why don't you address it now.

17        MS. HARRIS:  I didn't think she liked me, that was

18   my main reason, and when we first went through the entire

19   pool, we had Lanita Foley, who I assumed, and maybe my

20   assumption is incorrect, but I assumed that she was a person

21   of color.  We also have Mr. Dsousa, who I believe is a

22   person of color.  I don't believe that her race should be

23   dispositive one way or the other.  It was my feeling that

24   she was disinclined to listen to me or to give me a fair

25   shake.  It was a complete personal reaction.

1          THE COURT:  Okay.

2          MS. SCAPICCHIO:  Judge, just for the record, I

3    would note that she is the only African-American juror that

4    is from the City of Boston.  She's the only inner city juror

5    that was summonsed that showed up today.  I don't know if

6    she was the only one on the summons, but she's the only one

7    that showed up today.

8          MR. CURRAN:  The other issue, Judge, is she grew

9    up in the South End where a lot of the parties in this case,

10   although she didn't identify knowing anybody, but she grew

11   up at a time our case is the city was under the siege of

12   violence, and the cops were overworked, and I have an issue

13   of her sitting here as a juror under the circumstances.

14          At the same time I would note that all the jurors

15   who came in here over the course of two days, they were

16   always very polite and came, they sat down, and what brought

17   our attention to her right away was where she sat in the

18   jury room with her arm back, kind of had an attitude from

19   the beginning.

20          THE COURT:  Okay.

21          MR. CURRAN:  One, this is a civil case, this isn't

22   a criminal case, in regards to this type of challenge, but

23   there are numerous reasons, numerous reasons.  We didn't

24   challenge the juror from Phillips Andover who was

25   African-American.  We had every intention on keeping her on

1    this jury.  She called in because of the pressure at work.

2         THE COURT:  That was Ms. Foley, yes.  I'm going to

3    accept, I'll accept your reasons.  I just thought that it is

4    subject -- it's important to scrutinize this given the

5    nature of the jury pool in federal court, so do you want to

6    take a moment?

7         The other thing is just, again, on the record

8    Mr. McAlear is going to read the following to the jurors on

9    the 1-800 number, he'll say, "You may not obtain information

10   about this case other than any information obtained in the

11   courtroom during the trial of this case.  You may not read

12   about the case, watch television, conduct research on the

13   Internet or in any other setting.  You may not communicate

14   about this case in any form during your service as a juror."

15        The latter sentence is to deal with the Twittering

16   juror, you're trying to cover all bases.  Do you want to

17   take a minute about whether you can come to an agreement, if

18   you cannot come to an agreement, then I'm going to have you

19   exercise your challenges again.

20        MS. HARRIS:  If I could just ask your Honor, when

21   you say we'll exercise the peremptories, again, you're

22   saying that we'll exercise three out of this body?

23        THE COURT:  Yes.

24        MS. HARRIS:  How is that going to leave us with a

25   different result?

1          THE COURT:  You're right.  No, what happened is

2   that the first 12, bearing in mind -- no, wait a second, if

3   what you're saying is that had I known it was going to be

4   12, we would have stopped at Karen Bresnahan.

5          MS. HARRIS:  And would have never gotten to the

6   last two.

7          THE COURT:  And would have never gotten to the

8   last two, that's actually right.  Is that right, Maryellen?

9          MS. HARRIS:  We would have ended with

10  Ms. Bresnahan.

11         THE COURT:  So, under those circumstances, I can

12  strike Mary Schiappa and Stephanie Malaver, and that's what

13  I will do.  In other words, had I known that we were only

14  selecting 12, I would have stopped after Ms. Bresnahan.

15         MS. HARRIS:  That's right.

16         THE COURT:  So the jury then is Leighton, Dsousa,

17  O'Leary, Troia, Millard, Scott, Longo, Quigley, Gilbert,

18  Lombardo, Slade and Bresnahan.  That's all I called you back

19  for.  Thank you very much.

20         THE CLERK:  Thank you.

21         (Whereupon, the hearing was suspended at

22  2:50 p.m.)

23

24

25

1                    C E R T I F I C A T E

2

3     UNITED STATES DISTRICT COURT )

4     DISTRICT OF MASSACHUSETTS    )

5     CITY OF BOSTON               )

6

7          I, Valerie A. O'Hara, Registered Professional

8     Reporter, do hereby certify that the foregoing transcript

9     was recorded by me stenographically at the time and place

10    aforesaid in No. 04-11193-NG, in re:  Shawn Drumgold vs.

11    Timothy Callahan and thereafter by me reduced to typewriting

12    and is a true and accurate record of the proceedings.

13                         /S/ VALERIE A. O'HARA

14                         _____

15                         VALERIE A. O'HARA

16                         REGISTERED PROFESSIONAL REPORTER

17                         DATED APRIL 28, 2011

18

19

20

21

22

23

24

25