| | |
|---|---|
| **SHAWN DRUMGOLD,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 04cv11193-NG** |
| ) | |
| **TIMOTHY CALLAHAN,** ) | |
| **Defendant.** ) | |

GERTNER, D.J.:

## MEMORANDUM AND ORDER RE: POST-TRIAL MOTIONS
August 18, 2011

Shawn Drumgold ("Drumgold") brought this action for damages arising from his
wrongful conviction and unlawful imprisonment for the murder of a twelve-year-old girl, Tiffany
Moore. He alleges that former homicide detectives, Timothy Callahan ("Callahan"), Paul
Murphy ("Murphy"), and Richard Walsh ("Walsh"), withheld exculpatory evidence. The
exculpatory evidence included information that the police provided one of the government's key
witnesses, Ricky Evans ("Evans"), with cash, meals, and housing at a Howard Johnson's Hotel
for months, fed him information about the Tiffany Moore murder, and promised assistance with
his own pending criminal cases. Evans was homeless at the time. He recanted his trial
testimony that placed Drumgold near the scene of the crime before and after Tiffany Moore's
murder. In a motion for a new trial in state court, Drumgold argued that the fact that this
impeachment evidence was withheld contributed to his wrongful conviction of first degree
murder, for which he was sentenced to life in prison without parole. After fourteen years of
incarceration, Drumgold's motion for a new trial was granted, and he was released; the District
Attorney entered a nolle prosequi on November 6, 2003.

Drumgold filed this civil suit on June 3, 2004. He brought claims under 42 U.S.C. §
1983 and Mass. Gen. Laws. ch. 12 § 11 against detectives Callahan, Murphy, and Walsh, police

commissioner Francis Roache ("Roache"), and the City of Boston for violations of his state and federal constitutional rights. See Compl. (document #1). The case went to trial in March 2008. That trial, by motion of the defendants, was divided into three phases before the same jury: The first phase addressed the liability of defendants Walsh and Callahan,[1] the second phase would address the liability of defendants Roache and City of Boston, and the third phase would address damages.

At the first phase, the jury found in favor of the defendants on all claims, except that it found that defendant Callahan had violated Drumgold's civil rights in connection with one witness: Evans. The jury was asked whether Callahan violated Drumgold's right to a fair trial by withholding exculpatory evidence from prosecutors, manufacturing evidence, and/or obtaining false statements regarding: (1) Evans' alleged observations of Drumgold and his co-defendant, Terrance Taylor ("Taylor"), on the day of the crime; (2) that Evans was housed at a hotel and provided with meals; (3) that Evans was given substantial amounts of money; and (4) the disposition of Evans' criminal cases. Verdict Slip at 2-3, Apr. 9, 2008 (document #265). The jury found that Callahan had violated Drumgold's rights as to the third claim: that he had given Evans "substantial amounts" of money and not disclosed it. The jury rejected the other three claims regarding Evans.

All parties agreed to proceed to phase three to assess damages in lieu of proceeding against defendant Roache and the City of Boston. At this final phase, however, the jury was unable to reach a verdict on the appropriate award for Drumgold as against Callahan. I

---

[1] The case against Paul Murphy was dismissed on January 7, 2008.

subsequently granted a retrial only as to defendant Callahan and issues regarding his conduct with witness Evans. See Order Re: Scope of Retrial, Mar. 31, 2009 (document #313).

The case proceeded to a second trial in September 2009. This trial was again divided into two phases: liability and damages. At the first phase of the second trial, the jury was asked whether Drumgold had proven by a preponderance of the evidence that Callahan had intentionally or recklessly withheld evidence from prosecutors about: (1) the fact that Evans was housed at a hotel and provided with meals; (2) that there were promises of favorable treatment in Evans' pending criminal cases; and (3) that money was given to Evans.[2] The jury found that Callahan had intentionally or recklessly withheld evidence from prosecutors about housing and meals (category 1) and cash given to Evans in the amount of $20 (category 3). The jury also found that this evidence was material and its withholding was a legal cause of Drumgold's conviction. The jury rejected the claims that Callahan had withheld exculpatory evidence of promises of favorable treatment in Evans' pending criminal cases and that Callahan had intentionally or recklessly obtained false statements. See Verdict Slip, Oct. 14, 2009.

At the second phase of the second trial, Callahan was permitted to argue to the jury that there had been an intervening cause of the harm to Drumgold. Specifically, Callahan claimed that the prosecutor later came to learn of the exculpatory evidence and as such, he was required to turn it over to the defense; Callahan's conduct did not cause any injury to Drumgold. The jury rejected that argument entirely. It awarded $14,000,000 to the plaintiff from Callahan. See Verdict Slip, Oct. 21, 2009 (document #395).

---

[2] Note that the wording of the verdict slip was slightly different in the second trial, in part because the second trial focused exclusively on Callahan and his conduct vis a vis Evans. Compare Verdict Slip at 2-3, Apr. 9, 2008 (document #265) with Verdict Slip, Oct. 14, 2009 (document #383).

The case is presently before the Court on post-trial motions.  Callahan has renewed his motion for judgment as a matter of law.  See Def. Mot. JMOL (document #422).  He argues that his conduct did not rise to the level of a constitutional violation under Brady v. Maryland, 373 U.S. 83 (1963), and even if it did, qualified immunity precludes a damage award.  He alleges that the law was not clearly established at the time of the events in question such that he would have been on notice that his conduct was unlawful.  In the alternative, he argues that the scope of the second trial was over-broad and therefore the jury's verdict is invalid as a matter of law.  Next, Callahan moves for a new trial on the grounds that the Court erred in an evidentiary ruling, in its jury instructions on causation and in the definition of exculpatory evidence.  Def. Mot. New Trial (document #424).  Finally, Callahan moves for remittur because the jury lacked sufficient evidence to reject his intervening cause defense and because the verdict is excessive.  Def. Mot. Remittur (document #426).  I will consider each motion in turn below.

## I.     FACTS

I should note at the outset that this trial, like most, hinged on questions of credibility. Many of the witnesses had testified in four prior proceedings:  Drumgold's criminal trial in 1989, the hearing in state court on the motion for new trial in 2003, the 2008 trial in this court, and now the 2009 trial, in addition to depositions.  For some, their stories changed.[3]  Indeed, with

---

[3] Of course Evans' story changed most dramatically.  He openly admits that he lied in Drumgold's criminal trial.  He testified that he finally told the truth in 2003:

> Everybody have a conscious [conscience], and my conscious [conscience] was I
> lied and I had a guy locked up for a certain amount of years, and it stuck with me
> for the longest, all my life, and I got tired living with those, that guilt, that's the
> only time I could make it up right, try to make things right.

Trial II Tr. Day 4 at 92.  The jury had to weigh his testimony and determine whether he was lying then or lying now, balancing his incentive to lie in each circumstance.  The jury was entitled to believe some of his story and not all of it; their verdict suggests that they did just that.

conflicting testimony from virtually every witness, the jury was asked to assess whose story they believed -- and which version or part of that story -- and render their verdict accordingly. At this stage of the litigation, we are to defer to the jury's judgment and consider the facts in the light most favorable to the verdict. Marcano Rivera v. Turaba Med. Ctr. P'ship, 415 F.3d 162, 167 (1st Cir. 2005). Where a jury finds in favor of one party on some claims and in favor of another party on other claims, the court is to construe the facts in the favor of the verdict on each claim. See Raiche v. Pietroski, 623 F.3d 30, 37 (1st Cir. 2010). "[I]t is the duty of the courts to attempt to harmonize" a jury's findings "if it is possible under a fair reading of them." Gallick v. Baltimore & Ohio R.R. Co., 372 U.S. 108, 119 (1963).

Here I recite the facts as presented to the jury at the second trial, bearing in mind that the jury found that Callahan intentionally or recklessly withheld evidence from prosecutors regarding Evans' housing and meals, and cash in the amount of $20, but not with respect to favorable treatment in his pending criminal cases or obtaining false statements. See Verdict Slip, Oct. 14, 2009. I will present only the facts relevant to those claims.

The story begins on August 19, 1988, when twelve-year-old Tiffany Moore was murdered during gang warfare in Boston. Drumgold was arrested on unrelated drug charges on August 28. He was held in custody and moved to the Roxbury District Court the next morning for arraignment. On August 29, he was charged with the first-degree murder of Tiffany Moore. On September 8, Drumgold and Taylor were indicted by the Suffolk County Grand Jury.

Detective Callahan was assigned to the Moore homicide in late May or early June 1989. The jury heard evidence that Callahan launched a vigorous investigation, during which he called on Evans. Evans was a young homeless man who had recently been a victim in another

shooting. Evans' shooter had killed his cousin, Roy Evans, in his presence, but Evans had been miraculously spared. He was now unemployed, wounded, with no benefits, and living with his brother in violation of his brother's lease. Callahan had been investigating the Evans' shooting for six months; Evans was the main witness against the alleged shooter, Treas Carter. Callahan had developed a relationship with Evans by the time he asked him about the Tiffany Moore case in June of 1989.

Evans testified, "As soon as I talked about the murder of Tiffany Moore that Sergeant Callahan whisked me away to the Howard Johnson's." Trial II Tr. Day 4 at 52-53. The exact dates of his stay were disputed at trial, but Evans claimed that he spent up to eight months at the hotel, where he could charge meals to his room. Not only did he take his own meals at the Howard Johnson's, but he also invited family and friends to join him. He testified, "after I spoke about Tiffany Moore, I started getting . . . I started getting everything I wanted." During his stay at the hotel, Callahan gave Evans cash – the sum of which the jury determined to be $20.[4] Evans later testified that during this period, he would take information from the investigators and "tell them what they wanted to hear." Trial II Tr. Day 4 at 96. Evans left the Howard Johnson's sometime after he testified in Drumgold's trial.

Meanwhile, Callahan worked closely with the prosecutors in both cases. Assistant District Attorney Paul Connolly ("ADA Connolly") prosecuted the case against Treas Carter for

---

[4] There was evidence to suggest that Evans was given cash often during his time at the hotel. Because there was no concrete estimate of exactly how much, however, the jury concluded that Evans was given $20. The jury was asked:

How much money did Defendant Timothy Callahan give to Ricky Evans?
$20 _____ or more than $20 _____

The jury concluded $20. Verdict Slip at 1, Oct. 14, 2009.

the shooting of Evans and his cousin.[5]  Assistant District Attorney Phil Beauchesne ("ADA

Beauchesne") prosecuted the case against Drumgold for the murder of Tiffany Moore.  Callahan

did not tell ADA Beauchesne about Evans' long stay at the Howard Johnson's, nor the meals

provided to him and his family and friends.  There was no record of the hotel in the police file or

the prosecutor's file of the Tiffany Moore case.

 Drumgold's trial counsel, Attorney Steven Rappaport ("Rappaport"), filed a motion for

exculpatory evidence, including a request for promises, rewards, or inducements provided to

witnesses.  He asked for any formal agreements with witnesses or a summary of promises made

to any prospective witness.  He later testified that ADA Beauchesne had an open file policy, and

Rappaport had never experienced any difficulty obtaining evidence from him.  In fact, the parties

met for a pre-trial conference on September 25, 1989, on the record.  Rappaport asked,

> Certainly for the purposes of cross-examining Mr. Evans, I would
> like to know as much as I can about the background about how he
> came to the police, was it a result of the murder investigation, was
> he a suspect in another murder case, whether any formal deals that
> had been made, is there some sort of inducement for him to offer
> his testimony.

Trial II Tr. Day 6 at 68-69.  ADA Beauchesne responded that he understood his continuing

obligation to disclose information regarding Evans.  He said that he had provided three

documents relating to this witness: a report by Callahan about a conversation with Evans on June

---

[5] Connolly was aware of the hotel arrangements.  Treas Carter ultimately pled guilty, and Evans was never called to testify against him.  After the plea, Connolly wrote a memorandum to victim advocate Laura Scherz ("Scherz"), assigned to the case, in which he noted that he had forgotten to tell her that they had placed Evans in a hotel.  Memorandum from Paul Connolly, Assistant District Attorney, to Laura Scherz, Victim Witness Advocate, Trial Ex. M.  The memo is dated January 30, 1990, *after* Drumgold's criminal trial.

 Callahan mentioned that Evans was a witness in the Moore case, but he never told her about the housing arrangement.  This was unusual because it is typically the responsibility of the victim advocate to place victims or witnesses in housing.  Trial II Tr. Day 11 at 123-124.

21, 1989, a complaint by Evans against an investigator on September 12, 1989, and a report of a taped transcript from a recording of Evans on August 6, 1989. While ADA Beauchesne was forthcoming, he gave no indication that he knew of any hotel accommodations, meals, or cash provided to Evans.[6]

Drumgold was tried by jury in October of 1989. At trial, Evans testified that he had seen Drumgold and Taylor together before the shooting. Evans testified that Taylor told Drumgold, "I know where Chris and Mervin and Chaney's at," referring to the individuals who were believed to be the intended targets of the shooting. Trial II Tr. Day 4 at 76. He testified that he saw Drumgold and Taylor that evening two blocks from the scene of the murder. They were carrying guns. About forty-five minutes later, Taylor and the defendant returned without the guns. Evans reported that Taylor said that the guns were "hot." Evans had given similar statements to the police and prosecutors on June 21, 1989, and August 6, 1989. Rappaport cross-examined Evans about his lengthy criminal history, the fact that he had used aliases when arrested, that his brother was a member of a local gang, and that police officers on the Tiffany Moore murder had

---

[6] The parties dispute whether ADA Beauchesne ever did come to learn of the housing provided to Evans. ADA Beauchesne's testimony from 2003 was admitted into evidence. He testified that he had no memory of Ricky Evans staying at the Howard Johnson's and never saw any documents relating to his stay. He testified that the only reason that the DA's office would put him in a hotel is for security reasons.

Frances O'Meara, the head of Suffolk County District Attorney's Homicide Unit in 1988, however, testified at the 2009 trial that sometime after Drumgold's conviction, Deputy Joseph Dunford of the Boston Police Department called him regarding the expenses incurred in housing Evans at the Howard Johnson's Hotel. It was the practice of the District Attorney's Office to bear the costs of prosecution post-indictment. O'Meara would notify the assistant district attorney and confirm that it was an appropriate expense that had to be paid. In this instance, O'Meara testified that he confirmed the expense with ADA Beauchesne, and the District Attorney's office then paid the bill.

O'Meara was substantially impeached, however, with his testimony from the hearing on Drumgold's Motion for New Trial in 2003: at that time, he testified precisely the opposite -- that the District Attorney never received any bills from the Howard Johnson's and that he had no memory of talking to ADA Beauschesne concerning the hotel bill.

"cleared-up" his warrants.  Rappaport asked if he had received anything in exchange for his testimony, and Evans said, "no."[7]

Rappaport later testified that had he known of the benefits provided to Evans, he would have cross-examined him about them.  He testified that this circumstance was significantly different than other information that wasn't disclosed until trial and to which he did not object: another witness from out of town had been provided with a hotel for one night.  Rappaport explained, "If you tell me somebody is homeless, they don't have a penny in the pocket, and suddenly they are placed in a hotel room, and they have an expense account, that's a different situation."  Trial II Tr. Day 6 at 80-81.  With respect to Evans, Rappaport testified that his entire

---

[7] At trial in 2009, Evans explained why he lied:

A.    If -- if I wouldn't have testified, if I wouldn't have testified back then in '88, '89, about the things about what I was supposed to say or what was fair to me, I was young, I was on the street.  I didn't know where I was going to sleep the next night.  I didn't know where I was going to get my next meal from.

Q.    And then you got tired?

THE COURT: Let the witness answer.

A.    I didn't know where I was going to sleep the next day, I didn't know where I was going to eat. You got two detectives backing you up for everything you do, of course I lied.  It was a lie.

Q.    And, in fact, you lied to the detectives, didn't you?

A.    Excuse me, about?

Q.    You lied to the detectives about the information that you gave them?

A.    I was taking the information from them, and I would tell them what they wanted to hear.

Trial II Tr. Day 4 at 95-96.

defense strategy would have been different.[8]

Evans was by no means the only witness who testified against Drumgold. His testimony, however, was important: it placed Drumgold and Taylor together, carrying guns, near the scene of the crime. His testimony significantly undermined Drumgold's alibi witness, Reverend Rodney Sadberry, who had testified that Shawn Drumgold was elsewhere, with him getting a sandwich at 7:20 the evening of the murder.

At the conclusion of the Commonwealth's case, the court allowed Taylor's motion for required findings of not guilty. Commonwealth v. Drumgold, 423 Mass. 230, 233 (1996).

On October 13, 1989, the jury reached a verdict, convicting Drumgold of first degree murder. The judge sentenced Drumgold to life in prison without parole.

Fourteen years later, Drumgold's counsel interviewed several witnesses who recanted their testimony. She moved for a new trial in 2003, and at the hearing, she subpoenaed Evans. Along with other witnesses who recanted their earlier testimony at the 2003 hearing, Evans testified that Callahan "fed" him facts about the crime and Drumgold, including descriptions of Drumgold's clothes, car, and conversations that he otherwise would not have known. He testified that Callahan had paid for his food and lodging for several months before the trial.

Drumgold's motion for a new trial was granted, and the government nolle prossed Drumgold's case. Drumgold was released after fourteen years in prison.

---

[8] Indeed, when the investigation was ultimately challenged in a motion for new trial, several witnesses -- not just Evans -- recanted. and Drumgold was granted a new trial; the prosecutor declined to prosecute the case again.

## II.    JUDGMENT AS A MATTER OF LAW

The jury in the instant case found Callahan liable for recklessly or deliberately withholding evidence that Evans had been provided with housing and meals for months, as well as with cash, that this evidence was material, and that its withholding was the legal cause of Drumgold's conviction.[9]  The jury awarded $14,000,000 in damages.  <u>See</u> Verdict Slip, Oct. 21, 2009.  Callahan challenges the jury's verdict.

### A.    Standard

It is well established that one who seeks to overturn a jury verdict faces an "uphill battle." <u>Marcano</u>, 415 F.3d at 167.  "Courts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party."  <u>Rivera Castillo v. Autokirey, Inc.</u>, 379 F.3d 4, 9 (1st Cir. 2004) (internal quotation marks and citation omitted).  Still, a motion for judgment as a matter of law will be granted where the court determines that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a).

---

[9] As a preliminary matter, Callahan argues once again that the scope of the 2009 trial was over-broad and therefore the jury's verdict is invalid as a matter of law.  He argues that the jury should have been asked only whether a "substantial amount of money" was given to Evans and in what amount, since that is the issue upon which the first jury hung.  I have addressed this argument before and I need not belabor the point here.  <u>See</u> Order Re: Scope of Retrial, Mar. 31, 2009.  Because the first jury reached an impasse, a new trial was required.  The question was the scope of that trial.  <u>Id.</u> at 3.  I declined the plaintiffs' request to grant a full retrial as against all of the defendants, on all issues, and I instead granted a partial retrial only against Callahan as to his conduct with one witness, Evans.  I refused to further limit the retrial because the specific claims regarding Callahan and Evans -- the withholding of information about money, meals, housing, and illegally obtained statements -- were not "so distinct and separable . . . that the trial of [one] alone [could] be had without injustice."  <u>Gasoline Prod.'s Co. v. Champlin Ref. Co.</u>, 283 U.S. 494, 500 (1931).  It was, in effect, a single narrative which could not be sliced and diced as the defendants requested.

**B.      Brady Violation**

As I explained to the jury, a defendant has a constitutional right in a criminal trial to be provided with material exculpatory evidence in the hands of police and prosecutors. Jury Instructions at 3 (document #376); see generally Brady, 373 U.S. 83. Exculpatory evidence includes evidence that might be used to impeach the credibility of a witness, such as evidence of bias where a witness has been paid or provided with benefits by the government in connection with his testimony. See United States v. Bagley, 473 U.S. 667, 676 (1985); United States v. Irwin, 661 F.2d 1063, 1068 (5th Cir. 1981); Commonwealth v. Fuller, 394 Mass. 251, 263 (1985).

To be sure, the right to exculpatory material is expansive but not infinite. See Mastracchio v. Vose, 274 F.3d 590, 601 (1st Cir. 2001) ("It is well-established that the prosecution's failure to disclose favorable information to the defense constitutes a violation of the defendant's constitutional rights only if, and to the extent that, it deprives the defendant of a fundamentally fair trial."). The right is violated only where the exculpatory evidence is *material*. Strickler v. Greene, 527 U.S. 263, 280 (1999). I explained to the jury that:

> Exculpatory evidence is "material" when it is of a type that could undermine confidence in the outcome of a trial. It would include evidence that has the potential to alter a jury's assessment of the credibility of a significant prosecution witness.
>
> In determining what is material, the question is not whether a defendant would more likely than not receive a different verdict if the evidence had been disclosed. Rather, the question is whether without the evidence he would receive a fair trial, understood as a trial resulting in a verdict worthy of confidence.
>
> And in considering whether a verdict worthy of confidence would result, you must consider the setting: In this case, the burden of proof is on the plaintiff to prove his case by a fair preponderance of the

evidence. In the criminal trial, however, the burden of proof that was on the Commonwealth of Massachusetts was much higher. In that case, the burden of proof was beyond a reasonable doubt. The Commonwealth was required to convince a unanimous jury beyond a reasonable doubt to sustain a conviction against Mr. Drumgold. Thus, one way of understanding materiality is to consider whether the undisclosed evidence would have created reasonable doubt of defendant's guilt .

In assessing materiality, the focus must be on the cumulative effect of the evidence that you found was not disclosed, rather than the impact of each piece of evidence taken in isolation.

There is no constitutional deprivation, however, if the plaintiff or his counsel in fact knew of the exculpatory evidence at the time of the underlying criminal trial.

Nor is there a constitutional deprivation if the officers in fact turned the exculpatory evidence over to the prosecutor before or during the criminal trial.

Jury Instructions at 4 (document #376) (internal outline numbers omitted).

Callahan argues that Drumgold's claim fails as a matter of law because no reasonable jury could have found that the cash, meals, and housing provided to Evans was material such that its disclosure would have affected the fairness of the trial.[10]

---

[10] Callahan raises this argument in two respects. First, he challenges the sufficiency of the evidence to support the 2008 jury's verdict as to "substantial sums of money" provided to Evans. The time for such an argument has long since past. Fed. R. Civ. P. 50(b) provides: "No later than 28 days after the entry of judgment -- or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged -- the movant may file a renewed motion for judgment as a matter of law . . ." When a trial ends in a mistrial, the time for filing a Rule 50(b) motion runs from the discharge of the jury. Art Attacks Ink, LLC v. MGA Entm't Inc., 581 F.3d 1138, 1142 (9th Cir. 2009). Here, the jury was discharged on April 16, 2008. Callahan should have moved for judgment as a matter of law on this ground long before the retrial in 2009. It is certainly not timely now.

Second, Callahan argues that Drumgold's constitutional rights were not violated as a matter of law because he did not have a clearly established right to the evidence at issue. In other words, the evidence is not material exculpatory evidence under Brady. In support, Callahan cites to criminal cases, in which appellate courts analyzed whether the trial court's rejection of a Brady claim was an abuse of discretion, or habeas cases in which a district court is obliged to defer to a state court's ruling.

This case is in a different posture than the criminal or habeas cases cited. First, I cannot conclude that the facts here can never make out a Brady claim. The question is contextual, depending entirely on the facts that were presented to the jury, significantly facts concerning Evans' unique vulnerability to the benefits that were provided.

The evidence presented to the jury, however, was more than sufficient to lead it to conclude that the benefits were material. The jury heard that when Evans began to talk about the Moore murder, he was unemployed, homeless (although staying with his brother in violation of his brother's lease), and wounded after the Treas Carter shooting: "I was young, I was on the street. I didn't know where I was going to sleep the next night. I didn't know where I was going to get my next meal from." Trial II Tr. Day 4 at 95-96. The jury may well have credited his testimony that the moment he spoke of the Moore murder, he was "whisked" to a hotel, where he was given free reign to entertain guests and charge all expenses to his room for an extended period of time -- up to eight months.

To be sure, to constitute material Brady evidence, the benefits provided to a witness must be more than de minimis. Bagley, 473 U.S. at 675 n.7 ("[A] rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments."). For example, travel expenses for one witness to testify and for another witness to leave town for security reasons may not qualify. Fuller, 394 Mass. at 263-64. Here, however, a homeless person was provided with food and shelter for months, benefits that he claimed started just as he began to talk about Drumgold in connection with the Tiffany Moore murder. In *these* circumstances, in *this* context, the jury reasonably found that the provision of such benefits for an indigent person is material impeachment evidence. It is axiomatic that for

Second, I am being asked to review the decisions of a jury, which is at least as deferential a review as is the abuse of discretion standard for a trial court. I am obliged to consider the Brady argument here in light of the evidence presented in the 2009 trial and the 2009 jury's verdict that the evidence of cash, meals and housing provided to Evans was in fact material and its suppression undermined the credibility of Drumgold's conviction.

someone who is homeless and vulnerable, the potential of food and housing provides a very real incentive to lie.

Here, the jury may have drawn the inference that Callahan had an implicit deal with Evans: if you testify for us, we will take care of you -- to the tune of a lengthy hotel stay and an expense account. The jury may reasonably have concluded that not only was this a classic "promises, reward, or inducement" for a government witness, but that Callahan intentionally hid it from the prosecutor, and thereby the defendant. Although Callahan documented interviews and conversations with Evans as part of his investigation, there was no reference to the Howard Johnson's stay in his file. When Callahan spoke with the victim advocate, Scherz, about the case, he neglected to inform her that Evan needed a hotel room -- even though she was generally responsible for making housing arrangements for victims and witnesses.

In spite of an open file policy and a specific request for exculpatory material as to Evans -- both in writing and at the pre-trial conference -- defense counsel was never told and never learned of these arrangements. And in fact the evidence suggested that the prosecutor -- who was generally forthcoming with exculpatory evidence -- was entirely unaware of the cash, housing and meals provided to Evans. The jury may reasonably have drawn the inference that this was not merely a lack of communication and an inadvertent omission, but rather an intentional effort on the part of Callahan to hide the information.

In addition, there was sufficient evidence for the jury to conclude that without this evidence, Drumgold's trial did not result in a "verdict worthy of confidence." To be sure, Rappaport vigorously cross-examined Evans with the information that he had: his criminal convictions, his aliases, and his pending criminal cases about which he had spoken with

Callahan.  But Rappaport was missing information that a jury could find to be a significant weapon in his arsenal: namely, the benefits that Evans had been provided given his particular circumstances.  Indeed, testimony about what a witness may have been paid for his information is the classic cross examination of a government witness.  And yet when Evans testified that he had not received any benefits in exchange for his testimony, Rappaport had no information with which to challenge him.  Although Evans now admits that he was lying on the stand, Rappaport was unable to point to the eight months of hotel expenses that arguably provided him with an added motive to skew his testimony.

This is not a case where the government disclosed the fact of the benefits, but did not disclose their *extent*.  Cf. Mastracchio, 274 F.3d at 594-96 (finding that the state court had not unreasonably determined that some extra benefits were merely "cumulative" and not material under Brady where the government had disclosed that a key witness had received substantial benefits, "including payment of personal expenses averaging $1500-$1800 per month, a thirty-day stay with his family during the holidays, conjugal visits at a local motel, twenty-five to fifty excursions to restaurants, easy access to alcohol throughout the course of his custody, and unlimited telephone privileges," but failed to disclose the true extent of those benefits, such as the fact that he had received a sky diving lesson, sums of cash, access to marijuana, and free passage through the police on roller-skates).  Drumgold's jury was not made aware of any benefits provided to Evans at all.

Nor is this a case where the jury necessarily had to find that the disclosure would have been merely collateral.  United States v. Dumas, 207 F.3d 11, 16 (1st Cir. 2000) ("Impeachment evidence, even that which tends to further undermine the credibility of the key government

witness whose credibility has already been shaken due to extensive cross-examination does not create a reasonable doubt that did not otherwise exist where that evidence is cumulative or collateral." (internal quotation marks and citations omitted)).  In <u>United States v. Brandao</u>, the First Circuit held that a district court had not abused its discretion by finding no <u>Brady</u> violation where the prosecution had failed to learn and disclose that its key witness had a new state criminal conviction.  539 F.3d 44, 64 (1st Cir. 2008). The First Circuit reasoned that there was other evidence that the witness had incentive to lie and the witness' story had not changed over the four years before trial.  <u>Id.</u>

Likewise Callahan insists that the benefits provided to Evans were not material because his story was the same all along, both before and after the supposed benefits.  The record is not at all clear on this point, and given the deferential review of a jury's verdict, that should be sufficient.  The jury could well have believed Evans' account that he was somehow fed the relevant information, or it could have believed that Evans came up with the story on his own, from what he heard about the crime.  All that is clear, however, is that for this particular witness, the benefits of cash, steady meals and good housing were not insubstantial.

Callahan renews his argument that but for Evans' testimony, Drumgold would have been convicted anyway; Evans' testimony was not central to Drumgold's conviction.  At this stage of the litigation, again, I am to credit the jury's verdict if the evidence supports it: the jury found that the failure to disclose the impeachment evidence about this witness undermined the credibility of Drumgold's guilty verdict.  Indeed, the case against Drumgold was a close one. The trial judge, for example, went so far as to direct a verdict against Drumgold's co-defendant, Taylor.  Evans' testimony placed Drumgold near the scene of the crime and with a gun.  I cannot

say that the jury's conclusion that Evans' testimony was critical to Drumgold's verdict was not against the weight of the evidence.

In sum, because there was sufficient evidence for a reasonable juror to conclude that Callahan withheld exculpatory evidence from Drumgold's trial counsel, and that that evidence was so material as to affect the credibility of his conviction, the jury's verdict that Drumgold's constitutional rights were violated is AFFIRMED.

### C.    Qualified Immunity

To prevail against a state officer who claims qualified immunity, however, a plaintiff must show not only that his constitutional right was violated, but also that that right was clearly established at the time of the events in question.  Saucier v. Katz, 533 U.S. 194, 202 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009).  The First Circuit has articulated that this "clearly established" inquiry is two fold: (1) whether the law was generally clearly established; and (2) whether the law was clearly established as applied to the factual context -- or whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights *in this instance*.  Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).

I instructed the jury: "If you find that Officer Callahan knowingly and deliberately withheld any material exculpatory evidence from the prosecutor in the criminal case against the plaintiff, then you should find that the officer violated the plaintiff's constitutional rights."  Jury Instructions at 5 (document #376).[11]  Here, Callahan argues that by 1988, the law was not clearly

_____

[11] I have acknowledged that during deliberations of the 2008 trial, I erred in instructing the jury that it was sufficient that an officer turn over exculpatory evidence to someone in the district attorney's office, rather than to turn it over to an individual under circumstances in which it is reasonably foreseeable that the relevant prosecutor will see it.  Indeed, I granted a new trial on all of the claims as to Evans in part to redress that error.  See Order Re:

established that exculpatory evidence must be turned over *to the prosecutor in the specific criminal case*; it was enough that the evidence be turned over to someone in the prosecutor's office. And because ADA Connolly knew of the hotel arrangements, his knowledge should be imputed to ADA Beauchesne.

By 1988, the law was clearly established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. In United States v. Agurs, the court held that the duty to disclose is affirmative: the government must turn over material exculpatory evidence even when the defense has failed to request it. 427 U.S. 97, 108 (1976). And in Bagley, the court clarified that evidence that the defense might use to impeach a key government witness is material exculpatory evidence under Brady if its suppression would "undermine[] confidence in the outcome" of the trial. 473 U.S. at 682. It was established that impeachment evidence will be material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id.

Callahan does not contend that police are immune from this affirmative duty. He admits that police officers are required to turn over exculpatory evidence to the prosecution. He simply contends that at least at the time, he need not have turned it over to the prosecutor of the specific case. Callahan's argument simply defies principles that were clearly established by Brady, Agurs, and Bagley. Brady and its progeny emphasized the purpose of disclosure: that the defendant be afforded the opportunity for a fair trial. See, e.g., Bagley, 473 U.S. at 675 n.6 ("By

---

Scope of Retrial at 3-4.

requiring the prosecutor to assist the defense in making its case, the Brady rule represents a limited departure from a pure adversary model. The court has recognized, however, that the prosecutor's role transcends that of an adversary: he is representative not of an ordinary party to a controversy, but of a sovereignty whose interest in a criminal prosecution is not that it shall win a case, but that justice shall be done." (internal quotation marks and citation omitted)). To the extent that a key government witness has been given benefits associated with his testimony, the defense must have the opportunity to impeach the witness with that information.

At its core, then, Brady requires that material impeachment evidence not simply be turned over but also that it be received by the defense. A reasonable officer in 1988 would have known that in order for information to reach the defense, he had to get it to the prosecutor assigned to the case, or under circumstances where that transmission was reasonably foreseeable. It would defy common sense to expect a prosecutor down the hall to recognize exculpatory evidence for a case to which he is not assigned and then ensure that it is received by the appropriate prosecutor at the appropriate time to insure that it would be disclosed it to defense counsel in a timely fashion.[12] I find therefore that the law was clearly established as early as 1988 that police officers had the duty to turn over exculpatory evidence to the prosecutor assigned to the case, or under circumstances in which that was reasonably foreseeable.

Still, the Court must ask whether the law was clearly established as to these facts such that "the unlawfulness of *particular conduct* will be apparent *ex ante* to reasonable public officials." Jennings v. Jones, 499 F.3d 2, 17 n.18 (1st Cir. 2007) (emphasis added). In this case,

---

[12] Nor would it be sufficient for a police officer to include the information in the case file of a different case. For example, if a police department and a prosecutor's office have"open file" policies, the government would not meet its obligation under Brady if the exculpatory document is in another suspect's case file that is arguably "open" to defense counsel.

the particular factual circumstance only proves the point. The impeachment evidence about Evans' hotel stay never did reach the defense because Callahan never turned it over to ADA Beauchesne. Nor did he include any receipt or mention the hotel in his case notes that could be accessible to the defense. The fact that another prosecutor, ADA Connolly, knew of the hotel arrangement did not mean that he had occasion to share the information with ADA Beauchesne. Indeed, ADA Connolly's memo mentioning the hotel eventually landed in the *Evans* shooting case file, not in any file related to the Moore murder case, and it was placed there *after* Drumgold's conviction.

The linchpin of the qualified immunity analysis is the reasonableness of the officer's conduct in the particular case at hand. See Anderson v. Creighton, 483 U.S. 635, 638 (1987). Here, a reasonable officer would have known that he was required to turn over this information to the prosecutor assigned to the case. That this particular factual circumstance had not arisen by 1988 does not render the law "unclear." Prior cases are not a code book of what officials can and cannot do in every circumstance. "Officials can still be on notice that their conduct violates established law even in novel factual circumstances." Lopera v. Town of Coventry, 640 F.3d 388, 397 (1st Cir. 2011). Here, in light of Brady, Agurs, and Bagley, a reasonable officer would have known that police officers must turn over material exculpatory evidence such that there is a reasonable probability that it will be disclosed to and received by the defense. A reasonably competent officer would not assume that he had met his obligation under Brady by providing information to some other prosecutor. To the extent that Callahan truly misunderstood his obligation, that mistake was not reasonable.

In short, because a reasonable officer in the place of Callahan would have known that failing to turn over this evidence to -- indeed intentionally withholding it from -- ADA Beauchesne was unlawful, qualified immunity is DENIED.

## III.   MOTION FOR A NEW TRIAL

Next, Callahan moves for a new trial under Fed. R. Civ. P. 59(a), which allows the court to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Here, Callahan argues that the Court erred in an evidentiary ruling and in two jury instructions, errors which require a new trial.

### A.   Evidentiary Ruling

During the 2009 trial, Callahan sought to introduce forty-five reports documenting witness interviews that he conducted in the course of his investigation of the Tiffany Moore murder.  I excluded all but four of the reports on the grounds that they contained hearsay and contained arguable evidence of Drumgold's guilt of the crime, which rendered them more prejudicial than probative.  The defendant claims that the reports were not offered for the truth of the statements therein, or to prove Drumgold's guilt, but rather to refute evidence offered by Drumgold to establish Callahan's deliberate or reckless indifference.  The reports would have shown, he argues, that he conducted the investigation diligently and in good faith, without "indifference" to Drumgold's rights.

I agreed that the defendant was entitled to make this argument, so long as he made it through evidence that was not hearsay or more prejudicial than probative under Fed. R. Evid. 403.  Indeed, upon the plaintiff's objection, I allowed Callahan to present a Rule 1009 chart that illustrated the full extent of Callahan's investigation, including each of the witnesses he

interviewed.  The purpose for which the investigation reports were offered was more than satisfied by the chart, which I found to be enormously effective.[13]

Callahan argues now that I erred by failing to admit the substance of these reports -- specifically the statements that may have corroborated Drumgold's alleged guilt.  He analogizes this ruling to a probable cause analysis.  If an officer were charged with making an unlawful arrest, I would allow him to introduce evidence of the suspect's guilt known to the officer at the time of the arrest to support the officer's belief that there was probable cause.  But the analogy is completely unavailing.  Unlike the probable cause inquiry, evidence of actual guilt is irrelevant to the police officer's obligation to disclose exculpatory evidence.  A police officer obviously cannot withhold information that may be used to impeach a key government witness simply because he strongly believes the suspect to be guilty.  Such a rule would turn an adversary system, in which the defense is supposed to have the tools to challenge guilt, into an inquisitorial system, in which the prosecutor presents evidence to the court to determine guilt or innocence.

Indeed, Drumgold's guilt or innocense is irrelevant to his <u>Brady</u> claim altogether, except as to one respect: if the evidence against Drumgold in his criminal trial had been so overwhelming of guilt, then the 2009 civil jury could not have reasonably found that the suppression of impeachment evidence as to Evans undermined confidence in the outcome of the

---

[13] Indeed, the chart was introduced over the plaintiff's objection in an electronic order on October 5, 2009:

> Judge Nancy Gertner: Electronic ORDER entered denying Motion in Limine to Exclude the Defendant's Chart of Interviews: The Chart in question is admissible under Fed. R. 1006.  The Rule permits the presentation of "voluminous writings, recordings, or photographs which cannot conveniently be examined in court" in the form of a chart.  The underlying documents must be made available to test the accuracy of the chart, as they were in this case.  The underlying documents are relevant for a non hearsay purpose, notably the fact that Officer Callahan interviewed the individuals noted, to rebut the claim he had a motive to contrive Ricky Evans' testimony (because of the failure of proof in other respects).

criminal trial.  To make that determination, however, the 2009 jury did not need investigative reports that had never been presented in the earlier trial.  Rather, the jury was only entitled to review the transcript of the criminal trial to determine if the suppression of the benefits provided to Evans undermined the credibility of that verdict.  To the extent that these investigative reports were not introduced into evidence in Drumgold's criminal trial in 1989, they would not have influenced his conviction.  They are thus completely irrelevant to Drumgold's § 1983 claim.

The Motion for New Trial for error in this evidentiary ruling therefore is DENIED.

## B.      Jury Instructions

In his Motion for New Trial, Callahan also challenges the Court's instructions on causation and exculpatory evidence.  Jury instructions are reviewed "with a focus on whether the instructions adequately illuminate the law applicable to the controlling issues in the case without unduly complicating matters or misleading the jury." Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 135 (1st Cir. 1997) (internal quotation marks and citation omitted).  An error in a jury instruction is reversible if it "(1) was misleading, unduly complicating, or incorrect as a matter of law, and (2) adversely affected the objecting party's substantial rights." Sheek v. Asia Badger, Inc., 235 F.3d 687, 697 (1st Cir. 2000).

A preliminary note: The Court provides counsel with written instructions in draft form prior to the charge conference. At the charge conference, counsel is encouraged to comment about the law reflected in the instructions, the order of the instructions and the specific language. After the charge conference, the written instructions, now reflecting counsel's input, are read to the jury and then distributed to the jury. The jury receives the written instructions, formatted by topic area -- and reviewed by counsel.

**C.     Causation**

Callahan first challenges my instruction on causation.  I gave the jury the following

summary of the law on causation under § 1983:

1.     If you determine that Officer Callahan committed a
constitutional violation either by obtaining false statements or
suppressing material exculpatory evidence, you need to
address the relationship between the constitutional violations
that you found and Shawn Drumgold's conviction.  This
relationship is defined by the legal concept known as
causation.

2.     Causation has two elements: factual cause and proximate
cause.  An act is a factual cause of an injury if it appears from
the evidence that the act was a substantial factor in bringing
about the injury.  There may be a number of factual causes of
any particular injury; not everyone whose acts are factual
causes of an injury is legally responsible. The law determines
whether it is fair to hold someone responsible for an injury
using the concept of proximate cause.   An act is the
proximate cause of an injury if the injury is a reasonably
foreseeable consequence of the act.

3.     This does not mean that the law recognizes only one legal
cause of an injury or damage, consisting of only one factor or
thing, or the conduct of only one person.  On the contrary,
many factors or things may operate at the same time, either
independently or together, to cause injury; in such a case,
each may be a legal cause.

4.     Let me give you an example of legal causation.  Two fires are
raging in the forest.  One started when lightning struck and
the other when someone dropped a match on the ground.  The
two fires join together and then burn down a barn.  Dropping
the match was a substantial factor in the barn burning down,
and the barn burning down was a reasonably probable result
of dropping the match.  In other words, the match legally
caused the damage to the barn even if the lightning by itself
would have burned it down.

5.     Put in the context of this case, you should decide whether
Officer Callahan's wrongful conduct was a substantial factor

in bringing about Shawn Drumgold's conviction and whether it was reasonably foreseeable that a conviction could result from his conduct. Officer Callahan's conduct need not be the only cause nor the latest or nearest cause; it is sufficient if it concurs with some other cause acting at the same time which in combination with it contributed to Shawn Drumgold's conviction.

6.     Concerning legal cause, I remind you that plaintiff has the burden of proving that any constitutional violations you identify were the cause of the damages Plaintiff Drumgold has sustained. In other words, Mr. Drumgold must prove by a preponderance of the evidence that Officer Callahan's actions in obtaining false statements or failing to disclose material exculpatory information were a substantial factor in causing Mr. Drumgold's conviction and the conviction was a reasonably foreseeable result of Officer Callahan's actions. The evidence on which you are to you need to address the relationship between the constitutional evaluate legal cause is the trial transcript which is now before you of the 1989 criminal trial.

Jury Instructions at 6-8.

Callahan challenges the Court's definition of the term "substantial factor" in ¶ 5. He argues that the instruction misleads the jury to believe that the defendant could be liable even if his alleged misconduct by itself would not have led to Drumgold's conviction, as long as it concurred with some other cause to contribute to the conviction. That is not, however, the instruction that was given to the jury. The jury was told that Officer Callahan's conduct had to be reasonably likely to have caused harm even if it had not been acting in concert with other forces. The concurring cause instruction suggested only that Callahan's conduct did not have to be the only cause or the latest or nearest cause.

In the final analysis, § 1983 is governed by tort law and is best understood "against the background of tort liability that makes a man responsible for the natural consequences of his

actions."  Valley v. Briggs, 475 U.S. 335, 344 n.7 (1986) (internal quotation marks and citations omitted).  Thus, I instructed the jury that to hold Callahan liable, it had to find that "[Drumgold's] conviction was a reasonably foreseeable result of Officer Callahan's actions."  In other words, the conduct had to have the potential to cause harm.

As in tort, however, to constitute proximate cause of a harm under § 1983, the conduct must be *a* cause but it need not be the *only* cause.  See Sheehan v. N. Am. Mktg. Corp., 610 F.3d 144, 150 (1st Cir. 2010) (explaining that proximate cause "need not be the sole and only cause").  Indeed, as I explained to the jury, it is often the case that "many factors or things may operate at the same time, either independently or together, to cause injury" and "in such a case, either can be the cause."

The Restatement (Second) of Torts § 432 provides:

> (1) Except as stated in Subsection (2), the actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent.

> (2) If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about.

Notably, Callahan cites § 432(1) but ignores § 432(2), which applies where two harms are alleged to have acted in concert to cause the injury.

To be sure, as Callahan argues, the defendant's conduct must be sufficient to have caused harm in its own right -- even if it would not have caused the *extent* of harm that it caused acting in concert with another force.  I explained this concept to the jury by analogy:

> Let me give you an example of legal causation. Two fires are raging
> in the forest. One started when lightning struck and the other when
> someone dropped a match on the ground. The two fires join together
> and then burn down a barn. Dropping the match was a substantial
> factor in the barn burning down, and the barn burning down was a
> reasonably probable result of dropping the match. In other words, the
> match legally caused the damage to the barn even if the lightning by
> itself would have burned it down.

This fire example was lifted directly from the comment of Section 432(2) of the Restatement
(Second) Torts.

Upon this review, therefore, I conclude that the jury instructions on causation were not
in error. The jury was appropriately instructed that to constitute proximate cause, Drumgold's
conviction had to be a reasonably foreseeable result of Callahan's conduct, and that Callahan's
conduct was reasonably likely to have caused harm even if it had not been acting in concert
with other forces.

### D.    Exculpatory Evidence Instruction

Finally, Callahan challenges the following instruction on exculpatory evidence:

> Any deals, promises, understandings, arrangements, or material
> benefits provided to a witness by a governmental actor in exchange
> for testimony are also exculpatory, as they may lead a witness to give
> biased or false testimony and may be presented to a jury to enable
> that jury to evaluate the credibility of the witness.

Jury Instructions at 4 (document #376). He argues that this instruction would mislead the jury
to believe that *any* deals, promises, understandings, arrangements, or material benefits
constitute <u>Brady</u> material -- not just evidence that is so highly impeaching that there is a
reasonable probability that its suppression would undermine the credibility of the jury.

Again, Callahan takes this instruction out of context. When I instruct a jury, I attempt to
present the law as clearly as possible in simple English. Here, I explained to the jury that "in

order to prevail on a claim that Officer Callahan suppressed exculpatory evidence, the plaintiff must prove that Callahan knew of certain *material exculpatory* evidence and that he intentionally or recklessly withheld the information from the prosecutor."  Jury Instructions at 3 (document #376) (emphasis added).  I then defined the term "exculpatory evidence" -- including the instruction to which Callahan objects -- and I defined the term "material."  The jury would have understood that in order to constitute "material exculpatory" evidence, the evidence had to be exculpatory and the evidence had to be material.  Consider the instruction in full:

1. A defendant has a constitutional right in a criminal trial to be furnished with material exculpatory evidence in the hands of the police and prosecution.  The police and prosecutors are the representatives of a government whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  This special role explains the basis for a broad duty of disclosure of exculpatory evidence in criminal cases.

2. In order to prevail on a claim that Officer Callahan suppressed exculpatory evidence, the plaintiff must prove that Officer Callahan knew of certain material exculpatory evidence and that he intentionally or recklessly withheld the information from the prosecutor.

   a. What is exculpatory evidence?

      (1) Exculpatory evidence includes evidence which tends to suggest the innocence of a person suspected of or charged with a crime, such as evidence which tends to prove that the defendant did not commit the crime and evidence which suggests that the crime might have been committed by someone else.

      (2) It also includes evidence which might be used to impeach the credibility of any person the Commonwealth intended to call as a witness at trial.  Exculpatory evidence includes information that tends to show a defect in the witness's perception, memory, narration, or

truthfulness; evidence which suggests a motive to testify falsely; or evidence which demonstrates that the witness had an interest in the outcome.

(3)  Any deals, promises, understandings, arrangements, or material benefits provided to a witness by a governmental actor in exchange for testimony are also exculpatory, as they may lead a witness to give biased or false testimony and may be presented to a jury to enable that jury to evaluate the credibility of the witness.

(4)  As such, any agreement, whether oral or written, made by a police officer with a government witness for testimony in exchange for monetary compensation or favorable treatment in the criminal justice system must be disclosed as impeachment evidence.

(5)  Exculpatory evidence does not have to be evidence that actually exonerates the plaintiff.

3.  What does "material" mean?

a.  Exculpatory evidence is "material" when it is of a type that could undermine confidence in the outcome of a trial. It would include evidence that has the potential to alter a jury's assessment of the credibility of a significant prosecution witness.

b.  In determining what is material, the question is not whether a defendant would more likely than not receive a different verdict if the evidence had been disclosed. Rather, the question is whether without the evidence he would receive a fair trial, understood as a trial resulting in a verdict worthy of confidence.

4.  And in considering whether a verdict worthy of confidence would result, you must consider the setting: In this case, the burden of proof is on the plaintiff to prove his case by a fair preponderance of the evidence. In the criminal trial, however, the burden of proof that was on the Commonwealth of Massachusetts was much higher. In that case, the burden

of proof was beyond a reasonable doubt. The Commonwealth was required to convince a unanimous jury beyond a reasonable doubt to sustain a conviction against Mr. Drumgold. Thus, one way of understanding materiality is to consider whether the undisclosed evidence would have created reasonable doubt of defendant's guilt .

5.  In assessing materiality, the focus must be on the cumulative effect of the evidence that you found was not disclosed, rather than the impact of each piece of evidence taken in isolation.

6.  There is no constitutional deprivation, however, if the plaintiff or his counsel in fact knew of the exculpatory evidence at the time of the underlying criminal trial.

7.  Nor is there a constitutional deprivation if the officers in fact turned the exculpatory evidence over to the prosecutor before or during the criminal trial.

    a.  A law enforcement officer is constitutionally required to furnish material exculpatory information in his possession to the prosecutor's office.

    b.  The officer must disclose the information before the criminal trial, and he must disclose it under circumstances in which it is reasonably foreseeable that the information will reach the prosecutor in the criminal case against the plaintiff.

    c.  If you find that Officer Callahan knowingly and deliberately withheld any material exculpatory evidence from the prosecutor in the criminal case against the plaintiff, then you should find that the officer violated the plaintiff's constitutional rights. If you find that he did not, then you should find that he did not violate the plaintiff's constitutional rights.

Jury Instructions at 2-5 (document #376). In the context of all of the other instructions given to the jury on material exculpatory evidence, ¶ 2(a)(3) would not have misled the jury to believe that to prevail on a <u>Brady</u> claim the plaintiff did not have to prove that the evidence was material.

# IV.     MOTION FOR REMITTUR

Finally, in his Motion for Remittur (document #427), Callahan challenges the jury's verdict on damages in two respects: (1) as to his intervening cause defense; and (2) as to the damage award of $14,000,000.  I will consider each in turn.

## A.     Intervening Cause Defense

At the damages phase of the trial, I allowed Callahan to argue that there was a intervening cause for Drumgold's harm -- namely that the prosecutor may have ultimately learned of the hotel expenses and failed to disclose the information to the defense after Drumgold's conviction.  I gave the following instruction to the jury:

1.     Now, although this stage is about damages attributable to the conduct of Officer Callahan that you have found, an issue has arisen with respect to causation that also relates to damages.

2.     A defendant may be held liable for the consequences of his actions, including actions attributable to intervening events like the acts or omissions of third parties, when those intervening events are reasonably foreseeable to him.

3.     Sometimes we speak of a chain of causation.  A defendant is responsible for all the consequences in that chain, unless the chain is somehow broken by a significant intervening event that is unforeseeable to the defendant.

4.     Bear in mind that on this issue -- whether there was a significant intervening cause that broke the chain of causation -- Officer Callahan has the burden of proof by a preponderance of the evidence.

5.     So what is a significant intervening unforeseeable event in the context of this case?  A prosecutor has a continuing duty to disclose exculpatory evidence that comes to his attention, even after a conviction.  And if the prosecutor decided not to turn it over, that decision may break the chain, but only if that decision is independent of the defendant's original actions in withholding the information.  Specifically, you must find

a.     that the prosecutor in the Drumgold case actually

received the information which the officer failed to disclose prior to the conviction;

    b.    that the prosecutor received it in a fashion that would have enabled him to exercise an independent decision about whether it should have been turned over; and

    c.    that the prosecutor's failure to turn over that information was not foreseeable to Officer Callahan.

    6.    Bear in mind, however, that if you find that the prosecutor did make an unforeseeable decision not to disclose information at some point after Shawn Drumgold's trial, Officer Callahan is still liable for any harm suffered before that decision.

Jury Instructions at 3-4 (document #393).

Here, Callahan does not challenge the instruction but rather the sufficiency of the evidence. He argues that the evidence was overwhelming in favor of the intervening cause such that the jury's verdict rejecting it should be overturned.

As I explained to the jury, Callahan had the burden to prove the intervening cause. And contrary to his assertion, the evidence presented was far from overwhelming. Callahan failed to convince the jury that ADA Beauchesne ever learned of the hotel expenses. To be sure, O'Meara testified that he had a conversation with ADA Beauchesne about Howard Johnson's sometime after Drumgold's conviction. But this testimony directly contracted O'Meara's own testimony in 2003 that the district attorney's office had never received a bill for the Howard Johnson's and that he had no recollection of talking to ADA Beauchesne about it. And ADA Beauchesne testified in 2003 that he himself had no recollection of any conversation about the hotel costs. The jury had to decide who to believe -- and which version of their story. It was certainly reasonable for the jury to believe ADA Beauchesne and to conclude that O'Meara's testimony in 2003 was more credible than his testimony in 2009 -- even longer after the fact and perhaps in a civil context where he had an incentive to lie.

I may "overturn a jury's verdict and grant judgment in favor of the verdict loser only if the evidence, so viewed, is such that reasonable minds could not help but reach an outcome at odds with the verdict." Cook v. State of R.I., Dep't of MHRH, 10 F.3d 17, 21 (1st Cir. 1993). In this context -- with conflicting testimony about which reasonable minds could disagree -- I will not overturn the jury's verdict rejecting Callahan's intervening cause defense.

### B.    Damages

In a final attempt to overturn the jury's verdict, Callahan argues that its award of $14,000,000 is excessive.

Fed. R. Civ. P. 59 allows the trial court to order remittur where a damage award is not supported by the evidence. See Catullo v. Metzner, 834 F.2d 1075, 1082 (1st Cir. 1987). Remittur requires, however, that the defendant show that the "award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." Marcano, 415 F.3d at 173. Where the jury determined the value of non-economic damages, remittur is allowed "only rarely and in extraordinary circumstances." Bielunas v. F/V Misty Dawn, Inc., 621 F.3d 72, 80 (1st Cir. 2010). In this case, the jury awarded a total of $14 million, or approximately $1 million per year of Drumgold's incarceration. The question is whether that award "shocks the conscience."

Compensation of $1 million per year of imprisonment is not automatic. That I awarded a similar sum for unjust imprisonment in Limone v. United States, 497 F. Supp. 2d 143, 243-45 (D. Mass. 2007), aff'd, 579 F.3d 79 (1st Cir. 2009), is mere coincidence. Judge O'Toole in Waters v. Town of Ayer, No. 04-10521-GAO, 2009 WL 3489372, at *3 (D. Mass. Sept. 17, 2009), by contrast, chose to award damages at the rate of $1,000 per day for unjust imprisonment.

The fact finder has discretion to award damages according to the harm caused to the particular plaintiff in front of them, in light of all of the circumstances of a given case. When I was in the shoes of the fact-finder, I wrote,

> Losses of this magnitude are almost impossible to catalogue. The loss of liberty. The loss of the enjoyment of their families. The loss of the ability to care for and nurture their children. The loss of intimacy and closeness with their spouses. Indeed, the task of quantifying these losses -- which I am obliged to dog -- is among the most difficult this Court has ever had to undertake.

Limone, 497 F. Supp. at 243. I noted then that in recent cases, both juries and courts had awarded wrongfully imprisoned plaintiffs damages worth $1 million per year of false imprisonment. Id. (citing Ramirez v. Los Angeles County Sheriff's Office, 2:04-cv-06102-GAF-FMO, 2006 WL 1428310 (C.D. Cal. Feb.16, 2006) ($18 million in compensatory damages for malicious prosecution that resulted in ten months' incarceration); Mark Diaz Bravo v. Giblin, No. B125242, 2002 WL 31547001, at *24, (Cal. App. 2d Dist. Nov. 18, 2002) ("$3,537,000 to compensate [plaintiff] for 1,179 days of incarceration at the rate of $3,000 per day" or $1,095,000 per year, in addition to $1 million for emotional damages suffered prior to sentencing); Newsome v. McCabe, 319 F.3d 301 (7th Cir. 2003), cert. denied, 539 U.S. 943 (2003) ($15 million in compensatory damages for malicious prosecution that resulted in 15 years' imprisonment, or $1 million per year); Jones v. City of Chicago, No. 83 C 2430, 1987 WL 19800, at *1(N.D. Ill. Nov. 10, 1987) aff'd in part, 856 F.2d 985 (7th Cir. 1988) ("$71,100 for false arrest; $71,100 for intentional infliction of emotional distress; $355,500 for false imprisonment; and $213,300 for malicious prosecution" resulting in one month's imprisonment, or $8,532,000 per year).

To be sure, an award of $1 million per year is generous, even so generous as to be at what the First Circuit has called the "outermost boundary of what might be thought

conscionable." <u>Limone</u>, 579 F.3d at 106.  The First Circuit has held nevertheless that such an award is not grossly excessive and does not shock the conscience.  <u>Id.</u> at 106, 107 (deferring to the fact-finder's determination because "placing a dollar value on the emotional pain incident to wrongful incarceration, the dreary sameness of life behind bars for years on end, and the loss of freedom, relationships, and hope cries out for approximation.  Moreover, the difficulty inherent in monetization of those injuries is itself a reason for deference to the front-line judgment of the trial court.").  Here, too, I will defer to the jury's finding on the monetary value of the harm that Drumgold suffered for fourteen years in prison.

**The jury's verdict of FOURTEEN MILLION AND 00/100 ($14,000,000.00) DOLLARS  is therefore AFFIRMED.**

**V.     CONCLUSION**

For the foregoing reasons, the Defendant's Renewed Motion for Judgment as a Matter of Law (**document #422**), Motion for New Trial (**document #424**) and Motion for Remittur (**document #426**) are **DENIED.**

**SO ORDERED.**

**Date:  August 18, 2011**          /s/ Nancy Gertner
                                     **NANCY GERTNER, U.S.D.J.**